UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 6: 09-16-S-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| RUSSELL CLETUS MARICLE, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*

Defendants Charles W. Jones, Freddy Thompson and Defendant Russell Cletus Maricle have filed motions for judicial disqualification based on: (1) statements made by the Court at the sentencing of Kenneth Day in a separate case; (2) statements made by the Court at a hearing regarding pre-trial release of Defendant Jones; and (3) a comment contained in a footnote in the Court's order granting home detention to Defendant Maricle and responding specifically to an argument of his attorney. [Record Nos. 375, 381] The United States opposes the motions. [Record No. 425] For the reasons stated below, these motions will be denied as being without merit.

## I.      RELEVANT FACTS

To properly address the Defendants' motions, it is necessary to provide a summary of several related cases as well as matters raised – and information provided to the Court – in the present action.

-1-

A.     The Kenneth Day Case

In April 2005, a federal grand jury returned an indictment against several residents of the Clay County, Kentucky area. (*See United States v. Kenneth Day, et al.*, 6: 05-CR-30-DCR (E.D. Ky. 2005); hereafter, the "*Day* case").  The indictment was later amended to include a variety of drug, firearms, and corruption charges against a total of eighteen individuals.  The specific charges included a conspiracy to possess and distribute marijuana and cocaine (21 U.S.C. §§ 841, 846), money laundering (21 U.S.C. § 1956(h)), conducting a continuing criminal enterprise (21 U.S.C. § 848), a conspiracy to corruptly obstruct an official proceeding (18 U.S.C. § 1512(k)), and a conspiracy to obstruct justice by a pretrial services officer (18 U.S.C. § 1503). The focus of many of the charges centered on the drug distribution activities of Kenneth Day, a convicted felon.  The indictment also charged Jennings White, a former Clay County official, in the drug and money laundering conspiracies (superseding Indictment, Counts 2s, 4s, 27s and 28s) and the conspiracy to corruptly obstruct, influence or impede an official proceeding (superseding Indictment, Count 5s).  Jennifer Garrison, a former Kentucky pretrial services officer, was named in three counts charging her with participation in the conspiracy to distribute and possess with intent to distribute marijuana (original Indictment, Count 2), conspiracy to corruptly obstruct, influence, or impede an official proceeding (original Indictment, Count 5), and obstruction of justice by a pretrial services officer (original Indictment, Count 29).

Of the eighteen individuals indicted, seventeen eventually entered guilty pleas.  Several agreed to cooperate with the government in the investigation and prosecution of others.  The Plea Agreements entered by several Defendants contained a factual summary of their conduct

supporting their guilty pleas.  The agreements also provide some context for the motion for

disqualification which is currently pending.  For example, while no Defendant in the current case

is identified directly or by inference, the Day's Plea Agreement provided, in relevant part, that:

> 2. (a) The defendant, Kenneth Day, during dates charged in the indictment
> conspired with those listed in the indictment to possess with intent to distribute
> and to distribute over 5 kilograms of cocaine and over 1000 kilograms of
> marijuana.  The defendant, Kenneth Day, was the organizer and leader of the drug
> organization that involved more than 5 participants. . . .  Loreda Smith, Jennings
> White, James Davidson, Terry Holland, and others assisted the defendant,
> Kenneth Day in attempting to influence the court system in Clay County for the
> purposes of protecting the drug organization, In addition, the defendant, Kenneth
> Day, Loreda Smith, James Davidson, and Terry Holland following the arrest of
> Thomas Effler on April 9, 2005 devised a scheme to influence the Clay County
> Court system in lowering the bond of Effler.  Kenneth Day and Jennings White
> further schemed to get the case against Effler dismissed in the Clay County court
> by paying law enforcement personnel to remove from evidence the 30 pounds of
> marijuana seized from Effler n April 9, 2005.

[*See Day* case; Record No. 611.]

Kenneth Day entered a guilty plea to Counts 1ss, 2ss, 3ss, 4ss, 11ss, 20ss, 23ss, 24ss,

25ss, and 33ss of the second superseding Indictment on August 9, 2005.  On October 12, 2005,

the United States moved to revoke the bond of Jennings White.  [*Id.*; Record No. 421]  In

support, the government argued that, while White had been released earlier on a secured bond,

evidence presented during an October 11, 2005, hearing on a motion to transfer venue provided

specific instances of White's propensity to commit or hire others to commit violent acts and that

White had attempted to influence jurors and contact a key witness.  [*Id.*]

A hearing on the United States' motion to revoke White's bond was held on October 14,

2005, with the United States relying upon the testimony that Denver Sizemore and Kenneth Day

presented during an October 11, 2005, hearing[1] on the United States' motion to transfer venue.

[*Id*.; Record Nos. 422, 499]

The attorney representing Jennings White at the October 14th hearing summarized the evidence presented during the earlier hearing as follows:

> First of all, Your Honor, I would like to summarize for you, and this is from my meetings with co-counsel about basically the accusations that were made on Tuesday from Denver Sizemore, it is my understanding that two anonymous phone calls were made to his family looking for him. It's my understanding that neither of those calls could be tied to Mr. Jennings White. Secondly, Your Honor, that Mr. White allegedly asked about Mr. Sizemore at a parking lot of a gas station. It's my understanding that Mr. Sizemore testified that his sister had been asked by Mr. White about his whereabouts and that she told his mother and his mother told him. It's my understanding that Mr. Sizemore said that in May Mr. Stivers had asked Merle Sizemore how Denver was doing and where he was. And he also testified apparently that Mr. White had paid him $12,500 for him to kill Bill Rowland Phillips and that on election day in '02, he had asked him to shoot a Charles Stivers. It is further my understanding, Your Honor, and of course you'll remember this better than I since you were here, that he testified that he had no testimony to offer against Mr. White in this present drug case related to the facts of this drug conspiracy and he was not aware of any reason why Mr. White had any reason to harm him.

[*Id*.; Record No. 499, p. 4-5]   After further discussions regarding Sizemore's role as a confidential witness, the following exchange between the Court and Jenning White's attorney occurred:

> THE COURT: Well, if they did, and let's just assume for a moment that they knew either some or part of that as part of an ongoing investigation, obviously they would not have known the information that Mr. Day came forward with, I believe, until after he would have, perhaps, entered his plea and was debriefed at that time.

---

1.      After receiving testimony, the Court denied the United States' Motion to change venue.  However, the Court warned the parties and their counsel that any direct or indirect contact or attempt to influence a juror or witness may result in a finding of contempt "and would include the attorney of the party making such contact."  [*Id.*; Record No. 422]

MR. COX: You're absolutely right.

THE COURT: So we really have – we have a selection of statements that I'm concerned with. You mentioned some. Obviously, you weren't here and didn't get the full impact of the testimony, but there was also testimony that Mr. Stivers, your co-counsel, had suggested to Mr. Sizemore that he make himself unavailable for the next little bit of time. And that was prior to the time that Mr. White was indicted in the case. That was the third superseding indictment [in] which he was added in July. And I believe Mr. Sizemore indicated that call came just shortly after the arrest occurred in April of this year. So we have additional testimony there, as well as these other contacts or attempts to contact Mr. Sizemore.

Regardless of whether I accept all of that as true or not, what it does indicate to me is that there was what appeared to be a pattern of ongoing activity to contact Mr. Sizemore, and the connections seem to be coming from Mr. White.

[*Id.*; Record No. 499, pp. 6-7] The Court then made the following findings which were required

in connection with its ruling on the motion to revoke bond.

Mr. Sizemore presented a substantial amount of evidence indicating that members of his family had been contacted. And, as I indicated, there is enough circumstantial evidence that would indicate that Mr. White was attempting to contact a person that was at the time a confidential source, a confidential informant. So that causes me some concern that he would do that. At the time that the first contact was made, he was named in the case but had been served with a search warrant for his home.

