United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) London, Kentucky |
| RUSSELL CLETUS MARICLE | ) September 2, 2009 |
| DOUGLAS C. ADAMS | ) 10:35 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM R. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) |
| STANLEY BOWLING | ) |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE DANNY C. REEVES

Appearances of Counsel:

On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                   JASON D. PARMAN, ESQ.

On behalf of the Defendant         DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:            MARTIN S. PINALES, ESQ.

On behalf of the Defendant         R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                  BENNETT E. BAYER, ESQ.

On behalf of the Defendant         T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant         ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant         RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:

On behalf of the Defendant         JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant         ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant         DANIEL A. SIMONS, ESQ.
Stanley Bowling:

Court Reporter:                    CYNTHIA A. OAKES, CRR

```
 1   Appearances of Counsel:

 2

 3   On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                        JASON D. PARMAN, ESQ.
 4                                      Assistant U.S. Attorney
                                        601 Meyers Baker Road
 5                                      Suite 200
                                        London, Kentucky  40741
 6
     On behalf of the Defendant         DAVID S. HOSKINS, ESQ.
 7   Russell Cletus Miracle:            107 East First Street
                                        Corbin, Kentucky  40701
 8
                                        MARTIN S. PINALES, ESQ.
 9                                      150 E. Fourth Street
                                        Cincinnati, Ohio 45202
10
     On behalf of the Defendant         R. KENT WESTBERRY, ESQ.
11   Douglas C. Adams:                  220 West Main Street
                                        Suite 1900
12                                      Louisville, Kentucky  40202

13                                      BENNETT E. BAYER, ESQ.
                                        106 West Vine Street
14                                      Suite 800
                                        Lexington, Kentucky  40507
15
     On behalf of the Defendant         T. SCOTT WHITE, ESQ.
16   Charles Wayne Jones:               133 West Short Street
                                        Lexington, Kentucky  40507
17
     On behalf of the Defendant         ROBERT L. ABELL, ESQ.
18   William R. Stivers:                271 West Short Street
                                        Lexington, Kentucky  40507
19
     On behalf of the Defendant         RUSSELL JAMES BALDANI, ESQ.
20   Freddy W. Thompson:                300 West Short Street
                                        Lexington, Kentucky  40507
21
     On behalf of the Defendant         JERRY W. GILBERT, ESQ.
22   William B. Morris:                 212 North Second Street
                                        Richmond, Kentucky  40475
23
     On behalf of the Defendant         ELIZABETH SNOW HUGHES, ESQ.
24   Debra L. Morris:                   201 West Short Street
                                        Lexington, Kentucky  40507
25
```

3

```
 1   On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
     Stanley Bowling:                  116 West Main Street
 2                                      Suite 2A
                                        Richmond, Kentucky  40476
 3
     Court Reporter:                   CYNTHIA A. OAKES, CRR
 4                                      Official Court Reporter
                                        United States District Court
 5                                      560 Athens Boonesboro Road
                                        Winchester, Kentucky  40391
 6                                      (859) 983-4346

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

1          THE COURT:  Thank you.  Good morning, everyone.

2          Madam Clerk, if you could call the matter scheduled

3   for 10:30, please.

4          THE CLERK:  Yes, Your Honor.  London Criminal

5   No. 09-16-S, United States of America v. Russell Cletus

6   Maricle, Douglas C. Adams, Charles Wayne Jones, William E.

7   Stivers, Freddy W. Thompson, William B. Morris, Debra L.

8   Morris, and Stanley Bowling.

9          THE COURT:  Thank you.

10          If counsel could state their appearance, and,

11   Mr. Smith, we'll start with you.

12          MR. SMITH:  Good morning, Your Honor, I'm Stephen

13   Smith, and Jason Parman and myself are representing the United

14   States this morning.

15          THE COURT:  All right.  Thank you.  Good morning.

16          MR. HOSKINS:  David Hoskins for the defendant,

17   Russell Cletus Miracle, along with Martin Pinales.

18          THE COURT:  All right.  Thank you.

19          MR. WESTBERRY:  Good morning, Judge, Kent Westberry

20   for Douglas Adams, and Mr. Adams is present in the courtroom

21   this morning.

22          THE COURT:  All right.  Thank you.

23          MR. BAYER:  Bennett Bayer, also for Mr. Adams.

24          THE COURT:  Thank you.

25          MR. WHITE:  Good morning, Your Honor, Scott White on

1   behalf of Charles Wayne Jones, who's in the courtroom, along

2   with my colleague, Taylor Hamilton, Your Honor.

3           THE COURT:  All right.  Thank you.

4           MR. ABELL:  Judge, Robert Abell on behalf of William

5   Stivers.  Mr. Stivers is over here to my right.

6           THE COURT:  All right.  Thank you.

7           MR. BALDANI:  May it please the Court, Russ Baldani

8   on behalf of Freddy Thompson, Your Honor.

9           THE COURT:  Thank you, and Mr. Thompson is also here.

10          MR. BALDANI:  He's here.

11          THE COURT:  Thank you.

12          MR. GILBERT:  If Your Honor please, Jerry Gilbert on

13  behalf of William B. Morris, who is seated to my left.

14          THE COURT:  All right.  Thank you.

15          MS. HUGHES:  Elizabeth Hughes on behalf of Debra

16  Morris, who's seated behind me.

17          MR. SIMONS:  Dan Simons, Your Honor, for Stanley

18  Bowling.  Mr. Bowling is right behind me.

19          THE COURT:  All right.  Thank you.

20          Thank you, Counsel.  This matter was originally

21  scheduled for a preliminary pretrial conference today with the

22  trial date being scheduled at the end of the month.  I have

23  since granted a motion to continue the trial date, and I

24  rescheduled that for December, and I want to hear from counsel

25  on that in just a moment, but there are some preliminary

1    matters that we'll need to take up as well.  One involves

2    resolving issues dealing with transcripts and audio recordings.

3    I believe that was the motion of the United States, and then I

4    believe one of the defendants had also filed a motion relating

5    to the authenticity of transcripts or audiotapes that are going

6    to be introduced during the trial.

7           I also put the parties on notice of a venue issue

8    that I raised under Rule 18, and I do want to hear the parties'

9    positions with respect to the location of trial.  We also need

10   to discuss a pretrial conference date.

11          And before we get to all those motions, we've had a

12   problem in this case with attorneys not filing matters

13   correctly electronically, and what I have instructed the Clerk

14   to do is if -- the next motion that's incorrectly filed, she's

15   directed to strike that pleading, strike it from the record.

16   You will need to file a motion at that point to file whatever

17   it is that you're attempting to file that you filed

18   incorrectly.  You will also be required to attend CM/ECF

19   training classes scheduled for Lexington on September 29th.  So

20   clear your schedules for that date if you decide that you're

21   not going to file things correctly from this point going

22   forward.  I know that there's been a problem with several

23   attorneys in the case not filing matters correctly.  So

24   consider this to be your warning, your first warning, that the

25   result will be -- Madam Clerk, you're to strike any incorrectly

1   filed pleadings, you're to notify me immediately, and you're to

2   notify me of the offending attorney, and then I will enter an

3   order requiring that attorney or attorneys.  If there's more

4   than one in the case, if you have co-counsel for a particular

5   defendant and you file something incorrectly, then your

6   co-counsel is going to have to go to training as well.  So make

7   sure that you file those matters correctly.

8           Madam Clerk, you're to notify me immediately if that

9   were to happen.

10          THE CLERK:  Yes, Your Honor.

11          THE COURT:  With respect to the motion that the

12  United States has filed on the transcript and audio recording

13  issue, Mr. Smith, I understood that the audiotapes and the

14  transcripts that were in issue were the ones that were attached

15  to your motion.  Is that correct, or are there additional

16  matters that will need to be taken up?

17          MR. SMITH:  Your Honor, we have attached a schedule

18  which lays out the recordings that have been produced in

19  discovery.  We have indicated in that schedule those which

20  transcripts have been prepared, and that was attached to our

21  motion Docket Entry 377.

22          THE COURT:  All right.  So we've narrowed the issue

23  down to those particular transcripts.

24          MR. SMITH:  Yes, Your Honor.

25          THE COURT:  How long are the audiotapes that

1    correspond with those in terms of scheduling a hearing to

2    listen to those and to decide any issues of accuracy of the

3    transcripts?

4            MR. SMITH:  Your Honor, there's going to be

5    exceptions to this, but generally these tapes vary between an

6    hour-and-a-half to two hours on average per tape.

