1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    SOUTHERN DIVISION at LONDON
                               - - -
 3
      UNITED STATES OF AMERICA,        :  Docket No. CR 09-16-S
 4                                     :
                      Plaintiff,       :  Frankfort, Kentucky
 5                                     :  Tuesday, January 19, 2010
           versus                      :  9:00 a.m.
 6                                     :
      RUSSELL CLETUS MARICLE,          :
 7    DOUGLAS C. ADAMS                 :
      CHARLES WAYNE JONES              :
 8    WILLIAM R. STIVERS               :
      FREDDY W. THOMPSON               :
 9    WILLIAM B. MORRIS                :
      DEBRA L. MORRIS                  :
10    STANLEY BOWLING,                 :
                                       :
11                    Defendants.      :

12


13                            - - -
                       TRANSCRIPT OF HEARING
14                  BEFORE DANNY C. REEVES
              UNITED STATES DISTRICT COURT JUDGE
15                            - - -

16    APPEARANCES:

17    For the United States:      STEPHEN C. SMITH
                                  JASON D. PARMAN, ESQ.
18                                Assistant U.S. Attorney
                                  601 Meyers Baker Road
19                                Suite 200
                                  London, KY 40741
20
      For the Defendant           MARTIN S. PINALES, ESQ.
21    Russell Cletus Maricle:     Strauss & Troy
                                  150 E. Fourth Street
22                                Fourth Floor
                                  Cincinnati,OH  45202
23
                                  DAVID S. HOSKINS, ESQ.
24                                107 E. First Street
                                  Corbin, KY  40701
25
```

2

```
 1      For the Defendant          R. KENT WESTBERRY, ESQ.
        Douglas C. Adams:          Landrum & Shouse, LLP
 2                                 220 West Main Street
                                   Suite 1900
 3                                 Louisville, KY 40202

 4                                 BENNETT E. BAYER, ESQ.
                                   Landrum & Shouse, LLP
 5                                 106 West Vine Street
                                   Suite 800
 6                                 Lexington, KY  40507

 7
        For the Defendant          T. SCOTT WHITE, ESQ.
 8      Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
                                   133 West Short Street
 9                                 Lexington, KY  40507

10
        For the Defendant          ROBERT L. ABELL, ESQ.
11      William R. Stivers:        271 West Short Street
                                   Lexington, KY  40507
12

13      For the Defendant          RUSSELL JAMES BALDANI, ESQ.
        Freddy W. Thompson:        Baldani, Rowland & Richardson
14                                 300 West Short Street
                                   Lexington, KY  40507
15

16      For the Defendant          JERRY W. GILBERT, ESQ.
        William B. Morris:         Coy, Gilbert & Gilbert
17                                 212 North Second Street
                                   Richmond, KY 40475
18

19      For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
        Debra L. Morris:           Gess, Mattingly & Atchison, PSC
20                                 201 West Short Street
                                   Lexington,KY40507
21

22      For the Defendant          DANIEL A. SIMONS, ESQ.
        Stanley Bowling:           Thompson, Simons, Dunlop & Fore
23                                 116 West Main Street
                                   Suite 2A
24                                 Richmond, KY 40476

25
```

1    Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                  Official Court Reporter
2                                 35 W. Fifth Street
                                  P.O. Box 1073
3                                 Covington, KY  41012
                                  (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings commenced at 9:03 a.m.)

2         THE COURT:  Thank you.  Good morning, everyone.

3    Madam Clerk, if you could call the matter scheduled for 9:00,

4    please.

5         DEPUTY CLERK:  London criminal action 09-16.  United

6    States of America versus Russell Cletus Maricle, Douglas C.

7    Adams, Charles Wayne Jones, William E. Stivers, also known as

8    Al Man, Freddy W. Thompson, William B. Morris, also known as

9    Bart, and Debra L. Morris, also known as Debbie.  This matter

10   is being called for a hearing, Your Honor.

11        THE COURT:  Thank you.  If counsel could state their

12   appearances, please.  Mr. Smith, we'll start with you.

13        MR. SMITH:  Good morning, Your Honor.  I'm Stephen

14   Smith, accompanied by Jason Parman, representing the United

15   States this morning.

16        THE COURT:  Thank you.

17        MR. PINALES:  Marty Pinales, David Hoskins, on behalf

18   of Mr. Maricle.

19        MR. BAYER:  Good morning, Judge.  Bennett Bayer and

20   Kent Westberry on behalf of Douglas Adams.

21        THE COURT:  Thank you.

22        MR. WHITE:  Scott White, Your Honor, on behalf of the

23   defendant, Charles Wayne Jones, behind me.

24        MR. ABELL:  Judge, Robert Abell for Mr. Stivers.

25        MR. BALDANI:  Russ Baldani for Freddy Thompson.

1          MR. GILBERT:  Jerry Gilbert for William Morris,

2     seated to my right.

3          MS. HUGHES:  Elizabeth Hughes for Debra Morris,

4     behind me.

5          MR. SIMONS:  Dan Simons, Your Honor, on behalf of

6     Stanley Bowling, behind me.

7          THE COURT:  The Court will note for the record all

8     defendants are present.  This matter is scheduled for a

9     hearing on the issue of admissibility of evidence under

10    Rule 404(b).

11         Mr. Smith, are you prepared to proceed?

12         MR. SMITH:  Your Honor, I do need to confirm with the

13    court security, we've had, I believe, our witnesses

14    transported up this morning.  I thought I would confirm

15    they've arrived.  I was told they were expected to be here by

16    now.  If I could get that confirmation.

17         I do want to ask the Court for a little bit of a

18    clarification.  I know in our last hearing, we discussed we

19    present the evidence.  It's our position, obviously, Your

20    Honor, it's background evidence.  And the Court advised we'd

21    should be prepared to present this evidence today on both

22    background and 404(b), which we are ready to proceed in that

23    fashion.  The only thing that the United States would inquire

24    of the Court, obviously, is for purposes of judicial economy,

25    whether or not it might be worth discussing the possibility of

6

1    bifurcating the hearing and at least looking at what we

2    believe to be background evidence, presenting that, and then

3    looking at the remaining issues, isolating those that are

4    404(b) and then proceeding in a fashion with which we could

5    then address those directly with the witnesses.  I throw that

6    out for the Court to consider.

7          Obviously, you've had some time now to look at the

8    issue and maybe give us your thoughts on that, Your Honor, as

9    far as how you would like us to proceed.

10         THE COURT:  Well, the reason that I left the issue

11   open for this hearing was that the position that had been

12   taken by the United States in its notice was that this was

13   background evidence, initially.  And also, that if the Court

14   determined that it was not background evidence, that the

15   United States believed that it was also admissible under

16   Rule 404(b).

17         And, of course, if it's alternatively admissible

18   under 404(b), then the Court has to conduct the analysis

19   that's outlined in the various cases, Merriweather and other

20   cases.

21          If you believe or if you're only seeking to

22   introduce some of the evidence that has been included in the

23   notice only as background evidence, then the Court will only

24   evaluate that as background evidence.  If you believe that

25   there is some evidence that's included in the notice that

1    would only fall under that category, then you can certainly

2    advise the Court of that, and the Court will then limit the

3    analysis as to that particular bit of evidence.

4            But if you believe that you wish to present this

5    alternatively under 404(b), then I'll need to hear the

6    evidence and make that determination as well.  So it will be

7    up to the United States to make that determination and offer

8    that proof.  I'm not sure if that's all that helpful to you,

9    Mr. Smith.

10            MR. SMITH:  It is.  Can I have a chance, if I could,

11    Your Honor, to speak with Court security about our witnesses?

12            THE COURT:  Yes.  Do you need a recess to line up the

13    witnesses, a short break to do that?

14            MR. SMITH:  I think I do need to confirm that they're

15    here.  They're all in-custody witnesses.  If I could have that

16    opportunity, I'd appreciate it.

17            THE COURT:  Why don't we take five minutes to allow

18    you to do that.  We'll be in recess for five minutes.

19                    (Recess from 9:08 a.m. until 9:14 a.m.)

20            THE COURT:  Thank you.  Mr. Smith, are you ready to

21    proceed?

22            MR. SMITH:  We are, Your Honor.

23            THE COURT:  Thank you.

24            MR. SMITH:  United States would call our first

25    witness, Kenneth Day.

*DAY - Direct*                                                                8

1          THE COURT:  Thank you.  Mr. Day, you may be sworn.

2            KENNETH DAY, GOVERNMENT'S WITNESS, SWORN

3          THE COURT:  Thank you.  Mr. Smith, you may proceed.

4                      DIRECT EXAMINATION

5    BY MR. SMITH:

6    Q.   State your name, please.

7    A.   Kenneth Day.

8    Q.   And Mr. Day, could you tell us how old you are?

9    A.   Fifty-eight.

10   Q.   And where did you grow up?

11   A.   Clay County.

12   Q.   And how long did you live in Clay County, Mr. Day?

13   A.   All my life.

14   Q.   And while living there, could you tell us what jobs you

15   held?

16   A.   I'm a service manager for White Chevrolet for 20 some

17   years, and then I run a pawn shop.

18   Q.   Okay.  And when you say you ran a pawn shop, was that

19   your own business?

20   A.   Yeah, I own a pawn shop.

21   Q.   And those businesses were both located in Clay County?

22   A.   In Burning Springs community of Clay County.

23   Q.   And White's Chevrolet was in Manchester?

24   A.   That's correct.

25   Q.   Mr. Day, do you have children?

*DAY - Direct*                                                                                    9

1    A.   I do.  I have two.

2    Q.   And what are their ages?

3    A.   One's 38 and one's 30.

4    Q.   And during the time that you lived in Clay County, were

5    you, at some point in time, involved as the Republican

6    election commissioner for Clay County?

7    A.   Yes, I was.

8    Q.   And could you tell us approximately when that was?

9    A.   Somewhere in the mid '80s to the mid '90s.

10   Q.   And if you could, Mr. Day, tell us, when did you get

11   involved in politics in Clay County?

12   A.   When did I?

13   Q.   Yeah.  Did this start your involvement in politics, or

14   had you been involved before then?

15   A.   I fooled with politics most of my adult life.

16   Q.   And what did that entail?  What did that involve as far

17   as getting involved in politics in Clay County for you?

18   A.   Well, I had a son coming along.  And in Clay County, if

19   you're not in politics or in with the clique, you don't get

20   nothing.  If there's any jobs comes available or something

21   like that, it's not there.  It's a power struggle.

22   Q.   So what did you do to involve yourself in politics?

23   A.   Well, I worked the elections up till I become Republican

24   election commissioner.  Got elected.  Then I had access and

25   control over the Republican officers that went to each

*DAY - Direct*                                                           10

1    precinct.

2    Q.   Now, when you say you, quote unquote, worked the

3    elections before becoming a commissioner, what do you mean by

4    that, Mr. Day?

5    A.   I mean I went on the ground and bought votes.

6    Q.   And when you say you went on the ground, is that at the

7    poll?

8    A.   At the poll, that's right.

9    Q.   And how would that generally work back in those days?

10   A.   Well, you had somebody like me or -- and then I would

11   probably have something helping me outside.  And when they'd

12   come in, we would -- it would be like a bidding war.  When

13   they rolled up, it was like going to the stop sales at the

14   Pin Hook.  There would be somebody on top of them when they

15   come in.  You buy a vote and you send it in to the judge

16   inside, and he sent you a ticket back out or a nod at the door

17   that the vote was the way it was supposed to go in.

18   Q.   Now, during the time that you worked the grounds out

19   at -- which precinct would you have been working the ground,

20   Mr. Day?

21   A.   Burning Springs.

22   Q.   And during the time period that you worked the grounds at

23   Burning Springs, do you ever recall encountering Mr. Cletus

24   Maricle or Douglas Adams?

25   A.   Yeah, worked electionS with several of them.

*DAY - Direct*                                                                    11

1    Q.   And tell us the ones you recall working with Mr. Maricle

2    and Mr. Adams.

3    A.   Well, the two stands out in my mind is when Clay Bishop

4    run against -- when Clay Bishop run against House.

5    Q.   Okay.  And would that have been a county-wide race?

6    A.   That was a -- three counties.  That would have been

7    Jackson County and Laurel -- or Jackson, Clay and Leslie.

8    Q.   And what position were they trying to obtain in that

9    election?

10   A.   Circuit judge.

11   Q.   Okay.  And tell us what you recall, the involvement that

12   you had with Mr. Maricle or Mr. Adams during that election.

13   A.   Well, I wasn't going to work the election that time, but

14   Doug had got saved and got religion, and he wouldn't handle no

15   money.  So Dobber Smith and Neville approached me to work the

16   election for Clay M.

17   Q.   Neville being Neville who?

18   A.   Neville Smith.

19   Q.   And they approached you to do what?

20   A.   To buy votes.

21   Q.   So after they approached you, what happened then,

22   Mr. Day?

23   A.   Well, I met with Neville and Dobber Smith, which Dobber

24   was the head of the Shamrock Coal Company at the time, and

25   they wanted Clay M. in there.  They didn't want Gayle there.

*DAY - Direct*                                                                    12

1    So after I met with them, then I got with Doug, and we set up,

2    the night before the election, we drove all night long from

3    house to house, getting people lined up to be on the polls the

4    next morning at 6:00 to vote.

5    Q.   Okay.  Let me stop you right there.  Who is "we" went

6    around that night?

7    A.   Me and Doug Adams.

8    Q.   And when you say you went around house to house to get

9    them lined up for the next morning, what were you telling the

10   voters?

11   A.   We was telling them if they'd be there at 6:00 to vote,

12   we'd give them a hundred dollars to vote.

13   Q.   You say you went all around.  Where were you traveling,

14   what precincts?

15   A.   Burning Springs.

16   Q.   And then what happened?

17   A.   Then the next morning, they was lined up there, probably

18   a hundred people.  And it was a bidding war between Cletus and

19   me and Doug.  Cletus was trying to steal our voters out of the

20   line and pay them more money for them.

21   Q.   Now, when you say Cletus, are you referring to Cletus

22   Maricle?

23   A.   Cletus Maricle, that's right.

24   Q.   Do you see Mr. Maricle and Mr. Adams in the courtroom

25   here this morning?

*DAY - Direct*                                                                13

1    A.   Yes, I do.

2    Q.   If you could, would you point out Mr. Maricle, where he's

3    seated for the Court's record, please?

4    A.   Straight over top on the bench there.

5    Q.   What is he wearing?

6    A.   He's wearing a suit with a blue tie.

7         MR. SMITH:  I'd ask the record to reflect he's

8    identified Mr. Maricle.

9         THE COURT:  Record will so reflect.

10   Q.   Mr. Adams, do you see him in the courtroom?

11   A.   He's sitting right beside of him, best I can see back

12   there.  I can't hardly see for the one guy.

13   Q.   What's he wearing, for the record?

14   A.   I can't see him.  He's wearing a leather jacket.

15        MR. SMITH:  Okay.  I'd ask that the record reflect he

16   has identified Mr. Adams.

17        THE COURT:  Record will so reflect.

18   Q.   You say Mr. Maricle was -- Cletus, you call him, was

19   working the election.  Was he for some other candidate other

20   than your candidate, Mr. Bishop?

21   A.   Oscar Gayle.

22   Q.   And when you say there was bidding wars going on for the

23   voters, is that what you're talking about?

24   A.   That is right.  Just like buying cattle.

25   Q.   And how was that exchange between -- who was the exchange

*DAY - Direct*                                                                          14

1     between, you and Mr. Maricle or Mr. Adams and Mr. Maricle?

2     A.   It would be me and Cletus at times, and Doug and Cletus

3     at times bidding against each other.  Me and Doug worked

4     together.  Cletus, as far as I know, he didn't have nobody to

5     help him that day down there.

6     Q.   And at that time, you said there were actual bidding

7     going on.  What was a voter getting for his vote at that time?

8     A.   The highest I seen a vote go that day was $800.

9     Q.   And how did that develop?

10    A.   Cletus started bidding on it, and Doug started bidding on

11    it, and it just went backwards and forwards till $800 got the

12    vote.

13    Q.   And who paid the voter?

14    A.   I did.

15    Q.   Now, in that election, during that race, Mr. Day, when

16    you would actually pay those voters, how is it that you were

17    able to confirm that they voted the way that you paid them to

18    vote?

19    A.   They sent a ticket -- we had a ticket system set up that

20    day.  The judge inside had a ticket, and they sent the ticket

21    back out if they voted right.

22    Q.   Did Mr. Maricle approach you that day at any time and

23    talk to you about trying to persuade you, maybe, to leave?

24    A.   He tried to get me to leave the ground that day, yes, he

25    did.

*DAY - Direct*                                                              15

1    Q.   How did he do that?

2    A.   He tried to ask me how much I would take to leave.  And I

3    told him money wouldn't make me leave.

4    Q.   You said there were two occasions that you recall

5    specifically where Mr. Adams or Mr. Maricle were involved with

6    you in the elections in Burning Springs; is that right?

7    A.   That is correct.

8    Q.   When was the next time that you recall?

9    A.   Cletus had had some disagreement with the Democrat party,

10   J.E. Henson, and I don't know what that pertained to.  But he

11   wanted to get the money from J.E.  J.E. was for Corky

12   McKeehan.  So he come and got me to go with him to J.E., and

13   he told J.E. that I was going to buy the votes for Corky

14   outside and send them in, and him and Doug was going to vote

15   'em for Corky.  He got $10,000 off of J.E. that day.

16   Q.   And who is that?  You say he did.  Who did?

17   A.   Cletus.  J.E. give him $10,000 that day to buy votes for

18   Corky McKeehan.

19   Q.   And who were you helping?

20   A.   I was helping Cletus and Doug both.

21   Q.   Okay.  And were Doug and Cletus both for the same

22   candidate at that time?

23   A.   Yes, they was.

24   Q.   And what transpired that day?

25   A.   Well, Corky McKeehan was running against Mike Hooker, and

*DAY - Direct*                                                          16

1    there was several more on the poll that day that was running.

2    And James Craft was on the ground that day.  He helped.  And

3    Corky McKeehan had a brother there from Richmond.  He come up

4    and helped us too.  What would happen is, is we'd buy votes

5    and send them in, and Cletus and Doug would vote 'em for Mike

6    Hooker.  We was buying them on the ground for Corky McKeehan.

7    Q.   So in other words, there was a double-cross?

8    A.   That is right.

9    Q.   Did you know there was a double-cross going on?

10   A.   Yes, I did.

11   Q.   What else transpired?

12   A.   Well, along up in the afternoon, around 4:00 or 5:00,

13   they got worried, because there had been so many votes went

14   in.  And they called me to the door and told me what they was

15   going to do is they was going to call the votes off opposite

16   from what they was and for me to go ahead and leave and get on

17   out of the way, and they was going to go to the courthouse.

18   Q.   And did they explain to you why they were going to do

19   this?

20   A.   They was afraid that they'd get killed.

21   Q.   And so what happened after that?

22   A.   Well, they called the votes off exactly opposite than

23   what they was at the door, like they always come to the door

24   and call them off.  And I left and went home, and they went on

25   to the courthouse, and I don't know where else they went to

*DAY - Direct*                                                    17

1    from there.

2    Q.   But they told you the plan was to report to the public at

3    the poll that the other fella, Hooker, won as opposed to

4    actually McKeehan at that precinct?

5    A.   No.  They told me that they was gonna report it that

6    Corky McKeehan won at that precinct instead of Hooker.

7    Q.   Okay.  Now, you said James Craft helped you.  What was he

8    doing?

9    A.   Helping buy votes.  Corralling the people up when they

10   come in, getting them lined up.

11   Q.   And when you were buying votes during that election, what

12   was used to buy the votes with?  Paying them with money or --

13   A.   Money.

14   Q.   Do you know what the votes were running, average --

15   A.   Hundred dollars a vote, two hundred dollars a vote.  Some

16   50.  It's just according.

17   Q.   Now, you indicated that you were selected at some point

18   to be the election commissioner, I believe you said sometime

19   in the '80s?

20   A.   Yes, I was.

21   Q.   How did you -- who approached you?

22   A.   Roy Morgan.

23   Q.   And after he approached you, did you have an assignment

24   or a job to do as far as election commissioner where you had

25   to actually decide who was going to be the election officers?

*DAY - Direct*                                                                18

1    A.   Well, each precinct, they submit a list, and you pick two

2    people, either a judge or the clerk or the sheriff one from

3    each precinct.  They submit a list, and you take the list that

4    they submit and pick the officers for the precinct on the

5    Republican side.  That's the one I picked.

6    Q.   And do you recall who it was on the other side, as far as

7    the Democrat commissioner?

8    A.   There was two Democrat commissioners.  Cecil Craft was

9    one and then Ralph Hoskins was the other.  And when they --

10   and I don't know exactly the year that they come or went, but

11   that's who I worked with while I was there.

12   Q.   Did Roy Morgan, shortly after you were appointed, direct

13   you to go to Cletus Maricle?

14   A.   Not directly after.  When Cletus was running, he

15   instructed me to take the Republican list and leave it with

16   Cletus and let Cletus pick who he wanted to be the Republican

17   officers.

18   Q.   Okay.  And at that time, was Cletus a Republican?

19   A.   He was a Democrat.

20   Q.   Okay.  So you were directed to take the list to him, and

21   what did you do?

22   A.   I took the list to him and left it with him.

23   Q.   And what happened after that?

24   A.   Couple three days later, he give me the list and had

25   marked who he wanted me to pick for judge, sheriff or the

*DAY - Direct*                                                                19

1    clerk in each precinct.

2    Q.   Then what did you do with the list?

3    A.   I took the list to the courthouse, and we had our

4    meeting.  I picked officers.

5    Q.   Okay.  Now, when you all convened at the courthouse, was

6    that with the rest of the Clay County Board of Elections, the

7    other members?

8    A.   That's right.

9    Q.   And how was your list received by the group?

10   A.   Everybody okayed it.

11   Q.   There were no objections to your recommendations?

12   A.   Not to my knowledge or remembrance, there was no

13   objection.

14   Q.   Did you, in conversation with others, learn that

15   Mr. Maricle had also been in contact with the Democrat

16   commissioner?

17   A.   Yes.  Roy told me that he had both lists.  As a matter of

18   fact, he told me that he had both lists.

19   Q.   Who told you?

20   A.   Cletus.

21   Q.   So Cletus told you himself?

22   A.   That's right.

23   Q.   Now, during your term as Republican election

24   commissioner, how much of an impact did the school board have

25   in the selection of election officers?

*DAY - Direct*                                                          20

1    A.   School board, when I was elected, the Republican election

2    commissioner, we went right along with the school board.  If

3    they had a school board member running, Roy would tell me to

4    pick whoever they wanted.  He would tell me who to pick.

5    Q.   When you were involved as Republican election

6    commissioner, were you still working elections during

7    elections?

8    A.   Well, I would -- not on the ground on election day, but

9    I'd work them before.

10   Q.   How did absentee or the early voting play a part in it?

11   A.   Well, I never really had a big, big hand in absentee, but

12   they done -- Roy done some of them I was aware of.  Like at

13   the nursing home down there, he got somebody who worked at the

14   nursing home, some of the family, and he'd take the list, he'd

15   take the forms.  When he got them back, he'd help them vote

16   down there and send them back in.  But that was in the early

17   '90s.  Absentees wasn't a big thing back then when I was doing

18   it.

19   Q.   How long did you serve -- when did you stop serving, I

20   guess, as election commissioner?

21   A.   I resigned when I was at Morgantown, West Virginia, doing

22   federal time.

23   Q.   What were you doing federal time for there?

24   A.   Cocaine.

25   Q.   And that was a conviction in what state?

*DAY - Direct*                                                        21

1    A.   Florida.

2    Q.   Was that your first?

3    A.   That's the first.

4    Q.   Do you recall testifying, I think, earlier before this

5    Court about a circumstance in which you were accompanied by

6    others, including Cletus Maricle, to get a jury fixed in a

7    civil case?

8    A.   That's right.

9    Q.   Do you know when that was, approximately, that that

10   happened?

11   A.   I don't know exactly the year that it happened, but

12   somewhere around '92.  I don't know exactly when, but it was

13   '91, '92, '93, right in that area somewhere.

14   Q.   Was this after you were Republican election commissioner?

15   A.   Yes.

16   Q.   And how is it you got involved in a lawsuit?

17   A.   Say that again now?

18   Q.   How is it that you got involved in this lawsuit, Mr. Day?

19   A.   Okay.  Gary Runion run over my sister-in-law and her

20   daughter down at Laurel Creek School and killed my

21   sister-in-law.  And my brother -- and the other girl, she got

22   hurt.  She lived, but my brother wasn't capable of handling

23   the business, and they made me administrator of the estate.

24   Q.   So as administrator of the estate, you had filed a

25   lawsuit?

*DAY - Direct*                                                          22

1    A.   That is correct.

2    Q.   And --

3    A.   Yancey White filed the suit.

4    Q.   And was he your lawyer?

5    A.   Yes.

6    Q.   And how is it that it came to be that you and others,

7    including Mr. Maricle, approached this juror?

8    A.   Well, Pres Henson had an ex-wife or a girlfriend or

9    whatever she was on the jury, and we went to his house the

10   night before or couple nights before that we seen that she was

11   picked on the jury and talked to Pres about talking to her and

12   getting her to bring back a guilty verdict.  And Pres called

13   her on the phone right then and told her not to come back with

14   anything less than a million dollars.

15   Q.   Do you recall what that lady's name was?

16   A.   No, I can't.

17   Q.   Now, in the meeting you said that you had with Pres

18   Henson, who was in your presence?

19   A.   Cletus Maricle was there.

20   Q.   And who else?

21   A.   Larry Joe Roberts.  And the best of my knowledge, Scott

22   Madden was with us.

23   Q.   And did you and Mr. Maricle at some point discuss

24   something he wanted in return for him helping you with the

25   jury?

*DAY - Direct*                                                                    23

1    A.   Well, Cletus was Gary's lawyer, and with their help and

2    with Gary's help, they wanted to -- me to agree that I

3    wouldn't press no charges against Gary for killing Loretta.

4    Q.   And was this something that they made as part of the deal

5    before they would help you with your case?

6    A.   Well, it was all a deal, you know, from the get-go.

7    Q.   Now, did Cletus Maricle have to run for that position of

8    circuit judge at some point while you were involved over there

9    as election commissioner?

10   A.   Yes.  He got appointed first, then he had to run for the

11   unexpired term.

12   Q.   Do you know when it was that he ran?

13   A.   Somewhere around '92.  Right -- he was -- when we was

14   seein' about the Pres Henson, Cletus knew he was going to get

15   the appointment from the governor.  He knew he was going to be

16   appointed governor -- I mean judge from the governor.  He knew

17   that.  It wasn't official, but he knew it, that he was going

18   to be.

19   Q.   Did he speak about it?

20   A.   Yes, he did.

21   Q.   Now, did he ask you to help him in his bid for that job?

22   A.   Yes, he did.

23   Q.   The election?

24   A.   Yes, he did.

25   Q.   And what did he ask you to do?

*DAY - Direct*                                                          24

1    A.   He asked me for the voters, for the list.  I gave him the

2    list.  And then every night, I would go with him to Jackson

3    County, and we'd ride from place to place.  We'd go to Poodle

4    Marcum first, and Poodle would tell us where to go to.

5    Q.   And Poodle Marcum, is he somebody of political

6    significance?

7    A.   He's a politician from Jackson County, yes.

8    Q.   And do you know why -- what significance was it that

9    Cletus Maricle had Kenneth Day in the vehicle with him riding

10   around Jackson County?

11   A.   I'm a Republican election commissioner, and he had the

12   Republicans on his side in Clay County, and he was wanting to

13   show that in Jackson County so he could get more support.

14   Q.   Mr. Day, did you, in the course -- you said you pled

15   guilty to cocaine charges in Florida; is that right?

16   A.   That's right.

17   Q.   And you pled guilty to drug charges in this federal court

18   in the Eastern District as well?

19   A.   That is right.

20   Q.   What did you plead guilty to in this case?

21   A.   I pled guilty to conspiracy, continued criminal

22   enterprise, and thousand yards of a school, and drugs.

23   Q.   And did you get sentenced by this Court?

24   A.   Yes, I did.

25   Q.   What sentence are you serving?

*DAY - Direct*                                                                          25

1    A.   Eighteen years.

2    Q.   Okay.  And where did you have your drug business?

3    A.   Burning Springs at the pawn shop.

4    Q.   And how long did you run a drug business there in Clay

5    County?

6    A.   When I got back out in '01 from jail, I started right

7    then.  But I initially started like in '93, '94, '95.

8    Q.   And during those time periods, when you say you're

9    selling drugs, were you selling drugs right there from your

10   shop or your place of residence there in Clay County?

