United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) London, Kentucky |
| RUSSELL CLETUS MARICLE | ) February 4, 2010 |
| DOUGLAS C. ADAMS | ) 9:00 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM R. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 3-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES

Appearances of Counsel:
On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                   JASON D. PARMAN, ESQ.

On behalf of the Defendant         DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:            MARTIN S. PINALES, ESQ.
                                   CANDACE C. CROUSE, ESQ.

On behalf of the Defendant         R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                  BENNETT E. BAYER, ESQ.
                                   KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant         T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant         ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant         RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:                R. TUCKER RICHARDSON III, ESQ.

On behalf of the Defendant         JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant         ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant         DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                        JASON D. PARMAN, ESQ.
 3                                      Assistant U.S. Attorneys
                                        601 Meyers Baker Road
 4                                      Suite 200
                                        London, Kentucky  40741
 5
     On behalf of the Defendant        DAVID S. HOSKINS, ESQ.
 6   Russell Cletus Miracle:           107 East First Street
                                        Corbin, Kentucky  40701
 7
                                        MARTIN S. PINALES, ESQ.
 8                                      CANDACE C. CROUSE, ESQ.
                                        150 East Fourth Street
 9                                      Federal Reserve Building
                                        Cincinnati, Ohio  45202
10
     On behalf of the Defendant        R. KENT WESTBERRY, ESQ.
11   Douglas C. Adams:                 KRISTEN N. LOGAN, ESQ.
                                        220 West Main Street
12                                      Suite 1900
                                        Louisville, Kentucky  40202
13
                                        BENNETT E. BAYER, ESQ.
14                                      106 West Vine Street
                                        Suite 800
15                                      Lexington, Kentucky  40507

16   On behalf of the Defendant        T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:              133 West Short Street
17                                      Lexington, Kentucky  40507

18   On behalf of the Defendant        ROBERT L. ABELL, ESQ.
     William R. Stivers:               120 North Upper Street
19                                      Lexington, Kentucky  40507

20   On behalf of the Defendant        RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:               R. TUCKER RICHARDSON III, ESQ.
21                                      300 West Short Street
                                        Lexington, Kentucky  40507
22
     On behalf of the Defendant        JERRY W. GILBERT, ESQ.
23   William B. Morris:                212 North Second Street
                                        Richmond, Kentucky  40475
24
     On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
25   Debra L. Morris:                  201 West Short Street
                                        Lexington, Kentucky  40507
```

```
 1   On behalf of the Defendant         DANIEL A. SIMONS, ESQ.
     Stanley Bowling:                   116 West Main Street
 2                                       Suite 2A
                                         Richmond, Kentucky  40476
 3
     Court Reporter:                    CYNTHIA A. OAKES, CRR
 4                                       Official Court Reporter
                                         United States District Court
 5                                       560 Athens Boonesboro Road
                                         Winchester, Kentucky  40391
 6                                       (859) 983-4346

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

1        (Whereupon, the jury entered the courtroom, after which

2    the following proceedings were had in open court.)

3            THE COURT:  Thank you, and good morning, everyone.

4    The record will reflect that all members of the jury are

5    present.  All parties and counsel are also present at this

6    time.

7            Mr. Smith, are you ready to call your first witness?

8            MR. SMITH:  Yes, we are, Your Honor.

9            THE COURT:  You may proceed.

10           MR. SMITH:  The United States will call Kenneth Day.

11           THE COURT:  Thank you.

12                       KENNETH DAY,

13   having been first duly placed under oath, was examined and

14   testified as follows:

15           THE COURT:  All right.  Thank you.

16           Mr. Smith, you may proceed.

17           MR. SMITH:  Thank you.

18                   DIRECT EXAMINATION

19   BY MR. SMITH:

20   Q    Will you state your name, please?

21   A    Kenneth Day.

22   Q    Mr. Day, could you tell us where you were born and raised?

23   A    I was born and raised in Clay County, Manchester,

24   Kentucky.

25   Q    And tell us a little bit about yourself, Mr. Day.  Do you

1  have children?

2  A    I got two kids, one 38 and one 30.

3  Q    And you appear this morning in orange clad wear.  Where

4  are you currently residing?

5  A    Franklin County Detention Center.

6  Q    And are you serving a sentence of imprisonment, Mr. Day?

7  A    Yes, I am.

8  Q    And how much time did you receive?

9  A    Eighteen years.

10  Q    What did you plead guilty to, Mr. Day?

11  A    I pled guilty to continuing criminal enterprise,

12  conspiracy within a thousand yards of a school, and drugs.

13  Q    And when you entered a plea of guilty, did you enter into

14  a plea agreement with the United States?

15  A    Yes, I did.

16  Q    I would like to hand you what's marked as Government's

17  Exhibit PA2.  Do you recognize that exhibit?

18  A    Yes, I do, that's my plea agreement.

19  Q    Okay.  And is there a date which that was entered before

20  the Court?

21  A    It was filed February the 2nd —— February the 12th of

22  2006.

23  Q    And is that your recollection about the day in which you

24  were sentenced or entered your plea?

25  A    I was final sentenced that day the best I remember.

1  Q    Okay.  And according to the plea agreement, what's your

2  understanding —— Did you agree with the United States to

3  testify if called as a witness?

4  A    Yes, I did.

5  Q    And what's your understanding under the plea agreement as

6  far as your responsibility if called upon as a witness?

7  A    I got to testify truthfully.  If I don't, I get another

8  charge and lose everything I've got.

9  Q    Now, has the government promised you a specific sentence

10 or reduced sentence for your testimony here today?

11 A    They have not.

12 Q    Who will decide, Mr. Day —— according to your

13 understanding, who will decide whether your sentence gets

14 reduced?

15 A    Mr. Reeves.

16 Q    Was he the judge in which you entered your plea of guilty

17 and was sentenced originally?

18 A    Yes, he was.

19        MR. SMITH:  I move for introduction of Government's

20 Exhibit PA2.

21        THE COURT:  All right.  Any objection?

22        That exhibit will be admitted at this time.

23 BY MR. SMITH:

24 Q    Mr. Day, you said that one of the charges you pled guilty

25 to was a continuing criminal enterprise.  Had you been

1  convicted previously for drug trafficking?

2  A    Yes, I got caught in Orlando, Florida, with eight kilos of

3  cocaine in '96 or '97.  '97, I think.

4  Q    And was that also prosecuted by the federal court system?

5  A    Yes, it was.

6  Q    Now, in your past conviction there in Florida, how much

7  time did you receive in Florida, Mr. Day?

8  A    Sixty-eight months.

9  Q    And do you remember the judge who sentenced you in that

10 case?

11 A    I do not.

12 Q    At the time that you were in Florida, Mr. Day, could you

13 tell us a little bit about that circumstance of which you found

14 yourself arrested and later convicted?

15 A    I was going down to Miami and picking up cocaine and

16 bringing it back to Kentucky and selling it.

17 Q    And what part of Kentucky were you doing your business

18 from at that time?

19 A    Pawnshop at Burning Springs, a little community outside of

20 Manchester, about ten or 11 miles north of Manchester.

21 Q    And in 2006, in which you were sentenced on the charges

22 here in the Eastern District of Kentucky, those were drug

23 trafficking charges as well; correct?

24 A    That is correct.

25 Q    And where were you conducting your business at that time?

1   A    At a pawnshop at Burning Springs, and I was running it out

2   of the pawnshop.

3   Q    Okay.  Was this the same pawnshop that you had back in '97

4   when you were caught in Florida?

5   A    No, it was not.  I built a new one when I come home in

6   '01, 2001.

7   Q    Is that when you were released from your federal sentence

8   in Florida?

9   A    That's when I — yeah, I got released from Beckley,

10  West Virginia.

11  Q    When did you get started in the drug business, Mr. Day?

12  A    Somewhere in the middle '90s, '93, '94, '95, somewhere in

13  that neighborhood.  I don't know exact year.

14  Q    Okay.  And how did you get started?

15  A    Somebody give me some meth one day and I done it, and I

16  done the other drugs to support my habit.

17  Q    And when you say "meth," is that methamphetamine?

18  A    That's crystal methamphetamine, that's right.

19  Q    And how were you taking that drug at that time, Mr. Day?

20  A    I was eating it and putting it in coffee and snorting it.

21  Q    And when you would take that drug, what kind of effects

22  did you experience?

23  A    Well, it was a high.  You couldn't go to sleep on it, you

24  would work 24 days a day, stay up all night long for a week at

25  a time.

1   Q     What kind of work were you doing during that time period?

2   A     Pawnshop.

3   Q     And were your pawnshop — what were the hours which you

4   operated the pawnshop?

5   A     Supposed to have been 8:00 to 5:00, but I was there all

6   night long a lot of times.

7   Q     And in the pawnshop, did you employ other people?

8   A     Yes, I did.

9   Q     Were you there primarily as well with the business?

10  A     Yes, I was.

11  Q     Now, in the drug business, you say that you started out

12  actually selling drugs in order to afford your habit; is

13  that —

14  A     That's how I initially got started, that's right.

15  Q     What kind of drugs did you sell, Mr. Day?

16  A     Cocaine and marijuana.

17  Q     And how big of quantities did you sell at the height of

18  your business over there in Clay County?

19  A     I was selling tons of marijuana at the height of it.  I

20  would get a ton about every two to three weeks, I would get a

21  ton of marijuana in.

22  Q     Now, a ton, in my opinion — my recollection, is about

23  2,000 pounds?

24  A     That is correct.

25  Q     And is marijuana sold by the ton or by the pound when you

1  sold it?

2  A    I sold it by the pound.

3  Q    And what was it bringing per pound?

4  A    I sold mine for $1400 a pound.

5  Q    And where was this marijuana that you were getting?  Did

6  you get it from the same place all the time that you were

7  dealing drugs there in Clay County —

8  A    Yes.

9  Q    — or different places?

10 A    I got it all the time except one time I got some out of

11 El Paso, Texas, I got a load there.  The other guy, he run

12 short and didn't have no product, and I got a load out of

13 El Paso, Texas.

14 Q    And you said there was a constant supply otherwise.  Where

15 was that coming from?

16 A    It was coming out of Arizona.  It come out of Florida

17 through Arizona and thataway.  They was bringing it into

18 Dayton, Ohio, on a train, and the supply point out of Dayton,

19 Ohio, was bringing mine to me in a rental — in a U-Haul.

20 Q    What were the names of your suppliers, Mr. Day?

21 A    He went by King, but that wasn't his real name.  He — I

22 can't recollect his name.

23 Q    What did he —

24 A    John Sherry.

25 Q    Okay.  But he used the name King to you?

1    A    That's right.

2    Q    And has he been prosecuted and convicted?

3    A    Yes, he was.

4    Q    And your other supplier, what was his name from El Paso,

5    Texas?

6    A    Rishdi Asam.

7    Q    And has he also been convicted?

8    A    Yes, he has.

9    Q    Now, this marijuana that you were selling you said was

10   coming in in bulk quantity, you were selling it in what, one

11   pound quantities or ten-pound, or what did it range?

12   A    Most of my customers that I dealt with at the time would

13   get like a hundred, 200, 300 pound.

14   Q    And in the course of your business there in Clay County,

15   was that all conducted there at the pawnshop?

16   A    Yes, it was.

17   Q    Mr. Day, did you have any concern — Let me ask you this:

18   Your criminal history, have you ever been convicted by any

19   charges over there in Clay County for state charges?

20   A    Never.

21   Q    You have a clean state court history and never been

22   convicted?

23   A    That is correct.

24   Q    Have you ever been charged in Clay County with a drug

25   charge?

1  A    I have not.

2  Q    Now, this marijuana you were selling for $1400 a pound to

3  your customers; is that right?

4  A    That is correct.

5  Q    Did you have some customer base within Clay County itself?

6  A    Well, what I done is when I went to prison, I done time at

7  Morgantown and I done time at Beckley, West Virginia, and I

8  recruited my customers while I was there doing the drug program

9  at Beckley.  And my brother, he done the drug program at

10 Morgantown.  I was there two years with him, then I left him

11 and went to Beckley by myself.  But I recruited a guy from

12 North Carolina, Old Fort, North Carolina, one from Frankfort,

13 and one from Louisville.  Them was my three main customers when

14 I come home.  The guy from Louisville would take three or 400

15 pound every ten days.  The guy from Frankfort, a couple, 300

16 pound, and the guy from Old Fort, North Carolina, he would come

17 in, stay all night, take a load back out.  It averaged --

18 sometimes he would take a hundred, sometimes he would take 200,

19 sometimes he would take 30 or 40.

20 Q    And during the time period, Mr. Day, that you were

21 operating there, did you also have some local customers?

22 A    Well, I tried not to have none, but on the last, I did.  I

23 got greedy and took on some local customers, and that was the

24 downfall of me.

25 Q    Did you ever know a fellow by the name of Oscar Hubbard?

KENNETH DAY - DIRECT - MR. SMITH          13

1   A    Yes, I do.

2   Q    And how do you know Oscar Hubbard?

3   A    I sold him marijuana.

4   Q    And did he get prosecuted in your case?

5   A    Yes, he did.

6   Q    And was he convicted?

7   A    Yes, he was.

8   Q    And is he related to Doug Adams in any way?

9   A    Yes, he is.

10  Q    How is he related to Doug Adams?

11  A    Doug married his sister.

12          MR. BAYER:  Judge, may we approach the bench, please?

13          THE COURT:  Yes, you may.

14      (Whereupon, the following discussion was had between the

15  Court and counsel at the bench, out of the hearing of the

16  jury.)

17          MR. BAYER:  Good morning, Judge.

18          THE COURT:  All right.  Also, Counsel, I'm going to

19  assume for the rest of the trial that if one defendant objects

20  that all other defendants join in the objection unless someone

21  tells me otherwise; okay?

22          Mr. Bayer.

23          MR. BAYER:  Judge, I've got a real problem with the

24  line of questioning that Mr. Smith is getting ready to embark

25  upon.  This is based upon the comments I was making the other

KENNETH DAY - DIRECT - MR. SMITH                    14

1  day and the issues I was bringing up.  The 404(b) ruling, the

2  Court very specifically indicated that the United States should

3  not try to do any linking of Mr. Adams with drug trafficking.

4  This line of questioning is directly going to give the

5  inference of tying Doug Adams with a drug dealer.  And this is

6  what I've been concerned about all along, this is the concern I

7  had during the opening.  And the perception of the jury right

8  now is that Doug Adams has a tie to this massive drug dealer,

9  which is an improper perception and one that is contrary to the

10  Court's ruling.  So I object.  And first of all, I'm going to

11  ask for a mistrial depending on what the Court does with that.

12  The reason I have to ask for the mistrial is because now this

13  plays upon what happened in the opening.

14          THE COURT:  All right.

15          Mr. Smith?

16          MR. SMITH:  Your Honor, I believe that counsel has

17  taken in his pleadings and now he continues to argue the same

18  line of argument, and that is that the government somehow

19  cannot show that Doug Adams is a drug dealer.  We've never said

20  Doug Adams is a drug dealer.  This witness is not going to say

21  that.  But the facts are the facts.  He's associated with

22  people who are in that business, and that is not, in my

23  understanding of the Court's ruling, impermissible.

24          THE COURT:  Well, it wasn't intended to prevent you

25  from showing relationships certainly between various parties or

1   individuals in the case.  So I'll overrule the objection, I'll

2   deny the motion for a mistrial, and to the extent that my

3   previous ruling was ambiguous and gave the impression that the

4   United States could not seek to introduce such connections with

5   Mr. Adams, I'll correct that, the United States may do so.  All

6   right.

7            MR. BAYER:  All right.

8            MR. SMITH:  Thank you.

9        (Whereupon, the following proceedings continued in open

10  court.)

