United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09–16–S |
| vs. | ) |
| | ) London, Kentucky |
| RUSSELL CLETUS MARICLE | ) February 5, 2010 |
| DOUGLAS C. ADAMS | ) 1:15 p.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM R. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 4–B |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES

Appearances of Counsel:
On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                   JASON D. PARMAN, ESQ.

On behalf of the Defendant         DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:            MARTIN S. PINALES, ESQ.
                                   CANDACE C. CROUSE, ESQ.

On behalf of the Defendant         R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                  BENNETT E. BAYER, ESQ.
                                   KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant         T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant         ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant         RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:                R. TUCKER RICHARDSON III, ESQ.

On behalf of the Defendant         JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant         ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant         DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States:   STEPHEN C. SMITH, ESQ.
                                       JASON D. PARMAN, ESQ.
 3                                     Assistant U.S. Attorneys
                                       601 Meyers Baker Road
 4                                     Suite 200
                                       London, Kentucky  40741
 5
     On behalf of the Defendant        DAVID S. HOSKINS, ESQ.
 6   Russell Cletus Miracle:           107 East First Street
                                       Corbin, Kentucky  40701
 7
                                       MARTIN S. PINALES, ESQ.
 8                                     CANDACE C. CROUSE, ESQ.
                                       150 East Fourth Street
 9                                     Federal Reserve Building
                                       Cincinnati, Ohio  45202
10
     On behalf of the Defendant        R. KENT WESTBERRY, ESQ.
11   Douglas C. Adams:                 KRISTEN N. LOGAN, ESQ.
                                       220 West Main Street
12                                     Suite 1900
                                       Louisville, Kentucky  40202
13
                                       BENNETT E. BAYER, ESQ.
14                                     106 West Vine Street
                                       Suite 800
15                                     Lexington, Kentucky  40507

16   On behalf of the Defendant        T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:              133 West Short Street
17                                     Lexington, Kentucky  40507

18   On behalf of the Defendant        ROBERT L. ABELL, ESQ.
     William R. Stivers:               120 North Upper Street
19                                     Lexington, Kentucky  40507

20   On behalf of the Defendant        RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:               R. TUCKER RICHARDSON III, ESQ.
21                                     300 West Short Street
                                       Lexington, Kentucky  40507
22
     On behalf of the Defendant        JERRY W. GILBERT, ESQ.
23   William B. Morris:                212 North Second Street
                                       Richmond, Kentucky  40475
24
     On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
25   Debra L. Morris:                  201 West Short Street
                                       Lexington, Kentucky  40507
```

```
 1   On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
     Stanley Bowling:                  116 West Main Street
 2                                      Suite 2A
                                        Richmond, Kentucky  40476
 3
     Court Reporter:                    CYNTHIA A. OAKES, CRR
 4                                      Official Court Reporter
                                        United States District Court
 5                                      560 Athens Boonesboro Road
                                        Winchester, Kentucky  40391
 6                                      (859) 983-4346

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

1     (Whereupon, the jury returned to the courtroom, after

2  which the following proceedings were had in open court.)

3          THE COURT:  Thank you.  The record will reflect all

4  members of the jury are present, all the parties and counsel

5  are also present.

6          Mr. Roberts, you're reminded you're still under oath.

7          THE WITNESS:  Yes, sir.

8          THE COURT:  Mr. Smith, you may continue your

9  examination of the witness.

10          MR. SMITH:  Thank you.

11                  CONTINUED DIRECT EXAMINATION

12  BY MR. SMITH:

13  Q    Mr. Roberts, I believe as we broke for lunch you

14  identified a fellow by the name of Ricky Whitehead on the

15  photograph?

16  A    That is correct.

17  Q    And I believe you indicated he was the county —— detective

18  for the county attorney, at that time, was Clay Bishop?

19  A    That is correct.

20  Q    And I asked you just as we were breaking about whether or

21  not on election day of that May primary, 2002, whether you had

22  seen Mr. Whitehead at other locations.  Do you recall that?

23  A    Yes, sir.

24  Q    And if you could, tell us what you —— what you saw.

25  A    Mr. Whitehead had made rounds to several precincts.  I

1  also had occasion to run into him over in a section of east

2  Manchester, what is called the Y Hollow, and the Y Hollow

3  basically is an old coal tipple load out that was owned by one

4  of the major coal companies there, and it was basically closed

5  down, it was abandoned property.  And he was there in a motor

6  home with Bart Morris.

7  Q    And was this Y Hollow pretty much abandoned except for

8  this old coal tipple?

9  A    Yes, sir.  It was the old tipple there, and then there was

10 the old scales and the scale house that was still there, but

11 nobody was occupying them.

12 Q    And you said that there was a fellow by the name of Bart

13 Morris?

14 A    Yes, sir.

15 Q    Did you know Bart Morris before seeing him on that day?

16 A    Yes, sir.

17 Q    And how did you know Bart Morris before then?

18 A    Just, you know, common knowledge or, you know, talking to

19 him, friendship, I guess.

20 Q    Did he have a business in town?

21 A    Yes, sir.

22 Q    And what business did he have?

23 A    He owned the transfer station there for the garbage.

24 Q    Okay.  So when you say you made rounds, you went up into

25 the Y Hollow.  What made you take a trip up into Y Hollow where

1  there's no homes?

2  A    One of the attorney generals had said that they had

3  received a complaint of vote buying going on out of a motor

4  home up in the Y Hollow, and I basically accompanied them up

5  there to that and observed it for a while, and then after that,

6  I actually drove up around there and talked to them for just a

7  few minutes, and then I left.

8  Q    And when you went up to talk to them, who did you see in

9  the motor home?

10  A    Mr. Morris and Mr. Whitehead.

11  Q    And do you see Mr. Morris here in the courtroom this

12  afternoon?

13  A    Yes, sir, I do.

14  Q    For the record, could you point out what he's wearing and

15  where he's seated?

16  A    I can't see what he's wearing but he's the third one on

17  the back wall.  That's him standing.

18          THE COURT:  All right.  The record will reflect that

19  the witness has identified the defendant, William Morris.

20  BY MR. SMITH:

21  Q    Now, you indicated that Ricky Whitehead was there with

22  him?

23  A    Yes, sir.

24  Q    And what kind of motor home was this that you saw?

25  A    It was like a — you know, a Winnebago-type motor home,

1   fully functional, you know, that you drive.

2   Q    And did you engage in conversation with Mr. Morris at that

3   time?

4   A    Yeah, I basically talked to him for a minute or so.  They

5   said that they had come up there to drink.  That was basically

6   the end of the conversation, you know, I talked to them just a

7   minute.

8   Q    Did you observe any other folks while you were there

9   coming into the area?

10  A    Not while I was there but while we were sitting down the

11  road, it actually sits — the place is on a slope, and while we

12  were sitting down around the — where you go up the slope,

13  there was a lot of cars that had come and went there.

14  Q    And how long did you have an opportunity to observe this

15  access to the motor home?

16  A    I guess before I drove up there we were probably there 30

17  to 45 minutes.

18  Q    And he said that they were drinking.  Did you see any

19  beverages there?

20  A    I never did get out of my vehicle.  They had their door

21  open and I stayed in my vehicle and they basically were sitting

22  in there, there's furniture in there, like a couch and, you

23  know, a dinette or whatever.  So I talked to them from there.

24  I never — I never approached their vehicle, I just pulled up

25  close enough to where I could talk out my window.

1  Q    Now, did Bart Morris have an interest in that election

2  that you know of?

3  A    He supported candidates that were in the -- that were

4  running basically in the county and the city, because he done

5  the garbage work for them.  So I guess he had an interest as

6  far as his business went.

7  Q    Who was giving him contracts at that time?

8  A    Well, I know he had a contract with the city and the

9  county to do all their garbage, because that's where the trucks

10 would dump their -- you know, when they pick it up from the

11 city customers, they would dump at his transfer station.

12 Q    And were you able to determine which candidates he was

13 aligned with in May of 2002?

14 A    The best of my knowledge, Jennings White.

15 Q    And Bart Morris, he wasn't on the ticket as a candidate

16 himself for any office?

17 A    No, sir.

18 Q    Now, you identified earlier Mr. Stivers, Williams Stivers,

19 and Paul Bishop as being there in early voting.  Were you able

20 to determine who their candidate of choice was in the election?

21 A    Yes, sir.

22 Q    And who were they supporting?

23 A    Freddy Thompson.

24 Q    And did Jennings White have his constituents there, his

25 election officers in the early absentee voting as well?

TODD ROBERTS - DIRECT - MR. SMITH                    9

1  A    Yes, sir.

2  Q    And who did he have inside working in the Board of

3  Elections in 2002?

4  A    Lester Harmon and Vernon Hacker.

5         MR. SMITH:  I would like to look at some photographs

6  if we could.  I'd like to hand the witness, Your Honor,

7  Government's Exhibits P19 through P30.

8         THE COURT:  Yes, sir.

9  BY MR. SMITH:

10 Q    Do you recognize those, Mr. Roberts?

11 A    Yes, sir.

12 Q    And what are those?

13 A    Those are additional photographs that I turned over to the

14 FBI.

15 Q    And were these taken, again, during the same early voting

16 period there outside the temporary office of the county clerk?

17 A    Yes, sir, they was.

18        MR. SMITH:  I would move for the introduction of

19 Government's Exhibits P19 through P30, Your Honor.

20        THE COURT:  Any objection?

21        Those exhibits will be admitted at this time.

22        MR. SMITH:  I would ask for permission to publish

23 those at this time.

24        THE COURT:  They may be published.

25 BY MR. SMITH:

TODD ROBERTS - DIRECT - MR. SMITH                    10

1  Q     Picking up at P19, do you recognize anyone in this
2  photograph?
3  A     Yeah, the individual standing there with the cigarette in
4  his mouth with a ball cap on with the Adidas shirt is Charles
5  Wayne Marcum.  And the lady that's facing him there with her
6  back to the picture or sideways in the picture, she's a
7  Roberts, but I don't know her first name, I can't think of it
8  at this time.
9  Q     Now, Charles Marcum, he was — was he the incumbent
10 holding the office of jailer at that time?
11 A     That is correct.
12 Q     And was he also aligned in supporting one of the county
13 clerk candidates?
14 A     Yes, sir.
15 Q     And which county clerk candidate was he aligned with?
16 A     Freddy Thompson.
17 Q     Go on to P20.
18 A     In that photograph, starting to the left of the picture is
19 Charles Marcum's daughter, Lee Lee.  And the girl — the
20 blonde-headed girl next to her is his granddaughter, I think
21 they call her Nay Nay, I'm not real sure of her full name.  And
22 then the gentleman sitting there with the cap on is one of
23 Charles's relatives, Buzzy Marcum.  And the individual there in
24 the right lower corner is Charles Marcum, the jailer.
25 Q     At that time, Officer, as you were a police officer at the

1  time, did they have any rules regarding how close candidates

2  could be to the polling places?

3  A    Within 500 feet of the polling and election area.

4  Q    So anyone, whether candidate or not a candidate, shouldn't

5  be electioneering within that distance?

6  A    No, sir.

7  Q    And that was what was enforced at the time that you were

8  taking these photos?

9  A    Yes, sir.

10 Q    Let's move on to P21.

11 A    The individual there leaned over is the Roberts lady, I'm

12 not sure of her first name.  And the other lady there was

13 somebody they brought in, but I'm not sure exactly of her name.

14 Q    You said earlier that there was a 15-passenger van.  Did

15 you take any photographs of the 15-passenger van?

16 A    Yes, sir, they're in here.

17 Q    Okay.  Let's move on to P22.

18 A    In that photograph, the individual with the white cap on

19 is Bill Ed Sizemore.  At the time he was the chief deputy

20 jailer under Mr. Marcum.  And the other individuals, the

21 photograph is somewhat blurred on that so I can't really make

22 out who they are, but they were people that had been brought in

23 there that they took them to vote.

24 Q    Let's go on to P23.  It appears to be a duplicate.

25 A    That is a picture, again, of Charles Wayne Marcum and the

1   Roberts lady.

2   Q    P24.

3   A    The gentleman with the white ball cap on smoking the

4   cigarette is Bill Ed Sizemore, he's the chief deputy jailer.

5   Directly in front of him is Charles Marcum's daughter, Lee Lee,

6   and to the right of Mr. Sizemore is Jerry Sizemore with the

7   black cap on, which is a nephew by marriage to Charles Marcum,

8   the jailer.  The lady that's got her back to the picture, the

9   blonde-headed lady, is Mr. Sizemore's wife.  And then the two

10  individuals behind Mr. Sizemore is Carol Fisher, and that's her

11  husband there, I'm not sure of his name.  But they live there

12  in Manchester.

13  Q    Go on to P25.

14  A    Again, that is a picture of Jerry Sizemore.  And the

15  individual behind him with the ball cap is Bill Ed Sizemore,

16  the chief deputy jailer.

17  Q    P26.

18  A    That is the picture of the 15-passenger van, the license

19  plate number on that van, which --

20  Q    Did you seek to investigate where this van came from?

21  A    Yes, sir, I did, I actually ran the registration of the

22  van.

23  Q    What did you learn?

24  A    It belonged to Cornett Chevrolet and Pontiac there in

25  Manchester, because we inquired with the Chevrolet dealer.

 1  They had loaned it out.  They didn't know it was being used for

 2  that purpose.

 3  Q    And did they tell you who they loaned it to?

 4         MR. RICHARDSON:  Objection.

 5         MR. WHITE:  Objection.

 6         THE COURT:  Sustained.

 7  BY MR. SMITH:

 8  Q    After you reported and had this conversation with Cornett

 9  Chevrolet, what happened?

10  A    This particular van was not used anymore, but they managed

11  to get some other vehicles from other places.

12  Q    And what happened to this van?

13  A    They returned it back to the Chevrolet dealer.

14  Q    Okay.  P27.

15  A    That is a copy of the van that was being used that was in

16  the previous picture, picture of the registration tag.

