United States District Court
Eastern District of Kentucky
Southern Division at London

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | London Criminal |
| | ) | Action No. 09-16-S |
| vs. | ) | |
| | ) | Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) | February 12, 2010 |
| DOUGLAS C. ADAMS | ) | 9:00 a.m. |
| CHARLES WAYNE JONES | ) | |
| WILLIAM E. STIVERS | ) | |
| FREDDY W. THOMPSON | ) | |
| WILLIAM B. MORRIS | ) | |
| DEBRA L. MORRIS | ) | VOLUME 7-A |
| STANLEY BOWLING | ) | |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                   JASON D. PARMAN, ESQ.

On behalf of the Defendant         DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:            MARTIN S. PINALES, ESQ.

On behalf of the Defendant         BENNETT E. BAYER, ESQ.
Douglas C. Adams:                  R. KENT WESTBERRY, ESQ.
                                   KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant         T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant         ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant         RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:                R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant         JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant         ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant         DANIEL A. SIMONS, ESQ.
Stanley Bowling:

2

```
 1   Appearances of Counsel:

 2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, Kentucky  40741
 5

 6   On behalf of the Defendant     DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:        107 East First Street
 7                                   Corbin, Kentucky  40701

 8                                   MARTIN S. PINALES, ESQ.
                                     150 East Fourth Street
 9                                   Federal Reserve Building
                                     Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant     BENNETT E. BAYER, ESQ.
     Douglas C. Adams:              106 West Vine Street
12                                   Suite 800
                                     Lexington, Kentucky  40507
13
                                     R. KENT WESTBERRY, ESQ.
14                                   KRISTEN N. LOGAN, ESQ.
                                     220 West Main Street
15                                   Suite 1900
                                     Louisville, Kentucky  40202
16

17   On behalf of the Defendant     T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:           133 West Short Street
18                                   Lexington, Kentucky  40507

19
     On behalf of the Defendant     ROBERT L. ABELL, ESQ.
20   William E. Stivers:            120 North Upper Street
                                     Lexington, Kentucky  40507
21

22   On behalf of the Defendant     RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:            R. TUCKER RICHARDSON III, ESQ.
23                                   300 West Short Street
                                     Lexington, Kentucky  40507
24

25
```

```
 1   On behalf of the Defendant          JERRY W. GILBERT, ESQ.
     William B. Morris:                  212 North Second Street
 2                                       Richmond, Kentucky  40475

 3
     On behalf of the Defendant          ELIZABETH SNOW HUGHES, ESQ.
 4   Debra L. Morris:                    201 West Short Street
                                         Lexington, Kentucky  40507
 5

 6   On behalf of the Defendant          DANIEL A. SIMONS, ESQ.
     Stanley Bowling:                    116 West Main Street
 7                                       Suite 2A
                                         Richmond, Kentucky  40475
 8

 9   Court Reporter:                     CYNTHIA A. OAKES, CRR
                                         Official Court Reporter
10                                       United States District Court
                                         560 Athens Boonesboro Road
11                                       Winchester, Kentucky  40391
                                         (859) 983-4346
12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

1          (Whereupon, the jury entered the courtroom, after which

2     the following proceedings were had in open court.)

3               THE COURT:  Thank you.  And good morning, everyone.

4               The record will reflect that all members of the jury

5     are present.  All parties and counsel are present as well.

6               Let's see, Mr. White has returned to the witness

7     stand.  He's still under oath.

8               Mr. Smith, I think you were examining the witness

9     when we broke yesterday afternoon.

10              MR. SMITH:  Yes, Your Honor.  Thank you.

11              THE COURT:  You may continue.

12              MR. SMITH:  I would like to hand the witness what's

13    marked as Government's Exhibit A5A.

14                        KENNON WHITE,

15    being previously duly sworn, was examined and testified further

16    as follows:

17                   CONTINUED DIRECT EXAMINATION

18    BY MR. SMITH:

19    Q    Do you have a disc in front of you identified as

20    Government's Exhibit A5?

21    A    Yes.

22    Q    And can you identify that?

23    A    Yes, it's a recording I made of some of the defendants.

24    Q    Okay.  And do you know the date of this recording?

25    A    April the 10th.

1  Q    Of what year?

2  A    Okay.  I don't know exactly on this.  It says April 10th,

3  2009.

4  Q    Okay.  Your recollection would have been that these

5  recordings were all made in what year, Mr. White?

6  A    2007.

7  Q    All right.  And this recording, have you had an

8  opportunity to review it?

9  A    Yes.

10 Q    And, Mr. White, in reviewing that, can you identify that

11 you were a participant in that conversation?

12 A    Yes, I was.

13 Q    And is it a fair and accurate depiction of what was

14 recorded in that conversation -- what was said in that

15 conversation rather?

16 A    Yes, it was.

17 Q    You also have in front of you Government's Exhibit A5A.

18 Can you identify that for the Court?

19 A    It's a transcript of the recording.

20 Q    And have you had an opportunity to review that?

21 A    Yes, I have.

22 Q    And does that transcript accurately reflect the words that

23 were spoken in the conversation in which you were a

24 participant?

25 A    Yes, it does.

1           MR. SMITH:  At this time, Your Honor, I would move
2    the introduction of Government's Exhibits A5 and A5A.
3           THE COURT:  Any objection other than those previously
4    stated?
5        (No response.)
6           THE COURT:  Exhibits A5 and A5A will be admitted.
7           MR. SMITH:  At this time, I would ask the Court's
8    permission to publish.
9           THE COURT:  Yes, sir, you may.
10       (Whereupon, a portion of Government's Exhibit No. A5 was
11   played to the Court and jury, after which the following
12   proceedings were had in open court.)
13          MR. RICHARDSON:  Your Honor, our monitor is not
14   working for some reason, and I've not —
15          MR. SMITH:  We're also identifying jurors that are
16   having problems, so we need to have an opportunity to test this
17   equipment.
18          THE COURT:  All right.  Why don't we — let's take a
19   break.  I know we just started, but we'll take a break, we'll
20   try to get these problems corrected so we can — so everyone
21   will be able to see and hear.  The jurors will be excused at
22   this time.  Please keep in mind the admonition you were given
23   previously.
24       (Whereupon, the jury retired from the courtroom, after
25   which the following proceedings were had in open court.)

1            THE COURT:  Thank you.  Mr. Smith, if you could

2    advise the CSO whenever the equipment is operating properly and

3    we'll start again.

4            MR. SMITH:  Your Honor, I may have a request of the

5    Court.

6            THE COURT:  All right.  Please be seated.  We'll take

7    up your request.

8            MR. SMITH:  If it appears that these headsets have

9    not had the proper charging overnight, I'm not sure that's the

10   issue, we do have additional headsets that are available, and

11   I'm not sure whether there's an objection to using the Court's

12   rechargeable as opposed to the ones with batteries, but I did

13   want to bring that up if that happens to be the issue.

14           THE COURT:  All right.

15           MR. RICHARDSON:  No problem.

16           MR. PINALES:  I don't care.

17           MR. WHITE:  Do you need these?

18           MR. PINALES:  I'm able to hear from the monitor.

19           MR. WHITE:  And these are all the other ones.

20           MR. PINALES:  And the other thing, our monitor is

21   working, I've been watching this monitor because it's easier to

22   see.

