United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09–16–S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) February 19, 2010 |
| DOUGLAS C. ADAMS | ) 8:30 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 10–A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:   STEPHEN C. SMITH, ESQ.
                                  JASON D. PARMAN, ESQ.

On behalf of the Defendant        DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:           MARTIN S. PINALES, ESQ.

On behalf of the Defendant        R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                 KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant        T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant        ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant        RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:               R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant        JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, Kentucky  40741
 5

 6   On behalf of the Defendant     DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:        107 East First Street
 7                                   Corbin, Kentucky  40701

 8                                   MARTIN S. PINALES, ESQ.
                                     150 East Fourth Street
 9                                   Federal Reserve Building
                                     Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant     R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:              KRISTEN N. LOGAN, ESQ.
12                                   220 West Main Street
                                     Suite 1900
13                                   Louisville, Kentucky  40202

14
     On behalf of the Defendant     T. SCOTT WHITE, ESQ.
15   Charles Wayne Jones:           133 West Short Street
                                     Lexington, Kentucky  40507
16

17   On behalf of the Defendant     ROBERT L. ABELL, ESQ.
     William E. Stivers:            120 North Upper Street
18                                   Lexington, Kentucky  40507

19
     On behalf of the Defendant     RUSSELL JAMES BALDANI, ESQ.
20   Freddy W. Thompson:            R. TUCKER RICHARDSON III, ESQ.
                                     300 West Short Street
21                                   Lexington, Kentucky  40507

22
     On behalf of the Defendant     JERRY W. GILBERT, ESQ.
23   William B. Morris:             212 North Second Street
                                     Richmond, Kentucky  40475
24

25
```

```
 1   On behalf of the Defendant       ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                 201 West Short Street
 2                                    Lexington, Kentucky   40507

 3
     On behalf of the Defendant       DANIEL A. SIMONS, ESQ.
 4   Stanley Bowling:                 116 West Main Street
                                      Suite 2A
 5                                    Richmond, Kentucky   40475

 6
     Court Reporter:                  CYNTHIA A. OAKES, CRR
 7                                    Official Court Reporter
                                      United States District Court
 8                                    560 Athens Boonesboro Road
                                      Winchester, Kentucky   40391
 9                                    (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

4

1          (Whereupon, the following proceedings were had in

2    chambers.)

3          THE COURT:  Good morning.  We're holding this session

4    back in my library because I don't think it's necessary to —

5    for all parties to be present.  Ms. Hughes is present and

6    Mr. Smith.  I understand that Ms. Morris is ill this morning.

7          MS. HUGHES:  That's right.  She looked horrible when

8    I walked in the door and I asked her if she was okay.  She said

9    that she was ill.  I asked her what kind of ill.  She told me

10   that she had been vomiting and her husband said that on their

11   way here this morning they had to stop twice on the road and

12   she had vomited.

13          So I notified the court security officer that this

14   issue was going on in order to ask permission that if something

15   overcame her, she could discreetly or semi-discreetly, to the

16   extent you can be discreet in a courtroom, step out of the

17   backdoor.

18          THE COURT:  Of course, she has a right to be present

19   at all stages, all critical stages of the proceeding, and we're

20   getting to the point now where you're going to be cross-

21   examining one of the key witnesses in the case and she

22   certainly is entitled to be present —

23          MS. HUGHES:  Absolutely.

24          THE COURT:  — when that takes place.  If we need to

25   stop the proceedings so she can leave the courtroom, then we'll

1  do that.  We'll try to be as discreet as we can.

2        The problem that I see is that it's going to be hard

3  from where she's seated to get out of the courtroom very

4  discreetly.  There is this side door here, she could come into

5  my office if she didn't think she could --

6        MS. HUGHES:  Make it?

7        THE COURT:  -- make it to the restroom, and that may

8  be the best way to handle that.

9        Now, the problem may be, from a worst case scenario,

10  you could be up cross-examining the witness and you wouldn't

11  realize what's going on behind you.  So we may have to take a

12  quick break.

13        MS. HUGHES:  Right.  And hopefully it will be the

14  best case scenario and we'll make it through the morning and

15  she'll start to feel better.  I will say that I certainly trust

16  and would rely upon Mr. Gilbert and Mr. Simons, who sit on

17  either side of me, to notify the Court if we need to take a

18  break, and I can certainly advise them -- I mean, Mr. Gilbert

19  is Mr. Morris's attorney, so he certainly knows what's going

20  on.  And if I could just tell them that if we need to take a

21  break, if they could just go on and be obnoxious and jump up

22  and, you know, ask the Court to do that.

23        THE COURT:  All right.  Well, I'll certainly stop the

24  proceedings.  If you're cross-examining a witness and

25  Ms. Morris has to leave, I'll stop the proceedings.  I may tell

1  the jury that, you know, we're in the — this is the cold and

2  flu season, there may be some folks that aren't feeling well,

3  so I may need to stop the proceedings from time to time and

4  they shouldn't infer anything from that when that takes place.

5          MS. HUGHES:  All right.

6          THE COURT:  That's about the only way I know to

7  handle it.

8          MS. HUGHES:  I think that's fine.  And I will — it

9  will come as no surprise that I do not anticipate my cross-

10  examination of this witness will be very lengthy.

11          THE COURT:  All right.

12          Mr. Smith do you have any comments on any other — or

13  any other suggestions on how to handle this?

14          MR. SMITH:  Just that I'm going to upset with

15  Ms. Hughes if we all get sick.

16          THE COURT:  Well, this is Friday and we don't have

17  Court on Monday.  I'm sure the jury is going to be disappointed

18  when I remind them of that today, but hopefully that won't

19  happen.  That is the time of the year that we're dealing with

20  and there's nothing we can really do about that, so —

21          MS. HUGHES:  Flu and snow.

22          THE COURT:  I'm told that spring is just around the

23  corner.

24          MS. HUGHES:  The groundhog didn't see his shadow.

25  The day we started trial was Groundhog Day.

1          THE COURT:  Well, I've also been advised that you

2   should never start a trial on Groundhog Day, but that's another

3   story.

4          Anything else we need to go over?

5          MS. HUGHES:  No, sir, I appreciate it.

6          MR. SMITH:  No, sir.

7          THE COURT:  Mr. Smith, have you updated anyone on the

8   issue we talked about -- I forget to raise the issue at the end

9   of the session yesterday on the text message issue.

10         MR. SMITH:  Oh, I did talk with agents last evening,

11  they hadn't gotten a response.  I'm waiting on a response from

12  them this morning.  They were calling again.

13         THE COURT:  Well, whenever you receive information,

14  I'm just going to let you advise counsel for the defendants and

15  then we can take it up.  I'm not going to keep raising it until

16  I have more information.

17         MR. SMITH:  I hope to have an answer this morning.

18         THE COURT:  All right.  I appreciate that.

19         All right.  We'll trudge ahead.  Thank you.

20       (Whereupon, the jury entered the courtroom, after which

21  the following proceedings were had in open court.)

22         THE COURT:  Thank you, and good morning, everyone.

23         The record will reflect that all members of the jury

24  are present.  The parties and counsel are also present.

25  Mr. White has returned to the witness stand and he is still

KENNON WHITE/CROSS - MR. GILBERT                    8

1    under oath.

2            THE WITNESS:  Thank you, Your Honor.

3            THE COURT:  Let's see, Mr. Gilbert, you're about to

4    begin cross-examination.

5            Before you do, ladies and gentlemen, there are a few

6    folks here that are not feeling well today, maybe a little bit

7    under the weather.  So if we need to take a quick break, I'll

8    need to excuse you, and I want to remind you in advance of the

9    admonition.  I won't have time to do that if we need to take a

10   quick break, but I'll advise you if we need to take a quick

11   break and we'll proceed in that manner.

12           All right.  Mr. Gilbert.

13           MR. GILBERT:  Thank you, Your Honor.

14                        KENNON WHITE,

15   being previously duly sworn, was examined and testified further

16   as follows:

17                      CROSS-EXAMINATION

18   BY MR. GILBERT:

19   Q    Good morning, Mr. White.

20   A    Good morning.

21   Q    My name is Jerry Gilbert, and I represent Bart Morris.

22   A    Okay.

23   Q    I'll try to be brief.  Number six on the list, there's a

24   lot of questions that have been asked you over the last couple

25   of days, and I just want to get into a couple of issues with

1    you; okay?

2    A    All right.

3    Q    The first thing I would like to discuss with you is the

4    meeting that you described at the old courthouse.  I believe

5    that you testified that that was about two weeks prior to the

6    2002 primary?

7    A    It was somewhere around that time, yes.

8    Q    Okay.  And present at that meeting was Jennings White?

9    A    Yes.

10   Q    Edd Jordan?

11   A    Yes.

12   Q    Tommy Harmon?

13   A    Yes.

14   Q    Yourself?

15   A    Yes.

16   Q    And your wife, Wanda?

17   A    No, my wife was not there.

18   Q    She was not there?

19   A    Huh-uh.

20   Q    Todd Roberts?

21   A    Yeah, he came up.  And my wife may have came by, but she

22   wasn't actually in the building, she was out in a car.  Todd

23   Roberts came by later when the meeting was going on, but —

24   Q    Okay.  And Doug Bowling?

25   A    Yes.

1  Q    And Bart Morris and Stanley Bowling?

2  A    Yes.

3  Q    Was anyone else at that meeting that you recall?

4  A    They were others, but I'm not recalling who they were.

5  But they was others there.  Some I didn't even know.

6  Q    So you believe there may be others, but you're unable to

7  identify those at this time?

8  A    That's right.

9  Q    Now, in 2002, you testified that you consulted various

10 individuals before deciding to enter the race for jailer.

11 A    That's right.

12 Q    And the first person you went to was Jennings White?

13 A    Yes.

14 Q    And as you testified, he's a relative of yours?

15 A    He's a distant cousin; that's correct.

16 Q    And mentored you in elections back in the '90s?

17 A    He helped with my aunt's race where she ran for

18 representative in the '90s; that's correct.

19 Q    And after you met with him, you said that you met

20 individually with both Bart Morris and Stanley Bowling.

21 A    I met with them individually and together.

22 Q    Okay.  And their advice to you was similar, in that you

23 needed the support of the school board and Jennings White?

24 A    Yes.

25 Q    Now, that turned out to be an impossibility in that May

1    primary?

2    A    That's correct.

3    Q    None of the candidates that ran a countywide election had

4    the support of both the school board and Jennings White?

5    A    I will not say that they did not — that they wasn't any

6    candidate ran that didn't have some support from both sides

7    because they probably was.

8    Q    All right.  One of the races in that May primary was

9    Barbara Colter and Tim Couch?

10   A    That's correct.

11   Q    Jennings White supported Barbara Colter?

12   A    Yes.

13   Q    And the school board supported Tim Couch?

14   A    To my knowledge.

15   Q    County judge, James Garrison and Roy Morgan.  The Whites

16   supported James Garrison; is that correct?

17   A    Yes.

18   Q    And the school board would have supported Roy Morgan?

19   A    In most precincts.

20   Q    All right.  County court clerk, obviously, Jennings White

21   and Freddy Thompson?

22   A    That's right.

23   Q    The school board supported Freddy Thompson?

24   A    Yes.

25   Q    And Mr. White would have supported himself obviously?

1  A    Yes.

2  Q    Sheriff Edd Jordan and Danny Reid, Jennings White

3  supported Edd Jordan?

4  A    Yes.

5  Q    And the school board supported Danny Reid?

6  A    No, that's — they didn't fully support.  Their main

7  concern at this time was getting Freddy Thompson elected, it

8  didn't matter who else was running.  Danny Reid was even a

9  cousin to Doug Adams, but he did not support him fully because

10 his main concern was getting Jennings White beat and getting

11 ahold of the County Court Clerk's Office.

12 Q    All right.  But none of the candidates in the sheriff race

13 enjoyed both the support of the school board and Jennings

14 White?

15 A    I will not say that.  I know that in my race that they was

16 a couple of precincts that — like South Fork and Oneida, which

17 are commonly school board precincts, that I got support from

18 people from the board, and I testified to that earlier in this

19 trial.

20 Q    Yes, sir.

21 A    So they are, you know, times that you will find pockets of

22 support and you might be able to dip in and get support here

23 and then may not have it in another precinct.  But, yes, the

24 school board — some of the school board give me some votes in

25 Oneida and South Fork.

1  Q    Those are the only two precincts?

2  A    To my knowledge, that's correct.

3  Q    And you enjoyed no support from the school board other

4  than those two precincts?

5  A    Not my knowledge.

6  Q    All right.  So what Bart and Stanley told you at that time

7  turned out to be true?

8  A    That I would need the support of Doug Adams and Jennings

9  White if I was to have a sure thing and win, as well as Cletus

10 Maricle told me that.

11 Q    All right.  Now, you also testified that prior to the 2006

12 primary that you were at Bart Morris's garage where you

13 observed some absentee ballots.

14 A    Several times.

15 Q    All right.  And I believe you testified that there was a

16 stack of them.

17 A    There was a stack of them several different times.

18 Q    And you also described to the jury the stack as — you

19 placed your hands, from my point of observation, it appeared to

20 be eight to ten inches?

21 A    But the stack was turned over in Darnell's seat, one stack

22 was.  Now, a lot of the stacks was smaller than that, but the

23 stack was a seatful, I couldn't — I mean, they were a seatful

24 of those in Darnell's passenger side when he would pull up.

25 And I have seen numerous times that they were, you know, quite

 1  a few absentee ballots.  I've seen stacks that was stacked, you

 2  know, that probably — well, somewhere around that, that's

 3  pretty good stacks.  But now they was — at one time I seen a

 4  really large bunch that were laying in Darnell's seat.  Now,

 5  how much they stacked up to when he would get them out, because

 6  he would grab them and bring a few in and they would sit down

 7  and fill them out.  You know, I mean, that's what he done.

 8  Q    How many absentee ballots would you say would be in a

 9  stack this high?

10  A    A stack that high, I'd say that would be quite a few, sir.

11  Q    Two to 300?

12  A    I don't have any idea.

13  Q    150?

14  A    I don't know.

15  Q    Less than that?

16  A    I do not know.

17  Q    Now, that was in the 2006 primary; is that correct?

18  A    They was in the general and they were some in the primary

19  also.

20  Q    All right.

21  A    They was in both elections that they were doing that.

22  Q    Now, Bart Morris and Stanley Bowling are pretty close

23  friends, aren't they?

24  A    Friends and partners.

25  Q    And Stanley Bowling had a race for magistrate that 2006

1    primary, did he not?

2    A    Yes.

3    Q    And would it surprise you, Mr. White, that out of the 765

4    votes that he received only 18 were paper mail-in ballots?

5    A    Which race was that?

6    Q    Magistrate.

7    A    I mean, for -- was that in the primary, did you say?

8    Q    Yes, sir.

9    A    Well, you know, that's what -- I was talking about City

10   precincts when I was telling you that.  He didn't run in the

11   City precincts, if that's what you want me to clarify.  Stanley

12   Bowling's race is not in the City precincts.

13   Q    It's at Harts Branch?

14   A    It's at Harts Branch, Big Creek, I think Greenbriar, I

15   forget.  There's Harts Branch, I don't know the other precinct

16   that it's in.  But I know it's not in the Manchester precinct,

17   that's Tommy Harmon's -- was his precinct, he was magistrate.

18             MR. GILBERT:  That's all the questions I have.

19             THE COURT:  All right.  Thank you, Mr. Gilbert.

20             Ms. Hughes.

21             MS. HUGHES:  Thank you, Your Honor.

22             THE COURT:  Yes, ma'am.

23                       CROSS-EXAMINATION

24   BY MS. HUGHES:

25   Q    Mr. White, my name is Elizabeth Hughes.  I represent

 1  Debbie Morris.

 2       I noticed, sir, in yesterday's testimony that you wanted

 3  to know where the defense lawyer's questions were going, so I'm

 4  going to tell you that in advance --

 5  A    Okay.

 6  Q    -- in the hopes of moving this right along.  I am

 7  interested in pinning down some dates; fair enough?

 8  A    If it's possible.

 9  Q    All right.  I'm going to ask you first about the May of

10  2002 primary; okay?

11  A    Uh-huh.

12  Q    That was the primary Republican race between Mr. Thompson

13  and Mr. White; correct?

14  A    In 2002, that's correct.

15  Q    And that was the same primary where you ran for jailer and

16  lost; right?

17  A    That's correct.

18  Q    And in May of 2002, that -- you testified that "We set up

19  in Bart's garage"; is that correct?

20  A    We set up and bought absentee votes out of his garage;

21  that's correct.

22  Q    And then on election day also in Bart's garage?

23  A    That was in the -- for the election for council and a

24  later date.

25  Q    I don't understand.  So on election day in the primary of

1   2006 —

2   A    On election day.

3   Q    Right.  — (continuing) where was the operation?

4   A    On election day, in the primary of 2006, some of it

5   done — was done from Bart's, some of it done — was done from

6   a house that was — his wife owned on Town Branch, and also

7   they sometimes would move their motor home around and, you

8   know, do it there.

9        On election day I was at other precincts a lot of the

10  time, so I wasn't with them all the time.  However, in the

11  primary — or the general election —

12  Q    I don't want to go to the general election yet.

13  A    All right.  Okay.  Well, then —

14  Q    I'm really trying to keep the dates straight.

15  A    Yeah, you're — I understand what you're trying to do.

16  Q    Right.  So what did you see of Bart Morris's operation on

17  election day, primary 2002?

18  A    I seen him buy votes, I seen —

19  Q    Whoa, whoa.  Where?

20  A    At his home.

21  Q    Okay.  Did you see him buy votes anywhere else, because

22  you started talking about the motor home and —

23  A    Yeah, he was paying voters, he had people hauling those

24  votes, they were paying them.

