United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) February 24, 2010 |
| DOUGLAS C. ADAMS | ) 8:40 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 12-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States: STEPHEN C. SMITH, ESQ.


On behalf of the Defendant         DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:            MARTIN S. PINALES, ESQ.

On behalf of the Defendant         BENNETT E. BAYER, ESQ.
Douglas C. Adams:                  R. KENT WESTBERRY, ESQ.
                                   KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant         T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant         ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant         RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:                R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant         JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant         ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant         DANIEL A. SIMONS, ESQ.
Stanley Bowling:

1  Appearances of Counsel:

2  On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                   Assistant U.S Attorney
3                                  601 Meyers Baker Road
                                   Suite 200
4                                  London, Kentucky  40741

5
   On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
6  Russell Cletus Miracle:         107 East First Street
                                   Corbin, Kentucky  40701
7
                                   MARTIN S. PINALES, ESQ.
8                                  150 East Fourth Street
                                   Federal Reserve Building
9                                  Cincinnati, Ohio  45202

10
   On Behalf of the Defendant      BENNETT E. BAYER, ESQ.
11 Douglas C. Adams:               106 West Vine Street
                                   Suite 800
12                                 Lexington, Kentucky  40507

13                                 R. KENT WESTBERRY, ESQ.
                                   KRISTEN N. LOGAN, ESQ.
14                                 220 West Main Street
                                   Suite 1900
15                                 Louisville, Kentucky  40202

16
   On behalf of the Defendant      T. SCOTT WHITE, ESQ.
17 Charles Wayne Jones:            133 West Short Street
                                   Lexington, Kentucky  40507
18

19 On behalf of the Defendant      ROBERT L. ABELL, ESQ.
   William E. Stivers:             120 North Upper Street
20                                 Lexington, Kentucky  40507

21
   On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
22 Freddy W. Thompson:             R. TUCKER RICHARDSON III, ESQ.
                                   300 West Short Street
23                                 Lexington, Kentucky  40507

24

25
   On behalf of the Defendant      JERRY W. GILBERT, ESQ.

```
 1    William B. Morris:              212 North Second Street
                                      Richmond, Kentucky  40475
 2

 3    On behalf of the Defendant     ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:               201 West Short Street
 4                                   Lexington, Kentucky  40507

 5
      On behalf of the Defendant     DANIEL A. SIMONS, ESQ.
 6    Stanley Bowling:               116 West Main Street
                                     Suite 2A
 7                                   Richmond, Kentucky  40475

 8
      Court Reporter:                CYNTHIA A. OAKES, CRR
 9                                   Official Court Reporter
                                     United States District Court
10                                   560 Athens Boonesboro Road
                                     Winchester, Kentucky  40391
11                                   (859) 983-4346

12

13

14

15

16

17

18

19

20

21

22

23

24
      Proceedings recorded by mechanical stenography,
25    transcript produced by computer.
```

1    (Whereupon, the following proceedings were had outside the
2  presence of the jury.)
3        THE COURT:  Thank you.
4        The record will reflect the jury is not present at
5  this time.
6        Mr. Smith, I think you have an issue to take up; is
7  that correct?
8        MR. SMITH:  Yes, Your Honor.  I have made our review
9  of the text messages and I would like to, for the record, go
10 ahead and give that over to counsel at this time.
11       THE COURT:  All right.
12       MR. SMITH:  And so I have an extra copy for the Court
13 if this comes up.
14       THE COURT:  Yes, sir.
15       MR. SMITH:  It's my understanding that while the
16 numbers are there for explanation, no text messaging occurred
17 between Kennon White and the agents.  So any that are reflected
18 would be that between Wanda White and the agents.
19       THE COURT:  All right.
20       MR. SMITH:  A couple other matters if the Court will
21 allow —
22       THE COURT:  Yes, sir.
23       MR. SMITH:  — regarding examination — further
24 examination of Ms. White.  It is — part of our investigation
25 revealed that shortly after the testimony of Ms. White and also

1    others, including Terry Smith, that a home that was owned by

2    them was set afire by arson.  The date of that was 9-14-07, and

3    it was basically a situation where the incident reported that

4    there was no utilities hooked up on the home, there was no —

5    there was no insurance on the home at the time, and it was set

6    fire, again, following the testimony of Terry Smith, who was a

7    witness in front of the grand jury.  There's also — subsequent

8    to the first hearing in this matter, Ms. White was the victim

9    of an act of intimidation and threat when her MySpace account

10   received a picture of a young man pointing a semiautomatic

11   firearm at the recipient saying good job, look what your lies

12   have caused, or something to that effect.  And I just believe

13   that both those incidents, Your Honor, are relevant to the

14   issues at hand, and we would like to, again, just bring that to

15   the Court's attention that we would like to explore that with

16   Ms. White this morning in her testimony.

17        THE COURT:  All right.  Let's see if there's a

18   response.

19        Mr. Hoskins, you first.

20        MR. HOSKINS:  Your Honor, this is the first I've

21   heard anything about an arson after a grand jury witness

22   testified.  I would certainly object to any mention of that

23   before the jury.  If that's all the information that the

24   government has, it would be pure speculation.  Houses get

25   burned down all the time and they may or may not have had

6

1  anything — especially in Manchester.

2          THE COURT:  I'm sorry.  Go ahead.

3          MR. HOSKINS:  That is what it is, Judge.

4          THE COURT:  Yes, sir.

5          MR. HOSKINS:  In any event, it would be unduly

6  prejudicial under Rule 403 to bring that evidence into this

7  trial.  The Court has fully explored the MySpace threat that

8  was made by a Hubbard and —

9          THE COURT:  And there is a connection with Mr. Jones

10  to that incident.

11          MR. HOSKINS:  There was a connection with Mr. Jones,

12  but the Court determined that it wasn't close enough that he

13  needed to have his pretrial release revoked, he was allowed to

14  stay on —

15          THE COURT:  No, I believe what happened — and

16  perhaps Mr. White is the best person to address this, but I

17  believe it came to the Court's attention through the magistrate

18  judge.  The magistrate judge issued a determination that there

19  wasn't a violation and I found that there was but that the home

20  detention issue would sufficiently cover it.  So I did find

21  that there was a violation of the terms of release as a result

22  of that particular incident.

23          MR. HOSKINS:  I recognize that, Your Honor.  My point

24  was that you did not then determine he needed to be kept in

25  jail to protect people.  So I think the tenuous nature of that

1    connection -- I know Mr. Hubbard has cooperated with the FBI to
2    say what Mr. Jones' involvement was, and I would submit that
3    what that young man did was a bad mistake in judgment, but it
4    should not reflect on any of these defendants.  Again, it would
5    be unduly prejudicial under Rule 403.
6            THE COURT:  All right.
7            Let's see, Mr. White, do you wish to address that?
8            MR. WHITE:  Did you want me to go ahead and at least
9    deal with the Hubbard issue?
10           THE COURT:  Either or both, yes, sir.
11           MR. WHITE:  I'll just go on to what Mr. Hoskins said
12   about the arson, the alleged arson.  I can't remember if
13   Mr. Smith said it was in fact proven or what that situation is,
14   but it's the first I've heard of that.
15           As to the Hubbard situation, Your Honor is correct in
16   terms of the magistrate -- Judge Wier found that it was not a
17   violation.  Of course, we came up here that day on appeal, Your
18   Honor did find the violation.  My recollection, and please
19   correct me if I've wrong, without going back and rereading your
20   memorandum opinion, was that Mr. Jones's violation was having
21   the conversation with Mr. Hubbard and his son.  I don't
22   think -- at least my recollection is, is that there was any
23   finding that my client directed Hubbard to go get on MySpace or
24   talk to the cooperating witness, Ms. White.  And so that's just
25   my recollection.

1          My view is, is that since the connection between

2    Mr. Hubbard and my client in terms of what he did, which was I

3    think — just to correct Mr. Hoskins, I don't think it was just

4    a bad judgment, I think he was actually charged and may have

5    even pled to intimidating a witness.  But that piece is so

6    tenuous that it's not really relevant, I would argue, to any

7    issue the jury has to decide in this case, whether or not my

8    client's alleged conduct between '02 and '06 somehow gives rise

9    to criminal liability.

10          I would further argue, as Mr. Hoskins has, that if

11    the Court does find it is relevant to some issue that the jury

12    has to determine in this case, that the prejudicial value far

13    outweighs any probative value, primarily because you go back to

14    the tenuous connection, if there is any connection at all,

15    between the conversation my client had with the Hubbards and

16    then what the Hubbard boy then did with his MySpace page.  So

17    that would be my argument, and I would be happy to answer any

18    questions that you may have.

19          THE COURT:  All right.  I assume most of the

20    parties — most of the defendants will join in with these

21    arguments, but let's see if there are any additional arguments

22    to make.

23          MR. BALDANI:  I do, Judge.

24          THE COURT:  Mr. Baldani.

25          MR. BALDANI:  It seems to me we're talking pure

1    404(b), and we had a hearing, an evidentiary hearing, about

2    evidence that someone burned down a house is evidence of

3    another crime, as is evidence of a threat of a witness.  And at

4    the outset, I would say we already had a 404(b) hearing.  We

5    haven't been given notice.  And I think one thing that

6    sometimes gets forgotten in the 404(b) matters is the first

7    thing you got to look at when you're talking about whether to

8    introduce that is, is there evidence that any of the defendants

9    committed the act.  And, I mean, I don't — I haven't heard any

10   suggestion whatsoever of any evidence that any of these

11   defendants committed the act with the exception of, you know,

12   the Hubbard thing.  And so I don't see how you can get past

13   that hurdle.

14          THE COURT:  If a person intimidates a witness in the

15   course of a trial, and I've had this issue come up actually, a

16   witness is afraid to testify based upon threats or implied

17   threats that have been made, should the Court consider that as

18   404(b) evidence because it's — because it happens in

19   connection with the proceeding as opposed to some other matter?

20          MR. BALDANI:  I think that you should, but you should

21   do away with the notice requirement.  I mean, it's still other

22   crime, but, you know, the government should be alleviated of

23   the notice requirement because it just happened.  But neither

24   of these things happened during the course of trial.  I think

25   he said September of '07?  Is that what I heard about the house

1  burning, September of '07?  And then I don't know when the

2  Hubbard thing.  So if there was evidence that somebody

3  threatened Wanda White while the trial was going on, sure.

4  　　　　　THE COURT:  Well, in this particular case, we have

5  this incident that Mr. Smith has just told me about, September

6  of '07, after the witness testifies before the grand jury.  We

7  have these threatening text messages or these — not text

8  messages but MySpace messages that are sent to individuals,

9  cooperating witnesses, after it's determined that they're

10  cooperating witnesses.  We have the incident with the other two

11  witnesses where Mr. Stivers is now in custody as a result of

12  his — it can be viewed as threats of intimidation, and then we

13  have a whole host of statements that are made in the course of

14  these transcripts concerning Mr. Stivers essentially acting as

15  the muscle for this alleged organization.  So there is more

16  than just this isolated incident that pulls this together.

17  　　　　　But, Mr. Smith, what would the evidence be with

18  respect to a particular individual with this incident?  Are you

19  just planning to ask Ms. White if in fact her home burned and

20  establish there were no utilities that were connected?  Is

21  there some type of investigation or report that's been

22  performed?

23  　　　　　MR. SMITH:  There was a report that was shared with

24  counsel in discovery, a fire incident report which was

25  investigated.  Primarily, what I think kind of brings this up

1  in her testimony, I had intended on bringing, of course,

2  Mr. Smith here to testify, he was an employee of the Morrises

3  and was operating during this election as an employee for them.

4  He was brought to the grand jury.  And during the time period

5  that he was at the grand jury, there were incidents where his

6  car was vandalized while at the grand jury, and then several

7  weeks after he testified, his home burned with the contents

8  that he had.

9          THE COURT:  That his home burned?

10         MR. SMITH:  It was his dwelling, it was owned by the

11 Whites, and there's some information that she knows about the

12 ownership of the home that Mr. Smith might not know about, and

13 that's why I wanted to bring it up with her, that, you know,

14 they owned it, they didn't have insurance, and these were —

15 these were issues that I was going to try to develop through

16 her.  This did occur in September '07, and it was, I believe, a

17 single—wide mobile home that was in a rural part of Clay

18 County.  Terry Smith and his family were residing there, and he

19 was — after testifying in front of the grand jury, he was — I

20 don't know, he lost his job with the Morrises, and then he lost

21 his home.  He also lost, I believe, use of his vehicle the day

22 he was at the grand jury.  And there were some statements made

23 by, I believe, Chris Duff, who's the son of the Morrises, to

24 him while he was here at the grand jury and I would like to be

25 able to examine him on those issues.

1          THE COURT:  And there's already been testimony

2   presented that would tie Chris Duff into the conspiracy in the

3   case.

4          MR. SMITH:  That's the same Chris Duff that's been

5   discussed several times throughout ––

6          THE COURT:  All right.

7          MR. SMITH:  –– the trial at this point.

8          The issue about the threat, I think there are some

9   additional facts.  Of course, Richard Brian Hubbard was also

10  employed by the enterprise and he was brought up through –– as

11  a youth precinct person and then later as an election officer

12  at the –– basically the direction of Wayne Jones and Al Man

13  Stivers, he was promised a job, and during that time period

14  this arrest occurred, he went to visit him.  After visiting

15  him, he was enraged such that he acted upon that rage in

16  sending a threat –– threatening message to our witness.  I

17  believe that, again, the White testimony this morning will not

18  be able to complete the story, they'll have to be additional

19  witnesses called to flesh out exactly what was said to him by

20  Mr. Jones when he went to his house the evening he sent the

21  threat, and I believe that it will support, again, that this

22  was an act essentially in furtherance, Your Honor.  The conduct

23  that this enterprise has been involved with includes

24  obstruction of justice; that acts that were basically set in

25  motion while the conspiracy is still going on continues to

1    react and formulate into actions, that it is not a separate

2    incident, that is an other act under 404(b), but instead is a

3    change reaction, which was, again, Richard Brian Hubbard was

4    groomed during the conspiracy to become an election officer for

5    this group and to do the things that these people have

6    testified they were doing for this group, and now it grew into

7    a chain reaction, again, that followed from that that resulted

8    in this threat to our witness. And so we would just, again,

9    argue to the Court that this was part of the conspiratorial

10   objectives and it was not completely manifest until they

11   actually made the arrest in this case that he further acted at

12   their direction. I believe that we'll be able to show he's a

13   very young man, about 20-something, very impressionable and

14   someone that's very simple and someone who this group, I

15   believe, has been shown to be manipulative and they manipulated

16   him into doing this act, and that would be our argument in

17   support of introducing this evidence as intertwined with the

18   charged conduct.

19           THE COURT: All right. Let me hear from counsel for

20   the Morrises, because it would appear that if I allow this

21   evidence in of this fire that there certainly seems to be a

22   connection with Mr. Duff making these threats.

23           Would your arguments be the same as those made by

24   counsel for the other defendants?

25           MR. GILBERT: Yes, Your Honor.

1                 THE COURT:  All right.

2                 MR. ABELL:  Judge?

3                 THE COURT:  Yes, sir.

4                 MR. ABELL:  If I may, I think there's an additional

5     point I would like the Court to consider.

6                 THE COURT:  Yes, sir.

7                 MR. ABELL:  The conspiracy as charged ends in July, I

8     believe, of 2007, a couple of months before this fire happened

9     in September of 2007, and, therefore, I would respectfully

10    submit it can't be in furtherance of the conspiracy.

11                THE COURT:  Mr. Hoskins, you have an additional

12    point?

13                MR. HOSKINS:  Your Honor, I will make a couple of

14    requests.  I would first point out that I don't believe

15    Ms. White or Mr. Smith either one would be qualified to express

16    an opinion that this building burned as a result of arson, and

17    I think we should have a hearing to determine the accuracy of

18    that before we let something in so highly prejudicial.  And if

19    the Court does determine that something like that should come

20    in, I would renew my motion on behalf of Mr. Maricle for a

21    separate trial from the other defendants.

22                THE COURT:  All right.  With respect to the issue of

23    whether this — I'm sorry.  Mr. White?

24                MR. WHITE:  I'm sorry, Your Honor, can I just respond

25    very briefly —

1     THE COURT:  Yes, sir.

2     MR. WHITE:  –– to two factual points?

3     THE COURT:  Yes, sir.

4     MR. WHITE:  One is, unless I'm mistaken, I don't

5  believe that Hubbard, Jr., was ever an election officer.  I

6  believe what Hubbard, Jr., was was the youth delegate for that

7  precinct, which is a party –– political party process.

