United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
|  vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 2, 2010 |
| DOUGLAS C. ADAMS | ) 8:58 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 16-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                JASON D. PARMAN, ESQ.

On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:         MARTIN S. PINALES, ESQ.

On behalf of the Defendant      R. KENT WESTBERRY, ESQ.
Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant      T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant      ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:             R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant      JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States:  STEPHEN C. SMITH, ESQ.
                                      JASON D. PARMAN, ESQ.
 3                                    Assistant U.S. Attorneys
                                      601 Meyers Baker Road
 4                                    Suite 200
                                      London, Kentucky  40741
 5

 6   On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:          107 East First Street
 7                                     Corbin, Kentucky  40701

 8                                     MARTIN S. PINALES, ESQ.
                                       150 East Fourth Street
 9                                     Federal Reserve Building
                                       Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant       R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.
12                                     220 West Main Street
                                       Suite 1900
13                                     Louisville, Kentucky  40202

14
     On behalf of the Defendant       T. SCOTT WHITE, ESQ.
15   Charles Wayne Jones:             133 West Short Street
                                       Lexington, Kentucky  40507
16

17   On behalf of the Defendant       ROBERT L. ABELL, ESQ.
     William E. Stivers:              120 North Upper Street
18                                     Lexington, Kentucky  40507

19
     On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
20   Freddy W. Thompson:              R. TUCKER RICHARDSON III, ESQ.
                                       300 West Short Street
21                                     Lexington, Kentucky  40507

22

23   On behalf of the Defendant       JERRY W. GILBERT, ESQ.
     William B. Morris:               212 North Second Street
24                                     Richmond, Kentucky  40475

25
```

```
 1   On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                  201 West Short Street
 2                                      Lexington, Kentucky   40507

 3
     On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
 4   Stanley Bowling:                  116 West Main Street
                                        Suite 2A
 5                                      Richmond, Kentucky   40475

 6
     Court Reporter:                   CYNTHIA A. OAKES, CRR
 7                                      Official Court Reporter
                                        United States District Court
 8                                      560 Athens Boonesboro Road
                                        Winchester, Kentucky   40391
 9                                      (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

 1         (Whereupon, the jury entered the courtroom, after which

 2   the following proceedings were had in open court.)

 3              THE COURT:  Thank you.  And good morning.

 4              The record will reflect that all members of the jury

 5   are present.  All parties and counsel are also present.

 6              Let's see, I believe we're ready for a new witness,

 7   Mr. Smith?

 8              MR. SMITH:  Yes, Your Honor.  The United States will

 9   call Ray Adams.

10              THE COURT:  Thank you.

11                        RAY ADAMS,

12   having been first duly placed under oath, was examined and

13   testified as follows:

14              THE COURT:  Thank you.

15              Mr. Smith, you may proceed.

16              MR. SMITH:  Thank you.

17                   DIRECT EXAMINATION

18   BY MR. SMITH:

19   Q    Good morning, sir.  Would you state your name for the

20   record, please?

21   A    Ray Adams.

22   Q    Hi, Mr. Adams.  Could you tell us where you live

23   currently?

24   A    Manchester, Kentucky.

25   Q    And how long have you lived in that area, sir?

```
 1   A      All my life.

 2   Q      And are you a married man?

 3   A      Yes.

 4   Q      And do you have children?

 5   A      Yeah, three children.

 6   Q      And what are their ages?

 7   A      One boy is 40, girl is 37, and the other one is 27.

 8   Q      Okay.  And, sir, as you've lived there in Manchester, have

 9   you held jobs in the past?

10   A      Yes.

11   Q      And what kind of jobs have you held in the past, sir?

12   A      Well, I was a meat cutter for about 12 or 14 year and then

13   I worked for Frito Lay for 30 year, retired two year ago.

14   Q      What did you do for Frito Lay, sir?

15   A      Salesman.

16   Q      And did that require you to travel in the local area or

17   were you outside the local area?

18   A      Yeah, I worked —— at one time I was working three

19   counties.

20   Q      Okay.  And when did you retire from that job?

21   A      Two year ago.

22   Q      Okay.  And as that retirement came, have you sought public

23   office, sir?

24   A      Yes.

25   Q      And what position did you first seek for public office?
```

1    A    Magistrate.

2    Q    And what district was that?

3    A    District One.

4    Q    And could you tell us generally what precincts District

5    One takes in?

6    A    It takes in Garrard, Manchester, and East Manchester.

7    Q    Okay.  And your first bid was 2002.  Were you successful

8    that year?

9    A    No.

10   Q    And if you could, tell us, sir, during the 2002 election,

11   were you ever approached by a man by the name of William

12   Stivers?

13   A    Yes.

14   Q    Do you know him by any other name?

15   A    Al Man.

16   Q    Okay.  And if you could, sir, tell us how it was that you

17   and Mr. Stivers met back in 2002 prior to the election.

18   A    Pardon?

19   Q    If you could, tell us about that meeting that you had with

20   Mr. Stivers prior to the election day in 2002.

21   A    Him and another fella came to my house and they wanted to

22   put me on the ticket to run, you know, for magistrate and he

23   asked me for $6,000.

24   Q    Do you know who the other fella was that was with him?

25   A    Yes.

1    Q    What was his name?

2    A    Jeff Farmer.

3    Q    And you say they came by your house?

4    A    Yeah.

5    Q    Have you been living at the same place?

6    A    Yes.

7    Q    And that was the Manchester home that you live in now?

8    A    Yes.

9    Q    And you say they came by.  Do you know how far in advance

10   of the election it was they came by your house?

11   A    No, I don't.  I don't exactly know.  It was pretty close.

12   Q    Okay.  And you said that they talked to you in terms of

13   money.  How much money did they ask you for?

14   A    $6,000.

15   Q    And what did you tell them?

16   A    I told them no, I didn't want to win it that way and I

17   didn't have the money to do nothing like that no way.

18   Q    Now, they referred to putting you on a ticket.  Did you

19   know what they meant by that?

20   A    No.

21   Q    Okay.  Did you ask them to explain it to you any more?

22   A    No.

23   Q    Did you get approached any more by Mr. Stivers before that

24   election in 2002?

25   A    Yes, he come back a week or maybe two weeks after that and

1  rung the doorbell, and I went to the door and he asked me had I

2  changed my mind and I said no and he left.

3  Q    Okay.  Do you know if Mr. Stivers served at the polls in

4  2002 as an officer?

5  A    I don't know whether he was an officer or a challenger,

6  but he was there.

7  Q    And which poll did you see him at during the 2002

8  election?

9  A    Garrard precinct.

10  Q    And does that Garrard precinct, does it have a location

11  that's at a school somewhere there?

12  A    Yes, Paces Creek Elementary School.

13  Q    Were you around the poll that day to vote yourself?

14  A    Yes.

15  Q    Could you describe for the ladies and gentleman of this

16  jury and the Court the atmosphere that you witnessed during

17  that 2002 election day?

18  A    I voted early that morning, and at that time, it wasn't

19  that bad, I got in.  But on up in the day, they was a line, it

20  took you like two hours to vote.

21  Q    Have you voted pretty often over the years there?

22  A    Every election.

23  Q    Have you ever seen it any more heavy in volume of voters

24  than you did in 2002, sir?

25  A    No.

RAY ADAMS - CROSS - MR. ABELL                    9

1   Q   Did you try for public office at a later time?

2   A   Yes, in '06.

3   Q   And were you successful in '06?

4   A   Yes, I was.

5   Q   And were you approached by anyone to join and be on a

6   ticket in 2006?

7   A   No.

8          MR. SMITH:  I'll pass the witness.

9          THE COURT:  Thank you.

10         MR. PINALES:  No questions, Your Honor.

11         MR. WESTBERRY:  No questions.

12         MR. WHITE:  No questions, Your Honor.

13         THE COURT:  All right.  Mr. Abell.

14         MR. ABELL:  Judge, a few.

15                   CROSS-EXAMINATION

16  BY MR. ABELL:

17  Q   My name is Robert Abell, and I represent William Stivers

18  in this case.

19      After you announced you were running for office in 2002,

20  it sounds to me like Mr. Stivers and Mr. Farmer came to see you

21  at your home; correct?

22  A   Yes.

23  Q   Their suggestion to you, if I understand your testimony,

24  was that if you had $6,000 to invest in your campaign your

25  prospects for winning would be better; is that fair?

MARCUS MCKISSIC DIRECT - MR. SMITH                10

1  A    I don't know if that's what they meant or not.  But, I
2  mean, it — that's what he asked me for.
3  Q    Okay.  You're really not sure what they meant but you were
4  sure you didn't have the money to put up; is that fair?
5  A    Yes.
6          MR. ABELL:  Okay.
7          Nothing further, Judge.
8          THE COURT:  All right.  Thank you.
9          Anything else for any of the other defendants?
10     (No response.)
11         THE COURT:  All right.  Any redirect of the witness?
12         MR. SMITH:  No, thank you, Your Honor.
13         THE COURT:  All right.  Thank you, sir, and you may
14  step down.
15         Mr. Smith, you may call your next witness.
16         MR. SMITH:  Marcus McKissic.
17         THE COURT:  Thank you.
18                    MARCUS MCKISSIC,
19  having been first duly placed under oath, was examined and
20  testified as follows:  Thank you.  Mr. Smith, please proceed.
21                    DIRECT EXAMINATION
22  Q    Good morning.
23  A    Good morning.
24  Q    State your name, please.
25  A    My name is Marcus McKissic.

1   Q    Okay.  And, Mr. McKissic, where do you live?

2   A    I live at 221-D Town Branch Road, Manchester, Kentucky.

3   Q    And, sir, are you married?

4   A    I'm divorced.

5   Q    Okay.  And at the time that — You say you're currently

6   living in Manchester.  How long have you lived there?

7   A    I've lived there — I moved there in '07.

8   Q    And were you living somewhere else prior to that time?

9   A    Yes, sir.  I was living in Tucson, Arizona.

10  Q    And what were you doing in Tucson, Arizona, Mr. McKissic?

11  A    I was the facility manager at the federal complex in

12  Tucson, Arizona.

13  Q    And could you explain to us who you were employed by?  Is

14  there a Bureau of Prisons that employed you at that time?

15  A    Yes, sir, I had been employed with the Bureau of Prisons

16  for 17 years and I just kept traveling around, moving around,

17  and I wound up as the associate warden at the USP McCreary

18  County, Kentucky.

19  Q    Okay.  And McCreary County, is that some distance from

20  Clay County?

21  A    It's about an hour-and-a-half drive, yes, sir.

22  Q    Okay.  Now, you returned to Clay County in 2007.  Are you

23  originally from that area?

24  A    Yes, sir, I was born and raised in Manchester, Kentucky.

25  Q    How long had you been away from Manchester once you

 1  returned in 2007, sir?

 2  A    Seventeen year.

 3  Q    So your job required you to live in different cities

 4  across the country?

 5  A    Yes, sir.  If I wanted to promote, yeah.

 6  Q    Now, in May of 2006 and November of 2006, could you tell

 7  us where you were living at that time?

 8  A    I was living in Tucson, Arizona.

 9  Q    Okay.  And were you in Clay County to vote as a voter in

10  either of those elections in November or May, to your

11  recollection?

12  A    No, sir.

13  Q    When was the last time that you voted as a voter in Clay

14  County, sir?

15  A    2008.

16  Q    Okay.  And that was after you moved back in '07; is that

17  correct?

18  A    Yes, sir.

19  Q    And before '07, when was the last time that you voted?

20  A    Probably in '92 or something like that.

21  Q    Okay.  So many, many years back?

22  A    Many, many years, yeah.

23         MR. SMITH:  All right.

24         I would like to hand to the witness what's marked as

25  Government's Exhibit PR31C.

1  BY MR. SMITH:

2  Q    Sir, on that first page there, do you see that in front of

3  you in this exhibit listed PR31C, do you see on page one the

4  name Marcus McKissic written in a printed form on the second

5  column down, line number two?

6  A    Yes, sir.

7  Q    And above that, do you see the date of the election?

8  A    Yes, sir.

9  Q    Could you tell us what date the election was on this

10 exhibit?

11 A    November the 7th, 2006.

12 Q    Okay.  There appears to be a signature next to the name

13 Marcus McKissic, do you see that on, again, the block called

14 "signature line"?

15 A    Yes, sir.

16 Q    And this says, "Absentee Ballot Signature Roster."  Is

17 that your signature, sir?

18 A    No, sir.

19 Q    I would like to hand you now what's marked as Government's

20 Exhibit PR33.  It should be PR33, at the top it says "Voter

21 Absentee Ballot Application."  Do you see down in the middle of

22 that document a signature of applicant dated 10-22-2006?  Do

23 you see a signature next to that date?

24 A    Yes, sir.

25 Q    Is that your signature, sir?

 1  A    No, sir.

 2  Q    At the top of this document, sir, it's also got a printed

 3  out name.  Whose name does it have printed out there?

 4  A    It has my name, Marcus McKissic.

 5  Q    And it says, "Where you will be on election day," and it

 6  says what?

 7  A    Tucson, Arizona.

 8  Q    Yes, sir.  Does that appear to be, again, a representation

 9  of your actual name and actual place where you were during that

10  time period?

11  A    Yes, sir.

12  Q    And can you explain to these ladies and gentlemen of the

13  jury how these voter application and this voter signature on

14  the roster form got put there?

15  A    Well, I have no idea really how the signature got here.

16  But I was building a house in Manchester, Kentucky, in 2006 and

17  I was in from Tucson checking on it every now and then, but as

18  far as the signature or anything as far as voting, anything

19  like that, I didn't have anything to do with that.

20  Q    So if somebody voted under the name of Marcus McKissic, it

21  wasn't you; is that what you're saying, sir?

22  A    No, that's not — that wasn't me.

23           MR. SMITH:  Thank you.

24           Pass the witness.

25           MR. HOSKINS:  No questions.

 1              THE COURT:  Any questions?

 2              MR. WESTBERRY:  Nothing.

 3              MR. WHITE:  No questions.

 4              THE COURT:  All right.  Thank you.  You may step

 5   down, sir.  You can leave those documents there.

 6              Okay.  Mr. Parman?

 7              MR. PARMAN:  Yes, Your Honor, the United States calls

 8   James Douglas Coleman.

 9                        JAMES DOUGLAS COLEMAN,

10   having been first duly placed under oath, was examined and

11   testified as follows:

12              THE COURT:  Okay.  Thank you.

13              Mr. Parman, you may proceed.

14              MR. PARMAN:  Thank you, Your Honor.

15                        DIRECT EXAMINATION

16   BY MR. PARMAN:

17   Q    Good morning, sir.

18   A    Good morning.

19   Q    Would you state your name, please?

20   A    James Douglas Coleman.

21   Q    Sir, how old are you?

22   A    Thirty-one.

23   Q    Where are you from?

24   A    Manchester, Kentucky.

25   Q    How long have you lived there in Manchester?

1   A   All my life.

2   Q   Are you married?

3   A   No.

4   Q   Do you have any kids?

5   A   No.

6   Q   Are you currently employed?

7   A   I do odd jobs, not steady income.

8   Q   How long has it been since you've had a steady income?

9   A   A couple of year.

10  Q   Sir, did you vote in 2002?

11  A   Yes.

12  Q   In 2002, did you sell your vote?

13  A   Yes.

14  Q   Who bought your vote in 2002?

15  A   Darnell Hipsher.

16  Q   Could you state the name again?

17  A   Darnell Hipsher.

18  Q   How much did he pay you for your vote?

19  A   Twenty to $25.

20  Q   Where did he buy your vote from?

21  A   I was paid behind Speedway at Bart Morris's driveway.

22  Q   Was there a way that you were identified as having

23  correctly voted the way you were supposed to?

24  A   Yeah.

25  Q   How so?

1   A    They marked my hand, dotted it with a marker.

2   Q    How did you know how to vote?

3   A    Darnell Hipsher, he give me the –– he's like, go vote,

4   vote for me and like these guys, Vernon Hacker.  There was at

5   least a couple of them that I had to vote for.

6   Q    There was a group of people that you were supposed to vote

7   for?

