United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) February 19, 2010 |
| DOUGLAS C. ADAMS | ) 10:40 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 10-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TESTIMONY OF WANDA WHITE
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                   JASON D. PARMAN, ESQ.

On behalf of the Defendant         DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:            MARTIN S. PINALES, ESQ.

On behalf of the Defendant         R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                  KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant         T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant         ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant         RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:                R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant         JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant         ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant         DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1    Appearances of Counsel:

 2    On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                      JASON D. PARMAN, ESQ.
 3                                    Assistant U.S. Attorneys
                                      601 Meyers Baker Road
 4                                    Suite 200
                                      London, Kentucky  40741
 5

 6    On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
      Russell Cletus Miracle:         107 East First Street
 7                                    Corbin, Kentucky  40701

 8                                    MARTIN S. PINALES, ESQ.
                                      150 East Fourth Street
 9                                    Federal Reserve Building
                                      Cincinnati, Ohio  45202
10

11    On Behalf of the Defendant      R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.
12                                    220 West Main Street
                                      Suite 1900
13                                    Louisville, Kentucky  40202

14
      On behalf of the Defendant      T. SCOTT WHITE, ESQ.
15    Charles Wayne Jones:            133 West Short Street
                                      Lexington, Kentucky  40507
16

17    On behalf of the Defendant      ROBERT L. ABELL, ESQ.
      William E. Stivers:             120 North Upper Street
18                                    Lexington, Kentucky  40507

19
      On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
20    Freddy W. Thompson:             R. TUCKER RICHARDSON III, ESQ.
                                      300 West Short Street
21                                    Lexington, Kentucky  40507

22
      On behalf of the Defendant      JERRY W. GILBERT, ESQ.
23    William B. Morris:              212 North Second Street
                                      Richmond, Kentucky  40475
24

25
```

```
 1   On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                  201 West Short Street
 2                                      Lexington, Kentucky   40507

 3
     On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
 4   Stanley Bowling:                  116 West Main Street
                                        Suite 2A
 5                                      Richmond, Kentucky   40475

 6
     Court Reporter:                   CYNTHIA A. OAKES, CRR
 7                                      Official Court Reporter
                                        United States District Court
 8                                      560 Athens Boonesboro Road
                                        Winchester, Kentucky   40391
 9                                      (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

1          (Whereupon, the jury returned to the courtroom, after

2   which the following proceedings were had in open court.)

3               THE COURT:  Thank you, and please be seated.

4               The record will reflect that all members of the jury

5   are present.  Ladies and gentlemen, I apologize for the delay.

6               The parties and counsel are also present.

7               Mr. Smith, at this time, you may call your next

8   witness.

9               MR. SMITH:  Thank you, Your Honor.  The United States

10  will call Wanda White.

11              THE COURT:  Thank you.

12                        WANDA WHITE,

13  having been first duly placed under oath, was examined and

14  testified as follows:

15              THE COURT:  Mr. Smith, you may proceed.

16              MR. SMITH:  Thank you.

17  BY MR. SMITH:

18  Q    State your name, please.

19  A    Wanda Price White.

20  Q    Now, Ms. White, we're going to be asking questions today

21  of you, and I appreciate you speaking into the microphone

22  because we've had some trouble hearing other witnesses.  Tell

23  us a little bit about yourself, Ms. White.  Who are you married

24  to?

25  A    D. Kennon White.

1  Q    And how long have you two been married?

2  A    Since 1986.

3  Q    And during that marriage, have you-all had children?

4  A    We have two living children.

5  Q    And what are their ages?

6  A    Twenty-two and 16.

7  Q    Where were you born, Ms. White?

8  A    Indianapolis, Indiana.

9  Q    And when is it that you moved to Clay County?

10 A    Mid 1970s.

11 Q    Did you live other places other than Indianapolis growing

12 up?

13 A    Dallas, Texas.

14 Q    And how long did you live in Texas?

15 A    Several years off and on throughout my childhood.

16 Q    Once you moved to Clay County, how long did you live

17 there?

18 A    My adult life.

19 Q    Okay.  And —

20 A    Part of my childhood.

21 Q    Do you still live there now?

22 A    I don't.  I live in London, Kentucky.

23 Q    And when did you move to London, Kentucky, Ms. White?

24 A    Three years ago next month.

25 Q    Now, do you have family in Clay County?

1   A    I have one — two uncles that live in Clay County.

2   Q    And what brought your family from out West back to Clay

3   County?

4   A    My mother's family is from there, from Leslie County and

5   parts of Clay County.

6   Q    And what's your mother's maiden name?

7   A    Wombles.

8   Q    Now, Ms. White, where were you educated?

9   A    Clay County High School.

10  Q    And were you a graduate of that high school?

11  A    I obtained my GED through Clay County High School.

12  Q    And following your high school education, did you further

13  your education in other areas?

14  A    I have two trade school diplomas.

15  Q    And tell us a little bit about that, Ms. White.  What

16  trade schools did you attend?

17  A    Real estate and cosmetology.

18  Q    Do you recall the approximate time periods that you

19  attended those trade schools?

20  A    The mid '90s.

21  Q    And where did you go to obtain that education?

22  A    A-Pass-Weikel Institute in Lexington, Kentucky, and

23  Southeast School of Cosmetology in Manchester, Kentucky.

24  Q    And about how long are those courses that you took or

25  those trade school degrees?

1  A     1800 hours for the cosmetology degree and 96 classroom

2  hours for the real estate diploma.

3  Q    Have you worked outside the home, Ms. White?

4  A     Yes.

5  Q    And could you tell the Court and the jury what kind of

6  occupations you've held?

7  A     I worked for the Clay County Board of Education in the

8  early '90s for several years as a teacher's assistant.  And I

9  worked at the Laurel Creek Nursing Home.  I worked at my hair

10  salon, which is The Cutting Edge.  And I worked at the

11  Manchester City Police Department before working at the

12  Manchester City Hall.

13  Q    Now, your first employment was with the Board of

14  Education?

15  A    Yes.

16  Q    And at that time, you said you were a teacher's assistant?

17  A    Yes.

18  Q    Did you work in one school or —

19  A    One school.

20  Q    Okay.  And about how long were you there?

21  A    Three years.

22  Q    Okay.  And then you said something about a business that

23  you had.  What was the name of your business?

24  A    The Cutting Edge.

25  Q    And where was that located?

1  A    Manchester, Kentucky.

2  Q    And about how long did you have that business?

3  A    Five years.

4  Q    Do you know when that business ceased to exist?

5  A    I do not.

6  Q    Did you have employees working for you?

7  A    Yes.

8  Q    And at the optimum or maximum number, what would that have

9  been, how many employees?

10  A    Seven.

11  Q    Then I think you said you had a job at the City of

12  Manchester?

13  A    Uh-huh, yes.

14  Q    Did you hold just one job or several jobs there?

15  A    Well I worked at the Manchester Police Department in the

16  capacity of police clerk.

17  Q    What does a police clerk do?

18  A    Log-ins, filing, all clerical duties.

19  Q    Okay.  And what other duties or jobs did you hold with the

20  City?

21  A    I transferred to the Manchester City Hall and was a

22  Mayor's Assistant.

23  Q    And what were your general duties as Mayor's Assistant?

24  A    I answered the phone, I did water bills, I did taxes.

25  Basically anything I was asked to do I did.

```
 1  Q    Now, while in Manchester or Clay County area, have you

 2  lived as husband and wife in more than one location?

 3  A    Yes.

 4  Q    Could you tell us generally where you and your husband

 5  lived while you've been married in the county?

 6  A    We lived in a community called Horse Creek in Manchester,

 7  Kentucky.  And then we moved to Island Creek, which is still in

 8  Manchester, and Greenbriar, and then we moved to the city

 9  limits.

10  Q    So your last place of residence in Manchester would have

11  been within the city limits?

12  A    Yes.

13  Q    And prior to that, you lived out in the county?

14  A    Yes, always.

15  Q    Now, Ms. White, have you yourself sought to be a candidate

16  for any political office?

17  A    No.

18  Q    And prior to meeting your husband Kennon White, were you

19  involved in any politics?

20  A    No.

21  Q    If you could, tell us, Ms. White, when it was that you

22  first got introduced to politics in Clay County.

23  A    In 2002, when my husband ran for jailer.

24  Q    And how is it that you and your husband came to the

25  decision to run for jailer, if you recall?
```

1  A    What I recall is that we both wanted to make a difference

2  and make a change and that was one of the offices that we

3  thought needed a change.

