United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | )  London Criminal |
| | )  Action No. 09-16-S |
|   vs. | ) |
| | )  Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | )  March 15, 2010 |
| DOUGLAS C. ADAMS | )  9:55 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | )  VOLUME 24-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:  STEPHEN C. SMITH, ESQ.
                                        JASON D. PARMAN, ESQ.

On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:         MARTIN S. PINALES, ESQ.

On behalf of the Defendant      R. KENT WESTBERRY, ESQ.
Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant      T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant      ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:             R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant      JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
1   Appearances of Counsel:

2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                    JASON D. PARMAN, ESQ.
3                                   Assistant U.S. Attorneys
                                    601 Meyers Baker Road
4                                   Suite 200
                                    London, Kentucky  40741
5

6   On behalf of the Defendant     DAVID S. HOSKINS, ESQ.
    Russell Cletus Miracle:        107 East First Street
7                                  Corbin, Kentucky  40701

8                                  MARTIN S. PINALES, ESQ.
                                   150 East Fourth Street
9                                  Federal Reserve Building
                                   Cincinnati, Ohio  45202
10

11  On Behalf of the Defendant     R. KENT WESTBERRY, ESQ.
    Douglas C. Adams:              KRISTEN N. LOGAN, ESQ.
12                                 220 West Main Street
                                   Suite 1900
13                                 Louisville, Kentucky  40202

14
    On behalf of the Defendant     T. SCOTT WHITE, ESQ.
15  Charles Wayne Jones:           133 West Short Street
                                   Lexington, Kentucky  40507
16

17  On behalf of the Defendant     ROBERT L. ABELL, ESQ.
    William E. Stivers:            120 North Upper Street
18                                 Lexington, Kentucky  40507

19
    On behalf of the Defendant     RUSSELL JAMES BALDANI, ESQ.
20  Freddy W. Thompson:            R. TUCKER RICHARDSON III, ESQ.
                                   300 West Short Street
21                                 Lexington, Kentucky  40507

22
    On behalf of the Defendant     JERRY W. GILBERT, ESQ.
23  William B. Morris:             212 North Second Street
                                   Richmond, Kentucky  40475
24

25
```

```
1   On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
    Debra L. Morris:                201 West Short Street
2                                   Lexington, Kentucky   40507

3
    On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
4   Stanley Bowling:                116 West Main Street
                                    Suite 2A
5                                   Richmond, Kentucky   40475

6
    Court Reporter:                 CYNTHIA A. OAKES, CRR
7                                   Official Court Reporter
                                    United States District Court
8                                   560 Athens Boonesboro Road
                                    Winchester, Kentucky   40391
9                                   (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
    Proceedings recorded by mechanical stenography,
23  transcript produced by computer.

24

25
```

4

1          (Whereupon, the following proceedings were had outside the

2   presence of the jury.)

3          THE COURT:  Thank you, and good morning, everyone.

4   The jury is not present at this time.

5          I understand that there is a couple of issues we need

6   to take up this morning.

7          MR. HOSKINS:  Your Honor, briefly, I will advise the

8   Court that we will not be calling any additional witnesses.  I

9   do — would move to introduce into evidence the chart that our

10  expert used to explain his testimony.

11          THE COURT:  All right.

12          MR. HOSKINS:  I would also advise the Court that the

13  virus that started on one end of the table has worked its way

14  down to Mr. Maricle and he's had a rough night and he may need

15  to exit the courtroom quickly.

16          THE COURT:  All right.  We'll follow the same

17  procedure, if that happens and we need to take a quick recess,

18  we'll certainly do that.

19          Any objection to the introduction of the chart that

20  was used by — it wasn't the last witness, and I'll get his

21  name here in just one moment.  Mr. Slyter.

22          MR. SMITH:  Your Honor, we would ask that — I

23  believe in his summary expert testimony we were provided, he

24  actually had arrows that were blue and red, and this doesn't

25  have that, which I understand he made these in the courtroom.

1    So I would just ask that both this and the one he prepared for

2    his testimony summary be admitted as well.

3              THE COURT:  All right.  I believe you used that

4    during your cross-examination of him, at least on the overhead?

5              MR. SMITH:  Yes, Your Honor.

6              THE COURT:  All right.  Any objection to that?

7              MR. HOSKINS:  No objection, Your Honor. I have the

8    original of those that has a colored markings on it.  I don't

9    know if I have it in the courtroom with me or not, but we'll

10   find it.

11             THE COURT:  All right.  Let's see, that would be —

12   the chart that Mr. Hoskins would like to have introduced would

13   be Maricle Exhibit — it would be the next numbered exhibit.

14             THE CLERK:  No. 9.

15             THE COURT:  No. 9.  Mr. Smith, would you like to have

16   the additional chart marked as 9A or as the next numbered

17   government exhibit?

18             MR. SMITH:  We would ask that it be a government

19   exhibit, Your Honor.

20             THE COURT:  All right.  So it will be the next

21   numbered government exhibit.  We have a number — we have a

22   series of exhibits.  Will this be part of the A series,

23   Mr. Smith?

24             MR. SMITH:  We would ask it that be the next D.

25             THE COURT:  D series.  It's in the 70s, I think, and

1    I'm not sure what the —

2              MR. SMITH:  I'm told D85, Your Honor.  I'm not sure

3    if that —

4              THE CLERK:  That's correct.

5              THE COURT:  85?  All right.

6              MR. WHITE:  I'm sorry, is that "D" as in "dog?"

7              THE COURT:  D, D85 would be the next numbered

8    government exhibit.

9              All right.  Those motions will be sustained and those

10   exhibits will be admitted.  I will advise the jury this morning

11   that those exhibits have been admitted as well, so they'll know

12   what's been marked and introduced.

13             What was the Maricle exhibit number?

14             THE CLERK:  Nine.

15             THE COURT:  All right.

16             All right.  Mr. Hoskins, will you have any additional

17   witnesses to offer at all?

18             MR. HOSKINS:  No, Your Honor.

19             THE COURT:  All right.  So you'll be closing at this

20   time?  And we'll go to Mr. Westberry next.

21             Are your witnesses here this morning?

22             MR. WESTBERRY:  Yes, I was a little concerned, but I

23   have at least four of our witnesses and we'll be ready to go,

24   Judge.

25             THE COURT:  All right.  Thank you.

7

1          One other matter to take up before the jury comes in.

2    The Clerk advised me this morning that one of our jurors when

3    he checked in this morning advised that a close acquaintance of

4    his is a cousin to one of the defendants.  That's all the

5    information that I have.  I don't know how close the

6    relationship is, who the cousin is, or who the defendant is in

7    the case.  So this is the procedure we'll follow on this:  If

8    the parties wish the Court to excuse this juror, if everyone

9    agrees, then I'll excuse the juror.  If not, then I'll follow

10   the same procedure that I followed earlier, and that is I'll

11   voir dire the juror back in my chambers, I'll come back out and

12   I'll advise you of any additional information about this

13   particular person, and then we can take this up further, we can

14   discuss this and I'll make a determination as to whether or not

15   to excuse the juror.  Again, I have limited information,

16   Counsel.  I assume that you-all would like for me to voir dire

17   back in chambers just to be on the safe side?

18          MR. HOSKINS:  (Nodding head affirmatively.)

19          THE COURT:  All right.  It will take us just a minute

20   then to get started.

21          Cindy, I'll need to have you set up back in chambers.

22          And, Kim, if you could come back as well.

23          I'll briefly question the juror and get some

24   additional information, then I'll come back out as soon as I

25   have that and we can take this matter up further.

1          Anything else before we take a brief recess?

2          Mr. White?

3          MR. WHITE:  Your Honor, I just have one quick thing.

4          THE COURT:  Yes, sir.

5          MR. WHITE:  It might be more efficient to bring it up

6  now.

7          THE COURT:  Yes, sir.

8          MR. WHITE:  During the government's examination of

9  Sarah Ball Johnson, who is the Executive Director of the State

10  Board of Elections, you had asked me to show relevance on a

11  particular exhibit, and that exhibit was — it was a — three

12  different documents that corresponds between the Clay County

13  Board and the State Board regarding the purchase of a machine

14  and how that process went.  Your Honor did allow me to question

15  her about that but not use the exhibit.  One of the witnesses

16  I'm going to be bringing in later today or in the morning is

17  Katy Gabhart, she is the General Counsel for the State Board,

18  and I was going to attempt at that time to introduce that.  I

19  understand one of the objections was foundation and when I went

20  through my notes, I realized I forgot to ask those questions

21  about the regular course of business and those things, but in

22  terms of the relevance, I didn't know if you wanted me to

23  address that now or — I didn't want to get into it without at

24  least alerting you.

25          THE COURT:  All right.  I appreciate that.  We should

1    be able to take that up either at a break or at the noon hour.

2    That will give me a chance to check my notes on that particular

3    issue and refresh myself.

4              MR. WHITE:  And if it would help the Court, I've got

5    copies of it and I can give that to the Court at the break and

6    you will be to actually see the exhibit —

7              THE COURT:  That would be helpful I think.

8              MR. WHITE:  And the second thing I was going to ask

9    you, Your Honor, is one of the witnesses that I anticipate

10   Defendant Adams is going to call is William Hugh Bishop, and

11   Mr. Bishop is also under subpoena by me.  I don't know what the

12   Adams team is going to ask him, but given that he's under

13   subpoena, he's going to have to — today is his second trip up

14   from Manchester.  If the Court would allow me to go ahead and

15   do my direct of him as well if it's not duplicative of

16   Mr. Westberry's, and I was going to even suggest, if the Court

17   was of a mind, let me go ahead and do that before the witness

18   is turned over for cross-examination for the United States.

19   And I'm happy, obviously, to do whatever you want, I'm just

20   trying to make the most efficient use of the time.

21             THE COURT:  All right.  I assume —

22             Mr. Smith, I assume there will be no objection if we

23   go out of order a little bit and I advise the jury that I'm

24   allowing Mr. White to go ahead with his questions since he has

25   the witness under subpoena as well.  So we'll go with

1  Mr. Westberry, then Mr. White, and then you would cross-

2  examine, then any —

3          MR. BALDANI:  We subpoenaed him as well, Your Honor.

4  I don't really care about the order.

5          THE COURT:  Okay.

6          MR. BALDANI:  But we had some questions for him as

7  well.

8          THE COURT:  All right.

9          MR. SMITH:  No objection.

10         THE COURT:  All right.  We'll go out of order a

11 little bit with respect to that witness.  I appreciate you

12 calling that to my attention.

13         MR. WHITE:  Thank you, Your Honor.

14         THE COURT:  If there are other witnesses that fit

15 into that same category, you can advise me as well of that.

16         MR. WHITE:  I will, and I'll get up with

17 Mr. Westberry during the break.

18         THE COURT:  All right.

19         MR. WHITE:  And if suddenly somebody shows up that I

20 didn't know about, I'll just — you want me to just ask for a

21 side bar?

22         THE COURT:  That will be fine.

23         MR. WHITE:  Thank you, Your Honor.

24         THE COURT:  That will be fine.  Thank you.

25         Anything else?

1    (No response.)

2         THE COURT:  All right.  Well, let's take a brief

3    recess.  I'll come back out without the jury being present and

4    advise you as to any additional information, then we can go

5    further.

6         MR. WESTBERRY:  How much would it go, five or ten

7    minutes?

8         THE COURT:  I wouldn't anticipate it's going to be

9    much longer than that.

10        All right.  We'll be in recess.

11        (Whereupon, the following proceedings were had in

12   chambers between The Court and Juror No. 19.)

13

14

15

16

17

18

19

20                     TRANSCRIPT SEALED

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12                        TRANSCRIPT SEALED

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13                              TRANSCRIPT SEALED

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13                    TRANSCRIPT SEALED

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13                    TRANSCRIPT SEALED

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13                          TRANSCRIPT SEALED

14

15

16

17

18

19

20

21

22

23

24

25

1          (Whereupon, the following proceedings were had outside the

2     presence of the jury in open court.)

3               THE COURT:  All right.  Thank you, Counsel.

4               Again, the jury is not present.  The parties and

5     counsel are present.

6               The juror advised me that on one day last week that

7     he observed someone that he knows as a person he described as

8     an acquaintance or friend, someone that he sees three to four

9     times a year, and that he saw this person on Friday evening.

10    He asked if he didn't see her in the courtroom earlier in the

11    week and the person said yes, he did, that she was the first

12    cousin of Douglas Adams.  The juror said that he thought that

13    it looked like her.  He said that they're not close, someone

14    that he knows, and that it's a person that his ex-wife had

15    worked with back in 1979 at Kmart, that he had refinished or

16    refurbished some furniture for this person back in 1988 or 1989

17    and that — again, that he sees this person three to four times

18    a year.

19              Upon questioning by me, he indicated that his

20    relationship with this person would not alter his ability to

21    serve as a juror and that he could — he thought that he could

22    continue to serve and it would not influence his opinion one

23    way or the other in the case.  That's the information.  So I'll

24    open it up for comments at this point.  If you need to consult

25    with —

1          MR. WESTBERRY:  Yes, thank you.

2          THE COURT:  Yes, if you need to consult, please take

3    a moment to do that.

4          MR. WESTBERRY:  Thank you, Judge.

5          THE COURT:  Yes, sir.

6          MR. WESTBERRY:  We're inclined to —— in lieu of what

7    you said his responses were during your in-camera voir dire, we

8    think it's fine.  We're not asking that you release him at this

9    time.

10          THE COURT:  All right.  Thank you.

11          MR. WHITE:  We're fine, Your Honor.

12          THE COURT:  Any of the other defendants feel

13    differently than Mr. Westberry?

14       (No response.)

15          THE COURT:  No?

16          Mr. Smith, what's the position of the United States?

17          MR. SMITH:  We're fine, Your Honor.

18          THE COURT:  All right.  We'll proceed with the juror.

19          The conversation that I had with the juror will

20    remain under seal until the end of the case, but at that point

21    it will be available.  I believe the references were made to

22    his juror number, not to his name, but if there are references

23    to his name, then those should be removed from the transcript

24    for privacy concerns.

25          All right.  Mr. Westberry, do you have your first

1   witness lined up?

2            MR. WESTBERRY:  Yes, Your Honor, Roy Allen.

3            THE COURT:  All right.  What we'll do is I'll —

4   we'll bring the jury in, I'll allow Mr. Hoskins to announce

5   closed, and I'm going to advise the jury also before he does

6   that of the admissibility — of the admission of these two

7   exhibits that we referenced and I'll describe those.

8            Are those available in case we need to have those

9   shown —

10           THE CLERK:  Yes, sir.

11           THE COURT:  All right.  Thank you.

12           You can bring in the jury.

13      (Whereupon, the jury entered the courtroom, after which

14   the following proceedings were had in open court.)

15           THE COURT:  Thank you, and please be seated.

16           Good morning, everyone.  I hope everyone enjoyed that

17   extra hour of sleep this morning.  With the time change, I'm

18   not sure it was such a break.

19           Before we continue, there are two exhibits that I

20   have admitted that were discussed and shown during Mr. Sester's

21   direct and cross—examination.  Those were the two charts that

22   were used.  That was Mr. Hoskins witness.

23           Madam Clerk, do you have those?  You can just display

24   to the jury what those are.  There are two charts.

25           Mr. Hoskins moved for the admission of the larger

1 | chart, and I have admitted that as Maricle Exhibit No. 9.

2 | There was another chart, or a page actually, that Mr. Smith

3 | used during cross-examination, and that has been admitted as

4 | United States Exhibit D85.  The Clerk is showing you what that

5 | is at this time.  I believe it was shown on the overhead.

6 | Those two exhibits have been admitted.

7 |         Let's see, Mr. Hoskins.

8 |         MR. HOSKINS:  Thank you, Your Honor.  At this time,

9 | the defendant, Russell Cletus Maricle, would announce closed.

10 |         THE COURT:  All right.  Thank you.

11 |         I will move to Mr. Adams' presentation of proof.

12 | Mr. Westberry, you may call your first witness.

13 |         MR. WESTBERRY:  Yes, we would call Roy Allen.  Roy

14 | Allen, please.

15 |         THE COURT:  Thank you.  And I erroneously referred to

16 | the witness as Sester.  It should be Slyter.  I apologize for

17 | that.

18 |                     ROY D. ALLEN,

19 | having been first duly placed under oath, was examined and

20 | testified as follows:

21 |         THE COURT:  Thank you.

22 |         Mr. Westberry, you may proceed.

23 |         MR. WESTBERRY:  Thank you.

24 |                   DIRECT EXAMINATION

25 | BY MR. WESTBERRY:

1  Q    Good morning, sir.  I am Kent Westberry, and I represent

2  Doug Adams.  Could you state your full name, please?

3  A    I'm Roy D. Allen.

4  Q    Mr. Allen, where do you reside?

5  A    I live in the Burning Springs community, a place called

6  Sacker.

7  Q    And what county is that in?

8  A    That's Clay County.

9  Q    How long have you lived in Clay County, Mr. Allen?

10 A    For the past 30 years.  Will be this July.

11 Q    Not to get overly personal, but how old are you, sir?

12 A    I'm 66.

13 Q    And you said you've lived in Clay County for the past, did

14 I hear you say, 30 years?

15 A    Thirty, the last 30 years.  I grew up in that area, but I

16 was gone for a while and then returned.

17 Q    In between the time that you were gone and returned, what

18 did you do, Mr. Allen?

19 A    I served in the military and worked in Cincinnati in the

20 toolmaking place and after that went into the gospel ministry,

21 and 17 years after I left home I came back to Clay County.

22 Q    Are you currently employed?  Do you have an occupation?

23 A    Yes, sir, I'm the Director of Missions for the Booneville

24 Baptist Association.

25 Q    And what is the — what does the Director of Missions at

1   the Booneville Baptist Association do, Mr. Allen?

2   A     I coordinate the activities between the 26 churches in our

3   association, helping the pastors with whatever needs they might

4   have.  Also, I serve as a link between the local association

5   and Kentucky Baptist Convention and the Southern Baptist

6   Convention.

7   Q     How long have you been doing that work, sir?

8   A     I became director of missions in 2007, in September of

9   2007.

10  Q     How long have you been associated or a part of the

11  Booneville Baptist Association?

12  A     Well, it's — back in 1980 I came home, and that's when I

13  became part of the Booneville Association.  But I've been

14  affiliated with the Southern Baptist since 1973.

15  Q     Thank you.  Are you married, sir?

16  A     Pardon, sir?

17  Q     Are you married, Mr. Allen?

18  A     Yes, I am.

19  Q     Who is your wife?

20  A     Barbara Allen.

21  Q     Okay.  And how long have you been married?

22  A     It will soon be 43 years.

23  Q     Do you-all have children?

24  A     Three children.

25  Q     All grown?

