United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 17, 2010 |
| DOUGLAS C. ADAMS | ) 9:25 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 26-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States: STEPHEN C. SMITH, ESQ.
JASON D. PARMAN, ESQ.

On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:         MARTIN S. PINALES, ESQ.

On behalf of the Defendant      R. KENT WESTBERRY, ESQ.
Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant      T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant      ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:             R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant      JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
1   Appearances of Counsel:

2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
3                                    Assistant U.S. Attorneys
                                     601 Meyers Baker Road
4                                    Suite 200
                                     London, Kentucky  40741
5

6   On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
    Russell Cletus Miracle:          107 East First Street
7                                    Corbin, Kentucky  40701

8                                    MARTIN S. PINALES, ESQ.
                                     150 East Fourth Street
9                                    Federal Reserve Building
                                     Cincinnati, Ohio  45202
10

11  On Behalf of the Defendant       R. KENT WESTBERRY, ESQ.
    Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.
12                                   220 West Main Street
                                     Suite 1900
13                                   Louisville, Kentucky  40202

14
    On behalf of the Defendant       T. SCOTT WHITE, ESQ.
15  Charles Wayne Jones:             133 West Short Street
                                     Lexington, Kentucky  40507
16

17  On behalf of the Defendant       ROBERT L. ABELL, ESQ.
    William E. Stivers:              120 North Upper Street
18                                   Lexington, Kentucky  40507

19
    On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
20  Freddy W. Thompson:              R. TUCKER RICHARDSON III, ESQ.
                                     300 West Short Street
21                                   Lexington, Kentucky  40507

22
    On behalf of the Defendant       JERRY W. GILBERT, ESQ.
23  William B. Morris:               212 North Second Street
                                     Richmond, Kentucky  40475
24

25
```

1    On behalf of the Defendant          ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                    201 West Short Street
2                                        Lexington, Kentucky   40507

3
     On behalf of the Defendant          DANIEL A. SIMONS, ESQ.
4    Stanley Bowling:                    116 West Main Street
                                         Suite 2A
5                                        Richmond, Kentucky   40475

6
     Court Reporter:                     CYNTHIA A. OAKES, CRR
7                                        Official Court Reporter
                                         United States District Court
8                                        560 Athens Boonesboro Road
                                         Winchester, Kentucky   40391
9                                        (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25

1          (Whereupon, the following proceedings were had outside the

2     presence of the jury.)

3               THE COURT:  Thank you, and good morning.

4               I understand that Mr. Westberry had an issue to take

5     up.

6               And, Mr. Abell, we'll get to you.

7               Mr. Westberry.

8               MR. WESTBERRY:  Thank you, Judge, good morning.  I

9     have been told that — and I have not seen today's Lexington

10    Herald-Leader, but I have been told that the above-the-fold

11    story is a recount of the detention yesterday of Mr. Adams.  I

12    looked at the story early this morning from home on the

13    Internet, but I didn't — I have not actually seen a

14    newspaper —

15              THE COURT:  Uh-huh.

16              MR. WESTBERRY:  — itself.  I am concerned — I know

17    the Court admonishes the jury each day, each evening, probably

18    if I recall, including the breaks, not to read or to hear

19    anything — any news source that would be covered during the

20    trial.

21              THE COURT:  Who has a phone in here?

22              MR. BALDANI:  Judge, I just turned my computer on,

23    it's not a phone.

24              THE COURT:  All right.

25              I'm sorry, Mr. Westberry.

1          MR. WESTBERRY:  No problem.  I wanted to make my
2     concerns on behalf of Mr. Adams known that apparently it is a
3     very prominent story.  I think it's probably, from what has
4     been described to me, the most prominent news account that the
5     Herald-Leader has written about this trial to date, perhaps
6     since — at least until the time the charges were returned
7     sometime last year.  I haven't seen the paper, but —
8          THE COURT:  All right.
9          MR. WESTBERRY:  — people that have seen it have
10    generally described it to me.  I'm seeking a little guidance
11    from the Court.  And I know I'm in a darned-if-I-do-, darned-
12    if-I-don't situation with additional voir dire, but I'm a
13    little concerned.
14          THE COURT:  I would suggest that at the end of the
15    day today that I give a more extensive admonition about news
16    coverage, reading, watching, listening to anything, the jury
17    should not do that, and if that should ever happen, they should
18    completely disregard and pay no attention to any stories, any
19    articles, radio broadcasts, television, because, obviously,
20    individuals that report try to do their best sometimes but they
21    haven't been here for eight weeks the way we have.  I can do
22    that.  I could do it earlier, but if I do it earlier, then it
23    may give added emphasis.  But if you want me to, I'll do that.
24          MR. WESTBERRY:  I was more inclined, if the Court
25    does it, I would like to suggest you do it at the end of the

1    day —

2              THE COURT:  Okay.

3              MR. WESTBERRY:  — and not at the beginning of the

4    day, because I do —

5              THE COURT:  All right.

6              MR. WESTBERRY:  — agree that that would add undue

7    emphasis to anything they may or may not have seen.

8              THE COURT:  I'll certainly do that.

9              MR. WESTBERRY:  Can I think about it just a little

10   bit?

11             THE COURT:  Sure.

12             MR. WESTBERRY:  And I'll remind the Court at the end

13   of the day.

14             THE COURT:  And if you want, I can do it at the lunch

15   break.

16             MR. WESTBERRY:  That's fine.

17             THE COURT:  But if you want know do it at the lunch

18   break, before we break if you could ask to come up just

19   briefly.

20             MR. WESTBERRY:  Absolutely.

21             THE COURT:  Sometimes I do forget to do that, but if

22   you'll remind me, I'll — if you want to discuss it further, we

23   can certainly do that before we take our lunch break.

24             MR. WESTBERRY:  Thank you.  That's fine.  Thank you,

25   Judge.

1    THE COURT:  Let's see, I believe where we ended

2 yesterday, Mr. Baldani, you were thinking about whether to call

3 an additional witnesses.

4    MR. BALDANI:  We're ready to announce closed, Your

5 Honor.

6    THE COURT:  Okay.  You'll announce closed.

7    And then, Mr. Gilbert, you'll be ready to go?

8    MR. GILBERT:  Yes, Your Honor, I'm prepared, my

9 witnesses are in the anteroom.

10    THE COURT:  Okay.

11    MS. HUGHES:  Your Honor?

12    THE COURT:  Yes, ma'am.

13    MS. HUGHES:  One of the witnesses of Mr. Gilbert is

14 Debbie Edwards from the County Clerk's Office and one is from

15 the Circuit Clerk's Office to authenticate some records.

16    THE COURT:  All right.

17    MS. HUGHES:  I have some records I also need to

18 authenticate rather than bringing them back this afternoon or

19 whenever.

20    THE COURT:  Yes, ma'am.

21    MS. HUGHES:  I would ask the Court to let me do that

22 as well.

23    THE COURT:  Yes, ma'am.

24    MS. HUGHES:  Thank you.

25    MR. SIMONS:  Your Honor, I would ditto Ms. Hughes, I

1 || have one record to get in through the Circuit Court.

2 ||         THE COURT:  All right.  Again, what we're talking

3 || about is expanding the scope of what otherwise would be your

4 || cross-examination to include direct examination, and I just

5 || remind the parties when the jury is not present, when you do

6 || that you're on direct, and so leading is permissible for some

7 || reasons if we need to get through a particular witness,

8 || sometimes that's permissible, but I just remind you that when

9 || you do that you're on direct.

10 ||         Anything else we can take up before the jury is

11 || brought in?

12 ||     (No response.)

13 ||         THE COURT:  All right.  You can bring the jury in.

14 ||         MR. WHITE:  Your Honor, if I could drop something off

15 || back here?

16 ||         THE COURT:  Yes, sir.

17 ||         I'm sorry.  Mr. Abell, did you have another issue?

18 || I'm sorry.

19 ||         MR. ABELL:  No, Judge, I do not.  Thank you.

20 ||         THE COURT:  Personal comfort?

21 ||         MR. ABELL:  I guess.

22 ||         THE COURT:  All right.  Thank you.

23 ||     (Whereupon, the jury entered the courtroom, after which

24 || the following proceedings were had in open court.)

25 ||         THE COURT:  Thank you, and please be seated.

1          The record will reflect that all members of the jury

2     are present.  The parties and counsel are also present.  Good

3     morning again.

4          Let's see, I believe when we finished yesterday, we

5     just completed one of Mr. Thompson's witnesses.

6          Mr. Baldani?

7          MR. BALDANI:  That's right, Your Honor.  And may it

8     please the Court, Freddy Thompson is prepared to announce

9     closed at this time.

10          THE COURT:  All right.  Thank you.

11          Defendant Thompson, having announced the close of his

12     case in chief, we'll proceed with Mr. Bart Morris.

13          Mr. Gilbert, are you ready to call your first

14     witness?

15          MR. GILBERT:  Yes, Your Honor.  We'll call Debbie

16     Edwards.

17          THE COURT:  Thank you.

18                         DEBBIE EDWARDS,

19     having been first duly placed under oath, was examined and

20     testified as follows:

21          THE COURT:  Please proceed.

22                       DIRECT EXAMINATION

23     BY MR. GILBERT:

24     Q    Would you state your name, please, ma'am?

25     A    Debbie Edwards.

DEBBIE EDWARDS - DIRECT - MR. GILBERT                    10

1   Q     And where do you live, Ms. Edwards?

2   A     Manchester, Kentucky.

3   Q     And are you employed?

4   A     Yes, I am.

5   Q     By whom and in what capacity?

6   A     The Clay County Clerk's Office as a deputy clerk.

7   Q     And how long have you worked there?

8   A     Twenty years.

9   Q     As a part of your job responsibilities, are you the

10  custodian of the records of the Clay County Clerk?

11  A     Yes, I am.

12  Q     Okay.  And are you responding to the subpoena that I

13  issued and served upon you in this case?

14  A     Yes, I am.

15  Q     Requesting your appearance and to bring a certain

16  document?

17  A     Yes.

18  Q     And have you done that here today?

19  A     Yes.

20  Q     Do you have the original?

21  A     Yes, I do.

22  Q     And have you, at my request, made a certified copy of that

23  document?

24  A     Yes, I have.

25          MR. GILBERT:  If I could have the witness shown the

1   document.

2           THE COURT:  Yes, sir.

3   BY MR. GILBERT:

4   Q    Is that document an amended agreement?

5   A    Yes.

6   Q    And what is the date of the document?

7   A    The date of the document is October the 5th of 2004 and it

8   was recorded in our office October the 7th of 2004.

9   Q    And does that appear — and what book does that appear in

10  in the official records of the —

11  A    Miscellaneous Book 60, page 112.

12  Q    And who are the parties to that agreement?

13  A    City of Manchester is a party of the first part, B & J

14  Transfer, party of the second part.

15  Q    The certified copy that you have there, is that a true and

16  accurate copy of the original record?

17  A    Yes, it is.

18  Q    And does it contain your certification of such?

19  A    Yes.

20  Q    Does the document indicate who it was prepared by?

21  A    Clint J. Harris.

22  Q    And do you recognize him as a local attorney?

23  A    Yes.

24  Q    At the time that he executed that, was he also the City

25  Attorney for the City of Manchester?

DEBBIE EDWARDS DIRECT - MR. GILBERT                12

