United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 18, 2010 |
| DOUGLAS C. ADAMS | ) 8:30 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 27-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States: STEPHEN C. SMITH, ESQ.
JASON D. PARMAN, ESQ.

On behalf of the Defendant        DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:           MARTIN S. PINALES, ESQ.

On behalf of the Defendant        R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                 KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant        T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant        ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant        RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:

On behalf of the Defendant        JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
Stanley Bowling:

2

```
 1  Appearances of Counsel:

 2  On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                    JASON D. PARMAN, ESQ.
 3                                  Assistant U.S. Attorneys
                                    601 Meyers Baker Road
 4                                  Suite 200
                                    London, Kentucky  40741
 5

 6  On behalf of the Defendant     DAVID S. HOSKINS, ESQ.
    Russell Cletus Miracle:        107 East First Street
 7                                  Corbin, Kentucky  40701

 8                                  MARTIN S. PINALES, ESQ.
                                    150 East Fourth Street
 9                                  Federal Reserve Building
                                    Cincinnati, Ohio  45202
10

11  On Behalf of the Defendant     R. KENT WESTBERRY, ESQ.
    Douglas C. Adams:              KRISTEN N. LOGAN, ESQ.
12                                 220 West Main Street
                                   Suite 1900
13                                 Louisville, Kentucky  40202

14
    On behalf of the Defendant     T. SCOTT WHITE, ESQ.
15  Charles Wayne Jones:           133 West Short Street
                                   Lexington, Kentucky  40507
16

17  On behalf of the Defendant     ROBERT L. ABELL, ESQ.
    William E. Stivers:            120 North Upper Street
18                                 Lexington, Kentucky  40507

19
    On behalf of the Defendant     RUSSELL JAMES BALDANI, ESQ.
20  Freddy W. Thompson:            300 West Short Street
                                   Lexington, Kentucky  40507
21

22  On behalf of the Defendant     JERRY W. GILBERT, ESQ.
    William B. Morris:             212 North Second Street
23                                 Richmond, Kentucky  40475

24

25
```

```
 1   On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                  201 West Short Street
 2                                      Lexington, Kentucky   40507

 3
     On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
 4   Stanley Bowling:                  116 West Main Street
                                        Suite 2A
 5                                      Richmond, Kentucky   40475

 6
     Court Reporter:                   CYNTHIA A. OAKES, CRR
 7                                      Official Court Reporter
                                        United States District Court
 8                                      560 Athens Boonesboro Road
                                        Winchester, Kentucky   40391
 9                                      (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

4

1          (Whereupon, the jury entered the courtroom, after which

2     the following proceedings were had in open court.)

3               THE COURT:  Let's see, we're missing Mr. Westberry

4     and Mr. Hoskins, who's just now coming into the courtroom.

5               MS. LOGAN:  He's here.  I'm not sure —

6               THE COURT:  Where?

7               MS. LOGAN:  He came in before me, so —

8               THE COURT:  Okay.  Well, we're going to go ahead and

9     proceed, Ms. Logan is present on behalf of Mr. Adams, so all

10    defendants are represented at this time by counsel.

11              There are two issues that we need to take up this

12    morning before the jury comes in.  First is the issue dealing

13    with the witness who may or may not be invoking his Fifth

14    Amendment rights against self-incrimination.

15              The second issue is an issue raised in connection

16    with a witness, James Craft, who Defendant William Morris

17    wishes to call as an expert witness on the issue of profits.

18    We did take a break yesterday and I have researched this issue

19    and have received briefs, supplemental authority, on behalf of

20    both the United States and Defendants William Morris, Debra

21    Morris, and Stanley Bowling.  And, of course, I've also looked

22    at the proposed — examined the proposed testimony through the

23    supplement expert reports that were submitted in the case.

24              The United States had requested some time to argue

25    the issues this morning, so we'll proceed with arguments by the

1    affected parties at this time.

2            Mr. Smith, you've moved to exclude the testimony of

3    the witness, so we'll start with you.

4            MR. SMITH:  Thank you, Your Honor.  The United States

5    has, I think, set out in our memorandum our position, I

6    believe, clearly, which is that *Santos*, number one, does not

7    apply.  The Fraud Recovery Act, of course, cured the decision

8    after *Santos* and defined the proceeds as gross receipts, and I

9    believe that there is precedent within the Sixth Circuit to

10   help us determine whether or not there are issues.

11           THE COURT:  Well, doesn't the Court really have to

12   look at the *Kratt* case to make this decision at this point?

13           MR. SMITH:  Well, I think that *Kratt* does provide us

14   an analysis, framework which we should follow, and I believe

15   that under the *Kratt* analysis, there is only an issue under

16   *Santos* if there's a merger problem, and I believe that clearly

17   in this case there's not, because we do not have a disparity in

18   statutory maximums.  Number one, Count One, the racketeering

19   conspiracy, is maximum 20 years.  The underlying SUA, extortion

20   under 1951, is maximum of 20 years.

21           THE COURT:  What about the bribery charge?  I know

22   that would fall under state law, and, of course, I guess

23   Congress can't be expected to evaluate every single penalty for

24   bribery under state law because it's going to vary from

25   jurisdiction to jurisdiction.

6

1          MR. SMITH:  Well, that's an interesting argument,

2     Your Honor, but how we get to the bribery statute in the first

3     place under the money laundering statute is that you have to go

4     through 1961 definition for the RICO predicates, and that's how

5     you get there.  And so I think that it's — while one could

6     argue you have to look at one to five years under the state

7     statute, that's not accurate.  I would argue that it's because

8     it is a racketeering predicate act recognized under 1961 that's

9     adopted under 56(a)(7), therefore is an SUA, and I believe that

10    it is only applicable in this case because it's a racketeering

11    predicate act, and a racketeering predicate act under Count One

12    still exposes the defendant to a maximum of 20 years'

13    punishment.

14          THE COURT:  So we still have the 20-year punishment,

15    which is equal to what would be provided by the money

16    laundering statute, so there's no merger issue, essentially?

17          MR. SMITH:  That's our position.

18          THE COURT:  All right.  Let me ask a couple other

19    questions.  The defendants, in the brief that they filed later

20    than was allowed by the Court, but in any event, the brief was

21    filed late, they essentially respond to your arguments and take

22    the position that, at this point, you're not looking at

23    proceeds as being the contracts that were awarded to the two

24    companies as a result of the illegal activity, they're saying

25    that you're now defining proceeds to be the difference in the

1    bribery amounts, the vote buying amounts, the money that was

2    pooled, certain amounts were paid for vote haulers, and they're

3    attempting to limit it to that level as opposed to the

4    contracts that were awarded.  I wasn't really sure from looking

5    at your brief that that was your theory, but that appears to be

6    their argument in response to it.

7             MR. SMITH:  It's not our theory.  I think, again,

8    what we have under *Santos*, the analysis is that *Santos* looked

9    at gambling, and I believe gambling is clearly limited in the

10   *Wooten* case, as it analyzed it, that that was, again,

11   restricted to its facts as to illegal gambling.  And then we

12   look at the expenses, and, of course, gambling, illegal

13   gambling, was the SUA.  What's the SUA here?  It's bribery and

14   extortion that's listed in Count 2.  So our argument is, is

15   that in *Santos*, if you wanted to follow that analysis under

16   illegal gambling, the only expenses, if the Court is going to

17   allow it to come in, would be those expenses associated with

18   illegal gambling.  The fact that the monies that were pooled

19   later changed form and then eventually came back in the form of

20   salaries and contracts doesn't change their illegal nature.

21   They're still intermingled within those contracts and salaries,

22   we are going to argue, is the proceeds of the SUA.

23             So I'm not real sure that the —— again, that the

24   argument, again assuming *Santos* applies and assuming that the

25   Court is going to require or allow this testimony on a net

1   theory.

2          THE COURT:  Well, I'm not sure that it's relevant to

3   the counts that are before the jury at this point.  Perhaps as

4   to the forfeiture counts it may be an issue for the RICO

5   forfeiture charge, but I'm not sure that it is.  I'm just

6   trying to figure out if your theory is, as you've explained it

7   throughout the course of the proceeding or if it's changed to

8   the theory that the defendants are now attempting to argue.

9          MR. SMITH:  It has not, Your Honor, and if I've given

10  that impression through our memorandum, I want to correct that

11  at this point.  I do want to be heard on the issue of the

12  forfeiture and whether or not that analysis would include a

13  different view of a net versus gross, because I have done some

14  research on that and I certainly would like an opportunity to

15  brief the Court on that issue as well.

16         THE COURT:  We're not at that point —

17         MR. SMITH:  All right.

18         THE COURT:  — just yet, so we'll stick with the

19  first, I guess, 11 counts that are before the jury.

20         Let me see if I've correctly understood the

21  defendants' position.  Ms. Hughes, it appears to me that you

22  may have prepared this brief.

23         MS. HUGHES:  That's true.  We apologize for it being

24  late.  It was the three of us together, and at 6:00 we were

25  still, you know, deep in trying to identify issues.  I

9

1   apologize for that.

2          THE COURT:  All right.  Well, let me ask you a few

3   questions, and if the other attorneys want to jump in, of

4   course, they're certainly free to do that.  But it appears to

5   me that you're essentially wanting to rearrange the deck chairs

6   on the Titanic, and this is what I mean by that:  You are

7   conceding that there's a level of profits --

8          MS. HUGHES:  Yes.

9          THE COURT:  -- under the proceeds definition as

10  you've defined it, but you just say it's less profits than the

11  government claims it is because you want to use a net figure as

12  opposed to a gross revenues figure.

13         MS. HUGHES:  Correct.

14         THE COURT:  And that's not really the issue that's

15  before the jury in terms of determining the amount at this

16  point.  That may be a forfeiture issue, but I'm not sure that

17  it goes to the elements of the offense in this particular case,

18  because there's a concession that that element has been

19  satisfied.

20         MS. HUGHES:  Well, I concede there's an element of

21  profits that have been generated.  Whether it is -- and I do

22  want to rearrange the deck chairs because of the brief that the

23  government filed.  And I realize I'll not responding directly

24  to the Court's question, but where we got bogged down is the

25  government expressly says in its brief that the financial

1    transaction — and the statute requires a financial

2    transaction, and the financial transaction has to involve the

3    proceeds of specified unlawful activity, here, the proceeds of

4    state law bribery and extortion.  And so they're saying that

5    those proceeds of extortion are then going into the financial

6    transaction of vote buying.  So the proceeds are the extortion.

7    Then they're, I guess — you know, if that's it, and we're

8    talking about how much extortion there is and what the expenses

9    are there, then, fine, we would strike the testimony of the

10   gross revenues of those companies.

11            It's difficult to find the cases analyzing it,

12   because under the government's more expansive theory you would

13   then follow that money, the proceeds, to a nonfinancial item,

14   which is a vote.  And we have struggled with this from the

15   beginning over how it turns from proceeds, which are clearly

16   monetary, although it can go into other forms and I understand

17   that, but a vote is a — definitely a nonfinancial piece of —

18   it's not even property.  I don't know what it is.  But it's a

19   vote that then somehow goes to an election of a candidate and

20   the candidate is on the City or County governing body, and that

21   candidate then raises their hand and votes yes, Stanley

22   Bowling's company will get a job or, yes, Bart Morris's company

23   will get a job.

24            THE COURT:  And then contracts are awarded —

25            MS. HUGHES:  Then contracts are awarded.  That's

1    their theory.

2           THE COURT:   —— in certain amounts.

3           Now, if I accept your theory, a person could be

4    guilty of money laundering if he were a good businessman, but

5    not if he were a bad businessman.  For example, if I award two

6    contracts, under the government's theory, with this —— as a

7    result of this illegal conduct that's occurred, extortion,

8    bribery that results in individuals being elected, and I issue

9    one contract to Mr. Morris, one contract to Mr. Bowling,

10   Mr. Bowling goes out and hires ten people because he wants to

11   hire as many people as he can in the community, and he loses

12   money as a result of that.  Mr. Morris, on the other hand, is a

13   good businessman, he drives his own truck, he doesn't hire

14   anyone, and as a result, he has a significant profit.  Under

15   your theory because we have these —— the contracts have been

16   issued, and now we're talking about who's a good businessman

17   and who's not a good businessman, because that's going to

18   determine profit, we're going to have one person who's not

19   going to be liable, would not be responsible under money

20   laundering, and one that would be; correct?

21          MS. HUGHES:  Well, I think that that —— first of all,

22   it's not my theory, it's my attempt to explain the government's

23   theory that I don't think is valid because it turns into a

24   nonprofit.

25          THE COURT:  Well, it's your attempt to explain where

1   profits should -- where proceeds should be defined and how they

2   should be defined.

3           MS. HUGHES:  And I agree with that.  I mean, if

4   you're not making any business profit, then I think that's an

5   issue that goes to the intent to conceal, I think that it's an

6   issue that goes to the money laundering.

7           THE COURT:  But that's an after-the-fact issue as to

8   intent as opposed to the time the contracts were awarded.

9           MS. HUGHES:  Well, I think that a businessman knows,

10  you know, if your desire is to make money, then -- well, I

11  guess I can't say everybody has the motive to make money but I

12  think it does go to the issue of intent.

13          And I will also just say as an aside, we didn't open

14  the door to the issue of the county -- or the city, excuse me,

15  basically got ripped off by the B & J contracts.  I mean, it's

16  the government that put the mayor on who said saving a hundred

17  thousand dollars a year, creating the impression that no good

18  work was done, that there was some sort of unreasonable profit

19  on the part of B & J.  Likewise -- and I don't want to speak

20  for --

21          THE COURT:  But that's a different issue than the

22  issue of proceeds.

23          MS. HUGHES:  I agree.

24          THE COURT:  And we're talking about apples and

25  oranges there, and the Court may have to engage in a 403

1  analysis with respect to that issue, because it's so confusing

2  that the jury could never understand the difference between

3  what you're attempting to argue on the one hand and the

4  elements of the offense on the other hand.

5          MS. HUGHES:  I do understand that, but I think the

6  reality is that the Court is trying to bring in an issue that

7  doesn't appear in this case, because I think what the expert

8  reports show is that both B&B and B & J did, in fact, make

9  money, and so we're not talking about a loss where one would be

10 and one wouldn't be.  And I know theoretically that's an

11 interesting debate, but we're not presented with that issue

12 because there are, in fact, profits.  These folks did not

13 operate at a loss.  Nor do I believe it's complicated.  I don't

14 think that Mr. Craft is going to get on here and say anything

15 that's complicated.  He's going to say, I looked at the

16 corporate tax returns, there were reasonable and necessary

17 business expenses, and their profit margin was comparable to

18 like industry and businesses, and it's not going to be that

19 complicated.

20         THE COURT:  Well, but the problem with your theory

21 is, if this is going to be the issue that the United States

22 presented that the defendants weren't on the up-and-up in terms

23 of their performance of the contracts, this witness can't

24 testify to that, he can't testify as to whether someone put

25 their thumb on the scale, for example.  He can only look at the

1    numbers and make a decision as an accountant would do,

2    P & L-type determination.

3              MS. HUGHES:  No, he can't, and his opinion wouldn't

4    be qualified in that regard.  He will readily admit that.  But

5    that in generally looking at the numbers, that there are

6    reasonable expenses and these are reasonable profits that have

7    been made, which counters the -- not the issue of the thumb on

8    the scale, but the issue of some other form of over -- just

9    overcharging in general.  The jury could still believe the

10   thumb was on the scale but that the profit was not

11   unreasonable.  Nonetheless, maybe it was too high, but it

12   wasn't, you know, extremely high.  Mr. Craft would say -- it's

13   John Craft, by the way.

14             THE COURT:  I'm sorry, did I call him by the wrong

15   name?

16             MS. HUGHES:  Well, his name was incorrect in the

17   government's brief.

18             THE COURT:  You really have an issue with that, don't

19   you?

20             MS. HUGHES:  I do.  That B & J Transport --

21             THE COURT:  I do see the footnote that you pointed

22   out.  I appreciate that.

23             Okay.  Let me see if the other defendants have any

24   additional arguments they would like to make.

25             Mr. Gilbert, I assume that you adopt the same

1  arguments Ms. Hughes has made?

2          MR. GILBERT:  I do, Your Honor.

3          THE COURT:  Mr. Simons, do you have additional

4  arguments to make?

5          MR. SIMONS:  Your Honor, I only have one additional

6  point.  All the cases that I have tried to analyze, the

7  business activity of the defendant has been — is not

8  legitimate, it's dealing in drugs or illegal lotteries or

9  organized crime.

10          THE COURT:  Uh-huh.

11          MR. SIMONS:  That's the subject of the generation of

12  funds.

13          THE COURT:  Right.

14          MR. SIMONS:  I don't think there's any question but

15  that both B & J and B&B had legitimate businesses that served

16  the community.  I mean, they hauled garbage and they built

17  sewers.

18          THE COURT:  Right.

19          MR. SIMONS:  And that's the problem I have with their

20  whole analysis.