Looking at Mr. Sizemore's other testimony, he testified to these other acts, including attempts to tamper with a jury in which he did not specify the case that was involved so I'm not going to put a lot of weight on that testimony. But he did testify that on other occasions that he accompanied Mr. White as he attempted to buy votes in the community with Mr. Jordan, the sheriff. He testified about envelopes being delivered to various persons. So there is additional concern that the Court has that Mr. White may not, if I credit this testimony, that he may not respect the court system, that he would attempt to influence the outcome of certain matters.

There was also testimony about his relationship with various individuals in positions of authority, including the clerk, the assistant county attorney, the sheriff, and the chief of police of Manchester. Probably the testimony that concerns me the most was the testimony that Mr. White arranged a meeting with

-5-

Mr. Day and Mr. Jordan, the sheriff, in order to determine whether Mr. Day's operation was under investigation. And Mr. Day testified that, in his opinion, Mr. White knew the purpose of the meeting and was present when the conversations took place. . . .

Now I do find Mr. Sizemore presented credible testimony in the case. Although I understand that he is a person that has an incentive to assist the government as much as possible, I have to consider that in weighing his testimony. But I do find that he is a credible witness. And likewise, I find that Mr. Day was a credible witness in the case. I have not been presented with any testimony or evidence to convince me otherwise, quite frankly. And so based on my view of his credibility at this time, I do believe that he was a credible person. . . .

[*Id.*; Record No. 499, pp. 14-16] At the conclusion of the October 14, 2005, hearing, the Court granted the United States' motion to revoke bond and ordered Jennings White detained pending trial. [*Id.*; Record No. 433] Shortly thereafter, several defendants in the *Day* case filed motions to be re-arraigned for the purpose of entering guilty pleas. [*Id.*; Record Nos. 437, 440, 452, 453, 458, and 461]

Jennings White was re-arraigned on October 25, 2005. The Plea Agreement tendered by the parties on that date contained the following factual summary of White's criminal conduct:

2. (a) The defendant, Jennings B. White, during dates charged in the indictment conspired with those listed in the indictment to possess with intent to distribute and to distribute over 1000 kilograms of marijuana. . . . On or about April 14, 2005, the defendant, Jennings White, conspired with Kenneth Day to approach Vernon Hacker, the 911 director in Clay County, and offer Hacker a bribe to obtain the 30 pounds of marijuana seized from Thomas Effler on April 9, 2005. The defendant, Jennings White, subsequently approached Hacker with the plan but was unsuccessful as he learned from Hacker that the evidence was secured by the Kentucky State Police and not the Manchester Police Department. During 2004, exact date unknown, the defendant, Jennings White, at the request of Kenneth Day contacted Sheriff Ed Jordan, Clay County Sheriff, and set up a meeting with Kenneth Day. Day advised White that he was concerned about UNITE officers working in the area and a possible detection of his drug operation. White set up the meeting in which Day discussed his concern and was told by Sheriff Jordan that he knew of no problems.

-6-

[*Id.*; Record No. 638]

On November 29, 2005, following the entry of guilty pleas by seventeen Defendants in the *Day* case, Jennifer Garrison, the remaining Defendant, proceeded to trial on the charges against her, including a charge that she used her position as a pretrial services officer to corruptly obstruct, influence, or impede an official proceeding. Several Defendants named in the *Day* case, including Kenneth Day, testified on behalf of the government.[2] On December 6, 2005, the jury returned a not guilty verdict on all three counts presented. [*Id.*; Record No. 557]

Kenneth Day's sentencing hearing was held on February 13, 2006. [*Id.*; Record No. 798] As outlined above, by the time of this proceeding, Day had testified on several issues with respect to criminal activity of several individuals in the Manchester/Clay County area. Based, in part, on Day's cooperation, the United States moved the Court for a reduction of his guideline range in accordance with United States Sentencing Guideline section 5K1.1. [*See Id.*; Record No. 798, pp. 13-27] Although a portion of the sentencing transcript remains under seal, the Court was required to evaluate the *nature* and *extent* of Day's cooperation and the specific information provided in determining an appropriate sentence. Further, the Court was required to address the specific arguments of counsel for the government and the Defendant. For example, Day's counsel made the following arguments during the hearing:

---

2.      More recently, Kenneth Day testified as a government witness in the action styled *United States v. Wayne Reid, et al.*, 6: 07-CR-110-DCR (E.D. Ky. 2007). Following a jury trial, both Wayne Reid and his wife and co-Defendant, Donna Reid, were convicted of several counts of money laundering and conspiring to launder money in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B). The Reids were also convicted of harboring and concealing a fugitive in violation of 18 U.S.C. § 1071. The individual harbored, Larry Jackson, was involved in the Kenneth Day drug conspiracy.

MR. BENTLEY: . . . as the Court knows, Section 355(a) has a number of different variables for the Court to consider in determining what an appropriate sentence is. . . .  To begin with, we look at the nature and circumstances of the offense and the history and characteristics of Mr. Day.  The circumstances of this offense are very serious.  Mr. Day has never denied that.  This is conduct that is unacceptable and it illegal, and that's why Mr. Day is here.  However, when we look at some of the circumstances that have occurred more recently for Mr. Day, he has completely accepted his role in this offense. . . .

The need for the sentence to impose and promote certain statutory objectives, obviously, we want to promote respect for the law, and we want the punishment in this case to achieve that goal.  And obviously, a significant sentence is warranted here.  However, I would point out that Mr. Day has demonstrated, as has been pointed out in some other cases, a, you know, 180-degree turnaround.  His activities since his indictment demonstrates someone that understands the importance of respect for the law, the need for law enforcement to be able to enforce the laws of our land and protect our communities from this type of behavior.

Obviously, we want a sentence that's going to provide an adequate deterrence to criminal conduct.  The deterrence we seek here is for others who may have an idea that they want to pursue a criminal livelihood or criminal activity to understand that there will be serious circumstances for them if they do undertake those activities.  Mr. Day here is going to be an example to all of those people. . . . I know there is this desire in a statutory mandate for deterrence of criminal conduct, but there's also, I believe, within this, within the spirit of the statute, the need to promote this idea that you have an opportunity to help yourself if you're willing to go 100 percent and cooperate with the government and admit what you've done and not try to shy away from your criminal activity.

[*Id.*; Record No. 798, pp. 28-32]  Day's attorney concluded his remarks and argued for a reduced sentence by asserting that a sentence of twelve years or less would be justified based on Day's activities and cooperation with the government.[3]  [*Id.*; Record No. 798, pp. 33-34]

---

3.      The United States' statements regarding the factors to be considered in imposing an appropriate sentence are contained in the sealed portion of the sentencing transcript.  [*Id.*; Record No. 799]  Until such time as the United States moves the Court to unseal this portion of the transcript, it will remain sealed and will not be subject of specific comments by the Court.  However, the Court comments in the unsealed portion of the transcript of the Day sentencing hearing relate to all arguments of counsel made during the sentencing hearing, as required by 18 U.S.C. § 3553 and relevant post-*Booker* case law.

-8-

In responding to the parties' oral arguments as well as those contained in the Defendant's sentencing memorandum, the Court made findings and explained the reasons for the sentence to be imposed in the context of the relevant § 3553 factors. In explaining the nature and circumstances of the offense, the Court made the first comment that counsel for Defendants Maricle, Jones and Thompson now find objectionable.

> Of course, the first factor that I do want to reference in Section 3553 is the fact that the Court should impose a sentence sufficient but not greater than necessary to comply with the purposes set forth in subparagraph 2, which has all the individual factors listed that counsel has reviewed. And the first – before we get to those factors, of course, *the first thing the Court is to consider is the nature and the circumstances of the offense and the history and the characteristics of the defendant*. And in looking at the nature and circumstances of this particular offense, this is probably the most egregious case that I've had in a little over four years. It's a very large – it was a very large drug conspiracy that was allowed to develop in a culture of corruption in Clay County. Mr. Day has acknowledged it. . . . [T]he only way that these types of conspiracies can exist is for those at the local level to turn their heads; and if you turn your head long enough, it becomes so pervasive that sometimes the federal officials take notice, and that's what happened here. And in this particular case, you had some federal officials and some state officials that were willing to work very hard to find out and try to get to the bottom of what was happening, but I still wonder what's going on at the state level. We heard a lot about it during the Garrison trial. I haven't seen a lot of evidence of any change at the state level, and I wonder what's happening at the state level. We don't know if the attorney general, this has gotten his attention. There is no indication that it has. But certainly there was an abundant – there was a mountain of evidence that was presented in the Garrison trial that would cause me to have some real serious concerns. And I'm sure a lot of that is ongoing, but it threatens a lot of things, it threatens the joint federal-state operations like HIDTA and UNITE. It's hard to have confidence in our state officials when we hear about this kind of things that happened in this particular case. So the nature and the circumstances of the offense were very egregious. . . .
>
> *So I have considered the nature and the circumstances of this particular offense and the history and characteristics of Mr. Day prior to this particular case*, and they don't bode well for him. If I were only looking at those factors, he would be looking at a life sentence. And that's kind of my starting point in a case such as this.