7            THE COURT:  All right.  So I may need to set aside a

8    week to do this if everything is objected to; is that fair?

9            MR. SMITH:  Well, I think that as we have proposed in

10   our motion, Your Honor, I would hope that there would be some

11   agreement as to some of the transcripts and that we would not

12   have a have a hearing.  If we isolate those disputed portions,

13   I believe that we can narrow the time in which the Court would

14   have to be involved.

15           THE COURT:  You might be more optimistic than I am at

16   this point, Mr. Smith.  In a worst case scenario, if I need to

17   listen to all these tapes and make decisions as to the

18   transcripts and if I set aside a week to do that, would that be

19   sufficient to listen to all of these recordings?

20           MR. SMITH:  It would, Your Honor, yes.

21           THE COURT:  All right.  In terms of a schedule, I do

22   want to hear from the defendant in terms of when they would be

23   able to respond to the United States in terms of the

24   transcripts that are disputed.  I know that there are a lot of

25   transcripts and we need to look at those and listen to those

1  audio recordings that correspond to the transcripts.  But if I

2  were to require the defendants to respond to the government in

3  terms of the ones that they object to within two weeks, is that

4  sufficient time?

5           MR. HOSKINS:  Your Honor, I would ask for 30 days,

6  and I think —— I like the government's proposed mechanism for

7  addressing this; and based on my work with the government in

8  the past, Mr. Smith in particular, I think that we can probably

9  reduce the amount of time the Court would have to spend on this

10  if we have enough time to generate our own transcripts ahead of

11  time and confer with the government.  So I would ask for 30

12  days.

13           THE COURT:  Thirty days to listen to all these

14  transcripts, make a decision as to the ones that are

15  objectionable, and also meet with the government in an attempt

16  to resolve those issues?

17           MR. HOSKINS:  Yes, Your Honor.

18           THE COURT:  At that point, after 30 days, you can

19  notify me as to the number of audiotapes that are in issue, and

20  I would anticipate scheduling a hearing about 15 days after

21  that to make that —— to make those decisions.

22           Is there anyone that would have a problem with that

23  type of a schedule, 30 days, and then approximately 15 days

24  later for a hearing?  No issue?  Anyone?

25           (No audible response.)

1          THE COURT:  All right.  If there's no objection, I

2     assume that that would be agreeable.  I'll prepare an

3     appropriate order following the hearing, but it will

4     essentially provide that the parties are to attempt to resolve

5     the issue within 30 days.  Mr. Bayer, did you have —

6          MR. BAYER:  Yes, sir, I just wanted to check on one

7     thing, because we had talked about that and we feel very

8     comfortable about that, as to whether or not there will be any

9     other transcripts coming, because that is the only issue that

10    concerns me at this point in time.

11         THE COURT:  All right.  Mr. smith, I don't know if

12    you're able to respond to that at this point.

13         MR. SMITH:  Your Honor, we have, at this point, given

14    our very best effort to transcribe those which we've had the

15    opportunity to do.  These are very time consuming, and I do not

16    expect, at this point, based on the position that we are again

17    preparing for trial on September the 28th, and this is what

18    we've prepared.  So I don't see today —

19         THE COURT:  All right.

20         MR. SMITH:  — a reason to ask the Court for

21    additional time to introduce other transcripts.  I certainly

22    would bring it to the Court's attention immediately if I learn

23    of such a tape, but today I do not know of it.

24         THE COURT:  All right.  Well, what I'll do is I'll

25    limit your — the issues with respect to these tapes to this

1  30-day period, and if there are other tapes that are

2  transcribed, we'll have to take that up separately, but you'll

3  only be required to respond to the tapes that have been

4  identified by the government.

5        MR. BAYER:  That was what I was hoping for.  Thank

6  you.

7        THE COURT:  I will pick a date, I will tell you it

8  will be about 15 days, and I want to see what's in dispute

9  before I set that final date for the hearing.  I don't know how

10 many days it's going to take.  If there's not many, we can do

11 it in one day, but if I need to set aside a block of time, I

12 may need to move some other things around in order to do that.

13 But approximately 15 days after your agreement or attempted

14 agreement, which will be 30 days from today's date, I'll set a

15 hearing about 15 days thereafter to resolve any issues as to

16 transcripts.

17       And at least one of the defendants I know objected to

18 issues of authenticity of the tapes, and, of course, I'll take

19 that up at the same time, the authenticity of any tapes.  And

20 the objection we can take up to the admissibility for those

21 reasons at that hearing, so we'll need to take that up as well.

22       Venue, let's talk about venue just for a moment.  I

23 know that a number of attorneys are not located in this area,

24 others are located, of course, in this area.  That may be a

25 wash in terms of attorneys' convenience, but, of course, that's

1    not one of the factors for the Court to consider.  The Court

2    does need to consider the needs of the defendants as well as

3    potential witnesses in the case and other issues that are

4    addressed in Rule 18, and that would include the amount of

5    pretrial publicity in this matter.  And I do understand that

6    there has been a lot of publicity in some of the local papers

7    here.  There's been a little bit less publicity in the regional

8    papers, which would include the Lexington and the Louisville

9    newspapers.  But I do want to get your — all of your opinions,

10   the defendants' opinions, first as to possible transfer for

11   venue reasons.

12            Mr. Hoskins or Mr. Pinales.

13            MR. HOSKINS:  Thank you, Your Honor.  We would object

14   to the trial being moved anywhere out of London.  And in

15   addition to the grounds cited in the Defendant Jones'

16   objection, I would submit that there may be, to the extent that

17   there are victims in this case, they would be the citizens of

18   Clay County, who would have a much easier time for those people

19   who want to be here to watch this trial.

20            One other point.  If we — you know, we are going to

21   produce our own witnesses, it's going to be more and more

22   expensive the further away the trial is from where these people

23   reside because we have to pay their expenses to be there.

24            THE COURT:  Uh-huh.

25            MR. HOSKINS:  Also for a trial that's going to be

 1   really lengthy, there's going to be a lot of people who want to

 2   be there, and it's going to be quite expensive for the

 3   defendant and his family to essentially live on the road for as

 4   long as this trial would take.

 5          THE COURT:  All right.  So your objection is

 6   primarily for the convenience of the defendants, the potential

 7   witnesses, family members, and I guess victims, which is kind

 8   of the loose sense of the term?

 9          MR. HOSKINS:  Yes, Your Honor.

10          THE COURT:  All right.  Let me — Well, I'll wait on

11   this other issue.

12          Mr. Westberry.

13          MR. WESTBERRY:  Thank you, Judge.  We would agree

14   with what Mr. Hoskins said.  I haven't had an opportunity to

15   read closely what the Defendant Jones filed, Judge, but I

16   believe he cited, in addition to Rule 18, the *Foley v. Parker*

17   case, a fairly recent case out of the Sixth Circuit, 488 F.3d

18   at 377, and that case seems to talk about presumed prejudice

19   versus actual prejudice.  At least it's been my experience,

20   Judge, that when you have a case with some publicity, if you're

21   able to demonstrate to the Court that it's presumed prejudice,

22   it may be those kind of situations where someone's done

23   something like a community attitude survey or something similar

24   to that.  To my knowledge, nothing like that has taken place.

25   I think we would have heard about it if it had.  Actual

1    prejudice, of course, seems to occur, Judge Reeves, when we're

2    picking the jury, enough of them raise their hands and indicate

3    that they've heard enough about this case that their opinions

4    would be impacted.

5            For the same reasons that the Defendant Maricle

6    indicated, our client lives in Clay County, it would be a real

7    economic hardship, I think, for he to fund a defense where we

8    had to go much further away.  Pikeville may be the closest in

9    terms of having the least economic impact, but I think we would

10   echo what Defendant Maricle said and request that you assign

11   this case -- leave it to stay here in the London Division.

12           THE COURT:  Well, Pikeville is a beautiful place in

13   the wintertime, there's no doubt about that.

14           MR. WESTBERRY:  Judge Van Tatenhove and I spent a

15   month there not long ago, and I won't say anymore.

16           THE COURT:  All right.  All right.  Thank you.

17           Let's see, Mr. White.

18           MR. WHITE:  Yes, Your Honor.  I've already filed, as

19   you know, our reasons.  The only thing I would add is I do

20   think, just to emphasize the interest of justice, when you look

21   at it globally, I think are met by having the case tried here,

22   because everything related to the case obviously occurred here.