11   A.   I was selling from the pawn shop, yes.

12   Q.   And that's a pretty public area there in Burning Springs,

13   a lot of people would possibly see you.  Weren't you concerned

14   about local police, getting caught for drug trafficking in

15   Clay County?

16   A.   I wasn't concerned about the local.

17   Q.   And why were you not concerned about them, Mr. Day?

18   A.   Because in Clay County, you can do whatever you want to

19   do as long as you don't -- as long as it stays in Clay County,

20   you're all right.

21   Q.   And did you have you assurances -- you say as long as it

22   was in Clay County.  Was that because of your involvement in

23   the politics?

24   A.   That is right.  Ed Jordan was the sheriff at that time,

25   and he told me that he would never bother me as long as he

*DAY - Direct*                                                           26

 1    lived.

 2    Q.   And did he do you favors as a drug dealer?  Did you call

 3    on him at times?

 4    A.   I was friends with Ed, but, I mean, as far as calling on

 5    him and saying arrest somebody or do something like that, no,

 6    I never did.

 7    Q.   Did you ever call him and say is there an investigation

 8    going on that I need to know about or anything like that?

 9    A.   Jennings White went and talked to him about it.  He

10    called me up.  Jennings was at his office.  He called me up to

11    his office and reassured me there was no investigation going

12    on by his department.

13    Q.   Now, can you connect for us and help me understand how

14    your involvement and Cletus Maricle's involvement was

15    important when it came to approaching that juror, fixing that

16    jury?  Why was that important?

17    A.   Well, they was several, maybe a couple things that was

18    important.  One of the things, if we could get the jury fixed,

19    and Gary went along, and we got a settlement, we agreed that

20    we wouldn't press charges against him.  And Cletus has always

21    represented Gary and his daddy and all of them all his life.

22    They're long-time Democrats, and they was all close.

23    Q.   So this was a case that Maricle spoke to you with some

24    degree of significance?  He thought this was a very important

25    thing that he help Gary Runion?

*DAY - Direct*                                                          27

1    A.   Yes, he did.

2    Q.   And Gary Runion's father is who?

3    A.   John C. Runion.

4    Q.   And you say he's an influential man in politics?

5    A.   Well, he was.  He's dead now.

6    Q.   Okay.

7         MR. SMITH:  Have a moment, Your Honor?

8         THE COURT:  Yes.

9    Q.   Mr. Day, you recall what kind of verdict the jury did

10   come back with in that case?

11   A.   It was 3 or 4 million dollars, what they come back with.

12   I don't remember exactly what it was.  I think it was 3

13   million dollars.  I don't remember exactly.

14   Q.   And you spoke about this bidding war for that voter back

15   when you and Cletus Maricle were bidding for the voter's vote,

16   and you said you went up to $800.  Why would you go that far

17   in money for one vote?

18   A.   To show who had the power at the precinct.

19        MR. SMITH:  Pass the witness, Your Honor.

20        THE COURT:  Thank you.

21        MR. SMITH:  If I could ask to admit, just for

22   purposes of the record, and I think this may already be, but

23   I'd like to mark and put in the record Mr. Day's plea

24   agreement.  If I could hand this to the witness, see if he can

25   identify that for us.

*DAY - Direct*                                                          28

1          THE COURT:  Yes, sir, you may.

2    A.   I see it.

3    Q.   Do you recognize that, Mr. Day?

4    A.   Yes, sir.

5    Q.   Is that the plea agreement you entered into in U.S.

6    District Court at London, Kentucky?

7    A.   Yes, it is.

8    Q.   And you spoke of the charges that you pled.  Has the

9    government promised to help you in this case?

10   A.   It's left up to the judge.  They've not promised me

11   nothing.

12   Q.   It says in your plea agreement that you agree to

13   cooperate and testify truthfully in any and all proceedings

14   which you may be called.  Do you recognize that?

15   A.   Yes, I do.

16   Q.   And have you testified previously?

17   A.   Yes, I have.

18   Q.   Are you expecting that the Court may at some point

19   resentence you if it grants the motion?

20   A.   Yes, I am.

21   Q.   Have you ever been resentenced for your cooperation in

22   past cases?

23   A.   No, I have not.

24   Q.   What's your understanding, Mr. Day, would happen today if

25   you were to testify falsely?

*DAY – Cross (Pinales)*                                                29

1    A.  I would not get my resentencing and I would get another

2    charge.

3            MR. SMITH:  I move now to introduce Government's

4    Exhibit Number 1, Your Honor.

5            THE COURT:  Any objection?

6                                (No audible response.)

7            THE COURT:  Exhibit 1 will be admitted for purposes

8    of this hearing.

9            MR. SMITH:  Thank you.

10                       (Government Exhibit No. 1

11                        was admitted into evidence.)

12           THE COURT:  Thank you.  Mr. Pinales, you may examine

13   the witness.

14           MR. PINALES:  Thank you.

15                       CROSS-EXAMINATION

16    BY MR. PINALES:

17   Q.  Good morning, Mr. Day.

18   A.  Good morning.

19   Q.  When you started testifying this morning, you said that

20   you were in a bidding war for votes.  Do you remember that?

21   A.  Yes, sir.

22   Q.  What time was that?  What time frame?  What year?

23   A.  It was in early '80s.

24   Q.  In the early '80s?

25   A.  It was when Clay M. run against Oscar Gayle, whatever

*DAY - Cross (Pinales)*                                                    30

1    year that was.  I don't remember the year.

2    Q.  And you said that this bidding war was between you and

3    Cletus Maricle?

4    A.  No.  It was between Doug and Cletus Maricle.

5    Q.  Between Doug.  Now, how did you fit in on that?

6    A.  I was paying -- I had the money.

7    Q.  You had the money to pay who?

8    A.  To pay the voter that we bought.

9    Q.  Okay.  So how did that work?  Just run through one with

10   me.

11   A.  Well, we'd buy a vote.  You go in and vote, you get a

12   ticket, you come back out and I pay you.

13   Q.  And was the price arranged in advance?

14   A.  Yes.

15   Q.  How did that work?  Tell me.  Just run it through.

16   A.  Well, you drive on the -- you drive on the precinct

17   grounds, and we approach you and say hey, we'll give you 50

18   dollars, 100 dollars, whatever it may be to go in and vote and

19   get a ticket and come back out.

20   Q.  Were these people that you'd talked to the night before?

21   You said you rounded up people.

22   A.  Most of -- the next morning, there was probably a hundred

23   people in line waiting to vote that we had contacted the night

24   before.

25   Q.  And was the price arranged with these people the night

*DAY - Cross (Pinales)*                                                31

1   before?

2   A.   We told them we'd give them a hundred dollars a vote the

3   night before.

4   Q.   How did it get up to 800?

5   A.   Bidding war.

6   Q.   Tell me.  Run through it with me.  I want to hear it.

7   A.   Cletus was here, and Doug was here, and this man wanted

8   to vote.  We offered him a hundred.  Cletus offered him two.

9   I mean, right on up, the way it went.

10  Q.   Did you pay anybody $800?

11  A.   Yes, I did.

12  Q.   How many?

13  A.   One.

14  Q.   Do you know who that was?

15  A.   No, I don't.

16  Q.   And what year was that, the early '80s, you say?

17  A.   When Cletus run against Oscar Gayle, whatever year it

18  was.  I do not recollect the year.

19  Q.   Who else was around?  How many people were around?

20  A.   At the voting?

21  Q.   Um-hmm.

22  A.   I was there, Doug was there, Cletus was there, James

23  Craft was there.  I don't remember everybody that was there.

24  Q.   Big crowd?

25  A.   Oh, always a big crowd.

*DAY - Cross (Pinales)*                                               32

1    Q.   I want to talk about this time you were talking about

2    when you were administrator of the estate.

3    A.   Yes.

4    Q.   When was that, what year?

5    A.   '92, I think.  I think '92.

6    Q.   You said that Cletus Maricle was not a judge but knew he

7    was going to be appointed to judge at that point?

8    A.   That is right.

9    Q.   And what did you do, specifically?  How did you get to

10   the house?  How did you get there?  You said you drove to the

11   house, right?

12   A.   Do what now?

13   Q.   You said you went to the house to talk to the husband of

14   the juror, correct?

15   A.   We went to Pres Henson's.

16   Q.   And how did you get there?

17   A.   We drove.

18   Q.   Who drove?

19   A.   Me and Cletus and Larry Joe Roberts and Scott Madden.

20   The best I -- I'm not a hundred percent sure it was Scott, but

21   I think Scott was with us.

22   Q.   Who drove?  Who was driving?

23   A.   I don't remember.

24   Q.   Do you know what car you were in?

25   A.   No, I don't.

*DAY - Cross (Pinales)*                                                    33

1    Q.   Where did you go, to the house?

2    A.   We went to a trailer up on Muddy Gap.

3    Q.   Did you go inside the trailer?

4    A.   Yes, we did.

5    Q.   All three or four of you?

6    A.   All of us went in, the best I recollect.

7    Q.   And was anybody else there?

8    A.   No.

9    Q.   And how long were you there?

10   A.   I can't remember.

11   Q.   Half an hour?

12   A.   I can't remember.

13   Q.   Was it a long time or a short time?

14   A.   I can't remember.

15   Q.   Who did the talking?

16   A.   Cletus.

17   Q.   Do you remember what he said?

18   A.   He wanted Pres to see the woman and to have her to bring

19   back a guilty verdict.

20   Q.   What did he specifically say?  Do you recall the

21   language?

22   A.   Say that again?

23   Q.   Do you recall the exact language, how --

24   A.   No.

25   Q.   How did this come up?

*DAY - Cross (Pinales)*                                                      34

1    A.   No, I do not recall their exact language.

2    Q.   Did you talk at all during that meeting?

3    A.   No, I did not.

4    Q.   Anybody else talk during that meeting?

5    A.   I do not recollect.

6    Q.   You talked about having the voting list.  Remember?

7    A.   Um-hmm.

8    Q.   You said you had the Republican voting list.

9    A.   That is right.

10   Q.   You said that you gave it to Cletus?

11   A.   I did.

12   Q.   And he gave it back to you a few days later?

13   A.   That is right.

14   Q.   You said it was marked in some way?

15   A.   Yeah, the names wrote down that he wanted me to pick for

16   each precinct.

17   Q.   Written down in how -- in what --

18   A.   I don't remember exactly how he had them wrote down.  It

19   would have been a judge, a clerk or a sheriff, one of the two

20   is how he had the names out from them.  He had a judge out

21   from this name or a clerk out from this name or a sheriff out

22   from this name.

23   Q.   Written out, handwriting?

24   A.   Yes.

25   Q.   Whose handwriting?

*DAY - Cross (Pinales)*                                                          35

1    A.   I don't know.

2    Q.   What did you do with that list?

3    A.   I took it back to the clerk's office and picked the

4    election officers like he had them marked.

5    Q.   And then what did you do with the list?

6    A.   Throwed it away, I guess.  I don't remember.

7    Q.   How did you approach the clerk about the list?  What did

8    you say?

9    A.   Do what?

10   Q.   You said you had the list.  You had the names written

11   down.  Tell me what happened when you got to the clerk's

12   office.

13   A.   I'm the Republican election commissioner.

14   Q.   Yes.

15   A.   I bring the list in.  The chairman sets over here,

16   Democrat's over here, the sheriff's over here.  And they go

17   down each precinct.  For Burning Springs, John Doe or whoever.

18   Q.   Um-hmm.

19   A.   Right on down the list.

20   Q.   Who was there?

21   A.   Who was there?

22   Q.   Yep.

23   A.   I don't remember at the time who.

24           MR. PINALES:  Can I have a moment, Your Honor?

25           THE COURT:  Yes, sir.

*DAY - Cross (Pinales)*                                                      36

1              MR. PINALES:  Thank you.

2   Q.   When you're there with the names, back to the names that

3   you say were written by somebody on that list --

4   A.   The list of the Republican election officers, that's

5   right.

6   Q.   And you said nobody objected.  Is that the norm?

7   A.   It was when I was on the Board, yeah.

8   Q.   And while you were on the Board, you were on it for how

9   long?

10  A.   Approximately ten years, eight years.

11  Q.   And during that eight or ten years, this was a common

12  occurrence?  You would come in with a list and name the

13  officers?

14  A.   That's right.

15  Q.   And all of those times during that eight or ten years,

16  nobody objected?

17  A.   I can't remember nobody ever objecting.

18  Q.   It was sort of the way things were, right?

19  A.   Nobody never objected.

20  Q.   And you didn't object to the Democrat, and they didn't

21  object to you?

22  A.   No, I did not.

23              MR. PINALES:  Nothing further.

24              THE COURT:  All right.  Thank you, Mr. Pinales.

25  Mr. Bayer?

*DAY - Cross (Bayer)*                                                    37

1          MR. BAYER:  Thank you, Judge.

2                    CROSS-EXAMINATION

3     BY MR. BAYER:

4     Q.  Mr. Day, I'm Bennett Bayer.  I'm one of the attorneys for

5     Mr. Adams.  Your testimony is dealing with issues that are now

6     almost 30 years old, correct?

7     A.   Approximately.

8     Q.  And as I understand it, fundamentally, you were talking

9     about that there was this constant fighting for votes going on

10    in Clay County?

11    A.   I was talking about the -- when Clay M. run against Oscar

12    Gayle.

13    Q.  Well, working as a Republican commissioner, how often

14    would you find yourself as opposed to the Democrats in Clay

15    County?  Was that a big deal?

16    A.  Say that again now.

17    Q.  Okay.  You're a Republican commissioner.  In Clay County,

18    how much of a fight was it between the Republicans and

19    Democrats for each one of these elections?

20    A.   Well, unless the Democrats had somebody running in the

21    fall, there wasn't too much of a fight, because they pretty

22    well went along.

23    Q.  What does that mean?

24    A.  Say that again?

25    Q.  I said what does that mean, what you just said?

*DAY - Cross (Bayer)*                                              38

1   A.   I don't understand what the question is.

2   Q.   You just said they pretty well went along.  I said what

3   does that mean?

4   A.   Well, like I said, when we picked the officers up there,

5   there was not much disagreements.  Everybody was pretty well

6   in agreements.

7   Q.   Why?

8   A.   I don't know why.

9   Q.   So are you telling me that the Democrats would help pick

10  the Republican precinct officers and the Republicans would

11  help pick the Democratic precinct officers?

12  A.   No.  That ain't what I said.

13  Q.   Well, explain to me what you're saying, then, because

14  you've got me very confused.

15  A.   I had a list.  I picked the Republicans, and the

16  Democrats picked their Democrats.

17  Q.   So in other words, they really were acting independently

18  from each other?  Is that what you're saying?

19  A.   I had a list, and the Democrat commissioner had a list.

20  He picked his and I picked mine.

21  Q.   Well, again, my question is, then, you were acting

22  independently and different from that of the Democrat?

23  A.   I don't know what you're trying to ask me.  I'm telling

24  you, I had a list of the Republicans that was submitted from

25  each precinct.  And out of that list, I picked two officers

*DAY - Cross (Bayer)*                                                    39

1    for each precinct.

2    Q.   And then the Democrat would do the same?

3    A.   And the Democrat would do the same.

4    Q.   And you each would pick your own officers for each

5    precinct every election, correct?

6    A.   Yes.

7    Q.   How many times do you remember over the time that you

8    were commissioner that somebody told you what officers you

9    were supposed to pick?

10   A.   The whole time that I was commissioner, I was told who to

11   pick.

12   Q.   Who would tell you to do that?

13   A.   Roy Morgan.

14   Q.   And who was Roy Morgan?

15   A.   He's a Republican in Clay County.

16   Q.   What office did he hold?

17   A.   He don't hold nothing now.  He used to hold the

18   magistrate.

19   Q.   Was he a magistrate at the time he told you who to pick?

20   A.   No.

21   Q.   What was he then?

22   A.   Nothing.

23   Q.   But it was Roy Morgan who would always give you your

24   instructions?

25   A.   Roy give me the instructions on who to pick.  He give me

*DAY - Cross (Bayer)*                                                40

1    the instructions to give Cletus the list.

2    Q.   I'm talking about generally speaking, who would give you

3    your instructions?

4    A.   Roy.

5    Q.   Okay.  And then on this one occasion, Roy Morgan was the

6    one who instructed you to give the list to Cletus?

7    A.   That is right.

8    Q.   Now, you spoke of this one judicial race in which Oscar

9    Gayle House was running against Clay Bishop?

10   A.   Right.

11   Q.   Contested race?  Hot race?

12   A.   Hot race.

13   Q.   One was a Democrat, one was a Republican?

14   A.   You know, I don't know.  I mean, that's an

15   unpartial [sic].  I don't know if one is -- I don't know.

16   Q.   But it seemed to be very hotly contested?

17   A.   Yes, it was.

18   Q.   Who were leading the different factions for Gayle House,

19   for Oscar Gayle House?

20   A.   Cletus Maricle.

21   Q.   And who was leading the faction for Clay Bishop?

22   A.   Neville Smith, Dobber Smith.  I don't know who else.

23   That's who contacted me.

24   Q.   Who contacted you?

25   A.   Neville Smith.

*DAY - Cross (Bayer)*                                                      41

1   Q.   Okay.  But what role did Doug Adams have in all of this?

2   A.   Neville told me, when he contacted me, he wanted me to

3   handle the money.  Doug would help, but Doug wouldn't handle

4   no money because he'd got saved, he got religion, and he

5   wouldn't handle no money.

6   Q.   So if I understand you correctly, Doug never handled any

7   money?

8   A.   No.

9   Q.   And it was Neville Smith who came to you about the money?

10  A.   Neville Smith wouldn't give me all the money.  They

11  didn't trust me with all the money.  Neville set at mouth of

12  break ridge with the money.  And when we would run low, Doug

13  would go get five, ten thousand dollars and bring it and give

14  it to me.

15  Q.   But you said he didn't handle the money.

16  A.   He didn't pay no votes.  He brought the money to me, but

17  he didn't buy no votes.

18  Q.   Why was it that Neville Smith didn't want you to have all

19  the money?

20  A.   I guess he didn't trust me.

21  Q.   Why?

22  A.   I don't know.

23  Q.   Why do you think?

24  A.   I have no idea.

25  Q.   And you said that Cletus Maricle and Doug Adams would bid

*DAY - Cross (Bayer)*                                                    42

1    against each other?

2    A.   They did on that one, one time.

3    Q.   How hotly contested was that when they were bidding

4    against each other?

5    A.   It was hot.  It went up to $800.  That's the most I ever

6    seen paid for a vote in my whole life.

7    Q.   You said there was one person that got paid $800?

8    A.   That's right.

9    Q.   How did they manage to wrangle $800?

10   A.   They done it.

11   Q.   You also made a comment that it was so important because

12   they were fighting to show who had power?

13   A.   Who had the power at the precinct that day, that's right.

14   Q.   Well, explain that.

15   A.   Who had the most money there.

16   Q.   So they're against each other?

17   A.   That time, they was.

18   Q.   They're not cooperating with each other?

19   A.   Nope.

20   Q.   Do you remember telling an FBI agent about Jennings White

21   trying to set Doug Adams up?

22   A.   I sure do.

23   Q.   Tell me about that, please.

24   A.   Doug -- Jennings wanted somebody to plan --

25              MR. SMITH:  Your Honor, I'm going to place an

*DAY - Cross (Bayer)*                                                              43

1    objection as to this.  I believe this question would go

2    outside the scope of the hearing, and I would object.

3              THE COURT:  All right.

4              MR. BAYER:  If I can explain, it goes to the exact

5    intent of how they're presenting Mr. Day's testimony and how

6    it correlates with this dynamic that's going on within the

7    county.  And if the Court would give me a little leeway, I'd

8    like to have a chance to tie it all together.

9              THE COURT:  I'll sustain the objection.

10   Q.  You talked about that there was this, this double-cross

11   regarding Hooker.  Explain that to me, because you lost me on

12   that when you were testifying.  What was going on in that

13   election?

14   A.  Doug and Cletus was inside.  Cletus was the Democrat

15   judge.  Doug was the Republican judge.

16   Q.  And let me interrupt you for a minute.  This would have

17   been May of 1985?

18   A.  Whenever Corky McKeehan run for magistrate against Mike

19   Hooker, whatever year that is.  I don't recollect the year.

20   Q.  Okay.  So go ahead and explain to me what was going on.

21   A.  I was buying votes outside for Corky McKeehan, sending

22   them inside to vote.  And when they'd go inside to vote, they

23   were voting for Mike Hooker.

24   Q.  How do you know that?

25   A.  Say that again?

*DAY - Cross (Bayer)*                                                44

1    Q.    How do you know that?

2    A.    I bought votes all day long.  End of the day, whatever

3    there was, Mike Hooker got three or four hundred votes, and

4    Corky got 20 or 30 or 40, whatever it was.

5    Q.    So you were the one buying the votes?

6    A.    I bought the votes, that's right.

7    Q.    I don't understand what you were saying then that Doug

8    Adams had to do with any of this.

9    A.    I was buying the votes outside.  Doug Adams was the

10   Republican election judge inside.  Cletus was the Democrat

11   judge.  When I would send them in, I would send them in to

12   Cletus and Doug to vote 'em, and they would vote 'em, give me

13   the nod, and I would pay them when they'd come out.

14   Q.    Who would give you the nod?

15   A.    Doug would one time, Cletus would one time.  Just

16   backwards and forwards.

17   Q.    But they were inside, you were outside?

18   A.    They was inside, and I was outside.

19   Q.    So how did they give you a nod?

20   A.    Standing at the door watching them.

21   Q.    Would one of them nod depending upon how they voted one

22   way and the other one nod depending upon if they voted a

23   different way?

24   A.    They'd just give me a nod if they voted the right way.

25   If they didn't vote the right way, they shook their head or

*DAY - Cross (Bayer)*                                                    45

1    something.  I can't remember exactly how they done it.

2    Q.   You can't remember how they done it.  You can't really

3    remember what they were doing, can you?

4    A.   I remember that I was sending them in for Corky McKeehan,

5    and they voted 'em for Mike Hooker.

6    Q.   Why?

7    A.   They was double-crossing J.E. Henson and Corky McKeehan.

8    Q.   Then why would you send them in to vote for McKeehan,

9    knowing that they were going to be voting for Hooker?

10   A.   McKeehan's brother was with us that day on the ground.

11   He helped us buy votes all day long.

12   Q.   So why, again, I ask you, why would you send them in

13   supposedly to vote for McKeehan, knowing that they were going

14   to wind up voting for Hooker?

15   A.   Because Corky McKeehan's brother was on the ground that

16   day helping us.  He thought they was voting for his brother.

17   Q.   Why were you assisting in this double-cross?

18   A.   Just the way of Clay County.

19   Q.   Who was paying you to do that?

20   A.   I didn't get no money.

21   Q.   Then did you tell McKeehan's brother you were

22   double-crossing him?

23   A.   Nope.

24   Q.   Did you tell anybody you were double-crossing him?

25   A.   No.

*DAY - Cross (Bayer)*                                                46

1    Q.   Did you know you were double-crossing him?

2    A.   Yes, I did.

3    Q.   Why did you do it?

4    A.   Because Cletus and Doug wanted me to do it.

5    Q.   How do you know that?

6    A.   I went with Cletus to get the $10,000 from J.E. Hensley,

7    and he asked me if I would help him do it.

8    Q.   But that wasn't Doug.

9    A.   Doug was inside with Cletus that day.  Doug did not go

10   with us to get the money.  I went with Cletus to get the

11   money.

12   Q.   So you're sitting here today and you're telling us

13   because you would see Doug Adams nod, he was involved in this?

14   A.   At the end of the day, they got scared about how they was

15   going to call the votes off.  And they called me up to the

16   door and told me they was going to call them out, reverse the

17   vote and to go ahead and leave as soon as the last vote was

18   voted.

19   Q.   Who told you that?

20   A.   Doug and Cletus both did.

21   Q.   And they said they were going to reverse the votes?

22   A.   Yep.  When they called them off at the door.

23             MR. BAYER:  Judge, if I can have just a moment.

24             THE COURT:  Yes, sir.

25   Q.   I want you to tell me how often that you would deal with

*DAY - Cross (Bayer)*                                                47

1    Roy Morgan.

2    A.   I don't know what you're asking.

3    Q.   Well, during the time that you were an election

4    commissioner, how often would it be that you took your

5    direction from Roy Morgan on what you were supposed to be

6    doing?

7    A.   I can't recall.

8    Q.   Do you consider Roy Morgan as being the one who most

9    often told you what you were supposed to be doing, whether it

10   was picking officers or the other things that you were

11   supposed to be doing?

12   A.   Ask that question again now.

13   Q.   Would you say that most of the time that you were acting

14   as a commissioner and that you were taking instructions on how

15   to select precinct officers or other things that you were

16   supposed to be doing, that those instructions principally came

17   from Roy Morgan?

18   A.   A lot of the times, they did.

19   Q.   What was the link between you and Roy Morgan that you

20   would listen to him?

21   A.   Just good friends.

22   Q.   How did you get on as commissioner?

23   A.   I got elected.  The precinct, the precinct captains and

24   co-captains and youth captain, they met at the precincts and

25   vote and all go to the courthouse and vote you in.  It's like

*DAY - Cross (Bayer)*                                                48

1    an oral vote.  It ain't on a voting machine or nothing like

2    that.  It's just a show of hands.

3    Q.   And Roy Morgan was the one who approached you to be the

4    commissioner?

5    A.   Yes, he did.

6    Q.   And you became elected to commissioner?

7    A.   Yes.

8    Q.   That would have been in the early 1980s?

9    A.   Somewhere in the '80s.  I don't know the exact year.

10   Q.   And you served for about ten years, you think?

11   A.   When I was at Morgantown, West Virginia, in '97, '98, I

12   resigned, because I was locked up and --

13   Q.   For all the time that you were a commissioner, did Roy

14   Morgan tell you who were going to be the people that you would

15   buy votes for?

16   A.   Ask me that again.

17   Q.   During the time that you were a commissioner, did Roy

18   Morgan, was he the one who told you who you should buy the

19   votes for, which candidate?

20   A.   I don't recall him ever telling me who to buy no votes

21   for.

22   Q.   But he would tell you who to pick as far as the precinct

23   officers?

24   A.   A lot of the times.

25   Q.   And if I understand your testimony today, the only

*DAY - Cross (White)*                                                    49

1    knowledge that you have about anything regarding Doug Adams
2    goes back to 1985?
3    A.   I don't know the exact year, but it goes back when I
4    testified there to Corky McKeehan, when he run, and when Oscar
5    Gayle ran against him.
6    Q.   If I told you those were the races in 1983 and 1985, you
7    don't know anything about Doug Adams since that time, do you?
8    A.   Personally, no.
9              MR. BAYER:  Thank you.
10             THE COURT:  See if any of the other defendants wish
11   to examine the witness on these matters.
12             MR. WHITE:  If I could, Your Honor.
13             THE COURT:  Yes.
14                       CROSS-EXAMINATION
15    BY MR. WHITE:
16   Q.   Good morning.
17   A.   Good morning.
18   Q.   Couple quick questions.  One, you said you lived in Clay
19   County all your life.  And in Clay County, being involved in
20   politics, you got to know a lot of folks when you were living
21   there growing up.  If you could give us an audible answer.
22   Was that a yes?
23   A.   Say that again now.
24   Q.   When you were growing up in Clay County, going to school,
25   working in Clay County, before you went away to prison, you

*DAY - Cross (White)*                                                  50

1   got to know a lot of people living in that county?

2   A.   Yes, I did.

3   Q.   And what part of the county did you say you lived in,

4   Burning Springs?

5   A.   Burning Springs.

6   Q.   And was that the precinct that you worked in the election

7   between Mr. House and Mr. Bishop back in '83 or '85?

8   A.   Whatever year it was, that's the precinct I always

9   worked.  I always worked Burning Springs.

10  Q.   That's right.  And to vote in Burning Springs, you had to

11  live in that Burning Springs precinct, correct?

12  A.   That is correct.

13  Q.   And did you have a pretty good idea of who all the voters

14  were in that precinct?

15  A.   We had a list.

16  Q.   You had a list of all the voters?

17  A.   Yeah.

18  Q.   Did you know most of them?

19  A.   Majority of them.

20  Q.   Well, you say majority.  Would you say more or less than

21  80%?

22  A.   No.

23  Q.   Well, more than 80% or less than 80%?

24  A.   I might have known 40 to 50 percent of the people there

25  on a first name basis.

*DAY - Cross (White)*                                                        51

1    Q.   Well, since you were involved in elections and were on

2    the Board of Elections, did you know how many people, how many

3    registered voters were in the Burning Springs precinct,

4    approximately?