11           THE COURT:  All right.  Thank you, Counsel.

12           Mr. Smith, you may continue.

13  BY MR. SMITH:

14  Q    How long was your relationship with Mr. Oscar Hubbard,

15  Mr. Day?

16  A    Well, I've knowed Oscar most of my life, but he started

17  buying marijuana off of me in '02 or '03.

18  Q    And did he continue up until the time that you were taken

19  down by the FBI?

20  A    Yes, he did.

21  Q    And what was he doing for a job?  Did he have a job,

22  employment?

23  A    He was the superintendent of the bus garage up there over

24  the transportation.

25  Q    And is that a job which is overseen by the school board

1  and the superintendent of schools?

2  A    That is right.

3  Q    So he was over the transportation of school buses?

4  A    School buses.

5  Q    Mr. Day, you have indicated that in your past that you had

6  this pawnshop business.  What other jobs have you held in the

7  past, Mr. Day?

8  A    I worked at White Chevrolet for 20-some-odd years, a

9  service manager there in Manchester.

10 Q    And White Chevrolet, is that business still a going

11 concern?

12 A    I think Cornett's has bought it out.

13 Q    And you say that you were service manager there?

14 A    That is correct.

15 Q    And when did that employment at White Chevrolet end?

16 A    I started in 1969, and I left in maybe '89 or '90 and

17 bought a grocery store, worked there for a couple of years, and

18 then went back to White's for maybe a year.  I sold my -- I

19 sold my part of the business of the grocery store out and then

20 I went back to White's and worked a year or a couple of years

21 there, and then I opened up a pawnshop.

22 Q    Now, you indicated that when you were going down to Miami,

23 Florida, to pick up this cocaine that that's when you got

24 caught in '97?

25 A    That is right.

1  Q    And were there other family members of yours that got

2  caught at that time?

3  A    My brother.

4  Q    And was he with you on that trip?

5  A    Yes, he was.

6  Q    And during the time period in which you were working with

7  your brother, where were you selling that cocaine from?

8  A    At the old pawnshop there right beside of my house where I

9  lived at as you go up the hill, as you go up the Burning

10 Springs hill on the south side.

11 Q    Now, during the course of relocating your business, about

12 how far are those two pawnshop locations?

13 A    Approximately a mile.

14 Q    Is that a highway that you were on?

15 A    421.

16 Q    Is that one of the major highways in Clay County?

17 A    Yes, it is.

18 Q    And is that the 421 that leads to Richmond, Kentucky?

19 A    That is correct.

20 Q    All right.  And so you had road frontage property there

21 where you put your business?

22 A    That's right.

23 Q    During this '90s period, what was the quantities of

24 cocaine that you were buying and selling there in your business

25 at the pawnshop?

KENNETH DAY - DIRECT - MR. SMITH                18

1    A    I would get six, seven, eight kilos, just according to

2    what kind of money I had when I went down there.

3    Q    And what was cocaine, at that time, selling for?

4    A    I sold mine for 1050.

5    Q    Okay.  Now, 1050, is that per ounce, per kilo, per pound?

6    A    Ounce, $1,050 an ounce.

7    Q    And approximately how many ounces is in a kilo of cocaine?

8    A    35.7.

9    Q    So you got over 35 ounces out of a kilo of cocaine that

10   you were selling for over a thousand dollars an ounce?

11   A    That's right.

12   Q    And you were getting around how many kilos every other

13   week?

14   A    Five, six, seven, it just depended on what kind of money I

15   had, you know, people that -- I fronted a lot of stuff, if they

16   brought -- you know, if the money would come in from the people

17   that I let have the stuff on credit.

18   Q    Now, at that time, you had not served time with anybody in

19   federal prison?

20   A    That's right.

21   Q    Where did you get your customers at that time?

22   A    All in Clay County, 99 percent of it was Clay County.

23   Q    And would you normally sell less than an ounce to your

24   customers there in Clay County?

25   A    Sometimes I would.  But very seldom.  I always wanted to

1   sell an ounce.

2   Q    Now, at the time that you were in Clay County operating

3   the pawnshop, before you got arrested in Florida, were you also

4   involved in politics?

5   A    Yes, I was.

6   Q    And how were you involved in politics, Mr. Day?

7   A    I've been involved in politics most of my adult life,

8   buying votes, Election Commissioner.

9   Q    And do you recall when it was that you became Election

10  Commissioner in Clay County?

11  A    Somewhere in the mid '80s.  I don't know exactly the date.

12  Q    Okay.  And how long did you serve as a commissioner in

13  Clay County?

14  A    I resigned in '97 at Morgantown, West Virginia, doing

15  federal time.

16  Q    Now, as we've been told, there's two commissioners that

17  serve on the Board of Elections.  Was that the way it was when

18  you served?

19  A    That's right, a Republican and a Democrat.

20  Q    And which party did you represent?

21  A    Republican.

22  Q    Now, you said you had been in politics basically all your

23  life.

24  A    That's right.

25  Q    Before becoming Republican Election Commissioner, what

1  kind of political involvement did you have, Mr. Day?

2  A    I always bought votes.

3  Q    And what do you mean when you say you "bought votes"?

4  A    Well, I always worked the Burning Springs precinct and we

5  would get a ticket up, four or five people, put money in on it,

6  and when people come on the grounds to vote and we would

7  approach them to buy their vote to go in and vote the way we

8  wanted them to vote.

9  Q    So you would have candidates, I assume.  You say when you

10  got four or five together.

11  A    We would get a sheriff, a magistrate, a judge, a clerk.

12  Q    Okay.  So you would get a group of candidates that

13  contribute money and then they would bring this money to you?

14  A    That is right.

15  Q    And how long has that been going on in Clay County,

16  Mr. Day?

17  A    As far back as I can remember.  I —

18  Q    Did — Go ahead.

19  A    I bought my — I bought my first vote with a half pint of

20  liquor.

21  Q    And when liquor was used, how far back in the day was

22  that?

23  A    I was probably 17, 18, 19 years old, and I — when I

24  worked my first election.

25  Q    And you say that you worked Burning Springs primarily?

1  A    Primarily.  The first one I ever worked was Pinhook.

2  Q    And that's a precinct that's still existing as far as you

3  know?

4  A    To my knowledge, it is.  They've busted a bunch of them up

5  and I don't know how it goes now.  I've not kept up with it in

6  the last five years.

7  Q    But most of your work was at Burning Springs?

8  A    That is correct.

9  Q    Now, you say that these voters would be on the ground.  At

10 that time, you're talking about on election day?

11 A    Say that again now.

12 Q    When you say people were buying votes on the ground,

13 Mr. Day, was that on election day?

14 A    Yes, it was.

15 Q    And how were the voters, at that time, handled as far as

16 you were concerned as a vote buyer?

17 A    Well, you almost always had an officer inside, a judge.

18 If you didn't have a judge, it was hard to do anything about

19 it, you just — I've worked them before without a judge inside,

20 but you've got a judge inside and you either — you've got a

21 ticket system, you give him — he's got the tickets, and when

22 people — you tell them go in and vote to get a ticket, and

23 they go in the door and they say, "I want to vote to get a

24 ticket."  And when they vote — when they do that, the judge

25 that's inside the precinct goes in a booth with them, votes

1  them, gives them a ticket and comes back out.  If they don't

2  bring the ticket back out, that meant they never vote the right

3  way.

4  Q   And so what did they do with the ticket after they voted?

5  A   They would bring it to me and I would pay them and keep

6  the ticket.

7  Q   And what were you paying these voters to vote the way you

8  and your group of candidates wanted?

9  A   Well, it's just according.  Like the first votes I ever

10 bought, I paid a half a pint or a pint of liquor, whatever it

11 was, for it.  And then as time went on, $5 a vote, $10 a vote.

12 I have paid as high as $800 a vote.

13 Q   Now, would this go on election after election?

14 A   Election after election, day in and day out, every

15 election I ever worked it went on.

16 Q   Now, during the time period that you gained this knowledge

17 and experience, did you learn that there were families in

18 certain places that you could always count on that would be

19 willing to sell their votes?

20 A   Oh, the whole family.  You would go buy a whole family,

21 that's right.

22 Q   So would you go back to those same people in the next

23 election?

24 A   That is right.

25 Q   During the time period that you lived there in Burning

1  Springs, did you ever have a relationship or know a fellow by

2  the name of Cletus Maricle?

3  A    I have.

4  Q    And how did you first come to know him?

5  A    I worked the grounds with him; he was buying votes on one

6  side and I was buying them on the other side.

7  Q    Did he live out there in that community in which you lived

8  and later operated your businesses?

9  A    He lived out Fogertown a little ways, yes.

10 Q    Is that in the Burning Springs precinct?

11 A    That is correct.  He later moved to Manchester.  I don't

12 know the year he moved, but back in the day that's where he

13 lived at.

14 Q    Do you see him here this morning in the courtroom?

15 A    Yes, I do.

16 Q    And just for the record, could you point out kind of where

17 he's seated and what he's wearing?

18 A    He's right behind that guy there, he's wearing a blue

19 suite and a blue tie and a white shirt.

20        THE COURT:  The record will reflect that Mr. Day has

21 identified the defendant, Cletus Maricle, in the case.

22 BY MR. SMITH:

23 Q    Mr. Day, tell us about — you worked on the grounds there

24 with Mr. Cletus Maricle.  Do you recall the circumstances in

25 which that happened?

1   A    Well, they's two that stands out in my mind.  One of them

2   is when Oscar Gayle House run against Clay M. Bishop, that's

3   one that stands out in my mind.  And the other one is when

4   Corky McKeehan and a bunch of other candidates, including Mike

5   Hooker, run for magistrate.  And them's the two that stands out

6   in my mind.  They was the talk of the county, them two

7   elections was.

8   Q    Now, this first one you mentioned as Oscar Gayle House

9   versus Mr. Bishop, Clay M. Bishop, I believe you said.

10  A    That is right.

11  Q    What office were they seeking?

12  A    Circuit judge.

13  Q    Okay.  And is there only one circuit judge in the Clay

14  County circuit over there?

15  A    That is right, Clay, Jackson, and Leslie County.

16  Q    You have to run in a three-county race?

17  A    That's right.

18  Q    And how is it that you and Mr. Maricle were involved

19  together in that race, would you tell us?

20  A    Well, what happened was Oscar Gayle was running against

21  Clay M. and the Republican facture didn't want Oscar Gayle

22  there.  I'm talking about Neville Smith and Dobber Smith

23  approached me to handle the money at Burning Springs on that

24  election.  Doug usually handled it, but they informed me that

25  Doug had got saved and got religion and he wasn't afooling with

1  it no more, the money.

2  Q    Doug.  Who are you referring to?

3  A    Doug Adams.

4  Q    Doug Adams.  And you say that they brought it up to you

5  and said he would not help handle the money at that time?

6  A    That's right.

7  Q    Okay.  So what happened?

8  A    Well, I met with Dobber, which was Shamrock — he was

9  president of Shamrock Coal Company, and he didn't want Oscar

10 Gayle there for some reason, I don't know, and I met with

11 Neville, and they informed me that Doug would be on the grounds

12 to help but they needed somebody to handle the money that day.

13 Neville was going to come down there to the mouth of Bray

14 Creek, which is just a little bit down the road, and he would

15 bring the money and he would dole it out to us as we needed it

16 as the day went along.  He didn't give us all the money at one

17 time.  Doug would go over and get 5- or $10,000 and bring it

18 back and give it to me and I would pay the people when they

19 come out of the voting room.

20 Q    Now, you say that he would dole it out during the day.

21 You mean hand it out in installments?

22 A    Well, that's right.  He must not have trusted us with all

23 the money at the same time.  We started out, I don't know, 5-

24 or $6,000, and then when we'd get to running low, Doug would

25 run down there to the mouth of Bray Creek and get us another

1  fresh supply of money.

2  Q    Now, where was Doug Adams while you were buying these

3  votes?

4  A    He was right with me.  He was helping me get them, he just

5  wouldn't pay them.

6  Q    So who negotiated the voters to what it was going to take

7  to bribe them to vote the way you wanted them to vote?

8  A    Me sometimes, Doug sometimes, and like I say, Cletus was

9  buying them for Oscar Gayle.

10  Q    And did you see Cletus on that election day?

11  A    All day long.

12  Q    And could you describe for the jury how you-all were set

13  up there on the grounds of Burning Springs, Cletus Maricle, and

14  yourself and Doug Adams?

15  A    Well, we was — you know, the night before — the night

16  before the election, me and Doug got together with the list of

17  the voters at Burning Springs and we went to the people that we

18  had bought previously and their families.  Like we would go to

19  one man and he would control his family, four or five, six

20  votes, whatever it may be, and told them if they'd all be there

21  at 6:00 on election day to vote, we would give them a hundred

22  dollars apiece.  Well, election morning come, we had a mess.

23  They was everywhere.  And it's sort of like — if I might

24  describe it, like being at an auction, abidding on the voters

25  as they come in.  And we started losing a lot of votes because

1  Cletus was getting them out of line.  We got them to come there

2  that morning, but he was taking advantage of where we had

3  brought them in.

4  Q    You say he would take them out of line.  What would he do

5  with them when he got them out of the line?

6  A    Well, he'd take them over to the side and start talking to

7  them, trying to influence them to vote his way.

8  Q    And did you see him paying voters money?

9  A    All day long.

10 Q    And what was the going price that it was taking to bribe

11 these voters in that election?

12 A    The most I seed was $800, the least I seed was 50.

13 Q    And you indicated that there was a second occasion which

14 you recalled specifically.

15 A    On the second occasion, I was working at White's and

16 Cletus come by one afternoon, it was a Friday or a Saturday,

17 one, because all of J.E.'s workers was there when we got over

18 there.  Him and J.E. had had some kind of disagreement over the

19 Democrat party, and J.E. Hensley had double-crossed him.  How

20 it was, I don't know.  But he asked me if I would go with

21 him —

22 Q    Who asked you?

23 A    Cletus did, Cletus.

24 Q    Asked you if you would go with him where?

25 A    Over to J.E.'s, he was going to set J.E. up and take

KENNETH DAY - DIRECT - MR. SMITH                    28

1  $10,000 off of him because J.E. was for Corky McKeehan.

2       So we get over there, and Darrell McQueen was sitting

3  there, I remember Darrell because Darrell said -- told J.E., he

4  said, "It ain't going to work."  He said, "They ain't gonna --

5  they're double crossing you, J.E.  And J.E. cussed a big oath

6  and said, "You can trust a Democrat, but you can't trust a

7  Republican."  He said, "Cletus will do what he says he'll do."

8       So we got the $10,000, Cletus did, and Tuesday morning, I

9  was on the ground, there must have been ten or 15 people

10 running for magistrate that day, James Craft was there again,

11 and Doug and Cletus was election officers, one was a Democrat

12 judge and one was a Republican judge inside, the people that

13 votes them when they go in.  And we had Corky McKeehan's

14 brother there with us that day, he come to watch us.

15 Q    What office were they seeking, when you said Corky

16 McKeehan and Mike Hooker?

17 A    Magistrate.

18 Q    And Mike Hooker, is he related in any way to Doug Adams?

19 A    He's first cousin, I think.

20 Q    I neglected to ask you, do you see Doug Adams here in the

21 courtroom this morning?

22 A    Yes, I do.

23 Q    And, again, for the record, could you point out where he's

24 seated?

25 A    Right straight back there.  He just stood up and sat back

1  down.

2      THE COURT:  The record will reflect that Mr. Day has

3  identified the defendant, Mr. Adams.