17  Q    And is this a parking lot near the polling place?

18  A    Yes, sir.  These other vehicles here was used to — people

19  were using them to bring people to vote, because you notice the

20  way the striping is here, they were actually congesting the

21  traffic way of downtown Manchester, they were pulling in there

22  just anywhere they could jump out and run in there to the

23  voting precinct.

24  Q    P28.

25  A    That is a picture — the gentleman with the Harvick shirt

TODD ROBERTS - DIRECT - MR. SMITH                    14

1    on is Bobby "Red" Sams.  I know her face but I don't know the

2    lady's name, but that was somebody that he'd brought in there

3    to vote.  The individual behind him is Charles Wayne Marcum,

4    again, with the ball cap on.

5    Q    Now, did he have a candidate that he was supporting in the

6    county clerk's race?

7    A    Which one?

8    Q    Bobby "Red" Sams.

9              MR. BALDANI:  Objection.

10             THE COURT:  Overruled, if you know.

11             THE WITNESS:  Yeah, I assume, but I don't -- I don't

12   know exactly which one.

13   BY MR. SMITH:

14   Q    How often did you see Bobby "Red" that day?

15   A    He was a -- he was a frequent visitor to the clerk's

16   office.

17   Q    What do you mean by "frequent"?

18   A    Probably 20 or 30 times, just what I observed.

19   Q    Is that within one day or more than one day?

20   A    In one day.

21   Q    And this polling place was open how many days?

22   A    I'm not real sure.  I'm wanting to think two weeks prior

23   to the election.

24   Q    Let's move on to P29.

25   A    The people in that picture is -- starting from the right

1    is Bobby "Red" Sams.  And next to him is — I know her as Lee

2    Lee, she's Charles Marcum's daughter, the jailer's daughter.

3    And then the guy in the white shirt facing the individual in

4    the cap is a Bowling.  He was one of them that was hauling

5    voters, but I'm not sure of his name, first name.  The other

6    two individuals in the picture was somebody they had brought in

7    to vote.

8    Q    P30.

9    A    That is a picture of Charles Marcum's daughter again, Lee

10   Lee.  And the individual with his back there is another

11   individual, he's a Bowling also, I think his name is Jackie.

12   Q    These photos that you took, was this just in one day?

13   A    Yes, sir, it was.

14   Q    And why didn't you take pictures over each of the days

15   that this was going on?

16   A    When I talked to Special Agent Johnson, he told me to try

17   to get pictures of the people that was frequenting the polling

18   place but to also be careful as to not to try to impede the

19   election process, the electoral process.  So we made the

20   decision to take them that one day and that was it.  And the

21   pictures that I took was of people that were there frequent, I

22   mean, that was bringing people, coming and going.

23   Q    Now, during this 2002 election, did you have conversations

24   with Vernon Hacker?

25   A    Yes, sir, I did.

 1  Q    And did he tell you or make any explanation to you about

 2  what was going on?

 3          MR. WESTBERRY:  Objection, Your Honor.

 4          THE COURT:  All right.  You may need to approach on

 5  this.

 6      (Whereupon, the following discussion was had between the

 7  Court and counsel at the bench, out of the hearing of the

 8  jury.)

 9          THE COURT:  Mr. Smith, is it your position that

10  statements by Mr. Hacker would be the statements of a

11  co-conspirator?

12          MR. SMITH:  Yes, Your Honor.  We have identified him

13  already in our opening statement as an unindicted co-

14  conspirator and of course I expect that he will testify in this

15  case, and this officer has identified what he suspected to have

16  been vote buying going on there at this place where Vernon

17  Hacker was situated.

18          THE COURT:  All right.  Would this be a statement

19  made in furtherance of the conspiracy by Mr. Hacker?

20          MR. SMITH:  Well, I believe that he will make an

21  answer and I believe that he would say something to the effect

22  that Vernon is trying to express to him what interest he had in

23  doing this as far as helping in the election.  And, obviously,

24  we have Todd Roberts, who's in an interesting situation as

25  well, Your Honor, because he has also been convicted and

1    prosecuted in a prior federal case.  He is someone who, at this

2    time — and I believe that after cross-examination it's going

3    to be fleshed out and it's a little more difficult without

4    leading to get into those things, but, obviously, he had a role

5    in this.  And we have two factions going at each other, and I

6    believe that conversations with Mr. Roberts during this time

7    period would have been statements that were made by unindicted

8    co-conspirators, and I believe that we can show — again, I'm

9    not real sure what his answer will be, but I believe he did

10   have some conversations with Mr. Hacker.  And I believe that

11   those conversations would have been, at that time, between two

12   people who were part of this conspiracy and that those

13   conversations would have been advancing, promoting, or somewhat

14   in an effort to conceal this illegal operation.

15          THE COURT:  All right.

16          Mr. Westberry?

17          MR. WESTBERRY:  It appears he has stated his purpose

18   and we have a better understanding.  I think we can withdraw

19   the objection, and I apologize.  I just wanted to have a better

20   idea.

21          THE COURT:  All right.  I would be inclined to

22   conditionally admit it.  I may have to order that it be

23   stricken later, but at this point, I'll allow the question to

24   be asked and answered.

25          MR. BALDANI:  Your Honor?

1          THE COURT:  Yes, sir, Mr. Baldani.

2          MR. BALDANI:  I objected to the question of Mr. Sam

3   basically because I thought it elicited hearsay, who was he

4   supporting, and you overruled it.  But I wanted at least you to

5   understand I think there's some people that are so obviously

6   for one side or another they make it clear, you know, by their

7   actions, but it seemed to me that that individual -- even

8   though he wound up not knowing, it seemed to me that he would

9   have asked -- you know, Sams would have said, I'm for this side

10  or that side.  So I just wanted to explain my reasoning in case

11  it comes up again and I object so you know my reason.

12         THE COURT:  Of course, many times that type of an

13  answer, a person expresses their belief, and it can be based on

14  a number of things, what they observe, and that's the type of

15  question that can be fleshed out on cross-examination.

16         MS. HUGHES:  Your Honor, with respect to the -- I

17  understood that you had already ruled on the issue of the

18  co-conspirator statements.  I mean, are we going to need to

19  make an objection to preserve that every time?

20         THE COURT:  No, no, you are not.  I wasn't sure about

21  Mr. Hacker's role.

22         MS. HUGHES:  Okay.

23         THE COURT:  That was what I was not sure about, and

24  that's why I wanted to make sure that I understood what the

25  government's position was before we went forward.

TODD ROBERTS DIRECT - MR. SMITH                    19

1          MS. HUGHES:  I just wanted to make sure I didn't have

2     to jump up every time someone talks about my client.

3          MR. HOSKINS:  Your Honor, my concern is that it seems

4     to me that the evidence is pointing towards a number of

5     independent conspiracies and that while Mr. Hacker may have

6     been a conspirator with some people, there doesn't seem to be

7     anything yet to show that he's a conspirator with my client or

8     any of the defendants.

9          THE COURT:  Perhaps not, but, of course, the

10    government doesn't have to establish its case just through one

11    witness and we have to put the pieces together at some point in

12    time.  So that's why I'll allow this line of questioning

13    subject to being revisited at some later point.

14          MR. BAYER:  So he can raise the issue again later on?

15          THE COURT:  Something like that, yes.

16       (Whereupon, the following proceedings continued in open

17    court.)

18          THE COURT:  Thank you, Counsel.

19          Mr. Smith, you may continue.  Do you need to have the

20    last question read back?

21          MR. SMITH:  Let me — That would be fine, Your Honor.

22          THE COURT:  All right.  We can find that.

23       (Whereupon, the court reporter read the record as

24    requested.)

25          THE WITNESS:  Answer it?

TODD ROBERTS - DIRECT - MR. SMITH                    20

1  BY MR. SMITH:

2  Q    You may answer.

3  A    Yes, sir, he did.

4  Q    And what do you recall the conversation —

5  A    I basically inquired to him as to why all the traffic was

6  over there, and he said that they were trying to get a jump on

7  early voters to make sure or secure that they got their vote

8  before the other individuals got to it and that they were, you

9  know, basically split.  He explained to me who was for who as

10 far as the officers was and —

11 Q    Tell us what he told you.

12 A    He said that him and Lester Harmon was working for

13 Jennings White and the people on Jennings's ticket and that

14 Paul Bishop and William Stivers was there working at the

15 direction of Doug Adams for Freddy Thompson and the ticket that

16 they had put together.

17 Q    Did Vernon have any financial interest with Jennings White

18 at that time?

19 A    Yes, sir, he did.

20 Q    And what financial interest did he have with Jennings

21 White?

22 A    He cleaned the county court clerk's every night.  Jennings

23 was the clerk, so he gave him the job cleaning the clerk's

24 office.

25 Q    Who other jobs did Vernon Hacker hold at that time?

1  A    He was the director of the 9-1-1 center, the emergency

2  call center for the police and fire and EMS, as well as a city

3  council member.

4  Q    And did he have any other jobs?

5  A    Yes, sir, he drove a school bus for the Clay County Board

6  of Education.

7  Q    So he was employed both by Jennings White and Doug Adams

8  and the school board?

9  A    Yes, sir, he was.

10 Q    Did he talk to you about any concern that he had about his

11 job with the school board?

12 A    Yes, he did.

13 Q    What did he say?

14        MR. HOSKINS:  Your Honor, can we approach?

15        THE COURT:  Yes, you may.

16     (Whereupon, the following discussion was had between the

17 Court and counsel at the bench, out of the hearing of the

18 jury.)

19        MR. HOSKINS:  Your Honor, I'm going to object to this

20 question and I'm also going to ask the Court to move to strike

21 the last response about what Vernon Hacker said.  While he may

22 be a co-conspirator, the government has alleged that, that

23 statement was not made in furtherance of the conspiracy in

24 being made to this police officer.

25        THE COURT:  All right.  Any other basis for that?

1          MR. HOSKINS:  No, Your Honor.

2          MR. ABELL:  Judge, may I add --

3          THE COURT:  Yes, sir.

4          MR. ABELL:  -- the statement -- this is a description

5     of what is alleged to be, I would argue, competing factions.

6     It's a description of activity.  Now, if he's recruiting him,

7     perhaps a description could be in furtherance of a conspiracy,

8     but a description of conspiracy is not aiding or moving toward

9     its goal, it's just describing it, unless it's for the purpose

10    of recruiting.  We've got no indication of that.  It's not

11    advancing the goals of this conspiracy at all and, therefore, I

12    respectfully submit it can't be in furtherance of it.

13          MR. SMITH:  Judge, I don't think there's a better

14    illustration of showing a coverup than when you got men out

15    here violating criminal law in town and they're talking to the

16    city police telling them why they're doing this and the city

17    police is obviously not doing anything to stop it.  It's

18    because it's part of the coverup, that's why it's advancing

19    this conspiracy, and he needed to know, because that was his

20    man.  He said Jennings White was my man, and I'm not going to

21    be -- you know, this is statements certainly in the coverup in

22    my opinion and that's why I'm offering it.  If it's not, we'll

23    withdraw it and move on to something else.

24          THE COURT:  No, I'll overrule the objection.  I think

25    under the circumstances here that it certainly can be construed

 1  as furthering or advancing the conspiracy when this police

 2  officer is observing this conduct and there's this explanation

 3  given as to what's going on by a person that's alleged to be

 4  part of this whole scheme.  So I'll overrule the objection.

 5      (Whereupon, the following proceedings continued in open

 6  court.)

 7          THE COURT:  All right.  Thank you.  The objection

 8  will be overruled.

 9          Mr. Smith, you may proceed.

10  BY MR. SMITH:

11  Q    I apologize, Your Honor.  I'm having a tough time

12  reconstructing that question.  If the Court could read the last

13  question back, Madam Reporter?

14          THE COURT:  Yes.

15      (Whereupon, the court reporter read the record as

16  requested.)

17  BY MR. SMITH:

18  Q    You may answer.

19  A    He told me that he had pressure applied to him, as well as

20  his wife.  I failed to mention that she was a cook for the

21  public school system as well, that if he didn't back off in the

22  election of county court clerk that he would lose his bus

23  route, as well as his wife would be transferred or terminated.

24  Q    Despite that statement, did he continue to tell you that

25  he was going to support Jennings White?

TODD ROBERTS - DIRECT - MR. SMITH                    24

1   A    Yes, sir, he did.

2   Q    And did you observe him continuing to support him there at

3   the early voting as an election officer during that early

4   voting?

5   A    He was one of the officers who were voting these people

6   that were going in to vote.

7   Q    Now, did Jennings White call on you at some point before

8   the primary election to meet with a person that you had

9   arrested for drugs —

10  A    Yes, sir.

11  Q    — prior to the election?

12  A    Yes, sir.

13  Q    And tell us about that, Mr. Roberts.

14  A    I had received a call from him on my cell phone asking me

15  to stop by Patty's Place, which is a restaurant there in

16  Manchester, a buffet-style restaurant, and coincidence I just

17  had left there probably about 15 or 20 minutes before that, I

18  usually eat there or one of the other places in town, and asked

19  me if I could come by there.  He didn't explain on the phone

20  for any legitimate reason.  So I went by there, and when I

21  walked in he was sitting there with Eugene Stewart, Moose is

22  his nickname, and —

23  Q    Let me ask you about that name.  We've heard Kenny Day's

24  testimony previously in this case and there was mention of a

25  partner of his named Eugene Stewart.  Is there any relationship

1  between those two individuals?

2  A    They are the same.

3  Q    And has he been later prosecuted by federal authorities?

4  A    Yes, sir, he has.

5  Q    Okay.  So tell us what happened when you went down to

6  Patty's Place.

7  A    When I walked in, Mr. Stewart was sitting there with

8  Jennings White, as well as Edd Jordan, the sheriff, and I had

9  had an occasion to raid Mr. Stewart prior to that and seized

10 somewhere around approximately $80,000 in cash as well as

11 paraphernalia and stuff related to the drug trade.  And we also

12 confiscated a safe that was locked that we couldn't open, so we

13 took it into custody to get a court order to open the safe.

14 And they inquired to me would I object to returning his stuff,

15 his property that was in that safe that wasn't contraband as he

16 was going to help them in the election.