23           MR. RICHARDSON:  We got ours to work.  If you

24   actually hit the power button, it does a lot better.

25           THE COURT:  All right.  So it's a headset problem.

1          THE CLERK:  I'll change them.  There's two sets and

2  I'll give the bottom set -- we'll check it out and make sure.

3          THE COURT:  Can you test those before the jury comes

4  back?

5          THE CLERK:  Yes.

6          THE COURT:  We'll take a short break and we'll do

7  that.  And if we can't work it out with these headsets, then

8  we'll switch out some of these others that are available.

9          All right.  Thank you.  We'll be in recess.

10      (Whereupon, a short recess was had, after which the jury

11  returned to the courtroom and the following proceedings were

12  had in open court.)

13          THE COURT:  Thank you.

14          All members of the jury are again present, and the

15  parties and counsel are also present.

16          I believe that was our shortest session ever, ladies

17  and gentlemen.  We'll start again.

18          Mr. Smith, I believe you were beginning with

19  Exhibit A5?

20          MR. SMITH:  Yes, Your Honor.

21          THE COURT:  All right.

22          MR. SMITH:  If we could start from the beginning?

23          THE COURT:  Yes, sir.  That's what I was going to

24  suggest, yes, sir.

25      (Whereupon, a portion of Government's Exhibit No. A5,

 1  00:14:38 to 00:17:20, was played to the Court and jury after

 2  which the following proceedings were had in open court.)

 3  BY MR. SMITH:

 4  Q    Mr. White, would you identify the speakers in the

 5  conversation at this point?

 6  A    It was Wayne Jones and Al Man Stivers — well, to this

 7  point, to this point, it was — yeah, it was Mary Betty

 8  Stivers, Al Man Stivers, my wife, Wanda White, myself, and

 9  Wayne Jones.

10  Q    Now, Mr. Jones asked would — if you-all had served as

11  elections officers.  Who was he referring to, to your

12  understanding?

13  A    To my wife or myself.

14  Q    And Mr. Stivers said, "Cletus said not to."  To your

15  understanding, who was he referring to as "Cletus"?

16  A    Cletus Maricle.

17  Q    Now, your wife made some statement that was attributed to

18  Wanda saying that "whenever we got our votes down there on that

19  absentee machine."  To your understanding, what was she

20  referring to?

21  A    She was referring to the votes that we sent in that Wayne

22  Jones assisted.

23  Q    In what election?

24  A    In the general election.

25  Q    Of what year?

1    A    2006.

2    Q    And that would have been the year -- the race in which

3    your dad was defeated?

4    A    That's correct.

5    Q    Now, your wife said, "I figured he played both."  To your

6    understanding, what was she referring to?

7    A    She was referring to a council member named Darnell

8    Hipsher, that he had tied in with voters on both sides and

9    assisted both sides and got more votes for hisself, but

10   splitting the votes up to get for my father and some for the

11   other mayor candidate.

12   Q    Mr. Stivers, at the end, says, "They won't figure out

13   what's going on, they're not the smartest people."  To your

14   understanding, who was he referring to?

15   A    He was referring to some of the new administration that

16   had won for council.

17        MR. SMITH:  All right.  If we could, play the next

18   segment, please.

19        (Whereupon, a portion of Government's Exhibit A5 from

20   00:19:09 to 00:20:38 was played to the Court and jury, after

21   which the following proceedings were had in open court.)

22   BY MR. SMITH:

23   Q    Mr. White, in this conversation segment, there's a

24   statement that "Doug Adams wanted it," Stivers says, and Jones

25   says, "Because Doug Adams wanted it."  To your understanding,

1   what were they referring to?

2   A    Was wanting to get the election officer he wanted

3   appointed.

4        MR. SMITH:  Let's move on to the next segment then,

5   thank you.

6        (Whereupon, a portion of Government's Exhibit No. A5 from

7   00:23:15 to 00:25:40 was played to the Court and jury, after

8   which the following proceedings were had in open court.)

9   BY MR. SMITH:

10  Q    Mr. White, this segment references that your wife, Wanda,

11  said something, "Who in their right mind would talk to Todd?"

12  To your understanding, who was she referring to?

13  A    Todd Roberts.

14  Q    And then Stivers mentions the name Vernon Hacker and Jones

15  says, "Vernon's the one that spilled his guts."  To your

16  understanding, who is Vernon?

17  A    Vernon Hacker, he's a former councilman that is serving

18  time now.

19  Q    And then there was a suggestion that "They're looking at

20  the fiscal court," and there was a comment by your wife said,

21  "Well, they took care of that, though, they put it in state

22  court."  To your understanding, what was she referring to?

23  A    She was referring to the situation on the Pride cleanups

24  that Stanley and Bart had attempted to get the bid on and that

25  had arranged for to get that bid and was mad at Joe Swafford

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          12

1  over it, and that's what she was talking about, and that they'd

2  put it in state court to keep it out of federal court.

3  Q    She also made the comment "Why didn't they put in state

4  court on Doug?"  To your understanding, who was she referring

5  to as "Doug"?

6  A    She was talking about my father.

7        MR. SMITH:  If we could now play the next segment.

8        (Whereupon, a portion of Government's Exhibit No. A5 from

9  00:37:32 to 00:38:45 was played to the Court and jury, after

10 which the following proceedings were had in open court.)

11 BY MR. SMITH:

12 Q    Mr. White, in this segment, there's a reference to "Nobody

13 running," and somebody says, "Yeah" - I believe it was Stivers

14 says Clay Massey.  To your understanding, who is he referring

15 to?

16 A    Clay Massey Bishop.

17 Q    And then Stivers says, if he don't -- if they don't put

18 money down in there, he's beat.  To your understanding, who is

19 he referring to?

20 A    He's referring to Clay Massey and his supporters.

21        MR. SMITH:  We'll play the next segment.

22        (Whereupon, a portion of Government's Exhibit No. A5 from

23 00:39:39 to 00:44:22 was played to the Court and jury, after

24 which the following proceedings were had in open court.)

25 BY MR. SMITH:

1  Q    Mr. White, in this segment, to your understanding, who's
2  Mr. Stivers referring to when he says, "Well, now, they could
3  pay him, you know, 3- or $4,000 a month just to keep his mouth
4  shut"?

5  A    Talking about Tommy or Lester Harmon.

6  Q    Now, Tommy or Lester Harmon, their names were mentioned
7  here later in the end of this conversation.  I'm referring to
8  page 11.

9  A    Okay, let me go back to page 11.  Referring to Joe
10 Swafford.

11 Q    And to your understanding, who's Joe Swafford?

12 A    Joe Swafford is the Chamber of Commerce coordinator.

13 Q    Okay.  And there was mention by your wife that he could
14 serve some time, maybe get 20 years after a guilty verdict?

15 A    Yeah, what she was — what she was referring to, that they
16 were telling him that they were going to help him out and get
17 him out of trouble, but what they would do to destroy his
18 credibility was help to get him convicted and get him out of
19 the way so that he couldn't have any credibility.