25  Q    Where else did you see Bart Morris besides his house on

1  Green Street, if anywhere?

2  A    Okay.  I seen Bart also at his home.  Actually, my father

3  was with me.  We seen him at a house that's on Town Branch,

4  that's referred to the road, Town Branch.  His wife owns a

5  residence there, to my knowledge, and they moved the operation

6  there briefly.  They were paying people there.  They were

7  paying people some in the morning.  It was according to whether

8  the Attorney General came in and, you know, whether Jennings

9  White called and said, you need to pack up and move here or you

10 need to, you know, move your operation.  They were several

11 different safety mechanisms in there, and that's exactly

12 what -- how that works.

13 Q    All right.  So you saw Bart Morris and his operation in

14 two locations on election day in the 2002 primary?

15 A    Ma'am, I have seen Bart Morris buy votes --

16 Q    I want --

17 A    -- and I have seen him buy votes continuously.

18 Q    Sir?  Sir, sir, sir, sir, I just want to ask you about

19 where on election day, primary 2002, you saw him in those two

20 locations.

21         MR. SMITH:  Your Honor, I'm going to object and ask

22 that counsel allow the witness to answer the question.

23         MS.  HUGHES:  And I understand --

24         THE COURT:  I'll overrule the objection.  I

25 understand you're trying to ask a specific question.

1        Mr. White, if you could, please, listen to her

2   question and attempt to answer that.  And if you need to

3   explain, you need to tell me that you need to explain; okay?

4        THE WITNESS:  Okay, Your Honor.

5        THE COURT:  All right.

6        MS. HUGHES:  Thank you.

7        THE COURT:  Thank you.

8   BY MS. HUGHES:

9   Q    2002, election day, May, did you see Bart Morris at any

10  location other than the two that you have identified; yes or

11  no?

12  A    I don't recall.

13  Q    All right.  Now, at Bart's house on Green Street, that was

14  in the garage; correct?

15  A    He works that out of his garage, yes.

16  Q    All right.  Now, I want to go to November of 2002; okay?

17  A    Okay.

18  Q    That was primarily a city council race; correct?

19  A    Yes, and the school board race.  And also, to my

20  knowledge, I think Stanley Bowling had competition at that

21  time, too.

22  Q    All right.  Now, going back to your testimony last week or

23  earlier this week, it was in November of 2002, correct, that

24  you testified that Bart and Stanley became alarmed and so they

25  changed locations; is that correct?

1  A    They do change locations, ma'am.  I mean, you're trying to

2  pin me down to a date so you can say, oh, you made a mistake.

3  But I'm going to tell you, it's hard to keep up with that.  I

4  mean, I understand what you're doing.

5  Q    I'm not trying to trick you.  I'm trying to find out, sir,

6  what you know and what you recall about specific dates.  So in

7  November of 2002, where do you recall the location is?

8  A    Let me tell you something.  In November of 2002, Darnell

9  and Vernon set up and were buying votes outside of the

10 Manchester precinct.  They were moving around because Bart, at

11 that time, was trying to help Stanley.  At that time, me and

12 Bart delivered money, we stopped by James Garrison's office,

13 picked up money, we picked up money off Oscar Gayle House, who

14 Bart had taken money for to buy votes.  We take — we also —

15 Q    Did this occur on election day?

16 A    Yes, it did.

17 Q    All right.  So on election day, 2002, your testimony is

18 that Bart Morris was traveling —

19 A    Which election day — which election day are you talking

20 about?

21 Q    Very good question.  The fall of 2002, the general

22 election, Bart Morris was with you driving around delivering —

23 A    A fraction of the day; that's correct.  Stanley had called

24 and he was on Big Creek and he had run out of money.  Bart was

25 trying to oversee the operation — two operations at that time.

1   He was trying to oversee the one on Harts Branch, so he was

2   having to run back and forth between locations.  So what -- I

3   mean, what are you wanting me -- I mean, what are you getting

4   at?

5   Q    Where was Bart Morris's operation in November of 2002?

6   You're telling me that he was with you in the car driving

7   around delivering money?

8   A    It was in different locations.

9   Q    All right.  What were those different locations, sir, on

10  election day?

11  A    Okay.  He was helping -- he was trying to assist Stanley

12  on purchasing votes, buying votes, getting them hauled on Harts

13  Branch precinct, which is --

14  Q    So was he at Harts Branch precinct?

15  A    Ma'am, he was there, back and forth, that's what I'm

16  trying to tell you.  Vernon and Darnell Hipsher was helping to

17  run the operation from Bart's house and in front -- Bart's

18  house is located in front of the Manchester precinct, very

19  short distance.

20  Q    Where did you see Bart?

21  A    I seen Bart everywhere, just --

22  Q    Okay.  He was everywhere?

23  A    Well, he was everywhere to do with the election.  He was

24  at Stanley Bowling's, he was -- me and him rode to Big Creek,

25  we went to James Garrison's office, picked up, to my knowledge,

```
 1   I think it was around $2500.  We got a thousand dollars off

 2   Oscar Gayle House for his wife who was running for council.

 3   Q    Where was that?

 4   A    It was in front of the county judge's office, executive

 5   office, which is in front of the Manchester Baptist Church on

 6   top of Courthouse Hill in front of the courthouse also.

 7   Q    Where else did you see Bart Morris on that day?

 8   A    Also we drove to -- picked up $2,000 off of Jennings

 9   White.

10   Q    Where was that?

11   A    That was at Jennings White's house.  Now, this is in

12   the --

13   Q    General election, 2002.

14   A    Yes.

15   Q    That's all I'm asking about.

16   A    We picked up $2,000 from Jennings because he was backing

17   Dobber.  Stanley and Bart had a problem with the school board,

18   they didn't want to get in a school board race, but Jennings

19   would not put money up and they were needing extra money, so

20   Jennings put money up if they would assist Dobber in votes on

21   his school board race, Charles Weaver.  So Bart was a lot of

22   places on that day; okay?

23   Q    That was my question.  Thank you.

24   A    When election day was going on, he did what he had to do.

25   If he had to move around, especially when Stanley was running,
```

1    he did what he needed to do.  He tried to be in as many

2    locations and he did run here, there, and everywhere, and he

3    had people stationed at these places that were doing what they

4    were supposed to be doing.

5    Q    Any other locations where you saw Bart Morris on 2002

6    election day, November —

7    A    Not that I recall.

8    Q    — the general primary?

9    A    Not that I recall, miss.

10   Q    All right.  Now, now let's skip forward.

11   A    Uh-huh.

12   Q    November 2006, are you with me?

13   A    Well, that's where we've been so far is November — no,

14   that's November 2002.  Yeah, November 2006.

15   Q    This is the election where your father was running for

16   mayor and was defeated; is that correct?

17   A    Uh-huh.  That's correct.

18   Q    And this was the election, as I recall your testimony,

19   where you said that Bart and Stanley told you they were leaving

20   for Gatlinburg; is that correct?

21   A    I think they said Pigeon Forge or Gatlinburg, they didn't

22   know which, but they needed to get a room.  They also — can

23   I — can I tell you what they told me when they left, or are

24   you just wanting to know that that's where they were going so

25   that can be —

1  Q    I'm asking you if it was November of 2006 when they told

2  you they were going to Gatlinburg or Pigeon Forge?

3  A    That's what they said.

4  Q    All right.  I sort of had the impression that you didn't

5  think they really left; is that true?  You didn't think that

6  they left?

7  A    I know more about Bart that day in 2006 because he was

8  back home probably around 3:00, I think, or I don't know the

9  exact time, but it was toward the evening time.  We had went

10 and had Stacey Perkins, we had given — arranged for her to buy

11 votes, we had did a lot of stuff prior to that.

12        THE COURT:  All right.  Let me stop you, because

13 you're going beyond the question that's being asked.  You need

14 to listen to her question and answer her question if you can.

15 If you need to explain your answer, you can do that, but not

16 expand upon it; okay?

17        THE WITNESS:  Okay.  Thank you.

18        MS. HUGHES:  Thank you, Your Honor.

19        THE COURT:  You can continue.

20 BY MS. HUGHES:

21 Q    All right.  So it's your testimony that on November —

22 whatever the election day was, in November of 2006, on election

23 day, that Bart was back from Gatlinburg and you saw him at 3:00

24 or 4:00 in the afternoon?

25 A    He was back from — if he had went to Gatlinburg.  I

1    didn't see him for a period of time during that day.  I don't

2    know exactly what time.  It was of the afternoon that he got

3    back on election day.

4    Q    Now, I want to — sorry for not going in chronological

5    order, but I want to back up just a little bit.  Spring 2006.

6    A    Okay.

7    Q    Okay?  This is the election, am I right, where your wife

8    and Dobber Weaver were working the Manchester precinct;

9    correct?

10   A    That's correct.

11   Q    And this is when Crawdad Sizemore and James Garrison were

12   running for county judge executive; right?

13   A    Uh-huh.

14   Q    Yes?

15   A    Uh-huh.  Yes, that's correct.

16   Q    Thank you.  And this is the race where Edd Jordan was

17   defeated for sheriff; correct?

18   A    That's correct.

19   Q    Okay.  Can you tell me where, and I'm just asking you

20   where, Bart Morris's operation was in — on election day on the

21   May primary, 2006?

22   A    On election day, he had taken care of voters prior to

23   the — he —

24        THE WITNESS:  Can I explain my answer, Your Honor,

25   about —

1          THE COURT:  The question is where was Bart Morris's

2     operation on election day.

3     BY MS. HUGHES:

4     Q    And if you don't know, just tell me you don't know.  We

5     all understand that it was a long time ago.

6     A    Okay.  On election day, I do not know.

7     Q    Thank you.  Now, I'm sticking with dates here; okay?

8     A    Uh-huh.

9     Q    Do you know what year Bart and Debbie Morris were married;

10    yes or no?

11    A    I do not.

12    Q    And, finally, off the date subject for a moment, I'm going

13    to ask you about these tape recordings for a moment; okay?

14    A    Okay.

15    Q    I believe that you testified that you made about 50 hours

16    or more of tape recordings; right?

17    A    I don't know exactly how many.

18    Q    But 50 hours was --

19    A    I said that, around or about.

20    Q    And we've heard some of those -- some portion of those

21    tape recordings over the course of the last week or so;

22    correct?

23    A    Yes, we have.

24    Q    All right.  And you would agree with me, wouldn't you,

25    that Debbie Morris was not on any of those tapes?

1  A    If she was, it was not very much.  I don't recall that she

2  was on those.

3  Q    And, in fact, to the best of your recollection —— And you

4  reviewed the transcripts to verify their accuracy, you made the

5  recordings, of course.  To the best of your recollection, she

6  wasn't mentioned on any of these audio recordings, was she?

7  A    I don't recall, ma'am.

8             MS. HUGHES:  That's all.  I pass the witness.

9             THE COURT:  All right.  Thank you.

10             All right.  Mr. Simons.

11                       CROSS—EXAMINATION

12  BY MR. SIMONS:

13  Q    Good morning, Mr. White.  Excuse me.

14  A    Good morning.

15  Q    Can you hear me okay?

16  A    Yes.

17  Q    I'll try to get my throat cleared.  My name is Dan Simons,

18  and I'm from Richmond, Kentucky, and I represent Stanley

19  Bowling.

20  A    Okay.

21  Q    Okay?  You and I have never met?

22  A    Not to my knowledge.

23  Q    This is the first time we've ever talked?

24  A    To my knowledge.

25  Q    I'm going to change gears a little bit.  You've been on

1  the stand for several days, the jury has heard all kinds of

2  testimony about nefarious activities in Clay County, and I

3  don't want these folks to get the impression there aren't any

4  good honest voters in Clay County.  Would you —

5          MR. SMITH:  Your Honor, I'm going to object to

6  counsel making a statement.  There's not a question at this

7  time.

8          THE COURT:  I'll —

9          MR. SIMONS:  I'll get to a question.

10          THE COURT:  I'll sustain.  You can rephrase your

11  question.

12          MR. SIMONS:  Thank you.

13  BY MR. SIMONS:

14  Q    Would you agree that there are plenty of voters in Clay

15  County who are honest and they take their right to vote very

16  seriously?

17  A    There's a — there's a percentage of voters that's that

18  way; that's correct.

19  Q    There are people there who are educated, they can read and

20  write, they know who they want to — in office, they follow the

21  papers and who's running, and they drive themselves to the

22  polls and they go in and they cast a vote for the person they

23  want to hold the office; isn't that true?

24  A    Yes, they's people there that don't sell their vote that

25  votes.

1  Q    Those people wouldn't sell their vote, they go in, they

2  look at the machine, they understand how to use it, and they

3  cast their vote for the person they want elected.  Would you

4  agree with that?

5  A    I don't think they understood how to use the machine in

6  the — when the new machine was introduced, no.

7  Q    You don't —

8  A    A lot — there's a big portion of them that was not

9  computer-oriented people and they may have knew how to vote on

10 the other machines, but they did not know how to vote on those

11 machines because of the two-step process at the end.

12 Q    So you're telling me that of the 7- or 8,000 voters in

13 Clay County in '06 that nobody understood how to use that

14 machine?

15 A    Sir, when you get to the end of that machine and there's a

16 two-step process, there is a lot of people that did not

17 understand the two-step process at the end.  And when you have

18 election officers that are telling them "Thank you for your

19 vote" and they walk off from that machine and then, you know,

20 they're — you know, they're taking what the election officer

21 tells them a lot of times, you know.

22 Q    Well, let me ask you this:  You've acknowledged for me

23 that there's a section of the electorate in Clay County who is

24 honest and trying to vote correctly; you would agree with that?

25 A    Yes, they are.

1  Q    All right.  Let's just hypothetically, if somebody were

2  running for office and they were — Clay County is a fairly

3  small county, we've established that, and reputation plays a

4  big part?

5  A    Around about 20,000 is the population there.

6  Q    And you said 1800 to 2,000 in the city.

7  A    Something like that.

8  Q    And if somebody were — had been working for a long time

9  at one job and they had done a very good job and people knew

10 them and felt they were honest and hardworking, that would give

11 them an edge, a leg up, would it not, with the honest portion

12 of the voters in Clay County?

13       MR. SMITH:  Your Honor, again, I'm going to object to

14 counsel making statements.

15       THE COURT:  Well, I think it's outside the scope of

16 this witness's knowledge, so I'll sustain the objection.

17       MR. SIMONS:  All right.  Your Honor, may I approach?

18       THE COURT:  Yes, sir, you may.

19    (Whereupon, the following discussion was had between the

20 Court and counsel at the bench, out of the hearing of the

21 jury.)

22       MR. SIMONS:  Obviously, what I'm trying to show is

23 that Stanley Bowling was an honest, hardworking guy and people

24 could go vote for him without him buying the vote.   I

25 understand the Court's ruling, I'm not asking you to reconsider

1 that.  My next question, however, is going to be the flip side

2 of that, and he was running in '02 and his reputation was

3 terrible and he was running for jailer.  And before I draw an

4 objection to that question, that's what I was going to posture

5 to the Court, and show that he was going to have a hard time

6 getting elected, and maybe the reason that he got defeated and

7 the votes were doubled against him was because of his

8 reputation and his acknowledged problems.

9        THE COURT:  So you want to ask him about his

10 understanding of his own reputation in the community, and to do

11 that, of course, you would need to establish that he has an

12 understanding of what his reputation is in the community and

13 the next question is —

14        MR. SIMONS:  Do you think that hurts you.

15        THE COURT:  No, the next question is, what is your

16 understanding of your reputation, good or bad, and then

17 whatever he answers, then you're struck with it and that's it.

18 We don't need details after that as to general reputation.

19        MR. SIMONS:  I'll move on to another topic.

20        MS. HUGHES:  I would like to know what he thinks his

21 general reputation is.

22        THE COURT:  All right.  That's what you're attempting

23 to ask, his understanding of his general reputation in the

24 community, and if you're asking a question about general

25 reputation —

1          MR. SIMONS:  And once he answers, then that's the

2   answer.

3          THE COURT:  Yeah.  You can ask a witness if he has

4   knowledge of his reputation in the community for truth and

5   veracity, because that's what it comes down to, that's the

6   issue, and the witness answers, yes, I do or, no, I don't.  And

7   if he answers yes, what is it.  Well, it's good or it's bad.

8          MR. SIMONS:  Am I limited to truth or veracity in my

9   question?

10          THE COURT:  I think so.  In the area that we're

11   covering here, I think it would be.

12          MR. SIMONS:  Okay.  I understand.

13          THE COURT:  Anyone else?

14          MR. SIMONS:  I'll decide what I'm doing to do between

15   now and the time I reach the podium.

16          THE COURT:  All right.  Thank you.

17      (Whereupon, the following proceedings continued in open

18   court.)

19          THE COURT:  All right.  Thank you, Counsel.  We'll

20   let everyone get back to their seats.  Thank you.

21          Mr. Simons, you may continue.

22          MR. SIMONS:  Thank you.

23   BY MR. SIMONS:

24   Q    I want to move forward a little bit and talk about the

25   elections.  You ran in 2002 for jailer; correct?

1  A    That's right.

2  Q    That's a countywide race?

3  A    Yes.

4  Q    Okay.  And that was the first time you had put your hat in

5  the ring for public office?

6  A    Yes.

7  Q    And Mr. Gilbert went over it and people you had talked to

8  and sought advise from about that race; correct?

9  A    Yes.

10 Q    And when you were deciding to run, there was a meeting at

11 the — I believe you said it was at the Clerk's Office?

12 A    I already had decided to run at that point.  That was a

13 meeting after I had decided to run.

14 Q    And at that meeting you said there was Uncle Bud Smith?

15 A    Yes.

16 Q    Randall Wagers?

17 A    Yes, he was there.

18 Q    Jennings White?

19 A    Uh-huh.

20 Q    Tommy Harmon?

21 A    Yes.

22 Q    And Clinton Johnson?

23 A    Yes.

24 Q    Correct?

25 A    That's right.

1  Q    That's when you announced —

2  A    They were more people there than that.  Also Bart Morris

3  was the one — him and Stanley were the two that had called me

4  to come there.

5  Q    But they weren't at the meeting?

6  A    Yes, absolutely were at the meeting.

7  Q    I'm not talking about at the courthouse, I'm talking about

8  the Clerk's Office.