8     The second point I would make, on this issue of the

9  obstruction of justice, my client has not been charged with

10  obstruction of justice.

11     So I would just make those two points.  Whether

12  they're pertinent to your analysis of not, I just wanted to

13  raise them.

14     THE COURT:  All right.

15     With respect to the –– the first issue is whether

16  this information would constitute evidence under 404(b).  I

17  don't believe that it would constitute 404(b) evidence.

18  Although it is technically outside the time period that's

19  alleged in the conspiracy, it's very close in time, it's within

20  three months of –– or two months, I suppose, of the date that's

21  alleged in the indictment.  It is close in time.  Is it

22  intertwined conduct?  I believe that it is.  But even if the

23  Court considers this under 404(b) and undertakes the

24  *Merriweather* analysis, the first issue is, is there sufficient

25  evidence of a bad act occurring.  It wouldn't necessarily have

1   to be criminal conduct, but a bad act occurring.  And, of

2   course, if it's arson, then it would be -- it certainly would

3   be a crime, but it would also be a bad act.

4           The United States essentially attempts to introduce

5   this in stages, first to establish that the home burned and

6   then later to establish the connection between one or more

7   defendants in the case through another party.

8           Is there sufficient evidence that the act occurred?

9   There is evidence if the witness testifies that the home

10  burned, and the United States has provided other indications

11  that the home, in fact, burned.  Then there is sufficient

12  evidence to allow the defendant to testify to that fact, that

13  factual matter.

14          The next question then would become whether it would

15  be admitted for a proper purpose under 404, such as to show

16  motive, intent, opportunity, plan.  And I do believe that if

17  the Court undertakes a 404(b) analysis, it would be relevant

18  for several reasons, including motive and plan and to further

19  the objectives of the conspiracy, but at least for those two

20  purposes, motive and plan.  To further the objectives of the

21  conspiracy means that it would be admissible substantively

22  outside the scope of 404(b), but under 404(b) it would also be

23  admissible as well.

24          Then the analysis becomes whether the evidence would

25  be more prejudicial than probative under a 403 analysis, and

1  this type of evidence would be prejudicial, but would it be

2  unduly prejudicial?  Number one, is it relevant?  I do believe

3  that it would be highly relevant to the issues that have been

4  charged in the case.  Would it be more prejudicial or highly

5  prejudicial?  I think when the Court balances the probative

6  nature of the evidence versus the prejudicial effect that I

7  come out on the side of it's more probative than prejudicial.

8           There is other evidence in the case of bad acts on

9  behalf of several of the defendants, and this, of course, would

10  be further indication of that, and so, at this point, the Court

11  would allow the testimony to be presented with respect to the

12  fire.

13          The defendant -- I'm sorry, the witness, Wanda White,

14  will not be allowed to testify as to her conclusion as to

15  whether it was arson but just as to whether a fire, in fact,

16  occurred.  And then I'll have to consider further evidence as

17  it is presented.

18          Mr. Smith, will that be the only -- we've talked

19  about two different incidents here, the acts of intimidations

20  and threats through Mr. Hubbard.  And I assume that you would

21  be soliciting from Ms. White the fact that she received these

22  messages from Mr. Hubbard; is that correct?

23          MR. SMITH:  I do have a copy I think of what was sent

24  to her MySpace account and I was intending on exhibiting that.

25  That's a copy of the message.  If I can hand a copy to the

1  Court.

2         THE COURT:  All right.

3         MR. SMITH:  For the record, we are marking our

4  proposed Exhibit D73.

5         THE COURT:  All right.

6         Mr. Hoskins.

7         MR. HOSKINS:  Your Honor, just one more point.

8         THE COURT:  Yes, sir.

9         MR. HOSKINS:  I would be prepared to stipulate that

10  there was a fire and to any ownership documents that may need

11  to come in later, but I think if the evidence comes in through

12  Ms. White that a piece of property that she owned burned and

13  then the government can't show that that was arson, the jury is

14  going to be invited to speculate that it was arson and that it

15  was in connection with this case.  Letting that evidence in now

16  could ring a bell that couldn't be unrung.  If the government

17  can come in with somebody who can prove that that fire was

18  arson, then all the steps in the Court's analysis I would

19  submit --

20         THE COURT:  I'm not going to -- I'm not saying at

21  this point that the government has to establish it was arson.

22  The government has indicated that they're going to establish

23  that there were other threats that were made toward the person

24  that was living in the home at the time, specifically the son

25  or the stepson of the Morrises.  So there's a sufficient

1  connection with the defendants for the Court to allow that

2  evidence in.  Although, there may have to be some inferences

3  that either can be drawn or can be refuted by the parties, I

4  think there is sufficient evidence at that point under the

5  first part of the 404(b) analysis if the Court had to conduct a

6  404(b) analysis.  But at this point, I tend to agree with

7  Mr. Smith that this is further evidence of a conspiracy

8  undertaken by all members of the conspiracy as a group

9  together.  So I would not limit this testimony just to one

10 defendant in the case if the government, in fact, offers proof

11 that threats were made to this individual who was testifying

12 before the grand jury just immediately before this home burned.

13           MR. HOSKINS:  If it's not arson, it's not a bad act.

14           THE COURT:  That's correct, if it's —— if it's ——

15 well, if it's arson, it's not a bad act.  My finding is that I

16 would not have —— I'm not requiring the government to prove

17 arson to introduce this as a bad act.  A crime can be a bad

18 act, 404, but it doesn't have to be established.  The Court

19 only has to be convinced by a preponderance of the evidence

20 that the bad act occurred as opposed to a crime having been

21 prosecuted and established.  And so even if the Court conducted

22 a 404(b) analysis, I believe the evidence would still be

23 admissible.  But I'm not sure that 404(b) even applies here.

24 I'm going through that analysis with the parties, but I'm not

25 sure that 404(b) would even apply here because of what's been

1  alleged in the proximity to the time charged in the indictment

2  period.

3         Mr. Bayer, you're wanting to respond?

4         MR. BAYER:  A couple of different points, Judge.  If

5  I understood Mr. Smith correctly, he may be asking questions of

6  Ms. White which she may be interpreting or explaining some

7  occurrence for someone else.  I would ask that the Court not

8  allow her to speculate on what may have been the motivations as

9  it relates to the other witness.  I think if Ms. White is going

10 to come in and testify that she testified and then there was

11 this event that occurred shortly thereafter, that might be

12 something that she would be able to testify for herself

13 personally, but she can't explain what happened to anyone else

14 and she can't go into any detail as to what may have occurred

15 to a different witness.  I think that would be wholly improper.

16 And I understand the Court's ruling, and I'm not asking the

17 Court to revisit all of that because you've already explained

18 that.  But I think for her to go beyond just the testimony that

19 she — that she went before the grand jury and then there was a

20 fire and then explain that and give any kind of detail as far

21 as what she's speculating, I think that would go beyond what

22 the Court has already ruled.

23         And, secondly, she cannot then try to explain for the

24 young man what she thinks happened there as well, because I

25 don't — I don't think she has the providence or power to be

1    able to speculate on what was going on with someone else.  And

2    I would join in with Mr. Hoskins, I think that for our client

3    it's horribly prejudicial without any probative value, and

4    that's part of the problem as being part of this entire group

5    of defendants, and I think that that effect upon us, we would

6    renew our motion for severance as well.

7         THE COURT:  All right.  Well, the motions — the oral

8    motions for severance are denied at this time.  Let me try to

9    go back and recap and make sure that there's not confusion on

10   this issue.

11        I'm assuming that Ms. White will testify that she and

12   her husband owned this trailer or owned this property.  She may

13   be able to testify, if she knows, the date that this other

14   individual testified before the grand jury.

15        What is his name again, Mr. Smith?

16        MR. SMITH:  Terry Smith.

17        THE COURT:  She may be able to testify as to the date

18   that he testified before the grand jury.  She either knows the

19   date or she doesn't know the date, and that would be a factual

20   matter.  She can testify that the event occurred, that the home

21   burned.  If she knows whether there was or was not electricity

22   hooked up to the home, she might be able to testify to that.

23   But that's about as far as she'll be able to go with respect to

24   this particular issue unless she has other factual information

25   that the parties haven't advised me of.  Now, if she does,

1    that's a separate matter.

2           MR. SMITH:  Your Honor, the only other fact that I'm

3    pretty confident in is that she's going to state that it was —

4    it was not insured by her and her husband at the time.  It was

5    basically a self-insured — it was a small dwelling, single

6    mobile home, there was no insurance on it, which —

7           THE COURT:  All right.

8           MR. SMITH:  — you know, the facts are going to be

9    that there was no electricity, there was no gas, there was no

10   insurance on the home.

11          THE COURT:  So there's no motivation for either she

12   or her husband to —

13          MR. SMITH:  Exactly.  And I wanted to at least be

14   able to establish those facts, if possible, through her, and I

15   understand the Court's ruling.

16          THE COURT:  All right.  Then with respect to the —

17   this is MySpace, isn't it, as opposed to — yes, MySpace.

18          MR. WHITE:  Yes, Your Honor.

19          THE COURT:  Mr. Smith, it would be your intention to

20   essentially show this document to her as to what she received

21   on a certain date?

22          MR. SMITH:  Yes, I believe on March — or on or about

23   March the 24th —

24          THE COURT:  24th?

25          MR. SMITH:  — 2009, she received this following an

1  initial evidentiary hearing where her statements were discussed

2  in Court, she received this message.  And, obviously, as a

3  recipient of it, it created fear and intimidation to her and I

4  would like for her to be able to explain that.

5          THE COURT:  All right.

6          MR. BALDANI:  Judge, can I say one more thing?

7          THE COURT:  Yes, sir, Mr. Baldani.

8          MR. BALDANI:  I just — I want to be cautious about

9  protecting Mr. Thompson's record.  I know you ruled —

10         THE COURT:  Yes, sir.

11         MR. BALDANI:  — about the separate trial issue, but

12 I want to add that even the tenuous evidence that anybody at

13 the table was involved in either of these things had to do with

14 possibly Mr. Jones and possibly the Morrises through this Chris

15 Duff, and there's nothing directly linking to Mr. Thompson.  So

16 I want to also join in the oral motion for a separate trial.

17 And I understand you've ruled on that, Your Honor.  And, you

18 know, I would — at the risk of arguing after you've ruled,

19 Judge, if you want to hear, I would like to add that, you know,

20 implicit in the *Merriweather* analysis is sufficient proof that

21 somebody did it in the first place, and when you kind of went

22 through *Merriweather* you really didn't discuss that.  And the

23 only reason I'm bringing that up is I've raised this exact

24 issue in the Sixth Circuit on a case, and it was actually held

25 to be reversible because there wasn't sufficient proof — I

1   mean, there was — all the other things would have applied, but

2   there wasn't enough proof linking anybody to the offense.  And

3   I'm not saying it to look like a know-it-all, but it just kind

4   of came up on the spur of the moment, and I really think we're

5   risking injecting reversible error into the case when there's

6   not even — not sufficient evidence linking any one of these

7   persons especially to the arson.  So I just wanted to add that

8   for the record.

9           THE COURT:  All right.  Well, I appreciate that.  To

10  me, it does appear to be relevant certainly to the RICO charges

11  in the case, which charge all defendants, and the action of one

12  can be attributed to the action of others for jointly

13  undertaken criminal activity, and it does appear to me, at this

14  time, that there is sufficient evidence if, in fact, the United

15  States offers proof, as indicated that they will offer in the

16  case, that there would be a connection to one or more

17  defendants in this matter.  And so for those reasons I will

18  overrule the request for severance, for separate trials, and

19  also overrule the objection to the introduction of this

20  evidence, at least with respect to the scope that's been

21  discussed here this morning.

22          All right.  Does anyone need to take a short break

23  before we bring the jury in?

24          MR. ABELL:  If we could, Your Honor, please.

25          THE COURT:  All right.  Let's see, there's a few

1  other folks that want to speak.

2        MS. HUGHES:  I just wanted to raise the issue

3  of *Jencks* in light of this.  We do have Mr. Terry Smith's grand

4  jury testimony and we do have the fire incident report, and I

5  believe — and I was aware of Mr. Smith's connection, his

6  allegation connecting Mr. Duff to the car incident by virtue of

7  one of the tapes, and I cannot recall whether it was Mr. or

8  Mrs., or both, White who made a recording of Mr. Smith and he

9  made those statements on it.  It's not been designated as

10  something the government intended to introduce into evidence,

11  and so I haven't gone back and focused on it.  I am wondering

12  if there have been additional interviews of Mr. Smith since

13  that time, because we don't have any that would connect it up.

14  So I would just ask the government to give us any of that

15  information if, in fact, it exists.

16        THE COURT:  All right.  Thank you.

17        Mr. Simons.

18        MR. SIMONS:  Just on behalf of Mr. Bowling, I have no

19  additional argument, but I want to join the objection and the

20  motion for severance.  I understand the Court's ruling.

21        THE COURT:  All right.  Yes, sir.  I will note for

22  the record that the defendants all agree — or disagree with

23  the United States' attempt to introduce this evidence and have

24  requested severance as a result based on the alleged effect

25  that it could have — or the arguable effect that it could have

1   on one defendant if it only relates to a specific defendant in

2   the case and their position on that.

3           Mr. Hoskins.

4           MR. HOSKINS:  Your Honor, I would just advise the

5   Court that I would ask for a recess after Ms. White finishes

6   her direct testimony before we do our cross-examination.

7           THE COURT:  To look at these text messages?

8           MR. HOSKINS:  Well, there does appear to be something

9   in the text messages.  It's kind of hard to decipher some of

10  this and where it may all fit in with all the other stuff, but

11  there does appear to be something in 2008 that talks about this

12  fire.  And we would also request a little time to look at,

13  based on the Court's ruling this morning, this fire evidence

14  that's coming in or may come in to consider and obtain an

15  expert to look into that and see if there was a proven case

16  that there was arson.

17          THE COURT:  All right.  Well, your last request is

18  for a more lengthy recess.

19          MR. HOSKINS:  Yes.

20          THE COURT:  -- in the matter, and I'll take that

21  under consideration.  I don't know what this report says that's

22  been referenced, that's being provided in discovery, and I need

23  to look at that before making that decision.

24          Mr. Bayer.

25          MR. BAYER:  Just so that I'm fully understanding, the

1  use of the MySpace printout, to the extent that they'll be
2  eliciting any testimony from Ms. White other than the fact that
3  she received that, I would like if the United States might be
4  able to explain that, because I think for her to be able to
5  then go into some sort of extrapolation as to what this means,
6  I think, would be more objectionable than just --

7          THE COURT:  Well, I'm not going to try to interpret
8  what the United States intends to do, but my understanding is
9  that the United States will be asking her her reaction to this
10 after receiving it.  I mean, this was -- can be deemed to be a
11 very threatening, intimidating message.  A person was charged
12 and actually has entered a guilty plea as a result of this, and
13 I'm assuming that the United States wants to show the effect on
14 these -- on these people when they receive this information,
15 and I think that certainly would be relevant to do.  Now, in
16 terms of how far she'll be able to go, I will have to wait and
17 see what the questions are on that, but that's my understanding
18 of what the United States intends to do.

19          Mr. Smith, am I correct or incorrect on that?

20          MR. SMITH:  Your Honor, that's exactly what I intend
21 to ask.  And as far as whether there's other -- how she
22 responds, I can't prognosticate for Mr. Bayer exactly what her
23 response is going to be.  I believe that she will say that she
24 was very much intimidated by this message, and how she
25 articulates that, I'm not sure.

1              THE COURT:  Yes, sir.

2              MR. BAYER:  I think the only point I'm making is that

3    I think it would be improper if all of a sudden she begins to

4    say that all these defendants are responsible for me feeling

5    this great fear.

6              THE COURT:  Well, Mr. Bayer, at this point, I can't

7    anticipate what she might say and we'll have to address that at

8    the appropriate time.  All I can say is that you can send folks

9    messages in a lot of ways, including MySpace, and a lot of

10   other manners or methods.

11             Let's take a five-minute recess at this time.

12   Counsel, anyone need to take a bathroom break before we start

13   up?

14             MR. SMITH:  Your Honor, I do have a extra copy of the

15   incident report if that would assist the Court as we go through

16   these —

17             THE COURT:  If you can pass that up to me, please,

18   yes, sir.

19             We will — we'll begin with the jury at 9:30.  We'll

20   be in recess until then.

21          (Whereupon, a short recess was had, after which the jury

22   entered the courtroom and the following proceedings were had in

23   open court.)