8   A    Yes, sir.

9   Q    And after you voted, you were then paid?

10  A    Yes.

11  Q    And where were you paid again?

12  A    At Bart Morris's house in the driveway.

13  Q    Now, did you vote again in 2006?

14  A    Yes.

15  Q    Would that have been the spring or the fall?

16  A    It was the fall.

17  Q    And were you paid to vote in 2006?

18  A    Yes.

19  Q    Do you recall how much you were paid to vote?

20  A    The same thing, I got 20, $25.

21  Q    Who paid you to vote?

22  A    Darnell.

23  Q    Was there a slate of candidates you were supposed to vote

24  for then?

25  A    Yeah, it was like the same setup, the same group of –– as

1  before.

2  Q    Where were you paid from then?

3  A    Bart Morris's driveway.

4  Q    Did you see Bart Morris at the house when you were paid to

5  vote?

6  A    Yeah, he was like in the garage.

7  Q    How did you know that you could be paid to vote in both

8  2002 and 2006?

9  A    It was just word of mouth.  People that I knows, like if

10  you'll make — you know, if you'll make — you can sell your

11  vote down there, Darnell will give you 20, $25, you know, to

12  vote for him and, you know, their little group.

13  Q    So it was known in the community that's where you would go

14  to get paid for your vote?

15  A    Yes.

16          MR. PARMAN:  Can I have just a moment, Your Honor?

17          THE COURT:  Yes, sir.

18          MR. PARMAN:  That's all I have, Your Honor, thank

19  you.

20          THE COURT:  All right.  Thank you.

21          Let's see if — Mr. Hoskins, any questions?

22          MR. HOSKINS:  Just briefly, Your Honor.

23          THE COURT:  Yes, sir.

24                    CROSS—EXAMINATION

25  BY MR. HOSKINS:

1   Q     Good morning, my name is David Hoskins, and I represent

2   Cletus Maricle.

3   A     Yes.

4   Q     I just want to make sure that I understand what you're

5   telling us.  2002, when you voted, you voted for Darnell that

6   paid you for your vote?

7   A     Yes.

8   Q     And you also voted for Vernon Hacker?

9   A     The best I remember, yes.

10  Q     Do you remember anybody else that you voted for in that

11  election?

12  A     Not right offhand.

13  Q     Darnell and Vernon were both city council people in

14  Manchester; right?

15  A     I assume, yeah.

16  Q     Okay.  And then 2006, when you again sold your vote to

17  Darnell, you voted for the city council people, the same group

18  rather?

19  A     Yes.

20          MR. HOSKINS:  All right.

21          That's all, thank you.

22          THE WITNESS:  Okay.

23          THE COURT:  Let me see if we have anyone else that

24  has some questions?

25          Mr. Gilbert, you have some questions?

1          MR. GILBERT:  Yes, sir.

2          THE COURT:  Yes, sir.

3                         CROSS–EXAMINATION

4    BY MR. GILBERT:

5    Q    Mr. Coleman, Jerry Gilbert, I represent Bart Morris.

6    A    Yes.

7    Q    Do you remember which election it was in 2002 that you're

8    referring to?

9    A    I'm thinking it was the one in the fall.

10   Q    In the fall?  And what about '06?

11   A    In the fall.

12   Q    In the fall?  Both fall elections?

13   A    Yes.

14   Q    Now, in both of those times, you paid — you were paid by

15   Darnell Hipsher; is that right?

16   A    Yes.

17   Q    And the first election he wanted you to vote for himself

18   and Vernon Hacker?

19   A    Yes.

20   Q    And the same two people in '06?

21   A    Yes.

22   Q    Now, Bart Morris didn't pay you, did he?

23   A    No.

24          MR. GILBERT:  That's all.

25          THE COURT:  Anyone else?

1          MS. HUGHES:  No, sir.

2          THE COURT:  Thank you.

3          Any redirect of the witness?

4          MR. PARMAN:  Just briefly, Your Honor, if I may from

5  here.

6          THE COURT:  Yes, sir.

7                      REDIRECT EXAMINATION

8  BY MR. PARMAN:

9  Q    Sir, in these elections in 2006, do you recall everybody

10  you were asked to vote for?

11  A    No, sir.

12  Q    But you do recall that there was a slate or a group of

13  individuals you were supposed to vote for?

14  A    Yes.

15  Q    Now, the same in 2002, do you recall every single person

16  on that slate?

17  A    No.

18  Q    But you do recall that there was a slate or group of

19  people you were supposed to vote for?

20  A    Yes.

21          MR. PARMAN:  That's all I have, Your Honor.

22          THE COURT:  All right.  Let's see if there's anything

23  else.  Anyone?

24      (No response.)

25          THE COURT:  No?

1            Thank you, sir, you may step down.

2            Mr. Smith.

3            MR. SMITH:  Billy Ray Sester.

4            THE COURT:  Thank you.

5                        BILLY RAY SESTER,

6   having been first duly placed under oath, was examined and

7   testified as follows:

8                        DIRECT EXAMINATION

9   BY MR. SMITH:

10  Q    Good morning.

11  A    Good morning.

12  Q    State your name, please.

13  A    Billy Ray Sester.

14  Q    I see you found that microphone, you're doing good.  Just

15  adjust it if you need to.

16  A    Okay.

17  Q    Mr. Sester, where do you currently live?

18  A    Manchester, Kentucky.

19  Q    And do you work somewhere down that way?

20  A    No, actually, sir, I work in London.

21  Q    Okay.  And what do you do in London?

22  A    I work for Shaw & Jones Masonry.

23  Q    And are you-all in a construction project down there in

24  London?

25  A    Yes, we're building the new St. Joseph's Hospital.

1   Q    And how long have you been working with this crew?

2   A    Next month will be —— April the 5th will be a year.

3   Q    Okay.  And how long have you lived in the Manchester area,

4   Mr. Sester?

5   A    For 38 year.

6   Q    Okay.  And during that time period, have you been a voter

7   over there in various elections?

8   A    Yes, I have.

9   Q    And do you recall a point in time when Bart Morris and

10  Kennon White came to your house and visited you about one of

11  the elections?

12  A    Yes, I do.

13  Q    Tell us what you remember.

14  A    Well, me and my wife, we were sitting on the couch one

15  night and someone knocked on the door, and I opened the door

16  and it was Kennon White and Bart Morris, and like, "Hey, Bill,

17  they said, "you want to try to help us out?"  And I was like,

18  "Yeah, guys," I said, "I got to work, you know," but I said,

19  you know, "If I can get my aunt or sisters or somebody, you

20  know, that's willing to vote," I said, "I'll help you whatever

21  way I can."

22  Q    Okay.  Did you sell your vote?

23  A    Yes, sir, I did.

24  Q    And do you recall when you sold your vote?

25  A    It was in the 2006 mayor election.

BILLY RAY SIZEMORE - DIRECT - MR. SMITH          24

1   Q    Okay.  How much were you paid, sir?

2   A    $20.

3   Q    And where did you go to get that money, sir?

4   A    Nowhere actually.  I was just coming down Town Branch Road

5   there and Mr. Morris and Darnell Hipsher, they was behind me,

6   and I pulled in at JR's Handy Mart there and they pulled in

7   behind me, and they gave me $20 there.

8   Q    And had you voted at that point?

9   A    Yeah, I had already voted.

10  Q    Okay.  And at that time you took $20, you believe?

11  A    Yes.

12  Q    Is that cash?

13  A    Yes.

14  Q    Okay.  Had you talked to someone about how you were to

15  vote before you went and cast your vote?

16  A    I'm really not for sure about that one.

17  Q    Did they ask you who you voted for?

18  A    When I -- when they came to the house, they told me who

19  they was for and everything like that.

20  Q    Okay.  Before you voted?

21  A    Yeah, before I voted.

22  Q    So they knew. or at least you knew from that conversation

23  who they wanted you to vote for?

24  A    Yes, pretty much so.

25  Q    And when they met you at the Handy Mart, did you

1 acknowledge to them or admit to them that you did vote for them

2 as they wanted you to?

3 A    Well, I really can't recall, but I'm going to go ahead --

4 I'm going to go out on a limb and say yes, I did.

5 Q    You don't recall what was said before you got the $20?

6 A    No.  But, I mean, I knew who they wanted me to vote for

7 and everything and, you know, I --

8 Q    Had you done this before, sir?

9 A    Yes, I have.

10 Q    How many times have you sold your vote, sir?

11 A    More than twice probably.  But that -- you know, that's

12 been since I was 18 year old.

13 Q    And had you -- did you have a relationship with Bart

14 Morris prior to this 2006 election, did you know him?

15 A    Yeah, Bart was a friend of mine.

16 Q    Okay.  And how long had he been a friend of yours?

17 A    Well, I worked for the City of Manchester and I got to

18 know Bart through the City of Manchester.

19 Q    Okay.  How long did you work for the City of Manchester?

20 A    Roughly six year.

21 Q    Okay.  Now, when you went to vote, were there election

22 officers that you recall seeing when you went in to vote?

23 A    Yes, sir.

24 Q    And do you recall who they were, their names?

25 A    Well, Wanda White was there, Charles "Dobber" Weaver,

BILLY RAY SESTER DIRECT - MR. SMITH                26

1  Steven Price — or not — what is that guy's name?  He's Wanda

2  White's little brother.  Travis Price, that's his name.  And

3  Charles Ray Lewis was there and —

4  Q    Let me ask you this, Mr. Sester:  Who did you recognize as

5  being working at the poll at the time?  All these people or

6  just some of them?

7  A    Well, no, the only two people back — you know, where you

8  go back to vote at —

9  Q    Yes, sir.

10  A    — was Wanda White and Charles Weaver.

11  Q    Okay.  And when you voted, did they watch you vote?

12  A    Well, no, they didn't actually watch me vote, but, I mean,

13  they was standing probably — they was closer than I am to you,

14  you know, behind me.

15  Q    They were behind you when you voted?

16  A    Yeah.

17  Q    Did you have a conversation with either one of them?

18  A    No.

19  Q    Who was closest to you, Wanda White or Charles Weaver?

20  A    Ms. White.

21  Q    How close was she, sir?  Do you know, if you could

22  estimate?

23  A    Between six to eight feet.

24  Q    Six to eight feet?

25  A    Uh-huh.

BILLY RAY SESTERS DIRECT - MR. SMITH          27

1  Q    But she was behind you?

2  A    Yes.

3  Q    Okay.  Had Bart Morris helped you in the past with certain

4  things that you had gotten in trouble over?

5  A    Well, yeah, one time I had got caught for -- I was on

6  probation right there and I got caught for AI or something

7  there, and I just didn't want to go in front of the judge, you

8  know, because I was afraid, you know, where I had got that AI

9  that it might break my probation or whatever.

10 Q    Yes, sir.

11 A    And Bart talked to a gentleman and they just called my

12 name, and it was like, "Bill Sester," and I said, "Here," and

13 it was, like, dismissed, motion of the Commonwealth or

14 whatever.

15 Q    Did you talk to Bart Morris before you went to court?

16 A    I may -- I probably talked to him a day or two before,

17 but, I mean --

18 Q    What did you ask him to do for you, Mr. Sester?

19 A    I just asked him to help me out there a little bit if he

20 could, and he said that he would.

21 Q    You said he went to talk to a gentleman there in court.

22 Did you recognize who he went to speak to?

23 A    Clay Bishop.

24 Q    And is that the County Attorney there in Clay County?

25 A    He is the prosecuting attorney I think.

1  Q   Okay.  And you say after he talked to him the Judge

2  announced -- what did the Judge say about your case?

3  A   Well, I was -- I was the first one called up.  And, I

4  mean, you know, most of the time they go by alphabetical order,

5  and where my last name stars with "S," I'm usually in there,

6  you know, like a couple hours, but --

7  Q   All right.

8  A   -- they just called my name right out of the gate, and I

9  stood up.  I mean, I didn't even walk up to -- in front of the

10  judge, they was like dismiss, motion of the Commonwealth.

11  Q   All right.  After you got your case dismissed, did

12  Mr. Morris say anything he wanted you to do for him?

13  A   Well, he told -- he was wanting me to help him in the

14  election, which I had a job and everything.  You know, I was

15  like, "Bart, you know," I said, "I'll get my aunt or some --

16  you know, somebody to vote, you know," I said, "I'll sure try

17  to help you out."

18  Q   Had he helped you on a case before that?

19  A   No, sir.  No, I don't think.

20  Q   Any other cases since that he's helped you with?

21  A   No, sir.

22  Q   Just the one?

23  A   Yeah.

24  Q   I'm sorry?

25  A   Yeah, just that one.

BILLY RAY SIZEMORE DIRECT - MR. SMITH          29

1  Q    Just the one case?

2  A    Uh-huh.

3  Q    Now, did you — have you had a charge as serious as drug

4  trafficking before?

5  A    Yeah, I got caught back in '04, I think, for trafficking.

6  Q    And was that a case that went up to circuit court in front

7  of Cletus Maricle?

8  A    Yes, it was.

9  Q    Okay.  And how did that case get resolved?

10  A    Well, it cost me $2500 cash and seven months — well, 201

11  days house arrest and drug testing every week.

12  Q    So instead of going to jail, you took house arrest?

13  A    Yeah.

14  Q    And how long were you on house arrest?

15  A    201 days.

16  Q    And how much did that cost you for house arrest down there

17  in Manchester at the time?

18  A    At the time it was 300 a month.

19  Q    Do you remember back in 2002 the election?

20  A    No, not really, I don't.

21  Q    Do you recall an election where Bart Morris handed you

22  some money for voting?

23  A    No, just maybe '06.

24  Q    Okay.  You said there were other elections that you had

25  voted in where you had been paid for your vote.  Do you

1  remember what those elections were, sir?

2  A    No, sir, I don't.

3  Q    Well, can you tell us the circumstances of what happened,

4  how did you get paid from that prior election you say you were

5  paid?

6  A    In the 2002 election or the 2006?

7  Q    Listen to my question.  You had testified earlier, I

8  believe — if I misunderstand, you can clarify it for us, but

9  you said you had sold your vote in prior elections before '06?

10  A    Uh-huh.

11  Q    Do you recall how it was that you sold your vote in the

12  prior election?

13  A    Well, if I'm thinking correctly, and I'm 99.9 percent that

14  Bobby Sams may have been the person that brought my money to

15  me.

16  Q    Okay.  And Bobby Sams, is he somebody that you knew?

17  A    Well, I worked with his brother on the railroad and

18  everything and Bobby was always — he ran for constable or

19  magistrate or something there one year, and I had knowed him

20  probably eight or ten year, and he's — he would always come to

21  the house, you know, "You going to help me out, Bill," and all

22  this and that, and I'm —

23  Q    How much did he pay you?

24  A    Probably $20.  I'm not for sure.

25  Q    Did he have candidates other than himself that he wanted

1  you to vote for when he gave you the money in that election?

2  A    Yeah, I'm sure he did.

3  Q    Okay.  In the '06 election when you were approached by

4  Bart Morris and Darnell Hipsher, did they tell you who the

5  candidates were they wanted you to vote for?  Were there more

6  than one?

7  A    Yeah, there was more than one.

8           MR. SMITH:  Okay.

9           If I can have just a moment, Your Honor?

10          THE COURT:  Yes, sir.

11 BY MR. SMITH:

12 Q    Did Wanda White mention to you at the time that you were

13 voting there in '06 anything about a job?

14 A    Yeah, she told me if I would help Doug White out that it

15 could lead to a — because when I worked for the City, I work

16 there six year and one of the reasons I quit is I was just

17 making like 6.85 an hour.  Well, after I quit, they moved the

18 pay scale up to maybe ten, $11 an hour, I'm not for sure, and

19 she said, "Bill," she said, "help us out, it could lead to you

20 a job back at the City."

21 Q    Did she or Weaver say anything to you after you voted?

22 A    No, sir.

23 Q    But you got paid after you voted by Darnell Hipsher and

24 Bart Morris at the Handy Mart?

25 A    Yes, sir.

1          MR. SMITH:  Thank you.  Pass the witness.

2          THE COURT:  Thank you.

3          Mr. Hoskins.

4          MR. HOSKINS:  Thank you, Your Honor.

5                          CROSS-EXAMINATION

6    BY MR. HOSKINS:

7    Q     Morning, Mr. Sester.  My name is David Hoskins, and I

8    represent Cletus Maricle.