4  Q    Okay.  And were you able to make that decision without

5  consulting others?  Did you-all just make the decision on your

6  own, or how did that come about?

7  A    Well, we thought at first that we could make the decision

8  on our own, but getting into it we found out real quick that it

9  wasn't just up to us.

10  Q    Okay.  Do you recall having discussions with other people

11  that were involved in politics in Clay County?

12  A    Several politicians, yes.

13  Q    Were you present at some of those meetings with

14  politicians?

15  A    Yes.

16  Q    If you could, tell us who you recall visiting at that

17  time, in 2002.

18  A    I recall visiting with Jennings White, Cletus Maricle,

19  Yancey White, Barbara Colter, Edd Jordan.

20  Q    And if you could, just break down for us a little bit

21  about how these people are political -- were, at that time,

22  involved in politics.

23  A    Well, Edd Jordan was the sheriff and Barbara Colter was

24  the state representative and Cletus Maricle was the circuit

25  judge, and Yancey White was a local attorney that was very

 1  influential.

 2  Q    And in your recollection, what kind of advice or direction

 3  did you-all receive with each of these individuals, Ms. White?

 4  A    Well, at the time we were running, there was other

 5  candidates that were thinking about running, too.  So we were

 6  encouraged, and it being hindsight now, I see that it was so

 7  there would be competition mostly.  Yancey White was

 8  frustrated, he had — he was supporting Charles Marcum and he

 9  let us know right off the bat that he would not support us.

10  And so overall, we were supported in running.

11  Q    Now, you say you met with Cletus Maricle?

12  A    Yes.

13  Q    Were you present when you-all had discussions about

14  Kennon's prospect of running for jailer?

15  A    Yes.

16  Q    And do you recall what was discussed in that meeting?

17  A    He encouraged us, told us it would be hard but that it

18  could be done and that we would have to put money up.

19  Q    You would have to put money up?

20  A    We'd have to put money up to win it.

21  Q    And did he explain to you what kind of money or what was

22  the money going to be used for?

23  A    We would have to buy the office.  He explained to us that

24  that's how you got in if you got in.

25  Q    What did he say about that, buying the office?

```
 1   A    He asked us if we were willing to put money in the race.

 2   Q    And did you-all talk about any figure or amounts of money

 3   or did he specifically say how much if you recall?

 4   A    I can't recall.

 5   Q    Now, you say you met with Yancey White, a local attorney?

 6   A    We did.

 7   Q    He didn't want you to run?

 8            MR. WHITE:  Objection, asked and answered, Your

 9   Honor.

10            THE WITNESS:  No.

11            THE COURT:  Overruled.

12   BY MR. SMITH:

13   Q    Was there anybody else that discouraged you and your

14   husband from running that you recall that you -- that you met

15   with?

16   A    James Phillips.

17   Q    And who's James Phillips?

18   A    He's the Clerk in the courthouse.

19   Q    And what do you recall him saying about Kennon's prospect

20   for running?

21   A    What I recall is that he is a distant cousin to Kennon and

22   we thought he would sign Kennon's -- the papers for him to

23   file, his filing papers.  And he told Kennon that he was -- he

24   would not sign them because Kennon would be throwing a rift

25   into the -- all their plans and that he couldn't sign them,
```

 1  that that would put him in a hard spot, him holding an office

 2  himself, with Charles Marcum, which was the current jailer.

 3  Q    And how long had Charles Marcum been jailer there in Clay

 4  County when you-all chose — decided to run against him?

 5  A    Many years.  I can't give specific amount of years.

 6  Q    Anyone else that you recall meeting before you-all decided

 7  ultimately to run?

 8  A    Not that I recall.

 9  Q    Did anybody visit you and your husband at your home and

10  discuss the prospect or the possibility of you-all running?

11  A    Not that I can remember.  We lived out in the county at

12  that time.  Not that I remember.

13  Q    Did you-all ultimately decide to file and run?

14  A    We ultimately did, yes.

15  Q    Okay.  And after making that decision, did you have any

16  discussions with any of the political figures about what was

17  going to be needed for you to be successful?

18  A    We did, yeah.  We had several discussions.

19  Q    And who do you recall meeting with?

20  A    I recall meeting with Cletus and I recall — actually, I

21  recall meeting with William "Al Man" Stivers.  He did come to

22  our home, he and his brother.

23  Q    And tell us about that meeting, Ms. White.

24  A    They were upset because his niece, Jody Stivers, was of

25  age to vote, and James Phillips, the Clerk, was not allowing

1   her to vote and they had seen that they were running into some

2   problems and wanted to know how we stood on that and if -- how

3   we felt about it and basically trying to persuade us to go with

4   their party that they had decided to go with.

5   Q    Their party?

6   A    Uh-huh.

7   Q    Were they like lined up with the Republican or the

8   Democrat?  What do you mean by "party"?

9   A    No, it was all mixed up.  It was -- the person at that

10  time that they chose, William Stivers and Charles Stivers, was

11  Freddy Thompson.

12  Q    And what kind of comments did they make to you that you

13  recall to try to persuade you to come over to support their

14  side?

15  A    The fact that we were -- had all been friends and we

16  knew Jennings would double-cross us and we knew that he and

17  Charles Marcum and Jennings White had always been together

18  throughout politics through the years and they could not be

19  trusted, and new faces, new change, and we needed to go with

20  them.

21  Q    Were there any prequalifications or conditions that

22  you-all would have to meet before you could actually get on

23  their side?

24  A    Explain that to me.  I don't understand how you're asking

25  me that.

1  Q    It's poorly worded.  What did he say it would take for you

2  to get on their side?

3  A    William Stivers?

4  Q    In that conversation.

5  A    In that conversation?  We pool all our money together and

6  we win it and that's just how it was going to be.  Basically,

7  who do you want to put your money with.

8  Q    All right.  Did you-all talk — to your recollection, did

9  he talk about a specific figure with you and your husband?

10  A    I don't remember.

11  Q    Now, you said that he made some mention of Jennings White

12  not to be trusted and he might be going to join up with Marcum?

13  A    Yes.

14  Q    And Marcum was your opposition?

15  A    Yes.

16  Q    And did you-all agree to join the Stivers' invitation to

17  join the Freddy Thompson side of things?

18  A    We left it in the air at that time.

19  Q    Who else did you meet with, ma'am, after you-all had made

20  this decision?

21  A    We met with Bart Morris, Vernon Hacker, different people

22  in the — within the city limits that we thought would support

23  us.

24  Q    And where did you meet up with Bart Morris?

25  A    At his home.

1  Q    Who was present?

2  A    Myself and Bart and his wife, Debbie, and my husband,

3  Kennon.

4  Q    And what did you-all discuss with the Morrises at that

5  time?

6  A    Would they support us in the candidacy for jailer.

7  Q    And what was their response?

8  A    Yes.

9  Q    And did you-all talk about anything else that was needed

10 for you-all to succeed in your seeking that office with the

11 Morrises?

12 A    We talked about who we needed -- the key people who we

13 needed to talk to, which we already knew anyway, because

14 Kennon's dad was mayor and we went over a few details of that.

15 Q    What do you mean, you needed to talk to some key people?

16 What are you talking about?

17 A    In matters of Darnell Hipsher and Vernon Hacker and some

18 of the city council members, just make sure they were on board

19 with --

20 Q    On board with what?

21 A    -- supporting us.

22 Q    And supporting you in what way, ma'am?

23 A    Supporting us with the ticket that would be formed

24 together and supporting us with the people and their contracts,

25 their influence.