```
 1  A    All grown, yes, sir.

 2  Q    Any grandchildren?

 3  A    Three grandchildren and one great grandson.

 4  Q    Now, Mr. Allen, in the years that you lived in, you said,

 5  the Burning Springs area of Clay County, have you had an

 6  occasion to get to know someone named Doug Adams?

 7  A    Yes, sir, I know Mr. Adams.

 8  Q    Okay.  And how long have you known Mr. Adams?

 9  A    Well, all of his life actually.

10  Q    Did you know how he was raised?

11  A    Yes, sir.  Yes, sir.

12  Q    Did you know his father?

13  A    I knew his father.

14  Q    Who was his father?

15  A    Landon, Landon Adams.

16  Q    What kind of business was Landon Adams in?

17  A    I think it was mostly used car and garage work.

18  Q    What do you know about Doug Adams briefly?

19  A    Worked with his father growing up, he worked his way

20  mostly through school, and like most of us from that area, he

21  had to -- had to work to manage to get to where he wanted to

22  be.  In college he worked his way, as far as I can tell, and

23  helped, you know, support getting through college.  And we

24  stayed in contact.  And I remember he became a schoolteacher

25  with the proper certification, qualified as such, and that's
```

1  about the time we picked up, when I moved back home, from then

2  he was teaching school at Laurel Creek at the time.

3  Q    What kind of school was Laurel Creek?

4  A    That was an elementary school.

5  Q    Do you know what kind of work Mr. Adams, Doug Adams, did

6  after teaching at Laurel Creek Elementary?

7  A    Well, he stayed there and he drove a school bus and did

8  some farm work.  And he also was a mechanic, so —

9  Q    Yes, sir.

10  A    — with proper time and when the positions became

11  available, he became assistant principal at our high school.

12  Q    Yes, sir.

13  A    When the vacancy occurred, he was well qualified for

14  principalship, he became principal there, and then later as —

15  in the superintendent's office and eventually became

16  Superintendent of Clay County Schools.

17  Q    Yes, sir.  Do you know if he's since retired as

18  Superintendent of Clay County Schools?

19  A    Yes, he has.

20  Q    Did he do a good job, from your personal knowledge, as

21  superintendent?

22  A    Well, I would have that knowledge.  He did, yes, sir.

23  He's always been a good leader.  He handled the staff well,

24  treated them fairly, and our school progressed and competed.

25  Even in a poverty-stricken area, our schools competed.  And he

1   can be credited for a lot of that success.

2   Q    Okay.  Now, turning back, Mr. Allen, you said that you

3   lived — your family has lived in the Burning Springs area for

4   a good number of years; is that — did I hear you correctly?

5   A    Yes, sir, I was born and raised in Clay County and

6   attended the public schools and went in the service and, as I

7   said, was gone for a few years, and in 1980 we moved back and

8   I've lived there since, yes, sir.

9   Q    Do you know if Doug Adams also lives in the Burning

10  Springs area, Mr. Allen?

11  A    Yes, sir, he's lived in and around that area and —

12  actually, he lives on Laurel Creek now, but that's just a short

13  distance from where he was raised.

14  Q    Could you take a look around the courtroom and see if you

15  could identify Doug Adams anywhere?

16  A    Oh, yes, sir, I see him, I'm sorry.

17  Q    What is he wearing, sir, if you could briefly describe

18  him?

19  A    Right then, a suit.

20          MR. WESTBERRY:  May the record reflect —

21          THE COURT:  Yes, sir.  The record will reflect that

22  the witness, Mr. Allen, has identified the defendant, Doug

23  Adams.

24  BY MR. WESTBERRY:

25  Q    Do you know if Doug Adams has family?

1    A    Yes, I do.

2    Q    Is he married?

3    A    Yes.

4    Q    Do you know who his wife is?

5    A    Yes, it is, we call her "Sissy."  I guess that's close

6    enough.

7    Q    Do you know if he has children?

8    A    Yes, sir, he has two daughters.

9    Q    And do you know their names?

10   A    Yes, sir.

11   Q    And if you could, just briefly tell us what their names

12   are?

13   A    Melanda and Danielle.

14   Q    Have you known the family for a long -- a good long period

15   of time?

16   A    Yes, sir.  Yes, sir.

17   Q    Now, Mr. Allen, turning your attention back to Burning

18   Springs and the years that you lived there, I would ask you,

19   could you tell the jury if at any time you had ever served as

20   an election officer in Clay County?

21   A    Yes, sir.  I served several times as a -- as an officer of

22   the Election Board as a precinct worker, and the last time I

23   served was in 2002.

24   Q    I would ask you if you recall having served as a precinct

25   officer in the May 2002 primary?

1   A    Yes, sir, I remember.

2   Q    Now, what party are you affiliated with, Mr. Allen?

3   A    I'm a Republican.

4   Q    Okay.  Could you tell the jury what position you served as

5   in the May '02 primary, what particular office or position that

6   you served in and what that position would require you to have

7   done, sir?

8   A    When those appointments came down, sir, they listed me as

9   the sheriff.  I had worked as a clerk before, but this time I

10  was listed as the sheriff.  But there were opportunities when

11  there was a break necessary, we could exchange back with the

12  clerk and give him a break or something, and so I'm familiar

13  with that.  But I was appointed as the sheriff for that term.

14  Q    That day, Mr. Allen, how many election officers, in

15  addition to yourself, would have been serving out at Burning

16  Springs in that May '02 primary?

17  A    When we got there in the morning, which was quite early

18  because we had to open the doors and prepare the facility for

19  the reception, the voters, there were three of us that showed

20  up, and I don't know — we didn't necessarily all get there at

21  the same time, but before 5:30, I'm thinking was the time we

22  were there, because it took time to get the proper things

23  posted and secure the area for the voting and make sure the

24  machine — three of us showed up, and when we called to tell

25  the Clerk's Office there was only three of us — it was going

1  to be a lot of traffic that day, we knew it was probably going

2  to be a big turnout, so they sent down an alternate.  So there

3  were four of us eventually.

4  Q    To the best of your recollection, Mr. Allen, could you

5  tell us who you recall the other three election officers,

6  which, of course, would include the alternate?

7  A    Yes, sir.  The others beside myself was Darrell

8  Reynolds —

9  Q    Yes, sir.

10  A    — Larry Sizemore, and Thum Davidson.  Please don't ask me

11  his real name, I just don't know.

12  Q    What positions did they hold as officers in the precinct

13  that morning?

14  A    Darrell was officially appointed as the clerk, Darrell

15  Reynolds.

16  Q    Yes, sir.

17  A    And Larry Sizemore and Mr. Davidson were the judges.

18  Q    Okay.  If you recall, who were Republicans and who were

19  Democrats?

20  A    I really don't know.  I think Larry was on the Democratic

21  side and I think Darrell was the other Republican.  I'm not

22  sure about Thum.  I don't know — we were all — we knew each

23  other and we just never talked about that.

24  Q    What time do you recall that the polls would have opened

25  that morning in Burning Springs, the May '02 primary?

1  A    They were open at 6:00 when we were supposed to.

2  Q    Now, can you tell the jury just how –– Let me back up and

3  I'll rephrase that question.

4       Where in Burning Springs was the actual polling place,

5  Mr. Allen?

6  A    It was at the Burning Springs Elementary School.

7  Q    Okay.  Now, were schools closed that day, if you have

8  personal knowledge?

9  A    Yes, sir, that day they were closed.

10 Q    And why do they do that, if you know?

11 A    Well, for the need of having a polling place, first of

12 all.  And it's kinda hard to have kids and voters, everybody

13 together, it's a security risk to have school when you're

14 having an election.  And just –– and the convenience, we didn't

15 have –– we don't have that many places that I know of that has

16 a separate polling place, so it's best to dismiss school on

17 that day and give the teachers or anybody else a chance to vote

18 if they need to.

19 Q    Do you know, is it common in Clay County that polling

20 places are located in schools around the county?

21 A    Yes, sir.  Yes, sir.

22 Q    Now, could you describe for the jury, Mr. Allen, just how

23 the voting machines were set up, where in the Burning Springs

24 Elementary School the polling place was located?

25 A    To go back to the road where you came off to enter into

1   the school grounds, you came down, it was a parking lot on the

2   left of the building, and one -- you could drive in front of

3   it.  And to the right there was also some parking.  It was an

4   awning and a shelter over the front of the building there -- I

5   mean, over the unloading area for kids to get off without

6   having to get in the rain when the buses pulled up.  The

7   entrance was up a short walk from the drive, which two double

8   doors opened that could be locked from within, and each side of

9   the door was windows.  I mean, it was all glass.

10  Q    Clear glass?

11  A    Clear, yes, sir.  And that was sort of the situation.  In

12  the office, when you entered in -- through the doors, the

13  principal's office was on the left and the gymnasium was to the

14  right through the doors, and there was a hallway going down to

15  the classrooms, and we were located right there between the

16  entrance to the gymnasium and that of the principal's office --

17  I mean, the -- yeah, the principal's office, and the

18  secretary's desk, the Clerk's desk, was sort of back on the

19  side of the principal's office door, which it was open where we

20  could go in and out and make calls if we needed to or answer a

21  call if we needed to.  And the machine would have been right at

22  the entrance of that hall.  And you could see folks -- see

23  their feet, you know, but fixed so that the curtain was to the

24  back.  And that's how it was set up.  Do you need to know about

25  the machine?

1  Q    Yes.

2  A    The machine was — I'm recalling how they were, they were

3  two buttons.  When you came in, first of all —

4  Q    Let me ask you this, it's something I thought of.  Were

5  there machines — were there two machines, Mr. Allen?

6  A    There were that day, sir —

7  Q    Really?

8  A    — because — yeah.

9  Q    Yes, sir.

10 A    Because there was a number of people coming and we didn't

11 want people to have to wait.  I'm assuming that's —

12 Q    Were they out in the open, two machines?

13 A    Both of them were visible.  As I said, you could —

14 certainly.

15 Q    I interrupted you.  Go ahead, and if you could continue,

16 please, sir, what you personally observed that day with regard

17 to the machines and how they were set up.

18 A    Okay.  They were set up where that the judges had to be

19 beside that machine, one of the judges or somebody there, one

20 of the officers of the precinct, there were two buttons, and if

21 you came through and after proper credentials displayed that

22 you were a legal voter and you were on the registry and been

23 properly identified, they went over to one of the machines and

24 acknowledged that — from the clerk that they were a Democrat

25 or Republican, because it was a closed primary, you had to

1   declare what party you were, and they would pull a lever

2   depending on which party you were.  And, of course, after that

3   happened, they would go around to the back and the curtain

4   would be open, a curtain would be open.  The voter would go

5   inside, and it was up to the left, with your left hand you turn

6   a red knob down and that curtain would close and that ballot

7   would come down.  And then, of course, the person would turn

8   the lever before the person's name they wanted to vote for.  So

9   whatever party they had declared, that's how that happened,

10  but —

11  Q    Do you recall that day, sir, did you have any mechanical

12  problems with one of the machines?

13  A    We felt that one of them would give us trouble, it had in

14  the past, and when that happened we did have a backup and we

15  did have that other machine in case.  And I don't remember

16  exactly whether we had to shut that one down or what, but we

17  have had — we had problems with it in the past, and, of

18  course, they weren't going to replace that with a new one and

19  our same machine came back year after year and — when I was

20  there, at least.  So we had another machine for strategic

21  purposes and making sure people got the right to vote.

22  Q    How were the lines that day, sir, "that day," '02 primary

23  at Burning Springs?

24  A    There were times there were more than others, but it was

25  fairly steady, especially before 8:00, which was the work time,

1  and then from 4:00 on up to 6:00 was pretty heavy.  But never

2  excessive, but a line where folks could, you know, stand for a

3  while.  They could spend some time getting through the line,

4  but it wasn't excessive.  We tried to get folks through fair

5  and as best we could.  But there were lines — there was a

6  line.

7  Q    From your personal knowledge, did you know — do you have

8  recollection of recognizing or knowing most of the voters who

9  were there that morning at the Burning Springs precinct, that

10 day?

11 A    Either I knew them personally or somebody in the precinct,

12 one of the officers, would say I know that person and vouch for

13 them.  We did have — and if not, then, of course, we asked for

14 identification, driver's license or an ID card or a Social

15 Security card or something to prove who they were if we did not

16 know them.  They had to present some kind of credentials, yes,

17 sir.

18 Q    Now, were you — Mr. Allen, can you tell us, were you

19 moving around any or did you stay still or just how did you

20 spend the day that day?

21 A    Well, sometimes you would have to go out to check the

22 area, because — one of us would have to do that because we

23 were mandated to do it from our instructions from the Court.

24 We had to — because once you got in line, you were under the

25 jurisdiction of the precinct officers, once you were in line to

1  vote.  And when folks -- you know, we wanted to know how many

2  were out there and just to make preparations for them when they

3  came in.  So there were occasions we would walk outside the

4  check the grounds, because there were certain distances that we

5  were responsible for, no politicking or stuff like that to take

6  place or -- there were things we were responsible for.

7  Q    Did the line occasionally extend out through the two doors

8  that had the glass on either side of them?

9  A    There was a line outside the door, yes, sir.

10 Q    Were you able to see out the door and through the glass?