```
 1   A    Yes.
 2              MR. GILBERT:  That's all I have of this witness.  And
 3   we move to introduce the document.
 4              THE COURT:  All right.  Ms. Stoneking, what would
 5   that be, William Morris Exhibit No. 3?
 6              THE CLERK:  Three.  Let me check that, Your Honor,
 7   because I have Debbie Morris as well.
 8              THE COURT:  Let me see if there's any objection to
 9   the introduction first.
10              THE CLERK:  It would be 4.
11              THE COURT:  Mr. Smith?
12              MR. SMITH:  Your Honor, I would like to see the
13   original.  I have some concerns about the copy I have and I'm
14   sure it's correct, but I just want to verify, if the Court
15   would allow.
16              THE COURT:  All right.  That'll be fine.
17              If you could show Mr. Smith the original, please.
18              MR. SMITH:  No objection, Your Honor.
19              THE COURT:  It will be admitted as William Morris
20   Exhibit No. 4 for the record.
21              You can provide that back to the witness.
22              Ma'am, that's your original, correct, that you have?
23              THE WITNESS:  Yes, it is.
24              THE COURT:  All right.
25              Mr. Smith, any questions of the witness?
```

1              MR. SMITH:  No.  Thank you.

2              THE COURT:  All right.  Thank you.

3              Ms. Hughes, I believe you may have -- you may have

4    the witness under subpoena.  If you do, if you want to ask

5    questions as if on direct, you can proceed.

6              MS. HUGHES:  Thank you, Your Honor.

7              If the security officer could assist me in handing

8    two documents to this young lady.

9              THE COURT:  Yes, ma'am.  Let Mr. Smith see these

10   first.

11             Mr. Smith, have you reviewed the documents?

12             MR. SMITH:  Yes, I was writing the dates.

13             THE COURT:  All right.  You can show those to the

14   witness, please.

15                      DIRECT EXAMINATION

16   BY MS. HUGHES:

17   Q    Would you look first at the one that's entitled "Marriage

18   License"?

19   A    Yes.

20   Q    Is that a certified copy of a record that is maintained by

21   your office?

22   A    Yes, it is.

23   Q    And so you would be the custodian of that record?

24   A    Yes.

25   Q    And can you tell me what that document is?

1   A    It's a marriage license.

2   Q    And who are the parties marrying?

3   A    Debra Lynn Smith and William Bartley Morris.

4   Q    All right.  And the lower part, Marriage Certificate.  Can

5   you tell me the date of the marriage?

6   A    June the 21st, 2003.

7           MS. HUGHES:  Thank you.

8           Your Honor, I would mark that as Debra Morris No. 3,

9   I believe, and move to introduce it.

10          THE COURT:  All right.  Any objection to the

11  admission of Debra Morris Exhibit No. 3?

12          MR. SMITH:  No, Your Honor.

13          THE COURT:  All right.  That document will be

14  admitted.

15  BY MS. HUGHES:

16  Q    And then, ma'am, if you could look at the next document,

17  which is a Deed of Conveyance?

18  A    Yes.

19  Q    Is that a certified copy of a record held by your office?

20  A    Yes.

21  Q    And are you the custodian of that record?

22  A    Yes.

23  Q    All right.  And would you tell me whether or not this is a

24  deed for property on Green Street in Manchester?

25  A    I mean, it just says it's in the City of Manchester, it

1    doesn't actually cite -- in the description I don't see Green

2    Street.

3    Q    All right.  Do you see where it says Green Street in the

4    second line?

5    A    Okay.  Yes.

6    Q    All right.  And who is the grantee, the party acquiring

7    ownership by this deed?

8    A    Bart Morris.

9    Q    Does it indicate whether or not he is single or married?

10   A    Single.

11   Q    And what's the date of this deed?

12   A    The date it was dated was May the 30th of 2000.

13           MS. HUGHES:  Your Honor, I would like to mark this as

14   Debra Morris No. 4 and move to introduce it, please.

15           THE COURT:  All right.

16           Any objection to the admission of Exhibit No. 4?

17           MR. SMITH:  No, Your Honor.

18           THE COURT:  All right.  Debra Morris Exhibit No. 4

19   will be admitted.

20           MS. HUGHES:  And that's all I have, Your Honor.

21   Thank you.

22           THE COURT:  All right.  Thank you.

23           Mr. Smith, any questions for this witness?

24                         CROSS-EXAMINATION

25   BY MR. SMITH:

1  Q    Ma'am, just for the record, on the marriage license -- I

2  believe that's Debra Morris No. 3.  Do you have that in front

3  of you?

4  A    Yes.

5  Q    -- (continuing) how does Ms. Morris spell her first name?

6  A    D-e-b-r-a.

7  Q    Okay.  And does she seem to sign it the same way,

8  D-e-b-r-a?

9  A    Yes.

10 Q    And on Exhibit No. 4, the deed -- Do you have that in

11 front of you?

12 A    Yes.

13 Q    -- (continuing) who prepared the deed as their lawyer?

14 A    Carl Short.

15 Q    And what address does he give?

16 A    P.O. Box 463, Manchester.

17 Q    And how much did the deed reflect the parties paid for

18 this property?

19 A    28,000.

20        MS. HUGHES:  I object to the characterization

21 "parties," because there's only one grantee.

22        THE COURT:  All right.  I haven't seen the document.

23 I'll sustain based on representations of counsel.

24 BY MR. SMITH:

25 Q    Is there more than one person listed as the seller, ma'am?

DEBBIE EDWARDS - CROSS - MR. SMITH                17

```
 1  A    As the seller, yes.

 2  Q    And what were their names?

 3  A    Lloyd Morris and Gaye Morris.

 4  Q    And did they have to certify what was paid for the

 5  property?

 6  A    Yes.

 7  Q    And what did they certify they received for the property?

 8  A    It says consideration of $28,000.

 9  Q    Okay.  And based on their acknowledgment, that's a sworn

10  statement as to the consideration, is it not, ma'am?

11  A    Yes.

12  Q    And that's punishable by law of one to five years if

13  you're to represent that; is that a fair description?

14  A    That's correct.

15          MR. SMITH:  That's all, thank you.

16          THE COURT:  Mr. Simons?

17          MR. SIMONS:  Not of this witness, Your Honor.

18          THE COURT: All right.  Thank you.

19          Let me go back and see if any of the other parties

20  have questions.