21          THE COURT:  Well, and I agree with you, and that's

22  why this case doesn't fit neatly within any of the cases, any

23  of the authorities that are cited, because this is a more

24  complicated situation than running an illegal gambling

25  operation where you have runners, you have collectors, and then

1   you have payments that are made, as in the *Santos* case.  It's

2   an entirely different creature that we're dealing with here,

3   it's a much more complicated creature.  All right.  Thank you.

4         Well, with respect to this issue, I am going to

5   sustain the United States' motion to exclude the testimony of

6   this particular witness.  This ruling would also go to the

7   witness that the Defendant Stanley Bowling would be expected to

8   call.  Specifically – and I'll refer to the supplemental

9   disclosures – Mr. Bowling refers to the forfeiture issue, that

10  he would testify as to forfeiture matters that are contained in

11  counts that are not presently before the jury.

12        With respect to both of the experts that the parties

13  would anticipate calling, both Mr. Morris as well as

14  Mr. Bowling, if this Court conducts the type of analysis that's

15  outlined by Judge Sutton in the *Kratt* case, we do get to a

16  position where there's not a merger problem because of the

17  penalty provisions with the respective offenses, the predicate

18  offenses, as well as the penalty for money laundering.  So we

19  don't get to the second step of the process.

20        Again, though, I do note that the defendants in this

21  case are not arguing an insufficiency of proof, they are

22  conceding the fact that there are profits, just not the profit

23  level that the United States has argued or will argue.  And, of

24  course, the jury doesn't have to make a determination as to

25  level of profits with respect to making a determination of

1  guilt as to the counts that are being presented, the first 11

2  counts that are being presented.  The United States has

3  indicated it wishes to present further arguments on the gross

4  profit/net profit, gross revenues issue with respect to the

5  RICO count, and I'll certainly entertain those arguments at the

6  appropriate time.  But at this stage of the proceedings, I do

7  believe that it would be unduly confusing to the jury to

8  present this issue, this particular issue on profits, it's not

9  one that they need to determine in order to make the initial

10  findings I've indicated, and I believe it would be unduly

11  confusing under Rule 403 for the reasons that I've stated in my

12  questions to counsel.

13       So I will sustain the motion as to Mr. Craft.

14  Hopefully, I'm pronouncing his name correctly, James A. Craft,

15  CPA.  And, again, that would extend to the additional witness

16  that Mr. Bowling would anticipate calling on this –– on a

17  similar issue.  I will issue a memorandum opinion later today

18  as I have the opportunity to do so.

19       MR. GILBERT:  Judge, he also is prepared to testify

20  as to comparable rates, very similar to Mr. Gravitt testified

21  for Defendant Adams.

22       THE COURT:  Comparable rates of trash ––

23       MR. GILBERT:  Yes, Your Honor.

24       THE COURT:  –– amounts that is based on his

25  independent research that he's performed?

1           MR. GILBERT:  Yes, Your Honor.

2           THE COURT:  All right.  Will there be objection to

3    that line of inquiry?

4           MR. SMITH:  May I have just a moment?

5           THE COURT:  Yes, sir.

6           MR. SMITH:  Your Honor, I believe that, as I

7    understand the proffered testimony, would again lead us right

8    back into the same area, and that is essentially that aspect of

9    how much were they making and whether they were reasonable in

10   their rates.  And, again, I believe that that is 403, an area

11   which, again, it's not relevant.  If it is relevant, has some

12   relevance, it would be more confusing than anything.  And,

13   again, it opens up — it begs the question and it basically

14   sucks us right back into the same areas of which, you know, the

15   crux of our motion to exclude has addressed.  So we would

16   object on those grounds.

17          THE COURT:  All right.  Well, I'm not going to

18   exclude the testimony if it is factual in nature and if it's

19   not expressing an opinion as to profitability.  If it's

20   responsive to testimony that has been presented by the United

21   States as to various rates, tipping fees, or whatever the

22   specific testimony will be, that is responsive to information

23   that has been provided by the United States.  But, of course, I

24   do think that counsel — that the defendants understand my

25   ruling with respect to profitability.  If we do get into that

1    issue, then the Court's ruling would certainly stand.

2              MR. GILBERT:  I understand, Your Honor.  I will need

3    some time with him to discuss the ruling of the Court today and

4    what areas are appropriate and what areas are not appropriate.

5              THE COURT:  All right.  But with respect to issues

6    that are responsive to testimony that's been presented by the

7    United States, factual matters going to hauling rates, tipping

8    fees, and things of that nature, as long as we don't get into

9    issues of profitability that would be covered by what I've just

10   discussed, then I will allow that testimony; all right?

11             MR. GILBERT:  Yes, Your Honor.

12             THE COURT:  The second issue -- And we will take a

13   break to give you a chance to speak with Mr. Craft.

14             The second issue is the testimony of Steven Bowling.

15   Yesterday, after we recessed, the Court, of course, appointed

16   counsel for Mr. Bowling.  Mr. Helmuth was appointed as his

17   counsel.

18             Mr. Helmuth, at this point, I know you've had an

19   opportunity to confer with Mr. Bowling.  I do not know whether

20   Mr. Bowling anticipates asserting any Fifth Amendment rights if

21   he's called back to the witness stand in the case.  Are you

22   able to inform the Court?

23             MR. HELMUTH:  Your Honor, it is my advice and my

24   counsel and it will be his desire to assert Fifth Amendment

25   rights as to certain matters that may be asked upon cross-

1 examination either by the U.S. or potentially by counsel for

2 other defendants.

3          Based on the statements by Mr. Smith made to this

4 Court after my client's direct examination by Mr. Gilbert, it

5 is apparent to me that the United States intends to go into

6 specific lines of questioning, to which my client would, upon

7 my advice, have to assert his Fifth Amendment rights.  And that

8 raises, Your Honor, I know —

9          THE COURT:  If you would like to come up, I think the

10 reporter will be able to hear you a little better.

11          MR. HELMUTH:  Your Honor, I know that raises specific

12 issues under, specifically, a certain line of Sixth Circuit

13 cases that state that the witness can only assert Fifth

14 Amendment rights in response to a specific question.  However,

15 again, based on the fact that the United States was the party

16 that raised the issue of potential self-incrimination, that

17 raised the issue of appointment of counsel for Mr. Bowling and,

18 as I stated earlier, has indicated that they believe that they

19 will go into a line of questioning which could potentially

20 result in self-incrimination.  I would ask the Court to

21 entertain a blanket Fifth Amendment right assertion.

22          THE COURT:  Well, I'm sure you're aware that the

23 Court has to conduct further inquiry before allowing a blanket

24 assertion of a privilege in a case.  I need to make a

25 determination as to whether the assertion of the privilege

1  would be appropriately made first, if there's a reasonable fear

2  of prosecution as a result of an answer given to a question.

3  There has to be a reasonable fear, of course, it can't be an

4  unfounded fear.  Second, the Court would have to make a

5  determination as to whether it is a matter pertaining to his

6  direct testimony or whether it would be a collateral matter.

7  And I will tell you that if it would appear to be a collateral

8  matter, then the Court would exercise its discretion and it

9  would require the witness to assert his Fifth Amendment rights

10  in front of the jury as opposed to outside the presence of the

11  jury and then instruct the jury that they're not to draw any

12  improper -- or any inferences that the testimony would be

13  favorable or not favorable to a party in the case or to the

14  United States.

15          But in fairness to the United States, the United

16  States is allowed to question a witness concerning his or her

17  credibility, and, of course, issues of prior testimony and

18  whether false testimony was given would certainly go to that

19  issue.  And I don't know whether the line of inquiry would go

20  beyond testimony presented to the grand jury or not.  I don't

21  know what the questions would be, so I'm going to have to make

22  that determination outside the presence of the jury.  So we'll

23  need to have Mr. Bowling present.  I'm going to allow the

24  United States to conduct voir dire of him on areas.  I'm going

25  to allow you to be present with him and to consult with him in

1   making a determination as to whether he should assert his Fifth

2   Amendment rights, and then you can provide me with any

3   statements that you believe would be helpful as to whether

4   that's a proper assertion of a right.  So that's the way we'll

5   be proceeding with that issue.

6           Is Mr. Bowling here this morning?

7           MR. HELMUTH:  He should be right outside the door,

8   Your Honor.

9           THE COURT:  All right.  Let me ask Mr. Smith or

10  Mr. Parman, if we proceed in the manner that I've outlined, how

11  long would you anticipate the questioning of the witness with

12  respect to matters that might be — that might result in

13  assertion of a Fifth Amendment privilege?

14          MR. SMITH:  Well, I have several questions;

15  15 minutes, Your Honor, possibly.

16          THE COURT:  All right.  Well, and the reason I ask is

17  I want to be able to tell through the security officer that it

18  will probably be another 30 minutes before they're called in,

19  because they were expecting to be in here at 9:00.  And if it

20  will take about 15 minutes, then I do want to give Mr. Gilbert

21  a chance to speak with Mr. Craft this morning.  So I'll

22  probably tell them about 40 minutes to be on the safe side.

23          You can advise — you can advise the jury of the fact

24  that it will be probably 40 minutes before they're called in.

25          THE MARSHAL:  Yes, Your Honor.

1          THE COURT:  Mr. Helmuth, at this time, is Mr. Bowling

2    in the witness room over here?

3          MR. HELMUTH:  He is on the bench outside the

4    courtroom.

5          THE COURT:  All right.  If you could bring him in

6    please.

7          MS. HUGHES:  Your Honor, while we're waiting, I do

8    have a couple of issues that relate to my case, so if you don't

9    mind.  One is that I served a subpoena on Special Agent Briggs

10   to bring the photographs of the search of the Morris residence.

11         THE COURT:  Yes, ma'am.

12         MS. HUGHES:  Those photographs include a photograph

13   of the infamous handwritten letter that the Court has ruled

14   upon before, as well as some photographs of the safe.  And so I

15   guess I wanted to get approval from the Court to go on and pull

16   those photographs -- to work with the United States to pull

17   those photographs so that when Special Agent Briggs is called

18   we wouldn't have to deal with that and those would already be

19   out of the stack of photographs.

20         THE COURT:  All right.  Let's see if -- I know that

21   Special Agent Briggs is in the courtroom.  Let's see if he has

22   those materials with him.

23         MS. HUGHES:  Then the next --

24         THE COURT:  I'm listening, I'm sorry.

25         MS. HUGHES:  Then the next issue, could I speak with

1    the Court ex parte at the bench about the witness problem that

2    I had yesterday?

3            THE COURT:  Yes.  Yes, you may.

4        (Whereupon, the following discussion was had between the

5    Court and Ms. Hughes at the bench, out of the hearing of the

6    other parties.)

7            MS. HUGHES:  I spent my Sunday in Manchester trying

8    to track down the list of the people that Wanda White testified

9    that she had absolutely seen my client pay to buy votes.  It

10   was a very interesting day, and I spent my day knocking on

11   doors, do you know where so-and-so lives and so-and-so lives.

12   So it was not easy to track down these people.  I have tracked

13   down four.  This gentleman is Sam Buttery, is his name.

14           So yesterday we had an issue.  I did speak with his

15   daughter, they were coming this morning until last night at

16   9:30 when they called me on my cell phone and informed me that

17   Mr. Buttery had been admitted to Memorial Hospital in

18   Manchester.  I asked them to send me documentation of that.

19   They have faxed that to my office and I have it on line.  I

20   have not been able to reach them this morning to find out what

21   the status of that is.

22           Now, some of it depends on -- he had high blood

23   pressure.  So they were concerned about a cardiac incident, is

24   what the daughter told me last night and what appears to be

25   confirmed from the one-page admission sheet that I do have.

1          I'm not really asking for any relief at the moment, I

2   don't know if my case will go on and conclude today.  I suspect

3   he will be discharged today, because I do.

4          Let me also -- another reason I want to be here

5   ex parte is I did -- there's a significant drug problem in

6   Eastern Kentucky and when you track down these people --

7          THE COURT:  That's what I've heard.

8          MS. HUGHES:  -- some of them are quite loaded.  And

9   what we saw with Mr. Darren Smith a couple of weeks ago was the

10  condition that I find people in.  Mr. Buttery was not in quite

11  that bad of a condition, but he was in a bad condition.  He was

12  paid a witness fee, I suspect that has been spent on

13  nontravel-related items, and I just -- I guess I'm worried, you

14  know, that I'm not going to be able to get him here.  I don't

15  want the Marshal to go drag somebody out of the hospital, but,

16  you know, it's so hard to find people.

17         THE COURT:  It's very frustrating, I know.

18         MS. HUGHES:  Correct.  So I just wanted to let the

19  Court know.  When we do break, I'll call, I'll see if he's out

20  of the hospital.

21         THE COURT:  Well, it may not be someone that you want

22  to call.  I know you've got to make that evaluation.  If you do

23  need relief -- This is the person that originally told you his

24  house exploded?

25         MS. HUGHES:  Correct.  And the explanation for that

1  was, well, it wasn't his apartment but the house that they rent

2  out — well, the granny really rents out exploded.

3           THE COURT:  So it may be that he just doesn't want to

4  be here based on that prior —

5           MS. HUGHES:  I suspect it's because he can't afford

6  to get here because he's spent his mileage and witness fee

7  already.

8           THE COURT:  All right.  Well, if it does appear — if

9  you do have a reasonable belief that he is just avoiding

10  appearing here pursuant to a subpoena that has been issued, a

11  subpoena fee that has been paid, I'll issue an order for him —

12  for the Marshal to pick him up and bring him here.  The problem

13  is once I issue an order, they follow their rules and

14  regulations, which means they put a cuff on him —

15           MS. HUGHES:  I know.

16           THE COURT:  — and bring him in, and if he does have

17  a heart problem — and so Fred Sanford?  Watch out Elizabeth?

18           MS. HUGHES:  Right, that is a dilemma, you know, you

19  don't want to put a witness on who's angry with you because

20  they've just been cuffed —

21           THE COURT:  Right.

22           MS. HUGHES:  — and transported by the Marshal.

23           THE COURT:  That's my option.  If you want him here,

24  it does sound like that he may be attempting to evade service.

25  If you want him here, if you want me to have the Marshals go

1  out and bring him in, I'll do that, and I'll also attempt to

2  talk with the Marshal and tell them that he has a heart

3  condition, I don't want them to do anything that would put him

4  over the edge.  Those are really the options that we have.  If

5  you want to fill me in more after a break, at lunchtime

6  perhaps.

7        MS. HUGHES:  I will.  I just didn't want the Court to

8  be — I wanted to share my frustration.  We're all strung out

9  here and I think that —

10        THE COURT:  Not for the same reason Mr. Buttery is

11  apparently.

12        MS. HUGHES:  Correct.  Correct.

13        THE COURT:  All right.  Thank you.

14     (Whereupon, the following proceedings continued in open

15  court.)

16        THE COURT:  All right.  Mr. Helmuth.

17        And, Mr. Bowling, if you could come up as well,

18  please, sir.

19        Mr. Helmuth, if you like, you can remain at the

20  witness stand with Mr. Bowling as he's questioned by the United

21  States.

22        You can please resume the witness stand, and,

23  Mr. Bowling, I will remind you that you are still under the

24  oath that was administered yesterday to you, sir.

25        THE WITNESS:  Yes, sir.

1          THE COURT:  All right.  Thank you.

2          Mr. Smith, you may proceed.

3                        STEVEN BOWLING,

4     being previously duly sworn, was examined and testified further

5     as follows:

6                        DIRECT EXAMINATION

7     BY MR. SMITH:

8     Q    Good morning.

9     A    Good morning.

10    Q    I have a few questions for you.  First of all, you're

11    Steven Bowling; correct?

12    A    Yes, sir.

13    Q    And you have some paperwork there in front of you.  Could

14    you tell us what that is?

15    A    That was just a thing my lawyer wrote to me here.

16    Q    Okay.  What does it say?

17    A    That I respectfully decline to answer the questions, I

18    assert my Fifth Amendment right against self-incrimination.

19    Q    Okay.  So you've been advised of your rights and you

20    understand all those at this point; correct?

21    A    Yes.

22    Q    Okay.  Mr. Bowling, you testified yesterday about several

23    things and I want to touch on some of those.  The first thing I

24    think I want to talk to you about is this company, B&B?

25    A    Yes, sir.

1  Q    Who's company is that, sir?

2  A    My dad's, Stanley Bowling.

3  Q    And how long have you worked for the company?

4  A    I don't work for him at this time.  I worked for him —

5  started in — the company started back in '93, but I was not

6  working for him full time then.  I probably come full time 2001

7  up to probably 2007.

8  Q    And in that time period, what was your position?

9  A    I run equipment.

10 Q    Okay.  Did you-all have any other employees?

11 A    Not right now, no.

12 Q    During the time period '01 through '07, sir, did you have

13 any other employees?

14 A    Yes, sir.

15 Q    And who were they?

16 A    Michael Collins worked for us, Wes Hacker, Bartley Morris

17 worked for us.  I don't recall all of them, sir.

18 Q    And during the time period that you-all did business, did

19 you-all seek to get contracts from the City of Manchester?