(Emphasis added.) [*Id.*; Record No. 798, pp. 35-37]  Again, while the Court referenced inaction at the state level, no Defendant in the present case was referenced directly or indirectly.

After explaining the starting point based on the seriousness of the offense, the Court then explained other mitigating factors which must be addressed on the record, post-*Booker*.  For example, the Court noted that,

> . . . the Guidelines are another factor that the Court has to consider.  And in this particular case, of course, I have heard the parties at the bench in terms of the cooperation that has been provided by Mr. Day, and it is noteworthy.  The type of cooperation that he has provided, the attorneys have referenced it and I've referenced it, but he's really done a 180 from the time he was arrested in this matter.  He was addicted to narcotic drugs and he was a mess.  But shortly thereafter, he did cooperate significantly, *and I believe his cooperation resulted in the guilty pleas that were entered in this case by the various defendants*.

(Emphasis added.) [*Id.*; Record No. 798, pp. 38-39]  Finally, in addressing § 3553(a)(6), the Court reiterated the significance and scope of the case.

> I have to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.  This case is a little bit unusual in that, as I said earlier, this is probably the most significant case that I've had in the four years that I've been in London.  So there really isn't anything for me to compare it with.

[*Id.*; at Record No. 798, p. 39]  Based on the relevant § 3553 factors and the United States Sentencing Guidelines, the Court sentenced Day to a term of imprisonment of 216 months[4] to be followed by a ten-year term of supervised release.

---

4.     Day's term of imprisonment consisted of 192 months on Counts 1, 2, 3, 4 and 11, and 120 months (consecutive) on Count 20, together with a consecutive term of imprisonment of 24 months on a supervised release violation.

B.     The Bobby Joe Curry Case

In June 2006, the grand jury returned another indictment charging drug possession and distribution in the Clay County, Kentucky, area by Defendant Bobby Joe Curry and Tammy Napier.  (*See United States v. Bobby Joe Curry, et al.*, 6: 06-CR-82-DCR (E.D. Ky. 2006); hereafter, the *Curry* case.)  Curry's drug distribution activities resulted in the death of one person.  Approximately two months later, the indictment was superseded to include charges against Todd Roberts, the former Manchester, Kentucky, Assistant Chief of Police, and Vernon Hacker, Manchester's 911 director.  [*See Curry* case; Record No. 55]

Defendant Hacker appeared on August 21, 2006, before a United States Magistrate Judge in London, Kentucky, for purposes of arraignment on the charges contained in the first superseding Indictment.  [*Id.*; Record No. 65]  After entering a not guilty plea to the charges placed against him, Hacker was released on personal recognizance.  [*Id.*; Record No. 67]  However, on October 5, 2006, the United States moved the Court for an arrest warrant and hearing on a bond violation by Hacker.  [*Id.*; Record No. 117]  That motion was granted by United States Magistrate Judge Robert Wier and a hearing on the alleged violation was held on October 11, 2006.[5]  [*Id.*, Record No. 138]

_____

5.     Chronologically, approximately two weeks prior to the hearing on the bond violation before the Magistrate Judge, Defendants Roberts and Hacker filed a motion to disqualify the undersigned from further proceedings in the case.  [*Curry*, Record No. 109]  The motion was based on the Court's statements made during the sentencing hearing of Kenneth Day which are outlined above.  This motion, together with the United States' motion to transfer venue, was subsequently referred to then-Chief Judge Joseph M. Hood for review.  [*Id.*, Record No. 115]  By Memorandum Opinion and Order dated October 26, 2006, Judge Hood denied the Defendants' motion to disqualify and granted the United States' motion to transfer venue.  With respect to the venue motion, Judge Hood concluded that, "[w]hile trial in the Ashland or Covington divisions would be a great inconvenience to the parties, travel from the London division to the Frankfort division does not present such an inconvenience to the defendant or witnesses as to outweigh the interests of justice that would be served by such a transfer."  [*Id.*, Record No. 171, pp. 3-4]  Accordingly, trial of the matter was

-11-

As a result of evidence presented during the bond revocation hearing, Magistrate Judge Wier granted the government's motion.  The evidence presented in support of its motion before the Magistrate Judge included the testimony of Martin Lawson.  This testimony is summarized as follows:

> -That he [Lawson] had approximately a ten year relationship with Vernon Hacker.  Part of the relationship involved minor dealings between Lawson and Hacker regarding, *e.g.,* gun holsters.

> -That Vernon Hacker had, on 3-5 occasions from around early September until the end of September, approached Lawson seeking testimony for Hacker's upcoming federal criminal trial.  Lawson specifically testified that Hacker has asked him to testify falsely that Lawson had heard Defendant Bobby Joe Curry, in the past, threaten to kill Hacker.

> -That Hacker said he'd pay $500, or $100 apiece, for 4-5 different witnesses, if Lawson could find such witnesses to relate a Curry threat.  Lawson testified that Hacker, at one point, waived several $100 dollar bills as he discussed his desire to have witnesses testify about the Curry threat.  Lawson denied ever hearing Curry make any sort of threat against Hacker.  Lawson testified that when, during their last discussion, he informed Hacker that he had not heard a threat and would not testify falsely to that effect, Hacker became upset with Lawson.

> -That he was "worried about" Hacker's approaches, from the outset.  Lawson had sought advice, early on, in how to deal with Hacker's overtures.  Lawson had first approached Clay County Commonwealth Attorney Gary Gregory about Hacker's conduct, and Gregory had suggested that Lawson report the matter to Trooper Day.  Lawson did that, according to his testimony, ultimately resulting in contact with federal authorities some weeks later.

> -That Lawson felt fear because he'd been followed, since making his report to federal authorities, by friends or associates of Hacker.

[*Id.*; Record No. 152, pp. 3-4]

While additional superseding indictments were returned subsequently, all Defendants eventually entered guilty pleas to various charges with none proceeding to trial.  The Plea

---

transferred to Frankfort.

Agreements provide additional, relevant information regarding charges of public corruption. Again, however, the charges of corruption do not identify any Defendant in this action, directly or indirectly. For example, on October 2, 2006, Defendant Bobby Joe Curry entered a guilty plea to Counts 1, 2, 4, 16, and 17. Through his Plea Agreement, Curry admitted the following facts:

> 3. (a) The Defendant [Curry] conspired during the dates and places alleged in the indictment with Todd Roberts [Manchester Chief of Police], Vernon Hacker [Manchester 911 Director], Tammy Napier, and others to knowingly and intentionally distribute over 5 kilograms of a mixture or substance containing cocaine, and a quantity of pills containing oxycodone and methadone, all schedule II controlled substances. . . .
>
> (e) Todd Roberts and Vernon Hacker became involved in the conspiracy in July 1999 after the Defendant assisted them in burning a residence owned by Johnny Taylor Smith. Roberts and Hacker joined the conspiracy with the Defendant and helped protect the Defendant in exchange for his help in burning the house of Johnny Taylor Smith. Smith refused to sell his property to the City of Manchester and was holding up the construction of the new police department and 911 center. During the conspiracy, Roberts and Hacker, who worked inside the Manchester Police Department, each provided protection on numerous occasions for the Defendant by making calls to the Defendant advising of police activity. The Defendant was supplied drugs by Roberts from the evidence of the Manchester Police Department. In addition, Roberts and Hacker helped the Defendant by purchasing from the Defendant stolen merchandise including firearms which were taken in by the Defendant in trade for drugs.