23   So I think the people that live here have that kind of an

24   interest.

25           The only other thing that I would add just

1  anecdotally, and I was reluctant to put it in my response, just

2  anecdotally, I have had a lot of non-lawyers in Fayette County

3  and Frankfort mention this case to me, which tells me it has

4  affected the Fayette County area more than I would have

5  expected.  And so I just wanted to share that with you

6  anecdotally.

7           THE COURT:  Well, in terms of anecdotal information,

8  I think you'll find perhaps attorneys follow these cases a

9  little more closely than the public does.  I recently tried a

10 case that had a lot of publicity.  At least I thought it was

11 going to have — there would be a lot of jurors that would have

12 read about the case, and I transferred the trial to Frankfort.

13 And in picking the jury it wasn't a problem, because while

14 people had remembered seeing a headline, but they didn't

15 remember anything about the case.  They were more concerned

16 with the child that had been kidnapped down in Florida, that

17 was really the only case at the time that they were following.

18 So sometimes I think we may assume that perhaps jurors read

19 stories in the regional papers more closely than they do, but,

20 again, that's anecdotal, that's not based on any studies.  But

21 that is a point that the Court will certainly consider.

22           MR. WHITE:  Thank you, Your Honor.  That's all I

23 have.

24           THE COURT:  Thank you.

25           Mr. Abell.

1          MR. ABELL:  Judge, I join in the comments the other

2     counsel have already made and point out Mr. Stivers has

3     appointed counsel, has been found indigent, and rightly so, and

4     the financial burden's on him of effectively residing in

5     another town while this case is tried, perhaps if not

6     insurmountable are close to impossible, and for that reason and

7     the others stated, I think the case should be tried here.

8          THE COURT:  All right.  Thank you.

9          Mr. Baldani, I assume that -- and if you join for the

10     same reasons that have been stated, you can let me know that,

11     but if you have additional reasons, I certainly --

12          MR. BALDANI:  I do join for the same reasons stated.

13     I do have an additional reason, Your Honor.

14          THE COURT:  All right.

15          MR. BALDANI:  I believe that the Rule 18 factors

16     really weigh in favor of trying the case here, with the only

17     question being the interest of justice or the publicity that

18     you're rightfully concerned about.  But it occurs to me, Your

19     Honor, after looking at the publicity in the local papers, if

20     there's prejudice to anybody, it would be to the defendants.

21          THE COURT:  Exactly, and that's my concern.

22          MR. BALDANI:  Right.  And we appreciate that, Your

23     Honor.  But after discussing the issue with my client, who also

24     appreciates your concern, we think that can be dealt with in

25     jury selection and the prejudice that has been evidenced in --

1    or that could come from the publicity, in our opinion, the

2    convenience to Mr. Thompson, to his family, to those

3    interested, to the witnesses, outweighs that.

4              THE COURT:  All right.

5              MR. BALDANI:  Thank you, Your Honor.

6              THE COURT:  All right.  Thank you.

7              Mr. Gilbert.

8              MR. GILBERT:  On behalf of Mr. Morris, Your Honor, we

9    would join in the request to keep it in London for the reasons

10   previously stated.

11             THE COURT:  All right.  Thank you.

12             MS. HUGHES:  Hello, Your Honor.

13             THE COURT:  Ms. Hughes.

14             MS. HUGHES:  On behalf of Ms. Morris, I'll just echo

15   the same.

16             THE COURT:  All right.

17             MS. HUGHES:  We prefer to try it here.

18             THE COURT:  All right.  Thank you.

19             MR. SIMONS:  Your Honor, when you go last, there's

20   very little to say.  I don't have anything to add.  I would

21   concur with the general opinions of counsel.

22             THE COURT:  All right.  Thank you.

23             Mr. Smith or Mr. Parman, what is the position of the

24   United States, if you have a position on this?

25             MR. SMITH:  Your Honor, in preparing for a response

1    today, I have asked that we look at some of the issues that I

2    think that the Court has to look at here under Rule 18.  Of

3    course, I apologize to the Court, I had not received

4    Mr. White's objections, so I'm somewhat short in being able to

5    respond to his —— and it's certainly not blaming Mr. White.  I

6    have found that there were a lot of filings that came in.  I

7    was out of my office yesterday.  But I do believe that it is

8    well settled that this is a matter within this Court's

9    discretion.  This is not an issue of venue but a place of

10   trial, and I think the local rules set forth clearly what the

11   factors are.

12            And as the Court mentioned, pretrial publicity has

13   several things to consider.  Not only the defendants' interest

14   but the interest of the government and also the time in which

15   we would have —— whether we could, you know, efficiently seat a

16   jury in this particular area.  So I looked at some things in

17   preparation for that.

18            First of all, I would like to tender to the Court ——

19   we looked up on the local and regional papers and found here in

20   Exhibit 1, which I would like to tender to the Court and a copy

21   to be shared among defense attorneys, I believe that in our

22   sampling on pretrial publicity, Your Honor, I believe that we

23   numbered 51 articles to date that relate to this indictment

24   alone.

25            THE COURT:  Are these from local papers, or would

1   this include regional papers as well?

2          MR. SMITH:  This includes regional papers as well.  I

3   believe that as we looked at those, there were nine in the

4   Lexington Herald-Leader and two out of the Courier Journal

5   which I noted.  Richmond Register, I believe, had one,

6   Manchester papers had 29, Corbin papers, London papers, those

7   distributed in our local area and region.  Again, it indicates

8   that there has been a lot of publicity.

9          I think that as the Court looks at this issue,

10  however, when we're going into voir dire, we have to also

11  consider not only the parties to which this publicity has

12  involved but also the witnesses.  As the Court is well aware in

13  this case, itemized I believe already in the search warrant

14  affidavit, there were a listing of witnesses that include

15  Jennings White, a former county clerk of the Clay County, Todd

16  Roberts, a former assistant police chief, Daugh White, a former

17  mayor of Manchester, Vernon Hacker, a former city councilman in

18  Manchester, Clinton Johnson, a former magistrate in Clay

19  County, Darnell Hipsher, a former city councilman in

20  Manchester, Charles Weaver, a former fire chief and emergency

21  director in Manchester and Clay County.  And in that particular

22  case, of course, it's already been noted by the parties and in

23  this litigation that in the Roberts/Hacker ruling of Judge

24  Hood, I believe he noted there were 41 or 40 articles at the

25  time of his hearing regarding, again, the parties, including

1  WYMT news stories, which we were not able to do an official

2  sampling of that in preparation for this hearing, but according

3  to my agents, there have been a multitude of stories that have

4  been carried by WYMT here in the area.

5          And so I believe that in addition, Your Honor, as we

6  look at the time and efficiency which is imposed upon the

7  Court, the complicated case in which we've got to litigate, the

8  number of parties, we've also got to look at the time and the

9  resources that are going to be involved in getting through the

10 pretrial publicity in this case.  And I would submit to the

11 Court that it includes not only the publicity to this

12 particular indictment but to the prior indictments in the case.

13 I believe that if numbered, there's over 60 defendants that

14 have been prosecuted in this overall FBI investigation in this

15 particular area.  So we have a lot of issues here locally to

16 deal with that would not necessarily be an issue, I believe, in

17 a location such as Lexington, for instance.  It's, I think,

18 worth noting that it's been suggested by someone that Pikeville

19 might be a place, but that's — according to my experience,

20 it's about a two-and-a-half-hour drive from here, whereas folks

21 in the London area could get to Lexington.  And most of them

22 make trips there for doctors' appointments and things and

23 that's a very familiar area.

24          THE COURT:  For practical purposes, if I were to

25 select another location for trial, I don't believe I could

1   reserve a courtroom in Lexington for the length that this case

2   would take.  So really we're looking practically speaking at

3   another location other than Lexington; perhaps Frankfort,

4   perhaps Covington, but as we could go further, that would

5   increase the costs and that would cause the Court to think that

6   perhaps that might not the best route to take, Covington.  So

7   realistically, if the Court were to transfer the case and if

8   there were not other reasons, Frankfort would be the obvious

9   location, because I can control that courthouse obviously.