5    A.   We always had a list.

6    Q.   I understand.  But was that -- were there a thousand

7    people on that list or 50 people on that list?

8    A.   I don't recall.

9    Q.   Was it more or less than a hundred?

10   A.   I don't recall.

11   Q.   Okay.  And you say that $800 was the most you'd ever seen

12   paid for for a vote?

13   A.   That is right.

14   Q.   And you only saw that one time?

15   A.   That is right.

16   Q.   And you were the one that handed the $800 over to this

17   person?

18   A.   That is right.

19   Q.   And either Mr. Adams or Mr. Maricle was the one that gave

20   you that $800; is that your testimony?

21   A.   Adams give me the money.

22   Q.   Mr. Adams gave you the $800.  Based on all that history,

23   it's your sworn testimony in this court that you do not know

24   who that person was you gave $800 to?

25   A.   I do not.

*DAY - Cross (White)*                                                    52

1    Q.   Now, you were in -- I think you testified that you were

2    convicted of carrying, what, about six kilos of coke down in

3    Florida, or caught down in Florida?

4    A.   Eight kilos.

5    Q.   Eight kilos.  Did you do your time in Gilmer?

6    A.   No, I done it at Morgantown and Beckley, West Virginia.

7    Q.   Okay.  And that would have been -- so you were in the

8    drug business, what, in the coke business anyway, in the '90s

9    when you were arrested?

10   A.   Yes.

11   Q.   And did you ever sample your product?  Did you take drugs

12   yourself?

13   A.   Yes, I did.

14   Q.   Did you smoke crack?

15   A.   Nope.

16   Q.   You just used powder?

17   A.   Nope.

18   Q.   What did you use?

19   A.   I done crystal meth.

20   Q.   Other than crystal meth, did you smoke any green?  Did

21   you smoke any marijuana?

22   A.   Maybe one or two in my whole life.

23   Q.   Okay.  You were just a crystal meth man?

24   A.   Right.

25            MR. WHITE:  That's all I have, Your Honor.

*DAY - Cross (Abell)*                                                      53

1              THE COURT:  Thank you.

2                          CROSS-EXAMINATION

3    BY MR. ABELL:

4    Q.   Mr. Day, I have a few questions to try to help me

5    understand your testimony.  You were in the cocaine dealing

6    business in the '90s, and you eventually got convicted for

7    eight kilos of cocaine; is that right?

8    A.   That's right.

9    Q.   You're saying, though, you weren't a cocaine user ever;

10   is that true?

11   A.   I might have used it one or two times, but that wasn't my

12   drug of choice.

13   Q.   Crystal meth was your drug of choice?

14   A.   That is correct.

15   Q.   You used it regularly?

16   A.   Yes, I did.

17   Q.   Every day?

18   A.   Yes, I did.

19   Q.   Several times a day?

20   A.   Yes, I did.

21   Q.   For many years?

22   A.   From early '90s till I got locked up.

23   Q.   You got locked up -- early '90s would be '91.  You got

24   locked up in '97?

25   A.   '97.

*DAY - Cross (Abell)*                                                    54

1    Q.   So six years, you were a daily heavy user of crystal

2    meth; is that right?

3    A.   Five or six years, yes.

4    Q.   Now, when you were locked up, you didn't use drugs during

5    that period, I guess, right?

6    A.   No, I did not.

7    Q.   You got out in '01?

8    A.   '01.

9    Q.   Went back into the cocaine business?

10   A.   That is right.

11   Q.   Began using drugs again?

12   A.   That is right.

13   Q.   You got locked up again in '07?

14   A.   '05.

15   Q.   About four years, again, '01 to '05, you used drugs

16   regularly?

17   A.   About two years.  I was on supervised release, and they

18   was giving me a UA every month or every two months or whatever

19   have you.  Then probably the last two years I was out.

20   Q.   Daily use of crystal meth?

21   A.   When I started back, it was daily use, yes.

22   Q.   Several times a day?

23   A.   Yes.

24   Q.   What's your serve-out date on your sentence?

25   A.   On this sentence?

*DAY - Cross (Baldani)*                                                     55

1   Q.   Yeah.  You got 18 years?

2   A.   2021.

3   Q.   How old are you going to be then?

4   A.   Sixty-nine.

5   Q.   In resentencing, what you're hoping for is a reduction in

6   your sentence?

7   A.   That is correct.

8   Q.   You got to be hoping as a result of your testimony in

9   this case, you get out of jail before you die, right?

10  A.   Whatever.

11  Q.   The answer is yes, right?

12  A.   What was the question now?

13         MR. ABELL:  That's fine.  Thank you, Judge.

14         THE COURT:  Yes, sir, Mr. Abell.  Give Mr. Abell a

15  second to get in.  Mr. Baldani, you can come out.

16                     CROSS-EXAMINATION

17   BY MR. BALDANI:

18  Q.   Good morning, Mr. Day.

19  A.   Good morning.

20  Q.   I just have a few questions for you.  You testified in

21  particular about a couple of hotly contested elections this

22  morning, correct?

23  A.   Yes.

24  Q.   Freddy Thompson didn't have any involvement in those, did

25  he?

*DAY - Cross (Baldani)*                                                    56

 1    A.   No, he did not.

 2    Q.   All right.  And he didn't have any involvement in any of

 3    that jury business you were talking about, did he?

 4    A.   No.

 5    Q.   And he didn't have any involvement in any of the drug

 6    business that you'd been involved with throughout the years,

 7    did he?

 8    A.   No.

 9    Q.   Now, you testified about power.  Power struggles,

10    perception of power in Clay County.  In these years you were

11    talking about the '80s and '90s, Freddy Thompson wasn't

12    perceived as being a power player in Clay County, was he?

13    A.   No, he was not.

14    Q.   Nor was his family?

15    A.   Not to my knowledge.

16    Q.   All right.  And you said you got out in '01, right?

17    A.   Right.

18    Q.   Now, when you became a -- when you were convicted of a

19    felony, did that disqualify you from being an election

20    commissioner?

21    A.   I can't answer that question.  I don't know.

22    Q.   You don't know whether it automatically disqualifies you,

23    but you resigned because you were in the joint; is that right?

24    A.   That's right.

25    Q.   Okay.  You talked about your involvement in the past.

*DAY - Cross (Baldani)*                                                    57

1    Were you involved in the '02 election?

2    A.   The '02 election?

3         MR. SMITH:  Your Honor, I'm going to object.  This

4    inquiry I believe to be outside -- this question calls for

5    questions that are inside the period.  We're talking about

6    allegations that occurred outside.

7         THE COURT:  Let's see if it's relevant to what's been

8    listed in the United States' notice.  Is it relevant?

9         MR. BALDANI:  No problem, Judge.

10   Q.   Mr. Day, you testified this morning that you've testified

11   previously since being convicted, right?

12   A.   That's right.

13   Q.   What case was that?

14   A.   I testified in the Jennifer Garrison case and Wayne

15   Reeves' case.

16   Q.   Those two?

17   A.   Those two.

18   Q.   As witness for the government?

19   A.   Well, I've been involved with some more cases, but them's

20   the only two that I took the stand on.

21   Q.   Okay.  And since your conviction, you've met on occasion

22   with either the federal prosecutor or federal agents and

23   talked about various things in Clay County, right?

24   A.   Yes.

25   Q.   And we call these proffer sessions, right?  Is that what

*DAY - Cross (Baldani)*                                                    58

1   you understand them to be?

2   A.   I don't know.

3   Q.   You sit down, usually you have your lawyer.  There's an

4   agent, there's a prosecutor.  Usually they ask you questions.

5   A.   I got debriefed, if that's what you're asking me.

6   Q.   We can call it that.  You were asked about Clay County

7   officials who were corrupt during one of these debriefs,

8   weren't you?

9   A.   I don't recall.

10   Q.   You've never mentioned Freddy Thompson's name when you've

11   been debriefed, have you?

12   A.   No, I have not.

13   Q.   That's because during this whole time period that we're

14   talking about, as far as you know, he was clean, right?

15   A.   I never had no dealings with Freddy Thompson whatsoever.

16           MR. BALDANI:  That's all, Judge.

17           THE COURT:  Thank you.

18           MR. GILBERT:  I have no questions.

19           THE COURT:  Thank you.  Miss Hughes, Mr. Simons, any

20   questions?

21           MR. SIMONS:  No, Your Honor.

22           THE COURT:  Any follow-up, Mr. Smith, on matters that

23   have been covered on cross?

24           MR. SMITH:  No, Your Honor.

25           THE COURT:  All right.  Thank you.  Mr. Day, you may

*LEWIS - Direct*                                                              59

1    step down, sir.  Thank you.

2            MS. HUGHES:  While we're in between witnesses, is it

3    possible to move the computer screen, because Mr. Simons and I

4    cannot see the witness at all over here.

5            THE COURT:  We're waiting on the marshal to return.

6    I assume the next witness is in custody.

7            MR. SMITH:  Yes, Your Honor, Gene Lewis.

8            EUGENE LEWIS, GOVERNMENT'S WITNESS, SWORN

9            THE COURT:  Thank you.  Mr. Smith, you may proceed.

10                       DIRECT EXAMINATION

11   BY MR. SMITH:

12   Q.  Do you need some water, Mr. Lewis?

13   A.  I'll be all right.

14   Q.  State your name, please.

15   A.  Eugene Lewis.

16   Q.  Mr. Lewis, tell us your age.

17   A.  Seventy years old.

18   Q.  And where did you grow up?

19   A.  Manchester.

20   Q.  How long did you live in Clay County?

21   A.  All my life, except when I was locked up.  Sixty some

22   years.

23   Q.  And Mr. Lewis, what did you do for jobs while you were

24   living in Clay County?  What was your job?

25   A.  I did construction work for several years, and then I got

LEWIS - Direct                                                    60

1    a job in Fayette as a federal coal mine inspector in the early

2    '70s.  I worked for them till '94, and I took an early

3    retirement.  And I was farming and doing construction work on

4    my own, dozers and stuff like that, working with gas lines.

5    Q.  What was your first job?

6    A.  First job, working at the state highway department.

7    1961.

8    Q.  Okay.  And did you graduate from high school?

9    A.  Yes, 1957.

10   Q.  What did you do after high school?

11   A.  Went straight, one week later, I was in the United States

12   Air Force.

13   Q.  And how long were you in the United States Air Force?

14   A.  I got grade for four years.  I got two or three months

15   early out, something like that, come overseas.

16   Q.  And from your state job, you went into construction?

17   A.  When -- I believe it was '67, when Louie Nunn went into

18   office there, that's when they got rid of a lot of the guys on

19   the state department at that time.  I went straight to

20   construction and got a good job.

21   Q.  Politics in Clay County, were you Democrat or Republican

22   during that time?

23   A.  I had been a Democrat ever since I got out of service

24   when I registered, because you had to be at that time, in

25   1961, when I started with the state department.

LEWIS - Direct                                                    61

1   Q.   And did you get yourself involved in the Clay County

2   Board of Elections at some point as an election officer?

3   A.   Yes, sir.

4   Q.   Tell us when that was, approximately.

5   A.   I started serving as election officer probably around

6   '80, 1980 there, but I'd been involved with elections for, you

7   know, in the '70s.

8   Q.   Okay.  And when you say you were involved in elections,

9   how did you get yourself involved?

10  A.   Well, I was asked, you know, being a Democrat.  And in

11  the precinct I was at, there's not many Democrats.  And I was

12  asked by certain guys to be a Democrat judge.

13  Q.   Okay.

14  A.   And I was judge for many, many times, spring and fall,

15  through most all '80s and into the '90s.  I think '94 was the

16  last one.

17  Q.   And what precinct was that?

18  A.   Pin Hook precinct.

19  Q.   And Pin Hook would have been where you were your whole

20  time?

21  A.   Yes, sir.

22  Q.   Prior to becoming a selection for the election officer

23  position, Democrat judge, had you been involved in any

24  political races, involved yourself in trying to help a

25  candidate?

*LEWIS - Direct*                                                    62

1   A.   Yes, sir.

2   Q.   And how did you get involved and how did you help?

3   A.   Well, that was helping people, when they was selling

4   their votes, you know, buying votes.

5   Q.   And how did that work over there in Pin Hook?

6   A.   Well, if I was judge, there was guys come in with a

7   ticket, I would make sure that the guys that was buying their

8   vote, that they got their right vote.  I'd watch them vote and

9   I'd give them the nod back outside.

10  Q.   When you'd give a nod back outside, was that to somebody?

11  A.   Yes, sir.

12  Q.   And what was the significance -- what did you understand

13  that to mean?

14  A.   That I give them a nod that they voted for the right

15  person, and I was confirming with who they supposed to vote

16  for.

17  Q.   And did that happen regularly at Pin Hook?

18  A.   Yes, sir.

19  Q.   Can you ever recall election when it didn't happen in Pin

20  Hook?

21  A.   No, sir.

22  Q.   While you were election officer, was there ever an

23  election when that didn't happen?

24  A.   Not -- no, sir.

25  Q.   This position that you got, I believe, was a judge

1    position?

2    A.    Yes, sir.

3    Q.    How hard was that to maintain over the years?  Did you

4    have to lobby for it and position yourself for it?

5    A.    It was almost automatic.

6    Q.    Now, during the time period that you were operating

7    inside the polls as a judge, you knew these vote buying

8    situations were going on.  Did anybody ever bring you money as

9    an officer, while you were an officer?

10   A.    Yes, sir.

11   Q.    Could you tell us about that, Mr. Lewis?

12   A.    Well, several people brought me money to be for their

13   candidate.  And the last election would be 1994, when the

14   county judge, the sheriff, the clerk, probably four elections

15   on there.  That was Roy Morgan brought me money to be for him.

16   Carl Crawdad Sizemore, Charles Marcum for jailer.  That's

17   three for sure, sir.

18   Q.    And that would have been your last time that you served?

19   A.    I'm pretty sure that's the last time.  I could have

20   served in spring of '95, but that's when I got charged with a

21   fed so --

22   Q.    What did you get charged with by the feds?

23   A.    Cocaine trafficking, sir.

24   Q.    Okay.  And did you enter a guilty plea or were you

25   convicted?

*LEWIS - Direct*                                                          64

1    A.   I entered a guilty plea.

2    Q.   Okay.  And did that end your service as election officer?

3    A.   Yes, sir.

4    Q.   Okay.  Now, you said that Roy Morgan, you recall -- who

5    was -- was anybody with him when he brought you the money?

6    A.   Yes, sir.  He called me at home that night, come out

7    there at Garrard to meet him.  A guy by the name of Cletus

8    Maricle was in the car with him.

9    Q.   Okay.  And do you see Mr. Maricle here in the courtroom

10   this morning?  I'm going to stand aside.

11   A.   Yes, sir.

12   Q.   Okay.  Could you, for the record, describe what he's

13   wearing, where he's seated?

14   A.   Repeat the question again, sir.

15   Q.   Could you point out for the record where he's seat the

16   and what he's wearing?

17   A.   He's sitting straight back there -- the white-headed guy.

18        THE COURT:  The record will reflect that Mr. Lewis

19   has identified the defendant, Mr. Maricle.

20        MR. SMITH:  Okay.  Thank you.

21   Q.   And where did they bring the money?

22   A.   They had the money, and I got in the car with them and

23   they give me -- Roy give me a thousand dollars to be for him

24   in the election.

25   Q.   Was that cash money?

*LEWIS - Direct*                                                                65

1    A.   Yes, sir.

2    Q.   What did Roy ask you, or did anybody give you any

3    directions or talk to you about what they wanted you to do?

4    A.   Yes, sir.  To be for him, spend the money for him to buy

5    votes for the election.

6    Q.   And had Mr. Maricle had anything to do with you getting

7    involved as election officer?

8    A.   Well, I know Mr. Maricle for many years.  And being a

9    Democrat judge, he spoke to me one day, would I care to be a

10   Democrat judge, and I said yes, no problem with me, you know.

11   Q.   And that would have been early on before you started as

12   election officer?

13   A.   That was around, somewhere in '80, '81, somewhere close

14   in there.

15   Q.   And was this the first time he'd come with the candidate

16   with money and asked you to vote -- to buy votes with?

17   A.   Yes, sir.

18   Q.   Okay.  And you believe this would have been the '94

19   election?

20   A.   Yes, sir.

21   Q.   The last one?  Have you ever given Mr. Maricle any money

22   over --

23   A.   Yes, sir.

24   Q.   And could you tell us about that?

25   A.   I guess when he was running for judge, he came to my

LEWIS - Direct                                                          66

```
 1   house, and I gave him $2,000 cash money when he was running.
 2   There was a guy by the name of James Hoskins with him in my
 3   living room, in my house.
 4   Q.   James, does he go by a nickname?
 5   A.   Hoss.
 6   Q.   So he and Hoss came to your house?
 7   A.   Yes, sir.
 8   Q.   And you said Maricle was asking for support?
 9   A.   Yes, sir.
10   Q.   This money that you gave him, the 2,000, was that cash
11   money?
12   A.   Yes, sir.
13   Q.   Were you selling drugs back then when you had that cash
14   money?
15   A.   2004, no, sir.
16   Q.   '94.
17   A.   '94.  No, sir.
18   Q.   Was it '94 -- do you know what year it was that you
19   gave -- I'm sorry.  I don't want to put words in your mouth.
20   Do you recall what year it was that you gave Mr. Maricle
21   that -- Mr. Hoskins, I believe, the money?
22   A.   That would be probably the late '80s, I guess, when he
23   was running for circuit judge the first time.  I'm not for
24   sure.
25   Q.   When did you start into marijuana drug business, growing
```

LEWIS - Direct                                                  67

1    marijuana or selling marijuana, Mr. Lewis?

2    A.   Yes.

3    Q.   Do you recall when you started?

4    A.   When did I start, sir?

5    Q.   Yes, sir.

6    A.   Let me back up.  In the late '80s, we rented a farm in

7    Henry County, 30 or 31 of us guys from Clay County who deer

8    hunt on a farm.

9    Q.   All right.

10   A.   And this -- from this lady, and we gave her a hundred

11   dollars apiece to hunt on this farm.  During this time we was

12   all hunting down there, it become obvious that there was good

13   spots to grow marijuana.  So that summer, after we had the

14   farm, we leased it in the fall.  The next summer, me and a guy

15   named Mansell Baker and Wayne Jones --

16   Q.   Is that Charles Wayne Jones?

17   A.   Yes, sir.

18   Q.   Do you see him here in the courtroom and could you

19   identify him if you can?

20   A.   Yes, sir, he's standing up back there, sir.

21   Q.   Okay.

22        MR. WHITE:  Stipulate identification.

23        THE COURT:  The record will reflect the witness has

24   identified Wayne Jones.

25   A.   Me and Charles Wayne, that summer, that spring, we dug in

1    a bunch of pot plants on this land that we had leased.  And we
2    probably put out roughly 500 marijuana plants that year.
3    Q.   And this was at this farm in Henry County?
4    A.   Yes, sir.
5    Q.   And when you say we put it out, who was that?
6    A.   Me and Mr. Jones and Mansell Baker.
7    Q.   With the intention of doing what with it?
8    A.   Cultivating marijuana for profit.
9    Q.   And how long did that partnership you say that you formed
10   with Mr. Jones and Mr. Baker last?
11   A.   Wayne stayed down there with me a couple years.
12   Q.   And did you ever take ownership of that farm?
13   A.   Yes, sir.
14   Q.   And could you tell us how that came about?
15   A.   Me and Baker and Jones, to my knowledge, we gave the lady
16   $55,000 -- well, let me back up.  The lady passed away, and
17   one section of the farm come available.  148 acres, I believe,
18   was the correct.  So we borrowed some money from the State
19   Bank in Manchester, us three guys.  And Wayne stayed with us a
20   year or so, and he got out.  So I kept the farm until '95, but
21   I got the other guys out.
22   Q.   Okay.  So Mr. Baker and Mr. Jones, were all of you deed
23   holders?  Were your names on the deed?
24   A.   Sir, I'm almost positive that me and Baker was on the
25   deed.  I don't believe Wayne put his name on the deed.  But he

*LEWIS - Direct*                                                            69

1    borrowed -- he signed the deed -- he signed a note at the

2    bank, I'm almost positive.

3    Q.   And during the time period that you all were partners in

4    this drug business, how did you all split the profits?

5    A.   One-third each.

6    Q.   All right.  And do you recall, Mr. Lewis, approximately

7    how much money you were profiting from your marijuana growing?

8    A.   We probably, us three probably made, at a rough guess,

9    because you don't know what they got for their part, probably

10   75,000 apiece, somewhere in that vicinity.

11   Q.   And during your drug partnership with Mr. Jones,

12   Mr. Baker, what were you doing with the marijuana once you

13   harvested it?  Where did you take it?

14   A.   I took a lot of it to my house and hired a couple ladies

15   to clean it.

16   Q.   What do you mean clean it?

17   A.   Pardon?

18   Q.   What do you mean by clean it, Mr. Lewis?

19   A.   That's kind of picking the little, what they call the pad

20   leaves and some of the long leaves off and get a lot of the

21   garbage, they call it, you know.  And I would distribute their

22   part, their part, and -- three parts.  And sometimes --

23   Q.   So Mr. Jones got a part, you got a part and Mr. Baker got

24   a part?

25   A.   And sometimes I would sell all of it and then take their

LEWIS - Direct                                                    70

1    money, but not every time.  I would give them these three

2    parts.

3    Q.   And what was it selling for a pound?

4    A.   Back then, about 2,000.

5    Q.   And then when you'd sell marijuana, then you'd split the

6    profits with them?

7    A.   That is true.

8    Q.   And did you sell marijuana there in Clay County?  Is that

9    where you sold it from?

10   A.   Yes, sir.  Every bit of it, mine was sold in Clay County.

11   Q.   Were you not concerned about the police there and the

12   authorities in Clay County?

13   A.   They might not have knew.  But I figured if I got caught

14   that I had protection, you know.

15   Q.   And when you say you thought if you got caught in Clay

16   County you had protection, had you -- the old adage, you

17   scratch my back, I scratch yours?  Is that the way it is in

18   Clay County?

19   A.   Yes, sir.

20   Q.   And had you scratched some backs in power over there?

21   A.   Well, I figure I've done a few things to help them as far

22   as buying votes and things like that.

23   Q.   Did he ever pay you for buying votes at the polls in Pin

24   Hook?

25   A.   No, sir.

*LEWIS - Direct*                                                               71

1    Q.   You did that expecting if you needed a favor later on,

2    you could get it?

3    A.   Yes, sir.

4    Q.   Had Cletus Maricle ever proven to you he had some power

5    in politics over there?

6    A.   Well, sir, when you're one of the most --

7    Q.   Let me ask you this.  How did you get your job with the

8    state?

9    A.   Well, with the state, back then, Mr. Maricle wasn't -- he

10   was just, you'd say, a youngster back then.  Probably in law

11   school at that time.  How I got my job with the state, my

12   mother and Bert Combs were brother and sister's kids.  And me

13   being -- that's how I got mine.  Me and my brother both worked

14   in the state.  Half the family.

15   Q.   Let me ask you this, Mr. Lewis.  Did you ever get charged

16   with a crime over there in Clay County?

17   A.   No, sir.

18   Q.   You never got charged until it happened in federal court?

19   A.   No, sir.

20   Q.   Did Mr. Maricle ever tell you that he was there to help

21   you if he ever needed you -- if you ever needed him?

22   A.   I have known Mr. Maricle probably for 50 years off and

23   on, you know, just as a friend, I'd say.  And I'd see him many

24   times at the courthouse, many times at little Democrat, you

25   know, little get-togethers for some guy coming in the county

LEWIS - Direct                                                          72

1    to make a little speech, you know.  I've seen Mr. Maricle many

2    times.  He said I'm your friend.  If you ever need anything,

3    I'm there for you.

4    Q.   Did you understand that to mean that if you got in

5    trouble over there with some of your drug selling in Clay

6    County, that you could call on him for a favor?

7    A.   Yes, sir.  I would take that to be a favor if I need it,

8    but I never did have to ask.

9    Q.   Now, you and Mr. Jones split ways in the drug business

10   there several years back; is that right?

11   A.   Yes, sir.

12         MR. WHITE:  Objection as to form.  Your Honor, I

13   think it's a mischaracterization of prior testimony.

14         THE COURT:  Overruled.

15         MR. WHITE:  Thank you.

16   Q.   Did you ever make an answer to that question?

17   A.   What was the question?  I didn't hear it.

18   Q.   Okay.  I'm trying to direct you back a little bit.  And I

19   want to ask you about, you said that you and Mr. Jones split

20   ways in the partnership at some point after a couple of years?

21   A.   Yes, sir.

22   Q.   Do you recall that testimony?

23   A.   Yes, sir.

24   Q.   Did you and Mr. Jones ever talk about marijuana together

25   later, more recently?

LEWIS - Direct                                                73

1    A.   Yes, sir.

2    Q.   When did you last talk to him about the marijuana

3    business?

4    A.   Probably in the late -- in the 2000s, after the

5    elections, many times.

6    Q.   Okay.  Where was it that you remember meeting him and

7    talking to him about the marijuana business?

8    A.   Sir, I seen Wayne Jones almost daily at the -- on --

9    there was a little pawn shop there in Manchester.  And almost

10   five or six nights a week, it was open.  I would pretty well

11   see Wayne there, and I'd seen Wayne fishing, hunting.  He'd go

12   down by the house, you know.  I seen Wayne almost daily for

13   several years.

14   Q.   And when you last talked to him about the marijuana

15   trade, what was the nature?  What did he say to you?

16   A.   Well, if I got any marijuana -- I know he asked me a

17   couple times or several times, did I have any marijuana to

18   sell.  He'd growed some good plants and stuff like that.  I

19   said, I'm not fooling with no marijuana.

20   Q.   And you think that could have happened as late as 2000?

21   A.   Yes, sir.  Yes, sir.

22   Q.   Now, did you know Mr. Jones to hold a position with the

23   Clay County Board of Elections during that time period?

24   A.   Repeat that question, sir.

25   Q.   Did you know Mr. Jones to hold a position with the Clay

LEWIS - Direct                                                    74

1    County Board of Elections?

2    A.   Did he hold a position with the Clay County Board of

3    Elections?

4    Q.   Yes, sir.

5    A.   I don't -- I'd say his position -- I don't know the

6    question you're trying to say.

7    Q.   Let me ask it this way.  Did he ever serve as election

8    officer with you down there in Pin Hook?

9    A.   No, sir.

10   Q.   Did you know him to serve as an election officer in other

11   precincts?

12   A.   I think so, yes, sir.  He served the Heart Branch

13   precinct, I'm pretty sure.

14           THE COURT:  What was the name of that precinct?

15           THE WITNESS:  Heart Branch.

16   Q.   And do you know his close friends, who he's closely

17   associated with?

18   A.   I guess Wayne's got a lot of friends.  I know him and

19   Mr. Maricle's awful close.

20   Q.   How do you know that, Mr. Lewis?

21   A.   How many times I'd seen them together the last few years

22   together, at Chevron and Arby's.  Any time I'd stop for

23   breakfast or dinner, stop to get something to eat, I'd see

24   them together.  Them and Mr. Stivers.

25   Q.   Talking about Al Man Stivers?

LEWIS - Direct                                                    75

1   A.   Yes, sir, William Al Man Stivers.

2   Q.   Do you see him in the courtroom this morning?

3   A.   Yes, sir, bald-headed man sitting back there with the

4   jumpsuit on.

5           THE COURT:   Record will reflect the witness has

6   identified Mr. Stivers.

7   Q.   Mr. Lewis, tell us about your past.  You have already

8   admitted to me that you had a conviction in the mid '90s, I

9   believe.  That was what conviction for?

10  A.   Cocaine trafficking in Lincoln County.  Around a pound of

11  cocaine.  Just a little higher over a pound.  500 some grams,

12  I believe it was, sir.

13  Q.   And did you get a sentence by the federal judge in that

14  case?

15  A.   Sixty-seven months.

16  Q.   All right.

17  A.   Jennifer Coffman, Judge Jennifer Coffman.

18  Q.   Did you complete the service of that sentence?

19  A.   Yes, sir.

20  Q.   And did you later get a second conviction in federal

21  court?

22  A.   Yes, sir, I did.

23  Q.   Can you tell us about that?

24  A.   That was tied in through the original relevant conduct on

25  the first, that they come out and found some.  Could have been

*LEWIS - Direct*                                                      76

1    left there, you know, from the first.  And it was one kilo of

2    cocaine, which was two pounds, 2.2 pounds.  And while I was in

3    prison, they brought me back to Lexington, and Judge Forester

4    sentenced me to -- altogether, it was 67 months.  Anyway, he

5    gave me one more year.