4  BY MR. SMITH:

5  Q    And during this particular race between McKeehan and

6  Hooker, you say that you-all had picked up the money from J.E.

7  Hensley, I believe?

8  A    $10,000.

9  Q    And what happened with the money?

10 A    I bought votes with it all day long.

11 Q    And how does that work?  You said you had inside the poll

12 at this election Cletus Maricle on one side and Doug Adams on

13 the other.

14 A    Well, what happened was, as we bought for a slate of

15 people that day, maybe they was three or four more candidates

16 on the list, Cletus and Doug knew who they was, I bought them

17 to go in and vote for Corky McKeehan.  And what would happen

18 was when they would go in to vote for Corky, they would vote

19 them for Mike Hooker.  And Corky's brother help buy votes all

20 day long and helped pay for them all day long.

21 Q    So, now, as Election Commissioner that you served over the

22 years, is it correct that a Democrat and Republican judge are

23 in there for a check and balance, to kind of make sure that —

24 they're watching out and make sure that these elections are run

25 fairly?

1    A    Well, what they're supposed to do is make sure the other

2    one don't steal no votes and make sure people get to vote the

3    way that they's supposed to vote and who they want to vote for.

4    Q    On this occasion, you said that you had both Republican

5    Doug Adams and Democrat Cletus Maricle working together?

6    A    That is correct.

7    Q    What happened throughout the conclusion of that day?

8    A    Well, up in the afternoon around 4:00 or 5:00 they got

9    scared, we had bought so many votes that day for Corky McKeehan

10   and they had voted him for Mike Hooker with Corky's brother

11   there, because along up in the afternoon, Corky's brother told

12   me, he said — he said, "Come on out, we're going to party

13   tonight."  Said, "We won this election here," said, "I want you

14   to come out and we're going to cook and eat."  And they called

15   me to the door and they said that they was going to call the

16   votes off at — At 6:00, it's customary that the officers comes

17   to the door and they tell what candidate got how many votes

18   during the day.

19   Q    So your election officers would announce publicly out to

20   the folks at the precinct the vote totals?

21   A    That's right.  There's always a bunch of people standing

22   there wanting to know who got what, how many votes each person

23   got.

24   Q    You said, "They called me up there and talked to me" —

25   who are you talking about?

1 A    Doug and Cletus did.

2 Q    And what did they say to you?

3 A    They got scared that if they called the votes off the way

4 that they was that there would be a killing, and they told me,

5 they said, "You go ahead and leave and get on out of the way,

6 we're going to call" — "we're going to switch the votes at

7 6:00 so we can get out without getting — something happening.

8 Q    So what do you mean when you say we're going to call out

9 the votes and were going to switch them?

10 A    Well, what they done, when they went to the courthouse,

11 they had to take the correct tally there because the machines

12 would say that.  But what they done, they told Corky that he

13 got the votes that Mike Hooker got and Mike got the votes that

14 Corky got.  They switched — like the actual vote was 300, 400

15 for Mike Hooker and Corky got 25 or 30, whatever it may be, and

16 they just switched them numbers at the end of the day.

17 Q    You're not saying that's the actual numbers, that's just

18 an example?

19 A    That's — yeah.  I don't know the exact number, but it was

20 a big lopsided victory.

21 Q    And they gave you time to leave?

22 A    I left early, that's right.

23 Q    Now, you indicated earlier that at one point that there

24 was an instance where you actually paid as much as $800 a vote?

25 A    That is right.

1  Q    And do you recall the circumstances in which you paid that
2  much money to a voter?
3  A    Well, Cletus and Doug got into a bid on a voter there —
4  That was the election where that Clay M. run against Oscar
5  Gayle House.  They got in a bidding war on one vote there, and
6  Doug — the last bid was $800, and I paid the voter.
7  Q    So when you say there was bidding going on, how was that
8  taking place?
9  A    Well, they was just one person come up to vote and Doug
10 had bought him for a hundred dollars, and Cletus said, "I'll
11 give you two," Doug said, "I'll give three," and it went right
12 on up like that.
13 Q    And why was it important to you — And I guess you were
14 working for whom at that time?
15 A    I was working with Doug at that time.
16 Q    Why was it important for you to pay that much and to do
17 that in that instance?
18 A    Well, the most important thing was that that showed the
19 people on the ground who had the power and who had the money to
20 buy the votes with that day.
21 Q    Now, you said that eventually you worked your way up from
22 being a vote buyer to the Republican Election Commissioner?
23 A    That is correct.
24 Q    And you indicated that was sometime in the '80s?
25 A    Sometime in the '80s, that's right.

1  Q    Who is it that first approached you about becoming Clay

2  County's Republican commissioner?

3  A    Roy Morgan.

4  Q    And Roy Morgan, was he a friend, associate, how did you

5  know him?

6  A    I had knowed Roy for — Roy for several years, I'm

7  acquainted with him.  He had a parts store there at Garrard and

8  I just become associated with him through the — through him

9  being a magistrate and things.

10  Q    So he was an office holder at one time?

11  A    He was a magistrate, that's right.

12  Q    And did he also seek office for other positions?

13  A    He run for judge and was defeated.

14  Q    Do you know when that was?

15  A    That would have been somewhere in the late '80s or mid —

16  early '90s.

17  Q    And at the time that he approached you, tell us kind of

18  how that came about.

19  A    Well, I guess the first election I worked with Roy is when

20  Edd Jordan run for sheriff.  We had him on our ticket down

21  there at Burning Springs.  And then he approached me about

22  becoming a Republican Election Commissioner.

23  Q    I'm sorry.  Who approached you?

24  A    Roy Morgan.

25  Q    And this was after Edd Jordan got elected the first time

1  as sheriff?

2  A    The best I recollect, that's right.

3  Q    And so —

4  A    No, it could have been — Edd run once and was defeated.

5  I don't know exactly the timeframe in there, but it had to do

6  with Edd Jordan.

7  Q    So Roy approached you, and what was your response?

8  A    I told him I would do it.

9  Q    And had you, at that time, ever served on the Board of

10  Elections as an election officer?

11  A    No, I always bought votes.

12  Q    So you never served down there as a judge or sheriff or a

13  clerk, in any of those positions?

14  A    No.

15  Q    And what was the first business that you recall doing as

16  commissioner?

17  A    Well, the one that sticks out in my mind is when Cletus

18  run against Oscar Gayle House.  He got appointed — the

19  Governor appointed him for the remaining whatever it was

20  that — when Clay M. Bishop died.  Then he had to run for

21  office.  And Roy told me to take the list and give to it Cletus

22  and let him pick who he wanted for election officers.

23  Q    So what did you do when you were asked by Mr. Morgan to

24  take the list?

25  A    I give it to him.

1  Q    And what did he do with the list?

2  A    Four or five days —

3          MR. PINALES:  Objection, Your Honor.

4          THE COURT:  Overruled.  You may proceed.  You can

5  answer.

6          THE WITNESS:  Two or three days or four or five days,

7  whatever it was, I don't know the exact timeframe, he brought

8  it back with the people that he wanted picked for election

9  officers.

10  BY MR. SMITH:

11  Q    What kind of list was it that you gave Mr. Maricle?

12  A    I give him the list that comes from each precinct, the

13  precinct captain and the co-captain and the youth captain, they

14  meet there and then they pick five names, if my memory serves

15  me right, and you got to pick two names from them five.  It may

16  be six names, it's somewhere in that neighborhood.  But from

17  the list that you submit to the Republican Election

18  Commissioner, you have to pick two names, one judge, and you

19  got a clerk and a sheriff.  And you rotate them with the

20  Democrats.  I mean, if I pick — it was customary if I picked a

21  sheriff at this precinct, the Democrats got to pick the sheriff

22  at the next precinct.  But we all — the Democrats had a judge

23  and the Republicans had a judge.

24  Q    When the list was returned to you, did he make selections

25  that you were expecting?

1   A    Yes, he did.

2   Q    What did you do with that list that he brought back to

3   you?

4   A    When we met to pick the election officers, I took it with

5   me to the courthouse and picked who he wanted picked.

6   Q    Was there any opposition to the nominations that you

7   brought to the meeting?

8   A    None whatsoever.

9   Q    Do you recall who was serving as the Democrat commissioner

10  at that time?

11  A    Do what now?

12  Q    I'm sorry.  Do you recall who was representing the

13  Democrat commissioner at the meeting?

14  A    I served with two Democrat, one was Cecil Craft and the

15  other was Ralph Hoskins, and they changed right in that term

16  there.  I can't tell you exactly who the other one was.

17  Q    Now, during the times that you had said you were working

18  with Cletus with the election list, did you have an occasion to

19  call on him for some favors?

20  A    Yes, I did.  What happened was, is Gary Runyons run over

21  my sister-in-law and killed her, and the insurance company

22  didn't want to pay off, and Roy Morgan come to me and

23  approached me about Yancey being the attorney.

24  Q    Now, introduce us to Yancey.  How is Yancey and Roy Morgan

25  associated?

1  A    Yancey married Roy's daughter, Annette.

2  Q    Is he a lawyer in Clay County?

3  A    Yes, he is.

4  Q    And his wife, do you know what she does?

5  A    She's a lawyer too.

6  Q    And do they both work in Manchester in Clay County?

7  A    They do.

8  Q    So Roy came to you and asked you to consider what?

9  A    He wanted Yancey to take the case of the — where that

10 Gary had run over Loretta.  But he also wanted me to be

11 appointed administrator of the estate.  My brother at the time,

12 he's dead now, was drawing SSI.  And Roy said that where he was

13 drawing SSI, we could get me appointed administrator of the

14 estate.  And we did, and I got Yancey and Annette to take the

15 case.

16 Q    So how did this case bring you to call upon Cletus

17 Maricle?

18 A    Well, Cletus was Gary's attorney at the time, and Cletus

19 knew that he was going to be appointed judge, it was common

20 knowledge in the circle that he had the appointment, it wasn't

21 official, but he had it.  And I asked Cletus — we got the —

22 we got the voters — we got the 12 jurors.  We had the jury

23 list, and we was working the jury list.  They was me, Roy,

24 Cleat, Scott Madden, Larry Joe Roberts —

25 Q    Okay.  Now, let's introduce those people to us, now.  Tell

1  us who Scott Madden is.

2  A    He's a local attorney there in Manchester.

3  Q    Okay.  And then you said there was another person there.

4  A    Larry Joe Roberts.

5  Q    Did he –– was he a lawyer too?

6  A    He was a lawyer in with Scott Madden.  See, Cletus used to

7  be partners with them before he become judge, he was in with

8  Scott and Larry Joe.  But Larry Joe is dead now, he died of

9  cancer.

10 Q    Okay.  So this group did what?

11 A    Well, we was going over the list, the jury list, we was

12 going to work the jury.  I mean, it was common –– it's common

13 to –– till I went to jail and come back in '01, I can't tell

14 you how many juries that I worked.

15 Q    Now, what do you mean, Mr. Day, when you say you "worked"

16 a jury?

17 A    Okay.  May I use this example?

18 Q    Yes.

19 A    Like these people here, me or Roy or Yancey or Cletus or

20 whoever it may be, we knowed somebody on this jury here.  I'm

21 using that for example.  We knew somebody on this jury, and one

22 of us out of the bunch was able to go to see this gentleman or

23 this lady, or if not them, their brother-in-law or their

24 sister-in-law or somebody like that, and we approached them to

25 make a decision for us on a jury time and time again.

1  Q    So in this instance you were the administrator over the

2  estate, you were seeking a judgment of money; is that right?

3  A    That is right.

4  Q    And so tell us, when you were working the jury in this

5  case, what did you-all do?

6  A    Well, Scott, to the best of my recollection, says this

7  lady here is Pres Henson's ex-girlfriend, ex-wife, ex-lover,

8  whatever it may be.  So we decided, me, Cletus, Scott, and

9  Larry Joe, we went to Cecil — Pres.

10 Q    Did you-all not know the ex-wife or the ex-girlfriend?

11 A    Well, we knew who she was but none of us knew her good

12 enough to approach her with that kind of decision.

13 Q    Did you-all know Pres Henson?

14 A    Yes, they did.

15 Q    How did they know him?

16 A    I didn't know him, but Cletus and Scott and Larry Joe did.

17 Q    And do you know how they came to know him?

18 A    I do not know that.

19 Q    So the suggestion was made to go see Pres Henson?

20 A    That is correct.

21 Q    So what did you do?

22 A    We went.

23 Q    And what happened?

24 A    Cletus talked to him and so did Scott talk to him about

25 getting ahold of this woman and making sure that she brought

1   back a guilty verdict on the insurance company.

2   Q     Okay.

3   A     Pres called her there, and we was in the living room of

4   the trailer, and he called her up and said, "Don't come back

5   unless one mill."  That's exactly the words he said to her,

6   "one mill, bring back a guilty verdict."  And we left, the

7   jury — we tried the case and they come back with a three or

8   4 million-dollar law — verdict.

9   Q     You say this wasn't the only time that you had done this.

10  You've done this before?

11  A     I've done it several times, that's right.

12  Q     Do you recall doing it at times later that you were

13  approached to talk to a jury in a case?

14  A     I approached — they approached me to work the jury when

15  John Kennedy's son wrecked that — I believe it was a Honda

16  there at the youth center.  I worked that jury along with Kenny

17  Price and James Phillips.

18  Q     And Kenny Price, is he somebody that holds office over

19  there in Clay County?

20  A     He's a — he's a jailer now, but at the time he was the

21  head of the ambulance service.

22  Q     And James Phillips, is he an office holder?

23  A     Circuit court clerk.

24  Q     Any other juries that you worked since then that you

25  recall?

1  A    I worked the jury where Ford Motor —— where they sued Ford

2  Motor Company for the truck afalling in reverse and going ——

3  and killing that guy.

4  Q    And do you recall when that was that you worked that jury?

5  A    I don't recall the year, no, I do not.

6  Q    Do you recall the outcome in that case?

7  A    They got a guilty verdict, 30 or 40, $50 million.

8  Q    And who approached you in that instance to work the jury

9  in that case?

10 A    The guy that married the widow, they had a coal company, I

11 can't —— I can't remember what his name was right offhand, but

12 he was partners in a coal company up there and this guy was

13 working for them, and when he got killed, he married the widow.

14 And he was married to her while the lawsuit was going on.

15 Q    You indicated that —— to this jury that you actually

16 worked with Cletus Maricle, was involving yourself as

17 administrator of the estate.  Did you have to return some

18 favors for Cletus after doing —— after him doing you that

19 particular favor?

20 A    Well, one of the favors was, you know, I give him the list

21 of the Republican election officers and while the election was

22 going on I worked all day at White Chevrolet, and when I got

23 off work, me and him would head to Jackson County, and we ——

24 first we'd go to see Poodle Marcum down there.  And we took

25 her ——

KENNETH DAY - DIRECT - MR. SMITH                    42

1  Q    Who is Poodle Marcum?

2  A    He run a hardware store there in town, and he was a

3  political figure, prominent political figure.  They was people

4  he could go to and there's people that he couldn't go to.  But

5  every night that we went down there, we went to Poodle's first,

6  he would always wait for us at the hardware store and he would

7  tell us where we needed to go to.  We eat supper with a lot of

8  people, we'd go eat supper with them of the night.  There was a

9  lot of times they'd have -- they'd be cooking.

10 Q    And what was the significance of you going along with

11 Cletus on those trips to Jackson County?

12 A    Cletus wanted to show that he had the Republican support

13 in Clay County and it was a good possibility that he was going

14 to win the election in Clay County, and everybody wants a

15 winner, there ain't nobody wants to be for a loser, and he

16 wanted to make it appear to them that he was definitely a

17 winner.