17 Q    So who is "they"?  Who approached you as assistant chief

18 of police to return this drug dealer's property?

19 A    Jennings White and Edd Jordan.

20 Q    And they said that this was so he would help them in the

21 election.  What help were they expecting him to give them in

22 the election?

23 A    Buy votes for them.

24 Q    And was there any discussion about where he was going to

25 buy and what was he going to do with the election to help them?

```
 1  A    No, they basically — that was the extent of their
 2  conversation with me, but they continued to talk.  I told them
 3  that I had turned the money and the case over to the FBI and
 4  the ATF, because when I turned it over to them, I explained to
 5  them that if I kept it in my custody that the local courts
 6  would more than likely return it before the case could ever be
 7  taken care of or disposed in the usual manner.
 8  Q    So did Jennings White in your presence make a
 9  representation to Eugene Stewart that he was going to come
10  through for him?
11  A    Yeah, he told him he would try to help him, but I told him
12  I didn't —— that it was in federal court, that it —— you know,
13  and it was out of my hands, I couldn't release nothing without
14  a court order.
15  Q    Did you tell that to Mr. Stewart?
16  A    Yeah, he was sitting there also.
17  Q    And Jennings White said otherwise?
18  A    He said he would see what he could do, but he never did
19  get his stuff returned.
20  Q    Well, did Eugene Stewart help in the election of Jennings
21  White?
22  A    To my knowledge, yes, he did.
23  Q    And what did he do to help Jennings White in the election?
24  A    He was working a precinct down in the lower part of the
25  county, the Allen precinct.
```

TODD ROBERTS - DIRECT - MR. SMITH                     27

1   Q    And what was he doing down in the Allen precinct?

2   A    He was bringing voters in to vote.

3   Q    Was he given any resources by Jennings White?

4   A    That, I don't know for sure.

5   Q    Did Jennings White tell you he had given him some

6   resources?

7   A    He told me that he was taking care of his money down

8   there.

9   Q    Did he say how much money he had given him to take care of

10  down in the Allen precinct?

11  A    The best of my knowledge, it was $5,000.

12  Q    Now, this case that you say you took this money from this

13  drug dealer, what happened to that case, Mr. Roberts?

14  A    The actual case was brought in Clay –– the Clay court

15  system, started out in district court, and at a preliminary

16  hearing, the district judge Oscar Gayle House dismissed the

17  case.  And then we proceeded in circuit –– or federal court,

18  I'm sorry, with the case, and then the magistrate judge upheld

19  the ruling of the district court at the time, the best I

20  remember exactly how it happened, but it was disposed of.

21  Q    So he didn't get convicted on that?

22  A    No, sir, not on that particular case.

23  Q    Did you have an individual in your department by the name

24  of Mike Bishop?

25  A    Yes, sir, I did.

TODD ROBERTS - DIRECT - MR. SMITH                28

1    Q    And is Mike Bishop any relation to Paul Bishop?

2    A    That's his son.

3    Q    And his mother, what's her name?

4    A    I can't think of it at this time, but — I know her, but I

5    can't think.

6    Q    Does she work in town somewhere?

7    A    Yes, sir, she does.

8    Q    Where does she work?

9    A    She's a secretary for the superintendent at the Clay

10   County Board.

11   Q    And who was the superintendent she served?

12   A    Mr. Doug Adams.

13   Q    And how long did she work for him?

14   A    I'm wanting to think she took that job right after the

15   election, somewhere in close proximity —

16           MR. BAYER:  Objection, Judge, speculation.

17           THE COURT:  He can testify based on what his

18   knowledge is subject to cross-examination.

19           You may answer.

20           THE WITNESS:  Best of my knowledge —

21   BY MR. SMITH:

22   Q    You said she took the job just after the election.  Which

23   election are you referring to?

24   A    The 2002 election.

25   Q    And how long did she work for Superintendent Adams?

1    A    To my knowledge, I've been gone there since '07, so she

2    was still working then.  So I don't — I don't know if she's

3    still there or what her status is.

4    Q    And how did Mike Bishop start out employed for the

5    Manchester police?

6    A    He started out as a school resource officer at the Clay

7    County High School.

8    Q    Do you know when that was?

9    A    I'm not — I'm not sure.  I think it was 2001 maybe.

10   Q    And did he get any promotions while you were the assistant

11   chief?

12   A    Yes, sir, he did.

13   Q    And could you tell us the promotions he got?

14   A    He was promoted to sergeant.

15   Q    From a school resource officer?

16   A    Yes, sir, that is correct.

17   Q    Is that a common step up for a school officer, to go up to

18   sergeant?

19   A    No, not at the time.

20   Q    And then where did he go from there?

21   A    He went from there to assistant chief of police.  They

22   created another assistant chief of police position within the

23   police department.

24   Q    And did he take on any other promotions after that?

25   A    Yes, sir, he was acting chief of police.

TODD ROBERTS - DIRECT - MR. SMITH                    30

1   Q    When did he become chief of police?

2   A    It was August of 2005, the best I remember.

3   Q    Did Mike Bishop — you being assistant chief of police,

4   did you serve under him while he was chief of police?

5   A    Yes, he was appointed by the mayor.  The present chief of

6   police, Dennis Rice, had chose to retire and there was a

7   heated-up debate about the chief position, whether it would be

8   given to me or Mr. Bishop.

9   Q    How did Mr. Bishop manage to get that position over you,

10  Mr. Roberts?

11  A    He used his connection with Mr. Douglas Adams.

12  Q    And how do you connect Mr. Adams having any power over the

13  police department?

14  A    Political.

15  Q    Well, connect the dots for us.

16  A    The mayor was anticipating a reelection bid in the

17  upcoming mayor's race.  Mr. Adams had already put together a

18  ticket that had actually won the election with Mr. Thompson and

19  various other individuals down the ticket.  So he was

20  considered the most powerful political figure in the county at

21  the present time.  And the mayor and his son, Kennon White, was

22  trying to appease Mr. Adams so that he would support them in

23  the upcoming 2006 election.

24  Q    So the Whites were trying to give Mr. Adams support?

25  A    That is correct.

1  Q    And why would Mr. Adams have an interest in Mike Bishop

2  being chief of police?

3  A    Mr. Bishop and his father, Paul Bishop, were good friends

4  of Mr. Adams's and then they helped in the elections, the

5  previous elections.  Mr. Paul —— or Mr. Mike Bishop was also

6  election officer at the Allen precinct —— or not the Allen

7  precinct, I'm sorry, it was the precinct down in the lower end

8  in Oneida, but it's not the Oneida precinct, it's another one

9  that's down there.

10 Q    Was there any favoritism shown to Mr. Mike Bishop when he

11 started out at the police department?

12 A    Yes, when these individuals started out as school resource

13 officers, Mr. Bishop started out at a higher pay rate than a

14 regular patrolman that had been on the road for several years.

15 Q    How did these school officer positions become created at

16 Manchester?

17 A    We wrote the grant within the police department.  I

18 actually was involved in writing the grant along with some

19 people that worked at the school board.  At the time the first

20 initial grant was wrote, Charles White was the superintendent

21 of schools.  And we were awarded an officer that started out

22 initially was Clifton Jones, and we took a drug dog and so

23 forth into that.  And then we got awarded a total of four

24 positions within the school system for school resource officer.

25 Actually, we had more than anybody in Eastern Kentucky.

1  Q    Now, this money, is that federal money?

2  A    Yes, sir, it is.

3  Q    So all these federal dollars come to Manchester, and how

4  does the school board play a part in that?

5  A    The school board actually reimburses -- there's a match,

6  there's a 25 percent match on the grant.  The school board

7  reimburses the city for the 25 percent match.  The school board

8  has a -- or did in this particular case have a big say in the

9  selection of who these officers would be.  They were paid by

10  the City of Manchester as police officers, but the school board

11  would reimburse the city for the 25 percent match of their

12  salary, as well as any other expenses incurred by them.

13  Q    So what did the school resource officer do?  You said you

14  had four of them.  What did they do?

15  A    Some of them were stationed at particular schools, but

16  they traveled around to all the schools in the county to try to

17  keep down drugs or any type of violence or somebody that may

18  come on the property as a predatory or something that wanted to

19  do harm to some of the staff or some of the school children.

20  Q    And what did Mike Bishop do?

21  A    His position was at the high school.  He basically was out

22  at the high school.  He ended up being the supervisor of the

23  school resource officers.

24  Q    Was he the top paid man in the school resource position?

25  A    Yeah, he was one of the top.

1  Q    So he took that position, if you recall, in 2001?

2  A    I'm sorry, I couldn't —

3  Q    I wrote down you had mentioned that he took that position

4  in 2001.

5  A    The best I remember he started about 2000 or 2001,

6  somewhere in that timeframe.

7  Q    How long did he keep the position?

8  A    He held it up to I guess around 2004 or '05.  I think he

9  came on board at the police department as a sergeant and

10  basically drifted away from the school police job.  He was

11  always on the payroll, so to differentiate when he, you know,

12  migrated out of that position into another one, I don't know

13  that, you know, exactly the timeframe.

14  Q    Now, you made a statement that Mike Bishop got the

15  position of the chief of police because he was a Doug Adams

16  supporter.

17  A    That is correct.

18  Q    How do you know that?

19  A    I know it from various individuals that have told me that,

20  including the mayor and the mayor's son, Kennon White.

21  Q    Did you talk to Mike about it?

22  A    Yes, sir, I did.

23  Q    What did he say to you?

24  A    He basically came in — you know, I got along good with

25  Mike, I never had no problem with him, so he basically came in

 1  to try to console me to the fact that he was going to get the

 2  position.  He just basically said that it was their time, that

 3  the Whites had had it, they were in power, they had lost it,

 4  now they had it, and, you know, he basically was trying to make

 5  amends with me.

 6  Q    Now, you said he helped Doug Adams in the election, you

 7  talked about him being an election officer.

 8  A    That's correct.

 9  Q    Did he tell you what he did with Doug Adams as an election

10  officer?

11  A    He told me that he bought votes at the precinct down in

12  Burning Springs — or not Burning Springs, but Oneida, I'm

13  sorry.

14  Q    What else did he tell you?

15  A    He told me about their — after the election, he came in

16  and sat down and told me about their organization, how they put

17  it together and so forth.

18  Q    How did he say they put it together?

19  A    They would have meetings down at his house.  He had a big

20  metal garage behind his house, a red garage or a metal

21  building, and they would all meet there in his building.  He

22  had a kitchen, you know, a cooking area in the garage and they

23  would have meetings there and decide who was going to do what

24  in the election and pool their money together and put their

25  organization and ticket together.

1  Q    Did he ever tell you who was in with Mr. Adams?

2  A    As far as on the ticket?

3          MR. BALDANI:  Excuse me, Your Honor.

4          THE COURT:  Yes, sir.

5          MR. BALDANI:  I just wanted to object on the record

6  for this.

7          THE COURT:  All right.  I'll overrule the objection.

8  You may proceed.

9  BY MR. SMITH:

10  Q    You may answer.

11  A    Yes, he told me that there was Freddy Thompson in the

12  clerk's race, Charles Marcum in the jailer's race, and Tim

13  Couch for state representative in the state representative's

14  race.

15  Q    Did he tell you any other details about how they were

16  organized?

17  A    Yes, he told me how they pooled the money together at that

18  particular function at his house.

19          MR. BALDANI:  Your Honor, may we approach for a

20  moment, please?

21          THE COURT:  Yes, you may.

22      (Whereupon, the following discussion was had between the

23  Court and counsel at the bench, out of the hearing of the

24  jury.)

25          MR. BALDANI:  Your Honor, I'm not trying to beat a

1    dead horse as far as an objection, but one thing I do want to
2    emphasize with regard to Mike Bishop, Mike Bishop wasn't even
3    at the meeting that now he's talking about what he heard and
4    relating it to Todd Roberts.  So I understand you overruled
5    previous objections based upon co-conspirator statements, but
6    Mike Bishop wasn't even there.  And I'm assuming the government
7    probably is going to call Mike Bishop.

8            I think the harm in this, Your Honor, is basically we
9    got Mike Bishop — or this witness saying what Mike Bishop
10   said, and Mike Bishop is reporting what another person said,
11   and so I don't think it's in furtherance of the conspiracy.
12   And I think it's so many levels of hearsay that if the people
13   that are actually there are going to testify, I think it's
14   extremely unfair to us to let witness after witness after
15   witness relay the same thing when the government is going to
16   call the person that was actually present.  And I don't know if
17   you knew that Mike Bishop didn't even claim to be at that
18   meeting.  That's why we objected again.

19           THE COURT:  Well, I understood based on what this
20   witness said that Mr. Bishop indicated he was there at these
21   various meetings that had taken place.  Am I mistaken, Mr.
22   Smith?

23           MR. SMITH:  That seems to be the way he's describing
24   it.  Now, I will say the context of this conversation is Mike
25   is consoling him and trying to bring him back into the fold of

1   things, the enterprise being used.  Factions are broken up,

2   they're coming back together, they're bringing about a new

3   evolution in Clay County, the Whites are out, now you got to

4   get with the other program.  Mike is explaining to him this is

5   how the program works.  And I think it is in furtherance of the

6   conspiracy.

7           THE COURT:  Under 801(d)(2)(E), I think all elements

8   have been satisfied to this point.  Now, obviously I know

9   you're going to be cross-examining him on these issues, but

10  under the standard that this Court will consider, preponderance

11  of the evidence certainly has been satisfied.  This witness can

12  testify to those issues made by a person that does appear to

13  have been involved in this conspiracy, attempting to bring the

14  factions back together to keep the conspiracy going.  So I'll

15  overrule the objection at this time.

16          MR. BALDANI:  Could I say one other thing?  And I'm

17  not trying to belabor it, Judge, but you inquired of Mr. Smith

18  was Mike Bishop there.  And I seemed —

19          THE COURT:  What I was attempting to clarify was I

20  understood the witness to be saying that he was present at some

21  of these meetings.

22          MR. BALDANI:  There's one big meeting that we're

23  talking about.