20 Q    To your understanding, where was he prosecuted, in what
21 court?

22 A    In Clay Court, Clay County Court.

23 Q    Who was the Judge over that case?

24 A    To my understanding, it was Oscar Gayle House.

25 Q    Okay.  And what sentence did he ultimately get in that

1  case?

2  A    I don't know for sure.

3  Q    Now, there was mention by Wanda again saying, "Anthony
4  didn't go to court with Cork today."  To your understanding,
5  who's she referring to?

6  A    Anthony Short as the attorney and her brother, Eugene
7  Corky Price.

8  Q    And she mentioned that "Anthony didn't show up."  To your
9  understanding, what was she referring to?

10  A    Anthony had never — hadn't shown up to go to court with
11  him that morning.

12  Q    And why was Cork supposed to attend or be appearing in
13  court at that time?

14  A    He was supposed to be getting out of jail, they was
15  supposed to be letting him out of jail.

16  Q    And to your understanding, who are they referring to, "I'm
17  glad to see," Jones says, "those Harmons getting those good
18  jobs"?  Your understanding, who was he referring to?

19  A    He was referring to Tommy and Lester Harmon.

20  Q    And Tommy Harmon, was he a political figure in Clay County
21  at that time?

22  A    Yes, he was a magistrate that had just been defeated.

23  Q    And Lester Harmon, had he also been involved in politics?

24  A    Yes, that's Tommy's brother and he's heavily active in
25  politics.

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          15

1   Q    And had he served as election officer during any of the

2   elections that you were involved in?

3   A    He had helped me to -- helped me to buy votes, and I think

4   his sister had served.

5          MR. SMITH:  We'll play the next segment, please.

6          (Whereupon, a portion of Government's Exhibit No. A5A was

7   played from 00:46:17 to 00:46:25 to the Court and jury, after

8   which the following proceedings were had in open court.)

9   BY MR. SMITH:

10  Q    Mr. White, at this point, do you recognize a new member to

11  the conversation?

12  A    Yes.  Just one moment.  Yes, Cletus Maricle.

13         MR. SMITH:  Continue on.  Thank you.

14         (Whereupon, a portion of Government's Exhibit No. A5A was

15  played from 00:46:25 to 00:47:53 to the Court and jury, after

16  which the following proceedings were had in open court.)

17  BY MR. HOSKINS:

18  Q    Mr. White, in this segment, it was stated by Mr. Maricle,

19  "Yeah, I'm glad they got out of the Whites and the Maricles."

20  To your understanding, who is he referring to?

21  A    He's referring to Carmen Lewis, the new mayor.

22  Q    And to your understanding, what does that mean, "out of

23  the Whites and the Maricles"?

24  A    He had got rid of Cletus's daughter -- or she had got rid

25  of Cletus's daughter where she didn't work there anymore and

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          16

1   his grandson.  And then, of course, I wasn't working there

2   anymore or my wife.  So he was talking about us.

3   Q    Further he says, "She laid off people that voted for her

4   too."  To your understanding, who was he referring to?

5   A    Well, he was referring to Williams Stivers's family.

6   Another William Stivers, not Al Man.

7   Q    Finally, your wife, Wanda, makes a comment something to

8   the effect, I'm not going to rub in it.  To your understanding,

9   what was she referring to?

10  A    She was referring to William Stivers — not Al Man, but

11  another William Stivers's wife's mother and family had went

12  against — had went against my dad, and then he had got laid

13  off, and she was talking about that he had said he was going to

14  be okay either way.  And so that's what she was talking about.

15  Q    There's also a comment Maricle made, said, "I said, 'Roy,

16  can't you do anything with her?'"  And he said, "No."  To your

17  understanding, who was he referring to?

18  A    He was referring to Roy Morgan talking to some of his

19  relatives, which was a relative of William Stivers' wife.

20  Q    Okay.  And he says, "I said, 'Roy, can't you do anything

21  with her?"  Who is the her, to your understanding, he was

22  referring to?

23  A    Susie Arnett.

24       MR. SMITH:  If we could play the next segment.

25       (Whereupon, a portion of Government's Exhibit No. A5,

1  00:51:42 to 00:56:22, was played to the Court and jury, after

2  which the following proceedings were had in open court.)

3  BY MR. SMITH:

4  Q    Mr. White, at the beginning of that segment, there was,

5  again, a reference to "Did Cork show up for court today?" your

6  wife said.  To your understanding, who was she referring to?

7  A    My brother-in-law, Eugene Price.

8  Q    And Stivers says, "Anthony never got the order."  To your

9  understanding, who was he referring to?

10  A    His attorney, Eugene's attorney, Anthony Short.

11  Q    There was a further comment by Stivers, said, "Me and

12  Wayne needs to make a little extra money."  To your

13  understanding, what was he referring to?

14  A    He was referring to the people that were -- that were in

15  trouble, that -- he was referring to helping them, the people

16  that were in trouble that had got -- Cletus had revoked their

17  probation.

18  Q    To your understanding, is William Stivers or Wayne Jones a

19  lawyer?

20  A    No.

21  Q    To your understanding, how were they going to help these

22  people who were caught in trouble with probation violations and

23  make extra money?

24  A    They were going to -- they were going to talk to Cletus

25  for them.

1  Q    What did that mean, to your understanding?

2  A    That he would help them out in court, that he would help

3  them in court.

4  Q    And how was that going to realize Jones and Stivers money,

5  to your understanding?

6  A    Because that would -- they would be able to receive money

7  from the people for helping them get out of trouble.

8          MR. PINALES:  Your Honor, may I approach?

9          THE COURT:  Yes, you may.

10      (Whereupon, the following discussion was had between the

11  Court and counsel at the bench, out of the hearing of the

12  jury.)

13          THE COURT:  Yes, sir.

14          MR. PINALES:  Martin Pinales on behalf of

15  Mr. Maricle.  Your Honor, I'm going to object to relevancy.  I

16  think we're going far, far afield of the allegations against my

17  client and I just think it's totally irrelevant and very

18  prejudicial.

19          THE COURT:  All right.

20          Mr. Smith?

21          MR. SMITH:  Your Honor, the indictment alleges that

22  these defendants, including Maricle, not only used the Board of

23  Elections but their personal office as circuit judge and Doug

24  Adams as superintendent used their offices to benefit

25  themselves both politically and pecuniary benefit.  This is a

1 | statement from one of the co-defendants, it says that he and
2 | Wayne are talking to Maricle himself saying that they need to
3 | make extra money, and I think it is relevant, I think it is
4 | permissive for this witness to say what his understanding of
5 | that comment was and what it related to.
6 |        MR. PINALES:  Your Honor, I think the comment speaks
7 | for itself.  He is speculating.
8 |        THE COURT:  Well, as to relevancy, I'll overrule the
9 | objection.
10 |        But, Mr. Smith, you'll need to establish the basis
11 | for this witness's statement as to how he interprets the
12 | statement that's been given in that manner, and maybe based on
13 | past conduct or other activities, but there needs to be a
14 | little better foundation for that.  But I'll overrule on
15 | relevancy.