9  A    Yeah, that's the one I'm talking about.  They were the one

10 that called me there, sir.  They were talking with Jennings,

11 and they're the ones that got me to come — they're the ones

12 that notified me to come down there.  Bart actually was the one

13 that called.

14 Q    All right.  Well, let me go on.  In the election itself,

15 you mentioned — at a meeting you mentioned a fellow named Doug

16 Bowling.

17 A    That's correct.

18 Q    All right.  Now, I want to establish for the jury, he's no

19 relation whatsoever to Stanley Bowling, is he?

20 A    I do not know that.

21 Q    Well, for instance, there's a lot of Whites we've talked

22 about in Clay County, is there not?

23 A    There's quite a few Whites.

24 Q    You're not related to all of them, are you?

25 A    I guess I'm not.  I mean, I don't —

1  Q    In fact, in a minute here I'm going to ask you about a

2  fellow named Mike White.  Are you related to him?

3  A    Distant relative is —

4  Q    There are a lot of Bowlings in Clay County; correct?

5  A    They's quite a few.

6  Q    Okay.  Now, in the election, you testified on direct that

7  you gave Doug Bowling $4500 in '02; is that right?

8  A    Yes, I give it — I give it to Stanley — actually, I give

9  it to him and Stanley present, Stanley asked me to give it to

10 him.

11 Q    Well, let me ask you, the results of the May primary in

12 '02, I think you described as you got beat in a landslide?

13 A    Yes, I did.

14 Q    If the numbers show that your opponent, Charles Marcum,

15 got 4194 votes and you got 2351, he beat you almost two to one?

16 A    That's correct.  Yeah, he beat me.

17 Q    Beat you pretty soundly?

18 A    Yeah, he beat me decent.

19 Q    And the numbers in that same race for Stanley Bowling, who

20 was running in three little precincts for magistrate,

21 District 2, he actually won in a landslide, did he not?

22 A    Yes, he did.

23 Q    Okay.  Now, you've told the jury that the absentee ballots

24 were a big part of the scam that was going on, did you not?

25 A    For the City precincts.

1   Q   Oh.  So it wouldn't include Mr. Bowling?

2   A   I don't know how many they did.  I just know that in the

3   City precincts that Darnell and Bart were working on those all

4   the time.

5   Q   Well, if the record would reflect that Stanley Bowling got

6   12 mail-in absentee ballots, would that surprise you?

7   A   I wouldn't know.

8   Q   You would agree with me that that's very few, would you

9   not?

10  A   I don't know how many was voted during that time in that

11  precinct.

12  Q   Now, you were never at Stanley Bowling's garage on

13  election day in May of '02, were you?

14  A   In May of '02?

15  Q   Yes, sir.

16  A   In May of '02, I may not have been there, because --

17  Q   That's correct, you were not there.

18  A   Huh-uh.

19  Q   Now, Stanley Bowling actually in May of '02 was in

20  Big Creek all day, was he not?

21  A   I don't know.  I mean, I --

22  Q   You don't know where he was on election day?

23  A   I know on general -- I know in the general election he

24  had -- he had opposition from a Democrat.

25  Q   I'm going to ask you that in just a minute.

1   A    Okay.  All right.

2   Q    I want to talk about that in a minute.  But in May of '02,

3   on the primary of '02, you don't know where Stanley Bowling was

4   on election day?

5   A    I don't know where all he was.  I seen him after the

6   election.

7   Q    After the election, he won and there was a gathering; is

8   that fair?

9   A    I seen him, yes.

10  Q    All right.  But during election day, you didn't see him,

11  you don't know where he was?

12  A    I was told that he was — went to Big Creek.

13        MR. SIMONS:  I asked the question, but he's trying to

14  respond with what he was told.

15        THE COURT:  Well, I think you're asking if he knows

16  where he was, and then he's trying to explain to you how he

17  knows or how he believes — his knowledge, so I'll —

18        MR. SIMONS:  I'll withdraw the question.

19        THE COURT:  But he'll be entitled to explain that if

20  you want to ask him that question.

21        MR. SIMONS:  I do not wish to ask him.

22        THE COURT:  All right.

23  BY MR. SIMONS:

24  Q    In the fall of '02, we'll move to the actual general

25  election, Stanley wins the primary in a landslide, he does have

KENNON WHITE CROSS - MR. SIMONS                    38

1   opposition in the fall from a Democrat; correct?

2   A    Yes.  That's correct.

3   Q    And that opposition is who?

4   A    Billy Jones.

5   Q    And Billy Jones, is he related to any of the defendants in

6   this case?

7   A    Yes, he is.

8   Q    Who's he related to?

9   A    He's related to Wayne Jones.

10  Q    And what is that relationship?

11  A    I do not know exactly, but I know they're related.

12  Q    In fact, Billy Jones is Wayne Jones' --

13         MR. SMITH:  Your Honor, I'm going to object, the

14  witness says he doesn't know.

15         THE COURT:  All right.  Sustained.

16  BY MR. SIMONS:

17  Q    Would it to surprise you to learn that he is --

18         MR. SMITH:  Same objection, Your Honor.

19         THE COURT:  Sustained.  If he doesn't know, he

20  doesn't know.

21  BY MR. SIMONS:

22  Q    Let's move to the 2004 election.  Stanley Bowling didn't

23  run?

24  A    No.

25  Q    He wasn't in any election, was he?

1  A    In 2004?

2  Q    2004, yes, sir.

3  A    I don't think so, no.

4  Q    Okay.  And you were going to run for council in 2004, but

5  Yancey White talked you out of it?

6  A    That's right.

7  Q    And when you got talked out of that, your dad, who was the

8  mayor, Doug White — is it Doug or Daugh, which is it?

9  A    He goes by Doug, but it is Daugh, is his name.

10  Q    I'll call him Doug.  Would that meet with his agreement?

11  A    Yeah, Doug is what he goes by.

12  Q    And Doug had created a job for you as what's called city

13  manager?

14  A    He created a job for me.

15  Q    Okay.  That's a job that never existed before?

16        MR. SMITH:  That's been asked and answered.

17        THE COURT:  I think it's a prefatory to something, so

18  you can ask.

19        MR. SIMONS:  It is, Your Honor.

20  BY MR. SIMONS:

21  Q    Correct?

22  A    What's that?

23  Q    That's a job that never existed before?

24  A    He created a job for me and put me to work; that's right.

25  Q    And my client, Stanley Bowling, had held a position known

1    as City Supervisor for many years and his boss was your father,

2    Doug White?

3    A    That's correct.

4    Q    And Stanley had started —— When were you born?  What year

5    were you born?

6    A    I was born in 1968.

7    Q    '68.  And you met my client, Stanley Bowling, when you

8    were a youngster?

9    A    That's right.

10   Q    He had actually started work for the City in 1972 under ——

11   I guess, your uncle ——

12   A    That, I ——

13   Q    —— was the mayor?

14   A    I don't know.  I mean, that's ——

15   Q    All right.  And then your dad, Doug, got to be mayor in

16   what year?

17   A    I don't know.

18   Q    You don't know?

19   A    I don't know.

20   Q    All right.  How long was your dad mayor; do you know?

21   A    He was mayor for many years.  I don't know the exact

22   number of years, but I do think it was over 24, 25 years.

23   Q    Okay.  And Stanley served for most of the last part of

24   that time as a person called City Supervisor; is that correct?

25   A    He served up to a few years prior to this, till he

1   started — well, I'm done.

2   Q    He served many years as the City Supervisor for your

3   father and he was in charge of water, sewer, and streets; is

4   that correct?

5   A    That's — well, yeah, he was —

6   Q    Is that correct.

7   A    I presume that's correct.

8   Q    And he retired in 2000 from that position?

9   A    Okay.

10  Q    Correct?

11  A    I don't know if that's the exact date he retired or not.

12  Q    I understand.  I'm going to suggest to you that it is.

13  A    Okay.

14        MR. SMITH:  Your Honor, I'm going to —

15  BY MR. SIMONS:

16  Q    You don't have any —

17        MR. SMITH:  — object.  The witness has said he

18  doesn't know, and now counsel is trying to testify.

19        MR. SIMONS:  I'll move on.

20        THE COURT:  Sustained.

21  BY MR. SIMONS:

22  Q    Do you know who took over as City Supervisor when Stanley

23  retired?

24  A    Yes, I do.

25  Q    Was it Wes Hacker?

1   A    To my knowledge, that's correct.

2   Q    Okay.  And do you know how long Wes Hacker stayed in that

3   job?

4   A    I do not.

5   Q    Do you know who replaced him?

6   A    Mike White.

7   Q    And is Mike White still in that job?

8   A    To my knowledge.  I don't know for sure, though.

9   Q    And would you agree that the job that was created for you

10  as city manager puts you above both Wes Hacker and Mike White?

11  A    Wes Hacker was not there, and, no, it did not put me above

12  Mike White.  I answered daily to my father and about the

13  operations of what going –– of what went on at the City and I

14  carried what he delegated me to carry to the employees and tell

15  them what to do.

16  Q    Did Mike White still retain the position known or titled

17  known as City Supervisor?

18  A    Yes.

19  Q    Okay.  And you couldn't give directions to Mike White?

20  A    If they came from my father, I could.

21  Q    Okay.  So if your dad told you you could tell Mike White

22  what to do, you could?

23  A    That's right.

24  Q    All right.  And did you have command over the police

25  department also?

1  A    No, I did not.

2  Q    You didn't have any authority over the police department?

3  A    I didn't have no authority to tell them what to do.  I

4  mean, I went down there and sometimes, you know, helped, you

5  know, gather information for my father and took back to him and

6  I was there and talked with them almost daily.

7  Q    Did you have any hands-on involvement in looking into the

8  missing evidence, the money that was missing from the police

9  locker room?

10 A    When you say "hands-on," can you explain what --

11 Q    Well, what involvement did you have?

12 A    My involvement was I talked with Dan Rice and a couple

13 other police officers about it.

14 Q    You went down there and looked into it, didn't you?

15 A    I looked into it, but I -- yeah, but I -- they're the ones

16 that really looked into it.

17 Q    When did that happen?

18 A    I don't know the exact date on that.

19 Q    It was -- it was on your watch as city manager, wasn't it?

20 A    That wasn't when it happened, that's when we become aware

21 of things that had happened there.

22 Q    And then you also had some involvement in blacktopping

23 private driveways, did you not, while you were city manager?

24 A    That's not got anything to do with what happened at the

25 city police department, if that's what you're speculating.

1  That's the way that you're saying that, so, no, that's two
2  different issues.
3  Q    I'm asking you different ways.  The police department is
4  one thing.  I'm asking you now about blacktopping private
5  driveways.  Was it your —
6  A    I have addressed that.  And, yes, I did, and I'm not proud
7  of what I've done, I'm ashamed that I done it and I'm sorry
8  that I done it.
9  Q    And you went out and followed the blacktopper as he
10  blacktopped private driveways to get —— to get notoriety from
11  doing favors for political friends?
12  A    I followed the blacktopper for all of a couple of hours
13  one day when they first started.
14  Q    And wasn't there a situation in the City while you were
15  city manager where there were a lot of water bills that were
16  cut as political favors for friends of your father, Doug?
17  A    That would be — they were water bills that were cut, but
18  that was cut by my father.
19  Q    Okay.  Did he ask you to do it?
20  A    They might have been some instances.
21  Q    Yeah, you came into the City Clerk's Office and told them
22  to cut the water bills, did you not?
23  A    They were times that that was correct, that they were
24  adjustments that were made on water bills.  Matter of fact, I
25  did some for your client that he asked me to do also, Stanley.

1 Q    Well, who else did you do it for?

2 A    I did them for people that came in there that had -- you

3 know, that had asked, but, I mean, they went before -- my

4 father was the one that authorized them, but there was water

5 leaks sometimes, there was things of that nature that caused

6 that a lot of the times.

7 Q    Okay.  I want to talk to you for a few minutes about

8 Stanley's company and contracts he had with the City; okay?

9 A    I'll be more than happy to talk about that.

10 Q    Now, Stanley did some work for the City while you were

11 city manager, he had a series of contracts; correct?

12 A    He did.

13 Q    He wasn't the only contractor for sewer and water that

14 worked for the City while you were city manager?

15 A    While I was there, he was the majority of the ones, except

16 for they were certain other contracts, but he got -- he got a

17 lot of them.

18 Q    Well, let me ask you this:  Clay Pipeline did a

19 multimillion-dollar project, sewer and water, while you were

20 city manager, did they not?

21 A    Yes, he did.  Stanley -- we can go into that a little bit

22 further.

23 Q    No, I just want an answer.

24 A    Yeah, I'm sure you do.

25 Q    I want you to answer my question first.  Okay.  Is that

1 true?

2 A    Yes, they did.

3 Q    Okay.  And did Sammons Construction, Mike Sammons, did he

4 do sewer and water work for the City while you were city

5 manager?

6 A    He was — he was already doing it when I came; that's

7 correct.

8 Q    And, in fact, he did a project right out by Stanley's

9 home, out by Big Creek, did he not?

10 A    I don't know.

11 Q    Okay.  What about J & R, what about Scott Robinson?

12 A    Yes, they did some work.

13 Q    Jackie Jones, they did some work for the City, did they

14 not?

15 A    Yes, they did, and they worked for the City.

16 Q    What about Laurel Construction, did they do some work for

17 the City?

18 A    Yes, they was numerous contracts, they was a big water

19 line extension going on and those guys got a lot of that.

20 Q    So there were lots of contractors.  Let me ask you this:

21 Did you try to extort money from any of them?

22 A    Only when Stanley Bowling called me on behalf of Norty

23 Garrison and wanted me to come up there and to meet with Norty,

24 which is Clay Pipeline, to move a water line that was running

25 in the road to a field, and Stanley arranged for him — wanted

1  me to help him to do that and he called Stanley to get that

2  deal arranged, and Mike, me and him and Stanley met and I

3  did — Stanley had him get me a thousand dollars to do that.

4  Q    Did you ever — did you ever approach Jackie John —

5  Jackie Jones or Scott Robinson and try to shake them down for

6  money?

7  A    I talked with Jackie and Scott, but they were talking on

8  behalf of — because Stanley had came in and got a lot of their

9  business, because that was one of the reasons that Stanley

10  wanted me to have that job, because they had directed a lot of

11  the work that he was getting from Stanley to them and he was

12  very aggravated with the management there at that time, and

13  that was what he, you know —

14  Q    I'm just asking you if you ever tried to shake down Jackie

15  Jones —

16  A    I didn't try to shake down —

17  Q    Yes or no?

18  A    No.

19  Q    Oh, okay.  Thank you.

20        MR. SIMONS:  Your Honor, if I could have the Marshal

21  hand Mr. White his plea agreement.  It's PA1 exhibit, please.

22        THE COURT:  Yes, sir.

23  BY MR. SIMONS:

24  Q    Now, Mr. White, we've talked about that quite a bit

25  already.  I just want to focus on a couple of paragraphs, and I

1  want you to look at them if you would, please.

2  A    Uh-huh.

3  Q    The first paragraph I want you to look at is 2(a).  Do you

4  see that, paragraph two, subsection (a)?

5  A    Uh-huh.

6  Q    And does it say that "The defendant conspired with others

7  to knowingly and willfully obtain money from another"?  Is that

8  what that says?  I'm sorry, it's on the front page.

9  A    Yeah.  Well, I'm looking —

10 Q    Well, first of all, look at the document and see that

11 that's your plea agreement.

12 A    Yes.

13 Q    Is that it?

14 A    Yes, that's correct.  That's correct.  That's correct.

15 Q    All right.  On the last page, it has your signature?

16 A    Uh-huh.

17 Q    And it's dated April 27th, 2007; correct?

18 A    I think that's correct.  Yes.

19        MR. SMITH:  Your Honor, I'm going to ask to approach,

20 if I could.

21        THE COURT:  All right.  Come up, please.

22     (Whereupon, the following discussion was had between the

23 Court and counsel at the bench, out of the hearing of the

24 jury.)

25        THE COURT:  All right.

1          MR. SMITH:  Your Honor, it appears to me that counsel

2   is wanting to explore the intricacies of the federal law under

3   1951 with the witness.  And specifically, his questions are

4   relating now to elements of the offense, which I fail to see

5   how elements of the offense — again, he's not asked the

6   witness, first of all, what his understanding of the offense

7   is, and he's seeking now through his questions to again

8   impermissibly I believe, go into a legal issue.  And, you know,

9   if counsel wants to debate what it takes to be guilty of a

10  Hobbs Act with the witness, I fail to see, number one, how it's

11  relevant, and any relevance that it is, it's going to confuse

12  the issues that we have before us in this case and will require

13  the government, I believe, basically to respond with legal

14  arguments to the jury in some way to resolve the confusion it's

15  going to create.  I mean —

16         THE COURT:  Well, let's see where we're going on

17  this.

18         MR. SIMONS:  We're going to be real quick with this,

19  Your Honor, I promise you.

20         THE COURT:  Well, even though we're quick, I need to

21  know.  It still has to be relevant.  It can be quick and

22  irrelevant.

23         MR. SIMONS:  Well, I just want to — I want to go

24  over paragraph 2(a) and (b), what he acknowledged that he did

25  in those two paragraphs, and then I'm going to get over to

1  3(a).

2        You're familiar with 3(a), Steve, I know.

3        THE COURT:  Okay.

4        MR. SIMONS:  That's all.  That's all I'm going to ask

5  him.

6        THE COURT:  All right.  If we get into debating

7  the —

8        MR. SIMONS:  I'm not going to get into debating the

9  law.  I don't know the legal intricacies myself.

10        MS. HUGHES:  I was going to say Mr. Simons might lose

11  that debate.

12        MR. SIMONS:  I'm certain that I will.

13        THE COURT:  Well, again, we've, I think, been over

14  the plea agreement several times and he's acknowledged his

15  activities, but you're entitled to go over with him as well.

16        MR. SIMONS:  I'm going to be very quick.

17        THE COURT:  If you can lay the foundation for what he

18  did with an acknowledgment that he did what's outlined in

19  paragraph three, then you can do that.