24             THE COURT:  Thank you.

25             The record will reflect that all members of the jury

 1  are present.  The parties and counsel are also present.

 2  Ms. White has returned to the witness stand.

 3          And, ma'am, you're still under oath, of course.

 4          THE WITNESS:  Okay.

 5          THE COURT:  I do want to apologize for the jury — to

 6  the jury for our late start this morning.  I did have a matter

 7  that I needed to take up with the attorneys, and so I do

 8  apologize to you.  I know you were all on time and I appreciate

 9  that.

10          Mr. Smith, you may continue.

11          MR. SMITH:  Thank you.

12                          WANDA WHITE,

13  being previously duly sworn, was examined and testified further

14  as follows:

15                  CONTINUED DIRECT EXAMINATION

16  BY MR. SMITH:

17  Q    Ms. White, I believe when we broke yesterday, we had

18  completed our review of A19.  Do you have A19A transcript in

19  front of you?

20  A    I do.

21  Q    And, again, this was a conversation between yourself and

22  who?

23  A    Al Man Stivers.

24  Q    Okay.  On page 23, top of the page, you make the

25  statement, "I've seen Jimmy Dobson.  Should I say him too?"

1  "No."  "Okay."  Stivers says, "No, I wouldn't tell nobody what

2  I didn't say."

3       Who were you referring to as "Jimmy Dobson," Ms. White?

4  A    He's a business owner in Manchester.

5  Q    And could you explain to us your understanding of what was

6  meant by this statement that you made and the response to

7  Mr. Stivers?

8  A    I had seen Jimmy Dobson deliver money to Jennings White at

9  Bart Morris's home, and I had seen him and I asked Al Man

10 should I say that too?  And he said, "No, I wouldn't tell them

11 anything that I didn't say."

12 Q    And to your understanding, what did he mean by that, don't

13 tell them what I didn't say?

14 A    Well, if I hadn't already said it, not to say it at all.

15 Q    Now, at this point, you were anticipating testifying in

16 front of the grand jury under a grant of immunity?

17 A    Yes.

18 Q    And previously when you had been called in front of the

19 grand jury, you had reported to these defendants that you had

20 been asked questions but not given a response?

21 A    Yes.

22 Q    What did you tell the defendants?

23 A    I told them that I would be reappearing and I had jotted

24 down several of the answers -- or questions to go over with --

25 that I thought I would be asked again.

1  Q    On page 24 at the bottom of the page, you make the

2  statement, "You think I ought to tell on Dobber?"  And Stivers

3  says, "No."  Who were you referring to, Ms. White?

4  A    Dobber Weaver.

5  Q    And when you say, "Should I" -- "Do you think I ought to

6  tell on him," tell on him where?

7  A    To the grand jury.

8  Q    And what were you referring to about telling, what subject

9  matter were you referring to?

10 A    What we had done during the election as election officers

11 in the precinct.

12 Q    On page 26, top of the page, you make the statement, "Did

13 you change anyone's vote without their consent?"  Stivers says,

14 "Why, no."  What were you referring to?

15 A    I was referring to this piece of paper that he and I were

16 going over of the questions, and I was reading it to him and he

17 was giving me answers.

18 Q    And you were referring to what exhibit number there, piece

19 of paper there, ma'am?

20 A    D15.

21 Q    All right.  Stivers further says, "You don't admit to

22 nothing, Wanda."  To your understanding, what was he referring

23 to?

24 A    Anything that would incriminate me that I did during the

25 election.

1  Q    Top of page 27 you make the statement, "Yeah, I only took

2  about ten people, but it's people I know, people that they

3  couldn't talk to, you know what I mean?"  And Stivers later

4  says, "I wouldn't admit to it."  What were you referring to,

5  ma'am?

6  A    I was referring to people that I had taken to vote

7  absentee, and he was saying I wouldn't — I wouldn't admit it

8  in the 2006 election.

9  Q    Okay.  You were referring to which election, ma'am?

10  A    The '06.

11  Q    Fall or the primary?

12  A    Both.  I was referring to both.

13        MR. SMITH:  If we could publish D15, I believe it's

14  previously been admitted.

15        THE COURT:  Yes, sir.

16        MR. SMITH:  Well, I don't see that I have the ability

17  to do that at this point.

18        THE COURT:  Okay.

19  BY MR. SMITH:

20  Q    You say that D15 was taken to this meeting with Stivers?

21  A    Yes.

22  Q    Now, did you actually jot down some answers to the

23  questions on that paper?

24  A    Yes.

25  Q    Were those made while you were present speaking to Stivers

1  there at the time?

2  A    Yes.

3  Q    Did he have the opportunity to see that piece of paper?

4  A    Yeah, he read it.  As in this transcript, he read it out

5  loud.

6  Q    All right.  And did he make any answers of his own

7  handwriting on the paper ——

8  A    No.

9  Q    —— to your recollection?

10      Did you leave him a copy of it, or did he ask for a copy

11 of to it be left with him?

12 A    No.

13 Q    You indicated earlier that you had gone over this same set

14 of questions with Mr. Maricle?

15 A    Yes.

16 Q    And in the meeting with Mr. Maricle, did you write down

17 any of his answers on that D15?

18 A    I can't recall if I did.

19        MR. SMITH:  If I can have just a moment, Your Honor?

20        THE COURT:  Yes, sir.

21 BY MR. SMITH:

22 Q    Ms. White, you have —— during the time period that you

23 made visits with Mr. Maricle, did he ever express to you that

24 he had a list of witnesses that had appeared previously to the

25 grand jury?

1   A    He did, yes.

2   Q    I would like to hand to you now what's marked as

3   Government's Exhibit D16.  Can you identify Government's

4   Exhibit D16?

5   A    Yes.

6   Q    And what is that, ma'am?

7   A    It's a list of names that I was told appeared in front of

8   the grand jury.

9   Q    And who told you that, ma'am?

10  A    Mr. Maricle.

11  Q    Do you recall when he presented you with this list?

12  A    Prior to me visiting with the grand jury.

13  Q    Okay.  Was it while you were cooperating with the FBI?

14  A    It was, yes.

15  Q    Okay.  And what did you do with that list once you got it,

16  ma'am?

17  A    I gave it to the agents.

18  Q    And was that a list already written out for you when you

19  received it from Mr. Maricle?

20  A    It was.

21  Q    And what is it exactly he represented to you that this

22  was?

23  A    Well, a lot of them are council members and a lot of them

24  are City employees.  He was making me aware who had been down

25  there.

1  Q    Okay.  Listen to my question.

2  A    Okay.

3  Q    What did he represent to you that this was a list of,

4  ma'am?

5  A    Witnesses.

6  Q    Witnesses where?

7  A    That would appear in the grand jury.

8          MR. SMITH:  I move, at this time, for introduction of

9  Government's Exhibit D16.

10         THE COURT:  Any objection?

11         MR. HOSKINS:  Can we approach on it, Your Honor?

12         THE COURT:  Yes, you may.

13     (Whereupon, the following discussion was had between the

14  Court and counsel at the bench, out of the hearing of the

15  jury.)

16         THE COURT:  Yes, sir.

17         MR. HOSKINS:  My objection would be that the

18  government has yet to lay a proper foundation for this

19  document.  It's not been identified who specifically wrote this

20  out.  At least to my recollection, it's not clear whether Ms.

21  White says she wrote this out or somebody else did.

22         THE COURT:  She testified that it was prepared — it

23  was given to her in this form; in other words, she did not

24  indicate that she wrote it out but it was given to her by

25  Mr. Maricle, and if that's the case, then a sufficient

1   foundation has been laid.  Now, she testified that this was

2   given to her as a list of witnesses appearing before the grand

3   jury, which is a relevant issue in the case.  So I think a

4   proper foundation has been laid.  It's certainly subject to

5   cross-examination as to who prepared it, whether she, in fact,

6   prepared it, things of that nature, but I do think the proper

7   foundation has been laid for its admission.  Any other

8   objections to its admissibility at this point.

9          MR. HOSKINS:  Just the timing of it, Judge.  I don't

10  think it's been shown sufficiently as to when it was prepared.

11         THE COURT:  Okay.  She indicated that this was

12  prepared while she was cooperating with the FBI.  So I think it

13  is during the time period that's been charged in the -- in the

14  indictment.  There hasn't been a specific date that's been

15  given, but, again, that would be subject to cross-examination.

16  So I'll overrule the objection.

17         Anything else while we're here with the exception of

18  a couple of counsel?  Anything else?

19      (No response.)

20         THE COURT:  No?  Okay.  Thank you.

21      (Whereupon, the following proceedings continued in open

22  court.)

23         THE COURT:  All right.  Thank you, Counsel.

24  Exhibit D16 will be admitted at this time.

25         And, Mr. Smith, if you wish, you may publish that to

1  the jury.

2  BY MR. SMITH:

3  Q    Ms. White, at the top of that page, it has the name

4  William Stivers.  Do you know if there's more than one William

5  Stivers that lives in the Manchester area, Clay County?

6  A    That's my husband's — yes, there's more than one.  And,

7  actually, I know two, which is William "Al Man" Stivers, and

8  William Stivers, which is my husband's cousin.

9  Q    All right.  And is he employed somewhere?

10 A    For the City of Manchester.

11 Q    What does he do at the City of Manchester?

12 A    He operates the sewer plant.

13 Q    When you were given this list, did you recognize from your

14 knowledge of what was going on in the federal investigation any

15 of these names which you understood had been grand jury

16 witnesses that you knew before getting this list?

17 A    I'm not understanding your question.

18 Q    When you were presented this, Mr. Maricle represented this

19 to be a list of people who had testified in front of the grand

20 jury?

21 A    Yes.

22 Q    Did you know at the time he gave you that that some of

23 these people were, in fact, prior grand jury witnesses?

24 A    I knew some of them had, yes.

25 Q    And could you look at that list and tell us who you knew

1  who had been for sure grand jury witnesses to your knowledge?

2  A    I knew that William Stivers had been and Scott Robinson.

3  Jeff Deaton.  I knew Jamie Mills had been.

4  Q    Okay.  Moving back to the time period in which this

5  cooperation was going on, you indicated that at points in times

6  that he was very interested in knowing about the agent — the

7  agents that were involved in the case?

8  A    Yes, he did.

9  Q    Was there some point when you made a statement to him that

10 Agent Briggs was having an affair?

11 A    I did.

12 Q    And do you recall why you made that statement to

13 Mr. Maricle?

14 A    Agent Briggs had instructed me to detour his thinking of

15 where he lived and that he wasn't with his family.

16 Q    And why was that a concern in the investigation, ma'am?

17 A    Because he had — before —

18         MR. HOSKINS:  Objection, Your Honor.

19         THE COURT:  I'll sustain the objection.

20 BY MR. SMITH:

21 Q    What information had you related to Agent Briggs that made

22 him ask this — ask you to make this response to change the

23 direction of his interest?

24         MR. HOSKINS:  Object.

25         THE COURT:  Overruled.

1          THE WITNESS:  He had asked us before what kind of

2    vehicle Agent Briggs drove and where he lived, if he was

3    married, just general questions about him that I felt like — I

4    didn't want to know where he lived.

5          MR. HOSKINS:  Object.

6          THE COURT:  Overruled.

7    BY MR. SMITH:

8    Q    Ms. White, after you told Agent Briggs that Mr. Maricle

9    was trying to find out where he lived and what he drove, what

10   did he tell you?

11   A    He said, "You tell him that I'm getting a divorce and that

12   I live somewhere out London, you don't know where, that I'm

13   seeing someone in London and detour him away from my family."

14         MR. SMITH:  D1 and D12.

15         THE COURT:  Yes, sir.

16   BY MR. SMITH:

17   Q    I'll ask that you take a look at those two exhibits, D11

18   first, please.

19   A    Okay.

20   Q    You may need to take it out of that container so you will

21   be able to fully view it, ma'am.

22        Can you identify D11?

23   A    This is a recap sheet from '04.

24   Q    And do you know how you came — Well, let me ask you this:

25   Did you come into possession of that document at some point?

1  A    I did.

2  Q    Do you know when you received that, ma'am?

3  A    During the '06 election.

4  Q    And who did you receive that document from, ma'am?

5  A    Mr. Maricle.

6  Q    And do you remember the circumstances in which you

7  received that?

8  A    He gave it to us while we was at our home to tally up and

9  make sure we knew the amount of votes that would be gotten in

10 the City of Manchester.

11 Q    And you said this was leading up to the fall 2006

12 election?

13 A    Yeah.  The May and fall, yeah.

14 Q    When you say that Cletus Maricle had an understanding that

15 based on your work for him he was going to return and help your

16 father-in-law —

17 A    Yes.

18 Q    — what exactly did he tell you he was doing to help your

19 father-in-law in addition to giving you this sheet that you say

20 was given to you for the 2004 election?

21 A    He told me that he would contact people that we thought

22 were iffy, influential people, and he would — anybody that he

23 needed to talk to, that he would try to persuade them to go

24 with my father-in-law.

25 Q    Was Roy Morgan someone that you were interested in knowing

1  who he was supporting in the election?

2  A    It was, yes.

3  Q    And why were you interested in knowing about Roy Morgan?

4  A    He had a big family vote in the Manchester precincts.

5  Q    And had he had involvement in the elections in the past?

6  A    He had ran for county judge in the past.

7  Q    All right.  Do you know when that was that he ran?

8  A    He ran several times previous to the '06.

9  Q    Okay.  And did Mr. Maricle represent to you that he had

10  influence over Mr. Morgan?

11  A    He did, yes.

12  Q    What did he tell you?

13  A    He told me that he would —— they were friends and he would

14  speak with him, as well as Ralph Hoskins, and he thought that

15  they could talk to the family members and persuade them to be

16  for Doug White.

17  Q    Now, who was Ralph Hoskins?

18  A    Superintendent of Jackson County Schools.

19  Q    And does he have relatives in Clay County?

20  A    The same relatives as Roy Morgan.

21        MR. SMITH:  I move for the introduction of

22  Government's Exhibit D11.

23        THE COURT:  Any objection?

24    (No response.)

25        THE COURT:  Exhibit D11 will be admitted.

1  BY MR. SMITH:

2  Q    Turning your attention now to D12, ma'am.  In that '06

3  election, before we actually look at that exhibit, ma'am, did

4  you also have concern about Penny Robinson, the city council

5  woman —

6  A    We did.

7  Q    — who she was supporting in the '06 fall election?

8  A    Yeah, we did.

9  Q    And did you talk to Mr. Maricle about her?

10 A    I did.  She was in the Woman's Club with Carmen Lewis, so

11 we had concerns that she may support Carmen, and he said not to

12 worry about that, that Penny would do whatever he asked of her.

13 Q    Did he further explain himself on why she would do what he

14 directed?

15 A    Well, she and Judy are cousins, so it was self-

16 explanatory.

17 Q    Did he ever explain anything he had done for her in

18 elections past?

19 A    I can't recall that he did.

20 Q    You have in front of you D12?

21 A    Yep.

22 Q    Do you recognize D12, Ms. White?

23 A    It's a 2002, it's a recap sheet also.

24 Q    And do you recall, is that a document which you received?

25 A    It is.  There's actually two, there's one from 2004 and

1  one from 2002 that's listed as D12.

2  Q    What were the circumstances of which you received that

3  document, ma'am?

4  A    Well, all documents come through the Clerk's Office, but

5  these were given to me by Mr. Maricle, and they were the

6  general elections of both years.  They had kept track of the

7  results.

8  Q    And do you know when he gave you that list, ma'am?

9  A    I can't recall it.  I can't recall.

10 Q    Do you recall —

11 A    It would have been to the benefit of the 2006 election.

12 Q    Okay.  So when you say "to the benefit," would it have

13 been prior to the 2006 election?

14 A    It would have been, yes.

15         MR. SMITH:  I move for the introduction of

16 Government's Exhibit D12.

17         THE COURT:  Any objection?

18     (No response.)

19         THE COURT:  Exhibit D-12 will be admitted.

20         MR. SMITH:  If I could publish that at this time,

21 Your Honor?

22         THE COURT:  Yes, sir, you may.

23 BY MR. SMITH:

24 Q    I believe the date on the top of that is November 2002.

25 Who were the candidates running for city council in November of

1  2002, Ms. White?

2  A     Sherrie House, Carl Hoskins, Darnell Hipsher, Laura House,

3  Penny Robinson, Ronnie Hacker, and Bobby "Red" Sams.

4  Q     And is Sherrie House, is she related to now Circuit Judge

5  Oscar Gayle House?

6  A     She's his wife, yes.

7  Q     And Darnell Hipsher, is that the same Darnell Hipsher that

8  you've referred to as being previously convicted and a previous

9  city council person?