9          First I want to ask you about this AI charge.  That AI

10   stands for alcohol intoxication; right?

11   A     Yes, sir.

12   Q     And you said Clay Massey Bishop was the prosecutor on that

13   case?

14   A     Uh-huh.

15   Q     So that means it was in district court; right?

16   A     Yes.

17   Q     So it was not in front of Judge Maricle, was it?

18   A     No, sir.

19   Q     And that case got dismissed?

20   A     Uh-huh.

21   Q     Were you on probation out of Judge Maricle's court?

22   A     No.

23   Q     The probation that you were on, what court was that out

24   of?

25   A     District.

1  Q    Okay.  When you were asked by Kennon White for help in the

2  election, he was asking — you say it was for the mayor's race?

3  A    Yes.

4  Q    And that would have been the mayor of Manchester?

5  A    Yes, sir.

6  Q    Of the City?  And the mayor that he was wanting you to

7  vote for was his daddy, Doug?

8  A    Yes, sir.

9  Q    Now, you talked a little bit about your charge that put

10 you on home incarceration.  Were you working at the time that

11 you were on home incarceration?

12 A    Yes, I was.

13 Q    So by being on home incarceration, you were allowed to

14 stay home at night?

15 A    Uh-huh.

16 Q    And leave your house and go to work during the day?

17 A    Yeah, uh-huh.

18 Q    And you were drug tested on a regular basis?

19 A    Right.

20 Q    So you were able to keep your job?

21 A    Uh-huh.

22 Q    And since you got off of that program, you've got another

23 job and you're working construction work?

24 A    Uh-huh.

25 Q    And staying out of trouble?

1   A    Yeah, pretty much.

2         MR. HOSKINS:  Thank you.  That's all.

3         THE COURT:  Let's see if anyone else has anything of

4   the witness.

5         MR. RICHARDSON:  Briefly, Your Honor.

6         THE COURT:  Yes, sir.

7                        CROSS-EXAMINATION

8   BY MR. RICHARDSON:

9   Q    My name is Tucker Richardson, and I represent Freddy

10  Thompson.  Just a couple of questions, please.

11       You voted in November '06; correct?

12  A    Yes, sir.

13  Q    And you were able — you operated the machine?

14  A    Uh-huh.

15  Q    And you were able to do that correctly?

16  A    Yeah.

17        MR. SMITH:  Your Honor, I'm going to object.  This is

18  a mischaracterization of the — the casting of the vote, I

19  believe that again this calls for speculation at this point as

20  to whether or not it was done correctly.

21        THE COURT:  All right.  It's outside the scope of

22  direct, but I'm going to allow him to ask a few questions about

23  it.

24        MR. RICHARDSON:  Thank you, Judge.

25  BY MR. RICHARDSON:

1   Q    So you were able to operate that machine?

2   A    Yes.

3   Q    Did you have to read the -- did you read the instructions

4   to operate that machine?

5   A    Yes, I did.

6   Q    And they were posted at the polling place?

7   A    Well, yeah, I'm sure they were.  I mean, I've got a good

8   education, you know, I mean, I can read and write and all that.

9   I mean --

10  Q    Sure, sure.  Where did you read the instructions?

11  A    Sir, I really can't recall that unless they were there.  I

12  guess they were on the monitor screen.

13  Q    Yes, sir.

14  A    I'm not for sure, but they could have been right here or

15  right here.  I mean, but I read how to do it there and

16  everything.

17  Q    So you were able to operate that machine?

18  A    Yeah.

19         MR. RICHARDSON:  No further questions.  Thank you

20  very much.

21         THE COURT:  Thank you.

22         Anyone?  Mr. Gilbert?

23         MR. GILBERT:  Thank you.

24                      CROSS-EXAMINATION

25  BY MR. GILBERT:

BILLY RAY SESTER - CROSS - MR. GILBERT                36

1  Q    Mr. Sester, my name is Jerry Gilbert, and I represent Bart
2  Morris.
3  A    Yes, sir.
4  Q    This AI charge that you had, it was back in the '90s, was
5  it not?
6  A    Yeah, somewhere in there.
7  Q    A long time ago?
8  A    Yeah, it's been a while back.
9  Q    Have you ever hauled votes for Bart Morris?
10 A    No, sir, I haven't.
11 Q    Did you ever take his money to vote the way he told you to
12 vote?
13 A    Why, yeah, if Bart told me who to vote for, that's who I
14 voted for.
15 Q    Darnell Hipsher is the one that handed you the money; is
16 that right?
17 A    I'm not quite sure, but I — I'm trying to think here.  I
18 think Darnell may have been the one that gave me the money, but
19 I — I mean, I'm not a hundred percent sure on that, but we
20 just pulled — they pulled up — I pulled like right here and
21 they just pulled in on the other side of me, you know what I'm
22 saying?  And I don't even know if they handed me the money or
23 just tossed it in the car to me.  You know, I'm not for sure.
24 Q    And this was after you voted?
25 A    Yes, after I voted.

BILLY RAY SIZEMORE CROSS - MR. GILBERT          37

1  Q    Do you remember testifying before the federal grand jury?

2  A    When, back in July of --

3  Q    2007.

4  A    Yes, sir, I do.

5  Q    And where was that located at?

6  A    That was in Lexington, I'm thinking.

7  Q    And you were there responding to a subpoena issued by the

8  United States?

9  A    Yes, sir.

10 Q    And when you went into that grand jury, did you take an

11 oath to tell the truth?

12 A    Yes, I did.

13 Q    Do you remember being asked, and I'm referring to page

14 seven, line one, "Did you ever take up Bart Morris's offer to

15 haul votes for him?"

16 A    No.

17 Q    And your answer was, "No, sir, never did haul no votes"?

18 A    No, I never hauled -- never hauled no votes.

19            MR. SMITH:  Your Honor, I'm going to object as to --

20            THE COURT:  Prior consistent statement?

21            MR. SMITH:  That's a consistent statement.

22            THE COURT:  Sustained.

23 BY MR. GILBERT:

24 Q    And the next question was, "Did you ever take his money

25 and vote the way he told you to vote?"  And your answer was,

1  "No, but one time — well, in this past election, Darnell

2  Hipsher did give me $20.  But, I mean, what happened was — I

3  mean, I didn't really ask for the money, they said, 'Bill, did

4  you vote?' And I was like that, and he's like, 'Here, old

5  buddy, take this right here.' And I was like, you know, I mean,

6  a poor boy, I ain't got no money.  So, I mean, you know,

7  somebody can reach you $20, I mean —" Did you answer it that

8  way?

9  A    Yes, I did.

10  Q    And the next question was, "So Darnell Hipsher handed you

11  the money?"  And your answer was, "Uh-huh."

12  A    Uh-huh.

13  Q    And the next question was — Well, and that was in — you

14  were referring to the fall mayor's election; is that correct?

15  A    I think so.

16  Q    So in your prior testimony, you didn't say that Bart

17  Morris was there, did you?

18  A    Yeah, Bart was with Darnell.

19  Q    In your prior testimony before the grand jury, you didn't

20  say that Bart Morris was with Darnell Hipsher at that time, did

21  you?

22  A    Sir, I don't recall if I did or not.  I would have to

23  review.  But, I mean, Bart and Darnell was with the ones that

24  stopped me at the Handy Mart.

25  Q    Well, I'm talking about appearing in Lexington before the

1  grand jury and what you told them at that time, you did not

2  mention Bart Morris, did you?

3  A    Yeah, he was discussed there with me and —

4  Q    But not paying you money for a vote, Mr. Sester?

5  A    What do you mean, not paying me money for a vote?  I mean,

6  can you be a little more specific with me there, sir?

7  Q    I read you your grand jury testimony, Mr. Sester, and you

8  don't say that Bart Morris gave you any money.

9  A    No, Darnell, I guess, is the one that gave it to me.

10            MR. GILBERT:  That's all.

11            THE COURT:  Anything else?

12            Ms. Hughes.

13                    CROSS—EXAMINATION

14  BY MS. HUGHES:

15  Q    Mr. Sester, my name is Elizabeth Hughes, I represent

16  Debbie Morris.

17       Debbie Morris never gave you any money to vote, did she?

18  A    No, I don't even know Debbie.

19            MS. HUGHES:  Thank you.

20            THE COURT:  All right.  Thank you.

21            Mr. Simons, nothing?

22            All right.  Any redirect of the witness, Mr. Smith?

23            MR. SMITH:  Thank you.

24                    REDIRECT EXAMINATION

25  BY MR. SMITH:

BILLY RAY SESTER REDIRECT - MR. SMITH          40

1   Q    Mr. Sester, when you testified in front of the grand jury,

2   you told them you got paid $20 for the vote; is that right?

3   A    Right.

4   Q    And you told them that Bart Morris had helped get your

5   charges dismissed down there in district court?

6   A    Yes, sir.

7   Q    And you told them that Darnell Hipsher is the one handed

8   you the money?

9   A    Yes, sir.

10  Q    Did you — were you asked who was with Darnell Hipsher

11  when he handed you the money in the grand jury?

12  A    No, I wasn't.

13  Q    And that came out today, is when you have talked to this

14  jury today, you told them who was with Darnell when he gave you

15  the money?

16  A    Yeah.

17  Q    And that was — who was with Darnell when he gave you the

18  money?

19  A    Bart Morris.

20            MR. SMITH:  That's all I have.  Thank you.

21            THE COURT:  Let's see if there's any —

22            Mr. Gilbert, do you have any recross?

23            MR. GILBERT:  Yes, Your Honor.

24            THE COURT:  Yes, sir.

25                          RECROSS-EXAMINATION

1  BY MR. GILBERT:

2  Q    When you testified before the grand jury, Mr. Sester, you

3  were asked this question:  "Did you ever take his money" -- And

4  the prior question referred to Bart Morris.  So it's referring

5  to Bart Morris.  "Did you ever take his money and vote the way

6  he told you to vote?"  And your answer then was, "Uh, no, but

7  one time" --

8         MR. SMITH:  That's been asked and answered.  We're

9  reading it now for the second time.

10        THE COURT:  I'm going to let him finish the question.

11        Go ahead.

12 BY MR. GILBERT:

13 Q    And your response was, "Uh, no, but one time -- well, in

14 this last election, Darnell Hipsher did give me $20."

15        So you were asked the question as to whether or not Bart

16 Morris had given you money and in front of the grand jury, you

17 answered no; is that correct?

18 A    Yeah, I guess it is, but, I mean, Bart was with Darnell.

19 But, I mean --

20        MR. GILBERT:  That's all.

21        THE COURT:  All right.  Thank you.

22        Anything else of the witness?

23        MR. SMITH:  No.

24        THE COURT:  All right.  Thank you, Mr. Sester.  You

25 may step down, sir.

1              THE WITNESS:  All right.

2              THE COURT:  The witness will be finally released.

3         Thank you.  Mr. Smith or Mr. Parman?

4              MR. SMITH:  Deshae Henson.  I'm going to need

5    reference to the video exhibit, I believe that's V —

6              THE COURT:  You need be sworn, wait just a minute.

7              Madam Clerk, you can swear the witness, please.

8                        DESHAE HENSON,

9    having been first duly placed under oath, was examined and

10   testified as follows:

11             THE COURT:  Have a seat.

12             MR. SMITH:  V1, Madam Clerk.

13                     DIRECT EXAMINATION

14   BY MR. SMITH:

15   Q    Good morning.

16   A    Good morning.

17   Q    Would you state your name, please?

18   A    Deshae Henson.

19   Q    And, Mr. Henson, how old are you?

20   A    Thirty-four.

21   Q    And where do you currently reside?

22   A    Cincinnati.

23   Q    And how long have you been living in Cincinnati?

24   A    Around a year now.

25   Q    Okay.  And where did you live prior to that, Mr. Henson?

1    A    Manchester, Kentucky.

2    Q    Okay.  And how long were you living in Manchester?

3    A    About 22 years or so.

4    Q    Okay.  Are you married?

5    A    No.

6    Q    Do you have any children?

7    A    No.

8    Q    Your mom and dad still living?

9    A    Yes.

10   Q    What are their names?

11   A    Cheryl and Earl Henson.

12   Q    And where do they live?

13   A    Cincinnati.

14   Q    Do you have family in the Clay County area?

15   A    Yes.

16   Q    Is that what brought you there back several years ago?

17   A    Yes.

18   Q    Where were you born and raised, Mr. Henson?

19   A    I was born in Cincinnati, and then at the age of eight I

20   moved to Manchester, Kentucky, and then the past year, I have

21   moved back.

22   Q    Okay.  Are you working somewhere at this point?

23   A    Yes.

24   Q    And what kind of job do you have at this time?

25   A    I do maintenance on old houses.

1  Q    And do you work for yourself or do you have a —

2  A    No, I —

3  Q    — company that you're working for?

4  A    I work for — I work for this guy that buys the homes, and

5  then we just — we, you know, put — we just do the maintenance

6  on them.

7  Q    Okay.  And how long have you been working for him?

8  A    About eight, nine — nine months or so.

9  Q    Okay.  Mr. Henson, were you living in the Manchester area

10 around the 2004 elections?

11 A    Yes.

12 Q    And during that time period, did you spend some time at

13 the Morris residence?

14 A    Yes.

15 Q    Could you tell us where the Morris residence was back in

16 2004, where it was located?

17 A    Behind Speedway, called Green Street.  I think it's Green

18 Street.  Yeah.

19 Q    And during that time period of the election, you say you

20 were spending time there the Morrises'?

21 A    Yes.

22 Q    And how often would you be there?

23 A    Whenever I was there, it was just with a — with a friend

24 of mine.

25              MR. SMITH:  Okay.

1          I would like to show the witness, Your Honor, if the

2   Court would allow, Government's Exhibit V1.

3          THE COURT:  Yes, sir.

4          MR. SMITH:  We're going to publish that from our

5   computer, if that's okay?

6          THE COURT:  Yes, sir.

7          Give that to Mr. Smith, if you would, I believe —

8   it's already been entered.

9          MR. SMITH:  Your Honor, for this part of the

10  questioning, could I remain at counsel table?

11         THE COURT:  Yes, sir, that's fine.

12  BY MR. SMITH:

13  Q   Mr. Henson, I'm going to ask you to — there's a monitor

14  that's there next to you.  If you would, take a look at that

15  and we're going to begin a video here shortly.

16         (Whereupon, Government's Exhibit No. V1 was played to the

17  Court and jury as the following proceedings were had in open

18  court.)

19  BY MR. SMITH:

20  Q   Are you able to see the video at this point, Mr. Henson?

21  A   Yes.

22  Q   Okay.  Do you recognize this street?

23  A   Yes.

24  Q   What street is that, Mr. Henson?

25  A   Green Street.

1  Q    Okay.  And the video at this point is paused.  Do you

2  recognize any of the vehicles there in the view of the camera

3  at this point?

4  A    Yes.

5  Q    If you could, tell us the description of the vehicle and

6  what you know about the owner -- or who the owner is, rather.

7  A    The maroon Blazer.

8  Q    Yes, sir.  Whose vehicle is that, sir?

9  A    Bart's.

10  Q    Bart who?

11  A    Morris.

12  Q    Okay.  Do you recognize any other vehicles there?

13  A    No.

14  Q    Do you recognize the residence there?

15  A    Yeah.

16  Q    Whose residence is that, sir?

17  A    Bart Morris.

18  Q    And if you could, in relation to that red Chevy Blazer,

19  where is the Morris residence?

20  A    Sitting off to the left.

21  Q    Okay.  There's a person there.  Do you recognize the

22  person getting out of that car?

23  A    No.

24        MR. SMITH:  Okay.

25        (Whereupon, Government's Exhibit No. V1 continued to be

 1  played to the Court and jury, as the following proceedings were

 2  had in open court.)