1  Q    Supporting you with the ticket.  Tell me what a ticket is.

2  A    A ticket is a list of candidates that politicians gather

3  up before elections of who they're supporting and who's put

4  money in.

5  Q    And what's the money put in for?

6  A    To buy votes.

7  Q    So you were discussing that with Bart and Debbie Morris at

8  their house?

9  A    They discussed that with us, yes.

10  Q    And did you-all talk about a money figure with the

11  Morrises, about how much money would be needed?

12  A    Yeah, we talked about a figure with them.

13  Q    Do you recall a specific figure that was talked about?

14  A    I remember Bart indicated that it would probably cost

15  $50,000 to win the jailer's race.

16  Q    And did you-all make an agreement with the Morrises at

17  that meeting about what you-all were going to be doing in the

18  race?  Did you-all reach an understanding about —

19  A    We reached an understanding, yes.

20  Q    And what was that understanding, ma'am?

21  A    That we would come with our money and he would be the

22  person that headed it in the city limits.

23  Q    Now, you talked about a ticket.  Did you-all reach an

24  agreement at that time or understanding about what particular

25  candidates was going to be on the ticket with the Morrises?

 1  A    Not at that time, but we had a general idea of who he

 2  would support.

 3  Q    And who was that?

 4  A    Jennings White and Edd Jordan and Kennon White.

 5  Q    And those would have been the offices of county court

 6  clerk —

 7  A    Yes.

 8  Q    — sheriff, and jailer?

 9  A    And Barbara Colter, yes.

10  Q    And Barbara Colter for what office?

11  A    State representative.

12  Q    Now, had you met with Barbara Colter and your husband?

13  A    Yes.

14  Q    And was money discussed with her?

15  A    Yes.

16  Q    Tell us about that discussion.

17  A    First she thought that it was a mistake that Kennon had

18  got in the race because that created a — for her to have to

19  make a decision on who she was going to — it would make it to

20  where she would have to obligate and she didn't want to have to

21  obligate herself and she felt like him being her nephew that it

22  created, again, a rift for her, selfish in her own nature.

23  Q    And she felt like she had to obligate herself in what way,

24  ma'am?

25  A    To Kennon.

1  Q    And his candidacy?

2  A    And his — yes.

3  Q    You said there was money discussed with your aunt?

4  A    Yes.

5  Q    Or his aunt?  And what was discussed between you?

6  A    We discussed how much she would put up and where she would

7  put it and who she was putting it with, and we wanted to be on

8  the same page so that we didn't have a conflict.

9  Q    And generally what was her offer as far as putting money

10 up?

11 A    I don't recall her exact offer, but she said that when it

12 come time that her money would be there.

13 Q    Now, at that time, you say that you had worked for the

14 school board.  Were you working for Doug Adams when you were at

15 the school board?

16 A    Charles White.

17 Q    And did you at any time meet with Doug Adams in 2002 to

18 discuss the election?

19 A    After the election.  And actually he and — myself and my

20 husband met with him at his home a couple of times.

21 Q    And do you know when that was, before or after the

22 election that you met those few times?

23 A    Before.

24 Q    And if you could, tell us what was discussed in that

25 meeting with Mr. Adams at his home.

1    A    Well, we were trying to persuade him to be for us, and he

2    kind of teeter-tottered around and in the end told us that he

3    would and that we would have to make some arrangements as far

4    as the people in town, in the city limits.  For one, he wasn't

5    happy with the way Bart was heading things and he had no inlet

6    in the city limits and he was dissatisfied with that, but —

7    Q    Okay.  What else did he talk to you-all about about being

8    successful in your bid for jailer if he were to support you?

9    A    He told us — Doug Adams told us if we went with the

10   ticket, which consisted of him supporting Freddy Thompson, that

11   we would be a winner, if we tied with Freddy.

12   Q    Did you-all talk about money?

13            MR. WHITE:  Objection, leading, Your Honor.

14            THE WITNESS:  Yes.

15            THE COURT:  Overruled.

16   BY MR. SMITH:

17   Q    What was money — what money was discussed with Mr. Adams

18   at that time?

19   A    He indicated to us did we know that it took a great amount

20   of money to win the election, and we said yes, and he asked us

21   if we were willing to put it up, and we said yes.

22   Q    Did he give you a figure?

23   A    No, not at that time.

24   Q    Did he at a later time?

25   A    Yeah, he told us later on when we met with him the second

 1  time that, again, it would be anywhere from 50 to $70,000.

 2  Q    Did he tell you what the money would be used for?

 3  A    Yeah, to buy votes.

 4  Q    What else did you-all talk about with Mr. Adams?

 5  A    We discussed his son-in-law, Stevie Collins, and at that

 6  time, he wanted to know if Kennon's dad had planned to run for

 7  mayor in the future and that Stevie was either interested in

 8  running for James Phillips's position or running for the

 9  mayor's position, we discussed that.  And Kennon told him that

10  he didn't know, that it was early on and Doug didn't have any

11  competition, that he didn't know what his plans were.

12  Q    Now, Stevie Collins, you say that's his son-in-law?

13  A    Yes.

14  Q    And did he live in the city?

15  A    I'm not sure at that time.  He lives in the city now.

16  Q    In talking with Mr. Adams, you said you-all did eventually

17  talk about a grand total figure.  Did you-all talk about

18  other — at other times money with Mr. Adams?

19  A    No.  In my last meeting I had with him at the Board of

20  Education, we discussed that.

21  Q    Okay.  Was that before or after the election?

22  A    After the election.

23  Q    Okay.  Let's stay on here before the election, Ms. White,

24  if we could.

25  A    Okay.

1  Q    Did you-all decide to join the Adams faction and join

2  their ticket?

3  A    No, we didn't.

4  Q    And ultimately, what did you-all decide to do?

5  A    Ultimately, we decided to side with Jennings White.

6  Q    And what did that come down to ultimately?

7  A    Defeat.

8  Q    And what made you ultimately decide to go with Jennings

9  White?

10  A    Well, he's a distant relative of Kennon's and a close

11  relative of mine and we just felt like he was the winning

12  ticket at the time.

13  Q    Now, after making that decision, did you-all join Doug

14  Adams in giving money to his side?

15  A    In some places.

16  Q    And could you explain to us how that happened?

17  A    Well, in Oneida, which is primarily his -- what would you

18  say, stomping grounds, we gave money to Mike Bishop there in

19  the Laurel Creek area.

20  Q    How is he connected with Doug Adams?

21  A    Mike Bishop's father is Doug Adams's best friend.

22  Q    And what's his name?

23  A    Paul Bishop.

24  Q    All right.  Who else?

25  A    John Russell Brown.  We gave money to John Russell Brown.

1  Q    How come you to give money to John Russell Brown?

2  A    Well, I had worked with him previously when I worked at

3  the Board of Education and he was the principal, so I had

4  become familiar with him there.  And he told us that he would

5  support Kennon, although he could not support Barb, so -- which

6  is Kennon's aunt.  So we decided to put money with him, and he

7  is an affiliate of Doug Adams.

8  Q    And how are they connected?

9  A    They've been friends for many years and he works at the

10  superintendent's office with him.

11  Q    Is Doug Adams his boss?

12  A    Yes.

13  Q    And how much money did you take to him?

14  A    $5,000.

15  Q    And when you took this money to him, were you present and

16  discussed what the money was going to be used for?

17  A    I was not present.

18  Q    Okay.  Do you know who took the money to him?

19  A    My husband.

20  Q    All right.  What did you learn John Russell Brown did with

21  the money?

22  A    Well, I learned two days after the election he told my --

23         MR. WESTBERRY:  Objection, Your Honor.

24         THE COURT:  All right.  There's an objection.

25         MR. SMITH:  John Russell Brown was buying votes with

1    the money.

2                THE COURT:  I'm sorry?

3                MR. SMITH:  John Russell Brown is a co-conspirator,

4    unindicted obviously, but he was buying votes.