11 A    You could -- you could see out the door and the driveway

12 to the sidewalk, and most of the time the -- well, as far as I

13 know remembering back, by looking through the side window,

14 there wouldn't have been any reason not to see the whole line

15 really, because it never got that long.

16 Q    Do you have any recollection, Mr. Allen, if someone from

17 the Attorney General's Office would have come by the Burning

18 Springs precinct that day?

19 A    Well, yes, sir, it was kind of an amusing thing.  This

20 fellow with a fellow with him came in and said he wanted to see

21 the assisted voter records, and I said, "Who are you?"  And he

22 said he was from the Attorney General's Office.  And I said,

23 "How do I know that you are from the Attorney General's

24 Office?"  And we -- my fellows and I insisted that he show us

25 proper credentials, and he did.  I don't know if he looked

ROY D. ALLEN - DIRECT - MR. WESTBERRY                    35

1  around much.  He said, "How's things going" and "Do you have

2  any problems," and then he left.  But we knew they were in the

3  area and — which it didn't bother us, we were right on with

4  what we were supposed to be doing.

5  Q    Did any voters need assistance that day at the Burning

6  Springs precinct, if you recall, Mr. Allen?

7  A    Well, yes, sir.  That was a common thing, because several

8  of our voters have been already asterisked as being in need of

9  assistance.  They're in the book, they're already on the roster

10 saying they are qualified to have someone assist them to vote.

11 And there were others that came and said they did as well, and

12 after proper affidavits being signed and swearing they needed

13 it, there might have been — some of that might have happened.

14 But those others were a matter of record, too, that were

15 already eligible for assisted voting, and --

16 Q    From your personal knowledge, Mr. Allen, were there any

17 problems that day with assisted voting in the Burning Springs

18 precinct that you are personally aware of?

19 A    No, sir.  We never had any, other than if someone was

20 handicapped to a point they might be a little slow.  But I

21 wouldn't consider that to a problem, you know, getting through

22 the line.  But we tried to help those that were handicapped or

23 needed assistance the best we could, making sure that people's

24 civil rights were not violated and they couldn't see and they

25 were diagnosed as blind, we — you know, we allowed that there

1    were certain things.  But, no, we didn't have any problems.

2    And it should be a matter of record, as I said, sir.

3    Q    Do you have recollection, Mr. Allen, as to whether you

4    recall seeing Doug Adams that day at Burning Springs, out at

5    the precinct?

6    A    Yes, sir.  Yes, sir, I remember.

7    Q    What do you recall?

8    A    Well, he stood in line for a while like everybody else and

9    came on in, and we knew who he was, there wasn't much use to

10   put him through the mill and personal identification and he

11   voted like everybody else and left.

12   Q    Has Doug Adams, Mr. Allen, ever –– from your personal

13   knowledge, ever approached you and tried to influence you in

14   your capacity as an election officer in any way that you can

15   recall?

16   A    No, sir, he's never tried to persuade me to his thinking

17   about anything like that, no, sir.

18   Q    Has anybody on his behalf, Mr. Allen, from your personal

19   knowledge, ever approached you and asked to influence you in

20   your capacity as an election officer in any way?

21   A    No, sir.  No, sir, he has not.  Neither his associates.

22   Q    Any of his family members?

23   A    No, sir.

24   Q    Anybody from the school system ever approached you?

25   A    No, sir.

1  Q   Has anybody ever approached you, Mr. Allen, and tried to

2  influence you in terms of the years that you've served as a

3  precinct officer?

4  A   No, sir; no, sir.

5  Q   Have you served — have you served on occasions other than

6  the May '02 primary as a precinct officer?

7  A   Yes, sir, prior to that I had served on the — as election

8  officer before.  I had.

9  Q   Ballpark, if you can, Mr. Allen, about how many times

10 would you say that you've worked as a precinct officer?

11 A   Just guessing, don't hold me to it, four or five times,

12 just guessing.

13 Q   Is that prior to?

14 A   Prior to, prior to the '02 election, yes, sir.

15 Q   Have you served since '02?

16 A   No, sir, I have not.

17 Q   If you recall, and turning your attention back to the

18 May '02 primary, if you recall, do you remember about what time

19 Doug Adams would have been there that day?

20 A   No, sir, I don't.  We were — we were rather busy that

21 day, and as a matter of fact, we didn't even get a chance to

22 take a lunch break for that matter, but — at the exact time,

23 but I remember him coming, and it was a matter of he always

24 did, so that wasn't unusual.  So I don't know the exact time, I

25 couldn't say that.

1  Q    Did you ever observe Doug Adams walking a line of voters

2  who may have been standing in line to vote and putting money in

3  people's pockets from your personal observation?

4  A    Well, first of all, sir, that would have been violating

5  the laws of the land.  The laws we were under, first of all.

6  And if we had seen that, we would have stopped it and reported

7  it.  But I didn't see that, and it didn't happen.  It didn't

8  happen.

9  Q    No one reported any incident like that to you?

10  A    No, sir.  No, sir.

11  Q    That day, Mr. Allen, do you have any recollection of ever

12  seeing Doug Adams wearing a Hawaiian shirt, if you know what I

13  mean by "Hawaiian shirt"?

14  A    Well, I have known Mr. Adams since he was a little boy,

15  and he's always dressed properly, but not flamboyantly, no,

16  sir.  And that would have been out of character for him, and if

17  I best remember that day, he had a pullover shirt with Docker

18  trousers and — his typical self and —

19  Q    Do you know an individual named Jennings White?

20  A    Yes, sir, I do.

21  Q    Do you know an individual named Denver Sizemore?

22  A    Yes, I do.

23  Q    Do you have any recollection of ever seeing Jennings White

24  and/or Denver Sizemore that day, the May '02 primary, out at

25  Burning Springs?

1   A    I don't know if I even talked to him or saw him or

2   anything.  It wasn't there that I know of.  Now, he may have

3   been, but I never saw him, either of them.

4           MR. WESTBERRY:  Could I have one second, please?

5           THE CLERK:  Yes, sir.

6   BY MR. WESTBERRY:

7   Q    One last question, Mr. Allen.  At some point in time in

8   your career, have you been a teacher in Clay County?

9   A    Yes, sir, I'm a retired schoolteacher, yes, sir.

10  Q    And what years did you teach and where did you teach,

11  Mr. Allen?

12  A    I believe I started -- I'm almost sure that I started in

13  the fall of the 1980 year, and I taught until the fall -- the

14  fall -- spring, excuse me, of '03, I believe is when I retired.

15  Q    Okay.  About 13 years roughly?

16  A    Twenty-three years, sir.

17  Q    Excuse me.

18  A    I had 23 years on the -- I'm sorry.

19  Q    No, you're fine.

20  A    Twenty-three years as a teacher and had four years

21  military time, sir, and that was -- made up my 27, so --

22  Q    When you were teaching in the Clay County School System,

23  Mr. Allen, do you know what position Doug Adams would have

24  occupied within the school system?

25  A    When I began teaching, he was teaching at Laurel Creek

1  Elementary and I was at Manchester Elementary.  I later went to

2  the high school and he was still at Laurel Creek.  But he did

3  come -- when we built the new high school, he came to the new

4  high school, and I don't -- I don't remember the date, maybe

5  '91.  I'm not even sure about that, but he became assistant

6  principal and then principal and later he was superintendent

7  for us.  He was superintendent when I retired.

8  Q    Did he treat you fairly?

9  A    Oh, yes, sir, always.  He treated all of his teachers

10 fairly.

11 Q    From your personal knowledge, did he ever try to influence

12 you politically in any way?

13 A    No, sir, we spent a lot of time together outside the

14 school, and not even outside or in school, no, he didn't.  He

15 knew where I stood and he respected me as a minister and he was

16 always a fine fella and a good friend, and, no, he never -- he

17 never -- he never pushed his friends anyway like that.

18           MR. WESTBERRY:  Thank you.

19           I pass the witness, Judge.

20           THE COURT:  All right.  Thank you, Mr. Westberry.

21           Mr. Smith.

22           MR. SMITH:  Thank you.

23                    CROSS-EXAMINATION

24 BY MR. SMITH:

25 Q    Good morning, Mr. Allen.

1  A    Good morning, sir.

2  Q    I'm Stephen Smith, and I represent the United States, and

3  I would like to ask you a few questions.

4  A    All right.

5  Q    As I understand it, sir, according to your testimony, you

6  are serving as a Director of Missions at the Booneville Baptist

7  Association?

8  A    Yes, sir, that's right.

9  Q    And Booneville, Kentucky, is in Owsley County.  What about

10 this association that you're serving, what county is it in,

11 sir?

12 A    The old association started there in the Booneville area,

13 but it grew into including Owsley and some of Laurel and Clay

14 County.  But our office is in Manchester, Kentucky, that's

15 where the office is.  We have 26 churches, there's four in

16 Owsley County, one in Breathitt County, and the remainder are

17 in Clay County.  And it's just the name, the location is not —

18 Q    I think I understand.  Thank you.

19 A    Okay.

20 Q    Now, as you testified, I believe, you've been in Clay

21 County for about 30 years?

22 A    Yes, sir, I was born there, but I left for a while and

23 then moved back in 1980, yes, sir.

24 Q    And over that time period you voted in most of these

25 elections; would that be fair?

1  A    Yes, sir.

2  Q    And would you normally vote in Burning Springs?

3  A    Yes, sir, that's where we vote, yeah.

4  Q    During the time period that you were a voter over there,

5  Mr. Allen, do you recall Cletus Maricle and Doug Adams serving

6  as election officers there in your precinct?

7  A    I don't — I don't know if they did or not, honest.  I

8  know Cletus, but I don't —

9  Q    You have no recollection of them serving as election

10 officers?

11 A    I'm sure — I'm sure they may have, but I just don't —

12 right off, I don't know.

13 Q    Do you recall there being an occasion where Clay Bishop

14 was being challenged as circuit judge by a fella by the name of

15 Oscar Gayle House?  Do you remember that race?

16 A    Yes, sir, I do.

17 Q    Do you remember Doug Adams and Cletus Maricle at the

18 Burning Springs precinct during that election?

19 A    If you mean I saw them over there, I did, but I don't know

20 what was going — I usually went on and parked and went in and

21 voted and left, sir.  I don't know what went on.

22 Q    Do you know a fella by the name of Kenneth Day?

23 A    Yes, I do.

24 Q    Do you remember seeing him there that day?

25 A    No, sir.

1  Q    Do you remember the magistrate race down there in your

2  district between a fella by the name of McKeehan and a fella by

3  the name of Hooker, I think, who is some relation to Doug

4  Adams; do you remember that race?

5  A    Yes, sir, I do.

6  Q    Do you remember seeing Doug Adams and Cletus Maricle at

7  the Burning Springs election poll that election, sir?

8  A    I can't say, I don't know if I saw them there or not.  I

9  didn't stay there at the polling booth — just long enough to

10 vote.

11 Q    Do you recall seeing Kenneth Day there on that occasion,

12 sir?

13 A    I can't say that I ever saw Kenneth out there at any

14 election, sir.

15 Q    Do you know where his business KD's Pawnshop was located?

16 A    Yes, sir.

17 Q    Did you have any occasion to travel by there on election

18 day or —

19 A    I might have had an occasion, but I didn't — I didn't go

20 in there.  I've not been in his pawnshop, I never have.

21 Q    You know that place was a place where drugs were sold and

22 eventually the FBI searched and seized all of the assets of

23 that property?  Do you recall that place?

24 A    I know where it is, yes, sir.  I know exactly where it is.

25 Q    Do you recall the churches in Clay County rising up to try

1   to organize an effort to battle the problems that were going on

2   in Clay County with crime?  Do you recall that, sir?

3   A    I don't know about churches.  If you're talking about the

4   UNITE people, I know about that.

5   Q    You weren't a part of that organization?

6   A    No, sir, I was not part of UNITE.

7   Q    And I assume you weren't a participant in the march that

8   occurred in 2004 in Manchester where Reverend Doug Abner and

9   others marched in the streets of Manchester?  You weren't a

10  part of that?

11  A    No, sir, I did not march.

12  Q    Now, as I understand your testimony, sir, there were

13  officers working with you in the May primary of 2002, including

14  Darrell Reynolds; is that right?

15  A    Yes, sir, he was.  He was one of them.

16  Q    And do you know where he worked at the time he was serving

17  as election officer in 2002?

18  A    He was employed by the School Board, yes, sir.

19  Q    Larry Sizemore and Thum Davidson, do you know how they

20  were employed?

21  A    I don't know what Thum was doing.  At various times he

22  worked for the court system, and Larry, he was a — he worked

23  in a grocery store and I don't know where he was working at

24  that time.  I just don't know.

25  Q    Now, if I understand your testimony, sir, you were you

1  serving as the sheriff?

2  A    That's what I was appointed to be, yes, sir.

3  Q    And generally what kind of duties does the sheriff have to

4  function on a busy election such as the one in May 2002?  What

5  was your job?

6  A    Well, we're to be observant to make sure things are done

7  orderly and make sure there's no illegal activity taking place,

8  and also to fill out a report regularly and that report later

9  to be submitted to the correct authorities for review.

10  Q    And as part of your duties, how many times did you

11  actually exit the school grounds — or the school property

12  building and go out on the grounds that day?  Did you make any

13  effort to log how many times you went out and inspected the

14  lines and the outside of the property?

15  A    Everything that was pertaining to the activity that day,

16  anything normal was indicated, if it was not normal, and that

17  would have been indicated on the log as well.  And I don't know

18  the number of times, but there were times we did check the

19  grounds that you could see visibly from the door.  You could

20  see the highway and everybody around, it wasn't a need to go

21  very far except to exit the doors.

22  Q    But you were, as I understand it, inside the building most

23  of the time?

24  A    Yes, sir.  Yes, sir, we were inside the building, but,