21          MR. PINALES:  No, Your Honor.

22          THE COURT:  Mr. Westberry, did you say you did?

23          MR. WESTBERRY:  No, thank you, Judge.

24          MR. WHITE:  No, Your Honor.

25          THE COURT:  All right.  Thank you.
```

```
 1              Anything else of the witness?
 2              MR. GILBERT:  Nothing further, Your Honor.  May she
 3   be excused?
 4              THE COURT:  Yes, you'll be excused at this time,
 5   ma'am.  If you have original documents that have been
 6   introduced, you can take those back with you.
 7              THE WITNESS:  Okay.
 8              THE COURT:  Anything that's been marked as an exhibit
 9   will need to remain.
10              THE WITNESS:  Okay.
11              THE COURT:  Thank you.
12              Mr. Gilbert, you may call your next witness.
13              MR. GILBERT:  Thank you, Your Honor, Glenda Sester.
14                          GLENDA SESTER,
15   having been first duly placed under oath, was examined and
16   testified as follows:
17                        DIRECT EXAMINATION
18   BY MR. GILBERT:
19   Q    State your name, please, ma'am.
20   A    My name is Glenda Sester.
21   Q    Where do you live, Ms. Sester?
22   A    In Manchester, Kentucky.
23   Q    And are you employed?
24   A    Yes.
25   Q    By whom and in what capacity?
```

GLENDA SESTER - DIRECT - MR. GILBERT          19

1  A    The Circuit Clerk's Office in Clay County as a deputy

2  clerk.

3  Q    And how long have you worked there?

4  A    Seventeen years.

5  Q    Are you responding to a subpoena that I issued for you to

6  appear here today?

7  A    Yes.

8  Q    And does that subpoena reference a certain court case?

9  A    Yes.

10  Q    And what is that court case?

11  A    Bobby Sams.

12  Q    And do you have the original record with you here today?

13  A    I do.

14  Q    And have you, at my request, made a certified copy of the

15  entire record?

16  A    Yes, I did.

17        MR. GILBERT:  May I show the certified copy?

18        THE COURT:  Yes.  If you could show that to

19  Mr. Smith, please.

20        Let me see if any of the other parties would like to

21  look at that before it's shown to the witness.

22        MR. PINALES:  (Shaking head negatively.)

23        THE COURT:  No?  All right.  Thank you, I appreciate

24  that.

25  BY MR. GILBERT:

GLENDA SESTER - DIRECT - MR. GILBERT                    20

1  Q    Is the certified copy that you have in front of you a true

2  and accurate copy of the original record?

3  A    Yes, it is.

4  Q    Ms. Sester, your duties as a Deputy Clay District Clerk,

5  does that include being the custodian of the records?

6  A    Yes, it does.

7  Q    And are these records kept in the ordinary course of

8  business for the Clay District Court?

9  A    Yes.

10  Q    You're familiar with District Court records, are you not?

11  A    Yes.

12  Q    And does that record contain a criminal complaint?

13  A    Yes, it does.

14  Q    And can you tell the jury who took out that criminal

15  complaint?

16  A    A Mary Gail Roberts.

17  Q    And do the records reflect the date that the alleged

18  criminal offense took place?

19  A    It looks like November the 1st of 2002.

20  Q    And the criminal complaint is for menacing; is that

21  correct?

22  A    Yes, it is.

23  Q    And do the records also reflect the date which Mary Gail

24  Roberts signed that complaint?

25  A    It looks to be on November the 4th of 2002.

GLENDA SESTER DIRECT - MR. GILBERT                    21

1   Q    And that was sworn before a notary public?

2   A    Yes, it was.

3   Q    Do they — do those records also include a citation?

4   A    Yes.

5   Q    Uniform citation?

6   A    Yes.

7   Q    Of the Manchester Police Department?

8   A    Yes.

9   Q    And what does that uniform citation indicate to you?

10  A    It indicates that Scotty Sandlin, who was a Manchester

11  police officer, served this criminal summons — criminal

12  warrant on Bobby Sams on November the 5th of 2002 at 9:35.

13  Q    And where does he indicate that the arrest was made?

14  A    Clay County Middle School.

15          MR. GILBERT:  That's all the questions I have of this

16  witness.  I would move for the introduction of the Court

17  record.

18          THE COURT:  All right.  That would be No. 5?

19          THE CLERK:  Yes, Your Honor.

20          THE COURT:  All right.  Let me see if there's any

21  objection to William Morris Exhibit No. 5.

22          MR. SMITH:  No, Your Honor.

23          THE COURT:  William Morris Exhibit No. 5 will be

24  admitted at this time.

25          Mr. Smith.

GLENDA SESTER- CROSS - MR. SMITH                    22

1            MR. SMITH:  Yes, Your Honor.  Is it okay if I use

2    your copy?

3            MR. GILBERT:  Yes, that's fine.

4                          CROSS-EXAMINATION

5    BY MR. SMITH:

6    Q    I have a few questions for you, Ms. Sester.

7    A    Okay.

8    Q    You've been asked to describe this court file, and I have

9    a few questions about it for you as well on the Bobby Sams

10   case.

11   A    Okay.

12   Q    You would agree with me, ma'am, that this was a warrant of

13   arrest and not a summons that was —

14   A    It was an arrest warrant, yes.

15   Q    And this would be part of the document, I believe, in your

16   packet.  Do you recognize that?  Wait just a second, I'm sorry.

17   A    Yeah, that looks like a bond.

18   Q    And that's Bobby Sams on this occasion?

19   A    Yes.

20   Q    And that was for a hundred dollars cash?

21   A    Let me find that.  Yes.

22   Q    And that was set by a judge?

23   A    Judge House.

24   Q    Judge House.  Is there a time noted on your bond document

25   about what time the bond was filled and accepted?

GLENDA SESTER - CROSS - MR. SMITH                    23

1   A     It looks like it was dated November the 5th of 2002.

2   Q     But you don't know what time?

3   A     No, I don't.

4   Q     According to the documents, you can't tell us how long a

5   person stayed in jail before the bond was filled?

6   A     No, I can't.

7   Q     Now, you were also asked about the nature of the

8   complaint.  I believe this would be the document which was

9   referenced in the court system as the complaint; is that fair?

10  A     Yes, the arrest warrant.

11  Q     And whose name appears down here as — above the

12  signatory?  Could you read that name for us, ma'am?

13  A     What are you looking at?

14  Q     I'm sorry.  Just above the signature line of Mary Gail

15  Roberts.

16  A     I believe that says Tonya Davidson.

17  Q     Okay.  And are these generally complaints that are filled

18  out by citizens?  Are these the types of complaints that a

19  citizen could come in and fill out in the court system there in

20  Clay County?

21  A     No, they have to go to our County Attorney to get a

22  warrant.

23  Q     I understand.  But they're actually going themselves to

24  present the complaint?

25  A     Yes, yes.

1   Q   And at this point, you would agree that Tonya Davidson's

2   name was written in as portrayed here on this document; is that

3   fair?

4   A   Yes.

5   Q   Okay.  And the complaint itself, can you read what it was

6   alleged that Mr. Sams did?

7   A   Let's see.  "Placed the affiant in a reasonable

8   apprehension of physical injury" — there's some word before

9   that, but I don't know what it is.  — (continuing) "a physical

10   injury when he told her 'Your day is coming,' thereby

11   threatening the affiant.  In the past, the defendant has cursed

12   the affiant and run her car off the road with his automobile."

13   Q   Do you know who wrote out that complaint, ma'am?

14   A   No, I don't.

15   Q   Can you state here today that Mary Gail Roberts used that

16   language and wrote that out herself?

17   A   No.

18   Q   And who was the County Attorney at the time this warrant

19   would have been brought out in 2002, ma'am?

20   A   It would be Clay Bishop was the County Attorney and Clint

21   Harris, the assistant.

22   Q   And the County Attorney's Office would have been

23   responsible for preparing these warrants, based on your

24   knowledge?

25   A   Yes.

1          MR. SMITH:  Thank you.

2          THE COURT:  Thank you.

3          Let me start over here first, and we'll work our way

4  around.

5                      DIRECT EXAMINATION

6  BY MS. HUGHES:

7  Q    Hi, Ms. Sester.

8  A    Hi.

9  Q    I'm Elizabeth Hughes, I represent Debra Morris.  Did we

10  ask you to bring another record with you today?

11  A    Yes, you did.

12  Q    And what record is that?

13  A    This is a divorce styled Bonnie Ann Morris Hughes v.

14  William Bartley Morris.

15  Q    And have you brought with you a certified copy of that

16  record today?

17  A    Yes, ma'am.

18  Q    And are you the custodian of those records that — we've

19  already established that?

20  A    Yes.

21          MS. HUGHES:  Your Honor, there are actually only two

22  documents within the record that I think are pertinent.  She's

23  brought the whole one.  I would move to introduce the

24  Separation Agreement and the Final Decree.  But I think we can

25  do that at another time to pull out those relevant documents,

GLENDA SESTER DIRECT — MS. HUGHES                    26

1    but I do move to introduce those portions thereafter.

2              THE COURT:  As a Joint Exhibit or as two separate

3    documents?

4              MS. HUGHES:  It's two separate documents, so it would

5    be Debra Morris No. ——

6              THE COURT:  4 and 5.

7              MS. HUGHES:  5 and 6.

8              THE COURT:  Yes, 5 and 6.

9              All right.  Any —— let's see if there's any objection

10   to the admission of those of two documents.

11             MR. SMITH:  Just for the record, I need to know which

12   one is going to be designated 5 and 6.

13             MS. HUGHES:  That's a good idea.  Let's call the

14   Separation Agreement 5, and we'll call the Decree of

15   Dissolution No. 6.

16             THE COURT:  Any objection?

17             MR. SMITH:  No.

18             THE COURT:  All right.  Debra Morris Exhibits 5 and 6

19   will be admitted.

20             MS. HUGHES:  That's all we have, Your Honor.  Thank

21   you.

22             THE COURT:  All right.  Thank you.

23             Now let me start over here first, and then I'll come

24   back around, I promise.

25             MR. SIMONS:  No cross, but ——

1            THE COURT:  Mr. Simons?  You have some questions as

2    if on direct?

3            MR. SIMONS:  Yes.

4            THE COURT:  All right.

5                         DIRECT EXAMINATION

6    BY MR. SIMONS:

7    Q    Good morning, Ms. Sester.

8    A    Good morning.

9    Q    My name is Dan Simons, I represent Stanley Bowling.  Did I

10   also ask you to pack a few documents in here today?

11   A    You did.

12   Q    And did I give you a subpoena to bring some documents?

13   A    Yes.

14   Q    And did you bring the original court record and also a

15   certified copy, please ——

16   A    Yes.

17   Q    —— of that record?

18        And did I ask you to bring the entire record from a case

19   styled Commonwealth of Kentucky v. Jimmy Mills?

20   A    Yes.

21   Q    Okay.  Do you have the original in front of you?

22   A    I do.

23   Q    Okay.  Would you take —— you can either look at that or

24   your certified copy.  And could you turn, please, to the page

25   where the bond for Mr. Mills is set?  First of all, what was

1  Mr. -- what crime was Mr. Mills charged with, ma'am?

2  A    Criminal attempt to commit murder, possession of a handgun

3  by a convicted felon.

4  Q    And that is a felony offense, of course, is it not?

5  A    Yes.

6  Q    And was his bond set in the District Court?

7  A    Yes, it was.

8  Q    And if you could turn and look at that page, please.  Do

9  you have that in front of you?

10  A    I do.

11  Q    What was his bond established, what was the nature of his

12  bond that was set?

13  A    50,000 surety.

14  Q    Okay.  And who set that bond, please, ma'am?

15  A    Judge House.

16  Q    Okay.  Does it say there the day that bond -- does it have

17  a date that the bond was established?

18  A    11-13 of '03 is the day the bond was filled.

19  Q    Now, did someone sign a surety bond for Mr. Jimmy Mills on

20  that date?

21  A    Yes.

22  Q    Okay.  Who would have signed that, please, ma'am?

23  A    I think the first name is Crit, Crit Smith.

24  Q    Do you have any independent knowledge of who Mr. Smith is

25  relative to Jimmy Mills?

1  A    No, I don't.

2           MR. SIMONS:  If Your Honor please, I would move that

3  we introduce that.  I believe it would be Defendant Stanley

4  Bowling No. 1; is that correct?

5           THE CLERK:  Yes.

6           THE COURT:  I think that's right.

7  BY MR. SIMONS:

8  Q    Is the certified copy a true and accurate and identical

9  copy of the original record, ma'am?

10 A    Yes, it is.

11          MR. SIMONS:  Okay.  I would move for introduction of

12 that at this time.

13          THE COURT:  Let's see if there's an objection to its

14 admission.

15          MR. SMITH:  Yes, Your Honor, I would like to ask to

16 approach.

17          THE COURT:  Yes, sir, you may come up.

18     (Whereupon, the following discussion was had between the

19 Court and counsel at the bench, out of the hearing of the

20 jury.)

21          MR. SMITH:  Your Honor, I would object as to the

22 relevance of this document.  There's been absolutely no way

23 that it's been established that this is linked to the case

24 that's at issue here in trial today and I fail to see how this

25 document should be introduced into evidence.

1          THE COURT:  I don't recall Jimmy Mills being a

2     witness in the case.

3          MR. SIMONS:  He was not, Your Honor.  Dan Simons for

4     Stanley Bowling.  Kennon White said at the very end of his

5     testimony that my client, Stanley Bowling, put up $10,000 to

6     get Jimmy Mills out of jail and that he was then shot and

7     murdered, and he said it in his testimony, and that's murder,

8     Your Honor.  All I'm doing is showing that that was completely

9     wrong.

10          MR. SMITH:  I'm sorry, you went so fast —

11          MR. SIMONS:  Kennon White said that Stanley Bowling

12     put up the bail money for Jimmy Mills, and then he was killed

13     thereafter and that my client got him out of jail so that he

14     could be murdered.  That's what he testified to.  You don't

15     recall it probably, but that's what he said.

16          And that's the relevance, Your Honor.

17          MR. SMITH:  Well, Your Honor, the problem that I see