20 A    Yes, we did do contracts from the City of Manchester.

21 Q    And what kind of contracts did you do for the City of

22 Manchester?

23 A    We done water and sewer lines.

24 Q    And were those projects in which you-all had to get City

25 Council approval before you could do those jobs?

1    A    The jobs was bid.

2    Q    Okay.  And they were bid through the City of Manchester?

3    A    Yes, sir.

4    Q    Were there times when you didn't have to bid for the

5    contracts?

6    A    Not that I recall, no.

7    Q    Are you familiar with change orders?

8    A    No, sir.

9    Q    Are you familiar with contracts done on an emergency

10   basis?

11   A    I respectfully decline to answer that question and I

12   assert my Fifth Amendment against the right of self-

13   incrimination.

14           MR. HELMUTH:  Your Honor?

15           THE COURT:  Yes, sir.

16           MR. HELMUTH:  Am I allowed to speak with my client

17   without his requesting to do so?

18           THE COURT:  Yes, you may.

19           MR. HELMUTH:  Okay.  Thank you.

20           THE COURT:  Yes, sir.

21           MR. HELMUTH:  Thank you, Your Honor.

22           MR. SMITH:  Are we in need of restating that question

23   or are we still taking the same position on the question,

24   Counsel?

25           I'll ask the witness.

1   BY MR. SMITH:

2   Q    Are you still asserting your Fifth Amendment privilege on

3   the question of the emergency basis contracts?

4   A    Can you repeat that question to me, again?

5   Q    Well, you've spoken with counsel.  I just want to make

6   sure for the record, sir, if you're still maintaining the Fifth

7   Amendment privilege on my last question?

8   A    Yes, sir.

9   Q    You've indicated that during the time period that you

10  worked there for the company that you–all did cleanup projects

11  in the Jackson County area; do you recall that testimony?

12  A    Yes, sir.

13  Q    And I believe you testified that those were projects in

14  which B&B had the contract with?

15  A    Yes.

16  Q    Were you also partners with Bart Morris on those

17  contracts?

18  A    We were not partners.  He helped us.

19  Q    And how did you pay him?

20  A    We just wrote him a check.

21  Q    And how did you base the compensation?

22  A    What do you mean by that, sir?

23  Q    Well, did you pay him by the hour, did you pay him by the

24  salary, by the job, how was he paid?

25  A    We just — at the end of the job, your know, we just sat

1  down and added everything up and just split everything 50/50,

2  him and Dad did.

3  Q    Okay.  And was that the basis of which you-all operated on

4  Clay County jobs as well?

5  A    What kind of Clay County job are you referring to, sir?

6  Q    Any Clay County jobs.

7  A    No.

8  Q    Your testimony is that you didn't split profits with Bart

9  Morris on Clay County jobs?

10  A    If he worked with us on Clay County jobs, we did.

11  Q    Okay.  Did you-all take any profit from his business?

12  A    If he was to have a contract and he hired us to clean it

13  up, yes, we did.

14  Q    And how was that split?

15  A    The same way, sir.

16  Q    Now, during your time period that you worked, '01 through

17  '07, and specifically I think it's your testimony in this trial

18  that there on Jackson County jobs, is it your testimony that

19  your dad worked on those jobs as well?

20  A    He was not there much on the Jackson County jobs.

21  Q    And what do you mean when you say he wasn't there much?

22  A    Well, on the Halcomb Hill job, my dad was sick and in the

23  hospital.

24  Q    And what time period was that, sir?  What date was that?

25  A    That was from October to November.

1  Q    Of what year, sir?

2  A    That is '04.

3  Q    So your dad wasn't around in '04?

4  A    No, very briefly, just in and out.

5  Q    What about '06?

6  A    The same way.  He was just in and out.

7  Q    What about Bart Morris?

8  A    He was there.

9  Q    What do you mean, "he was there"?

10 A    He was there working every day.

11 Q    Now, you know he's got a son, Bartley?

12 A    Yes, sir.

13 Q    You're not referring to Bartley?

14 A    No.

15 Q    You're referring to his dad, Bart?

16 A    Right, sir.

17 Q    The defendant here in this case?

18 A    Yes, sir.

19 Q    And your testimony is he was present daily?

20 A    Yes, sir.

21 Q    Every day?

22 A    Yes, sir, that I was there.

23 Q    Every hour of every day?

24 A    I don't say every hour of every day, but, yes, pretty much

25 every hour.

1  Q    Pretty much every hour.  When would you not see him?

2  A    Mostly just when he was gone to talk a load of garbage off

3  and back.

4  Q    Where did he take his garbage?

5  A    Took it to his transfer station.

6  Q    Where was that located?

7  A    In Manchester.

8  Q    Is that near downtown Manchester?

9  A    No, not in downtown.

10 Q    How far is it from downtown Manchester?

11 A    Approximately a mile, mile and a half.

12 Q    How long would he be gone?

13 A    From down there, just depended, you know, on —

14 Q    Depended on what?

15 A    What he got hung up in, if he had to wait on hooking to

16 another trailer at his transfer station and getting back to us

17 or stuff like that.

18 Q    So he might be gone one hour, might be gone two hours,

19 might be gone longer?

20 A    Two hours would be at the most.

21 Q    Two hours would be at the most?

22 A    I would — yes, that I recall.

23 Q    And then what did he do when he come back?

24 A    He would come back and start helping the boys do whatever

25 we needed to do and we would start loading garbage back in the

1  truck again.

2  Q    What happens with the truck gets loaded again?

3  A    He leaves with another load and takes it out.

4  Q    Now, Mr. Bowling, you've testified that this company is

5  one in which you worked for from '01 to '07; is that right?

6  A    Yes, sir.

7  Q    And during the time period, you're aware that you-all were

8  seeking contracts through the City of Manchester; is that

9  right?

10 A    Yes, sir.

11 Q    And isn't it true, sir, that you represented to the City

12 of Manchester that you were a co-owner of the company?

13 A    I respectfully decline to answer the question and assert

14 my Fifth Amendment right against self-incrimination.

15 Q    All right.  Isn't it true, sir, that the reason that you

16 were -- You've actually misrepresented yourself as a co-owner

17 of that company numerous times to the City of Manchester; isn't

18 that a fact?

19 A    I respectfully decline to answer the question and assert

20 my Fifth Amendment right against self-incrimination.

21 Q    Well, you've testified here previously here today and also

22 yesterday that it's your dad and your dad only that owns the

23 company; isn't that true?

24 A    Yes, sir.

25 Q    Isn't it also true, sir, that you've represented to the

1  county of Clay County that you were a co-owner of the company

2  of B&B Excavating?

3  A    I respectfully decline to answer the question and assert

4  my Fifth Amendment right against self-incrimination.

5  Q    Isn't it true, sir, you don't have any shares of stock in

6  that company?

7  A    Yes, sir.

8  Q    Isn't it true there are no other owners of this company

9  other than your father?

10 A    Yes, sir.

11 Q    Isn't it true that your father didn't have much of

12 anything to do with the jobs which you were performing over in

13 Jackson County?

14 A    Yes, he did not have much to do.

15 Q    And yet isn't it true, sir, you don't know anything about

16 the contracts that your company held over the years, you

17 couldn't name any of the contracts in which your company held

18 during that time period either, could you?

19 A    No, sir.

20 Q    It's your testimony that your dad didn't take any money

21 out of that company?

22 A    I respectfully decline to answer the question and assert

23 my Fifth Amendment right against self-incrimination.

24 Q    Have you ever paid him any money?

25 A    I respectfully decline to answer the question and assert

1  my Fifth Amendment right against self-incrimination.

2  Q    Isn't it true you had a conversation with Jared Murphy

3  about kickbacks in which you were witnessing your dad paying

4  Kennon White?

5  A    I respectfully decline to answer the question and assert

6  my Fifth Amendment right against self-incrimination.

7  Q    Isn't it true that the house in which you live in is

8  furnished with utilities, including gas that's been furnished

9  by the City of Manchester for some time which you have not paid

10 anything on?

11 A    Yes, sir, I have gas out of a gas well that is the City's.

12 Q    You don't pay for that gas?

13 A    No, sir.

14 Q    How did you get that free gas, sir?

15 A    The land is in -- I respectfully decline to answer the

16 question and assert my Fifth Amendment right against self-

17 incrimination.

18 Q    Has your father made any statements to you about Kennon

19 White, giving him kickbacks for projects which you were getting

20 through B&B?

21 A    I respectfully decline to answer the question and assert

22 my Fifth Amendment right against self-incrimination.

23 Q    Has Kennon White been given -- during the time period of

24 '01 through '07, at any time, are you aware of Kennon White

25 giving your father inside information on dropping numbers for

1    bids in order to make sure he's the lowest bidder?

2    A    I respectfully decline to answer the question and assert

3    my Fifth Amendment right against self-incrimination.

4              MR. SMITH:  That's all.

5              THE COURT:  All right.  Let me ask the attorneys for

6    the defendants if they have questions they would like to

7    present at this time which in their opinion may result in the

8    assertion of the Fifth Amendment privilege other than those

9    that have been asked by Mr. Smith?

10             MR. WHITE:  No, Your Honor.

11             THE COURT:  No?  All right.  I will make a finding at

12   this time that the assertion of the Fifth Amendment right

13   against self-incrimination that has been expressed by the

14   witness, that the assertions are legitimate assertions of a

15   Fifth Amendment right, that the defendant does have a

16   reasonable basis to be concerned about prosecution should he

17   respond to those questions in the manner in which they were

18   posed.  So he will be allowed to assert his Fifth Amendment

19   rights when he continues his testimony before the jury here

20   today.

21             Mr. Smith, you'll be allowed to cross-examine as to

22   those areas, and he can assert his Fifth Amendment rights.  The

23   Court will instruct the jury that they should not draw any

24   inference, positive or negative, to any party in the case based

25   upon the assertion of the Fifth Amendment right by a nonparty

1    to the action.

2            MR. SIMONS:  Your Honor, I do have one point.

3            THE COURT:  Yes, sir.

4            MR. SIMONS:  The questions that were asked by

5    Mr. Smith, a large portion of them, were beyond the scope of

6    his testimony on direct from Mr. Gilbert and I think,

7    generally, would be inappropriate.  He did exercise his Fifth

8    Amendment right in response, but I would state that those

9    questions could not be properly asked of this witness on cross.

10            THE COURT:  All right.  Well, I believe the questions

11   not only are appropriate but they're inextricably intertwined

12   with his -- issues of credibility in the case and the testimony

13   that he has given on direct.  And so while the Court believes

14   that they are relevant to questions on direct, the Court would

15   also exercise its discretion to allow the United States to go

16   beyond the scope of direct on these areas of inquiry that are

17   certainly central to the case.

18            Mr. Abell?

19            MR. ABELL:  I would ask the Court to make more

20   particularized findings regarding the areas in which the Court

21   finds this witness can properly assert his Fifth Amendment

22   rights --

23            THE COURT:  Yes, sir.

24            MR. ABELL:  -- with regard to that one of the issues

25   that Mr. Bowling has asserted his Fifth Amendment rights during

1  examination is with regard to his familiarity of contracts done

2  on emergency basis about which he testified before the grand

3  jury, and that testimony appears on page 23 of his transcript

4  and refers to a riverbank project, and my understanding, he was

5  granted immunity with regard to the dealings, if I may use this

6  term generally, between the City and Kennon White's

7  involvement.  But he has testified about at least one emergency

8  contract and his familiarity with it, and I would respectfully

9  suggest to the Court that at least on that topic it does not

10 appear to me there is a Fifth Amendment issue.

11             THE COURT:  Yes, sir.

12             MR. ABELL:  But more generally, I would ask the Court

13 to make particularized findings.

14             THE COURT:  Yes, sir.  I'll do so.  He has testified

15 before the United States grand jury as to a number of matters

16 and particularly the matter which you've justed raised.  The

17 possibility of a perjury prosecution exists whenever an

18 individual takes an oath in a civil or criminal matter where

19 the law of the United States authorizes an oath to be

20 administered and willfully gives testimony material to the

21 inquiry being pursued, which to the individual's knowledge is

22 false, and if this individual has a good-faith basis for

23 believing that some or all of that testimony was fraudulently

24 given or falsely given, then he could assert his Fifth

25 Amendment right in the course of this proceeding in responding

1   to those questions about that subject matter.

2           MR. HELMUTH:  Your Honor, if I may?

3           THE COURT:  Yes, sir.

4           MR. HELMUTH:  I would like to — so that the parties

5   and the Court is aware of my advice to my client as to his

6   assertion of the Fifth Amendment right on specific issues,

7   pursuant to a line of cases, including *Blau v. United States*

8   and *Hoffman v. United States*, both Supreme Court cases, my

9   advice to my client is — and those cases indicate that the

10  answers potentially to the questions in and of themselves may

11  not be — support a conviction or enough to raise — to expose

12  him to criminal prosecution but may provide a link —

13          THE COURT:  The link, yes, sir.

14          MR. HELMUTH:  — or a step-by-step, and that was well

15  articulated by the Third Circuit in *U.S. v. Coffey*.  And so I

16  want to make it clear to everybody that it is with that

17  understanding that he is asserting his Fifth Amendment right on

18  the questions and the issues which were raised by Mr. Smith.

19          THE COURT:  All right.  Thank you.

20          Again, let me ask if any of the attorneys anticipate

21  asking any questions that might result in further assertion of

22  the Fifth Amendment right.  I don't believe anyone indicated

23  that they were.

24      (No response.)

25          THE COURT:  Mr. Gilbert, I do want to give you time

1    to consult with your witness.  I want to do that now, because

2    when we come back we're going to continue with Mr. Bowling's

3    testimony, he was on the witness stand, he was getting ready

4    for cross-examination when we broke yesterday when we had a

5    bench conference.  So we'll continue at that point, but I want

6    to give you a chance to speak with Mr. Craft.  You believe 10

7    to 15 minutes would be sufficient for that purpose?

8              MR. GILBERT:  Absolutely.

9              THE COURT:  All right.  We'll resume, provided that

10   you have sufficient time, we'll resume at 9:40.  But if you

11   need an additional five minutes, advise the security officer of

12   that and you can certainly have that if you need it.

13   Otherwise, we'll be in recess until 9:40 this morning.

14        (Whereupon, a short recess was had, after which the

15   following proceedings were had outside the presence of the

16   jury.)

17             THE COURT:  All right.  Thank you.

18             The record will reflect the jury is not present at

19   this time.  I understand Mr. Simons has one issue to take up

20   outside the presence of the jury, and then I have another one.

21             MR. SIMONS:  Do you want to go first?

22             THE COURT:  No, I want you to go first.

23             MR. SIMONS:  In light of the events of this morning,

24   and I did not subpoena Steven Bowling —

25             THE COURT:  I'm sorry, you'll have —

1          MR. SIMONS:  Mr. Gilbert subpoenaed Steven Bowling to

2    the stand —

3          THE COURT:  Yes, sir.

4          MR. SIMONS:  — and in light of his repeated

5    assertions of his Fifth Amendment privilege this morning in

6    response to questions that the Court has found permissible and

7    not beyond the scope, I think that that — those repeated

8    assertions would be very unfairly prejudicial to Stanley

9    Bowling, who is my client, and I would move that the testimony

10   of Steven Bowling be excluded.

11         THE COURT:  In its entirety?

12         MR. SIMONS:  In its entirety and he not be cross-

13   examined.

14         THE COURT:  All right.  Let me see how many object to

15   that.

16         Mr. Gilbert, it's your witness.

17         MR. GILBERT:  We would object to that, Your Honor.

18         THE COURT:  All right.  Let's —

19         Mr. Abell?

20         MR. ABELL:  I would move for the exclusion of

21   Mr. Bowling's testimony as well.

22         THE COURT:  All right.

23         MR. BALDANI:  Mr. Thompson would as well, Your Honor.

24         THE COURT:  Mr. Baldani?  All right.

25         MR. PINALES:  So does Judge Maricle, Your Honor.

 1              THE COURT:  All right.  Thank you.

 2              MR. WHITE:  Your Honor, can you give me just a

 3    moment?

 4              THE COURT:  Yes, sir.  I'll see what the United

 5    States' position is on this issue.

 6              MR. SMITH:  Your Honor, we would ask that the Court

 7    overrule the motion and allow him to testify.

 8              THE COURT:  I'm sorry?

 9              MR. SMITH:  We would ask that the Court overrule

10    Mr. Bowling's motion and allow him to testify.

11              THE COURT:  All right.

12              Mr. White?

13              MR. WHITE:  For whatever it's worth, we also would

14    object to the motion and ask that the testimony remain.

15              THE COURT:  Well, on balance, I believe that the

16    witness should be allowed to be cross-examined for the reasons

17    I stated previously, so I will overrule the motion to exclude

18    the testimony of this particular witness.

19              Next, I understand that the smell of alcohol has been

20    detected from Mr. Thompson, so we'll be conducting — or he'll

21    be subject to an alcohol test, Breathalyzer, when we take our

22    break in about an hour at 10:45 this morning.  I understand the

23    Frankfort Police Department will be administering the test and

24    we'll do that during our morning recess.  I wanted to advise

25    the parties of that fact.