[*Id.*; Record No. 111, pp. 2-3]

Following the return of a second superseding indictment, Defendant Vernon Hacker entered a guilty plea to Counts 1 and 2 on February 2, 2007. The factual basis for Hacker's plea outlined information implicating other Manchester officials in illegal activities. More specifically, Hacker admitted, in part, that:

    3. (a) The Defendant [Hacker] conspired during the dates and places alleged in the indictment with Richard Todd Roberts, Bobby Joe Curry, and others to knowingly and intentionally distribute over 5 kilograms of a mixture or substance containing cocaine and a quantity of pills containing oxycodone and methadone, all Schedule II controlled substances.

    (b) Beginning in 1999, the City of Manchester began the process of constructing a new police department and 911 call center. Mayor Daugh K. White approached Johnny Taylor Smith with a proposal to buy his dilapidated home which was unoccupied and lot situated behind the proposed site for the police department and 911 center. Smith refused the offer for his property. White schemed with Assistant Chief Todd Roberts and Councilman Vernon Hacker to hire someone to burn the property of Smith. James Arkus Hibbard, a city employee now deceased, suggested that Bobby Joe Curry would do the job. Bobby Joe Curry was a known drug dealer at the time and operator of a small used car lot. White, Roberts, and Hacker, at Hibbard's suggestion, approached Curry and inquired if he would be willing to burn the Smith house. . . . White promised Curry he would protect and take care of Curry in the future if he would do the arson.

[*Id.*; Record No. 408, pp, 2-3]  Hacker's statements did not reference any Defendant in the current criminal action.  However, in addition to former Manchester Mayor Daugh White, Manchester City Councilman Darnell Hipshire was added to the *Curry* case as a Defendant by way of a superseding indictment.

Daugh White entered a guilty plea on August 13, 2007, to two counts, including a count charging a conspiracy to violate the Racketeer Influenced and Corrupt Organization Act (18 U.S.C. § 1962(d)).  [*Id.*; Record No. 324]  Two days later, Defendant Hipshire entered a guilty plea to the same counts.  [*Id.*; Record No. 402]  The Plea Agreements of Defendants Daugh White and Darnell Hipshire outline a different type of public corruption by Manchester officials. In written and oral admissions, White admitted the following facts:

    3. (b) . . . In 2004, the Defendant [Daugh White] created a new position in the City of Manchester, entitled City Manager, for his son, Kennon D. White, at a salary of approximately $49,000 per year plus benefits. The Defendant, Mayor

of the City of Manchester, conspired with others to extort kickbacks from B and B Excavating, Inc., a company doing business with the City of Manchester. Beginning in may 2004 and continuing through October 2006, B and B Excavating, Inc. was awarded approximately eight contracts by the Defendant on behalf of the City.   The Defendant often avoided bid requirements and procurement policies in many instances by making unjustified change orders for contracts, by declaring unjustified emergencies, and using other inducements to ensure that B and B Excavating, Inc. obtained these contracts for water and sewer projects which were funded in part by federal funds.   As part of the conspiracy, it was understood that the contract would not be awarded to the contractor unless cash payments were made by the contractor to the son, Kennon D. White.   Prior to the Defendant's awarding of contracts to the contractor, Kennon D. White would negotiate the amount of kickback necessary for the contractor to obtain the job.   During the course of the conspiracy, the Defendant and Kennon D. White obtained approximately $67,000 from B and B Excavating, Inc.

[*Id.*; Record No. 324]

Defendant Darnell Hipshire's Plea Agreement outlines the following admissions which

are also contained Defendant Daugh White's Plea Agreement at paragraph 3. (c):

3. (b) . . . During the Fall of 2005, the Defendant [Hipshire] and Daugh K. White, hereinafter referred to as the Mayor, in anticipation of the upcoming election contest, made efforts to gain favor with potential voters by paving private driveways with asphalt paid for by public funds and designated for use on the public streets in the city of Manchester.   The Defendant and the Mayor, directed Elmo Greer and Sons, Inc., a contractor hired by the City to pave City streets, to pave a total of 32 private driveways and to patch 4 driveways with City resources. In April 2006, the State Auditor's Office audited the City and discovered that the City had paved private driveways without billing for the services.   The Mayor was confronted with the issue by the auditors.   Within days, the Mayor and the Defendant schemed to disguise the free paving services with bogus invoices to 11 persons.   The invoices were created with the intent to defraud the State Auditor's Office, the City of Manchester, and its citizens of their right to be informed of all relevant facts and circumstances concerning receipts and expenditures of public funds for private driveways.   On April 25, 2006, the Mayor directed a city clerical worker to prepare the 11 invoices based upon estimates.   Upon review, the Defendant objected to the amounts on the invoices.   On this same date, the Mayor directed that invoices be mailed to a few of the recipients including Lonnie Napier, Bea Burchell, Virginia Mccarty, Shane Lewis, and Terry Spurlock. Defendant took the remaining six invoices to be delivered by hand.   Based upon

-15-

the records of Elmo Greer and Sons, approximately $30,000 in pavement was used on private driveways.

[*Id.*; Record No. 402, pp. 2-3]  In addition to the facts outlined above, Defendant Hipshire admitted to testifying falsely before a federal grand jury on November 21, 2006, in an effort to obstruct justice.  [*Id.*; p. 3]

In summary, prior to the current matter being instituted, Kenneth Day had been indicted, entered a guilty plea, and had been sentenced by the Court.  As required by relevant statutes and case law, the Court considered the nature and circumstances of the offense as well as the history and characteristics of Mr. Day in imposing a sentence.  This included his cooperation in his cases as well as related cases subsequently returned by the grand jury.  Additionally, several other cases returned by the grand jury resulted in a number of former Clay County officials being indicted on a variety of charges.  While the Court handled these proceedings in accordance with the Federal Rules of Criminal Procedure and established case law from the circuit, at no time during the course of these proceedings did the Court make statements concerning the guilt, innocence or credibility of any Defendant indicted in the present case.

C.     The Present Criminal Action

On March 3, 2009, a federal grand jury returned a ten-count indictment in this case, against Defendants Maricle, Jones, Thompson and five additional Defendants.  *United States v. Russell Cletus Maricle, et al.*, 6: 09-CR-16-ART (E.D. Ky. 2009).  Following recusal of the judge originally assigned to the case, the matter was assigned to the undersigned.  [Record No. 7] The Defendants appeared before United States Magistrate Judge Robert Wier for arraignment and the setting of bond beginning March 20, 2009.  Defendant Freddy Thompson appeared on

-16-

that date at 2:00 p.m.  As a standard condition of release, the Defendants were advised that they may not possess firearms.  However, several Defendants, including Defendant Thompson, apparently expressed some concern with being able to abide by this condition within the time set by the Magistrate Judge.  During a subsequent meeting with a United States Probation Officer to review the specific conditions of his release, Defendant Thompson again expressed a concern with the prohibition on firearms in his residence.  Thereafter, this information was relayed to the undersigned.

1.    *The Maricle Detention Issue*

The majority of the Defendants in the *Maricle* case were released on bond at their initial appearances without objection from the United States.  [Record Nos. 19, 21, 23, 24, 25, and 26]  However, the United States sought detention of Defendant Maricle.  [Record No. 37]  Accordingly, a detention hearing was scheduled and held before United States Magistrate Judge Wier on March 23, 2009.  [Record Nos. 37, 53]  After considering the evidence offered by the United States,[6] and by Order entered March 26, 2009, Magistrate Judge Wier determined that the United States had met its statutory burden and that Defendant Maricle should be detained pending trial.  In making this determination, the Magistrate Judge reached the following salient conclusions based on the information provided to him:

> Could the Court reasonably expect this Defendant, confronting substantial personal jeopardy, to respect and abide by release conditions? The hearing record indicates a defendant: willing (as judge) to corrupt a civil jury, willing (as judge) to suborn perjury to orchestrate the result of a criminal trial, willing to influence corruptly the testimony of a federal grand jury witness in this case, and willing to

---

6.      Maricle's counsel did not offer evidence to refute the proof offered by the United States during the detention hearing.

participate in a multi-year conspiracy designed to adulterate the fundamental democratic institution of voting. Pre-trial detention is prophylactic, not punitive, and a person with a demonstrated capacity for fraudulently manipulating the judicial system is a poor candidate for pretrial release. The Court simply has no confidence that Defendant [Maricle] would follow court restrictions designed to protect the integrity of the judicial process, a process that must unfold on the merits, and *only* on the merits, in this and every case.