10          MR. SMITH:  Your Honor, I believe that that would be

11  a nominal issue if we're talking about Lexington as opposed to

12  Frankfort.  In my experience, that's not necessarily much

13  difference as far as location's concerned.  I think that's

14  maybe 30 minutes from Lexington.  And obviously, these issues

15  that we're looking at as far as the pretrial publicity,

16  basically, as the government sees it, Your Honor, we have a

17  situation where folks in the Frankfort area or Lexington area

18  who pick up the paper and read about the Clay County officials

19  being indicted, that's "here today, gone tomorrow" kind of

20  news, whereas folks that live here in this region, we're an

21  adjoining county, Clay County has been the lead story in many

22  of these articles that we have exhibited here to the Court, and

23  the impact is going to be much longer lasting and it's going to

24  have, I believe, a bigger impact upon that particular juror and

25  create, again, a more serious issue for us in selecting a fair

22

1   and impartial jury.

2           In addition, Your Honor, I think that it's worth

3   noting some of the other issues that we're going to have to

4   navigate through as we deal with the jury selection in the

5   case.  We had asked the Administrative Office of the Courts to

6   provide us a listing of the number of counties in which Judge

7   Maricle has been seated as a judge or served as a judge.  And I

8   would like to hand to the Court Exhibit 2, and it -- of course,

9   our Local Rule 18 establishes the London jury pool as set forth

10  in my copy to be Bell, Clay, Harlan, Jackson, Knox, Laurel,

11  Leslie, McCreary, Owsley, Perry, Pulaski, Rockcastle, Wayne,

12  and Whitley.  Again, from the records of the Administrative

13  Office of the Courts here in Kentucky, they were able to again

14  look back over the region which includes these counties that

15  the London pool is going to be drawn from, and according to our

16  tabulations, 496 cases have been handled by Judge Maricle in

17  counties including Bell, Clay, Harlan, Jackson, Knox, Laurel,

18  Leslie, McCreary, Pulaski, Rockcastle, Wayne, and Whitley.  So

19  as we again navigate through, again, trying to seek a fair and

20  impartial jury, we've got potentially 496 cases involving an

21  unknown number of defendants, unknown number of witnesses,

22  again a situation which is going to create obstacles for us in

23  obtaining what we believe to be a fair and impartial jury, one

24  that would -- again, it's a possibility and in your voir dire

25  and individually with these jurors, Judge Maricle is going to

23

1   want to know what side of the litigation they were on, how the

2   rulings came out, who were the witnesses, and all these issues

3   are going to have to be ferreted out as we try to seat a jury

4   here.  And, again, this is -- these are a statistical sampling

5   that came from the Administrative Office of the Courts as to

6   Judge Maricle.

7           And then, obviously, we have candidates here in

8   public office, which, again, I hand the Court Government's

9   Exhibit No. 3.  And we have also asked from the Kentucky

10  Registry of Elections to provide us a sampling of -- or

11  actually a measurement of the vote totals that Judge Maricle

12  has garnered as a long-time circuit judge in the area of Clay,

13  Leslie, and Jackson counties.  And I think that what, again,

14  was produced from that is some numbers which I think again

15  create for us some issues.  In 2006, the Kentucky Registry of

16  Elections noted that he garnered 8,849 votes in Clay, Leslie,

17  and Jackson counties.  I believe also it shows that in those

18  three counties there were a little over 30,000 registered

19  voters.  So approximately a third of the registered voters in

20  those three counties found it -- again, that they should vote

21  and support and show their support for Judge Maricle at the

22  voting poll in this way.  And, again, that's another issue

23  which I think the Court and the parties again will have to

24  address as we go through trying to seat a fair and impartial

25  jury.  And that's not to mention the local influence of Freddy

1    Thompson, who has succeeded himself as county clerk in Clay
2    County, and Stanley Bowling as the magistrate there, likewise,
3    have a lot of influence and constituents that are going to have
4    to be, again, identified in the selection process.

5         Also, the various business interests that have been
6    identified already.  Judy Maricle, Cletus Maricle's spouse, has
7    been — testified here in this court before the magistrate
8    about her realty business and her many contacts throughout the
9    region, including clients in London, out of state, meeting and
10   showing properties in the region.  Those are other areas that
11   we're going to have to look at.  Judge Maricle, of course,
12   having ownership of property in various counties, rental
13   properties and business interests, including a relationship
14   with a marina in Pulaski County, thousands of dollars he's
15   paying there for storage of a houseboat; again, just issues
16   that are relating to those kind of matters.

17        And then we have other defendants like Doug Adams,
18   who has just recently retired as the Superintendent of the
19   Schools in Clay County.  Checking the records in Clay County, I
20   believe we could support that there's over 900 employees that
21   are employed by the Clay County School Board, and that is a
22   large segment of the working populous in Clay County.  And it's
23   going to be one in which, again, it's households that are
24   represented here.  We're not talking about individuals, we're
25   talking about households, where wives and husbands and

1    children — and then, of course, again, the issues that are
2    going to have to be ferreted out in the seating of this jury,
3    we're all going to have to again look at those issues in terms
4    of this case, frankly, Your Honor, because there's this
5    overriding interest of justice issue, and the Court, I think,
6    is very familiar with the past of this case, but this case is
7    set as the Court adequately I think addressed it in this most
8    recent memorandum dealing with the disqualification issue.  And
9    I think that in that there were several things that were I
10   think worthy of highlighting here at this case, particularly
11   the past history noted among these past defendants.  Of course,
12   Jennings White I noted in the Court's order having his
13   involvement being brought out in prior hearings of propensities
14   to commit or hire others to commit violent acts, attempt to
15   influence jurors, and contact key witnesses.  Vernon Hacker,
16   again, brought out before this Court, a situation where, again,
17   he was found to be attempting to pay a witness to testify
18   falsely in front of a federal court here.

19           And then, of course, the highlights of the Mayor
20   White and his administration and Darnell Hipsher, their
21   admitted acts of — again, involving favors to pave driveways
22   in the area of Manchester and also Hipsher having been found
23   guilty of obstructing justice by testifying falsely to a
24   federal grand jury.

25           And then you take that background and you look at

1   what's happened in the current case, again, the magistrate

2   judge having found initially with Judge Maricle that he was

3   willing to corrupt a civil jury based on evidence in front of

4   him, he was willing to suborn perjury in a criminal trial

5   before him, and he was willing to influence testimony of a

6   federal grand jury witness, as indicated by this grand jury's

7   indictment, and also to participate in this long-term scheme as

8   a sitting judge.  These are all issues, again, which have been

9   noted.  And historically, of course, it was laid out in Agent

10  Briggs' affidavit for search warrant that Judge Maricle

11  actually had a list of the federal grand jury witnesses that

12  were testifying in this investigation and produced that to the

13  sources during the investigation in 2007.

14          So these are, again, issues that's have been played

15  out in this case setting.  And not to mention Defendant Jones.

16  Of course, again, the Court noted his conduct in this case;

17  again, reaching a point where actual communication was made and

18  actually led to threats to two key government witnesses in this

19  case.

20          So in I guess the background which we're faced with

21  this particular case, Your Honor, I believe the Court has wide

22  discretion according to case law as to where the place of the

23  trial is.  I think that these issues of pretrial publicity,

24  interest of justice outweigh this particular argument that it's

25  more convenient here for the parties.  I believe that the large

1   majority of the practicing attorneys here are in the Lexington
2   area or closer to the Lexington area than they are London.
3   Personally, again, it seems to me that those issues pale in
4   comparison to what the Court has to consider as to how much
5   time and resources it is going to take to seat a fair and
6   impartial jury in this matter and can it be done effectively
7   and efficiently, given the pretrial publicity, given the
8   notoriety of these defendants and their business and political
9   interests in the area, and I believe that that is a concern
10  that the Court has, the government shares it, the government
11  would urge the Court to move the place of trial to Frankfort.
12  I think we can avoid these issues, I think that, again, the
13  matter of convenience, we're dealing with a number of witnesses
14  ourselves and it's a situation where traveling from Clay County
15  to London or Clay County to Frankfort, I believe that is not
16  significant enough to outweigh these other issues that the
17  Court is having to consider.
18          THE COURT:  Mr. Smith, as several of the attorneys
19  have pointed out for the defendants, we have a number of
20  defendants that have been found to be indigent and CJA counsel
21  has been appointed to represent them.  My understanding would
22  be that if the Court were to move the location of trial that
23  the government would be responsible for paying the lodging when
24  the trial would start of those individuals so they can be
25  present, reasonable meal and lodging expenses.  Is that your

1  understanding as well?

2          MR. SMITH:  I believe it is, Your Honor.  I believe

3  those are covered by, again, the CJA program.

4          THE COURT:  Well, I'm going to take this issue under

5  advisement.  I haven't made a final determination yet.  It

6  looks like we have a couple of folks that want to respond.