6    Q.   And did you get a third conviction?

7    A.   Yes, sir.

8    Q.   And do you recall what that was for?

9    A.   Cocaine trafficking.

10   Q.   And what court was that in that you got convicted?

11   A.   London District Court, sir.

12        MR. SMITH:  Hand the witness Government's Exhibit

13   Number 2.  I'd like to hand it to the witness.

14        THE COURT:  Yes, sir.

15   A.   I think I've read this, sir, before.

16   Q.   You recognize that, Mr. Lewis?

17   A.   Yes, I read this years ago, sir.  It's been five years

18   ago or longer.

19   Q.   And what is that?

20   A.   That's where I was charged, sir.

21   Q.   Okay.  And does that also reflect that you admitted your

22   guilt and pled guilty before --

23   A.   Yes, sir.

24   Q.   -- the judge?  And you were sentenced for that conduct by

25   the Court at that time?

*LEWIS - Direct*                                                                 77

1    A.   Yes, sir.

2    Q.   What did you get for a sentence in that case?

3    A.   144 months, sir, by Judge Reeves.

4    Q.   And in that plea agreement, did you understand you had to

5    cooperate with the United States if called as a witness in any

6    matter?  Direct you to page 5, paragraph 9 --

7    A.   Yes, sir.

8    Q.   -- of the plea agreement?

9    A.   Yes, sir.

10   Q.   And what's your understanding, Mr. Lewis, would happen if

11   you were to testify untruthfully?

12   A.   I'd be charged with perjury, sir.  More time.

13   Q.   And have you been promised a reduction in your sentence

14   in this case?

15   A.   No, sir.

16   Q.   Do you know who would determine if you do get a sentence

17   reduction?

18   A.   Yes.  The judge.

19   Q.   And in your understanding, Mr. Lewis, have you had

20   opportunity to testify in any other proceedings?  Have you

21   ever been called as a witness before?

22   A.   No, sir.

23   Q.   This is your first time?

24   A.   Yes, sir.

25            MR. SMITH:  Move for the introduction of Government's

LEWIS - Direct                                                    78

1    Exhibit Number 2.

2            THE COURT:  Any objection?

3                            (No audible response.)

4            THE COURT:  Exhibit 2 will be admitted for purposes

5    of this hearing.

6                    (Government Exhibit No. 2

7                    was admitted into evidence.)

8    Q.   Mr. Lewis, you were giving us a background on marijuana.

9    Who was the first person to bring marijuana into the county,

10   to your recollection?

11   A.   Sir, I've been told -- Mr. Jones told me himself several

12   times that he was probably one of the first guys ever to bring

13   marijuana seed into the county.

14   Q.   Okay.

15   A.   Now, whether that's true --

16   Q.   Are you telling me they didn't grow marijuana before

17   Mr. Jones got on the scene?

18   A.   He told me he was one of the first persons ever to bring

19   seed into Clay County.

20   Q.   And that was his statement?

21   A.   Yes, sir.  He called it hemp.

22   Q.   After the partnership with Mr. Jones, did you all ever

23   trade marijuana between your --

24   A.   One time.

25   Q.   And tell us that instance, if you could.

*LEWIS - Direct*                                                         79

1   A.   In 1992, I sold Wayne five pounds of marijuana at $2,000

2   a pound, and I've never gotten my money yet.

3   Q.   Okay.  So he still owes you that money?

4   A.   Yes, sir.

5   Q.   Do you hold a grudge against him for that?

6   A.   No, sir.  That's a -- no, sir.

7   Q.   But you haven't forgotten it?

8   A.   No, sir.

9   Q.   When is the last time he asked you to handle money, or

10  has he ever asked you to handle money for a candidate?

11  A.   Wayne talked to me about the election.  When he assumed I

12  was running, he asked me if I wanted to work for Freddy and

13  take money during the 2002 election.  I told him no, I'm on

14  parole, and I did not even bother fooling with the 2002

15  election.

16           MR. SMITH:  Pass the witness, Your Honor.

17           THE COURT:  We're going to take a brief recess before

18  cross-examination.  We'll take approximately a ten-minute

19  recess at this time.

20                (Recess from 10:56 a.m. until 11:10 a.m.)

21           THE COURT:  The record will reflect that all counsel

22  are present.  As we took our break, Mr. Smith, I believe you

23  completed direct examination.  Mr. Hoskins will be doing

24  cross-examination?

25           MR. HOSKINS:  Yes, Your Honor.

*LEWIS - Cross (Hoskins)*                                                      80

1          THE COURT:  You may proceed.

2                           CROSS-EXAMINATION

3     BY MR. HOSKINS:

4     Q.   Mr. Lewis, the farm that you had in Henry County, who did

5     you buy that from?

6     A.   Sir, the lady, I'd have to go back -- you'd have to go

7     back and get the records.  It's some older lady that she

8     passed away, and some of her distant relatives had it -- I

9     mean, they sold it, but it went to the heirs some way.  The

10    one that handled most of it, the deed and everything, she

11    worked at the Lincoln County clerk's office.  I think she

12    might have been an attorney down there.  And Gary Gregory, the

13    commonwealth attorney of Clay County, is the one that done the

14    deed for me.

15    Q.   Do you remember the name of anybody that you bought it

16    from?

17    A.   Yes, sir.  That's been a few years ago.  I could go back

18    and get the record.  Not right off, I can't tell you.  Just an

19    older lady.  She had a real big farm, and we just bought one

20    little tract of it.  148 acres is I believe what it was, sir.

21    Q.   What -- I'm sorry.  I didn't mean to cut you off.

22    A.   Go ahead.

23    Q.   What part of the county was that in?

24    A.   I would say that's in the southeastern part.  Right next

25    to Kentucky River, about a mile and a half from the Kentucky

*LEWIS - Cross (Hoskins)*                                                    81

1    River towards the Owen County line, if you're familiar with

2    any of that area down in there.

3    Q.   And you started going up there with some other people

4    from Clay County?

5    A.   Yes, sir.

6    Q.   To hunt on that property?

7    A.   Yes, sir.

8    Q.   Deer hunt.  One of the people that you hunted with up

9    there was Ed Jordan?

10   A.   Ed Jordan hunted on my farm years ago, yep.  After, yes,

11   sir.  But not at the time that we first leased it, sir.

12   Q.   Okay.  When it was yours, after you bought it, you let --

13   A.   Yes, sir.

14   Q.   -- Ed Jordan, who was sheriff there, hunt it?  Now,

15   Cletus Maricle never did hunt there, did he?

16   A.   Not as I know of.  He didn't when I was there.

17   Q.   You talked about a time that you gave some money to

18   Mr. Maricle when he was running in an election.  Do you

19   remember who he was running against?

20   A.   Sir, I believe might have been Gayle House.

21   Q.   And what was he running for at the time?

22   A.   Circuit judge.

23   Q.   You told us that you were not selling drugs at that time,

24   though, were you?

25   A.   Sir, what year was that?

*LEWIS - Cross (Hoskins)*                                                          82

1    Q.   I don't know --

2    A.   The question you asked me was cocaine.  Was cocaine.  I

3    was thinking -- I started selling drugs when me and Wayne and

4    them had the farm down there.

5    Q.   What year did you start selling drugs?

6    A.   That was then.  That's the first drugs that I ever sold.

7    Q.   Well, I'm asking you if you can tell us --

8    A.   The late '80s when we bought that farm, sir.

9    Q.   That's when you started selling marijuana?

10   A.   Yes, sir.

11   Q.   Later on, you went up a level and started dealing in

12   cocaine?

13   A.   Well, sir, if you know the situation, I let a guy that I

14   about raised trick me into that deal, and that's what got me

15   caught.

16   Q.   You didn't have any idea you were getting involved in

17   cocaine trafficking?

18   A.   Well, I do now.

19   Q.   But you didn't at the time?

20   A.   No, sir.

21   Q.   And you didn't when Judge Forester brought you back to

22   sentence you again.  Did you know it was cocaine?

23   A.   Yes, sir.

24   Q.   Then when you got caught this last time, did somebody

25   trick you into that too?

*LEWIS - Cross (Hoskins)*                                                    83

1    A.   No, sir.

2    Q.   You knew right what you were doing?

3    A.   Yes, sir.

4    Q.   You knew it was against the law?

5    A.   (Nodding affirmatively).

6    Q.   Now, you were asked if you were ever charged in state

7    court with this, and you said, well, they may not have known I

8    was doing it.  Didn't you?

9    A.   Are you sure I said that?  I didn't say that.

10   Q.   Did you say something along those lines?

11   A.   Not to my recollection.

12   Q.   Okay.  Did you make -- did you try to keep your drug

13   dealing secret?  Did you tell everybody you ran into about it?

14   A.   I think most people do, don't they, sir?

15   Q.   Yes, they do, I would say.  And you were just like most

16   people.  You didn't want everybody in the world knowing you

17   were growing marijuana and selling marijuana, right?

18   A.   That's true.

19   Q.   When you started in the cocaine business, about the time

20   you really knew you were in the cocaine business, you were

21   keeping that secret too, weren't you?

22   A.   Until I got caught.

23   Q.   Doing your best to keep anybody from knowing about it

24   that didn't need to, right?

25   A.   Yes, sir.

1   Q.   So when you made a campaign contribution to Cletus

2   Maricle, you didn't say hey, this is drug money, did you?

3   A.   No, sir.

4   Q.   He didn't have any way of knowing that, did he?

5   A.   Probably not, no, sir.

6   Q.   When you were at political meetings with Cletus Maricle

7   and he said something about "I'm your friend," you didn't say

8   anything about "so if I get caught with drugs, you'll get me

9   out of trouble"?

10  A.   No, sir, I didn't.  No, sir.  But you take that as a

11  compliment [sic] if you did, he would help you in state court.

12  Q.   Well, now, he never --

13  A.   I never did have to ask him, though.

14  Q.   You never did ask him?

15  A.   No, sir.

16  Q.   And you and he never had any conversation about drugs --

17  A.   No, sir.

18  Q.   -- did you?  You and Mr. Maricle never had any

19  conversations about any criminal activity that you were

20  involved with, did you?

21  A.   No, sir.

22  Q.   But you're saying that when you heard the words "I'm your

23  friend, I'll help you if I can" you took it to mean if you

24  ever get in trouble with the law, I'll help you?

25  A.   Yes, sir, I took it that way.

*LEWIS - Cross (Hoskins)*                                                85

1   Q.   So you got in trouble with the law, got caught in Lincoln

2   County?

3   A.   Yes, sir.

4   Q.   With cocaine?

5   A.   Yes, sir.

6   Q.   Did you call Mr. Maricle?

7   A.   No, sir.

8   Q.   Never spoke to him about it, did you?

9   A.   No, sir.

10  Q.   When you got caught this last time, you didn't call

11  Mr. Maricle?

12  A.   No, sir.

13  Q.   You talked about Roy Morgan giving you money to buy

14  votes.

15  A.   Yes, sir.

16  Q.   Roy Morgan's a Republican?

17  A.   Yes, sir.

18  Q.   Tell us exactly where you were when that happened.

19  A.   Up at Garrard, next to that filling station he used to

20  own there.  Garrard, Kentucky.

21  Q.   Who used to own?  Who used to own a filling station?

22  A.   Roy did.

23  Q.   What kind of filling station was it?

24  A.   It's like a quickie mart with gas pumps and things like

25  that.

*LEWIS - Cross (Hoskins)*                                                  86

1    Q.   How did you come to be there?

2    A.   He called me at the house.

3    Q.   Roy Morgan called you at the house?

4    A.   Yes, sir.

5    Q.   Okay.  Where did he call you from; do you know?

6    A.   I have no idea.

7    Q.   But you were at your home?

8    A.   Yes, sir.

9    Q.   Okay.  Roy Morgan calls you, and what did he say?

10   A.   Come up here, I need to see you.  And I drove straight up

11   there.

12   Q.   Okay.  When you got there, what happened?

13   A.   I got in the car with him and Cletus Maricle.  He give me

14   a thousand dollars to buy votes at the election for him for

15   county judge executive.

16   Q.   Did he say to help him or to buy votes?

17   A.   It's to help him or buy either one.  It's the same thing,

18   isn't it, sir?

19   Q.   There are other things you can do besides buying votes to

20   help somebody in an election.

21   A.   Well, we're buying votes to help him.

22   Q.   You were buying votes?

23   A.   Yes, sir.

24   Q.   But there are other things that can be done to help

25   somebody in an election, aren't there?

*LEWIS - Cross (Hoskins)*                                              87

1   A.   Not that I know of.

2   Q.   It never occurred to you there's legal things that can be

3   done to help an election?

4   A.   (Nodding negatively).

5   Q.   Didn't cross your mind?

6   A.   No.

7   Q.   Cletus Maricle didn't give you any money?

8   A.   No, sir.

9   Q.   Roy Morgan did?

10  A.   Yes, sir.

11  Q.   Cletus Maricle didn't say anything to you about buying

12  votes, did he?

13  A.   No, sir.

14  Q.   Never has, has he?

15  A.   No, sir.

16  Q.   You took early retirement from your job with the federal

17  mine inspectors?

18  A.   Yes, sir.

19  Q.   You didn't really have any choice, did you?

20  A.   Yes, I had a choice.  I could have stayed on if I wanted

21  to.

22  Q.   You were being investigated for taking bribes for mine

23  operators, weren't you?

24  A.   Not as I know of.  Not as I know of.

25  Q.   You were doing that, though, weren't you?

*LEWIS - Cross (Bayer)* 88

1   A.   No.  No, sir.

2             MR. HOSKINS:  That's all.

3             THE COURT:  Let's see.  Mr. Bayer?

4             MR. BAYER:  Thank you, Judge.

5                        CROSS-EXAMINATION

6    BY MR. BAYER:

7    Q.   Mr. Lewis?

8    A.   Yes, sir.

9    Q.   You were a Democrat election officer for 20 years?

10   A.   Roughly, in that -- maybe a few years less.  Roughly in

11   that vicinity.

12   Q.   When did that term of office for you begin?

13   A.   Probably in the early '80s.  I worked elections for 40

14   years, probably.

15   Q.   What's it mean to be a Democrat as an election officer in

16   Clay County during the time that you did that?

17   A.   What's it mean to be an election officer?

18   Q.   Sure.

19   A.   Well, you got -- if you're a Democrat, and there's not

20   many in the precinct that I was at, you can be an election

21   officer, a judge, a sheriff or a clerk.  Ever which one it

22   comes up to.

23   Q.   Well, I'm not from Clay County, and I really don't know

24   much about Clay County.  Tell me about the politics in Clay

25   County.  Tell me the difference between the Democrats and the

*LEWIS - Cross (Bayer)*                                                        89

1    Republicans in Clay County.

2    A.   I don't know there's any difference.  One's registered as

3    a Democrat, one's registered as a Republican.

4    Q.   Which one is in the majority?

5    A.   Republicans.

6    Q.   Would you say the Republicans are a very large majority?

7    A.   Yes, sir.

8    Q.   How difficult is it for a Democrat to get elected in Clay

9    County?

10   A.   It's almost impossible.

11   Q.   Democrats do get elected, though, don't they?

12   A.   Very rare.

13   Q.   Well, how often do the Republicans cooperate to elect the

14   Democrats?

15   A.   Very rare.

16   Q.   Doesn't happen, does it?

17   A.   Very rare.

18   Q.   Did you ever have any help at all when you were an

19   election officer?

20   A.   Did I have any?  Very little.

21   Q.   I want you to tell me, as you know it -- I'm going to

22   read you off some names, and you tell me in Clay County

23   whether they're Democrat or Republican.  Russell Cletus

24   Maricle.

25   A.   Right now, sir, I could not say.

*LEWIS - Cross (Bayer)*                                                    90

1   Q.   Well, at the time that you were Democrat election

2   official?

3   A.   It's always construed that he is a Democrat.  Now,

4   whether he is or not, I don't know.

5   Q.   Okay.  Doug Adams.

6   A.   He's a Republican.

7   Q.   Charles Wayne Jones.

8   A.   He's a Democrat.

9   Q.   William Stivers.

10  A.   I'd say he's a Democrat.

11  Q.   Freddy Thompson?

12  A.   A Republican.

13  Q.   William Bart Morris.

14  A.   I'd say Republican.

15  Q.   Debra L. Morris?

16  A.   I'd say Republican.

17  Q.   Stanley Bowling?

18  A.   A Republican.

19  Q.   You were at one point in time you were in the Pulaski

20  County Jail?

21  A.   Yes, sir.

22  Q.   Who was your cellmate?

23  A.   Pulaski County Jail.  Let me see what year that was.

24  Q.   Maybe 2004, 2005, right in there.

25          MR. SMITH:  Your Honor, I'm going to object as to the

*LEWIS - Cross (Bayer)*                                                        91

1     relevance of the question.

2             MR. BAYER:  Intensely relevant, Judge.

3             THE COURT:  What is the relevance?

4             MR. BAYER:  He was a cellmate with Kenny Day.

5             THE COURT:  You can ask.

6     A.   Yes, he was in there for a while, yes, sir, but there was

7     several other guys.

8     Q.   I understand that, but you were in a cell with Kenny Day?

9     A.   Yes, sir.

10    Q.   What did you all talk about regarding what you were going

11    to do to cooperate with the United States regarding what was

12    going on in Clay County?

13    A.   Zero.

14    Q.   Why?

15    A.   We just wouldn't do nothing then.  I was worrying about

16    my health, and he was worried about his.

17    Q.   Did Kenny Day ever say anything to you about that he had

18    knowledge about some of the election problems in Clay County?

19    A.   Not to my knowledge, he ever say anything to me.

20    Q.   Now, he was a Republican, I believe?

21    A.   Yeah.

22    Q.   Did he act as a Republican?

23    A.   Yes, I think he was a Republican, yes, sir.

24    Q.   How many times did you and Kenny Day ever get together

25    and cooperate on working elections together?

*LEWIS - Cross (Bayer)*                                                          92

1    A.   Zero.

2    Q.   Why?

3    A.   I only worried about my precinct.  Never did we get

4    together.

5    Q.   So if I understand you correctly, you were principally

6    working, from your testimony, you were talking about working

7    with Cletus Maricle quite a bit, correct?

8    A.   Working with Cletus?

9    Q.   Yes, sir.

10   A.   I was just a Democrat judge, sir.

11   Q.   And you never worked with the Republicans, did you?

12   A.   Yes, sir.

13   Q.   You did?

14   A.   I would pretty well go with their party too.  If you're

15   in Clay County, like you said, a Democrat don't win.  If the

16   Democrats, Republicans are together, they can elect John Doe.

17   Q.   So in other words, in Clay County, just because you're a

18   Democrat voting for a Republican, it's not because you've done

19   anything wrong?  Is that what you're saying?

20   A.   Probably not.

21   Q.   A lot of Democrats vote for Republicans in Clay County?

22   A.   Yes, sir.

23   Q.   And it has nothing to do with them getting paid off, does

24   it?

25   A.   No, sir.

*LEWIS - Cross (White)*                                                    93

1    Q.   Did you ever do anything with Doug Adams?

2    A.   No, sir.

3    Q.   Do you know even Doug Adams?

4    A.   Yes, sir.

5    Q.   Why do you know him?

6    A.   If you go to Clay County basketball games and him the

7    school superintendent, I think you would know him.  I been

8    seen Doug Adams for many times.

9    Q.   But you never did anything politically with him at all?

10   A.   No, sir.

11   Q.   And you don't know anything about the Democrats doing

12   anything with Doug Adams, do you?

13           MR. SMITH:  Your Honor, he's trying to make this an

14   expert witness about all Democrats in Clay County.

15           MR. BAYER:  Judge, he's not an expert witness.  It

16   goes to the elements of the indictment and why this is called

17   inextricably intertwined background evidence.

18           THE COURT:  You're getting outside the scope of what

19   it's being offered for so I'll sustain your objection.

20           MR. BAYER:  I don't have any other questions.

21           THE COURT:  All right.  Thank you.

22                          CROSS-EXAMINATION

23   BY MR. WHITE:

24   Q.   Good morning.

25

*LEWIS - Cross (White)*                                                    94

1   A.   Hello.

2   Q.   Now, did you testify, I think, on direct that you're

3   serving, what, a 144-month sentence that Judge Reeves handed

4   down to you for that cocaine conspiracy?

5   A.   Yes.

6   Q.   Trafficking?

7   A.   Yes, sir.

8   Q.   And if my math is right, and I'm a product of Woodford

9   County so I'm not sure if it is, but I think that's 12 years?

10  A.   Yes, sir.

11  Q.   And so you're four years into your 12-year -- what's your

12  serve-out?

13  A.   2017, with good time 2015.  I've been right at five years

14  right now.

15  Q.   And you're 70 years old now?

16  A.   Yes, sir.

17  Q.   And so if you serve out, you're going to be about 75?

18  A.   Yes, sir.

19  Q.   And it's your hope, though, in testifying that the United

20  States will come ask Judge Reeves to reduce that amount of

21  time?  Is that correct?

22  A.   You would hope that you might would get a break, but

23  not --

24  Q.   That's why you're here, isn't it?

25  A.   I'm here to testify in this case, sir.

*LEWIS - Cross (White)*                                                    95

1    Q.   I see.  Now, did you testify on questions of Mr. Bayer,

2    who is the gentleman that just finished questioning you, that

3    when you were a cellmate of Kenny Day's, that y'all didn't

4    talk about how you might cooperate in this case to help out

5    the United States, because you were worried about your health?

6    A.   Sir, that was never -- me and him never mentioned that to

7    one another about that.

8    Q.   Were you trying to help the United States out shortly

9    after you were arrested in 2005?

10   A.   Did I help them out?

11   Q.   Did you offer to help them out?

12   A.   It's on my PSI that said if I had to come back to

13   testify, that I would testify.

14   Q.   I understand that, but you gave them a specific list of

15   names of folks that you'd be willing to help; is that not

16   correct?

17   A.   Is it on there?

18   Q.   Well, it's on this 302 from --

19   A.   I probably did.

20   Q.   Okay.  Now, do you recall giving an interview recently in

21   September with a federal official?  September of '09.  Just a

22   few months ago.  Does that ring a bell?

23   A.   Are you asking was I --

24   Q.   Were you interviewed by a federal official on

25   September 16th, 2009?

*LEWIS - Cross (White)*                                                96

1    A.   I don't know the correct date, but sometime around that,

2    sir.  It may not be --

3    Q.   Where were you housed at that time?

4    A.   Where was I housed?

5    Q.   Yes.

6    A.   In Grayson.

7    Q.   Grayson County Detention Center?

8    A.   Yes, sir.

9    Q.   Okay.  Now, you testified earlier about this farm that

10   you all leased and bought.  Is your testimony correct, you

11   began to lease it, leased it for two years and purchased it

12   after about two years?

13   A.   Yes, sir.

14   Q.   And that was in the late '80s?

15   A.   Late '80s.  Could have been '90 before it was done.

16   Q.   '90 before it was done.  And you testified that Mr. Jones

17   was one of the partners?

18   A.   Yes, sir.

19   Q.   And that you all let him out after a year or two?

20   A.   Yes, sir.

21   Q.   Now, how much did each of y'all have to put up for that

22   property?

23   A.   We gave 54,000 -- I mean $55,000, sir.

24   Q.   And did you all --

25   A.   That's very close to the --

1    Q.   Thereabouts.  Was that 55 each or 55 total?

2    A.   I believe it might have been 54 something.  Around

3    55,000.  Either a few dollars each way, you know what I mean?

4    Q.   I see.  And when you let Mr. Jones out, did you give him

5    his money back?

6    A.   We gave him a little money, yes, sir.

7    Q.   You gave him a little money, but did you give him all his

8    money?

9    A.   No, we didn't.  He made money.  Put it that way, sir.

10   Q.   I see.  And Mr. Jones, is it your testimony that he was

11   on the note at the bank where you all borrowed the money to

12   buy this property?

13   A.   I think that's true, sir.

14   Q.   And that was at the Bank of Manchester, State Bank of

15   Manchester?

16   A.   State Bank.

17   Q.   I know you've been incarcerated since -- when did you go

18   in, 2006?

19   A.   No, 2005.

20   Q.   2005, I'm sorry.

21   A.   April the 27th, 2005.

22   Q.   Do you remember, in April of 2005, was it still the State

23   Bank of Manchester or some other bank bought it?  You know how

24   banks buy each other from time to time.

25   A.   No, I don't know what you're talking about, sir.

1   Q.   Is there still a State Bank of Manchester?

2   A.   I don't know, sir.

3   Q.   Was there in 2005?  That's okay.

4   A.   I don't know.

5   Q.   But you testified that the current commonwealth attorney

6   down there in Clay County was the fellow that drew up the deed

7   for you?

8   A.   Yes.

9   Q.   And was Mr. Jones on that deed?

10  A.   I'm not for sure, sir.  I don't think he was.  He wanted

11  to keep his name clear.

12  Q.   He wanted to keep his name clear?

13  A.   His name clear.

14  Q.   I see.  Was that because y'all were also doing some

15  cattle rustling up there in Henry County?

16  A.   No, sir.

17  Q.   You didn't rustle any cattle?

18  A.   No, sir.  No, sir.  Three times, no, sir.

19  Q.   Okay.  Was Denver Sizemore a partner in this venture on

20  the farm?

21  A.   After Wayne got out, we kind of let him in for a year or

22  so, and then I got him out.

23  Q.   Okay.  So the last time that you did any business in

24  terms of the marijuana trade with Mr. Jones would have been

25  when he stiffed you on those five pounds of marijuana back in

*LEWIS - Cross (White)*                                                99

1    '92?

2    A.  Yes, sir.

3    Q.  Okay.  What happened to that farm?  Who did you sell it

4    to?

5    A.  I sold it in '95, 1995, when I got caught my first time

6    with the feds, and I sold it to some gentleman around

7    Louisville.

8    Q.  Remember his name?

9    A.  No, sir.

10   Q.  I see.  Now, when Mr. Jones, when you testified that

11   Mr. Jones approached you at the 2002 election, you didn't

12   agree to do any work; is that correct?

13   A.  That's true.

14   Q.  That's because you were a convicted felon, and you

15   weren't eligible to serve as an election official, were you?

16   A.  I wasn't, that's true.

17   Q.  Okay.  Now, I think you testified earlier down there at

18   Pin Hook, there aren't many of you Democrats, right?

19   A.  There are not many in Clay County, that precinct I'm in.

20   Q.  Now, when you were down there, though, I think you

21   testified in response to questions that Mr. Smith asked you

22   that finding Democrats to even act as election officials was

23   difficult.  Is that correct?

24   A.  A lot of guys don't want to serve, didn't want to serve.

25   Q.  Whether or not they wanted to serve, there weren't very

*LEWIS - Cross (White)*                                                      100

1    many to even be able to serve?  Is that not right?

2    A.   That may be true.

3    Q.   Because you know state -- Kentucky state law requires

4    that so many Democrats and so many Republicans serve in the

5    precincts, correct?

6    A.   Yes, sir.

7    Q.   Have you ever been convicted, since -- did you have any

8    criminal convictions, drug related, prior to that first, that

9    first conviction where Judge Coffman sentenced you, the one

10   back in the '90s?

11   A.   Sir, I never had nothing except one speeding ticket

12   before then in my lifetime.

13   Q.   Okay.  But at that time, since that time to today, all

14   your convictions are related to cocaine and not marijuana; is

15   that correct?

16   A.   Yes, sir.

17   Q.   Your partner in the '90s, when you got into the cocaine

18   business, that's a -- that's somewhat of a capital heavy deal.

19   I mean, you need cash to be able to get into that business and

20   acquire the cocaine to distribute, correct?

21   A.   It would take a little money.

22   Q.   Yeah, I mean --

23   A.   Yes, sir.

24   Q.   Fair amount, wouldn't it?  Of course, we may define that

25   differently, but all that being said, you needed a partner,

*LEWIS - Cross (White)*                                                   101

1    didn't you?

2    A.   Yes.  Yes, sir.

3    Q.   And your partner in this cocaine business that you

4    started in the '90s was Charles McClure, correct?

5    A.   No, sir.

6    Q.   It was not?

7    A.   No, sir.

8           MR. WHITE:  Your Honor, if you'd give me just a

9    moment, please.

10          THE COURT:  Yes.

11          MR. WHITE:  Thank you.

12   Q.   Was it a gentleman named Smith that was your partner?

13   A.   No, sir.

14   Q.   Kenny Smith?

15   A.   No, sir.

16   Q.   Didn't give you any money?

17   A.   No, sir.

18          MR. WHITE:  I think I'm just about done, Your Honor.

19   Q.   And you didn't do any work in '04?  You didn't do

20   anything in the 2004 election; is that correct?