18            MR. SMITH:  May I have just a moment, Your Honor?

19            THE COURT:  Yes, sir.

20            MR. SMITH:  Your Honor, may we approach?

21            THE COURT:  Yes, you may approach.

22     (Whereupon, the following discussion was had between the

23 Court and counsel at the bench, out of the hearing of the

24 jury.)

25            MR. SMITH:  Your Honor, I just wanted to bring to the

1    Court's attention and make sure that I don't run afoul of this

2    motion in limine that was made on Mr. Jones, but I expect that

3    Mr. Day had a relationship with Charles Wayne Jones in

4    purchasing some of this marijuana in the mid '90s and expect if

5    I go into this there may be an objection.  Of course, I wanted

6    to bring it to the Court's attention, make sure I didn't run

7    afoul of the Court's order.

8            THE COURT:  My ruling allowed you to question about

9    the activities but not about convictions.

10           MR. SMITH:  Okay.  That's my understanding.

11           MR. WHITE:  My understanding is — well, Your Honor,

12   the only concern I've got is that in the 404(b) notice, there

13   was nothing mentioned at all about Mr. Jones.  I have gone

14   through all the testimony from the 404(b) hearing, and

15   Mr. Jones' name is not even mentioned.  That's why I didn't go

16   into it at the hearing.

17           THE COURT:  Right.  I conducted the hearing out of an

18   abundance of caution under 404(b) as an alternative.  I only

19   found one item of evidence that would fit under 404(b) as

20   opposed to evidence that is inextricably intertwined or

21   background evidence.  So if you'll go back and look at the

22   rulings that I made that related to background evidence what

23   could come in, there was the one item of 404(b) — I'll have to

24   go back and look at that now to determine what that was, but I

25   know it was a very discreet issue.  For example, we didn't

1   discuss Mr. Day's role in working juries in these other cases

2   other than the one at the last hearing that we had on that, but

3   inasmuch as its background evidence, the Court is allowing it.

4   I will give a limiting instruction when you finish if any

5   defendant wants me to give a limiting instruction generally on

6   background evidence, but I'll leave that to you as to what you

7   request.

8           MR. WHITE:  Your Honor, did you want us to do a

9   draft?

10          THE COURT:  I have one.

11          MR. WHITE:  Could I just during the break take a

12  gander at that?  Is it in the pattern instructions?

13          THE COURT:  With respect to Mr. Day's testimony, it

14  will read, "Ladies and gentlemen, the United States has

15  introduced certain evidence —— "certain testimony in evidence,

16  which the Court has admitted as background evidence.

17  Background evidence includes an act or acts other than the

18  specified acts charged in the indictment which is inextricably

19  intertwined with the offense or offenses charged.  Introduction

20  of background evidence is offered to complete the story of the

21  charged offense or offenses.  Here the United States is

22  offering this evidence to show the origin of the enterprise,

23  that is the inception of the conspiracy that has been alleged

24  and the roles of the respective members of the alleged

25  enterprise."  And with respect to Mr. Day, what I will add is

1  that "You are cautioned that the United States does not allege

2  that the conspiracy occurred in the 1980s with Mr. Maricle and

3  Adams participating in vote buying.  Instead, the United States

4  offers this evidence to show that the activity was the origin

5  of Maricle and Adams joining the enterprise and their roles in

6  the enterprise.

7          MR. BAYER:  Note our objection to that.

8          THE COURT:  For what reason?

9          MR. BAYER:  Just objection to the conclusion that

10 they were joined together during that period of time.

11         THE COURT:  I'll say that it's being offered by the

12 United States to show that.  So your objection will be

13 overruled.

14         MR. WHITE:  Your Honor, I don't need to be heard,

15 I've already stated why I didn't think it needed to come in.

16 If you'll just consider that an objection.

17         THE COURT:  I understand.

18         MR. WHITE:  I understand you're overruling it.  And

19 if I would just ask, obviously I presume you're going to craft

20 an addition based on Steve's introduction of the 106 of

21 Mr. Jones.  If we could just go over that with me again before

22 we do it.

23         THE COURT:  On Mr. Jones, it's going to come out, I

24 guess at this point, on the marijuana issue?  We'll be able to

25 take that up at the break.

1              MR. WHITE:  Okay.

2              THE COURT:  We'll be able to take that up at the

3    break.

4              MR. WHITE:  Thank you, Your Honor.

5              THE COURT:  Anything else while we're all here?

6              MR. WHITE:  No, sir.

7              MR. SMITH:  I'm not sure what the Court indicated

8    we're going to take up at the break, I'm sorry.

9              THE COURT:  Mr. White would like me to add some

10   additional language about background evidence as it relates to

11   his client, Mr. Jones, and marijuana, which would essentially

12   be, I assume, that you'll be offering it to show source of

13   funds and his role.  But he wants to discuss the language, and

14   since I haven't heard how this will come in, I'll need to

15   consider that and we can talk about that at the break.

16             MR. WHITE:  Mr. Smith, what period of time are you

17   talking?

18             MR. SMITH:  Late '90s.

19             MR. WHITE:  Late '90s?

20             THE COURT:  All right.  Thank you.

21        (Whereupon, the following proceedings continued in open

22   court.)

23             THE COURT:  All right.  Thank you, Counsel.

24             And, Mr. Smith, you may continue.

25   BY MR. SMITH:

1  Q    Mr. Day, your involvement in elections and the politics of

2  Clay County, did you intend to use that in any way in your drug

3  business?

4  A    Well, I knew that as long as I stayed in Clay County that

5  I would never have no problems with none of the local

6  officials.  I had the sheriff — I had Edd Jordan's assurance

7  on that, that he would never bother me.

8  Q    Did you talk to Edd Jordan about needing some assurance?

9  A    Well, what happened was the rumor got to going around that

10  maybe they was investigating a lot of people here and there or

11  whatever, and different people, you know, UNITE was in and —

12  Q    UNITE, is a new program for the area?

13  A    That's a Drug Task Force, and I wasn't aware of it or had

14  no control, it was a program that Hal Rogers had, and a lot of

15  the ministers had a lot of involvement in it, like Doug — I

16  can't think of his last name, a local preacher there at the

17  community church.  So I called —

18  Q    Did they actually have demonstrations in town and marches?

19  A    That's right, they would march through town, and my — the

20  neighbor that lived right straight across in front of me had

21  this big sign in his yard, "Report any illegal drug activity,"

22  call this number and stuff, you know, and that.  So I called

23  up Jennings and I told Jennings to swing by, I had done some

24  business with Jennings in the past and he had done me some

25  favors, and —

1  Q     Now, tell us who Jennings —— White, is that Jennings

2  White?

3  A     Jennings White.  He was the county court clerk at one time

4  and Freddy beat him and so ——

5  Q     You're talking about Freddy Thompson?

6  A     Yes, sir.  So I called him and asked him would he come by.

7  He come by my place about every week or every four or five days

8  or something like that, and I told him when he got down there,

9  I said, "I'm concerned that I might be under investigation,

10 what about you going up and talking to Edd and finding out if

11 they's anything going on?"  I felt like that Jennings could go

12 talk to Edd easier than I could, sort of get me in the door

13 with him, you know.  I mean, if it had been —— if push had of

14 come to shove, I could have went and talked to Edd myself, but

15 I would rather for Jennings to go, that way it would show Edd

16 that I had more than me, you know, that they was other people

17 looking at it.

18       So Jennings went and seed him, and Jennings called me from

19 Edd's office and told me to come on up.  So I go up

20 and Jennings said, "I've talked to Edd about your situation

21 here."  Edd said, "As long as I ever —— "As long as I live and

22 stay sheriff of Clay County, you'll never —— that I'll never

23 have no investigation on you myself or have any —— or bother

24 you whatsoever."

25 Q     And did that prove to be true as far as Clay County law

1  enforcement was concerned?

2  A    Yes, it did.

3  Q    Now, as your business in Clay County evolved, you said

4  different drugs and particularly marijuana, did you have any

5  local suppliers of your marijuana?

6  A    No, I did not.

7  Q    Did you ever have a relationship with a fellow by the name

8  of Charles Wayne Jones or some people call him Wayne Jones?

9  A    I've knowed Wayne all my life where he worked at the

10  welfare office over there and stuff, and the only -- Wayne come

11  by the pawnshop a time or two, but the only thing I ever done

12  with Wayne was back in the '90s, he had some real good

13  marijuana and I had an older gentleman in Dayton, Ohio, and he

14  smoked marijuana, and I bought several ounces off of Wayne,

15  ten, 15, 20, I don't know what it was, that I would take and

16  give to the old man up there in Dayton, Ohio.  That's the only

17  thing I ever had to do with Wayne whatsoever.

18  Q    Did Wayne tell you where he was getting his marijuana?

19  A    He said he growed it.

20  Q    Now, what did you have to pay for the marijuana?

21  A    I'd give him $125 an ounce for it.

22  Q    And at that time what was the going price of marijuana at

23  the ounce levels?

24  A    Well, it all had to do with the quantity -- the quality of

25  it.  Wayne had good stuff.  It was really worth more than that,

1    I guess.  But I had — I was selling marijuana at the time, but
2    an ounce of mine was maybe 50 or $75.
3    Q    Can you explain to me, a man in the business of selling
4    drugs, why would you be giving drugs away to an old man in
5    Ohio?
6    A    Well, he was an old friend of mine that I've knowed for
7    years.  I had bought cocaine off of him back in the day and I
8    would go up and stay with him, and I traded him marijuana for
9    cocaine, and he smoked.  He was 70 years old at the time.  I
10   don't know if he's alive today or not, but he liked good stuff,
11   and Wayne had some of the best that I had ever seen, and I
12   would buy it and take it up there and give to him.
13            MR. SMITH:  Just a second, Your Honor.
14            THE COURT:  Yes, sir.
15   BY MR. SMITH:
16   Q    Mr. Day, do you see Mr. Charles Wayne Jones here in the
17   courtroom this morning?
18   A    Yes, I do.  He's sitting right over there.
19   Q    Could you point out where he's seated and what he's
20   wearing?
21   A    He just stood up, the gray jacket.
22            THE COURT:  The record will reflect that Mr. Day has
23   identified the defendant, Wayne Jones.
24            MR. SMITH:  I apologize, Your Honor.  I need another
25   couple of seconds if I could.

1           THE COURT:  That's fine.

2   BY MR. SMITH:

3   Q    Mr. Day, after Cletus Maricle got elected as circuit

4   judge, did he at any point appoint you to any boards or any

5   positions himself while he was circuit judge, do you recall?

6   A    They was abuilding a road down at the top of the Island

7   Creek — or the Island Creek hill there going out to the

8   prison, and they was condemning that property through there,

9   and I got appointed on a board, me, Ralph Hoskins, and I don't

10  remember who else went with us, to go out there and appraise

11  property.  I got — I went on one appraisal and I never did go

12  on another one.  I never did — I never did get called to go on

13  another one.  But I went on one appraisal there at Billy

14  Hacker's and that's the only one I ever went on.

15  Q    Did you get paid for those appraisals?

16  A    Yes, I did.

17          MR. SMITH:  I pass the witness, Your Honor.  Thank

18  you.

19          THE COURT:  Counsel, do you need to take a short

20  break before we begin with cross-examination?

21          MR. PINALES:  Yes, Your Honor.

22          THE COURT:  All right.

23          MR. WHITE:  Your Honor, if we could also just

24  approach.  I don't know if you're going to let the jury out —

25          THE COURT:  I am.  I'm going to do that so they can

 1  take their break at this time.

 2          Ladies and gentlemen, we will take our morning break

 3  at this time, we'll take about a 20-minute recess.  Please keep

 4  in mind the admonition that you were given previously not to

 5  discuss the case among yourselves while we are in recess.  The

 6  jury will be excused until 10:35 this morning.

 7          (Whereupon, the jury retired from the courtroom, after

 8  which the following proceedings were had in open court.)

 9          THE COURT:  Thank you.  Please be seated.

10          Let me go to Mr. Pinales first.

11          MR. PINALES:  Thank you, Your Honor.  In light of the

12  government's motion for a brief continuance and in light of

13  them passing the witness, I would make a formal request at this

14  time for any additional *Jencks* material that may have been

15  discovered —

16          THE COURT:  All right.

17          MR. PINALES:  — as I will on each and every witness

18  that comes by.

19          THE COURT:  All right.

20          Mr. Smith, any addition *Jencks* material?

21          MR. SMITH:  Your Honor, the only thing that we were

22  able to find, and I know it's been discussed in previous

23  hearings, I believe that Mr. Day, we've talked about it, had

24  testified in the Wayne Reed, Donna Reed trial.  We contacted —

25  of course, that's been transcribed and put in the record and

1   the Clerk has a copy of it.  We have made some extra copies for

2   everybody if they have not already obtained that, but that is

3   the only thing that I could find in our review.  And, again,

4   that was —

5           THE COURT:  All right.

6           MR. SMITH:  — the transcribed testimony and we do

7   have those.

8           THE COURT:  All right.

9           MR. PINALES:  I would request that, Your Honor.

10          THE COURT:  All right.  I assume that's lengthy

11  transcripts?

12          MR. SMITH:  Well, it's —

13          MR. PINALES:  Your Honor, I also understand, if I

14  may, staying on this subject —

15          THE COURT:  Yes, sir.

16          MR. PINALES:  — that the government picked up all of

17  the files out of the courthouse dealing on the Runyon case

18  which was testified to, and we would request copies of those.

19          THE COURT:  All right.  That would be in the Clay

20  Circuit Court?

21          MR. PINALES:  Yes.  Yes.

22          MR. SMITH:  Your Honor, I believe I gave counsel

23  notice of that well in advance of this trial, that those

24  records were available for inspection and review and copying,

25  and I got no takers on that.

1          THE COURT:  All right.  So you've previously made

2     those documents available but haven't received a request?

3          MR. SMITH:  We certainly —

4          Do we have those here this morning?

5          Yeah, we do have those in our office here, so,

6     obviously, we could make those available.

7          THE COURT:  All right.

8          MR. SMITH:  And I do — I do show that we have made

9     copies of relevant portions of that record, which were given in

10    discovery and already copied as exhibits and stamped, Bates

11    stamped for counsel.

12         THE COURT:  All right.  Well, I'm going to give

13    counsel the time during the break to review the testimony of

14    Mr. Day during the — Was it the Wayne Reed trial?

15         MR. SMITH:  Yes, Your Honor.

16         THE COURT:  All right.  I presided over that trial,

17    so I'm somewhat familiar with the testimony that was given in

18    the case.  If you need a few more minutes to look over that, of

19    course, you just need to let me know.

20         MR. PINALES:  Thank you, Your Honor.

21         THE COURT:  Let me take up the issue of — with

22    Mr. White of the cautionary instruction that I'll give with

23    respect to Mr. Day's testimony regarding Mr. Jones.  The Court

24    would intend to include to the end of what we discussed here at

25    the bench that "The United States offers the testimony

1  regarding the relationship of" — "or Mr. Day's knowledge of

2  Mr. Jones to show their relationship and Mr. Jones' activities

3  in drug manufacturing."

4       MR. WHITE:  Your Honor, I would — if you could,

5  instead of using the phrase "drug manufacturing," I believe

6  what he testified to was he had bought several ounces of

7  marijuana from my client —

8       THE COURT:  His supply of marijuana?

9       MR. WHITE:  I would just say "purchased several

10  ounces of marijuana" from my client, would be my preference.

11       MR. SMITH:  Your Honor, the only — in describing

12  that, the only additional comment that I would make to the

13  Court is that my recollection of the testimony was that Wayne

14  Jones grew the best marijuana around and that he represented to

15  Kenny that he had grown the marijuana.  So I don't know that

16  just stating that he sold marijuana would accurately reflect, I

17  guess, in our opinion, what was the total context of the

18  testimony.