24          THE COURT:  Even if he were not present at the

25  meetings, he obviously or he appears to have been a part of the

1  conspiracy and was making these statements to further or

2  advance the conspiracy by keeping it together.  So it does

3  appear to me that -- it does appear to me that the statements

4  meet all of the elements under 801(d)(2)(E) that have to be

5  established.  So I'll overrule the objection.  I do understand

6  your point.

7          MR. ABELL:  Judge, may I add, I also don't want to

8  beat a dead horse, but it's just for the record.  It seems to

9  me that the testimony has established or arguably established

10  under the government's theory that a conspiracy formed

11  principally in the defeat of Jennings White.  Now, that has

12  taken place, okay.  According to this man, a new group is in

13  charge and the purposes of the initial conspiracy have been

14  accomplished, its life has ended.  And the Court has described

15  the starting up of what sounds to me like a new conspiracy

16  under the government's theory and, therefore, I would say this

17  would not be in furtherance of this overall conspiracy that is

18  the government's principal theory.

19          THE COURT:  I understand your point.  You're talking

20  about discreet conspiracies, arguably discreet conspiracies,

21  but I think the government is offering this evidence, at least

22  in part, to refute the claims that have been made that these

23  folks couldn't have possibly conspired together because they

24  are part of different political factions.  So I think not only

25  is it relevant to the overall conspiracy but I think it's also

TODD ROBERTS - DIRECT - MR. SMITH                    39

1  relevant to rebut that assertion that's been made.  So I'm

2  going to allow the testimony.

3       (Whereupon, the following proceedings continued in open

4  court.)

5            THE COURT:  All right.  Thank you.

6            Mr. Smith, you can continue, the objection is

7  overruled.

8  BY MR. SMITH:

9  Q    You may continue, Mr. Roberts.

10           THE COURT:  Do you recall the last question?

11           THE WITNESS:  Could you read it back to me, please?

12       (Whereupon, the court reporter read the record as

13  requested.)

14           THE WITNESS:  He told me about meeting at his place

15  behind his house, that the candidates would meet there, as well

16  as Mr. Adams and him and his father and some of the various

17  election officers, and that they pooled money together.  And he

18  told me what those three individuals had put into the pot to

19  buy votes with.

20  BY MR. SMITH:

21  Q    And what was it that he told you?

22  A    He said that Tim Couch, the candidate for state

23  representative, had put up $40,000 and that Mr. Charles Marcum

24  had put up 40,000, he was running for reelection as the jailer,

25  and that Freddy Thompson put up 120,000.  He also said that

TODD ROBERTS - DIRECT - MR. SMITH                    40

1  there was additional candidates that put up money, but he

2  didn't go into details.  Those were the three biggest races

3  that he had an interest in that he told me about, but there was

4  additional candidates.

5  Q    And did he tell you these things as he was seeking his

6  promotion to chief of police?

7  A    Yes, sir.

8  Q    And did you change directions and begin supporting him in

9  his promotion after having this conversation with him?

10 A    No, sir.

11 Q    Did he get the promotion?

12 A    Yes, sir, he did.

13 Q    How long after this conversation did he get the promotion?

14 A    It was shortly thereafter.  I can't really tell you a

15 timeframe, but it was --

16 Q    Shortly as in days, weeks, or months?

17 A    Probably within the month or so.  There was a council

18 meeting that was coming up.

19 Q    And who was on the council at that time?

20 A    There was Vernon Hacker, Penny Robinson, Jamie Mills,

21 Sherry House, Jeff Deaton, and Darnell Hipsher.

22 Q    And did you, in your conversation with Mike Bishop, did he

23 tell you how he was going to get the support on the council?

24 A    Yes, sir, he did.

25 Q    And what did he tell you?

TODD ROBERTS - DIRECT - MR. SMITH                    41

1    A    Mr. Hipsher and Mr. Deaton both are employees of the Clay

2    County Board of Education, and Mr. Deaton actually lives in one

3    of the school's houses, he's a custodian for the middle school.

4    And he told me that Penny Robinson and her sons worked for the

5    Clay County Board at the time also as schoolteachers, and he

6    also indicated that he thought that Vernon Hacker would be for

7    him.

8    Q    And were you present when the vote was taken on the

9    matter?

10   A    Yes, sir, I was.

11   Q    And did he get approved?

12   A    Not by the council.

13   Q    And how was the vote broken on the council vote?

14   A    They basically –– they didn't –– the mayor entertained a

15   motion to vote him in and they wouldn't –– they wouldn't act

16   upon it.  And the mayor told him that he would use his

17   executive power and appoint him interim chief in the meantime.

18   He basically told them he was going to appoint him and he

19   wanted them to ratify it, and they failed to act on it.

20   Q    Were there any voting for him?

21   A    That, I can't remember exactly.  I'm wanting to think that

22   Mr. Hipsher and maybe Mr. Deaton spoke up on his behalf, but

23   there was a lot of discussion there, there was –– it got real

24   heated up.

25   Q    Did you still have your relationship with Mr. Hacker at

 1   that time?

 2   A    Yes, sir.

 3   Q    And was he on the city council?

 4   A    Yes, sir, he was.

 5   Q    And was he being vocal for you in this position for

 6   promotion?

 7   A    Really, he was trying to stay in the middle I think at the

 8   time.

 9   Q    Now, in 2002, there were two elections that year, a

10   primary and a general; is that correct?

11   A    Yes, sir, that is correct.

12   Q    And did you also have any involvement in the fall election

13   of 2002?

14   A    Yes, sir.

15   Q    Now, generally, in Clay County, we've been told that it

16   was a Republican county and that there's a big primary.  But

17   then in the fall there's not much of a race to look forward to.

18   Has that been your experience?

19   A    Yes, sir, unless it's a nonpartisan election.

20   Q    So nonpartisan being judge-type position, is that what

21   you're talking about?

22   A    Judge and school board and city council usually runs in

23   the fall.

24   Q    Did you have a city council race every four years or every

25   two years in Clay County?

1   A     I think it's every two year.

2   Q     So 2002 in the fall, do you recall there being a city

3   council race going on?

4   A     Yes, sir.

5   Q     And was there also a nonpartisan race that you recall?

6   A     Yes, sir, there was.

7   Q     What was the position sought for in the fall that you

8   recall?

9   A     School board member.

10  Q     And was there a particular race of interest that you had

11  in the fall of 2002?

12  A     Yes, sir.

13  Q     And what was that?

14  A     The school board race.

15  Q     And who was the candidates in the fall 2002 election for

16  school board?

17  A     There was the present board member, Charles Keith, who was

18  chairman of the school board, and he was being challenged by

19  Charles Dobber Weaver, who is the fire chief there in

20  Manchester, an employee of the state highway.

21  Q     And was he also a friend of yours?

22  A     Yes, sir.

23  Q     And what do you recall as far as your involvement in that

24  race?

25  A     The — my involvement in that race was they started with

1  the absentee voting again, opening up the clerk's office,

2  allowing individuals to come in and vote that were going to be

3  out of town or had some other reason or medical problem that

4  they couldn't vote on election day.  And I happened to be at

5  the clerk's office that morning, and there was the altercation

6  that took place at the county court clerk's office concerning

7  one of the election officers and the county court clerk,

8  Jennings White.

9  Q    And what happened?

10 A    The altercation took place between William "Al Man"

11 Stivers and Jennings White, who was the county court clerk.

12 Mr. Stivers was appointed to serve as a representative of one

13 of the parties as an election officer, and he came into the

14 voting precinct that morning, I was standing over in the county

15 clerk part of the office.  When you go into the office, there's

16 actually two entrances.  You can go to the right and go up to

17 where there's a desk that the people go in to license their

18 vehicle or you can go straight ahead into a double doors and

19 there's a hallway there, and that's where they had their voting

20 machine.  But it actually is all one -- one area, it's a common

21 area, open area, but there's two different entrances.  And I

22 was standing over by one of the desks talking to the ladies

23 about a prior event that happened the day before of a escapee

24 from the local federal prison that had escaped and we had

25 caught next to the middle school, they were concerned about him

TODD ROBERTS - DIRECT - MR. SMITH                    45

1  being close to the middle school.  And I heard a shouting take

2  place and — over by the absentee voting machine, and I looked

3  over and it was Mr. Stivers and Mr. White, the county court

4  clerk, they were nose to nose in a confrontation.  And

5  Mr. White turned and yelled at me and said, "This man has been

6  drinking, I want him removed from my office."

7  Q    And did you arrest him?

8  A    Yes, sir, he was arrested.

9  Q    And were those charges brought against him?

10 A    Yes, sir.

11 Q    And what happened to those charges?

12 A    They were dismissed.

13 Q    When you took upon yourself — Did you actually arrest him

14 yourself?

15 A    There was three of us that were there, and one of them

16 brought in a portable breath tester and administered it to

17 Mr. Stivers.  And my response to Mr. Stivers was, I said,

18 "Surely you've not come here as an election officer today and

19 have been drinking."  And when the officer indicated that

20 Mr. Stivers had the presence of alcohol on his breath, I told

21 him — he called his brother, his brother had arrived there by

22 then, and I told him to go on home.  And he said, "No, just

23 take me to jail," and at that time he was placed under arrest.

24 Q    Now, did you and Mr. Stivers end up in court after these

25 charges were dismissed?

```
 1   A    Yes, sir, we did.

 2   Q    How is it that you got in court with Mr. Stivers after his

 3   arrest?

 4   A    There was the hearing in which the charges were dismissed,

 5   and then following that, he filed suit against the city and

 6   myself.

 7   Q    Did he hire a lawyer?

 8   A    Yes, sir, he did.

 9   Q    What lawyer did he use?

10   A    Yancey White.

11   Q    And who's Yancey White?

12   A    He's an attorney there in Manchester, him and his wife

13   practice civil and criminal matters in Manchester.

14   Q    And who did he marry?

15   A    Annette Morgan.

16   Q    And who's her daddy?

17   A    Roy Morgan.

18   Q    And is he involved in the politics scene — politics there

19   in Clay County?

20   A    Yes, he's held several offices and then run for several

21   others.

22   Q    Do you recall if he ran for office in 2002?

23   A    Yes, sir, he did.

24   Q    Do you know what office he ran for in 2002?

25   A    County judge executive.
```

TODD ROBERTS - DIRECT - MR. SMITH                    47

1   Q    So what happened when you got served with that lawsuit?

2   A    The insurance carrier for the city, which is the Kentucky

3   League of Cities, hired two separate -- you know, they hired

4   attorneys to represent me and the city or whatever, and the

5   suit actually ended up going into mediation and we took a

6   deposition and so forth.

7   Q    Now, whose court did that lawsuit get filed in?

8   A    That was a --

9   Q    Let me ask it this way:  Who was the judge over the case?

10  A    I'm trying to think, Mr. Smith.

11  Q    If I handed you a document of the suit, would that refresh

12  your memory?

13  A    Yes, sir.

14            MR. SMITH:  If I can have just a moment, Your Honor.

15            THE COURT:  Yes, sir, you may.

16            MR. WESTBERRY:  Could we see it?

17            MR. SMITH:  Your Honor, it appears that this is a

18  document that is going to take a few moments to locate, and I

19  would just advise the Court if this factors into when you want

20  to take our break.

21            THE COURT:  That's a good idea.  We'll go ahead and

22  take our afternoon break at this time.

23            Ladies and gentlemen, we'll take about a 20-minute

24  recess.  Please keep in mind the admonitions that you were

25  given previously.  The jury will be excused for 20 minutes.

1          (Whereupon, the jury retired from the courtroom, after

2     which the following proceedings were had in open court.)

3          THE COURT:  Thank you.  We'll be in recess for

4     20 minutes.

5          (Whereupon, a short recess was had, after which the jury

6     returned to the courtroom and the following proceedings were

7     had in open court.)

8               THE COURT:  Thank you.

9               The record will again reflect that all members of the

10    jury are present.  The parties and counsel are present as well.

11              Mr. Roberts, of course, you're still under oath.

12              THE WITNESS:  Yes, sir.

13              THE COURT:  Mr. Smith, before you continue, I advised

14    counsel at the lunch break that we may be stopping sessions a

15    little early because of weather.  I'm going to let the jury

16    know we'll probably be ending about 4:00 this afternoon so

17    everyone can make it home safely.

18              Mr. Smith, you may proceed.

19              MR. SMITH:  Thank you.

20    BY MR. SMITH:

21    Q    Mr. Roberts, I believe that as we broke we were discussing

22    the civil case that got filed against the City after the arrest

23    of Mr. Stivers.

24    A    Yes, sir.

25              MR. SMITH:  I would now like to hand the witness,

TODD ROBERTS - DIRECT - MR. SMITH                   49

1   Your Honor, what has been marked as Government's Exhibit PR81.

2           THE COURT:  Yes, sir.

3   BY MR. SMITH:

4   Q    My question to you, I believe where we broke was, will you

5   take a look at this document and see if it refreshes your

6   memory as to who the Judge was over the suit?

7   A    R. Cletus Maricle.

8   Q    And is that the same R. Cletus Maricle that you see here

9   in the courtroom today?

10  A    Yes, sir.

11  Q    Now, what was the result of the suit?  How did it end?

12  A    To my understanding, it was settled at mediation.  The

13  insurance company elected to settle it as opposed to take it to

14  trial in Clay County.

15  Q    And was that a sealed matter which is not supposed to be

16  reported to your knowledge?

17  A    I don't know that for sure.

18  Q    Were you ordered by the Court not to speak about what the

19  terms of the settlement were to your knowledge?

20  A    Yes, sir.

21  Q    So the judge ordered you not to speak about what the

22  settlement terms were?