16 |        Mr. Abell, yesterday at a bench conference, I had
17 | mentioned to counsel that if you requested me to instruct the
18 | jury that the statements of the cooperating witnesses were
19 | offered to put context — to provide context to the statements
20 | of the defendant that I would instruct the jury along those
21 | lines.  This morning there has been a lot of conversation
22 | involving Mr. Stivers.  Again, if the parties want me to advise
23 | the jury of their use of the White statements, I'll do that,
24 | but only if I'm requested to do so.  Okay.
25 |        MR. PINALES:  Quite candidly, I forgot about it last

1    night.  I'll think about it, yeah.

2              THE COURT:  Well, I just wanted to remind you.

3              MR. PINALES:  Thank you.  I appreciate that.

4              MR. WHITE:  Your Honor, Scott White on behalf of

5    Charles Wayne Jones.  I have been thinking about that, too.

6    Before we move to the next tape -- is this something that

7    you're thinking about giving like at a break or something to

8    kind of do it over all the tapes that are played or do you want

9    to do it after each one?

10             THE COURT:  I was going to wait until requested to do

11   so.

12             MR. WHITE:  Okay.  If we could, before we play the

13   next exhibit recording --

14             THE COURT:  A6?

15             MR. WHITE:  Yeah.  I may want to talk about that,

16   because I'm all over this one obviously, and I kind of need to

17   find out what others are going to do.

18             THE COURT:  All right.  If you want me to give that

19   instruction to the jury before the next exhibit would be

20   played, remind me of that and I'll do so.

21             MR. WHITE:  Thank you, Your Honor.

22             THE COURT:  Anything else while we're here?

23             All right.  Thank you.

24        (Whereupon, the following proceedings continued in open

25   court.)

1            THE COURT:  Thank you, Counsel.

2            And, Mr. Smith, you may proceed.

3   BY MR. SMITH:

4   Q    Mr. White, you have stated your understanding of what was

5   meant by the conversation of Stivers saying, "Me and Wayne need

6   to make a little extra money"?

7   A    Uh-huh.

8   Q    How do you know that Mr. Wayne Jones, Mr. Al Man Stivers,

9   had the ability to make money in circumstances such as this as

10  you've described?

11  A    I've heard — I've heard them make statements like that

12  several times.

13  Q    And those statements would have been made prior to this

14  one?

15  A    Yes.

16  Q    And could you tell us what they told you in the past?

17  A    They just — they would — well, just when court cases

18  would come up and stuff, they would talk about getting certain

19  people on the jury, that they needed to make money, and certain

20  things like that.

21  Q    So these comments had been made to you several times in

22  the past?

23  A    Yes.

24            MR. PINALES:  Your Honor, note my objection at this

25  point.

1          THE COURT:  All right.  The objection will be

2    overruled.

3    BY MR. SMITH:

4    Q    Mr. White, there was — earlier in the conversation

5    Mr. Maricle mentioned going to a singing and saw Rex there.  To

6    your understanding, who was he referring to?

7    A    Rex Sizemore.

8    Q    And who is Rex Sizemore?

9    A    He was — to my knowledge, I think he's Roy Sizemore's

10   brother and Harold Sizemore's brother, a local person that's

11   involved in politics, works — used to work for the school

12   board.

13   Q    Okay.  Roy Sizemore and Harold Sizemore's brother?

14   A    To my knowledge, I think that's correct.

15   Q    Okay.  And how was Rex Sizemore involved in politics at

16   this time, in 2007?

17   A    He was supporting Bruce Lunsford.

18   Q    Okay.  And Mr. Maricle made the statement, "And if they

19   got them in line that day, they got them all."  To your

20   understanding, what was he referring to?

21   A    He was — he was referring to Darnell helping them at the

22   precinct in Manchester to steal and buy votes.

23   Q    Maricle went on to say, "They were sitting right there

24   with Hawkeye and Darnell."  To your understanding, who was

25   sitting right there with Hawkeye and Darnell, to your

1  understanding?

2  A    Rex and, I think, Roy.

3  Q    And who is, to your understanding, Hawkeye?

4  A    Hawkeye is Earl Pennington.  He served as election officer

5  and also captain of that precinct in Manchester before.

6  Q    And Darnell, your understanding, who was that referencing?

7  A    Darnell is the city councilman, Darnell Hipsher.

8  Q    And is that the same Darnell that had replaced your wife

9  as election officer for this 2007 election?

10 A    Yes, it was.

11 Q    Now, Stivers said, "I'd say he did say that about Ray

12 Brown, about that magisterial district."  To your

13 understanding, who was he referring as Ray Brown?

14 A    He's a magistrate that had —— that had won the magistrate

15 seat for that district, Horse Creek.

16 Q    And to your understanding, what was he referencing here in

17 that comment about Ray Brown?

18 A    That they had got votes lined up for Ray Brown, that Ray

19 Brown was helping them.

20 Q    When you say he "got votes lined up for Ray Brown," what

21 are you referring to?

22 A    Votes —— bought votes.

23 Q    Finally, there was an exchange between Mr. Maricle and

24 Mary Betty and Stivers, and Stivers said, "No, he said it" at

25 the end.  Your understanding, who was he referring to?

1  A     Cletus Maricle.

2  Q     And what was he referring to, what was said?

3  A     He had said to not put my wife back in as election officer

4  in that Manchester precinct.

5        MR. SMITH:  Let's move on to the next segment.

6        (Whereupon, a portion of Government's Exhibit No. A5 from

7  00:56:30 to 00:57:51, was played to the Court and jury, after

8  which the following proceedings were had in open court.)

9  BY MR. SMITH:

10 Q     Mr. White, in this segment, there was a reference to

11 "William."  To your understanding, who was Mr. Maricle

12 referring to when he called the name "William"?

13 A     William Stivers, and then a plant — he worked at the

14 sewer plant in the City of Manchester.

15 Q     He made a comment something to the effect, so she had to

16 get somebody to be for and she picked on him.  You're

17 understanding, what was — who is he referring to as "she"?

18 A     Carmen Lewis, the new mayor.

19 Q     And to your understanding, what was he referring to as

20 "picking on him"?

21 A     Cause he had supported my father and wore a sticker that

22 she laid him off.

23        MR. SMITH:  Let's move on to the next segment,

24 please.

25        (Whereupon, a portion of Government's Exhibit No. A5,

1  00:58:44 to 01:03:10, was played to the Court and jury, after

2  which the following proceedings were had in open court.)

3  BY MR. SMITH:

4  Q    Mr. White, in this segment, it starts out with Maricle

5  making this comment, "He spent last week in London."  To your

6  understanding, who was he referring to?

7  A    Jennings White.

8  Q    And to your understanding, where was Jennings White during

9  this time that these conversations were being recorded?

10  A    He was in federal custody.

11  Q    And your wife made something — a comment something to the

12  effect, he's telling them something on Todd, Doug, and Vernon.