20        MR. SIMONS:  Thank you.  And 2(a) and (b) also, Your

21  Honor, just to make it smooth?

22        THE COURT:  That's the foundational thing, sure.

23        MR. SMITH:  There's one other thing that I have been

24  advised by co-counsel, and, again, I hate to keep bringing this

25  up, but snickering from the parties at the witness's answers

 1  has caused distraction for us and I believe it's also for this

 2  proceeding, and —

 3              THE COURT:  Is that Mr. Stivers?

 4              MR. PARMAN:  It appears to be, yes.

 5              THE COURT:  We're having a tough time dealing with

 6  your client.  I noticed it.  Let me speak with Mr. Abell, he

 7  said he was going to take the issue up.

 8              MR. ABELL:  I'll speak with Mr. Stivers regarding

 9  this issue immediately and in an appropriate way, Judge.

10              THE COURT:  I hate to have to admonish the parties

11  again.  I'm not a schoolteacher.

12              MR. ABELL:  Well, I appreciate the Court's patience

13  and I will respond in the way that you can expect.

14              THE COURT:  I know you're doing everything that you

15  can, but I'm just going to ask you to again remind him it's not

16  helping his case when he does that.  It really isn't.

17              MR. ABELL:  I agree with the Court.

18              THE COURT:  And parties sometimes become very

19  emotional in cases, they just have to keep their emotions in

20  check.  So I appreciate you taking this up.

21              MR. ABELL:  Thank you, Judge.

22              THE COURT:  Thank you.

23      (Whereupon, the following proceedings continued in open

24  court.)

25              THE COURT:  Thank you.

1         Mr. Simons, you may continue.

2    BY MR. SIMONS:

3    Q    Mr. White, I was referencing your plea agreement,

4    paragraph 2(a).  And it does say that "The defendant" - and

5    that is you - "conspired with others to knowingly and willfully

6    obtain money from another"; correct?

7    A    Yes.

8    Q    And it also says just below that in paragraph 2(b), that

9    the defendant, and that is you, did so by means of extortion

10   under color of official right"; is that correct?

11   A    That's what it says, yes.

12   Q    Okay.  Now, you signed that plea agreement and you had

13   counsel advising you at the time; correct?

14   A    Yes, I signed it.

15   Q    And you signed it on April the 27th of 2007; is that

16   correct?

17   A    Yes.

18   Q    Now, I want you to go to paragraph 3(a) and I want you to

19   take a minute and read that paragraph silently.

20   A    Okay.

21   Q    Is it fair to say that that outlines the contracts that my

22   client had with the City of Manchester, that that's what that

23   paragraph is about?

24   A    That is what the paragraph is about, but I assure you he's

25   not a victim, sir.

1  Q    Well, I just want to ask you about one sentence in that

2  paragraph; okay?

3  A    Okay.

4  Q    And that's the very last sentence, and it says, "During

5  the course of the conspiracy, the defendant" - that's you -

6  "obtained approximately $67,000 from Bowling."  Is that what it

7  says?

8  A    Yes, it is.

9  Q    Where did that number come from?

10          MR. SMITH:  Your Honor, I'm going to object to the

11  relevance.

12          THE COURT:  Sustained.

13          MR. SIMONS:  Your Honor, could we approach on that,

14  please?

15          THE COURT:  It's a collateral matter, Counsel.  We'll

16  take it up at the break.  Thank you.

17          MR. SIMONS:  There's a — Your Honor, if Your Honor

18  please, there's a second reason I want to ask.

19          THE COURT:  All right.  You can come on up, then.

20          MR. SIMONS:  Thank you.

21     (Whereupon, the following discussion was had between the

22  Court and counsel at the bench, out of the hearing of the

23  jury.)

24          MR. SIMONS:  I want to show, one, that that

25  information did not come from him.

1        THE COURT:  I'm sorry?

2        MR. SIMONS:  I want to show that it did not come from
3  Kennon White.  In fact, we know -- one thing I want to show is
4  that it came from my client, Stanley Bowling, and it was given
5  to the FBI and to Mr. Smith.

6        THE COURT:  Are we getting back to this --

7        MR. SIMONS:  No, no, I'm not going to get back --

8        THE COURT:  -- immunity issue?  Is that where this is
9  going?

10        MR. SIMONS:  No, my next question to him was the
11  second matter.  I'm going to ask him if he has filed amended
12  tax returns to report this income since he entered this plea
13  agreement.  It's clearly income to him and I want to know if he
14  reported it.

15        THE COURT:  That would be 608(b), specific instances
16  of misconduct.

17        All right.  Mr. Smith?

18        MR. SMITH:  Well, I believe, Your Honor, the question
19  under 608(b) would have to be based, number one, on a good-
20  faith basis in cross-examination before they ask the question,
21  and I'm sure counsel is -- I don't know how he knows what his
22  tax returns are, but he must have some reason to believe he has
23  failed to report it.  Number two, I think the key issue here
24  and what the whole purpose behind this question is, is to
25  relitigate and try to go into collateral matters, Your Honor.

1  How the 67,000-dollar figure came about, what relevance — how

2  does that tend to show this witness is more credible or less

3  credible?  How does this intend to show any of the issues

4  framed before this Court?  And I would argue that there is no

5  probative value to knowing how that figure came about.  The

6  only reason that he's asking that question, I think, is,

7  again — I really don't know any other reason that he could

8  have to want to — what relevance there is to the source of

9  that 67,000-dollar figure.  If the government —

10             MR. SIMONS:  Well, it has —

11             MR. SMITH:  — through the FBI, which is what I'm

12 going to have to then show, I'm going to have to go in and put

13 an agent on and I'm going to have to go in and explain how

14 their investigation created the case against Kennon White and

15 where they got those numbers.  We litigated that in front of

16 the Court, we showed through Agent Briggs the significance

17 and — or the lack of significance of Stanley Bowling's

18 testimony before the grand jury and how it was not used, and

19 now I believe that if we go into this — if we go down this

20 road, it's going to create a collateral matter, and I would be

21 forced to litigate now a second time on an issue that I believe

22 is not relevant.

23             THE COURT:  I don't think that the question — this

24 line of questions would be relevant under 608(b), and the Court

25 does have discretion under 608(b) to exclude collateral

1  matters.  Also, it would be excluded under 403, because we are

2  going down a road that will take a great deal of time to

3  address.  It will be a waste of time for the Court and for the

4  jury and would cause confusion to the jury.  So I'll sustain

5  the objection.

6      (Whereupon, the following proceedings continued in open

7  court.)

8  BY MR. SIMONS:

9  Q    I'm going to move on to another matter, Mr. White, if

10 that's okay with you.

11 A    That's fine.

12 Q    I want to talk about the 2006 election.

13 A    Okay.

14 Q    Now, Ms. Hughes asked you a number of questions about

15 that.  I just want to ask you about Stanley's involvement.  He

16 had run in 2002 in a primary and a contested November election,

17 he did not run in 2004, and in 2006 there was a primary contest

18 that he was in; correct?

19 A    Yes.

20 Q    And he was in that primary with a number of other persons.

21 Are you aware of that?

22 A    Who all ran against him, is that what you're saying?

23 Q    No, no, no, no.  I'm saying in the May primary of 2006,

24 Stanley ran against -- Oh, who all ran against him is what --

25 A    Yes.

1  Q    That is what I was getting at.  Are you aware of that?

2  A    I knew that at one time that he had more than one

3  opponent.

4  Q    And do you know the results of that election?

5  A    He won.

6  Q    And he won again in another landslide victory, did he not?

7  A    When you control the elections officers, you can do that.

8  Q    Now, you don't know the numbers of that election and by

9  how many votes he won, do you?

10 A    No.

11 Q    Now, in November he ran again and he was unopposed, was he

12 not?

13 A    I don't know.

14 Q    Okay.  I think you said in your -- in direct examination

15 from Mr. Smith that you didn't remember whether he ran or

16 whether he was unopposed, but either way he wasn't concerned

17 about it.  Is that a fair assessment of your testimony?

18 A    I would like to see where that I've said that.

19 Q    I don't have a transcript for you.

20 A    Okay.

21 Q    But right now, as you sit here, you don't know whether

22 you --

23 A    Okay.  What exactly are you saying that I said?  I mean, I

24 don't --

25 Q    You said that in either event, he was not concerned about

1 | that.

2 | A    Stanley was not very concerned about ever losing because

3 | of the way things was set up.

4 | Q    All right.  I want to ask you about — I want to go to

5 | something else and ask you about the tapes just a little bit.

6 | And I don't want to drag them out and put them up on the

7 | screen, but I want to ask you about two or three comments that

8 | you make on the tapes.

9 | A    Okay.

10 | Q    And I want to see if you remember these comments.  And I'm

11 | going to start — I'm just going to start with the first tape.

12 | It was a March 27, 2007, tape, and it was you wearing the

13 | recording device, I think, you or Wanda, and it was taken in an

14 | interview with Mr. Cletus Maricle.

15 | A    May I have a copy of that?

16 |          MR. SIMONS:  Certainly.  It would be A1A, I suspect.

17 |          THE COURT:  Yes, sir, that's fine.

18 |          THE WITNESS:  Okay.

19 | BY MR. SIMONS:

20 | Q    The tape starts out the very first thing and says – and

21 | this is your words, I think – "I hope they ain't got Stanley."

22 | Is that right?

23 | A    Yes, I say that.

24 | Q    Now, turn to page five for me, if you don't mind.

25 | A    Okay.

1  Q    Okay.  And on that page, does it say -- you said,

2  "Stanley's the only thing that bothers me."  Do you see where

3  you say that?

4  A    Yes.

5  Q    Turn to page six.  Do you see where you say, "It would be

6  a shame to get beat to the punch"?

7  A    Uh-huh.

8  Q    Okay.  There later on page six do you say, "You don't

9  think Stanley would go over there and say something about me"?

10 Did you say that?

11 A    Yes.

12 Q    All right.  Now, isn't it true what you were worried about

13 was Stanley going and reporting to the FBI or to a grand jury

14 that you were extorting money from him?  You weren't worried

15 about vote buying here, were you?

16 A    I was worried about it all.

17 Q    You were worried about Stanley going and talking to the

18 federal grand jury or to the FBI and telling them you were

19 shaking him down for money; were you not?

20 A    Sir, Stanley had already approached me of how that this

21 had concerned me, Stanley had already approached me and asked

22 me -- he said that he had put up $10,000 to get Jimmy Mills out

23 of jail and Jimmy Mills ended up dead just a few days after

24 that.  And he asked me if I would go to the -- and lie for him

25 in front of a federal court.  And let me tell you, I was

1  concerned, because Stanley said they had been talking to him.

2  Stanley had already told me that they had talked to him about

3  that matter.  Whether he -- you know, I mean, that's what he

4  had told --

5  Q    Stanley said he had been talking to who?

6  A    He said the FBI had questioned him, he said he was

7  worried, that he had put up $10,000 cash for -- to get Jimmy

8  Mills out of jail.  He said Jimmy Mills ended up dead.  Jimmy

9  Mills did end up dead.  He was a constituent and well known by

10 Stanley, and Stanley had asked me if it came down to it, would

11 I say what I needed to say in federal court to help him,

12 because he was concerned that he was going to be in trouble for

13 that.  Also -- well --

14 Q    Let me ask you questions, you can answer them.  If you

15 need to explain them, you can; okay?  In November of '06, did

16 you know that Stanley's son, Steven Bowling, who worked for

17 B and B Excavating, had gone to Lexington to testify in front

18 of a grand jury?

19       MR. SMITH:  Your Honor, I'm going to object as to

20 relevance.

21       THE COURT:  Overruled.

22       If you know, you can answer.

23       THE WITNESS:  What was the question again?

24 BY MR. SIMONS:

25 Q    Did you know that Stanley's son, Steven, had already gone

1  and testified in front of a grand jury in Lexington in November

2  of 2006?

3  A    I know that -- I was told about that, but I was told that

4  he took the Fifth Amendment.

5  Q    Oh, you were told who took the Fifth Amendment?

6  A    That Stanley's son took the Fifth Amendment.

7  Q    Okay.  But didn't you go on Thanksgiving Day or just

8  before, you and Wanda White, to my client's house with some

9  desserts and want to talk to Stanley about what Steven told the

10 grand jury?

11 A    I don't recall that conversation, but Stanley was more

12 than willing to tell me anything that he had talked with the

13 FBI about, and he would -- like I said, the -- he was very

14 concerned about the situation where he had put up the $10,000

15 cash for Jimmy Mills to get out of jail and Jimmy Mills had

16 ended up dead.

17 Q    Didn't Stanley actually --

18 A    He was murdered, sir.

19 Q    Didn't Stanley Bowling actually tell you to leave his

20 property on Thanksgiving day of 2006 and never come back --

21 A    No, he --

22 Q    -- that he didn't want to fool with you anymore?

23 A    That is an absolute falsehood and a lie.

24 Q    It is?

25 A    Yes, it is.

1  Q    All right.  Now, were you — how many hours of tape did

2  you tape from these folks?  We said 50.  Is that pretty close?

3           MR. SMITH:  Your Honor, that's, again, been asked and

4  answered.

5           THE COURT:  All right.  It has.  Sustained.

6  BY MR. SIMONS:

7  Q    Well, this jury heard a lot of those tapes.  Stanley

8  Bowling was not on one of them, was he?

9  A    No.

10 Q    There's a lot of tapes they didn't hear.  Stanley Bowling

11 wasn't on any of them?

12 A    I did not —

13           MR. SMITH:  He's representing now —

14           MR. SIMONS:  I'm asking —

15           MR. SMITH:  — information that's not in the record

16 and asking the witness to comment on it.

17           THE COURT:  All right.  Mr. White, are you aware of

18 whether Mr. Bowling is on any of the tape recordings that you

19 recorded?

20           THE WITNESS:  I don't — no, he wasn't.

21           THE COURT:  You don't know.  All right.

22 BY MR. SIMONS:

23 Q    Was the answer no, he was not?

24 A    To my knowledge, I don't think he was.

25 Q    All right.  And you have known Stanley Bowling since you

1  were a child?

2  A    I've knowed Stanley a long time.  All my life.

3          MR. SIMONS:  That's all.  I'll pass the witness, Your

4  Honor.

5          THE COURT:  All right.  Thank you.

6          Mr. Smith, any redirect?

7          MR. SMITH:  Your Honor, based on my review at this

8  time, unless the Court opens up for other defense counsel, no,

9  I do not.

10          THE COURT:  All right.  Let me ask the defendants if

11  they have questions about matters that were brought up on

12  cross-examination.

13          Mr. Pinales?

14          MR. PINALES:  I have two questions, Your Honor.

15          THE COURT:  All right.  You can proceed.

16          MR. PINALES:  And I will be brief, Your Honor.  Thank

17  you.

18                          RECROSS-EXAMINATION

19  BY MR. PINALES:

20  Q    As long as your plea agreement is in front of you, that's,

21  for the purposes of the record, PA1?

22  A    Yes.

23  Q    That is dated April 27th of 2007?

24  A    That's correct.

25  Q    And that was the day that you actually entered your plea;

1   is that correct?

2   A    I think that's correct.

3   Q    And that was done secretly and you didn't tell anybody

4   else about that, did you?

5   A    It was done secretly.

6   Q    Okay.  And you didn't tell anybody else about that?

7   A    I did not tell anyone else about that.  I don't recall

8   telling anyone.  It's —

9   Q    Okay.

10  A    You know, I'm not going to say it's impossible, but I

11  don't think so.

12  Q    Okay.  I'm done with that.

13       Now, I want to call your attention to D14, and that is the

14  pink paper.  We don't need it, but I'm just calling your

15  attention to it.  Do you recall it, do you know what I'm

16  talking about?

17  A    D14, you're talking about the pink piece of paper —

18  Q    Yes.

19  A    — that we've had so much discussion over?

20  Q    Right, the only pink piece of paper before us now.  To

21  clear up some confusion in my mind, that was now done in the

22  mid '90s, as you sit here now; is that correct?

23  A    Uh-huh.

24  Q    You said you did it for two reasons; is that correct?

25  A    I did it for two reasons.  I primarily did it to keep

1  election records of knowing if I ever run for a political

2  office.  But, also, if I got in trouble for when I done that

3  that time, I was concerned that I could get in trouble, because

4  I never did anything like that before.

5  Q    And that was in the mid '90s —

6  A    Yes.

7  Q    — am I right about that?

8  A    That's correct.

9  Q    After the mid '90s, you did do stuff like that again?

10 A    Under the —

11 Q    Yes or no?

12 A    Under the direction of Judge Maricle.

13 Q    I'm asking —

14 A    Yes.

15 Q    — yes or no.  Did you do it —

16 A    I have —

17 Q    — after the mid '90s; yes or no?

18 A    I did.

19 Q    Did you make a record and preserve it like the pink paper;

20 yes or no?

21 A    Did I make a record and preserve?

22 Q    Yes.  Let me ask it maybe a little easier to understand.

23 I apologize to you.  D14 was made in the mid '90s?

24 A    That's correct.

25 Q    Okay.  You said you did it for two reasons.

KENNON WHITE - CROSS - MR. PINALES                66

1  A    That's right.

2  Q    One, if you ever ran for office; right?

3  A    Yeah, if I got involved in politics.

4  Q    Sure.  And, secondly, because you felt that it was a

5  problem and you wanted some record to protect yourself; yes or

6  no?

7  A    Yes.  But that — okay.

8  Q    Okay.  You did, in fact, get involved in politics later,

9  after the mid '90s; yes or no?

10  A    Yeah, many years — about nine years later or something.

11  I mean —

12  Q    Well, you were involved?

13  A    In 2002.  Yes, I ran in 2002, but I never got involved in

14  a great amount of politics when I had the mobile home

15  dealership in London.

16  Q    Sure.  But in 2002 you were involved —

17  A    Yes, I was.

18  Q    — in politics and actually ran yourself?

19  A    Yes.

20  Q    Did you make a list like that?

21  A    I don't remember exactly what I made, but whatever

22  information that I did have on these elections and what I did

23  was turned over to the FBI.