10  A     Yes.

11  Q     Ronnie Hacker, who is Ronnie Hacker?

12  A     He's Vernon's cousin and he is also a cousin to Judy

13  Maricle.

14  Q     And Bobby "Red" Sams, who is he?

15  A     I don't know who -- I don't know how to explain Bobby

16  "Red" Sams, I don't --

17  Q     Did he help you in the election of 2002, 2004, or 2006?

18  A     When my husband ran, he worked against us.  But he was

19  active in all the elections.

20  Q     When you say "he was active," what was his activity?

21  A     He was a vote hauler, vote buyer, vote seller.

22  Q     The second page, I believe, of D12 lists other candidates

23  for other offices, including city council, I believe, down at

24  the bottom, which includes Vernon Hacker, Jamey Mills, Gary

25  Jackson, and Darrell Davidson; is that correct?

1   A    Yes, that's correct.

2   Q    Now, moving on to 2004, the next page, page four.

3   A    Yes.

4   Q    Does that also list the candidates that ran in 2004 for

5   city council?

6   A    Yes.

7   Q    And can you read those names for us?

8   A    Carmen Lewis, Gary "Ouchie" Jackson, Darrell Davidson,

9   Darnell Hipsher, Laura House, Sherrie House, Vernon Hacker,

10   Jeff Deaton, Dorothy Sizemore, Jamey Mills, Bobby Reid, Penny

11   Robinson.

12   Q    Now, leading up to that 2006 election, did you –– did you

13   get an appointment notice from the County Clerk's Office that

14   you were going to serve in that November election as well?

15   A    Yes.

16   Q    I would like to hand to you what's marked as Government's

17   Exhibit D5.  Can you identify Government's Exhibit D5?

18   A    Yes, I do identify it, yes.

19   Q    What is that, ma'am?

20   A    It's my appointment notice.

21   Q    And what's the date that you recall receiving that?

22   A    The date on the letter is Thursday, November 2nd, 2006.

23   Q    And was that the only official notice that you received

24   that you recall indicating that you were going to be serving as

25   an election officer for the Board of Elections in the 2006 fall

1  election?

2  A    It's the only one I recall, yes.

3          MR. SMITH:  I would move for the introduction of

4  Government's Exhibit D5.

5          THE COURT:  All right.  Any objection?

6      (No response.)

7          THE COURT:  D5 will be admitted.

8  BY MR. SMITH:

9  Q    Now, Ms. White, during the time period that you were

10  associated with Cletus Maricle and involved with him, as you've

11  indicated, you indicated earlier that you had been assured that

12  he was going to assist your family in helping your brother,

13  Eugene Corky Price?

14  A    Yes.

15  Q    Were there other cases in which you recall where

16  Mr. Maricle assisted you or someone at your request?

17  A    Several times, yes.

18  Q    And tell us what you recall.

19  A    I recall Eugene Price, I have a brother Steven Price,

20  which is a drug addict, and he had been arrested for drug

21  possession, Cletus helped him with it.  And at the time of that

22  drug arrest on my brother Steven, when they come into the home,

23  they arrested my mother as well.  I'm not sure what she was

24  charged with, but he helped me on that.

25  Q    Let me ask you to slow down just a second, Ms. White.

WANDA WHITE - CONTINUED DIRECT - MR. SMITH                47

1   A    Okay.

2   Q    Your brother Steven Price?

3   A    Steven Price.

4   Q    Do you know when this was that your brother got into

5   criminal charges in front of Judge Maricle?

6   A    I'm sorry, I couldn't remember the year, sir.

7   Q    Okay.  Was it during the period between 2002 and 2007?

8   A    It would have been between the period of 2004 and 2007.

9   Q    Okay.  And during that time period, you say you went to

10  ask Mr. Maricle to assist you in that.  What did you ask him to

11  do?

12  A    Well, no, actually he came to me.  I was at work at City

13  Hall and he knew it was coming up and he came and called me in

14  the conference room in the back of City Hall and said, "What

15  are you" — "What are you wanting to do on this," because I had

16  expressed to him I was kind of fed up with my brother's drug

17  addiction.  And he's like, "You want to help?"  I said, "Yeah,

18  if you got" — "I don't want him to go away for a long time, if

19  you can help me, help me."

20  Q    And what happened to the case against your brother?

21  A    He served a little bit — a short amount of time in jail.

22  Q    You don't recall how long?

23  A    I don't — it wasn't very long.

24  Q    You said your mother was also charged at the time that

25  your brother got this charge?

1    A    Yes.

2    Q    What's her name?

3    A    Sarah Price.

4    Q    And do you recall specifically what they were charged

5    with, what kind of charge?

6    A    I don't — it was a drug charge, I don't recall the

7    specifics of what it was.

8    Q    How did your mother's case come up in conversation between

9    you and Mr. Maricle?

10    A    He said — when he approached me on Steven, he said, "What

11    about your mother?"  And I said, "Well, she really didn't have

12    anything to do with it, she was just charged along with him."

13    Q    And what happened to your mother's case?

14    A    It was dismissed.

15    Q    Now, do you recall, when you say he came to you and asked

16    you to give conversation about this topic, had you, to your

17    recollection, been approached by him at that point to serve as

18    an election officer for this upcoming 2006 election?

19    A    I had.

20    Q    And was this before you actually served as an election

21    officer?

22    A    It was, yes.

23    Q    Okay.  Were there any other instances, Ms. White, that you

24    recall talking to Mr. White — or Mr. Maricle about making some

25    favor or beneficial ruling in favor of you or someone at your

1  request?

2  A    My brother got a DUI.  My brother Travis got a DUI.

3  Q    And what were the circumstances of that, ma'am?

4  A    He was incarcerated at the Clay County jail during the

5  time that I felt it was unsafe for him to be there, and he

6  called and — Renee Muncy and — he said to me if I let him out

7  she won't —

8  Q    In going to ask you, again, for the record —

9  A    I'm sorry.  Okay.

10 Q    Who is "he" that you're referring to?

11 A    Cletus Maricle.

12 Q    Okay.  If you could, now tell us what Mr. Maricle said.

13 A    I went to him and said, "Travis has got a DUI and he's in

14 jail and this is quite a few DUIs, they'll probably keep him,

15 but I feel like it's unsafe for him to be in the Clay County

16 jail, and if you don't mind, I need for him to be released.

17 Q    Now, was he a person under Judge Maricle's court at that

18 time?

19 A    No, he was in district court.

20 Q    So how was he able to effect a change in his situation in

21 another court?

22 A    Well, he then got on the phone in myself and my husband's

23 presence and phoned Renee Muncy, which was the judge in

24 district court, and got it done through her.

25 Q    Okay.  Now, what did he get done, to your knowledge,

1  ma'am?

2  A    He was released, to my knowledge.

3  Q    After the phone call that Mr. Maricle made to the other

4  judge, did he get released, to your knowledge?

5  A    Shortly after, days after.

6  Q    Now, when did this occur?  Was this before you served as

7  an election officer at his request or was it after?

8  A    Before.

9  Q    Do you know a person by the name of Doug Lovins?

10  A    I do.

11  Q    How do you know him?

12  A    He's the instructor at the local cosmetology school in

13  Manchester.

14  Q    Okay.  And did you ever have discussion or did he ever

15  call you and make —— ask you a favor?

16  A    He did.

17  Q    And what was that favor he asked you?

18  A    He asked me to —— he knew that Cletus and I were friends,

19  and he asked me to basically ask Cletus to release his mother

20  and to remind him that his mother was who took care of Cletus's

21  mother while she was in the nursing home.

22  Q    And what did you do after he made that request of you,

23  ma'am?

24  A    I went straight to Cletus's home and told him.

25  Q    And what happened?

1   A    To my knowledge, and from what Doug told me, that she

2   was — that it was — nothing come of it.  I later asked him,

3   he said everything worked out.

4   Q    Did this occur before you served as election officer or

5   after, to your recollection?

6   A    I can't remember.

7   Q    Do you have a sister named Stephanie Price?

8   A    I do.

9   Q    And did you ever talk to Mr. Maricle about your sister,

10  Stephanie Price?

11  A    Can I explain the circumstances of that?

12  Q    Well, first answer my question.

13  A    Well, not directly, no; indirectly.

14  Q    Okay.  Indirectly.  Who did you talk to indirectly?

15  A    His son, Rusty Maricle.

16  Q    Okay.  And at the time that you approached him, what did

17  you tell Rusty Maricle?

18  A    I approached him on — this was after the election, and I

19  approached him on the sidewalk coming in — he was coming into

20  the courthouse and I was coming out.  And he said, "What are

21  you doing here?"  And I said, "Well, I'm upset right now."  He

22  said, "Why?"  I said, "Because Cletus had told me awhile back

23  that he had taken care of Stef's — all of Stef's fines and

24  it's not taken care of and she's going to state boards now and

25  she can't take her state boards unless these fines are taken

1  care of."  And I said, "Joe White" – which is my

2  brother-in-law, which is an attorney – "they basically told

3  him, no, that they wasn't touching it on him."  And I said,

4  "I've done everything I was supposed to do and help you-all and

5  nothing has been done."  And he said, "Let me" –– he said,

6  "Calm down and I'll go talk to Dad and see if we can't get it

7  taken care of."  Well, at this time, this was in Clay County

8  and I lived in London.  So I get to London, and I called

9  back –– Joe calls me and he said ––

10  Q    Who is Joe?

11  A    Joe White is my brother-in-law, my husband's brother.

12  Q    Is he a lawyer?

13  A    He's an attorney.

14        MR. HOSKINS:  Object to hearsay.

15        THE COURT:  Sustained.

16  BY MR. SMITH:

17  Q    You had a conversation with Joe White?

18  A    Yeah.

19  Q    Was he acting as an attorney for your sister?

20  A    He was acting as attorney for my sister.

21  Q    And after you talked to him, what did you do?

22  A    Well, he told me, he says, "Wanda, there's nothing" ––

23        MR. HOSKINS:  Objection.

24        THE COURT:  I sustained the objection to your

25  conversation with him.

1          THE WITNESS:  With Joe?

2          THE COURT:  Yes.

3          THE WITNESS:  Okay.

4          THE COURT:  And Mr. Smith is asking you another

5    question.

6          THE WITNESS:  Okay.

7    BY MR. SMITH:

8    Q    Just listen to my question.

9    A    Okay.

10   Q    You had a conversation with Mr. Joe White.  What did you

11   do in response?  After talking with him, what did you do?

12   A    I talked to him twice in the same day.

13   Q    Okay.  And what did you say to him?

14   A    I said, "Don't worry about it, Joe, I think I've got it

15   taken care of another way."  And he said, "No, I'm sorry" —

16          MR. HOSKINS:  Objection.

17          THE COURT:  Wait a minute.  See, you can't — you

18   can't say what he said to you.  Mr. Smith is asking what you

19   said to him.

20          THE WITNESS:  Okay.

21          THE COURT:  But you can't say what he said to you

22   because that would be hearsay.

23          THE WITNESS:  Okay.

24          I told him, "Don't worry about it, I think I have it

25   taken care of."

WANDA WHITE – CONTINUED DIRECT – MR. SMITH          54

1  BY MR. SMITH:

2  Q    And what happened to your sister's –– her case?

3  A    It disappeared and all the fines.

4  Q    And could you explain to me what was the big deal and why

5  was your sister so upset over this particular situation at that

6  time?

7  A    Because it kept her from taking her state boards.  And the

8  amount of money was –– she couldn't afford to pay the amount of

9  money.

10  Q    How long did it take for this to get resolved after you

11  talked with Mr. Maricle's son?

12  A    By the time I got back to London, it was taken care of.

13  Q    And about how long does that take you, to get ––

14  A    Well, I would say within an hour it was taken care of.

15  Q    Now, you indicated earlier that in the fall of 2006 that

16  there was a change in the lineup of election officers which you

17  served?

18  A    There was.

19  Q    And how did it –– who came on new and served with you in

20  the November '06 election?

21  A    Charles Weaver's wife, Minnie Weaver.

22  Q    And do you recall how it –– what it took to accomplish her

23  to be able to serve in that position?

24  A    I recall that she was an alternate, and whoever didn't

25  show up, that she was replaced.

WANDA WHITE — CONTINUED DIRECT — MR. SMITH          55

1  Q    Were there occasions when officers that were chosen were

2  switched at the last moment?

3  A    Yes.

4  Q    And do you recall that being explained to you by

5  Mr. Maricle as to — or Mr. Jones and Mr. Stivers as to why

6  that would happen sometimes in effecting the scheme?

7  A    I don't understand what you're asking me.

8  Q    Was it ever explained to you why sometimes it was needed

9  for them to make last-minute changes on officers?

10 A    Well, they held them out at the last minute.  That was the

11 point of it, to hold it out to — to be able to slip them in at

12 that time, who they wanted to serve.

13 Q    Now, during the course of your involvement in this, did

14 you ever have knowledge that Mr. Freddy Thompson was involved

15 in helping them do that?

16 A    To my knowledge, Wayne Jones said he would help them do

17 that.

18 Q    Okay.  And what connection does Wayne Jones have with

19 Freddy Thompson?

20 A    Freddy is married to Wayne's daughter.

21 Q    And what did Wayne tell you he would do?

22 A    He said not to worry about a replacement, at the last

23 minute they would put Minnie in.

24 Q    Have you ever heard of a challenger?

25 A    I have.

WANDA WHITE — CONTINUED DIRECT — MR. SMITH          56

1  Q    And what is a challenger, Ms. White?

2  A    A challenger is a — the candidate's selection of who they

3  want to be placed in a precinct to challenge the voter, whether

4  or not they live there or lived in the county period, or

5  whether they could be assisted to vote.

6  Q    And do those have to be approved through the Board of

7  Elections?

8  A    They do.

9  Q    And did you have someone serving as a challenger for your

10 father-in-law, Daugh White, in the fall 2006 election?

11 A    At both precincts.

12 Q    And who did you have serving at those precincts?

13 A    My brothers -- my brother Travis Price and my husband's

14 brother, Joe White.

15 Q    And did you-all have any trouble getting Joe White in as a

16 challenger?

17 A    We did.  He didn't make the deadline.

18 Q    And what do you mean when you say "he didn't make the

19 deadline"?

20 A    There was a deadline, a certain amount of -- a timeframe

21 that he had to be put down, and at that point he wasn't

22 interested, so the deadline kinda lapsed, and at the last

23 minute he decided he would serve.

24 Q    So how did you get him qualified through the Board of

25 Elections as a challenger after the deadline passed?

1    A    Freddy approved it and backdated it.

2    Q    Freddy who?

3    A    Freddy Thompson.

4    Q    And you say he backdated it?

5    A    That's what he told us, not to worry about it, he would

6    backdate it and it would be fine.

7    Q    Had he ever backdated other documents at your-all's -- to

8    your knowledge?

9    A    To my knowledge, I don't know.

10   Q    This was the one that he told you he did?

11   A    Yes.

12   Q    And this would have been for the fall 2006 election?

13   A    Yes.

14   Q    During the 2006 election, ma'am, did you ever receive a

15   call from Freddy Thompson and Roy Morgan?

16   A    I did.

17   Q    Do you recall, what was the nature of the call?

18   A    To see how the election was going, if everything was going

19   as planned.

20   Q    And was this in the spring or the fall election of 2006?

21   A    It was the spring.

22   Q    And what else was discussed in the call, ma'am?

23         MR. BALDANI:  Judge, I'll object.  I think he's asked

24   her has she received a call from two people, and my objection

25   is she hasn't identified who she's speaking with.

1          THE COURT:  I believe he indicated Roy Morgan and

2     Freddy Thompson, and the call -- or the conversation would be

3     admissible under 801(d)(2)(E) as to both individuals.

4          MR. BALDANI:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          You may proceed.

7          THE WITNESS:  I received a call in the office of the

8     middle school.  Freddy Thompson said, "Hold on, Roy Morgan is

9     wanting to speak with you."  And he then said, "How's

10    everything going, Sis?"  And I said, "Well, it seems to be

11    going just as planned."  And he then said, "At the end of the

12    day, you and Dobber need to print off that voter sign-in

13    sheet."  And I said, "Why?"  He said, "You just need to make

14    copies of it."  And I said, "Well, how are we going to do

15    that?"  And he said, "Just make copies of it."  And I said,

16    "Okay."