 3          MR. SMITH:  Okay.  Pause there again.

 4  BY MR. SMITH:

 5  Q    Do you recognize any of these persons?

 6  A    No.

 7          MR. SMITH:  Okay.  Proceed.

 8  BY MR. SMITH:

 9  Q    Do you recognize this gentleman, sir?

10  A    Yes.

11  Q    And tell us who that is, Mr. Henson?

12  A    Tiny Philpot and his daughter, Tina.

13  Q    And do you know where they're parked at this point in the

14  video, what location this vehicle is in?

15  A    No, I can't see it because of the -- I just see a

16  building.

17          MR. SMITH:  Okay.  Let's proceed on.

18  BY MR. SMITH:

19  Q    Are you able to identify where that vehicle is now, where

20  it was parked?

21  A    No.

22  Q    Okay.  Do you recognize those two gentlemen?

23  A    Yes.

24  Q    And who are they, sir?

25  A    Darnell Hipsher and Vernon Hacker.

1   Q    Do you know where they were headed at this point, what

2   direction they're walking?

3   A    Down towards Bart's.

4   Q    How far was Bart Morris's home there on Green Street from

5   the voting poll, to your knowledge, Mr. Henson?

6   A    Not even a half a mile.

7   Q    Do you recognize this street?

8   A    Yes.

9   Q    We now have a vehicle in view.  Do you recognize this

10  vehicle?

11  A    Yes.

12  Q    Whose vehicle is that, Mr. Henson?

13  A    Ashley's.

14  Q    I'm sorry.  You got to speak up.

15  A    Ashley Smith.

16  Q    And what — is that a driveway that that vehicle is

17  entering into?

18  A    Yes.

19  Q    Do you know whose driveway that is?

20  A    No.

21  Q    Okay.  Do you recognize this street again?

22  A    Yes.

23  Q    What street is this?

24  A    Green Street.

25  Q    And can you identify the Bart Morris residence from this

1   vantage point?

2   A    Yes.

3   Q    And where is it?

4   A    Sitting on their —— sitting on the right.

5   Q    Okay.  We now have two other persons in the view of the

6   camera.  Do you recognize either of those gentlemen?

7   A    Yes.

8   Q    Who are they?

9   A    Jeff Allen and Ouchie Jackson.

10  Q    During this 2004 election, Mr. Henson, did you witness

11  people coming there to sell their vote?

12  A    Yes.

13  Q    And do you know why Gary "Ouchie" Jackson was there?

14  A    Yes, because he was running for council, I think.

15  Q    Okay.  And at this point, he's walking —— is he the

16  gentleman with his back to us ——

17  A    Yes.

18  Q    —— or is he the gentleman facing us?

19  A    He's the one with his back to us.

20  Q    Okay.  Do you recognize any of those vehicles in view at

21  this point?

22  A    No.

23  Q    Okay.  We now have another vehicle backing out there.  Do

24  you recognize that vehicle?

25  A    Yes.

DESHAE HENSON - DIRECT - MR. SMITH                    50

1  Q    Whose vehicle is that, Mr. Henson?

2  A    Bart's.

3  Q    Is that Bart Morris?

4  A    Yes.

5  Q    Do you know who's operating that vehicle, the convertible?

6  Can you identify who the person is driving it?

7  A    I can't —

8  Q    We'll play it on forward a little bit.

9  A    Yes.

10 Q    Tell us who that is, Mr. Henson.

11 A    Bart's son.

12 Q    And what's his name?

13 A    Bartley.

14 Q    Now, we have another vehicle backing out of the Morris

15 residence.  Do you recognize that vehicle, sir?

16 A    Yes.

17 Q    Whose vehicle is that?

18 A    Tiny Philpot.

19 Q    Is that the fellow you identified previously in the

20 picture?

21 A    Yes.

22 Q    We have two other vehicles in view.  Do you recognize

23 either of those, Mr. Henson?

24 A    Yes, one.

25 Q    Which one do you recognize, sir?

DESHAE HENSON - DIRECT - MR. SMITH                    51

1   A    Terry Gilbert, the van.

2   Q    Okay.

3   A    But that's where he lives at.

4   Q    Okay.  Another vehicle now in view, sir.  Do you recognize

5   either of those?

6   A    Yes, I see the white van.

7   Q    And who do you recognize that van to be?

8   A    I don't know if it belonged to Ouchie Jackson or what.

9   Q    Did you see him operating that van that day, sir?

10  A    No.

11  Q    Who did you see operating that van?

12  A    I didn't see.

13  Q    Okay.  But you recognize that as being his vehicle?

14  A    Correct.

15  Q    Okay.  We have, again, a vehicle coming out of this

16  driveway.  Do you recognize that vehicle, sir?

17  A    Yes.

18  Q    Whose vehicle is that?

19  A    Ashley Smith's.

20  Q    Did you see her at the Bart Morris residence that day?

21  A    No.

22  Q    Okay.  Do you know where she was leaving from there at

23  that particular vantage point?

24  A    No.

25  Q    Okay.  Do you know a lady by the name of Ella Wagers?

1  A     Yes.

2  Q     Do you know where she lives?

3  A     Yes.

4  Q     Where does she live, Mr. Henson?

5  A     Where that car turned beside the fence in the back, right

6  behind SuperAmerica, Speedway.

7  Q     Okay.  And is that driveway that that vehicle was leaving

8  from, does that lead to her house?

9  A     Yes.

10 Q     Can you identify either of these persons that are in the

11 view of the camera at this point, sir?

12 A     One.

13 Q     Who is that, sir?

14 A     Ouchie Jackson.

15 Q     We now have a vehicle pulling out again from the Green

16 Street Morris residence.  Do you recognize that vehicle?

17 A     Yes.  The Blazer?  The Blazer?

18 Q     Yeah.  Who was operating the Blazer that day; do you know?

19 A     No.

20 Q     Okay.  Who owns the Blazer, sir?

21 A     Bart Morris.

22 Q     Mr. Henson, do you need to take a break, sir?

23 A     Yes, please.

24        THE COURT:  We'll take a short recess.

25        Ladies and gentlemen, we'll take approximately a

1  ten-minute recess.  Please keep in mind the admonitions that

2  you've been given previously not to discuss the case among

3  yourselves.  The jury will be excused for ten minutes.

4       (Whereupon, the jury retired from the courtroom, after

5  which the following proceedings were had in open court.)

6            THE COURT:  Counsel, any matters to take up outside

7  the presence of the jury?

8            MR. PINALES:  Your Honor, if I may, with regard to my

9  memo that was filed yesterday, I have been unable to find any

10 cases that support my position nor was Lexis able to find any

11 with their helpline, and, therefore, I would withdraw that

12 motion, Your Honor.

13           THE COURT:  All right.  Very well.  That motion will

14 be denied as moot.

15           MR. PINALES:  Thank you, Your Honor.  Either I was

16 totally wrong or they're all totally wrong.

17           THE COURT:  All right.

18           MR. PINALES:  Thank you.

19           THE COURT:  Anything else that we can take up while

20 we take a short break?

21      (No audible response.)

22           THE COURT:  We'll be in recess for ten minutes.

23      (Whereupon, a short recess was had, after which the jury

24 returned to the courtroom and the following proceedings were

25 had in open court.)

1          THE COURT:  All right.  Thank you.

2          The record will reflect that all members of the jury

3    are present.  The parties and counsel are all present.

4    Mr. Henson has returned to the witness stand.

5          Mr. Henson, you're still under oath, of course.

6          Mr. Smith, you may continue.

7    BY MR. SMITH:

8    Q    Mr. Henson, this video, we know there are several minutes

9    longer, and I just want to make sure that we stop here and talk

10   a little bit about this Green Street address there of Bart

11   Morris's.  Have you been there at times when you say there was

12   election activity going on?

13   A    Yes.

14   Q    Have you seen a lot of people visit that place during the

15   elections?

16   A    Yes.

17   Q    And could you tell us generally how it was — how the

18   traffic of people would flow there at the residence of the

19   Morrises during election times?

20   A    Steady.

21   Q    And were they greeted at the door or was there another

22   part of the property that these voters were usually welcomed by

23   the Morrises?

24   A    Garage door.

25          MR. SMITH:  Okay.  Now, can we forward that video a

1   little bit further?  Is there a picture of the residence there?

2   Go forward just a little bit and try to get that residence in a

3   better shot, Ms. Poynter.

4   BY MR. SMITH:

5   Q    When you say, Mr. Henson, that they were going into the

6   garage there at the Morris's place, how is it that you were

7   able to see these voters go in?  Were you inside the residence

8   or out in the garage yourself?

9   A    Yes.

10  Q    Did you hang out there for a period of time on election

11  days?

12  A    Yeah, some.  Yes.

13  Q    And who was talking with these voters once they would come

14  into the garage?

15  A    Vernon Hacker.

16  Q    Vernon who?

17  A    Hacker.

18  Q    Okay.

19  A    And Darnell Hipsher.

20  Q    Okay.

21  A    Bart, Ouchie.

22  Q    Bart Morris?

23  A    Yes.

24  Q    Okay.  And did you see money there at the Morris

25  residence?

1  A   Yes.

2  Q   Could you describe for the ladies and gentlemen of the

3  jury what -- the money that you saw, how did you see the money

4  and what kind of money did you see there, sir?

5  A   Like money, just --

6  Q   If you could just adjust that microphone a little bit, Mr.

7  Henson, we're having a little bit of trouble hearing you back

8  here.  I'm asking you to explain the money that you saw.

9  A   Yes.

10  Q   Were there quantities of money that you saw at certain

11  points in times, sir, large quantities?

12  A   Yes, people bringing in it, yes.

13  Q   And when you say people would bring in large quantities,

14  were these people that you recognized?

15  A   Yes.

16  Q   Were they running for office?

17  A   Yes.

18  Q   And when they would bring it, who would they give the

19  money to that you saw?

20  A   I can't recollect who they actually --

21  Q   What was the money in --

22  A   -- handed it to.

23  Q   When they brought it in, what was it in usually?

24  A   Different things.  Bank money bags or something like that.

25  Q   Bank money bags?

DESHAE HENSON DIRECT - MR. SMITH                    57

1  A     I'm sorry, yeah.

2            MS. HUGHES:  I apologize.

3            THE COURT:  Ms. Hughes, you can't hear?

4            MS. HUGHES:  I can't —

5            THE COURT:  Money bags.  You said bank money bags?

6            THE WITNESS:  Yes.

7            THE COURT:  All right.  Thank you.

8            MS. HUGHES:  If he could just maybe —

9            THE COURT:  If you could adjust that microphone down

10  a little bit.  There we go, see if that's a little better.

11            MR. SIMONS:  I can't see because of that monitor.

12            THE COURT:  If you need to move around, you can, but

13  he needs to look at the monitor so he can see what's on the

14  screen.  So if you need to move, you can move.

15            Thank you.  You can continue.

16            THE WITNESS:  Thank you.

17  BY MR. SMITH:

18  Q     At this point, Mr. Henson, do you have a better view of

19  Debbie and Bart Morris's residence?

20  A     Yes.

21  Q     Can you show us in this particular vantage point where the

22  garage is that you said you saw lots of voters going into on

23  election days?

24  A     Sitting next to — in front of the gray car.

25  Q     Okay.  So this gray car that the arrow is pointing at, is

1  that the gray car you're pointing to?

2  A    Yes.

3  Q    So in front of that is the garage?

4  A    Yes.

5  Q    And so when you see lines of people going into the Morris

6  residence, it was into that garage area?

7  A    Yes.

8        MR. GILBERT:  Objection, Your Honor.  I don't believe

9  he testified about lines of people.

10       THE COURT:  I'll sustain the objection to the form of

11 the question.  You may rephrase it.

12 BY MR. SMITH:

13 Q    How many people did you see, Mr. Henson, one, two or ten

14 or more?

15 A    In the building at the same time?  In the garage?

16 Q    On election day, sir.

17 A    Oh, they was —

18 Q    I thought you said lots of people.

19 A    Yes.

20 Q    How many people would you estimate there were that were

21 coming there to the garage?

22 A    More than ten.

23 Q    I'm sorry?

24 A    More than — more than ten.

25 Q    More than ten?  There were more than ten?

1   A    Yeah.

2   Q    Okay.  Would they form lines, sir?

3   A    No.

4   Q    Okay.  So there were lines formed outside the garage?

5   A    No.

6   Q    About how many did you say it was, more than ten?

7   A    Yes.

8   Q    More than 20?

9   A    Yes.

10  Q    Do you have an estimate, sir, how many people you saw

11  there on election days?

12  A    There was a bunch.

13  Q    Do you know why those people were there, Mr. Henson?

14  A    Yes.

15  Q    Why were they there, Mr. Henson?

16  A    Money.

17  Q    And do you know how much money they were getting?

18  A    Probably 20, 30, $30 a vote.

19  Q    Do you recall seeing people with marks on their hands?

20  A    Yes, tickets.

21  Q    Tickets?

22  A    Yeah.

23  Q    Did you see marks on their hands as well?

24  A    Uh-huh.

25  Q    And when you saw them with tickets or marks on their

1  hands, was that at the Morrises' residence?

2  A    No, that was after they voted.

3  Q    Okay.  And did they come to the Morrises' residence after

4  they voted?

5  A    Some.

6  Q    Were you aware that they had a ticket of candidates or a

7  slate of candidates that they wanted the voters to vote for

8  when they took their money?

9  A    Yes.

10 Q    Do you remember the names of the candidates that they put

11 on their slate?

12 A    People that was running for city council that 2004 year.

13 Q    Okay.  Do you remember any of their names?

14 A    I'd say probably Vernon, Vernon Hacker.

15 Q    Okay.

16 A    Darnell Hipsher, Ouchie Jackson.

17 Q    Okay.

18 A    And that's all I can recollect right now.

19 Q    Were there others that you don't remember at this point

20 that you recall?

21 A    Yes.

22 Q    Okay.  Do you know a fellow by the name of Chris Duff?

23 A    Yes.

24 Q    And what was he doing, if anything, in this 2004 election,

25 to your knowledge?

1   A    Probably hauling voters.

2   Q    Is he related to Bart and Debbie Morris?

3   A    Yes.

4   Q    How is he related to them, sir?

5   A    Debbie's son and Bart's stepson.

6   Q    Okay.  Did you see Debbie Morris in the house when these

7   bags of money were brought in?

8   A    In the building, the garage.

9   Q    Yes, sir.

10  A    Yes.  She just — yes.

11  Q    Was Bart Morris there when they brought the money in?

12  A    Yes.

13  Q    And is that the money that you saw being used to pay these

14  voters?

15  A    Yes.

16  Q    Now, were you interviewed by the FBI, Mr. Henson?  Do you

17  remember being interviewed by the FBI?

18  A    Yes.

19  Q    Do you remember being called as a witness before the

20  federal grand jury in Lexington?

21  A    Yes.

22  Q    Did you tell them the whole truth and nothing but the

23  truth the first time you talked to them?

24  A    No, I didn't.

25  Q    Why didn't you do that, Mr. Henson?

1  A     Scared.

2              MR. SMITH:  I pass the witness.

3              THE COURT:  Thank you.

4              Mr. Pinales.

5                      CROSS-EXAMINATION

6  BY MR. PINALES:

7  Q     The precincts that you were talking about that we saw on

8  the video, they were in Manchester?

9  A     I can't hear you, you got to speak up, sir.

10 Q     I'm sorry.  The precincts that you were talking about and

11 you saw in the video, was that in Manchester?

12 A     Yes.

13 Q     In the City of Manchester?

14 A     No, it's not right downtown, but it's —

15 Q     Within the city limits?

16 A     Limits, yes.

17 Q     Not the county.  It's in Clay County?

18 A     Yes.  Yes.  Yes.

19 Q     But within the city limits?

20 A     Yes.

21             MR. PINALES:  That's all.  Thank you, Judge.

22             THE WITNESS:  Okay.

23             THE COURT:  All right.  Mr. Henson, could you turn

24 that monitor around?  The monitor over here, the screen, if you

25 could just — no, the other direction so the attorneys will be

1    able to ask you questions.  All right.  Thank you.