5                THE COURT:  All right.  I'll overrule.

6                THE WITNESS:  Days later he called my father-in-law,

7    which he has no ties to whatsoever, and returned the money and

8    said that he felt bad and he didn't to spend the money against

9    us, but he had -- under the direction of Doug Adams had to

10   be -- support the other candidate.

11   BY MR. SMITH:

12   Q    He called your father-in-law.  Who's your father-in-law?

13   A    Doug White.

14   Q    And what did you do when you got the call?

15   A    What did I do?  He's the one that got the call.  I didn't

16   find out --

17   Q    What happened to the money?

18   A    It was returned.

19   Q    How was it returned?

20   A    In cash form.

21   Q    To who?

22   A    To Doug White, and he returned it to us.

23   Q    And he said he had been forced to go with the other side.

24   Who was your opposition?

25   A    Charles Marcum.

1  Q    Now, you indicated that after the election you met with

2  Doug Adams?

3  A    I did.

4  Q    And tell us about that meeting.

5  A    Well, it took place in his office at the Board of

6  Education, and we discussed everything that happened and he

7  indicated to me that Kennon and I should have went with him,

8  that he worked circles around Jennings and Jennings had 15

9  people in the Burning Springs precinct working and he himself

10 worked circles around them buying votes.

11 Q    What else was discussed?

12 A    That he basically said, you know, we still have ties, and

13 I indicated that we didn't, and I — just really nothing other

14 than that Kennon should run again, which was out of the

15 question, he wasn't going to run again.

16 Q    What did he encourage you to run for?

17 A    For jailer again.

18 Q    And you say that was out of the question.  Why was it out

19 of the question?

20 A    We had just had our fill of it.

21 Q    When you made that visit to Adams, who was with you?

22 A    I was by myself.

23 Q    Now, during election day, did you have any meetings with

24 any of these political people on election day that you recall?

25 A    We met with — pretty — yeah, we met with Bart Morris,

 1  Darnell Hipsher, Vernon Hacker, Doug White, Barbara Colter, I

 2  met Cletus that day.

 3  Q    When you met Bart Morris that day, what was going on and

 4  where were you when you met Bart Morris?

 5  A    We came by his home early that morning.

 6  Q    And what did you see?

 7  A    Voters being hauled in and out.

 8  Q    And what do you mean, voters being hauled in and out

 9  where, ma'am?

10  A    From his home.

11  Q    And who do you recall seeing hauling these voters?

12  A    His workers, his employees, city employees.

13  Q    Do you recall any names of people?

14  A    Deshae Henson, Antwan Henson, James Goins, Bill White.

15  Q    Now, Deshae Henson and Earl Henson, are they employees of

16  Bart Morris or employees of the City?

17  A    Earl Henson is an employee of the Board of Education.  And

18  Antwan Henson was not an employee of the City at that time.

19  Q    Now, you said Deshae, is that the same person, Antwan —

20  A    No, two different people.

21  Q    And Antwan, who does he work for?

22  A    I have no idea.

23  Q    James Goins, who does he work for?

24  A    Bart Morris.

25  Q    You said Bill White?

1  A    Yes.

2  Q    And is he a White related to Jennings White?

3  A    Brother.

4  Q    And so while at the Morris residence, you said you saw

5  Bart there.  Did you see anybody else at Bart's house other

6  than Bart —

7  A    I'm saw —

8  Q    — and these vote haulers?

9  A    I saw Darnell there and Vernon Hacker.

10  Q    Okay.  And what were Darnell and Vernon Hacker doing?

11  A    They were hustling voters.

12  Q    What do you mean, "hustling voters"?

13  A    What I mean by that is they would — groups of — for one

14  thing, they had vans and vehicles and they would haul in four,

15  five, six, I mean, however many that would fit in the vehicle

16  and they would bring them in, and some of the times they would

17  drive them in theirselves, and then they would pay the voters

18  there and then they would disperse them, take them to vote in

19  whatever precinct.  Not only did — there was different

20  precincts that still met there to be taken to vote.

21  Q    So not just Manchester?

22  A    Not just Manchester.

23  Q    What other precincts do you know of that were being paid,

24  voters being bribed, at the Morris residence in 2002 other than

25  the Manchester precinct?

1    A    The Horse Creek area, the Beech Creek area, Manchester

2    area.

3    Q    Now, was there an early voting period that went on for

4    absentee voters prior to the election in May of 2002?

5    A    There was.

6    Q    And were you present at the Morrises at any time for that

7    early voting?

8    A    I was.

9    Q    How many times do you think you were there during the

10   early voting period?

11   A    Several times over the period that they had high volume.

12   Q    When you say "high volume," what are you referring to?

13   A    Well, one particular day, they had probably a couple

14   hundred voters lined up outside the voting — absentee voting

15   precinct, and I was present at that one.

16   Q    Now, a couple hundred voters were lined up for the

17   absentee voting?

18   A    Yes.

19   Q    And where was the absentee voting taking place in Clay

20   County for that May primary, 2002?

21   A    Downtown.  They were constructing the courthouse and they

22   had a temporary facility set up at the old bank, the Clerk's

23   Office across from the 9-1-1 building.

24   Q    Now, when you say that you-all made these plans to put

25   this money into bribe voters, did you-all also have a plan to

1  use election officers who were employed by the Board of

2  Elections to assist in this scheme to bribe the voters?

3  A    Yes, they were in place.

4  Q    And in the early voting, who did you-all have that worked

5  for the Board of Elections or were operating within the Board

6  of Elections as an election officer to assist in carrying out

7  the scheme?

8  A    During the absentee voting?

9  Q    Yes, ma'am.

10 A    Jennings White did most of it on our behalf.

11 Q    He was county clerk?

12 A    County clerk.

13 Q    And served on the Board of Elections?

14 A    Yes.

15 Q    And how was he operating for the early voting period for

16 your faction?

17 A    He would just submit the voters when we brought them in

18 and he voted them himself.

19 Q    Okay.  And why was it important, according to your

20 understanding of the scheme, that you had an election officer

21 working for the Board of Elections inside the poll voting the

22 voter?

23 A    Why was it important?

24 Q    Why was that necessary?

25 A    That was necessary to ensure you got your vote, to ensure

1  that your paid voter was –– voted the way they should.

2  Q    Once Jennings White voted your voters, then what happened,

3  according to the plan?

4  A    Then they were taken to Bart Morris's and paid or they

5  were paid on the spot.

6  Q    Okay.  And when you say they were taken to Bart Morris's,

7  how far did they have to travel from the polling place for the

8  early voting to Bart Morris's?

9  A    Less than a mile.

10 Q    And did you witness this payoff going on at the Morrises'?

11 A    I did.

12 Q    And could you describe who you saw participating and

13 furthering the scheme to pay off and bribe the voters at the

14 Morris's residence?

15 A    I saw Debbie Morris and Bart Morris paying them.  They had

16 a table set up in the garage and they had a checklist, and when

17 the voter was brought in they would check the list to make sure

18 that they didn't vote –– that they hadn't been paid already and

19 they would check the list and pay the voter.

20 Q    Now, who had the list the times that you saw?

21 A    Debbie Morris.

22 Q    And you say it was a list that was used to make sure they

23 weren't paid twice?

24 A    Right.

25 Q    And why was that a concern for your scheme to be

1  successful, that you not pay people twice?

2  A     Well, it was important because if you didn't keep track of

3  it they would try to come back, and a lot of them were –– a lot

4  of them were drug addicts and they would come back and try to

5  be paid twice or they would show up on election day and pretend

6  like they hadn't voted.  So it was important to keep track of

7  them.  And then at the end of the day, you could compare your

8  notes with who you had at the Clerk's Office.

9  Q     Now, during this scheme, did you-all have daily meetings?

10 A     Yes.

11 Q     And where were those meetings held?

12 A     At Bart Morris's.

13 Q     And who do you recall participating in those end-of-

14 the-day meetings after you-all had had your day with the early

15 voting poll?