25  mind you, the building is all glass in the front.

1  Q    And you indicated that there were lots of people, lines of

2  people, I believe you said?

3  A    No, no, there was a line, a line, single.

4  Q    It was a single line?

5  A    Yes, sir, that wasn't but one —

6  Q    There were two machines but one line?

7  A    And at one time we opened up the second machine, yes, sir.

8  Q    Did the second line form or did you just keep one line?

9  A    No, no.  They had to come — one person at a time come by

10 the desk, register, and then go to the — never two lines, no,

11 sir.

12 Q    So you're maintaining order within the polling area that's

13 defined by the building inside; is that — is that accurate?

14 A    Well, if I could explain it, sir?  We were under

15 obligation to make sure it was done right, so if they didn't

16 get past the secretary or the clerk's desk, they weren't going

17 to vote.  So they had to be properly certified, then one of the

18 judges would see that the machine was prepared and they voted

19 that way.

20 Q    But you spent most of your time inside; is that — is that

21 fair?

22 A    Majority of it, yes, sir.

23 Q    The majority of your time was inside.  And you

24 occasionally peered, I believe you said, through the glass

25 window and you would check the line on the outside; is that

ROY D. ALLEN - CROSS - MR. SMITH                47

1  fair?

2  A    I want — I want you to understand we didn't have to go

3  anywhere, just turn and look and you could see.  It was easy to

4  see out the door and out the glass, because the sidewalk which

5  they were standing on getting ready to come in to vote, it was

6  visible from where we sat — where we sat inside.

7  Q    Well, how far did the line extend, sir?

8  A    Well, back to the curb sometimes.  I don't have a picture

9  of it or anything, sir, exactly, but there was a line usually

10 out there, but sometimes shorter, sometimes longer.

11 Q    Was it a curved line or a straight line?

12 A    It was a straight line for that part, people talking to

13 each other back and forth, but not anybody getting out of line,

14 it was very orderly for the ramifications of a hotly contested

15 election.

16 Q    There were hundreds of voters at Burning Springs that day;

17 is that fair?

18 A    That would be fair, but I don't remember the exact total.

19 It's been eight years, sir.

20 Q    And Burning Springs is one of 20, I believe, polling

21 places in Clay County; is that fair?

22 A    That's fair, but I don't know the total number there

23 either.

24 Q    And, obviously, Burning Springs is a fairly well-populated

25 precinct within the 20 of Clay County; would that be fair?

1   A    Yes, sir, that would be fair.

2   Q    And you indicated that during that day you had

3   opportunities to observe several people that day.  Do you

4   recall what Darrell Reynolds was wearing that day, sir?

5   A    Darrell is — just his normal stuff.  I mean, we didn't —

6   we didn't dress like we would appearing in court, but just

7   routine clothes, sports shirt, pants, possibly blue jeans even,

8   because we were working and busy and sweating and that sort of

9   thing, so —

10  Q    Possibly blue jeans?

11  A    Possibly, yeah.

12  Q    Possibly Dockers?

13  A    Possibly, yeah.

14  Q    What about Mr. Sizemore, what was he wearing, do you

15  recall?

16  A    Larry usually wore a pullover shirt and some kind of jeans

17  like the rest of us, it's just normal stuff.  But funny thing,

18  you never think about those things at the time.

19  Q    I believe you said that — when asked about Jennings White

20  and Denver Sizemore, you're not real sure whether they were

21  there or not?

22  A    I don't remember seeing them, sir.  I sure don't.

23  Q    But you were very sure that you knew exactly what Doug

24  Adams did the entire time he was in line; is that fair?

25  A    I'm sure about what anybody did, sir, during that time,

1  because we were observing the line to make sure it was orderly.

2  Q    So you're sure about those in line, but you're not sure

3  about Jennings White and Denver Sizemore; is that fair?

4  A    They wouldn't had any need to be in line, they didn't vote

5  in that precinct.

6  Q    You just don't recall?

7  A    No, they wouldn't have been in the voting line, because

8  they didn't vote in that precinct.

9  Q    Are you sure about that?  Denver Sizemore, you're sure he

10 doesn't live in the Burning Springs area?

11 A    I don't know where he lives, to be honest.  I just don't

12 know.

13 Q    So you don't know whether he should have been in line to

14 vote there or not that day, do you?

15 A    Well, I'd have to go back and look at the book again, but

16 if he wasn't on the book, he wouldn't have been in the line.

17 Q    You just don't know; is that fair?

18 A    Well, I didn't see him, sir.

19         MR. SMITH:  Okay.

20         If I could have just a minute?

21         THE COURT:  Yes, sir.

22 BY MR. SMITH:

23 Q    Sir, this incident where Denver Sizemore and Jennings

24 White where you were questioned, that's happened almost eight

25 years ago, that's been over eight years ago, I guess; right?

ROY D. ALLEN - CROSS - MR. SMITH                    50

1  A    Yes, sir, soon be.

2  Q    And these events which you've been asked to recall all

3  occurred on this day in May 2002; is that right?

4  A    (Witness nodding head affirmatively.)

5  Q    In your time period there, sir, as a resident and voting

6  member of Burning Springs precinct, are you aware of vote

7  buying going on in Clay County?

8  A    To my knowledge, I have never seen it personally.  I have

9  never seen it.  That doesn't say it didn't happen.  I did not

10 see it and I'm a little skeptical to believe everything I hear.

11 That wouldn't count here anyway.  But I did not see it and

12 nobody approached me.  No one approached me.

13 Q    You've never been approached by anybody over there?

14 A    No, sir, and never in my life have I been approached for

15 somebody to buy my vote.

16 Q    And you've never witnessed any vote buying?

17 A    I never saw anyone give somebody anything for a vote, no,

18 sir.

19 Q    And like you said, we're not supposed to talk about what

20 other people tell us, but for your observation, as far as you

21 know, there's never been any vote buying going on in the

22 Burning Springs precinct; would that be fair?

23 A    To my knowledge — to my knowledge, yes, sir, that would

24 be.  I have no knowledge of that.

25         MR. SMITH:  Thank you, sir.

1      THE COURT:  Yes, sir.

2      MR. WHITE:  No questions.

3      THE COURT:  All right.  Thank you, Mr. White.

4      Anyone else of this witness?

5    (No response.)

6      THE COURT:  All right.  Thank you, sir, you may —

7      MR. WESTBERRY:  May I ask a brief redirect?

8      THE COURT:  Yes, yes, sir, certainly. I'm sorry.

9      MR. WESTBERRY:  May I ask from here, Judge?

10      THE COURT:  Yes, sir.

11                     REDIRECT EXAMINATION

12   BY MR. WESTBERRY:

13   Q    You had indicated, Mr. Allen, that you know a fella named

14   Denver Sizemore?

15   A    I know Denver, but I haven't been acquainted with him for

16   many, many years, sir.

17   Q    From your personal knowledge, do you know if he votes in

18   the Sextons Creek precinct, if you know?

19   A    I don't know.  I just don't know.

20   Q    You heard the name asked of you Kenny Day.

21   A    Yes, sir.

22   Q    Do you recall that question?

23   A    Yes, sir.

24   Q    From your personal knowledge, do you know if Kenny Day is

25   a convicted drug dealer?

ROY D. ALLEN - REDIRECT - MR. WESTBERRY          52

1    A    Well, I suppose so, he's there, so — I know Kenny, but I

2    don't know, you know, what he was convicted of, but he's —

3    Q    Did you have personal knowledge that he had been in the

4    drug — is it common knowledge in Clay County that he has been

5    in the drug business?

6    A    It is now, yes, sir.

7    Q    Sextons Creek, is that on the other side — excuse me, I'm

8    sorry.

9    A    Yes, sir, I wasn't asked that before, but they have a

10   separate entrance.  They went down past — the driveway past

11   us, around the back, and came in the back entrance of the

12   building.  Sextons Creek precinct votes in that Burning Springs

13   school, too.  Yes, they do.

14   Q    But that's a separate precinct?

15   A    Separate precinct altogether.  And sometimes we would have

16   folks that would come to one and have to be redirected over

17   there and likewise.

18   Q    Would they have a separate voting line?

19   A    Oh, yes, sir.  They had a separate entrance, we didn't —

20   unless it was a mistake where somebody accidentally came in,

21   posted out front, Burning Springs, posted out in the back

22   Sextons Creek.  It was plainly posted what precinct it was.

23   But still yet, somebody might get mixed up where they were

24   supposed to vote, but that didn't happen much.

25   Q    You would not have had any responsibility to observe —

1  A    No, sir.

2  Q    -- the Sexton's Creek --

3  A    No, sir, they had their own four precinct officers over

4  there and they did their own policing of the voting that day.

5  Q    And do you have any recollection of seeing anybody wearing

6  a Hawaiian shirt that day?

7  A    It's not appropriate attire for Burning Springs area, no,

8  sir, I don't.

9  Q    And do you have any recollection of anything -- did you

10  personally observe seeing anything that day that you would --

11  of electioneering activity that you would consider improper or

12  illegal by anybody?

13         MR. SMITH:  It's been asked and answered, I will

14  object to that.

15         THE COURT:  It is repetitive, I'll sustain.

16  BY MR. WESTBERRY:

17  Q    One last question, Mr. Allen.  You had indicated that you

18  got there, I believe you said, at 5:30 in the morning?

19  A    Don't hold me to that exact time, sir, but quite a bit of

20  time before the polls opened, because it was necessary to post

21  the voting booth signs and to get the flag out and get the

22  machine open and getting ready to receive the voters as they

23  came.  So we were there quite early, yes, sir.

24  Q    And approximately what time did you finally leave the

25  Burning Springs precinct that day, sir?

1  A    I don't know, but when it got 6:00, we got either at the

2  end of the line or we begin to close down the polling booth at

3  that time.  And whenever every voter who was eligible to vote

4  had voted, we locked the doors and began the process of

5  calculating the total for that day.  And once that machine is

6  opened, that's it, you couldn't do anything to it, it

7  was just — that was it.  So we closed the machine down and

8  after recording the totals, they were put in the envelope,

9  copies of the information was sent to the grand jury, sent to

10  the Clerk's Office, one got hand carried to the Clerk's Office,

11  I don't know who all, there was about four copies that went to

12  the various people that needed to know about it.  And that

13  packet was hand carried to — then to the Clerk's Office, and

14  whoever took it — whomever took it looking neither right nor

15  left, they walked straight through and gave it to the Clerk,

16  and he opened the packet and nobody knew what the totals was

17  except somebody who lingered at the polling both — I mean, at

18  the polling place after we was gone to see where we had posted

19  the sign on the window for the totals.  That's all they would

20  have known about that precinct.

21  Q    So you would have been at least 12 hours.

22  A    Well, I would say closer to 13 or 14.

23  Q    The entire day?

24  A    Yes, sir, the entire day.  Yeah, we never left the

25  grounds.

1          MR. WESTBERRY:  Thank you.  I pass the witness.

2          THE COURT:  All right.

3          Any further questions of the witness, Mr. Smith?

4          MR. SMITH:  Just a couple.

5          THE COURT:  Yes, sir.

6                        RECROSS-EXAMINATION

7    BY MR. SMITH:

8    Q    Mr. Allen, as I understand now, your further testimony is

9    you weren't part of the polling area that would service the

10   Sextons Creek area; is that fair?

11   A    Yes, sir, that building is —

12   Q    So you had the same building but there were doors entering

13   your precinct and Sextons Creek at the same schoolhouse?

14   A    Yeah, but not in the same entrance, no, sir.

15   Q    Not the same entrance?

16   A    No, sir.  No, sir.  They went around back and came in a

17   separate entrance, they sure did.

18   Q    And you couldn't tell us how many voters were lined up for

19   that precinct, could you?

20   A    I have no knowledge, no, sir.  I have no knowledge about

21   that.  We never discussed it.

22   Q    You wouldn't know whether Doug Adams visited any of those

23   voters that day or not, would you?

24   A    No, sir, I wouldn't.

25   Q    And as far as what goes on behind those closed curtains,

1  you don't know what goes on behind there when an election
2  officer goes in there and escorts a voter, do you, because
3  there's curtains that close behind them, isn't there?
4  A    Well, no, you couldn't actually say what they did.
5  Q    We just don't know, do we?
6  A    That's a personal privilege a person has to vote and not
7  my right to know what they voted or who they voted for.
8  Q    And if an election officer went back there with them, you
9  wouldn't know what that election officer did either, would you,
10 sir?
11 A    Well, I didn't go back myself, so, no, I guess that would
12 be true.
13 Q    That wasn't your job, was it, as sheriff, you had to go
14 back and escort voters —
15 A    Well, I wasn't allowed — wasn't allowed to do that.
16 That's a privacy act, sir.  I mean, I can't watch a man vote or
17 a woman vote, no, sir.
18 Q    You didn't assist any voters, is my question?
19 A    No, sir, I never did.
20         MR. SMITH:  Thank you.
21         THE COURT:  Anything else of this witness?
22     (No response.)
23         THE COURT:  All right.  Thank you, Mr. Allen, sir.
24 You may step down.
25         THE WITNESS:  Thank you, sir.

1           THE COURT:  Mr. Westberry, you may call your next

2   witness.

3           MR. WESTBERRY:  Thank you, Judge.  Charles Keith.

4           THE COURT:  Thank you.

5           THE WITNESS:  Am I subject to recall or —

6           THE COURT:  He's excused.  Thank you.

7                      CHARLES D. KEITH,

8   having been first duly placed under oath, was examined and

9   testified as follows:

10                    DIRECT EXAMINATION

11  BY MR. WESTBERRY:

12  Q    Good morning, sir.  I'm Kent Westberry, and I'm one of the

13  attorneys for Doug Adams.

14       Could you tell us your full name, sir?

15  A    Charles D. Keith.

16  Q    Where do you reside, Mr. Keith?

17  A    I'm at 3379 Highway 687, Manchester, Kentucky.

18  Q    How long have you lived in Manchester?

19  A    Ten years.  In Manchester?

20  Q    Yes, sir.

21  A    Seventy-three years.

22  Q    I don't mean to pry.  Are you 73 years old?

23  A    Will be in April, yes.

24  Q    All right.  Are you married, Mr. Keith?