18     is that Jimmy Mills is a person who has, to my knowledge, a

19     criminal record that is extensive, and he was a drug trafficker

20     and was someone who was murdered in 2005.  This is a 2003, Your

21     Honor, which counsel is seeking to bootstrap and make his

22     argument.

23          I certainly will acknowledge that there was some

24     testimony from Kennon White that Stanley Bowling posted bond

25     for this fella who was later murdered, and I don't know that he

1   went into that much detail.  I think his point was in his
2   testimony was that Stanley came to him and wanted him to lie
3   for him and say that you need to swear that I didn't have
4   anything to do with putting that money up, is what I recall the
5   testimony being.  And I guess the concern that I have is, is
6   that this record, at this point, there's not been a proper
7   foundation laid to establish that this is even the case in
8   which the witness was referring to.  And if he pinned him down
9   to that kind of detail, I don't recall it.  I do not recall
10  specifics of the Mills charge being laid out in his testimony.
11  And I certainly heard a lot of testimony and I could be
12  corrected here by Mr. Simons if he's got the record.
13          MR. SIMONS:  I don't confess that my memory is more
14  accurate than Mr. Smith's, but I do recall in my interrogation
15  that he was contending that Stanley Bowling bailed Mr. Mills
16  out of jail and then he was murdered and —
17          THE COURT:  Did he say when that happened?
18          MR. SIMONS:  He did not, but, you know, this is —
19  clearly attacks his credibility on that issue and proves that,
20  in fact, Stanley Bowling did not bail him out of jail, he was
21  signed out on a surety bond by his father.  Or father-in-law.
22  I'm not quite sure who Mr. Smith is.
23          THE COURT:  You're only seeking to introduce the one
24  page of that document, not the entire record; correct?
25          MR. SIMONS:  If Your Honor —

1          THE COURT:  If you're attempting to introduce the

2     entire record of the proceeding, I'm going to sustain the

3     objection.  If you're intending to introduce one page that

4     you've referenced here, then I'm going to allow its admission.

5     It goes to weight, obviously.  It may require some — well —

6          MR. SIMONS:  Certainly, Your Honor.

7          THE COURT:  — it goes to weight.  I don't recall the

8     dates when various witnesses, Mr. White testified that this

9     money was put up by Mr. Bowling, but it's a matter for argument

10    before the jury.

11         MR. SIMONS:  Certainly, Your Honor.  The one page

12    will be sufficient.

13         MR. SMITH:  Which page is it?

14         MR. SIMONS:  It's the bond.  I guess it's about the

15    third page down there.

16         MR. SMITH:  Your Honor, the only — and I understand

17    the Court's ruling, but the only problem that I think that that

18    poses for us is that we can't cross-examine a document under

19    403 if the document — you know, confusion of the issues

20    outweigh the probative value.  The balancing test, even though

21    it is relevant, if it's unduly prejudicial after the Court

22    balances its prejudicial nature, and it just seems to me that

23    without the proper foundation of some sort — I mean, there's

24    law enforcements officers in here, there's all kinds of people

25    he can call to put a foundation in on this charge if he wants

GLENDA SESTER CROSS - MR. SIMONS                     33

 1  to tie it back to the testimony of Kennon White.  I fail to see

 2  enough detail, that he didn't get the date, he didn't -- I do

 3  not recall the crime.  All I recall is he said that in a

 4  criminal offense he had posted bond for Jimmy Mills and that he

 5  had asked him to basically give -- if called upon, if he called

 6  upon him as a witness, he would testify he didn't have anything

 7  to do with it.  And Kennon said that's what -- I think the

 8  Jimmy Mills' incident that I recall being brought up.  And,

 9  again, for us to rely upon a 2003 document, I believe it would

10  be confusing and not passing the balancing test.

11          THE COURT:  All right.  Well, I'm going to allow the

12  admission of this one page for the limited purpose of

13  Mr. Simons offering it, and that is the issue of who posted the

14  bond.  If his father posted the bond, subject to cross-

15  examination for this witness, it is of limited relevance, and I

16  don't think that it's unduly prejudicial and I don't think the

17  prejudicial effect would outweigh its limited probative value.

18  So I'll allow the one page to be admitted.

19          MR. SIMONS:  Thank you.

20      (Whereupon, the following proceedings continued in open

21  court.)

22          THE COURT:  All right.  Thank you, Counsel.  I will

23  admit, at this time, Bowling Exhibit No. 1, which is the one

24  page that's been referenced.

25  BY MR. SIMONS:

GLENDA SESTER - CROSS - MR. SIMONS                    34

1  Q    Ms. Sester —

2  A    Yes.

3  Q    —— can you separate, please, the one page reflecting the

4  bond from the balance of the record that you have brought

5  there?

6          MR. SIMONS:  If I could have the Clerk mark that,

7  please, Defendant Bowling No. 1.  And, Your Honor, I would move

8  the introduction of that at this time.

9          THE COURT:  I've admitted the document.

10          MR. SIMONS:  Thank you.

11  BY MR. SIMONS:

12  Q    Do you have the original with you there at the stand?

13          MR. SIMONS:  If Your Honor please, Mr. Smith has

14  asked to see the original, and I would like to see it also if

15  the court security officer could bring it?

16          THE COURT:  Yes, sir, that will be fine.

17          MR. SIMONS:  This can go back to the witness.

18          THE COURT:  That's fine.

19  BY MR. SIMONS:

20  Q    Ms. Sester, there is a pink sticky attachment to the

21  original document.  Could you tell the jury, please, what that

22  says?

23  A    Okay.  This is a sticky note, this is my handwriting that

24  says that the bond is 50,000 surety to keep the peace with no

25  use of drugs or alcohol, to be signed by his dad per Judge

1  House.

2  Q    And is that a part of that page in your original record?

3  A    Yes.

4           MR. SIMONS:  I'll pass the witness, Your Honor.

5           THE COURT:  All right.  What I'm going to do before

6  we go to cross-examination, I'm going to go and see if any of

7  the other defendants have questions of this witness either as

8  if on direct if she's under subpoena or on cross.

9           Mr. Pinales.

10          MR. PINALES:  Thank you, Your Honor.

11                      CROSS-EXAMINATION

12 BY MR. PINALES:

13 Q    Good morning, Ms. Sester.

14 A    Good morning.

15 Q    I'm Martin Pinales and I represent Cletus Maricle.  Just a

16 couple of questions for you.

17      When you were sworn in and gave your job -- And your

18 occupation, you said you were a clerk in the Circuit Court?

19 A    I'm a deputy clerk in the Circuit Clerk's Office.

20 Q    Now, the Circuit Clerk's Office actually handles both the

21 district and the circuit court?

22 A    Yes, it does.

23 Q    And as an example of that, Mr. Sams case that was -- that

24 you discussed first, that was a district court case, wasn't it?

25 A    Yes, it was.

1  Q    And that was not in front of the circuit judge,

2  Judge Maricle?

3  A    No, it wasn't.

4          MR. PINALES:  Thank you, nothing further.

5          THE COURT:  All right.  Let's see if any of the other

6  defendants have questions.

7          MR. WHITE:  No, Your Honor.

8          THE COURT:  No?  All right.  Let me go back around,

9  then, for cross-examination.

10         Mr. Smith.

11                     RECROSS-EXAMINATION

12  BY MR. SMITH:

13  Q    Ms. Sester, you have the Bowling exhibit there in front of

14  you, I believe it was referred to as the Jimmy Mills bond?

15  A    Yes.

16  Q    Do you know how many bonds have been filed by Jimmy Mills

17  in the Clerk's Office from researching your records?

18  A    No.

19  Q    Are you aware that bonds can be filled in both circuit

20  court and district court?

21  A    Yes.

22  Q    And this is a district court bond; is it not, ma'am?

23  A    Yes, it is.

24  Q    And the date of this bond would have been what date,

25  ma'am?

GLENDA SESTER, RECROSS - MR. SMITH                    37

1    A    November the 13th of '03.

2    Q    And looking at Debra Morris's Exhibits 5 and 6, this would

3    be a divorce action between Bonnie Morris and William Bartley

4    Morris; is that correct?

5    A    Yes.

6    Q    And the date they divorced, according to the decree, was

7    what, ma'am?

8    A    You'll have to give me a minute to find the decree.  It's

9    in this —

10        Findings of Fact, Conclusions of Law, and Final Decree of

11   Dissolution was entered into the record on February the 20th of

12   1997.

13   Q    Okay.  And would you agree with me, ma'am, that Carl

14   Anthony Short was also a lawyer in this action?

15   A    Yes.

16   Q    And that R. Cletus Maricle was the judge who approved this

17   divorce settlement?

18   A    Yes.

19        MR. SMITH:  That's all the questions I have.  Thank

20   you.

21        THE COURT:  Let me go back around first.

22        Mr. Gilbert?

23        MR. GILBERT:  No questions, Your Honor.

24        THE COURT:  Ms. Hughes, anything else?

25        MS. HUGHES:  No.

1          THE COURT:  Mr. Simons?

2          MR. SIMONS:  Your Honor, I may have one, and I

3   apologize, but I would like to approach before I ask.

4          THE COURT:  All right.  Why don't we do this.  I

5   think there's a couple of these documents that we're going to

6   have to separate out to mark as exhibits.  I was going to

7   excuse the jury while we did that.

8          So we can go ahead and I'll excuse the jury for a few

9   moments, we'll get these documents straightened up.  I'll give

10  you—all a break so you don't have to sit in here while we do

11  that.  About ten minutes.  Please keep in mind the admonitions

12  that you were given previously not to discuss the case among

13  yourselves, and I do hope to call you back in the next ten

14  minutes.  Thank you.

15      (Whereupon, the jury retired from the courtroom, after

16  which the following proceedings were had in open court.)

17         THE COURT:  Ma'am, if you would like to step down for

18  a few moments.  What we'll do is we're going to take a break

19  here in a little bit and I'm going to have the attorneys come

20  in and assist you in marking those documents, 5 and 6.

21         THE WITNESS:  Okay.

22         THE COURT:  Then we'll make copies of those so you'll

23  be able to retain your original records.

24         THE WITNESS:  Okay.

25         THE COURT:  But I'll excuse you for a few moments at

1    this time.

2                And, Counsel, everyone please be seated.

3                THE MARSHAL:  Do the exhibits stay here?

4                THE COURT:  You can just leave those here at the

5    witness stand.  Thank you, ma'am.

6                All right.  Mr. Simons.

7                MR. SIMONS:  If Your Honor please, when the witness

8    arrived this morning, I was steered to her by the court

9    security officer --

10               THE COURT:  Yes, sir.

11               MR. SIMONS:  -- and she told me, and I did not know

12   that there was one additional page to the record since I

13   subpoenaed it, and the last page was the disposition of the

14   case which was dismissed because the defendant, Jimmy Mills,

15   was deceased.  And I would ask her about that on redirect, if

16   the Court would allow.

17               THE COURT:  All right.

18               MR. SIMONS:  The evidentiary exhibit is the page of

19   the bond.

20               THE COURT:  Speak up just a little bit.

21               MR. SIMONS:  The only exhibit is the one page of the

22   bond, but as part of the file, it shows that the case was

23   disposed of due to Mr. Mills' demise.

24               THE COURT:  All right.  Well, let me see if there

25   will be an objection to that question by anyone if raised.

1          Mr. Smith?

2          MR. SMITH:  I've not been given a copy of this

3    document that he's referring to.  I certainly accept

4    Mr. Simons' representation to the Court that it's there now, I

5    just haven't seen it.  I would like an opportunity to look at

6    it and —

7          THE COURT:  All right.  Well —

8          MR. SMITH:  — I think at that point, you know,

9    again, our objection is the same and the Court's ruling may be

10   the same, but that would be our position.

11         THE COURT:  All right.  Let's do this:  We'll take a

12   break.  If you need Ms. Sester to come back in to retrieve

13   those two documents from the file, 5 and 6, Exhibits 5 and 6,

14   you can pull those out.  We can make a copy of the exhibits for

15   the record.

16         MS. HUGHES:  I actually have separate certified

17   copies of just those, but I think that we need — Mr. Smith and

18   I need to look through that record and make sure that these are

19   the same thing that she brought and we won't have to worry with

20   copies.

21         THE COURT:  Okay.  At the time we take our break,

22   though, you can go ahead and look at that record, Mr. Smith,

23   and if you have question or an objection about this last entry

24   and any questions about the entry, then you can raise that

25   before the jury comes back in if we need to have further

1    conversations about that; all right?

2              Otherwise, we'll take about a —— at this point, about

3    a five-minute recess.  Thank you.

4        (Whereupon, a short recess was had, after which the jury

5    returned to the courtroom and the following proceedings were

6    had in open court.)

7              THE COURT:  Thank you.

8              Let's see, Mr. Simons, I think we're back to you.

9              MR. SIMONS:  Yes, Your Honor.

10             THE COURT:  The record will reflect the members of

11   the jury are present and that the witness is still under oath.

12   But you can proceed.

13                      REDIRECT EXAMINATION

14   BY MR. SIMONS:

15   Q    Ms. Sester, I just have one more question for you.  If you

16   would look at the Jimmy Mills matter.  Do you have that in

17   front of you?

18   A    I have the bond.  Is that what you want me to look at?

19   Q    No, actually I was going to ask you about the balance of

20   the file.  Do you have it all there?

21   A    Yes.