1          All right.  If you could bring the -- well, before

2    you bring the jury in --

3          Mr. Helmuth, do you wish to be present at the witness

4    stand when Mr. Bowling testifies?

5          MR. HELMUTH:  If the Court will so allow, Your Honor.

6          THE COURT:  I will allow, but I will advise the jury

7    that you are counsel for Mr. Bowling and are present in that

8    capacity.

9          MR. HELMUTH:  Thank you, Your Honor.

10         THE COURT:  All right.  If you could bring the jury

11   in, please.

12       (Whereupon, the jury entered the courtroom, after which

13   the following proceedings were had in open court.)

14         THE COURT:  Thank you, and please be seated.

15         The record will reflect that all members of the jury

16   are patiently present.  Again, I do appreciate the fact that

17   you were here this morning.  And I delayed starting, but I do

18   appreciate you being here on time.

19         The parties and counsel are also present.

20         When we stopped yesterday, Mr. Steven Bowling was

21   testifying.  If you could bring him back in, please.

22         Mr. Helmuth and Mr. Bowling, could you please come

23   up?  And Mr. Bowling's counsel will also be present with him as

24   he testifies in the case, Mr. John Helmuth.  I've allowed that

25   to occur.

1          Thank you.  And before we continue with cross-

2    examination, I will advise Mr. Bowling, of course, he's still

3    under oath.

4          And, Mr. Smith, you may proceed with your questions.

5                         STEVEN BOWLING,

6    being previously duly sworn, was examined and testified further

7    as follows:

8                       CROSS-EXAMINATION

9    BY MR. SMITH:

10   Q    Thank you.  Good morning, my name is Steve Smith, and I

11   represent the United States.  A few questions for you,

12   Mr. Bowling.

13        You testified yesterday, I believe, that you were a

14   part -- at least in '01 through '07 you were working for a

15   company known as B&B?

16   A    Yes, sir.

17   Q    And that is a company in which I believe you said your dad

18   owns?

19   A    Yes, sir.

20   Q    And you indicated that you had recalled jobs in which

21   you-all had performed back in Jackson County as far back as six

22   years ago; do you recall that testimony?

23   A    Yes, sir.

24   Q    What other jobs did you-all do in 2004?

25   A    I don't recall, sir, any other jobs besides the one on

1  Halcomb Hill.

2  Q    Is it your testimony that there were no other jobs that

3  B&B did other than cleanup projects in Jackson County in 2004?

4  A    I'd say we had others jobs.  I can't recall what B&B done,

5  sir.

6  Q    Did you work on the Millpond project?

7  A    Yes, sir.

8  Q    When was that project?

9  A    I don't know the exact date, sir.

10 Q    Okay.  That was a project in which you-all got the

11 contract; is that not true?

12 A    Yes, B&B got the contract.

13 Q    But you don't recall when you worked Millpond?

14 A    I don't recall the date or year, no, sir.

15 Q    What about sewer pump stations, are you familiar with

16 sewer pump stations?

17 A    Yes, sir.

18 Q    How many sewer pump stations did B&B do while you worked

19 for them, sir?

20 A    I respectfully decline to answer the question and assert

21 my Fifth Amendment right against self-incrimination.

22 Q    During the time that you worked for B&B, you testified

23 that you personally observed an inspector come on the job

24 there, a Mr. Spivey?

25 A    Yes, sir.

1  Q    How many times did he come on your job, sir?

2  A    Mr. Spivey was there at least every other day, if not

3  every day.  He was around a lot.

4  Q    Did you make records of when he made visits to your job

5  sites?

6  A    No, sir.

7  Q    So your independent recollection is that he was there

8  specifically on the dates that you've testified earlier, I

9  believe you testified that November the 2nd he came to you?

10  A    Yes, sir, he was on the job.

11  Q    In 2004?

12  A    Yes, sir.

13  Q    And you recall that job ended on November the 19th, 2004?

14  A    Yes, sir.

15  Q    But you don't keep any records?

16  A    I recall it.

17  Q    Who keeps records for your company?

18  A    I respectfully decline to answer the question and assert

19  my Fifth Amendment right against any self-incrimination.

20  Q    Where is your office located?

21  A    The office is located at my dad's house.

22  Q    And where are all his books kept at your dad's house?

23  A    I respectfully decline to answer the question and assert

24  my Fifth Amendment right against self-incrimination.

25  Q    Does your dad have a bookkeeper?

1  A    I respectfully decline to answer the questions and assert

2  my Fifth Amendment right against self-incrimation.

3  Q    Isn't it true, sir, you've not looked at any of those

4  books?

5  A    Can I ask -- can you ask that again, sir?

6  Q    Isn't it true you've not looked at the books of the

7  company?

8  A    Yes, sir.

9  Q    That would be true?

10  A    Yes, sir.

11  Q    Where's the office located in your father's house?

12  A    I respectfully decline to answer the questions and assert

13  my Fifth Amendment right against self-incrimation.

14  Q    Were you the only worker that was employed by B&B during

15  your time from '01 to '07?

16  A    No, I was not the only employee.

17  Q    Who else worked for the company?

18  A    I don't recall everybody.  Michael Collins, Wes Hacker,

19  Bartley Morris worked.  I don't recall all of them, sir.

20  Q    Bartley Morris is the son of Bart Morris?

21  A    Yes, sir.

22  Q    He worked for your company?

23  A    Yes, sir.

24  Q    Was your dad present on that job in Jackson County?

25  A    He was in and out.  He wasn't present much.

STEVEN BOWLING - CROSS - MR. SMITH          50

1  Q    Was Bart Morris present on that job?

2  A    Yes, sir.

3  Q    Your testimony was he was there pretty much every day all

4  the time?

5  A    Yes, sir.

6  Q    Did he ever leave your presence while you were there?

7  A    Yes, he did leave some.

8  Q    And how long did he stay gone?

9  A    Just depended.  He would take garbage out in tractors and

10 trailers and probably, at the longest, be gone two hours and

11 back.

12 Q    Was he there — how many days a week did you-all work?

13 A    We worked at least six days a week.

14 Q    Rain or shine?

15 A    No, if it rained hard and stuff, no, we couldn't work

16 during the rain.

17 Q    So if it was raining, you didn't work.  And if it wasn't

18 raining, is it your testimony he was there every day —

19 A    Yes, sir.

20 Q    — to work?

21 A    Yes, sir.

22 Q    And he was there every hour that you worked —

23 A    Yes.

24 Q    — as a truck driver for his transportation of the

25 garbage?

STEVEN BOWLING CROSS - MR. SMITH                51

1   A     Yes, sir.

2   Q     How long would he stay gone transporting garbage?

3   A     Just depended; approximately around maybe two hours to get

4   to Manchester and back.

5   Q     No more than two hours?

6   A     Not that I recall, no, sir.

7   Q     Now, where he took this garbage, was that close to the

8   City of Manchester?

9   A     It was outside the City some.

10  Q     How far outside the City was it?

11  A     A mile, mile-and-a-half.

12  Q     How far is that from Green Street?

13  A     Probably two mile or further.  A little bit further maybe.

14  Q     And you don't know what he did when he came to Manchester,

15  do you, sir?

16  A     No, sir.

17  Q     You don't know who he saw when he came to Manchester, do

18  you, sir?

19  A     No.

20  Q     You don't know if he paid voters when he got there to

21  Manchester or not, do you, sir?

22  A     No, sir.

23  Q     Now, is it your testimony that you-all were already

24  hauling garbage on election day in 2004, sir?

25  A     Yes, we were hauling garbage.

1  Q    Is it your testimony that you were already excavating and

2  digging up garbage on that site on election day in 2004?

3  A    Yes.  Well, we waited until after the inspector come, and

4  he looked it over and told us what we needed to do to finish

5  this and we went to digging.

6  Q    So you didn't start digging until after the inspector

7  come; is that your testimony, sir?

8  A    Yes, sir.

9  Q    So if an inspector had a date showing November the 6th,

10 you would not — or November the 9th, you would not have

11 started until after the November 9th date; is that fair?

12 A    November the 9th?  Which dump are you talking about, sir?

13 Q    Well, I think we're still talking about the Jackson County

14 site of Halcomb Hill.  Do you recall that testimony, sir?

15 A    Yes.

16 Q    Your testimony was is that I believe you started that job

17 in October —

18 A    Yes, sir.

19 Q    — through November?

20 A    Yes, sir.

21 Q    And now you said your testimony is that you didn't start

22 that project until after the inspector came; is that not true?

23 A    No, we didn't start working that day until after the

24 inspector come.

25 Q    Now, you — your father and Bart Morris are partners, are

STEVEN BOWLING CROSS - MR. SMITH                53

1  they not, sir?

2  A    No, sir, they are not.

3  Q    Well, let me ask you this:  On this job in Jackson County,

4  were your father and Bart Morris splitting that money 50/50?

5  A    Yes.

6  Q    So doesn't that make them partners on that job, sir?

7  A    Well — no, sir.

8  Q    So how did you-all split the money?

9  A    Well, I mean, they split it, but referring to partners, my

10 dad owns his own business and Bart owns his own business.

11 Q    How much did you-all get paid for that job in Jackson

12 County?

13 A    I don't recall, sir.

14 Q    It was just a small job compared to those big contracts

15 that you were getting through the City of Manchester; isn't

16 that true?

17 A    I respectfully decline to answer the question to assert my

18 Fifth Amendment right against self-incrimination.

19 Q    Isn't it true that you and your dad were getting these

20 contracts to avoid bidding by getting these projects declared

21 emergencies by Kennon White and his father, Daugh White?

22 A    I respectfully decline to answer the question to assert my

23 Fifth Amendment right against self-incrimination.

24 Q    How much money was your dad making on these jobs?

25 A    I respectfully decline to answer the question and assert

1  my Fifth Amendment right against self-incrimination.

2  Q    Who owned the company?

3  A    My dad owns B&B.

4  Q    How much money did he make on these jobs that he's getting

5  from the City of Manchester?

6  A    I respectfully decline to answer the question and assert

7  my Fifth Amendment right against self-incrimination.

8  Q    Do you recall submitting bids to the Manchester City Hall

9  to Daugh White, Mayor, Sir?

10  A    Do what, sir?  I'm sorry.

11  Q    Do you recall B&B submitting bids back in 2002 and years

12  following to the Honorable Daugh K. White, Mayor, City of

13  Manchester?

14  A    I respectfully decline to answer the question and assert

15  my Fifth Amendment right against self-incrimination.

16  Q    Do you recall being called as a grand jury witness in the

17  federal grand jury in Covington, Kentucky, on January the 12th,

18  2006?

19  A    Yes, sir.

20  Q    Do you recall being asked whether or not your father

21  received money from that company?

22  A    I respectfully decline to answer the question and assert

23  my Fifth Amendment right against self-incrimination.

24  Q    Isn't it a fact, sir, that in your bid proposals for B&B

25  you represented to the City of Manchester that you were

 1  actually a co-owner of the company of B&B Excavating,
 2  Incorporated?
 3  A    I respectfully decline to answer the question and assert
 4  my Fifth Amendment right against self-incrimination.
 5  Q    Isn't it a fact, Mr. Bowling, that you were given inside
 6  information by Kennon White and his father, Daugh White, on
 7  bidding on contracts in the City of Manchester that enabled you
 8  and your father to drop your bids?
 9  A    I respectfully decline to answer the question and assert
10  my Fifth Amendment right against self-incrimination.
11  Q    Isn't it true, Mr. Bowling, that Jared Murphy worked with
12  your company?
13  A    Yes, sir, he did work.
14  Q    Isn't it true that you spoke to him regarding kickbacks
15  that you-all were paying to Kennon White and Daugh White on the
16  City of Manchester contracts?
17  A    I respectfully decline to answer the question and assert
18  my Fifth Amendment right against self-incrimination.
19  Q    Isn't it true, Mr. Bowling, that you're living in an area
20  where you're getting free gas from the City of Manchester?
21  A    Yes —
22        MR. SIMONS:  Your Honor, I object and ask to
23  approach, please.
24        THE COURT:  All right.  You may approach.
25      (Whereupon, the following discussion was had between the

1  Court and counsel at the bench, out of the hearing of the

2  jury.)

3         MR. SIMONS:  Dan Simons for Stanley Bowling, Your

4  Honor.  The question was about free gas from the City of

5  Manchester.  The answer to that is yes, but the answer is

6  they're entitled to free gas because they live within 500 feet

7  of the well.  It's a perfectly legal thing.  This young man

8  wouldn't know the answer to that, he wouldn't be able to

9  respond to it.  But the inference is clear that somehow there's

10 some special deal to allow them free gas, and that's just not

11 the fact.

12        MR. HELMUTH:  This is also beyond the scope of direct

13 examination.

14        THE COURT:  Mr. Smith?

15        MR. SMITH:  I think it clearly is relevant to his

16 credibility, Your Honor, when he is —— has an incentive here to

17 testify falsely, including when I questioned him outside the

18 jury's presence, I asked him how did you get the free gas, sir,

19 and he took the Fifth Amendment.  I think it's definitely

20 relevant as to an area of cross—examination because it does go

21 to his credibility.

22        MR. ABELL:  It would sound to me, Your Honor, that he

23 would not have a basis for the Fifth Amendment privilege as to

24 that issue if, as Mr. Simons says, he's legally entitled to

25 free gas because he lives so proximate to the well.

1           THE COURT:  All right.  I think I'm going to sustain

2    the objection as to this line of inquiry unless there is some

3    evidence that this is part of an ongoing conspiracy.  If he's

4    still receiving free gas and if there's something improper

5    about it, that would be a separate issue, but I don't think we

6    want to get to that point, we're not at that point in the case,

7    so I'll sustain the objection.

8           MR. SIMONS:  Thank you.

9           THE COURT:  Thank you.

10       (Whereupon, the following proceedings continued in open

11   court.)

12           THE COURT:  All right.  Thank you, Counsel, and I

13   will sustain the objection to the last question.

14   BY MR. SMITH:

15   Q    Mr. Bowling, are you familiar with the Big Creek job on

16   Laurel Branch Road?

17   A    I respectfully decline to answer the question to assert my

18   Fifth Amendment right against self-incrimination.

19   Q    Did you and your father actually reroute the line and put

20   in inside the county road for the purpose of getting the

21   County's resources to repave and regravel that property?

22   A    I respectfully decline to answer the question and assert

23   my Fifth Amendment right against self-incrimination.

24   Q    Isn't it true you billed the City of Manchester for gravel

25   which was supplied by the County, Clay County?

1   A    I respectfully decline to answer the question and assert

2   my Fifth Amendment right against self-incrimination.

3         MR. SMITH:  I pass the witness.

4         THE COURT:  All right.  Before there's any further

5   examination, I will advise the jury that when a witness invokes

6   his or her Fifth Amendment rights not to testify, the jury

7   should not draw any inference that the answer would be

8   favorable or unfavorable either to the United States or to any

9   party in the case, any defendant in the case, and you are so

10  instructed.

11        Let's see, Mr. Pinales.

12        MR. PINALES:  No questions.  Thank you, Your Honor.

13        THE COURT:  Mr. Westberry?

14        MR. WESTBERRY:  No questions, Your Honor.

15        MR. WHITE:  No questions, Your Honor.

16        MR. ABELL:  No questions, Your Honor.

17        THE COURT:  Mr. Baldani?

18        MR. BALDANI:  Nor from us, Your Honor.

19        THE COURT:  All right.  Now, let me go back around.

20  I believe, Ms. Hughes, you would be next before we would go to

21  any redirect.

22        MS. HUGHES:  I don't have any questions, thank you.

23        THE COURT:  All right.  Thank you.

24        And, Mr. Simons.

25        MR. SIMONS:  I do.

1          THE COURT:  All right.  You may proceed.

2                       DIRECT EXAMINATION

3   BY MR. SIMONS:

4   Q    Morning —

5   A    Morning.

6   Q    — Steven.  When you were on the Jackson County job in

7   November of 2004 that you've testified about —

8   A    Yes, sir.

9   Q    — you said that your dad was not there often, he might

10  come for a little white, a little bit; is that right?

11  A    Yes, sir.

12  Q    You also said he was sick; right?

13  A    Yes, sir.

14  Q    Can you tell the jury what his health issue was?

15          MR. SMITH:  Your Honor, I'm going to object as to

16  relevance.

17          THE COURT:  Overruled.

18  BY MR. SIMONS:

19  Q    Would you please tell the jury what the condition of your

20  father's health was that made him unable to work every day in

21  November of 2004?

22  A    He was diagnosed with a disease called —

23          MR. SMITH:  Your Honor, I'm going to object the

24  hearsay.

25          THE COURT:  Overruled.  It's his understanding of

1   what any medical condition might have been that would prevent

2   him from being present.

3   BY MR. SIMONS:

4   Q   Okay.  Steven —

5   A   Yes, sir.

6   Q   — what was the nature of his health problem?

7   A   He was diagnosed with a disease called Guillain-Barre and

8   was in and out of the hospital.

9   Q   Okay.  And did that extend for several months during that

10  period of time?