The United States proved the need for detention, based on dangerousness, by clear and convincing evidence. Theatrics aside, the defense offered little to counter or weaken the Government's strong showing. The PSR, which contains a recommendation in the Defendant's favor, pre-dates the hearing and does not encompass much of the critical hearing content. The Court orders Defendant detained pending the trial of this case.

[Record No. 66, at p. 12]

Following the Magistrate Judge's order of detention, Maricle obtained new counsel and requested the opportunity to present additional evidence and arguments in support of his release pending trial. [Record No. 91] In support of this motion, Maricle argued that his former counsel, Henry Hughes, provided ineffective assistance during the initial detention hearing. And in arguments to the Court and briefs filed in support of release, Maricle's counsel challenged the testimony of Kenneth Day based, in part, on his status as a convicted felon and his incentive to assist the government in this action.

The Court granted this motion and conducted a hearing on the detention issue on April 20, 2009. [Record Nos. 135, 155, 170] Following this hearing, the Court ordered Defendant Maricle's release to home detention. [Record No. 215] In reaching this determination, the undersigned considered the additional evidence presented and concluded that the restrictions imposed would be sufficient to protect the public. This evidence included Defendant Maricle's

failure to disclose assets to the Probation Officer in connection with his original bond hearing

before the Magistrate Judge.

The Court also addressed the specific arguments of David Hoskins, Maricle's new

counsel, challenging the testimony of Kenneth Day.  The Court explained that,

> [i]n reaching this determination [to release Defendant Maricle to home detention],
> the Court does not discount the Magistrate Judge's findings that strong evidence
> has been presented implicating Defendant Maricle in manipulating the verdict in
> a civil trial in Clay County.  While the Defendant has challenged the credibility
> of Kenneth Day concerning this issue, the undersigned does not discount his
> statements based on the fact that he is a convicted felon or because Defendant
> Maricle was not the judge assigned to the case in question.  Likewise, the Court
> does not discount the weight of the evidence in the present case as the Magistrate
> Judge has described.  However, the undersigned considers the fact that, with the
> restrictions that will be imposed, the likelihood that the Defendant will: (1)
> attempt to obstruct justice, (2) improperly contact or attempt to intimidate
> witnesses, or (3) threaten or attempt to threaten or harm law enforcement officers
> is greatly reduced.

[Record No. 215, p. 3]

In footnote 1, the Court further explained its evaluation of Day's credibility for purposes

of the detention issue.

> While Kenneth Day did not appear before the undersigned during the April 20,
> 2009, hearing, the Court does not write on a blank slate regarding his credibility
> as a witness.  Mr. Day has appeared before the undersigned on several occasions
> in connection with his case as well as a witness in other proceedings.  To date, the
> Court has found Day's testimony to be credible.

[Record No. 215, p. 3, footnote 1]  In light of the history of cases outlined above, this statement

constitutes a correct reflection of findings this Court has previously made regarding testimony

offered by Kenneth Day.  And as the Court clearly indicated, this evaluation is based on

testimony provided in other proceedings *to date*.  Further, this statement was necessarily

-19-

responsive to attorney Hoskins' arguments regarding the detention issue and Hoskins' attempt to discredit the testimony offered by the United States.

2.    <em>The Jones Detention Issue</em>

During the same general time period that the United States was seeking detention of Defendant Maricle, it became aware that a witness had received a threatening communication from Richard Brian Hubbard, a friend/associate of Defendant Charles Wayne Jones. As a result, the United States sought his detention. [Record Nos. 145, 163] A hearing was subsequently scheduled for April 27, 2009, before United States Magistrate Judge Wier. [Record No. 177]

By Order dated May 8, 2009, Magistrate Judge Wier determined that Jones' bond should not be revoked based on his connection with a threatening message sent by Richard Brian Hubbard to a potential witness in this case, *via* a MySpace website. However, the Magistrate Judge concluded that additional restrictions should be imposed.

> Notwithstanding a finding of no violation, the Court has revisited release conditions in light of the hearing record. The Bail Reform Act permits a court, at any time, to "amend" a release order "to impose additional or different conditions of release." *See* 18 U.S.C. § 3142(c)(3). Just because the Government did not meet the precise proof structure of § 3148 does not mean that the Court is satisfied with Jones's level of compliance. The March 23 discussion with the Hubbards at least contributed to the March 24 threat. Jones's decision to discuss the subject matter of the case with two persons that arguably could be witnesses indicated questionable judgment by Jones while on release. The Hubbards are not *clearly* witnesses, but they are persons with ties to the election apparatus in Clay County. Jones's choice to talk about the prosecution subject matter did, as a minimum, foment Brian Hubbard's anger on March 24, and the Court must guard against witness intimidation from any source in this case.

[Record No. 205, pp. 14-15] Based on these findings, Magistrate Judge Wier placed Jones on home incarceration with other restrictions.

-20-

The United States objected to the Magistrate Judge's determination and sought an immediate hearing before the undersigned. The United States' request for emergency relief was granted and a further hearing was conducted on the issue of whether Jones' bond should be detained based on the alleged violation of his release conditions. [Record No. 207] On May 12, 2009, the Court issued a Memorandum Opinion and Order sustaining the United States' objection to the Magistrate Judge's conclusion that Defendant Jones had not violated the conditions of release by having indirect contact with potential trial witnesses. [Record No. 212] However, the Court denied the government's request that Jones' bond be revoked and that he be incarcerated pending trial as a result of his violation. Instead, the Court concluded that the amended conditions of release outlined in the Magistrate Judge's May 8, 2009, Order would be sufficient to assure that Defendant Jones would not pose a danger to the safety of any other person or the community.

Unfortunately, due to the nature of the current motion, the Court finds it necessary to repeat at length some of the findings and conclusions (including footnotes) contained in the May 12, 2009, Memorandum Opinion and Order. Specifically, the Court noted that:

> Jones has been indicted by a federal grand jury for federal election-related charges, including an alleged RICO conspiracy involving the former Clay County Circuit Judge and members of the Clay County Board of Elections. The election and RICO charges pertain to the period 2002 to 2007, while additional counts alleging extortion and/or honest services mail fraud relate to the 2004 and 2006 elections.
>
> The United States has alleged and offered proof that Brian Hubbard has close connections with Defendant Jones. [Footnote omitted.] Following the return of the indictment in this case, Hubbard attempted to meet with Jones at Jones' home on or about March 20, 2009. However, Jones was unavailable during this first attempt. Later, Hubbard and his father, Readie Richard Hubbard, returned to

-21-

Jones' home on March 23rd and discussed the criminal proceedings. Approximately twelve hours later, Brian Hubbard sent a threatening message to two government witnesses. In the message, Hubbard identifies himself as the sender and transmits a photograph of himself pointing a gun at the camera. Hubbard accuses the witnesses of lies and states, "Look what you have caused by your lies. Good job." The United States claims that this message was instigated by Defendant Jones.

After learning of the message from Brian Hubbard to the government witnesses, Special Agent Briggs interviewed Hubbard on several occasions. Initially, Hubbard stated that he had learned of the identities of the witnesses from either newspaper accounts or from conversations overheard at a local hospital. And while Hubbard conceded that Jones has talked about some of the likely prosecution witnesses during their meeting on March 23rd, he did not indicate that Jones identified the recipients of the threats. In later interviews, however, Hubbard conceded that he and Jones had discussed the persons Hubbard threatened in the early hours of March 24, 2009. Nothwithstanding this concession, Hubbard has not admitted that Jones suggested that Hubbard threaten any witness.