7  Before you get to your response, I haven't made a final

8  determination yet.  I obviously haven't looked at these

9  materials, but I was going to give the defendants a chance if

10 they wanted to file any articles or additional information to

11 do that before making a final determination.  But if you have

12 other comments —

13         Mr. Hoskins.

14         MR. HOSKINS:  Your Honor, I think there are some

15 things that Mr. Smith has argued that demand an immediate

16 response.  I am disappointed that the government has presented

17 evidence and brings this evidence back in here today about this

18 civil trial that we proved beyond any doubt Judge Maricle was

19 not the Judge in, the juror who was allegedly contacted was not

20 a juror in this case, and I think we refuted that.  I think to

21 make those arguments at this point is bringing back something

22 that has been disproved, and I don't think —

23         THE COURT:  Well, I don't know that that's the case,

24 but there's not a jury here so we don't need to necessarily

25 debate the issue.

29

1          MR. HOSKINS:  Judge, there's not a jury here, but

2    there are reporters here and there's going to be additional

3    publicity.

4          THE COURT:  All right.  Again, it's not an issue that

5    this Court has made any ruling on that would be binding on a

6    jury, these are just factors for the Court to take into

7    account.  I do understand that you disagree with that aspect of

8    his argument and I do want to give you a chance.  Additional --

9    if there's additional information for the Court to consider,

10   statistical additional information or other hard evidence,

11   other than anecdotal evidence, we can talk all day about that,

12   but our own experiences really don't get us very far.

13         MR. HOSKINS:  I agree, Your Honor.  And I would just

14   briefly say that the vast majority of all of Mr. Smith's

15   concerns would relate to potential jurors from Clay County.

16         THE COURT:  Well, I'm not sure that's the case based

17   upon this information which Mr. Maricle presided at the trials

18   in a number of locations, and so that is a little different, it

19   doesn't relate just to Clay County.

20         MR. HOSKINS:  Judge, I agree it doesn't relate just

21   to Clay County, but an analysis of those cases needs more than

22   just, okay, there were 77 cases in Harlan County.  Harlan

23   County is also a small county by Clay County.  That was a

24   period of time -- one thing I would suggest that the Court

25   could consider is calling an additional number of jurors and

1    also the possibility of a jury questionnaire to see if they've

2    ever been a party in a case where Judge Maricle was involved.

3    I agree it would be very difficult to find a resident of Clay

4    County who's not connected to the school board in some way.

5            THE COURT:  Well, that's always the case in small

6    counties.

7            MR. HOSKINS:  It is, Judge, and yet we can try cases

8    involving the Whitley County Board of Education in Whitley

9    County.  I tried a murder case involving the Pulaski County

10   Sheriff in Pulaski County.  Both of those cases we could seat a

11   jury, and I have no doubt that we can seat from the people in

12   this region and this jury division, we can find a fair jury

13   that will fairly decide this case.

14           THE COURT:  My plan is to give you two weeks.  If

15   there's anything else that you would like to file —— I know

16   what the issues are, obviously.  I know what the issues are

17   under the *Foley* case that was referenced, I know what the

18   issues are in *United States v. Lewis*, which really is the case

19   from this district that discusses location of trial, and I'm

20   obviously familiar with the Rule 18 factors.  But if there is

21   some meat to be put on the bones, such as newspaper articles,

22   things of that nature, if you would like to file anything, my

23   thought is to give you 15 days to do that.  Will that be

24   sufficient?

25           MR. HOSKINS:  Yes, sir.

31

1          THE COURT:  All right.

2          MR. WESTBERRY:  Very briefly.

3          THE COURT:  Yes, sir.

4          MR. WESTBERRY:  Judge, last year, Judge Reeves, in

5   Judge Van Tatenhove's court, for a couple of weeks, we tried a

6   somewhat similar case, and it involved Knott County, and I just

7   wanted to offer this anecdotally to Your Honor.  After we went

8   through the jury selection process, no one from Knott that had

9   been called as a prospective juror was actually picked for

10  reasons that aren't too terribly complicated.

11          THE COURT:  You're getting into troubled waters,

12  because I tried a Knott County case in Pikeville and I had a

13  person attempt to influence or intimidate a witness during the

14  course of the trial in that case.  It was the Donnie Newsome

15  case.  And so if you're going to talk about those cases, they

16  really cut both ways.

17          MR. WESTBERRY:  If we're really presuming prejudice

18  based on these newspaper articles, which I really, quite

19  frankly, haven't had an chance to digest just yet, I would dare

20  say many of them come from local papers.  Talking about the

21  regional papers, Judge Reeves, the Herald-Leader and, to a

22  lesser extent, the Courier Journal, but primarily the

23  Herald-Leader, if there's probably one division outside London

24  that would be the least affected by — we know what it is, it's

25  Covington.  It's an entirely different media market.  It

32

1  wouldn't be Frankfort, Judge.  We don't know — your chambers
2  are there, everybody picks up the Herald-Leader at a grocery
3  store, sometimes the Courier Journal, to a lesser extent
4  perhaps the daily Frankfort paper, but Covington is a media
5  market into itself, it's driven by the Cincinnati papers and
6  Cincinnati television stations.  So if we're presuming
7  prejudice, as I read that *Foley v. Parker* case, based on what
8  the government has submitted just this morning, I think — I
9  respectfully submit that Frankfort is trouble.  I say this with
10 the greatest respect.  That would be a troubled venue as well.
11 Perhaps even worse than perhaps London, Kentucky, but if you
12 give us two weeks, we can digest this material —

13          THE COURT:  All right.

14          MR. WESTBERRY:  — and see if can give you something.

15          THE COURT:  All right.  That's my plan.

16          MS. HUGHES:  I would like to just address one thing
17 that Mr. Smith said.  The Court made reference — I'm a
18 CJA-appointed attorney.  I don't think it is correct to assume
19 that the CJA budget pays for lodging for my client.  I think
20 what the Court is referring to, since the defendants are saying
21 let's stay here, that it would come out of — those are
22 different budgets.  And so when Mr. Smith says, oh, of course,
23 it comes out of the CJA budget, I don't think that's really
24 what the Court's asking him.  The Court's asking him, are you
25 willing for it to come out of the government's budget, not the

1    CJA.

2              THE COURT:  I'm going to get the answer to that

3    question —

4              MS. HUGHES:  Right.

5              THE COURT:  — before I make any decision, but it

6    occurs to me that when you have a person that's indigent, if

7    lodging is required and reasonable meal expenses, that the

8    government in some sense of the word is required to pick up

9    that expense.  But I'll get the answer to that.

10             MS. HUGHES:  I just don't think it's something that

11   we turn in expenses for.

12             THE COURT:  No, I understand that.  I know that your

13   budgets are limited and probably some of you have already

14   shot — probably shot through your cap, at least your statutory

15   cap in this case.

16             MS. HUGHES:  Some of us?  I believe we all have.

17             MR. WHITE:  I believe we have, Your Honor.

18             THE COURT:  So that's at least one person that's done

19   that.  But, again, I'll look at that issue.  But if you want to

20   file anything else in response to what Mr. Smith has filed, I

21   do plan to look at this.  Now, of course, I don't get local

22   newspapers and so some of the information that I have is what I

23   understand to be the case, but I will look through these

24   articles and if there's anything that you would like to submit,

25   of course, you can do that in two weeks and that will give me

1    sufficient time to make a determination.  If we need to have

2    any further hearings on this issue, I'll certainly schedule

3    those.

4            I will tell you that regardless of the location of

5    the trial, it would be my intent to do a questionnaire in this

6    case, but it would be closer in time to the actual trial date.

7            MR. WESTBERRY:  Yes, sir.

8            THE COURT:  I'm not sure that it will help some

9    people, but --

10           MR. HOSKINS:  One other point, Your Honor, related to

11   this is that I guess all the defense counsel needs a copy of

12   what the government has submitted here.

13           MR. BAYER:  If they can just pdf it and send it to

14   us, that would be fine.

15           THE COURT:  Well, I'm sure Mr. Smith can make those

16   available.

17           Mr. Smith, can you make copies of these articles

18   available?  They don't have to be color copies, but can you

19   make these available to counsel?

20           MR. SMITH:  I believe I have produced a copy --

21           THE COURT:  One set, but if you could produce

22   multiple copies, several copies --

23           MR. SMITH:  Sure.

24           THE COURT:  -- and I'm sure that you can share some

25   of those.