21   A.   No, sir.

22   Q.   And, of course, the 2006 election --

23          MR. SMITH:  Your Honor, I'm going to object --

24   Q.   -- you would have been incarcerated?

25          MR. SMITH:  This is outside of the inquiry of the

*LEWIS - Cross (Abell)*                                             102

1    Court's hearing today.

2              MR. WHITE:  I'll withdraw, Your Honor.

3              THE COURT:  You are getting outside the scope.

4              MR. WHITE:  Give me just one moment.

5              THE COURT:  Yes, sir.

6              MR. WHITE:  That's all I have, Your Honor.  Thank

7    you.

8              THE COURT:  Thank you.  Let's see.  Mr. Abell, do you

9    have --

10             MR. WHITE:  Thank you, Mr. Lewis.

11                         CROSS-EXAMINATION

12   BY MR. ABELL:

13   Q.  Mr. Lewis?

14   A.  Yes, sir.

15   Q.  You said that you saw my client -- Mr. Stivers is my

16   client, okay?  I know there's a lot of people here.

17   A.  Um-hmm.

18   Q.  You saw Mr. Stivers at a Chevron --

19   A.  Yes, sir.

20   Q.  -- in Manchester?  You saw him there frequently?

21   A.  Several times, sir.

22   Q.  His brother, Charles Stivers, in fact, owned that

23   Chevron?

24   A.  For a while, yes, sir.

25   Q.  And I'm sure you saw Mr. Stivers there with Mr. Maricle?

*LEWIS - Cross (Abell)* 103

1    A.   Yes, sir.

2    Q.   And I think you said Mr. Jones too on occasion, right?

3    A.   Yes, sir.

4    Q.   And you saw him there on other occasions with other

5    people many times, right?

6    A.   Yes, sir.

7    Q.   Okay.  Your last conviction, that was your third felony

8    drug conviction in federal court, correct?

9    A.   Yes, sir.

10   Q.   And you were told, when you got indicted, that you were

11   looking at a possible life sentence, correct?

12   A.   No, sir.

13   Q.   You were not?

14   A.   Not to my knowledge.

15   Q.   Okay.  But you had, in fact, two prior drug felonies; is

16   that right?

17   A.   Yes, sir.

18   Q.   Okay.  You were in the drug trade, both marijuana and

19   cocaine, for off and on 20, 25 years, sounds like?

20   A.   Oh, no, sir.

21   Q.   Huh?

22   A.   No, sir.  That numbers is too high.  A little bit of

23   marijuana for about four years and then cocaine probably two,

24   four, probably six years.  Probably not over, much over ten

25   years altogether.

*LEWIS - Cross (Baldani)*                                                104

1    Q.   All right.  Did you use cocaine?

2    A.   No, sir.

3    Q.   Never?

4    A.   No, sir.  Just took my finger and just tasted it a couple

5    times.  I've never shot, never snorted.  Don't use cocaine.

6    Q.   Did you use any drugs?

7    A.   Pardon?

8    Q.   Have you ever used any drugs?

9    A.   No, I don't use no drugs.

10   Q.   All right.

11   A.   Never smoked marijuana.

12           MR. ABELL:  Nothing further, Judge.

13           THE COURT:  Thank you.  Mr. Baldani on behalf of

14   Mr. Thompson, you may ask.

15           MR. BALDANI:  Thank you, Your Honor.

16                        CROSS-EXAMINATION

17   BY MR. BALDANI:

18   Q.   Good morning, Mr. Lewis.

19   A.   Hello.

20   Q.   I want to ask you a few questions about Freddy Thompson,

21   okay?

22   A.   Yes, sir.

23   Q.   And I'll get right to the point.  You talked about the

24   hunting you all did up in Henry County.  Freddy wasn't

25   involved in any of that, was he?

1    A.   No, sir, not to my knowledge he wasn't.

2    Q.   And he wasn't involved in any of the marijuana growing up

3    on the farm?

4    A.   No, sir.

5    Q.   All right.  And to your knowledge, he wasn't involved in

6    any of this drug business that's gone on?

7    A.   No, nothing with me, sir.

8    Q.   Not even using, to your knowledge?

9    A.   I never knowed the man to use any drugs.

10   Q.   All right.  And all that business back when you were

11   election officer, Freddy wasn't involved in any of those

12   elections, was he?

13   A.   Not as I know of.  I never had any business with him.

14   Q.   I mean, you were very good friends with his

15   father-in-law, but you didn't have any type of relationship

16   with Freddy Thompson, did you?

17   A.   No, sir.  Just took him as a gentleman.  I had him in

18   little league baseball and senior league baseball, and I

19   thought he was a fine guy.

20   Q.   Now, were you coaching?

21   A.   Yes, sir, I coached.  He played on my little league

22   baseball team two years for sure.  He might have been on it

23   during the senior league, the 13 to 15, he could have been on

24   it too.

25   Q.   He never was perceived as any kind of power player in

*LEWIS - Cross (Baldani)*                                              106

1    Clay County, was he?

2    A.   No, sir.

3    Q.   Basically perceived as a pretty clean guy whose daddy had

4    a hardware store; is that about right?

5    A.   Yes, sir.

6    Q.   And this business about you said Wayne Jones came to you

7    in '02, when you were on parole and asked you about helping

8    Freddy, Freddy wasn't involved in that conversation?  He

9    wasn't present?

10   A.   No, sir.

11   Q.   So you don't even know whether he had anything to do with

12   Wayne coming to you on his behalf, right?

13   A.   No.

14   Q.   And basically, Wayne said, hey, you want to help my

15   son-in-law, because he's trying to beat Jennings White, right?

16   A.   Yes, sir.

17   Q.   And you said no, I ain't getting involved, I'm on paper,

18   more or less, right?

19   A.   That's true.

20   Q.   One thing that kind of confused me, you mentioned, you

21   told us about how you started growing and selling weed, and

22   you said you got tricked into cocaine dealing.  Who tricked

23   you go cocaine dealing?

24   A.   A guy named Mansell Baker.

25   Q.   How did that happen?

*LEWIS - Cross (Baldani)*                                                      107

A.    This is the guy -- the other lawyer asked me about my
first time.  A guy named Mansell Baker.  Mansell had been in
drugs, and he growed up kind of like you might say an orphan
like.  And me, I got him a job in the coal mines, and he got
on drugs and went broke, lost his farm, tractors and
everything.  Come to me and said, Gene, I can make us a little
money.  You know what I did, sir?

Q.    No.

A.    I went and sold 20 some thousand dollars worth of my
cattle to go buy one kilo of coke.

Q.    And that got you into business, right?

A.    I was a little dealer.  Very small.

Q.    How much did you figure you made selling --

A.    Pardon?

Q.    How much do you figure you made selling coke throughout
the years?

A.    When I threw with Mansell Baker, I went in the hole.

Q.    Throughout your years doing it?

A.    I couldn't tell you, sir.  Not a great deal.  Nothing
like got taken off of me in proceeds.  I tell you that.

Q.    Let me ask you this.  A couple people asked you about
when you were rooming with Kenny Day at Pulaski County, and I
want to make sure I got it straight.  You said that you and
Kenny did not talk about how you all could cooperate and who
you could cooperate against to get your sentences reduced?

*LEWIS - Cross (Baldani)*                                                        108

1    A.   No, sir.  That was never even entered our minds at that

2    time.

3    Q.   No discussions about that whatsoever?

4    A.   No, sir.

5              MR. BALDANI:  That's all I got, Judge.  Thanks.

6              THE COURT:  Thank you.  Mr. Gilbert, Miss Hughes?

7              MS. HUGHES:  No, thank you.

8              MR. SIMONS:  No questions, Your Honor.

9              THE COURT:  Thank you.  Mr. Smith, I'm assuming that

10   the next witness will be about the same length as the first

11   two; is that a fair assumption?

12             MR. SMITH:  I think they'll find it somewhat more

13   brief, but at this point, I think I've outlined generally in

14   my motion, memorandum what he's going to testify to.  I thing

15   close to the same amount of time.

16             THE COURT:  We'll go ahead and take our lunch break

17   at this time.  Mr. Bayer?

18             MR. BAYER:  Judge, prior to the time we take a break

19   and excuse this witness, as a follow-up, may I ask him one

20   question, please?

21             THE COURT:  Let me see if Mr. Smith has any

22   additional questions.  Mr. Smith, were you going to have any

23   redirect of this witness?

24             MR. SMITH:  Yeah, I do have a couple of follow-up.

25             THE COURT:  We'll go ahead and finish with Mr. Lewis,

*LEWIS - Redirect*                                                          109

1    then.

2                          REDIRECT EXAMINATION

3     BY MR. SMITH:

4    Q.   Mr. Lewis, you were asked some questions, I believe, by

5    Mr. Jones' lawyer.  He threw out some names, drug partners.

6    You said you had a drug partner in the cocaine business.  You

7    remember those questions?

8    A.   Which time, sir?

9    Q.   Well, I think that's where maybe I need to get

10   clarification.  You've indicated that Mansell Baker and you

11   started --

12   A.   That was the first time, yes, sir.

13   Q.   Did you have other partners that came along later?

14   A.   And the second time, sir, that was nothing.  That stuff

15   they found down there, that's zero.  And the third time was

16   the gentleman he asked, McClure.

17   Q.   Okay.  So McClure was a partner?

18   A.   Yes, sir.

19   Q.   Mansell Baker was a partner?

20   A.   The first time.

21   Q.   And you said that second time, there was zero.  You mean

22   no partner?

23   A.   No partner.

24   Q.   You were in it yourself?

25   A.   In fact, I hadn't sold none.  I just, just got a little

LEWIS - Redirect                                                    110

1    out that had been stored from the previous, and here they come

2    for some reason.  I don't know if McClure told on me or what.

3    I don't know, sir.

4    Q.   So you had stockpiled cocaine on the farm?

5    A.   A kilo.  When you have a heart attack, you thought you

6    was dying too, then --

7    Q.   Do you recall when you first spoke with the FBI agents

8    about information you might have?

9    A.   Pardon?

10   Q.   Do you remember when you first talked to the FBI about

11   information that you had that might be able to help them in

12   their investigation?

13   A.   Do I remember that?

14   Q.   Yeah, do you remember when you first talked to them?

15   A.   Yes, I remember when I first talked to them, yes, sir.

16   Q.   And at that time, did you talk to them about what

17   information you had as far as cocaine and marijuana and stuff

18   that's going on in Clay County?

19   A.   Yes, sir, I did talk to them.  Who I sell it to and who

20   the other guy was.

21   Q.   Did you tell them that you were cellmates with Kenny Day?

22   A.   Yes, sir.

23   Q.   All right.

24   A.   In Lincoln County, in 1995.

25   Q.   Okay.  I'm not sure I understood that --

*LEWIS - Recross (Bayer)*                                            111

1    A.   I mean 2005.  Sorry.

2    Q.   Okay.  So you were cellmates with Kenny Day during 2005?

3    A.   For just a while.  It wasn't long.

4    Q.   And you told them that?

5    A.   Pardon?

6    Q.   And you recall telling them that?

7    A.   Yes, sir.

8              MR. SMITH:  Can I have just a moment?

9              THE COURT:  Yes.

10             MR. SMITH:  That clears up the questions I had.

11   Thank you, Your Honor.

12             THE COURT:  Thank you.  Mr. Hoskins, do you have

13   additional questions?

14             MR. HOSKINS:  No, Your Honor.

15             THE COURT:  All right.  Thank you.  Mr. Bayer?

16             MR. BAYER:  Yes, Your Honor.

17                      RECROSS-EXAMINATION

18    BY MR. BAYER:

19   Q.   Mr. Day -- I'm sorry.  Mr. Lewis, I wanted to follow up

20   with you on that line of questions regarding when you and

21   Mr. Day were in custody together.  What were the charges that

22   you were under at the time?

23   A.   What were my charges?

24   Q.   Yes, sir.

25   A.   Cocaine trafficking, sir.

*LEWIS - Recross (Bayer)*                                            112

1   Q.   And what was his charges at the time?

2   A.   I couldn't say.  I'd say it was drugs, I guess.

3   Q.   Okay.

4   A.   I can't say.

5   Q.   How long had you known Kenny Day prior to the time that

6   you two were incarcerated together?

7   A.   Probably 20 years, 25 years.

8   Q.   Did you know that he had been a Republican commissioner?

9   A.   Yes, sir.

10   Q.   So while the two of you were in the cell together, did

11   you all talk politics at all?

12   A.   Zero.

13   Q.   Why?

14   A.   I don't know why.  When you're -- sir, when you're locked

15   up and thinking you may die in prison, you lay in your bunk

16   and a lot of things run through your mind.  You keep to

17   yourself, try to.

18   Q.   So did you and Kenny Day ever talk politics at all prior

19   to the time that you were in custody together?

20   A.   Me and Kenny never talked politics.  I was never hardly

21   around him.  Just knowed him as a friend because he worked at

22   White Chevrolet Pontiac.

23   Q.   Why was it that he was never around even though the two

24   of you were both active in politics?

25   A.   I wasn't the Republican.

*LEWIS - Recross (Bayer)*                                                113

1   Q.   Does it make a difference in Clay County as to whether or

2   not you're a Republican or a Democrat, as to whether or not

3   you get around with each other and talk politics?

4   A.   Yes, it does.

5   Q.   What is the difference?

6   A.   Because the Republicans, they can elect anybody they want

7   with a little Democrat help.  They can elect John Doe or Miss

8   Piggy.  No matter who you are.  You can put your name on it,

9   win.

10  Q.   Well, we'll see.  I'll take my shot at that, see what

11  happens.

12  A.   Okay.

13  Q.   But fundamentally, there isn't any real cooperation

14  between Democrats and Republicans in Clay County, is there?

15  A.   Yes, they are.

16  Q.   Tell --

17        MR. SMITH:  Your Honor, we're back where we were in

18  the original cross-examination, and I think these questions

19  have all been asked and answered.

20        MR. BAYER:  I've got nothing further.  Thank you,

21  Judge.

22        THE COURT:  All right.  Thank you.

23        MR. WHITE:  Your Honor, I just have one quick

24  question.  Can I ask it from here?

25        THE COURT:  Yes, sir, that's fine.

*LEWIS - Recross (White)*                                                      114

1          MR. WHITE:  I just want to clarify the record.

2                    RECROSS-EXAMINATION

3     BY MR. WHITE:

4     Q.  Mr. Lewis, is your nickname Mutton?

5     A.  Yes, sir.

6     Q.  I think we all knew that.  I just wanted to make sure for

7     the record.  Thank you again, sir.

8          MR. WHITE:  Thank you, Your Honor.

9          THE COURT:  Anyone else?

10         MR. ABELL:  No, Judge, not on my behalf.

11         THE COURT:  Anyone else?  I'll assume the answer is

12    no.  We'll take our lunch break at this time until 1:00.  Sir,

13    you can step down at this time.

14         THE WITNESS:  Do what?

15         THE COURT:  You can step down at this time.  The

16    attorneys are finished asking you questions.

17         MR. WHITE:  Your Honor, I have two quick housekeeping

18    things if I could trouble the Court now.

19         THE COURT:  Yes, sir.

20         MR. WHITE:  First thing is I owe an apology to the

21    Court.  I said hello to one of your law clerks.  I wasn't

22    aware of your rule about no contact with the clerks.  I

23    apologize about that.  I won't do it again.  Second thing is

24    we are in very close quarters here.  Would the Court consider

25    letting us move this table out --

LAWSON - Direct                                                    115

1          THE COURT:  No, don't be moving the furniture in the

2   courtroom.  Mr. White, Mr. Hoskins, Miss Hughes, let's see,

3   who else?  Mr. Westberry and Mr. Smith, I'll see you all back

4   in my library in five minutes.  We'll be in recess until 1:00.

5                  (Recess from 11:53 a.m. until 1:00 p.m.)

6          THE COURT:  Thank you.  The record will reflect all

7   counsel are present.  Mr. Smith, are you prepared to proceed?

8          MR. SMITH:  Yes, we are, Your Honor.

9          THE COURT:  You may call your next witness.

10         MR. SMITH:  The United States would call J.C. Lawson.

11         J.C. LAWSON, GOVERNMENT'S WITNESS, SWORN

12         THE COURT:  Thank you.  Mr. Smith, you may proceed.

13                       DIRECT EXAMINATION

14  BY MR. SMITH:

15  Q.   State your name, please.

16  A.   J.C. Lawson.

17  Q.   Mr. Lawson, where are you from?

18  A.   Clay County.

19  Q.   Clay County?  Is that where you were born and raised?

20  A.   Yes, sir.

21  Q.   And how old are you, Mr. Lawson?

22  A.   Fifty-five.

23  Q.   And tell us a little bit about yourself.  Do you have

24  children?

25  A.   Yes, I got a daughter and a son, two grandchildren.

*LAWSON - Direct*                                                          116

1   Q.   Okay.  And during the time that you lived back in Clay

2   County, did you hold any jobs?

3   A.   No, sir.

4   Q.   You refer to yourself as an employed person back in those

5   days?

6   A.   Yeah.

7   Q.   And what was your occupation?

8   A.   Self-employed farmer.

9   Q.   Okay.  And as you call yourself a farmer, what crops did

10  you specialize in?

11  A.   Marijuana.

12  Q.   And where did you grow that marijuana?

13  A.   In the mountains.

14  Q.   Okay.  And did you leave Clay County to grow your

15  marijuana?

16  A.   No, sir.

17  Q.   And did you sell that marijuana?

18  A.   Yes, sir.

19  Q.   Where did you normally sell that marijuana?

20  A.   Up north and places.

21  Q.   And when you say up north and places, you'd have buyers

22  come into town in Clay County and buy it from you?

23  A.   Yes, sir.

24  Q.   So did you normally sell it from your home place there in

25  Clay County?

*LAWSON - Direct*                                                    117

1    A.   Yes, sir.

2    Q.   When did you get started in the marijuana business,

3    Mr. Lawson?

4    A.   When I was about 16, 17 years old, started growing it.

5    Q.   Okay.  And would you consider yourself a pretty good

6    grower?

7    A.   Yes, sir.

8    Q.   Have you had a lot of experience growing marijuana?

9    A.   I sure have.

10   Q.   How many crops would you try to tend every year?

11   A.   Well, you can only get like one crop a year, but a lot of

12   plants.

13   Q.   Did you try different places to grow your marijuana?

14   A.   Yes, sir.

15   Q.   Did you find that some places in Clay County are better

16   to grow your marijuana than others?

17   A.   Yes, sir.

18   Q.   This marijuana that you would grow, Mr. Lawson, did you

19   sell it by the pound or by the plant, or how did you sell it?

20   A.   Sell it by the pound.

21   Q.   Okay.  And when you sold it by the pound, what normally

22   would you expect to get for it?

23   A.   Most of the times, 12, 16 hundred, 18.

24   Q.   Now, during the time that you grew marijuana, you say

25   that you considered yourself a pretty good grower?

*LAWSON - Direct*                                                     118

1    A.   Yes, sir.

2    Q.   Did you have any competition in Clay County?

3    A.   Yes, a lot of competition.

4    Q.   Okay.  Did you ever have any competition from Charles

5    Wayne Jones?

6    A.   No, sir.

7    Q.   Okay.  Did you ever know him to grow marijuana?

8    A.   I've seen him one time.

9    Q.   Okay.  You seen him one time.  What was he doing?

10   A.   He was growing some pretty close to where I was growing

11   some, but he never seen me.

12   Q.   Where was this place that you saw him?

13   A.   Down on Sutton Branch on 80.

14   Q.   Sutton Branch, is that what you said, Sutton Branch?

15   A.   Yeah.

16   Q.   S-u-t-t-o-n?

17   A.   S-u-t-t-o-n, Sutton.

18   Q.   Okay.  And what was your business down on Sutton Branch?

19   A.   I was growing too.

20   Q.   Okay.  And where did you see him?

21   A.   At the river.

22   Q.   And was he in his own marijuana or yours?

23   A.   He was in his.

24   Q.   Okay.  And you say he didn't get a chance to see you?

25   A.   No.

*LAWSON - Direct*                                                          119

1    Q.   How come?

2    A.   I was already in there working when he come in so I just

3    set still.

4    Q.   Okay.  Had you and Mr. Jones talked about marijuana

5    growing at any point?

6    A.   No, sir.

7    Q.   Did you ever talk to him about your marijuana growing?

8    A.   No, sir.

9    Q.   Did you ever tell him that you saw him down there near

10   your patch?

11   A.   No, sir.

12   Q.   Okay.  You see Mr. Jones here in the courtroom?  You may

13   have to stand up.  I'm not sure with all these tables,

14   Mr. Lawson.  If you need to stand up.

15           MR. WHITE:  We'll stipulate identification.

16   A.   No, I couldn't say I can.  I haven't seen him in a long

17   time, in a while.

18   Q.   Well, let me ask you this.  Mr. Lawson, how many times

19   did you have a chance to meet with Mr. Jones?  You know him as

20   a friend?

21   A.   No.  Just a couple times I've met him.

22   Q.   Okay.

23   A.   Two or three.

24   Q.   And you say you don't see him here in the courtroom

25   today.  What kind of fella did he look like?  Can you tell us

LAWSON - Direct                                                          120

1    about how tall he was?

2    A.   He was just a short, skinny fella.

3    Q.   You said he was short and skinny?

4    A.   About the size of me.

5    Q.   Did he have any noticeable facial hair or --

6    A.   Yeah, he had kind of skimpy with hair on it.

7    Q.   Skimpy with hair.  Did he wear any beards or mustaches?

8    A.   Not when I seen him.

9    Q.   Okay.  Did he hold any positions over in Clay County?

10   A.   Yeah, he used to work in the food stamp office.

11   Q.   Okay.

12            THE COURT:  You can be seated.

13   Q.   Food stamp office?

14   A.   Yeah.

15   Q.   And did he work there for a long time or short time?

16   A.   Long time.

17   Q.   A long time.  And during the time that you knew him, did

18   you ever know him to get in trouble for anything?

19   A.   Yeah, when he worked in the food stamp office, I think

20   him and one of my friends, James Harris, got caught in London

21   with some pot.

22   Q.   Okay.  So he got caught with some pot.  Do you know if he

23   got convicted of that?

24   A.   No, sir, I don't.

25   Q.   You don't know?

1    A.   Uh-uh.

2    Q.   Did he get in any other kind of trouble that you know of

3    over the years that you've known him?

4    A.   I don't know him that good, you know, just --

5    Q.   How long has it been, Mr. Lawson, would you say it's been

6    since you actually laid eyes on Mr. Jones?

7    A.   About 2004, I guess, something like that.

8    Q.   Okay.  So it's been some time ago that you saw him?

9    A.   Yeah.

10   Q.   Where was it that you saw him then?

11   A.   Well, the last time I saw him was about 2004, 2005, when

12   they had the old courthouse in the Ford building in Judge

13   Maricle's office.

14   Q.   And did you see him, you say, at the courthouse or in

15   Maricle's office?

16   A.   At the courthouse in Maricle's office.

17   Q.   So he was in Maricle's office?

18   A.   Yeah.

19   Q.   Had you seen him in Maricle's office before?

20   A.   Do what now?

21   Q.   Had you ever seen him there before?

22   A.   Yeah, I seen him a couple times in there.

23   Q.   Pretty common to see him hanging out at the judge's

24   office?

25   A.   Yeah, seemed to me like it was.  When I'd go by, it was.

*LAWSON - Direct*                                                        122

1   Q.   Now, Mr. Lawson, you at some point made public, I guess,

2   in some ways that you believe marijuana growing was a good

3   thing, and you gave an interview at some point; is that right?

4   A.   Yes, sir.

5   Q.   Did you give an interview to a newspaper?

6   A.   Yeah.

7   Q.   And do you remember what newspaper it was you gave an

8   interview to?

9   A.   Lexington Herald.

10  Q.   Okay.  And did you give them any pictures of you?

11  A.   Yes, sir.

12  Q.   And what were the pictures?  Did they have a picture with

13  a background, or were you with someone, or how was the

14  pictures?

15  A.   I was standing in a pot patch, holding a plant.

16  Q.   And did that make pretty good news back in Clay County

17  when it ran?

18  A.   Yeah, it sure did.

19  Q.   Did you get a lot of attention out of it?

20  A.   Yeah, too much.

21  Q.   Too much.  Did you get in trouble?

22  A.   Yes, sure did.

23  Q.   And how come you get in trouble, Mr. Lawson?  Who caught

24  you?

25  A.   Who caught me?

*LAWSON - Direct*                                                        123

1    Q.   Yeah.  Was it the federal or the state?

2    A.   The feds got me.

3    Q.   Who was it?

4    A.   FBI, Bill Sheets.

5    Q.   And did you get convicted?

6    A.   Yes, sir, I did.

7    Q.   And do you remember when that was you first got

8    convicted?

9    A.   I think they got me in '86, something like that.

10   Convicted in '87 or '88.

11   Q.   Okay.  How many times have you been convicted,

12   Mr. Lawson?

13   A.   This is the third time.

14   Q.   And what drugs -- were they all drug cases that you were

15   convicted of?

16   A.   Yes, sir.

17   Q.   And what drug was it that you were convicted of?

18   A.   Well, one time, cocaine and pot; and then this time,

19   marijuana.

20   Q.   Okay.  Now, in your time that you were there in Clay

21   County, did you make quite a bit of money?

22   A.   Yes, sir, I did.

23   Q.   What would be one of your best years that you recall as

24   far as grossing money or profiting?  How much money would you

25   make, in other words, off marijuana growing?  One of your

1    better years.

2    A.    Probably about -- one year, I'd say about 350, 400

3    thousand.

4    Q.    Okay.  And were you in partners with anyone at that time,

5    or is that pretty much all for yourself?

6    A.    That was all by myself.

7    Q.    And would that have been at or about the time you gave

8    that interview to the Lexington Herald Leader that you had

9    already realized that kind of year?  Had you made that kind of

10   money, in other words, before you gave that interview?

11   A.    Yeah, I'd made that money before.

12   Q.    Okay.  Mr. Lawson, during the time period you were living

13   over there in Clay County, did you have interest in politics?

14   Did you ever support any of the candidates over there?

15   A.    Yeah, a little bit.

16   Q.    Okay.  And why were you, as a marijuana grower,

17   interested in getting involved in politics in Clay County?

18   A.    Well, just kind of keep the law and stuff off my back,

19   you know.

20   Q.    Okay.  And did you find that it helped?  Did you feel

21   like it helped you?

22   A.    Yeah, seemed to me like it did.

23   Q.    Okay.  And did you ever give any money that you knew to

24   be going into the hands of Cletus Maricle?

25   A.    I give some money Alan Roberts and Gayle House.  Alan

*LAWSON - Direct*                                                                                    125

1  Roberts, give him 8 or 9 thousand, which I can't say for sure

2  they got it, but it went to him.

3  Q.   You delivered it to Alan Roberts --

4         MR. BAYER:  Excuse me.  Could he repeat that answer,

5  please?  I could not hear the entire answer.

6         THE COURT:  If you could speak up a little bit.  What

7  was your last answer?  You gave the money to who?

8  A.   To Alan Roberts, 8 or 9 thousand to Gayle House and

9  Cletus.  I'm not sure the money made it to their hands,

10  because I never asked.

11  Q.   So you weren't invited over to Judge Maricle's house to

12  deliver the money?

13  A.   No, sir.

14  Q.   But you gave it to Mr. Roberts, who -- did you know

15  Mr. Roberts to be a vote buyer?

16  A.   Yes, sir.

17  Q.   Was he a long-time vote buyer over there?

18  A.   Yes.

19  Q.   Did he usually come around election time looking for

20  money for that reason?

21  A.   Yeah, sometimes he would.

22  Q.   Had he hit you up before?

23  A.   No.

24  Q.   Okay.  Could have been around the time that you gave that

25  interview to the Lexington Herald Leader that he came by for

*LAWSON - Direct*                                                          126

1    the money?

2    A.   Just a little after.

3    Q.   Just a little after.  So just a little after that,

4    Mr. Roberts comes, and does he come up to your holler to see

5    you?

6    A.   No, I seen him.

7    Q.   Where did you see him?

8    A.   Down on the river creek, his house.

9    Q.   Did he call you to come down there?

10   A.   No, I was just out walking around.

11   Q.   And you gave this money, was it cash?

12   A.   Yeah.

13   Q.   Was it profits from your drug dealing?

14   A.   Yes, sir.

15   Q.   And who was present that you recall when you gave him

16   that money?