19       MR. WHITE:  Your Honor, my response would be the

20  instruction is — of course, the instruction that I'm

21  requesting and what Mr. Smith has essentially said is I believe

22  what's testified, but he can argue that all day in his closing

23  arguments.  I think the purpose of the instruction is to try to

24  help the jury understand what it's really for rather than

25  trying to bolster it, if you will.

1             THE COURT:  What I'll indicate is that the evidence
2   is being offered regarding Mr. Jones' marijuana activities.
3   Now, I think that may — it's going to come up again,
4   obviously, later with another witness, and I would like to be
5   as consistent as I can with respect to those two instructions.
6   I think actually it benefits your client if I am consistent and
7   I don't expand it later.  So that's what I will do, I'll
8   include "Mr. Day's testimony concerning Mr. Jones is offered as
9   evidence of Mr. Jones' marijuana activities."
10            MR. WHITE:  I would agree with your analysis, Your
11  Honor, and thank you as well.
12            THE COURT:  All right.  Thank you.
13            MR. WHITE:  And that's all I have, and I don't know
14  what would be easier for you, but just from the expediency
15  standpoint, when Mr. Pinales stood up, that was the first thing
16  I was going to ask, too, was about any additional *Jencks* or
17  *Brady* and *Giglio*.  And if you want, I can just say I'll make
18  that same motion as to all of his witnesses as he calls them.
19  That way I don't have to keep being a jack in the box.
20            THE COURT:  All right.  That'll be fine.
21            Yes, sir, Mr. Abell.
22            MR. ABELL:  Judge, I'm just standing up for personal
23  comfort.
24            THE COURT:  I see.  Well, I'm going to do that myself
25  here in just a moment.  So I want to give you-all as much time

1    as you need to look over these — this additional material.

2              So without any — unless someone has another issue,

3    we'll go ahead and take a recess at this time, and I will alert

4    the jury that we may need a few more minutes before we call —

5              MR. WESTBERRY:  About a hundred pages of testimony.

6              THE COURT:  All right.  Well, I'll give you-all time.

7    I know you-all are —

8              MR. BAYER:  When you come back, we'll be here without

9    the jury so we'll have occasion to discuss it with you then.

10             THE COURT:  Yes, we'll handle it that way, that will

11   be fine.

12             MR. WESTBERRY:  Thank you.

13             THE COURT:  Let the jury know that we'll be probably

14   an additional 15 minutes or so.

15        (Whereupon, a short recess was had, after which the

16   following proceedings were had outside the presence of the

17   jury.)

18             THE COURT:  Thank you.

19             The record will reflect the jury is not present at

20   this time.  All parties and counsel are present.

21             Mr. Pinales, any matters to take up before we bring

22   the jury back in?

23             MR. PINALES:  No, Your Honor.  Thank you, though.

24             THE COURT:  All right.  Thank you.

25             Bring the jury in.

1        (Whereupon, the jury returned to the courtroom, after

2   which the following proceedings were had in open court.)

3              THE COURT:  Thank you.  And please be seated.

4              We need to have Mr. Day brought back in, please.

5              The record will reflect that all members of the jury

6   are present.

7              Thank you.  And Mr. Day has returned to the witness

8   stand.

9              Of course, you're still under oath.  Mr. Day, there's

10  some water here in case you would like some.

11             THE WITNESS:  I've got some, yes.  Yeah.

12             THE COURT:  Mr. Pinales, I believe you'll be

13  conducting cross-examination on behalf of Mr. Maricle.

14             MR. PINALES:  Thank you, Your Honor.

15             THE COURT:  You may proceed.

16                        CROSS-EXAMINATION

17  BY MR. PINALES:

18  Q    Good morning.

19  A    Good morning.

20  Q    I'm Marty Pinales, and along with David Hoskins and

21  Candace Crouse, we represent Cletus Maricle.

22       I have a few questions for you, and to follow at least in

23  the same order that Mr. Smith followed so that we can keep

24  everything sort of chronologically together, I believe he asked

25  you whether or not you had a plea agreement.  Do you recall

1  that a few moments ago?

2  A    Yes, I do.

3  Q    And, in fact, that was placed in front of you?

4  A    Yes.

5  Q    And you looked at it and identified it by the date, and

6  that plea agreement is still in front of you; is that correct?

7  A    That's correct.

8           MR. PINALES:  And for the purposes of the record,

9  that is PA2.

10 BY MR. PINALES:

11 Q    You've read this; right?

12 A    Yes.

13 Q    You signed it?

14 A    Yes, I did.

15 Q    And in response to one of the questions by Mr. Smith, you

16 said it was your understanding that Judge Reeves, the Judge

17 that's right here today, that he's the only one that will

18 decide whether or not you get a reduction of your sentence; is

19 that right?

20 A    That's my understanding.

21 Q    That's your understanding.  But also it's your

22 understanding and pursuant to the plea agreement that you did

23 sign, you agreed, as you stated earlier, to fully cooperate;

24 correct?

25 A    I did.

1  Q   And in fully cooperating in that plea agreement, the

2  government, Mr. Smith, who also signed that plea agreement,

3  says that they can file a motion to ask Judge Reeves for a

4  reduction of sentence.  You understand that?

5  A   I don't know what the procedure is to do it, no, I don't.

6  Q   If you look at page five of the plea agreement that you

7  signed with Mr. Smith, do you see number eight there?  Do you

8  see where it starts at the bottom of the page, number eight?

9  A   I see it.

10 Q   Would you just read it to yourself and let me know when

11 you're finished?

12     That's right, it continues on the second — on page six.

13 A   Okay.

14 Q   And that clearly states that Mr. Smith, representing the

15 government, has the sole discretion of asking the Judge for a

16 downward departure, a reduction in your sentence; isn't that

17 right?

18 A   I don't know.  I've told you that I don't understand the

19 procedures of it.  My understanding was that Mr. Reeves had the

20 final say.

21 Q   Okay.  You've met with Mr. Smith, have you not?

22 A   Yes, I have.

23 Q   And you've met with the agents, have you not?

24 A   Yes, I have.

25 Q   Not just once, not just twice, but many times?

1   A    Several times.

2   Q    And you've reviewed your testimony with them?

3   A    I have not reviewed my testimony with them.

4   Q    Didn't they go over the questions that they were going to

5   be asking you?

6   A    No, they did not.

7   Q    They did not.  Okay.  I believe in response to some of the

8   questions that Mr. Smith asked you you said that you had used

9   drugs?

10  A    Yes, I have.

11  Q    And you listed cocaine?

12  A    Yes.

13  Q    Methamphetamine?

14  A    Yes.

15  Q    You used marijuana?

16  A    Marijuana put me to sleep.  I never used it.

17  Q    Okay.  You used pain pills?

18  A    Yes.

19  Q    How often were you using drugs?

20  A    Every day.

21  Q    Sometimes more than once a day?

22  A    More than once a day, yeah.

23  Q    Methamphetamine more than once a day?

24  A    Yes, that was my drug of choice.

25  Q    Drug of choice.  How many years were you using

1  methamphetamine?

2  A    It started somewhere around '95, '96, '94, somewhere right

3  in there.  I don't know the exact year.

4  Q    And when did it end?

5  A    When I got locked up.

6  Q    But you got out; right?

7  A    I started back up again.

8  Q    Started back up again.  And I want to talk about that.

9  You went to a federal prison?

10  A    I did.

11  Q    In that federal prison, they offer a lot of programs?

12  A    They do.

13  Q    One of the programs that you took advantage of that the

14  federal government offered was the opportunity of getting a

15  GED?

16  A    I did.

17  Q    And you got your GED?

18  A    I did.

19  Q    You successfully completed the program?

20  A    I did.

21  Q    Another program that the federal government offers and you

22  took advantage of was the drug program?

23  A    I did.

24  Q    It's called the 500 Program?

25  A    500-hour.

1  Q    And that 500 Program is to take people like you who have a

2  drug problem, you said you were using drugs every day,

3  sometimes more than every day, and put them in a drug rehab

4  program so that when they came out they wouldn't be involved or

5  addicted to drugs.  That's the purpose of it; right?

6  A    That is the purpose of it.

7  Q    It's an educational program that you took advantage of

8  offered by the Bureau of Prisons; right?

9  A    I took it, yes, I did.

10 Q    And you took advantage of that program not to correct your

11 drug habit but to make contacts with other people using drugs;

12 right?

13 A    That is exactly right.  That's where I met all my

14 customers at, in -- was in the drug program.

15 Q    And so you misabused that program that was offered to help

16 you?

17 A    I did.

18 Q    Another program that's offered by the Federal Bureau of

19 Prisons to help people get back into the community is to go

20 into a halfway house?

21 A    That is right.

22 Q    And that program helps people come from prison to reorient

23 them into everyday life?

24 A    I got six months halfway house.  You automatically get six

25 months when you take the drug program.

1  Q    Well, you got time of your sentence by taking the drug

2  program and you got the halfway house; right?

3  A    That is correct.

4  Q    Okay.  And at that halfway house, you got a job, which is

5  encouraged by a probation officer who is supervising you?

6  A    That's right.

7  Q    And you worked in London, Kentucky, at a Chrysler

8  dealership?

9  A    That's right.

10 Q    And while you were at that halfway house, you started

11 doing drugs again?

12 A    I did not.

13 Q    You started dealing drugs again?

14 A    The first week I was there, when I got to go home the

15 first week, that's when I started.

16 Q    Go home to the halfway house?

17 A    No.  After you're there the first week, you get a weekend

18 pass.  When I got the weekend pass, that's when I started.

19 Q    That's right.  But you got six months in the halfway

20 house; right?

21 A    That's right.

22 Q    And that six months comes off the tail end of your

23 sentence?

24 A    That's right.

25 Q    And while —— during that six months, you started using and

1  dealing drugs again?

2  A    No, I didn't start using until about a year–and–a–half

3  later.  But I started dealing while I was at the halfway house.

4  Q    In fact, while you were under federal probation

5  supervision, you were involved even in a big load of bad,

6  soured marijuana, spoiled marijuana?

7  A    I did.

8  Q    And you talked about that.  You've talked about that;

9  right?

10  A    Right.

11  Q    Okay.  Now, Mr. Smith was asking you questions about your

12  pawnshop.  Do you remember those questions?

13  A    Yeah, he asked me some questions.

14  Q    And one of those questions was it was on the main street

15  that ran through Clay County?

16  A    It fronted 421.

17  Q    And you said you were using that pawnshop to sell drugs?

18  A    I did.

19  Q    Reality is you were very cautious, were you not?

20  A    I tried to be.

21  Q    And you were cautious because you didn't want to be

22  caught?

23  A    That's true.

24  Q    And you didn't go on national television and talk about

25  your drug dealing, did you?

1   A    No, I did not.

2   Q    Now, you didn't store your drugs on that main street that

3   Mr. Smith was talking about?

4   A    Not there, but on a main street about a mile down the

5   road.

6   Q    And hidden in a secret compartment?

7   A    That's right.

8   Q    A compartment that was a secret room?

9   A    That is right.

10  Q    So it wouldn't be exposed to people driving down the

11  highway?

12  A    That's right.

13  Q    It wasn't out in the open; right?

14  A    That's right.

15  Q    Now, you've testified before?

16  A    Yeah.

17  Q    You've testified in other cases?

18  A    Yes.

19  Q    Other cases Mr. Smith was the prosecutor in?

20  A    That's correct.

21  Q    And you've testified in this case in some preliminary

22  matters?

23  A    Yes.

24  Q    As a matter of fact, I cross-examined you in one of those?

25  A    Tuesday a week ago.

1   Q    Yeah.  And you've testified even before that?

2   A    That's right.

3   Q    And today you came into court and you said that you were

4   out to influence a juror with Cletus Maricle; right?

5   A    Say that again now.

6   Q    You said — you came into court today and you said you

7   went out to visit kin of one of the jurors in a case that you

8   were the administrator of?

9   A    That is right.

10  Q    Okay.  Now, I want to talk about that a little bit now.

11  Your sister-in-law was killed?

12  A    That's right.

13  Q    In a terrible, tragic automobile accident; right?

14  A    That's right.

15  Q    She was hit by a truck with a drunk driver?

16  A    That's right.

17  Q    She was killed instantly and her little daughter was

18  injured in that accident?

19  A    That's correct.

20  Q    Your sister-in-law was a nurse?

21  A    Do what?

22  Q    Your sister-in-law was a nurse, was she not?

23  A    No.

24  Q    What did she do?

25  A    She was just a housekeeper.

1   Q    She was a housekeeper.  And the caretaker of her daughter,

2   your niece?

3   A    Yeah.

4   Q    You told this jury that the jury came back with a three-

5   and-a-half million dollar verdict?

6   A    Somewhere, three-and-a-half or 4 million.  I don't

7   remember the exact figure.

8   Q    You didn't get that?

9   A    No.

10  Q    Because there was insurance that only had a certain amount

11  to it?

12  A    That is right.

13  Q    And that amount was $350,000?

14  A    350,000, and then we got another 50.

15  Q    Fifty, making a total of four; is that correct?

16  A    Because the insurance company didn't act in good faith.

17  Q    Okay.  So for the actual death of your sister-in-law, the

18  recovery to the estate, which you were the administrator, was a

19  total of $400,000?

20  A    That's right.

21  Q    You testified here a few moments ago that Cletus Maricle

22  was about to be a judge?

23  A    He knew he was going to be a judge, that's right.

24  Q    But in response to the question that I asked you before,

25  you've testified in this matter before; right?

1   A    Say that again now.

2   Q    You've testified about that before in preliminary matters?

3   A    Yes, I have.

4   Q    And in March, actually March 23rd of '09, you testified at

5   a detention hearing.  Do you remember that?

6   A    Yes, I do.

7   Q    And you were asked questions about that episode.  Do you

8   remember that?

9   A    Yes.

10  Q    And you answered them under oath?

11  A    I did.

12  Q    And one of the questions that you were asked:

13       Question:  "During the time that you've known him, have

14  you ever been asked to go with him in his presence to approach

15  a spouse of a potential juror or a juror in a court case before

16  him as a judge?"

17       Do you remember that?

18  A    I do.

19  Q    And your response:  "Yes, I did" —

20  A    Yes, I did.

21  Q    — "Yes, I have."  And you're referring to your sister-in-

22  law's case?

23  A    That's right.

24  Q    And then further on in the proceeding, you said in

25  response to this question:  "And so this matter was before

1    which judge?"

2          And your response:  "Cletus Maricle."

3          Do you remember that?

4    A    I do.

5    Q    So in March of 2009, when you testified about this matter

6    that you've just testified, you said Cletus Maricle was the

7    judge then?

8    A    I said that, but I made a mistake.

9    Q    You made a mistake.  You said you were with other people?

10   A    I was.

11   Q    And you said one passed away?

12   A    Right.

13   Q    Who else was there?

14   A    Scott Madden, Larry Joe Roberts, me, and Cletus Maricle.

15   Q    And all of those people can confirm what you've just said?

16   A    Well, Larry Joe can't, he's dead.

17   Q    Yeah, I understand that, but all the other people?

18   A    Scott should be able to.

19   Q    Sure.  Now, one of the questions that Mr. Smith asked you

20   was that during a particular election, you were involved in a

21   race with Oscar Gayle House and Mr. Bishop?

22   A    Clay M. Bishop.

23   Q    He didn't ask you when that was.  Do you recall?

24   A    No, I do not.

25   Q    That was the election of 1983, wasn't it?

 1  A    I don't recall.

 2  Q    It was well before Judge Maricle was ever a judge?

 3  A    He wasn't no judge at that time.

 4  Q    And who was around then who can confirm what you said?

 5  A    Do what now?

 6  Q    Who else was around?  Who were you with?

 7  A    Well, Mr. Maricle was there that day, he ought to be able

 8  to confirm it.