23  A    That was my understanding from our attorney.

24  Q    In the settlement of the matter, did they seek your

25  approval?

```
 1   A     No, sir, they did not.

 2   Q     Did they seek your input?

 3   A     To some degree.  They basically -- it was against our

 4   wishes that it be settled.

 5   Q     Do you recall when it was that the settlement was reached?

 6   A     The order here says September of 2003.  Somewhere prior to

 7   that, I guess before the final order was signed, we had a

 8   deposition in the case and you know there was talk amongst

 9   attorneys.

10   Q     Now, did you know Judge R. Cletus Maricle very well?

11   A     Yes, sir, I did.

12   Q     And did you know the people he associated with very well?

13   A     Yes, to some degree.

14   Q     Who do you recall being some of his closest associates?

15   A     Some of the lawyers there, Mr. Scott Madden, Ricky Bailey,

16   some of those people.  And then Mr. Stivers was a friend of his

17   also.

18   Q     Did you see them together a lot?

19   A     On several occasions, yes.

20   Q     How far back do those two go?

21   A     As far as I can remember.  I mean, as far as I know

22   through my professional experience as a law enforcement

23   officer.

24   Q     Did Mr. Stivers ever play a part in any business that had

25   any dealings with the court system?
```

1  A    Yes, sir.

2  Q    And what business did he have?

3  A    He operated the home incarceration program for the 41st

4  Judicial District.

5  Q    And is that the same district which Judge Maricle was the

6  Judge?

7  A    That's correct.

8  Q    And are you familiar with the home incarceration program

9  there in that county?

10  A    Yes, sir, I am.

11  Q    Did that affect you as assistant chief of police?

12  A    Yes, sir, it did.

13  Q    And during the time that you were working as assistant

14  chief of police, were you able to determine how that program

15  worked in Clay County and what it would cost individuals to be

16  placed on home incarceration?

17  A    Yes, sir.

18  Q    And what was the charge usually for an inmate to be placed

19  on home incarceration?

20  A    There was an initial fee that they paid, I think it went

21  up there, it fluctuated between 300-and-some dollars up to –– I

22  think at one time there toward the end it was 400-and-some, and

23  then it was like $11 a day.

24  Q    $11 a day?

25  A    Yes, sir.

1    Q     So about $300 a month?

2    A     Yes, sir.

3    Q     And the subjects that you arrested, did some of them end

4    up on that program?

5    A     Yes, sir, they did.

6    Q     Was it a widely used program in the county?

7    A     Yes, sir.

8    Q     Now, did Mr. Stivers continue to own or operate this

9    program?

10   A     He was in charge of it for a while, but I think he had

11   some problems that resulted in him having to quit it or

12   whatever.

13   Q     And who took over that program in the county?

14   A     Jo Davidson.

15   Q     And Jo Davidson, was she in any way employed by Judge

16   Maricle before she took over that business?

17   A     She was his secretary for a long time.

18   Q     How long was Jo Davidson his secretary?

19   A     As far as I know him being judge, you know, she was

20   secretary there at his office there in the courthouse.

21   Q     Did you and Judge Maricle ever have a conversation about

22   your outspokenness about arresting people on home

23   incarceration?

24   A     Yes, sir, we did.

25   Q     Tell the court and jury how you spoke out about the home

TODD ROBERTS - DIRECT - MR. SMITH                53

1  incarceration.

2  A     I had a lot of offenders that I had raided for drug

3  trafficking in the county that were on home incarceration, and

4  some of those offenders had reoffended, they were caught in the

5  process of selling drugs again and -- while they were on

6  incarceration from their home.  And I had made several

7  statements to the media and press releases or interviews to the

8  local media that these people were reoffending while they were

9  on home incarceration.  And I got a call one day to go by the

10 judge's office, that he wanted to see me.  And I went in and

11 talked to him, and he asked me that if I would -- in the

12 future, if I would refrain from mentioning the home

13 incarceration program in the news media.

14 Q     Did he explain himself about why he didn't want you

15 speaking about the home incarceration program?

16 A     He said it was a good program and he didn't want it to

17 affect or hurt the program in any way.

18 Q     So what did you do when the Judge told you not to be

19 speaking about people you were arresting being on home

20 incarceration?

21 A     I didn't speak out about the home incarceration.

22 Q     And why is that, Mr. Roberts?

23 A     Well, I mean, the circuit judge calls you to his office,

24 you know, he's the highest judicial power in the county, I

25 didn't -- you know, I didn't -- I didn't want to have no rift

1   with him.  I mean, I didn't want to have no problem.

2   Q    Now, this relationship you identified he had with

3   Mr. Stivers, did he have other means or reasons to be

4   associated with him other than this home incarceration program?

5   A    Not that I know of, other than they were, you know,

6   friends or acquaintances.

7   Q    Did you see them together a lot?

8   A    Yeah, Mr. Stivers used to frequent his office at the

9   courthouse.  You know, when we'd have a trial going on or

10  something and it would go late into the night, Mr. Stivers

11  would stay around and drive Judge Maricle home or, you know,

12  he — he made the remark one day that he was a bodyguard, so I

13  don't know.

14  Q    He told you that?

15  A    He made the remark in my presence, yes, sir.

16  Q    Was he an armed fellow, did he carry an arm on his side

17  that you noticed?

18  A    Yes, sir, he was an avid gun person.  I mean, he was all

19  the time talking about weapons.

20  Q    Now, you mentioned that this home incarceration business

21  got passed on to Jo Davidson, Judge Maricle's secretary; is

22  that right?

23  A    That's correct.

24  Q    And did you ever see them in the company of each other or

25  hear about them working together in that program as it

1  developed?

2  A    Well, they had to interact as far as in the courtroom, and

3  then they were -- they had -- you know, they were friends as

4  far as outside the courtroom and so forth, they took trips and

5  things together.

6  Q    Did they continue to be pretty close throughout the time

7  period that you were in Manchester?

8  A    Yes, sir.

9  Q    Now, where is that home incarceration business located

10 there in Manchester?

11 A    It's located on 421, south of Manchester.

12 Q    Is that the highway that leads out of Manchester to

13 Richmond?

14 A    Yes, sir, Richmond Road.  I said south.  I think that's

15 north, Mr. Smith.

16 Q    And this business, how long has it been located out there

17 at that location?

18 A    Three or four year or longer.

19 Q    And do you know how it got to be -- that the home

20 incarceration business got moved out there?

21 A    Yes, sir.

22 Q    Tell us how that happened.

23 A    Ms. Davidson and her husband purchased that residence at

24 an auction that was held there at the residence.  The gentleman

25 that owned the residence had passed away, so it was an estate

1  sale.

2  Q    And did you go to the sale?

3  A    Yes, sir, I participated in the auction.

4  Q    And how did you, as assistant chief of police, participate

5  in an auction?

6  A    I have my apprentice auctioneer's license through the

7  Kentucky Board of Auctioneers.

8  Q    And how did you become a participant in that auction?

9  A    When you get the apprentice license, you have to serve

10 under a principal broker for a term of two year because you can

11 be a principal broker, and Judge Maricle's wife, Judy, was a

12 principal broker, so I asked her to hold my license in her real

13 estate agency.

14 Q    So Judge Maricle's wife had a real estate company in town?

15 A    Yes, sir, she did.

16 Q    What was the name of that company?

17 A    It was Country Living & Associates, and then I think it

18 changed to ReMax, to one of the franchise organizations.

19 Q    And so tell us what it was that you did when you say you

20 got involved.  How did that come about?

21 A    Ms. Maricle called me and asked me if I would

22 participate –– if I wanted to participate with her in this

23 caution and help her with the sale of this property, and I told

24 her, yeah, because one of the requirements to getting your

25 principal is you have to participate in so many auctions in the

1    two year leading up to apply for the broker's position.

2    Q    So what did you do at the sale?

3    A    I was basically — on some of the personal property, I

4    actually done some of the auctioneering, and then when it came

5    down to the real estate part of it, I was a ring man, which is

6    a person who actually works the crowd to try to drum up the

7    bids or seek out people that's interested in the property and

8    convince them to bid on the property.

9    Q    And do you recall the sale itself, how active the

10   participation was at the sale?

11   A    Yes, sir, there was a lot of activity as far as the

12   personal property went, but when it went to real estate, there

13   was only a couple of bidders.

14   Q    And who were they?

15   A    The particular bidder that I had was Gilbert Moore, an

16   individual there in Manchester, and then Ms. Davidson was

17   bidding, I found out later, on the property as well.

18   Q    And how did you find out she was bidding?

19   A    After the sale was over, Ms. Maricle had disclosed to me

20   who had bought the property.

21   Q    And was Ms. Davidson present at the sale?

22   A    Yes, she was, her and her husband.

23   Q    And was there anybody calling out bids?

24   A    They worked through Judge Maricle, the best I remember.

25   He was helping work the crowd, or — you know, it was there and

1    under the carport of the property that was for sale, and he was

2    helping work the crowd, too.

3    Q    So Judge Maricle was working the crowd and calling out the

4    bids with you?

5    A    Yes, he was working whoever his bidder was, which I found

6    out later was Ms. Davidson, and my bidder was Mr. Moore, and I

7    was on one end of the carport and he was basically on the other

8    at the corner of the residence.

9    Q    So after the sale, the property went to Ms. Davidson?

10   A    That is correct.

11   Q    And then when did the home incarceration business start in

12   this property?

13   A    I'm not sure exactly.  Ms. Davidson has several children,

14   daughters, that they moved into the residential part of it, and

15   then there's a corner, like a corner office that they actually

16   run the home incarceration program out of, it's the office for

17   the CCA or whatever the name or acronym is for it, and a couple

18   of the girls worked in the home incarceration business.

19   Q    There in Manchester, were the Maricles pretty active in

20   the real estate business?

21   A    Yes, sir.

22   Q    And do you know of properties they came to own while you

23   were in Clay County at that time?

24   A    Some, yes.

25   Q    What are some of them that you recall he took ownership

1  of?

2  A    The one that Mr. Maricle is living in now up on Radio

3  Hill, it was actually purchased first by Mr. Marcum, a Charles

4  Marcum, but it's not the same Charles Marcum that -- as the

5  jailer there.  This individual lives in Jackson County.

6  Q    Does he have another name he goes by over there in Jackson

7  County?

8  A    Poodle, I think is his nickname.  And then there was

9  another piece of property over in east Manchester -- Along with

10 being the assistant chief of police, I was also the city

11 building inspector and the emergency management coordinator.

12 So my position was to go out and inspect vacant or rundown

13 properties or abandoned properties which needed to be fixed or

14 was unsuitable to live in.  And I inspected a particular

15 property in east Manchester that had been -- there had actually

16 been a murder that had occurred in there and it had sat empty

17 since then and it had gotten dilapidated and run down.

18 Q    And who's the owner of that property?

19 A    It's my understanding Mr. Maricle and Mr. Marcum was.

20 Q    You say there was a murder in that house.  Do you remember

21 the name of the defendant that was charged or the victim that

22 was involved?

23 A    He was a nurse at the local hospital there, Steve Meng, I

24 think was his name.  He was the accused in the murder.

25 Q    Now, we were talking, I believe, on the last about the

 1   election.  We got up, I believe, to the 2002 school board race.

 2   I think that's where we left off in the elections.  Do you

 3   recall that?

 4   A    Yes, sir, I do.

 5   Q    And I think you identified the school board race being

 6   between Dobber Weaver and Charles Keith?

 7   A    That is correct.

 8   Q    And did Dobber Weaver have support of one side of the

 9   faction in the county, or do you know?

10   A    Yes, sir, he did.

11   Q    Which faction did he have supporting him?

12   A    Jennings White.

13   Q    And Mr. Keith, which faction did he have supporting him?

14   A    Mr. Doug Adams.

15   Q    And this was the particular race in where —— at which you

16   mentioned this arrest of Mr. Al Man Stivers occurred?

17   A    Yes, sir.

18   Q    And was this arrest during the early voting or during the

19   actual election day?

20   A    It was the early voting that was taking place at the

21   county clerk's office.

22   Q    Now, was Jennings White able to make any appointments at

23   that time?  He got defeated in May.  Was he still clerk?

24   A    Yes, sir, he was.

25   Q    And did he place anybody for his side of the faction in

1  the election officer slots?

2  A    Yes, sir, he did.

3  Q    And who did he put in for his side?

4  A    He put in Mr. Weaver's parents, Homer and Pauline Weaver.

5  Q    And what role were they to play with the Board of

6  Elections?

7  A    He actually appointed them deputy county court clerks to

8  serve as officers there — or representatives at the polling

9  place.

10 Q    And was that something the county clerk had the power to

11 do?

12 A    Yes, sir, he does, to my knowledge.

13 Q    And what role did he ask these two parents of Dobber

14 Weaver to play as the election was unfolding there in the fall

15 of 2002?

16 A    They were officers there at the absentee polling place

17 inside the county court clerk's office, along with Mr. Stivers

18 and I think Mr. Bishop.  I'm sorry, it wasn't Mr. Bishop, there

19 was somebody else.  I don't remember exactly, but I don't think

20 Mr. Bishop served in the fall.

21 Q    So Jennings White actually made them deputy clerks?

22 A    Yes, sir.

23 Q    Was that just for the day?

24 A    No, that was for the duration of the voting for the early

25 voting, you know, absentee, that you weren't going to be there

TODD ROBERTS - DIRECT - MR. SMITH                62

1    for election day.

2    Q    And did you have an opportunity to observe vote buying,

3    vote hauling going on in that election?

4    A    Yes, there was.  There wasn't — it wasn't prominent in

5    the early voting, but there was on election day.

6    Q    And what kind of observations were you able to make on

7    election day?

8    A    The precincts that comprised the precincts for the school

9    board race, Portersburg being one of them and Manchester, east

10   Manchester, there was activity, vote hauling, and just the same

11   as it was in the primary election, basically the same people.

12   Q    Now, you previously mentioned Bart Morris?

13   A    Yes, sir.

14   Q    Did you see him involved in anything in the 2002 fall

15   election?

16   A    I'm not sure.  I'm not sure his involvement to that

17   election or not.

18   Q    As you recall the 2002 election, were there places out

19   like the Y Hollow where the motor home was set up in the fall

20   election?