13  To your understanding, first of all, who's telling?

14  A    Jennings White.

15  Q    And who is she referring to, to your understanding, when

16  she calls the name "Doug"?

17  A    Doug White, my father.

18  Q    And Todd?

19  A    Todd Roberts.

20  Q    And Vernon?

21  A    Vernon Hacker.

22  Q    You made a comment to the group something, "They're going

23  to roll in here on the '02 election and bring smoke."  What

24  were you referring to?

25  A    I was referring to the FBI that was going to roll in and

1  get a lot of people for vote fraud.

2  Q    Stivers says, "Oh, hell, we'll all be then."  Your

3  understanding, what was he referring to?

4  A    That we'll all be in trouble, then, if they do that.

5  Q    And then his wife, Mary, says, "All the people he can give

6  them is the people that was for him."  To your understanding,

7  who was she referring to?

8  A    To the people that had been for Jennings White, that he

9  wouldn't have had contact with other people.

10  Q    Your wife says something, "I'll bet you a million dollars

11  he tells on Aunt Barb."  To your understanding, who was she

12  referring to?

13  A    My aunt, Barbara Colter.

14  Q    And who was she referring to when she says, "He might tell

15  on Aunt Barb"?

16  A    Jennings White.

17  Q    Mr. Jones says, "That's about the only person he's got to

18  tell on," and Mr. Jones says, "Hal Rogers won't let them."  To

19  your understanding, who is Mr. Jones referring to?

20  A    Hal Rogers, Representative Hal Rogers.

21  Q    Is he a United States Congressman?

22  A    Yes, he is.

23  Q    For a district that includes Clay County?

24  A    That's correct.

25  Q    And to your understanding, who was he referring to Hal

1  Rogers won't let who?

2  A    He was referring to the FBI.

3  Q    You made the statement following that something to the

4  effect of "Jennings White knows a thing on you, it's a

5  problem."  What were you referring to?

6  A    I was referring to if Jennings White knows anything on you

7  for election fraud that it's a problem.

8  Q    And then you said, "See, Doug Adams told me that a month

9  ago."  What were you referring to?

10  A    That he told me that Jennings was in London and that he

11  was cooperating with the feds.

12  Q    And when did you have that conversation with Mr. Adams?

13  A    About a month prior to this recording.

14  Q    Stivers makes the comment following that saying, "He's the

15  son of a bitch that started it all."  To your understanding,

16  who was he referring to?

17  A    Jennings White.

18  Q    Later in the conversation Mr. Maricle joins in and says,

19  "When Darrell and Ray Brown on the same ticket."  To your

20  understanding, who was he referring to?  Page 28.

21  A    He was referring to Darnell Hipsher and Ray Brown, the

22  magistrate.

23  Q    What did, your understanding, he mean with the term "same

24  ticket"?

25  A    That was a slate of candidates that they would be stealing

1   votes and buying votes for.

2   Q    And you made a comment, "Gas is the cheapest thing in the

3   world to buy votes with."  What were you referring to?

4   A    Ray Brown is the gas man that brings around, like, gas

5   tanks and –– that you –– like propane and that sort of thing,

6   and I was referring that he would be giving breaks to people

7   that would help him in the election on the gas.

8         MR. SMITH:  Let's move on to the next segment.  Thank

9   you.

10        (Whereupon, a portion of Government's Exhibit No. A5,

11  01:17:00 to 01:26:35, was played to the Court and jury, after

12  which the following proceedings were had in open court.)

13  BY MR. SMITH:

14  Q    Mr. White, in the segment just played, there was

15  conversation again there with Mr. Maricle interjecting, "I may

16  have thought it, but I never said it."  To your understanding,

17  what was he referring to?

18  A    He was referring to my wife not being put in as election

19  officer.

20  Q    And did he acknowledge to you later that he did say it?

21  A    Yes.

22  Q    Now, there was mention then further that, "I never told

23  you to put the Darnell" –– "to put that Darnell Hipsher in

24  there" by Mr. Maricle.  To your understanding, what was he

25  referring to, putting Darnell Hipsher in where?

1   A    As election officer.

2   Q    Further in that conversation, you made the statement

3   something to the effect that Wanda had to not get up, and

4   everybody was depending on Dobber.  What were you referring to?

5   A    In the primary, Wanda had been very active on the machines

6   on — when people would come to vote helping to steal the

7   votes, and in this time, because they were watching Wanda, they

8   had asked Wanda to stand back and let Dobber handle all of it,

9   because the word that they would be watching her, the other

10  side where my dad was running.

11  Q    And your wife, Wanda, said something, "Lord, he called me

12  how many times, five or six times."  What was she referring to

13  there, to your understanding?

14  A    Let's see, what page is that?

15  Q    Just following on page 36 there.  You said, "He had to go

16  out there, and they called him four or five..."  She said,

17  "Lord, he called me five or six times."

18  A    Okay.  I don't know who she's referring to there.

19  Q    Stivers made the comment later, "for sure that Anthony

20  said that Dobber got 5,000 in the primary."  To your

21  understanding, what was he referring to?

22  A    That Dobber had received $5,000 either to help or to buy

23  votes with.

24  Q    And Wayne Jones mentioned, I bet it's J.E.  To your

25  understanding, who is J.E.?

1  A    He's referring to J.E. Hensley, a former business partner

2  of my dad.

3  Q    And to your understanding, what was J.E.'s involvement?

4  A    My understanding from this conversation that J.E. was the

5  man that had put the $5,000 up for –– to help Mayor –– the

6  current mayor get elected.

7  Q    And when Stivers says, "You don't think he would

8  double–cross Doug," to your understanding, which Doug was he

9  referring to?

10 A    My dad.

11 Q    Finally, you made a comment something that J.E. took his

12 money to Dobber instead of putting it in the regular pot down

13 there.  What were you referring to, a pot?

14 A    That Jamie is what you're –– referring to the pot that

15 they get up for the council ticket in the regular council.

16 Q    Jamie?  And who were referring to as Jamie?

17 A    Jamie Mills, he was a council member at that time.

18       MR. SMITH:  Your Honor, it doesn't appear that we're

19 going to get through this entire audio recording in the next

20 15 minutes.  I don't know if you want to take a break at this

21 point or ––

22       THE COURT:  That'll be fine.

23       MR. SMITH:  –– we can go through another short

24 segment or two if the Court wants.

25       THE COURT:  We'll go ahead and take our break at this

1   type.

2          We'll take a 15-minute recess, ladies and gentlemen.

3   Please keep in mind the admonition that you were given

4   previously, and the jury will be excused for 15 minutes.

5          (Whereupon, the jury retired from the courtroom, after

6   which the following proceedings were had in open court.)

7          THE COURT:  Thank you.  We'll be in recess for

8   15 minutes.

9          (Whereupon, a short recess was had, after which the

10  following proceedings were had outside the presence of the

11  jury.)

12         THE COURT:  Thank you.

13         The record will reflect the jury is not present.  I

14  understand that one of the attorneys has an issue to take up

15  before the jury comes back.