24  Q    Did you make a list, yes or no, like the D14 for 2002?

25  Simple question.  Either you did or you don't remember.

1          MR. SMITH:  Your Honor, objection to these questions,

2    because he says he doesn't recall.

3          THE COURT:  All right.  I'll overrule the objection.

4          Do you recall making such a list?

5          THE WITNESS:  I don't recall making the exact same

6    list, but I made — I did make a list, you know, of some things

7    like that.

8    BY MR. PINALES:

9    Q    And you turned it over to the FBI?

10   A    I don't know whether I — whether it made it to the FBI or

11   not.  But I turned over whatever I had at the time that I

12   started cooperating.  I don't know whether that was part of

13   what was turned over or not.  But whatever I did have, I did

14   turn over to the FBI.

15         MR. PINALES:  I have used my two questions, Your

16   Honor.  Thank you.

17         THE COURT:  Mr. Westberry?

18         MR. WESTBERRY:  Thank you, Judge, no questions for

19   this witness, Your Honor.  Thank you.

20         THE COURT:  All right.

21         Mr. White?

22         MR. WHITE:  No further questions for Mr. Jones, Your

23   Honor.  Thank you.

24         THE COURT:  Thank you.

25         Mr. Abell?

1         MR. RICHARDSON:  No, Your Honor.

2         THE COURT:  Mr. Abell?

3         MR. ABELL:  Judge, I don't have any further questions

4   either.

5         THE COURT:  Thank you.

6         Now, Mr. Richardson.

7         MR. RICHARDSON:  No, Your Honor.

8         THE COURT:  No?

9         Mr. Gilbert?

10         MR. GILBERT:  No, Your Honor.

11         THE COURT:  Ms. Hughes?

12         MS. HUGHES:  No, Your Honor.

13         THE COURT:  Mr. Simons?

14         MR. SIMONS:  No, Your Honor.

15         THE COURT:  All right.  Thank you.

16         Mr. Smith, any redirect on matters that were just

17   covered on recross?

18         MR. SMITH:  No.

19         THE COURT:  All right.  Thank you.

20         Mr. White, you can step down at this time, sir.

21   Thank you.

22         And, ladies and gentlemen, before the next witness is

23   called, I do want to give you an instruction relating to the

24   testimony that you've just heard, and you have heard the

25   testimony given by a witness which included his interpretation

of what other people meant by what they said.  You are reminded
that this testimony represents the witness's understanding of
what was meant by the statements and has been admitted to put
these statements and the parties' conversations in context.
You are so instructed.

Let's see.  Mr. Smith, are you ready to call your
next witness at this time?

MR. SMITH:  I will need a couple of minutes, Your
Honor.  I have a lot of material I need to move off my desk and
bring other material on.

THE COURT:  Well, so we don't waste the jury's time,
why don't we take a break at this point.

Ladies and gentlemen, we may take another break a
little bit later in the morning before we take our lunch break,
but we'll take about a ten-minute recess at this time.  Please
keep in mind the admonition that you were given previously.

(Whereupon, the jury retired from the courtroom, after
which the following proceedings were had in open court.)

MR. WHITE:  Your Honor, I'm probably reminding
everybody of something that they already know, but just out of
an abundance of caution, it's my understanding that the United
States is going to be getting us the text messages in the next
day or so.  And I would just ask that Mr. White not be released
until we've had a chance to look at those.

THE COURT:  I haven't released him at this point.

1          MR. PINALES:  I was going to make the same request.

2  I don't think he needs to sit in the courthouse, but just

3  subject to recall if necessary, Your Honor.

4          THE COURT:  Yes, sir.  He's not released at this

5  point, as I indicated.  We'll be in recess for ten minutes.

6          MR. WHITE:  Thank you, Your Honor.

7      (Whereupon, a short recess was had, after which the

8  following proceedings were had outside the presence of the

9  jury.)

10          THE COURT:  Thank you.

11          The record will reflect the jury is not present at

12  this time.

13          Mr. Hughes, are we okay?

14          MS. HUGHES:  Thank you, we had to delay for a few

15  moments, but we're okay to go.

16          THE COURT:  All right.  Thank you.

17          Mr. Hoskins, do you have an issue to take up?

18          MR. HOSKINS:  Yes, Your Honor.  It's my understanding

19  that the next witness that the government intends to call is

20  Wanda White.

21          THE COURT:  Uh-huh.

22          MR. HOSKINS:  And I would object to her being allowed

23  to testify at this time because we have not received all the

24  discovery relative to her testimony.  Two things in particular

25  that I have asked about, and I have written to the United

1   States months ago.  One is the file, documentary file, of the

2   Commonwealth's Attorney Gary Gregory in Clay County who

3   prosecuted Ms. White's brother, Corky Price.  I had asked the

4   United States about it several times, and until today I have

5   been told that they didn't think they had it, even though I

6   remembered seeing Mr. Gregory hand it to Mr. Smith in the

7   detention hearing that we had for Judge Maricle last spring.

8   Today, I'm advised that they found it, but they don't know when

9   I can see it.  I said I would like to see it during the break

10  or during lunch, but I haven't been able to see that yet.

11       The second thing is a list that's referenced in the

12  affidavit for search warrants and I believe maybe the -- well,

13  the affidavit for search warrants I'm sure, a supposed list of

14  22 names that's supposed to have come from Mr. Maricle to

15  Kennon and Wanda White, and I have asked for that in a letter,

16  I have yet to be provided with that.  We should have those

17  things before this witness is allowed to testify.

18       THE COURT:  All right.  I'm not real clear on the

19  second one, but I do think I understand the first one.

20       Mr. Smith?

21       MR. SMITH:  Your Honor, Mr. Gregory was Mr. Hoskins'

22  witness he called in the pretrial matters before this Court,

23  and he brought certain documents to the courtroom, and as he

24  left that day, he left certain documents, some of which were

25  left with us.  Mr. Hoskins asked for the first time to see that

1  information yesterday, and I have attempted to --

2         THE COURT:  Let me stop you there.  Let me stop you

3  there.

4         Is that true, Mr. Hoskins?

5         MR. HOSKINS:  That's not true, Your Honor.  I wrote a

6  letter to the United States.

7         THE COURT:  It's not true.  Where's your letter?

8         MR. HOSKINS:  I don't have it with me today, but I do

9  believe I have it here in Frankfort with me.  But I did write a

10  letter.

11         THE COURT:  All right.  Mr. Smith?

12         MR. SMITH:  And Mr. Hoskins asked me about this and I

13  advised him that I wasn't sure if we had -- I told him that I

14  know that there are videotapes of that proceeding that he was

15  talking about, the Corky Price trial, and I was under the

16  impression that that was the information he was seeking

17  earlier.  He did make a request in the letter, and I was under

18  the impression it was the video material.  It wasn't until

19  yesterday that he made clear to me that there was a document

20  that he was looking for.

21         I promptly asked the agents and advised him this

22  morning that it was available and he wanted to do it during a

23  break this morning, and I told him that I would obviously try

24  to do that, and now he brings this up as a surprise to me.  He

25  did not announce to me that this was going to be an issue with

1  me calling Wanda White.  This is the first mention that I've

2  heard that he would even have an objection, that it was an

3  urgent matter.  In fact, his statement to me, Your Honor, was

4  just whenever, just whenever.

5          THE COURT:  Okay.  Let me stop you there.

6          Mr. Hoskins, is that correct?

7          MR. HOSKINS:  Your Honor, my statement was I will be

8  available whenever, early in the morning, late tonight, during

9  lunch.  That was my statement.

10         THE COURT:  Okay.  Mr. Smith.

11         MR. SMITH:  Your Honor, that's —

12         THE COURT:  That's the material — that's the

13 material from — that Gary Gregory provided parts of that to

14 you at the issue of detention of Mr. Maricle in the case.

15         MR. SMITH:  It was Mr. Maricle's witness that he

16 subpoenaed —

17         THE COURT:  It was a hearing that I held.

18         MR. SMITH:  — that he brought documents pursuant to,

19 I assume, to his own subpoena, and for some reason, Mr. Maricle

20 didn't want it or whatever and it ended up on my table.

21         THE COURT:  So he subpoenaed the documents, he

22 brought those — Mr. Gregory brought those to the hearing and

23 then afterwards provided you with some of those materials and

24 now we're getting this request for those materials that were

25 subpoenaed but not provided to the defendant at the time he

1  subpoenaed those at a hearing previously in the case; is that
2  fair?

3          MR. SMITH:  That's my understanding.  I didn't see
4  the subpoena to know for sure what Mr. Maricle served on
5  Mr. Gregory, but when he left the courtroom, he left these red
6  folders on my desk and said, "I don't know who gets them," and
7  left them on my desk.  So, again, I was under the impression
8  that they were only the video VHS cassette recordings of that
9  proceeding, and I, again -- again, operated under that
10  impression until yesterday.  And I confirmed, as Mr. Hoskins
11  represented, there was in fact a document file that was
12  included, and it's in our office.  It is available.  He said he
13  wanted a copy, he wanted to inspect it, and I said, "I'll have
14  to have an agent there, if you give me a chance this morning."
15  And that was the conversation we had this morning, Your Honor.

16          THE COURT:  Okay.  Now, tell me about this second
17  part, a list, I guess, that was attached to an affidavit for a
18  search warrant that identifies 22 individuals.  I'm not really
19  sure what that's about.

20          MR. SMITH:  I believe counsel has been provided this
21  for -- multiple times in the initial discovery.  It's D16.  We
22  provided --

23          THE COURT:  D16?

24          MR. SMITH:  D16.

25          THE COURT:  D16.

1          MR. SMITH:  And I believe that's what —

2          MR. HOSKINS:  Judge, that's a list.  I've seen the

3  things that are in the discovery documents, we've asked for

4  some clarification.

5          THE COURT:  Okay.  Is that the list that you're

6  asking for now?

7          MR. HOSKINS:  If Mr. Smith tells me it is, I'm sure

8  that it is.

9          THE COURT:  Okay.  So that's available to you.  I'm

10  not going to delay the proceedings based upon your dilatory

11  actions, Mr. Hoskins.  This was your witness that you

12  subpoenaed.  You could have gotten those records from the

13  witness at the time, you chose not to do so.  Mr. Smith has

14  made a good-faith effort to make these materials available to

15  you and he can do so at lunch.  I assume this witness will take

16  hours, if not days, to complete, and you'll have sufficient

17  time to review those materials that you've been aware of for

18  some time now.

19          MR. HOSKINS:  Your Honor, I would like to respond to

20  the things Mr. Smith said, they're not accurate.

21          THE COURT:  Please go ahead.

22          MR. HOSKINS:  I wrote a letter to Mr. Smith asking

23  for that file.  I did not subpoena Mr. Gregory's files, I

24  subpoenaed him personally to come to that detention hearing.

25  At that detention hearing, I had the videotapes.  I submitted

1   the videotapes as exhibits in Judge Maricle's detention

2   hearing.  What I did not have and have asked for since -- I

3   think my letter is dated November, and I'll provide a copy of

4   that to the Court.  But I have not been dilatory in that.  I've

5   asked for it and Mr. Smith has told me he didn't think he had

6   it until today.  And I saw Mr. Gregory give it to Mr. Smith and

7   I asked for it promptly.

8            THE COURT:  All right.  Thank you.

9            Anything else we need to take up before the jury

10  comes back?

11      (No audible response.)

12           THE COURT:  You can bring the jury in.

13      (Whereupon, the jury returned to the courtroom, after

14  which the following proceedings were had in open court.)

15           THE COURT:  Thank you, and please be seated.

16           The record will reflect that all members of the jury

17  are present.  Ladies and gentlemen, I apologize for the delay.

18           The parties and counsel are also present.

19           Mr. Smith, at this time, you may call your next

20  witness.

21           MR. SMITH:  Thank you, Your Honor.  The United States

22  will call Wanda White.

23           THE COURT:  Thank you.

24                          WANDA WHITE,

25  having been first duly placed under oath, was examined and

1   testified as follows:

2              THE COURT:  Mr. Smith, you may proceed.

3              MR. SMITH:  Thank you.

4   BY MR. SMITH:

5   Q    State your name, please.

6   A    Wanda Price White.

7   Q    Now, Ms. White, we're going to be asking questions today

8   of you, and I appreciate you speaking into the microphone

9   because we've had some trouble hearing other witnesses.  Tell

10  us a little bit about yourself, Ms. White.  Who are you married

11  to?

12  A    D. Kennon White.

13  Q    And how long have you two been married?

14  A    Since 1986.

15  Q    And during that marriage, have you-all had children?

16  A    We have two living children.

17  Q    And what are their ages?

18  A    Twenty-two and 16.

19  Q    Where were you born, Ms. White?

20  A    Indianapolis, Indiana.

21  Q    And when is it that you moved to Clay County?

22  A    Mid 1970s.

23  Q    Did you live other places other than Indianapolis growing

24  up?

25  A    Dallas, Texas.

1  Q    And how long did you live in Texas?

2  A    Several years off and on throughout my childhood.

3  Q    Once you moved to Clay County, how long did you live

4  there?

5  A    My adult life.

6  Q    Okay.  And —

7  A    Part of my childhood.

8  Q    Do you still live there now?

9  A    I don't.  I live in London, Kentucky.

10  Q    And when did you move to London, Kentucky, Ms. White?

11  A    Three years ago next month.

12  Q    Now, do you have family in Clay County?

13  A    I have one — two uncles that live in Clay County.

14  Q    And what brought your family from out West back to Clay

15  County?

16  A    My mother's family is from there, from Leslie County and

17  parts of Clay County.

18  Q    And what's your mother's maiden name?

19  A    Wombles.

20  Q    Now, Ms. White, where were you educated?

21  A    Clay County High School.

22  Q    And were you a graduate of that high school?

23  A    I obtained my GED through Clay County High School.

24  Q    And following your high school education, did you further

25  your education in other areas?

 1  A    I have two trade school diplomas.

 2  Q    And tell us a little bit about that, Ms. White.  What

 3  trade schools did you attend?

 4  A    Real estate and cosmetology.

 5  Q    Do you recall the approximate time periods that you

 6  attended those trade schools?

 7  A    The mid '90s.

 8  Q    And where did you go to obtain that education?

 9  A    A-Pass-Weikel Institute in Lexington, Kentucky, and

10  Southeast School of Cosmetology in Manchester, Kentucky.

11  Q    And about how long are those courses that you took or

12  those trade school degrees?

13  A    1800 hours for the cosmetology degree and 96 classroom

14  hours for the real estate diploma.

15  Q    Have you worked outside the home, Ms. White?

16  A    Yes.

17  Q    And could you tell the Court and the jury what kind of

18  occupations you've held?

19  A    I worked for the Clay County Board of Education in the

20  early '90s for several years as a teacher's assistant.  And I

21  worked at the Laurel Creek Nursing Home.  I worked at my hair

22  salon, which is The Cutting Edge.  And I worked at the

23  Manchester City Police Department before working at the

24  Manchester City Hall.

25  Q    Now, your first employment was with the Board of

1   Education?

2   A      Yes.

3   Q      And at that time, you said you were a teacher's assistant?

4   A      Yes.

5   Q      Did you work in one school or —

6   A      One school.

7   Q      Okay.  And about how long were you there?

8   A      Three years.

9   Q      Okay.  And then you said something about a business that

10  you had.  What was the name of your business?

11  A      The Cutting Edge.

12  Q      And where was that located?

13  A      Manchester, Kentucky.

14  Q      And about how long did you have that business?

15  A      Five years.

16  Q      Do you know when that business ceased to exist?

17  A      I do not.

18  Q      Did you have employees working for you?

19  A      Yes.

20  Q      And at the optimum or maximum number, what would that have

21  been, how many employees?

22  A      Seven.

23  Q      Then I think you said you had a job at the City of

24  Manchester?

25  A      Uh-huh, yes.

WANDA PRICE - DIRECT - MR. SMITH                81

1  Q    Did you hold just one job or several jobs there?

2  A    Well I worked at the Manchester Police Department in the

3  capacity of police clerk.

4  Q    What does a police clerk do?

5  A    Log-ins, filing, all clerical duties.

6  Q    Okay.  And what other duties or jobs did you hold with the

7  City?

8  A    I transferred to the Manchester City Hall and was a

9  Mayor's Assistant.

10 Q    And what were your general duties as Mayor's Assistant?

11 A    I answered the phone, I did water bills, I did taxes.

12 Basically anything I was asked to do I did.

13 Q    Now, while in Manchester or Clay County area, have you

14 lived as husband and wife in more than one location?

15 A    Yes.

16 Q    Could you tell us generally where you and your husband

17 lived while you've been married in the county?

18 A    We lived in a community called Horse Creek in Manchester,

19 Kentucky.  And then we moved to Island Creek, which is still in

20 Manchester, and Greenbriar, and then we moved to the city

21 limits.

22 Q    So your last place of residence in Manchester would have

23 been within the city limits?

24 A    Yes.

25 Q    And prior to that, you lived out in the county?

1    A    Yes, always.

2    Q    Now, Ms. White, have you yourself sought to be a candidate

3    for any political office?

4    A    No.

5    Q    And prior to meeting your husband Kennon White, were you

6    involved in any politics?

7    A    No.

8    Q    If you could, tell us, Ms. White, when it was that you

9    first got introduced to politics in Clay County.

10   A    In 2002, when my husband ran for jailer.

11   Q    And how is it that you and your husband came to the

12   decision to run for jailer, if you recall?

13   A    What I recall is that we both wanted to make a difference

14   and make a change and that was one of the offices that we

15   thought needed a change.

16   Q    Okay.  And were you able to make that decision without

17   consulting others?  Did you-all just make the decision on your

18   own, or how did that come about?

19   A    Well, we thought at first that we could make the decision

20   on our own, but getting into it we found out real quick that it

21   wasn't just up to us.

22   Q    Okay.  Do you recall having discussions with other people

23   that were involved in politics in Clay County?

24   A    Several politicians, yes.

25   Q    Were you present at some of those meetings with

1  politicians?