17    BY MR. SMITH:

18    Q    Did you actually make copies of it as he suggested?

19    A    No.

20    Q    Was he on the ballot as a candidate in the spring 2006

21    election?

22    A    He was not.

23    Q    Had you discussed with Roy Morgan or been in meetings with

24    Roy Morgan before the election day?

25    A    I had.

1  Q    And could you tell us the circumstances of that?

2  A    We had — my husband and I had gone to his home several

3  times.  We had met with him and Roy Morgan and Ralph Hoskins at

4  Roy's home.  And he was making it clear to me that I was to

5  support Carl "Crawdad" Sizemore and in return we — in return

6  Kennon and I would have support for Kennon's dad, Doug White,

7  in the fall.  And Roy also came and seen me at City Hall in my

8  office.

9  Q    Okay.  And what was the purpose of his visit there?

10 A    The same.  The same thing, to make sure that everything

11 was still as planned.

12 Q    Now, during the 2004 election, you were involved in vote

13 hauling you told us about previously?

14 A    Yes.

15 Q    Did you, at any point in time, become alarmed that there

16 may be investigators in town?

17 A    Yeah.  We were told there were investigators in town.

18 Q    And did members of the organization make any change of

19 plan during that time period after hearing that there were

20 investigators in town?

21 A    They did.

22 Q    And what was that?

23 A    They moved from the Green Street location to a place in

24 east Manchester.

25 Q    And who was that you're referring to, ma'am?

1  A     Bart Morris.  He had told me that the investigators were

2  there.

3  Q     And where did Bart Morris move from?  Green Street to

4  where?

5  A     I'm not sure of the name.  It was in east Manchester.

6  Q     And did you visit that location?

7  A     I did not.

8  Q     Okay.  Do you know an individual by the name of Bill

9  Sester?

10  A     I do.

11  Q     And how do you know Bill Sester?

12  A     Well, I went to school with him, he rented from me.  I

13  just know him.

14  Q     Did you ever during the election try to get him to help

15  you?

16  A     I did.

17  Q     And tell us the circumstances of that.

18  A     I approached Bill, I said, "Bill, are you going to support

19  Doug?"  He said, "I will support whoever Bart Morris tells me

20  to support."

21  Q     And when you were asking for him to support, did you have

22  in mind specifically how you wanted his support?

23  A     I wanted him to haul voters like I knew he had done in the

24  past and get his family members for Doug.

25  Q     And after he told you that, what did you do?

1  A    My husband and I then went and got –– picked up Bart

2  Morris and went to his home on Mill Pond.

3  Q    And what happened when you brought Mr. Morris back to the

4  meeting?

5  A    He supported Doug White.

6  Q    In what way?

7  A    He hauled voters.

8  Q    Okay.  And hauled voters for what purpose?

9  A    To sell their vote.

10 Q    Do you know a fellow by the name of Roger Webb?

11 A    I do.

12 Q    And did he run for public office in the 2006 election?

13 A    He ran for magistrate.

14 Q    Do you know who he ran against?

15 A    Stanley Bowling.

16 Q    Did you ever have any conversations with him?

17 A    No, I did not.

18 Q    You indicated that Roy Morgan wanted your support for

19 Crawdad Sizemore?

20 A    Yes.

21 Q    Did he know you were going to be buying and stealing votes

22 in that election?

23 A    He did.

24 Q    How did he know that?

25 A    He said he had spoke with Cletus.

WANDA WHITE - CONTINUED DIRECT - MR. SMITH          62

1  Q    And were he and Cletus very close?

2  A    I felt like they were.

3  Q    And when you say he wanted you for Crawdad Sizemore, was

4  that the same Crawdad Sizemore that you indicated that Dobber

5  Weaver was obligated to?

6  A    Yes.

7  Q    Could you explain to us why Crawdad Sizemore didn't give

8  the slate and pool his money with the rest of the candidates

9  instead of going just directly to Dobber Weaver in that 2006

10 election?

11 A    Well, for one, he knew that Bart Morris supported James

12 Garrison.

13 Q    Okay.  And that was his opponent?

14 A    Yes.

15 Q    Okay.  Are there other reasons?

16 A    I don't know of any other reasons.

17 Q    Ms. White, the last recording I think that was introduced

18 was, I believe, June the 7th, 2007, which we introduced

19 previously to your testimony.  Did you-all make any recordings,

20 to your recollection, after June of '07?

21 A    No, not to my recollection.

22 Q    And during the time period that followed, were you

23 continuing to stay in contact with agents as the need arose?

24 A    Yes.

25 Q    And following your cooperation, was there a point in time

1  when you made a call to them concerned about a possible threat?

2  A    Yes.

3  Q    And if you could, ma'am, tell us the circumstances in

4  which you made a call to the agents about a possible threat.

5  A    I have an account with a networking site, which is called

6  MySpace, and I had logged on, and I had a message in my inbox.

7  And when you click in a message, the person that has that

8  account, their picture will pop up.  So I clicked into my

9  messages, and a man appeared with a gun held like this, a

10 handgun, and it just completely —— at that point, I hadn't even

11 read the message, it just took me back, I was like, oh, my God.

12 And it read —— then I read it, and it said something to the

13 effect, good job, look what you've done with your lies.  And at

14 that point, I started screaming at my husband, which was in the

15 other room, and I said, "You've got to come look at this."  And

16 he was like, "What is it?"  And I said, "There's a man that

17 sent me a message that has a handgun and it says, 'Look what

18 you've caused by your lies.'"  And he said, "Well, who is it?"

19 And I said, "It's Brian Hubbard.  Do you know who that is?"

20 And he said, "Yes, I do, that's the son of Richard Hubbard."

21 He said, "You need to get on the phone and call the FBI right

22 now."

23         MR. SMITH:  May I hand the witness what's marked as

24 Government's Exhibit D73?

25         THE COURT:  Yes, sir.

1  BY MR. SMITH:

2  Q    Do you have in front of you now D73, ma'am?

3  A    I do.

4  Q    Do you recognize that?

5  A    Yes.

6  Q    And what is that?

7  A    It's a copy of the message that he sent me.

8  Q    And were you able to print out a copy or were the agents

9  able to print out a copy of the exact, I guess, message that

10 was sent to you?

11 A    I printed off a copy.

12 Q    You printed it off your computer?

13 A    And they also obtained access through MySpace to access it

14 themselves.

15         MR. SMITH:  Okay.

16         I move, at this time, to introduce Government's

17 Exhibit D73.

18         THE COURT:  Any objection other than those previously

19 stated?

20     (No response.)

21         THE COURT:  Exhibit D73 will be admitted.

22         MR. SMITH:  If I could use the document projector for

23 the purposes of published this particular exhibit.

24         THE COURT:  Yes, sir.  Yes, sir.

25 BY MR. SMITH:

WANDA WHITE — CONTINUED DIRECT — MR. SMITH          65

1  Q    Ma'am, is that visible there in front of you now?

2  A    It is.

3  Q    Is that the photograph that appeared on your account?

4  A    It is.

5  Q    Did you know this young man?

6  A    I'd never met him before.

7  Q    Ms. White, after your cooperation, did you have any other

8  acts toward yourself or your property —

9  A    I did.

10 Q    — that occurred?

11     And if you could tell us, did you-all have a loss of

12 property?

13 A    We had some rental property in Manchester, which consisted

14 of four mobile homes, three of which we owned and one was a lot

15 rental, and I had rented the one on the far end to Terry Smith,

16 which I called "Pudge."  I had known him since I was in

17 cosmetology school, I had cut his hair.  And he had two small

18 children, and he rented from me in the far end.  And at that

19 time he didn't — he had no money to pay his electric bill, so

20 there was no electric hooked up to the home, and he had also

21 been a witness in front of the grand jury, and —

22 Q    Grand jury involving this subject matter?

23 A    Yes, involving this investigation.  And I got a call from

24 one of the neighbors that said —

25          MR. HOSKINS:  Objection.

1          THE COURT:  Sustain the objection as to the

2   statement.

3   BY MR. SMITH:

4   Q    You got a call from one of the neighbors, Ms. White?

5   A    I got a call from one of the neighbors.

6   Q    Now, I don't want you to repeat what the call was.

7   A    I won't.

8   Q    But just listen to my question.  So when you got a call

9   from one of the neighbors, what did you do?

10  A    I then phoned 9-1-1.

11  Q    And what did you say?

12  A    I said, "My rental" -- "There's a piece of my rental

13  property that's on fire, that's burning, and there's no

14  electric to it, so obviously somebody had set it on fire."

15          MR. HOSKINS:  Object.  Approach, Your Honor?

16          THE COURT:  I will overrule the objection as an

17  excited utterance.

18  BY MR. SMITH:

19  Q    Did you go visit the site of the fire?

20  A    I did.

21  Q    And could you describe the extent of the loss?

22  A    There was nothing left.

23  Q    Did you have opportunity to see Mr. Smith there?

24  A    No, he called me.

25  Q    Okay.  Do you know when he called you?

1  A    Shortly after.

2  Q    Shortly after what?

3  A    The fire.

4  Q    Now, did you and your husband have insurance on that

5  property?

6  A    No, we did not.  Can I add something else, sir?

7  Q    Well, I'm afraid that we're going to get an objection, so

8  I need to be careful.  You listen to my question in this area;

9  okay?  Is there something you need to explain in your answer

10 that you've just made?

11 A    I need to add something to it.

12 Q    Okay.  Does it involve conversation with someone outside

13 of the courtroom?

14 A    No.

15        MR. SMITH:  Okay.

16        Your Honor, may the witness explain?

17        THE COURT:  Yes.

18        THE WITNESS:  Another piece of property burned after

19 that, too, but it was –– it didn't belong to me, although I

20 rented the lot.  So there was actually two fires.

21 BY MR. SMITH:

22 Q    Were they close in proximity to each other?

23 A    Yes, it was the same –– on the same property.

24 Q    So you had somewhat like a trailer lot?

25 A    Yes.

1  Q    And you rented out homes that you owned, and in some

2  instances you rented lots to people who had their own home?

3  A    In one incidence, yes.

4  Q    How close in time did the other fire occur to this one?

5  A    Shortly afterwards.

6  Q    Days or weeks?

7  A    Weeks afterwards.

8  Q    Was there any gas, natural gas —

9          MR. BALDANI:  Objection, Your Honor.  Can we

10  approach, please?

11          THE COURT:  You can approach.

12      (Whereupon, the following discussion was had between the

13  Court and counsel at the bench, out of the hearing of the

14  jury.)

15          MR. BALDANI:  Judge, Russ Baldani on behalf of Freddy

16  Thompson.  The reason for my objection is, unless I missed

17  something, when the prosecutor told us about this, what I call,

18  404(b) this morning, I understood there was one fire, and now

19  we've gone into a totally separate fire, albeit on the same

20  property, but different occasions, and that, unless I just

21  missed it, I don't think we even discussed that.  So,

22  obviously, consistent with my original objection and for all

23  the reasons I stated in my original objection, I definitely

24  want to object on Mr. Thompson's behalf to this.

25          THE COURT:  Okay.  Of course, the Court didn't admit

1  it under 404(b).  Let me ask one question to you.  The recent

2  decision from the Sixth Circuit that indicates that the Court

3  should also weigh the evidence that's been presented up until

4  the point that 404(b) evidence is offered, would you consider

5  the United States' evidence against all defendants in this case

6  to be strong or weak at this point?

7          MR. BALDANI:  Judge, with respect to Mr. Thompson,

8  extremely weak.

9          THE COURT:  Weak?

10         MR. BALDANI:  Yes, sir.

11         THE COURT:  So that would give the Court additional

12 reasons, then, to admit evidence under 404(b) under the Sixth

13 Circuit's analysis.  So that weakens your argument under

14 404(b), but the Court didn't admit it for that reason, and I

15 don't believe that prior notice would be required because I

16 haven't admitted it under 404(b).  So I'll overrule the

17 objection, but the same limitations would be imposed with

18 respect to this witness.  Now, I did allow her to state as an

19 excited utterance what she said to the 9-1-1 operator, and she

20 can explain this particular incident, whether there was gas,

21 electricity, those things hooked up, whether she had insurance

22 on that particular piece of property but will not be allowed to

23 speculate as to the cause of the fire.

24         MR. SMITH:  I'll certainly try not to ask any

25 questions that will bring about an objection.

1          THE COURT:  I know you're doing your best, but I'm

2    trying to listen very closely, and if I think she's going

3    beyond that, I'll cut her off myself.

4          Yes, sir.

5          MR. ABELL:  Your Honor, Robert Abell for William

6    Stivers.  I join in Mr. Baldani's objection just for the

7    record.

8          THE COURT:  All right.

9          MR. HOSKINS:  David Hoskins for the defendant,

10   Russell Cletus Maricle, we join in that objection and move for

11   a mistrial.

12         MR. WESTBERRY:  Same for Douglas Adams.  Thank you,

13   Your Honor.  Just for the record.

14         THE COURT:  All right.  Those additional defendants

15   that have made objections, the questions for -- the question

16   for you would be the same as I asked Mr. Baldani.  If the Court

17   were to evaluate this evidence under 404(b), what is your

18   assessment of the weight of the government's case at this

19   point.

20         Mr. Abell?

21         MR. ABELL:  The weight of the government's evidence

22   as to an organization existing working for a common purpose is

23   scant at best, it is very weak.

24         THE COURT:  Mr. Hoskins?

25         MR. HOSKINS:  I agree with that part, but I would say

WANDA WHITE — CONTINUED DIRECT — MR. SMITH          71

1  overall it's 50/50, Judge.

2          THE COURT:  50/50.

3          MR. WESTBERRY:  I concur with Abell's assessment and

4  Mr. Hoskins, as well, on behalf of Mr. Adams.

5          THE COURT:  Well, it's hard to be scant and to be

6  50/50, but, again, the Court hasn't admitted this under 404(b)

7  and I'll overrule the objections and the — Mr. Hoskins' oral

8  motion for mistrial as well.

9          All right.  Thank you.

10      (Whereupon, the following proceedings continued in open

11  court.)

12          THE COURT:  All right.  Thank you, Counsel.

13          And, Mr. Smith, I'll need to ask you to repeat the

14  question.

15          MR. SMITH:  Certainly.

16  BY MR. SMITH:

17  Q    Ms. White, was there gas hooked up to that home of Terry

18  Smith?

19  A    No.

20  Q    Did Terry Smith have some belongings of his inside the

21  residence?

22          MR. HOSKINS:  Object.

23          THE COURT:  Only if you observed yourself.  Can you

24  answer based on your own observations?

25          THE WITNESS:  I had been in the home previously to

1  collect the rent.

2  BY MR. SMITH:

3  Q    And was the home furnished ——

4  A    The home ——

5  Q    —— the last time you were in it?

6  A    He lost everything.

7         MR. HOSKINS:  Object, Your Honor, move to strike.

8         THE COURT:  Ms. White, do you have reason to know

9  what was in the home at the time of the fire?

10        THE WITNESS:  I did, sir.  I was there the day

11 before.

12        THE COURT:  All right.  Objection overruled.

13        MR. SMITH:  If I could have a moment, Your Honor.

14        THE COURT:  Yes, sir.

15 BY MR. SMITH:

16 Q    Ms. White, while you were associated and, as you've

17 testified, acting at the direction at times of Mr. Wayne Jones

18 in these elections as an election officer, did he ever discuss

19 with you any of the federal candidates that were on the ballot,

20 how they were going to be affected in the scheme?

21 A    He did, but I can't recall of what he said exactly.

22 Q    Do you recall him mentioning Hal Rogers?

23 A    He did.

24 Q    And do you recall him stating to you how he was going to

25 vote the slate when it came to the candidate of Hal Rogers?

 1              MR. WHITE:  Objection, Your Honor, leading.

 2              THE COURT:  Okay.  Objection sustained as to leading.

 3  You'll need to rephrase your question.

 4  BY MR. SMITH:

 5  Q    Ms. White, did you have discussions with Wayne Jones?

 6  A    Yes.

 7  Q    Did he ever discuss with you Hal Rogers?

 8  A    Yes.

 9  Q    What did he say?

10  A    I can't recall, sir.

11  Q    When it came to you performing your duty for this

12  organization and during the time that you were acting inside

13  the polls, what directions did you receive regarding how you

14  were to vote people if they came into vote, if you had a chance

15  to steal their vote, they walked away, how were you told to

16  mark the ballot for the congressman's position of Hal Rogers?

17              MR. BALDANI:  Objection, Your Honor.

18              THE COURT:  All right.  Objection overruled.  You may

19  answer that question.