2            Mr. Westberry?

3            MR. WESTBERRY:  May I from here?  Just one question.

4            THE COURT:  Yes, sir, that's fine.

5                        CROSS-EXAMINATION

6    BY MR. WESTBERRY:

7    Q    Good morning, Mr. Henson, I'm Kent Westberry, I represent

8    Doug Adams.  Did you ever see Doug Adams around any of that

9    time?

10   A    No.

11           MR. WESTBERRY:  Thank you, sir.

12           MR. WHITE:  No questions, Your Honor.

13           THE COURT:  Mr. Abell?

14           MR. ABELL:  No, Your Honor.

15           THE COURT:  Mr. Richardson?

16           MR. RICHARDSON:  No, Your Honor.

17           THE COURT:  Mr. Gilbert.

18           MR. GILBERT:  Yes, Your Honor.

19           THE COURT:  Yes, sir.

20                        CROSS-EXAMINATION

21   BY MR. GILBERT:

22   Q    Mr. Henson -- I'll move around.  Mr. Henson, my name is

23   Jerry Gilbert and I represent Bart Morris.

24        What election -- the tape that you were shown on the

25   screen, that's the fall 2004 election, wasn't it?  Is that the

1    election you're talking about when you testified?

2    A    Yes.

3    Q    And you're seen on that video walking across the street

4    with a gentleman?

5    A    Yes, Glenn.

6    Q    Who is that?

7    A    Glenn Thompson.

8    Q    Glenn Thompson?  Does he live in the area?

9    A    He's deceased now.

10   Q    Did he live in the area at the time?

11   A    Yes.  Yes.

12   Q    And did he go over to the Morris residence?

13   A    Yes.

14   Q    Now, although that black Camero is owned by Bart Morris,

15   that was his son who was operating it that day, was it not?

16   A    Yes.

17   Q    And is he in college?

18   A    Yes.

19   Q    And the video that you saw doesn't show Bart Morris in it,

20   does it?

21   A    No.

22   Q    It does show Vernon and Darnell and Ouchie Jackson?

23   A    In the car?

24   Q    On the video.

25   A    Yes.

1   Q    Now, you weren't involved in the 2006 election, were you?

2   A    Yes.

3   Q    And Chris Duff, he's not shown on the video either, is he?

4   A    No, on that video, no.

5   Q    Now, you've seen that video before, have you not?

6   A    Yes.

7   Q    In its entirety, you were just shown a portion of it

8   today, weren't you?

9   A    Yes.

10          MR. GILBERT:  I think that's all the questions I

11   have.

12          THE COURT:  Thank you, Mr. Gilbert.

13          Ms. Hughes.

14                     CROSS-EXAMINATION

15   BY MS. HUGHES:

16   Q    Mr. Henson, my name is Elizabeth Hughes, I represent

17   Debbie Morris.

18       Debbie Morris never paid you any money for your vote, did

19   she?

20   A    No.

21          MS. HUGHES:  That's all I have.

22          THE COURT:  Thank you.

23          Mr. Simons, do you have any questions of the witness?

24          MR. SIMONS:  I do not, thank you.

25          THE COURT:  All right.  Any redirect, Mr. Smith?

1          MR. SMITH:  Yes, please.

2          THE COURT:  All right.  Yes, sir.

3                     REDIRECT EXAMINATION

4   BY MR. SMITH:

5   Q    Mr. Henson, you were asked whether you were involved in

6   the 2006 election?

7   A    Uh-huh.

8   Q    And your answer was yes.  Does that mean you were

9   involved?

10  A    Uh-huh.

11  Q    How did you get involved in the vote-buying scheme in

12  2006?

13  A    By hauling voters.

14  Q    And who were you hauling voters for in 2006?

15  A    Doug White.

16  Q    And when you hauled voters, could you tell us where you

17  hauled them to?

18  A    Picked them up at home, took them to the middle school,

19  voted them.  But which on 2006, I was just there for — I think

20  I got back from the doctor like at 1:00, 2:00, because I had

21  surgery done, foot, and I hauled like three or four of my

22  family, you know, members, so —

23  Q    Did you get paid some money in 2006?

24  A    No.

25  Q    You didn't get any money in 2006?

1  A      No.

2  Q      What about 2004, did you get any money in 2004?

3  A      Yes.  Yes.

4  Q      How much money did you get in 2004?

5         MR. WHITE:  Objection, Your Honor.

6         THE COURT:  Overruled.

7         THE WITNESS:  $40.

8  BY MR. SMITH:

9  Q      And who paid you that money?

10 A      Darnell Hipsher.

11 Q      Did you actually go in on the machine in 2006 and vote the

12 new machine?

13 A      Yes.

14 Q      And do you remember who the election officers were in

15 there when you voted in 2006?

16 A      Yes.

17 Q      Who were they?

18 A      Dobber Weaver and Wanda White.

19 Q      Okay.  Did you notice either one of them watching you cast

20 your vote?

21 A      Yes.

22 Q      Which one watched you cast your vote?

23 A      Wanda White.

24 Q      Were you asked to change any of your votes that you cast

25 in 2006?

1  A     One, yes, sir.

2  Q     And who asked you to change your vote?

3  A     Wanda White.

4  Q     And did you comply with her request?

5  A     Yes.

6  Q     After these voters that you took to the polls went to the

7  poll to vote in 2006, did they go down to Bart and Debbie's to

8  get paid?

9  A     I'd say some.

10          MR. SMITH:  That's all.  Thank you.

11          THE COURT:  Let's see if there are any further

12  questions on recross?

13          Mr. Gilbert.

14                    RECROSS-EXAMINATION

15  BY MR. GILBERT:

16  Q     Mr. Henson, can you see me?

17  A     Yes.

18  Q     Actually, Kennon White gave you $200 in 2006 --

19  A     Yes.

20  Q     -- to haul voters, did he not?

21  A     Yes.

22  Q     Bart Morris didn't give you any money?

23  A     No.

24  Q     And you're hauling voters for his father's mayor's

25  election, were you not?

1   A     Yes.

2            MR. GILBERT:  That's all.

3            THE COURT:  Anything else?  Anything else of this

4   witness?

5            MR. SMITH:  No, thank you.

6            THE COURT:  Thank you, Mr. Henson.  You may step

7   down, sir.

8            MR. SMITH:  I would ask that he be finally excused.

9            THE COURT:  Yes, he may be finally excused.

10           Let's see.  Mr. Parman?

11           MR. PARMAN:  Yes, Your Honor, the United States calls

12  Carl Curry.

13           THE COURT:  Thank you.

14                        CARL CURRY,

15  having been first duly placed under oath, was examined and

16  testified as follows:

17           THE COURT:  Thank you.

18           Mr. Parman, you may proceed.

19           MR. PARMAN:  Thank you, Your Honor.

20                    DIRECT EXAMINATION

21  BY MR. PARMAN:

22  Q     Good morning, sir.

23  A     Morning.

24  Q     Could you state your name, please?

25  A     Carl Curry.

1   Q    Sir, how old are you?

2   A    62.

3   Q    Where do you live?

4   A    Beech Creek Apartments, Manchester, Kentucky.

5   Q    Beech Creek Apartments, is that what you said?

6   A    Yes.

7   Q    How long have you lived there at Beech Creek Apartments?

8   A    Oh, gosh, 17, 18 year.

9   Q    How long have you lived in Manchester?

10  A    Oh, God.  A long time.  I have no idea.  I used to work

11  off from here in Chicago, and then moved back here, I don't

12  know how long I've been here the last time.

13  Q    Is it safe to say you've been in Manchester a long time,

14  though?

15  A    Yeah, I've been here — well, me and my wife has been

16  married over — say 18 or 19 year.

17  Q    Now, you said your wife was something.  Are you married?

18  A    Yes, sir.

19  Q    How long have you been married?

20  A    Eighteen, 19 year.  Well, 17, 18, 19, something like that,

21  roughly.

22  Q    Sir, have you participated in elections there in Clay

23  County?

24  A    Yes, sir.

25  Q    Back in 2002, did you participate in the election?

1   A    2002?  Now, like I said before, you have to tell me the

2   event that I can tell you if I did.  But most likely I did.

3   Q    Do you recall an election where Freddy Thompson was

4   running again Jennings White for county clerk?

5   A    Yes, sir.  Yes, sir.

6   Q    Okay.  What did you do in that election?

7   A    I would go around and I would get people, as many as I

8   could, to vote for the ones that was on the ticket.

9   Q    And when you say you went around to get people to vote for

10  the ones that was on the ticket, where did you go around to?

11  A    The apartments, the apartments there at Beech Creek.  And

12  then out towards Littleton.

13  Q    How many people are there in the Beech Creek Apartments,

14  if you know?

15  A    Oh, God, there's -- let's see, there's 80-some units, and

16  there are at least two to five to a unit -- I mean, to an

17  apartment.  Wait a minute.  Let me redo that.  There's -- yeah,

18  okay, up to five, because one man, his wife and he's got three

19  kids, yes, sir.

20  Q    So there's 80 units and there could be up to five people

21  in each unit; is that what you're saying?

22  A    Well, in some units.  Not all of them.  Some of them has

23  just got two in them and some has just got one in them.  It

24  varies from one to five.

25  Q    Sir, if you could be careful, that microphone is there and

1    if you move your arms around too much, you'll hit into it, so

2    just kind of be mindful where that is at, if you don't mind.

3    A    Sorry.

4    Q    No problem.  Who asked you to do that at the apartments?

5    A    Stanley.

6    Q    Stanley who?

7    A    Bowling.

8    Q    Okay.  Did Stanley Bowling pay you to do that at the

9    apartments?

10   A    Well, yeah, he give me a hundred dollars — well, for

11   working, yeah.

12   Q    He give you a hundred dollars?

13   A    A hundred dollars, yeah.  That was for working and I

14   assume some gas money, too.

15   Q    Now, you said that you went around and asked them to

16   support a ticket.  Do you recall who was on that ticket?

17   A    Okay.  There was Stanley, Edd Jordan, I think it was Edd

18   Jordan, I think — I'm not for sure if Judge Maricle was on it

19   or not.  And there was Kevin — I mean, Jim Trosper, that's the

20   coroner.  No, I don't remember all of them, no, I don't.

21   That's a long time ago, and it's —

22   Q    Now, when you got these voters together, who did you turn

23   them over to?

24   A    To the ones that was hauling.  Do you mean the names?

25   Q    Well, first of all, I asked you who you turned them over

1   to.  I think you just said to the ones that were hauling?

2   A    Yes.

3   Q    Okay.  What were the names of the people that were hauling

4   the voters to the polls?

5   A    There was Gail Roberts, Billie Jean — I think her name is

6   Berry, I'm not for sure.  And there was Tonya, Tonya — I don't

7   know what her last name is, she's been married a couple of

8   times, I don't know exactly what her last name is.  And there

9   was David Miller.  I think David Miller.  Yeah, David Miller

10  was hauling.  And I don't remember who else was a hauling.  But

11  they was definitely hauling.

12  Q    Now, this ticket that you have spoke of, who told you who

13  was on the ticket?

14  A    Oh, Stanley told me.

15  Q    Stanley Bowling?

16  A    Yeah.

17  Q    Did anybody else tell you who was going to be on the

18  ticket that was going to be supported besides Stanley?

19  A    Yeah, Bart.

20  Q    Bart who?

21  A    Bart Morris.  Well, in fact, they was both together when

22  they come up.

23  Q    When they told you who the ticket was going to be, Stanley

24  Bowling and Bart Morris was both together?

25  A    Yeah, they was both together, yes.

1  Q    Now, were you given anything after the election for the

2  work you did in the election?

3  A    Yes, sir, I was.

4  Q    What were you given?

5  A    I was give, I think it was, $150.

6  Q    Who give you the $150?

7  A    Bart, Bart Morris.

8  Q    Bart Morris?

9  A    Yeah.  That was for working, too, you know.

10  Q    Now, did you also participate in the 2006 election?  Now

11  I'll give you some context.  That was the election where Carmen

12  Webb Lewis run against Doug White for mayor.  Do you remember

13  that election?

14  A    Yeah, I remember that election, but I didn't -- I couldn't

15  help in that because that was city limits and I don't live in

16  the city limits.

17  Q    Okay.  But that general election, just to give you some

18  context, did --

19  A    Oh, okay, yeah, because the county race was going on at

20  the same time, yes.  Yes, sir, I did.

21  Q    Okay.  What did you do in the 2006 election?

22  A    The same thing, I would go around and get people to vote

23  for the ones that was on the ticket.

24  Q    Okay.  Who told you what the ticket was in 2006?

25  A    Stanley and Bart.

1  Q    When you say "Stanley," you mean Stanley Bowling?

2  A    Oh, yeah, Stanley Bowling.

3  Q    When you say "Bart," who do you mean?

4  A    Bart Morris.  Because I always work in an election and

5  they always come to me to help them.

6  Q    Was it Stanley and Bart who told you who the ticket was?

7  A    Yes.

8  Q    Were you paid for your participation in 2006?

9  A    Yeah, they give me — '06 now.  Yeah, they give me the

10 same thing.

11 Q    What was the same thing?

12 A    It was a hundred dollars.

13          MR. PARMAN:  Your Honor, may I have just a moment?

14          THE COURT:  Yes, sir, you may.

15          MR. PARMAN:  That's all I have, Your Honor.

16          THE COURT:  All right.  Thank you.

17          Mr. Hoskins?

18          MR. HOSKINS:  No questions.

19          MR. WESTBERRY:  No questions, Your Honor.

20          MR. WHITE:  No questions.

21          MR. ABELL:  (Shakes head negatively).

22          THE COURT:  Yes, sir.

23          Mr. Richardson?

24          MR. RICHARDSON:  Thank you, sir.

25                        CROSS-EXAMINATION

1  BY MR. RICHARDSON:

2  Q    Mr. Curry, my name is Tucker Richardson, I represent

3  Freddy Thompson here.

4       Did you have any dealings with Freddy Thompson during '02,

5  '04, and '06?

6  A    No, he was running against Jennings White; right?  No, I

7  was — helped him because he's my kinfolk.

8  Q    Who is your kinfolk?

9  A    Jennings.  I'm sorry, I should have said Jennings.  I'm

10 sorry.

11           MR. RICHARDSON:  Thank you.

12           THE COURT:  Anyone else?

13           MR. GILBERT:  Thank you.

14           THE COURT:  Yes, sir.  Mr. Gilbert.

15                    CROSS-EXAMINATION

16 BY MR. GILBERT:

17 Q    Mr. Curry, my name is Jerry Gilbert, and I represent Bart

18 Morris.

19 A    Yes.

20 Q    How long have you lived in the Beech Creek Apartments?

21 A    Oh, God, like I said, 17, 18 year, something like that.

22 Q    And you say there's 80 units up there?

23 A    I think there's 80 or — there might be 88, I'm not for

24 sure.  There's like 80.  That's on both sides, you know.

25 There's two different sides to the complex.

1  Q    And what you did in 2002 election, you didn't pay any

2  voters, did you?

3  A    No, sir.

4  Q    And you say that you're related to Jennings White?

5  A    Yes.  Yes, sir.

6  Q    Was he on that ticket also?

7  A    I believe he was.

8  Q    Pretty big election there between Jennings White and

9  Freddy Thompson in 2002, wasn't there?

10 A    Pardon me?

11 Q    Your kin, Jennings White, had an election that year, did

12 he not?

13 A    Yes, I think so.

14 Q    And who was he running against?

15 A    Freddy.

16 Q    Okay.

17 A    I think.

18 Q    And you say Jim Trosper was on the ticket?

19 A    No, Wes Romiger was on the ticket, and I wouldn't go along

20 with that.

21 Q    You wouldn't go along with that?

22 A    No.

23 Q    But, now, Jim Trosper and Wes Romiger were running for

24 coroner?

25 A    Yes, sir.

1    Q    Do you remember anyone else that was on the ticket in

2    2002?

3    A    No, sir, I sure don't.

4    Q    Do you remember who was running for county judge?

5    A    Yeah, Carl Sizemore and — I can't think of his name.  He

6    was the county judge at that time, county judge executive.