16 A     Bart and Debbie, of course, and Darnell Hipsher would be

17 there, myself, my husband, Vernon Hacker, William Stivers came

18 by several times, Doug Adams, I've seen him there several

19 times, Cletus Maricle would come into the –– he wouldn't come

20 in the house but he would come into the parking area.  Jennings

21 White.

22 Q     And these visits that you were a participant in,

23 Ms. White, what were you-all discussing at the end of the day?

24 A     We would discuss how many people we had seen, how many

25 people we had taken into vote absentee, who had been paid, who

 1  needed to be seen, just various things that you would go over

 2  to ensure that your people were doing — the people that you

 3  recruited to help you do this was doing what they was supposed

 4  to be doing.

 5  Q    Now, you've named people that were supporting Jennings

 6  White that were at that meeting.

 7  A    Yes.

 8  Q    And you named Doug Adams?

 9  A    Uh-huh.

10  Q    And how did that work out?

11  A    Oh, he was just playing both sides.

12  Q    Okay.  And you say he was playing both sides.  What do you

13  mean?

14  A    He was probably, at that time, the most influential

15  person, being superintendent, and he was throwing his weight

16  around basically, letting it be known that he was a presence.

17  Q    When you-all were discussing your end-of-the-day results,

18  did you discuss that in front of Doug Adams?

19  A    Some of the time.

20  Q    You said Cletus Maricle was there?

21  A    Uh-huh.

22  Q    But he didn't come in?

23  A    No.

24  Q    So how did he participate in the meeting sitting in his

25  car?

1  A    They would go out and speak to him, let him know what was

2  going on.

3  Q    And who is "they"?

4  A    They, Bart, Kennon.  Kennon's dad would be there on

5  occasion.  Different people.

6  Q    Now, this primary that you've mentioned had on your ticket

7  the sheriff?

8  A    Uh-huh.

9  Q    A jailer candidate, county clerk candidate.  What about

10 magistrate candidates?

11 A    Tommy Harmon.

12 Q    Did you-all tie in with any other magistrate candidates?

13 A    We tied in with Stanley Bowling, we tied in with — we

14 thought we tied in with Johnny "Poss" Gregory, but he ended up

15 spending our money against us.  So, yeah, we tied in with other

16 magistrates.

17 Q    Now, this Stanley Bowling, how did you-all come to include

18 him?

19 A    He's a long-time friend, best friend, of Kennon's dad,

20 Doug White.  He worked for the City and retired there as the

21 City Supervisor, and he's always been a political figure.

22 Q    Well, did he attend any of these meetings?

23 A    Yes.

24 Q    What kind of meetings did he show up at?

25 A    He showed up at meetings at Bart's and he also held

1  meetings in his garage.

2  Q    Okay.  So you remember seeing him at some of the meetings

3  at Bart Morris's?

4  A    Yes, he's a best friend of Bart Morris.

5  Q    And was he there frequently or seldom?

6  A    Daily.

7  Q    And was this during this early voting period that you saw

8  him there?

9  A    Yes.

10  Q    All right.  You say you saw him also at the Bowling's

11  garage?

12  A    Yes.

13  Q    He also has a garage?

14  A    He also has a garage.

15  Q    So Morris has a garage and Bowling has a garage.

16  A    Yes.

17  Q    How far apart are they approximately from each other in

18  the county?

19  A    Several miles apart.

20  Q    Are they both in the city limits or one in the county and

21  one in the city?

22  A    No, I don't think Stanley's is in the city limits.

23  Q    Okay.  Did you go to the meeting a Bowling's garage?

24  A    Yes.

25  Q    And what did you observe there, ma'am?

1   A    I observed plans, them discussing plans and strategies and

2   discussion of buying and hauling voters.

3   Q    Was this a meeting that was occurring while the early

4   absentee voting was ongoing?

5   A    Yes.

6   Q    Now, other than discussing these plans, did you see

7   Stanley Bowling act on any of these plans for you?

8   A    Yes, I picked up voters in his garage to take to the

9   voting precincts.

10  Q    You picked up voters and did what with them?

11  A    Took them to vote at the various precincts.

12  Q    And so you were vote hauling?

13  A    I was vote hauling.

14  Q    For Stanley Bowling?

15  A    For the ticket.

16  Q    For the ticket.  How is it that Stanley Bowling helped you

17  in that effort, ma'am?  What did he do to help you?

18  A    We exchanged voters, we exchanged — he tied with us.

19  Q    Now, I really don't understand what you mean.  Can you

20  explain to me how that operated on the ground?  When you say he

21  exchanged voters for you, how did that — how was that

22  implemented?

23  A    How it was implemented is he had people that he had

24  hauling for him that in return we hauled for him.  So he would

25  set up people in his precinct to haul voters and if I had

1  someone that I knew that was a relative or a friend of mine

2  that voted in his precinct, I would then haul my voters to his

3  precinct to vote.

4  Q    And how was it that Bowling's garage was going to be used

5  by you?  Was that a point of contact?

6  A    That was a point of contact.  That was a point in the

7  evenings we would meet, either there or at Bart's, and that was

8  where you picked up voters or they would discuss where you

9  needed to go to get voters.

10 Q    Now, while you were hauling these voters for the ticket,

11 where was the money coming from?

12 A    Bart Morris's home.

13 Q    Okay.  So who actually gave you the money that you used to

14 bribe the voters in the early voting of 2002, the primary?

15 A    Debbie Morris paid the voters.

16 Q    All right.  And was that consistent while you were

17 operating and hauling voters that Debbie did the paying?

18 A    That was consistent.

19 Q    All right.  And did that change on election day as to —

20 did your-all's method of operation change on election day?

21 A    No.

22 Q    So tell us what happened on election day.

23 A    The same.  The same happened on election day, we hauled

24 voters there, they got paid.

25 Q    You hauled voters where?

1  A    To the same —— to Stanley Bowling's precincts and

2  Manchester precincts.  We hauled voters to Horse Creek's

3  precincts.  But in the end, they got paid back at the

4  Morrises'.

5  Q    Now, at Stanley Bowling's precinct, there would have been

6  a different election officer on election day?

7  A    Yes.

8  Q    But in early voting, all voters had to go to the same

9  place?

10  A    Right.

11  Q    So 20 precincts, all had to vote at the same place, and

12  Jennings White was taking care of you-all as an election

13  officer for the early voting?

14  A    Primarily Jennings White.  There was —— I can recall Uncle

15  Bud Smith, I don't know his first name, he was there.  William

16  Stivers was there.

17  Q    And when you say they were there, what were they doing

18  there?

19  A    They were voting people inside the voting machine.

20  Q    And did William Stivers have a position with the Board of

21  Elections in the early voting to your knowledge?

22  A    To my knowledge, he did.

23  Q    And was he an election officer?

24  A    Yes.

25  Q    So he was on the same ticket or an opposite ticket of you

1  during that early voting of 2002?

2  A    He was the opposing ticket.

3  Q    Did he have any helpers as election officers in there, to

4  your knowledge, in the early voting of May of 2002?

5  A    To my knowledge, I don't know.

6  Q    The two you do know is Jennings White and William "Al Man"

7  Stivers?

8  A    Yes.

9  Q    Now, on election day, you said that you were hauling

10 voters not only to the Manchester precinct but to the Horse

11 Creek precinct and to Stanley's precinct --

12 A    Yes.

13 Q    -- Harts Branch?

14 A    Harts Branch.

15 Q    Did you have an understanding with the group who was going

16 to be operating on the inside as an employee of the Board of

17 Elections on election day?

18 A    I had an understanding of that.  We weren't concerned

19 about that.

20 Q    Okay.  And at Stanley's precinct, for instance, what was

21 your understanding -- how would -- who was going to accomplish

22 the task to be inside the polling at Stanley's precinct?