25  A    Yes, I am.

1   Q    And who is your wife, please?

2   A    Floretta E. Keith.

3   Q    How many years have you been married?

4   A    Fifty-three years.

5   Q    Do you-all have children?

6   A    I have two.

7   Q    Okay.  Have grandchildren?

8   A    I have four.

9   Q    Thank you.  Now, what is your occupation, Mr. Keith?

10  A    I've been self-employed in the lumber and logging business

11  all my life, yes.

12  Q    Are you currently — are you still at work, Mr. Keith?

13  A    No, I'm retired.

14  Q    Mr. Keith, I would like to turn your attention back -- or

15  to Clay County and ask you if at any time have you served as a

16  member of the Clay County School Board?

17  A    I have.

18  Q    How many years, Mr. Keith, have you served as a —

19  A    Twenty years.

20  Q    Twenty years?

21  A    Uh-huh.

22  Q    Who was the Superintendent of Schools when you first came

23  on the Clay County School Board?

24  A    Willy Sizemore.

25  Q    How many years did you serve on the Board with Willy

1   Sizemore?

2   A     Just a few years.  He retired in '90.  That's when I went

3   on, really.

4   Q     Now, who came after Mr. Sizemore?

5   A     Charles White.

6   Q     How many years approximately did Charles White serve as

7   School Board —

8   A     Something like eight or nine years.

9   Q     And who came after Charles White?

10  A     Doug Adams.

11  Q     Now, at any time, Mr. Keith, have you had the opportunity

12  to serve as chairman of the School Board?

13  A     I have, 20 years.

14  Q     So you've been chairman —

15  A     That's right.

16  Q     — the entire time that you've been on the Board?

17  A     That's right.

18  Q     Do you have members of your family, Mr. Keith, who have

19  been teachers?

20  A     Yes.

21  Q     Can you just give a brief description of the kind of

22  family that have taught school, where they've taught, if not in

23  Clay, perhaps in other areas?

24  A     Well, and I — my immediate family was seven children and

25  we — the brother and I was the only one that wasn't in the

1  school system.  My mother and father was in the school system,

2  and also my grandfather.  So we're –– yeah, we've been in the

3  teaching –– they're in the teaching business, not myself, but

4  other –– my family has, yes.

5  Q    Did that play any role, the fact that you had family

6  members that had taught school?

7  A    Yes, it did.

8  Q    Did that play any role in your interest in becoming a

9  member of the School Board?

10 A    Right, I thought we owed the system that.

11 Q    Do you recall the circumstances –– Let me rephrase the

12 question.

13       Do you know Doug Adams?

14 A    Yes.

15 Q    How long have you known Doug Adams, Mr. Keith?

16 A    It's been a number of years, but I've known him more

17 intimately since he come on as superintendent for the school.

18 Q    What year would that have been, again, sir?

19 A    I think in '99 or thereabouts.

20 Q    Could you look around the courtroom and just see if you

21 can spot Doug Adams?

22 A    Yeah, that's Doug Adams there.

23 Q    What's he wearing, Mr. Keith?  How is he dressed?

24 A    He's got a suit and tie on, it looks likes, or a shirt and

25 tie.

1           MR. WESTBERRY:  Thank you.

2           THE COURT:  The record will reflect the witness has

3   identified the defendant, Douglas C. Adams.

4   BY MR. WESTBERRY:

5   Q    Mr. Keith, from your personal knowledge, do you recall the

6   circumstances when Doug Adams was selected as Superintendent of

7   the Clay County School Systems?

8   A    I remember some of it, yes.

9   Q    Okay.  What do you — what circumstances, Mr. Keith, from

10  your personal knowledge, do you recall involving his selection

11  as superintendent?

12  A    Well, he was hired by the full Board.  I mean, it was —

13  we had the five members.  Of course, I don't get to vote

14  because I — you know, but the other four members was

15  unanimous.

16  Q    Who were the other four members at the time?

17  A    Well, we've got three of those that passed away at this

18  time, but they were W.J. Watkins, you had Wayne Blair, you had

19  Lee Brown, Leewood Cornett, and myself.

20  Q    When Doug Adams was initially hired — Let me rephrase the

21  question.  Let me back up and ask you a question leading up to

22  that.

23       Do you have person knowledge of what Doug Adams did for

24  work in Clay County before he became Superintendent of Schools

25  in '99?

CHARLES D. KEITH - DIRECT - MR. WESTBERRY          62

1  A    Yeah, he was in the elementary grades, taught elementary

2  school, and also he was the principal over at the high school

3  for a number of years.  Then he came into the office as

4  assistant principal, that is -- I mean, assistant

5  superintendent, and then he was hired as superintendent.

6  Q    When he taught elementary school, did you any knowledge,

7  did he drive a bus?

8  A    Yes, I think so, I think he was a bus driver at one time,

9  yes.

10  Q    Back again to the decision to hire Doug Adams as

11  superintendent, as you've testified, in 1999, from your

12  personal knowledge, as having been a member of the School

13  Board, did politics play any decision at all in the decision to

14  hire Doug Adams as superintendent?

15  A    No, sir.  No, sir.

16  Q    From your personal knowledge, Mr. Keith, has Doug Adams

17  ever tried to influence you politically in any way as the

18  chairman of the Clay County School Board?

19  A    No, sir.

20  Q    How was Doug Adams' salary initially set back in 1999 when

21  he became superintendent, if you recall?

22  A    How was what, now?  Rephrase the --

23  Q    How was his salary set?  How do you determine how to pay

24  him?

25  A    Well, we had had some troubles with the prior

1  superintendent, and so we were — set the salary pretty low,

2  and I think something around 80, 80,000.

3  Q    Do superintendents — do you have — the first contract

4  that Doug Adams entered into with the School Board in '99, do

5  you have any personal recollection as to how long that contract

6  was?

7  A    Well, we tried to hire him for two years, but he wouldn't

8  accept that, so we hired him for three years.

9  Q    Are contracts for superintendents, are they renewed

10  periodically, are they up for renewal periodically, in Clay

11  County?

12  A    Right.  Yeah.

13  Q    How does that work, Mr. Keith?

14  A    Most of the time it's the end of the contract, it's either

15  three or four more years, mostly it's four if they've done a

16  reasonably good job.

17  Q    From your personal knowledge of the Clay County School

18  Board, has Doug Adams done a good job as Superintendent of

19  Schools during the years that he served in that job?

20  A    Yeah, he's done an excellent job for us.  He's the best

21  superintendent I've been in contact with, I mean, far as my

22  tenure.  He — we had some — we've got — the middle school,

23  we did some renovation there and we've had some renovation in

24  some of the schools.  And we — also, we've — we started an

25  alternative school, which is give us another layer, instead of

1    sending some of those students home over the first offense,

2    we've got another layer now that we can put them in the

3    alternative school.  So we did a real job —

4  Q    First offense for what?

5  A    Do what, now?

6  Q    First offense for what, Mr. Keith?  You mentioned

7    alternative school and you said "first offense."  What was —

8  A    Well, if they do something that they need to be expelled

9    or whatever, we've got another layer that we can put them in

10   the alternative school and save those children as much as

11   possible.

12  Q    Was that started or implemented by Doug Adams?

13  A    Yes, it was.

14  Q    When you say "got in trouble," would that potentially

15   involve drug offenses?

16  A    That would — that would involve drugs or anything of that

17   nature, yes, sir.

18  Q    From your personal experience, have drugs been a problem

19   in the Clay County School System?

20  A    Very much so.  We've had trouble with drugs, yes, we have.

21  Q    Was there a time, Mr. Keith, in 2006, thereabouts, that

22   Doug Adams' contract was up for renewal?

23  A    Right.  Uh-huh.

24  Q    I think you said that the first contract in '99 went for

25   three years; is that correct?

1   A     That's right.

2   Q     That would be about 2002; correct?

3   A     Probably, uh-huh.

4   Q     Would his next contract have been up for renewal four

5   years thereafter?

6   A     That's true.

7   Q     And that would get us to about 2006; correct?

8   A     Right.

9   Q     Do you have, Mr. Keith, any recollection of renegotiating

10  Doug Adams' contract in 2006 and having an increase in his

11  salary at that time?

12  A     Yes, he had an increase.  We went by the surrounding

13  school districts that are — that border us and we set the

14  salary according to what was surrounding districts, which was

15  six or seven, we took the — their salaries and we gave them

16  the equal to those salaries, really, is what it amounted to.

17  Q     Did you average them?

18  A     The average, uh-huh.

19  Q     Do you recall what some of those counties were?

20  A     Yeah, we had Laurel County, we had Knox County, Bell

21  County, Leslie County, Perry County, Jackson, and Owsley.

22  Q     Okay.  Are some of those counties larger in population?

23  A     Oh, yes.  Yeah, Laurel County —

24  Q     What would be an example of a larger county?

25  A     Well, Laurel County would be larger, but Perry County

1  would be about our size, really.  And Knox County would be

2  pretty close.  Of course, Owsley and Jackson would be smaller,

3  and Leslie.

4  Q    Do you know of something called a — Mr. Keith, known as a

5  site-based council?

6  A    Yes.

7  Q    Okay.  Can you tell us just what a site-based council is?

8  A    Well, a site-based council consists of three teachers, a

9  principal, and two — and two parents.

10  Q    And —

11  A    They do — they do the hiring for individual schools.

12  Q    Okay.  What kind of hiring would the site-based council do

13  for the individual schools in Clay County, if you know?

14  A    What kind of hiring?

15  Q    Yes, sir.  Give us an example of the kind of hiring that

16  the —

17  A    Well, they would hire — if they needed another teacher,

18  if the — if the school needed different teachers or more

19  teachers, they would hire that teacher, or they would hire some

20  of the custodians or something of that nature or something of

21  the — they do — most of the schools do all the hiring for

22  that school, that particular school.

23  Q    From your experience, does the site-based council do more

24  or less hiring of employees in the school system than the

25  Office of Superintendent?

1   A    They do more hiring than the superintendent, because they

2   have to — they have to — the superintendent furnishes them

3   names of people that's qualified for these positions, then they

4   pick out of those names.

5   Q    From your personal knowledge, having served 20 years on —

6   as chair of the School Board, from your personal knowledge, has

7   Doug Adams ever tried to influence any hiring decision of any

8   position in the Clay County School System, regardless of

9   whether it was the responsibility of the site-based council or

10  some other office?

11  A    Not to my knowledge, no.

12  Q    Has Doug ever — Adams ever approached you and asked you

13  to — in your capacity as chair of the School Board, to

14  influence anybody?

15  A    No, sir, has not.

16  Q    From your personal knowledge, Mr. Keith, has the Clay

17  County School System ever had as many as 900 employees total in

18  the school system?

19  A    No, not to my knowledge; somewhere around 7-, 750.

20  Q    I want to turn your attention, Mr. Keith, back to the

21  May 2002 primary.  Do you recall the May '02 primary?

22  A    Yes.  Some of it, yes.

23  Q    But also at about that same time, in May of 2002, did you

24  have an opponent for reelection for your seat on the School

25  Board?

1   A     I did.

2   Q     And can you tell us who that opponent is?

3   A     That was Charles "Dobber" Weaver, was my opponent.

4   Q     Do you have any knowledge as to the circumstances under

5   which Dobber Weaver decided to run against you?

6   A     Nothing; just hearsay, is all.

7   Q     That's fine, we don't want to do that.

8         Do you have personal knowledge if Dobber Weaver was

9   aligned politically with someone named Jennings White?

10  A     He was, yes.

11  Q     And do you know who Jennings White is?

12  A     Yes.

13  Q     Do you know if he was the former County Clerk?

14  A     He was.

15  Q     You understand he's no longer the County Clerk?  He's no

16  longer —

17  A     No.  No.

18  Q     In that race, Mr. Keith, do you know if Doug Adams

19  supported you or Dobber Weaver, if you know?

20  A     Well, I would think he would support me, but I — you

21  know, other than — I don't know that to be a fact.

22  Q     Do you consider Doug Adams to be your friend?

23  A     I do.

24  Q     In that race with Dobber Weaver, did Doug Adams campaign

25  with you as you sought reelection to that post?

CHARLES D. KEITH - DIRECT - MR. WESTBERRY          69

1   A    Campaign with me?

2   Q    Yeah, did he campaign with you, if you can recall?

3   A    Not that I can remember.

4   Q    Ever raise or give you any money for your re-election?

5   A    No, he did not.

6   Q    Back again to the May '02 primary, in particular, do you

7   recall the race between Jennings White and Mr. Thompson for

8   clerk, the race for Clerk of the Court?  Do you recall that

9   race?

10  A    Yes.

11  Q    Do you recall that day, Mr. Keith, ever -- we're talking

12  about the May '02 primary, were you with Doug Adams any at all

13  that day, if you recall?

14  A    Yeah, I think we went to some of the precincts, not on the

15  ground but going by them just to see how the election was

16  going, because they used our facilities for the precincts, you

17  know, for the election.  They used the schools for those.  So

18  we did go by those, yes.

19  Q    Were the schools open that day, Mr. Keith?

20  A    No, that's where they had their -- that's where they hold

21  their election.  That's where they -- they use it for

22  precincts.

23  Q    Was anyone else traveling with you and Doug Adams?

24  A    It seems that -- yeah, they was someone else, but I can't

25  recall right off who it was.

1  Q    Do you have any recollection at all or not if a fella

2  named Jeff Deaton —

3  A    He was with us.  Yes, that's who it was.  Sorry about

4  that.

5  Q    Are you any relation to Jeff Deaton?

6  A    He married my niece, yes.

7  Q    Have you known Jeff Deaton for any period of time?

8  A    Yes, I have.

9  Q    Now, did I hear you — did we hear you say a moment go

10 that you — you-all were traveling in a vehicle together?

11 A    Yes.  Right.

12 Q    Whose vehicle was it?

13 A    It was the Board's vehicle.

14 Q    Now, what time of day were you and Doug Adams and Jeff