22   Q    Does the last page of that group of papers indicate what

23   the disposition of that case was?

24   A    Yes, it was dismissed, the defendant was deceased.

25   Q    Okay.  And the date of the bond was November 13th of 2003;

1  is that correct?

2  A    That's correct.

3  Q    And what is the date of the dismissal entry showing that

4  Mr. Mills was deceased?

5  A    November 17th, 2003, is —

6  Q    Four days later?

7  A    Yes.

8          MR. SIMONS:  Thank you.  That's all.

9          THE COURT:  All right.  Thank you.

10          Let's see if — Mr. Smith, any additional questions

11  of the witness?

12          MR. SMITH:  Yes, Your Honor.

13          THE COURT:  Yes, sir.

14                FURTHER RECROSS–EXAMINATION

15  BY MR. SMITH:

16  Q    Ms. Sester, there, I believe you have identified a docket

17  sheet at the end?

18  A    Yes.

19  Q    Does that same docket sheet reflect other cases that

20  occurred on that same day?

21  A    Yes.

22  Q    Do you have another Jimmy Mills also called up on that

23  same day?

24  A    I do.

25  Q    And you weren't asked to bring any of the documents on

1  that Jimmy Mills to court today?

2  A    No, I wasn't.

3  Q    And, again, you've not looked to see how many files on a

4  Jimmy Mills you have over there in circuit or district court,

5  have you?

6  A    No, sir.

7  Q    And I believe you were also asked about the lawyers that

8  were representing the parties in the divorce action of the

9  Morrises.  Do you recall that?

10 A    Yes.

11 Q    Would you look there in your file, and I believe there

12 were some motions that were being filed throughout before the

13 divorce was final, January the 21st of 1999 there was a motion

14 filed by Bart Morris, William Bart Morris?

15 A    It's just styled "Motion."

16 Q    Okay.  And the motion was by the respondent, William Bart

17 Morris; is that — is that fair?

18 A    Yes.

19 Q    And who were his lawyers at that time, ma'am?

20 A    Stephan Charles and Carl Anthony Short.

21      MR. SMITH:  Okay.  Thank you.

22      That's all.

23      THE COURT:  All right.  Let's see if there's any

24 other questions of this witness?

25      MR. WESTBERRY:  No, Your Honor.

BARRY SPIVEY - DIRECT - MR. GILBERT                    44

1            MR. WHITE:  No, Your Honor.

2            THE COURT:  All right.  Thank you.

3            Ma'am, you may step down.

4            THE WITNESS:  Am I excused?

5            THE COURT:  Yes, ma'am, you can take your original

6   documents unless they were admitted or marked as exhibits.

7            THE WITNESS:  Okay.

8            THE COURT:  I think we made copies of those.

9            THE WITNESS:  Yeah.  These are all that stays.

10           THE COURT:  Thank you.  Let's make sure ─

11           Madam Clerk, do you have Exhibits 5 and 6 that were

12  introduced?

13           THE CLERK:  Yes, I do, Your Honor.

14           THE COURT:  All right.  Thank you.

15           Mr. Gilbert, you may call your next witness.

16           MR. GILBERT:  Thank you.  Barry Spivey.

17           THE COURT:  Thank you.

18                           BARRY SPIVEY,

19  having been first duly placed under oath, was examined and

20  testified as follows:

21           THE COURT:  Please proceed.

22           MR. GILBERT:  Thank you.

23                        DIRECT EXAMINATION

24  BY MR. GILBERT:

25  Q    State your name, please, sir.

BARRY SPIVEY - DIRECT - MR. GILBERT                    45

1  A    Barry Spivey.

2  Q    Where do you live, Mr. Spivey?

3  A    McKee, Kentucky.

4  Q    How long have you — Is that in Jackson County?

5  A    Yes.

6  Q    How long have you been a resident of Jackson County?

7  A    Forty-plus years.

8  Q    Are you employed and, if so, by whom and in what capacity?

9  A    I'm a solid waste coordinator for the Jackson County

10 Fiscal Court.  I'm also the Pride coordinator.

11 Q    And how long have you held that position?

12 A    Well, I've worked for the County — this coming August

13 will make 23 years.

14 Q    Can you generally describe your job duties to the jury,

15 please?

16 A    Well, basically just all solid waste issues, as far as

17 residential collection of solid waste for households, operate

18 the transfer station, I do all the report and everything that

19 goes to Frankfort, the records they have to give of the annual

20 surveys, the five-year plans, write grants through Pride to

21 clean up dump sites, organize cleanups in the spring and the

22 fall, in between do cleanups in the summer with state money

23 through House Bill 174.  I supervise the transfer station.

24 We've also got a recycling program.  I mean, basically, if it's

25 waste, I'm there.

BARRY SPIVEY DIRECT - MR. GILBERT          46

1   Q    All right.  You're responding -- you're appearing here

2   today based upon a subpoena I issued for your appearance; is

3   that correct?

4   A    Right.

5   Q    And did I also ask you to bring some documents with you?

6   A    Right.

7   Q    Do you have there before you a spreadsheet that you have

8   prepared?

9   A    I do.

10  Q    And what does that document --

11  A    It's a list of dump sites that were cleaned from 2002

12  through 2006.  It's got the site name, the month they were

13  cleaned, who cleaned it, the tons that came out of it, the

14  cost, if it was on their five-year solid waste management plan,

15  it's got the GPS, the lat and long where the dump's located at,

16  how many tires come in, how many tons of metal, and who funded

17  the cleanup.

18  Q    Okay.  And does it also show the date -- the month of the

19  date of the cleanup?

20  A    The month and the year.  It don't show a day.

21  Q    All right.  And the contractor that performed the work?

22  A    Right.

23  Q    Are you familiar with B&B Excavating, Incorporated?

24  A    Yes.

25  Q    And who operates that business, to your knowledge?

1  A    That would be Stanley Bowling.

2  Q    Okay.  Do you see him here in the courtroom today?

3  A    Yeah.

4  Q    Can you —

5  A    He got a little older.  I didn't recognize him at first.

6  Q    And are you also familiar with B & J Transfer,

7  Incorporated?

8  A    Right.

9  Q    And who owns and operates that, to your knowledge?

10  A    Bart Morris.

11  Q    Do you see him here in the courtroom today?

12  A    Yeah.

13  Q    And how long have you known these two individuals?

14  A    I guess we first met, it looks like — they didn't do no

15  dumps in '02, started doing dumps for us in '03.  I guess that

16  would have been when we met them, first started, you know,

17  bidding out dumps.

18  Q    Now, that spreadsheet that you have here, did you prepare

19  that in your own handwriting?

20  A    Yeah.  I mean, this is an ongoing thing.  This is like

21  when I do my annual surveys, instead of having to drag out

22  these big folders and go through all this, this is just a quick

23  reference for me so I don't have to go through a folder that

24  thick to get this information that's on one page.

25  Q    Okay.

BARRY SPIVEY DIRECT - MR. GILBERT                    48

1   A    So I do this on a yearly basis.  Well, actually, when a

2   dump is cleaned, it goes in my book.

3   Q    All right.  And at my -- at my request, was a copy made of

4   those spreadsheets for those years?

5   A    Yeah.

6           MR. GILBERT:  May I show him a copy?

7           THE COURT:  Yes, sir.

8           MR. SMITH:  Your Honor, I apologize, may we have just

9   a moment to look at this document?

10          THE COURT:  Yes, sir, you may.

11          MR. SMITH:  Your Honor, may we approach?

12          THE COURT:  Yes, sir.

13      (Whereupon, the following discussion was had between the

14   Court and counsel at the bench, out of the hearing of the

15   jury.)

16          MR. SMITH:  Your Honor, I object to the relevance.

17          THE COURT:  All right.

18          MR. SMITH:  It appears to be for Jackson County.

19          MR. GILBERT:  Well, the relevance will be shown in

20   the year 2004, there will be testimony concerning this cleanup,

21   which was performed by B&B in November of 2004, and there'll be

22   testimony that the contractor was on the site on November the

23   2nd.  I have an interim site inspection that was made on that

24   date and there'll be testimony from this witness that the

25   contractor was there and working and there'll be testimony from

1  another witness that Bart Morris was there working that day,

2  and that is election day.  In 2006, there'll be similar

3  testimony with respect to Travis Road dumpsite, which was B&B.

4  It is also in November of 2006 and there'll be testimony not

5  from this witness but from another witness that, again, on

6  election day the contractor was present.

7          THE COURT:  I thought he was down in Tennessee

8  someplace.

9          MR. GILBERT:  No, that was May, Your Honor.

10          THE COURT:  All right.

11          MR. SMITH:  He was present on a B&B project?

12          MR. GILBERT:  Yes.

13          MR. SMITH:  So Mr. Jones may be right, Bowling and

14  Morris are partners in everything; is that right?

15          MR. SIMONS:  That's incorrect.

16          MR. GILBERT:  That's incorrect.

17          THE COURT:  I understand this is a summary of

18  documents that he has, it's something that he's prepared and he

19  maintains in the ordinary course of business.

20          MR. GILBERT:  Yes, Your Honor.

21          THE COURT:  All right.  I'll admit the document.  Of

22  course, it's subject to cross-examination.  What will the

23  number be on this one?

24          THE CLERK:  Six.

25          MR. GILBERT:  Six.

1      (Whereupon, the following proceedings continued in open

2  court.)

3          MR. GILBERT:  For the record, I would like that

4  marked Bart Morris Exhibit No. 6.

5          THE COURT:  Yes, sir.  I think it's — we have a

6  sticker, we just need to —

7  BY MR. GILBERT:

8  Q    Mr. Spivey, is that a true and accurate copy of your

9  spreadsheet that you have before you here today?

10 A    Yes, it is.

11 Q    And is that — the original is made in your own

12 handwriting?

13 A    Yes.

14 Q    And does the original reflect a summary of other documents

15 and information that you have entered into on that spreadsheet?

16 A    How do you mean?

17 Q    Well, you compiled that spreadsheet using the other

18 documents in order to put the dates, the contractor, and the

19 conclusion date on there, did you not?

20 A    Yes.

21 Q    Okay.  And is that a document that's kept by you in the

22 ordinary course of your business?

23 A    Yeah.  I mean, my office is full of folders on each and

24 every dumpsite we clean, it's got all the information, all the

25 site visits, any bonds that have to be got, copies of the bids

BARRY SPIVEY - DIRECT - MR. GILBERT          51

1    that's made by all contractors, not just the contractor that

2    the dump is awarded to, all the site visits from the compliance

3    officer through Pride, copies of the cancelled check where we

4    pay them, I mean, everything.

5    Q    Okay.

6    A    Everything is in there.

7         MR. GILBERT:  All right.  I move the introduction of

8    Exhibit 6, Your Honor.

9         THE COURT:  All right.  Do you have the documentation

10   supporting your entries with you here today, sir?

11        THE WITNESS:  There's copies of some of them that he

12   would have.

13        THE COURT:  All right.  I'll admit the exhibit

14   provisionally at this time.  It's going to be subject to

15   cross-examination, and I may change my ruling on this, but I'll

16   admit it at this time provisionally.

17        MR. GILBERT:  Yes, sir.

18   BY MR. GILBERT:

19   Q    Did B&B Excavating and B & J Transfer perform dumpsite

20   cleanups in Jackson County during those years?

21   A    I think B & J cleaned up one, two, three, four, five, six,

22   seven, eight, nine, ten — ten dumpsites in '03.  B&B did one

23   in '04, that was a super grant.  B&B did four in '05.  B & J

24   did one in '06, and B&B did two.

25   Q    And what type of work is involved in cleaning up a

1  dumpsite?

2  A    Well, there's a lot of work.  You got to bring in heavy

3  equipment.  As a practice, in years past, the counties and

4  state highway departments, for that matter, when they pulled

5  ditch lines, you know, perfect place to put that load of dirt

6  they need to get rid of, they figured it was overtop of a dump.

7  So a lot of these dumps have to actually be dug out, they can't

8  just be covered up, it has to be dug out.

9        The metal has to be recycled to some extent, everything

10  has to be seeded, vegetated.  If there's any streams or

11  anything like that of that nature around, you got to contact

12  the Division of Water.  There's a lot of different things.  If

13  there's a major river or, you know, a tributary that leads into

14  an endangered watershed, you really get into a lot of stuff.

15  Sometimes you have to contact the State Fish & Wildlife to get

16  approval, sometimes you have to go through the Federal Fish &

17  Wildlife, you have to go through the Division of Water.  If

18  you're going to disturb land that could create sediment runoff

19  that encompasses as much as an acre, a KPDS has to be got,

20  that's Kentucky Pollutant Discharge Elimination System permit.

21  There's a floodplain permit that's real bothersome about

22  getting.  There's just a lot of different, you know, entities

23  that you have to go through when you clean these, on some of

24  the larger dumps anyway.

25  Q    Yes, sir.  Now, once a contractor starts work on a

1    dumpsite, what is your involvement in overseeing the cleanup?

2    A    Well, I make sure that they start it, you know, when they

3    say they're going to, because there's a timeline for me to do

4    reimbursement.  You know, if that timeline is not met, then we,

5    as a county, would end up having to pay the contractor.  So

6    right in our — you can probably look at some of those

7    contracts, right in our contracts there's like a penalty clause

8    in there for every day they go over.  You know, they could be

9    charged so much.  I go to make sure — I mean, you've had some

10    contractors that will come in and they'll try to bury the trash

11    instead of digging it out or, you know, they don't go as deep

12    as they should.  I mean, it's just like business, you got to

13    watch.  Some people will do you right and some people won't.

14    Q    And how often would you check the cleanup sites once a

15    contractor started work?

16    A    Well, you know, if it was really good weather, you know,