11  A   Yes, sir.

12  Q   Prior to his diagnosis with Guillain-Barre syndrome, which

13  required repeated hospitalizations, did your dad work every day

14  for B&B or whatever company?

15  A   Yes, prior to that, yes, he was — he helped every day.  I

16  mean, you know, if he could.

17  Q   Six days a week?

18  A   Yes, sir, if he could.

19  Q   Unless the rain was so hard it rained you out?

20  A   Right, sir.

21  Q   Okay.  Now, your dad is the owner of B&B; is that fair?

22  A   Yes, sir.

23  Q   You don't own any stock in B&B?

24  A   No, sir.

25  Q   You don't do any books or records for B&B?

 1  A    No, sir.

 2  Q    You drive the heavy equipment?

 3  A    Yes, sir.

 4  Q    And how many days a week do you work?

 5  A    Right now, sir?

 6  Q    No, for B&B.

 7  A    For B&B I worked six days a week, sometimes seven if I had

 8  to.

 9  Q    And did you work long hours on those days?

10  A    Yes, sir.

11  Q    Okay.  When your dad was healthy, did he do that right

12  with you?

13  A    Yes, sir.

14  Q    You received a payroll check, did you not?

15  A    Yes, sir.

16  Q    You were paid by the hour?

17  A    Yes, sir.

18  Q    Were taxes taken out of your check?

19  A    Yes, sir.

20  Q    Was your payroll check issued from an accountant's office

21  in Manchester, Kentucky?

22  A    Yes, sir.

23  Q    Did you have any responsibility for — any responsibility

24  for the bookkeeping duties whatsoever, other than turning in

25  your hours?

1   A     No, sir.

2   Q     Now, you were also asked some questions about November of

3   2006; correct?

4   A     Yes, sir.

5   Q     And a different job also in Jackson County; is that

6   correct?

7   A     Yes, sir.

8   Q     And there was a newspaper article introduced at that

9   point?

10  A     Yes, sir.

11  Q     Along about that time, did your dad also have a different

12  health issue that was —

13          MR. SMITH:  Your Honor, I'm going to object —

14          THE WITNESS:  Yes, sir.

15          MR. SMITH:  — to the leading.

16          THE COURT:  Overruled for this question.

17  BY MR. SIMONS:

18  Q     Did your dad have a different diagnosis in — about that

19  time?

20  A     Yes, sir.

21  Q     And what was that?

22  A     Prostate cancer.

23  Q     And was that a serious condition that required treatment?

24  A     Yes, sir.

25  Q     Did he subsequently have surgery?

1   A    Yes, sir.

2   Q    And in the early part of 2007, did he have that surgery?

3   A    Yes, sir.

4   Q    All right.  Did that require an extended hospitalization

5   for him?

6   A    Yes, sir.

7   Q    Was he unable to work every day during that?

8   A    Yes, sir.

9        MR. SMITH:  Your Honor, I'm going to object to the

10  continued leading.

11       THE COURT:  I'll sustain the objection.

12  BY MR. SIMONS:

13  Q    Was your dad present or tried to work every day that his

14  health allowed?

15  A    Yes, sir.

16       MR. SIMONS:  Thank you, Steven.

17       I don't have any further questions.

18       THE COURT:  All right.  Let me go back to Mr. Gilbert

19  and see if there's any redirect of the witness.

20                     REDIRECT EXAMINATION

21  BY MR. GILBERT:

22  Q    I just have the a few follow-up questions, Mr. Bowling.

23       When you testified that when you were working the jobs up

24  in Jackson County and Mr. Morris would leave with a load of

25  garbage, do you remember that line of questioning?

1   A    Yes, sir.

2   Q    And how far — let's take Halcomb Hill, that's the project

3   that you did in 2004.  How far would you say that that project

4   is from the Clay County line?

5   A    From the Clay County line?

6   Q    Yes, sir.

7   A    Probably a mile and a half, two mile from the Clay

8   County —

9   Q    Would that be on 421?

10  A    No, that would be down off of, what they call, Sextons

11  Creek.  I don't know the number there.

12  Q    And how would you get to the City of Manchester from that

13  dumpsite, Halcomb Hill?

14  A    You'd have to come all the way out up Sextons Creek and

15  back up and hit 421 back to Manchester, which is —

16  Q    And how far would you say that is?

17  A    Probably around — down from there to the city, 35-mile,

18  30, 35-mile.

19  Q    Okay.  So he would have to travel 35 miles to get to the

20  city, another mile and half, two miles, to get to the transfer

21  station?

22  A    Yes, sir.

23  Q    And then make a round trip back, dump his load, and come

24  back?

25  A    Yes, sir.

STEVEN BOWLING - DIRECT - MR. GILBERT          65

1  Q    Okay.  421, that's a United States highway, isn't it?

2  A    Uh-huh.  Yes, sir.

3  Q    Is it a good highway, is it a straight highway?

4  A    No.  It ain't a real good highway, no, it's two-lane,

5  curvy.

6  Q    Kind of curvy.  So taking as much as two hours to leave

7  that site and to return, that wouldn't leave much time for

8  anything else, would it?

9  A    No, sir.

10 Q    And the Travis Road dumpsite that you-all were cleaning up

11 in November of '06?

12 A    Yes, sir.

13 Q    When did you — do you recall when you started that

14 project?

15 A    The first of November.

16 Q    Okay.  And when — at least you were on the job there on

17 November the 2nd, because that's reflected in the newspaper

18 article, isn't it?

19 A    Yes, sir.

20      MR. SMITH:  Your Honor, I'm going to object as to the

21 date of November the 2nd.  I don't believe that's represented

22 in the article.

23      THE COURT:  Sustained.

24 BY MR. GILBERT:

25 Q    When was the — when did the reporter come to the job

1  site?

2  A     It was ——

3        MR. SMITH:  Been asked and answered, I'll object,

4  outside the scope.

5        THE COURT:  It was covered on direct originally.

6  Sustained.

7  BY MR. GILBERT:

8  Q     How far is that dumpsite location from the Clay County

9  line?

10  A     The way we went in?  Probably from the Clay County line,

11  you're looking at 10, maybe 15 mile from the Clay County line.

12  Q     Okay.  And that added another —— how far would that be to

13  the City of Manchester?

14  A     From the site, you're probably looking 50, 55-mile one way

15  that way.

16  Q     And would the same be true, that a significant portion of

17  that would be traveled on Highway 421?

18  A     You would come out to 421, yes, but they was a lot of back

19  roads leading off 421 back to the job.

20  Q     And the same would be true with respect to leaving that

21  site with a load of garbage, two hours would not give

22  Mr. Morris much time to do anything else?

23  A     No, sir.

24  Q     Now, with respect to some of the questions that you did

25  not answer, those were involved with City contracts that B&B

STEVEN BOWLING - RECROSS - MR. SMITH

1  had?

2  A    Yes, sir.

3       MR. SMITH:  Your Honor, I'm going to object as to

4  counsel asking the witness now to comment or characterize his

5  testimony.

6       THE COURT:  Yes, if he has asserted a Fifth Amendment

7  right to those areas, I'll sustain the objection.

8       MR. GILBERT:  I think that's all I have, Your Honor.

9       THE COURT:  All right.  Thank you.

10       Let's see if we have any further cross-examination of

11  the witness.

12       MR. SMITH:  Yes, Your Honor.

13       THE COURT:  Mr. Smith.

14                      RECROSS-EXAMINATION

15  BY MR. SMITH:

16  Q    Mr. Bowling, you have now testified, I believe, that other

17  than those times when you say your dad was sick, that he worked

18  every day on these jobs, six days a week, rain or shine?

19  A    Yes, he worked when they — if they — while he was not

20  sick, yes, sir.

21  Q    And you were just an equipment operator?

22  A    Yes, sir.

23  Q    Sir, if your dad worked every day on there, six days a

24  week, on these jobs and you were just the equipment operator

25  for the company, could you explain to this jury why you would

1  represent to the City of Manchester that you were a co-owner of

2  the company?

3  A    I respectfully decline to answer the question to assert my

4  Fifth Amendment right against self-incrimination.

5  Q    If your dad worked there six days a week on these jobs,

6  rain or shine, why did you represent to the federal grand jury

7  in Covington, Kentucky, that your dad never received a penny

8  for working for the company?

9  A    I respectfully decline to answer the question to assert my

10 Fifth Amendment right against self-incrimination.

11            MR. SMITH:  That's all I have.

12            THE COURT:  Let me see if anyone has any other

13 questions of this witness.

14            MR. PINALES:  No questions, thank you.

15            THE COURT:  All right.

16            Mr. Simons, do you have anything else on these

17 limited areas that Mr. Gilbert and Mr. Smith just asked about?

18            MR. SIMONS:  I don't think so, Your Honor.

19            THE COURT:  All right.

20            All right.  Thank you, you can step down at this

21 time.

22            MR. HELMUTH:  Your Honor, is Mr. Bowling excused at

23 this time?

24            THE COURT:  Unless he's under subpoena by another

25 party, he's excused at this time.  Thank you.

1          All right.  Mr. Gilbert, call your next witness.

2          MR. GILBERT:  We call John Craft, Your Honor.

3          THE COURT:  Thank you.

4                         JOHN CRAFT,

5  having been first duly placed under oath, was examined and

6  testified as follows:

7          THE COURT:  Thank you.

8          You may proceed.

9          MR. GILBERT:  Thank you, Your Honor.

10                      DIRECT EXAMINATION

11 BY MR. GILBERT:

12 Q    State your name, please, sir.

13 A    John Craft.

14 Q    And are you engaged in any professional endeavor?

15 A    I'm a certified public accountant.

16 Q    And where are your professional offices?

17 A    They're in Richmond, Kentucky.

18 Q    Do you hold any professional licenses?

19 A    I hold a certificate with the State Board of Accountants.

20 Q    And when did you obtain that license?

21 A    1972.

22 Q    Can you tell the jury a little bit about your education,

23 educational background?

24 A    I have a Bachelor's Degree in Accounting from the Eastern

25 Kentucky University.

JOHN CRAFT - DIRECT - MR. GILBERT                    70

1  Q    And do you — are you a member of any professional

2  societies or associations?

3  A    American Institute of Certified Public Accountants and the

4  Kentucky Society of Certified Public Accountants, National

5  Association of Evaluation Analysts.

6  Q    And how long have you been a practicing certified public

7  accountant?

8  A    Forty — well, '72, would be 38 years.

9  Q    All right.  And have you previously qualified to give

10 opinion testimony in a court of law?

11 A    I have.

12 Q    And how many times would you estimate?

13 A    I don't have a list, but I would say it's close to a

14 hundred by now.

15 Q    Have you testified in both state and federal courts?

16 A    I have.

17 Q    Have you testified and qualified to give opinion testimony

18 in the Eastern District of Kentucky?

19 A    I have.

20 Q    Have you ever failed to qualify as an expert witness?

21 A    No.

22 Q    Were you employed by me to make an analysis of certain

23 financial documents of B & J Transfer, Incorporated?

24 A    Yes.

25 Q    And what were you requested to do?

1   A    To examine tax returns from 1999 to 2008 and to examine

2   certain contracts for transfer station with City of Manchester.

3   Q    What type of corporation is B & J Transfer, Incorporated?

4   A    It is a Subchapter S corporation.

5   Q    And how is that treated for tax purposes?

6   A    It's a flow-through entity, which means that the profits

7   made at the corporate level pass through to the shareholders.

8   Q    And who are the shareholders?

9   A    There's one shareholder.

10  Q    Who is that?

11  A    Bart Morris.

12  Q    And the examination of those records, did that reveal that

13  he was the sole recipient of any income that was generated by

14  that business?

15  A    That's correct.

16  Q    How would that be reflected on the tax returns?

17  A    For his tax returns, it would be reported on Schedule E as

18  a corporate -- S corporation income.

19  Q    What materials, documents, or other information did you

20  review in making your analysis?

21  A    I looked at the tax returns from 1999 to 2008 and the

22  contracts for the transfer service with the City of Manchester.

23  Q    And what did your analysis reveal?

24  A    That B & J is operated in a normal manner with

25  financial -- results of financial operations that I would

1  expect to see in a similar type of organization.

2  Q    Do you have an opinion as to the reasonableness of the

3  rates charged to the City of Manchester?

4  A    I do.

5  Q    And Clay County, with respect to the receipt and transport

6  of garbage to the landfill?

7  A    Yes, I do.  The rates started in 1994 at $12 a cubic

8  compacted yard, and it increased in increments, normal

9  increments I would call them, up to the year 2000 when the rate

10 was reduced from 18.50 per cubic compacted yard to 18, and then

11 it remained at that level until 2004, when the unit of measure

12 was changed from compacted cubic yard to ton.

13 Q    Can you explain to the jury or do you have an opinion as

14 to how that affected the amount that was charged to the City of

15 Manchester?

16 A    Yes, actually, over the period, if you look at the 15-year

17 period between the initial contract in 1994 and the rate being

18 charged in 2009, it represents an increase of about -- an

19 annual increase of about three -- a little less than

20 three percent per year.

21 Q    And would that be more or greater than the consumer -- the

22 increase of the consumer price index?

23 A    It would be less than the consumer price index for the

24 same period.

25 Q    When the change was made from compacted cubic yards to

1    tonnage, how did that affect what the City of Manchester was

2    charged?

3    A    It was less than what they had been charged previously.

4    Q    And does the State of Kentucky have a ratio that converts

5    compacted cubic yards into tonnage?

6    A    It does.  The regulations call for three compacted cubic

7    yards to equal one ton.

8    Q    And you say that the conversion from compacted cubic yards

9    to tonnage resulted in a decrease as to what the City was

10   charging.  How did that happen?  What was he charging?

11   A    He was charging prior to the change $18, which three times

12   18 would have been $54 per ton, and he started, at that point,

13   at 46.

14   Q    And have you reviewed that contract?

15   A    I have.

16   Q    And have you surveyed other transfer stations that are

17   similarly located in the area?

18   A    Yes, I surveyed five transfer stations in proximity to

19   B & J and found that B & J was within the range charged by

20   others.  The high I found was $54.31.  The low was 40.  In

21   2009, B & J was charging $50.55.

22   Q    And what was the average?

23   A    $47.58.

24   Q    Do you have an opinion as to whether -- what B & J

25   Transfer, Incorporated, was charging in the City of Manchester

1   was within reason?

2   A    I believe it was a reasonable rate throughout the period.

3            MR. GILBERT:  Thank you.  That's all.

4            THE COURT:  All right.  Thank you.

5            Mr. Smith.

6            MR. SMITH:  Yes, Your Honor.

7                        CROSS-EXAMINATION

8   BY MR. SMITH:

9   Q    Your name is Mr. Craft; is that correct?

10  A    That's correct.

11  Q    And you operate a business in Richmond?

12  A    I am a partner in a CPA firm, Craft, Noble & Company,

13  PLLC.

14  Q    And how close are you in proximity to the law offices of

15  Dan Simons and Jerry Gilbert there in Richmond?  Do you know

16  where their offices are?

17  A    I do.  They're downtown.  I'm on the Bypass.

18  Q    All right.  And have you ever done work for them before?

19  A    Not for Mr. Simons, but for Mr. Gilbert, yes.

20  Q    How many times have you worked for him in the past?

21  A    I believe twice.

22  Q    What kind of work was that?

23  A    A similar work to what we're doing today.  I believe the

24  last one was a divorce case in which I gave an opinion upon

25  some tax returns.

1  Q    And how do you charge for this type of work?

2  A    I charge by the hour.

3  Q    And what's that rate?

4  A    For preparation $195 an hour; for testimony, $250 an hour.

5  Q    And have you tabulated a bill at this point for

6  Mr. Morris?

7  A    Yes.

8  Q    And how much is that charge?

9  A    $7,600.

10 Q    Now, in the course of your testimony, I believe you

11 indicated that you made some investigation, looked at some

12 certain things, I believe you said tax returns and contracts

13 with the City of Manchester, in rendering your opinion?

14 A    That's correct.

15 Q    And I believe you later, then, said that you had also

16 looked at some other cities?

17 A    I made a survey by telephone.

18 Q    And when you surveyed by telephone, what cities was that

19 that you surveyed, sir?

20 A    Actually, they were counties.  Breathitt County, Letcher

21 County, Perry County, Harlan County, and Jackson County.

22 Q    Breathitt, Harlan, Letcher, Jackson — Did I miss one?

23 A    Perry.

24 Q    Perry.  And what was the nature of your survey, sir?

25 A    I called and asked them what their fees would be for a

1  permitted hauler to dump at their facility.

2  Q    Now, was there anything else that you used before

3  formulating your opinion other than these tax returns, the

4  contract with the City of Manchester, and this phone survey,

5  sir?

6  A    No.

7  Q    So based upon that investigation, you have rendered the

8  opinions that you have given to the jury today; is that fair?

9  A    That's correct.

10 Q    And I believe you said that you found the rates in this

11 case to be reasonable based on your investigation?