While Brian Hubbard was not called as a witness during the April 27th hearing, his father testified under subpoena. Admittedly, Richard Hubbard is a life-long friend of Defendant Jones. According to Hubbard Senior, Jones has recently assisted Brian Hubbard in obtaining employment and had nominated his son to act as a election "sheriff" in advance of the 2008 election. Hubbard Senior describes the March 23 visit with Jones as "social" and as lasting approximately 15 minutes. And while Hubbard Senior testified that Jones did mention some of the people who were probable witnesses against him in the pending criminal action, he did not indicate that Jones named the witnesses that were threatened by Brian Hubbard some twelve hours later.

In addition to the foregoing matters, Hubbard Senior offered testimony concerning a 2002 marijuana charge which was amended from a felony to a misdemeanor. While the charge was pending, he indicated that Jones and co-Defendant Freddy Thompson came to his home to encourage him to vote for Thompson in the upcoming election. Hubbard Senior also admitted that he had been subpoenaed to appear before a federal grand jury concerning an unrelated matter in 2006 and that he had talked to Jones about the subpoena at the time.

\*    \*    \*

Having reviewed the testimony and other evidence relating to this issue, the undersigned concludes that the *proof establishes by clear and convincing*

-22-

*evidence that Jones had indirect contact with potential witnesses regarding the subject matter of the litigation.* Specifically, the Court concludes that Jones indirectly communicated with the government witnesses through Brian Hubbard. Whether the communication constitutes additional criminal conduct is not dispositive. It is clear that Jones has a close personal relationship with Brian Hubbard and his family. It is equally clear that Jones and the Hubbards discussed on March 23, 2009, potential witnesses. According to the government, Brian Hubbard initially concealed the fact that he and Jones had discussed the witnesses who were later threatened. The undersigned does not believe that Hubbard's admissions to Special Agent Briggs with respect to this matter should be discounted because they occurred during a third interview. Instead, they represent evidence of concealment. There is no evidence of coercion prompting this concession by Hubbard.[7]

The Magistrate Judge reached the conclusion that Jones did not violate the restrictions of "no witness contact" after comparing the subject matter of the litigation with the potential roles of Brian Hubbard and his father as witnesses in this litigation. While this analysis is logical to a point, the Court notes that parties and their surrogates do not always act according to the dictates of logic.[8] However, the undersigned's focus in not confined to whether Brian Hubbard and his father are viewed as potential witnesses in this litigation but also extends to whether Brian Hubbard was used an in intermediary to contact other potential government witnesses.

After reviewing the proof presented by the parties, the Court is persuaded by clear and convincing evidence that Brian Hubbard attempted on at least two occasions to discuss the subject matter of the indictment and potential witnesses with Defendant Charles Jones (March 20, 2009, and March 23, 2009). Jones was

---

7.  According to Special Agent Briggs, Brian Hubbard admitted that he and Jones had discussed additional, potential trial witnesses (including the witness subsequently threatened) after Hubbard was advised by Briggs that he had failed a polygraph examination.

8.  The fact that the RICO conspiracy extends only to July 2007 (prior to the time Brian Hubbard had official involvement in Clay County elections) does not mean that Brian Hubbard lacks knowledge or information as a witness in the case. Likewise, the fact that Jones is charged with criminal conduct involving the 2004 and 2006 elections – while Hubbard Senior may have knowledge of illegal activity involving earlier elections – does not mean that Hubbard Senior lacks knowledge of illegal activities in subsequent elections. Defendant Jones was barred from having contact with potential witnesses regarding the subject matter of this case. The subject matter of this case involves election fraud in Clay County and allegedly extends over several years. Potential witnesses would include individuals with knowledge of the alleged election fraud, some of which may have occurred at times other than the period charged in the indictment. *See* F.R.E. 404(b).

-23-

unavailable on Hubbard's first attempt. However, shortly after Jones met with Brian Hubbard and his father, Hubbard contacted potential trial witnesses and made the threats described above. No evidence has been offered to indicate that Jones advised Hubbard or his father that he could not discuss the case with potential trial witnesses. Instead, Hubbard initially failed to disclose to Special Agent Briggs that the threatened witnesses had been discussed or identified during Hubbard's March 23rd conversation with Jones. While Hubbard did not send the threatening messages to the potential government witnesses for approximately twelve hours after the meeting with Jones, the Court does not conclude that this weighs in favor of Jones' position. Under the circumstances, it is fair to assume that additional time was needed to take and send the subject photograph to individuals who were the subject of the earlier meeting with Defendant Jones.

(Emphasis added.) [Record No. 212, pp. 2-7]

During the May 8, 2009, hearing, the undersigned warned the Defendant of the consequences of further bond violations. In addition, the Court explained to Jones' counsel in some detail the reason for the stern warning given to Jones.

THE COURT: Let me direct you to what I'm concerned with in this case specifically, and I don't want to cut off your argument, I know you have some other points to make, but it concerns me greatly that a person that is under indictment in this court and that has been admonished as to people he can speak with and people that he can't speak with, that a potential witness in the case or Mr. Hubbard approaches him at one point and he's not there, he's in the shower. Nothing happens. The witness comes back later with his father. So there's obviously a second attempt to have this conversation. And I'm looking at the circumstantial evidence. And when I think of jury instructions, circumstantial evidence is just as good as direct evidence. In some cases that's all we have is circumstantial evidence.

At any rate, there's this second encounter. And after the encounter, and, as you say, 12 hours, but 12 hours in the scheme of things, you can argue is a long time or you can argue it's not a very long time, it's within the same day that the conversation took place. But my thinking is that it's shortly after the parties are actually able to get together, three people get together. And according to Agent Briggs, after a polygraph examination, Mr. Hubbard, Jr., admits that he didn't tell the truth in the earlier examinations or meetings with the agent, which can be a separate crime, and I think has been charged as a separate crime, and provides

additional information, yes, we not only discussed the one witness, we discussed four other witnesses. The father testifies at the hearing before the magistrate and denies much of that. But the circumstantial evidence is that there was this attempted meeting, there was a later actual meeting, and then there was contact made with – threatening contact made with the witness, and I'm wondering if this is not pretty clear evidence that there was an indirect attempt through your client to communicate with a potential witness in the case, not the Hubbards being the witnesses, but the people that were sent the threatening message.

Quite frankly, it doesn't require that the Court find that Mr. Jones was the person that instigated the meeting with the Hubbards, because he's prohibited from having any discussion or contact with potential witnesses, and I think we would all agree that that's direct or indirect contact, either potential witnesses or victims, regarding the subject matter of the case except as through counsel.

So that's my number one concern. The number two concern that I have, and this goes to the magistrate judge's order, and I certainly respect Magistrate Judge Wier and the work that he's done in this case and every other case, but he'll be the first to tell you that when I think he's incorrect, I tell him that. Now, my concern with him is that he's a little bit overly concerned about the – whether this defendant understood the exact contours of the RICO charges in this particular case.

As a layman, of course, your client knew, because he was told that he couldn't have contact with potential witnesses in the case. And the United States makes a very compelling argument that these other folks and also the Hubbards were potential witnesses and they could certainly be considered that in a layman's sense. And without getting into the specific charges, whether it's 2002 to 2008 or 2007 in terms of the RICO charge, or the 2006 election, for example, and the involvement in a particular election, the question is whether your client had contact with someone that he thought was a witness or could be a witness in the case. And if, as the United States argues, that there was a very close connection and the close connection could involve illegal activity or vote hauling and the quid pro quo for that, then that certainly could be seen as a person in the defendant's position as contacting a potential witness.

So my concerns are really more with the bigger picture than they are with the minutia of the case and the specifics of a RICO charge, whether a person that clearly knew that he was not to have any contact, direct or indirect, had those indirect communications with people in an attempt to intimidate or to threaten.