1          MR. WESTBERRY:  We'll copy this.

2          THE COURT:  If you don't get a copy, contact my

3    office, I'll have a copy made and sent to you, if you don't get

4    one within a few days.

5          MR. WHITE:  The only other thing I would add, and the

6    only reason I do it now is I don't think it's really worthy of

7    filing something to this extent.  I was involved in a case in

8    North Carolina in which it was a similar situation, and I don't

9    know if any judges have done this here, where you have a

10   multi-county jury pool where you can actually excise certain

11   counties in pulling from the pool, and that may be an option as

12   well, and I just wanted to throw that out for you to think

13   about.

14         THE COURT:  That may violate our orders, but I will

15   certainly look at that issue.  It may violate the Court's

16   standing order on jury selection.

17         MR. WHITE:  I just wanted — I didn't even think

18   about that until the drive down, so —

19         THE COURT:  All right.  Well, that's something to

20   take into account.  And, of course, if it becomes necessary, we

21   may take that issue up.

22         MR. WHITE:  And I won't file anything on that.

23         THE COURT:  All right.  All right.  Let's move on if

24   we could.  Let's move on to the next issue, and it relates to

25   the trial date.  I have scheduled this case — I granted one of

1    the defendant's motion to continue, I forget now which one it

2    was, but continued the trial to December 7th, and, lo and

3    behold, I got a couple of objections to the date that I

4    selected.

5              What is the position of the United States with

6    respect to the current trial date of December 7th?  And I will

7    tell you that if I entertain any arguments about continuing the

8    trial beyond that date, I'm not going to continue it beyond

9    perhaps mid January, that's it.  So that would be the limits of

10   what I would be considering.

11             Mr. Smith, what's the position of the government?

12   And keeping in mind, of course, that if the matter stays on

13   December 7th, we have a couple of holidays in there, and then

14   once we get into January, regardless of whether the case is

15   tried here or someplace else, we're going to run into some bad

16   weather during the month of January.

17             MR. SMITH:  Your Honor, we're comfortable with the

18   7th, obviously understanding that there will be interruptions.

19   I personally don't like holiday trials, but we've had several

20   with this Court and found them to be efficient, effective, and

21   not necessarily —

22             THE COURT:  I know jurors don't like to be here on

23   Christmas day, and I think perhaps this year it's a Saturday,

24   so perhaps that's not a problem.

25             MR. WESTBERRY:  It's a Friday, Judge.

37

1        THE COURT:  Is it Friday?

2        MR. WESTBERRY:  It's Friday.

3        THE COURT:  Well, they'll have to be here, then.

4   We'll let them off early that day.

5        MR. WHITE:  We'll have a carol sing-a-long.

6        THE COURT:  Mr. Smith, in terms of time, I know it's

7   hard to predict with the number of parties we have in this

8   case, but in terms of presentation of your case, without

9   considerations of cross-examination, how long would you

10  anticipate your offer of proof would be at this time?

11       MR. SMITH:  Your Honor, we have estimated four weeks

12  and now is — you know, we're certainly well beyond where we

13  were the last time in trial preparation.  I think that that's

14  probably very optimistic considering, you know, the number of

15  parties that we have and the issues relating to evidentiary

16  objections I'm sure we're going to find along the way.  But I

17  still hope that we can stay somewhat close to that, give or

18  take a week.

19       THE COURT:  All right.  So if I set aside seven weeks

20  for this case, that would include all the case, you think

21  that's realistic, or do you want to reserve a little more time

22  than that, eight weeks?

23       MR. SMITH:  Well, I've had some suggest to me four

24  months, Your Honor, but I certainly don't —— you know, in my

25  experience with this Court, I find that many of those kind of

1  estimates fall to the wayside after we get started.  After the

2  first week or two, things move on very efficiency, effectively,

3  and I'm still holding to, yes, that we can do that within seven

4  weeks.

5          THE COURT:  All right.  Now, I know that — let's

6  see, Mr. White has filed an objection to the current trial

7  date.  I know Mr. Hoskins filed an objection.  I want to talk

8  to you about your objection in just a moment.

9          Anyone else have any objection to the current trial

10 date?

11         MR. WHITE:  Your Honor, the only thing I wanted just

12 to make clear, since we're in person now, that is only my

13 personal —

14         THE COURT:  Oh, I know that.

15         MR. WHITE:  Yeah, that's why — I just wanted to

16 let — my client, I mean, if you feel like we need to go

17 forward on the 7th, we can —

18         THE COURT:  All right.

19         MR. WHITE:  — but it's just I wanted to at least let

20 you know that.

21         THE COURT:  All right.  Anyone else have an objection

22 to the 7th or if the Court were to continue this case for about

23 30 days, would you have an objection to that type of

24 continuance?  Mr. Abell, I know that —

25         MR. ABELL:  Judge, it would be very much my

1  preference if the Court would entertain again this trial in the

2  middle of January.

3          THE COURT:  So you would agree with —

4          MR. WESTBERRY:  We're fine either way.

5          THE COURT:  Any objection to the current date?

6          MR. BAYER:  One thing I would like to bring up, and I

7  might as well do it right now.  Over the next, I don't know,

8  two to six months, I will probably — depending on the

9  circumstances, I may be absent for a considerable amount of

10 time during the course of trial, and I would like the Court to

11 know that.  Circumstances of my mother —

12         THE COURT:  All right.  Enough said.

13         MR. BAYER:  And Mr. Westberry is also in a similar

14 circumstance, so either one of us — and I can't predict when

15 it's going to happen.

16         THE COURT:  Those are circumstances we really can't

17 control, but I'll certainly take that into consideration.

18         MR. WESTBERRY:  Thank you.

19         THE COURT:  You just need to let me know and keep me

20 up to date on that.

21         MR. WESTBERRY:  And it's both of us, Judge.  It's

22 just —

23         THE COURT:  All right.

24         MR. WESTBERRY:  These things happen.

25         MR. BAYER:  Thank you, Judge.

1          THE COURT:  Now, Mr. Hoskins.

2          MR. HOSKINS:  Yes, Your Honor.

3          THE COURT:  You have a conflict on December 7th with

4   a trial in front of Judge Van Tatenhove.  It's 08-96.  What was

5   the date that case was filed?

6          MR. HOSKINS:  I think I referenced that in my motion.

7          THE COURT:  August 27th of 2008.

8          MR. HOSKINS:  That could be right.

9          THE COURT:  How many motions to continue the trial

10  date have been filed in that case?

11         MR. HOSKINS:  You know, I don't know that any — I

12  don't know, Judge.

13         THE COURT:  Fourteen.  How many have you filed?

14         MR. HOSKINS:  I don't know.

15         THE COURT:  Seven.  You want the dates?

16         MR. HOSKINS:  I'm certain the Court is correct.

17         THE COURT:  I've looked at the — what in the world

18  is going on?  Why do you need — And here's my point:  Will

19  this case ever get tried or will there be a series of

20  continuances and argue using a continuance as a bootstrap in

21  this case?

22         MR. HOSKINS:  Your Honor, absolutely not.  I will

23  tell the Court that that case started out with two defendants

24  and I was representing one of the original defendants.  Each

25  time the trial date approached – and I don't fault the

1  government for this, but different things happened – medical

2  evidence was given to us at a very --

3          THE COURT:  You had a seminar that you wanted to

4  attend, you went out of the country, you wanted to do further

5  investigation.  It's stunning to me.

6          MR. HOSKINS:  Well, I apologize.

7          THE COURT:  Fourteen.  I mean, it's not my case,

8  obviously, but you're using it in this case as a request to

9  continue the trial of this matter because you have this other

10  case set in which there's been numerous continuances.  You

11  filed seven requests to continue the trial date, and that's not

12  even the other requests to extend deadlines.  That's just the

13  trial date.

14          MR. HOSKINS:  Judge, all I can say is that is a case

15  that's gotten more complicated, the government has added

16  defendants to the case.

17          THE COURT:  Well, it's an assault case, isn't it?

18  Assault inside a prison?

19          MR. HOSKINS:  Prison gang is the allegation.  So what

20  we have now are five defendants, none of whom are inclined to

21  testify or become cooperating witnesses in any way.  This trial

22  date was set during a teleconference in which

23  Judge Van Tatenhove expressed a firm position that the case

24  would be tried on that date.

25          THE COURT:  All right.  How many other cases do you

1  have that are like this where you ask for — and, I'm sorry, I

2  don't mean to digress too much, but 14 motions to continue a

3  trial and you filed seven of them.