17   A.   Just me and him.

18   Q.   Okay.  Now, you have indicated that you've been convicted

19   before.  I'd like to hand to you Government's Exhibit

20   Number 3, Mr. Lawson, have you take a look at that.  Do you

21   recognize that to be your plea agreement, Mr. Lawson?

22   A.   Yes, sir.

23   Q.   Did you enter that plea in front of a district judge down

24   in London?

25   A.   Yes, sir.

*LAWSON - Direct*                                                    127

1    Q.   Do you know which judge it was your entered your plea in

2    front of?

3    A.   Karen Caldwell.

4    Q.   And how much was -- did you get sentenced on that plea?

5    A.   Yes, sir.

6    Q.   How much time did you get?

7    A.   Ten year.

8    Q.   And as part of your plea agreement over there, I believe

9    on page 3, it says that you have agreed to cooperate fully

10   with the United States and testify if you're called as a

11   witness truthfully.  Do you see that?

12   A.   Yes, sir.

13   Q.   What's your understanding, has the government promised

14   you anything as far as a reduction in your sentence,

15   Mr. Lawson?

16   A.   No, sir.

17   Q.   What's your understanding, do you have an understanding

18   that your sentence might be reduced?

19   A.   Yes, sir.

20   Q.   And who would reduce your sentence, Mr. Lawson?

21   A.   Back before the judge.

22   Q.   Okay.  And what's your understanding would happen,

23   Mr. Lawson, if you were to testify untruthfully here today?

24   A.   Get one to five.

25   Q.   And would this plea agreement have any benefit to you if

*LAWSON - Cross (Hoskins)*                                                    128

1    you lied here today?

2    A.  No, sir.

3              MR. SMITH:  Pass the witness.

4              THE COURT:  Thank you.  Let's see.  Mr. Hoskins.

5              MR. HOSKINS:  Thank you, Your Honor.

6                          CROSS-EXAMINATION

7    BY MR. HOSKINS:

8    Q.  Mr. Lawson, you told us that when you got up with this

9    Alan Roberts, that you just went to his house?

10   A.  Yeah.

11   Q.  You knew where he lived?

12   A.  Yes, sir.

13   Q.  Was he involved in drugs too that you know of?

14   A.  No, I don't think so.

15   Q.  Okay.  You knew him to be involved in politics?

16   A.  Yes, sir.

17   Q.  How did you know that?  How did you come to know that?

18   A.  He was always at the election booth, always buying votes

19   and stuff.

20   Q.  So did he know you were coming that day?

21   A.  No.  We kind of talked a little bit, and then I just met

22   him down there at his house.

23   Q.  You had talked to him before the day you met him at his

24   house?

25   A.  Yeah, we kind of -- I always talked to him.  We see one

LAWSON - Cross (Hoskins)                                              129

1    another every day all day long, passing by.  I only live about

2    five, six miles from him, daddy lived about half a mile, mile

3    from him, something like that.

4    Q.   I'm sorry.  I didn't hear what you said.  You lived five

5    or six miles away and someone --

6    A.   My daddy lived a mile from him.

7    Q.   Okay.  Thank you.  Had you talked to him before about

8    bringing money to him?

9    A.   Yeah, one time I kind of mentioned it a little bit.

10   Q.   Did you talk to anybody else --

11   A.   No, sir.

12   Q.   -- about that money?

13   A.   No, sir.

14   Q.   About any other money?

15   A.   No, sir.

16   Q.   So you never talked to Cletus Maricle about --

17   A.   No, sir.

18   Q.   -- this money?  The only person you know that got that

19   money was Alan Roberts?

20   A.   Yes, sir.

21   Q.   Do you know what year that was?

22   A.   I'm going to say '86, '87, something like that.

23   Q.   Now, was that before you went to prison the first time?

24   A.   Yes, sir.

25   Q.   So it was '86 or '87?

*LAWSON - Cross (Hoskins)*                                                    130

1    A.   Um-hmm.

2    Q.   Because you went to prison for the first time in '87 or

3    '88?

4    A.   '88.

5    Q.   You started serving your time in '88?

6    A.   I think '89 -- '88, '89, somewhere along there.

7    Q.   Okay.  Did you ever have any conversations with Cletus

8    Maricle about any of this drug business of yours?

9    A.   No, sir.

10   Q.   Ever have any conversations with him about elections or

11   politics or vote buying or anything like that?

12   A.   No, sir.

13   Q.   Mr. Lawson, the person that you were interested in having

14   access to or being friends with was the county sheriff, wasn't

15   it?

16   A.   Yes, sir.

17   Q.   Starting with Sheriff Sizemore?

18   A.   Yes, sir.

19   Q.   And you and Sheriff Sizemore were pretty tight?

20   A.   Yes, we was.

21   Q.   And you and Sheriff Sizemore's wife were pretty tight?

22   A.   Yes, sir.

23   Q.   A lot of money and jewelry and things of that nature went

24   from you to the sheriff?

25   A.   To his wife.

LAWSON - Cross (Bayer)                                        131

1   Q.   To his wife?  I'm sorry, I didn't understand.

2   A.   Yes, sir.

3   Q.   Because as a drug, marijuana farmer, you needed to know

4   who might be out trying to catch people like you, right?

5   A.   Right.

6   Q.   And that would be the sheriff or the police?

7   A.   The sheriff.

8   Q.   So you never had anything to do with any judges or

9   anything like that, did you?

10  A.   No, sir.

11          MR. HOSKINS:  That's all.  Thank you.

12          THE COURT:  Thank you.  Mr. Bayer?

13          MR. BAYER:  Thank you, Judge.

14                      CROSS-EXAMINATION

15  BY MR. BAYER:

16  Q.   Mr. Lawson, when you were interviewed for the Herald

17  Leader article, and I believe that was around September, 1987,

18  correct?

19  A.   Pretty close to there.

20  Q.   Okay.  When you were interviewed for that, how is it that

21  the Herald Leader came to talk to you?  What caused that?

22  A.   I called them.  The state police come up to my place and

23  shot a dog in front of my little young ones, one of my pups.

24  Q.   The article in the Herald Leader talked about that

25  offended you, they swooped in on the property, and you thought

LAWSON - Cross (Bayer)                                             132

1    it was time somebody stood up for the rights of marijuana

2    growers?

3    A.   Yes, sir.

4    Q.   At that point in time, if I understand through the

5    cross-examination by Mr. Hoskins and the direct examination,

6    whatever politics or whatever money you would have been

7    dealing with, allegedly, for Cletus Maricle would have been

8    before the time of that article, correct?

9           MR. SMITH:  Your Honor, I'm going to object.  That is

10   not what is in the record.  That's misstating, I believe, the

11   record, and I'm going to object on that basis.

12          THE COURT:  Well, I'll allow the witness to clarify

13   the time period as to when the actions would have taken place

14   in connection with the newspaper article.

15   A.   I think it was just a little bit after the article.

16   Q.   Because that was one of the things that you talked about

17   in the newspaper article is about how things were going on in

18   Clay County that you thought were unfair, and I suspect that

19   was because perhaps you were upset with Sheriff Sizemore over

20   the fact that the state police came in on you, weren't you?

21   A.   No, sir.  I wasn't.

22   Q.   Who did you blame for the state police coming in on you?

23   A.   Just the state police theirself.

24   Q.   And there was also some talk about maybe the governor and

25   other people had flown over your farm, or you were supposed to

LAWSON - Cross (Bayer)                                           133

1    have known about that?

2    A.   No.  Carl Sizemore found a patch of pot just below the

3    house, and he was bringing -- I want to say it's the governor

4    or somebody up there to cut it.  It was almost in the road,

5    probably outta the road 30, 40 feet.  And he said don't go cut

6    it, he said, I'm bringing the governor up to cut it.

7    Q.   And that was Sheriff Sizemore?

8    A.   Yes, sir.

9    Q.   And then after this period in the late '80s, around 1986,

10   1987, that you testified on direct, what other involvement did

11   you have in politics in Clay County?  And let me preface that

12   by saying, were you dissatisfied with the results of what you

13   had previously tried to accomplish in Clay County to benefit

14   you?

15   A.   No, sir.

16   Q.   Were you satisfied?

17   A.   Yeah, I was doing all right.

18   Q.   Sure.  So what did you do after that point in time?

19   A.   Rephrase that question again.

20   Q.   What did you do regarding Clay County politics after

21   1986?

22   A.   I just only helped one person after that in the election

23   stuff in '87.  That was when I donated the money and stuff.

24   Like I said, I don't know whether the money got to who it was

25   supposed to be going to or not.

*LAWSON - Cross (Bayer)*                                                    134

1    Q.   So basically, you donated money in one election.  You

2    don't know where it went, you don't know who got it.  That was

3    your only involvement in Clay County politically?

4    A.   I know who got the money.  I don't know it got where it

5    supposed to went.

6    Q.   Did you ever help anybody buy votes?

7    A.   Yes, sir.

8    Q.   Who?

9    A.   Stanley Bowling.

10   Q.   Who else did you help buy votes?

11   A.   Well, it was for Stanley Bowling.

12            MR. SMITH:  Your Honor, I'm going to object unless he

13   wants to clarify the time period.  I'm asking, again, for --

14   I'm going to state an objection that his questions now are so

15   open-ended that we're now asking globally, and I would ask

16   that, again, the hearing be limited to the parts prior to --

17            THE COURT:  I believe that this is one area that's

18   listed in the notice.  Specifically, the notice states that in

19   2002, Lawson was approached by Charles Wayne Jones and Stanley

20   Bowling to buy votes for a slate of candidates.  It is in the

21   notice so I'll allow Mr. Bayer to ask the questions.

22   Objection overruled.

23            MR. BAYER:  Thank you, Judge.

24   Q.   When did that happen?

25   A.   2002.

LAWSON - Cross (Bayer)                                          135

1    Q.   Between 1986 and 2002, did you ever do it?

2         MR. SMITH:  Your Honor, I'm going to state an

3    objection as, again, I believe that this question is too

4    open-ended as phrased, and I would object as to relevance as

5    to "doing it."

6         THE COURT:  It's a rather broad question.  If you can

7    narrow the question down.

8         MR. BAYER:  I have a difficult time narrowing it to

9    an extent, Judge, because I don't know all of his background

10   based upon the information that they've given to us.  And it

11   seems strange that Mr. Smith will object to relevance, because

12   I'm trying to find out what is the relevance of all of this.

13   And that's why it's a problem.

14        THE COURT:  All right.  I think Mr. Smith is

15   objecting to the form of the question because it was vague.

16   So I'll sustain the objection.  If you don't want to rephrase

17   the question, I'll sustain the objection.

18        MR. BAYER:  I'll try to rephrase it.

19   Q.   Between 1986 and 2002, did you ever engage in vote

20   buying?

21   A.   No.  I've helped work the elections, you know, like

22   hauling voters, something like that.

23   Q.   What is hauling voters all about?

24   A.   Well, go get people out, pay them to vote.

25   Q.   And who did you do that for?

*LAWSON - Cross (Bayer)*                                    136

1    A.   Honestly, about every one of them.

2    Q.   Now, this is in between the time of your marijuana

3    convictions?

4    A.   Yes, sir.

5    Q.   And were you doing this for the sheriff at the time?

6    A.   Yes, sir.

7    Q.   Were you also doing it for Ed Jordan at the time?

8    A.   Yeah, I've helped Ed Jordan, yeah.

9    Q.   Did you ever work with Kenny Day on anything?

10   A.   No, sir.

11   Q.   Do you know Kenny Day?

12   A.   Yes, sir, I know him good.

13   Q.   How do you know him?

14   A.   Well, I've knowed him before he run down the service, and

15   I knew him through the service and as jailer.

16   Q.   I didn't understand the last part.

17   A.   I've grown up around Kenny, pretty close to Kenny.  I've

18   knowed him all my life.

19   Q.   Did you ever talk politics with him?

20   A.   You're talking about Kenny Day?

21   Q.   Yes.

22   A.   I thought you were talking about Kenny Price, the jailer.

23   I never done nothing with Kenny Day, no.

24        MR. ABELL:  Judge, could he pull that closer?  It's

25   difficult to hear him.

*LAWSON - Cross (White)*                                               137

1   Q.   What about Eugene Lewis.  Do you know Eugene Lewis?

2   A.   No, sir.  I only know his son.  I've seen Lewis, but I

3   don't know him personally.

4   Q.   So you didn't have anything to do with either Kenny Day

5   or Eugene Lewis?

6   A.   No, sir.

7           MR. BAYER:  I don't have any other questions.

8           THE COURT:  All right.  Thank you.  Mr. White?

9                       CROSS-EXAMINATION

10  BY MR. WHITE:

11  Q.   Good afternoon, sir.  Let me ask you a couple of

12  questions.  One, this time that you testified that you saw

13  Mr. Jones down by the river, was that -- did that occur prior

14  to -- did you testify that occurred prior to the Herald Leader

15  story in, I think, '87?

16  A.   No, that was, that was before that.

17  Q.   Before 1987?

18  A.   Yeah.

19  Q.   And when you had seen Mr. Jones and Judge Maricle -- or

20  Mr. Jones in Judge Maricle's office, it was just, they were

21  just there as friends and you didn't -- you didn't testify

22  that you heard their conversation or knew what they were

23  talking about; is that correct?

24  A.   No, sir.

25  Q.   You just saw them there?

LAWSON - Cross (White)                                                138

1    A.   I just saw them.  I went to see Judge Maricle about

2    trying to help my son get out of jail.

3    Q.   Okay.  You just testified to Mr. Bayer about this 2002

4    visit by Stanley Bowling and Mr. Jones about -- what did he

5    ask you to do again?

6    A.   Well, Wayne come to the house first and talking about the

7    election and wanting me to help him out.  Then so really all

8    he was interested in was Freddy Thompson and Ed Jordan and

9    Gayle House.  And he never named nothing about Stanley, you

10   know.  Then after that, Stanley called.  And Stanley, you

11   know, wanted me to help him.  And Stanley growed up around

12   home, my daddy knowed him, you know.  And so --

13   Q.   And this was an election where Gayle House was a

14   candidate?  Is this 2002?

15   A.   Yeah, I think so.

16   Q.   So he talked to you about Ed Jordan, Gayle House and

17   Freddy Thompson?

18   A.   Yeah.

19   Q.   And was it your testimony he just asked you to help?

20   A.   Asked me to help buy voters and get voters stuff.

21   Q.   Were you given money by anyone to buy votes?

22   A.   Yes, sir.

23   Q.   And who was that?

24   A.   Well, Stanley had bought some money to me, and I didn't

25   want to keep it.  And so Garrett Gilbert, he got it, come up

LAWSON - Cross (Baldani)                                         139

1    to the house and set, and I would buy the votes and pay for

2    them, you know, get the money from him.

3    Q.   What precinct was that?

4    A.   I don't know.  Just over at Big Creek.

5    Q.   And that was Mr. Bowling, not Mr. Jones?

6    A.   Yeah, that was Mr. Bowling.

7    Q.   Okay.

8              MR. WHITE:  Give me just a moment, Your Honor.

9              THE COURT:  Yes.

10             MR. WHITE:  I believe that's all I have.  Thank you,

11   Your Honor.  Thank you, Mr. Lawson.

12             MR. ABELL:  No questions.

13             THE COURT:  Mr. Baldani?

14             MR. BALDANI:  Thank you, Your Honor.

15                         CROSS-EXAMINATION

16    BY MR. BALDANI:

17   Q.   Mr. Lawson, would it be fair to say your main income was

18   growing marijuana?

19   A.   Yes, sir.

20   Q.   You weren't a political guy?

21   A.   No, sir.

22   Q.   Never really were a political person, were you?

23   A.   Not really.

24   Q.   You're mainly living on the land and growing weed and got

25   pretty darn good at it, right?

*LAWSON - Cross (Baldani)*                                    140

1   A.  Yes, sir.

2   Q.  And really, the only, the only reason you even dabbled in

3   politics on the side was in the event some day you needed a

4   favor or you needed protection; is that fair to say?

5   A.  Yes, sir.

6   Q.  And for that reason, you got in good with Sheriff

7   Sizemore, right?

8   A.  Yes, sir.

9   Q.  And for the same reason, you got in good with Ed Jordan,

10  right?

11  A.  I never had much to do with Ed.

12  Q.  Okay.  But the point is, you weren't interested in

13  politics for politics sake.  You just basically did it as a

14  little insurance policy; is that fair to say?

15  A.  Um-hmm.

16  Q.  All right.  And you testified about Wayne Jones and

17  Bowling approaching you in '02.  Freddy Thompson never

18  approached you in '02, did he?

19  A.  No, sir.

20  Q.  And he wasn't there when either Wayne Jones or Stanley

21  Bowling came to you?

22  A.  No, sir.

23  Q.  And you cannot tell this judge that Freddy Thompson had

24  anything to do with that behind the scenes, can you?

25  A.  No, sir.  I just only had Freddy to ask me, just like

*LAWSON - Cross (Baldani)*                                                141

1    anybody else, just to vote and help him.  Nothing else.

2    Q.   Did you say Freddy asked you to vote for him?

3    A.   When I seen him, he asked me to help him.

4    Q.   That's all he asked you was for the legitimate act of

5    voting?

6    A.   Yes, sir, that's it.

7    Q.   And you've asked him for something before, hadn't you?

8    His hardware store after you got out of prison?

9    A.   I might of.  I can't say for sure.  I can't say for sure

10   right now.

11   Q.   How many separate times have you been to prison?

12   A.   This is the third time.

13   Q.   And the prosecutor asked you about getting a sentence

14   reduction?

15   A.   Yes, sir.

16   Q.   And you're hopeful you might get your sentence cut down,

17   aren't you?

18   A.   Yeah.

19   Q.   Because that's happened before, hasn't it?

20   A.   In '87, I think.

21   Q.   You got a sentence cut before from 34 months to 22

22   months?

23   A.   Yes.

24   Q.   What was that all about?

25   A.   That was helping out Bill Sheets.

LAWSON - Cross (Simons)                                          142

1    Q.   You know this process of once you get sentenced, if you

2    give some assistance to the government, then you can get your

3    sentence cut, right?

4    A.   Yeah, if you don't lie.

5    Q.   Been through it before?

6    A.   Once.

7              MR. BALDANI:  That's all.

8              THE COURT:  Mr. Gilbert.

9              MR. GILBERT:  No questions, Your Honor.

10             MS. HUGHES:  No, Your Honor.

11             THE COURT:  Mr. Simons?

12                          CROSS-EXAMINATION

13   BY MR. SIMONS:

14   Q.   Afternoon, Mr. Lawson.  Can you hear me all right?

15   A.   Yeah.

16   Q.   All right.  You've talked a great deal about drug trade,

17   you were a good grower, you grew lots of pot, you sold it.

18   You mentioned my client, Stanley Bowling.  He wasn't part of

19   any of that, was he?

20   A.   In the drugs?

21   Q.   Yes.

22   A.   No, sir.

23   Q.   Stanley didn't have a thing to do with marijuana, growing

24   it, producing it, selling it, nothing to do?

25   A.   No, sir.

LAWSON - Cross (Simons)                                    143

1    Q.   And the government in its motion says that you developed

2    a relationship with Stanley Bowling.   You didn't even know

3    Stanley Bowling before 2002, did you?

4    A.   No, sir.

5    Q.   As a matter of fact, Stanley Bowling's daddy grew up,

6    lived down in Big Creek near where you lived, didn't he?

7    A.   Right above my daddy.

8    Q.   And if you had any relationship with Stanley Bowling, it

9    would have been his daddy.   It would not have been him?

10   A.   Yes, sir.

11   Q.   Do you remember when you first met Stanley Bowling?

12   A.   Think it was in 2002, the election.   But I stated that in

13   my question before that I did not know Stanley Bowling before

14   the election.

15   Q.   Okay.

16   A.   My daddy did.

17   Q.   So from any time up to 2002, you had absolutely no

18   relationship, no talking with, no dealing with, nothing to do

19   with Stanley Bowling?

20   A.   No, sir.

21   Q.   All right.   Now, Stanley Bowling, you said, I think you

22   said he came to you after Wayne Jones had talked to you and

23   Stanley asked for your support?

24   A.   Um-hmm.

25   Q.   Is that correct?

*LAWSON - Cross (Simons)*                                               144

1   A.   Yes, sir.

2   Q.   He came by himself?

3   A.   There was somebody, I think, in the vehicle.  I'm not for

4   sure.

5   Q.   And he asked you to support him in the election, and he

6   was running for magistrate, right?

7   A.   Magistrate, yes, sir.

8   Q.   And he asked you to talk to people, talk him up.  You

9   come from a big family, don't you?

10  A.   Yeah.

11  Q.   How many Lawsons are there on Lawson Mountain?

12  A.   Quite a few.

13  Q.   There's a bunch.  A bunch of Bowlings too?

14  A.   Um-hmm.

15  Q.   Stanley would ask for your help if he was seeking office.

16  The government says there was no money that changed hands

17  until after the election.  That's true, isn't it, between you

18  and Mr. Bowling, if it happened?

19  A.   It was that night.

20  Q.   After the election?

21  A.   Yeah, at night, about 10:00.

22  Q.   So the election was over, polls were closed, right?

23  A.   Before that, I bought votes, you know.

24  Q.   Well, what I'm going to ask, was this the May election in

25  2002?

LAWSON - Cross (Simons)                                    145

1    A.   I'm not for sure now.  I know it was 2002.

2    Q.   There were two elections.  There was a primary election

3    in May of 2002.  I want you to think about it, and I want you

4    to tell me if that's the election you're talking about.

5    A.   I think it is.

6    Q.   Well, isn't it true in that election, you actually hauled

7    votes for Junior Sparks?

8    A.   No, sir.

9    Q.   That's not true?

10   A.   No, sir.  I did not haul votes for Junior Sparks.

11   Q.   Well, Junior Sparks would have been Stanley's opponent?

12   A.   Junior Sparks was my neighbor and one of my best friends.

13   Q.   How far away did you live from Junior Sparks?

14   A.   My daddy lives just rock throw.  And I lived, at that

15   time, I was staying there at daddy's.  Same place, about,

16   pretty close to it.

17   Q.   You say Junior Sparks was your neighbor and one of your

18   very best friends?

19   A.   Yes, sir.

20   Q.   Okay.  And you didn't help him in the primary election in

21   May of 2002?

22   A.   Right.

23   Q.   That's you did not?

24   A.   No.

25   Q.   Did you vote for him?

*LAWSON - Cross (Simons)*                                                   146

A.   What?

Q.   Did you vote for him?

A.   No, sir.  I couldn't vote then.  I was on probation.

Q.   Okay.  Now, after Stanley Bowling was -- let me ask you

this.  You say Stanley gave you some money the night of the

election at 10:00, after the election?

A.   10:00 or 11:00, somewhere like that.

Q.   Was it cash or check?  What did he give you?

A.   Cash.

Q.   How much was it?

A.   500.

Q.   500 dollars in cash?

A.   Yes.

Q.   Now, after that, let me ask you this.  Did Stanley talk

to you about voting for anybody -- and just he asked you only

about himself.  He wanted to win, and he asked you to help

him.  Is that fair enough?

A.   What now?

Q.   He didn't ask you to help anybody else but him?

A.   Only one on the ticket was Stanley, Freddy and Ed Jordan

and Gayle House.  That was the only four that was interested.

Q.   Now, Stanley was known to support Jennings White in that

election.  That was a big election in 2002.

A.   Um-hmm.

Q.   You're not telling me today that Stanley tried to get you

*LAWSON - Cross (Simons)*                                          147

1    to vote for Fred Thompson, are you?

2    A.   I don't think nobody helped Jennings White, to be honest

3    with you.

4    Q.   Okay.  Now, after Stanley was elected, did you make any

5    calls to him or ask any favors of him?

6    A.   Yeah.  Couple times.

7    Q.   Okay.  Didn't have anything to do with drugs, though, did

8    it?

9    A.   No, sir.  It's never had nothing to do with drugs,

10   Stanley.

11   Q.   Did you call him multiple times and ask him to put gravel

12   on personal roads for your family?

13   A.   Yes, sir.

14   Q.   In fact, did he gravel a cemetery road when you had a

15   relative die?

16   A.   My brother and my mother and sister got buried, yes.

17   Q.   And he put some gravel on that?

18   A.   Yes, sir.

19   Q.   You asked him three or four other times shortly after he

20   was elected to put gravel on your roads?

21   A.   Yes, sir.

22   Q.   And he refused every time, didn't he?

23   A.   Yep.

24   Q.   You asked him a couple times to put blacktop up on Lawson

25   Hill Road there that leads up to your family's mountain?

1  A.   No, sir, never did ask him nothing about Lawson Hill.

2  Got nothing to do with them people there.

3  Q.   There never was any new blacktop put on that road, was

4  there?

5  A.   I never did ask for nothing up there.

6  Q.   What about the fall election in 2002.  Do you remember

7  it?

8  A.   No, sir, can't really recollect it.

9  Q.   You didn't have anything to do with it, right?  Did you

10 involve yourself in the fall election of 2002, November?

11 A.   I can't say for sure.

12       MR. SMITH:  Your Honor, I'm going to object.  I

13 believe that witness obviously has asked and answered, and

14 we'd ask that the Court again, based on our understanding of

15 this hearing, to limit it to basically what we put in our

16 notice.  I acknowledge the Court has pointed out we did put

17 some substance, and I believe that's been cross-examined on.

18 This does not appear to be that.  This seems to be going much

19 beyond that.

20       THE COURT:  The witness has indicated he doesn't

21 recall.

22       MR. SIMONS:  The government's motion, Your Honor,

23 didn't specify what election in '02.

24       THE COURT:  We've got it delivered through the last

25 answer, so I'll sustain the objection.

1          MR. SIMONS:  All right.  Your Honor, I don't think I

2     have anything else.  Thank you.

3          THE COURT:  All right.  Thank you, Mr. Simons.  Let's

4     see if there's any redirect of the witness.  Mr. Smith, do you

5     have any additional questions?

6          MR. SMITH:  No.  Thank you.

7          THE COURT:  Any of the other defendants have

8     questions that were generated by some of the

9     cross-examination.  No?  All right.  Thank you, Mr. Lawson,

10    you may step down, sir.  Mr. Smith?

11         MR. SMITH:  Call Special Agent Timothy Briggs.

12          TIMOTHY BRIGGS, GOVERNMENT'S WITNESS, SWORN

13                     DIRECT EXAMINATION

14    BY MR. SMITH:

15    Q.   State your name, please.

16    A.   Timothy S. Briggs.

17    Q.   How are you employed?

18    A.   As a special agent with the Federal Bureau of

19    Investigation.

20    Q.   And have you participated in the investigation resulting

21    in the charges that are the subject of this indictment?

22    A.   Yes, I have.

23    Q.   During the course of your investigation, have you been

24    asked and at points in time on your own initiative sought out

25    records and public records as it relates to past elections in

*BRIGGS - Direct*                                                                      150

1    Clay County?

2    A.   Yes, I have.

3    Q.   Have you also sought out media examples relating again to

4    this investigation over the years?

5    A.   Yes, sir, I have.

6    Q.   If I can hand to you what's marked as Government's

7    Exhibit Number 4.

8    A.   Thank you.  Yes, sir.

9    Q.   Do you recognize that?

10   A.   Yes, sir, I do.

11   Q.   And what is that?

12   A.   It's a news clip off of "Inside Edition" from 1989 where

13   Mr. Russell Cletus Maricle is being interviewed, as well as

14   others.

15   Q.   And have you had an opportunity to view that?

16   A.   Yes, sir, I have.

17   Q.   And can you state that that's an accurate copy of that

18   interview, to the best of your knowledge and belief?

19   A.   Yes, it is.

20        MR. SMITH:  I'd move at this time for its

21   introduction and ask for permission to exhibit that as part of

22   the hearing.

23        THE COURT:  Any objection to its admission for

24   purposes of this hearing?

25        MR. BAYER:  Judge, do we want to reserve on the

BRIGGS - Direct                                                        151

1    introduction till we've maybe had a chance to review it, and
2    then I think he should rightfully at that point in time move
3    for the introduction.
4           MR. SMITH:  I believe that counsel has all been
5    provided to this in initial discovery in early 2009.  So if
6    they've not seen it, it's not because they weren't given it,
7    Your Honor.  I want to make that clear.
8           MR. BAYER:  I was just going for the formality of
9    what I thought would be a better way to do it, Judge.  I'll
10   withdraw it, if that's a problem.
11          THE COURT:  Is there an objection to the introduction
12   of this particular news clip for purposes of this hearing?
13          MR. BAYER:  Not yet.  I just thought more appropriate
14   that we see it before he introduce it, just from a technical
15   standpoint.  But that's fine.