 9  Q    Absolutely.  And who else?

10  A    Doug Adams.

11  Q    Uh-huh.

12  A    James Craft.

13  Q    Uh-huh.

14  A    I can't remember nobody.

15  Q    And you can't remember anyone else?

16  A    Not particularly, no, I can't.

17  Q    You talked about another race, the Hooker race.  Do you

18  remember that?

19  A    Yeah, I do.

20  Q    That was in 1985; right?

21  A    I don't know the year.

22  Q    Well before Judge Maricle was a judge?

23  A    That's right.

24  Q    Who was the -- you said this was a big slate of

25  candidates.

1   A    Probably had four or five people on the slate.  Do I
2   remember them?  No, I do not.
3   Q    You don't remember who else?
4   A    No.
5   Q    And you were talking about that particular race and you
6   said at that time, before Judge Maricle was a judge, he was a
7   judge in the election?
8   A    That is right.
9   Q    Okay.  I just want to make it perfectly clear that under
10  Kentucky law there is a Republican judge and a Democratic judge
11  that are involved in each precinct.
12  A    That's right.
13  Q    And these people have the term judge, but they're not
14  legal judges like Judge Reeves?
15  A    No, they vote the people when they go in and can't vote or
16  say they can't vote.
17  Q    And that is provided by Kentucky law?
18  A    I presume.
19  Q    And you said that you were told to go home early.
20  A    I was.
21  Q    And that there was an announcement at the door?
22  A    At the door?  Yes.
23  Q    And that announcement, you said, was opposite what really
24  happened?
25  A    That's right.

1  Q    And who else was around when that was done?

2  A    I have no idea.  I went home.

3  Q    Because you were gone?

4  A    Yeah.

5  Q    So that's something you've learned through hearsay?

6  A    That's what they told me to do.

7  Q    Somebody told you about it?

8  A    That's what they told me to do.

9  Q    Okay.  You went home?

10 A    I went home.

11 Q    And you weren't there to hear that announcement?

12 A    I did not.

13 Q    That's unofficial?  In your experience at polls, that's

14 unofficial where they come to the door and say who won; right?

15 A    Do what now?

16 Q    Let me back up, I'm sure that's a bad question.

17       People vote and there's a ballot; right?

18 A    Yeah.

19 Q    Either paper or a machine?

20 A    Machine.

21 Q    And the machines are turned into the Board of Elections?

22 A    That's right.

23 Q    And that is the official?

24 A    The Board of Elections got to make it official when they

25 meet and go over everything and check the machines.

1  Q    So as I understood your testimony, you're not saying that
2  the machine was phonied up, just an announcement as somebody
3  might have told you?
4  A    They switched the votes at the voter precinct.  They read
5  Corky's and Mike Hooker's, they switched them.
6  Q    Yes, that's what I'm getting at.  They read that at the
7  door?
8  A    At the door.
9  Q    But that wasn't what was in the machine?
10 A    No.  The —
11 Q    You're sure — I'm sorry, go ahead.
12 A    They switched the numbers at the door.  When they get
13 through with elections, with the old machines they had, they
14 would run them up, tally all the numbers across the top there
15 and they would write them down, come to the door and announce
16 them.
17 Q    And then they would take that machine to the Board of
18 Elections for the official?
19 A    No, they took the paperwork.  They wrote down the
20 paperwork, took it to the courthouse.  Later the Clerk received
21 all the machines back at the office and the Board of Elections
22 went through and verified and confirmed everything.
23 Q    And what did they confirm?
24 A    I wasn't on the Board of Elections at that time.
25 Q    Well, Mr. Hooker didn't win?

KENNETH DAY - CROSS - MR. PINALES                    75

1   A    Yes, he did.

2   Q    He did?

3   A    Yeah.

4   Q    Okay.

5   A    He got —— I don't remember the exact vote, somewhere

6   around 400, and Corky got 25 or 30, whatever it was.

7   Q    That's right.  And that was the real vote, not what was

8   said at the door?

9   A    That was the real vote.

10  Q    Not what was said at the door?

11  A    That's right.

12  Q    And so what was said at the door was just unofficial,

13  somebody opens the door and shouts out numbers and closes the

14  door and fills out paperwork and it all goes to the Board of

15  Elections?

16  A    Well, what they done, they was afraid they was going to

17  get killed that day, and they reversed the numbers so they

18  could leave there and not get hurt.

19  Q    Well, what they did was said a reverse number; right?

20  They didn't ——

21  A    I don't know what you're getting at.

22  Q    Okay.  Let me just slow it down.  I'm sure I'm asking a

23  clumsy question, I apologize to you.

24       The Board of —— the election poll closes, okay, 6:00 at

25  night?

1    A    That's right.

2    Q    There's an announcement at the door?

3    A    That's right.

4    Q    That announcement at the door was that Corky won?

5    A    That is correct.

6    Q    Then in real life, with the real votes that came in from

7    the Board of Elections, Mr. Hooker won?

8    A    That's right.

9    Q    And he actually served?

10   A    That is right.

11   Q    That's all I wanted to get to.

12        You testified that at some point a list of Republicans

13   from a poll was requested of you and given to Judge Maricle.

14   A    That is right.

15   Q    This is an official list from the Board of Elections?

16   A    There's five names on it, the best I remember, and out of

17   them five names, I picked two Republicans that served at each

18   precinct, and the Democrats do the same.

19   Q    Let me just back up.  That's an official list?

20   A    Yes, it is.

21   Q    From registered voters within that precinct?

22   A    That is right.

23   Q    Anybody could go in and get that list?

24   A    No.

25   Q    The list of registered voters?

1  A    Oh, the registered voters, they can.  Anybody can get that
2  list.
3  Q    And the list of those that are registered as Republicans
4  is available?
5  A    That is right.
6  Q    And the list of those that is registered as Democrats are
7  available?
8  A    When I was doing it, they was all on the same list,
9  Democrat, Republican, Independent, whatever you may have, it
10 was all on the list when you got it.
11 Q    And that is an official list from the Board of Elections?
12 A    That is right.
13 Q    If I go into the poll and I register as Republican, I will
14 be on that list?
15 A    That's right.
16 Q    Not a secret list?
17 A    No.
18 Q    Not a clandestine or a list that had some evil to it —
19 it's those that voted and gave their — who they wanted to vote
20 for, they declared their party affiliation; right?
21 A    No, that's not the list I'm talking about.
22 Q    What list are you talking about?
23 A    The list I'm talking about is the chairman and the youth
24 captain of each precinct, the youth captain chairman and
25 co-captain, three or four people that runs that precinct.  They

1  turn in a list of five names to the Board.

2  Q    And these are five names from the registered voter list

3  within that precinct?

4  A    That is right.

5  Q    And that list has the designation, the big list, as to

6  who's a Republican and who's a Democrat and who's an

7  Independent, who hasn't declared?

8  A    Ask that question again now.

9  Q    The list that you're talking about was made from the list

10 of registered voters?

11 A    That is right.

12 Q    And that list of registered voters has the designation

13 already on it of who's a Republican, who's a Democrat, and

14 who's an Independent; isn't that right?

15 A    The list that I get is five names, all Republicans, and

16 it's confidential.  And it comes into the Clerk's office and

17 the Clerk gives it to us then.  I mean, me the Republican, I

18 get the Republican's list of five names or six names from each

19 precinct, and I am to pick two people from that list, one being

20 a judge and the other a clerk or a sheriff, whatever it is.

21 Q    And that list is made up from the list within that

22 precinct of registered voters?

23 A    That's right.  You have to be a registered voter at that

24 precinct to get your name on that list.

25 Q    That's what I was after.  Now, you said that Cletus

1  Maricle was appointed to judge by the Governor?

2  A    That's right.

3  Q    Governor Wilkinson?

4  A    I don't know what governor it was, but he was appointed by

5  the Governor.

6  Q    A Democratic governor?

7  A    I don't know.

8  Q    But he had to run in the next election?

9  A    For the unexpired term, that's right.

10 Q    And in running for the unexpired term, you said you went

11 out with him and ate a lot of suppers?

12 A    Sure did.

13 Q    And you went out eating those suppers, you said, in

14 Jackson County?

15 A    That's where I worked with him at, in Jackson County every

16 night.

17 Q    When you said you worked with him, you went door to door?

18 A    We went to Poodle Marcum's first and he give us a list of

19 names we was to go to and see.

20 Q    And you visited these folks?

21 A    Yes, we did.

22 Q    And you introduced the Judge, he introduced himself?

23 A    Whichever, I don't know the way it was.

24 Q    And you said, "I would appreciate your vote, I want your

25 vote, I'm running for judge"?

1  A    I guess that's what he said.  I don't remember.

2  Q    He went campaigning?

3  A    Yeah.

4  Q    Okay.  He went door to door, he went to the people's

5  homes?

6  A    That is right.

7  Q    He introduced himself because he was from Clay County;

8  right?

9  A    That is right.

10 Q    Jackson was one of the three counties within the 41st

11 District, within that judicial district?

12 A    That's right.

13 Q    And he wasn't as well known there as he was in Clay

14 County?

15 A    Yeah, he was well known.

16 Q    But that wasn't his home county?

17 A    Clay County was his home county.

18 Q    Right.  So he went with you to meet voters and you said

19 went into their homes, ate a lot of dinners and kinda rubbed

20 elbows with everybody and got to know them so that they would

21 like Judge Maricle and vote for him?

22 A    That's right.

23 Q    You talked about after Judge Maricle was a judge you were

24 appointed an appraiser?

25 A    I was.

1   Q    And that is done by Kentucky law?

2   A    I don't know how it's done.

3   Q    You were a property owner?

4   A    Yes, I am.

5   Q    And you had to be a property owner in order to be an

6   appraiser within the meaning of Kentucky law; right?

7   A    I don't know.

8   Q    And you said you got paid?

9   A    Yes, I did.

10  Q    150 bucks, 200 bucks?

11  A    Something like that.

12  Q    I mean, it was set by a statute?

13  A    Whatever it was, 2- or $300.

14  Q    You were talking about the Gayle House and Bishop race.

15  Do you remember that?

16  A    Yes.

17  Q    That race got the interest of the big coal companies,

18  didn't it?

19  A    It sure did.

20  Q    And they pumped a lot of money into that race?

21  A    Yeah.

22  Q    And big coal was interested in that outcome?

23  A    Dobber Smith was.  That's the only one that I'm aware of.

24  Q    It was the big coal company?

25  A    Shamrock Coal Company.

1  Q     Yeah.

2              MR. PINALES:  Can I have a moment, Your Honor?

3              THE COURT:  Yes, sir.

4  BY MR. PINALES:

5  Q     I want to call your attention to something you testified

6  to before.  Do you recall a time that you came up to Cletus

7  Maricle's house after he was a judge and tried to give him

8  money?

9  A     Sure did.

10 Q     And he refused it?

11 A     I took him $20,000 up there and he wouldn't take it.

12 Q     Let me back up.  He was already a judge?

13 A     Yes.

14 Q     You went to his house to give him illegal, bad money;

15 right?

16 A     $20,000.

17 Q     $20,000, and he said no?

18 A     That's right.

19 Q     Who was there?

20 A     Me, Ralph Hoskins, Eugene Stewart.

21 Q     And you guys were trying to persuade him take this money

22 for something?

23 A     Ralph was the one that tried to give him the money and he

24 wouldn't take it.

25 Q     And he absolutely refused?

 1   A    That's right.

 2   Q    And that was after he was a judge?

 3   A    That is right.

 4        MR. PINALES:  One moment, Your Honor.

 5   BY MR. PINALES:

 6   Q    Where did that money come from?

 7   A    Drug proceeds.

 8   Q    What happened to that money?  You tried to give it to

 9   Judge Maricle and he said no.

10   A    I don't know what I done with it.  Bought more drugs with

11   it, I guess.

12   Q    You took half, didn't you?  You took the money?

13   A    The money?

14   Q    Yeah.

15   A    I don't know what happened to it.

16   Q    Did you take any of that money?

17   A    No, I didn't take none of it.  I bought more drugs with

18   it.

19   Q    Who bought more drugs with it?

20   A    I did.

21   Q    Then you took the money and bought more drugs with it?

22   A    I guess that's what I done.

23        MR. PINALES:  I guess that's what you done.

24        Nothing further.

25        THE COURT:  All right.  Thank you.

1          Mr. Bayer.

2                         CROSS—EXAMINATION

3    BY MR. BAYER:

4    Q     Mr. Day, if you remember, I'm Bennett Bayer, I'm Doug

5    Adams' attorney.  We spent some time together about a week or

6    so ago?

7    A     Yeah.

8    Q     Do you know what an FBI—302 is?

9    A     No, I do not.

10   Q     It's where the FBI makes a summary of all the statements

11   that you've made to them and they put it in summary form and

12   then they keep it in their records.  Have they provided you

13   copies of any of your statements?

14   A     No, they have not.

15   Q     Do you have any written material that you've used to

16   refresh your memory to get ready for trial?

17   A     The only thing that I had is what we done here Tuesday,

18   last Tuesday.

19   Q     What were you given?  What have you've gotten from them?

20   A     This is my plea agreement here.

21   Q     Did they give you a copy of the transcript from the

22   hearing last week?

23   A     Yes, sir.

24   Q     And were you able to look at that and figure out whether

25   or not you had made any errors during the course of that

1  hearing?

2  A    Not really.

3  Q    Well, when you say "not really," what does that mean?

4  A    I can't recall none.

5  Q    Who was it that gave you that transcript?

6  A    One of the agents.  I don't know what his name was.

7  Q    Was it Agent Briggs who's here?

8  A    No.

9  Q    It was a different FBI agent?

10 A    Yes.

11 Q    How many different FBI agents do you think you've met with

12 over the past four or five years in preparing to work for many

13 different trials?

14 A    Two.

15 Q    Who?

16 A    Tim Briggs and Buddy there.

17 Q    You also said another agent brought you the transcripts?

18 A    I don't know if he was an agent or what he was, but he

19 brought me the transcript.

20 Q    Your plea agreement is dated what?

21 A    February the 12th, '06.

22 Q    And since that point in time, how many different trials

23 have you testified in for the United States?

24 A    One is all I've testified in.

25 Q    Which one was that?

 1  A    Wayne Reed.

 2  Q    Did you not also testify in the Jennifer Garrison trial?

 3  A    Now, wait a minute.  That was before that –– that was in

 4  my case, Jennifer Garrison was, yes.

 5  Q    And you testified in that case, didn't you?

 6  A    I did.

 7  Q    You testified against Jennifer Garrison, didn't you?

 8  A    I did.

 9  Q    And she was found not guilty by the jury, wasn't she?

10        MR. SMITH:  Your Honor, I'm going to object.

11        THE COURT:  Sustained.

12  BY MR. BAYER:

13  Q    You testified in the Jennifer Garrison case, you testified

14  in the Wayne Reed case, and every time you testified you did it

15  under the impression that it was going to help you in getting

16  your sentence reduced at some point in time; correct?

17  A    That is right.

18  Q    And, in fact, just by coincidence, Judge Reeves has been

19  the judge in all these cases?

20  A    He has.

21  Q    Do you think by testifying for the prosecution that it's

22  going to impress Judge Reeves and help you?

23  A    I have no idea.

24  Q    Is that what your hope is?

25  A    I would like to.

1  Q    So every time you come into court you think it's helping

2  you, don't you?

3  A    Maybe.

4  Q    Mr. Maricle's counsel asked you some questions about when

5  you were in the drug rehab program.  You went into the drug

6  rehab program knowing that it would reduce your prison

7  sentence; correct?