21   A    No, sir, it was not.

22   Q    When it was set up in the spring election, did you

23   actually see or identify any familiar people that were visiting

24   Bart Morris's mobile home up there in Y Hollow?

25   A    Yes, sir.

TODD ROBERTS - DIRECT — MR. SMITH                63

1    Q    Could you give us the names of people that you remember
2    seeing?
3    A    The two most prominent ones was Jamie Goins, who was an
4    employee of Mr. Morris's, and David Hacker, who was also
5    working for Mr. Morris.
6    Q    This Goins, you say he's an employee of Bart Morris?
7    A    That's correct.
8    Q    And what did he do for him?
9    A    He worked at the transfer station, which is where they
10   dump the garbage.
11   Q    And you indicated a Hacker?
12   A    Yes, sir.
13   Q    And what did he do for Mr. Morris?
14   A    He also worked at the transfer station.
15   Q    You say you observed them prominently in the spring
16   election?
17   A    Yes, sir.
18   Q    And what kind of observations were you making of them?
19   A    They were hauling people back and forth to the motor home
20   and then to the voting precincts.
21   Q    Was this while you had a member of the Attorney General's
22   Office with you?
23   A    Yes, sir.
24   Q    Now, the 2004 election, Mr. Roberts, were you still there
25   in Manchester as assistant chief of police in 2004?

TODD ROBERTS DIRECT - MR. SMITH                    64

1    A    Yes, sir, I was.

2    Q    And was there an election of local interests that you had

3    in the primary in 2004 election?

4    A    Yes, sir.

5    Q    And what was the race of interest for you in that

6    election?

7    A    State representative's race.

8    Q    And who was in that race?

9    A    Tim Couch, who was the representative at the time, and

10   then Barbara Colter, who had been the previous representative

11   was running again.

12   Q    And were there factions again lined up against each other

13   in this race?

14   A    Yes, sir.

15   Q    And what were the factions that represented support for

16   those sides?

17   A    Ms. Colter, who is a sister to Mayor Daugh White, was

18   supported by the White faction, and then Mr. Couch was

19   supported by Doug Adams and his faction.

20   Q    And during that particular election, did you make any

21   observations of irregularities or suspected vote buying in that

22   election?

23   A    No, sir, I wasn't present at that particular election day,

24   I left the county.  But I had had a conversation also with

25   Mr. Bishop, who had indicated their involvement in that

1  election.

2  Q    Are you talking about which Bishop?

3  A    Mike Bishop, I'm sorry.

4  Q    And what did he tell you about his involvement with --

5  which faction was he involved with in the '04 election?

6  A    Tim Couch.

7          MR. WESTBERRY:  Same objection.

8          THE COURT:  All right.  The objection will be

9  overruled for the reasons previously stated.

10          MR. WESTBERRY:  Thank you.

11  BY MR. SMITH:

12  Q    What did you and Mr. Bishop talk about?

13  A    Mr. Bishop had told me that they had supported Mr. Couch

14  again and that they were going to beat Ms. Colter and that

15  Mr. Couch was putting up the money to spend in the election,

16  and after the election, he told me about a party that he

17  attended over at Big Creek with Mr. Couch and said him and his

18  father and some of them went over to a celebration party and

19  identified some of the people that were there and so forth.

20  Q    Mr. Roberts, were you ever asked to go speak to the mayor

21  about Mike Bishop getting a promotion?

22  A    Yes, sir.

23  Q    And who asked you to go speak to the mayor about Mike

24  Bishop getting a promotion?

25  A    Mr. Bishop and -- on one occasion Mr. Adams had mentioned

 1  it to me, that he would like to see Mike get a little something

 2  within the police department.  I mean, a promotion, is what I

 3  meant.

 4  Q    What did they ask you to do?

 5  A    Asked me to ask the mayor to promote Mr. Bishop to

 6  sergeant.

 7  Q    And what did you do when they asked you that?

 8  A    I was reluctant at first, because right after the 2002

 9  election, the mayor and his son, Kennon White, came in and told

10  me to fire Mr. Bishop, and I told them I couldn't do that, and

11  the mayor said, "Yes, you can," said, "I'm the mayor."  And I

12  said, "Yeah, but I said policemen are protected under the

13  Policemen's Bill of Rights in Kentucky," I said, "you can't

14  just up and fire a man."  But the purpose of them wanting him

15  fired was Mr. Bishop had indicated to the mayor and his son

16  that he was going to support Mr. Thompson and Mr. Couch but

17  that he would help the mayor's son, Kennon, in the jailer's

18  race, and he actually took up a sign down there and put

19  Mr. White's sign in his yard, but yet Mr. White lost the

20  precinct that Mr. Bishop was working in, which was the

21  South Fork precinct.  It just come to me.

22  Q    So was Mayor White running in 2002 or his son, Kennon?

23  A    His son, Kennon, was running for jailer against Charles

24  Marcum.

25  Q    And so Mike was supposed to be helping Kennon?

```
 1   A     That is correct.

 2   Q     With buying votes at the South Fork precinct?

 3   A     Yeah, he was an election officer there.

 4   Q     So what did -- what happened when the mayor told you to

 5   fire him and you told him that you couldn't do that?

 6   A     They were not really -- they wasn't happy about it, but

 7   they left and then came back later and basically changed

 8   positions, that their position was then that they probably

 9   needed to try to get in with Mr. Doug Adams.

10   Q     So they switched from the White faction to the Adams

11   faction?

12   A     Yes, they -- that's when the boy was promoted to sergeant

13   to try to appease Mr. Adams so that he would help him in future

14   elections.

15   Q     I see.  Now, you had indicated earlier that Vernon Hacker

16   had indicated to you that he was getting pressure to switch

17   sides.

18   A     That's correct.

19   Q     Did he ever tell you who he was getting pressure from?

20   A     Mr. Adams.

21   Q     And what did he tell you?

22   A     That they had threatened him and his wife.  His wife was a

23   cook at the Manchester Elementary and Mr. Hacker was a bus

24   driver, and I guess the shortness of the run is how they

25   consider whether they've got a good bus run or not, I don't
```

1    know exactly how the pay is, but apparently if you got a short

2    run, you get paid similar to somebody that may have a long run.

3    And he had a fairly good run and had a new school bus that had

4    just been given to him, and he told me that they had threatened

5    to take his bus and put him on a different run if he didn't

6    back off or come over to their side, one of the two.

7              MR. WESTBERRY:  Judge?

8              THE COURT:  Yes, sir.

9              MR. WESTBERRY:  Asked and answered earlier.  I think

10   we've heard this line of questioning once before.  I just

11   wanted to bring it to the Court's attention.

12             THE COURT:  All right.  I think it was touched upon,

13   but this was a little bit more expansive answer, so I'll

14   overrule the objection.

15   BY MR. SMITH:

16   Q    Now, during these elections there in Manchester, did you

17   have occasion, Mr. Roberts, to also observe the use of city

18   resources or county resources to be used for the benefit of

19   encouraging people to vote for people in elections down there?

20   A    Yes, sir.

21   Q    And what kind of observations did you see or did you make?

22   A    Both the city and the county was doing work on private

23   property for property owners that had fairly sizeable amount of

24   votes in their family.  Roadwork as far as gravel and blacktop.

25   Q    Well, there's nothing wrong with graveling or paving a

1   public road, is there, Mr. Roberts?

2   A    Yes, sir, there is.

3   Q    What's wrong with that?

4   A    In Kentucky that's theft of services.

5   Q    Well, if it's a public maintained road, thought, isn't it

6   the county's responsibility to keep it up?

7   A    Yeah, but they weren't working on county roads, they were

8   working on private drives.

9   Q    Private drives.  And did you note any of the officials in

10  your observations being along for the ride to see these things

11  done?

12  A    Yes, sir.

13  Q    And who were they?

14  A    The city officials was Darnell Hipsher and Kennon White,

15  who was the mayor's son.  His title was he was the city

16  supervisor.  And in the county capacity, the county was hauling

17  gravel to private drives using a private vendor, and which they

18  were paying them, but they weren't using county-marked

19  equipment.  But the magistrate in that district could usually

20  accompany that load of gravel or Lester Harmon and Darnell

21  Hipsher accompanied quite a few there in town where the city of

22  Manchester is comprised of.

23  Q    I'm a little bit confused.  You got private vendors'

24  trucks being used, but they're hauling county gravel?

25  A    That is correct.

1  Q    Do you know why they were using private trucks to haul
2  county gravel?
3  A    So it wouldn't be obvious to the citizens there that the
4  county was paying for the materials that was being laid on
5  private property.
6          MR. WHITE:  Your Honor, I would like to move to
7  strike the answer as pure speculation.
8          THE COURT:  All right.  Mr. Smith, the witness will
9  need to state his basis for that last answer.
10 BY MR. SMITH:
11 Q    Were these things that you personally observed,
12 Mr. Roberts?
13 A    Yes, sir, they was.
14         THE COURT:  Mr. Roberts, how do you know that it
15 was —
16         Well, I'm sorry, go ahead.  Overrule the objection.
17 BY MR. SMITH:
18 Q    Now, Kennon White, how did he come to be employed there at
19 the City of Manchester, Mr. Roberts?
20 A    His father, the mayor, hired him as the city supervisor.
21 Q    And is that a position that was in existence before
22 Mr. Kennon White came along?
23 A    They basically made that title up.  The closest thing to a
24 supervisor before Mr. Kennon White came on was Mike White,
25 which was the — he was over the water and street department.

TODD ROBERTS - DIRECT — MR. SMITH                    71

1  Q    So they made a new position for him?

2  A    That's correct.

3  Q    And what did it start out with a salary there with the

4  City of Manchester?

5  A    Somewhere between 45 and $50,000, is my understanding.

6  Q    And Kennon White, did he take an active role in city

7  business?

8  A    Yes, sir, he did.

9  Q    Did he ever get involved in your business?

10 A    He attempted to, yes, sir.

11 Q    Could you tell the Court and the jury about that?

12 A    He attempted to put pressure on one of the policemen there

13 in the police department to dismiss a DUI case against an

14 individual.  The individual was Jamie Goins, who was an

15 employee of Bart Morris.

16 Q    All right.  And he was — you say he had been cited for

17 DUI?

18 A    Yes, sir.

19 Q    And was that one of the officers that you had supervised?

20 A    Yes, sir.

21 Q    What was his name?

22 A    William Goins.

23 Q    And what did Kennon White do to try to influence him to

24 dismiss that case?

25 A    He had went to Mr. Goins on several occasions at his house

1   and also at his workplace at the police department, told him to

2   fail to show up on the charges against Mr. Goins so that the

3   Court could dismiss them.

4   Q    And what did you observe happen after he made that demand?

5   A    Mr. William Goins came to myself and also the chief of

6   police and expressed his concern about the fact of being

7   approached by the mayor's son to dismiss a — or fail to show

8   up in a criminal proceeding and asked what we thought that he

9   should do.  And I advised Mr. Goins to be there on every court

10  appearance, to not miss neither of the court appearances.

11  Q    Did he tell you who directly was putting pressure on him?

12  A    Yes, sir, Kennon White.

13  Q    Did he say to you what Kennon White was doing to make

14  pressure on him?

15  A    He threatened his job and had even indicated that he

16  would — or Mr. White indicated to me that he would put

17  Mr. Goins out cutting weeds on the street and sanitation crew.

18  Q    Now, why did Kennon White have an interest in helping out

19  Jamie Goins?

20  A    I had a conversation with Mr. White after this that took

21  place at the Clay County Board of Education, I was with the

22  members of the Office of Homeland Security doing a threat

23  assessment in the county, which is checking the vulnerability

24  of the schools and the major buildings in the county.  And I

25  just happened to be at the school board, and he asked the

1  dispatch where I was at, and he came out there and sent Darnell

2  Hipsher in, who was the city council member and also was a

3  school board employee at the time, told him to tell me to come

4  outside, he wanted to talk to me.  And when I approached

5  Mr. White's vehicle, he commenced to raving and cussing and

6  whatever, wanted to know why that Officer Goins had showed up

7  in the court proceeding that morning.  And I told him the

8  reason he showed up was because he had been directed to show

9  up, that was his job and that was his duty.  And he said that

10  he needed Mr. Morris for -- to take care of the elections for

11  him in Manchester and that sometimes that you had to do things

12  for people that worked in these elections and he was going to

13  do them.  And he gave me the understanding that I didn't know

14  how powerful he was and that if Mr. Goins showed up at the next

15  proceeding that he would put Mr. Goins out on the weed cutting

16  crew.  And at that point I told him if he put Mr. Goins out to

17  put me out there with him also.

18  Q    Do you know what happened with that case?

19  A    I know that it was postponed many, many times, but I don't

20  know the final disposition.  I think that it was disposed of in

21  some manner, it wasn't -- he never pled guilty to the DUI.

22  Q    And as a police officer, I assume you've had many cases in

23  that court system over there in Clay County?

24  A    Many.

25  Q    And do you place any significance on a case with the

1   jurors if it gets delayed and put off many, many times, as

2   you've described this one?

3   A    The general consensus is, is that the attorneys will try

4   to get cases put off in hopes that one day the officers won't

5   show up, and when the officers don't show up, they make a

6   motion to dismiss for a lack of prosecuting witness being

7   present.

8   Q    And is that generally successful in your experience in

9   Clay County courts?

10   A    It works a lot — it works quite a bit, because the fact

11   of the matter is, is what happens is, is every time that

12   officer has to go up there, it costs the city overtime, and

13   then the city in turn, they gripe about the police spending so

14   much overtime sending police officers to court.  And then also

15   in the same token, the officers get frustrated because they go

16   and go and go, and some of them work third shift all night and

17   then have to get up at 9:00 in the morning to be in court after

18   working a third shift and going home at 7:30, maybe sleeping 30

19   minutes or an hour or maybe not even sleeping at all and then

20   have to go sit in the court all day.

21           MR. SMITH:  Judge, could I take a moment?

22           THE COURT:  Yes, sir, you may.

23   BY MR. SMITH:

24   Q    Mr. Roberts, when we started your testimony this day, you

25   indicated that you pled guilty to some charges.  Do you

TODD ROBERTS DIRECT - MR. SMITH                    75

1  remember that?

2  A    Yes, sir, I do.

3  Q    And you said that you had admitted your guilt in a

4  conspiracy.  Could you tell us what it was that you did?