16         MR. PINALES:  Your Honor, we were discussing trying

17  to get some kind of consensus, which is difficult with a group

18  of lawyers, and we have — we would request the admonition to

19  the jury.

20         THE COURT:  All right.  The instruction that the

21  Court will give to the jury is as follows:

22         At the time the audio recordings were made, Kennon

23  White and his wife, Wanda White, were cooperating with the

24  United States.  You're instructed that their statements on

25  these audio recordings are admitted to provide context for the

1  defendants' statements.

2           That will be the instruction given by the Court.

3           MR. PINALES:  Thank you.

4           THE COURT:  All right.  Thank you.

5           Any objection?

6           MR. SMITH:  No, Your Honor.

7           THE COURT:  That's consistent with the Court's

8  pretrial ruling on those matters as well.

9           All right.  We can bring the jury in.

10      (Whereupon, the jury returned to the courtroom, after

11  which the following proceedings were had in open court.)

12          THE COURT:  Thank you, and please be seated.

13          And if you could, please, bring the witness back in.

14          Thank you.  And the record will reflect that all

15  members of the jury are present, all parties and counsel are

16  also present.  Mr. White has returned to the witness stand,

17  he's reminded that he's still under oath.

18          And, Mr. Smith, before you continue, let me advise

19  the jury that at the time the audio recordings -- audio

20  recordings were made, Kennon White and his wife, Wanda White,

21  were cooperating with the United States.  You're instructed

22  that their statements on the audio recordings are admitted to

23  provide context for the defendants' statements, and you are so

24  instructed.

25          Mr. Smith, I believe we were still discussing Exhibit

 1  A5 and A5A, if I'm not mistaken.

 2              MR. SMITH:  Yes, Your Honor.

 3              THE COURT:  You can continue.

 4              MR. SMITH:  If the Court please, we would like to

 5  play our next segment.

 6              THE COURT:  Yes, sir, you may.

 7              MR. SMITH:  Thank you.

 8       (Whereupon, a portion of Government's Exhibit No. A5,

 9  01:35:20 to 01:36:55, was played to the Court and jury, after

10  which the following proceedings were had in open court.)

11  BY MR. SMITH:

12  Q    Mr. White, at the beginning of that segment, your wife

13  says, "I wonder if William will be able to draw unemployment."

14  To your understanding, who's she referring to?

15  A    William Stivers, the person that the current mayor of

16  Manchester had laid off at the sewer plant at that time.

17  Q    Now, had you banked upon someone getting William Stivers'

18  family to help you-all in the election?

19  A    Yes.

20  Q    And who had you banked on getting his support?

21  A    I banked on Roy Morgan helping to get the support, Cletus

22  Maricle, and William Stivers that worked at the City.

23  Q    And did you learn that it was unsuccessful in getting his

24  support for your father's race?

25  A    Yes, his family's support that lived in the city, it was

1  unsuccessful.

2  Q    And what part did you expect Cletus Maricle to play in

3  that?

4  A    He was going to try to talk with Roy Morgan, which is a

5  relative of them, and see if he could help to get them to be

6  for us.

7  Q    Further in the conversation, there's mention of Crawdad

8  and Stanley.  To your understanding, who's being referred to

9  there?

10  A    That's Carl "Crawdad" Sizemore, the current county judge

11  of Clay County.  Stanley Bowling, which is a defendant here

12  today, and a magistrate of Clay County.

13  Q    Now, toward the latter part of the conversation of this

14  segment, Stivers said something about, mine is all serving

15  time.  "That Blue John came to me today, son."  To your

16  understanding, who's he referring to?

17  A    That's a nickname for a family that lives on Horse Creek

18  in Manchester.

19  Q    And what was the relevance of the Blue John's family in

20  this conversation?

21  A    They had came to Al Man to ask about helping to get out of

22  trouble with — for him to talk with Cletus, and the last time

23  that he had helped them they had made a statement that Daddy Al

24  Man would get me out of jail, and it had caused some friction.

25  Q    And what kind of trouble were they in?

1  A    For selling drugs, is my understanding.

2        MR. SMITH:  Let's move on to the next segment,

3  please.

4        (Whereupon, a portion of Government's Exhibit No. A5,

5  01:41:51 to 01:50:08, was played to the Court and jury, after

6  which the following proceedings were had in open court.)

7  BY MR. SMITH:

8  Q    Mr. White, you and your wife were in a conversation with

9  Mr. Stivers, and I believe that at the middle point there

10 Mr. Stivers says –– or your wife says, "You can't trust David

11 Hensley."  And Stivers says, "I don't want to get you in no

12 trouble."

13       To your understanding, what was he referring to about not

14 getting you or your wife in no trouble?

15 A    He didn't want –– he was saying that he didn't want Wanda

16 to serve as election officer, and because he knew what was

17 going on at the polls, that he didn't want her to be the one to

18 get in trouble if someone was going to get in trouble.

19 Q    Further in that conversation, your wife, Wanda, said,

20 "Well, I didn't have anything to do in the '02 election."  And

21 then I believe that one of the other participants of the

22 conversation said something "Well, what about White, White,

23 White?"  Do you recall that?

24 A    Yes.

25 Q    And what, to your understanding, was that being referenced

1  to by Ms. Stivers in the circumstance where she used the term

2  "White, White, White" in the '02 election?

3  A    It was a joke between everybody that she liked to always

4  joke to my wife about because there was a mentally challenged

5  man that was older that he would walk up and down the road and

6  usually Wayne would vote him and he —

7  Q    Wayne who?

8  A    Jones.  And Wanda had picked him up that day and took him

9  to the Clerk's Office and he had voted — Jennings White had

10  voted him on the machine, and he had came out of there and said

11  that Jennings White had voted him White, White, White, because

12  they was so many Whites on the ballot.

13  Q    Following that comment, Ms. Stivers said something to the

14  effect, he don't want to hear that.  And Mr. Stivers said,

15  "Yeah, he gets so damn mad he can't stand it."  To your

16  understanding, who were they referring to?

17  A    Cletus Maricle.

18  Q    And what had happened at this point during the recording?

19  A    We were talking — we were talking about the election, and

20  he had left and that was what we were talking about.

21  Q    To your understanding, why was Mr. Maricle going to leave

22  the conversation at that point?

23  A    Because that he did not want to be in an incriminating

24  conversation.  He sometimes catches hisself and he doesn't like

25  to expose hisself in that way.

1  Q    Well, Mr. Stivers made some comment, "He's tore up over

2  Darnell.  They get you on the stand."  To your understanding,

3  what was he referring to?

4  A    He was referring that he, in a situation like we were

5  talking, that Cletus Maricle would be afraid that he would be

6  called to the stand in an election case or something to do with

7  criminal activity.

8  Q    Toward the end of the conversation, your wife and

9  Mr. Stivers again talk about Anthony and something to the

10  effect, he says, "It's Anthony's fault."  To your

11  understanding, who's he referring to?