2  A     Yes.

3  Q     If you could, tell us who you recall visiting at that

4  time, in 2002.

5  A     I recall visiting with Jennings White, Cletus Maricle,

6  Yancey White, Barbara Colter, Edd Jordan.

7  Q     And if you could, just break down for us a little bit

8  about how these people are political -- were, at that time,

9  involved in politics.

10  A     Well, Edd Jordan was the sheriff and Barbara Colter was

11  the state representative and Cletus Maricle was the circuit

12  judge, and Yancey White was a local attorney that was very

13  influential.

14  Q     And in your recollection, what kind of advice or direction

15  did you-all receive with each of these individuals, Ms. White?

16  A     Well, at the time we were running, there was other

17  candidates that were thinking about running, too.  So we were

18  encouraged, and it being hindsight now, I see that it was so

19  there would be competition mostly.  Yancey White was

20  frustrated, he had -- he was supporting Charles Marcum and he

21  let us know right off the bat that he would not support us.

22  And so overall, we were supported in running.

23  Q     Now, you say you met with Cletus Maricle?

24  A     Yes.

25  Q     Were you present when you-all had discussions about

 1  Kennon's prospect of running for jailer?

 2  A    Yes.

 3  Q    And do you recall what was discussed in that meeting?

 4  A    He encouraged us, told us it would be hard but that it

 5  could be done and that we would have to put money up.

 6  Q    You would have to put money up?

 7  A    We'd have to put money up to win it.

 8  Q    And did he explain to you what kind of money or what was

 9  the money going to be used for?

10  A    We would have to buy the office.  He explained to us that

11  that's how you got in if you got in.

12  Q    What did he say about that, buying the office?

13  A    He asked us if we were willing to put money in the race.

14  Q    And did you-all talk about any figure or amounts of money

15  or did he specifically say how much if you recall?

16  A    I can't recall.

17  Q    Now, you say you met with Yancey White, a local attorney?

18  A    We did.

19  Q    He didn't want you to run?

20        MR. WHITE:  Objection, asked and answered, Your

21  Honor.

22        THE WITNESS:  No.

23        THE COURT:  Overruled.

24  BY MR. SMITH:

25  Q    Was there anybody else that discouraged you and your

1  husband from running that you recall that you — that you met

2  with?

3  A    James Phillips.

4  Q    And who's James Phillips?

5  A    He's the Clerk in the courthouse.

6  Q    And what do you recall him saying about Kennon's prospect

7  for running?

8  A    What I recall is that he is a distant cousin to Kennon and

9  we thought he would sign Kennon's — the papers for him to

10 file, his filing papers.  And he told Kennon that he was — he

11 would not sign them because Kennon would be throwing a rift

12 into the — all their plans and that he couldn't sign them,

13 that that would put him in a hard spot, him holding an office

14 himself, with Charles Marcum, which was the current jailer.

15 Q    And how long had Charles Marcum been jailer there in Clay

16 County when you-all chose — decided to run against him?

17 A    Many years.  I can't give specific amount of years.

18 Q    Anyone else that you recall meeting before you-all decided

19 ultimately to run?

20 A    Not that I recall.

21 Q    Did anybody visit you and your husband at your home and

22 discuss the prospect or the possibility of you-all running?

23 A    Not that I can remember.  We lived out in the county at

24 that time.  Not that I remember.

25 Q    Did you-all ultimately decide to file and run?

1  A    We ultimately did, yes.

2  Q    Okay.  And after making that decision, did you have any

3  discussions with any of the political figures about what was

4  going to be needed for you to be successful?

5  A    We did, yeah.  We had several discussions.

6  Q    And who do you recall meeting with?

7  A    I recall meeting with Cletus and I recall —— actually, I

8  recall meeting with William "Al Man" Stivers.  He did come to

9  our home, he and his brother.

10  Q    And tell us about that meeting, Ms. White.

11  A    They were upset because his niece, Jody Stivers, was of

12  age to vote, and James Phillips, the Clerk, was not allowing

13  her to vote and they had seen that they were running into some

14  problems and wanted to know how we stood on that and if —— how

15  we felt about it and basically trying to persuade us to go with

16  their party that they had decided to go with.

17  Q    Their party?

18  A    Uh-huh.

19  Q    Were they like lined up with the Republican or the

20  Democrat?  What do you mean by "party"?

21  A    No, it was all mixed up.  It was —— the person at that

22  time that they chose, William Stivers and Charles Stivers, was

23  Freddy Thompson.

24  Q    And what kind of comments did they make to you that you

25  recall to try to persuade you to come over to support their

1  side?

2  A    The fact that we were —— had all been friends and we

3  knew Jennings would double—cross us and we knew that he and

4  Charles Marcum and Jennings White had always been together

5  throughout politics through the years and they could not be

6  trusted, and new faces, new change, and we needed to go with

7  them.

8  Q    Were there any prequalifications or conditions that

9  you—all would have to meet before you could actually get on

10  their side?

11  A    Explain that to me.  I don't understand how you're asking

12  me that.

13  Q    It's poorly worded.  What did he say it would take for you

14  to get on their side?

15  A    William Stivers?

16  Q    In that conversation.

17  A    In that conversation?  We pool all our money together and

18  we win it and that's just how it was going to be.  Basically,

19  who do you want to put your money with.

20  Q    All right.  Did you—all talk —— to your recollection, did

21  he talk about a specific figure with you and your husband?

22  A    I don't remember.

23  Q    Now, you said that he made some mention of Jennings White

24  not to be trusted and he might be going to join up with Marcum?

25  A    Yes.

1  Q    And Marcum was your opposition?

2  A    Yes.

3  Q    And did you-all agree to join the Stivers' invitation to

4  join the Freddy Thompson side of things?

5  A    We left it in the air at that time.

6  Q    Who else did you meet with, ma'am, after you-all had made

7  this decision?

8  A    We met with Bart Morris, Vernon Hacker, different people

9  in the -- within the city limits that we thought would support

10 us.

11 Q    And where did you meet up with Bart Morris?

12 A    At his home.

13 Q    Who was present?

14 A    Myself and Bart and his wife, Debbie, and my husband,

15 Kennon.

16 Q    And what did you-all discuss with the Morrises at that

17 time?

18 A    Would they support us in the candidacy for jailer.

19 Q    And what was their response?

20 A    Yes.

21 Q    And did you-all talk about anything else that was needed

22 for you-all to succeed in your seeking that office with the

23 Morrises?

24 A    We talked about who we needed -- the key people who we

25 needed to talk to, which we already knew anyway, because

1  Kennon's dad was mayor and we went over a few details of that.

2  Q    What do you mean, you needed to talk to some key people?

3  What are you talking about?

4  A    In matters of Darnell Hipsher and Vernon Hacker and some

5  of the city council members, just make sure they were on board

6  with --

7  Q    On board with what?

8  A    -- supporting us.

9  Q    And supporting you in what way, ma'am?

10 A    Supporting us with the ticket that would be formed

11 together and supporting us with the people and their contracts,

12 their influence.

13 Q    Supporting you with the ticket.  Tell me what a ticket is.

14 A    A ticket is a list of candidates that politicians gather

15 up before elections of who they're supporting and who's put

16 money in.

17 Q    And what's the money put in for?

18 A    To buy votes.

19 Q    So you were discussing that with Bart and Debbie Morris at

20 their house?

21 A    They discussed that with us, yes.

22 Q    And did you-all talk about a money figure with the

23 Morrises, about how much money would be needed?

24 A    Yeah, we talked about a figure with them.

25 Q    Do you recall a specific figure that was talked about?

1   A    I remember Bart indicated that it would probably cost

2   $50,000 to win the jailer's race.

3   Q    And did you-all make an agreement with the Morrises at

4   that meeting about what you-all were going to be doing in the

5   race?  Did you-all reach an understanding about —

6   A    We reached an understanding, yes.

7   Q    And what was that understanding, ma'am?

8   A    That we would come with our money and he would be the

9   person that headed it in the city limits.

10  Q    Now, you talked about a ticket.  Did you-all reach an

11  agreement at that time or understanding about what particular

12  candidates was going to be on the ticket with the Morrises?

13  A    Not at that time, but we had a general idea of who he

14  would support.

15  Q    And who was that?

16  A    Jennings White and Edd Jordan and Kennon White.

17  Q    And those would have been the offices of county court

18  clerk —

19  A    Yes.

20  Q    — sheriff, and jailer?

21  A    And Barbara Colter, yes.

22  Q    And Barbara Colter for what office?

23  A    State representative.

24  Q    Now, had you met with Barbara Colter and your husband?

25  A    Yes.

1  Q    And was money discussed with her?

2  A    Yes.

3  Q    Tell us about that discussion.

4  A    First she thought that it was a mistake that Kennon had

5  got in the race because that created a — for her to have to

6  make a decision on who she was going to — it would make it to

7  where she would have to obligate and she didn't want to have to

8  obligate herself and she felt like him being her nephew that it

9  created, again, a rift for her, selfish in her own nature.

10 Q    And she felt like she had to obligate herself in what way,

11 ma'am?

12 A    To Kennon.

13 Q    And his candidacy?

14 A    And his — yes.

15 Q    You said there was money discussed with your aunt?

16 A    Yes.

17 Q    Or his aunt?  And what was discussed between you?

18 A    We discussed how much she would put up and where she would

19 put it and who she was putting it with, and we wanted to be on

20 the same page so that we didn't have a conflict.

21 Q    And generally what was her offer as far as putting money

22 up?

23 A    I don't recall her exact offer, but she said that when it

24 come time that her money would be there.

25 Q    Now, at that time, you say that you had worked for the

1  school board.  Were you working for Doug Adams when you were at

2  the school board?

3  A    Charles White.

4  Q    And did you at any time meet with Doug Adams in 2002 to

5  discuss the election?

6  A    After the election.  And actually he and — myself and my

7  husband met with him at his home a couple of times.

8  Q    And do you know when that was, before or after the

9  election that you met those few times?

10 A    Before.

11 Q    And if you could, tell us what was discussed in that

12 meeting with Mr. Adams at his home.

13 A    Well, we were trying to persuade him to be for us, and he

14 kind of teeter-tottered around and in the end told us that he

15 would and that we would have to make some arrangements as far

16 as the people in town, in the city limits.  For one, he wasn't

17 happy with the way Bart was heading things and he had no inlet

18 in the city limits and he was dissatisfied with that, but —

19 Q    Okay.  What else did he talk to you-all about about being

20 successful in your bid for jailer if he were to support you?

21 A    He told us — Doug Adams told us if we went with the

22 ticket, which consisted of him supporting Freddy Thompson, that

23 we would be a winner, if we tied with Freddy.

24 Q    Did you-all talk about money?

25         MR. WHITE:  Objection, leading, Your Honor.

1          THE WITNESS:  Yes.

2          THE COURT:  Overruled.

3   BY MR. SMITH:

4   Q    What was money -- what money was discussed with Mr. Adams

5   at that time?

6   A    He indicated to us did we know that it took a great amount

7   of money to win the election, and we said yes, and he asked us

8   if we were willing to put it up, and we said yes.

9   Q    Did he give you a figure?

10  A    No, not at that time.

11  Q    Did he at a later time?

12  A    Yeah, he told us later on when we met with him the second

13  time that, again, it would be anywhere from 50 to $70,000.

14  Q    Did he tell you what the money would be used for?

15  A    Yeah, to buy votes.

16  Q    What else did you-all talk about with Mr. Adams?

17  A    We discussed his son-in-law, Stevie Collins, and at that

18  time, he wanted to know if Kennon's dad had planned to run for

19  mayor in the future and that Stevie was either interested in

20  running for James Phillips's position or running for the

21  mayor's position, we discussed that.  And Kennon told him that

22  he didn't know, that it was early on and Doug didn't have any

23  competition, that he didn't know what his plans were.

24  Q    Now, Stevie Collins, you say that's his son-in-law?

25  A    Yes.

1  Q    And did he live in the city?

2  A    I'm not sure at that time.  He lives in the city now.

3  Q    In talking with Mr. Adams, you said you-all did eventually

4  talk about a grand total figure.  Did you-all talk about

5  other — at other times money with Mr. Adams?

6  A    No.  In my last meeting I had with him at the Board of

7  Education, we discussed that.

8  Q    Okay.  Was that before or after the election?

9  A    After the election.

10 Q    Okay.  Let's stay on here before the election, Ms. White,

11 if we could.

12 A    Okay.

13 Q    Did you-all decide to join the Adams faction and join

14 their ticket?

15 A    No, we didn't.

16 Q    And ultimately, what did you-all decide to do?

17 A    Ultimately, we decided to side with Jennings White.

18 Q    And what did that come down to ultimately?

19 A    Defeat.

20 Q    And what made you ultimately decide to go with Jennings

21 White?

22 A    Well, he's a distant relative of Kennon's and a close

23 relative of mine and we just felt like he was the winning

24 ticket at the time.

25 Q    Now, after making that decision, did you-all join Doug

1  Adams in giving money to his side?

2  A    In some places.

3  Q    And could you explain to us how that happened?

4  A    Well, in Oneida, which is primarily his -- what would you

5  say, stomping grounds, we gave money to Mike Bishop there in

6  the Laurel Creek area.

7  Q    How is he connected with Doug Adams?

8  A    Mike Bishop's father is Doug Adams's best friend.

9  Q    And what's his name?

10  A    Paul Bishop.

11  Q    All right.  Who else?

12  A    John Russell Brown.  We gave money to John Russell Brown.

13  Q    How come you to give money to John Russell Brown?

14  A    Well, I had worked with him previously when I worked at

15  the Board of Education and he was the principal, so I had

16  become familiar with him there.  And he told us that he would

17  support Kennon, although he could not support Barb, so -- which

18  is Kennon's aunt.  So we decided to put money with him, and he

19  is an affiliate of Doug Adams.

20  Q    And how are they connected?

21  A    They've been friends for many years and he works at the

22  superintendent's office with him.

23  Q    Is Doug Adams his boss?

24  A    Yes.

25  Q    And how much money did you take to him?

1  A    $5,000.

2  Q    And when you took this money to him, were you present and

3  discussed what the money was going to be used for?

4  A    I was not present.

5  Q    Okay.  Do you know who took the money to him?

6  A    My husband.

7  Q    All right.  What did you learn John Russell Brown did with

8  the money?

9  A    Well, I learned two days after the election he told my --

10         MR. WESTBERRY:  Objection, Your Honor.

11         THE COURT:  All right.  There's an objection.

12         MR. SMITH:  John Russell Brown was buying votes with

13  the money.

14         THE COURT:  I'm sorry?

15         MR. SMITH:  John Russell Brown is a co-conspirator,

16  unindicted obviously, but he was buying votes.

17         THE COURT:  All right.  I'll overrule.

18         THE WITNESS:  Days later he called my father-in-law,

19  which he has no ties to whatsoever, and returned the money and

20  said that he felt bad and he didn't to spend the money against

21  us, but he had -- under the direction of Doug Adams had to

22  be -- support the other candidate.

23  BY MR. SMITH:

24  Q    He called your father-in-law.  Who's your father-in-law?

25  A    Doug White.

1  Q   And what did you do when you got the call?

2  A   What did I do?  He's the one that got the call.  I didn't

3  find out —

4  Q   What happened to the money?

5  A   It was returned.

6  Q   How was it returned?

7  A   In cash form.

8  Q   To who?

9  A   To Doug White, and he returned it to us.

10 Q   And he said he had been forced to go with the other side.

11 Who was your opposition?

12 A   Charles Marcum.

13 Q   Now, you indicated that after the election you met with

14 Doug Adams?

15 A   I did.

16 Q   And tell us about that meeting.

17 A   Well, it took place in his office at the Board of

18 Education, and we discussed everything that happened and he

19 indicated to me that Kennon and I should have went with him,

20 that he worked circles around Jennings and Jennings had 15

21 people in the Burning Springs precinct working and he himself

22 worked circles around them buying votes.

23 Q   What else was discussed?

24 A   That he basically said, you know, we still have ties, and

25 I indicated that we didn't, and I — just really nothing other

1  than that Kennon should run again, which was out of the

2  question, he wasn't going to run again.

3  Q    What did he encourage you to run for?

4  A    For jailer again.

5  Q    And you say that was out of the question.  Why was it out

6  of the question?

7  A    We had just had our fill of it.

8  Q    When you made that visit to Adams, who was with you?

9  A    I was by myself.

10  Q    Now, during election day, did you have any meetings with

11  any of these political people on election day that you recall?

12  A    We met with -- pretty -- yeah, we met with Bart Morris,

13  Darnell Hipsher, Vernon Hacker, Doug White, Barbara Colter, I

14  met Cletus that day.

15  Q    When you met Bart Morris that day, what was going on and

16  where were you when you met Bart Morris?

17  A    We came by his home early that morning.

18  Q    And what did you see?

19  A    Voters being hauled in and out.

20  Q    And what do you mean, voters being hauled in and out

21  where, ma'am?

22  A    From his home.

23  Q    And who do you recall seeing hauling these voters?

24  A    His workers, his employees, city employees.

25  Q    Do you recall any names of people?

1  A    Deshae Henson, Antwan Henson, James Goins, Bill White.

2  Q    Now, Deshae Henson and Earl Henson, are they employees of

3  Bart Morris or employees of the City?

4  A    Earl Henson is an employee of the Board of Education.  And

5  Antwan Henson was not an employee of the City at that time.

6  Q    Now, you said Deshae, is that the same person, Antwan —

7  A    No, two different people.

8  Q    And Antwan, who does he work for?

9  A    I have no idea.

10 Q    James Goins, who does he work for?

11 A    Bart Morris.

12 Q    You said Bill White?

13 A    Yes.

14 Q    And is he a White related to Jennings White?

15 A    Brother.

16 Q    And so while at the Morris residence, you said you saw

17 Bart there.  Did you see anybody else at Bart's house other

18 than Bart —

19 A    I'm saw —

20 Q    — and these vote haulers?

21 A    I saw Darnell there and Vernon Hacker.

22 Q    Okay.  And what were Darnell and Vernon Hacker doing?

23 A    They were hustling voters.

24 Q    What do you mean, "hustling voters"?

25 A    What I mean by that is they would — groups of — for one

1   thing, they had vans and vehicles and they would haul in four,

2   five, six, I mean, however many that would fit in the vehicle

3   and they would bring them in, and some of the times they would

4   drive them in theirselves, and then they would pay the voters

5   there and then they would disperse them, take them to vote in

6   whatever precinct.  Not only did — there was different

7   precincts that still met there to be taken to vote.