20              THE WITNESS:  I can't remember that.

21  BY MR. SMITH:

22  Q    Do you recall Hal Rogers being on the ballot?

23  A    I can't remember Hal Rogers being on the ballot.

24  Q    Do you know him to be a United States congressman?

25  A    I do.

1  Q    Do you know how often United States congressmen run in the

2  United States?

3              MR. WHITE:  Objection, relevance, Your Honor.

4              THE COURT:  Overruled.

5              THE WITNESS:  Honestly, I don't know.  I don't know

6  how often they run.

7              MR. SMITH:  I would like to hand to the witness, Your

8  Honor, a document to refresh her recollection in this regard.

9  I do have it highlighted, and I'm sure counsel all have copies

10  of this at this point.

11             THE COURT:  All right.

12             MR. WHITE:  Your Honor, I would object.  She's not

13  indicated that she doesn't remember, she's indicated she

14  doesn't know.  So I don't think it's appropriate -- she doesn't

15  need anything to refresh her memory, so I would object.

16             THE COURT:  All right.  Objection overruled.

17  Ms. White, you're going to be shown a document.  You are

18  instructed that you may review the document in order to

19  determine whether it refreshes your memory.  Your testimony

20  would then not be based upon the document but upon whatever you

21  remember.

22             THE WITNESS:  Okay.

23             MR. SMITH:  Mr. White has asked for a few minutes,

24  Your Honor.

25             MR. WHITE:  No, I've asked just for a second to look

1  at what you've got.

2          THE COURT:  That's fine.

3          MR. WHITE:  Thank you.

4  BY MR. SMITH:

5  Q    I highlighted the portion, I believe, I want to direct

6  your attention to, ma'am.  If you would please take a moment to

7  read that, and I don't want you to restate that or read that

8  here on the record, please.  I just ask you now, have you had a

9  chance to read it?

10 A    I have.

11 Q    Does that refresh your recollection?

12 A    It refreshes my memory.

13 Q    Listen to my question.  Does that refresh your

14 recollection?

15 A    It does.

16 Q    I'm going to restate the question; okay?  Listen

17 carefully.  During the time period that you were serving for

18 this organization inside the polls where you were stealing

19 votes and you were having an opportunity then to revote these

20 people, did you receive any instruction from Wayne Jones as to

21 how you were to vote when it came to Hal Rogers?

22 A    I did.

23 Q    And what was that instruction, ma'am?

24 A    I remember his words being, "We need to beat his ass."

25 Q    And what did you do pursuant to his instructions?

1  A    We voted as many as we could against him.

2        MR. SMITH:  Thank you.  If I could withdraw that

3  document from the witness at this time.

4        THE COURT:  Yes, sir, you may.

5        MR. SMITH:  Thank you.

6        MR. WHITE:  Your Honor, I would ask that that

7  document be marked as an exhibit since it was used to refresh

8  her recollection.

9        THE COURT:  All right.  We'll take that up at a

10 break, Counsel.

11       MR. WHITE:  Thank you, Your Honor.

12       THE WITNESS:  Sir, can I add something to my last

13 comment?

14       THE COURT:  No, there's not a question that's pending

15 at this time, unless your answer was incorrect.

16       THE WITNESS:  No.

17       THE COURT:  All right.  Thank you.

18 BY MR. SMITH:

19 Q    During the time period that you and your husband were

20 involved with Mr. Maricle, did he ever give you-all money?

21 A    He did, he gave my husband money.

22 Q    And what circumstances did he give your husband money that

23 you recall?

24 A    He gave him money in the '02 election.

25 Q    What kind of money did he give him?

1  A    He gave him money to purchase votes.

2  Q    Do you recall how much money he gave him?

3  A    Around $500.

4  Q    And when he gave the money to him, do you recall him

5  making any statements to your husband about the money?

6  A    He gave it to him and said that, you know, that you don't

7  have to report this.

8  Q    Any other monies that you recall Mr. Maricle giving you or

9  your husband during that time period?

10  A    I don't recall.

11  Q    Do you know a fellow by the name of Richie Asher?

12  A    I do.

13  Q    And was he associated with Cletus Maricle during the time

14  period that you were cooperating with the FBI?

15  A    Yes.

16  Q    And what was his association with Mr. Maricle during that

17  time period?

18  A    He worked for drug court.

19  Q    And did he do any other duties for Mr. Maricle?

20  A    He did gardening and errands.

21  Q    Did he have a private investigator employed?

22  A    Yes.

23  Q    And did he tell you who his private investigator was?

24  A    Richie Asher.

25  Q    Do you know a person by the name of Melanda Adams?

1   A    I do.

2   Q    And is she related to Doug Adams?

3   A    It's his daughter.

4   Q    And during the time that you were associated with

5   Mr. Maricle and talking with him about him affecting the

6   decisions of other people, including Doug Adams, did he ever

7   discuss with you Melanda Adams?

8   A    He did.

9   Q    And tell us what he told you.

10  A    He told myself and my husband that Doug Adams couldn't

11  afford to go against him because he had helped Melanda out of

12  trouble.

13  Q    And did you know Melanda to have been in trouble?

14  A    Yes.

15  Q    And what trouble was she in?

16  A    A drug charge.

17  Q    Do you know what happened to her drug charges?

18  A    I don't know what happened to them.

19  Q    Did Mr. Maricle explain to you that the favor he did for

20  his — Doug Adams' daughter related to her drug charges?

21  A    That he made sure that she didn't get big time out of it,

22  because she could have.  To my knowledge, it was manufacturing

23  methamphetamine.

24       MR. SMITH:  Your Honor, I believe that's the

25  questions that we have at this time.  We pass the witness.

1          THE COURT:  All right.  Thank you.

2          Counsel, would you like a few moments before we begin

3   cross-examination?

4          MR. HOSKINS:  First, I would like to object and make

5   sure that we received all the *Jencks* material of this witness.

6          THE COURT:  All right.  We're going to do that at the

7   break here in just a moment.

8          MR. HOSKINS:  Yes, I do.

9          THE COURT:  All right.  Thank you.

10         Ladies and gentlemen, we'll take our morning recess

11   at this time.  We'll take approximately a 20-minute recess

12   until 11:05.  Please keep in mind the admonition that you've

13   been previously not to discuss the case among yourselves while

14   we are in recess.  The jury already be excused for 20 minutes.

15      (Whereupon, the jury retired from the courtroom, after

16   which the following proceedings were had in open court.)

17         THE COURT:  Thank you.

18         Ms. White, you may step down.

19         Thank you, Counsel.  Please be seated.

20         Mr. Smith, I understand that you've provided

21   additional information this morning, additional 3500 material.

22   Do you have any additional material to provide to the

23   defendants?

24         MR. SMITH:  Your Honor, I have sent the agent to

25   confirm.  We did have a couple of -- in our review of agent

1  notes, we did have a few that were copied and I believe counsel

2  has already been provided that, but I want to make sure.  So

3  other than that, I have confirmed that all other has been, yes.

4          THE COURT:  All right.

5          MR. SMITH:  I should have an answer here within a

6  minute.

7          THE COURT:  Okay.  We'll remain in session.

8          Other issues to take up outside the presence of the

9  jury.

10          Mr. White?

11          MR. WHITE:  Yes, Your Honor, just a couple, if I may.

12          The first is, on the transcript that we received of

13  the text messages, I want to thank the United States for

14  getting it for us, I was just wondering if they could just –– I

15  need a little explanation as to what these numbers are so I

16  know who was the one making the text message.  I think that

17  will make cross-examination be a little more efficient.

18          THE COURT:  All right.

19          MR. WHITE:  If they can just give us that list during

20  the break or something.

21          Then the second thing I have, Your Honor, I would

22  like to apologize to the Court for getting into a conversation

23  with Mr. Smith.  My frustration was that I know he had given us

24  the 302s and he had said you've already got this and it was

25  obviously something that the jury had heard, but the problem I

1  had was it wasn't an exhibit and I would have to pull out a CD,

2  find it, and all I wanted to do was look at it.

3      THE COURT:  And that's the kind of conversation I'm

4  trying to prevent in front of the jury.  I think everyone

5  understands that.

6      MR. WHITE:  I do, Your Honor, and I wanted to

7  apologize for that.  But at the same time, I would ask that —

8  and I will try to do this as well with my exhibits, is make

9  sure they get a chance to look at it and not have any

10 conversation about, well, you've had this or that kind of

11 thing.  But I felt like I needed to interject, I would like to

12 look at it before he handed it to the witness.

13     THE COURT:  All right.

14     MR. WHITE:  And then the last —

15     THE COURT:  Yes, sir.  Go ahead.

16     MR. WHITE:  And the last thing I have is, I'm not

17 necessarily saying I want to do anything with the exhibit that

18 they used to refresh Ms. White's recollection, although based

19 on one of the comments that she then subsequently made, I'm

20 fairly certain I'm going to use that exhibit.  I don't expect

21 to introduce the entire thing and I believe that I will only

22 limit my use of it to the pink highlighted portion that Mr. —

23 I presume has the highlight of Mr. Smith on it.

24     THE COURT:  I'm assuming that's a 302.

25     MR. WHITE:  It is a 302, Your Honor, from March 27th,

1  '07.

2          THE COURT:  All right.  That will be marked — we'll

3  have that marked as a Court exhibit.

4          MR. WHITE:  Okay.  Thank you, Your Honor.

5          THE COURT:  And, of course, I haven't read it, but I

6  would believe that there would be some material in that that

7  may not be admissible, and so that will be — you can certainly

8  use that for cross-examination on that point or to refresh

9  memory if you need to do so, but in terms of the record, it

10  will be placed under seal.

11          MR. WHITE:  Thank you, Your Honor.  And just to be

12  clear to you so you understand, I'm only going to refer to the

13  pink highlighted part, because I agree with you, there's much

14  in there that would obviously not be admissible.

15          THE COURT:  All right.

16          MR. WHITE:  Thank you, Judge.

17          THE COURT:  Let's see if we have an answer on the

18  first question about text messaging.

19          Mr. Smith?

20          MR. SMITH:  Okay.  Your Honor, it's been represented

21  to me and I believe it to be accurate, I think I gave counsel

22  notice earlier, that Wanda White was the only member of the two

23  cooperators that texted the agents.  So I didn't feel it was

24  necessary to make any further indication from the number, but

25  the number you see would be — it's represented to me that

1 | those were all from Wanda White.  We have given them all *Jencks*
2 | material, I now can confirm that.
3 |         As far as the 302 is concerned, Your Honor, if I was
4 | out of line in using this document or my method of handling it
5 | with counsel, I apologize.  I'm just feeling the pressure of
6 | the day and trying to get things done quickly.  I see that
7 | we've been with this witness some time and I'm trying to move
8 | it as quickly as I can.  So I apologize if I was rash in my
9 | handling of the document.
10 |         THE COURT:  All right.
11 |         MR. WHITE:  Your Honor, if I can respond.  Mr. Smith
12 | has been nothing but cordial and professional.  These things
13 | happen in trials.  I feel certain that the way I responded was
14 | not the right way either, so I look forward to a do-over.
15 |         THE COURT:  Okay.  All right.
16 |         MR. SMITH:  I will have this copied for the Court
17 | and, as the Court's directed, ask the Clerk to mark it as a
18 | Court exhibit.  And, of course, I reserve an opportunity to
19 | obviously object if counsel chooses to make any use of this
20 | other than what — you know, again, it was, I believe, used to
21 | refresh her recollection.
22 |         THE COURT:  Well, based on representations, he may
23 | ask questions about the highlighted portion, which is the part
24 | that you had shown her, so that's obviously a subject of
25 | cross-examination.  If we get into other issues, then we'll

1  need to — we'll need to take those up outside the presence of

2  the jury.

3          Any other — Mr. Hoskins?

4          MR. HOSKINS:  Your Honor, I would just ask that we at

5  the very least take an early lunch today so we can have time to

6  carefully go through these text messages.  There's several

7  pages that are at least a bit cryptic and —

8          THE COURT:  That will be fine.  We can break at 11:45

9  if you would like, and we'll take an hour and 15 minutes for

10 lunch.  That will give you at least an additional 15 minutes.

11 Is that sufficient for you?

12         MR. HOSKINS:  I would prefer to break now, Your

13 Honor.

14         THE COURT:  I don't think we can break now.  I mean,

15 unless you don't have any other areas of cross-examination to

16 cover with the witness.

17         MR. HOSKINS:  I do, Your Honor.

18         THE COURT:  All right.  I thought you probably did.

19 We need to proceed.  I have reviewed those materials and some

20 of that is duplication, of course.  We'll proceed here at 11:05

21 and if you get to a point where you're out of questions and you

22 need to take a break to further review that document, we can

23 certainly take that up at the appropriate time.

24         MR. WESTBERRY:  That was my suggestion.  In addition

25 to the text messaging, of course, we have some new information

1    that came to our attention today we're trying to assimilate as

2    much as we can to prepare for cross-examination.  That's

3    probably a little more challenging than the text messaging.  I

4    don't know, but I would ask the Court's indulgence if we get to

5    that point for additional time.

6            THE COURT:  Yes, sir, I'll try to be as lenient as I

7    can with that, keeping in mind, of course, that we do need to

8    keep the case progressing as best we can.

9            MR. WESTBERRY:  I was with Judge Van Tatenhove two

10   days ago, he once gave two weeks to review additional.  I mean

11   that just as a way of ending the morning before we take our

12   break.

13           THE COURT:  All right.  Thank you.  I thought my hair

14   was gray enough already.  We'll be in recess until 11:05.

15       (Whereupon, a short recess was had, after which the jury

16   returned to the courtroom and the following proceedings were

17   had in open court.)

18           THE COURT:  Thank you.

19           The record will reflect that all members of the jury

20   are present.  All parties and counsel are also present.

21           Let's see, Mr. Smith had just completed direct

22   examination.

23           Mr. Hoskins, you'll be questioning the witness?

24           MR. HOSKINS:  Thank you, Your Honor.

25           THE COURT:  You may proceed.

CROSS-EXAMINATION

BY MR. HOSKINS:

Q    Good morning, Ms. White.  My name is David Hoskins, and I
represent Cletus Maricle.  I would like to start by asking you
to go back to when you first met Cletus Maricle and Judy
Maricle.  Do you remember when that was?

A    I can't remember.  It would have been in the '90s.

Q    Okay.  Do you remember how you first came to meet them?

A    No, I don't.

Q    Was that at the time when you were already married to
Kennon?

A    Yes.

Q    And Kennon — Kennon's mother and Cletus Maricle's mother
are double first cousins; is that your understanding?

A    That's my understanding.

Q    So they have a family connection, not on the White side
but on Kennon's mother's side?

A    Yes.

Q    What was her maiden name?

A    Cornett.  She was — yeah, Cornett.

Q    And her first name is Gail; is that right?

A    Uh-huh.

Q    Did you first become friends with Cletus and Judy or did
you first become friends more with some of their children?

A    I don't remember.

1  Q    Okay.  But you remember that you were friends with the

2  children as well; right?

3  A    I was.

4  Q    And who are their children, what are their names?

5  A    Donna Mobley, Meredith Mobley, they're both married to

6  brothers.  Linsey Maricle and Rusty Maricle.

7  Q    And were those — did you go to school with any of

8  those — of Cletus and Judy's children?

9  A    No, I don't think I did.

10 Q    Okay.  Which one would be the closest in age to you and

11 your husband?

12 A    Donna would be close to Kennon's age and Rusty would be

13 close to my age.

14 Q    But you don't think you went to school with Rusty?

15 A    No, sir, I had a child at 15.  No, I wasn't in school at

16 the same time he was.

17 Q    Did you get to be pretty good friends with Linsey?

18 A    Yeah.

19 Q    Okay.  Can you tell us a little bit about how far back

20 your friendship with Linsey goes?

21 A    I can tell you the first time I ever met Linsey.

22 Q    Okay.

23 A    That I recall meeting Linsey.  She came to my home when

24 she was about 13 with my brother, Eugene Corky Price.

25 Q    Was Corky older than Linsey?

```
 1  A    I'm not sure.  Yeah, I think he's a few years older than
 2  her.
 3  Q    They came together to your home?
 4  A    They came together.
 5  Q    And that's when you first met her, and as the years went
 6  on, you got to be friends with Linsey, as well as Cletus and
 7  Judy and Donna and Meredith and Rusty?
 8  A    Yes.
 9  Q    And you got to be good enough friends with Cletus and Judy
10  and their children that you knew what was going on in their
11  lives; didn't you?
12  A    As far as what they told me, yes.
13  Q    I mean, you knew about some pretty significant personal
14  issues that they were dealing with?
15  A    Everyone did, sir.
16  Q    Okay.  You had conversations, though, with Cletus and Judy
17  about problems they were having; right?
18  A    Yes.
19  Q    Everybody didn't have those conversations, but you did?
20  A    To my knowledge, I can say that I had those conversations
21  with them.
22  Q    Did it seem to you when you were having those
23  conversations that you were a confidant, that they needed an
24  ear, they needed a friend to listen to them?
25  A    I'm not so sure about that.  They knew I was aware of
```

1   their problems, if that's what you're getting at, yeah.