7    Q    We're talking about the 2002 election?

8    A    Yeah.

9    Q    And you say Carl Sizemore was a candidate in 2002?

10   A    Yeah, I think.  Yeah.  I'm not for sure, but, yeah.  Or

11   he — I think he was.  I'm not for sure, now, about that.  I

12   think he was, but I don't know for sure.

13   Q    How about 2004?

14   A    2004.

15   Q    Were you involved in that election?

16   A    Pardon?

17   Q    The 2004 election, were you involved in it?

18   A    Yes, sir.

19   Q    Stanley Bowling didn't have a race, though, did he?

20   A    No, I think he was unopposed.

21   Q    2004, did Stanley Bowling run?

22   A    Yes, sure, I think — yeah, he run.

23   Q    So it would be your testimony he ran in 2002, 2004, and

24   2006?

25            MR. PARMAN:  Your Honor, I'm going to object.  It's

 1  somewhat misleading as far as what this witness's testimony

 2  was.  He's already testified previously that in order to

 3  understand the dates he has to have some context.

 4          THE COURT:  I understand.  I'll overrule the

 5  objection, you can ask him.

 6          MR. GILBERT:  Thank you, Judge.

 7  BY MR. GILBERT:

 8  Q    So in some of your elections you're unsure of the

 9  candidates and the actual dates of when they ran?

10  A    Yes, sir, I am.

11          MR. GILBERT:  That's all.

12          THE COURT:  All right.  Thank you.

13          Anything else, Mr. Simons?

14          MR. SIMONS:  Yes.

15          THE COURT:  Yes, sir.

16          MR. SIMONS:  I want to come around to the podium.

17          THE COURT:  That will be fine.

18                      CROSS-EXAMINATION

19  BY MR. SIMONS:

20  Q    Good morning, Mr. Curry.

21  A    Good morning.

22  Q    My name is Dan Simons, and I represent Stanley Bowling.  I

23  just have a couple of questions for you.

24          You say you lived at the Beech Creek Apartments for 17 or

25  18 years?

1  A    Yeah, something like that.

2  Q    And you'd know most of the people there, wouldn't you?

3  A    Oh, yes.

4  Q    And Stanley Bowling would have known that, would he not?

5  A    Yes.

6  Q    And he came around and tried to get you to talk for him

7  and to promote his candidacy, didn't he, in 2002?

8  A    Yes.

9  Q    Okay.  And he didn't give you any money to pay any voters?

10 A    No.

11 Q    Okay.  And you did that for him.

12 A    Yes, I did.

13 Q    You liked Stanley.  Did you think he was a good magistrate

14 candidate?

15 A    Yes, he was.

16         MR. PARMAN:  Objection, Your Honor.

17         THE COURT:  Sustained.

18 BY MR. SIMONS:

19 Q    Did you talk for him?

20 A    Pardon?

21 Q    Did you talk for him?

22 A    Oh, yeah.

23 Q    Favorably about him?

24 A    Yes, I did.

25 Q    And in 2006, the election Mr. Parman clues you into it, he

 1  says it was the Carmen Webb Lewis race against Daugh White.  Do

 2  you remember that race?

 3  A    Yes, I remember that race.

 4  Q    You couldn't vote in that because you weren't in the city,

 5  but you do remember the race?

 6  A    Yes.  Yes, sir, I do.

 7  Q    Now, Stanley didn't have any opposition in that race, did

 8  he?

 9  A    No, he was unopposed.

10  Q    So there wasn't any need for you to talk him up or do

11  anything on that occasion?

12  A    No, not with Stanley, no, there wasn't.

13           MR. SIMONS:  I think that's all I have, Your Honor.

14  Thank you.

15           THE COURT:  All right.  Thank you.

16           Let's see if there's any redirect.

17           MR. PARMAN:  Nothing further, Your Honor.

18           THE COURT:  Anyone else?

19        (No response.)

20           THE COURT:  No?

21           Thank you.  You can step down, sir.

22           The witness will be finally excused.

23           Thank you.  Mr. Smith or Mr. Parman, you may call

24  your next witness.

25           MR. SMITH:  Yes, Your Honor.  Woodrow W. Woods, Jr.

1    I'm trying to catch up with the rapid pace this morning, Your

2    Honor, but I believe that the word's been sent around that he's

3    to come down to the witness room.

4                        WOODROW W. WOODS, JR.,

5    having been first duly placed under oath, was examined and

6    testified as follows:

7              THE COURT:  Thank you.

8              Mr. Smith, you may proceed.

9              MR. SMITH:  Thank you, Your Honor.

10                       DIRECT EXAMINATION

11   BY MR. SMITH:

12   Q    State your name, please.

13   A    Woodrow Woods, Jr.

14   Q    And do you go by any other name, Mr. Woods?

15   A    I have a nickname, Dick Woods.

16   Q    Okay.  And where do you currently reside, sir?

17   A    1442 Highway 1524, Manchester, Kentucky.  That's in the

18   Bright Shade section.

19   Q    Okay.  And the Bright Shade section, is that a polling

20   place out there also named Bright Shade?

21   A    Yes, sir.

22   Q    And how long have you lived in that precinct, sir?

23   A    Fifty-eight years, 57 years.

24   Q    Okay.  And are you married?

25   A    Yes, sir.

1   Q    And do you have children?

2   A    Yes, sir.

3   Q    How many children do you have, sir?

4   A    Two.

5   Q    And what are their ages?

6   A    Forty-two and 40.

7   Q    And are they also employed?

8   A    My son is.

9   Q    Okay.  How is he employed?

10  A    Board of Education in Clay County.

11  Q    And is that where you were employed?

12  A    Yes, sir.

13  Q    How long did you work for the Board of Education?

14  A    About 25 years.

15  Q    What was your title when you left that position with —

16  when you left your job at the Board of Education, sir?

17  A    Assistant superintendent.

18  Q    And how many assistant superintendents do they have in the

19  Clay County School System at the time that you left?

20  A    At the time that I left?

21  Q    Yes, sir.

22  A    I was the only one.

23  Q    Okay.  And who was the superintendent that you were

24  assisting during your job there?

25  A    I started out with Charles White.

1    Q    Okay.

2    A    And then I was assistant under Mr. Adams.

3    Q    So how long would that make it that you were an assistant

4    superintendent in the Clay County School System, sir?

5    A    Roughly seven years.

6    Q    Okay.  And did you retire before Doug Adams or about the

7    same time if you recall?

8    A    I retired July 1, 2006.

9    Q    Okay.  And did he retire after you or before you, if you

10   recall?

11   A    After.

12   Q    Okay.  Now, who took your place as assistant

13   superintendent in the Clay County School System, sir?

14   A    I believe Ms. Reecia Samples was appointed assistant

15   superintendent two or three years later, '08, '09.

16   Q    I may be confused, but I thought I understood she was the

17   superintendent of schools.  Is that not correct?

18   A    She is now, yes.

19   Q    All right.  They don't have an assistant to her at this

20   point?

21   A    I don't think so.

22   Q    Okay.  When did your son become employed with the Clay

23   County School System, sir?

24   A    About 15 years ago.

25   Q    And how did he start his employment there, in what

1  position?

2  A     He was a substitute teacher.

3  Q     Okay.  And where is he currently positioned in the Board

4  of Education?

5  A     He's the DPP at the central office.

6  Q     What does that stand for, sir?

7  A     Director of Pupil Personnel.

8  Q     And when did he get that promotion?

9  A     I think this is his second year.

10  Q     So that would have made him promoted in 2008?

11  A     I think that — yeah.

12  Q     And what position did he hold prior to that, sir?

13  A     He was a truant officer, so to speak.

14  Q     When did he take that position?

15  A     He held that position -- I'm not sure.  Four or five years

16  maybe.

17  Q     You have just one truant officer in the Clay County system

18  or do you have more?

19  A     Susan Corn was also a truant officer.  I don't know if she

20  still is or not.

21  Q     So there were two positions when your son worked there?

22  A     Yes, there was two.

23  Q     Okay.  Now, prior to being assistant superintendent, what

24  did do you for the school system, sir?

25  A     I was the Director of Federal Programs at the Board of

1  Education; mainly Title I.

2  Q    Okay.  And if you could, just generally describe your trek

3  from your beginning employment there up to that position.

4  A    When I first started?

5  Q    Yes, sir.

6  A    I was a schoolteacher at Manchester Elementary for about

7  eight — eight or nine years and I went to the Clay County

8  Middle School as assistant principal for a couple of years and

9  then I was transferred to the Board of Education as Director of

10  Federal Programs I think in '92, '92 or '93, and I believe in

11  '99 is when I became assistant superintendent.

12  Q    Okay.  Now, Mr. Woods, did you also serve as an election

13  officer in the Bright Shade precinct in 2002?

14  A    Yes, sir.

15  Q    Did you serve there in the position as judge?

16  A    Yes, sir.

17  Q    And were you representing the Republican or the Democrat

18  party in that election, sir?

19  A    Republican.

20  Q    And who was also working there as election officers in the

21  2002 election with you?

22  A    Terry Hubbard was the sheriff, there was — there was a

23  Mr. Beatty, his first name escapes me, was the clerk, and I

24  think the Democratic judge was a fellow by the name of Shirley

25  Joe Smith.

1   Q    Shirley Joe Smith?

2   A    Smith.

3   Q    And that was the other judge that was serving the

4   Democratic party?

5   A    Yes, sir.

6   Q    Is that Shirley Joe a male or female, I'm sorry, I didn't

7   hear your —

8   A    Male.

9   Q    Had you served in that position prior to the 2002

10  election, Mr. Woods?

11  A    Prior to '02?

12  Q    Yes, sir.

13  A    I believe I served in '94.  Maybe — I don't think I

14  served in the '80s.  I could have, I don't know.

15  Q    Now, during that 2002 election, did you travel some with

16  Mr. Doug Adams on lunch hours?

17  A    We ate lunch, I would say, 75 percent of the time

18  together.

19  Q    Okay.  So you-all would travel for lunch, and during those

20  lunches, did you-all discuss the upcoming elections in 2002?

21  A    I'm sure we did.

22  Q    And was he made aware that you were going to be serving as

23  an election judge for the 2002 election there in Bright Shade?

24  A    I think he knew that, yes.

25  Q    Okay.  And when you-all had this 2002 election, did you

1  get invited to a meeting hosted at the home of Paul Bishop just

2  prior to the election?

3  A    Yes, sir.

4  Q    And if you could, tell us, Mr. Woods, did you go to that

5  meeting?

6  A    Yes.

7  Q    And could you tell us, Mr. Woods, where it was that you

8  traveled to go to attend this meeting?

9  A    It was at Paul Bishop's home.  He had a — sort of a metal

10 building outside his home.

11 Q    And did Mr. Adams consider Paul Bishop his friend, as well

12 as you?

13 A    I thought so.

14 Q    And do they live pretty close together out there in that

15 area of Clay County?

16 A    Yeah, not far apart.

17 Q    About how far do you estimate?

18 A    Maybe a mile, mile and a half.

19 Q    And does Paul Bishop have a son named Mike Bishop?

20 A    Yeah.  Yes.

21 Q    Does he live near Paul Bishop?

22 A    You know, I'm not sure where Mike lives.  I'm not actually

23 sure.  Maybe pretty close.  I'm not sure.

24 Q    Okay.  How many times have you been to Paul Bishop's, sir?

25 A    I think I've been one other time to his house.

1    Q    Okay.  So you've been there a couple of times that you

2    recall?

3    A    Yes.

4    Q    But you remember specifically in the '02 election, prior

5    to election day that you went there, did you see other people

6    there while you visited?

7    A    Yes, sir.

8    Q    Could you name the people that you saw there, Mr. Woods?

9    A    Paul and Mike.

10   Q    Paul and Mike?

11   A    Paul and Mike Bishop.  Jimmy Lyttle.

12   Q    Okay.

13   A    John Brown.

14   Q    Does he go by a middle name, sir?

15   A    John --

16   Q    Let me ask you this:  Does he work in the school system,

17   too?

18   A    He's retired.

19   Q    Did he work in the school system in 2002, Mr. Woods?

20   A    Yes, sir.

21   Q    What position did he have in 2002, sir?

22   A    DPP.

23   Q    The position that you last held?

24   A    Huh?

25   Q    That's the position that you last held?

1    A    No.  He was Director of Pupil Personnel.

2    Q    Okay.  I've got you confused with your son; is that right?

3    A    Evidently.

4    Q    Is that the position he holds, sir?

5    A    Yes, it is.

6    Q    John Russell Brown was —

7    A    Yeah, that's who he was, John Russell.  He was at the

8    school board at that time employed as the Director of Pupil

9    Personnel?

10   Q    Who else do you recall seeing there, sir?

11   A    Roy Morgan was there.  William Stivers, Wayne Jones,

12   Yancey White, Mr. Adams.

13   Q    Mr. Adams being?

14   A    Doug Adams.

15   Q    Okay.

16   A    Freddy Thompson was there.

17   Q    Okay.

18   A    There were a couple of guys there.  There were a couple of

19   boats in that building and there were a couple of guys, they —

20   they were working on a boat, a Lunsford fellow and a Stevens

21   fellow.

22   Q    Okay.  Now, while you were there, how long did you stay

23   there, Mr. Woods?

24   A    I would estimate about 45 minutes.

25   Q    Okay.  And when you arrived there, were these gentlemen

1  already there or most of them?

2  A    No, I don't think they were all there.  Paul and Mike was

3  there.

4  Q    Okay.

5  A    There might have been a couple other guys that I've just

6  forgotten.

7  Q    When you left the meeting, was it still going on?

8  A    I don't know if it was still going on, but there were

9  people still there when I left.

10 Q    Were you one of the first to leave or one of the last to

11 leave, to your recollection?

12 A    There was still people there when I left.  I don't --

13 Q    You don't know who had left before you, but --

14 A    No.  No.

15 Q    -- you left in about 45 minutes?

16 A    Yeah, I think 45 or 50 minutes.

17 Q    Okay.  And during the time period there, did you overhear

18 a discussion regarding Mr. Charles Marcum?

19 A    Well, they were discussing -- the discussion was --

20 Q    I'm asking the questions, sir, did you overhear a

21 discussion?  We don't want to get into hearsay here.

22 A    Okay.

23 Q    So I need to establish some groundwork for you.  Did you

24 overhear a discussion involving Charles Marcum?

25 A    No, I only heard Charles Marcum make a statement.

1  Q    Okay.  And so earlier you didn't list him in the names of

2  people that were there.  Did he show up at some point in time?

3  A    He was there.  He was there.

4  Q    And you heard him make a statement at that meeting?

5  A    Well, yes, I did.

6  Q    And what do you recall him saying, sir?

7  A    He —

8         THE COURT:  I'm sorry?

9         MR. BALDANI:  Objection, Your Honor; same one we were

10  discussed at the bench yesterday.

11         THE COURT:  You'll have to come up.  I'm unaware of

12  what it is.

13     (Whereupon, the following discussion was had between the

14  Court and counsel at the bench, out of the hearing of the

15  jury.)

16         THE COURT:  I'm not sure if this is something other

17  than what we discussed previously.  I don't know the nature of

18  the statement.  So you'll have to let me know before the

19  witness testifies.

20         MR. BALDANI:  Judge, I'm objecting because consistent

21  with my previous motions, I don't believe this is a

22  co-conspirator statement.  That's why I said the same objection

23  I raised yesterday.

24         THE COURT:  All right.

25         Mr. Smith, you believe Mr. Woods will testify that

1  Mr. Marcum made a statement in furtherance of the conspiracy

2  regarding the amount of money necessary to further the scheme;

3  is that correct?

4          MR. SMITH:  That's my expectation, Your Honor.  I do

5  sense that this is somewhat of a hostile witness to the

6  government and I can't predict anything at this point.

7          THE COURT:  All right.  I'll overrule the objection.

8  You may continue.

9      (Whereupon, the following proceedings continued in open

10 court.)

11         THE COURT:  Thank you.

12         Mr. Smith, you may continue.  The objection is

13 overruled.

14 BY MR. SMITH:

15 Q   Mr. Woods, I believe my last question was relating to the

16 comment that you overheard Mr. Marcum make.  Just for our

17 understanding, were you seated at the table with these

18 gentlemen that you've listed?