23 A    Well, to my recollection, he had people in place in there.

24 Jackie Jones was one of them.

25 Q    Okay.  And he was an election officer?

1    A    Yes.

2    Q    Any others you recall?

3    A    I don't recall.  I think his daughter-in-law, Crystal, was

4    an election officer.

5    Q    Does she have a last name you recall?

6    A    Bowling.

7    Q    What about Horse Creek, who was handling —

8    A    Sammy Gregory.

9    Q    Election officer?

10   A    Yes.

11   Q    And so when you were taking them to these county

12   precincts, when you were hauling the voters in, what did you do

13   with them when you got them to the polls?

14   A    When you got them to the polls, you met with the corrupt

15   worker that was there and they took it from there.

16   Q    Okay.  "Corrupt worker" being the inside election officer?

17   A    The inside election officer.

18   Q    And when you say "they took it from there," what did —

19   what did they do?

20   A    They went inside the voting booth and voted the ticket.

21   Q    And then once that was accomplished and the voter had

22   voted, what happened then?

23   A    We would wait for them as they come out the door and the

24   person would — for instance, Sammy Gregory would give you a

25   nod that he had taken care of them, and then you would take

1    them back to Bart Morris's residence and they would be paid and

2    they would check them off the list.

3    Q    Now, at the Manchester precinct, the May 2002 election

4    day, who was inside assisting you there?

5    A    I don't recall.  I never went inside.

6    Q    So how was it that you operated at the Manchester precinct

7    when you hauled voters there?

8    A    We would pull up to the — it was at the — at the middle

9    school.  We would pull up to the curb and get them with either

10   Darnell or Vernon and they would assist them on inside and we

11   would wait for them to bring them back out.

12   Q    Now, Darnell, who are you referring to when you say

13   Darnell?

14   A    Darnell Hipsher.

15   Q    And Vernon, who are you —

16   A    Vernon Hacker.

17   Q    And did they hold an office in — public office at that

18   time?

19   A    They were both city councilmen.

20   Q    So when you say it operated a little different in

21   Manchester, you didn't need a nod or a signal from them?

22   A    No, we had complete trust in them.

23   Q    During that, you say, return trip, you brought them back

24   to the Morrises'?

25   A    Yes.

1  Q    And who was it that paid them when you got them back?

2  A    Bart Morris or Debbie Morris.

3  Q    Now, during those meetings that you say that occurred at

4  the Morris residence, did you see other people bringing money

5  to be distributed as the election days went on?

6  A    I did.

7  Q    And tell us what other candidates you saw delivering money

8  to the Morrises' to be distributed as bribes to these voters?

9  A    I saw, of course, Jennings brought his money there,

10  Barbara sent money there.

11  Q    Barbara who?

12  A    Barbara Colter.

13  Q    Okay.  She was running for what?

14  A    State representative.

15  Q    Okay.  And who else?

16  A    Jimmy Dobson delivered money on behalf of James Garrison.

17  Q    Who is Jimmy Dobson?  Is he a business owner?

18  A    He's a business owner and a bank board member.

19  Q    And what was Garrison running for?

20  A    County judge.

21  Q    Any others that you recall?

22  A    Not that I can recall.

23  Q    Now, where did you get these lists of people that live out

24  in the county that you knew would be receptive to a bribe if

25  you wanted to approach them?  Where did you get that list?

 1  A    Out in the county?  Cletus gave us a list, Bart had lists,

 2  Kennon's dad had lists.

 3  Q    Okay.  And when you say they had lists, can you describe

 4  for us what you're talking about?

 5  A    The list would -- well, it was a group of people,

 6  influential people.  They didn't have to be politicians, they

 7  could have been heads of large households that had lots of

 8  votes in the families, preachers that were influential,

 9  different business owners, election officers, just basically

10  the list consisted of influential people that had control of

11  voters in their area.

12  Q    So you-all took that information and then developed this

13  plan as to how you were going to execute it in this primary

14  election in '02?

15  A    Yeah.

16  Q    And when you say that you had meetings with Cletus Maricle

17  and these other people, did they know why you wanted this list?

18  A    Yes.

19  Q    Did you-all discuss what you were going to do with this

20  list?

21  A    Yes, we did.

22  Q    And what did you-all discuss with Cletus Maricle you were

23  going to do with this list that he was giving you?

24  A    He gave us the list of people to contact that were

25  influential and had large families that could essentially be

1   bought.

2   Q    Well, "essentially be bought."  Did you-all talk about

3   bribing these voters with Cletus Maricle?

4   A    Yes.

5   Q    And did you talk about how much money it would take to

6   bribe, let's say, individuals that was on the list?

7   A    Well, a vote went for $20 a vote.  So that would have been

8   the amount.

9   Q    Did Cletus Maricle tell you where he got the list?

10  A    He had collected it over the years.

11  Q    Did he have places in the county where he was more

12  knowledgeable than others?

13  A    Yes, out in -- yes.

14  Q    And where did you know that he was most knowledgeable

15  about where voters could be bribed in the county?

16  A    Around the Burning Springs area, the Fogertown area, which

17  is -- he had lived there prior to moving to the city limits.

18  Q    Is Burning Springs a significant precinct?

19  A    It is a significant precinct.  It's a large precinct.

20  Q    You indicated earlier that you noticed during that early

21  voting that folks like James Goins and other employees of Bart

22  Morris were both hauling.  What role did they play on election

23  day that you recall?

24  A    The same role.

25  Q    So you participated in the same role that Bart Morris's

1   employees did?

2   A    I did.

3   Q    Were there any others that you recall on election day that

4   he used other than James Goins and Bill White?

5   A    There were many others.  Mary Gail Roberts was one and her

6   daughter, Ella Wagers.  Different family — large families.

7   Q    Now, Ella Wagers and Mary Gail Roberts, are these ladies

8   that live in that city area?

9   A    Well, I think Mary Gail lives in the Beech Creek area.

10  Q    Okay.  Is that one of the precincts that included Stanley

11  Bowling?

12  A    Yes, it is.

13  Q    And Ella Wagers, where did she live?

14  A    I think at that time she lived in the city limits.

15  Q    How long did you work on election day?

16  A    From the time our eyes opened till the time our eyes

17  closed we worked.

18  Q    Okay.  Timeframe?

19  A    Timeframe, well, we didn't sleep that night —

20  Q    What happened the night?

21  A    — prior.  Just it was crazy.  Just people lining people

22  up, have you got your people ready to go.

23  Q    What do you mean?

24  A    Vehicles gassed up.

25  Q    Okay.  "Lining people up," what do you mean by that?

1  A    Well, I'm going to use myself as an example.  The night

2  before, I would call everybody that I had lined up to take in

3  to vote and had them a specific time I would be there to pick

4  them up and asked them if they had their family members ready

5  to go as well, and that's what I mean by that.

6  Q    So when you started at early hours of election day, they

7  were ready to go?

8  A    Yeah.

9  Q    And you say you worked all day?

10 A    Worked all day.

11 Q    What other things do you recall went on?  You said you

12 didn't sleep any the night before.  Was it just making calls or

13 were there other things that went on the night before the

14 election?

15 A    There was meetings — just we were running all over town,

16 there was meetings everywhere, inside and —

17 Q    Meetings with who?

18 A    Meeting with Bart Morris and Darnell Hipsher and Vernon

19 Hacker and Cletus Maricle and Vernon Hacker and Barbara Colter

20 and Doug White.

21 Q    And in these meetings, what was the purpose of this

22 meeting just on the eve of election day?

23 A    The same scheme, lining everybody up.

24 Q    Was it clear in those conversations that you had with

25 these folks that everybody knew the purpose of lining up the

1   voters so that they could be bribed and bought on election day?

2   A    They knew.

3   Q    Now, how many voters do you estimate that you saw being

4   taken in on election day yourself?

5   A    I probably witnessed myself voters being taken in over

6   200.

7   Q    Now, at $20 a vote, that's quite a bit of money.  Did the

8   persons that you say handled the money, did they carry $40,000

9   around on them in one bag or box or anything?