15 Deaton traveling?  Just a ballpark estimate.

16 A    I think sometime around lunchtime or a little after.

17 Q    Do you have any recollection at all that day, Mr. Keith,

18 of seeing Doug Adams wearing a Hawaiian shirt?

19 A    No, I do not.

20 Q    Have you ever seen Doug Adams at any time wear —

21 A    I have not.

22 Q    — a Hawaiian shirt?

23 A    No, I have never seen him in a —

24 Q    Do you have any recollection that day, Mr. Keith, of Doug

25 Adams, Jeff Deaton, or anybody in that vehicle having any

CHARLES D. KEITH - DIRECT - MR. WESTBERRY          71

1  significant sums of cash, cash money?

2  A    I didn't see any, no.

3  Q    None was displayed in your presence?

4  A    None was displayed.

5  Q    Was there any discussion about sums of cash money during

6  the time --

7  A    Not to my remember -- not to my recollection, no, sir.

8  Q    Do you have any recollection if Doug Adams ever directed

9  Jeff Deaton to, you know, get in the car, you're on my payroll,

10 and ride with us?

11 A    No, I did not.

12       MR. WESTBERRY:  May I have just one second, please,

13 Judge?

14       THE COURT:  Yes, sir, you may.

15 BY MR. WESTBERRY:

16 Q    Just a couple of quick ones, Mr. Keith.

17 A    All right.

18 Q    Back to the day of the May '02 primary that you indicated

19 that you were riding in a vehicle, a School Board vehicle, with

20 Doug Adams and Jeff Deaton.

21 A    Right.

22 Q    Do you recall those questions?

23 A    Uh-huh.

24 Q    Was the purpose -- what was the purpose of the trip,

25 Mr. Keith?  Was it to check on schools?

CHARLES D. KEITH - DIRECT - MR. WESTBERRY          72

1          MR. SMITH:  Your Honor, that's been asked and

2 answered.

3          THE WITNESS:  Just to check and make sure everything

4 was —

5          THE COURT:  Overruled.  You can answer what the

6 purpose was.

7          THE WITNESS:  Just to check on the facilities and

8 make sure everything was as it should be.  That was our only

9 purpose.

10 BY MR. WESTBERRY:

11 Q    And one additional question as a continuation of what I

12 asked earlier.  In the 20 years that you've served as chair of

13 the School Board and been a member of that Board, has Doug

14 Adams or anybody on his behalf ever approached you to try to

15 influence you in some way in order to allow Doug Adams to keep

16 his job or renew his contract as the superintendent?

17          MR. SMITH:  Objection, Your Honor.

18          THE COURT:  Overruled.  You can answer that.

19          THE WITNESS:  No, I've never been approached to that

20 effect.

21 BY MR. WESTBERRY:

22 Q    And Doug Adams never approached you?

23 A    No, I have not.

24 Q    And nobody on his behalf?

25 A    No.

1          MR. WESTBERRY:  Thank you, Mr. Keith.

2          I pass the witness.

3          THE COURT:  All right.  Thank you.

4          Mr. Smith.

5                        CROSS-EXAMINATION

6   BY MR. SMITH:

7   Q    Good morning, Mr. Keith.

8   A    Good morning.

9   Q    My name is Stephen Smith, and I represent the United

10  States, and I have a few questions for you.

11  A    All right.

12  Q    As a school Board member, that's an elected body that is

13  elected by the people of Clay County; is that right?

14  A    Right.

15  Q    And you-all run for election on what kind of basis, two or

16  four years?

17  A    We were on four years, but we -- it's two and three.  We

18  don't all run at the same two-year -- we have three members

19  that run two years and then the next two at the other two

20  years.

21  Q    So every two years you've got a school board race?

22  A    Right.

23  Q    It's just not everybody on the race at the same time?

24  A    Right.

25  Q    But I believe you said you were on the ticket in 2002 --

1   A    Yes.

2   Q    —— to be reelected.

3   A    Uh-huh.

4   Q    And that would have been —— your race would have been in

5   the fall of 2002 ——

6   A    Right.

7   Q    —— not the primary; is that right?

8   A    No.

9   Q    You didn't have any opponents whatsoever in the primary?

10  A    No, I did not.

11  Q    As I understand your testimony, this school board is an

12  employer of 700 to 750 people at your estimate today; is that

13  right?

14  A    I think so.

15  Q    Is that fair?

16  A    Yes.

17  Q    And is it also considered one of the largest employers in

18  Clay County?

19  A    We are.

20  Q    Are there any larger that you know of, sir?

21  A    Any what, now?

22  Q    Do you know of an employer ——

23  A    No.

24  Q    —— in Clay County that's larger than the School Board?

25  A    No, I think we're the largest.

1  Q    Okay.  And I believe you said that during this time period

2  that you've served you've kind of learned how hiring and firing

3  and things go on in the school based on your experience at the

4  Board; is that fair?

5  A    Now, rephrase that question.

6  Q    I said based on your experience over the years with the

7  Board, you have an idea about how hiring and firing goes on in

8  the school; is that fair?

9  A    I think, yes.  Uh-huh.

10 Q    And I believe you said that your estimation is is that the

11 site-based council does more of the hiring decisions than the

12 superintendent --

13 A    Yes.

14 Q    -- now that we've got a change in the law?

15 A    Uh-huh.

16 Q    That wasn't always the case, that you had a site-based,

17 was it, Mr. Keith?

18 A    Do what, now?

19 Q    You've not always had a site-based council in Clay County?

20 A    It come in effect with KERA in 1990, that's when I went on

21 board.  So we've had a site-based most the time since then.

22 Q    Most the time.  And it's been your experience, I believe,

23 that site-based -- Do they hire bus drivers and school bus

24 drivers?

25 A    No, they do not.

1    Q    The superintendent takes care of those?

2    A    Right.

3    Q    And maintenance workers, superintendent takes care of

4    that?

5    A    Most of it, yes.

6    Q    So the site—based council, if I understand your testimony,

7    would do the majority of the hiring and firing, because the

8    majority of your employees are schoolteachers; is that fair?

9    A    Right.

10   Q    Now, as I understand your testimony, you indicated that

11   there was a time in 2002 when you accompanied the

12   Superintendent of Schools on a trip around to some of the

13   polling places?

14   A    That's true.

15   Q    And you didn't first recall who was with you, but I think

16   it was suggested that Jeff Deaton was there and you now recall

17   Jeff Deaton being on the trip?

18   A    I think that's right.

19   Q    And do you recall Freddy Thompson also being along on the

20   trip?

21   A    He was not.

22   Q    You just don't recall or he was not there?

23   A    No, he was not.  There was just three of us.

24   Q    Okay.  So your memory is refreshed and you know he wasn't

25   there?

1   A    I know he wasn't there.

2   Q    Okay.  And do you know how long you were in the vehicle

3   that day?

4   A    Well, roughly, I would say a couple hours probably.  I

5   don't really — I don't really recall, but —

6   Q    Were you the first to get in the vehicle with Mr. Adams or

7   were there others already in the vehicle when you got in?

8   A    I think we all left together really —

9   Q    And where did you live from?

10  A    — from the central office.

11  Q    And that's —

12  A    Central office, yes.

13  Q    And your superintendent's office is located there?

14  A    Right.

15  Q    Did you—all gather in his office before you left?

16  A    I don't recall that, no.

17  Q    Do you recall Jeff Deaton being a maintenance worker at

18  that time?

19  A    Right.

20  Q    And you don't recall Mr. Adams directing him to drive the

21  vehicle that day?

22  A    I don't recall that, no.

23  Q    Do you know who drove the vehicle that day?

24  A    I thought Mr. Adams drove it, but I may be mistaken.  I

25  don't know.

1  Q    Did you get out of the vehicle?

2  A    Did I get out?

3  Q    Yes, sir.

4  A    At the polling places, is that what you're asking me?

5  Q    Yeah, at any time did you get out of the vehicle?

6  A    We didn't even stop at the polling places, we just drove

7  by really.  We were not on the grounds, on the election

8  grounds.

9  Q    You just drove by?

10 A    Uh-huh.

11 Q    Do you know what time of day it was that you were doing

12 this?

13 A    Somewhere around lunch, I think, thereabouts.

14 Q    And did anybody stop and get out at any of those places?

15 A    No, not while — not while we were all together, no.

16 Q    Where did they drop you off, sir, after you —

17 A    Back at the office.  Yeah, we went back to central office,

18 and I left.

19 Q    And did you stay around the central office or did you go

20 home or do you recall where you went?

21 A    No, I probably went home.

22 Q    Do you know Mr. Adams' whereabouts the rest of that

23 afternoon?

24 A    No, I do not.

25 Q    Do you know his whereabouts that morning up until noon?

1  A    Not really, no.

2  Q    Now, you indicated that there was a time which I believe

3  you described your election with Dobber Weaver.  Do you recall

4  that testimony?  You had an election contest with Dobber

5  Weaver?

6  A    Right.

7  Q    And you indicated that you did not know if Mr. Adams

8  supported you or not; is that fair?

9  A    That's right, I do not know.

10 Q    And you do know that -- I believe you testified that

11 Dobber Weaver was supported by Jennings White?

12 A    That's what we were told.  That's what I was told.

13 Q    And are you aware that Jennings White and Doug Adams were

14 competitors in the political field, sir?

15 A    Yeah, I did know that.

16 Q    And at one time there in 2002 Doug Adams was a strong

17 supporter of Freddy Thompson; you knew that?

18 A    Yeah.  Yes, I knew that.

19 Q    And that Jennings White got beat?

20 A    Uh-huh.

21 Q    And that during the time of your election, are you also

22 aware that a fellow by the name of William "Al Man" Stivers got

23 into an argument down at the Clerk's Office and was arrested?

24 A    No, I do -- no, I don't know anything about that.

25 Q    You don't know anything about that?

1  A     No.

2  Q     And you recall that being during your race against

3  Mr. Weaver that this argument occurred?

4          MR. WESTBERRY:  Objection, he said he didn't know.

5          THE COURT:  Attempting to refresh, I'll overrule the

6  objection.

7  BY MR. SMITH:

8  Q     You may answer if you know.  If you don't, just —

9  A     What'd you say?  Do what?  Repeat the question, please.

10 Q     Do you recall this dispute which Mr. Stivers was arrested

11 during the time that you had this contest with Mr. Weaver for

12 School Board?

13 A     No.  I wasn't there, no.

14 Q     Now, I believe you indicated that you were very satisfied

15 with the job Mr. Adams had done, including, I believe,

16 alternative schools to try to battle the drug problems in Clay

17 County?

18 A     Yes, that's true.

19 Q     Clay County's young people have had a hard struggle over

20 the years, would that be fair, with drugs?

21 A     That's fair.

22 Q     And you-all are very concerned about the drug problem, I'm

23 sure, as a School Board member?

24 A     Yes, we are.

25 Q     And I guess it was also a great concern for you to learn

1    that Doug Adams' brother-in-law, Oscar Hubbard, was convicted

2    in 2006 for distributing large quantities of marijuana in Clay

3    County and being convicted in a drug conspiracy with Kenny Day;

4    would that be fair?

5    A    Yes.

6    Q    And he would have been, at that time, employed during the

7    time of his conspiracy in the Transportation Department in your

8    school system?

9    A    That's true.

10   Q    I assume he's no longer employed by the school system?

11   A    He is not.

12   Q    Would it be fair to say, Mr. Keith, that there was no

13   school business going on on election day on May of 2002; is

14   that fair?

15   A    Just the central office was open is all.

16   Q    And when you say the central office was open, was it

17   supported by support staff or just open as far as the doors

18   were open?

19   A    No, it was support staff, they — yes, they were there, I

20   think.

21   Q    And as far as you know, the purpose of this trip to go

22   around to the school systems at that time was just to check on

23   your facilities?

24   A    That's true.

25   Q    Would it be fair to say that — Strike that.  Just one

1    second.

2         Just so I can clarify a couple other things, Mr. Keith,

3    you said you were the chairman of the Board, the Clay County

4    Board, for 20 years?

5    A    Yes.

6    Q    And in 2002, you were well known to be the chairman of the

7    Board at that time?

8    A    Yes.

9    Q    And you were also confident that you were riding around

10   with the Superintendent of the Schools on election day; is that

11   fair?

12   A    Yes, that's right.

13             MR. SMITH:  Thank you.

14             THE COURT:  Let's see if any of the other defendants

15   have questions first.

16        (No response.)

17             THE COURT:  No?

18             All right.  Mr. Westberry, any redirect?

19             MR. WESTBERRY:  May I do it from here?

20             THE COURT:  Yes, sir.

21                         REDIRECT EXAMINATION

22   BY MR. WESTBERRY:

23   Q    Is the School Board a nonpartisan or a partisan position?

24   A    Nonpartisan.

25   Q    You mentioned that Dobber Weaver ran against you in '02.

1  Have there been any other contested races that you've ever had

2  during your term on the Board?

3  A    No, there has not.

4  Q    Is it common, if you know, for bus routes to frequently

5  change in the Clay County School System?

6  A    Yes.  When they change their routes, yes.

7  Q    And why is that?

8  A    Well, you have students that's — that one bus maybe can

9  take care of more students or not have to run the same route

10  with two different buses, so they change the routes along.

11  Yes, they do.

12  Q    You were asked a question by the government a minute ago

13  about Doug Adams' brother-in-law, Oscar Hubbard.

14  A    Right.

15  Q    Do you recall that?

16  A    Right.

17  Q    And you acknowledged that you know that Oscar Hubbard has

18  been convicted of a drug offense; correct?

19  A    Yeah, I heard — yes.

20  Q    I believe you also testified under Mr. Smith's questioning

21  that Oscar Hubbard is no longer employed at the Clay County

22  School System?

23  A    He is not.

24  Q    At any time after he was convicted, from your personal

25  knowledge, did Doug Adams ever try to influence you in an

1  effort to allow Oscar Hubbard to keep any kind of a job in the

2  Clay County School System?

3  A    He did not.

4  Q    Did anybody on Doug Adams' behalf ever try to influence

5  you in order to allow Oscar Hubbard to keep any kind of a job

6  in the Clay County School System?

7  A    No, they did not.

8           MR. WESTBERRY:  One second.

9           THE COURT:  Yes, sir.

10          MR. WESTBERRY:  Thank you.

11          Pass the witness, Your Honor.

12          THE COURT:  Any recross of the witness?