17    they could move right along with it, if it's good dry weather.

18    So, you know, the weather had a lot to do it.  I mean, I

19    basically would come around, a lot of times, just about on a

20    daily basis.  If not, at the least, I would be there, say,

21    probably at least three times a week.

22    Q    Okay.  And you said that with some contractor there was

23    problems about not digging deep enough.  Did you ever

24    experience any problems with either B&B —

25              MR. SMITH:  Objection, Your Honor.

1              THE COURT:  Sustained.

2   BY MR. GILBERT:

3   Q    What type of work did B&B and B & J do?

4   A    They done good work, as good as any contractors that we

5   ever had.  It took a lot off of me.  I mean, when B&B, B & J,

6   or Sears Excavation was awarded the bid, that made my job a lot

7   easier.

8   Q    Is there one particular project there on — that was

9   conducted in November of 2004 called Halcomb Hill?

10  A    That was a super grant.

11  Q    Are you familiar with that cleanup?

12  A    Yes.

13  Q    Was there an interim site visit made to that job site on

14  November the 2nd, 2004?

15  A    Yeah, and I have the original copy of that, I believe.

16       11-2-04.  This is the original copy of the interim site

17  visit that the field — the Pride compliance officer left, and

18  I always have to sign off on this.

19            MR. SMITH:  If we could just ask the witness to hold

20  his answer until we have a chance to look at this document.

21            THE COURT:  Yes, sir.

22            MR. SMITH:  I've not been able to see it before now.

23            THE COURT:  All right.  Mr. Smith, you go ahead and

24  review that.

25            And, sir, you'll need to wait until you're directed

1   to answer.

2   BY MR. GILBERT:

3   Q    And can you tell us about that visit that you made on

4   November the 2nd, 2004?

5   A    Well, you know, I mean, that was five-and-a-half years

6   ago, you know, I can't remember exactly what went on.  I mean,

7   I can read, you know, what's wrote on this and, you know, I --

8   but, you know, that's -- I doubt there's anybody in here can

9   remember what happened five-and-a-half years ago on the day,

10  you know.  I know we were there.

11  Q    Was that report made contemporaneous with your visit?

12  A    Yeah, I mean, anytime I made a site visit I had to go and

13  sign off on it.

14  Q    All right.  And does it contain your signature on it?

15  A    Yes, it does.

16  Q    And will you read where it says "review of the site

17  visit"?

18  A    Well, if I read his writing.  It's "Contractor working

19  today, handpicking a lot of small pieces, some appliances still

20  buried, and bank, removing them today.  Most of small dump up

21  and down edge of road has been cleaned up, probably 75 percent

22  complete so far."

23  Q    Okay.  Now, this is a B&B Excavating contract, is it not?

24  A    Yeah.  Like I say, there's so many of these I have to look

25  back at my paper.

1    Yeah, it's B&B.

2  Q    All right.  Now, to your knowledge, when B&B was awarded a

3  contract, did Bart Morris also participate in cleanups?

4  A    Yes.

5  Q    And what would he do based upon your observation?

6  A    Well, he had the trucks.  I mean, you got to have the

7  trucks to haul the trash.  You know, he had the equipment.

8  Q    All right.  And when you made these almost daily visits or

9  visits to the sites two or three times a week, would Bart

10  Morris be present?

11  A    Pretty much.  If he wasn't, then that would be because I

12  guess he was in transit with a load of trash, because if he

13  wasn't there, usually the truck wasn't either.

14  Q    And who would drive the big tractor-trailer truck?

15  A    I think for the most part he did.

16  Q    Now, do you have any independent recollection today as to

17  who was present there on the work site?

18  A    I know for 100 percent fact that me and Mark Davis was

19  there, because we both signed this paper.  But like I say, you

20  know, I can't remember back five-and-a-half year ago.  About

21  every time I went over there, I mean, you know, I would say

22  there's 99 percent chance that Bart was there.  Because you

23  know how it is when you got men working, somebody's got to

24  watch them.  I mean, he was basically always there.  But for me

25  to say without a shadow of a doubt that I saw him there that

BARRY SPIVEY - DIRECT - MR. GILBERT                     57

1   day, there's no way I can recollect back that far and say that.

2   Q     All right.  Has, at your direction, a copy been made of

3   the interim site report on November the 2nd, 2004?  Would you

4   compare this with your original, please, sir?

5               THE COURT:  Yes, that's fine.

6               MR. SMITH:  What number?

7               MR. GILBERT:  Seven.

8               THE WITNESS:  Yeah, that's it.

9   BY MR. GILBERT:

10  Q     Is that a true and accurate copy of the original that

11  you're comparing?

12  A     Yes.

13              MR. GILBERT:  I would move the introduction of

14  William Morris Exhibit No. 7, Your Honor.

15              THE COURT:  Any objection?

16              MR. SMITH:  No, Your Honor.

17              THE COURT:  Exhibit No. — William Morris Exhibit

18  No. 7 will be admitted.

19  BY MR. GILBERT:

20  Q     Also, on your spreadsheet, Mr. Spivey, was there a job in

21  November of 2006 for a dumpsite on Travis Road in Jackson

22  County?

23  A     Yes.

24  Q     And does that reflect the month in which that was — work

25  was done and completed?

BARRY SPIVEY - DIRECT - MR. GILBERT                58

1   A     It was completed in November by B&B.

2   Q     And do you have any recollection of visiting that site

3   during that period of time?

4   A     Yeah, I visited every site.

5   Q     And would the same thing that you said about Mr. Morris

6   being present on the previous job apply to this job?

7   A     Yeah, he was — he was, for the most part, always on these

8   jobs unless, you know, he was hauling trash or something had

9   broke down, he had to go get a part, but, you know, I mean, I

10  saw him a lot on these jobs.  I think Stanley might not have

11  been around on some of them as much, because I think Stanley

12  was having some health issues at that time.

13  Q     Did your records reflect that a site inspection was made

14  on November the 9th on the Travis Road dump?

15  A     Yeah.

16  Q     And that the job was completed on November the 15th of

17  2006?

18  A     Yes.

19        MR. GILBERT:  That's all the questions I have.

20        THE COURT:  All right.  Before we go to cross-

21  examination, let me see if any of the other parties have this

22  witness under subpoena.

23     (No response.)

24        THE COURT:  No?

25        All right.  Mr. Smith, we'll go to you first.

1          And for the record, I've admitted Exhibit 6 as a

2    Court exhibit only at this time until such time as the

3    underlying documentation has been provided under Rule 1006.

4          Mr. Smith, you may proceed.

5                        CROSS-EXAMINATION

6    BY MR. SMITH:

7    Q    Mr. Spivey, that ledger that you have there before you, is

8    that ledger prepared for the ordinary course of business?

9    A    Every time a dump is cleaned up, like I started this —

10   started keeping this in '02 when we started doing so many of

11   them.  And it's just like I say, it's a quick reference when

12   I'm doing my annual survey for the state so I don't have to go

13   back through all those folders and pull that information out.

14   Q    And do you have — are you the one that personally

15   prepared it?

16   A    This?

17   Q    Yes.

18   A    Yes.

19   Q    Is there anyone who reviews that in your office?

20   A    This?

21   Q    Yes.

22   A    Probably not this, but, I mean, the books.  And, you know,

23   the auditors with the state and Pride, they review, you know,

24   all the — this is just something basically for me, like I say,

25   for quick reference.

BARRY SPIVEY - CROSS - MR. SMITH                    60

1   Q    That was made for your own benefit, not necessarily for

2   your audits; is that fair?

3   A    Yeah.

4   Q    And you were asked to, I believe, look at these jobs with

5   B&B and B & J today, and you've referenced some of those in

6   your testimony; correct?

7   A    Yes.

8   Q    All right.  And I believe, if I understood your testimony,

9   that it really didn't make any difference whether the job was

10  given to B&B or B & J, you expected to see Bart Morris and

11  Stanley Bowling there working on those jobs, whether it be in

12  the name of B&B or B & J; is that accurate?

13  A    Pretty much, yes.

14  Q    Do you know who owns B&B?

15  A    Not really.

16  Q    Do you know who owns B & J?

17  A    Well, basically, I just took it for granted that Bart

18  Morris owned B & J, because that's what his transfer station

19  was called, B & J Transfer.

20  Q    Yes, sir.

21  A    And then I thought that Stanley Bowling owned B&B, and I

22  figured B&B was for Stanley and his son.

23  Q    Do you know how they compensated each other for work on

24  your jobs?

25  A    I have no idea.

BARRY SPIVEY - CROSS - MR. SMITH                    61

1  Q    Do you know if they were partners?

2  A    I have no idea.

3  Q    If I understood your testimony, you described Bart Morris

4  as being someone who drove the truck that I guess carried the

5  solid waste from your site and took it away?

6  A    Well, I mean, he was — I guess you could say he was

7  multifaceted.  I mean, he could be driving a semi load of trash

8  to the dump, he could be on a excavator digging trash up, he

9  could be on a dozer.  I mean, whatever needed to be done, but I

10 know I've seen him drive the truck.

11 Q    Okay.  I may have misunderstood your testimony.  I thought

12 you said the reason you thought that Bart Morris was involved

13 on it is because he's the one that had the trucks; is that —

14 A    Well, I just took it for granted.  I didn't think Stanley

15 had a truck, a big truck like that.

16 Q    You really don't know whether he does or not?

17 A    No, I don't.

18 Q    You just took it for granted that he didn't.

19 A    (Witness nodding head affirmatively.)

20 Q    The trucks that they use, was it — you said a

21 tractor-trailer, these were the semi, 18-wheeler-type trucks?

22 A    Yeah, probably.  I don't know, maybe a 48-foot open-top

23 trailer.

24 Q    And you would agree with me that that can haul a serious

25 load of garbage if needed; right?

BARRY SPIVEY - CROSS - MR. SMITH                    62

1    A    Well, when you're — when you're — like I say, on a lot

2    of these dumps, they're buried, so you're not only getting

3    garbage, you're getting dirt, and it can be damp and, I mean,

4    you're talking 30 tons or better sometimes a load.

5    Q    And those trucks would generally be loaded by, I assume,

6    if you're hauling that kind, by heavy equipment; is that

7    correct?

8    A    Or the excavator.

9    Q    Now, you indicated that you had no recollection, but I

10   believe you said that you had a record where you had been there

11   on November the 2nd, 2004?

12   A    Well, I mean, it's in that site visit form.  I had to be

13   there because my signature is on it, you know.

14   Q    Absolutely.  But if I understood your testimony, you don't

15   have a specific recollection of seeing Bart Morris or Stanley

16   Bowling there that day; is that fair?

17   A    I can't — you know, I can't honestly say I saw them

18   there.  But they basically were there anytime I went.  But, you

19   know, I can't remember back and answer that.  That's

20   five-and-a-half year ago.

21   Q    I understand.  You just don't know whether they were there

22   or not?

23   A    If it wasn't for this piece of paper with my name on it, I

24   couldn't tell you where I was at that day.

25   Q    I think I'm in the same boat.  Let me ask you this,

BARRY SPIVEY CROSS - MR. SMITH                    63

1  Mr. Spivey:  If I understand what was going on that day, you

2  said this note was made by somebody else.  You said you

3  couldn't — you wasn't sure you could read the writing.  That's

4  not you're writing, is it?

5  A    No, it's not, I just sign it.  That's the Pride compliance

6  officer.

7  Q    And the only notation that there is, is the one which you

8  were asked to reference there at the top, it says, "Contractor

9  working today and picking a lot of small pieces, some

10 appliances still buried in the bank, removing them today, most

11 of small dumps up and down the edge of the road has been

12 cleared up, probably 75 percent complete so far."  Is that how

13 that reads?

14 A    Yeah.

15 Q    So it would be fair, would it not, sir, that the Pride

16 representative noted that the day you-all were there that there

17 was handpicking a lot out of small pieces still buried in the

18 bank?  Would that be fair?

19 A    Hand picking would be just like the area that's been

20 cleaned, getting the little bitty stuff, you know, raking and

21 stuff like that.  Anything still buried in the bank is going to

22 require the — you're not going to handpick a refrigerator out

23 of a bank.

24 Q    Do you know a fella by the name of Raleigh Downing?

25 A    Raleigh Downing?  Can't say that I do.

BARRY SPIVEY - CROSS - MR. SMITH                    64

1    Q    Do you know that they had other people working for them

2    other than just Bart and Stanley cleaning up these job sites?

3    A    Oh, yeah, there was always other people.  You got have

4    laborers, you know.

5    Q    You had to have quite a bit of manual labor workers to do

6    these jobs; would that be fair?

7    A    Yeah, I — you know, over four, five, six maybe, I don't

8    know.  It varied.  You know, as it got closer to completion,

9    you know, they wouldn't need as many.

10   Q    Now, if I understand your testimony, your job site

11   inspection report does not state what time of day that this

12   visit occurred, does it?

13   A    No, it don't.

14   Q    And would it be fair to say, Mr. Spivey, that Jackson

15   County is just up the road from Clay County, it's an adjoining

16   county in other words?

17   A    Right.  This dumpsite is probably — I don't know,

18   probably seven or eight mile from the Clay County line, but

19   then it would probably be another 15 or 20 on into what you

20   call Manchester.

21   Q    So 15 or 20 miles or minutes?

22   A    Miles.

23   Q    Miles.  So maybe 30 minutes, 40-minute drive away from

24   Manchester; would that be fair?