12 A    I did.

13 Q    And did you investigate as to what scales Bart Morris was

14 using to weigh his garbage on?

15 A    No.

16 Q    Did you investigate how far these other cities had to haul

17 their garbage?

18 A    No.

19 Q    Did I understand you to say that there were an equation of

20 three yards equals one ton and that's what you used to base the

21 reasonableness of this conversion that occurred in 2004 by the

22 company of Mr. Morris?

23 A    That's correct.

24 Q    And are you stating to this jury and this Court that you

25 believe that every yard of garbage would weigh the same?

1  A    No.  As I stated earlier, I used the standard that is

2  contained in the Kentucky regulations, and that's what they

3  use.  So I took their lead.

4  Q    So that's just a point of reference, because everybody

5  knows that some garbage is heavier than others based on our

6  garbage can; right?

7  A    I wouldn't know.  I'm not an expert in garbage.

8  Q    Okay.  You don't have any expertise in that.  So you would

9  agree with me, if you had a yard of aluminum, that would weigh

10 a lot less than a yard of iron, if you had that compacted;

11 would you agree?

12 A    Again, that's not my expertise.

13 Q    And you don't know whose scales the Morris company used?

14 A    No, I do not.

15 Q    And I assume in determining this reasonableness rate that

16 you contacted the City of Manchester and looked at their

17 current services to see what they were charging and how they

18 were compared to Mr. Morris's contract, did you?

19 A    No, I did not.  Because my understanding is they're not

20 using a transfer service.

21 Q    So you haven't talked to the City of Manchester?

22 A    No.

23 Q    You have no idea what cost savings they've realized based

24 on their own hauling of the garbage as opposed to using an

25 independent contractor?

1  A    No.

2  Q    Now, you said you did examine the tax returns of

3  Mr. Morris and I think you rendered those numbers in a report

4  that you gave to counsel; is that right?

5  A    That's correct.

6  Q    And I believe the numbers you reported was that in 2001 he

7  reported to the IRS a salary of $9,700 in 2002; is that fair?

8  A    That's correct.

9  Q    17,300 in 2003?

10  A    Correct.

11  Q    And 21,900 in 2004?

12  A    I believe it's 21,950.

13  Q    I'm reading from a report furnished to me.  It says

14  21,900.  Do you have a different figure?

15  A    Yes, I do.

16  Q    And it's 950?

17  A    Yes.

18  Q    All right.  Thank you.  And $25,000 each year for the

19  years 2005 through 2008?

20  A    Yes.

21  Q    And he reported no salary to you prior to 2002?

22  A    He didn't report it to me at all, he reported it to the

23  Internal Revenue Service, but he reported none prior to that

24  time.

25          MR. SMITH:  If I can just have a moment, Your Honor?

1            THE COURT:  Yes, sir.

2            MR. SMITH:  Your Honor, I'll pass the witness.

3            THE COURT:  All right.  Let me see if counsel for any

4    of the other parties have questions.

5            MR. PINALES:  No questions.

6            MR. WHITE:  No.

7            THE COURT:  Ms. Hughes or Mr. Simons?

8            All right.  Mr. Gilbert, any redirect of this

9    witness?

10           MR. GILBERT:  May we approach, Your Honor?

11           THE COURT:  Yes, sir, you may.

12        (Whereupon, the following discussion was had between the

13   Court and counsel at the bench, out of the hearing of the

14   jury.)

15           MR. GILBERT:  If Your Honor please, based upon the

16   last series of questions asked by Mr. Smith of this witness in

17   terms of his income for certain periods, what years and what

18   salary that he has made, I would assert that the United States

19   has opened the door for me to ask him about profits and salary

20   in relation to the distributions that he received for those

21   years concerning his business.

22           THE COURT:  Mr. Smith?

23           MR. SMITH:  Your Honor, I disagree.  The jury — the

24   foundation he related to his investigation was that he looked

25   at his tax returns and contracts and contracts with Manchester,

1  and I think that we certainly limited our examination to those

2  areas of what he looked at.  And he looked at, he said, only

3  contracts with the City of Manchester, he did a phone survey,

4  and he looked at his tax returns.  And I asked him did he

5  report what he was making in those years in his tax returns and

6  he gave the number.  I fail to see how that opens up the door.

7          THE COURT:  I'm going to allow you to ask limited

8  questions as to how you determine profits or report profits on

9  tax returns.  We're not going to go into a lengthy analysis of

10 profits, but for those years how profits are determined, since

11 it's a flow-through, it's a Subchapter S.

12         MR. GILBERT:  He did give me a range and I believe

13 that the salary and distribution was an average somewhere

14 around $47,000 a year.

15         THE COURT:  Well, what I'm going to allow you to ask

16 him is based on his testimony on cross about reported income

17 for those years, how was the income determined.  If he was

18 reporting as a Subchapter S, how is that determined, what

19 matters do you include, what matters do you exclude.

20         MR. GILBERT:  Can I ask the average over the number

21 of years?

22         THE COURT:  I'm not sure what you're going to ask,

23 average over the number of years.

24         MR. GILBERT:  Well, he asked questions about salary.

25 And as you know, on a Subchapter S, you pay yourself a salary

1  for operating the business.  And at the end of the year, there

2  would be money left over to be distributed to the shareholder.

3  So he received a salary and then distributions throughout the

4  year, that would be his total compensation.  And I want to ask

5  him about that, and I want to ask him about whether he's done

6  an average over this period of time, from 2002 to 2008, as to

7  what the total amount of money that he received on a yearly

8  basis.

9           THE COURT:  What I'm allowing you to ask him about is

10  how you determine profits for a Subchapter S for the years that

11  have just been discussed, 2002 through 2008.  It was a

12  Subchapter S during that entire period of time; is that

13  correct?

14           MR. GILBERT:  Yes.

15           THE COURT:  You can ask him about how you determine

16  income that is reported on tax returns during that period of

17  time.

18           MR. GILBERT:  Okay.

19           THE COURT:  All right?

20           MR. SMITH:  I would assume, Your Honor, that does not

21  allow him then to go into his net profit ratio and calculations

22  that we have just excluded.

23           THE COURT:  No, just the area that you opened up by

24  your questions that his income was reported during those

25  periods of time to give the jury further explanation as to how

1  a Subchapter S would report income.  You can ask questions

2  along those lines.

3          MR. GILBERT:  Thank you.

4      (Whereupon, the following proceedings continued in open

5  court.)

6                       REDIRECT EXAMINATION

7  BY MR. GILBERT:

8  Q    Mr. Craft, you were asked on cross-examination a line of

9  questions about the salary that Mr. Morris received on a number

10  of years.

11  A    Correct.

12  Q    Can you explain to the jury how a Subchapter S corporation

13  works and whether Mr. Morris would have received other

14  compensation or distributions during those periods?

15  A    Yes.  Someone -- a shareholder of a Subchapter S

16  corporation, if he works for the corporation, would normally

17  take a salary for his services.  And that would be taxed

18  appropriately.  Any money made by the company over and above

19  the expenses and his salary, which would be profit, would then

20  pass through to him as a dividend, basically the same as

21  General Motors or any other company.

22  Q    And can you, for the years starting with 2002, tell the

23  jury what his total -- the total of his salary and his

24  distributions would have been?

25  A    Do you want an average for those years or do you want me

1  to —

2          THE COURT:  No, the numbers for those years is the

3  question.

4          THE WITNESS:  Okay.  Well, I'll have to add those

5  together.  Let's see here.  For the year 2002, 20,254; for

6  2003, $56,029; for 2004, 59,143; for 2005, $77,039; for 2006,

7  63,933; for 2007, $26,089; for 2008, $8,631.  That was all done

8  in my head.  I'm pretty sure of those numbers.

9  BY MR. GILBERT:

10  Q   Okay.  B&B transfer, from your review of the records, they

11  did more business than just with the City of Manchester or Clay

12  County, Kentucky?

13  A   That's correct.

14          MR. GILBERT:  That's all.

15          THE COURT:  Thank you.

16          Let's see if there's any other questions on cross

17  first by the United States, recross.

18          MR. SMITH:  No further questions.

19          THE COURT:  Anyone else have any questions?

20          MR. SIMONS:  I do have a question.

21          THE COURT:  Based on what Mr. Gilbert just asked?

22          MR. SIMONS:  Yes.

23                      CROSS-EXAMINATION

24  BY MR. SIMONS:

25  Q   Mr. Craft, if the owner of a sub-S corporation took no

1   salary, would all of the money pass through at the end of the

2   year as income?

3   A    That's correct.

4   Q    And it's up to the shareholder or the owner which he would

5   prefer to do?

6   A    Well, and the Internal Revenue Service.

7   Q    I understand.  Thank you.

8   A    Uh-huh.  Yes.

9         THE COURT:  Thank you.

10        Anything else?

11     (No response.)

12        THE COURT:  Mr. Craft, you may step down, sir, and

13   you're excused at this time.

14        THE WITNESS:  Thank you.

15        THE COURT:  Mr. Gilbert.

16        MR. GILBERT:  William Morris announces closed, Your

17   Honor.

18        THE COURT:  All right.  Thank you.  We got a little

19   bit late start this morning and we haven't taken a break yet,

20   so we're going to take a shorter break right now, ladies and

21   gentlemen.  We'll take about 15 minutes, until 11:00.  Please

22   keep in mind the admonitions that you've been given several

23   times not to discuss the case among yourselves while we are in

24   recess.  The jury will be excused until 11:00 a.m.

25        (Whereupon, the jury retired from the courtroom, after

1  which the following proceedings were had in open court.)

2          THE COURT:  Thank you.

3          Mr. Baldani, if you could accompany Mr. Thompson

4  downstairs to the Probation Office at this time.

5          MR. BALDANI:  Are they on the first floor?

6          THE COURT:  The first floor, downstairs, yes, sir.

7          And we'll be in recess for 15 minutes.

8      (Whereupon, a short recess was had, after which the

9  following proceedings were had outside the presence of the

10  jury.)

11          THE COURT:  Thank you.

12          The record will reflect the jury is not present.  I

13  understand that the parties have an issue to take up before the

14  jury is brought in.

15          MS. HUGHES:  My first witness, Your Honor, is a

16  records custodian from the Secretary of State's Office, and she

17  brought with her certified copies of the Articles of

18  Incorporation and the other corporate documents for B & J

19  Transfer and for B & J Transport, which is the name named in

20  the indictment and on the various exhibits and whatnot.  So I

21  was going to ask her to certify both of those to authenticate

22  both of those.  I believe Mr. Smith has an objection.

23          THE COURT:  All right.

24          Mr. Smith?

25          MR. SMITH:  Your Honor, the indictment does not

1    allege an offense against B & J Transport, it alleges that

2    Debra Morris and William B. Morris violated various statutes.

3    Counsel has adequately, I think, cross-examined government

4    witnesses, including Special Agent Sagrecy, and established

5    that the correct incorporated name is not B & J Transport but

6    B & J Transfer.  That apparently is the business in which

7    they've operated under that same.

8              To interject into this case now certified records

9    from B & J Transport, which is an incorporated entity that

10   operates a different business in a different county during a

11   different time period and really has, as we see it, no

12   relevance whatsoever to the issues at hand that we're trying

13   here today, and if there is any relevance in establishing

14   whether or not we specifically spelled the name "Transport" or

15   "Transfer" in some of our documents, I think that the

16   possibility of confusion would certainly outweigh any probative

17   value.  So we would move to exclude that record.

18             THE COURT:  All right.

19             MS. HUGHES:  In response, Your Honor, if there's any

20   confusion, I believe it is created by the government by naming

21   the wrong entity in the indictment.  And I think that it is

22   relevant.  It's not a charged entity, but it is the government

23   that has alleged that my client derives benefit from B & J

24   Transport, according to the indictment, and B & J Transfer

25   according to Special Agent Sagrecy's cross-examination.  I will

1  admit he acknowledged there had been an error.

2          THE COURT:  Well, I'm going to allow you to present

3  the witness and introduce the documents.  Of course, they'll be

4  subject to cross-examination.  I'm not going to tell anyone how

5  to — once again, I'm not going to tell anyone how to practice

6  their case, it may appear to be petty, quite frankly, but if

7  you want to do that, then, again, I'll give you a shovel with a

8  little bit longer handle on it, but that's up to you.  But as

9  long as there's not an attempt to confuse the jury through this

10 witness, I'll allow it, but if I — if it appears to me that

11 there is an attempt to confuse the jury, at that point I will

12 make a correction so we don't have a problem.

13         MS. HUGHES:  I definitely don't want to confuse the

14 jury, and if the Court will give me a second, I'll talk to my

15 client.

16         THE COURT:  Again, that's completely up to you.  You

17 can do that if you want while we're bringing the jury in, then

18 you can come around and call your first witness.

19         MS. HUGHES:  Thank you.

20         THE COURT:  Let's bring the jury in.

21     (Whereupon, the jury returned to the courtroom, after

22 which the following proceedings were had in open court.)

23         THE COURT:  Thank you, and please be seated.

24         Ladies and gentlemen, of course, you know, sometimes

25 when an attorney or a party says they have just one more

1  question, it turns out to be a little more than one.  Sometimes

2  the Court says we'll give you 15 minutes and it turns out to be

3  a little bit more than 15 minutes.  So I do apologize, but

4  we'll proceed at this time.

5          Ms. Hughes.

6          MS. HUGHES:  Thank you.  I would like to call Colleen

7  Chaney.

8          THE COURT:  Thank you.

9          And, of course, the record will reflect all members

10  of the jury are present.  The parties and counsel are also

11  present.

12                    COLLEEN CHANEY,

13  having been first duly placed under oath, was examined and

14  testified as follows:

15          THE COURT:  Thank you.  And please proceed.

16                  DIRECT EXAMINATION

17  BY MS. HUGHES:

18  Q    Hello, Ms. Chaney, my name is Elizabeth Hughes, I

19  represent Debra Morris.

20       Can you tell the jury how you're employed?

21  A    I am employed with the Office of Secretary of State here

22  in Frankfort and I'm the Director of Corporations.

23  Q    And are you here in that capacity, as a representative of

24  the Secretary of State's Office?

25  A    I am.

COLLEEN CHANEY - DIRECT - MS. HUGHES                89

1    Q    And is the Secretary of State's Office the place where

2    corporations file various documents and papers related to

3    corporations incorporated in Kentucky?

4    A    Correct, yes.

5    Q    And as a part of your job, are you the custodian of those

6    records?

7    A    We are.

8         MS. HUGHES:  I would like to have the court security

9    officer to hand you two packets, if that's okay with the Court.

10        THE COURT:  Yes, ma'am.

11        MR. SMITH:  What number?

12        THE COURT:  Seven.

13   BY MS. HUGHES:

14   Q    Did you bring those documents here today pursuant to a

15   subpoena?

16   A    I did.

17   Q    Okay.  Will you tell the jury what you brought?

18   A    These are two sets of filings.  They are certified by our

19   office, all documents that we have on file for two corporate

20   entities, B & J Transfer, Incorporated, and B & J Transport,

21   Incorporated.

22   Q    And are these true and accurate copies of the files

23   maintained by your office?

24   A    They are.

25        MS. HUGHES:  Your Honor, I would ask that the B & J

 1   Transfer be marked as Debra Morris Exhibit No. 7 and the

 2   Transport be marked as Debra Morris Exhibit No. 8, and I move

 3   their introduction at this time.

 4               THE COURT:  All right.

 5               Any objection?

 6               MR. SMITH:  Same as stated earlier, Your Honor.

 7               THE COURT:  All right.  The Exhibits 7 and 8 for

 8   Debra Morris will be admitted at this time as marked, those for

 9   B & J Transfer as Exhibit 7, B & J Transfer for Exhibit No. 8.

10   BY MS. HUGHES:

11   Q    Now, Ms. Chaney, if you would look, please, at the

12   Articles of Incorporation for B & J Transfer, Inc.

13   A    Yes, ma'am.

14   Q    Tell me when that company was incorporated.

15   A    This company was incorporated -- one moment.  It was filed

16   in our office December 6th, is the file stamp.

17   Q    Of what year?

18   A    Oh, I apologize, 2004.

19   Q    Are you looking at the Articles?

20   A    I am.

21   Q    Okay.  And would you look at your certification, please?

22   A    Oh, yes, I apologize.  We had filed -- December 6th, 1995.

23   Q    All right.  Thank you.  Now, if you would look at the

24   Articles and look at Article V, tell me who is the registered

25   agent for this company.

1  A    The registered agent for this company is Bart Morris.

2  Q    And if you would look at Article VI, who are the initial

3  stockholders?

4  A    Bart Morris.

5  Q    And if you could look at Article VIII and tell the jury

6  who the officers are — or directors, excuse me.  I apologize.

7  A    Okay.  It is Bart Morris, president; Mike Morris, vice

8  president; Lonnie Rice as secretary and treasurer.

9  Q    If you could look at the last page and tell me who

10 prepared the Articles of Incorporation.