-25-

It seems like – and I don't want there to be any spillover from other defendants in the case, but it appears to me that perhaps one or more defendants in this case don't get it, they don't understand that if they're subject of an order from the Court that they're expected to comply completely with an order from this Court, not to try to dance around it or be cute or to make threats to anyone, directly or indirectly.  And I am concerned that perhaps that's occurred here and that if the Court doesn't take action it's going to occur again, because, as I said, it appears to me that perhaps one or more defendants in this case just don't get it.  They don't get and they don't understand that these are very serious charges that they're facing, and they can face more serious charges if they engage in this kind of –  these kind of shenanigans that are charged here.

Now, that's a lot for you to respond to, and I understand that, but you see what my concern is?

[May 8, 2009, Transcript, pp. 40-44; Record No. 396][9]

Following this warning, Jones' counsel, T. Scott White, expressed his understanding of

the Court's concerns.

MR. WHITE: I do, Your Honor.

THE COURT: My concern is, and it's a concern that this Court has had in many cases that have originated from Clay County, the defendants coming from Clay County don't seem to understand that once they're under bond conditions of this Court that those are pretty serious conditions.

MR. WHITE: I understand.

THE COURT: Yes, sir.

MR. WHITE: Can I sort of grab something?

THE COURT: Yes, sir.

MR. WHITE: *Let me first say that not only as an officer of this Court I have no quarrel with your concerns.  I think they are valid.  You absolutely have to be*

---

9.    The hearing before the undersigned on Defendant Maricle's request that the Court reconsider his detention occurred on April 20, 2009.  During that hearing, the United States produced evidence that Maricle had not provided a complete listing of assets.

> able to depend upon people to respect orders of the Court.  But to be clear – I
> understand that you have a global concern with how perhaps other defendants
> have behaved in this case and that you need to send a clear message, if you will,
> but I still think, with all due respect to this Court, that you are still somewhat
> bound to deal with this defendant's conduct in this context.
>
> THE COURT: Absolutely.  Absolutely.

(Emphasis added.)  [*Id.*; at pp. 44-45][10]

Following further arguments of Jones' counsel, counsel for the United States argued that

Jones should not be released.  In part, the United States asserted that,

> [MR. PARMAN:] . . . As this Court has recognized previously, [under the facts
> presented by the present case] the type of danger that the Bail Reform Act is

---

10.     Brian Hubbard, the person sending the threatening messages to potential trial witness following his meeting with Defendant Jones, was indicted on April 23, 2009, and charged with threatening an essential government witness in violation of 18 U.S.C. § 1512(b)(1) (count 1), transmitting in interstate commerce a communication containing a threat to injure another person in violation of 18 U.S.C. § 875(c) (count 2), and making knowing and willful false, fictitious and fraudulent statements to an FBI agent in violation of 18 U.S.C. § 1001(a)(2) (counts 3 & 4).  (*See United States v. Richard Brian Hubbard*, U.S. Dist. Ct., E.D. Ky., Southern Div. at London, Criminal No. 6: 09-CR-25-DCR; hereafter, the "*Hubbard* case".)  A superseding indictment was returned in this matter on April 28, 2009.  Defendant Hubbard entered a guilty plea on June 15, 2009, to four counts.  [*See Hubbard* case, Record No. 43]  As outlined in his Plea Agreement, Hubbard admitted that he learned of the identity of the potential government witness from Jones on March 23, 2009, and that he discussed Jones' federal case on that date with him.

Through his Plea Agreement, Hubbard admitted:

3. (c) . . . The Defendant also advised that he and his father, Richard Hubbard, met with Charles Wayne Jones, a Defendant in 09-16-DCR, on March 23, 2009, and did discuss the case including possible witnesses.  He, however, specifically denied learning that the Myspace message recipients were witnesses during the conversation with Jones, but claimed that he sent the message "because she lied on people and got them put in jail."  The Defendant admitted to attaching with the message a photo of himself pointing a gun at the viewer.  He claimed that the photo was a profile image used categorically and that he was on a Myspace.com "friends list" with the witnesses.  In reality, the Defendant learned the specific identity of the Myspace message recipients during the conversation with Charles Wayne Jones on March 23, 2009.  After learning the identity of the witnesses, he then returned home and sent the above referenced message. . . .

[*Hubbard* case, Record No. 44, pp. 2-3]

-27-

talking about is the danger of obstruction of justice or intimidation of witnesses. So that clearly falls within the ambit of the danger posed by this defendant. . . . I think clearly this defendant is not willing to abide by conditions or release. We see that – I believe the record, and I don't want to be unclear, but I think it was three days after his release, after clearly being told what his release conditions were. I do not fathom how – if the Court finds a violation has occurred, how this defendant could ever be seen to be likely to abide by conditions of release when he goes out and does exactly what is forbidden him three days after his release.

[*Id.*, hearing, pp. 53-54]

It was in the context of this argument and the additional information the Court possessed regarding other Defendants' willingness to abide by conditions of release that the Court further explained its reasons for the stern warning given to the Defendant regarding the necessity of abiding by all terms and conditions of release pending trial.

THE COURT: Of course, Mr. Parman, I think you understand that sometimes when this Court goes off on a tangent, some would call it a rampage, but we'll say a tangent, and talks about what's expected, many times the Court does that with the purpose of making sure that if – for example, if I were to even alter the conditions imposed by the magistrate, I want to make sure that there's no doubt in anybody's mind as to what would happen if there were to be, and we've talked about it here, even a technical violation, that everyone completely understands where I am, what my position is on things. And so sometimes that's the reason for some of the rants that you hear coming from the Court to try to make sure that there's no doubt about what's expected. I do understand your position.

[*Id.*, at pp. 54-55]

**       **       **

Although extensive, the factual summary outlined above is needed to put the Defendants' motions in proper context. It is against this backdrop that Defendant Thompson (who expressed concern with the bond condition prohibiting his possession of firearms as a condition of release), Defendant Maricle (who was originally detained by the Magistrate Judge based upon his danger

-28-

to the community and himself and who was later found to have failed to disclose substantial assets to the Probation Office), and Defendant Jones (who has already violated the conditions of his bond) seek to have the undersigned disqualify himself from further proceedings based on statements and findings which were necessarily made in this and related proceedings.

## II.   LEGAL ANALYSIS

Judicial disqualification is mandated under 28 U.S.C. § 455(a) "in any proceeding in which [the Court's] impartiality might reasonably be questioned."  Section 455(b)(1) further requires disqualification "[w]here [the judge] has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."  The standard for judicial disqualification is set forth in *Liteky v. United States*, 510 U.S. 540, 555 (1994):

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. . . .  In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved.  Almost invariably, they are proper grounds for appeal, not for recusal.  Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. . . . *Not* establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.  A judge's ordinary efforts at courtroom administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune.

The Sixth Circuit has adopted the *Liteky* standard in judicial disqualification cases. *See, e.g.*, *Lyell v. Renico*, 470 F.3d 1177, 1186-87 (6th Cir. 2006); *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002). And as the Defendants acknowledge, this is an extremely high standard: for disqualification to be proper, a judge must "display a deep-seated favoritism or antagonism that would make fair judgment impossible"; even comments "that are critical or disapproving of, or even hostile to . . . the parties, or their cases" and "expressions of impatience, dissatisfaction, annoyance, and even anger" generally do not require disqualification. *Id.*

The undersigned is also mindful that the Sixth Circuit has cautioned that "[t]here is as much obligation upon a judge not to recuse himself when there is no occasion as there is for him to do so when there is." *Easley v. Univ. of Mich. Bd. of Regents*, 853 F.2d 1351, 1356 (6th Cir. 1988) (alteration in original) (citation omitted). Unnecessary recusals would waste judicial resources in cases such as this one, where the Court has presided over several related cases and is familiar with the underlying allegations. *See City of Cleveland v. Krupansky*, 619 F.2d 576 (6th Cir. 1980).