4         MR. HOSKINS:  Judge, frankly, I'm surprised that

5  that's the total.  I hadn't kept a count of that, but I'm sure

6  the Court is correct, and I will assure the Court that it is

7  not my practice or my desire to delay things for any

8  unnecessary purpose.

9         THE COURT:  Well, last time we were here together, I

10  got after Mr. Pinales, your co-counsel, because his co-counsel

11  in another case, as it turns out, had filed numerous motions to

12  continue to delay the case and not where it should have been.

13  I got after him for that.  Maybe he's just bad at picking

14  co-counsel, he picks co-counsel that likes to file

15  continuances.  I don't know.  But here's my point.  All joking

16  aside, here's my point:  If the case is continued into January,

17  that's going to be a hard-and-fast date, and we're going to

18  start, and we're going to go, and if you have other problems,

19  you're going to have to get those worked out with somebody

20  other than me.

21         Now, I do understand other attorneys in the case, if

22  they have personal issues with — if it's an elderly parent or

23  whatever, there's not much we can do about that, but in terms

24  of schedules, I can control the schedule.  So you need to

25  understand that if the case is continued into January, that's

1  it.  And I don't even want to hear — maybe Mr. Pinales would

2  want to file the motion.

3          MR. PINALES:  No, Your Honor, not after last week.

4          THE COURT:  But my point is, Mr. Hoskins, you're a

5  good attorney and you have a good reputation with me and I

6  would hate for you to ruin that by motions to continue.

7          MR. HOSKINS:  It would certainly be my desire not to

8  do that.

9          THE COURT:  All right.  So we're on the same page

10 with that?

11         MR. HOSKINS:  Absolutely.

12         THE COURT:  All right.

13         If the Court were to select a date of — let's see,

14 Mr. White has suggested January 17th or thereafter.

15 January 17th is a Sunday.  I would probably be inclined to go

16 that following Monday, the 18th.

17         MR. WHITE:  As a Presbyterian, we have a little bit

18 of flexibility there, Your Honor.

19         THE COURT:  All right.  January 18th.  The Court will

20 sustain the motion to continue the current trial date of

21 December 7th to January 18th, Monday, at 10:00 for the jury to

22 be present, and I'm going to have counsel present at 9:00.  I

23 usually have a 30-minute meeting with attorneys before trial,

24 but I think in light of the number of parties we have, an hour

25 would be more appropriate.

1          MR. WESTBERRY:  You said seven weeks is what —

2          THE COURT:  I'm going to set aside on my calendar

3   seven weeks.

4          MR. WESTBERRY:  I'm starting March 1st with Judge

5   Simpson in the Western District, but he's pretty forgiving on

6   motions to continue.

7          THE COURT:  Well, he's a nicer fellow than I am.

8          MR. WESTBERRY:  No, I wouldn't say that.

9          THE COURT:  Well, he tells me that all the time.

10          MR. WESTBERRY:  So I'm more optimistic I can get a

11   continuance in Western Kentucky.

12          MR. SMITH:  Your Honor, if I may interject, the

13   government-issued calendar has red letters on January the 18th,

14   2010, and I assume that means it's a holiday.  But obviously

15   we'll be here whenever the Court wants us here.

16          MR. BAYER:  That's going to be the King holiday,

17   because it was the 19th this year, so my wife would be off work

18   and you will, too.

19          THE COURT:  Well, no.  No, no, no, we try cases on

20   holidays here.  It creates problems for the security officers,

21   but we've been known to do that.  We'll move it to the 19th,

22   that will be Tuesday we'll start instead of the holiday.

23          MS. HUGHES:  Your Honor, Mr. Abell asked this when we

24   had the last trial date in front of the magistrate judge, if

25   your order could reflect the expected length of trial, it would

1  be helpful for those of us who are asking –– answering similar

2  questions of other courts with respect to scheduling other

3  matters.

4          THE COURT:  I'm going to set aside seven weeks for

5  the trial.  I'm going to try to keep open that eighth week just

6  in case.  I think, you know, once we get started we'll move the

7  case along fairly rapidly.

8          MS. HUGHES:  I do know that, and I know that we'll do

9  it within that time period.  It's just that when other courts

10  are trying to set trials, they say, Ms. Hughes, are you sure

11  that on February 27th you're going to be in trial?  I don't

12  think so.  It would be helpful if we had that in the order.

13          THE COURT:  Yes, ma'am, that will be included in

14  the ––

15          MS. HUGHES:  Thank you.

16          THE COURT:  –– order.

17          Yes, sir.

18          MR. BALDANI:  On behalf of Mr. Thompson, as you noted

19  in your order continuing the trial, we were amongst the parties

20  that objected to the continuance, and, for the record and to be

21  consistent I just wanted to voice our continued objection to

22  the additional continuance at this point.

23          THE COURT:  I will note the objection, but I believe

24  that the time actually will be excludable under the Speedy

25  Trial Act.  In light of the issues that counsel have raised, I

1  believe that time is necessary for adequate preparation in the

2  case.  And while the issues may not be as complex perhaps as

3  other cases that we've had, the issues are more complex than

4  others.  In light of the number of parties that we have in the

5  case, I do believe that the time should be properly excluded.

6  So I will note the objection, of course, for the record, but I

7  will overrule it at this time.

8          MR. BALDANI:  Thank you, Your Honor.

9          THE COURT:  Now, with respect to a pretrial

10  conference date, if everyone could look at their calendars the

11  first week of January and tell me if anyone has a conflict on

12  either Monday, January 4th, or Tuesday, January 5th.

13          MR. PINALES:  Your Honor, with three counsel, I don't

14  think my concern —— if the Court would excuse me if I do have a

15  conflict that week.

16          THE COURT:  All right.  That will be fine, as long as

17  we have one attorney here representing the defendants.

18          MR. PINALES:  Certainly.

19          THE COURT:  Because I think everyone knows what I

20  tend to do at the final pretrial conference, hopefully

21  everything —— all the motions will be ruled on at that time,

22  but we go through things such as jury selection, the way I do

23  voir dire, and, of course, prior to that time, if there's going

24  to be a jury questionnaire, it would have already gone out so

25  the information would already be back hopefully by that date,

1    so we'll talk about some nuts of bolts, seating arrangement,

2    use of courtroom equipment, things of that nature.  But that's

3    typically what I would cover in the final pretrial conference.

4    And I'm sure — co-counsel is here, he's had several trials

5    with me, he can certainly bring you up to speed on that.

6            MR. ABELL:  Judge, of those two days, I would like to

7    ask the Court to entertain the 5th as the date —

8            THE COURT:  All right.  Is the 5th okay with

9    everyone?

10            MR. WESTBERRY:  Sure.

11            THE COURT:  All right.  I'm going to leave the

12   location open until I've had a chance to read through these

13   materials on the location issue.  So I'll leave the location

14   open, but I will set the final pretrial conference for Tuesday

15   January 5th, and I'm going to schedule this at 11:00, because

16   I'm not sure where everyone is going to be traveling from, but

17   that should provide sufficient time for everyone to be there

18   without too much of a problem.

19            So we have our trial date, we have our pretrial

20   conference on January 5th at 11:00.  I scolded Mr. Hoskins for

21   his other case, which is none of my business, but I think he

22   understands the reason for taking that up.

23            Any other issues that we can take up at this time?  I

24   know that there are a number of pending motions, the magistrate

25   judge will be addressing some of those hopefully soon.  I will

 1   be addressing some of those motions hopefully soon.

 2         But are there other matters, Mr. Smith, that you

 3   would like to take up?

 4         MR. SMITH:  Your Honor, I did fail, including with

 5   exhibits tendered, I believe the one relating to the AOC

 6   statistics, we have prepared a summary chart.  I would like to

 7   tender that as Exhibit 4 and give counsel a copy of that as

 8   well.  That summarizes, I think, what's indicated in that

 9   record.

10         THE COURT:  Okay.

11         Yes, sir, Mr. White.

12         MR. WHITE:  Your Honor, just one very brief thing,

13   and it's just more direction on this.  I received an order from

14   the magistrate judge on a motion in which he —— I had asked for

15   more time to file a reply under —— the local rule gives you 11

16   days, and that's when the motion is submitted.  He had

17   indicated that the practice in this division ——

18         THE COURT:  There are no replies.  Local rules don't

19   provide for replies.