16          THE COURT:  All right.  Objection has been withdrawn.
17   It will be admitted.  Mr. Hoskins?
18          MR. HOSKINS:  Judge, we don't object for purposes of
19   this hearing.
20          THE COURT:  I understand.  That's why I made the
21   specific comment.  Thank you.
22                   (Government Exhibit No. 4
23                    was admitted into evidence.)
24          MR. SMITH:  I'd ask that it be played, Your Honor.
25          THE COURT:  All right.  Mr. Smith, you have a

1    separate copy you're going to play?

2          MR. SMITH:  We have, Your Honor, already dubbed up a

3    copy, if it's okay with the Court.

4          THE COURT:  Okay.  Let's make sure we have the

5    equipment working properly.

6                         (Government's Exhibit 4 was

7                          played in open court.)

8    Q.  Agent Briggs, in the story that just played, there was a

9    mention that at time, Mr. Sizemore had gotten defeated as

10   sheriff.  Do you know who replaced him as sheriff in Clay

11   County?

12   A.  Ed Jordan.

13   Q.  At the time the story played, it mentioned there were

14   indictments that had just come down about voter fraud.  Were

15   any of these defendants named in any of those indictments that

16   you've been able to find?

17   A.  Yes, sir.  Doug Adams.

18   Q.  And have you checked the records of Clay County for

19   purposes of identifying who represented him in that case?

20   A.  Yes, sir.  Cletus Maricle.

21   Q.  I'd like to hand to you now Government's Exhibit

22   Number 5.  Do you recognize Government's Exhibit Number 5?

23   A.  Yes, sir.

24   Q.  And what is that?

25   A.  It's entry of appearance by Russell Cletus Maricle on

*BRIGGS - Direct* 153

1   behalf of Doug Adams in Clay Circuit Court.

2   Q.   Does it list the indictment numbers?

3   A.   Yes, sir.  It's 89-CR-051.

4   Q.   And also 047?

5   A.   047, yes, sir.

6   Q.   What was the date he entered his appearance representing

7   Mr. Adams in this matter?

8   A.   28th day of July, 1989.

9        MR. SMITH:  Move for the introduction of Government's

10  Exhibit Number 5.

11       MR. BAYER:  Objection.

12       THE COURT:  Basis of the objection?

13       MR. BAYER:  Judge, I think it's wholly outside the

14  scope of this case, and it's highly irrelevant, prejudicial,

15  has no probative value whatsoever.

16       THE COURT:  All right.  Objection will be overruled.

17  Exhibit 5 will be admitted for purposes of this hearing.

18                    (Government Exhibit No. 5

19                     was admitted into evidence.)

20  Q.   Agent Briggs, we've heard testimony today from three

21  individuals, Kenneth Day, Eugene Lewis and J.C. Lawson.  And

22  during their testimony, there have been references to

23  historical elections that they were aware of, involved in in

24  some fashion.

25  A.   Yes, sir.

*BRIGGS - Direct*                                                      154

1    Q.   Have you, as part of your investigation, looked at some

2    of the records that pertain to topics that they've discussed

3    in their testimony here today?

4    A.   Yes, sir, myself and other investigators in the case.

5    Q.   All right.  Let's start with Mr. Kenneth Day.  He

6    indicated in his testimony earlier that he was the Republican

7    election commissioner.  Have you searched the records in Clay

8    County or has someone at your request and determined if there

9    was any evidence that he was actually the Republican election

10   commissioner in Clay County?

11   A.   Yes, sir.

12            MR. SMITH:  I'd like to hand to the witness now

13   what's going to be marked as Government's Exhibit Number 6.

14   Q.   Do you recognize Government's Exhibit Number 6?

15   A.   Yes, sir.  It's bond for Kenneth Day, Commonwealth of

16   County, Clay County.

17   Q.   Is this bond for him in the Clay County Board of

18   Elections?

19   A.   Yes, sir.

20   Q.   What does that show he's bonded to hold?

21   A.   Republican commissioner.

22   Q.   And for what years does he show bonded, according to

23   Government's Exhibit Number 6?

24   A.   It was witnessed on July 13, 1988, and expires on July 1,

25   1992.

*BRIGGS - Direct*                                                       155

1    Q.    Okay.  Now, that's the notary notarizing the day of the

2    signature of Mr. Day and his surety; is that correct?

3    A.    Yes.

4    Q.    One would assume that would reference a bond for him

5    serving at a point in time after July of 1988?

6    A.    Yes, sir.

7    Q.    And then second page there shows a bond that's signed

8    July the 8th of 1992, again for Kenneth Day as Republican

9    commissioner for Clay County Board of Elections.  Is that

10   right?

11   A.    Yes.

12   Q.    And the final one would be a 1996 bond for that same

13   purpose?

14   A.    Yes.

15   Q.    And those were found in records in what office?

16   A.    The clerk's office.

17   Q.    In Clay County?

18   A.    Clay County.

19          MR. SMITH:  I'd move that introduction now, Your

20   Honor, of Government's Exhibit 6.

21          THE COURT:  Objection?  Exhibit 6 will be admitted.

22                   (Government Exhibit No. 6

23                   was admitted into evidence.)

24   Q.    During his testimony, I believe we heard there were two

25   specific instances which he recalled being involved in

*BRIGGS - Direct*                                                              156

1    election crimes with Doug Adams and/or Cletus Maricle.  Do you

2    recall that testimony?

3    A.   Yes, sir, I do.

4    Q.   And he identified that there were two races in particular

5    that helped him remember those.  That was the McKeehan/Hooker

6    race and I believe the Bishop/House race.  Is that correct?

7    A.   Correct.

8    Q.   Have you looked at the records for those races and what

9    years they were?

10   A.   Yes, sir, I have, and we obtained those.

11        MR. SMITH:  I'd like to hand the witness now what's

12   been marked as Government's Exhibit Number 7.

13   Q.   Mr. Briggs, before I ask you questions, if it's okay with

14   the Court, I want to also hand you Exhibit 8, because I want

15   to discuss those collectively, if it's okay with the Court.

16        THE COURT:  Yes, sir, that's fine.

17   Q.   Do you recognize Government's Exhibit Number 8?

18   A.   Yes.  It's a tabulated statement of votes cast on -- in

19   May of 1985 in Clay County.

20   Q.   And these, both Exhibits 7 and 8 were obtained from

21   public records in Clay County?

22   A.   Clay County clerk's office.

23   Q.   And based on Government's Exhibit Number 8, can you find

24   the race of Corky McKeehan and Mike Hooker occurring as

25   tabulated on May, 1985?

*BRIGGS - Direct*                                                    157

1    A.   Yes, sir.

2    Q.   What does it show?  I believe it refers to them as

3    Justice of the Peace.  Is that also known as magistrate now?

4    A.   Yes, it is.

5    Q.   And there were multiple candidates, but you do see Mike

6    Hooker and Corky McKeehan on there as a slate of the

7    candidates in that election?

8    A.   Yes, sir.

9    Q.   And Government's Exhibit Number 7, could you tell us what

10   that is?

11   A.   This is the Board of Election commissioner's meeting, and

12   it specifies the individuals to serve as election officers on

13   September 16, 1985 election in Clay County.

14   Q.   And does it show who was serving at Burning Springs as

15   election officers?  If it does, does it include the names

16   R. Cletus Maricle and Douglas Adams as judges, both Republican

17   and Democrat, for that precinct in that election in 1985?

18   A.   Yes, it does.

19        MR. SMITH:  Move the introduction of Government's

20   Exhibits 7 and 8.

21        THE COURT:  Exhibits 7 and 8 will be admitted for

22   purposes of this hearing.

23                    (Government Exhibit Nos. 7 and 8

24                    was admitted into evidence.)

25   Q.   Mr. Day's testimony also referenced an earlier race, I

1    believe, indicating it was a judge's race between Mr. Bishop

2    and Mr. House?

3    A.   Yes, sir.

4    Q.   And have you researched the records from Clay County to

5    determine if there's any evidence of that race occurring?

6    A.   Yes, sir, we have.

7         MR. SMITH:  I'd like to hand the witness Government's

8    Exhibit Number 9.

9    Q.   Do you recognize that, Agent Briggs?

10   A.   Yes, sir.  It's the tabulated statements of vote cast May

11   of 1983 in Clay County.

12   Q.   Does that indicate individuals by the name of Bishop and

13   House running for office in that year of election?

14   A.   Yes, sir, for circuit judge.

15        MR. SMITH:  I'd move the introduction of Government's

16   Exhibit Number 9.

17        THE COURT:  Exhibit Number 9 will be admitted for

18   this hearing.

19                 (Government Exhibit No. 9

20                 was admitted into evidence.)

21   Q.   In the course of Mr. Day's testimony, he indicated that

22   he was involved with Cletus Maricle in fixing a jury involving

23   a case of his family versus Gary Runion?

24   A.   Yes, sir.

25   Q.   Do you recall that testimony?

*BRIGGS - Direct*                                                             159

1    A.   Yes, sir, I do.

2    Q.   Government's Exhibit Number 10.  Having trouble here with

3    my technology, Your Honor.  I apologize.

4    A.   Thank you.

5    Q.   Do you recognize Government's Exhibit 10?

6    A.   Yes, sir, I do.

7    Q.   What is that?

8    A.   It's a civil action of Paul Day, Kenneth Day as the

9    administrator of the estate of Loretta Day versus Gary Runion.

10   Q.   And what was the date which this judgment reflects that a

11   jury was sworn and a verdict returned for approximately $3

12   million for the estate of Loretta Day?

13   A.   September 20th, 1990.

14   Q.   That would have been the day that the case went to the

15   jury.  What day did they return a verdict, according to the

16   record?

17   A.   September 25th, 1990.

18   Q.   I call your attention, Agent Briggs -- I know you're

19   looking at a statement which is signed.  But does the order

20   itself reflect within, I believe, page 2, middle paragraph,

21   that the trial actually concluded and a jury retired and

22   returned a verdict, including that $3 million and a few

23   dollars verdict, on September 21, 1990?

24   A.   Yes, sir, I'm sorry.  It says at the conclusion of the

25   trial, September 21st, 1990.

*BRIGGS - Direct*                                                           160

1        MR. SMITH:  Move for the introduction of Government

2   Exhibit Number 10.

3        THE COURT:  Without objection, Exhibit 10 will be

4   admitted.

5                    (Government Exhibit No. 10

6                    was admitted into evidence.)

7   Q.  Mr. Day was also questioned and there was some mention

8   that this could have occurred around or about the time that

9   Cletus Maricle got the governor's appointment for the position

10  of circuit judge.

11  A.  Yes, sir.

12  Q.  I'd like to hand to you what I'm going to mark as

13  Government's Exhibit Number 11.  Do you recognize Government

14  Exhibit Number 11?

15  A.  Yes, sir, I do.

16  Q.  Would you tell the Court what Exhibit 11 is?

17  A.  It's a copy of an article from the Manchester Enterprise

18  dated September 27th, 1990.

19  Q.  From that article, can you determine what day it was

20  reported that he got sworn in as circuit judge?

21  A.  Yes.  Mr. Maricle was sworn in September 24th, 1990, the

22  Monday prior to this paper being published.

23  Q.  As the calendar goes, the jury verdict on the Runion

24  civil matter with over a million dollar verdict came in on

25  Friday, September 21st.  The judge gets appointed by the

BRIGGS - Direct                                                        161

1    governor on Monday, the following Monday, according to the

2    paper?

3    A.   Yes, sir.

4         MR. SMITH:   Move for the introduction of Government's

5    Exhibit Number 11.

6         THE COURT:   Any objection?   Exhibit 11 will be

7    admitted.

8                        (Government Exhibit No. 11

9                         was admitted into evidence.)

10   Q.   Like to hand the witness now what's marked as Government

11   Exhibit Number 12.   Do you recall, Agent Briggs, during

12   Kenneth Day's testimony that he indicated that as part of

13   consideration that Maricle asked for him to go help him fix

14   the jury that he wanted consideration in the murder case that

15   was pending against his client, Gary Runion?

16   A.   Yes, sir.

17   Q.   Have you looked at the records for evidence of

18   representation of Mr. Maricle or his firm?

19   A.   Yes, sir.

20   Q.   I'd like to hand to you Government's Exhibit Number 12.

21   A.   Yes, sir.

22   Q.   Tell us what Government's Exhibit 12 is, please.

23   A.   It's a court docket for Clay County, and it says

24   Commonwealth of Kentucky versus Gary Runion, and represented

25   by Maricle and Bailey.

1        MR. SMITH:  Move for the introduction now of

2   Government Exhibit Number 12.

3        THE COURT:  Any objection?

4        MR. PINALES:  Not for this hearing, Your Honor.

5        THE COURT:  12 will be admitted.

6                 (Government Exhibit No. 12

7                 was admitted into evidence.)

8   Q.   During the course of testimony of Eugene Lewis, there was

9   mention during his testimony that there was a farm that he

10  purchased with Wayne Jones and others for the purpose of

11  growing marijuana.  Have you sought to find out if there's a

12  deed on record showing any transactions to Eugene Lewis?

13  A.   Yes, sir.

14  Q.   In Henry County?

15        MR. SMITH:  I'd like to hand the witness Government's

16  Exhibit 13.

17        THE COURT:  Yes, sir.

18  Q.   Do you recognize Government's Exhibit 13?

19  A.   Yes, sir.

20  Q.   Would you tell the Court what that is?

21  A.   This is a deed dated February 11th, 1988.

22  Q.   And what does that reflect as far as subject of the deed?

23  A.   It is a parcel of property which was purchased by the

24  names on the deed are Eugene Lewis, Denver Sizemore and

25  Mansell Baker.

BRIGGS - Direct                                                     163

1   Q.  And what was the consideration for that piece of

2   property?

3   A.  $55,000.

4          MR. SMITH:  Move for the introduction of Government's

5   Exhibit Number 13, Your Honor.

6          THE COURT:  Objection?  Exhibit 13 will be admitted.

7                    (Government Exhibit No. 13

8                     was admitted into evidence.)

9   Q.  During the testimony of J.C. Lawson, he was questioned

10  about appearances that his story may have occurred in papers

11  of wide circulation, including the Lexington Herald Leader.

12  A.  Yes, sir.

13  Q.  Have you sought to find those articles that may have

14  referenced Mr. Lawson in the course of your investigation?

15  A.  Yes, we have.

16  Q.  I'd like to hand to you now what's marked as Government's

17  Exhibit 14.

18  A.  Yes, sir.

19  Q.  Do you recognize that?

20  A.  Yes, it's a newspaper article from the Lexington Herald

21  dated September 13, 1987, with a photograph of J.C. Lawson

22  posing in front of a -- in a marijuana patch.

23         MR. SMITH:  Move now for the introduction of

24  Government's Exhibit Number 14.

25         THE COURT:  Objection?  Exhibit 14 will be admitted.

*BRIGGS - Direct*                                                        164

1              (Government Exhibit No. 14

2              was admitted into evidence.)

3    Q.  Agent Briggs, during your review of media outlets, have

4    you also found this same story in USA Today?

5    A.  Yes, sir.

6    Q.  For purposes of this hearing, have you sought to

7    reproduce a copy of that?  I'm going to hand you now what I'm

8    going to mark as Government's Exhibit 15.

9              MR. SMITH:  I'd like to hand the witness Government's

10   Exhibit 15.

11             THE COURT:  Yes, sir.

12   Q.  Do you recognize that as the USA Today article featuring

13   J.C. Lawson as part of that story?

14   A.  Yes, sir.  It's a USA Today article dated July 11, 1989.

15   Q.  You have all those exhibits before you there?

16   A.  Yes, sir.

17   Q.  We had testimony from, I believe, Mr. Lewis that Roy

18   Morgan and company or Cletus Maricle delivered an amount of

19   cash to him at the election.  Would you look at the 1993

20   primary in Clay County to see if there's an indication that

21   Roy Morgan would have been a candidate for office.

22   A.  Do you recall which exhibit number that was?

23             MR. SMITH:  Apologize, Agent Briggs.  I believe I

24   overlooked one.  I believe we're on Exhibit 15, Your Honor.

25             THE COURT:  You haven't moved for the introduction of

BRIGGS - Direct                                                      165

1    Exhibit 15, the USA Today article.  This would be Exhibit 16.

2          MR. SMITH:  Move for the introduction of Government's

3    Exhibit 15 and now mark this as Exhibit 16.

4          THE COURT:  All right.  No objection to 15.  16 is

5    being marked and may be shown to the witness.

6                    (Government Exhibit No. 15

7                    was admitted into evidence.)

8    Q.  Do you recognize that, Agent Briggs?

9    A.  Yes, sir.  It's a tabulated statement of votes cast in

10   Clay County during the May, 1993 election.

11   Q.  And does that record reflect that Roy Morgan was, in

12   fact, candidate for judge executive in Clay County?

13   A.  Yes, sir, county judge executive.

14   Q.  And who was his opponent?

15   A.  James Garrison and Clyde P. House, Jr.

16         MR. SMITH:  Move for the introduction of Government's

17   Exhibit 16.

18         THE COURT:  Objection?  Exhibit 16 will be admitted.

19                    (Government Exhibit No. 16

20                    was admitted into evidence.)

21   Q.  Agent Briggs, have you in the course of your

22   investigation sought to determine if Cletus Maricle, in fact,

23   had a race against Oscar Gayle House?

24   A.  Yes.

25   Q.  And do you know when, based on your investigation, that

*BRIGGS - Direct*                                                                166

1    occurred?

2    A.   November 6, 1990.

3    Q.   And Kenny Day gave testimony about this agreement that he

4    and Maricle had about fixing the jury in the civil case.

5    During the time period, have you sought to find out if Pres

6    Henson was, in fact, contacted?  Have you tried to find out if

7    there was a juror contacted?

8    A.   Yes, sir.

9    Q.   And did you find that there was, in fact, a juror who

10   admitted she was contacted by Pres Henson?

11   A.   Yes, sir.

12   Q.   And what was her name?

13   A.   Essie Jackson.

14   Q.   Does her name appear on the judgment you've introduced

15   already on the record as being one of the jurors that sat on

16   the case?

17   A.   Yes, sir.  Exhibit 10.  Government Exhibit 10.

18   Q.   Okay.  And in substance, could you relate to us -- or in

19   summary, could you relate to us what she told you happened?

20   A.   She advised that I believe it was right after the jury

21   selection, before the court proceeding began, she received a

22   telephone call from Preston Henson advising her that she

23   should find a million plus in favor of the Day family.

24   Q.   Did she indicate to you that there might have been other

25   jurors that had been contacted, other than herself, when you

1    interviewed her?

2    A.   She felt quite confident that one other juror was also

3    fighting for a large settlement for the family, based upon

4    that juror's behavior during the court proceeding and the

5    deliberations.

6    Q.   We've heard that testimony from J.C. Lawson that he was

7    giving money for contributions from his drug distribution

8    business to support Cletus Maricle and Mr. Oscar Gayle House,

9    I believe.  Do you recall that testimony?

10   A.   Yes, I do.

11   Q.   And have you had an opportunity to interview Mr. Oscar

12   Gayle House about prior election practices in Clay County?

13   A.   Yes, I have.

14   Q.   And did he admit to you that he had been involved in

15   schemes that have been described here?

16   A.   Yes, he has.

17   Q.   And did he relate to you about what time period that he

18   was personally aware of these activities going on?

19   A.   I believe he said it was in the late '80s, I believe.

20           MR. BAYER:  Judge, if I could, please, I'd like to

21   pose an objection.  He's soliciting information regarding

22   testimony or statements made by Mr. House.  Unless he's a

23   co-conspirator and identified as such, I don't believe any of

24   this is admissible.  We ought to address this right now so it

25   doesn't accidentally come in during the course of the trial.

*BRIGGS - Cross (Pinales)*                                                    168

1           THE COURT:  As I understand, it's being offered in

2      the event the Court considers this information under

3      Rule 404(b).  One factor the Court has to consider is indicia

4      of reliability of the evidence that's being offered.  So your

5      objection is overruled inasmuch as that's my understanding of

6      why it's being offered.

7           Mr. Smith, am I mistaken in my understanding?

8           MR. SMITH:  No, you're not, Your Honor.  That's the

9      sole purpose of this hearing.

10          THE COURT:  All right.  Objection overruled.

11          MR. SMITH:  Pass the witness, Your Honor.

12          THE COURT:  Thank you.  Mr. Pinales, before you begin

13     your cross-examination, we're real close to where I would

14     ordinarily be taking a break.  Would you like to do that at

15     this point before we begin?

16          MR. PINALES:  I'm a guest in your house, Your Honor.

17          THE COURT:  All the guests will have a recess of 15

18     minutes.

19                  (Recess from 2:27 p.m. until 2:42 p.m.)

20          THE COURT:  Mr. Pinales, you may proceed.

21          MR. PINALES:  Thank you, Your Honor.

22                           CROSS-EXAMINATION

23      BY MR. PINALES:

24      Q.   Agent Briggs, Exhibit 4, the video that we saw of "Inside

25      Edition," 1989?

*BRIGGS - Cross (Pinales)*                                        169

1   A.   Yes, sir.

2   Q.   Did you see it aired in 1989?

3   A.   No, sir.

4   Q.   Do you know whether or not it was aired in any area here

5   in 1989?

6   A.   It's "Inside Edition."  It's a nationally syndicated

7   show.

8   Q.   It's a syndicated show, so every station has the right to

9   pick it up or not pick it up, correct?

10  A.   I'd have to check on that, sir.

11  Q.   So the answer is you don't know whether it was even aired

12  here?

13  A.   I believe it was, because a detective that was pictured

14  on there is the one who provided us a copy.  I think that he

15  made that copy from his home.  That's how we have it from that

16  point.

17  Q.   And when did you get a copy of that video?

18  A.   It was during the course of this investigation.

19  Q.   Do you know when?

20  A.   No, sir.

21  Q.   Exhibit Number 5, that was an entry of appearance.  Do

22  you have that in front of you?

23  A.   Yes, sir.

24  Q.   That is an entry of appearance in a case of Doug Adams?

25  A.   Yes, sir.

BRIGGS - Cross (Pinales)                                            170

1    Q.   In Clay County Circuit Court?

2    A.   Yes, sir.

3    Q.   And the attorney was Cletus Maricle?

4    A.   Yes.

5    Q.   From the law firm of Maricle and Bailey?

6    A.   Correct.

7    Q.   Clay County is a county of about, what, 23, 24 thousand

8    people?

9    A.   Let me backtrack there.  Maricle is the attorney.  I'm

10   not sure if they were partners at that time or not.  Yes, they

11   were.  It says Maricle and Bailey, you're correct.

12   Q.   My question is Clay County is a county of about 23, 24

13   thousand?

14   A.   Sir, I don't, I don't know the population.

15   Q.   Has about 12 lawyers?

16   A.   I don't know that either, sir.

17   Q.   Lawyers represent clients?

18   A.   Sure.

19   Q.   Criminal defense lawyer represents clients who are

20   charged in criminal cases?

21   A.   Absolutely.

22   Q.   And Cletus Maricle was a criminal defense attorney?

23   A.   Yes, sir.

24   Q.   In Clay County?

25   A.   Yes, sir.

BRIGGS - Cross (Pinales)                                               171

1   Q.   Talked about the jury fixing.  Want to draw to your

2   attention there --

3   A.   The Gary Runion case?

4   Q.   The jury fixing, yes.

5   A.   Yes, sir.

6   Q.   You said that Cletus Maricle was involved in talking to a

7   boyfriend, husband, spouse of a juror?

8   A.   A witness said that, yes, sir.

9   Q.   And he was not the judge in that case?

10  A.   No, sir.

11  Q.   It was before he ever was a judge in that case; isn't

12  that correct?

13  A.   I believe the judgment was three days before he was sworn

14  in.

15  Q.   So he was a lawyer, not a judge, at the time of this

16  event?

17  A.   Yes, sir.

18  Q.   You talked about Roy Morgan being a candidate for county

19  executive in Exhibit 16?

20  A.   County judge executive, May, 1993.

21  Q.   Exhibit 16?

22  A.   Yes, sir.

23  Q.   And actually, there was an election then, and Mr. Morgan

24  lost?

25  A.   Yes, sir.

*BRIGGS - Cross (Bayer)*                                          172

1   Q.   You talked about, in Exhibit 12, the Runion case.

2   A.   Yes, sir.

3   Q.   And you had a docket sheet?

4   A.   Yes, sir.

5   Q.   And the docket sheet showed the attorneys?

6   A.   Yes.

7   Q.   Who is the attorney?

8   A.   For the Gary Runion case?

9   Q.   Um-hmm.

10  A.   It says Maricle and Bailey.

11  Q.   Does it say which attorney?

12  A.   No, sir.

13          MR. PINALES:  One moment.  Nothing further.  Thank

14  you, Your Honor.

15          THE COURT:  Thank you.  Mr. Bayer?

16                       CROSS-EXAMINATION

17  BY MR. BAYER:

18  Q.   Agent Briggs, the gist of the video that we saw, it

19  begins with, I guess, Mr. O'Reilly stating "it makes me mad"

20  about all the drug, pot growing and so forth in Clay County.

21  Were you able to determine whether or not that video was seen

22  by any of the people in Clay County that, in some way or

23  another, it affected their politics or their actions or

24  anything politically that they did in Clay County at the time?

25  A.   Again, it was a nationally syndicated show.  I know that

*BRIGGS - Cross (Bayer)*                                                    173

1    one of the detectives that was in the video is from

2    southeastern Kentucky and made a copy for himself.  I imagine

3    it was aired in Clay County and throughout southeastern

4    Kentucky.

5    Q.  I understand it may have been aired there.  In talking to

6    people like Mr. Lawson or people like Carl Sizemore or

7    anything, did anything change in Clay County as a result of

8    the airing of that video?

9    A.  I'm not sure what your question is, sir.

10   Q.  Well, was there any new political action that any of

11   these people took as a result of that video?

12   A.  Mr. Maricle became the circuit judge after that.

13   Q.  You think that was directly as a result of that video?

14   A.  Sir, I can't speculate as to that.

15   Q.  That's what I'm getting at is you really can't speculate

16   that there's any link to any of these defendants and that

17   video, other than that some of them may have been in it,

18   correct?

19   A.  Rephrase the question, sir.

20   Q.  You can't speculate as to a link between that video, it

21   being aired and any of these defendants with the exception

22   that there was a mention of one or two of them or an interview

23   of one of them in the video, correct?

24   A.  I think it goes to show the mindset of the individuals

25   there, some of whom rose up to power through utilizing those

*BRIGGS - Cross (Bayer)* 174

1  same means.

2  Q.   That's your allegation that some of them rose to power

3  using those same means, correct?

4  A.   Yes, sir.

5  Q.   Okay.  Did you find --

6  A.   It's kind of the basis for our case, yes, sir.

7  Q.   What does that mean?

8  A.   Utilizing the information we're discussing today.

9  Q.   When you say basis of the case, what does that mean?

10 A.   This type of activity's been occurring for some time in

11 Clay County in southeastern Kentucky, and this is evidence

12 that that is the case.

13 Q.   When you say this kind of activity, what are you saying?

14 A.   Vote buying.

15 Q.   Well, except that --

16 A.   Vote fraud.

17 Q.   Go ahead.

18 A.   Voter fraud.

19 Q.   The indictment that is alluded to in the video regarding

20 Mr. Adams, did you find out what happened with those charges?

21 A.   They were dismissed.

22 Q.   Do you know why they were dismissed?

23 A.   No, sir, I don't.

24 Q.   You never found any link between Mr. Adams and any drug

25 dealing, did you?

*BRIGGS - Cross (Bayer)*                                                    175

1    A.   Sir, I didn't investigate that case.  You understand

2    that?

3    Q.   The question I'm asking you is fairly simple.  You didn't

4    find any link between Mr. Adams and any drug dealing, did you?

5    A.   I've had people report that, yes, sir.

6    Q.   Well, you had people talk about it, but you've not found

7    any proof, have you?

8    A.   I've had several witnesses advise us of that.  His

9    brother-in-law is convicted and there was talk that his

10   brother-in-law was involved with Mr. Adams.

11   Q.   Well, his brother-in-law was convicted, but there was

12   never any proof linking Mr. Adams with his brother-in-law, was

13   there?

14   A.   No conclusive proof, other than the witnesses I

15   mentioned.

16   Q.   Who were those witnesses?

17   A.   I don't recall.

18        MR. SMITH:  Your Honor, I'm going to object as we

19   apparently now are doing a discovery session as opposed to an

20   inquiry as to the issues at hand in this hearing.