8  A    That's right, seven months.

9  Q    How did you learn about that?

10 A    When I got to prison.

11 Q    You learn about a lot of things when you're in prison,

12 don't you?

13 A    Such as?

14 Q    Such as what a plea agreement will do for you in which you

15 agree to testify?

16 A    That's right.

17 Q    So in other words, when you were answering questions and

18 you really didn't — you said you really didn't understand what

19 your plea agreement might mean, and, in fact, when you were in

20 prison you talked with other people in the prison about what

21 that plea agreement would mean?

22 A    I did not.

23 Q    You did not?

24 A    I did not.

25 Q    Did you talk with other inmates there about what it might

KENNETH DAY - CROSS - MR. BAYER                    88

1  do for you if you testified?

2  A    No, I did not.

3  Q    Then how did you find out in prison that it would benefit

4  you?

5  A    I was talking about the drug programs, is what I was

6  talking about.  And all the programs that they have in prison

7  is what I was talking about.  I discussed my case with nobody

8  whatsoever.

9  Q    Well, I think you shared a jail cell with Eugene Lewis at

10 one point in time, didn't you?

11 A    I did.

12 Q    You talked to Mr. Lewis about the case?

13 A    About my case, I did.

14 Q    You talked with Mr. Lewis and you indicated to him that

15 you were going to help the government out and you had all sorts

16 of information on all sorts of people where you thought it was

17 going to help you, didn't you?

18 A    No, I did not.

19 Q    You didn't tell Mr. Lewis about all these cases?

20 A    No, I did not.

21 Q    You didn't tell Mr. Lewis that you had all sorts of

22 information that you were going to provide to the government?

23 A    I did do that.

24 Q    And why did you tell that to Mr. Lewis?

25 A    We was just sitting in the jail cell at Somerset over

1  there and we talked about it.

2  Q     What was it you told Mr. Lewis?

3  A     I talked about my case to him is all I talked about.

4  Q     And you said that you were hopeful you were going to get

5  your sentence reduced; correct?

6  A     I did not say that to him.

7  Q     You didn't?

8  A     I talked to him very little about anything.

9  Q     Let's talk about your sentence for a moment.  What is your

10 understanding is your sentence?

11 A     Eighteen years.

12 Q     How old are you?

13 A     Fifty-eight.

14 Q     Are you afraid of dying in prison?

15 A     If I die, I die.

16 Q     But you want to get out as soon as you can?

17 A     Well, everybody does that.

18 Q     And you went to prison for a drug conviction in what year?

19 A     '97.  The first one?

20 Q     Yes, sir.  And you came back — what year did you get out

21 of prison?

22 A     '01.

23 Q     And you were on supervised release at that time?

24 A     Five years.

25 Q     And during the time that you were on supervised release is

1  when you got arrested again, didn't you?

2  A    That is right.

3  Q    And if I understood your testimony this morning correctly,

4  you testified that when you went to prison you immediately

5  started rounding up new customers for your drug operations?

6  A    I didn't say immediately.  I said when I was in the drug

7  program, that's when I met all my people that I sold drugs to

8  when I got out.

9  Q    So you went into the drug program to cut your sentence;

10  and while you were in the drug program, you lined up new

11  customers so that you could cut your sentence, get out of

12  prison sooner, and then start dealing drugs again; correct?

13  A    That is correct.

14  Q    I want to talk a little bit about your involvement in

15  politics.  And if I understand you correctly, you stated that

16  you've been in politics all your adult life?

17  A    Most of my adult life.

18  Q    And the two circumstances that you testified to this

19  morning, the two races, was the race regarding Oscar Gayle

20  House and Clay M. Bishop —— not Clay M. Bishop, it was —— it

21  was Clay Bishop and Oscar Gayle House race?

22  A    That's right.

23  Q    You don't have a recollection when that year was?

24  A    No, I do not.

25  Q    But all the records indicate when we were at the hearing

1    last week it was 1983.  Do you disagree with that?

2    A    I don't remember the year.

3    Q    Does 1983 sound correct?

4    A    I don't remember the year.

5        MR. SMITH:  Your Honor, I'm going to object to

6    arguing.

7        THE COURT:  It has been asked and answered a couple

8    of times.  The witness has indicated he doesn't recall the

9    year.

10   BY MR. BAYER:

11   Q    When did you start dealing drugs?

12   A    The first time?

13   Q    Yes, sir.

14   A    Around '95; '94, '95.

15   Q    So if the evidence shows that the Clay Bishop-Oscar Gayle

16   House race was in 1983, that was over a decade before you

17   started being a drug dealer?

18   A    If that's what it shows.

19   Q    If the records show that the Mike Hooker race was 1985,

20   that was over a decade before you became a drug dealer?

21   A    Probably was.

22   Q    So what you're doing during the early '80s, the people

23   that you're associating with in the early '80s and the

24   political races that you're dealing with in the early '80s, had

25   nothing to do with drugs, did it?

1   A    Not in the early '80s, no, it did not.

2   Q    The members of the jury really don't understand the whole

3   concept, I think, of Clay County, as far as some aspects of the

4   political environment.  Describe for me the White family.

5   A    I don't know what you're looking for.

6   Q    Well, what — who are the Whites in Clay County?

7   A    Doug White, Jack White, I worked for them for 20 some

8   years, Jennings White.

9   Q    Who are these people?

10  A    I don't understand what you're asking.

11  Q    Okay.  You said you worked for one of the Whites?

12  A    I worked for two of them.

13  Q    Who?

14  A    Jack and Doug.

15  Q    Are they related to Jennings White?

16  A    I don't know — they are related, but I don't know what

17  the relationship is.

18  Q    Who is Charles White?

19  A    Charles White is -- I think he's Jennings' cousin maybe.

20  I don't know.

21  Q    Who's Daugh white?

22  A    That's Doug White.  That's a brother to Jack.

23  Q    What office did Doug White hold?

24  A    Mayor.

25  Q    What office did Charles White hold?

1   A    He was the superintendent at one time.

2   Q    Superintendent of Education?

3   A    Clay County Schools.

4   Q    Who is James Phillips Clay?

5   A    I don't know no James Phillips Clay.

6   Q    County Circuit Court Clerk, I think you told the FBI that

7   his wife's nephew is a White.

8   A    Do what now?

9   Q    Well, let me move on.  Who's Glenn Harris?

10  A    Glenn Harris is a cousin to Jennings White.

11  Q    Yancey White?

12  A    I don't know if Yancey is any kin to them or not.

13  Q    Jennings' cousin perhaps?

14  A    No.

15  Q    Charles Marcum?

16  A    Ex-jailer.

17  Q    Is he close to Jennings White?

18  A    I don't really know.

19  Q    And who is Jennings White?

20  A    Ex-clerk of Clay County.

21  Q    What is your relationship with Jennings White?

22  A    Just a good friend.

23  Q    Jennings White laundered some of your drug money, didn't

24  he?

25  A    Yes, he did.

1  Q    The two of you were in the drug business together?

2  A    Do what now?

3  Q    The two of you were in the drug business together?

4  A    That's not right.

5  Q    He laundered your drug money?

6  A    He did that.

7  Q    How did that happen?  Explain that to me, I don't

8  understand.

9  A    I took $20,000 to him, or 22,000, I don't remember the

10 exact number it was, and he wrote me a check for 18,000.

11 Q    Why?

12 A    To launder the money.

13 Q    How many times did you do that?

14 A    One time.

15 Q    And he charged you ten percent just to launder the money?

16 A    Yes.

17 Q    Why is it you would have gone to Jennings White to have

18 him launder that money for you?

19 A    I knew I could ask him to do it.

20 Q    Why?

21 A    We was close friends.

22 Q    Very close friends?

23 A    Yes, we was.

24 Q    Lifelong buddies?

25 A    No, not lifelong buddies, but we was close friends.

KENNETH DAY CROSS - MR. BAYER                    95

1   Q    How many times did you work in his political campaigns?

2   A    Once.

3   Q    When?

4   A    The first time he won.

5   Q    When was that?

6   A    I don't know the year.

7   Q    How many other White's campaigns did you work in?

8   A    None.

9   Q    How many other Whites are you close friends with?

10  A    None.

11  Q    You tried to align yourself with the White family

12  connections, though, didn't you?

13  A    Say that again.

14  Q    You tried always to align yourself with the White family

15  connections, didn't you?

16  A    I don't know what you're trying to say.

17  Q    In other words, you always wanted to stay in good graces

18  with the White family?

19  A    I did Jennings, yeah.

20  Q    You never came out against the White family, did you?

21  A    No, I did not.

22  Q    Why?

23  A    I was friends to Jennings.

24  Q    In 2002, what happened to Jennings White?

25  A    I didn't work that election, but he got beat.

1  Q    Who beat him?

2  A    Freddy Thompson.

3  Q    Freddy Thompson and Jennings White are not friends, then,

4  are they?

5  A    I don't know that.

6  Q    Who helped Freddy Thompson?

7  A    I do not know that.

8  Q    If somebody helped Freddy Thompson in 2002, they would not

9  be Jennings White's friend, would they?

10 A    I cannot speculate on that.  I do not know.  I had nothing

11 to do with that.

12 Q    Well, let me ask you this:  Jennings White at one time

13 told you that he was going to plant drugs in Doug Adams' car,

14 didn't he?

15 A    No, he did not.

16 Q    Who told you about that then?

17 A    Jennings tried to get me to do it.

18 Q    My mistake, I'm sorry.  Explain to me what Jennings told

19 you to do.

20 A    He didn't tell me to do nothing.  He asked me if I knew

21 anybody that would plant drugs in Doug Adams's automobile to

22 get him busted.

23 Q    Why would Jennings want Doug Adams busted?

24 A    I can't answer that.

25 Q    Jennings hates Doug Adams, doesn't he?

1  A    I don't know that.

2  Q    Why would he tell you to get Doug Adams set up?

3  A    I do not know that.

4  Q    Are you aware of whether or not Jennings White ever bought

5  votes?

6  A    Did I ever — yeah, I am.

7  Q    Tell us about that.

8  A    I seen him give Clinton Johnson $10,000.  And I also seed

9  him give Darrell McQueen $10,000.  He give Darrell McQueen

10  $10,000 in my presence, and he left my pawnshop agoing to

11  Clinton Johnson's with $10,000 for him in the '02 election.

12  Q    You also gave Jailer Charles Marcum a thousand dollars,

13  didn't you?

14  A    I did not.

15  Q    Who did?

16  A    I do not know.

17  Q    Tell me about Edd Jordan.  Who's Edd Jordan?

18  A    He used to be the sheriff of Clay County.

19  Q    And Jennings White sat up a meeting with Edd Jordan for

20  you, didn't he?

21  A    That is right.

22  Q    And you went over to meet with Edd Jordan and Jennings

23  White, didn't you?

24  A    I went right to the office.

25  Q    What was the purpose of the meeting?

1    A    Edd told me that he didn't —— that I wasn't under no

2    investigation and would not be as long as he was sheriff, I had

3    nothing to worry about.

4    Q    What's that mean?  I don't understand.

5    A    Do what now?

6    Q    I don't understand what you're trying to accomplish with

7    meeting with the sheriff.

8    A    What I was trying to accomplish is I was wanting

9    protection in Clay County to make sure that I wasn't going

10    to —— the Clay County Sheriff's Department was not going to

11    come into my pawnshop and try to raid or find drugs or illegal

12    activities going on.

13    Q    And Edd Jordan says as long as he's sheriff, you've got

14    that protection?

15    A    He said that.

16    Q    And Jennings White was there with you?

17    A    He was.

18    Q    And you asked Jennings White to set the meeting up for

19    you?

20    A    I did.

21    Q    Because Jennings White had a lot of power with Edd Jordan?

22    A    Jennings was closer to Edd than I was.

23    Q    And you're very close with Jennings?

24    A    Yes, I am.

25    Q    So Edd Jordan promises you that as long as he's going to

1    be sheriff he's going to take care of that?

2    A    That is right.

3    Q    And Jennings White is standing right there doing it?

4    A    Do what now?

5    Q    Jennings White is standing right there listening to that?

6    A    Yes, he is.

7    Q    Jennings White is in prison, isn't he?

8    A    Yes.

9    Q    What for?

10   A    Laundering drug money for me.

11   Q    And other people?

12   A    I don't know about other people.

13   Q    But he's in prison right now?

14   A    Who?

15   Q    Jennings.

16   A    To my knowledge, he is.

17   Q    Do you know who Vernon Hacker is?

18   A    I do.

19   Q    Tell me, who is Vernon Hacker?

20   A    He used to be councilman and head of the 9-1-1 building.

21   Q    What do you know about his drug dealings with Jennings

22   White?

23   A    I don't know nothing about his drug dealings with Jennings

24   White.

25   Q    What about with you?

1  A    None with me whatsoever.  The only thing I done with him

2  was I had a guy leave my place with 32-pound of marijuana, and

3  I called him — I didn't call him, I called Jennings to go see

4  him, him or Todd one, and I was going to give them $50,000 for

5  the drugs back.

6  Q    You know, you mentioned something about a Eugene Stewart.

7  Didn't you try to help Eugene Stewart get some charges dropped

8  against him?

9  A    I did not.

10  Q    Well, do you remember going — I'm sorry.  Do you remember

11  setting up a meeting between the Assistant Chief Roberts,

12  yourself, Kentucky State Representative Barbara White Colter

13  and Daugh White?

14  A    I did not.

15  Q    Well, did you tell the FBI that you did?

16  A    I did not.  And I wasn't at the meeting neither.

17  Q    So then you don't know anything about that?

18  A    I do not know nothing about that meeting.

19  Q    So if that's in your FBI-302, you don't know anything

20  about it?

21        MR. SMITH:  Your Honor, I'm going to object.  He's

22  already —

23        THE COURT:  Sustain the objection.

24  BY MR. BAYER:

25  Q    Do you know anything about State Representative Barbara

1  White Colter?

2  A    She's Doug and Jack's sister, is the only thing I know

3  about her.

4  Q    So when Mr. Smith was describing Barbara Colter to the

5  jury, it's actually Barbara White Colter, isn't it?

6  A    Do what now?

7  Q    Barbara is one of the Whites, isn't she?

8  A    I don't understand where you're coming from.  I didn't

9  hear Mr. Smith ask me nothing about Barbara White Colter.

10  Q    I'm sorry, that was a little bit confusing for you.  If

11  Barbara Colter has been described in this courtroom, it's

12  actually Barbara White Colter, isn't it?

13  A    She was a White before she married John Colter.

14  Q    Which White is she related to?

15  A    She's Jack and Doug's brother —— I mean sister.

16  Q    Did you ever talk to Edd Jordan about trying to get some

17  charges dropped against Eugene Stewart?

18  A    I did not.

19  Q    Well, did you ever talk with Vernon Hacker trying to get

20  some marijuana out of the evidence room over at the police

21  department?

22  A    I sure did.

23  Q    Tell us about that.

24  A    Well, I just told you, but I'll tell you again.  There was

25  a guy left my place with 32-pound of marijuana from North

1    Carolina, Old Fort, North Carolina, and he got stopped going

2    through Fogertown.  State Police took the marijuana off of him,

3    took him to the Clay County jail, and that's when I

4    approached Jennings to see Todd or Vernon, whichever one he

5    could see, to get the marijuana back.  I had a 50,000-dollar

6    reward on it, but Jennings goes up and sees them and, guess

7    what?  They didn't trust him to leave it in Clay County, they

8    took it to London.  I didn't get it back.

9    Q    You know, that's interesting because nobody ever trusted

10   you to handle money either, did they?