5  A    Basically picked up an individual and dropped him off

6  downtown where he set a fire to an unoccupied dilapidated house

7  that was in Manchester that was sitting in the way of a

8  construction project.

9  Q    Was that for your prospective 9-1-1 police building?

10  A    Yes, sir, I'm sorry, it was.

11  Q    And who was this person that you picked up and dropped off

12  to burn the building.

13  A    Bobby Joe Curry.

14  Q    And could you tell us what you know about that fella?

15  A    Mr. Curry was a drug dealer that had been raided several

16  times in the county, and he also had a previous record.

17  Q    And did you have anybody in your company go with you to

18  pick up the drug dealer Bobby Joe Curry to burn this house?

19  A    Vernon Hacker.

20  Q    And was Vernon Hacker, at that time, holding any positions

21  in the city?

22  A    Yes, he was the city council member and director of the

23  9-1-1.

24  Q    And what did you-all use to pick him up in?

25  A    My vehicle, which was a city-owned vehicle.

TODD ROBERTS - DIRECT - MR. SMITH                        76

1    Q    A police vehicle?

2    A    Yes, sir.  It was an unmarked vehicle.

3    Q    And you also indicated that you had also committed

4    obstruction of justice when you talked with the FBI about that

5    matter?

6    A    That is correct.

7    Q    Did you deny this to the FBI?

8    A    Yes, I didn't disclose the full facts to them concerning

9    this fire.

10   Q    And you admitted that you did lie to them?

11   A    Yes, sir, I accepted responsibility in this court -- well,

12   it was in London, but it was in U.S. court.

13   Q    And what judge did you have when you admitted your

14   responsibility or accepted your responsibility?

15   A    Judge Reeves.

16   Q    Mr. Roberts, while you were there within the context of

17   the police department, was there occasion where a number of

18   prominent people in Manchester got together a trip to

19   Washington, D.C.?

20   A    Yes, sir, there was.

21   Q    Do you recall what the circumstances of that trip was?

22   A    It was to go up and visit with the congressional

23   representatives for that area to obtain additional funding or

24   funding for the county and the city.

25   Q    Did you go along?

1  A    Yes, sir, I was asked to go.

2  Q    And how was this funded?

3  A    I think that the city paid for some representatives and

4  the county paid for some.  It was a split cost.  I know the

5  city — I went as a delegate of the city.  So I don't know, you

6  know, who —

7  Q    So Manchester paid for some and the county — the Clay

8  County taxpayers paid for —

9  A    That's correct.  Some of us went on a bus and some went on

10  a plane, and I think they split the cost of those things and

11  then the motel rooms.

12  Q    Anybody in this room that you see go along on that trip,

13  Mr. Roberts?

14  A    Mr. Bowling, Stanley Bowling, Mr. Doug Adams, and

15  Mr. Cletus Maricle.

16        MR. SMITH:  Thank you, Your Honor.  I'll pass the

17  witness.

18        THE COURT:  All right.  Thank you.

19        Mr. Hoskins, do you need a moment?

20        MR. HOSKINS:  I'm wondering if there's any other

21  *Jencks* material?

22        MR. SMITH:  I think we passed that to you before.

23        THE COURT:  You may proceed.  Thank you.

24                    CROSS-EXAMINATION

25  BY MR. HOSKINS:

TODD ROBERTS - CROSS - MR. HOSKINS                78

1   Q    Mr. Roberts, just to clear up a few things first.  This
2   DUI case that you talked about, Kennon White wanted to get the
3   case dismissed and you're saying it got put off and put off and
4   put off.  That case was not in Judge Maricle's court, was it?
5   A    No, sir, it was a district court case.
6   Q    Okay.  So it would have been in front of a different
7   judge?
8   A    Yes, it would have been in front of a district court
9   judge.  There's two of them, so one of the two.  I'm not sure
10  which one it was in front of.
11  Q    Who were those two judges?
12  A    Excuse me?
13  Q    Who were those two district judges?
14  A    At the time, it would have been Judge Oscar Gayle House
15  and Renee Muncy.
16  Q    Now, Judge Muncy was also the judge who dismissed the —
17  was it alcohol intoxication and disorderly conduct charges
18  against Mr. Stivers?
19  A    That is correct.
20  Q    So that also happened in a district court where Judge
21  Maricle was not involved?
22  A    That is correct.
23  Q    And there was a big long hearing in that case when those
24  charges were dismissed when officers testified, you testified?
25  A    That's correct.

TODD ROBERTS - CROSS - MR. HOSKINS                79

1    Q    And Jeff Culver testified?

2    A    Yes, sir, he did.

3    Q    Jeff Culver is the chief of police in Manchester now,

4    isn't he?

5    A    Now, that is correct.

6    Q    And Judge Muncy's ruling was that Mr. Stivers should not

7    have been arrested that day?

8    A    I'm not sure.  She dismissed it.  I'm not sure what she

9    put as her final disposition.  I don't know what actually she

10   put down for that, but, yes, it was dismissed.

11   Q    You were there when —

12   A    Yes, sir, I was.

13   Q    — the hearing took place and you testified?

14   A    That is correct.

15   Q    And you and Jeff Culver testified to very different facts,

16   didn't you?

17   A    That is correct.

18   Q    And the result was that your version of the facts were not

19   what held the day; correct?

20   A    Not in the court, no, sir.

21   Q    Okay.  And that was kind of big news in Manchester, wasn't

22   it?

23   A    Yes, sir, it was.

24   Q    It was on the front page of the Manchester paper that

25   Mr. Stivers was cleared of those charges?

TODD ROBERTS - CROSS - MR. HOSKINS                    80

1    A    That is correct.

2    Q    It caused you some embarrassment, didn't it?

3    A    No, not really.  I mean —

4    Q    It didn't bother you at all?

5    A    Why would it embarrass me?

6    Q    Because you were not believed by the Judge, were you?

7    A    She dismissed the case.

8    Q    You didn't want it dismissed, did you?

9    A    No, sir, I thought he was guilty.

10   Q    Now, you knew back then that Mr. Stivers and Judge Maricle

11   were friends?

12   A    Yes, sir.

13   Q    And when you had that lawsuit filed against you for

14   wrongfully arresting Mr. Stivers, you knew that Mr. Stivers and

15   Judge Maricle were friends?

16   A    Yes, sir.

17   Q    And you told your lawyers that?

18   A    Yes, sir, they knowed that.

19   Q    But nobody ever asked Judge Maricle to get off the case,

20   did they?

21   A    Not to my knowledge.

22   Q    Now, again, Clay County is a small county, population-

23   wise, isn't it?

24   A    Yes, sir.

25   Q    And you're aware that the judges, whether it's District

 1  Judge Muncy or District Judge House at the time or the circuit

 2  judge is frequently, in a state court, frequently going to be

 3  called upon to rule in cases or to be judge in cases where they

 4  may know some of the people in one degree or another; correct?

 5  A    What did you say toward the end?

 6  Q    That a judge in Clay County is frequently going to be

 7  called upon to be judge in a case where he may personally know

 8  some of the people involved?

 9  A    Yes, sir.

10  Q    And, in fact, you personally knew Judge Maricle, didn't

11  you?

12  A    Yes, sir, I did.

13  Q    And you were a witness in many cases in his court?

14  A    Yes, sir, I was.

15  Q    And the fact is in the civil case that Mr. Stivers filed

16  against you for his wrongful arrest, Judge Maricle never had to

17  make any kind of type of a ruling, it went to a mediation where

18  the parties basically worked out an agreement, isn't that true?

19  A    I can't say for sure that's exactly what happened, but I

20  was never in a courtroom setting on that particular case.  I

21  know I took a deposition or I gave a deposition and then they

22  took Mr. Stivers's deposition.

23  Q    And you're not aware of any ruling that Judge Maricle made

24  in that case that went against you or went against the other

25  side, are you?

1   A    None to my knowledge, other than this order of dismissal.

2   Q    Well, the order of dismissal was after the agreement was

3   made, wasn't it?

4   A    I assume, yes.

5   Q    You looked at it a little earlier, didn't you?

6   A    Yes, sir.

7   Q    And said that it was dismissed as settled?

8   A    Excuse me?

9   Q    Was it dismissed as settled or not?

10  A    Yes, sir.

11  Q    Okay.  And a settlement means both sides got together and

12  settled the case without the Court having to do it; right?

13  A    Yes, sir.  But the insurance company, the insurance for

14  the City, there's a clause in their policy that says that the

15  insurance company can elect to settle a case without the

16  agreement with the party that they are insured if it's in their

17  best interest.

18  Q    Okay.  So I understand that you didn't like it being

19  settled, you thought Judge Muncy was wrong when she dismissed

20  the case?

21  A    Yes, sir, I did.  I thought there was other factions that

22  played a role, too.

23  Q    Okay.  So you didn't want the civil case where you got

24  sued for the wrongful arrest, you didn't want that to be

25  settled either, did you?

TODD ROBERTS CROSS - MR. HOSKINS                    83

1    A    No, sir.

2    Q    But the point is that it wasn't Judge Maricle who ruled in

3    favor of his friend, Mr. Stivers, it was an agreement that the

4    insurance company and the other people made in the case, wasn't

5    it?

6    A    I assume, yes.

7    Q    And you're not suggesting in any way that Judge Maricle

8    did anything improper in that case, are you?

9    A    No, I just explain the facts as I know them.

10   Q    Okay.  Thank you.

11        You talked about Mr. Stivers talking about guns, and you

12   also are a gun enthusiast, aren't you?

13   A    I was a licensed federal firearms dealer, yes, sir.

14   Q    You had a nice gun shop in London, Kentucky, didn't you?

15   A    Yes, sir, I did.

16   Q    It was called Todd's Guns?

17   A    That is correct.

18   Q    So lots of people knew that you were a gun enthusiast and

19   would talk to you about that kind of thing, wouldn't they?

20   A    Yes.

21   Q    Now, a few minutes ago you were asked what you did to

22   obstruct justice, and I think your phrase that you used was you

23   didn't disclose the full facts?

24   A    That's correct.

25   Q    Did you tell the FBI anything at all about you being

TODD ROBERTS CROSS - MR. HOSKINS                    84

1  involved in burning down that building?

2  A    At the initial conversation I had with them, they asked me

3  about things that happened on the night of the fire.  They

4  didn't actually come out and ask me if I burned a house down or

5  if I assisted anybody and nor did I say anything to that

6  nature.  I just didn't disclose the facts to them at that time.

7  Q    Okay.  So my question was, you didn't tell them one single

8  thing about you being involved in burning that house down, did

9  you?

10  A    No, sir.

11  Q    Okay.  So you concealed the whole truth from the FBI that

12  day?

13  A    I didn't tell them.

14  Q    You had a career as a law enforcement officer?

15  A    Yes, sir.

16  Q    But during that career as a law enforcement officer you

17  were committing felonies, weren't you?

18  A    I don't think so.  There was the one incident.

19  Q    Well, there was the one incident where you lied to the

20  FBI, concealed facts from the FBI and lied about details of

21  what you did that night, that was one felony, wasn't it?

22  A    After I was indicted.

23  Q    That was a felony, wasn't it?

24  A    Yes, sir.

25  Q    When you burned the house down or helped — when you

TODD ROBERTS CROSS - MR. HOSKINS                    85

1  helped Bobby Joe Curry, the drug dealer, burn the house down,

2  picked him up, dropped him off, gave him instructions as to how

3  to do it and it didn't burn the first time, that was a felony,

4  wasn't it?

5  A    Yes, sir.

6  Q    Okay.  Now, you had been to Bobby Joe Curry's house lots

7  of times, hadn't you?

8  A    No, sir.

9  Q    You had been there?

10  A    I have been there, but not lots of times.

11  Q    Okay.  Are you telling this jury that you were only there

12  for official police business, or were you there also because he

13  was your friend?

14  A    Mr. Curry was an informant for me, and I did stop there on

15  occasions, and I did have two instances in which I raided

16  Mr. Curry.

17  Q    But when you raided Mr. Curry, he knew ahead of time that

18  he was going to be raided, didn't he?

19  A    I can't say that for sure because he didn't by me, and we

20  did seize drugs both times we raided, so I'll let you decide

21  that.

22  Q    Very small amounts of drugs?

23  A    No, sir, there was — on the second occasion, there was

24  quite a bit of quantity of cocaine that was seized that

25  actually resulted in his being charged in federal court in this

1  particular matter.

2  Q    One time you went there, though, expecting to -- or from

3  all appearances expecting to find a lot of drugs and there was

4  hardly anything there; right?

5  A    The first time we found five plants of marijuana, several

6  Xanaxes and Viagra, that was what we found on the first raid,

7  that's correct.

8  Q    Far short of what anybody would have expected if they were

9  playing it straight; right?

10 A    I don't understand what you're saying by that.  Sometimes

11 we go to do a raid and we may hit a lot of drugs, sometimes we

12 may not hit but just a small amount.  So to say that there

13 would be a set amount, that wouldn't be a fair statement.

14 Q    But you would have to have some idea what you're going to

15 find when you go to a judge and ask for a search warrant, don't

16 you?

17 A    That's right.  You have to work on either a confidential

18 informant or a drug buy.

19 Q    Now, Bobby Joe Curry did other things for you besides work

20 as an informant, didn't he?

21 A    No, sir.

22 Q    Nothing at all?

23 A    No, sir.  The only other incident that he would have been

24 involved in is the house, which I have already admitted to and

25 accepted responsibility for that I explained here.

TODD ROBERTS - CROSS - MR. HOSKINS                87

1    Q    Let me shift gears and ask you a few questions about the

2    trip to Washington, D.C.  When you were asked to go on that

3    trip, you were the assistant police chief, weren't you?