12  A    He refers to Anthony Short, my brother-in-law's attorney.

13  Q    And fault for what, to your understanding?

14  A    For not getting the correct paperwork filed so that Cletus

15  can let me brother-in-law out of jail.

16  Q    And were you-all promised that?

17  A    Yes.

18  Q    And who promised that to you?

19  A    Cletus Maricle.

20  Q    And Mr. Stivers related that it wasn't Cletus's fault but

21  Anthony Short, the lawyer's?

22  A    That's correct.

23  Q    And at the end of that last clip she said something, "The

24  young 'uns been down there how long?  Three years."  To your

25  understanding, who was she referring to?

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          38

1    A      My brother-in-law.

2            MR. SMITH:  I would like to now direct the witness to

3    Government's Exhibit A6, Your Honor.

4            THE COURT:  Yes, sir.

5            MR. SMITH:  And also for the record A6A.

6    BY MR. SMITH:

7    Q    Can you identify the disk that's been handed to you,

8    Mr. White, as Government's Exhibit A6?

9    A      Yes, it's a disk of the recording that was made by me with

10   some other defendants.

11   Q    And what was the date of the recording, Mr. White?

12   A      It was April the 11th, 2007.

13   Q    And were you a participant in that recording?

14   A      Yes, I was.

15   Q    And have you had an opportunity to review that before

16   testifying this morning?

17   A      Yes, I have, several times.

18   Q    And is that an accurate recording of the conversation in

19   which you were a participant?

20   A      Yes, it is.

21   Q    And you also have before you Government's Exhibit A6A.

22   A      Yes.

23   Q    And what is that?

24   A      That's a transcript of the conversations in this

25   recording.

1  Q    Have you had an opportunity to compare the transcript with

2  the recording in which you were a participant?

3  A    Yes, I have, several times.

4  Q    And does that transcript reasonably capture the

5  conversation that was recorded?

6  A    Yes, it does.

7  Q    And you've had an opportunity to compare those two?

8  A    Yes, I have.

9         MR. SMITH:  I would move for the introduction of

10  Government's Exhibit A6 and A6A, Your Honor.

11         THE COURT:  Any objection other than those previously

12  stated?

13      (No audible response.)

14         THE COURT:  Exhibits A6 and A6A will be admitted.

15         MR. SMITH:  I move to publish at this time.

16         THE COURT:  You may.

17      (Whereupon, a portion of Government's Exhibit No. A6,

18  00:04:20 to 00:04:30, was played to the Court and jury, after

19  which the following proceedings were had in open court.)

20  BY MR. SMITH:

21  Q    Mr. White, where was this recording made?

22  A    At Al Man Stivers's residence.

23  Q    And as you were entering, it sounds as though you were

24  walking.  Is that what you were doing?

25  A    Yes, I was walking to his back door.

1  Q    And you made a statement that Cletus slipped on the floor?

2  A    Yes.

3  Q    Could you tell us what you were referring to there?

4  A    Yeah, he was standing at the door when we were walking up,

5  and he came to the door and the door was open, the back door,

6  and he started to come out the door quickly and his feet flew

7  out from under him and he fell.

8         MR. SMITH:  All right.  Proceed.  Thank you.

9         (Whereupon, a portion of Government's Exhibit No. A6,

10  00:04:30 to 00:13:40, was played to the Court and jury, after

11  which the following proceedings were had in open court.)

12  BY MR. SMITH:

13  Q    Mr. White, this conversation earlier occurred on April

14  the 11th?

15  A    Yes.

16  Q    And who were the participants in the conversation?

17  A    It was myself, my wife, Cletus Maricle at the first of the

18  conversation, Al Man Stivers, and Wayne Jones and Mary Stivers.

19  Q    And as we heard from that first clip, Mr. Stivers said

20  they got Jan and Mary Lou again.  To your understanding, who's

21  he referring to as Jan and Mary Lou?

22  A    He's referring to Mary Lou Roberts and — sometimes known

23  as Sizemore and Jan Rombles.

24  Q    And to your understanding, what are they — what did he

25  mean when he said, "They got them"?

1    A    They had arrested them for dealing drugs.

2    Q    And then you made the comment, "Cletus has got plenty of

3    work ahead of him, don't he, 51 of them."  What were you

4    referring to?

5    A    I was — they had had a drug roundup in the county and

6    they had arrested around that amount of people.

7    Q    And were those subjects going to be brought before Cletus

8    Maricle as judge?

9    A    Yes.

10   Q    And, finally, there was mentioned something about didn't

11   know if Carmen was the mayor or not, and you said, "Ouchie said

12   he's ready to do that."  What were you referring to?

13   A    I was referring to they were talking about a lawsuit to

14   remove Carmen from being the current mayor.

15   Q    And who were you referring to as "Ouchie"?

16   A    Ouchie was a — was a candidate for council and a former

17   council member.

18          MR. SMITH:  Let's move on to the next segment.

19          (Whereupon, a portion of Government's Exhibit No. A6,

20   00:14:12 to 00:20:15, was played to the Court and jury, after

21   which the following proceedings were had in open court.)

22   BY MR. SMITH:

23   Q    Mr. White, in this segment, there was conversation between

24   you and the Stivers, and Ms. Stivers said something about, tell

25   you about bad luck, jury duty.  And Mr. Stivers says, "We'll

1  make a killing, dammit," and says that "We'll make a killing"

2  again several times.  Your understanding, what was he referring

3  to?

4  A    He's referring to being on jury duty, to his wife being on

5  jury duty.

6  Q    Okay.  And what's that got to do with making a killing.

7  What was he talking about, to your understanding?

8  A    Well, when people are on jury duty, they can get money for

9  verdicts that's rendered in insurance cases or criminal cases

10  and that sort of thing.

11  Q    And how do they go about getting money serving on juries?

12  A    They bribe them.

13  Q    And who, to your knowledge, is involved in bribing juries

14  in Clay County?

15  A    Well, who I've heard, Al Man Stivers and Wayne, Bill

16  Roland Phillips, used to be George Duff, he passed away, just

17  numerous different people.

18  Q    Now, Ms. Stivers recalls an instance where she was serving

19  as a juror and she referred, I believe, in the conversation

20  that she said, "Cletus called each of us individually back

21  there with Yancey, Annette, and Steve Yapp."  To your

22  understanding, who was she referring to there as Cletus?

23  A    Cletus Maricle.

24  Q    And back there with Yancey.  Who was she referring to

25  there?

1   A    Yancey White.

2   Q    And Annette?

3   A    Annette Morgan.

4   Q    And what were their roles at that time?

5   A    They were representing, from my understanding, the Yapp,

6   who was a defendant in a murder case.

7   Q    Finally, Ms. Stivers says, I knew that whatever jury they

8   got up there, they was going to find, that Yapp looking outfit,

9   I knew they was going to find him innocent.  To your

10  understanding, what was she referring to?

11  A    She was referring that they were picking a jury that

12  would -- that would ensure that the man would not be convicted

13  of the murder of that -- of that man.