8   Q    So not just Manchester?

9   A    Not just Manchester.

10  Q    What other precincts do you know of that were being paid,

11  voters being bribed, at the Morris residence in 2002 other than

12  the Manchester precinct?

13  A    The Horse Creek area, the Beech Creek area, Manchester

14  area.

15  Q    Now, was there an early voting period that went on for

16  absentee voters prior to the election in May of 2002?

17  A    There was.

18  Q    And were you present at the Morrises at any time for that

19  early voting?

20  A    I was.

21  Q    How many times do you think you were there during the

22  early voting period?

23  A    Several times over the period that they had high volume.

24  Q    When you say "high volume," what are you referring to?

25  A    Well, one particular day, they had probably a couple

1  hundred voters lined up outside the voting — absentee voting

2  precinct, and I was present at that one.

3  Q    Now, a couple hundred voters were lined up for the

4  absentee voting?

5  A    Yes.

6  Q    And where was the absentee voting taking place in Clay

7  County for that May primary, 2002?

8  A    Downtown.  They were constructing the courthouse and they

9  had a temporary facility set up at the old bank, the Clerk's

10  Office across from the 9-1-1 building.

11  Q    Now, when you say that you-all made these plans to put

12  this money into bribe voters, did you-all also have a plan to

13  use election officers who were employed by the Board of

14  Elections to assist in this scheme to bribe the voters?

15  A    Yes, they were in place.

16  Q    And in the early voting, who did you-all have that worked

17  for the Board of Elections or were operating within the Board

18  of Elections as an election officer to assist in carrying out

19  the scheme?

20  A    During the absentee voting?

21  Q    Yes, ma'am.

22  A    Jennings White did most of it on our behalf.

23  Q    He was county clerk?

24  A    County clerk.

25  Q    And served on the Board of Elections?

1  A    Yes.

2  Q    And how was he operating for the early voting period for

3  your faction?

4  A    He would just submit the voters when we brought them in

5  and he voted them himself.

6  Q    Okay.  And why was it important, according to your

7  understanding of the scheme, that you had an election officer

8  working for the Board of Elections inside the poll voting the

9  voter?

10  A    Why was it important?

11  Q    Why was that necessary?

12  A    That was necessary to ensure you got your vote, to ensure

13  that your paid voter was -- voted the way they should.

14  Q    Once Jennings White voted your voters, then what happened,

15  according to the plan?

16  A    Then they were taken to Bart Morris's and paid or they

17  were paid on the spot.

18  Q    Okay.  And when you say they were taken to Bart Morris's,

19  how far did they have to travel from the polling place for the

20  early voting to Bart Morris's?

21  A    Less than a mile.

22  Q    And did you witness this payoff going on at the Morrises'?

23  A    I did.

24  Q    And could you describe who you saw participating and

25  furthering the scheme to pay off and bribe the voters at the

1  Morris's residence?

2  A     I saw Debbie Morris and Bart Morris paying them.  They had

3  a table set up in the garage and they had a checklist, and when

4  the voter was brought in they would check the list to make sure

5  that they didn't vote —— that they hadn't been paid already and

6  they would check the list and pay the voter.

7  Q     Now, who had the list the times that you saw?

8  A     Debbie Morris.

9  Q     And you say it was a list that was used to make sure they

10 weren't paid twice?

11 A     Right.

12 Q     And why was that a concern for your scheme to be

13 successful, that you not pay people twice?

14 A     Well, it was important because if you didn't keep track of

15 it they would try to come back, and a lot of them were —— a lot

16 of them were drug addicts and they would come back and try to

17 be paid twice or they would show up on election day and pretend

18 like they hadn't voted.  So it was important to keep track of

19 them.  And then at the end of the day, you could compare your

20 notes with who you had at the Clerk's Office.

21 Q     Now, during this scheme, did you-all have daily meetings?

22 A     Yes.

23 Q     And where were those meetings held?

24 A     At Bart Morris's.

25 Q     And who do you recall participating in those end-of-

1  the-day meetings after you-all had had your day with the early

2  voting poll?

3  A    Bart and Debbie, of course, and Darnell Hipsher would be

4  there, myself, my husband, Vernon Hacker, William Stivers came

5  by several times, Doug Adams, I've seen him there several

6  times, Cletus Maricle would come into the — he wouldn't come

7  in the house but he would come into the parking area.  Jennings

8  White.

9  Q    And these visits that you were a participant in,

10  Ms. White, what were you-all discussing at the end of the day?

11  A    We would discuss how many people we had seen, how many

12  people we had taken into vote absentee, who had been paid, who

13  needed to be seen, just various things that you would go over

14  to ensure that your people were doing — the people that you

15  recruited to help you do this was doing what they was supposed

16  to be doing.

17  Q    Now, you've named people that were supporting Jennings

18  White that were at that meeting.

19  A    Yes.

20  Q    And you named Doug Adams?

21  A    Uh-huh.

22  Q    And how did that work out?

23  A    Oh, he was just playing both sides.

24  Q    Okay.  And you say he was playing both sides.  What do you

25  mean?

1  A    He was probably, at that time, the most influential

2  person, being superintendent, and he was throwing his weight

3  around basically, letting it be known that he was a presence.

4  Q    When you-all were discussing your end-of-the-day results,

5  did you discuss that in front of Doug Adams?

6  A    Some of the time.

7  Q    You said Cletus Maricle was there?

8  A    Uh-huh.

9  Q    But he didn't come in?

10  A    No.

11  Q    So how did he participate in the meeting sitting in his

12  car?

13  A    They would go out and speak to him, let him know what was

14  going on.

15  Q    And who is "they"?

16  A    They, Bart, Kennon.  Kennon's dad would be there on

17  occasion.  Different people.

18  Q    Now, this primary that you've mentioned had on your ticket

19  the sheriff?

20  A    Uh-huh.

21  Q    A jailer candidate, county clerk candidate.  What about

22  magistrate candidates?

23  A    Tommy Harmon.

24  Q    Did you-all tie in with any other magistrate candidates?

25  A    We tied in with Stanley Bowling, we tied in with — we

1  thought we tied in with Johnny "Poss" Gregory, but he ended up

2  spending our money against us.  So, yeah, we tied in with other

3  magistrates.

4  Q    Now, this Stanley Bowling, how did you-all come to include

5  him?

6  A    He's a long-time friend, best friend, of Kennon's dad,

7  Doug White.  He worked for the City and retired there as the

8  City Supervisor, and he's always been a political figure.

9  Q    Well, did he attend any of these meetings?

10 A    Yes.

11 Q    What kind of meetings did he show up at?

12 A    He showed up at meetings at Bart's and he also held

13 meetings in his garage.

14 Q    Okay.  So you remember seeing him at some of the meetings

15 at Bart Morris's?

16 A    Yes, he's a best friend of Bart Morris.

17 Q    And was he there frequently or seldom?

18 A    Daily.

19 Q    And was this during this early voting period that you saw

20 him there?

21 A    Yes.

22 Q    All right.  You say you saw him also at the Bowling's

23 garage?

24 A    Yes.

25 Q    He also has a garage?

1    A    He also has a garage.

2    Q    So Morris has a garage and Bowling has a garage.

3    A    Yes.

4    Q    How far apart are they approximately from each other in

5    the county?

6    A    Several miles apart.

7    Q    Are they both in the city limits or one in the county and

8    one in the city?

9    A    No, I don't think Stanley's is in the city limits.

10   Q    Okay.  Did you go to the meeting a Bowling's garage?

11   A    Yes.

12   Q    And what did you observe there, ma'am?

13   A    I observed plans, them discussing plans and strategies and

14   discussion of buying and hauling voters.

15   Q    Was this a meeting that was occurring while the early

16   absentee voting was ongoing?

17   A    Yes.

18   Q    Now, other than discussing these plans, did you see

19   Stanley Bowling act on any of these plans for you?

20   A    Yes, I picked up voters in his garage to take to the

21   voting precincts.

22   Q    You picked up voters and did what with them?

23   A    Took them to vote at the various precincts.

24   Q    And so you were vote hauling?

25   A    I was vote hauling.

1  Q    For Stanley Bowling?

2  A    For the ticket.

3  Q    For the ticket.  How is it that Stanley Bowling helped you

4  in that effort, ma'am?  What did he do to help you?

5  A    We exchanged voters, we exchanged — he tied with us.

6  Q    Now, I really don't understand what you mean.  Can you

7  explain to me how that operated on the ground?  When you say he

8  exchanged voters for you, how did that — how was that

9  implemented?

10 A    How it was implemented is he had people that he had

11 hauling for him that in return we hauled for him.  So he would

12 set up people in his precinct to haul voters and if I had

13 someone that I knew that was a relative or a friend of mine

14 that voted in his precinct, I would then haul my voters to his

15 precinct to vote.

16 Q    And how was it that Bowling's garage was going to be used

17 by you?  Was that a point of contact?

18 A    That was a point of contact.  That was a point in the

19 evenings we would meet, either there or at Bart's, and that was

20 where you picked up voters or they would discuss where you

21 needed to go to get voters.

22 Q    Now, while you were hauling these voters for the ticket,

23 where was the money coming from?

24 A    Bart Morris's home.

25 Q    Okay.  So who actually gave you the money that you used to

1   bribe the voters in the early voting of 2002, the primary?

2   A    Debbie Morris paid the voters.

3   Q    All right.  And was that consistent while you were

4   operating and hauling voters that Debbie did the paying?

5   A    That was consistent.

6   Q    All right.  And did that change on election day as to --

7   did your-all's method of operation change on election day?

8   A    No.

9   Q    So tell us what happened on election day.

10  A    The same.  The same happened on election day, we hauled

11  voters there, they got paid.

12  Q    You hauled voters where?

13  A    To the same -- to Stanley Bowling's precincts and

14  Manchester precincts.  We hauled voters to Horse Creek's

15  precincts.  But in the end, they got paid back at the

16  Morrises'.

17  Q    Now, at Stanley Bowling's precinct, there would have been

18  a different election officer on election day?

19  A    Yes.

20  Q    But in early voting, all voters had to go to the same

21  place?

22  A    Right.

23  Q    So 20 precincts, all had to vote at the same place, and

24  Jennings White was taking care of you-all as an election

25  officer for the early voting?

1  A     Primarily Jennings White.  There was —— I can recall Uncle

2  Bud Smith, I don't know his first name, he was there.  William

3  Stivers was there.

4  Q     And when you say they were there, what were they doing

5  there?

6  A     They were voting people inside the voting machine.

7  Q     And did William Stivers have a position with the Board of

8  Elections in the early voting to your knowledge?

9  A     To my knowledge, he did.

10  Q     And was he an election officer?

11  A     Yes.

12  Q     So he was on the same ticket or an opposite ticket of you

13  during that early voting of 2002?

14  A     He was the opposing ticket.

15  Q     Did he have any helpers as election officers in there, to

16  your knowledge, in the early voting of May of 2002?

17  A     To my knowledge, I don't know.

18  Q     The two you do know is Jennings White and William "Al Man"

19  Stivers?

20  A     Yes.

21  Q     Now, on election day, you said that you were hauling

22  voters not only to the Manchester precinct but to the Horse

23  Creek precinct and to Stanley's precinct ——

24  A     Yes.

25  Q     —— Harts Branch?

1  A    Harts Branch.

2  Q    Did you have an understanding with the group who was going

3  to be operating on the inside as an employee of the Board of

4  Elections on election day?

5  A    I had an understanding of that.  We weren't concerned

6  about that.

7  Q    Okay.  And at Stanley's precinct, for instance, what was

8  your understanding — how would — who was going to accomplish

9  the task to be inside the polling at Stanley's precinct?

10 A    Well, to my recollection, he had people in place in there.

11 Jackie Jones was one of them.

12 Q    Okay.  And he was an election officer?

13 A    Yes.

14 Q    Any others you recall?

15 A    I don't recall.  I think his daughter-in-law, Crystal, was

16 an election officer.

17 Q    Does she have a last name you recall?

18 A    Bowling.

19 Q    What about Horse Creek, who was handling —

20 A    Sammy Gregory.

21 Q    Election officer?

22 A    Yes.

23 Q    And so when you were taking them to these county

24 precincts, when you were hauling the voters in, what did you do

25 with them when you got them to the polls?

1   A    When you got them to the polls, you met with the corrupt

2   worker that was there and they took it from there.

3   Q    Okay.  "Corrupt worker" being the inside election officer?

4   A    The inside election officer.

5   Q    And when you say "they took it from there," what did —

6   what did they do?

7   A    They went inside the voting booth and voted the ticket.

8   Q    And then once that was accomplished and the voter had

9   voted, what happened then?

10  A    We would wait for them as they come out the door and the

11  person would — for instance, Sammy Gregory would give you a

12  nod that he had taken care of them, and then you would take

13  them back to Bart Morris's residence and they would be paid and

14  they would check them off the list.

15  Q    Now, at the Manchester precinct, the May 2002 election

16  day, who was inside assisting you there?

17  A    I don't recall.  I never went inside.

18  Q    So how was it that you operated at the Manchester precinct

19  when you hauled voters there?

20  A    We would pull up to the — it was at the — at the middle

21  school.  We would pull up to the curb and get them with either

22  Darnell or Vernon and they would assist them on inside and we

23  would wait for them to bring them back out.

24  Q    Now, Darnell, who are you referring to when you say

25  Darnell?

1  A    Darnell Hipsher.

2  Q    And Vernon, who are you —

3  A    Vernon Hacker.

4  Q    And did they hold an office in — public office at that

5  time?

6  A    They were both city councilmen.

7  Q    So when you say it operated a little different in

8  Manchester, you didn't need a nod or a signal from them?

9  A    No, we had complete trust in them.

10  Q    During that, you say, return trip, you brought them back

11  to the Morrises'?

12  A    Yes.

13  Q    And who was it that paid them when you got them back?

14  A    Bart Morris or Debbie Morris.

15  Q    Now, during those meetings that you say that occurred at

16  the Morris residence, did you see other people bringing money

17  to be distributed as the election days went on?

18  A    I did.

19  Q    And tell us what other candidates you saw delivering money

20  to the Morrises' to be distributed as bribes to these voters?

21  A    I saw, of course, Jennings brought his money there,

22  Barbara sent money there.

23  Q    Barbara who?

24  A    Barbara Colter.

25  Q    Okay.  She was running for what?

1   A    State representative.

2   Q    Okay.  And who else?

3   A    Jimmy Dobson delivered money on behalf of James Garrison.

4   Q    Who is Jimmy Dobson?  Is he a business owner?

5   A    He's a business owner and a bank board member.

6   Q    And what was Garrison running for?

7   A    County judge.

8   Q    Any others that you recall?

9   A    Not that I can recall.

10  Q    Now, where did you get these lists of people that live out

11  in the county that you knew would be receptive to a bribe if

12  you wanted to approach them?  Where did you get that list?

13  A    Out in the county?  Cletus gave us a list, Bart had lists,

14  Kennon's dad had lists.

15  Q    Okay.  And when you say they had lists, can you describe

16  for us what you're talking about?

17  A    The list would — well, it was a group of people,

18  influential people.  They didn't have to be politicians, they

19  could have been heads of large households that had lots of

20  votes in the families, preachers that were influential,

21  different business owners, election officers, just basically

22  the list consisted of influential people that had control of

23  voters in their area.

24  Q    So you-all took that information and then developed this

25  plan as to how you were going to execute it in this primary

1   election in '02?

2   A     Yeah.

3   Q     And when you say that you had meetings with Cletus Maricle

4   and these other people, did they know why you wanted this list?

5   A     Yes.

6   Q     Did you-all discuss what you were going to do with this

7   list?

8   A     Yes, we did.

9   Q     And what did you-all discuss with Cletus Maricle you were

10  going to do with this list that he was giving you?

11  A     He gave us the list of people to contact that were

12  influential and had large families that could essentially be

13  bought.

14  Q     Well, "essentially be bought."  Did you-all talk about

15  bribing these voters with Cletus Maricle?

16  A     Yes.

17  Q     And did you talk about how much money it would take to

18  bribe, let's say, individuals that was on the list?

19  A     Well, a vote went for $20 a vote.  So that would have been

20  the amount.

21  Q     Did Cletus Maricle tell you where he got the list?

22  A     He had collected it over the years.

23  Q     Did he have places in the county where he was more

24  knowledgeable than others?

25  A     Yes, out in -- yes.

1  Q    And where did you know that he was most knowledgeable

2  about where voters could be bribed in the county?

3  A    Around the Burning Springs area, the Fogertown area, which

4  is — he had lived there prior to moving to the city limits.

5  Q    Is Burning Springs a significant precinct?

6  A    It is a significant precinct.  It's a large precinct.

7  Q    You indicated earlier that you noticed during that early

8  voting that folks like James Goins and other employees of Bart

9  Morris were both hauling.  What role did they play on election

10 day that you recall?

11 A    The same role.

12 Q    So you participated in the same role that Bart Morris's

13 employees did?

14 A    I did.

15 Q    Were there any others that you recall on election day that

16 he used other than James Goins and Bill White?

17 A    There were many others.  Mary Gail Roberts was one and her

18 daughter, Ella Wagers.  Different family — large families.

19 Q    Now, Ella Wagers and Mary Gail Roberts, are these ladies

20 that live in that city area?

21 A    Well, I think Mary Gail lives in the Beech Creek area.

22 Q    Okay.  Is that one of the precincts that included Stanley

23 Bowling?

24 A    Yes, it is.

25 Q    And Ella Wagers, where did she live?

1   A    I think at that time she lived in the city limits.

2   Q    How long did you work on election day?

3   A    From the time our eyes opened till the time our eyes

4   closed we worked.