2   Q    Well, I'm just -- I'm asking if that was your

3   understanding.

4   A    Not really, no, that wasn't my understanding.

5   Q    You knew that Linsey developed a pretty bad drug problem.

6   A    I knew that, yes.

7   Q    And like you said, everybody knew that; right?

8   A    Yes.

9   Q    It really wasn't a secret at all, was it?

10  A    Not really, no.

11  Q    Did Cletus Maricle or Judy ever talk to you about that

12  drug problem that Linsey had?

13          MR. SMITH:  Your Honor, I'm going to object to

14  relevance.

15          THE COURT:  Overruled.

16          THE WITNESS:  Can I answer that question then?

17          THE COURT:  Yes, you can answer.

18          THE WITNESS:  They -- we discussed it.

19  BY MR. HOSKINS:

20  Q    Did they ever ask for your help in any way?

21  A    Not to my knowledge.

22  Q    Do you remember when Linsey got a job at City Hall?

23  A    Yes.

24  Q    And you were working at City Hall?

25  A    I was, yes.

1  Q    Your father-in-law got you that job?

2  A    Yes.

3  Q    And also got Linsey Maricle her job?

4  A    He did.

5  Q    And that was at a time when Linsey's drug problem was

6  already widely known?

7  A    Yes.

8  Q    Do you recall about when that was?

9  A    I don't recall.

10 Q    Okay.  Well, let's see if we can pin that down a little

11 bit.

12 A    Okay.

13 Q    You started working at City Hall in — or you started

14 working for the City at the police department; is that right?

15 A    Yes.

16 Q    And that was in 2004?

17 A    I believe so.

18 Q    After the mobile home lot closed down?

19 A    Uh-huh.

20 Q    And you were already working there when Linsey got her

21 job, weren't you?

22 A    Yes.

23 Q    Where you working at the police department at that time,

24 or were you then working in actual City Hall with the mayor?

25 A    When Linsey got her job, is what you're asking me?

1  Q    Yes, ma'am.

2  A    At City Hall.

3  Q    So that was some months, at least, after you started

4  working?  I mean, you started working in the fall of 2004 at

5  the police department; correct?

6  A    Right.

7  Q    And you were still working at the police department in the

8  early part of 2005; weren't you?

9  A    I think so.

10 Q    The application that we've already seen where you applied

11 for a drug court job, that was dated February 15th of 2005,

12 wasn't it?

13 A    If that's what it says.

14         MR. HOSKINS:  Your Honor, I would ask that the

15 witness be shown that exhibit.  It's already been admitted.

16         THE COURT:  All right.  What is the number,

17 Mr. Hoskins?

18         MR. WHITE:  D2.

19         MR. HOSKINS:  D2.

20         THE CLERK:  It should be up there in the exhibits.

21         THE WITNESS:  What did you say the date was on it?

22 It says February 15.

23 BY MR. HOSKINS:

24 Q    Okay.  And that's the date that you wrote it out, isn't

25 it?

1  A    Yes.

2  Q    That exhibit?

3  A    Yes.

4  Q    All right.  And I'm just using this as a point of

5  reference.  It shows that you were still working at the police

6  department, doesn't it?

7  A    I'm not sure.  It does.

8  Q    How much longer after that was it before you moved on to

9  the City Hall job?

10 A    I'm not sure.

11 Q    Do you have any idea when that was?

12 A    No, I don't have any idea.

13 Q    So the best we can do is that Linsey started there

14 sometime after February 15th?

15 A    Sometime afterwards.

16 Q    And at that point, Linsey's drug problem was widely known?

17 A    I would think so, yeah.

18 Q    You certainly knew all about it, didn't you?

19 A    I did.

20 Q    You knew that she had been arrested and been to jail more

21 than once for drugs and her stealing from her parents?

22 A    No, sir, I didn't know she was arrested.

23 Q    Okay.  Do you remember hearing on that conversation on the

24 recording when Judy Maricle was talking about having to take --

25 having to go to court, she was talking about how nervous she

1  was the time that she had to go to court?

2  A    I recall that.

3  Q    And she said, "That's when I had to get Linsey for writing

4  a check on me."

5  A    Uh-huh.

6  Q    Do you remember?  And you remember when Linsey got that

7  job at City Hall that Cletus and Judy asked you to keep an eye

8  on her and help her, didn't they?

9  A    They did, and I did.

10  Q    Because I think that you've told us, you said before that

11  Cletus and Judy trusted you, you-all?

12  A    From what I understood.  They told me they did.

13  Q    And you felt like they did?

14  A    They had no reason not to.

15  Q    So you felt like Cletus and Judy trusted you?

16  A    Yes.

17  Q    They trusted you with their grandchildren, didn't they?

18  A    Yes.

19  Q    You baby-sat for the grandchildren?

20  A    I did.

21  Q    And how many grandchildren do they have?

22  A    I have no idea.

23  Q    Well, how many have you baby-sat for?

24  A    Two or three.

25  Q    Okay.  And you know some of the others; right?

1  A    Yes, I do.

2  Q    You know — The ones that you baby-sat for, one would be

3  Blake; is that right?

4  A    Blake.

5  Q    How old is Blake?

6  A    It's been years since I seen Blake.  He's probably — I

7  don't know.  I don't know how old Blake is now.  He's probably

8  seven, eight now.

9  Q    Okay.  That's good.  Thanks.  He's the little boy we hear

10 on a lot of these recordings, isn't he, running around?

11 A    He is.

12 Q    He lives with Cletus and Judy?

13 A    To my knowledge, he did then.

14 Q    During that time, he did?

15 A    During that time, he did.

16 Q    Okay.  You've not been to their home recently; right?

17 A    No.

18 Q    So Cletus and Judy support Blake?

19 A    As far as I know.

20 Q    And Linsey is Blake's mother?

21 A    Yes.

22 Q    Linsey most of the time lives with Cletus and Judy?

23 A    As far as I know.

24 Q    Okay.  Certainly did back in that time period?

25 A    Yeah.

1   Q     When you were — you and your husband were visiting with

2   them two and three times a week?

3   A     Yes.

4   Q     And they were coming to your house fairly often?

5   A     Yes.

6   Q     So people who see each other that frequently are pretty

7   good friends; right?

8   A     Yes.

9   Q     You felt that way towards Cletus and Judy?

10  A     I did.

11  Q     And they felt that way towards you?

12  A     I think so.

13  Q     Over the years, you, Cletus and Judy and Kennon talked

14  about a lot of significant issues that we all have in life,

15  didn't you?

16  A     Yes.

17  Q     Okay.  One of the things that you talked with them about

18  was jobs and where people might work?

19  A     Yes.

20  Q     You had obviously — was the first time — Let me back up,

21  I shouldn't assume this.

22        That drug court application is February 15th —

23  A     Yes.

24  Q     — 2005.  Was that the first time that you applied for

25  drug court?

1  A    I'm not sure.

2  Q    How many times have you applied for drug court?

3  A    This is the one that I know of that I have in my

4  possession.  I know because I'm looking at it.

5  Q    And do you remember any other times?

6  A    No, I don't remember any other times.

7  Q    Okay.  So back then you had talked with Cletus Maricle

8  about a job in drug court?

9  A    Yes.

10  Q    Okay.  You had also talked back in the '90s about careers

11  and employment and that sort of thing with Judy and Cletus?

12  A    Yes.

13  Q    You went to real estate school, and you told us the name

14  of it but I didn't catch it.  Where did you go to real estate

15  school?

16  A    It's in Lexington, and it's called -- it was called

17  A-Pass-Weikel Institute.  I'm not sure if it's even there now.

18  Q    You took that after being encouraged to go into real

19  estate by Judy and Cletus?

20  A    I did.

21  Q    And Judy had a real estate business there in Manchester?

22  A    She did.

23  Q    Did you successfully complete that class?

24  A    I did.

25  Q    And you passed and got your -- got a license?

1  A    No, I didn't.

2  Q    Okay.  Did you ever take a test to get your license?

3  A    I did.

4  Q    But you didn't pass it?

5  A    No.

6  Q    You could go back and take that again, couldn't you?

7  A    I could.

8  Q    And at times Judy and Cletus encouraged you to go back and

9  do that again, didn't they?

10  A    I don't remember that.

11  Q    Do you remember on any of these recordings hearing a

12  discussion about going back to -- try to get back in your real

13  estate?

14  A    I don't remember.  If you would like to refresh my memory

15  on that, you may.

16  Q    Well, it's not that significant right now.

17  A    Okay.

18  Q    You remember -- Of course, you have worked as a

19  cosmetologist.

20  A    Yes.

21  Q    And you've worked -- in fact, you've cut hair for Cletus

22  and Judy and their children and grandchildren?

23  A    Yes.

24  Q    And do you recall talking with Judy Maricle and Cletus

25  Maricle about -- and, again, I'm talking about during the time

1  period that you were making these recordings, about going in

2  with somebody, getting a booth somewhere or getting a chair

3  somewhere to cut hair, suggesting that you go back into that

4  line of work?

5  A    Possibly.

6  Q    You do remember talking about that at some point; right?

7  A    Actually, I don't, but if you say they're on the

8  recordings, it's possible.

9  Q    Well, let me ask you, you have reviewed these recordings?

10 A    I have.

11 Q    Several times?

12 A    Several times.

13 Q    Fairly recently; right?

14 A    Yeah.  And if you recall, the recordings are substantial,

15 there's lots of them.

16 Q    There's lots and lots of them, isn't there?

17 A    Yes.

18 Q    Hours and hours?

19 A    Yes, there is.

20 Q    Lots of times you would go two-and-a-half or three hours

21 with the recorder running; right?

22 A    Yeah.

23 Q    Just estimating, would you tell us how many of those

24 recordings you think you made?

25 A    I would estimate, I don't know, 20, I don't know.

1  Q    So there are lots and lots of hours?

2  A    Yes.

3  Q    And it would be kind of unfair for me to expect you to

4  remember every single thing on there?

5  A    I would think so.

6  Q    I agree with that.  You talked not just about jobs, but

7  you talked about where you would live with Cletus and Judy?

8  A    Yes.

9  Q    When you — let me go back to when you say you first met

10 Linsey.  Where were you living at that time?

11 A    On Greenbriar, at — I'm thinking the address was Route 8,

12 Box 97.

13 Q    And that was — you and Kennon were married?

14 A    We were.

15 Q    And that was the home you-all owned?

16 A    Yes.

17 Q    Is that a place you-all lived for a number of years?

18 About how long?  Let me ask just about how long you lived

19 there?

20 A    We lived there more than a year.

21 Q    Does that mean less than two years or not?

22 A    No more than three years, I don't think.

23 Q    Somewhere a couple to three years you lived there?

24 A    Yeah.

25 Q    You knew Cletus and Judy at that point?

1  A    I did.

2  Q    When you—all moved from that house, did you sell it?

3  A    We did.

4  Q    Did Judy handle the real estate for you?

5  A    She did.

6  Q    Okay.  Where did you move to when you left Greenbriar?

7  A    We stayed on Greenbriar.

8  Q    Okay.  Bought another home on Greenbriar?

9  A    We built a home.

10 Q    Built one.  That is close to Manchester, but it's not in

11 the city; right?

12 A    I'd say it's roughly six or seven miles from Manchester.

13 Q    Outside the city limits?

14 A    Yes.

15 Q    How long did you and your husband and your children live

16 in that home?

17 A    Five years.

18 Q    So can you tell us about when you moved out of that home?

19 A    2003, somewhere in there.

20 Q    And just if I could back up a second, you and your husband

21 have two children?

22 A    We have two living children, yes.

23 Q    You have a son who's in high school still?

24 A    Yes.

25 Q    And you have a daughter who's graduated from college

1  already?

2  A     She graduated from UK, yes.

3  Q     And she's in graduate school now?

4  A     At Northern Kentucky, yes.

5  Q     She's engaged to be married?

6  A     She is.

7  Q     Who is she —

8           MR. SMITH:  Your Honor, I'm going to object to the

9  relevance.

10          THE COURT:  Sustained.

11          MR. HOSKINS:  Can we approach, Your Honor?

12          THE COURT:  You may.  Come on up.

13     (Whereupon, the following discussion was had between the

14  Court and counsel at the bench, out of the hearing of the

15  jury.)

16          MR. HOSKINS:  I'm sorry, Judge, I had to get a detail

17  quickly.  The relevance to this case is that the White's

18  daughter is engaged to marry Scott Madden's son, and we think

19  there's some other connections that would be developed later on

20  about Mr. Madden and connections, and so I think it's relevant

21  who she's going to marry.  It's a short question and answer.

22          THE COURT:  It is.  My concern is with a witness

23  who's been threatened, and there has been evidence that this

24  witness has been threatened.  I do want to make sure that there

25  is some relevance of putting family members' names and location

1   of where they live on public record.

2          MR. HOSKINS:  I understand, Judge.

3          THE COURT:  So there has to be relevance to the

4   question and you're assuring me as an officer of the court that

5   there is.

6          MR. HOSKINS:  Yes.

7          THE COURT:  All right.

8          Mr. Smith.

9          MR. SMITH:  Your Honor, I fail to see that there's

10  any relevance.  The fact that a child — Scott Madden decides

11  to marry a child of Wanda White, how that could be relevant.

12  There's been no mention of this child, Scott Madden, being

13  involved in any illegal activity or that he's in any way

14  associated with Cletus Maricle.  Now, his dad was partners, and

15  they were partners in a lot of things.  But what does that have

16  to do with his children?  And I feel strongly that it is an

17  area which there could be prejudice.  A government witness

18  comes in here and every government witness has to tell not only

19  about themselves and what they got themselves into, then to lay

20  out their children who are adults who are trying to make a

21  life, start a fresh slate, she's graduated from college, she's

22  got a new life started, and there's at this point a certain

23  amount of privacy, I think, that should extend to these

24  children.  And unless there's some proffer of some relevance

25  that I don't see, and I've studied this case for a long time,

1    I've been a part of this case for a long time, and I have yet
2    to hear Scott Madden's child being involved in anything.  And
3    so if Mr. Hoskins is aware of it, as an officer of the Court, I
4    am certainly going to take his representation, as this Court
5    will, but I can also represent as an officer of this Court, as
6    a member of this investigation since its inception, that I've
7    never heard of that child being involved.

8            THE COURT:  Mr. Hoskins, can you ask this question
9    without using the individuals' names?

10           MR. HOSKINS:  Well, I think the significance is that
11   it's to somebody in Scott Madden's family.

12           THE COURT:  All right.  Could you ask it that way?

13           MR. HOSKINS:  Okay.

14           THE COURT:  Why don't we do that.  And if we stay
15   away from where these people currently live, that might be help
16   as well.

17           MR. HOSKINS:  Sure.

18           THE COURT:  All right.

19           MR. HOSKINS:  Thank you, Judge.

20           MR. SMITH:  Thank you.

21       (Whereupon, the following proceedings continued in open
22   court.)

23           THE COURT:  All right.  Thank you, Counsel.

24           And, Mr. Hoskins, before you continue, I did want to
25   mention I'm going to need to break about 11:45 today, so we'll

 1  have a little bit longer lunch break.  I didn't want to

 2  interrupt your questioning, but when you get to about that

 3  time, I may tell you that it's time to take a break; okay?

 4          MR. HOSKINS:  Thank you, Judge.

 5          THE COURT:  Thank you.  And you may continue.

 6  BY MR. HOSKINS:

 7  Q    Ms. White, let me just ask the question this way.  Your

 8  daughter is going to be married, is engaged to be married to

 9  Scott Madden's son; right?

10  A    Yes.

11  Q    Okay.  That's all on that.

12       Somewhere in the materials I've looked at there was

13  indication that you had had — you had made the statement that

14  you and your husband were pretty much best friends with Rusty

15  Maricle and his wife, Robyn; is that right?

16  A    Yes.

17  Q    You–all were pretty close?

18  A    Pretty close friends.  I wouldn't say best friends, but,

19  yeah.