19 A   Yes, sir.

20 Q   Okay.  And were they arranged around a large table with

21 chairs, or how was it situated?

22 A   Yes, it was a rather large table.

23 Q   And —

24 A   Probably 12 people sitting around it.

25 Q   So 12 people seated around it?

1   A    Uh-huh.

2   Q    Okay.  You indicated you were seated at the table?

3   A    Yes, sir.

4   Q    Okay.  For the whole meeting?

5   A    No.

6   Q    Okay.  How long were you seated at the table, sir?

7   A    I would — I would estimate ten to 12 minutes.

8   Q    Okay.  And was that just prior to you leaving or was that

9   when you just got there, or could you relay a time that you

10  were seated at the table with these gentlemen?

11  A    I was there early.  Probably three or four people was all

12  was there when I was there, and then they came in.

13  Q    All right.  The comment that you say you overheard

14  Mr. Marcum make, was that while you were seated at the table?

15  A    Yes, sir.

16  Q    So this was early?

17  A    Uh-huh.

18  Q    Early in the discussion?  And what was it that you

19  overheard Mr. Marcum say in the presence of these other

20  individuals, sir?

21  A    Something to the effect that — he said, "Either I'm a

22  poor man or I'm not a rich man."  And I understood the amount

23  that he said, "Maybe I could come up with $10,000."

24  Q    Okay.  While you were there that 45 minutes to 50 minutes,

25  did you see him produce any of that money in your presence?

1  A     No, sir.

2  Q     Okay.  Now, on election day, did you have an opportunity

3  to see Doug Adams and Jeff Deaton in the company of each other

4  in that May 2002 election, sir?

5  A     I think they drove by the polling place.  They didn't get

6  out, but they drove by.

7  Q     Okay.  Now, about three or four days prior to the election

8  in 2002, were you paid a visit by a man by the name of Yancey

9  White at your home in the Bright Shade precinct?

10  A     Yes, sir.

11  Q     And when he came to you that evening, did you have a

12  conversation with him?

13  A     Yes.

14  Q     And was it relating to possible things regarding the

15  election --

16  A     Yes.

17  Q     -- in the next couple, three days?

18  A     Uh-huh.

19  Q     And did you recall seeing a couple of people come to your

20  house there to meet Mr. Yancey White?

21  A     Yes, sir.

22  Q     And did he give them money --

23  A     Yes, he did.

24  Q     -- in your presence?

25        Do you recall how much money he gave them in your

1  presence?

2  A     It would be an approximation on my part, 2500 to 3,000

3  maybe.

4  Q     Was that cash money that you saw?

5  A     Yes.

6  Q     And do you remember the names of these people that he met

7  there at your residence that night?

8  A     Eugene Mills, Ann Jackson, and her sister, Alfreida,

9  Ernest Edwards, and I think Mr. Mills's stepson-in-law

10 accompanied him there also, but he didn't receive any money.

11 Q     I'm sorry.  I was failing to catch that last name.  Whose

12 son-in-law?

13 A     Mr. Mills is Mr. Eugene Mills's stepson-in-law.

14 Q     Is Mr. Mills still leaving?

15 A     No, he's deceased.

16 Q     Okay.  And did Mr. Yancey White produce a yellow

17 highlighted voter list while he was in your presence?

18 A     He had a voter list and he let those people that were

19 there highlight names that they could contact or had contacted.

20 Q     And in your presence, did Yancey White tell them the

21 candidates that he wanted them to vote for when he gave them

22 the money?

23 A     He mentioned Mr. Thompson, Freddy Thompson, and his

24 father-in-law, Roy Morgan.

25 Q     Had Mr. White arranged with you before meeting these

1  people, did he get your permission to meet them there at your

2  place?

3  A    He called me.

4  Q    Did he get your permission, sir?

5  A    He told me to call them and have them meet him at my

6  house.

7  Q    Did he split that money up that you indicated between

8  these people in some denominations or forms?

9  A    Yes, sir.

10 Q    And could you explain to this jury how he split the money

11 up between these people that he met there at your residence

12 this night?

13 A    By that you mean the amount?

14 Q    If you recall, sir.

15 A    It seems like he gave one of the Jackson girls more than

16 the other, and I want to think maybe 6- or 700 and 300 to 350,

17 and he gave Mr. Mills more money than he did everybody ––

18 anybody, but I'm not sure of the amount; maybe 1500, maybe

19 more.  And it seemed like Mr. Edwards was 300.  I'm just not

20 positive.

21 Q    And Mr. Eugene Mills, was he, in fact, an election officer

22 in the past?

23 A    Yes.

24 Q    But he didn't serve with you in this 2002 election?

25 A    No.

1          MR. SMITH:  May I have just a moment, Your Honor?

2          THE COURT:  Yes, sir.

3          MR. SMITH:  I pass the witness.  Thank you.

4          MR. PINALES:  No questions, thank you.

5          THE COURT:  Mr. Westberry.

6          MR. WESTBERRY:  Thank you, Judge.  I'll come up to

7    the podium.

8                          CROSS-EXAMINATION

9    BY MR. WESTBERRY:

10   Q    Good morning, Mr. Woods.

11   A    Good morning.

12   Q    My name is Kent Westberry and I'm one of the attorneys for

13   Doug Adams —

14   A    Okay.

15   Q    — and I've got just a couple of questions for you.

16        I get the impression you worked in the Clay County School

17   System for a good number of years.  Did you, Mr. Woods?

18   A    Yes, sir.

19   Q    How many years would you say that you worked at the same

20   time that Doug Adams was employed in the school system, just

21   ballpark?  Just a ballpark.

22   A    I would say he was employed by the school system at least

23   as long as I was, maybe longer.

24   Q    And how many years was that, sir?

25   A    Well, I was there about 25 years.

1  Q    Now, you were first hired on by Charles White as assistant

2  superintendent; is that correct?

3  A    Yes.

4  Q    And you stayed on when Doug Adams took over as

5  superintendent; is that correct?

6  A    Yes, sir.

7  Q    I think Mr. Adams took over as superintendent in, what,

8  '99; does that sound about right?

9  A    Uh-huh, '99 or 2000, yeah.

10  Q    And you retired, I think, in 2006, Mr. Woods; is that —

11  A    Yes, sir.

12  Q    You told us that you, what, ate lunch with Doug 75 percent

13  of the time?

14  A    Yeah, that's a good guess.

15  Q    You're talking about days when you-all were working

16  together; is that correct?

17  A    Yes, sir.

18  Q    Would you eat lunch there at the school?

19  A    We ate lunch at some schools, fast food restaurants,

20  different places.

21  Q    Was it typically just the two of you that ate lunch

22  together?

23  A    No.

24  Q    Who would eat lunch with you?

25  A    Our finance officer, Mr. Ruben Hacker, would each lunch

 1  with us on occasion, and Mr. Brown would also each lunch with

 2  us.

 3  Q    Let me ask you if some other people would have eaten lunch

 4  with you.  Would Mr. Maricle have ever been part of your lunch

 5  group?

 6  A    No.

 7       MR. SMITH:  Your Honor, I'm going to object.  I

 8  believe that the witness has answered these questions to the

 9  best of his ability and we could name those people all day.

10       THE COURT:  I'm not sure that it's within the scope

11  of direct, Mr. Westberry.

12       MR. WESTBERRY:  Well, he volunteered, Mr. Woods did,

13  that he eats lunch with Mr. Adams about 75 percent of the time

14  in his direct testimony.  I'm just trying to pinpoint who the

15  regular lunch companions were and who they were not.  This goes

16  to Count One.  I think it was touched on by their direct

17  examination.

18       THE COURT:  All right.  The witness —

19       Mr. Woods, you may identify other people that you had

20  lunch with on a regular occasion.  Go ahead.

21       THE WITNESS:  It was either Mr. Adams and myself or

22  Mr. Hacker, Mr. Brown, and Mr. Adams and myself or the three of

23  us or four of us.  Two, three, or four.

24  BY MR. WESTBERRY:

25  Q    Anybody else that you can think of that may have been a

1  regular part of your-all's lunch group?

2  A    No.

3  Q    In the years that you worked with Doug Adams, particularly

4  during the time that Doug Adams was superintendent of the

5  school system, were politics something that he considered when

6  he made decisions on how the school system would be run?

7           MR. SMITH:  I'm going to object, outside the

8  witness's knowledge.

9           THE COURT:  Sustained.

10 BY MR. WESTBERRY:

11 Q    How much responsibility does a superintendent of schools

12 have for hiring decisions for -- if you know, for hiring

13 decisions for a person that might work at, say, one school in

14 the county?  How does that work?

15 A    Are you talking about a teacher?

16 Q    Could be a teacher, could be a maintenance person, a

17 custodian, DPP.  Assuming they work at one school, how much

18 responsibility does the superintendent alone have?

19           MR. SMITH:  Your Honor, I'm going to object again as

20 to it's beyond the scope.

21           THE COURT:  Sustained.  It's outside the scope.

22 BY MR. WESTBERRY:

23 Q    You talked about the day of the election back in the May

24 '02 primary.  And I think you were serving as an election

25 officer out of the Bright Shade precinct; is that correct?

1   A    Yes, sir.

2   Q    I believe you said that you saw Doug Adams and Mr. Deaton

3   drive by in a car; is that correct?

4   A    Yes, sir.

5   Q    But they didn't get out of the car?

6   A    No, sir.

7   Q    You also testified, Mr. Woods, about a meeting that

8   occurred in Paul Bishop's garage sometime before that May

9   primary back in '02.

10  A    Yes, sir.

11  Q    You had only been there once or twice before; did I hear

12  that right?

13  A    That's true.

14  Q    You said that there were a couple of fellows in there

15  working on a boat at the same time?

16  A    Yes, sir.

17  Q    Were some people interested in the boat that they were

18  working on, is that part of the reason that some of the

19  gathering had occurred at the garage?

20  A    I think only those two.

21  Q    No money was ever exchanged or presented or shown at that

22  particular meeting; do I understand that correct?

23  A    No, that's true.

24  Q    Have your families and Mr. Adams' families been acquainted

25  with each other for a period of time?

1   A    Yes, sir.

2         MR. WESTBERRY:  Could I have just one second, please,

3   Your Honor?

4         THE COURT:  Yes, sir.

5         MR. WESTBERRY:  Thank you, Mr. Woods.

6         Judge, that's all I have and I'll pass the witness.

7   Thank you.

8         THE COURT:  All right.  Thank you.

9         MR. WHITE:  No questions, Your Honor.

10         MR. ABELL:  No questions.

11         THE COURT:  Mr. Baldani.

12                    CROSS—EXAMINATION

13   BY MR. BALDANI:

14   Q    Good morning, Mr. Woods.

15   A    Good morning.

16   Q    My name is Russ Baldani, I'm one of Freddy Thompson's

17   lawyers.  I want to ask you a little bit about this meeting

18   that you've told the jury about.  Would you agree that this was

19   not what you would call a formal meeting?

20   A    Informal.

21   Q    Right.  In other words, there wasn't somebody said, all

22   right, I'm going to call the meeting to order and we got A, B,

23   C, D, E present and we've got somebody taking minutes.  Nothing

24   even close to that, was it?

25   A    No.

1  Q    And you can't tell us the exact date of the meeting, can

2  you?

3  A    No, sir.

4  Q    You can't tell us exactly what time it started, can you?

5  A    It was in the afternoon.

6  Q    All right.  You told us to the best of your recollection

7  who was there; is that right?

8  A    Yes, I did.

9  Q    All right.  You can't tell the jury when Freddy Thompson

10 got there or when he left, can you?

11 A    No.

12 Q    You don't recall that, do you?

13 A    No.

14 Q    And, in fact, he made have left before you did; is that

15 fair to say?

16 A    I don't know.

17 Q    Okay.  And he's not -- he wasn't leading the meeting, was

18 he --

19 A    No.

20 Q    -- Freddy?

21 A    No.

22 Q    He was pretty much sitting there listening?

23 A    That's true.

24 Q    Didn't have much to say?

25 A    No.

1  Q    And you certainly didn't hear him say anything about I'm

2  putting in a hundred thousand, 140,000, did you?

3  A    No.

4            MR. SMITH:  I'm going to object.

5            THE WITNESS:  Overruled.

6  BY MR. BALDANI:

7  Q    Didn't hear anything like that?

8  A    No.

9  Q    And you certainly didn't see him put any money down, did

10 you?

11 A    There was no money at that meeting.

12           MR. BALDANI:  That's all the questions I have, Judge.

13           THE COURT:  Thank you.

14           Mr. Gilbert.

15           MR. GILBERT:  No questions.

16           THE COURT:  Anyone else?

17           MR. SIMONS:  No.

18           THE COURT:  Thank you.

19           Mr. Smith, any redirect?

20                     REDIRECT EXAMINATION

21 BY MR. SMITH:

22 Q    Mr. Woods ——

23 A    Yes, sir.

24 Q    —— just so I'm clear, you weren't there for the beginning

25 to the end of the meeting?

1  A    I was close to being there at the beginning.

2           MR. WESTBERRY:  Objection.

3           THE COURT:  Overruled.

4  BY MR. SMITH:

5  Q    You were close to being there at the beginning?

6  A    But I don't think I was there when -- I wasn't the last

7  one to leave.

8  Q    You were seated at the table for ten to 12 minutes?

9  A    That's true.

10 Q    You weren't there for the whole meeting, were you,

11 Mr. Woods?

12 A    No.

13          MR. SMITH:  Thank you.

14          THE COURT:  Anything else of the witness?

15          MR. WESTBERRY:  One second, may I?

16          THE COURT:  Yes, sir.

17                       RECROSS-EXAMINATION

18 BY MR. WESTBERRY:

19 Q    One question.  Do you know how long Mr. Adams was at this

20 meeting; do you recall?

21 A    I couldn't be sure.

22 Q    Did he leave before or after you did; do you recall?

23 A    I'm not sure.

24          MR. WESTBERRY:  Thank you very much.  I appreciate

25 it.

1              THE WITNESS:  You're welcome.

2              THE COURT:  Okay.  Anything else?

3              MR. BALDANI:  Just to follow up, Judge.

4              THE COURT:  Yes, sir.

5                        RECROSS-EXAMINATION

6    BY MR. BALDANI:

7    Q    Mr. Woods, it's your best estimate that you were there for

8    about a total of 45 minutes?

9    A    Forty-five to 50 minutes, yes, sir.

10   Q    But only actually at the table for ten or 12 minutes?

11   A    True.

12   Q    But the rest of the time you were there you were within

13   earshot of what was going on, weren't you?

14   A    I didn't hear what was going on.  I was -- I was at the

15   boat talking to those two guys that were working on the boat.

16   Q    Okay.

17   A    Mr. Brown was not at the table, and I was -- he was at the

18   other boat and I talked to him for a while, and then I came

19   over and talked to Mr. Jimmy Lyttle, who was not at the table

20   for ten or 15 minutes.

21   Q    All right.  But as far as you know, Freddy Thompson might

22   have left before you?

23   A    He could have.

24             MR. BALDANI:  That's it, Judge.

25             THE COURT:  Anything else?

1    (No response.)

2              THE COURT:  Thank you, Mr. Woods, you may step down.

3              The witness will be finally excused.

4              Mr. Smith, before you call your —— or, Mr. Parman,

5    before you call your next witness, since we took just a shorter

6    break this morning, we're going to recess for lunch about

7    15 minutes till 12:00 today; okay?

8              MR. PARMAN:  Yes, Your Honor.  I believe we can get

9    the next witness in.