10  A    No, they had it in the safe.

11  Q    Who had it in the safe?

12  A    It was in Bart and Debbie's bedroom in the safe.

13  Q    Cash money?

14  A    Cash money.

15  Q    Is that basically the only thing that — or was that the

16  primary thing that you used to bribe the voters with, was cash

17  money?

18  A    That was the primary thing we used.

19  Q    During the conclusion of that day, what were the

20  outcome of — what was the outcome of your husband's race?

21  A    We lost.

22  Q    Did you discuss the loss with any of these people that you

23  talked to earlier before you got in the race?

24  A    As soon as the election was over, we went to Stanley

25  Bowling's garage and they were having a celebration party.  So

1  not much discussion went on that night.

2  Q    Okay.  You met with Doug Adams, you told us about that?

3  A    Yes.

4  Q    And talked with him after the election?

5  A    Yes.

6  Q    It was a one-on-one, just you and him?

7  A    Just me and him.

8  Q    Did you talk to Cletus Maricle?

9  A    Yes.

10 Q    And how long after the election was it that you met up

11 with Cletus Maricle?

12 A    Days.

13 Q    And what was said there in that meeting?

14 A    Basically, so many people in the election that it made

15 people have to commit to other sides and we were double-crossed

16 and we'll try again.

17 Q    Now, who made the comment that he believed you were

18 double-crossed?

19 A    Cletus did.

20 Q    And did he explain himself?

21 A    He explained it.

22 Q    And where did the double-cross happen in his estimation in

23 that conversation?

24 A    In his estimation, that we had put money in the wrong

25 places.

1  Q    Did he know where you had put money?

2  A    He knew.

3  Q    How did he know that?

4  A    We had discussed it.

5  Q    And had he counseled otherwise when you told him, I'm

6  going to take money and give it over here to the Jennings White

7  faction, and did he counsel against that?

8            MR. HOSKINS:  Objection, leading.

9            THE WITNESS:  He thought that was a good idea.

10           THE COURT:  Overruled.

11 BY MR. SMITH:

12 Q    And yet, at the end of the day, he said you were double-

13 crossed?

14 A    Yes.

15 Q    How did Jennings White double-cross you according to

16 Cletus Maricle?

17           MR. PINALES:  Objection.

18           THE WITNESS:  He went with Charles and us.

19           THE COURT:  Overruled, you can answer.

20 BY MR. SMITH:

21 Q    He went with Charles who?

22 A    Charles Marcum.  In other words, he played both sides.

23 Q    And had that kind of thing happened over there in Clay

24 County before, you put your money in with a pool and you get

25 double-crossed on election day?

```
 1              MR. WHITE:  Objection, Your Honor.

 2              THE COURT:  Sustained.

 3              THE WITNESS:  Can I answer that question?

 4              THE COURT:  No, he objected.

 5  BY MR. SMITH:

 6  Q    I don't think so.  I'll need to rephrase it.

 7  A    Okay.

 8  Q    In your discussions with Cletus Maricle, did he tell you

 9  about prior double-crosses that he had seen and witnessed?

10              MR. WHITE:  Objection, Your Honor.

11              THE COURT:  Overruled.

12              THE WITNESS:  He did.

13  BY MR. SMITH:

14  Q    And what did he tell you?

15  A    Well, he told me that he had himself worked on the ground

16  for one candidate and had went in afterwards and voted for the

17  other, so it happened, and that was part of politics and you

18  just try it again.

19  Q    So he left you with — he said try it again.  Did you try

20  it again?

21  A    Not in that — not in the same capacity, no.

22  Q    Okay.  What did you and your husband do after your defeat?

23  Go back to work?

24  A    We went back to work.  Just carried on.  What else was

25  there?  I mean, there was nothing else to do.
```

1   Q    You indicated that you—all made a move to the city at some

2   point?

3   A    We did.

4   Q    What precipitated the move to the City of Manchester?

5   A    Well, we actually won the City precincts and we were

6   encouraged that that was our strong points and that —

7   Q    Who encouraged you?

8   A    Cletus encouraged us.

9   Q    You say you won the City precincts?

10  A    Yes.

11  Q    More than one?

12  A    Yes.

13  Q    And you—all won both of those?

14  A    Yes, to my knowledge, we did.

15  Q    So he encouraged you to move to town for what reason?

16  A    To get into the City politics end of it, which is a

17  completely different aspect of politics in Clay County.  You

18  have two — you have your county politics and you have your

19  city politics, which is controlled by two different sets of

20  people.

21  Q    Meaning what?  You got the mayor running the City and you

22  got the Judge Executive of the county office?

23  A    And the superintendent —

24  Q    The superintendent?

25  A    — running the county.  Basically, yes.

1   Q    So when did you-all move into the city, Ms. White?

2   A    2003.

3   Q    Where did you move?

4   A    We moved in my husband's grandmother's home that had been

5   sitting vacant for 20-plus years, next door to Barbara Colter.

6   Q    And when you-all made your home there in Manchester, what

7   did you do for a living?  Did you change jobs?

8   A    I still worked at our dealership.

9   Q    Okay.  And what dealership was that?

10  A    White Mobile Homes in London.

11  Q    Okay.  So you also worked for White Mobile Homes?

12  A    Yes, I did.

13  Q    What did you do for them?

14  A    I was the clerk, I did secretarial work, sales, a little

15  bit of everything.

16  Q    Did you-all get back in politics once you moved to the

17  city?

18  A    We did.

19  Q    And tell us how that came about.

20  A    Well, my husband -- Barbara ran again in 2004.  My husband

21  filed to run for city councilman in 2004.

22  Q    How did you-all come to make that decision?

23  A    Well, lots of encouragement.

24  Q    From whom?

25  A    I didn't like it myself.

1  Q    Who had encouraged you-all?

2  A    Bart encouraged it, Vernon, Cletus, Darnell, various ones.

3  Q    So how did that campaign get started?

4  A    I'm sorry, I don't understand your question.

5  Q    All right.  Did you-all — did you-all make a decision to

6  actually run for city council?

7  A    He made the decision, yes.

8  Q    Okay.  And what did you-all do to organize your campaign

9  for city council?

10  A    Well, he filed, and it really didn't get off the ground

11  too much into it, so —

12  Q    What derailed you in your efforts to the city council

13  position?

14  A    What derailed it was an offering of a position at the City

15  for my husband.

16  Q    And who made that offer to your husband?

17  A    Doug White.

18  Q    And what was the offer?

19  A    That with — from other encouragement and flack that he

20  had gotten from the other council members, he thought it best

21  that Kennon take the position — a position that he would

22  create for him if he would come off, and basically it would

23  cause him problems, him being mayor and cause him to have

24  opposition.

25  Q    So did he take his name off?

WANDA WHITE - DIRECT - MR. SMITH                    53

1   A     Yeah.

2   Q     And then what happened?

3   A     He took his name off and several weeks, maybe —— it may

4   have been a month or two later, he was hired at the City of

5   Manchester.

6   Q     Now, did you get a job ultimately in the City as well?

7   A     Later on, I did.

8   Q     How did that come about?

9   A     That come about at Vernon Hacker's request for a swap-out

10  for his son a job at the City.

11  Q     What's his son's name?

12  A     Dennis Hacker.

13  Q     What do you mean when there's a swap-out?

14  A     Well, there was a position that was open, the lady that

15  had worked at the police department had left and there was a

16  position opened, and Vernon asked me if I would take it, and

17  upon taking that job, he wanted a job for Dennis at the City,

18  so ——

19  Q     Who was going to hire his son?

20  A     Kennon.

21  Q     And did Kennon agree to this?

22  A     He agreed to it, yes.

23  Q     And Dennis got a job doing what?

24  A     Working at the sewer plant.

25  Q     And all this took place in what year?

1  A    2004.

2         MR. SMITH:  I'm going to hand the witness what's

3  marked as D6, Your Honor.

4  BY MR. SMITH:

5  Q    You should have now in front of you, Ms. White, a

6  document, I believe it's one page, that has an exhibit sticker

7  on the front of it, and it should have D6 written on it.  Do

8  you see that?