13          MR. SMITH:  Yes, Your Honor.

14          THE COURT:  Yes, sir.

15                    RECROSS-EXAMINATION

16 BY MR. SMITH:

17 Q    Mr. Allen -- I'm sorry.  Mr. Keith, you indicated that

18 there was no pressure put on you to keep Oscar Hubbard after he

19 was a convicted felon.  Isn't it fair, sir, that the School

20 Board doesn't keep convicted felons in charge of the buses of

21 the county as a matter of law and policy?

22 A    Yes, we do not.

23 Q    You couldn't do that if you wanted to, could you?

24 A    No, we could not.

25          MR. SMITH:  Okay.  Thank you.

1          THE COURT:  Anything else of this witness?

2      (No response.)

3          THE COURT:  All right.  Thank you.  Mr. Keith, you

4   may step down, and you're finally excused.

5          Mr. Westberry.

6          MR. WESTBERRY:  Would you like to proceed?

7          THE COURT:  Approximately how long will your next

8   witness be?

9          MR. WESTBERRY:  Well, it will take more than ten

10  minutes.

11         THE COURT:  Let's proceed and we'll see how far we

12  get.

13         MR. WESTBERRY:  Yes, sir.  Leewood Cornett.

14         THE COURT:  Thank you.

15                     LEEWOOD CORNETT,

16  having been first duly placed under oath, was examined and

17  testified as follows:

18         THE COURT:  Thank you, and please proceed.

19         MR. WESTBERRY:  Thank you, Judge.

20                   DIRECT EXAMINATION

21  BY MR. WESTBERRY:

22  Q    Good morning, sir.  I'm Kent Westberry, I'm one of the

23  attorneys for Doug Adams.

24  A    Good morning.

25  Q    Could you tell us your full name, please?

1   A      Leewood Cornett.

2   Q      And how do you -- is Leewood one or two?

3   A      It's one word, L-e-e-w-o-o-d.

4   Q      Where do you reside, Mr. Cornett?

5   A      At Fogertown, Kentucky.

6   Q      And is that in Clay County?

7   A      Yes, sir.

8   Q      How long have you lived in Fogertown, Mr. Cornett?

9   A      Sixty-seven years.

10  Q      I don't mean to necessarily date you, but could you tell

11  us your age, please, Mr. Cornett?

12  A      I'll be 71 years old in June.

13  Q      Okay.  Are you a lifelong resident of Clay County, sir?

14  A      I lived my first three -- first three years in Laurel

15  County.

16  Q      Okay.  And the remainder of the time have you lived in

17  Clay County?

18  A      Yes, sir.

19  Q      Are you married, Mr. Cornett?

20  A      Yes, sir.

21  Q      Could you tell us your wife's name, please?

22  A      Mary, Mary Cornett.

23  Q      How long have you-all been married, Mr. Cornett?

24  A      Twenty-three years.

25  Q      All right.  Do you-all have children?

1   A    No, sir.  She has children and I have children, but me and

2   her together doesn't have any children together.

3   Q    I see.  How many children does she have, sir?

4   A    She has one, one daughter.

5   Q    Is she grown, daughter grown?

6   A    Yes, sir, she's 43 year old.

7   Q    How many children do you have, sir?

8   A    One.

9   Q    Do you have grandchildren?

10  A    I've got three grandchildren and one great-grandchild.

11  Q    Do they live in Clay County, the children and the

12  grandchildren?

13  A    No, they live in Florida.

14  Q    Thank you, Mr. Cornett.  Has there been a time,

15  Mr. Cornett, when you have served as a member of the Clay

16  County School Board?

17  A    Yes, sir, I'm a Board member at the present time.

18  Q    How many years have you served as a member of the School

19  Board, Mr. Cornett?

20  A    I'm on my 24th year.

21  Q    Who was the Superintendent of Schools when you first

22  signed on as School Board?

23  A    Mr. Willy Sizemore.

24  Q    How many years did you serve as a member of the Board when

25  Willy Sizemore was the superintendent?

1    A    Five.

2    Q    Who was the superintendent after Willy Sizemore,

3    Mr. Cornett?

4    A    A Mr. Charles White.

5    Q    Approximately how many years did Mr. White serve as

6    Superintendent of Schools?

7    A    He was there eight years.

8    Q    Now, do you know Doug Adams?

9    A    Yes, sir.

10    Q    If I asked you to look around the courtroom, do you think

11    you might be able to pick and identify Doug out?

12    A    Yeah, that's the gentleman that just stood up.

13    Q    What's he wearing, sir?

14    A    He's got on, it looks like, a blue suit and a blue tie and

15    a blue shirt from here.

16          MR. WESTBERRY:  Judge, could the record reflect —

17          THE COURT:  Yes, the record will reflect that the

18    witness has identified the defendant, Douglas Adams.

19    BY MR. WESTBERRY:

20    Q    Do you have family members, Mr. Cornett, who have been

21    schoolteachers?

22    A    Yes, sir.

23    Q    Can you tell us just briefly a little bit about what that

24    background was?

25    A    Okay.  My father and my mother both taught school.  I've

1  got 18 aunts and uncles that's retired schoolteachers,

2  principals, and superintendents.  I've got six sister-in-laws

3  that are retired schoolteachers.  Got one brother-in-law that's

4  a retired superintendent, and my wife is a retired

5  schoolteacher.  And I tried it for a couple of weeks.

6  Q    Okay.  Thank you.  Did the fact that you apparently come

7  from a family — have a family history of schoolteachers, did

8  that play any part in your desire to serve on a school board?

9  A    Yes, sir.

10  Q    Why is that, Mr. Cornett?

11  A    Well, I thought I had as good a background as anybody in

12  Clay County in order to know what — how the school system and

13  how they should operate financially.

14  Q    Mr. Cornett, when you — what is your educational

15  background?  I forgot to ask you that.

16  A    I've got one year of college.

17  Q    Is the School Board an elected position?

18  A    Yes, sir.

19  Q    Is it partisan or nonpartisan?

20  A    It's nonpartisan.

21  Q    Has there ever been a time when you had an opponent?

22  A    No, sir.  In my 24 years, I've never had anybody to file

23  to run against me.

24  Q    Who were members of the School Board, Mr. Cornett, if you

25  recall, back in 1999?

1  A    It was me, Charles Keith, W.J. Watkins, Wayne Blair, and
2  Lee Brown.

3  Q    Are any of those names that you mentioned just now, are
4  any of them now deceased?

5  A    All of them are deceased except me and Mr. Keith.

6  Q    Who are the current additional members of the School Board
7  in addition to you and Charles Keith?

8  A    Geraldine Smith and Norman Cornett, then we've -- which
9  we're no relation.  And we've got one vacancy see right now.

10 Q    Do you recall -- do you recall the year in which Doug
11 Adams was hired as Superintendent of Schools in Clay County?

12 A    Yes, sir.

13 Q    What year was that, that you recall?

14 A    It was 1999.

15 Q    Can you tell the jury just what were the circumstances
16 surrounding, that you recall from your personal knowledge, Doug
17 Adams being hired as Superintendent of Schools back in 1999?

18 A    Well, sir, Mr. Charles White was the superintendent and he
19 moved what amounted to a girlfriend in as his secretary, was
20 one thing he did.  And all the -- after two or three years of
21 her being there, our teachers and principals and stuff didn't
22 even want to come to the central office.  I mean, they had to
23 go through her in order to get to the superintendent.  And I
24 never heared him use the word "curriculum" anytime that he was
25 the superintendent.

1  Q    What do you mean by that?  Why is that important?

2  A    That's the most important thing.  I mean, curriculum, if

3  you don't have a good curriculum, you're going to teach the

4  children nothing.

5  Q    That kind of problem that you mentioned with Mr. White,

6  from your personal knowledge, have you had — ever had any kind

7  of problem like that?

8          MR. SMITH:  Objection, Your Honor, character

9  evidence.

10         THE COURT:  Sustained.

11 BY MR. WESTBERRY:

12 Q    When Mr. Adams was hired in 1999 as superintendent of

13 schools, from your personal knowledge, Mr. Cornett, did

14 politics play any role in the decision to hire him as

15 Superintendent of Schools?

16 A    A hundred percent no.

17 Q    Why do you say "a hundred percent no"?

18 A    We went through the standard procedure to hire the

19 superintendent.  You take applications for the vacancy, and

20 after the applications are — you give them a certain date, you

21 know, till they cease.  Then you have a screening committee

22 that's made up of one Board member, one principal, two

23 teachers, a classified person, and a PTO president.  Six people

24 screen them applications, and if the Board — they can ask you

25 to have anywhere from one to how many ever that they want to

1  interview.  So I was on the screening committee and then I was

2  on the Board, and, I mean, the word "politics" was never

3  mentioned.  There was nothing.  I mean, it was all — all the

4  procedures was followed just like it was supposed to be.

5  Q    From your personal recollection, Mr. Cornett, as a member

6  of the screening committee, did anybody on Doug Adams' behalf

7  ever approach you and try to influence you politically, in

8  terms of the decision, to offer him the job?

9  A    No, sir.

10  Q    Do you recall what the length of time the additional

11  contract was that Mr. Adams was offered?

12  A    Three years.  I believe the first contract was only three

13  years.

14  Q    That would have gotten to approximately 2002; is that

15  correct?

16  A    Yes, sir.

17  Q    99?

18  A    Yes, sir.  Yes, sir.

19  Q    From your personal knowledge, do superintendents of the

20  school in Clay County, are they up periodically for contract

21  renewal?

22  A    Every four years or at the end of whatever you give them

23  the first contract for.

24  Q    So from '03, the next would have been in either '06 or

25  '07; is that correct?

1   A    Yes, sir.

2   Q    Do you recall, from your personal knowledge and your

3   recollection, just how his salary was initially set?

4   A    Yes, sir.

5   Q    What do you recall, sir?

6   A    We take the seven — there are seven counties that border

7   Clay County.  We take them seven counties —

8   Q    I'm talking about the initial salary back in 1999, if you

9   recall.

10  A    This is the way that we established every salary or every

11  raise that's been done since I've been there.

12  Q    I gotcha.  Go ahead, I'm sorry.

13  A    We take them seven counties that borders Clay County, we

14  get their superintendent's pay, we add the seven together,

15  divide by seven, and get as close to the average to that as we

16  can get.

17  Q    Do you recall what some of those counties were, where they

18  were located?

19  A    Yes, sir.  They're Laurel County, Knox County, Bell

20  County, Jackson County, Perry County, Owsley County, and Leslie

21  County.

22  Q    Some of those counties are larger or smaller than Clay?

23  A    Yes, sir.

24  Q    Which are the bigger ones briefly and which are the

25  smaller ones?

1   A    Well, Laurel County is by far the biggest, and then Perry

2   County, Bell County, and —— are about the same as Clay County

3   and Knox County.  Jackson County and Leslie County are right

4   smart smaller, and Owsley County has about a fifth the

5   inhabitants that Clay County does.

6   Q    Do you recall times when Doug Adams' contract as

7   Superintendent of Schools would have been up for renewal?

8   A    Yes, sir, it would have been every four years.

9   Q    Was there anytime during any of those renewal periods that

10  you were ever approached and lobbied, if you will, to renew

11  Doug Adams' contract based on political considerations, if you

12  recall?

13  A    No, sir.

14  Q    From your personal knowledge, Mr. Cornett, how did Doug

15  Adams perform during the years he served as superintendent of

16  schools?

17  A    By far the best of any superintendent that's been there

18  from the time I've been there.

19  Q    Why do you say that, sir?

20  A    Well, when he started, our test scores were about as low

21  as they could get, and in the last three years —— it took him

22  about four or five years to really get all the teachers

23  where —— the right ones where they should be, get everybody on

24  the right page.  But in the last three years, we have had ——

25  one year we had two of the top ten elementary schools on their

 1  test scores in the whole state of Kentucky, and we've had one

 2  here yonder several years.

 3  Q    Are you familiar with the term CATS scores, C-A-T-S?

 4  A    Yes, sir.

 5  Q    Do you know -- are those the test scores that you're

 6  referring to, Mr. Cornett?

 7  A    Yes, sir.

 8  Q    Were those for the elementary schools that you --

 9  A    Yes, sir.

10  Q    Was that a source of pride in Clay County?

11  A    Oh, yes.  Yes.

12  Q    From your personal experience, Mr. Cornett, has there ever

13  been a time that you've been made aware that Doug Adams ever

14  made a hiring or firing decision based on politics, if you

15  know?

16  A    No, sir, not that I know.

17  Q    Anybody ever -- any concern like that ever been brought to

18  your personal attention?

19  A    No, sir.

20  Q    Are you familiar with the term or something called a

21  site-based council?

22  A    Yes, sir.

23  Q    Can you just tell us very briefly what a site-based

24  council is?

25  A    Okay.  It's made up of the principal, some parents, and

1  some teachers at each school, and they actually — in essence,

2  they actually do the hiring.  The superintendent recommends if

3  they have a vacancy, he will send them some names and recommend

4  them, but they can pick them — pick them one, and if they

5  don't, they can send them back and he has to send them some

6  more.

7  Q    From your personal experience and personal knowledge, have

8  you ever been made aware if Doug Adams has ever tried to

9  influence any of the decisions made by the site-based council,

10  if you know?

11  A    No, sir, not that I know.

12  Q    Any concern along those lines ever been brought to your

13  attention in the 24 years you've been on the Board?

14  A    No, sir.

15  Q    How many — approximately how many employees are there in

16  the Clay County School System, if you know?

17  A    At the present time?

18  Q    Yeah, just an approximate.

19  A    It will be — in the proximity of 750.

20  Q    If you know, about how many employees would there have

21  been in the Clay County School System back in 2002?  Your best

22  recollection.

23  A    We would have had about 600 students more then than we've

24  got now, so I would say there was probably 12, 15, maybe 20

25  more employees then than they are now.

Q    From your personal knowledge, has there ever been as much
as 900 employees in the Clay County School System, from your
personal knowledge?

A    No, not that I know of.

MR. WESTBERRY:  May I have one second, please, Judge
Reeves?

THE COURT:  Yes, sir, you may.

BY MR. WESTBERRY:

Q    I think, if I recall, Mr. Cornett, you testified that back
in 1999 you were a member of the screening committee that