25   A    I'd say 40 minutes, cause those are pretty crooked roads

BARRY SPIVEY - CROSS - MR. SMITH                    65

1   over in there.  Now, that would be different if you're talking

2   about hauling a load of trash out.

3   Q    And this contract, as I understand it, was not to B & J,

4   it was a B&B contract; is that what your records reflect?

5   A    This is the -- I get these mixed up.  This is the Halcomb

6   Hill; right?  No.  Was this the Halcomb Hill or the Travis?

7   It's not saying on this.

8   Q    Your records don't show what job site that references,

9   sir?

10  A    Well, all I can go back to the way it's dated, November of

11  '04, it would have to be the Halcomb Hill, because that's the

12  only dump they done in '04.

13  Q    You previously described it as a super grant, is that

14  still the same job?

15  A    Yeah.

16  Q    And that was a B&B project?

17  A    Yeah.

18  Q    Now, according to your testimony, I believe that you

19  indicated there was a 2006 dumpsite on Travis Road in Jackson

20  County also I believe done by B&B?

21  A    Yeah, there was two, one was Travis Road and one was

22  Owsley Maulden Road.

23  Q    And would you agree with me, sir, that election day of

24  2006 was on November the 7th?

25  A    I would have no idea.  I'm Republican, I don't vote in the

1  fall much.

2  Q    And based on your testimony, this contract work occurred

3  between the 9th and the 15th; is that fair?

4  A    That's -- yeah.

5          MR. SMITH:  Just one moment.

6          THE COURT:  Yes, sir.

7          MR. SMITH:  Nothing further.

8          THE COURT:  All right.  Let's see if any of the other

9  defendants have questions before we get back to --

10          MR. WESTBERRY:  No, Your Honor.

11          MR. WHITE:  No, Your Honor.

12          THE COURT:  Mr. Gilbert?

13          MR. GILBERT:  I just have a follow-up, Your Honor.

14          THE COURT:  Yes, sir.

15                    REDIRECT EXAMINATION

16  BY MR. GILBERT:

17  Q    Mr. Spivey, do you have some documents on the Travis Road

18  cleanup?

19  A    Just those site visit forms.

20  Q    Do you have a preliminary site visit form that is dated

21  September the 13th of '06?

22  A    Yeah, I do.

23  Q    Does that refresh your recollection as to when the work

24  started on that project?

25  A    Not really, because a lot of times, you know, I would

BARRY SPIVEY - REDIRECT - MR. GILBERT          67

1  write the grant to clean up the dumps, but, you know, I would

2  get Pride to come and, you know, look at them sometimes, you

3  know, even before I put them out for bid.

4  Q    All right.  The site visit that you made on November the

5  9th, you were asked is that the date that the work started.

6  A    Well, it says on this site visit form, 11-9-06, it's on

7  Travis Road, and this is what the compliance officer wrote

8  down.  "Travis Road, contractor just started.  There was a lot

9  of buried garbage," I think might be what he's saying.  Anyway,

10 this says he just started.

11 Q    Okay.  It doesn't indicate the date that he started?

12 A    No.

13 Q    And it indicates that a lot of garbage has already been

14 bagged?

15        MR. SMITH:  Your Honor, I'm going to object to the

16 leading.

17        THE WITNESS:  It don't say that.

18        THE COURT:  Let me stop you for a second.

19        Is this from a document that has been admitted?

20        MR. GILBERT:  No.

21        THE COURT:  I'll sustain the objection.  He's

22 indicated he doesn't refresh his memory, so I'll sustain the

23 objection.

24 BY MR. GILBERT:

25 Q    Did you make a site visit on that day, the 9th?

1  A     Yeah, evidently, I signed it.

2  Q     And work had been underway?

3            MR. SMITH:  Your Honor, same objection.

4            THE COURT:  Sustained.

5            MR. GILBERT:  That's all.

6            THE COURT:  All right.  Thank you.

7            Let's see if there's any further cross-examination of

8  the witness.

9            MR. SMITH:  Nothing further.

10           THE COURT:  All right.  Thank you.

11           Counsel, if you could come up just for one moment, I

12  want to make sure my ruling is clear on the admissibility of

13  one of these documents before this witness is excused.

14      (Whereupon, the following discussion was had between the

15  Court and counsel at the bench, out of the hearing of the

16  jury.)

17           THE COURT:  On the summary chart, which I think was

18  Exhibit No. 6, I'm not going to admit that unless he has the

19  underlying documentation available for review and inspection.

20  I don't think he has those with him at this time.  I didn't

21  understand that when we were here before.

22           MR. GILBERT:  He brought them --

23           THE COURT:  I'm sorry, does he have them in the

24  courtroom?

25           MR. GILBERT:  He does not.

1           THE COURT:  All right.  Well, it will be a Court

2    exhibit for now —

3           MR. GILBERT:  Yes, Your Honor.

4           THE COURT:  — until such time as the underlying

5    documentation has been made available for review and

6    inspection.  Quite frankly, I'm not sure that it would even

7    constitute a business record, but he's referred to it, so it's

8    been used to refresh his memory.  He's been able to testify

9    from it, but in terms of its introduction, it will be a Court

10   exhibit at this time.  I wanted to make sure that everyone was

11   clear on that before I excused him.  I didn't know if you were

12   going to finally excuse him or not.

13          MR. GILBERT:  I'll finally excuse him.

14          THE COURT:  All right.  Thank you.

15       (Whereupon, the following proceedings continued in open

16   court.)

17          THE COURT:  All right.  Thank you.

18          Mr. Spivey, you may step down.  If you have your

19   original documents, unless they have been marked and introduced

20   as an exhibit, you can take those back with you, sir.

21          THE WITNESS:  Okay.

22          THE COURT:  It's going to be the same number that it

23   was, but it's going to be a Court exhibit.

24          Mr. Gilbert, you may call your next witness.

25          MR. GILBERT:  Steven Bowling, Your Honor.

1    THE COURT:  Thank you.

2                    STEVEN BOWLING,

3    having been first duly placed under oath, was examined and

4    testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. GILBERT:

7    Q    State your name, please, sir.

8    A    Steven Bowling.

9    Q    How old are you, Mr. Bowling?

10   A    Thirty-five.

11   Q    Where do you live?

12   A    Manchester, Kentucky.

13   Q    How long have you lived in Clay County?

14   A    All my life, sir.

15   Q    Are you related to a defendant in this case?

16   A    Yes, sir.

17   Q    And who is that?

18   A    Stanley Bowling.

19   Q    And what relation do you have with him?

20   A    Father.

21   Q    Are you married?

22   A    Yes, sir.

23   Q    And what's your wife's name?

24   A    Crystal Bowling.

25   Q    And do you have any children?

STEVEN BOWLING - DIRECT - MR. GILBERT                71

1   A     Yes, sir.

2   Q     How many and what are their ages?

3   A     Two girls, one 17 and one ten.

4   Q     Are you employed, sir?

5   A     Yes, sir.

6   Q     By whom and in what capacity?

7   A     North Manchester Water Association.

8   Q     And how long have you held that position?

9   A     Be three years, going on three years.

10  Q     Prior to that, did you work for B&B Excavating ——

11  A     Yes, sir.

12  Q     —— Incorporated?

13        And who owns that business?

14  A     Stanley Bowling.

15  Q     That's your father?

16  A     Yes.

17  Q     And for what period of time did you work for them —— for

18  your father, Mr. Bowling?

19  A     Probably from '01, '02, up to '07.

20  Q     Okay.  And what kind of job responsibilities did you have?

21  A     I run equipment.

22  Q     And what type of equipment?

23  A     Excavator, backhoe, bulldozer.

24  Q     Back in November of 2004, did you participate in a dump

25  cleanup in Jackson County referred to as Halcomb Hill?

STEVEN BOWLING - DIRECT — MR. GILBERT                72

1   A    Yes, sir.

2   Q    Could you describe that job to the jury, please?

3   A    The job on Halcomb Hill?

4   Q    Yes, sir.

5   A    It was a garbage cleanup, a big dump, big garbage cleanup.

6   Q    And when did you start that project, if you know?

7   A    Probably October.

8   Q    And when was that job completed?

9   A    November 19th.

10  Q    And from October until the job was completed, what was

11  done at the site by B&B Excavating?

12  A    We took the garbage out, sir, removed the garbage with the

13  excavator, piled it up and loaded it into trucks.

14  Q    And did Bart Morris participate and his company, B & J,

15  participate in that cleanup?

16  A    Yes, sir, we loaded the garbage in his trucks and he

17  hauled it out.

18  Q    What sort of trucks does he have?

19  A    Tractors and trailers.

20  Q    And who would drive the tractor and trailer?

21  A    Bart would.

22  Q    Would anybody else?

23  A    No, sir.

24  Q    Were there also other workers, general labor workers, that

25  participated in that job?

1    A    Yes, sir.

2    Q    And who type of work would they do?

3    A    They just picked up garbage.

4    Q    Do you recall a site inspection that was made by Mr. Barry

5    Spivey and Mark Davis on November the 2nd, 2004, at the Halcomb

6    Hill dumpsite?

7    A    Yes, sir.

8    Q    Can you tell the jury about that, please?

9    A    They come that day and told us what was left to do to the

10   job to get it complete.

11   Q    And who all was there that day?

12   A    Me and Bart and some employees handpicking.

13   Q    And what was Bart Morris doing that day?

14   A    He was there with me and talking with them guys to see

15   what else we had to do to get the job complete.

16   Q    And how long was he on the job site?

17   A    He was there all day long as we worked.

18   Q    And what time did he leave?

19   A    Approximately 4:30, 5:00.

20   Q    In November of 2006, were you still working for B&B

21   Excavation?

22   A    Yes, sir.

23   Q    Did you participate in a dump cleanup site in Jackson

24   County referred to as Travis Road?

25   A    Yes, sir.

1  Q    Can you describe that job for the jury, please?

2  A    It was another garbage cleanup where it took excavators to

3  remove garbage and load in tractors and trailers.

4  Q    And what time of the year was the work performed on that

5  site?

6  A    It was in November.

7  Q    And do you know the completion date of that?

8  A    November 15th.

9  Q    And did Bart Morris participate in that cleanup?

10 A    Yes, sir.

11 Q    And what did he do?

12 A    He hauled the garbage out with his truck and trailers

13 after we loaded it.

14 Q    Okay.  Once you start a job, Mr. Bowling, on one of these

15 dump cleanup sites, how often are you there on the site?

16 A    There every day that you can work.  Well, you know,

17 excluding Sundays.

18 Q    And what days could you not work?

19 A    You know, just pouring the rain or something like that is

20 the only reason we didn't work.

21 Q    Do you remember a day when a newspaper reporter came to

22 the job site?

23 A    Yes, sir.

24 Q    And when was that?

25 A    That would have been November the 7th.

1   Q    And did the reporter take pictures?

2   A    Yes, sir.

3   Q    And did you save a copy of that article?

4   A    Yes, sir.

5        MR. GILBERT:  May I display the newspaper article to

6   the witness, please?

7        THE COURT:  Yes, sir.

8   BY MR. GILBERT:

9   Q    Is that an edition of the Jackson newspaper dated November

10  the 9th, 2006?

11  A    Yes, sir.  Yes, sir.

12  Q    And what is the name of the paper?

13  A    Jackson County Sun.

14  Q    Okay.  And has that edition been in your possession since

15  that day?

16  A    Yes, sir.

17  Q    And you saved that?

18  A    Yes.

19       MR. GILBERT:  I would move its introduction, Your

20  Honor.

21       THE COURT:  Any objection?

22       MR. SMITH:  No, Your Honor.

23       THE COURT:  All right.  What is the next numbered

24  exhibit?

25       THE CLERK:  No. 8.

1        THE COURT:  It will be admitted as William Morris

2   Exhibit No. 8.

3        MR. GILBERT:  If I could, Your Honor, I would move

4   that the photographs be published to the jury?

5        THE COURT:  Yes, sir, you may publish it.

6   BY MR. GILBERT:

7   Q    There are two photographs that appear on the job site, are

8   there not?

9   A    Yes, sir.

10  Q    Does that photograph show — does that photograph show

11  some of the workers there on November the 7th, 2006?

12  A    Yes, sir.

13  Q    And who is this individual here?

14  A    James Goins.

15  Q    And this individual here?

16  A    David Hacker.

17  Q    And this individual here?

18  A    Anthony Hayer.

19  Q    And this individual over here?

20  A    Raleigh Bowling.

21  Q    Okay.  This is a second picture that appears in that

22  newspaper article?  Is that the second picture that appears in

23  the newspaper article?

24  A    Yes, sir.

25  Q    Let me ask you first, this piece of equipment here with

1    the boom on it and the tread tracks, what type of piece of

2    equipment is that?

3    A    That's an excavator.

4    Q    And who would generally operate that piece of equipment?

5    A    I would, sir.

6    Q    And that equipment is owned by who?

7    A    B&B.

8    Q    And behind it, it appears to be a bed of a trailer?

9    A    Yes, sir.

10   Q    And what type of piece of equipment is that, Mr. Bowling?

11   A    That's a tractor and trailer that we loaded the trash

12   into.

13   Q    And who owns that?

14   A    Bart Morris.

15   Q    And who drives that?

16   A    Bart Morris.

17   Q    Do you know of anyone else that drives it?

18   A    No, sir.

19   Q    Now, the quality is not very good.  I'm not doing a very

20   good job centering it.

21        This picture also depicts several individuals in the

22   photograph, does it not?

23   A    Yes, sir.

24   Q    Who is this individual here?

25   A    Steven Bowling.

1  Q    And the individual standing beside you?

2  A    Raleigh Bowling.  James Goins.  I think that's David

3  Hacker.

4  Q    And who is the individual under the boom?

5  A    Bart Morris.

6  Q    To your recollection, Mr. Bowling, how long was Bart

7  Morris on the job site that day, November the 7th, 2006?

8  A    He was there until we completed work that evening.

9  Q    And what time did you-all arrive there that day?

10  A    We was there probably 7:00, 7:30 that morning.