11 A    Bart Morris is the incorporator.

12 Q    Yes.  And who prepared the documents, if you can see it?

13 A    It looks like Carl Short II.

14         MS. HUGHES:  Thank you.

15         That's all I have.  I'll pass the witness.

16         THE COURT:  All right.  Thank you.

17         Mr. Smith.

18                    CROSS-EXAMINATION

19 BY MR. SMITH:

20 Q    Ma'am, are you still looking at the Articles of

21 Incorporation for B & J Transfer?

22 A    Yes.

23 Q    And you listed some officers.  Does it state in there who

24 the stockholder initially was for the company?  Would that be

25 Article VI?

1    A    It just has initial stockholder as Bart Morris.

2    Q    And the location of this business is 107 Green Street,

3    Manchester, Kentucky?

4    A    Correct.

5             MR. SMITH:  Can I have just one second?

6             THE COURT:  Yes, sir.

7             MR. SMITH:  That's all.

8             THE COURT:  All right.

9             Let's see if any of the other parties have questions

10   for the witness?

11      (No response.)

12            THE COURT:  No?

13            All right.  Thank you --

14            Any redirect?

15            MS. HUGHES:  No, Your Honor.

16            THE COURT:  All right.  Thank you, ma'am.  You may

17   step down.  Thank you, ma'am, you're excused.

18            And, Ms. Hughes, you may call your next witness.

19            MS. HUGHES:  Regina Hipsher.

20                     REGINA HIPSHER,

21   having been first duly placed under oath, was examined and

22   testified as follows:

23            THE COURT:  Thank you.  Please proceed.

24            MS. HUGHES:  Thank you.

25                     DIRECT EXAMINATION

1   BY MS. HUGHES:

2   Q    Ms. Hipsher, would you tell the jury your name, please?

3   A    My name is Regina Hipsher.

4   Q    And do you go by another name?

5   A    Yes, ma'am, my nickname is Saffey Hipsher.

6   Q    How do you spell Saffey?

7   A    S-a-f-f-e-y.

8   Q    Where do you live?

9   A    I live at Manchester, Kentucky, Mountain View Apartments,

10  456 Mountain View, Town Branch Road.

11  Q    Do you know Debi Morris?

12  A    Yes, ma'am.

13  Q    Has Debi Morris ever paid you for your vote?

14  A    No, ma'am.

15       MS. HUGHES:  That's all I have.

16       THE COURT:  Thank you.

17       Mr. Smith?

18                    CROSS-EXAMINATION

19  BY MR. SMITH:

20  Q    Good morning.

21  A    Morning.

22  Q    Ms. Hipsher, my name is Steve Smith and I represent the

23  United States.  I just want to ask you a couple of questions.

24       Are you the relative of Darnell Hipsher?

25  A    Yes, sir, that's my brother.

1   Q    Okay.  And you were asked about Ms. Debra Morris offering

2   you or paying you money?

3   A    Yes, sir.

4   Q    During the '02, '04, and '06 elections, were you in

5   Manchester?

6   A    Yes, sir.

7   Q    And was your brother also in Manchester?

8   A    No, sir.

9   Q    And your brother is now, I guess, finishing his service of

10  a term of imprisonment?

11  A    Yes, sir.

12  Q    And would it be fair to say, ma'am, that you don't know

13  who your brother has been dealing with over the last eight to

14  ten years in the elections in Manchester?

15          MS. HUGHES:  Your Honor, I have an objection with

16  respect to the scope.

17          THE COURT:  Overruled.

18          THE WITNESS:  Will you repeat the question again,

19  please?

20  BY MR. SMITH:

21  Q    Okay.  Ms. Hipsher, let me ask you another question.

22  You —— are you employed, ma'am?

23  A    Yes, sir.

24  Q    And where do you work?

25  A    I work at —— I am employed by the Clay County Board of

 1  Education.  I work at Manchester Elementary.

 2  Q    And when did you get your job with the Clay County School

 3  Board, ma'am?

 4  A    8-16 of '91.

 5  Q    And how long have you been working?  You've been working

 6  there continuously since then?

 7  A    Yes, sir.

 8  Q    And your brother, Darnell, he worked there as well when he

 9  was in Manchester?

10  A    He worked for the Clay County Board of Education.

11  Q    Anyone else in your family that works for the Board of

12  Education, ma'am?

13  A    I have a cousin that works there.

14  Q    And what's your cousin's name?

15  A    Her name is Michelle Fair, F-a-i-r.

16  Q    Ms. Hipsher, did you work for the City of Manchester?

17  A    No, sir.  Maybe a program or something, but I have never

18  been employed by the City of Manchester.

19  Q    Have you ever received checks from the City of Manchester?

20  A    Yeah, just doing odds and ends, but —

21  Q    What would be the reason you would get checks from the

22  City of Manchester?

23  A    In what years?  I mean, I don't really recall.

24  Q    Well, do you recall getting checks from the City of

25  Manchester?

1    A     If it was, it would be long back, maybe just cleaning or

2    something.

3    Q     Where did you clean for the City of Manchester, ma'am?

4    A     We would clean buildings.

5    Q     And was that while Daugh White was mayor?

6    A     Yes, sir.  I done it one time.

7    Q     One time?

8    A     Yes, sir.

9    Q     And how many checks did you get for that one time?

10   A     I'd say I got one check.  I mean —

11   Q     Do you recall any other checks that you would have

12   received from the City of Manchester?

13   A     No, sir.

14   Q     Was your brother, Darnell Hipsher, also cleaning for the

15   City of Manchester?

16   A     Yes, sir, he did.

17   Q     And was he paid by the City of Manchester?

18   A     I would say he was.  We cleaned their recreation building

19   down there over at the swimming pool.

20              MR. SMITH:  That's all I have.

21              THE COURT:  Let's see if any of the other parties

22   have any questions.

23              Mr. Westberry?  Mr. Westberry, do you have —

24              MR. WESTBERRY:  May I have one?

25              THE COURT:  Yes, sir.

1                      CROSS-EXAMINATION

2    BY MR. WESTBERRY:

3    Q    Hello, Ms. Hipsher, I'm Kent Westberry, I'm one of the

4    lawyers for Doug Adams.

5         You indicated that you started to work in the school

6    system back in 1991; did we hear that right?

7    A    Yes, sir, in 1991.

8    Q    And who was running the school system back in those days?

9    A    Willy Sizemore.

10             MR. WESTBERRY:  Thank you very much.

11             MR. WHITE:  No questions, Your Honor.

12             THE COURT:  Anyone else?  Any redirect of the

13   witness?

14             MS. HUGHES:  No, sir.

15             THE COURT:  All right.  Mr. Smith, any further cross

16   based on Mr. Westberry's questions?

17             MR. SMITH:  No, Your Honor.

18             THE COURT:  All right.  Thank you, ma'am.  You may

19   step down, you're excused.

20             Ms. Hughes, you may call your next witness.

21             MS. HUGHES:  Thank you.  Marianna Smith.

22                      MARIANNA SMITH,

23   having been first duly placed under oath, was examined and

24   testified as follows:

25             THE COURT:  Please proceed.

1                          DIRECT EXAMINATION

2   BY MS. HUGHES:

3   Q    Hi, Ms. Smith.  Could you please tell your name to the

4   jury, please?

5   A    Marianna Smith.

6   Q    Can you spell that?

7   A    M-a-r-i-a-n-n-a.

8   Q    Where do you live?

9   A    Manchester.

10  Q    Do you know Debi Morris?

11  A    Yes.

12  Q    Has Debi Morris ever paid you to vote or offered to pay

13  you to vote?

14  A    No.

15             MS. HUGHES:  That's all I have.  Thank you.

16             THE COURT:  Thank you.

17             Mr. Smith.

18             MR. SMITH:  No questions.

19             THE COURT:  All right.  Anyone else have any

20  questions for Ms. Smith?

21             MR. WESTBERRY:  No.

22             MR. WHITE:  No.

23             THE COURT:  All right.  Thank you, ma'am.  You may

24  step down, you're excused.

25             THE WITNESS:  Thank you.

 1              THE COURT:  Ms. Hughes.

 2              MS. HUGHES:  Eddie Davidson.

 3                          EDDIE DAVIDSON,

 4  having been first duly placed under oath, was examined and

 5  testified as follows:

 6              THE COURT:  Please proceed.

 7                       DIRECT EXAMINATION

 8  BY MS. HUGHES:

 9  Q    Mr. Davidson, could you state your name for the jury,

10  please?

11  A    Eddy Davidson.

12  Q    And where do you live, sir?

13  A    Manchester, Kentucky.

14  Q    Do you know my client, Debi Morris?

15  A    Yes, I do.

16  Q    And has Ms. Morris ever paid you or offered to pay you for

17  your vote in any election?

18  A    No.

19              MS. HUGHES:  Thank you.

20              Your Honor, that's all I have, I pass the witness.

21              THE COURT:  All right.  Thank you.

22              Mr. Smith.

23                       CROSS-EXAMINATION

24  BY MR. SMITH:

25  Q    Mr. Davidson, hi, I'm Steve Smith with the United States.

1      I would ask you, Mr. Davidson, did you know that it's a

2  violation of Kentucky law for you to accept money for your

3  vote?

4  A    Yes, sir.

5            MR. SMITH:  Thank you.

6            That's all I have.

7            THE COURT:  Anything else of this witness?

8      (No response.)

9            THE COURT:  All right.  Thank you, sir.  You may step

10  down.

11           Ms. Hughes.

12           MS. HUGHES:  Edward Smith.

13                      EDWARD SMITH,

14  having been first duly placed under oath, was examined and

15  testified as follows:

16           THE COURT:  Thank you.  Please proceed.

17           MS. HUGHES:  Thank you, Your Honor.

18                   DIRECT EXAMINATION

19  BY MS. HUGHES:

20  Q    Mr. Smith, can you state your name?

21  A    Eddie Smith.

22  Q    And how old are you?

23  A    Forty-eight.

24  Q    How are you currently employed?

25  A    I work for the Clay County Board of Education as a teacher

1  at Clay County High School.

2  Q    All right.  Are you related to any of the parties of this

3  case?

4  A    I am.  My sister, Debra Morris, and my brother-in-law,

5  Bart Morris.

6  Q    All right.  I want to go back in time.  Is this your —

7  well, were you previously employed by the Board of Education

8  prior to this time?

9  A    Yes.

10  Q    All right.  Will you tell the jury when you were employed

11  by the Board of Education?

12  A    Yes.  I started my teaching career in 1985 at the Harlan

13  County Board of Education.  The next year, 1986, I was employed

14  by the Clay County Board of Education, worked continuously for

15  19 years until 2005 when I took another job in a

16  telecommunications company.

17  Q    All right.  And so you worked there from '85 to 2005 and

18  then you left.  Did your new job require you to relocate?

19  A    Yes.  I actually relocated to South Carolina.

20  Q    Okay.  And for how long were you relocated?

21  A    About six months.

22  Q    All right.  When did you return to Clay County?

23  A    January of 2006.

24  Q    At the beginning or end of the month, if you can recall?

25  A    It was at the end of the month.  I had a — actually, I

1  had a year lease on a house and I asked the real estate company

2  could I cut that lease short and they allowed me to after six

3  months.

4  Q    All right.  Did it come to your attention prior to your

5  return to Clay County in late January of 2006 that legal

6  proceedings had been instituted against you?

7  A    Yes.

8          MS. HUGHES:  Your Honor, I would like permission to

9  show the witness an exhibit.

10         THE COURT:  All right.  Show it to the United States.

11         MR. SMITH:  Your Honor, can we approach, please?

12         THE COURT:  Yes, please come up.

13    (Whereupon, the following discussion was had between the

14  Court and counsel at the bench, out of the hearing of the

15  jury.)

16         MR. SMITH:  I would object to the relevance of a 2005

17  civil action against Mr. Edward Smith.

18         THE COURT:  May I see it?

19         MS. HUGHES:  Sure.

20         THE COURT:  What is the relevance?

21         MS. HUGHES:  The relevance is that before he returned

22  from South Carolina he got notice of a default judgment motion

23  and he called Judge Maricle's office asking for some relief and

24  asking to have it delayed and asked him for a return call.  He

25  never — I think he'll testify that he even wrote a letter and

1   he got no response and the default judgment was entered,

2   nonetheless, against him.

3          There's been substantial allegations that

4   Judge Maricle did favors when he was on the bench for

5   members — alleged members of the conspiracy, and I want to

6   establish that this was very hard on this gentleman and that he

7   asked for assistance and did not receive it.

8          THE COURT:  So I don't really see the — I don't see

9   the relevance of the fact that the brother of one of the

10  parties didn't get a favor from the judge when he called him

11  from out of state asking for a favor.  So if the United States

12  were to offer proof of, say, ten bad acts, your position would

13  be that the defendants could then establish that in a hundred

14  cases there wasn't an improper favor performed.  So that's

15  somehow evidence that it didn't happen in every case?

16         MS. HUGHES:  Well, Wanda White testified that she was

17  a co-conspirator and she went to her co-conspirator, Cletus

18  Maricle, and she asked for a favor for her brother, her mother,

19  I can't even remember all the relatives she asked favors for.

20         THE COURT:  Right.

21         MS. HUGHES:  And so here is evidence that Debi

22  Morris, who is alleged to be a co-conspirator, sought the

23  assistance from Judge Maricle in his official capacity and was

24  not given any assistance.

25         THE COURT:  Well, is there testimony in the case that

1   Ms. Morris called —

2           MS. HUGHES:  No.

3           THE COURT:  — Judge Maricle and asked for a favor?

4           MS. HUGHES:  No.

5           THE COURT:  All right.  I'll sustain the objection.

6   I just do not see the relevance.

7           MS. HUGHES:  Well, then let me go on to the next

8   point that I'll make, is that after he returned from South

9   Carolina, at the end of January, he did go to Doug Adams, who

10   was the superintendent who was not the superintendent when he

11   was hired, but he asked to be reemployed and he was declined.

12   He became reemployed after a new superintendent took over.

13           THE COURT:  But this individual asked basically for a

14   job and was not reemployed?

15           MS. HUGHES:  That is correct.

16           THE COURT:  And there's no indication that any of the

17   defendants that are on trial went to intervene on his behalf?

18           MS. HUGHES:  No.

19           THE COURT:  There's no allegation that he's a member

20   of what's been alleged to be the conspiracy?

21           MS. HUGHES:  That is correct.  I don't think —

22           THE COURT:  I'm going to allow you to ask whether he

23   attempted to be reemployed and what the results were.  I don't

24   know that it has any relevance, but I'm going to give you a

25   little bit of latitude to establish that this fellow wasn't a

1  member of the conspiracy, I guess, or no favors were given to

2  him.  But to go beyond that, I would sustain the objection.

3          Mr. Westberry.

4          MR. WESTBERRY:  Thank you, Judge.  I'm hearing my

5  client's name over the teleprompter mentioned for the first

6  time.  It's all happened so quickly and I haven't had a chance

7  to think this through yet.  I don't know whether I would want

8  to interpose any objection on the record.

9          THE COURT:  All right.

10          MR. WESTBERRY:  And I hate to ask for any more

11  delays, but could I have a moment to confer with Mr. Adams and

12  perhaps Ms. Hughes just to get a better idea —

13          THE COURT:  Why don't you go back just quickly and

14  talk —

15          MR. WESTBERRY:  Sure.

16          THE COURT:  — with Mr. Adams.  We'll remain at the

17  bench.  We're not going to discuss the matter until you come

18  back and then you can speak with Ms. Hughes privately before

19  we —

20          MR. WESTBERRY:  Thank you, sir.

21          THE COURT:  And we'll talk basketball while he's gone

22  off the record.

23      (Whereupon, an off-the-record discussion was had, after

24  which the following proceeding continued at the bench.)

25          THE COURT:  We're back.

1      MS. HUGHES:  Mr. Westberry objects to me also.

2      THE COURT:  Generally or --

3      MS. HUGHES:  Objection generally, I believe, Your

4  Honor.

5      THE COURT:  Now, Mr. Smith, you were about to say

6  that you have some evidence that you'll be bringing out on

7  cross-examination if we go further on this about circumstances

8  surrounding his termination?

9      MR. SMITH:  I do have information about the

10  circumstances of his termination which are not very detailed,

11  but what I do -- can report to the Court is I was advised that

12  he was allegedly involved in theft at the school and that was

13  the reason.

14      MS. HUGHES:  Do we know when or --

15      MR. SMITH:  I would have to go back to the tables to

16  give you more details.  I'm just -- I'm just aware of that.

17      MR. WESTBERRY:  On behalf of Doug Adams, I just

18  wanted to place our objection on relevancy grounds to this line

19  of questioning.  I think you know the reason.  I don't need to

20  say much more.

21      THE COURT:  I previously found it has very, very

22  little relevance in the case, but if Ms. Hughes wants to ask

23  the question if he applied for reemployment and was denied, I'm

24  going to let her do that, and then we'll let Mr. Smith ask

25  questions about circumstances of his termination to explain why

1  he might not have been considered for reemployment.  So it will

2  be up to Ms. Hughes if she wants to open the door.