       A.    <u>The Challenged Statements</u>

The first challenged statement concerns comments of the Court made during the sentencing hearing of Kenneth Day. With respect to this issue, it should be readily apparent that federal courts are required to consider the seriousness of the offense under 18 U.S.C. § 3553(a) in making sentencing determinations. At Day's sentencing hearing, the Court noted that, in the context of "looking at the nature and the circumstances of offense," the case was [at the time] "probably the most egregious . . . that I've had in a little over four years. . . . [I]t was a very large

-30-

drug conspiracy that was allowed to develop in a culture of corruption in Clay County." [*Day* case; Record No. 798, p. 36]  The Court then noted that "the only way that these type of conspiracies can exist is for those at the local level to turn their heads." [*Id.*]  Although several local officials had been implicated in criminal activity (*i.e.*, Jennifer Garrison and Jennings White), and although several others would be indicted shortly thereafter (*i.e.,* Todd Roberts, Vernon Hacker, Daugh White, Darnell Hipshire), no Defendant in the current litigation was mentioned, directly or by implication.

Further, these comments were made in the context of an explanation of the sentence Mr. Day would receive.  While Day's counsel argued for a lesser sentence, this factor was part of the Court's analysis in imposing a term of imprisonment of 216 months.  [*Id.* at 35-37]  It is equally noteworthy that these statements were made in response to comments of counsel for the Defendant and the United States.  Again, such an explanation is required by statute, as well as by Sixth Circuit case law.  18 U.S.C. § 3553(c) ("The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence . . . ."); *e.g.*, *United States v. Bolds*, 511 F.3d 568, 580 (6th Cir. 2007) ("The district court must provide a clear explanation of why it has either accepted or rejected the parties' arguments and thereby chosen the particular sentence imposed, regardless of whether it is within or outside of the Guidelines.") (citing *Gall v. United States*, 128 S. Ct. 586, 2007 WL 4292116, at *7); *see also United States v. Herrod*, No. 07-2197, slip op. at 9-16 (6th Cir. Aug. 19, 2009) (Clay, J., concurring) (emphasizing the importance of a district judge's explanation on the record of the reasons behind a sentence and citing numerous Sixth Circuit cases on this point).

The Court prefaced and concluded the comments at Day's sentencing hearing by explicitly stating the reason for making them.  [*See Day* case; Record No. 798, pp. 35-37.] Further, the statements were general and not inflammatory when considered in the context of the attorneys' arguments for and against a lengthy sentence.  Likewise, the Court did not identify or mention any Defendant in the present case, nor did the Court make a blanket statement that all Clay County public officials were corrupt or had turned a blind eye to others' corrupt activities.  However, by the time of Kenneth Day's sentencing hearing, substantial evidence had been presented of public corruption carried out by a number of individuals.

In short, these statements do not suggest any bias or prejudice toward the Defendants in this case or toward all Clay County public officials.  However, out of an abundance of caution, the undersigned referred a motion for recusal in a subsequent case to then-Chief Judge Hood for evaluation.  Judge Hood found these statements wholly insufficient to support a motion to disqualify.  *See United States v. Roberts and Hacker*, 6: 06-CR-82-DCR (E.D. Ky. Oct. 26, 2006).

> B.  Statements Made During The Hearing Regarding Pre-trial Detention of Defendant Jones

During the Jones hearing, the Court expressed concern regarding the failure of Defendants in this and in related cases to abide by court orders.  The Court found that Jones had violated the conditions of release *within days* of the indictment being returned and of his appearance before the United States Magistrate Judge.  However, the Court was clear to state that Jones' behavior would not be considered as a general inclination to violate by other defendants in the case (*i.e.,* there should be no "spill-over"):

-32-

> [I]t appears to [the Court] that perhaps one or more defendants in this case don't get it, they don't understand that if they're subject of an order from the Court that they're expected to comply completely with an order from this Court, not to try to dance around it or be cute or to make threats to anyone, directly or indirectly. And I am concerned that perhaps that's occurred here and that if the Court doesn't take action it's going to occur again, because, as I said, it appears to me that perhaps one or more defendants in this case just don't get it.  They don't get and they don't understand that these are very serious charges that they're facing, and they can face more serious charges if they engage in . . . these kind of shenanigans that are charged here.
> . . . .
>
> My concern is, and it's a concern that this Court has had in many cases that have originated from Clay County, the defendants coming from Clay County don't seem to understand that once they're under bond conditions of this Court that those are pretty serious conditions.

[Record No. 397, pp. 43-44]

While counsel for Defendants may *now* object to the Court's statements, the concern outlined with bond violations in this and in other cases is *amply* supported by the record.  In fact, the Court's concern was *acknowledged* by Defendant Jones' counsel, T. Scott White, as legitimate.  [Record No. 397, pp. 44-45]  Finally, the Court made a point of emphasizing later in the hearing that the reason for the earlier statements was to ensure that "there's no doubt about what's expected" and to make clear that continued violations of bond conditions would not be tolerated.  [Record No. 397, pp. 54-55]

In summary, the statements are an accurate reflection of the Court's observations and experience in this and in related proceedings.  They further outline the Court's expectations with regard future compliance with bond conditions specifically applicable to Defendant Jones.  It bears repeating that Jones was appearing before the Court as a result of bond violations involving an expected trial witness (*i.e.,* conduct similar to that involving other Defendants in related

-33-

cases).  While the Court did not order Jones incarcerated for his conduct, the warning that given

was – and is – entirely appropriate under the circumstances and his attorney acknowledged that

fact at the time it was given.  Jones' attorney's recent "change of heart" would seem to reflect

more upon his motivation than the merits of his current position.

C.   The Footnote Contained In The Order Granting Home Detention to Defendant Maricle

Finally, Defendants grasp at a footnote in which the Court noted that Kenny Day "ha[d]

appeared before the undersigned on several occasions in connection with his case as well as a

witness in other proceedings" and that "[t]o date, the Court ha[d] found Day's testimony to be

credible."  [Record No. 215, pp. 3, n.1]  Contrary to Defendants' assertions, this was not an

expression of a strong favorable opinion regarding Mr. Day, but merely an observation based

on the Court's experience in the course of other judicial proceedings.  [Record No. 215, pp. 3,

n.1]

More importantly, the Court made this observation after noting that counsel for

Defendant Maricle had challenged Day's credibility.  [Record No. 215, pp. 3]  David Hoskins

raised the issue of Day's credibility, thus requiring that the issue be addressed by the Court in

connection with evaluating whether Maricle should be detained (as requested by the United

States) or released subject to stringent conditions of release (as requested by attorney Hoskins).

In any event, if Day is called as a witness during trial, his credibility, and the weight to be given

to his testimony, will ultimately be decided by the jury – not the Court.  *United States v. Seago*,

930 F.2d 482 (6th Cir. 1991).

In summary, and as a practical matter, if the Court were to accept the Defendants' arguments, neither District Judges not Magistrate Judges would be able to adequately and fully respond to attorney arguments, make required findings in bond hearings, sentencing hearings, or in other judicial proceedings.  However, it is abundantly clear that such an illogical result is not required.  *See EBI-Detroit, Inc. v. City of Detroit*, 279 F. App'x 340, 354 (6th Cir. 2008) (unpublished) (finding that recusal was unnecessary where alleged bias of judge was based on judge's knowledge of, and relationship with, the case solely through his extensive judicial role); *see also Liteky*, 510 U.S. at 550-51; *United States v. Partin*, 552 F.2d 621, 639 (5th Cir. 1977).

### III.    CONCLUSION

The Defendants' motions and corresponding arguments are not supported by the facts of the case, legal authority or logic.  The challenged remarks – taken in isolation or in combination – do not constitute grounds for disqualification or recusal under any objective standard.  Instead, the Defendants' motions appear to be an ill-founded attempt at judge shopping by Defendants Maricle, Thompson, Jones and their attorneys.  Likewise, the Defendants' request that this matter be referred to the Chief Judge of the District for consideration is without merit and would constitute a further waste of judicial resources.  Accordingly, it is hereby

**ORDERED** that Defendants' Motions to Disqualify [Record Nos. 375, 381] are **DENIED**.

This 27th day of August, 2009.



Signed By:

*Danny C. Reeves*  DCR

**United States District Judge**