20         MR. WHITE:  I think, Your Honor, with all due

21   respect, I believe the local rules do provide for a reply.  It

22   says replies can be filed 11 days after a response, and then

23   that's when the motion is submitted to the Court for a

24   decision.

25         THE COURT:  All right.  So you filed a motion ——

1          MR. WHITE:  I filed a motion for an extension of time

2     to file a reply.  He gave me, I think, an extra half a day.

3     And we have just received a number of responses back on motions

4     we had filed.  And I'm not saying we're going to file replies.

5     I will tell you I am going to file a reply to their response to

6     the motion to dismiss.  And so I just wanted to clarify with

7     the Court and the magistrate if we could have that opportunity

8     to file our reply within the local rule.

9          THE COURT:  You need to take it up with him.  You

10    need to take that up with the magistrate.  If he has set the

11    time period for doing that —

12         MR. WHITE:  He has not, Your Honor.  That's the

13    problem.  The local rule provides for the time —

14         THE COURT:  All right.  I'll discuss it with the

15    magistrate today and have him issue something on that.

16         MR. WHITE:  Thank you, Your Honor.

17         THE COURT:  And get his — I need to get his thoughts

18    on the timing of that.  So I'll take that up with him.

19         MR. WHITE:  Thank you, Your Honor.

20         THE COURT:  All right.

21         Mr. Smith, anything else on behalf of the United

22    States?

23         MR. SMITH:  Nothing, Your Honor.

24         THE COURT:  Mr. Bayer?

25         MR. BAYER:  Yes, I had a couple of housekeeping

1    matters —

2                 THE COURT:  All right.

3                 MR. BAYER:  — if I could address with the Court.

4                 THE COURT:  Yes, sir, certainly.

5                 MR. BAYER:  First off, there have been various

6    motions that have been filed by the defendants seeking

7    alternative forms of relief.  I'm confident that the Court will

8    sustain most all of those.  And because of my confidence in the

9    fact that the Court will sustain most of those motions, what I

10   would like to ask the Court — and none of us did file motions,

11   and the Court told us not to file a "me too" motion.  It is my

12   hope that in the event the Court would favorably entertain any

13   one of the defensive motions, that the effect would apply to

14   all of the defendants regardless of whether or not we did in

15   fact file a "me too" motion.  We were specifically instructed

16   not to do that, and due to the fact that all of the motions

17   were basically filed simultaneously, we would not have had an

18   opportunity to look at the other motions and then do something

19   similar.

20                So I would just ask that the Court, if it does

21   sustain a motion, to make it applicable to all the defendants

22   as it would be.

23                THE COURT:  Well, since I haven't made any

24   determinations on the motions, it's hard for me to answer the

25   question —

1          MR. BAYER:  I understand.

2          THE COURT:  –– but I'll mention that issue to the

3   magistrate judge as well.

4          MR. BAYER:  The next item, Judge, is you have set us

5   a new pretrial date.  Due to the significant changes in the

6   scheduling ––

7          THE COURT:  No more pretrial motions.

8          MR. BAYER:  I understand that.  And I'm not going to

9   ask for that.

10          THE COURT:  All right.

11          MR. BAYER:  The Court has made it very, very clear

12   that obviously if any other motions are to be filed, they have

13   to be done with a specific request.

14          THE COURT:  Within reason, yes.

15          MR. BAYER:  With good reason.  I think that's fair,

16   because I think due process obviously would allow us to file a

17   motion if the circumstances arose justifying a new pretrial

18   motion.

19          But I think what would be important, Judge, is there

20   are certain other dates that are appended to –– or attached to

21   these pretrial dates, certain milestones that you have affixed.

22   If the Court would consider looking at your previous pretrial

23   orders at some of the issues and some of the dates that you

24   have appended ––

25          THE COURT:  I was trying to remember what that could

1  be.

2          MR. BAYER:  Oh, things such as for getting acceptance

3  of responsibility.

4          THE COURT:  That was two days ago.  That was Monday.

5          MR. BAYER:  Yes, sir.  But the fact is, is that this

6  being the initial pretrial date, which is now with the trial

7  date that is now in January, the Court may want to look at some

8  of these other dates and perhaps advance those out further.

9  I'm just offering that as a suggestion, that the Court might

10  want to look at all the previous pretrial orders and see that

11  some of those dates might be adjusted as well.

12          THE COURT:  I will take that as a suggestion to do

13  that.

14          MR. BAYER:  And I would like to just state that as

15  far as on the filing issues, recently I did file something in

16  court in which I tried to use a link, and because we are

17  required to file specifically as it relates to our named

18  defendant, the system would not allow me to link to the motion

19  that I was attempting to link to.  Instead I had to link it to

20  the order that the Court had issued, and the Clerk did have to

21  correct that.  So what I will do is I will talk with the Clerk

22  about that.

23          THE COURT:  I have actually anticipated this issue,

24  and Michelle downstairs, I believe, is available to assist

25  today.  I'm not sure, it may be after the lunch hour, but

1  she'll be able to walk you through some of those issues.

2  MR. BAYER:  Because I couldn't do it.  It wouldn't

3  allow me to do it.  And I appreciate the consideration given to

4  us by the Court, but the circumstances —

5  THE COURT:  Michelle is available here, so she'll be

6  able to help you with those issues and anyone else that may

7  need assistance.  I know that you stood up.  There may be some

8  other folks that need —

9  MR. BAYER:  I have gone through the training and I

10 feel pretty comfortable with filing it, but when it won't let

11 me do it, I can't do it.

12 THE COURT:  Well, my goal is to make sure you don't

13 have to go through training again.

14 MR. BAYER:  Yes, sir, and that's my goal as well,

15 because Mr. Westberry looked at me and said, "You file anything

16 wrong, you're a dead man," because he doesn't want to go

17 through it again.

18 THE COURT:  It's good to have the assistance of

19 co-counsel in case of an —

20 MR. WESTBERRY:  Amen, Judge.  Thank you.

21 THE COURT:  Yes, sir, Mr. Baldani.

22 MR. BALDANI:  May I bring up one thing?

23 THE COURT:  Yes.

24 MR. BALDANI:  Mr. Bayer referred to a discussion

25 about no "me too" motions, and that might have been before I

1    got in on the case.  This is my motion by request, Your Honor.

2    As you know, most of the defendants file their pleadings on or

3    about the last day, and I have seen at least a couple of the

4    motions that I would like to join in on behalf of Mr. Thompson.

5    And what I'm asking is if we could have a day or two to file a

6    pleading identifying motions of co-defendants that I wish to

7    join in.  And it wouldn't — it wouldn't require any further

8    response for the government, any further legal analysis, but I

9    would simply make that request at this time, Your Honor.

10            THE COURT:  All right.  That request will be denied.

11            MR. WHITE:  Your Honor, just for the record, I would

12    too.  This is first I've heard about it.

13            THE COURT:  All right.  On behalf of all defendants,

14    I know that you would all like to join in everything that's

15    been filed on behalf of everyone else.  You had a deadline to

16    do so, requests are denied.  And I'll address these motions.

17    And if there are other matters that come up after the Court has

18    addressed the motions and if you think — and I'm sure some of

19    you will think that the Court has overlooked some issue, that

20    would be the time to take it up.  But at this point I have 40

21    motions pending, thereabouts.  So we need to work through these

22    motions before we start filing other motions in the case.  I

23    understand your concern, I understand that you would like to

24    perhaps join in what other parties have filed in the case, but

25    you had a deadline to do so, the Court did not prohibit you

1    from speaking with other counsel about motions that were filed,

2    so at least at this point, that request is denied.

3          All right.  Anything else, any other procedural

4    issues we can take up while we're here altogether?

5        (No audible response.)

6          THE COURT:  No?  All right.  Thank you, Counsel.

7    This matter will be in recess.

8                    Proceedings concluded at 11:20 p.m.)

9                    C E R T I F I C A T E

10        I, Cynthia A. Oakes, certify that the foregoing is a

11    correct transcript from the record of proceedings in the

12    above-entitled matter.

13

14    10/6/2009                    s/CYNTHIA A. OAKES
          DATE                     CYNTHIA A. OAKES, RPR, RMR, CRR
15

16

17                    E X H I B I T S

18    Government's                                          Page
      Exhibit No.              Identified               Admitted
19
          1                        18
20        2                        22
          3                        23
21        4                        48

22

23

24

25