21        MR. BAYER:  Judge, I can explain this very easily.

22   They have raised the premise that Mr. Adams is somehow

23   directly related to these drug dealers.  Part of the review

24   that the Court must make regarding the introduction of this

25   evidence is the reliability of it.  Right now, at this

1    hearing, we have the right to test the reliability of this

2    information and see what is the source and whether it really

3    has any credibility, because if, in fact, we can prove that

4    there is no credibility, they can't get it in to begin with.

5          THE COURT:  Objection overruled -- objection

6    sustained.  You're going far afield of the areas that the U.S.

7    has notified through the notice that's been provided.

8          MR. BAYER:  Well, if the Court will look at it, it

9    will see they are trying to make a direct link between

10   Mr. Adams and the drug dealers.  And that's what the agent

11   just testified to is that this whole premise of these drug

12   dealers and this voter fraud and vote buying is intertwined.

13   If that's the case, and I have asked him whether or not he has

14   any proof as to whether or not Mr. Adams has ever been

15   involved in any drug dealing, I have the right to inquire in

16   that, because he cannot give me any proof to that substance,

17   Judge.

18         THE COURT:  I do understand your position.  I

19   sustained the objection.

20         MR. BAYER:  Thank you, Judge.

21   Q.  The various exhibits that the United States has

22   introduced regarding the voting in the precincts, and I'm

23   referring now to the May, 1985 -- and I'm sorry, I don't know

24   which exhibit number that is.  Do you know which one I'm

25   talking about, Agent Briggs?

*BRIGGS - Cross (Bayer)*                                                    177

1    A.   I'm trying to find it.

2    Q.   It's the tabulated statement of votes cast at various

3    precincts May, 1985.  Perhaps 7, 8.  I'm hearing from the

4    bleachers.

5    A.   May, 1985?

6    Q.   Yes, sir.  Take a look at that for me.  If you go to the

7    second page --

8    A.   Exhibit Number 8.

9    Q.   Number 8?

10   A.   Yes, sir.

11   Q.   And I think that there seems to be some contention and

12   some discussion about the fact that there is the -- it was the

13   Justice of the Peace election, I guess, that is the subject of

14   the discussion.  The subject, Justice of the Peace for

15   District 2, correct, in which the candidates -- Corky McKeehan

16   is a candidate along with Mr. Hooker.  Is that the one that

17   we're dealing with, Michael Hooker?

18   A.   Yes, sir.

19   Q.   Okay.  What is the number of votes that you show total

20   for Corky McKeehan?

21   A.   169.

22   Q.   I believe it's actually 167, if you'll check.

23   A.   Yes, sir.

24   Q.   Okay.  And how many votes are you showing for Michael

25   Hooker?

*BRIGGS - Cross (Bayer)*                                                    178

1    A.   457.

2    Q.   Mr. Hooker appears to have been the highest vote getter,

3    correct?

4    A.   Yes, sir.

5    Q.   And he beat out the next candidate by a few votes, but

6    this is just a primary, isn't it?

7    A.   Yes, sir.

8    Q.   How many of these candidates would then be in the fall

9    election?

10   A.   Just two.

11   Q.   So which two candidates?

12   A.   I'm judging this merely on the two highest vote getters.

13   Well, no, you have to go party.  I don't know, sir.

14   Q.   Okay.  When you're looking at Mr. McKeehan's numbers, do

15   you know how he did precinct by precinct?  You can't tell from

16   this, can you?

17   A.   It's listed here, but it doesn't say which precinct is

18   associated with which number, I believe.

19   Q.   And his numbers are 89, that top row.  He's listed as

20   having 89 and Mr. Hooker has 10, correct?

21   A.   Yes, sir.

22   Q.   So if those totals were switched, then Mr. McKeehan would

23   have gotten the higher number and Mr. Hooker would have been

24   the subject of the losing number, correct?

25   A.   Excuse me?

*BRIGGS - Cross (Bayer)*                                              179

1    Q.   Well, you heard the testimony that the votes were

2    switched between there Mr. McKeehan and Mr. Hooker?

3    A.   For the purposes of fending off the crowd to get out

4    there, and then the correct results were reported at the

5    courthouse.

6    Q.   That wasn't what he testified to.

7    A.   That was his statement to me.

8    Q.   What exactly was the statement?

9         MR. SMITH:  Your Honor, object to Mr. Bayer's

10   characterization of the evidence.  I happen to disagree.

11        THE COURT:  I heard the testimony of the witness and

12   will take that for what it's worth, and you may cross-examine

13   on this point.

14        MR. BAYER:  Thank you, Judge.

15   Q.   What is it that you were told by the witness?

16   A.   Generally speaking, that at the conclusion of the voting,

17   they walked out to confront the individuals who were at the

18   poll and flip-flopped the numbers to let the crowd think

19   that -- I'm getting confused here.  That McKeehan had won,

20   when actually Hooker had won.  And then the correct results

21   were reported at the courthouse.

22   Q.   What was the problem with the crowd?  Were they -- why

23   were they trying to pacify the crowd?

24   A.   They were in fear for their safety.

25   Q.   So they were in fear for their safety.  And then when

*BRIGGS - Cross (Bayer)*                                              180

1   they got back to the courthouse, he used the real numbers?

2   A.   Correct.

3   Q.   So there was no voter fraud?

4   A.   Yeah.   They purchased votes.

5   Q.   I'm talking about switching the votes.   There was no

6   voter fraud if they reported the actual numbers, correct?

7   A.   No, that's incorrect.   They were purchasing votes for

8   Mike Hooker.

9   Q.   The question, Agent, has to do with flip-flopping of the

10  votes.   And the actual tallies were the correct ones, as far

11  as you know, right?

12  A.   The tallies were correct as for the way the votes were

13  cast.   But the votes were cast in a corrupt, fraudulent

14  manner.

15  Q.   I understand that what you're saying.   I'm asking you a

16  specific question.   The actual results were the votes actually

17  cast, correct?

18  A.   I disagree with that.

19  Q.   Did you look at all of the different indictments that

20  were contained within the "Inside Edition" piece?

21  A.   I reviewed the case generally.

22  Q.   What was the indictment for?

23  A.   As to Mr. Adams, it was for failing to fill out the voter

24  assistance forms and intimidating a voter.

25  Q.   What was the supposed intimidating of the voter?

*BRIGGS - Cross (Bayer)*                                                    181

1   A.   I can't speak to the specifics, sir.

2   Q.   So it had nothing to do with vote buying, did it?

3   A.   It was a voter fraud case, election fraud case.

4   Q.   The indictment had nothing to do with buying votes, did

5   it?

6   A.   An attempt to intimidate a voter to vote the way in which

7   they choose to vote is voter fraud.

8   Q.   You just said you didn't look into the background of the

9   facts so you don't know if that was the facts.  What I'm

10  getting at is the indictment was not for buying votes, was it?

11  A.   Sir, I'd have to review the file in more detail to be

12  able to answer that question.

13  Q.   Well, again, answer the question.  What was the counts of

14  the indictment?

15          MR. SMITH:  I'm going to object.  He's arguing with

16  the witness.

17          MR. BAYER:  No, sir, he's sparring with me.

18          THE COURT:  Mr. Bayer, I believe he's answering your

19  questions and you're attempting to spar with him.  You don't

20  like his answers, but they are his answers.

21          MR. BAYER:  That will be fine.

22          THE COURT:  Thank you.

23          MR. BAYER:  Thank you, Judge.

24          THE COURT:  I will sustain the objection.

25          MR. BAYER:  Thank you.  I don't have any other

*BRIGGS - Cross (White)*                                                  182

1    questions.

2            THE COURT:  Mr. White.

3                          CROSS-EXAMINATION

4    BY MR. WHITE:

5    Q.   Good afternoon, Agent Briggs.  How are you?

6    A.   Good afternoon.  Good.

7    Q.   Thanks.  I have to confess, I was not doing a good job of

8    writing down the numbers of the exhibits as they were coming

9    across.  Could you get the deed out that you testified to

10   earlier?  I'm not sure what that number is.

11   A.   Number 13.

12   Q.   Is it Number 13?

13   A.   Yes, sir.

14   Q.   This is the deed that relates to the Henry County farm

15   that Eugene Lewis testified about earlier?

16   A.   Yes, sir.

17   Q.   And, in fact, he was correct, Mr. Jones' name does not

18   appear anywhere on this?

19   A.   Yes, sir.

20   Q.   And as part of your -- did you obtain this as part of

21   your investigation?

22   A.   Yes.

23   Q.   And did you learn about the existence of this farm and

24   where the deed was recorded from your debriefing or

25   interviewing of Mr. Lewis?

*BRIGGS - Cross (White)* 183

1   A.   Yes, sir.

2   Q.   And so in that debriefing, he told you about that they

3   had mortgaged the property at the State Bank in Manchester?

4   A.   Yes, sir.

5   Q.   And did you bring those documents with you today?

6   A.   The mortgage paperwork?

7   Q.   Exactly.

8   A.   There is no such bank in Manchester any longer.

9   Q.   Did you attempt to find those documents?

10  A.   Not as of yet, but you're talking quite a while back.

11  Q.   You're right.  It was quite a while back.  It was 21

12  years ago.

13  A.   1988.

14  Q.   Let me ask you this.  In the document, the media

15  exhibits, USA -- did you do the USA Today article?

16          THE COURT:  Exhibit 15.

17  Q.   The USA Today article, the Herald Leader article and the

18  "Inside Edition," was Mr. Jones' name mentioned in any of

19  those documents, to your recollection?

20  A.   I'd have to reread them to give a positive, absolute

21  answer.  I don't recall him being mentioned.

22  Q.   Let me ask you this.  You testified about exhibit -- it's

23  actually a Board of Elections minutes document.  The title is

24  Record of Proceedings.  It's a regular sized piece of paper

25  dated September 16, 1985.

BRIGGS - Cross (White)                                          184

1    A.   Yes, sir.

2    Q.   And at the September, '85 meeting, it appears that the

3    Board of Elections approved the various precinct workers, the

4    two judges and the clerk and the sheriff for the 20 Clay

5    County precincts; is that correct?

6    A.   We have hereby selected and designated the following

7    named persons to serve as election officers.

8    Q.   And it goes on to say in the capacities and in the

9    various precincts of said county on Tuesday, November 5, 1985,

10   as named and listed as follows, and then they break down each

11   precinct?

12   A.   Yes.

13   Q.   In other words, the purpose of that was to put into

14   evidence who the precinct workers were; is that correct?

15   A.   Yes.

16   Q.   Actually --

17   A.   Put in -- I wouldn't say evidence, but put into the

18   record of the court at the clerk's office.  The clerk's office

19   who served during that time frame, that election.

20   Q.   I see what you're saying.  Do you know, as you sit here

21   today, whether a person who is named as an election worker in

22   a particular precinct actually served at that election for

23   which they were named?

24   A.   There are on occasion last minute changes.  I'm aware of

25   that happening, yes, sir.

*BRIGGS - Cross (White)*                                               185

1    Q.   You're familiar with Kentucky election law?

2    A.   Somewhat, yes, sir.

3    Q.   KRS 17, those chapters.  You're familiar with Kentucky

4    law provides for how people that have been named as an

5    election officer, what happens when they don't show up and an

6    election officer needs to be located?

7    A.   Yeah, the absentee officers that will step in.

8    Q.   Right, okay.  Now, take a look at the second page of that

9    document.  And what exhibit is that, Agent, that number?

10   A.   Government Exhibit Number 7.

11   Q.   Thank you.  If you can look at the top right, the Pin

12   Hook precinct.  And this is for the '85 general election.  Is

13   Eugene Lewis' name listed on there?

14   A.   In Pin Hook?

15   Q.   Yes.

16   A.   No, sir.

17   Q.   Okay.

18              MR. WHITE:  Give me just a moment, Your Honor.

19              THE COURT:  Yes, sir.

20              MR. WHITE:  Thank you, agent.  That's all I have.

21   Thank you, Your Honor.

22              THE COURT:  All right.  Thank you.

23              MR. WHITE:  Thank you.

24              THE COURT:  Mr. Abell, you may proceed.

25

*BRIGGS - Cross (Abell)*                                                    186

                              CROSS-EXAMINATION

1

2    BY MR. ABELL:

3    Q.  Agent Briggs, on the video clip, there was a statement by

4    a young woman, I think I wrote it down correctly, she said

5    everybody in the county grows pot.  She made that statement in

6    1989, correct?

7    A.  Something to that effect, yes, sir.

8    Q.  Surely, you agree that it was not true in 1989 that

9    everybody in Clay County was growing pot.  Is that fair?

10   A.  I would say not everyone was growing pot.

11   Q.  Okay.  And you would --

12   A.  Marijuana.

13   Q.  You would agree that it would be untrue and unfair to say

14   that at any time since 1989, up to today, that everybody in

15   Clay County is growing or involved with growing marijuana?  Is

16   that fair?

17   A.  Yes, I mean, I'm sure that's still not the case.

18   Q.  It's preposterous to paint everybody in the county with

19   that broad a brush, right?

20   A.  Yes, I don't think that.

21   Q.  The judgment you talked about, do you have any reason to

22   believe that the judgment returned by the verdict wasn't

23   supported by the facts in that case?

24   A.  Are you speaking of the Gary Runion case?

25   Q.  Yes, sir.

*BRIGGS - Cross (Abell)*                                          187

1    A.   What was the question again, sir?

2    Q.   You've introduced the judgment.  Do you have any reason

3    or basis to believe to tell the Court that the verdict that

4    was returned wasn't supported by the facts in that case?

5    A.   Yes, I mean, there was jury tampering by one juror, who

6    believed there was also another juror doing the same thing.

7    Q.   Do you know anything about the facts of the case, though?

8    A.   Some.  I've reviewed the case to a degree.

9    Q.   A young woman in her 30s was killed.  Correct?

10   A.   Correct.  I don't know how old she was.

11   Q.   She was employed as a nurse at the time she was killed?

12       MR. SMITH:  I'm going to object as to this line of

13   questioning.  I do not see how it's relevant to go behind and

14   have this agent sit as a juror and try the Runion case for

15   purposes of this hearing.

16       MR. ABELL:  Judge, the implication has been that the

17   mindset of people of Clay County, which include my client, are

18   you can do all kinds of things, including fixing jurors as

19   evidenced by a judgment returned for $3.5 million in this

20   case, which as I understanding was a young woman in her 30s,

21   employed as a nurse, left a child with special needs.  It's a

22   high verdict, but in the ballpark for that type of case.  It's

23   a wrongful death case.

24       THE COURT:  There's a disconnect here about the

25   testimony being offered, which is that a specific defendant in

*BRIGGS - Cross (Baldani)*                                              188

1    this case, Mr. Maricle, attempted to fix a jury by going to

2    either a relative or an ex-husband of a juror to ensure that a

3    verdict was returned.

4           You know, it's kind of like the argument that's been

5    made earlier that it's not vote buying if you give someone

6    $100 to vote and they would have voted for that person anyway.

7    It's the corrupt act the United States is seeking to

8    introduce.  So for those reasons, I will sustain the objection

9    to this line.

10          MR. ABELL:  All right.  I don't have anything

11   further.

12          THE COURT:  All right.  Thank you.

13                        CROSS-EXAMINATION

14   BY MR. BALDANI:

15   Q.  Agent Briggs, government introduced a few exhibits, I

16   think 6, 7, 8 and 9, that you obtained from the county clerk's

17   office; is that right?

18   A.  Yes, sir.

19   Q.  And you obtained those while Freddy Thompson was the

20   county clerk, correct?

21   A.  Yes, sir.

22   Q.  And, in fact, you've actually obtained boxes of documents

23   from the county clerk's office while Freddy Thompson is the

24   county clerk, correct?

25   A.  Yes, sir.

*BRIGGS - Cross (Baldani)*                                                    189

1    Q.   And Agent Briggs, would you agree with me during your

2    investigation of this case and requesting documents from the

3    clerk's office, they've been forthcoming and cooperative in

4    giving you whatever you've asked for?

5    A.   His staff has.  I've not dealt with Mr. Thompson

6    whatsoever.

7    Q.   He's a defendant in the case so you wouldn't have contact

8    with him directly, I suppose, anyway, right?

9    A.   Correct.

10   Q.   As far as the staff that he supervised, he is the clerk,

11   the clerk's office has given you everything you've asked for,

12   haven't they?

13   A.   Yes.

14        MR. BALDANI:  That's all, Your Honor.

15   A.   Well, I'm sorry.  One thing.  We didn't get some records.

16   Q.   You what?

17   A.   Some records were missing.

18   Q.   What did you ask for they didn't give you?

19   A.   I believe it was -- it was from '89, '91 and '92.  I

20   think it was the individuals that served as election

21   officials, I believe, is what it was.

22   Q.   Well, let me put it this way.  You don't have any reason

23   to say that they have withheld or stonewalled you, do you?

24   A.   Well, I can't explain where those records are at.  But

25   you'd have to ask your client.

BRIGGS - Cross (Baldani)                                    190

1   Q.   Well, I just asked you a minute ago, and as I was walking

2   away, you said hold on, there was something.

3   A.   Yes, sir.

4   Q.   That's the only thing we're talking about?

5   A.   Yes, sir.

6   Q.   Let me ask you a couple other things.  You were here for

7   the testimony of all these three felons who testified today,

8   right?

9   A.   Yes, sir.

10  Q.   And during the direct testimony, Mr. Smith kind of walked

11  you through tidbits of their testimony and then had you

12  corroborate some of the things they said, right?

13  A.   Through the evidence of these exhibits, correct, sir.

14  Q.   You recall Eugene Lewis saying that him and Kenny Day

15  never sat in the Pulaski County Jail and talked about what

16  they could do to cooperate, right?  You heard him say that?

17  A.   Yes, sir.

18  Q.   You took a statement from him in June of -- from Eugene

19  Lewis in June of '05, didn't you?

20  A.   I don't recall the date, sir.

21  Q.   Okay.  You don't recall the date, but do you recall Lewis

22  telling you that Day told Lewis that he could give information

23  on Larry Jackson, Daugh White, Oscar Hubbard, Wayne Jones,

24  Doug Adams, Cletus Maricle, Hoss Hoskins, Mike Young, Ed

25  Jordan, Charles Marcum, Roy Morgan, Yancey White?

*BRIGGS - Cross (Baldani)*                                      191

1    A.   Sir, I'm not looking at the document.  This is what

2    Mr. Day told Mr. Lewis?

3    Q.   Right.

4    A.   Correct.

5    Q.   Lewis told you that day told him about all these people

6    he could cooperate against?

7    A.   He didn't say in what context, as far as election fraud,

8    vote buying, but he did mention those names, correct, sir.

9    Q.   Right.  I guess my point is that would contrast with what

10   Lewis said on the stand that him and Kenny Day didn't talk

11   about who they could cooperate against while they were in the

12   Pulaski County jail, right?

13   A.   I don't recall the specific question asked of him, but

14   that statement was not in regard to, you know -- Kenny Day

15   didn't clarify what he could cooperate against these

16   individuals on.  Just said he could provide information on

17   them.

18   Q.   Well, you've been in the courtroom all day, correct?

19   A.   Yes, sir.

20   Q.   And Mr. Lewis was asked by at least two of the attorneys

21   whether him and -- whether he and Kenny Day discussed ways

22   they could cooperate with the government.  Right?  You recall

23   that being asked?

24   A.   Again, I don't recall the specifics of the question, but

25   I generally recall him being asked that.  I think he was

*BRIGGS - Cross (Baldani)*                                                192

1    thinking it was pertaining to election fraud exactly and

2    specifically and precisely.

3    Q.   That wasn't the question.  You're just saying -- you're

4    just putting yourself in Lewis' shoes and saying he was

5    probably thinking when we were asking that that we were asking

6    about election fraud rather than all this other various drug

7    activity and corruption.  Is that what you're saying?

8         MR. SMITH:  Your Honor, I'm going to object on the

9    basis of Mr. Baldani's recitation here.  He's asking, I think,

10   this witness to comment on evidence the Court's heard here

11   today.  It's the Court's function.  It's not the witness or

12   counsel's.  So I would object.

13        MR. BALDANI:  Could I respond, Judge?

14        THE COURT:  You may.

15        MR. BALDANI:  Judge, one of the things you've got to

16   assess is the credibility of the allegations.  And the

17   government put Mr. Briggs on to ask -- went through several

18   things that these three fellas had testified to and then asked

19   Briggs some independent facts to try to establish that what

20   they said was true.  This is an example where, I mean, the

21   record's going to speak for itself, but Lewis, in fact, was

22   asked did he and Kenny Day talk about who they could cooperate

23   against.  And this officer was there.  And the fact of the

24   matter is this officer took a statement from Lewis in which

25   Lewis told him that Day said, I can cooperate against all

1  these individuals.  So that's the point.

2        THE COURT:  Well, the problem I'm having is you've

3  asked him that question and he answered it.  And now you're

4  asking him to comment upon previous testimony that I heard.  I

5  don't know if that really gets us anywhere to have a witness

6  comment upon other testimony provided in the case.  I think

7  that's the nature of the question.

8        MR. BALDANI:  Because he said I'm assuming Lewis was

9  thinking this.  The point's been made, Judge.  Lewis testified

10 to what he testified.

11 BY MR. BALDANI:

12 Q.  But the fact of the matter is, detective, Lewis did tell

13 you that Day talked about his ability to cooperate versus all

14 these individuals, right?

15 A.  I don't recall his precise words, but something to the

16 effect I can help law enforcement with these individuals.  I

17 can't verify every name you mentioned, but I do recall some of

18 those names in his statement.

19 Q.  I'm reading from your 302.  Do you want to see it?

20 A.  If you want me to verify the names.

21        MR. BALDANI:  If we could, Judge.  I'm not going to

22 try to belabor this.

23 Q.  After the highlighted portion there, Agent, do you see

24 where Lewis reported that Day said he could cooperate, give

25 information versus all those individuals I just read off?

*BRIGGS - Cross (Baldani)*                                                    194

A.   Let me read through the individuals here.  Larry Jackson,
Mayor Daugh White, Oscar Hubbard, Wayne Jones, Doug Adams,
Cletus Maricle, Hoss Hoskins, Mike Young, Charles Marcum, Ed
Jordan, Roy Morgan, Yancey White, I think that's pretty much
it.

          MR. BALDANI:  That's all I've got on that issue.

Q.   One other thing.  Agent, you heard when Lawson, J.C.
Lawson testified about '02, he was given money to buy votes
for individuals including Oscar House, right?  Do you remember
him testifying to that today?

A.   Yes, sir.

Q.   All right.  As part of your direct testimony, you went
through various election results in Clay County.  Is it not
true, Agent, that in '02, Oscar House was unopposed?

A.   Sir, I'd have to see the --

Q.   You don't know offhand?

A.   I don't know offhand.  To clarify your earlier question,
I recall him saying that occurred as far as the election.  I
don't recall the date he said.  But I could, you know, we
could find the election records and see if that's the case.

Q.   Well, assuming he was unopposed, he'd have no need to buy
votes.  Is that fair to say?

A.   No, not necessarily.  Sometimes people pass out money for
other politicians.  His wife was a city council member.  There
are a number of reasons in which he could still be passing out

*BRIGGS - Cross (Baldani)* 195

1    money.

2    Q.   Well, the testimony was that he bought votes for himself,

3    that votes were bought for Oscar House, who I'm suggesting to

4    you was unopposed.  There would be no reason to buy votes for

5    someone who doesn't have opposition?

6    A.   If he wasn't running in 2002, he was passing out money,

7    you could come to that understanding that it wasn't for

8    himself, correct.

9              MR. BALDANI:  That's all, Judge.

10             THE COURT:  Thank you.

11             MR. GILBERT:  No questions.

12             MS. HUGHES:  No, thank you.

13             THE COURT:  Thank you.

14             MR. SIMONS:  No.

15             THE COURT:  Any redirect of Agent Briggs, Mr. Smith?

16             MR. SMITH:  No, Your Honor.

17             THE COURT:  Thank you.  Anyone else, based on

18   questions generated during cross-examination?  All right.

19   Thank you, Agent Briggs, you can step down.  If you'd like to

20   assemble those exhibits and you can pass those over to me, if

21   you would, please.

22             Mr. Smith, any additional witnesses?

23             MR. SMITH:  No, Your Honor.

24             THE COURT:  All right.  Thank you.  Do any of the

25   defendants wish to call any witnesses at this time?

196

1          MR. PINALES:  No, Your Honor, thank you.

2          MR. BAYER:  No, sir.

3          MR. WHITE:  No, Your Honor.

4          THE COURT:  All right.  Thank you.  The matters

5    before the Court on the United States' notice of its intent to

6    offer certain evidence in the case either as background

7    evidence, also called evidence that's inextricably intertwined

8    or, alternatively, as evidence under 404(b), several of the

9    defendants have filed motions in limine to prevent or seek to

10   exclude the introduction of some of the evidence that the

11   United States has proffered today that will be offered,

12   hopefully, according to the United States, the United States

13   hopes to seek to introduce at trial.

14          The Court will take this matter under advisement.  I

15   will issue a written opinion on these issues.  The Court does

16   not need further briefing from the parties, and the Court

17   understands the parties' position on these matters.

18          Madam Clerk, I believe our next hearing is at 4:30

19   this afternoon?

20          DEPUTY CLERK:  4:00.

21          THE COURT:  We'll be in recess until 4:00 p.m.

22          MR. WESTBERRY:  Judge, we're off for tomorrow; is

23   that correct?

24          THE COURT:  If we're finished with this hearing, we

25   are.

1          MR. WESTBERRY:  Thank you.

2                  (Proceedings concluded at 3:19 p.m.)

3                            - - -

4                    C E R T I F I C A T E

5          I, LISA REED WIESMAN RDR-CRR, certify that the
  foregoing is a correct transcript from the record of
6  proceedings in the above-entitled case.

7

8   \s\ Lisa Reed Wiesman              January 23, 2010
  LISA REED WIESMAN, RDR-CRR          Date of Certification
9  Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

<u>GOVERNMENT'S WITNESS</u>

KENNETH DAY
Direct Examination............................... Page   8
Cross-examination by Mr. Pinales................. Page  29
Cross-examination by Mr. Bayer.................... Page  37
Cross-examination by Mr. White................... Page  49
Cross-examination by Mr. Abell................... Page  53
Cross-examination by Mr. Baldani................. Page  55


EUGENE LEWIS
Direct Examination............................... Page   59
Cross-examination by Mr. Hoskins................. Page   80
Cross-examination by Mr. Bayer................... Page   88
Cross-examination by Mr. White................... Page   93
Cross-examination by Mr. Abell................... Page  102
Cross-examination by Mr. Baldani................. Page  104
Redirect Examination............................. Page  109
Recross-examination by Mr. Bayer................. Page  111
Recross-examination by Mr. White................. Page  114


J.C. LAWSON
Direct Examination............................... Page  115
Cross-examination by Mr. Hoskins................. Page  128
Cross-examination by Mr. Bayer................... Page  131
Cross-examination by Mr. White................... Page  137
Cross-examination by Mr. Baldani................. Page  139
Cross-examination by Mr. Simons.................. Page  142


TIMOTHY S. BRIGGS
Direct Examination............................... Page  149
Cross-examination by Mr. Pinales................. Page  168
Cross-examination by Mr. Bayer................... Page  172
Cross-examination by Mr. White................... Page  185
Cross-examination by Mr. Abell................... Page  186
Cross-examination by Mr. Baldani................. Page  188

                        - - -


<u>GOVERNMENT'S EXHIBITS</u>                          <u>ADMITTED</u>

Exhibit No. 1, Kenneth Day plea agreement
Admitted......................................... Page 29

Exhibit No. 2, Eugene Lewis plea agreement
Admitted......................................... Page 78

199

Exhibit No. 4, "Inside Edition" DVD
Admitted........................................ Page 151

Exhibit No. 5, Entry of Appearance, 89-CR-051
Admitted........................................ Page 153

Exhibit No. 6, Bonds
Admitted........................................ Page 155

Exhibit No. 7, September, 1985 election officers
Admitted........................................ Page 157

Exhibit No. 8, May, 1985 tabulation of votes
Admitted........................................ Page 157

Exhibit No. 9, May, 1983 tabulation of votes
Admitted........................................ Page 158

Exhibit No. 10, Day -v- Runion jury verdict
Admitted........................................ Page 160

Exhibit No. 11, Manchester Enterprise article
Admitted........................................ Page 161

Exhibit No. 12, 5/14/90 Calendar
Admitted........................................ Page 162

Exhibit No. 13, Deed
Admitted........................................ Page 163

Exhibit No. 14, Lexington Herald newspaper article
Admitted........................................ Page 164

Exhibit No. 15, USA Today newspaper article
Admitted........................................ Page 165

Exhibit No. 16, May, 1993 tabulation of votes
Admitted........................................ Page 165

- - -