11   A    Yeah.  Yeah, they did.

12   Q    Well, I thought you testified this morning that you didn't

13   handle the money in the McKeehan race because they didn't trust

14   you with the money.

15   A    That ain't what I testified to.  I testified that I had

16   the money in the McKeehan race, but in the Oscar Gayle and the

17   Clay M. race Neville Smith was sitting at the mouth of Bray

18   Creek with the money and he would dole it out to us, 5-,

19   $10,000 at a time.  Doug would go get the money, bring to it

20   me, and I would pay the people, because it was against Doug's

21   religion to pay them.

22   Q    Because he wouldn't handle the money?

23   A    Do what now?

24   Q    Doug wouldn't handle the money?

25   A    No, he had got religion and wouldn't handle the money, but

1  he would buy the votes.

2  Q    Well, he was talking to the people about the votes?

3  A    He approached the people and made the deals, and I paid

4  them.

5  Q    That's right, he would talk to the people about he votes.

6  What do you know —— Another one of the Whites we haven't talked

7  about yet.  Who's Kennon White?

8  A    That's Doug White's son.

9  Q    And did you help Kennon White get some cocaine charges

10 taken care of?

11 A    No, sir.

12 Q    What do you know about that?

13 A    Nothing.

14 Q    Well, didn't you testify that you knew about cocaine

15 charges being taken care of by Barbara Colter White?

16 A    Not to my knowledge, I did not.

17 Q    After Edd Jordan promised you as sheriff that he was going

18 to protect you, did you go out and buy votes for Edd Jordan?

19 A    No, I did not.

20 Q    You never told the FBI that you were —— that you always

21 bought votes for Edd Jordan?

22 A    I did.  But not after he told me that.  I didn't fool with

23 no elections after he told me that.

24 Q    When were you buying votes for Edd Jordan?

25 A    Back in the early, I don't know, '80s, late '80s, early

1  '90, whenever I brung —— when I was buying votes at Burning

2  Springs, Edd would always be on my list.

3  Q    So even before the time that you met with the sheriff to

4  make sure that the sheriff would give you protection, you were

5  doing work for the sheriff, you were buying votes for him?

6  A    Say that again now.

7  Q    Before the time that you went to the sheriff to get

8  protection, you were helping to buy votes for the sheriff?

9  A    Well, what happened was, if you want to get into that, was

10 I bought votes for Edd at Burning Springs.  There was an

11 election going on and Cletus was inside and Doug is inside and

12 we had a slate.

13 Q    When you say "we," who is "we"?

14 A    Me, I had a slate.

15 Q    Yes, sir.

16 A    And I had Edd Jordan on the slate, and Cletus stopped the

17 election, he was making them fill out the forms that they was

18 supposed to fill out, we was voting one about every 15 minutes.

19 And Doug comes to me and he says, "Cletus, he shut us down."  I

20 said, "What's he want?"  He said, "He wants Harold Sizemore."

21 Harold was running against Edd at that time.  I said, "Give

22 that to him, let's get back in business," and that's what

23 happened.  I bought votes for Edd Jordan, but I sold him out

24 that day.  He wasn't my most person on the list.

25 Q    When you went to ask him for protection, did you tell him

 1  you had previously sold him out?

 2  A    What do you think?

 3  Q    I don't know, I wasn't there.

 4  A    No, I did not.

 5  Q    Did he ever find out that you sold him out?

 6  A    I didn't tell him.

 7  Q    If he had found out that you sold him out when you were

 8  asking for protection, what do you think he would have done at

 9  that point in time?

10          MR. SMITH:  Your Honor, I'm going to object.

11          THE COURT:  I'm going to sustain the objection as to

12  speculation.

13  BY MR. BAYER:

14  Q    You've got a son, don't you?

15  A    Yes, I do.

16  Q    What is his name?

17  A    Kenneth Rodney.

18  Q    What does Kenneth Rodney do?

19  A    Nothing.

20  Q    Why?

21  A    He's a drug addict.

22  Q    Is he also a dealer?

23  A    No, he's not.

24  Q    How did he get hooked on drugs, Kenny?

25  A    I have no idea.

1    Q    Did you ever provide any drugs to your son?

2    A    No, I did not.

3    Q    What did you do to keep your son from becoming a drug

4    addict?

5    A    I tried everything.

6    Q    Like what?

7    A    Give him a job, tried to get him off of them, just

8    couldn't get him off of them.

9    Q    Does it bother you that your son is a drug addict?

10   A    What do you think?

11   Q    I don't know.

12   A    Yes, it bothers me.

13   Q    If you've got problems that your son is a drug addict, why

14   would you sell thousands of pounds of drugs so other children

15   could get hooked on it?

16   A    I did.

17   Q    That doesn't bother you?

18   A    Yes, it does, too.

19   Q    Rodney used to work at the Clay County schools, didn't he?

20   A    Yes, he did.

21   Q    What happened to him?

22   A    They fired him.

23   Q    Who fired him?

24   A    Doug Adams.

25   Q    Why did Doug Adams fire him?

 1  A    He was on drugs.

 2  Q    He came to work stoned, didn't he?

 3  A    He was on drugs.  I was locked up at the time.

 4  Q    And Doug Adams fired him?

 5  A    He did.

 6  Q    He's the same Doug Adams that you talked to somebody

 7  setting up with drugs in his vehicle.  Jennings wanted you to

 8  do that, didn't he?

 9  A    Yes, he did.

10  Q    Your good buddy, Jennings?

11  A    Yes, he did.

12  Q    Edd Jordan hates Doug Adams, doesn't he?

13  A    I don't know that.

14  Q    He's not told you that?

15  A    No, he has not.

16  Q    Edd Jordan is part of the Jennings White faction, isn't

17  he?

18  A    I do not know that.

19  Q    Well, Jennings was able to set up the meeting for you?

20  A    He did that.

21  Q    I would say that's pretty close contact.  I mean, let me

22  ask it this way:  If the sheriff of Clay County is going to

23  have a meeting with Jennings White and you were — he's going

24  to talk about giving you protection for all your drug business

25  and he does it in front of Jennings White, I suspect he's

 1   pretty close to Jennings White, wouldn't you?

 2             MR. SMITH:  Your Honor, I'm going to object again to

 3   speculation.

 4             THE COURT:  Sustained.

 5   BY MR. BAYER:

 6   Q    Let me ask it this way:  Edd Jordan didn't do anything to

 7   hide that information from Jennings White, did he?

 8   A    Do what now?

 9   Q    Edd Jordan made those statements in front of Jennings

10   White, didn't he?

11   A    Yes, he did.

12   Q    Didn't do anything to hide that information from Jennings

13   White?

14   A    He made them in front of him.

15   Q    At the time you were standing there, did it look like Edd

16   Jordan trusted Jennings White?

17             MR. SMITH:  Your Honor, again objection, speculation.

18             MR. BAYER:  I'm asking what he observed, Your Honor.

19             THE COURT:  I'll sustain the objection.

20   BY MR. BAYER:

21   Q    How many times now do you think you've testified to try to

22   help cut your sentence?

23   A    This is the third.

24             MR. SMITH:  Your Honor, I'm going to object again.

25   Mischaracterizing the testimony.

1                THE COURT:  I'll overrule.

2                You may answer the question.

3                THE WITNESS:  Ask it again now.

4    BY MR. BAYER:

5    Q    How many times have you now testified to try to reduce

6    your sentence?

7                THE COURT:  I'll sustain the objection to the last

8    part.  You can ask him how many times he's testified.

9    BY MR. BAYER:

10   Q    How many times now have you testified?

11   A    Well, you talking about the times in this case?

12   Q    Every time you have now come in as a government witness.

13   A    This is the third time on this case here, and two more

14   makes five, the best of my recollection.

15   Q    And all done with the idea that it's going to cut your

16   sentence?

17   A    That is right.

18               MR. BAYER:  Judge, if I could have a moment, please,

19   to check something?

20               THE COURT:  Yes, you may.

21   BY MR. BAYER:

22   Q    I just want to follow up briefly on the election that you

23   heard that the results were announced reversed.  Okay.  If I

24   understood your testimony correctly, it was because they were

25   afraid to announce the correct results there because they

1  thought the crowd was going to kill them?

2  A    No, they thought Corky McKeehan's brother was going to

3  kill them.

4  Q    So they were in fear of their life?

5  A    That is right.

6  Q    As far as -- but you have no knowledge whatsoever as to

7  whether or not the results were accurately and properly

8  recorded at the courthouse?

9  A    Do what now?

10  Q    You have no knowledge whatsoever as to whether or not the

11  results were accurately recorded at the courthouse?

12  A    No, I do not.

13  Q    But you just know that Corky McKeehan's brother was there

14  threatening to kill them if Corky -- if the results were not

15  announced that Corky won?

16  A    That is not right.

17  Q    What is it then?  I don't understand.

18  A    Corky was there, Cork -- I mean, Corky's brother was all

19  there helping buy votes, and along up in the afternoon, he

20  said, "We're going to have a party at Corky's tonight, Corky

21  has won this election."  And he said, "You're invited to come."

22  And I said, "Well, I don't know about that."  And along up in

23  the afternoon, Doug and Cletus called me to the door.  They

24  said that they was going to announce the votes opposite of what

25  they was because it was so lopsided that they feared that

1  Corky's brother that was there would kill them.

2  Q    And they told you to leave so you would be safe, didn't

3  they?

4  A    They told me to leave and they was going to announce the

5  votes, they was going to switch them.

6  Q    Switch the announcement?

7  A    That's right.

8  Q    Because of Corky McKeehan's brother?

9  A    That is right.

10          MR. BAYER:  No further questions.

11          THE COURT:  We're going to take our lunch break at

12  this time.

13          Ladies and gentlemen, we will take a break for lunch

14  before we continue with examination.  Please keep in mind the

15  admonitions that you've been given several times not to discuss

16  the case among yourselves while we are in recess.  I'm going to

17  ask you to be back if you can at 1:15.  If you're a little bit

18  longer than that, then we'll certainly give you a few moments,

19  but we'll shoot for 1:15 and see how that works.

20      (Whereupon, the jury retired from the courtroom, after

21  which the following proceedings were had in open court.)

22          THE COURT:  Thank you, and please be seated.

23          Counsel, before I excuse you for our lunch break, I

24  just wanted to confirm just a couple of points.  I had gone

25  over an instruction that I will give if requested to do so.

1   When we had our last bench conference, I believe the

2   instruction had been or would be instructed on behalf of

3   Mr. Maricle, the testimony relates to three witnesses in the

4   case -- I'm sorry three defendants in the case.  I believe that

5   counsel to Mr. Maricle wanted me to give the instruction,

6   counsel for Mr. Adams did not want me to give the instruction,

7   had objected to it, and counsel for Mr. Jones wanted me to give

8   the instruction.

9           MR. WHITE:  That's right, Your Honor.

10          MR. PINALES:  That's correct.

11          MR. BAYER:  I think Mr. Westberry will address the

12  issues of whether we object to the instruction in its entirety.

13          THE COURT:  Well, it's your client, you can confer

14  with him, but if you object to me giving the instruction, I'm

15  only going to give it with respect to the other two defendants

16  in the case.  If you want to give it, I'll note your objection

17  to the language, but if you want me to give the instruction --

18          MR. BAYER:  I would rather you give it to all three

19  rather than to isolate us out.

20          THE COURT:  Just so we're clear, the time to give the

21  instruction would be at the conclusion of the witness's

22  testimony, and if anyone asks me, at that time then I'll

23  certainly give the instruction.  But if you change your mind,

24  for whatever reason, just -- the three of you need to let me

25  know.  Again, this relates to testimony with respect to three

1   of the defendants in the case.  If anyone else feels the need

2   to join in, then you need to let me know that as well.

3          Are there any other issues that need to be taken up

4   outside the presence of the jury?  If so, I'm going to exclude

5   Mr. Day.

6          MS. HUGHES:  I know the government doesn't want to

7   tell us the order of proof, I anticipate there will be one more

8   attorney cross-examining today.

9          THE COURT:  I'm going to excuse Mr. Day and then

10  we'll talk about that.

11         Mr. Day, I'll let you step down.

12     (Whereupon, the witness exited the courtroom.)

13         THE COURT:  All right.  Thank you.

14         Mr. Day is not present at this time.

15         MS. HUGHES:  I was just thinking we could expedite

16  this if there was additional Jencks Act material for the next

17  witness, they could go on and turn that over and know what it

18  was and we wouldn't have to take the break in between.

19         THE COURT:  That may depend on how much cross-

20  examination is remaining with Mr. Day.  If I could get a

21  general sense of that.

22         Mr. White, how long do you anticipate spending?  I

23  will remind everyone you don't have to cover every question

24  that co-counsel has already gone over.

25         MR. WHITE:  I factored that in, because you had

1    actually told me to do that in our pretrial.  Taking out what

2    Mr. Bayer and Mr. Pinales did, I would say — and that's the

3    reason I was kind of getting up there, I think I got about

4    15 minutes, if that.  Of course, a lot depends upon — he's

5    done a pretty good job in terms of responding to questions, so

6    I would say about 15 minutes.

7                    THE COURT:  Fifteen.

8                    Mr. Abell.

9                    MR. ABELL:  Judge, I'm not going to question Mr. Day

10   today.

11                   MR. BALDANI:  I've got two minutes or less.

12                   MR. GILBERT:  I don't intend to cross-examine any.

13                   MS. HUGHES:  I'm not going to ask any questions.

14                   MR. SIMONS:  I'm not going to ask any questions.

15                   THE COURT:  It appears that we may be finished with

16   cross-examination, say, 15 to 20 minutes at most.  Will you be

17   in position to provide any *Jencks* material with respect to the

18   next witness you anticipate calling?

19                   MR. SMITH:  We will take care of that, Your Honor.  I

20   don't expect that we're going to have any, but I'm going to

21   double-check.  It's Eugene Lewis, for their benefit, if they

22   want to check their notes and we'll take an opportunity to

23   revisit that before resuming on the lunch break.

24                   THE COURT:  If the issue is still open when we come

25   back, let me know that, and if we need to take a little bit

1   longer lunch break on this issue, then we can certainly take

2   that up.

3          MS. HUGHES:  These witnesses don't affect my client

4   at all.  I thought it would be easier to move us along.

5          THE COURT:  I appreciate that.  Well, I want to get

6   all —— we'll go ahead and let you have your lunch break as

7   well.  So if the jury takes a little longer and when we stop

8   after 12:00, then they run into the lunch crowd here in town.

9   Hopefully, if they can get back by 1:15, we'll be ready to

10  resume at that time.  If one or more is not back, then, of

11  course, I'll let you know and we'll bring the jury back in if

12  there's nothing else to take up.  So we'll be in recess

13  hopefully until 1:15.

14         (Whereupon, a recess was had for the noon hour, after

15  which the proceedings continue uninterrupted to Volume 3-B)

16                  (Proceedings concluded at 12:20 p.m.)

17              C E R T I F I C A T E

18      I, Cynthia A. Oakes, certify that the foregoing is a

19  correct transcript from the record of proceedings in the

20  above—entitled matter.

21

22  2/7/2010                    s/CYNTHIA A. OAKES
        DATE                    CYNTHIA A. OAKES, RPR, RMR, CRR
23

24

25

1                             I N D E X

2                                                           PAGE

3    Testimony of KENNETH DAY:
          Direct Examination by Mr. Smith:              4
4         Cross-Examination by Mr. Pinales:            58
          Cross-Examination by Mr. Bayer:              84
5

6    Motion for Mistrial                                14

7

8                         E X H I B I T S

9
     Government's                                         Page
10   Exhibit No.                  Identified            Admitted

11        PA2                         5                    6

12

13

14

15

16

17

18

19

20

21

22

23

24

25