4    A    Yes, sir, I was.

5    Q    So you were a prominent citizen of Manchester, Kentucky?

6    A    Yes, I was an official of the city.

7    Q    Cletus Maricle at the time was the circuit judge?

8    A    Yes, sir.

9    Q    Doug Adams was the superintendent of the county schools?

10   A    Yes, sir.

11   Q    And the plan on that trip was to take some important folks

12   who knew about the county and knew about the city to talk to

13   your congressional people to try to get some help and money for

14   Clay County?

15   A    Yes, sir.

16   Q    Nothing improper about that, was there?

17   A    No.

18   Q    As a police officer, before you went to prison, you've

19   testified in court many times, haven't you?

20   A    Yes, sir, I have.

21   Q    State Court?

22   A    I'm sorry.

23   Q    State Court?

24   A    State and federal.

25   Q    Okay.  In fact, you worked on a lot of cases with

1  Mr. Smith, didn't you?

2  A    Yes, sir, I did.

3  Q    In federal court?

4  A    I'm sorry?

5  Q    In federal court then?

6  A    Yes, sir.  I have a hearing impairment and you're a real

7  light voice, so I've only got like 60 percent hearing in this

8  ear.  So if I ask you to repeat yourself, I'm not trying to

9  stall you.

10 Q    I appreciate that, and please ask me to repeat it if I

11 don't state it clearly or loud enough.

12 A    Yeah.

13 Q    As a police officer, you had some training in how to

14 testify?

15 A    As part of the training, the ten-week training that we

16 receive at the Department of Criminal Justice, there's one day

17 on courtroom procedures.

18 Q    You're very well familiar with how the process works for a

19 defendant trying to get a reduced sentence, aren't you?

20 A    Yes, sir.

21 Q    And you understand that when you sign a plea agreement

22 that says if you commit perjury that you could be prosecuted

23 again, you know who would decide if you had committed perjury

24 or not, don't you?

25 A    That is correct.

1  Q    It would be the prosecutor; right?

2  A    Do what now?

3  Q    It would be the prosecutor, the United States Attorney,

4  wouldn't it?

5  A    It would be a prosecutor, yes.

6  Q    Okay.  Nobody — no defense lawyer can bring you up on

7  perjury charges, can they?

8           MR. SMITH:  Your Honor, I'm going to object.

9           THE COURT:  Sustain the objection to the question.

10 BY MR. HOSKINS:

11 Q    You understand that before you can get your sentence

12 reduced, the prosecutor, the United States Attorney, has to

13 make a request to the Judge, don't they?

14 A    Yes, sir.

15 Q    And you would like to get your sentence reduced?

16 A    Yes, sir.

17 Q    You're a police officer, former police officer, and you're

18 in prison?

19 A    Yes, sir.

20 Q    And that makes for an especially difficult time in prison,

21 doesn't it?

22 A    I assume so, yes.

23 Q    Mr. Roberts, who was the representative of the Attorney

24 General's Office that you were with the day you talked about?

25 A    They were field officers.  I don't know their names

1   exactly.

2   Q    Do you have any recollection at all?

3   A    No, sir, I don't.  They send four or five in to monitor

4   most of the elections, and each time they change.  But they

5   should have a record of who came there.

6   Q    Okay.  You talked a little bit about the home

7   incarceration business in Clay County.  Just to be clear, you

8   talked about Jo Davidson ––

9   A    Yes, sir.

10  Q    –– running that business?

11  A    Yes, sir.

12  Q    As far as you know, she still runs that business to this

13  day?

14  A    As far as I know.

15  Q    Okay.  At the time –– And you talked about Jo Davidson

16  once being Judge Maricle's secretary.

17  A    That is correct.

18  Q    Those were two different times, weren't they?  She was not

19  his secretary and running that business at the same time, was

20  she?

21  A    You know, I can't answer that.  I don't know that for

22  sure.  I mean, only the records would reflect that.  I can't

23  really tell you that for sure.

24  Q    To your knowledge, that's true, though, isn't it?

25  A    To my knowledge, I don't know that, no, sir.

1  Q    Jo Davidson ran for jailer once, didn't she?

2  A    Yes, sir.

3  Q    And got beat?

4  A    Yes, sir.

5        MR. HOSKINS:  Judge, could I have just a minute?

6        THE COURT:  Yes, sir, you may.

7  BY MR. HOSKINS:

8  Q    Mr. Roberts, while you were a police officer in

9  Manchester, you called on Judge Maricle to sign search

10 warrants?

11 A    Yes, sir.

12 Q    And he made himself available when you needed him, didn't

13 he?

14 A    Yes, sir, he did.

15       MR. HOSKINS:  Your Honor, could we approach?

16       THE COURT:  Yes.

17     (Whereupon, the following discussion was had between the

18 Court and counsel at the bench, out of the hearing of the

19 jury.)

20       MR. HOSKINS:  I have a few more topics I want to go

21 into with this witness, and we're so close to 4:00 now and I

22 would suggest this is an appropriate place to stop.

23       THE COURT:  We'll do that.  Weather is moving in as

24 we — the weather is moving towards Louisville, so I don't want

25 to take up too much more time.  So rather than stop you in the

 1  middle of a topic, we'll just go ahead and end for the evening.

 2          And, Mr. Westberry, I guess you'll be next on Monday

 3  when we come back.

 4          MR. WESTBERRY:  Yes, sir.

 5          MR. BAYER:  Just as far as weather issues, I think

 6  the Court had talked to us about that if there's a delay for

 7  Franklin County schools or if they're out, in the event that

 8  there is serious weather this weekend, do you want to talk

 9  about this after you send the jury out?

10          THE COURT:  I was going to remind the jury of what

11  the inclement weather policy is, and that is we start at 10:00

12  if Franklin County schools are closed or delayed.  Otherwise,

13  if it gets really bad and we don't hold court, then there will

14  be a message on the recording, the clerk's message that you'll

15  be able to call in and check that.

16          MR. WHITE:  That number is on the website.  I think

17  we can call it.

18          THE COURT:  I believe so, but you can check with the

19  clerk.

20          MR. BAYER:  The second thing is, you want our expert

21  witness by 10:00 Monday morning?

22          THE COURT:  Let's see, I believe what we talked

23  about, I believe the parties were going to confer and advise me

24  at some point, you were going to supplement, I believe, on

25  Monday, and then you were going to tell me Tuesday morning

1    before we start.  I think Mr. Bayer wants to turn his in at

2    10:00.

3              MR. BAYER:  I just don't want to be late.

4              THE COURT:  All right.  Mr. Bayer can turn his in at

5    10:00, everyone else can have till 5:00.

6              MR. WHITE:  Can I ask a quick question about that?

7    If it turns out — if it turns out that I'm able to work out my

8    experts with the United States and the other experts are all

9    the CPAs, would I still need to be here for the CPAs or could I

10   let Judge Caldwell know I can be at the sentencing on Friday?

11   I'm trying to get a sense of what to let her know.  Or wait

12   until Monday and see what how it works out?

13             THE COURT:  We're going to have to wait and see who

14   we have that will be disputed.

15             MR. WHITE:  I'll do that.  I'll just leave a message

16   and let their office know that I'll know Monday.

17             THE COURT:  Since I don't know what you-all are going

18   to do on the experts, it's hard for me to speculate as to who

19   might need to be here based on what might be designated.

20             MR. WHITE:  You're right.  That's right.

21             MR. WESTBERRY:  Mr. Hoskins said something.  I

22   forgot, David, did you say this to the Court?

23             MR. HOSKINS:  During the direct examination of this

24   witness, I noticed that one of the jurors, he was asleep, with

25   his head down, it went down gradually and kept it down for some

1  period of time.  But I just — I don't ask the Court to do

2  anything right now, but if it turns out that that's a

3  continuing problem with this juror, I would ask the Court to

4  perhaps maybe designate him as an alternate.

5          THE COURT:  I didn't see which person it was.

6          MR. HOSKINS:  The gentleman second from the end on

7  the left.

8          MR. WESTBERRY:  He has sort of an American flag

9  shirt.

10          THE COURT:  On the front row toward the other end of

11  the jury box?

12          MR. WESTBERRY:  Yes.  Second from the left.

13          THE COURT:  Let me tell you how I handle that.  I try

14  not to draw attention to one particular juror.  But if I do

15  notice that in course of the trial, what I'll do, if we have a

16  little break in the action, is I'll tell the jury if they need

17  to stand up and stretch they can do that.  And if that one

18  person doesn't stand up, we know they haven't gotten the

19  message.

20          MR. SMITH:  I know that I'm not the most illustrious

21  counsel here.

22          MR. WESTBERRY:  Now that that's on the record.

23          THE COURT:  I've never had a defense counsel object

24  to someone sleeping during the government's case, but we'll try

25  to prevent that from happening in the future.  But I do

1    appreciate you calling that to my attention.

2             All right.  Thank you.

3             MR. WHITE:  Can you give us some heads-up when you do

4    that, too?

5             THE COURT:  Yes, sir.

6        (Whereupon, the following proceedings continued in open

7    court.)

8             THE COURT:  All right.  Thank you, Counsel.

9             Ladies and gentlemen of the jury, as I told you

10   earlier at the beginning of this session, we'll be breaking

11   about 4:00 to make sure that you-all didn't have any weather

12   problems getting home this afternoon.  And I do want to get you

13   out of here so you can get on home, but let me again remind you

14   of the admonition that you were given previously.  Again, as we

15   take a break, and we'll be taking a break until Monday morning

16   at 9:00, at the end of the admonition I do want to remind you

17   of our inclement weather policy.  But before I get to that, let

18   me again remind you that as we take breaks, of course, you

19   should not discuss the case with any of the other jurors.  When

20   you go home tonight, you shouldn't discuss the case with any of

21   your friends or family members.  You should not allow anyone to

22   approach you to discuss the case with you.  And, of course, if

23   that should ever happen, you should report that to the Court

24   promptly through one of the security officers and I will

25   certainly deal with that.  Don't read, watch, or listen to any

1  accounts of the case.  You've heard me talk already about

2  electronic communications, either through Blackberries or

3  tweeting and twittering and all those other electronic things

4  that folks do, don't do any of that.  So don't read, watch, or

5  listen to any of the accounts of the case if there should be

6  any.  And, of course, don't communicate about the case.  Don't

7  do any type of research or investigation, and, of course, don't

8  make up your mind about the case until it is finally submitted

9  to you.

10            With respect to our inclement weather policy, now, as

11  I think everyone knows, we may get some snow this weekend.  The

12  policy that we follow is that if the Franklin County schools

13  are closed, then you would be delayed reporting until 10:00.

14  But I will tell you that if the weather gets too bad and if I

15  determine that it's not safe for us to hold court, because I do

16  know that some of you have to drive some distance to get here,

17  that I will advise the Clerk of that fact and she will put that

18  message on the machine.  When you call in, you'll be able to

19  check that, and you'll know that you may not need to be here

20  until a later time.  But if you call that number and you're not

21  told, if you call Sunday night and the message does not

22  indicate that you should report any later than 10:00 if we have

23  a school closing, then you'll need to be here at 10:00.  So

24  again, if Franklin County schools are closed, then you should

25  assume that you should report at 10:00 unless you're told

 1   otherwise through the message that will be left on the machine.

 2   So everyone is clear on that.

 3            Ladies and gentlemen, have a safe trip home, and

 4   we'll see you Monday morning at 9:00 unless we do have bad

 5   weather.

 6       (Whereupon, the jury retired from the courtroom, after

 7   which the following proceedings were had in open court.)

 8            THE COURT:  All right.  Thank you.

 9            Counsel, before we recess, let me ask if there's any

10   other matters that need to be taken up outside the presence of

11   the jury.

12            MR. SMITH:  Yes, Your Honor.

13            THE COURT:  All right.  Thank you.

14            MR. SMITH:  Yes, Your Honor, I do have --

15            THE COURT:  Oh, you have a matter?  Please be seated.

16   If it doesn't involve the witness, as soon as the jury exits,

17   I'm going to allow Mr. Roberts to step down.  Let me give the

18   jury a moment to exit.

19            Does this matter affect the witness's testimony?

20            MR. SMITH:  It's scheduling, Your Honor.  I'm just

21   trying --

22            THE COURT:  That's fine.

23            MR. SMITH:  -- to plan for the next week; the week of

24   the 15th.  And, of course, I know on our government calendar

25   that it's highlighted in red, and I'm not sure, but somebody

1  told me that that means that it's a federal holiday.

2         THE COURT:  It's listed as President's Day on my

3  calendar.  If the parties would like, I can perhaps make some

4  arrangements to proceed with the trial on that date.  I'm not

5  sure –– how many hoops I'll need to jump through in order to do

6  that.  My preference would be to be here and to proceed.  As

7  you know we have too many holidays in the country anyway.  But

8  I'll have to check about the building, because other offices

9  share this courthouse.  I'll need to check on that.  It may not

10 be Monday before I'll know, but at least by Tuesday of next

11 week, I should have a better answer on that issue; okay?  I do

12 appreciate you calling that to my attention, I just noticed

13 that as well.

14        Anything else?

15        MR. SMITH:  No, Your Honor.

16        THE COURT:  No?  All right.  Thank you, Counsel.

17 Please have a safe drive home and we will see you Monday

18 morning hopefully at 9:00.

19        (Whereupon, the proceedings were adjourned for the day at

20 4:05 p.m., to be reconvened on the following Monday as ordered

21 by the Court.)

22             C E R T I F I C A T E

23    I, Cynthia A. Oakes, certify that the foregoing is a

24 correct transcript from the record of proceedings in the

25 above–entitled matter.

1

2  2/8/2010                       s/CYNTHIA A. OAKES

3     DATE                 CYNTHIA A. OAKES, RPR, RMR, CRR

4

5                      I N D E X

6                                                PAGE

7  Testimony of TODD ROBERTS:

       Continued Direct Examination by Mr. Smith:     4

8      Cross-Examination by Mr. Hoskins:           78

9

10                   E X H I B I T S

11

12  Government's                                    Page

    Exhibit No.             Identified        Admitted

13

14     P19                10            9

     P20                10            9

     P21                11            9

15     P22                11            9

     P23                11            9

16     P24                12            9

     P25                12            9

17     P26                12            9

     P27                13            9

18     P28                13            9

     P29                14            9

19     P30                15            9

     PR81              49

20

21

22

23

24

25