14  Q    Were you in Clay County at the time that case was tried?

15  A    Yes.

16  Q    And was that a high-profile case, to your recollection?

17  A    Yes, it was.

18  Q    And did you know the defendant, as to what he -- what

19  position in the community he held?

20  A    I believe, if my memory serves me correctly, he worked at

21  the hospital.

22  Q    And was he a native of Clay County?

23  A    No, he was not.

24  Q    Do you know where he was from?

25  A    No, I don't.

KENNON WHITE - CONTINUED DIRECT - MR. SMITH          44

1    Q    Do you know what happened to him after the verdict?

2    A    Yes, he — from my understanding, he moved away from Clay

3    County.  He was acquitted of murder, and he — his house — he

4    sold his house, and Cletus Maricle and Poodle Marcum ended up

5    being the owners of the home.

6    Q    So after the verdict of innocent, he left town?

7    A    Yes.

8    Q    Did he move out of state?

9    A    I don't know for sure.

10   Q    And he sold his property to the Judge, Cletus Maricle?

11   A    He ended up with the property.

12   Q    Okay.

13   A    Him and Poodle Marcum.

14   Q    Did you talk with Cletus about it later, did he confirm

15   that fact to you?

16   A    Yeah, he told me.

17   Q    And when did he tell you that he actually ended up owning

18   the property?

19   A    It was after the verdict.

20        MR. SMITH:  If we could now play the next segment,

21   please.

22        (Whereupon, a portion of Government's Exhibit No. A6,

23   00:21:33 to 00:39:36, was played to the Court and jury, after

24   which the following proceedings were had in open court.)

25   BY MR. SMITH:

1  Q    Mr. White, there was a conversation in this last clip

2  about a fellow by the name of Mike White, and Jones says, "I

3  knew he was against Doug when he didn't vote absentee."  From

4  your understanding, who was he referring to?

5  A    Mike White, it's the City Supervisor, general supervisor

6  of the City.

7  Q    And was this an election in which Wayne Jones was serving

8  as an election officer voting absentee voters?

9  A    Yes, it was.

10  Q    And when he said he was against Doug, was that -- who was

11  he referring to?

12  A    Mike White that was the --

13  Q    Which Doug was he referring to?

14  A    Doug White, my father.

15  Q    There's also mention by your wife that she -- there was a

16  Mark or a Bart, she said, "Well, I know I voted him."  Who was

17  she referring to?

18  A    Bart Morris.

19  Q    And when she voted him, what was she meaning, to your

20  understanding, about how she would vote Bart Morris?

21  A    When people's comes in that's helping you, a lot of times

22  they will tell you to vote them when you're an election officer

23  and you're participating in this thing together so that you'll

24  know how they -- how they really are, about if they're for you.

25  So, yes, she's talking about voting Bart Morris.

1  Q    Did she vote other members of the group in '06?

2  A    You'd have to ask her.

3  Q    Okay.  Did she tell you she voted other members of the

4  group?

5  A    Yes, she voted — she said she voted Judy Maricle.

6         MR. SMITH:  Let's move on to the last clip.

7         (Whereupon, a portion of Government's Exhibit No. A6,

8  00:41:30 to 00:48:51, was played to the Court and jury, after

9  which the following proceedings were had in open court.)

10 BY MR. SMITH:

11 Q    Mr. White, in this segment, there was a listing of

12 numerous people charged with drug crimes, and Mr. Jones said —

13 it sound like he said, "UNITE likes them numbers."  Do you

14 understand what he was referring to?

15 A    The number of people that was arrested in the drug

16 roundup.

17 Q    And UNITE being what?

18 A    That's the Drug Task Force for Southeastern Kentucky.

19        MR. SMITH:  Your Honor, that is, I think, the

20 completion of our last exhibit, and it might be a place we can

21 stop.

22        THE COURT:  All right.  Thank you.

23        We will take our lunch break at this time, ladies and

24 gentlemen.  Please keep in mind the admonition that you've been

25 given several times not to discuss the case while among

 1   yourselves while we are in recess.  I will again remind you to

 2   avoid any contact with any of the parties, attorneys, or

 3   witnesses in the case.  Please avoid any — or reading any

 4   matters or listening to any matters over the lunch hour about

 5   the case.  And, of course, don't make up your mind about the

 6   case until it is finally submitted to you.  The jury will be

 7   excused until 1:00 p.m. this afternoon.

 8        (Whereupon, the jury retired from the courtroom, after

 9   which the following proceedings were had in open court.)

10             THE COURT:  Thank you.

11             Any matters to take up outside the presence of the

12   jury?

13             MR. PINALES:  Yes, Your Honor.  I would like —

14             THE COURT:  All right.  Please be seated.

15             Mr. Pinales.

16             MR. PINALES:  Thank you.  I might ask that the

17   witness be excused.

18             THE COURT:  All right.

19             Mr. White, you may be excused until 1:00.  Thank you.

20             Yes, sir.

21             MR. PINALES:  Your Honor, I would like to renew my

22   objection to the commentary that is coming, you know, after the

23   tape is played, after it is written and highlighted in yellow.

24   I think that it is asking this witness what his impression is

25   of what is going on in someone else's mind, and questions —

1    the last question that was asked, as an example, is, well,

2    UNITE likes those numbers, and what did he mean by that?  And I

3    think that — and I'm not making it exactly — because I can't

4    write that quickly, exactly as a quote, but it's reoccurring

5    over and over again, and I would like for all of that record be

6    stricken and short of that a continuing objection, Your Honor.

7            MR. RICHARDSON:  We'll join in that objection, too,

8    Your Honor.

9            THE COURT:  Mr. Smith's last question was whether the

10   witness had an understanding of what was being referred to, the

11   reference to UNITE, so he was clearly asking for the witness's

12   understanding.  I don't believe that the questions that have

13   been asked of the witness for his understanding have been

14   improper in any way, so I will overrule the objection.

15           Any other matters that the parties wish to take up?

16      (No audible response.)

17           THE COURT:  All right.

18           MR. PINALES:  Thank you, Your Honor.

19           MR. WESTBERRY:  1:00, Judge?

20           THE COURT:  1:00, yes, sir.  Thank you.

21      (Whereupon, a recess was had for the noon hour, after

22   which the proceedings continue uninterrupted to Volume 7-B.)

23                       (Proceedings concluded at 11:57)

24

25

1              C E R T I F I C A T E

2        I, Cynthia A. Oakes, certify that the foregoing is a

3   correct transcript from the record of proceedings in the

4   above—entitled matter.

5

6   2/13/2010                      s/CYNTHIA A. OAKES
        DATE                       CYNTHIA A. OAKES, RPR, RMR, CRR
7

8

9

10                    I N D E X

11                                            PAGE

12  Testimony of KENNON WHITE:
            Direct Examination by Mr. Smith:          4
13

14

15                   E X H I B I T S

16

17  Government's                                      Page
    Exhibit No.           Identified             Admitted
18
        A5                    4                     6
19      A5A                   4                     6
        A6                   38                    39
20      A6A                  38                    39

21

22

23

24

25