5   Q    Okay.  Timeframe?

6   A    Timeframe, well, we didn't sleep that night ——

7   Q    What happened the night?

8   A    —— prior.  Just it was crazy.  Just people lining people

9   up, have you got your people ready to go.

10  Q    What do you mean?

11  A    Vehicles gassed up.

12  Q    Okay.  "Lining people up," what do you mean by that?

13  A    Well, I'm going to use myself as an example.  The night

14  before, I would call everybody that I had lined up to take in

15  to vote and had them a specific time I would be there to pick

16  them up and asked them if they had their family members ready

17  to go as well, and that's what I mean by that.

18  Q    So when you started at early hours of election day, they

19  were ready to go?

20  A    Yeah.

21  Q    And you say you worked all day?

22  A    Worked all day.

23  Q    What other things do you recall went on?  You said you

24  didn't sleep any the night before.  Was it just making calls or

25  were there other things that went on the night before the

1  election?

2  A     There was meetings — just we were running all over town,

3  there was meetings everywhere, inside and —

4  Q     Meetings with who?

5  A     Meeting with Bart Morris and Darnell Hipsher and Vernon

6  Hacker and Cletus Maricle and Vernon Hacker and Barbara Colter

7  and Doug White.

8  Q     And in these meetings, what was the purpose of this

9  meeting just on the eve of election day?

10  A     The same scheme, lining everybody up.

11  Q     Was it clear in those conversations that you had with

12  these folks that everybody knew the purpose of lining up the

13  voters so that they could be bribed and bought on election day?

14  A     They knew.

15  Q     Now, how many voters do you estimate that you saw being

16  taken in on election day yourself?

17  A     I probably witnessed myself voters being taken in over

18  200.

19  Q     Now, at $20 a vote, that's quite a bit of money.  Did the

20  persons that you say handled the money, did they carry $40,000

21  around on them in one bag or box or anything?

22  A     No, they had it in the safe.

23  Q     Who had it in the safe?

24  A     It was in Bart and Debbie's bedroom in the safe.

25  Q     Cash money?

1   A     Cash money.

2   Q     Is that basically the only thing that — or was that the

3   primary thing that you used to bribe the voters with, was cash

4   money?

5   A     That was the primary thing we used.

6   Q     During the conclusion of that day, what were the

7   outcome of — what was the outcome of your husband's race?

8   A     We lost.

9   Q     Did you discuss the loss with any of these people that you

10  talked to earlier before you got in the race?

11  A     As soon as the election was over, we went to Stanley

12  Bowling's garage and they were having a celebration party.  So

13  not much discussion went on that night.

14  Q     Okay.  You met with Doug Adams, you told us about that?

15  A     Yes.

16  Q     And talked with him after the election?

17  A     Yes.

18  Q     It was a one—on—one, just you and him?

19  A     Just me and him.

20  Q     Did you talk to Cletus Maricle?

21  A     Yes.

22  Q     And how long after the election was it that you met up

23  with Cletus Maricle?

24  A     Days.

25  Q     And what was said there in that meeting?

 1  A    Basically, so many people in the election that it made

 2  people have to commit to other sides and we were double-crossed

 3  and we'll try again.

 4  Q    Now, who made the comment that he believed you were

 5  double-crossed?

 6  A    Cletus did.

 7  Q    And did he explain himself?

 8  A    He explained it.

 9  Q    And where did the double-cross happen in his estimation in

10  that conversation?

11  A    In his estimation, that we had put money in the wrong

12  places.

13  Q    Did he know where you had put money?

14  A    He knew.

15  Q    How did he know that?

16  A    We had discussed it.

17  Q    And had he counseled otherwise when you told him, I'm

18  going to take money and give it over here to the Jennings White

19  faction, and did he counsel against that?

20            MR. HOSKINS:  Objection, leading.

21            THE WITNESS:  He thought that was a good idea.

22            THE COURT:  Overruled.

23  BY MR. SMITH:

24  Q    And yet, at the end of the day, he said you were double-

25  crossed?

1   A    Yes.

2   Q    How did Jennings White double-cross you according to

3   Cletus Maricle?

4              MR. PINALES:  Objection.

5              THE WITNESS:  He went with Charles and us.

6              THE COURT:  Overruled, you can answer.

7   BY MR. SMITH:

8   Q    He went with Charles who?

9   A    Charles Marcum.  In other words, he played both sides.

10  Q    And had that kind of thing happened over there in Clay

11  County before, you put your money in with a pool and you get

12  double-crossed on election day?

13             MR. WHITE:  Objection, Your Honor.

14             THE COURT:  Sustained.

15             THE WITNESS:  Can I answer that question?

16             THE COURT:  No, he objected.

17  BY MR. SMITH:

18  Q    I don't think so.  I'll need to rephrase it.

19  A    Okay.

20  Q    In your discussions with Cletus Maricle, did he tell you

21  about prior double-crosses that he had seen and witnessed?

22             MR. WHITE:  Objection, Your Honor.

23             THE COURT:  Overruled.

24             THE WITNESS:  He did.

25  BY MR. SMITH:

1   Q    And what did he tell you?

2   A    Well, he told me that he had himself worked on the ground

3   for one candidate and had went in afterwards and voted for the

4   other, so it happened, and that was part of politics and you

5   just try it again.

6   Q    So he left you with — he said try it again.  Did you try

7   it again?

8   A    Not in that — not in the same capacity, no.

9   Q    Okay.  What did you and your husband do after your defeat?

10  Go back to work?

11  A    We went back to work.  Just carried on.  What else was

12  there?  I mean, there was nothing else to do.

13  Q    You indicated that you-all made a move to the city at some

14  point?

15  A    We did.

16  Q    What precipitated the move to the City of Manchester?

17  A    Well, we actually won the City precincts and we were

18  encouraged that that was our strong points and that —

19  Q    Who encouraged you?

20  A    Cletus encouraged us.

21  Q    You say you won the City precincts?

22  A    Yes.

23  Q    More than one?

24  A    Yes.

25  Q    And you-all won both of those?

1   A     Yes, to my knowledge, we did.

2   Q     So he encouraged you to move to town for what reason?

3   A     To get into the City politics end of it, which is a

4   completely different aspect of politics in Clay County.  You

5   have two — you have your county politics and you have your

6   city politics, which is controlled by two different sets of

7   people.

8   Q     Meaning what?  You got the mayor running the City and you

9   got the Judge Executive of the county office?

10  A     And the superintendent —

11  Q     The superintendent?

12  A     — running the county.  Basically, yes.

13  Q     So when did you-all move into the city, Ms. White?

14  A     2003.

15  Q     Where did you move?

16  A     We moved in my husband's grandmother's home that had been

17  sitting vacant for 20-plus years, next door to Barbara Colter.

18  Q     And when you-all made your home there in Manchester, what

19  did you do for a living?  Did you change jobs?

20  A     I still worked at our dealership.

21  Q     Okay.  And what dealership was that?

22  A     White Mobile Homes in London.

23  Q     Okay.  So you also worked for White Mobile Homes?

24  A     Yes, I did.

25  Q     What did you do for them?

1  A    I was the clerk, I did secretarial work, sales, a little

2  bit of everything.

3  Q    Did you-all get back in politics once you moved to the

4  city?

5  A    We did.

6  Q    And tell us how that came about.

7  A    Well, my husband — Barbara ran again in 2004.  My husband

8  filed to run for city councilman in 2004.

9  Q    How did you-all come to make that decision?

10  A    Well, lots of encouragement.

11  Q    From whom?

12  A    I didn't like it myself.

13  Q    Who had encouraged you-all?

14  A    Bart encouraged it, Vernon, Cletus, Darnell, various ones.

15  Q    So how did that campaign get started?

16  A    I'm sorry, I don't understand your question.

17  Q    All right.  Did you-all — did you-all make a decision to

18  actually run for city council?

19  A    He made the decision, yes.

20  Q    Okay.  And what did you-all do to organize your campaign

21  for city council?

22  A    Well, he filed, and it really didn't get off the ground

23  too much into it, so —

24  Q    What derailed you in your efforts to the city council

25  position?

1   A    What derailed it was an offering of a position at the City

2   for my husband.

3   Q    And who made that offer to your husband?

4   A    Doug White.

5   Q    And what was the offer?

6   A    That with —— from other encouragement and flack that he

7   had gotten from the other council members, he thought it best

8   that Kennon take the position —— a position that he would

9   create for him if he would come off, and basically it would

10   cause him problems, him being mayor and cause him to have

11   opposition.

12   Q    So did he take his name off?

13   A    Yeah.

14   Q    And then what happened?

15   A    He took his name off and several weeks, maybe —— it may

16   have been a month or two later, he was hired at the City of

17   Manchester.

18   Q    Now, did you get a job ultimately in the City as well?

19   A    Later on, I did.

20   Q    How did that come about?

21   A    That come about at Vernon Hacker's request for a swap—out

22   for his son a job at the City.

23   Q    What's his son's name?

24   A    Dennis Hacker.

25   Q    What do you mean when there's a swap—out?

1   A    Well, there was a position that was open, the lady that

2   had worked at the police department had left and there was a

3   position opened, and Vernon asked me if I would take it, and

4   upon taking that job, he wanted a job for Dennis at the City,

5   so —

6   Q    Who was going to hire his son?

7   A    Kennon.

8   Q    And did Kennon agree to this?

9   A    He agreed to it, yes.

10  Q    And Dennis got a job doing what?

11  A    Working at the sewer plant.

12  Q    And all this took place in what year?

13  A    2004.

14        MR. SMITH:  I'm going to hand the witness what's

15  marked as D6, Your Honor.

16  BY MR. SMITH:

17  Q    You should have now in front of you, Ms. White, a

18  document, I believe it's one page, that has an exhibit sticker

19  on the front of it, and it should have D6 written on it.  Do

20  you see that?

21  A    Yes.

22  Q    And do you recognize that?

23  A    I do.

24  Q    And could you tell us what that is?

25  A    This is a list that me and Kennon and Cletus Maricle went

1  over, and this first list is a list of people he wanted us to

2  see, and the second list is people he felt that was against us.

3  Q    Okay.  All right.  Now, you have two pages to D6, is that

4  correct, two pages?

5  A    Yes.

6  Q    And did you make this list with a typewriter, computer, or

7  how did you generate that?

8  A    No.  We were at his home and we made a handwritten list,

9  and when I got home there was —— my husband and him made them

10 and I couldn't read them that well, so I put them on this where

11 I could read them a little better.

12 Q    And would this —— Do you know when this was made?

13 A    This was made during the election that Kennon ran in.

14 Q    What year?

15 A    2002.

16         MR. SMITH:  I would move for the introduction of

17 Government's Exhibit D6.

18         THE COURT:  All right.  Any objection?

19      (No audible response.)

20         THE COURT:  Exhibit D6 will be admitted.

21 BY MR. SMITH:

22 Q    Ms. White, how —— did you and your husband further involve

23 yourself in politics in Clay County after making your move in

24 your new jobs at the City?

25 A    Well, we did, yes.

1  Q    And tell us what you recall doing politically, Ms. White.

2  A    I became an election officer in the Manchester precinct.

3  Q    And how is it that -- First of all, what party were you

4  registered as?

5  A    A Republican.  I've been a Republican all my life.  And so

6  has Kennon and his family.

7  Q    Okay.  And did you ever change your status as a

8  Republican?

9  A    I did.

10  Q    And how is it that you changed?

11  A    Well, I changed to Democrat.

12  Q    And when did you do that?

13  A    Upon moving to the city.

14  Q    Okay.  And what caused you to make that change?

15  A    I changed it on the request of Cletus.  He suggested that

16  we do that.

17  Q    What was the conversation and how did it come about that

18  he wanted you to do that?

19  A    Well, he's a Democrat himself, and he suggested if I

20  changed to Democrat he would put me in as an election worker.

21  Q    Okay.  And when you say "election worker," what are you

22  talking about?

23  A    I would work in the capacity of when you go in to vote

24  there's election poll workers.  I was one of the officers that

25  you would see when you came to vote in your precinct.

1  Q    Now, did he explain to you that you would be serving in an

2  election officer position?

3  A    Yes.

4  Q    Okay.  And where did he specify that you would be working

5  for the Board of Elections as on election officer?

6  A    In the Manchester precinct.

7  Q    Okay.  And in order to do that this, he suggested that you

8  change to Democrat?

9  A    Yes.

10 Q    Did he explain to you why?

11 A    Well, they was already — the other side had Republicans

12 already in place and they were satisfied with who was there and

13 he stated that William Stivers had served in the capacity that

14 I would have been, but they was too much conflict and too much

15 heat on him, that he didn't need to serve in that capacity

16 anymore and he needed someone he could trust and would be

17 honest with him.

18 Q    So were you alone in making that change to Democrat?

19 A    My husband did also.

20 Q    Okay.  And you say that he spoke about — did he speak

21 about which election was coming up at that time, or was that

22 later?

23 A    No, he spoke about the election that was coming up.

24 Q    And what election was coming up?

25 A    Well, the general and the City races was coming up.

1   Q    Okay.  And what year would that have been that you changed

2   to the Democrat party?

3   A    I couldn't give you an exact timeframe on that.

4   Q    I'm going to hand to you now what's marked as Government's

5   Exhibit D4.

6        You should have now in front of you a document that has a

7   label D4, "D" as in "dog".

8   A    I do.

9   Q    Okay.  Do you recognize that, Ms. White?

10  A    I do.

11  Q    What is that?

12  A    This is my —— I don't know if it would be called an

13  application, but this is my statement where I would be serving

14  for the Clay County Board of Elections as an election officer

15  as a Democratic judge.

16  Q    And who signed this notice to you that you had been

17  selected as the Democrat judge for the Manchester precinct?

18  A    It's signed by Freddy Thompson.

19  Q    And what position did he hold at that time?

20  A    The clerk.

21  Q    And this was received by you in the mail, I assume?

22  A    Yes.

23  Q    Attached to that letter is some following pages.  Do you

24  know what those are?

25  A    It's a —— what would you call it?  It's a layout, a

1  graphic, of how the election machine would be — would be used

2  this year — that year.

3          MR. SMITH:  Okay.

4          I would move at this time to introduce Government's

5  Exhibit D4.

6          THE COURT:  Any objection?

7      (No audible response.)

8          THE COURT:  D4 will be admitted.

9          MR. SMITH:  I would ask, Your Honor, that that be

10 published.

11         THE COURT:  It can be.  When you get to a place to

12 stop, we're going to break for lunch here in a minute.

13         MR. SMITH:  Just a couple of questions on this issue.

14         THE COURT:  That's fine, yes, sir.

15 BY MR. SMITH:

16 Q    The top of this letter has a date, it looks like April

17 the 18th, 2006?

18 A    Yes.

19 Q    And is that about the time you received that letter?

20 A    It would have been, yes.

21 Q    And in that body of that letter, it says that the Clay

22 County Board of Elections has chosen you as an election officer

23 as — it has D-e-m, period, judge, and then circle around it.

24 What does that mean?

25 A    Democratic judge.

WANDA PRICE WHITE - DIRECT - MR. SMITH        132

1  Q     Okay.  It says that -- further in there you're required by

2  law to serve and to attend a training?

3  A     Yes.

4  Q     It says, "This training is in addition to the training for

5  the new iVotronic voting machines.  The school will be held on

6  Thursday, May 11th, 2006."  Did you attend such training?

7  A     I did.

8  Q     And had you had any training at all as an election

9  officer?

10 A     No.

11 Q     And when you got this letter, was this the first official

12 acknowledgment that you recall where you had been accepted in

13 that position?

14 A     No, I knew I was accepted already prior to this.

15 Q     Okay.

16 A     It was the first statement I had received.

17 Q     Okay.  When did you learn for sure that you were going to

18 be an election officer, Ms. White?

19 A     Months ahead of this letter.

20 Q     And who told you that?

21 A     Cletus Maricle told me that.

22        MR. SMITH:  This would be a point of a break, Your

23 Honor.

24        THE COURT:  All right.  Thank you.

25        Ladies and gentlemen, we will take our lunch break at

1   this time.  We'll take a recess until 1:00.  Please keep in

2   mind the admonition that you've been given previously not to

3   discuss the case among yourselves while we are in recess, and,

4   of course, don't allow anyone to approach you to discuss the

5   case.  The jury will be excused until 1:00 p.m. this afternoon.

6          (Whereupon, the jury retired from the courtroom, after

7   which the following proceedings were had in open court.)

8                    THE COURT:  Thank you.

9                    Ms. White, you can step down.

10                    Any matters to take up outside the presence of the

11  jury?

12                    Mr. Smith, if you could provide those files for

13  Mr. Hoskins to review over the lunch hour.

14                    MR. SMITH:  Yes, Your Honor.

15                    THE COURT:  All right.  We'll be in recess until

16  1:00.

17          (Whereupon, a recess was had for the noon hour, after

18  which the proceedings continue uninterrupted to Volume 10-B.)

19                    (Proceedings concluded at 12:00)

20

21                    C E R T I F I C A T E

22      I, Cynthia A. Oakes, certify that the foregoing is a

23  correct transcript from the record of proceedings in the

24  above-entitled matter.

25

1    2/22/2010                    s/CYNTHIA A. OAKES
       DATE                    CYNTHIA A. OAKES, RPR, RMR, CRR
2

3

4

5                          I N D E X

6                                                    PAGE

7    Testimony of KENNON WHITE:
          Cross-Examination by Mr. Gilbert:          8
8         Cross-Examination by Ms. Hughes:           15
          Cross-Examination by Mr. Simons:           27
9         Recross-Examination by Mr. Pinales:        63

10   Testimony of WANDA PRICE WHITE:
          Direct Examination by Mr. Smith:           77
11

12

13                      E X H I B I T S

14

15   Government's                                    Page
     Exhibit No.            Identified            Admitted
16
         D4                    130                   131
17       D6                    127                   127

18

19

20

21

22

23

24

25