20  Q    You socialized with Rusty and Robyn?

21  A    We did.

22  Q    Went to their home?

23  A    We went to their home, they came to our home, we went to

24  clubs, we went to concerts, yes.

25  Q    And Rusty passed away about a year ago?

1    A    He did.

2    Q    I don't mean to embarrass you—all by asking these

3    questions, but you've already talked about some of the members

4    of your family that have had some problems with drugs and

5    criminal charges.

6    A    Yes.

7    Q    And that's something that you've been able to avoid over

8    the years, isn't it?

9    A    What's that?

10    Q    You've never been involved in drugs?

11    A    No, I have not.

12    Q    Or had any criminal charges against you?

13    A    No.

14    Q    And in your family, you are kind of the leader, you're

15    kind of the one that the other members of the family come to

16    when they have problems?

17    A    They rely quite a bit on me, if that's what you're asking

18    me.

19    Q    So you've been a trustworthy member to your family?

20    A    I've tried to be.

21    Q    And you've talked about your concerns with Travis and

22    Steven and Stephanie and your mom?

23    A    Concerns about what?

24    Q    Different problems that they've had?

25    A    What are you asking me?

1  Q    I'm just asking you, you have talked with Cletus and Judy

2  about the problems that your —

3  A    I have, yes.

4  Q    And they've been a sympathetic ear for you some of those

5  times, haven't they?

6  A    Yes.

7  Q    You remember on these recordings that we listened to

8  yesterday your husband was telling Judy and Cletus how terribly

9  upset you were, how sick to your stomach you were about having

10 to go and testify before a federal grand jury?

11 A    That's a common emotion, yes.

12 Q    And it was talked about quite a bit?

13 A    It was.

14 Q    And your husband, Kennon, said, you know, she just needs

15 somebody — she doesn't have anybody to talk to, she just needs

16 somebody to talk to; right?

17 A    Yeah, that's what he said, yes.

18 Q    I mean, he said that to Cletus Maricle and Judy Maricle?

19 A    Sir, we were instructed to say that.

20 Q    I understand that you were instructed to say that.  You

21 were instructed to say it to Cletus Maricle?

22 A    Yes.

23 Q    And to his wife, Judy Maricle?

24 A    Yes.

25 Q    Okay.  And that's who you said it to; right?

1   A    Yes.

2   Q    And that was in the hopes that Cletus and Judy would be

3   somebody for you to listen to, that they would listen to you;

4   right?

5   A    What are you asking me again?

6   Q    I'm asking you when you talked with the agents about what

7   you should say to Cletus and Judy.

8   A    Okay.

9   Q    The hope was on your part and on the agent's part that

10  Cletus Maricle and Judy Maricle would listen to what you were

11  saying?

12  A    I'm assuming that's –– yeah.  Yes.  I really don't

13  understand your question.

14  Q    Well, the instructions were given to you for a purpose?

15  A    Yes.

16  Q    And the purpose was to get Cletus and Judy to listen ––

17  A    Yes.

18  Q    –– to what you were saying?

19  A    Yes.

20  Q    And to get them to offer suggestions?

21  A    Yes.

22  Q    Get them to offer advice?

23  A    Yes.

24  Q    And, of course, you've already talked to us a little bit

25  about your brother, Corky ––

```
 1   A     Yes.
 2   Q     -- and when he got in trouble in 2005 when Tish Saylor,
 3   Natisha Saylor, had her throat cut?
 4   A     Again, what are you asking me?
 5   Q     That's what you've talked to us about already; right?
 6   A     No, I've not discussed that with you.
 7   Q     Well, you talked in the courtroom about it.  You and I
 8   haven't talked about it?
 9   A     I don't ever recall discussing Tish Saylor in this
10   courtroom.
11   Q     Well, I agree that her name didn't come up, but let's back
12   up, maybe I'm getting ahead of myself.  I don't mean to do
13   that, I don't mean to confuse you, so I apologize.
14   A     No, that's --
15   Q     You have talked about Corky being in jail?
16   A     I have talked about Corky being a drug addict, yes.
17   Q     Well, I'm not so much concerned about -- I'm not asking
18   you about Cordy being a drug addict.  But you have told the
19   jury in this case about your brother, Eugene Corky Price --
20   A     Yes.
21   Q     -- being in jail?
22   A     Yes.
23   Q     And being in Court where the judge was Cletus Maricle?
24   A     Yes.
25   Q     Okay.  And what we're talking about there is in April of
```

1   2005 Natisha Saylor was just about killed, wasn't she?

2   A    Yes.

3   Q    She had her throat cut?

4   A    Yes.

5   Q    She was left to die out somewhere near Horse Creek?

6   A    Yes.

7   Q    She almost did die, but she survived?

8   A    She did, yes.

9   Q    Okay.  Now, Corky got in trouble for that?

10  A    Yes.

11  Q    Corky went to jail for that?

12  A    No, he did not go to jail for that, he pleaded to assault,

13  which was a lesser sentence.  That's what he agreed to plead

14  to.

15  Q    Right.  He agreed to plead guilty to an assault charge?

16  A    Yes.

17  Q    And the person who was assaulted was Tish Saylor?

18  A    He agreed to a plea to an assault charge.

19  Q    And the person that he agreed to plead guilty to assault

20  was Tish Saylor or somebody else?

21  A    He agreed to plead to assault, that's all I can tell you.

22  Q    You don't know who it was?

23  A    I can — you're asking me what he agreed to plead to.  He

24  agreed to plead to assault.

25  Q    I'm asking you who was assaulted.

1  A     He didn't assault anyone.  That's what he agreed to plead

2  to.

3  Q     So nobody was assaulted?

4  A     He did not assault anyone.

5  Q     Was somebody assaulted then?

6         MR. SMITH:  Your Honor, I'm going to object to the

7  argument and, obviously, the relevance of this --

8         THE COURT:  Why don't you come up?  I do need to

9  discuss this matter.

10        (Whereupon, the following discussion was had between the

11  Court and counsel at the bench, out of the hearing of the

12  jury.)

13        THE COURT:  Mr. Hoskins, the impression that's given

14  by your questions is that Mr. Price was the one that cut this

15  lady's throat.  Now, my understanding from the preliminary

16  proceeding that we had was that he agreed that he delivered --

17  or he had transported this lady and dropped her off but that he

18  didn't physically assault her.  That's my understanding of the

19  evidence, but the inference from your question is that he's the

20  one that cut her throat.

21        MR. HOSKINS:  Your Honor --

22        THE COURT:  Is that the inference you're trying to

23  draw?

24        MR. HOSKINS:  It absolutely is not.

25        THE COURT:  Okay.  In that case, I'll sustain the

1   government's objections to your questions.

2   MR. HOSKINS:  Well, my argument is that they brought

3   this incident up, and the jury needs to know the whole story.

4   Under the law, Corky Price was guilty of that assault of Tish

5   Saylor when he delivered her to these other three people

6   knowing it was going to happen.  That's what he said he did

7   under oath.

8   THE COURT:  But that's not the inference that the

9   jury can draw from the questions that you've asked that he and

10  he alone assaulted an individual by cutting her throat.  That's

11  the inference from your questions.

12  MR. HOSKINS:  And I don't mean to give that inference

13  because that would be an incorrect inference and I want the

14  jury —

15  THE COURT:  That's why I'm sustaining the objection

16  to it.

17  MR. HOSKINS:  Then I do want to back up and talk

18  about it in some more detail about what happened.  But like I

19  say, I mean, I was getting to that point.  Because that's where

20  the testimony issue becomes important, is him testifying

21  against the people who did do it.

22  THE COURT:  All right.

23  MR. SMITH:  Judge, she testified that she engaged in

24  this scheme with Cletus Maricle at his direction and at some

25  point he promised her certain favors, including that he would

1   help her on her sentence.

2           THE COURT:  On Corky's sentence.

3           MR. SMITH:  On Corky's sentence.  And counsel now is

4   seeking to basically change now, and that wasn't — there

5   wasn't any discussion.  What is the relevance of the

6   underlying — whether or not — do we have to call in witnesses

7   now to prove who did the crime and who was involved in the

8   crime and what his role was?  Again, we go down this — what

9   probative value is there in this solicitation of the salacious

10  and the inflammatory details of a woman who got her throat cut

11  and who, again, the inference is obvious that it's being thrown

12  in the lap of Eugene Price, and I think we're forced now to

13  make some rectification of the record on that issue.  But to

14  further explore it, I just object to relevance.

15          THE COURT:  We're not going to try that case

16  completely.

17          MR. HOSKINS:  I understand that, Judge.  I don't want

18  to bring in Tish Saylor and have her testify about that.  But

19  the relevance is that Wanda White has changed her story or has

20  given details in trying to make this accusation against Judge

21  Maricle that can be proven to be untrue based on timing, based

22  on actual facts, based on things Corky Price said.  I have no

23  intention of trying to mislead the jury on any point related to

24  this, and I'll make it very clear Corky Price didn't cut this

25  girl's throat, but her throat was cut and in every assault

1    there has to be a victim, he pled guilty to assault.  If she

2    had answered the question when she knew the answer, we would

3    have avoided all this.

4            THE COURT:  All right.  Well, there may be some

5    relevancy to this.  I can see, though, where the government's

6    then going to be able to get back into matters that were

7    touched on in direct with respect to promises that were made.

8    I do understand your point, that you're at least in part

9    attempting to show that your client was not lenient on this

10   individual.  It does get us into some collateral matters and

11   issues that were raised earlier about shock probation and

12   things of that nature.  So I'll give you a little bit of

13   latitude, but to give the impression to the jury that Corky

14   Price and Corky Price alone cut this lady's throat is the wrong

15   impression to give to the jury and your questions so far have

16   given that impression.  So I have sustained the objection to

17   those questions.

18           MR. HOSKINS:  Okay.

19           THE COURT:  But do you want to rephrase the question?

20   I haven't sustained it in front of the jury yet, but if you

21   want to rephrase the question, withdraw it and rephrase it,

22   I'll let you do that.

23           MR. HOSKINS:  Okay.  Well, I would withdraw that

24   question, and, I mean, I could go into more detail as I asked

25   the question that what Corky Price pled guilty to was

1  delivering Tish Saylor to three people that he knew were going

2  to do her harm.

3           THE COURT:  Rather than what did she understand his

4  role to be in that matter.

5           MR. HOSKINS:  Yes.

6           MR. SMITH:  Judge, the witness is allowed to state —

7  whether she states what Mr. Hoskins wants or not, it's his

8  witness right now.  But her understanding was he pled to

9  assault.  Now he's wanting to interject the underlying factual

10 basis for the plea of guilty to assault through her when at

11 this point he has no foundation to believe that she has that

12 knowledge.

13          MR. HOSKINS:  The problem, Judge, is that the

14 government relied on this story to detain Mr. Maricle when he

15 was first arrested.  Now they're trying to run away from it.

16          THE COURT:  The issue of detention isn't before the

17 jury.

18          MR. HOSKINS:  I understand it's not.  But statements

19 that were made in connection with that are statements that can

20 be brought out if they're inconsistent with what a witness

21 testifies to.  And it shows a motivation.  The fact is that

22 this very incident shows the bias that Wanda White had towards

23 my client because he wouldn't let her out.  He made a deal.

24          THE COURT:  Him out.

25          MR. HOSKINS:  Wouldn't let Corky Price out of jail.

1    Corky Price, through his attorney, made an agreement with the

2    Commonwealth's Attorney in Clay County that he would get

3    probated.  He entered his plea and the Commonwealth Attorney

4    wanted him out on bond.  Judge Maricle declined to do that.

5    And then, even though the agreement was for probation, Judge

6    Maricle didn't probate him.

7           THE COURT:  Well, here's the problem:  As we sit

8    here, I don't know that this witness can testify about all of

9    those details, the underlying -- of the underlying offense or

10   of the agreement, the plea deal, or whatever it might have

11   been.  She can testify about what she knows, what she observed

12   in conversations that she had with Mr. Maricle, for example,

13   but for her to then explain, for example, what the deal was, I

14   think is outside the scope of her knowledge.

15          MR. HOSKINS:  She's allowed to testify if it was for

16   probation.

17          THE COURT:  But you're getting into the minutia of

18   that.

19          MR. HOSKINS:  No, just -- all I want to get into is

20   that -- what I'm saying, the very fact that she thought the

21   deal was -- and it was for probation, Judge Maricle refused to

22   accept that deal, is motivation for her to have animosity

23   towards my client.  And I think it's fertile ground and quite

24   appropriate for us to explore that.

25          THE COURT:  All right.  Well, I'm not preventing you

1  from doing that, but, as I said, we can't try that case, we

2  can't try the assault case here in this proceeding.  That

3  clearly would be a collateral matter.  Now, in terms of

4  credibility, she's made an inconsistent statement, yes, but

5  again, we can't — when you came up here, it appears to me that

6  you're misleading the jury by implying that Corky Price is the

7  one that cut this lady's throat.  That's how we started this

8  conversation.  But if it's relevant for some issue, you can get

9  to the point and get to the relevancy of it.  But, you know,

10  we've spent 15 minutes on this at this point, so now we're at

11  our break.  So over the break, you can discuss with your

12  co-counsel how you want to get to that point, but we can't try

13  that issue, we can't try the assault case —

14          MR. HOSKINS:  I understand.

15          THE COURT:  — in this proceeding.  And it may be

16  relevant, but you can't give an incorrect impression to the

17  jury that Corky Price assaulted Tish Saylor by cutting her

18  throat.

19          MR. HOSKINS:  I assure the Court my intention was not

20  to do that, to show what the actual act was.

21          THE COURT:  That's my impression of what you just

22  said in front of the jury.  So we're going to go back and we're

23  going to have a restart after we come back from our lunch

24  break.

25          MR. HOSKINS:  Judge, my proposed way to deal with

1  that is the question as I rephrased it, that what he pled

2  guilty to was to delivering this woman, Tish Saylor, to three

3  people who he knew meant to do her harm.

4         THE COURT:  And if she has knowledge of that, then

5  she can answer it and you can go from there in terms of any

6  inconsistent statements that might have been made.

7         MR. PINALES:  As long as we're up here —

8         THE COURT:  Mr. Pinales.  I'll mention your name so

9  the reporter knows.

10        MR. PINALES:  Thank you.  I would like to make sure

11 the Court admonishes this witness she may not discuss her

12 testimony with anybody over the lunch break.

13        THE COURT:  I don't know if her attorney is here,

14 but, of course, she can talk to her attorney.

15        MR. PINALES:  Sure.

16        THE COURT:  All right.  I'll excuse the jury first.

17        MR. PINALES:  Yes.

18        THE COURT:  Thank you.

19     (Whereupon, the following proceedings continued in open

20 court.)

21        THE COURT:  All right.  Thank you.

22        Ladies and gentlemen, my extended conversation with

23 the attorneys has taken us up to the lunch break.  I did tell

24 you we were going to break a little bit earlier today.  So we

25 will break for lunch at this time until 1:00.  Please keep in

1   mind the admonition that you've been given several times in the

2   case not to discuss the matter while we are in recess, and the

3   jury will be excused until 1:00.

4        (Whereupon, the jury retired from the courtroom, after

5   which the following proceedings were had in open court.)

6            THE COURT:  And, Ms. White, we'll start back at 1:00.

7   Remember, of course, you can't speak with any potential

8   witnesses in the case.  You can talk with your attorney if he's

9   present, but you can't talk with anyone that might be

10  testifying in the case later.

11           THE WITNESS:  Okay.

12           THE COURT:  All right.  We will be in recess until

13  1:00 this afternoon.

14       (Whereupon, a recess was had for the noon hour, after

15  which the proceedings continue uninterrupted to Volume 12-B.)

16                  (Proceedings concluded at 11:47 a.m.)

17              C E R T I F I C A T E

18       I, Cynthia A. Oakes, certify that the foregoing is a

19  correct transcript from the record of proceedings in the

20  above-entitled matter.

21

22  2/28/2010                      s/CYNTHIA A. OAKES
        DATE                       CYNTHIA A. OAKES, RPR, RMR, CRR
23

24

25

I N D E X

PAGE

Testimony of WANDA WHITE:
        Continued Direct Examination by Mr. Smith:     29
        Cross-Examination by Mr. Hoskins:     86

E X H I B I T S

| Government's Exhibit No. | Identified | Page Admitted |
|---|---|---|
| D5 | 45 | 46 |
| D11 | 39 | 41 |
| D12 | 42 | 43 |
| D16 | 34 | 36 |
| D73 | 18 | 64 |

| Court Exhibit No. | Identified | Page Admitted |
|---|---|---|
| 1 | 81 | 82 |