10             THE COURT:  All right.  That's fine.

11             MR. PARMAN:  The United States calls Tanya K.

12   Davidson.

13             THE COURT:  Thank you.

14                        TANYA K. DAVIDSON,

15   having been first duly placed under oath, was examined and

16   testified as follows:

17             THE COURT:  Thank you.

18             Mr. Parman, you may proceed.

19             MR. PARMAN:  Thank you, Your Honor.

20                        DIRECT EXAMINATION

21   BY MR. PARMAN:

22   Q    Good morning.

23   A    Good morning.

24   Q    Could you state your name, please?

25   A    Tanya K. Davidson.

1   Q   Ma'am, how old are you?

2   A   How old am I?

3   Q   Yes.

4   A   Thirty-four.

5   Q   Where are you from?

6   A   I'm from Manchester, Kentucky.

7   Q   How long have you lived in Manchester, Kentucky?

8   A   All my life.

9   Q   Where do you live there in Manchester?

10  A   In Beech Creek Apartments.

11  Q   How long have you lived in Beech Creek Apartments?

12  A   Almost seven years.

13  Q   What is your mother's name?

14  A   Mary Gail Roberts.

15  Q   Do you have any kids?

16  A   Yeah.

17  Q   How many kids do you have?

18  A   I had three, two living and one passed away.

19  Q   Sorry to hear that.  What's the age of your children?

20  A   My little girl that's living is six, my little boy is

21  three, and my little girl that passed away would have been 12.

22  Q   Ma'am, have you participated in elections in the past?

23  A   Yes, I have.

24  Q   Did you participate in the 2002 election?

25  A   2002.

1  Q    Let me ask the question a different way.  Did you

2  participate in the election where Jennings White ran against

3  Freddy Thompson for county clerk?

4  A    Yes.

5  Q    And based on your memory, would that have been around

6  2002?  Does that sound accurate to you?

7  A    I can't remember the dates.  I'm not — I'm not good on

8  dates.  I participated in the election where all the fights and

9  stuff occurred.

10 Q    Is that the same election where Freddy Thompson ran

11 against Jennings White?

12 A    Yes, I think it was.

13 Q    Were you asked by somebody to participate in that

14 election?

15 A    Yes, I was.

16 Q    Who asked you to participate?

17 A    Stanley Bowling.

18 Q    What did Stanley Bowling ask you to do?

19 A    He asked me to haul voters for the election.

20 Q    Did Stanley Bowling pay you to haul voters in the

21 election?

22 A    Yes.

23 Q    What did he pay you.

24 A    It was around $250.

25 Q    How many voters did you haul?

1  A    A lot.  I can't remember the exact number.

2  Q    Would it have been more than 25?

3  A    Yeah.

4  Q    More than 50?

5  A    No.  Probably maybe 30, 35, maybe something like that.

6  Q    Where did you haul your voters from?

7  A    I hauled them from the apartments that I live in and the

8  area around it, it's called Littleton.

9  Q    Where did you take your voters to?

10  A    The Middle School.

11  Q    Did you then hand your voters off to somebody else?

12  A    Well, I took them in there and they signed in, and the way

13  the system worked, there was somebody there on our side that

14  was waiting for the people that we brought in and they would

15  take them and take them to the booth.

16  Q    Do you recall the names of some of those individuals?

17  A    I can't remember the older people, I can remember Chris

18  Duff was there and Crystal Bowling was there.

19          MR. SIMONS:  Your Honor, I'm sorry, I can't hear what

20  she's saying.

21          THE COURT:  She said Chris Duff was there and —

22          Crystal Bowling, is that the name?

23          THE WITNESS:  Yes.

24          THE COURT:  Crystal Bowling.

25  BY MR. SMITH:

1   Q    Do you know if Crystal Bowling is any relation to Stanley

2   Bowling?

3   A    She's his daughter-in-law.

4   Q    And do you know if Chris Duff has any relation to Bart

5   Morris?

6   A    I think it's his stepson.

7   Q    After the voters had voted, where did you take them?

8   A    To get paid.

9   Q    Where did you take them to?

10  A    Bart and Deb's house, and then I think maybe later on that

11  day they moved out on Y Hollow to an RV maybe.

12  Q    Okay.  You said Bart and Deb's house.  Please give me the

13  full name that you understand it to be.

14  A    Oh, Bart and Deb Morris, I'm sorry.

15  Q    Where was your house located?

16  A    On — it's behind SuperAmerica.  I don't know the name of

17  that road.

18  Q    Now, when you mean you took them to get paid, did you go

19  in and get the money to pay them or did you send them in?

20  A    I went in and got the money.

21  Q    Who did you specifically get the money from?

22  A    Mostly Deb, Deb Morris.

23  Q    How much money did you get for each individual voter?

24  A    It was between 30 and $40.

25  Q    And Deb Morris gave you that money to pay them?

1    A    Yes.

2    Q    Did she have a list that she was going by of voters?

3    A    Yes.

4    Q    Explain to the jury what that list was.

5    A    It was a list of all the voters in our precinct, and as we

6    brought them in, she highlighted each one.

7    Q    Now, did Bart Morris pay you after the election?

8    A    No.  He gave me gas money during the election.

9    Q    But Stanley paid you before for your participation?

10   A    No, he paid me after.

11   Q    Okay, I'm sorry.  I want to make sure we get that clear.

12   Stanley Bowling paid you after the election?

13   A    Yes.

14   Q    And then Bart gave you gas money during the election?

15   A    Yes.

16   Q    Now, you mentioned the Y Hollow and said you thought they

17   may have moved their operation.  Explain, to your knowledge,

18   why they moved the operation.

19   A    I think maybe because they knew something was happening.

20   I think maybe they knew like they was being watched or

21   whatever.

22   Q    So after the operation moved to Y Hollow, how did it

23   operate then?

24   A    We just went to the camper and got the money and give it

25   to the people.

1  Q    The camper, what do you mean by "the camper"?

2  A    They had a camper set up in Y Hollow, like a little RV

3  camper.

4  Q    So you then –– after getting the voters, taking them to

5  the poll to vote, you would then take them up to the Y Hollow

6  and that's where they were then paid?

7  A    Yeah.

8  Q    Did you go into the RV to get the money again?

9  A    Yeah.

10 Q    Who did you get the money from at the Y Hollow?

11 A    I can't remember who was at the camper.  I'm sorry.

12 Q    Now, after 2002, were you approached again to participate

13 in elections?

14 A    Yeah.

15 Q    Who approached you?

16 A    Stanley Bowling.

17 Q    Were you approached by anybody else?

18 A    No.

19 Q    What did you tell him?

20 A    No.

21 Q    Why?

22 A    Because I was scared, all the stuff that happened in that

23 erection, I didn't want anything else to do with it.

24 Q    When you say "that election," which one are you referring

25 to?

```
 1   A    The 2002 election.

 2   Q    Did you participate in any more elections after that?

 3   A    No.  I barely will even go vote now.

 4            MR. PARMAN:  If I may have just a moment, Your Honor?

 5            THE COURT:  Yes, sir.

 6            MR. PARMAN:  Nothing further, Your Honor.

 7            THE COURT:  All right.  Thank you.

 8            Mr. Hoskins?

 9            MR. HOSKINS:  No questions, Your Honor.

10            THE COURT:  Mr. Westberry?

11            MR. WESTBERRY:  No questions.

12            MR. WHITE:  Can you give me just a moment, Your

13   Honor?

14            THE COURT:  Yes, sir, certainly.

15            MR. WHITE:  I'm sorry, Your Honor.  No questions,

16   Your Honor.

17            THE COURT:  All right.  Thank you.

18            MR. ABELL:  No questions.

19            THE COURT:  Mr. Baldani?

20            MR. BALDANI:  Nor from us.

21            THE COURT:  Mr. Gilbert?

22            MR. GILBERT:  I have a few.

23            THE COURT:  Yes, sir.

24                      CROSS-EXAMINATION

25   BY MR. GILBERT:
```

1   Q    Ms. Davidson, my name is Jerry Gilbert, and I represent

2   Bart Morris.

3        Actually, you did participate in the 2006 election, did

4   you not?

5   A    No, I did not.

6   Q    Weren't you approached by Jack Jones and Bobby "Red" Sams?

7   A    No, I was not.

8   Q    Do you remember when you testified before the federal

9   grand jury on July the 12th, 2007?

10  A    Yes.

11  Q    And where was that grand jury located, Ms. Davidson?

12  A    In Lexington.

13  Q    And you appeared in Lexington pursuant to a subpoena?

14  A    Yes.

15  Q    And when you appeared before the grand jury, did they

16  administer an oath to you?

17  A    Yes.

18  Q    And you swore to tell the truth?

19  A    Yes.

20  Q    And I'm referring to page three of the transcript.  Do you

21  recall being asked this question:  "And this particular — do

22  you know if it was the spring or fall or both elections?"

23       And you answered: "Spring."

24       And you were questioned:  "It was the spring?"

25       And your answer was: "In 2006, is that what you're talking

1   about?"

2         And the question was: "Yes."

3         And your answer was: "Spring."

4         Do you remember being asked those questions and giving

5   those answers?

6   A    No.

7   Q    And further question:  "Did you have anyone approach you

8   prior to voting, and who would have approached you?"

9         And your answer was:  "Bobby Sams and Jack Jones."

10        Do you remember that question and giving that answer?

11  A    No.

12  Q    And further, "And what did -- and you did that for them?"

13        And your answer was: "Yes."

14        Question:  "How many people did you haul?"

15        "I hauled about 25 that day."

16        Do you remember being asked that question and giving that

17  answer?

18  A    No.

19  Q    So it's your testimony here today that you did not

20  participate or haul voters for Jackie Jones or Bobby "Red" Sams

21  in 2006?

22  A    No, I have never worked for Jack Jones or Bobby "Red"

23  Sams.

24  Q    Now, Mr. Morris has not approached you to work in

25  elections in 2004 or 2006, has he?

1    A      No.

2              MR. GILBERT:  That's all.

3              THE COURT:  All right.  Thank you.

4              Ms. Hughes?

5                        CROSS-EXAMINATION

6    BY MS. HUGHES:

7    Q      Ms. Davidson, my name is Elizabeth Hughes, I represent

8    Debbie Morris.

9           Have you ever sold your vote?

10   A      Yes, I have sold my vote.

11   Q      And who paid you for your vote?

12   A      They did, Deb and Bart.

13   Q      So it's your testimony that Debbie Morris gave you money?

14   A      Yeah.

15             MS. HUGHES:  Thank you.

16             THE COURT:  Mr. Simons?

17             MR. SIMONS:  Yes, Your Honor.  I have to go to the

18   podium.

19             THE COURT:  That will be fine.

20                        CROSS-EXAMINATION

21   BY MR. SIMONS:

22   Q      Ms. Davidson —

23   A      Yes.

24   Q      — my name is Dan Simons, I represent Stanley Bowling.

25          Did I understand you live in the Beech Creek Apartments?

1  A    Yes, I do.

2  Q    Okay.  And the voters that you hauled to vote were from

3  those apartments?

4  A    Yes.  And there's like three little blocks, you know.

5  Q    Right close there?

6  A    Yeah.  And it was in the area.

7  Q    And how did you drive them?

8  A    I used my grandmother's car.

9  Q    Okay.  And did you say Mr. Bowling asked you to do that in

10 the election that involved Freddy Thompson and Jennings White?

11 A    Yes.

12 Q    Okay.  And he didn't give you any money to pay any voters,

13 did he, Mr. Bowling?

14 A    No, he didn't give me the money.

15 Q    And he didn't give you any money before you hauled the

16 voters, as I understood it?

17 A    No.

18 Q    He paid you afterwards?

19 A    Afterwards.

20 Q    Okay.  And you didn't — he didn't approach you in 2004 or

21 2006 for anything, did he?

22 A    Yeah, he approached me the next — the next year, but I

23 didn't want to.

24 Q    What year are you talking about?

25 A    2004.

TANYA K. DAVIDSON - CROSS - MR. SIMONS          120

1  Q    Mr. Bowling didn't run in 2004.  He was not a candidate in

2  2004.  Could it be that you're confusing the year?

3  A    It might be, yeah.

4  Q    I'm sorry?

5  A    I could be confusing the year.

6  Q    Now, you mentioned that you testified in front of a grand

7  jury in Lexington —

8  A    Yeah.

9  Q    — in July of 2007.  And Mr. Gilbert asked you some

10  questions that you were asked on that occasion while under

11  oath.  Did you remember those answers that you gave?

12  A    No.

13  Q    Okay.  Do you remember the first time that you talked with

14  any investigating agents of the government?

15  A    Yes, I remember they came to my apartment complex and

16  talked to me.

17  Q    Was that just before your grand jury appearance?

18  A    Yes.

19  Q    Okay.  In late June or early July of 2007?

20  A    Yeah.

21         MR. SIMONS:  Okay.  That's all I have, Your Honor.

22  Thank you.

23         THE COURT:  All right.  Thank you.

24         Let's see if there's any redirect.

25         MR. PARMAN:  May we have just a moment, Your Honor?

1          THE COURT:  Yes, sir, you may.

2          MR. PARMAN:  Your Honor, nothing further on redirect,

3    but we would ask that she not be finally excused until after

4    the lunch break.

5          THE COURT:  All right.  That will be fine.  Ma'am,

6    you may — you're not finally excused from your subpoena, but

7    you may step down at this time.

8          Counsel, we'll take our lunch break before the next

9    witness is called.

10          Ladies and gentlemen, at this time, we will take a

11    lunch break until 12:45 this afternoon.  Please keep in mind

12    the admonition that you've been given previously not to discuss

13    the case among yourselves while we are in recess.  The jury

14    will be excused until 12:45.

15      (Whereupon, the jury retired from the courtroom, after

16    which the following proceedings were had in open court.)

17          THE COURT:  Thank you.

18          Any matters to take up outside the presence of the

19    jury?

20      (No response.)

21          THE COURT:  We'll be in recess.

22      (Whereupon, a recess was had for the noon hour, after

23    which the proceedings continue uninterrupted to Volume 16–B.)

24                          (Proceedings concluded at 11:45 a.m.)

25

1    C E R T I F I C A T E

2        I, Cynthia A. Oakes, certify that the foregoing is a

3    correct transcript from the record of proceedings in the

4    above-entitled matter.

5

6    3/5/2010                    s/CYNTHIA A. OAKES
         DATE                    CYNTHIA A. OAKES, RPR, RMR, CRR

7

8

9

10                    I N D E X

11                                                  PAGE

12   Testimony of RAY ADAMS:
         Direct Examination by Mr. Smith:          4
13       Cross-Examination by Mr. Abell:           9

14   Testimony of JAMES DOUGLAS COLEMAN:
         Direct Examination by Mr. Parman:         15
15       Cross-Examination by Mr. Hoskins:         18
         Cross-Examination by Mr. Gilbert:         20
16       Redirect Examination by Mr. Parman:       21

17   Testimony of BILLY RAY SESTER:
         Direct Examination by Mr. Smith:          22
18       Cross-Examination by Mr.Hoskins:          32
         Cross-Examination by Mr. Richardson:      34
19       Cross-Examination by Mr. Gilbert:         35
         Cross-Examination by Ms. Hughes:          39
20       Redirect Examination by Mr. Smith:        39
         Recross-Examination by Mr. Gilbert:       40
21
     Testimony of DESHAE HENSON:
22       Direct Examination by Mr. Smith:          42
         Cross-Examination by Mr. Pinales:         62
23       Cross-Examination by Mr. Westberry:       63
         Cross-Examination by Mr. Gilbert:         63
24       Cross-Examination by Ms. Hughes:          65
         Redirect Examination by Mr. Smith:        66
25       Recross-Examination by Mr. Gilbert:       68

INDEX (Cont'd)                                                    PAGE

Testimony of CARL CURRY:
        Direct Examination by Mr. Parman:              69
        Cross-Examination by Mr. Richardson:           75
        Cross-Examination by Mr. Gilbert:              75
        Cross-Examination by Mr. Simons:               79

Testimony of WOODROW W. WOODS, JR.:
        Direct Examination by Mr. Smith:               82
        Cross-Examination by Mr. Westberry:            98
        Cross-Examination by Mr. Baldani:             103
        Redirect Examination by Mr. Smith:            105
        Recross-Examination by Mr. Westberry:         106
        Recross-Examination by Mr. Baldani:           107

Testimony of TANYA K. DAVIDSON:
        Direct Examination by Mr. Parman:             108
        Cross-Examination by Mr. Gilbert:             115
        Cross-Examination by Ms. Hughes:              118
        Cross-Examination by Mr. Simons:              118




                        E X H I B I T S


Government's                                              Page
Exhibit No.              Identified                     Admitted

PR31C                        13
PR33                         13