9  A    Yes.

10 Q    And do you recognize that?

11 A    I do.

12 Q    And could you tell us what that is?

13 A    This is a list that me and Kennon and Cletus Maricle went

14 over, and this first list is a list of people he wanted us to

15 see, and the second list is people he felt that was against us.

16 Q    Okay.  All right.  Now, you have two pages to D6, is that

17 correct, two pages?

18 A    Yes.

19 Q    And did you make this list with a typewriter, computer, or

20 how did you generate that?

21 A    No.  We were at his home and we made a handwritten list,

22 and when I got home there was –– my husband and him made them

23 and I couldn't read them that well, so I put them on this where

24 I could read them a little better.

25 Q    And would this –– Do you know when this was made?

1    A    This was made during the election that Kennon ran in.

2    Q    What year?

3    A    2002.

4         MR. SMITH:  I would move for the introduction of

5    Government's Exhibit D6.

6         THE COURT:  All right.  Any objection?

7    (No audible response.)

8         THE COURT:  Exhibit D6 will be admitted.

9    BY MR. SMITH:

10   Q    Ms. White, how — did you and your husband further involve

11   yourself in politics in Clay County after making your move in

12   your new jobs at the City?

13   A    Well, we did, yes.

14   Q    And tell us what you recall doing politically, Ms. White.

15   A    I became an election officer in the Manchester precinct.

16   Q    And how is it that — First of all, what party were you

17   registered as?

18   A    A Republican.  I've been a Republican all my life.  And so

19   has Kennon and his family.

20   Q    Okay.  And did you ever change your status as a

21   Republican?

22   A    I did.

23   Q    And how is it that you changed?

24   A    Well, I changed to Democrat.

25   Q    And when did you do that?

1   A    Upon moving to the city.

2   Q    Okay.  And what caused you to make that change?

3   A    I changed it on the request of Cletus.  He suggested that

4   we do that.

5   Q    What was the conversation and how did it come about that

6   he wanted you to do that?

7   A    Well, he's a Democrat himself, and he suggested if I

8   changed to Democrat he would put me in as an election worker.

9   Q    Okay.  And when you say "election worker," what are you

10  talking about?

11  A    I would work in the capacity of when you go in to vote

12  there's election poll workers.  I was one of the officers that

13  you would see when you came to vote in your precinct.

14  Q    Now, did he explain to you that you would be serving in an

15  election officer position?

16  A    Yes.

17  Q    Okay.  And where did he specify that you would be working

18  for the Board of Elections as on election officer?

19  A    In the Manchester precinct.

20  Q    Okay.  And in order to do that this, he suggested that you

21  change to Democrat?

22  A    Yes.

23  Q    Did he explain to you why?

24  A    Well, they was already — the other side had Republicans

25  already in place and they were satisfied with who was there and

1  he stated that William Stivers had served in the capacity that

2  I would have been, but they was too much conflict and too much

3  heat on him, that he didn't need to serve in that capacity

4  anymore and he needed someone he could trust and would be

5  honest with him.

6  Q    So were you alone in making that change to Democrat?

7  A    My husband did also.

8  Q    Okay.  And you say that he spoke about — did he speak

9  about which election was coming up at that time, or was that

10 later?

11 A    No, he spoke about the election that was coming up.

12 Q    And what election was coming up?

13 A    Well, the general and the City races was coming up.

14 Q    Okay.  And what year would that have been that you changed

15 to the Democrat party?

16 A    I couldn't give you an exact timeframe on that.

17 Q    I'm going to hand to you now what's marked as Government's

18 Exhibit D4.

19      You should have now in front of you a document that has a

20 label D4, "D" as in "dog".

21 A    I do.

22 Q    Okay.  Do you recognize that, Ms. White?

23 A    I do.

24 Q    What is that?

25 A    This is my — I don't know if it would be called an

1   application, but this is my statement where I would be serving

2   for the Clay County Board of Elections as an election officer

3   as a Democratic judge.

4   Q    And who signed this notice to you that you had been

5   selected as the Democrat judge for the Manchester precinct?

6   A    It's signed by Freddy Thompson.

7   Q    And what position did he hold at that time?

8   A    The clerk.

9   Q    And this was received by you in the mail, I assume?

10  A    Yes.

11  Q    Attached to that letter is some following pages.  Do you

12  know what those are?

13  A    It's a —— what would you call it?  It's a layout, a

14  graphic, of how the election machine would be —— would be used

15  this year —— that year.

16          MR. SMITH:  Okay.

17          I would move at this time to introduce Government's

18  Exhibit D4.

19          THE COURT:  Any objection?

20       (No audible response.)

21          THE COURT:  D4 will be admitted.

22          MR. SMITH:  I would ask, Your Honor, that that be

23  published.

24          THE COURT:  It can be.  When you get to a place to

25  stop, we're going to break for lunch here in a minute.

1        MR. SMITH:  Just a couple of questions on this issue.

2        THE COURT:  That's fine, yes, sir.

3   BY MR. SMITH:

4   Q    The top of this letter has a date, it looks like April

5   the 18th, 2006?

6   A    Yes.

7   Q    And is that about the time you received that letter?

8   A    It would have been, yes.

9   Q    And in that body of that letter, it says that the Clay

10  County Board of Elections has chosen you as an election officer

11  as –– it has D-e-m, period, judge, and then circle around it.

12  What does that mean?

13  A    Democratic judge.

14  Q    Okay.  It says that –– further in there you're required by

15  law to serve and to attend a training?

16  A    Yes.

17  Q    It says, "This training is in addition to the training for

18  the new iVotronic voting machines.  The school will be held on

19  Thursday, May 11th, 2006."  Did you attend such training?

20  A    I did.

21  Q    And had you had any training at all as an election

22  officer?

23  A    No.

24  Q    And when you got this letter, was this the first official

25  acknowledgment that you recall where you had been accepted in

 1  that position?

 2  A     No, I knew I was accepted already prior to this.

 3  Q     Okay.

 4  A     It was the first statement I had received.

 5  Q     Okay.  When did you learn for sure that you were going to

 6  be an election officer, Ms. White?

 7  A     Months ahead of this letter.

 8  Q     And who told you that?

 9  A     Cletus Maricle told me that.

10        MR. SMITH:  This would be a point of a break, Your

11  Honor.

12        THE COURT:  All right.  Thank you.

13        Ladies and gentlemen, we will take our lunch break at

14  this time.  We'll take a recess until 1:00.  Please keep in

15  mind the admonition that you've been given previously not to

16  discuss the case among yourselves while we are in recess, and,

17  of course, don't allow anyone to approach you to discuss the

18  case.  The jury will be excused until 1:00 p.m. this afternoon.

19        (Whereupon, the jury retired from the courtroom, after

20  which the following proceedings were had in open court.)

21        THE COURT:  Thank you.

22        Ms. White, you can step down.

23        Any matters to take up outside the presence of the

24  jury?

25        Mr. Smith, if you could provide those files for

1  Mr. Hoskins to review over the lunch hour.

2           MR. SMITH:  Yes, Your Honor.

3           THE COURT:  All right.  We'll be in recess until

4  1:00.

5      (Whereupon, a recess was had for the noon hour, after

6  which the proceedings continue uninterrupted to Volume 10-B.)

7                      (Proceedings concluded at 12:00)

8

9                  C E R T I F I C A T E

10     I, Cynthia A. Oakes, certify that the foregoing is a

11  correct transcript from the record of proceedings in the

12  above-entitled matter.

13

14  2/22/2010                    s/CYNTHIA A. OAKES
        DATE                     CYNTHIA A. OAKES, RPR, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25

I N D E X

                                                              PAGE

Testimony of WANDA PRICE WHITE:
     Direct Examination by Mr. Smith:                          4


E X H I B I T S

| Government's Exhibit No. | Identified | Page Admitted |
|---|---|---|
| D4 | 57 | 58 |
| D6 | 54 | 55 |