selected Doug Adams as the Superintendent of Schools?

A    Yes, sir, and then I was also on the Board that hired him.

Q    Was there something about his application or credentials
that stood out that you recall, that weighed in favor of
extending him that job?

MR. SMITH:  Your Honor, I'm going to object as to
relevance.

THE COURT:  Sustained.

MR. WESTBERRY:  I believe that's all I have and pass
the witness, Your Honor.

THE COURT:  All right.  Thank you, Mr. Westberry.

Mr. Smith, any questions of the witness?

CROSS-EXAMINATION

BY MR. SMITH:

Q    Good afternoon.

1    A    Yes, sir.

2    Q    I'm Stephen Smith and I represent the United States.  I

3    have a few questions for you, Mr. Cornett.

4    A    Okay.

5    Q    Is it Cornette or Cornett?

6    A    I'm a Cornett.  The Cornettes have the money.

7    Q    That's good to know.  So I know in Eastern Kentucky you

8    can be a Napier or a Napper?

9    A    That's under the same situation.

10   Q    All right.  As a Fogertown resident, I assume you vote in

11   the Burning Springs?

12   A    No, sir, I vote at the Fogertown precinct.

13   Q    Excuse me.  And that is held at which school building?

14   A    That is held in the Fogertown Fire Department.

15   Q    And as you have described, sir, your membership, I

16   believe, has been 24 years on the School Board?

17   A    I'm in my 24th year, sir.

18   Q    And you-all run in districts in the School Board, you

19   don't run over the whole county?

20   A    No, we've got — you run in districts, yeah.

21   Q    And, obviously, Fogertown would be in your district?

22   A    Yeah, that would be one of the four.

23   Q    And you've never had an opponent?

24   A    No, sir.

25   Q    But others on the Board have had opponents; would that be

1  fair?

2  A    Yes, sir.

3  Q    And you-all run every two years; would that be fair?

4  A    No, that's not -- we run every four years.

5  Q    Okay.  I may have misunderstood.  There's not a School

6  Board alternative, you have three that are on year and three

7  that have to run every two years; is that not the way it works?

8  A    Oh, yeah.  But each one runs every four years.  There's

9  three runs this time and two years from now, the other two will

10 run, then two years after, them first three will run.

11 Q    I see.  So there's a School Board race, would it be fair,

12 sir, every two years with somebody having to race?

13 A    Yes, sir.

14 Q    And I believe that you indicated that, as you indicated,

15 there were three that were on the selection committee of -- or

16 on the Board at the time they selected Mr. Adams that are

17 deceased?

18 A    Yes, sir.

19 Q    And if I understand it, Mr. Keith would have been the

20 chairman of the Board at that time?

21 A    Yes, sir.

22 Q    And he would not have had a vote unless there was a tie;

23 is that fair?

24 A    That's correct.

25 Q    So you and the other three would have been the ones that

1   had, I guess, a vote unless there was a tie and Mr. Keith would

2   have voted?

3   A    Yes, sir.

4   Q    And I assume, sir, you're not speaking on their behalf

5   here today, you don't -- you don't have any personal knowledge

6   of any influence or you wouldn't have reason here to give

7   testimony about these deceased members, would you, sir?

8   A    No, sir.

9   Q    You're just speaking for yourself?

10  A    That's right.

11  Q    And you would agree, sir, that this School Board is a

12  large employer in Clay County?

13  A    Yes, sir.

14  Q    Do you know one larger, that employs more people in Clay

15  County at the current time?

16  A    No, sir.

17  Q    And you would also agree, sir, that the superintendent has

18  specific, I believe, authority in some areas to hire and fire,

19  especially when it comes to school bus drivers and maintenance

20  workers; would you agree?

21  A    Yes, sir.

22  Q    And that doesn't go through the site-based council, does

23  it, sir?

24  A    No, sir.

25  Q    And during the time period that you served, I believe you

 1  indicated that you had no indications that schoolteachers had

 2  been influenced as far as Mr. Adams is concerned?

 3  A    No, sir.

 4  Q    All right.  You believe, though, that the superintendent,

 5  would it be fair, he submits the names of the teachers that get

 6  considered by the site-based; would that be fair?

 7  A    Yes, sir.

 8  Q    And the site-based then makes a selection based on the

 9  list he gives them; would that be fair, sir?

10  A    Yeah, they make their decision on the ones he submits.  If

11  they don't agree to any of them, he has to submit more.

12  Q    And then you-all generally approve -- whatever comes to

13  you-all, you-all have to make final approval of that, sir; is

14  that fair?

15  A    Yes, sir.

16  Q    And whether or not this superintendent gets rehired,

17  you-all make that final decision, don't you, sir?

18  A    We hire two people.  We hire the superintendent and the

19  board attorneys, is the only two people we hire.

20  Q    And my question is, again, sir, the superintendent, you

21  would agree, is this person that you-all are required to vote

22  on and approve?

23  A    Yes, sir.

24  Q    Sir, you're living there in Fogertown, I'm now

25  understanding.  You would agree, sir, do you know about vote

1  buying going on in Clay County?

2  A    I've heared the term, but I know nothing about any vote

3  buying.

4  Q    You've never witnessed it yourself?

5  A    No, sir.

6  Q    And never have been a victim of it yourself?

7  A    No, sir.

8  Q    You don't agree with it?

9  A    No, sir.

10  Q    You'd like to see it end?

11  A    Yes, sir.

12          MR. SMITH:  Thank you.

13          THE COURT:  Let's see if any of the other defendants

14  have questions?

15      (No response.)

16          THE COURT:  No?  All right.  Thank you.

17          Mr. Westberry, do you need just a moment?

18          MR. WESTBERRY:  May I ask from here, Judge Reeves?

19          THE COURT:  Yes, that's fine.

20                  REDIRECT EXAMINATION

21  BY MR. WESTBERRY:

22  Q    I forgot to ask you what your occupation is, Mr. Cornett.

23  A    I'm a tobacco farmer, have been for 57 years.

24  Q    Is it common, if you know, that bus routes change in the

25  Clay County School System?

1  A    Every year.

2  Q    Why is it common?

3  A    Well, in our county, they may be students in one, as we

4  call them, hollers that rides the bus this year, some of them

5  may graduate and not be there.  In order to utilize your buses,

6  you've got to get as many children on that bus route as you can

7  on that bus, because fuel is pretty high.  So you change them

8  bus routes every year to fit the students, where the students

9  are living.

10 Q    If you know, Mr. Cornett, what would be the total number

11 of bus drivers and maintenance workers that the office of

12 superintendent could hire, if you know?

13 A    I would say probably — Maintenance workers and bus

14 drivers?

15 Q    Yes, if you know.

16 A    Somewhere around a hundred.

17 Q    Is that combined, total?

18 A    Yeah, for both of them.

19 Q    And, again, how many total employees are currently in the

20 Clay County School System?

21 A    About 750.

22 Q    And I believe you said there were a little bit more back

23 in '02 because there were more kids in school?

24 A    We had approximately 600 more students in '02 than we've

25 got now.

1              MR. WESTBERRY:  Thank you, sir.

2              THE WITNESS:  Yes, sir.

3              MR. WESTBERRY:  I pass the witness.

4              THE COURT:  Any further questions?

5              MR. SMITH:  Yes, Your Honor.

6              THE COURT:  Yes, sir, you may.

7                        RECROSS-EXAMINATION

8   BY MR. SMITH:

9   Q    Sir, you were asked about your knowledge of the bus routes

10  in the county?

11  A    Yes, sir.

12  Q    Are you familiar with the Littleton bus route?

13  A    Yes, sir.

14  Q    And are you familiar with the vocational school route?

15  A    Yes, sir.

16  Q    Would you consider those to be desirable or undesirable as

17  far as bus routes?

18  A    Well, I don't know as I would say any bus route we've got

19  would be desirable and undesirable if the pay was about the

20  same.

21  Q    Okay.  Is it possible that some routes where you get paid

22  the same but they're shorter in distance would be -- result in

23  you having to be on the bus less time; would that be fair?  If

24  your bus route is shorter, your time on the bus would be

25  shorter; is that fair?

1   A    I would — yes, sir.

2   Q    And you would agree that some of these routes, despite

3   your-all's best efforts, are going to end up shorter than

4   others?

5   A    But mighty little.

6   Q    And then you would also agree with me, sir, that an

7   automatic bus is sometimes preferred over those standard-shift

8   buses?

9   A    Well, sir, I would rather have the standard-shift truck

10  myself, but some people might like the automatic the best.

11  Q    Have you driven buses before?

12  A    I've driven everything from a tractor to a bulldozer.

13  Q    Were you a school bus driver by occupation at any time?

14  A    No, sir.

15  Q    Okay.  I understand your preference, but you would agree

16  with me that it might be more likely than not that a person

17  would like an automatic over a standard shift?

18  A    Probably some people, probably some people would.

19  Q    Tobacco farmers excluded?

20  A    Yes, sir.

21  Q    If you exclude tobacco farmers —

22  A    Yes, sir.

23  Q    — the rest of the population might agree with an

24  automatic over standard shift?

25  A    Might, yeah.

1  Q    And the newer buses I assume have got some improvements

2  that the old buses just don't have; would that be fair?

3  A    We try to get the best buses that we can pay for.

4  Q    And in 2002, a 2000 or 2001 model bus would likely be a

5  much more up-to-date and more plush, if there is such a word

6  for a school bus, 5than, say, those older '90 models; would

7  that be fair?

8  A    Yes, that would be fair.

9  Q    And you said you are familiar with the vocational school

10 route?

11 A    Yes, sir.

12 Q    That's one of the smaller buses, isn't it?

13 A    Yes, sir.

14 Q    And would you say in your estimate that would take less

15 time to operate the vocational school route than the county

16 routes?

17 A    Well, sir, some of them vocational routes is tied in with

18 some of the county routes.  They run two routes in the same

19 day.

20 Q    Two routes in the same day?

21 A    Yes, sir.

22 Q    So you're just not sure you would agree with me that

23 that's a better route than some of the others?

24 A    No, sir.

25          MR. SMITH:  Okay.

1          THE COURT:  Mr. Westberry, any follow-up.

2          MR. WESTBERRY:  Yes, in response to that.

3                    FURTHER REDIRECT EXAMINATION

4    BY MR. WESTBERRY:

5    Q    Is pay for school bus drivers, if you know, Mr. Cornett,

6    based on the amount of miles that a driver will drive?

7    A    Yes, sir.

8    Q    So if someone has a less mileage route, do they get paid

9    less?

10   A    Yes, sir.

11   Q    Do all bus drivers get to pick the same bus that they may

12   want to drive?

13   A    No, sir.

14   Q    Why is that?

15   A    Well, you might have ten drivers wanting the same bus.

16   How could you ever make your runs?

17          MR. WESTBERRY:  Thank you, sir.

18          Pass the witness.

19          THE COURT:  All right.

20          Anything else on this last series of questions?

21          MR. SMITH:  No, thank you.

22          THE COURT:  All right.

23          Thank you, sir, and you may step down, you're

24   excused.

25          THE WITNESS:  Thank you, sir.

1          THE COURT:  Yes, sir.

2          Ladies and gentlemen, we will take our lunch break at

3   this time.  We'll take a recess until 1:15 this afternoon.  Of

4   course, please keep in mind the admonitions that you have been

5   given several times not to discuss the case among yourselves

6   while we are in recess.  The jury will be excused until 1:15

7   this afternoon.

8          (Whereupon, the jury retired from the courtroom, after

9   which the following proceedings were had in open court.)

10          THE COURT:  Thank you, Counsel.  Any matters to take

11   up outside the presence of the jury?

12          Mr. Westberry, how are we doing on our time with our

13   witness?

14          MR. WESTBERRY:  Much better than I would have

15   thought.  I'm going to check.  I know I have at least one.  I'm

16   pretty confident there are several back there.

17          THE COURT:  Mr. White, do you have someone lined up

18   if we get to that point?

19          MR. WHITE:  If you could give me just a moment real

20   quick.  I've got four which I put in the 15- to 30-minute

21   category.  I've got one that I've told you about, Ms. Gabhart.

22   The only issue I've got with her, I've been a little reluctant

23   to release her today in case I run out, but she's got — I

24   think I told you, she has a torn ACL and surgery.  She's got a

25   3:20 physical therapist.  She could be here first thing in the

1  morning.  If I run out at the end of the day, I guess that's

2  what I'm trying to get some direction from you.

3          THE COURT:  We'll check —

4          MR. WHITE:  We'll have her handy —

5          THE COURT:  We'll check at the break and see how

6  that's coming.

7          MR. WHITE:  Okay.  Thank you, Your Honor.

8          THE COURT:  If there's nothing else to take up, we'll

9  be in recess until 1:15.

10     (Whereupon, a recess was had for the noon hour, after

11  which the proceedings continue uninterrupted to Volume 24-B.)

12                  (Proceedings concluded at 12:20)

13                  C E R T I F I C A T E

14     I, Cynthia A. Oakes, certify that the foregoing is a

15  correct transcript from the record of proceedings in the

16  above-entitled matter.

17

18  3/15/2010                    s/CYNTHIA A. OAKES
        DATE                     CYNTHIA A. OAKES, RPR, RMR, CRR
19

20

21

22

23

24

25

I N D E X

                                                              PAGE

Testimony of ROY D. ALLEN:
        Direct Examination by Mr. Westberry:          20
        Cross-Examination by Mr. Smith:               40
        Redirect Examination by Mr. Westberry:        51

Testimony of CHARLES D. KEITH:
        Direct Examination by Mr. Westberry           57
        Cross-Examination by Mr. Smith:               73
        Redirect Examination by Mr. Westberry:        82
        Recross-Examination by Mr. Smith:             84

Testimony of LEEWOOD CORNETT:
        Direct Examination by Mr. Westberry:          85
        Cross-Examination by Mr. Smith:               97
        Redirect Examination by Mr. Westberry:        102
        Recross-Examination by Mr. Smith:             104
        Further Redirect Examination by Mr. Westberry: 106

E X H I B I T S

| Government's Exhibit No. | Identified | Page Admitted |
| --- | --- | --- |
| D85 | 6 | 6 |

| Defendant's Maricle Exhibit No. | Identified | Page Admitted |
| --- | --- | --- |
| 9 | 5 | 6 |