11        MR. GILBERT:  That's all I have.

12        THE COURT:  Thank you.

13        MR. SMITH:  Your Honor, may we approach?

14        THE COURT:  Yes, sir, you may.

15     (Whereupon, the following discussion was had between the

16  Court and counsel at the bench, out of the hearing of the

17  jury.)

18        MR. SMITH:  For the record, Mr. Steven Bowling

19  testified in front of a federal grand jury in Covington,

20  Kentucky, on January the 12th, 2006, and he's testified here in

21  front of this jury here today that -- I believe that Stanley

22  Bowling was the owner of B&B Excavating.  Under oath in front

23  of the federal grand jury, I asked that same question, "Does

24  your father have a position or does he work" -- it says, "His

25  father has a position with the company?"  He says, "No, he

1    doesn't."  "Does your dad — how long has that status and your

2    company with your dad?"  "He's helped me as far as jobs and

3    stuff but I've never known him to take a check from the

4    company."

5                I think that in this testimony, Your Honor, there is

6    inconsistencies throughout with his representation already.  I

7    intend — the reason I wanted to approach is I wanted to

8    explore some of these areas that may be outside necessarily

9    just the fact that his dad — whether or not his dad owned the

10    company, but also his role in the company, his operation of the

11    company, and some of those things that we touched upon earlier

12    in his prior sworn testimony.

13                There's two issues there.  One, I believe that are

14    going to be inconsistencies that have already presented

15    themself, I believe, in the way he's described the company, and

16    I want to explore that with him.  The second issue is, is that

17    when he was giving his testimony he was given a grant of

18    immunity by order of the Court pursuant to our petition, and I

19    believe that while that grant of immunity does one thing as far

20    as his exposure to liability for giving testimony and the

21    subject of this inquiry, it does not immunize him from perjury.

22    So if I find within this transcript inconsistencies here today,

23    I want to make sure that I'm on safe ground using this sworn

24    testimony to impeach him if necessary.  I make this point.  I'm

25    not saying that I have gone far enough with his explanation of

80

1    the company to identify line by line and item by items, but I

2    wanted to bring this to the Court before I start down that

3    road.

4            THE COURT:  Well, in terms of issues of credibility,

5    of course, you can inquire if he's given inconsistent

6    statements.  The concern I have is whether this witness needs

7    to be advised outside the presence of the jury of the

8    possibility of charges of perjury.  I don't know if he's

9    testified falsely, but I'm concerned that if he feels like that

10   he's testifying pursuant to a grant of immunity that he may be

11   mistaken if he gives inconsistent or what's believed to be

12   perjured testimony here today, and I'm wondering if we need to

13   take an earlier lunch break so I can advise him of that

14   possibility.  I hate to send the jury back another time for

15   another five or ten minutes just to come back out here for

16   another 15 or 20 minutes.  If everyone is in agreement, if we

17   can go ahead and take our lunch break at this time, I could

18   advise him just generally of his obligations of testifying

19   truthfully here, and then we can resume at 12:30 instead of

20   1:00, if the parties are prepared.

21           MR. WESTBERRY:  Judge?

22           THE COURT:  Mr. Westberry.

23           MR. WESTBERRY:  On behalf of Doug Adams, we have

24   thought about our discussion earlier about the expanded

25   admonition.

1          THE COURT:  Yes, sir.

2          MR. WESTBERRY:  We would request you give that before

3    the lunch break.

4          THE COURT:  Before the lunch break?  All right.

5          MS. HUGHES:  Elizabeth Hughes on behalf of Debra

6    Morris.  I don't believe the defense has a copy of the grand

7    jury testimony, so if Mr. Smith is going to use that to

8    impeach, I would ask that all the defense counsel be given a

9    copy of it.

10         MR. SIMONS:  Of course, I want to join that request

11   on behalf of Stanley Bowling.

12         THE COURT:  Mr. Smith, will you be able to make a

13   copy of that and make that available during the lunch hour?

14         MR. SMITH:  Yes.

15         THE COURT:  All right.  That's another reason to go

16   ahead and take our lunch break.  Thank you, Counsel.

17       (Whereupon, the following proceedings continued in open

18   court.)

19         THE COURT:  All right.  Thank you, Counsel.

20         Ladies and gentlemen, a little bit of good news for

21   you.  We're going to take our lunch break early today.  Those

22   of you that were wondering, I know we didn't take a very long

23   break as we usually do because we started a little bit later.

24   So we'll go ahead and take our lunch break at this time.

25   Before we do break for lunch, I do want to again remind you of

1    the admonition that's been given.  What I'm going to do is I'm
2    going to give you until 12:45, so you'll have a little more
3    time to take your lunch in case you want to go outside the
4    building.  I know a lot of you stay in for lunch, but if you
5    want to get out and get some fresh air, we'll give you a little
6    bit extra time to do that today.  Of course, inasmuch as you
7    may be going outside, I do want to remind you of the admonition
8    that I've given to you previously not to discuss the case among
9    yourselves, not to allow anyone to approach you to discuss the
10   case.

11          Of course, we're getting close to tournament time,
12   and so I do want to warn you that you shouldn't read, watch, or
13   listen to anything about this case.  Now, there may be times
14   where you'll hear something on the radio or see something in a
15   newspaper.  You should not read, watch, listen to anything
16   about this case.  I do want to emphasize that to you.  You
17   should never do that during the course of the case.  And please
18   don't do that today.  If you go out, don't do that, don't talk
19   with any of the witnesses in the case, don't attempt to do any
20   type of research or perform any investigation.  We talked about
21   electronic communications earlier several times, don't do any
22   of that.  And, of course, don't make up your mind about the
23   case until it is finally submitted to you.  So with that
24   admonition, the jury will be excused until 12:45 this
25   afternoon.

83

1          (Whereupon, the jury retired from the courtroom, after
2   which the following proceedings were had in open court.)
3               THE COURT:  Thank you, and please be seated.
4               Before I excuse everyone for —
5               Mr. Westberry, in your opinion, was that admonition
6   sufficient with —
7               MR. WESTBERRY:  I recall one additional thing that
8   you were discussing earlier today that, I'm going to
9   paraphrase, the contents of which you see on TV.
10              THE COURT:  I was saving that a little bit for later
11  so as not to add too much emphasis, but I'll —
12              MR. WESTBERRY:  With that one statement, yes.
13              THE COURT:  All right.  I'll give a further
14  admonition at the end of the day, but I didn't want to load up
15  too much at the lunch hour.
16              MR. WESTBERRY:  I understand.
17              THE COURT:  If you load up too much at lunch, people
18  tend to fall asleep.
19              Before we recess for lunch, Mr. Bowling, I wanted to
20  remind you of a couple of matters to make sure that you're
21  fully aware.  I understand that you testified previously before
22  a federal grand jury in this matter pursuant to a grant of
23  immunity; is that correct?
24              THE WITNESS:  Yes, sir.
25              THE COURT:  I want to make sure that you do

1   understand that while you testified pursuant to a grant of

2   immunity, in the event you should give false testimony during

3   the course of this proceeding, that that grant of immunity

4   would not immunize you from charges of perjury.  You do

5   understand that?

6           THE WITNESS:  Yes, sir.

7           THE COURT:  And if you were to give false or

8   incorrect testimony in the course of this proceeding, false or

9   perjured testimony, charges could be brought against you

10  charging you with perjury, and, of course, that would be a

11  criminal penalty and you could be — if found to be guilty of

12  those charges, you could be, if convicted, sentenced to a term

13  of incarceration of up to five years.  And you're aware of

14  that?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  All right.  I also want to remind you

17  that you do have a right to counsel if you should choose to

18  exercise that right during the course of this proceeding if you

19  believe that any answer to a question asked of you by the

20  United States or by any of the attorneys for the defendant

21  would tend to incriminate you.  And you do understand that?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  All right.  Thank you.

24          Mr. Smith?

25          MR. SMITH:  Your Honor, I'm not sure — there's one

1   other admonition that I would ask this Court to consider giving

2   the witness.  One is the rule on separation.

3           THE COURT:  Yes, sir.

4           MR. SMITH:  And also it would further be the position

5   of the United States that if he testifies here today to

6   something — in other words, if there's an occasion that he

7   testified falsely before the grand jury —

8           THE COURT:  Yes, sir.

9           MR. SMITH:  — previously, that's also subject to

10  prosecution for perjury, and that would be the position we

11  would take.

12          THE COURT:  All right.  I will give the witness

13  further information.

14          First, with respect to separation of witnesses, the

15  Court has previously invoked the rule on separation of

16  witnesses.  It's a rule that prohibits or prevents witnesses

17  from discussing their testimony with anyone else that might

18  testify in the case.  That also would prevent you from

19  discussing any prior witness's testimony in the case.  In other

20  words, you're not allowed to talk about your testimony or the

21  testimony of anyone else during the course of the proceeding.

22  And you do understand that?

23         THE WITNESS:  Yes, sir.

24         THE COURT:  Now, also, as Mr. Smith correctly

25  indicated, with respect to your testimony before the grand

1  jury, if it were determined subsequently that that testimony

2  was false, was given —— was given falsely, you do understand

3  that charges could be brought against you for perjury for that

4  testimony?

5        THE WITNESS:  Yes, sir.

6        THE COURT:  You understand that?  In other words,

7  just because you're given immunity, that would not allow you to

8  give false testimony in the course of a proceeding, whether

9  it's before this Court or before a grand jury.  And you do

10  understand that?

11       THE WITNESS:  Yes, sir.

12       THE COURT:  All right.  Thank you.

13       Let me ask the attorneys if there's anything else

14  before I excuse the witness or before we take our lunch break?

15  Anything else?

16     (No response.)

17       THE COURT:  All right.  If not, we will be in recess

18  until 12:45 this afternoon.

19     (Whereupon, a recess was had for the noon hour, after

20  which the proceedings continue uninterrupted to Volume 26-B.)

21                 (Proceedings concluded at 11:39)

22

23

24            C E R T I F I C A T E

25     I, Cynthia A. Oakes, certify that the foregoing is a

87

1  correct transcript from the record of proceedings in the
2  above-entitled matter.

3

4  3/17/2010                    s/CYNTHIA A. OAKES
      DATE                    CYNTHIA A. OAKES, RPR, RMR, CRR
5

6

7

8                          I N D E X

9                                                    PAGE

10  Testimony of DEBBIE EDWARDS:
       Direct Examination by Mr. Gilbert:            9
11     Direct Examination by Ms. Hughes:            13
       Cross-Examination by Mr. Smith:              15
12
   Testimony of GLENDA SESTER:
13     Direct Examination by Mr. Gilbert:           18
       Cross-Examination by Mr. Smith:              22
14     Direct Examination by Ms. Hughes:            25
       Direct Examination by Mr. Simons:            27
15     Cross-Examination by Mr. Pinales:            35
       Recross-Examination by Mr. Smith:            36
16     Redirect Examination by Mr. Simons:          41
       Further Recross-Examination by Mr. Smith:    42
17
   Testimony of BARRY SPIVEY:
18     Direct Examination by Mr. Gilbert:           44
       Cross-Examination by Mr. Smith:              59
19     Redirect Examination by Mr. Gilbert:         66

20  Testimony of STEVEN BOWLING:
       Direct Examination by Mr. Gilbert:           70
21

22

23

24

25

1

2                                    E X H I B I T S

3

4   Defendant
    William Morris                                              Page
    Exhibit No.                    Identified                 Admitted
5
          4                            11                        12
6         5                            20                        21
          6                            46                        *
7         7                            55                        57
          8                            75                        76
8

9
    Defendant
10  Debra Morris                                                Page
    Exhibit No.                    Identified                 Admitted
11
          3                            13                        14
12        4                            14                        15
          5                            25                        26
13        6                            25                        26

14

15
    Defendant
16  Stanley Bowling                                            Page
    Exhibit No.                    Identified                 Admitted
17
          1                            27                        33
18

19

20  Court                                                      Page
    Exhibit No.                    Identified                 Admitted
21
          6                            49                      51 *
22

23

24  *   William Morris Exhibit No. 6 conditionally accepted as Court
25      Exhibit No. 6.