3          MS. HUGHES:  I don't want to open the door because I

4  think that the impact of the evidence is lessened dramatically

5  if I don't get to do it when it's coupled with the other

6  exhibit that the Court has already ruled upon.  So at this

7  point I would ask the Court to excuse the witness.  I don't

8  know how else to handle it.  I mean, I don't want to tell the

9  jury that there have been rulings that make him irrelevant.

10          THE COURT:  If you don't have any further questions,

11  you can just indicate there are no further questions of the

12  witness and we'll see if anyone else has any based on what you

13  have asked to this point.  It may not result in any questions.

14          All right.  Thank you.

15      (Whereupon, the following proceedings continued in open

16  court.)

17          MS. HUGHES:  Thank you, Mr. Smith.

18          We don't have any more questions.

19          THE COURT:  All right.  Thank you.

20          Let me see first if Mr. Smith has questions of the

21  witness.

22          MR. SMITH:  No, Your Honor.

23          THE COURT:  All right.  Any of the other parties have

24  questions?

25      (No response.)

 1          THE COURT:  All right.  Thank you, sir.  You may step

 2  down, you're excused.

 3          Thank you.  And, Ms. Hughes, you may call your next

 4  witness.

 5          MS. HUGHES:  Your Honor, may we -- we started to talk

 6  about some scheduling issue.

 7          THE COURT:  Yes, ma'am.  I apologize.  Yes.

 8      (Whereupon, the following discussion was had between the

 9  Court and counsel at the bench, out of the hearing of the

10  jury.)

11          MS. HUGHES:  Sorry.

12          THE COURT:  Sorry.  Do you want to take our lunch

13  break now?

14          MS. HUGHES:  Yes, so I can work on the computer

15  thing.

16          THE COURT:  All right.  I apologize, I cut you off

17  earlier.  You had an issue about a disk that you wanted to try

18  to go over the lunch hour.

19          MS. HUGHES:  Right.  As I told the Court when we

20  started this morning, I had asked Special Agent Briggs to bring

21  the photos from the search of the Morris residence, and when I

22  looked at him when we were having that discussion he held up a

23  CD for me.  So I need to make sure that I can get those -- I

24  can figure out how to get those and work with the Clerk

25  displayed but not displayed to the jury and get my computer

1    hooked up and that they wouldn't be published on the screen

2    until after they would be admitted.

3              THE COURT:  All right.  Well we'll go ahead –– what

4    we'll do is we'll take our lunch break now.  I need to take

5    up ––

6              Mr. Baldani?

7              MR. BALDANI:  Yes, I'm sorry, Judge.

8              THE COURT:  Before do you that, I'm going to need to

9    take up the issue of this alcohol use of Mr. Thompson.  He did

10   test positive at least to a small amount.  But I do want to

11   take that up with him since he's been warned by the Marshal

12   previously after the Marshal detected alcohol on his breath.

13   So we need to take that up.  I want to do that first.

14             MR. BALDANI:  Can we do it at the bench?  The only

15   reason, Judge, is because of the newspaper issue, and I don't

16   think they would deem it –– but if you don't mind, I'd

17   prefer ––

18             THE COURT:  We can take it up here at sidebar.

19             MR. BALDANI:  Thank you, Your Honor.

20             THE COURT:  What I'll do is I'll excuse the jury

21   first.  I'm going to have them come back at 1:00.  That should

22   give us time to get the computer issue worked out and I can

23   take up this issue with Mr. Thompson at the sidebar.  Again,

24   we'll do that first, but I want to go ahead and excuse the

25   jury.

1          MR. WHITE:  Your Honor, do you need all of us to be

2     here or can Mr. Baldani just handle that?

3          THE COURT:  It's just his client, he's in jeopardy of

4     being detained based on his alcohol use.  It's only Mr.

5     Thompson at this point that's in jeopardy.  We may need a

6     bigger boat by the time trial is over, but you can be here if

7     you want to.

8          MR. WHITE:  If you think it would be beneficial?

9          THE COURT:  No, I don't think so.  Thank you.

10         MR. WHITE:  Thank you, Your Honor.

11     (Whereupon, the following proceedings continued in open

12     court.)

13         THE COURT:  All right.  Thank you.

14         Good news, longer lunch break than usual.  We'll

15     recess until 1:00 this afternoon.  That should give you

16     sufficient time if you do want to go out and have lunch.  But,

17     again, let me remind you that if you leave the courtroom, you

18     shouldn't read, watch, or listen to any accounts of the case if

19     there should be any, and, of course, don't talk with anyone

20     about the case.  Don't allow anyone to approach you to discuss

21     the case.  Please keep in mind all other admonitions that

22     you've been given.  I'll not go through those at length at this

23     time but will remind you that you are still subject to all

24     admonitions, and the jury will be excused until 1:00.

25         (Whereupon, the jury retired from the courtroom, after

1  which the following proceedings were had in open court.)

2          THE COURT:  Thank you, and please be seated.

3          Ms. Hughes, we'll work out those computer issues here

4  in just a moment.

5          Before we get to that, Mr. Baldani, if you and

6  Mr. Thompson could come up and either Mr. Parman or Mr. Smith.

7  Craig, if you could also come up as well.

8      (Whereupon, the following discussion was had between the

9  Court and counsel at the bench, out of the hearing of the

10  jury.)

11          THE COURT:  All right.  We're here at sidebar on an

12  issue involving Defendant Freddy Thompson's alcohol use during

13  the course of the trial.  The original order setting conditions

14  of release required that the defendant refrain from any

15  excessive use of alcohol.  I have been advised by the Marshal

16  that during the course of the trial on one occasion,

17  approximately two weeks into the trial, that the Marshal

18  detected — the deputy marshal detected alcohol on

19  Mr. Thompson's breath and reminded him that he should not be

20  consuming alcohol during the course of the proceeding.

21          Similar activity occurred today.  The Court directed

22  that a test be performed to determine whether the defendant had

23  used alcohol, and the tests were positive but the amount that

24  was detected, the test performed at 10:45, was a minimal

25  amount, I believe the amount was .009, at least that's the

1   information I have received.

2           The Court has to make a determination as to whether

3   that constitutes a violation under Title 18, Section 3148, or,

4   alternatively, I will call the parties' attention to the fact

5   that Rule 26 -- I'm sorry, Rule 46 allows the Court -- it

6   states as follows:  "A person released before trial continues

7   on release during trial under the same terms and conditions,

8   but the Court may order different terms and conditions or

9   terminate the release if necessary to ensure that the person

10  will be present during trial or that the person's conduct will

11  not obstruct the orderly and expeditious progress of the

12  trial."

13          Now, the Court does not have to find excessive

14  alcohol use in order to revoke or to add additional conditions

15  under Rule 46.  The Court would have to find excessive alcohol

16  use in order to revoke under the statute, Title 18,

17  Section 3148, I believe.  But there is evidence of alcohol use.

18          Mr. Baldani, would you like to respond?

19          MR. BALDANI:  I would, Judge.  You are correct, it

20  was brought to our attention once before.  I don't really

21  specifically recall that the Marshal said don't use alcohol,

22  but I mean it was brought to our attention, so there's no doubt

23  about that.  I was present when a portable breath test was

24  administered, and the officer from Frankfort PD described it as

25  a trace.  And he said -- he asked Freddy what he had had to

1    drink and what he had had to eat, and basically he said if you

2    had eaten it wouldn't show anything.

3          THE COURT:  Was the question also asked, when did you

4    last consume alcohol, and did the witness respond he didn't

5    remember?

6          MR. BALDANI:  I think he said he didn't remember the

7    exact time.  He told him it was last night and it was after he

8    ate.  And I think he did say — he told him it was last night.

9    And it wasn't any greatly detailed, he wasn't pressed on it,

10   was it before 9:00, after 9:00.

11         Judge, I would suggest — I talked to Freddy about

12   this, changing the condition to no alcohol at all.  I mean, the

13   amount — the trace amount that was detected, as far as I know,

14   I mean, a person can drive a commercial vehicle with a .01.

15   And I understand the reason for a concern.  I can tell you,

16   Judge, that Freddy has been very diligent, being here on time,

17   he has been extremely diligent, you know, can I talk to, you

18   know, my father-in-law without his — as far as does his

19   attorney — The bottom line is, Judge, I believe he has

20   attempted in good faith to abide by all conditions.

21         Now, I'll also tell you that this prosecution has

22   taken its toll on him and he has had a couple of drinks at

23   night.  And, you know, I think we get the message loud and

24   clear, and I would ask — I mean, I definitely feel that to

25   revoke his bond over a trace amount under these circumstances

114

1  is more than necessary.  But on the other hand, to change into

2  no use of alcohol for the remainder of the trial, we can

3  certainly live with that, Judge.  So that would be my request.

4          THE COURT:  It's not necessarily what you can live

5  with, it's what the Court can live with as well.  Let me see

6  what the position of the United States would be on this issue.

7          Mr. Smith or Mr. Parman?

8          MR. SMITH:  Well, Your Honor, I think that a major

9  concern that I have is that this test was done after he had

10 been here for two hours and 15 minutes, if he got here at 8:30

11 when court started, and I do recall seeing him at about 8:30.

12 The rate of dissipation on alcohol is known to be quite rapid

13 and for him to make statements to this Marshal that his last

14 drink was last night and that that's a reason for this level

15 two hours and 15 minutes after he's been here in Court today,

16 his body has metabolized, it's difficult for us to fully

17 accept.  But taking what he says on its face and not

18 questioning it, we still have concerns about operating motor

19 vehicles, exposing the public to undue danger, and I don't

20 think that the request by the defense is sufficient.

21         THE COURT:  All right.  Well, this is what I'm going

22 to do at this time.  I've tried to get everyone's attention in

23 this case.  I have attempted from the very beginning to impose

24 what I consider to be the least restrictive conditions.  This

25 road started with Mr. Maricle, he's placed on home detention,

1  although the magistrate judge ordered him detained and I

2  lessened those conditions, and then we had the incident with

3  Mr. Jones.  I found that he violated the terms of his release

4  by threatening witnesses, and I placed him on home detention

5  thinking that would be sufficient.  Then I had an issue with

6  Mr. Stivers with intimidating witnesses and then during the

7  course of the trial making improper remarks to counsel for the

8  United States during opening statements.  Now, of course, he

9  shot himself in the foot on that.  But my point is that, at

10  this time -- and then, of course, we had the recent incident

11  with Mr. Adams.

12          MR. BALDANI:  Right.

13          THE COURT:  And I'm wondering if I'm kind of spitting

14  into the wind on this, if I'm not getting folks' attention.

15  And my concern is that all of the defendants in the case be

16  completely capable of assisting counsel during the course of

17  this proceeding, exercising good judgment as they do so, and

18  not endanger the public when they're not in the courtroom.

19          Now, if Mr. Thompson or anyone else feels like that I

20  will not do what's necessary to accomplish those goals, then

21  they're spitting into the wind, because I can assure you that

22  if I feel like the public is in danger in any way, either

23  through threatening witnesses, making improper statements,

24  improper consumption of alcohol, or any other bond condition, I

25  would pull the rug out from under them real quick.  So don't

1  feel like that I won't, especially at this stage of the

2  proceedings when we've had so much improper activity by the

3  defendants in this case.

4         So this is what I'm going to do:  I'm not going to

5  revoke his release conditions at this time.  Under Rule 46, I

6  am going to alter those conditions, they will be changed to no

7  alcohol whatsoever, none, zero.  I am going to require that on

8  a daily basis — and I'm going to leave this up to the

9  probation officer.  Unfortunately we didn't have a probation

10 officer here, Frankfort is always shorthanded when it comes to

11 probation officers, and had we had a probation officer here

12 this morning, this test could have been administered and I

13 could have had a little more information about this, but we

14 didn't.  But I am going to require that a test be performed

15 every day.  I want the results of the test every day, and if it

16 shows any use of alcohol, I will assure you that Mr. Thompson

17 will have a new residence for the remainder of trial.

18         MR. BALDANI:  Understood, Judge.

19         THE COURT:  Mr. Thompson, now, you're not required to

20 respond to me, but you need to talk with your attorney and make

21 sure that you understand that I am deadly serious about this.

22 I don't put up with a lot of shenanigans in my case, and this

23 case has gone far beyond the limits of what I would ever put up

24 with in a matter.  So I don't give a lot of second warnings,

25 and there won't be one in this case if this happens again.

1          So I'll contact the Probation Office, if I can find

2    an officer, and advise the officer that this condition has been

3    amended, it will be reflected in the minutes today that the

4    condition has been amended, it's been changed from excessive

5    use, he's required to refrain from any use of alcohol

6    whatsoever.

7          I would be hesitant if I were in Mr. Thompson's

8    position to put on too much aftershave, quite frankly, because

9    I'm at the limit in the case.

10         MR. BALDANI:  Do we wait to hear from Probation as

11   far as when we report or from the Court?

12         THE COURT:  Yes, sir, he's already been tested today,

13   but it will be a requirement that he have daily tests

14   throughout the course of this proceeding.  So —

15         MR. BALDANI:  We get the message loud and clear,

16   Judge.

17         THE COURT:  So be forewarned about this.

18         MR. BALDANI:  I appreciate you letting us discuss

19   this at the bench, Your Honor.

20         THE COURT:  All right.  Anything else?

21       (No response.)

22         THE COURT:  The United States' objection to the

23   Court's order is noted for the record.  I do understand your

24   concerns.  I appreciate your concerns.  Again, I feel like my

25   duty, at this point, is to impose the least restrictive

1   conditions under the circumstances of the case.  I may be

2   wrong.

3           MR. PARMAN:  Your Honor, Mr. Smith and I discussed

4   another issue that the Court might could consider.  The driving

5   situation, a no driving condition perhaps will go further to

6   assure community safety, because our concern from what we're

7   been talking about, if he's drinking and drinking to the point

8   of being able to smelled when he walks in in the morning, that

9   indicates a problem, and I don't know how well, if you'll be

10  able to stop, and if he's driving backwards and forth under the

11  influence, I think that would cause a further concern to

12  community safety that might need to be addressed in the

13  conditions.

14          THE COURT:  Well, I'm not going to impose a

15  restriction of no driving at this point.  I do understand — Is

16  he here with his wife?

17          MR. BALDANI:  She comes sometimes, Your Honor.  She

18  was here yesterday, I don't know if she's still here.

19          THE COURT:  I'm not going to do that at this point,

20  because what's going to happen is if there's any alcohol

21  detection whatsoever, it will be a moot point.  It will be a

22  moot point, because the Marshal will be handling all the

23  transportation at that stage.

24          MR. PARMAN:  Yes, Your Honor.

25          MR. BALDANI:  Thank you, Judge.

EDWARD SMITH - DIRECT - MS. HUGHES           119

1      (Whereupon, the following proceedings continued in open

2  court.)

3           THE COURT:  Thank you.

4           Ms. Hughes, you're probably wondering when am I going

5  to get finished so you can get on to your resolving your

6  document issue, and the answer is its now, and we will be in

7  recess until 1:00 this afternoon.

8      (Whereupon, a recess was had for the noon hour, after

9  which the proceedings continue uninterrupted to Volume 27-A.)

10                    (Proceedings concluded at 12:00 p.m.)

11

12

13              C E R T I F I C A T E

14      I, Cynthia A. Oakes, certify that the foregoing is a

15  correct transcript from the record of proceedings in the

16  above-entitled matter.

17

18  3/18/2010                  s/CYNTHIA A. OAKES
     DATE                      CYNTHIA A. OAKES, RPR, RMR, CRR
19

20

21

22

23

24

25

1

2                    I N D E X

3                                                        PAGE

4  Testimony of STEVEN BOWLING:
        Voir Dire Examination by Mr. Smith:        28
5       Cross-Examination by Mr. Smith:            46
        Direct Examination by Mr. Simons:          59
6       Redirect Examination by Mr. Gilbert:       63
        Recross-Examination by Mr. Smith:          67
7
   Testimony of JOHN CRAFT:
8       Direct Examination by Mr. Gilbert:         69
        Cross-Examination by Mr. Smith:            74
9       Redirect Examination by Mr. Gilbert:       82
        Cross-Examination by Mr. Simons:           83
10
   Testimony of COLLEEN CHANEY:
11      Direct Examination by Ms. Hughes:          88
        Cross-Examination by Mr. Smith:            91
12
   Testimony of REGINA HIPSHER:
13      Direct Examination by Ms. Hughes:          92
        Cross-Examination by Mr. Smith:            93
14      Cross-Examination by Mr. Westberry:        97

15 Testimony of MARIANNA SMITH:
        Direct Examination by Ms. Hughes:          98
16
   Testimony of EDDY DAVIDSON:
17      Direct Examination by Ms. Hughes:          99
        Cross-Examination by Mr. Smith:           100
18
   Testimony of EDWARD SMITH:
19      Direct Examination by Ms. Hughes:         100

20

21                E X H I B I T S

22

23 Defendant
   Debra Morris                                    Page
24 Exhibit No.            Identified            Admitted

25      7                     89                   90
        8                     89                   90