United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 19, 2010 |
| DOUGLAS C. ADAMS | ) 1:00 p.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 28-B |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:   STEPHEN C. SMITH, ESQ.
                                  JASON D. PARMAN, ESQ.

On behalf of the Defendant        DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:           MARTIN S. PINALES, ESQ.

On behalf of the Defendant        R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                 KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant        T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant        ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant        RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:

On behalf of the Defendant        JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
Stanley Bowling:

2

```
 1   Appearances of Counsel:

 2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, Kentucky  40741
 5

 6   On behalf of the Defendant     DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:        107 East First Street
 7                                   Corbin, Kentucky  40701

 8                                   MARTIN S. PINALES, ESQ.
                                     150 East Fourth Street
 9                                   Federal Reserve Building
                                     Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant     R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:              KRISTEN N. LOGAN, ESQ.
12                                   220 West Main Street
                                     Suite 1900
13                                   Louisville, Kentucky  40202

14
     On behalf of the Defendant     T. SCOTT WHITE, ESQ.
15   Charles Wayne Jones:           133 West Short Street
                                     Lexington, Kentucky  40507
16

17   On behalf of the Defendant     ROBERT L. ABELL, ESQ.
     William E. Stivers:            120 North Upper Street
18                                   Lexington, Kentucky  40507

19
     On behalf of the Defendant     RUSSELL JAMES BALDANI, ESQ.
20   Freddy W. Thompson:            300 West Short Street
                                     Lexington, Kentucky  40507
21

22   On behalf of the Defendant     JERRY W. GILBERT, ESQ.
     William B. Morris:             212 North Second Street
23                                   Richmond, Kentucky  40475

24

25
```

```
 1    On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:                  201 West Short Street
 2                                       Lexington, Kentucky   40507

 3
      On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
 4    Stanley Bowling:                  116 West Main Street
                                        Suite 2A
 5                                       Richmond, Kentucky   40475

 6
      Court Reporter:                   CYNTHIA A. OAKES, CRR
 7                                       Official Court Reporter
                                        United States District Court
 8                                       560 Athens Boonesboro Road
                                        Winchester, Kentucky   40391
 9                                       (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
      Proceedings recorded by mechanical stenography,
23    transcript produced by computer.

24

25
```

1   (Whereupon, the jury returned to the courtroom, after which
2   the following proceedings were had in open court.)

3   (Whereupon, the jury returned to the courtroom, after which
4   the following proceedings were had.)

5          THE COURT:  All right.  Thank you.

6          The record will reflect that all members of the jury
7   are present.  The parties and counsel are also present.

8          If you could bring the witness back in, please.

9   (Whereupon, the witness returned to the stand, after which
10  the following proceedings were had in open court.)

11         THE COURT:  Please be seated.  The witness will be
12  reminded she's under oath.

13         Let's see if any of the attorneys have questions for
14  this witness.

15         Mr. Hoskins -- Mr. Pinales, we'll start with you and
16  work our way around.

17         MR. PINALES:  No questions.

18         MR. WESTBERRY:  No questions.

19         MR. WHITE:  No, Your Honor.

20         THE COURT:  No?

21         MR. BALDANI:  No, Your Honor.

22         MR. GILBERT:  No questions, Your Honor.

23         MS. HUGHES:  No, sir.

24         THE COURT:  All right.  We'll go back to redirect then
25  if there are questions.

1          MR. SIMONS:  I have no redirect.

2          THE COURT:  No more questions?  All right.  Ma'am, you

3   may step down, you're excused at this time.

4          THE WITNESS:  Thank you.

5          And, Mr. Simons, you may call your next witness.

6          MR. SIMONS:  Your Honor, I would call James Garrison.

7          THE COURT:  Thank you.

8          MR. SIMONS:  He's not there?  He was here this

9   morning.  I'll call a different witness, if that's all right.

10          THE COURT:  All right.  That'll be fine.

11          MR. SIMONS:  Is Mr. Benton Hanson there?

12          THE MARSHAL:  Yes, sir, he is.

13          MR. SIMONS:  It will take me a minute, Your Honor,

14   to —

15          THE COURT:  Yes, sir, you can reload.

16                    PHILLIP BENTON HANSON,

17   having been first duly placed under oath, was examined and

18   testified as follows:

19          THE COURT:  Please be seated.

20                    DIRECT EXAMINATION

21   BY MR. SIMONS:

22   Q    Good afternoon.  Would you state your name for the jury,

23   please?

24   A    Phillip Benton Hanson.

25   Q    Mr. Hanson, my name is Dan Simons and I represent one of

1  the defendants in this case, Mr. Stanley Bowling.  Do you know

2  Mr. Bowling?

3  A     Yes.

4  Q     Do you see him here in the courtroom?

5  A     Yes, I do.

6  Q     Okay.  What is your profession, sir?

7  A     I'm an engineer, professional engineer.

8  Q     And could you describe a little bit your educational

9  background, how you got to be an engineer?

10  A     I graduated from Mississippi State with a Bachelor in

11  Science, and I passed the professional engineering exam in

12  Kentucky and I'm a professional engineer, licensed engineer.

13  Q     How long have you been so licensed?

14  A     Twenty-one years.

15  Q     And where did you start practicing as a professional

16  engineer, sir?

17  A     First job was in Arkansas.

18  Q     Was it —

19  A     Arkansas.

20  Q     Okay.  And if you could bring us up to the present in

21  general terms, I would appreciate it.

22  A     I worked a couple of years in Arkansas, a couple of years

23  in Mississippi, and for the past 23 years in Kentucky.

24  Q     Okay.  Are you here today pursuant to a subpoena that I

25  issued to you?

PHILLIP BENTON HANSON - DIRECT - MR. SIMONS          7

1    A    Yes.

2    Q    And you were in court the other today and produced a large

3    amount of documents at my request that were the subject of that

4    subpoena; is that true?

5    A    Yes.

6    Q    All right.  Do you have a current, what I would call, a

7    resume' or curriculum vitae?

8    A    Yes.

9              MR. SIMONS:  Okay.  Could I get the court security

10   officer, please.

11             MR. SMITH:  Could I see that, please?

12   BY MR. SIMONS:

13   Q    Does that look like your current curriculum vitae?

14   A    Yes, sir.

15   Q    And does it fairly and accurately detail your education and

16   the work that you've been engaged in over the last several

17   years?

18   A    Yes, sir.

19             MR. SIMONS:  Okay.

20             Your Honor, that's been marked, I have forgotten the

21   exhibit number.

22   BY MR. SIMONS:

23   Q    Mr. Hanson, could you look on that and tell me, please.

24   A    Exhibit SB10.

25             MR. SIMONS:  Exhibit 10 will be Bowling 10, Your

PHILLIP BENTON HANSON - DIRECT - MR. SIMONS          8

1    Honor, I would move the introduction of Mr. Hanson's CV at this
2    time.
3              THE COURT:  Any objection?
4              MR. SMITH:  Yes, Your Honor, I did not find that on
5    the disclosure previously.  Under Rule 16, we would object.
6              THE COURT:  All right.  Come up to sidebar, please.
7         (Whereupon, the following discussion was had between the
8    Court and counsel at the bench, out of the hearing of the jury.)
9              THE COURT:  All right.  Was this submitted to the
10   United States in response to Rule 16, it's the —
11             MR. SIMONS:  Expert disclosure.
12             THE COURT:  — resume of the witness.
13             MR. SIMONS:  It was not attached to the disclosure,
14   Your Honor, but it was given to the United States on the day
15   that Mr. Hanson appeared pursuant to my subpoena, along with
16   rest of these documents.
17             THE COURT:  That was during the course of the trial.
18             MR. SIMONS:  Yes.  And I do not intend to ask him
19   opinion questions at all, I just thought it would be useful to
20   the jury.
21             THE COURT:  Then I'll sustain the objection.
22             MR. SIMONS:  Okay.
23             THE COURT:  Thank you.
24        (Whereupon, the following proceedings continued in open
25   court.)

1              THE COURT:  The objection to admission of Exhibit

2    No. 10 will be sustained.  The exhibit will not be admitted.

3    BY MR. SIMONS:

4    Q    Mr. Hanson, who is your current employer?

5    A    HDR, Incorporated.

6    Q    And where is HDR located?

7    A    Lexington.

8    Q    And what is the nature of the business of HDR?

9    A    They provide professional engineering services.

10   Q    And to whom do they provide such services?

11   To cities, municipalities, water, sewer districts, generally.

12   Q    Is a large part of your professional practice involved with

13   water and sewer projects?

14   A    Yes, that's what I specialize in.

15   Q    You're kind of exclusively in that realm, are you not?

16   A    Water and sewer.

17   Q    Have you done substantial work for municipalities across

18   the State of Kentucky?

19   A    Yes.

20   Q    And how long have you been engaged in that type of

21   activity?

22   A    In Kentucky, since 1987.

23   Q    All right.  Now, in 1987, who was your employer?

24   A    HMB.

25   Q    Okay.  And is that a firm in Frankfort, Kentucky?

1    A    Yes, sir.

2    Q    And when did you leave HMB and where did you go from there?

3    A    I worked from 1987 to 1994 at HMB, and then at that time I

4    went to work for Quest Engineers.

5    Q    Okay.  And where is Quest located?

6    A    In Lexington.

7    Q    Okay.  And were there other locations of Quest outside of

8    Lexington?

9    A    Yes.

10   Q    Throughout Kentucky?

11   A    Quest has an office in Louisville and Cincinnati.

12   Q    Okay.  Were you exclusively assigned to the Lexington

13   office?

14   A    Yes, sir.

15   Q    And the company you now work for is HDR?

16   A    Quest was bought by HDR.

17   Q    Okay.  HDR subsumed Quest; is that a correct statement?

18   A    Yes.

19   Q    And is HDR a national company?

20   A    Yes.

21   Q    And where —— out of what office do you work currently for

22   HDR?

23   A    Out of the Lexington office.

24   Q    Okay.  Now, when you were at Quest Engineering, were you

25   the engineer with regard to —— with regard to certain projects

PHILLIP BENTON HANSON – DIRECT – MR. SIMONS          11

1   in the City of Manchester?

2   A    Yes, I was.

3   Q    All right.  Particularly, some projects –– well,

4   particularly projects I'm going to ask you about involving B&B

5   Excavating.  Are you familiar with company?

6   A    I'm familiar with B&B.

7   Q    Okay.  And whom do you know to be the owner and chief

8   operator of B&B?

9   A    It's just an assumption, but Stanley Bowling.

10  Q    Okay.  Now, let me –– Pursuant to the subpoena that I

11  issued to you, did you bring all of the records that were the

12  property of formerly Quest, now HDR, with respect to all of the

13  jobs done by B&B Excavating in Manchester, Kentucky, between

14  2004 and 2006?

15  A    What we could find, we brought everything.

16  Q    If I called a job Mill Pond Phase II wastewater pump

17  station, do you know what I'm talking about?

18  A    Yes, sir.

19        MR. SIMONS:  If I could have the court security

20  officer, please.

21  BY MR. SIMONS:

22  Q    Are the documents in front of you now ––

23  A    Yes, sir.

24  Q    –– reflective of that particular project?  You said yes,

25  sir?

PHILLIP BENTON HANSON – DIRECT – MR. SIMONS          12

1   A     Yes, sir.

2   Q     Okay.  Now, on that project, who employed Quest

3   Engineering, please?

4   A     The City of Manchester.

5   Q     Okay.  When a city hires Quest Engineering to do the work

6   on a sewer or water project, what is involved in that from an

7   engineering standpoint, what do you do?

8   A     We provide professional engineering services for particular

9   projects.

10  Q     Do you draw the plans?

11  A     Yes, sir.

12  Q     Okay.  Did you draw the plans for this particular project?

13  A     Yes, we did.

14  Q     You don't have them in front of you now, do you?

15  A     No.

16          MR. SIMONS:  One more time, please.

17  BY MR. SIMONS:

18  Q     Would you examine that document and see if those are the

19  plans for —

20  A     Yes, they are.

21  Q     Okay.  Now, did you also prepare an engineering estimate

22  for that particular job, sir?

23  A     Yes, sir.

24  Q     Okay.  And is that contained within the documents that you

25  have before you?

1  A     Yes.

2  Q     Okay.  And could you reference me to it on a page, please,

3  sir?

4  A     The estimate was on -- it's on the third page of the

5  document.  It doesn't have it on there.

6  Q     And what was the amount of the estimate, sir?

7  A     $167,596.

8  Q     Okay.  Did you also do the technical specifications for

9  that particular job?

10  A     Yes, sir.

11  Q     And are they contained in the documents before you?

12  A     I believe they were referenced to another set that's not

13  here.

14           THE COURT:  Yes, sir.  Have those been shown to the

15  United States?

16           MR. SIMONS:  They have, Your Honor.

17           THE COURT:  All right.  They can be shown to the

18  witness.

19  BY MR. SIMONS:

20  Q     Are those the technical specifications?

21  A     They are not the technical specifications for this project.

22  Q     Oh, it's a different project?

23  A     Yes, sir.

24  Q     Oh, I'm sorry.  What project is that?

25  A     This is for Little Mill Pond Old Timers Road.  The other

 1  ones are just Little Mill Pond.

 2           MR. SIMONS:  Okay.

 3           Your Honor, can I have just a moment to see if I have

 4  them?

 5           THE COURT:  Yes, sir, you may.

 6  BY MR. SIMONS:

 7  Q    All right.  Let me try this again.  Back to the engineering

 8  estimate.  The amount of that was, what, 167,000, I think you

 9  said?

10  A    Yes, sir.

11  Q    All right.  Do you also draft the contract between the City

12  and the contractor?

13  A    They requested that we draft it, yes.

14  Q    Did you draft a contract ––

15  A    Yes.

16  Q    –– in this particular instance?

17  A    We did.

18  Q    Okay.  Did you coordinate between the City, the contractor,

19  and the lending institution in this instance?

20  A    Yes.

21  Q    Where did the available funds come from for this particular

22  project?

23  A    It was a federal or state grant.

24  Q    Are you sure which?

25  A    I believe it was a federal grant, 531 grant funds.

1  Q    Okay.  And did it involve monies that were left over from a

2  previous project?

3  A    That's correct.

4  Q    Okay.  And what had the previous project been, if you know?

5  A    It was called Marcum Hill, Square Marcum, Little Mill Pond

6  sewers.

7  Q    Okay.  And then you and/or Quest had done that work also —

8  A    Yes, sir.

9  Q    — for the City of Manchester?

10 A    Yes, sir.

11 Q    So there was money left to engage in this Phase II Little

12 Mill Pond project; correct?

13 A    That's right.

14 Q    Describe for the jury just generally what the nature of the

15 project was, if you would please.

16 A    It was providing sewers to several small areas that were on

17 septic tanks or straight pipes, one or the other, and so it put

18 them on the City sewer system.

19 Q    Okay.  And what was the terrain of the area?

20 A    Hilly, rough, you know, houses on the side of hills in some

21 instances, so —

22 Q    Okay.  Did it make the engineering aspects more difficult?

23 A    A little bit, but not much, no.

24 Q    Did it make the contractor's performance a little more

25 difficult?

PHILLIP BENTON HANSON - DIRECT - MR. SIMONS          16

1  A    It makes the contractor's job a little more difficult.

2  Q    Okay.  Did Quest Engineering also provide oversight with

3  regard to inspection of the job?

4  A    Yes, sir.

5  Q    Okay.  And who was the inspector assigned to this

6  particular job?

7  A    I believe Joey Rader.

8  Q    And he was an employee of Quest as well?

9  A    Yes.

10  Q    And were you on site on occasion?

11  A    Yes.

12  Q    Okay.  Would that be at the initiation of the project or as

13  it moved through its progress?

14  A    Probably at the kickoff of it and maybe one other time.

15  Q    Okay.  What was the amount -- Do you have the contract in

16  front of you?

17  A    Yes, I do.

18  Q    And what's the amount of the contract, please, sir?

19  A    $166,810.

20  Q    Is that -- is that reasonable in comparison to your

21  engineering estimate, sir?

22  A    Yes.

23  Q    Okay.  When was this project completed, if you know?

24  A    I don't remember exactly what the dates are when it was

25  completed.

1  Q    Okay.  Was it certified fully completed by Quest?

2  A    Yes, it was.

3  Q    All right.  Are there any problems that you're aware of or

4  that are revealed by the records in connection with the

5  performance of B&B Excavating on this job?

6  A    We had no problems.

7  Q    Okay.  Were there — with respect to this job, were there

8  any change orders?

9  A    The best of my recollection, there was an adjustment of

10 quantities change order at the end of the project.

11 Q    Okay.  Would that be reflected in your records in the

12 amount of the change orders or could you put your hand on that

13 record?

14 A    Let's see if I can find it.  I think it was $2,100, was the

15 adjusted change order.

16 Q    Do you find that unusual in any way at all?

17 A    No, sir.

18 Q    Is it customary to have change orders in quantities when

19 you do sewer and water line work?

20 A    It's normal.

21 Q    All right.  Now, I want to ask you about a second —— First

22 of all, are the plans that — the initial plans I gave you and

23 the documents with respect to Mill Pond Phase II–A kept in the

24 ordinary course of business of HDR, formerly Quest?  Do you keep

25 those records?

PHILLIP BENTON HANSON — DIRECT — MR. SIMONS        18

1  A    Yes.  Yes.

2  Q    All right.  And are those true and accurate copies of the

3  records that you have at Quest?

4  A    Yes.

5        MR. SIMONS:  Your Honor, I would move the introduction

6  of — I do not know the numbers, but the plans and the second

7  stack of documents that he's identified as being a part of this

8  project.

9        THE COURT:  The plans will be No. 10 since the

10 previous exhibit was not admitted.

11        Any objection to the admission of the plans as No. 10

12 and then the remaining documents as Collective Exhibit No. 11

13 for Stanley Bowling?

14        MR. SMITH:  No, Your Honor.

15        THE COURT:  All right.  Exhibits 10 and 11 will be

16 admitted.

17        MR. SIMONS:  Excuse me, if I could have the court

18 security officer one more time.

19 BY MR. SIMONS:

20 Q    The plans that were just handed to you, what's the

21 designation on them?  We may have to change them.

22 A    SB9 on this one.

23        MR. SIMONS:  Do we have a 9 at this point?  That's

24 okay?

25        THE CLERK:  Yes.

1                MR. SIMONS:  All right.

2    BY MR. SIMONS:

3    Q     Would you tell me what the plans for SB9 reflect?  What are

4    those the plans?

5    A     They say Little Mill Pond Old Timers Road sewers, sewer

6    extensions.

7    Q     Are you familiar with that project?

8    A     Yes, sir, I am.

9    Q     Were you the engineer in charge of that project?

10   A     Yes, sir.

11   Q     Okay.  Did you prepare the bid advertisements on that

12   particular job?

13   A     Yes, we did.

14   Q     Okay.  Do you have those in front of you in the other stack

15   of documents that I've given you?

16   A     Yes, there's a draft copy here.

17   Q     Of the advertisement?

18   A     Of the advertisement.

19   Q     Okay.  Do your records disclose where the advertisements

20   were placed?

21   A     No.

22   Q     Okay.  Were there multiple bidders on this particular

23   project?

24   A     Yes, sir.

25   Q     And who bid this project, please, sir?

PHILLIP BENTON HANSON - DIRECT - MR. SIMONS          20

1   A    B&B Excavating, Incorporate, Laurel Construction Company,

2   Incorporate.

3   Q    Okay.  Could you tell me the amount of the bid of B&B

4   Excavating, Inc., please, sir?

5   A    Their bid for the base bid was $439,300.

6   Q    And what was the competing bid of Laurel Construction

7   Company, please?

8   A    $522,804.

9   Q    So roughly $80,000 higher, or 90?

10  A    Yes.

11  Q    There is a second bid shown there on the next page that I

12  didn't fully understand.  Maybe you could explain it to me.

13  A    I believe that was for — depending on what the bids came

14  in at, if it was within the funding package that they — the

15  City of Manchester had, that they could do additional work, and

16  so we got bids for some other design work that we had on sewer

17  lines in that same area and — but I don't remember it being

18  done, so —

19  Q    Okay.  But the bid — the same two bidders also bid that

20  job?

21  A    Right.

22  Q    Or prospective bids for the job that didn't materialize?

23  A    They were bid as a package.  You had the base bid and then

24  you had an alternate.

25  Q    Okay.  And B&B was the low bidder on both of those bids?

1   A    Yes.

2   Q    Now, did Quest Engineering recommend that the contract be

3   let to B&B based upon these bids?

4   A    Yes.

5   Q    And did Quest Engineering draw the contract in this

6   particular matter?

7   A    No.

8   Q    Do you know who did?

9   A    The funding agency.

10  Q    Okay.  And who was the funding agency?

11  A    United States Department of Agriculture, Rural Services,

12  Rural Development.

13  Q    Okay.  Now, did Quest Engineering inspect the performance

14  of B&B during this project?

15  A    Yes.

16  Q    And who was the assigned inspector?

17  A    Joey Rader.

18  Q    Okay.  And was the job successfully completed?

19  A    Yes, sir.

20  Q    Was it certified complete by Quest Engineering?

21  A    Yes, sir.

22  Q    Were there any known difficulties or problems with

23  performance of the contract by B&B Excavating, Inc.?

24  A    Not that I'm aware of.

25  Q    Okay.  Now, there were some additional jobs that were done

1    in connection with this job by way of change orders; is that

2    correct?

3    A    Yes.

4    Q    Okay.  Is one of those known as Littleton?

5    A    Yes.

6    Q    Okay.  What was the nature of that change order?

7    A    I believe, if I'm not mistaken, that goes by more than one

8    name.  I think maybe County Garage pump station and Littleton

9    pump station.

10   Q    All right.

11   A    And it was the rehab of the equipment of that pump station.

12   Q    Okay.  So I'm not sure the jury would understand, because I

13   don't.  What does it mean when you say the rehab of the

14   equipment of the pump station?

15   A    Well, the best of my recollection, it's a sanitary sewer

16   pump station that has pumps, controls, piping, and guide rail,

17   and it was in poor condition, so the City wanted to put new

18   equipment into the existing or put a new wet well in so that

19   they would have a new better functioning, more reliable pump

20   station.

21   Q    Okay.  And did that require the approval of Quest

22   Engineering?

23   A    Yes, sir.  Well, we would recommend.

24   Q    Okay.  Did you recommend that that work be done?

25   A    Yes.

PHILLIP BENTON HANSON - DIRECT - MR. SIMONS          23

1  Q    And did that require the approval of the lending agency?

2  A    Yes.

3  Q    And did that work require the approval of the City?

4  A    Yes.

5  Q    And of the Commonwealth?

6  A    Yes.

7  Q    And was that work done?

8  A    Yes.

9  Q    Did Quest prepare, in connection with that, an engineering

10  estimate on the project?

11  A    The best of my recollection, I don't remember if we

12  prepared an estimate for that particular one.

13  Q    Do you know the amount of the change order of the repair,

14  refurbishment of the pump station?

15  A    It says here $55,000.

16  Q    Is that a reasonable cost for that work in your opinion,

17  sir.

18  A    Yes, sir.

19  Q    If it had been unreasonable, you would have called that to

20  the attention of someone, I would expect?

21  A    Yes.

22  Q    Okay.  Was there another change order in connection with

23  that -- Well, let me ask you this:  Was the pump station, as

24  refurbished, inspected by Joey Rader of Quest?

25  A    Yes, to the best of my recollection, it was.

1  Q    And was it fully compliant with all the plans and

2  specifications?

3  A    Yes, sir.

4  Q    Okay.  Was there any problem discovered with the work

5  whatsoever?

6  A    No, sir.

7  Q    Okay.  Now, there was another change order known as Muddy

8  Gap.  Are you familiar with that?

9  A    Yes, sir.

10 Q    And can you tell the jury, please, what that was?

11 A    Muddy Gap was a pump station also, and it was rehab of that

12 pump station.

13 Q    Okay.  Now, why is a pump station necessary?

14 A    In wastewater, a pump station is necessary to get over a

15 certain grade, like up a hill, you pump over a hill into another

16 gravity drainage basin on the way to the wastewater treatment

17 plan.

18 Q    Okay.  So there's gravity flow, and if it has to go uphill

19 you need a pump station?

20 A    That's correct.

21 Q    And Muddy Gap is just the name of a particular pump

22 station?

23 A    That's right.

24 Q    Okay.  The request of the change order was made by whom,

25 the City —

1  A    The City of Manchester.

2  Q    And the recommendation or non-recommendation of that would

3  have been in the bailiwick of Quest; am I fair about that?

4  A    It was up to the City whether they wanted to rehab it or

5  not.

6  Q    I understand.

7  A    We would recommend based on the price that the contractor

8  gave if it was a reasonable cost.

9  Q    Okay.  What was the price projected by the contractor for

10 the Muddy Gap project?

11 A    $85,000.

12 Q    Okay.  And was that a reasonable price in your estimation?

13 A    Yes.

14 Q    Okay.  Were you the person that reviewed that bid or the

15 price?

16 A    Yes.  Yes, I was.

17 Q    Okay.  And did the lending agency also approve that?

18 A    Yes.

19 Q    And was the work completed on time and satisfactorily?

20 A    To the best of my recollection, it was.

21 Q    Well, you weren't the inspector on the job; correct?

22 A    No, sir.

23 Q    Would that, again, have been Joey Rader, do you think?

24 A    Yes, sir.

25 Q    Is there any reflection in your file anywhere that the work

1  of B&B Excavating on that pump station was in any way deficient?

2  A    No.

3  Q    Okay.  Now, there is a third change order on that job and

4  that would be Wayne Street sewer.  Are you familiar with that?

5  A    I'm not as familiar with Wayne Street sewer, no.

6  Q    Do you have records for that?  Take your time, sir.

7  A    I have — I have the change order for that, yes.

8  Q    Okay.  Would you just describe for the jury — that's not a

9  pump station, it's a different project.  Would you explain to

10  the jury what it is, please?

11  A    I believe it is a replacement of a gravity sewer line,

12  eight-inch gravity sewer line.

13  Q    Okay.  And, again — Well, first of all, did you do an

14  estimate on the cost of that?

15  A    I do not remember.

16  Q    Okay.  Do you know what the contract price for B&B was on

17  that particular one?

18  A    $34,300.

19  Q    Okay.  And did the lending agency approve that project?

20  A    Yes, sir.

21  Q    And did Quest review it on behalf of the City and recommend

22  it?

23  A    Yes, sir.

24  Q    And the City approved it and the contractor approved it?

25  A    Yes.

1  Q    All right.  And that work was done.  Did you draw —— did

2  you draw plans for that also?

3  A    I don't believe so, no, sir.

4  Q    Okay.  Did Quest inspect that particular job?

5  A    To the best of my recollection, yes.

6  Q    Okay.  Was there any problem with workmanship of that job?

7  A    Not that I'm aware of, no.

8  Q    In your —— well, do you believe the price was reasonable?

9        MR. SMITH:  Your Honor, I'm going to object.  I don't

10 believe that ——

11        THE COURT:  Sustained.

12        MR. SMITH:  —— he's established a foundation for this

13 job.

14        THE COURT:  Sustained.

15 BY MR. SIMONS:

16 Q    Did Quest approve the price, Mr. Hanson?

17 A    We recommended the change order, yes.

18 Q    All right.  Thank you.

19      Did Quest Engineering —— Well, can you tell me the total

20 amount that was paid by this funding agency in coordination with

21 Quest Engineering and the City of Manchester to B&B Excavating,

22 Inc., for the original job and the three jobs which I have just

23 addressed with you, including any minor change orders in terms

24 of quantities?

25 A    Well, based on our documentation, the final price was

PHILLIP BENTON HANSON - DIRECT - MR. SIMONS          28

1  $669,880.

2  Q    Okay.  And did Quest Engineering certify that all the work

3  was complete and according to the plans and specifications that

4  Quest designed?

5  A    Yes, sir.

6  Q    And all of that work was inspected by Quest employees —

7  Were they all done by Joey Rader?

8  A    The best of my recollection, yes, all by Joey.

9  Q    And all of the change orders were approved fully by the

10 lending agency, the City, yourself, or Quest Engineering?

11 A    We recommended and they accepted.

12 Q    Okay.  Now, would it be true that you have no criticism, or

13 if you do, tell me, of Stanley Bowling or B&B in respect to any

14 of these projects that I've addressed with you this afternoon?

15 A    From my experience and based on what others at Quest

16 Engineers told me, that they did an adequate to good job.

17 Q    Okay.  The projects that we've talked about, you and I here

18 in the last few minutes, in the grand scheme of things, would

19 you consider them small, medium, or large projects, in terms of

20 sewer projects?

21 A    Sewer projects?  Small to medium.

22        MR. SIMONS:  Your Honor, I've lost track of the

23 exhibits that I've introduced.

24        THE CLERK:  They've been premarked.

25        THE COURT:  I think there are two that are up there

1  that have been premarked.  I don't know their numbers.

2         Do they have numbers assigned, Ms. Stoneking?

3         THE CLERK:  Yes, they do.  This is 9, 10, 11, and 12,

4  Your Honor.

5         THE COURT:  Okay.  I admitted 10 and 11, then we went

6  back and had 9.  And then we had two others that were shown

7  after those three.  Is that all we have, just those three?

8         All right.  There's been discussion of Exhibit No. 9,

9  the best I can tell, and I don't believe the witness has

10 testified to the document that's been marked as Exhibit 13; is

11 that correct?  Let me ask the witness.

12        Sir, which documents have you been testifying from?

13        THE WITNESS:  Nine, 10, 11, 12.

14        THE COURT:  All right.  Tell me what 12 is, please.

15        THE WITNESS:  Twelve is information on the Little Mill

16 Pond Old Timers Road.

17        THE COURT:  All right.  And what's 13 that's been

18 marked?

19        THE WITNESS:  Thirteen is the technical and

20 specifications for Little Millpond Old Timers Road.

21        THE COURT:  All right.  Is there a -- which of those 9

22 through 12 been admitted at this point, 10 and 11?

23        THE CLERK:  Ten and 11.

24        THE COURT:  All right.  Do you wish to move to admit

25 Exhibit Nos. 9 and 12 at this time?

1          MR. SIMONS:  I do, Your Honor.

2          THE COURT:  Any objection?

3          MR. SMITH:  No, Your Honor.

4          THE COURT:  All right.  Exhibits 9 and 12, Stanley

5   Bowling Exhibits 9 and 12 will be admitted.

6          MR. SIMONS:  And I will pass the witness.

7          THE COURT:  Thank you.

8          Mr. Smith, you may question the witness.

9          MR. SMITH:  Thank you.

10                    CROSS-EXAMINATION

11  BY MR. SMITH:

12  Q    Mr. Hanson, I'm Steve Smith, and I represent the United

13  States.  I have a few questions for you.

14          Counsel, at the end, described the Mill Pond project with

15  the change orders as minor change orders.  Is that your

16  testimony as well?

17  A    What do you mean by "minor"?  They were reasonable.

18  Q    Okay.  I've just recalled the questions, sir.  I'm asking

19  for you to clarify for me.  I'm not trying to characterize your

20  testimony.

21  A    Okay.

22  Q    I'm trying to understand it.  So they were reasonable, but

23  as far as the amount in the change orders, you're not saying

24  they were minor; is that fair?

25  A    I don't — you know, when I say "reasonable," they were

1    within -- generally within estimates.

2    Q    Okay.

3    A    But not unusual for some projects.

4    Q    Okay.  Manchester is a city of about 1500 people; would you

5    agree?

6    A    I don't know what the population is, but it's a small town.

7    Q    It's a small town.  And you said this is a small- to

8    medium-sized project.  Have you done a survey of small towns,

9    1500 and under, as to whether or not this is a small project for

10   a town of that size?

11   A    Well, I characterize it small to medium because the project

12   before this was for almost $2 million.  So it was smaller than

13   the 2 million-dollar project.

14   Q    And so there were projects prior to '04 that you were

15   involved with?

16   A    That's right.

17   Q    Was B&B involved in those contracts?

18   A    No, sir.

19   Q    Was Kennon White involved in those contracts prior to '04?

20   A    No, sir.

21   Q    Okay.  So it was only after Kennon White came on in '04

22   that you started seeing B&B as a contractor?

23   A    I personally don't know Kennon White.  I might have met him

24   one time.  So I'm not sure when he came on with the City.

25   Q    Assuming that he came on in '04, your testimony would be

1  that's when you saw B&B as a contractor in work that you were

2  doing for the City; is that fair?

3  A    Approximately, yes.

4  Q    Okay.  And I believe that you indicated that these jobs

5  were federally funded through USDA?

6  A    The one project was USDA, the other project was 531, which

7  administrated through the Corps of Engineers.

8  Q    And that would be federal funds as well?

9  A    Right.  Right.

10 Q    I saw notations in your documentation of the terminology

11 PRIDE, P-R-I-D-E?

12 A    Right.

13 Q    And also RD.  Do you know what those stand for?

14 A    Well, RD stands for Rural Development, which is a

15 department under the Department of Agriculture.  And so on that

16 project, funds were -- some of the funds were theirs that they

17 awarded to the City, and then they also administrate the funding

18 before, during, and after construction.  The PRIDE, I can't

19 remember what that stands for, but it's a federal program for

20 trying to remove septic systems in rural communities in Eastern

21 Kentucky.

22 Q    Is that also a funding mechanism that was used in these

23 contracts that were awarded to B&B?

24 A    Yes, they funded these projects.

25 Q    And, sir, I believe that you indicated that the total cost

PHILLIP BENTON HANSON - CROSS - MR. SMITH       33

1  of this project originally, as bid by B&B, was 439,000-some

2  dollars; is that accurate?

3  A    The Little Mill Pond Old Timers Road, yes.

4  Q    And three subsequent change orders occurred, and I think

5  that your total ended up about $666,880; is that -- is that your

6  testimony?

7  A    Approximately, yes.

8  Q    And resulting in roughly, my math, $230,000 in change

9  orders?

10  A    Yes.

11  Q    And all this was inspected by Joey Rader?

12  A    I believe so, yes.

13  Q    Do you know where he's from?

14  A    He's from Clay County.

15  Q    And during the time that you had conversation with

16  Mr. Bowling as the contractor -- You did have conversations with

17  him?

18  A    Sometimes, yes.

19  Q    -- (continuing) did he disclose to you how much money in

20  kickbacks he was paying to the Mayor and his son to get these

21  contracts?

22        MR. SIMONS:  Objection.

23        THE COURT:  I will sustain to the form of the

24  question, but you can -- you can rephrase the question.

25  BY MR. SMITH:

1  Q    Assuming there is evidence, sir, that Mr. Bowling was

2  paying kickbacks to the mayor and his son during the time period

3  of these contracts, were you made aware of that as part of your

4  duties as engineer over the project?

5  A    No, I wasn't.

6            MR. SMITH:  That's all I have.

7            THE COURT:  All right.  Let me see if any of the other

8  attorneys have any questions first.

9            MR. PINALES:  No.

10            THE COURT:  Redirect on matters that were covered on

11  cross?

12                     REDIRECT EXAMINATION

13  BY MR. SIMONS:

14  Q    Mr. Hanson, the original bid on the one project was

15  439,000, it wound up being 667,000, but the citizens of

16  Manchester got a lot more work for that, did they not?

17  A    Yes.

18  Q    Yeah, they got a functioning pump station, a second

19  functioning pump station, and they got sewers to the septic down

20  the street; is that fair enough?

21  A    Yes, generally.

22  Q    And each time you reviewed it as a engineer and the lending

23  agents reviewed it to see whether it was appropriate and

24  reasonable and they approved it; is that fair?

25  A    Yes.

1          MR. SIMONS:  Thank you.  That's all.

2          THE COURT:  Anything else of the witness?

3          MR. SMITH:  No, thank you.

4          THE COURT:  All right.  Anything else?

5          MR. PINALES:  No.

6          THE COURT:  Thank you, sir, and you may step down.

7    You're excused at this time.

8          You may call your next witness.

9          MR. SIMONS:  Let's try Mr. James Garrison again.

10                        JAMES GARRISON,

11   having been first duly placed under oath, was examined and

12   testified as follows:

13         THE COURT:  Please proceed.

14                     DIRECT EXAMINATION

15   BY MR. SIMONS:

16   Q    Afternoon, Mr. Garrison, how are you?

17   A    Good afternoon.

18   Q    My name is Dan Simons, I represent Stanley Bowling.  Do you

19   know Mr. Bowling?

20   A    Yes, sir.

21   Q    Can you see him here in the courtroom, please?

22   A    Yes, sir.

23   Q    All right.  State your name, please.

24   A    My name is James Garrison.

25   Q    And where do you live?

1  A    I live at Manchester, Kentucky.

2  Q    And what's your occupation currently?

3  A    Right now, sir, I'm retired.

4  Q    Okay.  How long have you been retired?

5  A    Since '06.

6  Q    Okay.  And what position did you retire from?

7  A    County judge executive.

8  Q    And how many years were you county judge executive in

9  Manchester, Kentucky?

10 A    From '94 to the end of '06.

11 Q    So approximately 12 years; is that correct?

12 A    Thirteen, I think.

13 Q    Thirteen?

14 A    That first year was five.

15 Q    All right.  Thank you.  I just have a couple of very

16 focused questions or issues I want to talk to you about today;

17 okay?

18      Stanley Bowling was a magistrate — has been a magistrate.

19 I think the evidence is he was first elected in — Do you

20 remember when Stanley first became a magistrate?

21 A    I think it was '02.

22 Q    Okay.  And you retired in '06?  Was he a magistrate on your

23 fiscal court for those four years?

24 A    Yes, sir.  Uh-huh.

25 Q    Okay.  Did there come a point in time when the county

1   needed an excavator for its use?

2   A    Yes, sir.

3   Q    Okay.  Would you explain to the jury, please, the

4   circumstances of that?

5   A    Uh-huh.  We live in a county where there's two major rivers

6   that splits our county, and for years there we had needed an

7   excavator, something that was bigger than just a normal backhoe.

8   And so we had tried to get a backhoe through our surplus

9   department here at Frankfort for five or six years with no

10  success out of the military system or something of that nature,

11  wherever they get all their equipment from, but — so we were

12  unsuccessful in being able to get a piece of equipment like that

13  that we needed from the surplus because we never had money

14  enough, our county didn't, to purchase what would be a brand-new

15  piece of equipment like that.

16       And so B&B Construction, knowing we needed a piece of

17  equipment of this nature and he — or B&B Construction, whomever

18  that is, I don't know who really owns B&B Construction, I just

19  know it as B&B Construction.  And they had bid some water lines

20  in our county where we were advised by I think it's Bill

21  Clinton's first term that he was in office that every time we

22  had county judge and magistrate meetings and stuff somewhere,

23  association meetings, why, we were advised by people from

24  federal government and state government that it was going to be

25  the responsibility of all counties throughout the United States,

1  not only in Kentucky, but to be sure that by the year 2020 that
2  we had palatable water for all the residence of our county.
3  That means municipal water.  And so we worked hard for that, you
4  know.  And Stanley needed a bigger piece of equipment when he
5  got the bid for the water line.  And so he was willing to allow
6  us to just start paying $2,000 a month on this piece of
7  equipment until we got it paid for, and then we paid for $40,000
8  for it, we didn't have to pay any interest.  And if we had
9  bought that kind of piece of equipment from a dealer, it would
10  be probably 60 or $70,000, if not more, and then we would have
11  had to have put down a 10 percent down payment, you know, on a
12  piece of equipment of that nature.
13  Q    Let me ask you this:  Did the County have funds available
14  to buy a new piece of equipment?
15  A    Oh, absolutely not.
16  Q    Did the County have money available to put a sizeable down
17  payment and pay the equipment over time?
18  A    Nothing, no.  Huh-uh.
19  Q    All right.  Did the County or did you and the County
20  approach Mr. Bowling about the excavator that he had?
21  A    Well, our road foreman understood that Mr. Bowling or
22  B&B Construction had this piece of equipment, and they was
23  thinking about trading it in on a new piece, and I think he was
24  the one that originally made the first contact with Mr. Bowling
25  about the excavator.  And so he let me know about it then, and

1   then we brought it up in front of Fiscal Court.

2   Q    Are you familiar with heavy equipment like excavators?

3   A    Yes, sir.

4   Q    Do you know what kind of excavator this was?

5   A    It was a Caterpillar.

6   Q    Do you know what attachments it had with it?

7   A    Well, it — another thing that was real good for us, it had

8   a big 48-inch wide bucket on it.  So when we had slides that

9   come down out of the mountains on us and slid into the roads,

10  why, that big wide bucket helped us to pick up that slushy earth

11  and, you know, get it loaded in a truck to get the roads opened

12  back up.

13  Q    Do you recall when this occurred?

14  A    Sometime in the latter part of '04, somewhere in '04.

15  Q    As county judge executive, are you the head of the Fiscal

16  Court?

17  A    I would say I was the executive officer of the County, yes,

18  sir.

19  Q    Are minutes taken of all the Fiscal Court meetings?

20  A    Oh, yes.

21  Q    Okay.

22  A    Uh-huh.

23       MR. SIMONS:  If I could have the witness shown a

24  document.  Could we approach, please, Your Honor?

25       THE COURT:  Yes, sir, you may.

1      (Whereupon, the following discussion was had between the

2  Court and counsel at the bench, out of the hearing of the jury.)

3          MR. SIMONS:  I was wanting to introduce the minutes of

4  the meeting of the Fiscal Court where they agreed to purchase

5  the excavator through this witness and authenticate it through

6  him that way.  I think I can do that.

7          THE COURT:  My only question is whether these are

8  already in evidence.  I don't know.

9          MR. SIMONS:  I do not believe they are.

10          MR. SMITH:  I have not seen this before.  Have you

11  supplied that to us?

12          MR. SIMONS:  No, not before right now, I don't think.

13          MR. SMITH:  Your Honor, we've had records custodians

14  from the County appear throughout this trial and this being

15  brought in through a judge executive who no longer works there,

16  we would object.  I don't know he can say these are records that

17  are kept down there at this time.  There seems to be no

18  certificate, no authentication of this document from the records

19  of anyone in a position of recordkeeping at the County offices,

20  so we would object on that basis as well.

21          MR. SIMONS:  My thought, Your Honor, would be that he

22  is the ultimate person responsible for the keeping of the

23  records and that he would be in a position to authenticate this

24  as a —— as the minutes of the meeting on October 22nd, 2004, of

25  the Clay County Fiscal Court.

1          THE COURT:  This appears to be a copy of a document,

2    purports to be minutes of the meeting, it's sought to be

3    introduced by the former county judge executive.

4          MR. SMITH:  I'll withdraw the objection.  We can go

5    forward, that's fine.

6          THE COURT:  Let me finish my analysis.  The document

7    was not previously shown to the United States, not provided in

8    discovery, shown for the first time, I suppose, today.

9    Ordinarily, I would not allow the document into evidence based

10   on this witness not being able to lay a proper foundation, at

11   least to this point, but inasmuch as the United States has

12   withdrawn its objection, I'll admit the document.

13         What's the number — And, Counsel, let's get these

14   numbers straight with these witnesses.  Don't just hand him a

15   document and then expect the Clerk to try to figure out what the

16   next number is; okay?

17         MR. SIMONS:  Yes.  I apologize, Your Honor.

18      (Whereupon, the following proceedings continued in open

19   court.)

20         THE COURT:  Kim, what is the next number?

21         THE CLERK:  Your Honor, this was premarked 7.

22         THE COURT:  Do you have a 7?

23         THE CLERK:  No, prior to coming into court, he asked

24   me to number it.

25         THE COURT:  This was going to be an earlier witness.

 1  All right.

 2  BY MR. SIMONS:

 3  Q    Mr. Garrison, you've been handed a document marked

 4  Defendant's Exhibit No. 7.  Can you see that, sir?

 5  A    Yes, sir.

 6  Q    Does that appear to be the minutes of the meeting of the

 7  Clay Fiscal Court on October 22nd, 2004, in Clay County?

 8  A    Yes, sir, it is.

 9  Q    And you were the County Judge at that time?

10  A    Yes, sir.

11  Q    And does it demonstrate the — or set forth the magistrates

12  who were present on this occasion?

13  A    Yes, sir, it does.

14  Q    All right.  Would you please recite for the jury, please,

15  the magistrates who were there?

16  A    Well, the Clerk called the roll.  If I'm speaking too loud

17  or not loud enough, please let me know.  You guys got a good

18  system here, we don't have nothing this good in Clay County.

19       Roll call taken by our clerk was Tommy Harmon, absent;

20  Stanley Bowling, absent; Terry Davidson, yes; Randall Wagers,

21  yes; Johnny Gregory, yes; Clinton Johnson, yes; and James

22  Garrison, yes.

23  Q    Okay.  Do the minutes reflect that B&B Excavating or Steven

24  Bowling with B&B Excavating addressed the Court concerning the

25  desire of the Court to enter into a purchase agreement with B&B

JAMES GARRISON - DIRECT - MR. SIMONS                    43

1    Excavating for a Caterpillar 140 excavator?

2    A    Yes, sir.

3    Q    And does it say the type of excavator that's there?

4    A    Yes, it says for a Caterpillar 140 excavator, Serial No.

5    662308, and that's — I was a little wrong on the bucket there

6    from just my memory.  It's a 42-inch bucket instead of a 48.

7    Q    And it recites the price that you said.  Does it give a

8    reason why the County desires to purchase that equipment?

9    A    Sir?

10   Q    Does it then say why the County needed the equipment at

11   that point in time?

12   A    Well, we had been declared a disaster and we had bridges,

13   culverts, slides that had slid down into the roads and had the

14   roads blocked and —

15   Q    Resulting from what, sir, if you know?  What had caused

16   that?

17   A    Oh, flooding.  Yeah.  Uh-huh.

18            MR. SIMONS:  All right.  Okay.

19            I would move the introduction, it's already been

20   introduced.

21            THE COURT:  It has not been introduced, but there

22   being no objection, I will admit Bowling Exhibit No. 7.

23            MR. SIMONS:  Thank you, Your Honor.

24            MR. SMITH:  No objection.

25   BY MR. SIMONS:

1  Q     I want to change gears with you for just a second.  Are you

2  familiar with a water line extension that B&B Excavating did on

3  Laurel Branch at Rocky Branch Road?

4  A     Yes, sir.

5  Q     Okay.  Tell me or tell the Court what you remember — Well,

6  let me just ask you this:  Was there a situation that arose that

7  required the use of County gravel?

8  A     Yes, sir.

9  Q     Would you describe for the jury what happened, please?

10 A     Maybe let me go back just a little bit past this particular

11 thing so they'll understand why we made the decision to do what

12 we done there.

13 Q     Whatever is necessary.

14 A     Two or three years before, we had given a gas company

15 permission to lay a gas line down through one of our county

16 roads, it was out in the Fogertown community, it's the west end

17 of our county.  And they went out there in the wintertime and

18 dug a ditch down through the middle of our county road and the

19 school buses and everything have to run this road twice a day.

20 And so they dug a distance of probably 1500 foot right down the

21 middle of this county road on us without us knowing really

22 anything about it.  And they were supposed to have stayed in the

23 ditch line as well, but they got out and got in the road because

24 there was some kind of a line already in the ditch line.

25        And what happened then, the rain, the rainy season, we like

1   to never in the world got the school buses back and forth

2   through that road the rest of the winter, because when you push

3   dirt back into these ditches that are about 36 or 48 inches

4   deep, you can't pack that dirt in the wintertime.  If you get a

5   rain real quick, why, it soaks to the bottom, and no matter how

6   much gravel you dump in there, it will just sponge it right out,

7   it just lets it float right back out the gravel.  And so if you

8   dig your main roads —

9          MR. SMITH:  Your Honor, I'm going to object to the

10  relevancy of this —

11         THE COURT:  Well, I'm going to sustain the objection.

12  I believe this would — outside the scope of this witness's —

13         MR. SIMONS:  All right.

14         THE COURT:  — ability to testify, so I'll sustain the

15  objection.  The jury may disregard his answer.

16         MR. SIMONS:  Thank you.

17  BY MR. SIMONS:

18  Q    With respect to the project that B&B was doing on Laurel

19  Branch Road, are you familiar with the fact — do you know why

20  they had to dig in the road?

21  A    Yes, sir.

22  Q    And why was that?

23  A    When the engineering company had drawed the water line

24  extension up, they had drawn it to be in the ditch line.

25  Q    Yes.

1  A    But when they actually got down there physically doing the

2  work, a gas company had already had a gas line in the ditch

3  line, and so the out slope of the road was so steep that you

4  couldn't get around through there with any kind of piece of

5  equipment.  And so the county let him dig the road up, put the

6  water line in the road and —

7  Q    Rather than replace it with mud?

8  A    We said we'll furnish the gravel, put the water line,

9  because we don't want another bad program on our hands there.

10  Q    So the county was fully aware that the gravel was used for

11  that project —

12  A    Exactly.

13  Q    — and endorsed that use of gravel; is that fair?

14  A    Yes.

15        MR. SIMONS:  Thank you.  I think that's all I have, I

16  pass the witness.

17        THE COURT:  All right.  Thank you.

18        Mr. Smith.

19                    CROSS-EXAMINATION

20  BY MR. SMITH:

21  Q    Mr. Garrison, I'm Steve Smith from the United States, and I

22  have a few questions for you.

23  A    Yes, sir.

24  Q    If I understand your testimony, you are formerly the Judge

25  Executive in Clay County; is that fair?

JAMES GARRISON CROSS - MR. SMITH                47

1  A    Yes, sir.

2  Q    You weren't the Judge Executive for Manchester, were you?

3  A    Say what?

4  Q    You were not the Judge Executive for Manchester, were you?

5  A    No, that's controlled by the Mayor and the City Council.

6  Q    So your government is County and the mayor controls the

7  City; is that the way it works?

8  A    Exactly.

9  Q    And during that time period, you indicated that you served

10 with Stanley Bowling.  That's the man who's seated here on

11 charges here today; is that right?

12 A    Yes, sir.

13 Q    And he served in your court from the time period that you

14 say 2002 through 2006 he was there?

15 A    Yes, sir.

16 Q    And then Terry Davidson, he's a federal convict, is he not,

17 he's been convicted of federal charges, he was also on your

18 court in 2004, was he not?

19 A    Somewhere -- I don't know the exact time, but somewhere in

20 there.

21 Q    Well, you listed him as being, I believe, present at the

22 meeting in which this special meeting was called to make sure

23 that you-all got this piece of equipment purchased; is that

24 right?

25 A    Yes, sir.  Uh-huh, yeah, Terry Davidson.

1  Q    And then Clinton Johnson, he's also a federal convict, is

2  he not?

3  A    Yes, sir.

4  Q    And he was also present at that meeting?

5  A    He was charged with something.  I don't know what it was.

6  Q    Election fraud.

7  A    Okay.

8  Q    Vote buying in Clay County ——

9  A    Okay.

10 Q    —— in 2002.

11       MR. HOSKINS:  Objection, Your Honor.

12       THE COURT:  You want to rephrase the question,

13 Mr. Smith?

14 BY MR. SMITH:

15 Q    If the evidence shows, sir, that Mr. Johnson was convicted

16 of election fraud, vote buying in 2002 in Clay County, are you

17 aware of that, sir?

18 A    Yes, sir.

19 Q    And Tommy Harmon was a close associate of Jennings White

20 during the 2002 election; isn't that a fact?

21 A    In a county like Clay County, everybody is, you know,

22 friends in some roundabout way.

23 Q    Well, they were a little bit more than friends, I think in

24 that early voting election period, they were down there helping

25 Vernon Hacker; do you recall that?

1  A    Repeat that, sir.

2  Q    Jennings White had some people down there, you know, Paul

3  Bishop and William "Al Man" Stivers, working the early election

4  there in 2002, are you aware —

5           MR. SIMONS:  Objection.

6           THE COURT:  Overruled.

7  BY MR. SMITH:

8  Q    Are you also aware that they had — Jennings White had

9  Lester and Tommy and also the Harmons down there working with

10  Vernon Hacker?

11 A    I don't know nothing about that, sir.

12 Q    Do you not know anything about vote buying in Clay County

13 in 2002, sir?

14 A    Well, I've heared of it all my life, I guess, since I got

15 old enough to vote, but I've never —

16 Q    Never observed it?

17 A    — seen or bought one vote, and I've never seen it.  I've

18 always had to work — go back to work.  I'd vote and go to work.

19 Q    You just heard about it?

20 A    Yeah.  Uh-huh.  Yeah, I've heared about it.

21 Q    Well, there've been some complaints over there about vote

22 buying; would you agree?

23           MR. BALDANI:  Objection, Your Honor.

24           THE COURT:  Overruled.

25 BY MR. SMITH:

1  Q    Would you agree?

2  A    Oh, are you waiting on me?

3  Q    Yes, sir.

4  A    Repeat that again, sir.

5  Q    I said there have been complaints about vote buying in Clay

6  County; would you agree?

7  A    Oh, they have for 40 years.

8  Q    But you've never complained about it?

9  A    Maybe just a little bit, I did, uh-huh.  I guess it would

10 have been in the '02.  But other than that, I've tried to keep

11 myself in a frame of mind that politics is every four years,

12 which one of those terms happened to be five years at that time

13 because state legislators was trying to get more state, federal,

14 and county elections to be at the same time to try to save

15 monies for the counties.  It's about 23, 24,000 a year, is what

16 it cost to have an election in our county.

17 Q    Isn't it true, sir, that you went as far as voicing a

18 complaint to federal authorities about vote buying in 2002?

19 A    I didn't about vote buying, no.

20 Q    You don't recall on the date of September the 23rd, 2002,

21 talking with federal authorities and reporting problems in Clay

22 County of vote buying in the last local election, sir?

23 A    I remember speaking to someone, I don't know who they were.

24 Q    We need to be careful about hearsay; okay?  You need to

25 listen to my question.

1  A    Yeah.  Uh-huh.

2  Q    Do you recall going to federal authorities on September

3  the 23rd, 2002, and reporting there were problems in Clay County

4  in vote buying in the last local election?  Isn't that true?

5  A    No, I don't — sir, I'm sorry, but I don't remember no such

6  phone call to nobody concerning that.

7  Q    Do you know a man by the name of Bill Lambert?

8  A    No.

9  Q    Did you not travel to Lexington, Kentucky, with a

10 businessman from Manchester, Kentucky, by the name of Bill

11 Lambert —

12 A    No, sir.

13 Q    — and identified yourself as the County Judge Executive

14 and reported to federal authorities on that date problems of

15 vote buying in the last local election?

16 A    It wasn't Bill Lambert, sir.  I traveled back and forth to

17 Lexington with a Bob Lambert a few times.  He was the one —

18 Q    I guess my question, the answer is yes or no.  Did you

19 not —

20 A    Well, he was the one — let me rephrase.  He was the one

21 that done all the talking, sir, it wasn't me.

22 Q    The report indicates that Garrison and Lambert —

23       MR. BALDANI:  Objection, Your Honor.

24 BY MR. SMITH:

25 Q    — both indicated —

1          THE COURT:  Overruled.

2  BY MR. SMITH:

3  Q    So now you disagreed that you also indicated to the federal

4  authorities the problems in Clay County of vote buying in the

5  last local election?

6  A    What I observed in the last election in the precinct that I

7  voted in?

8  Q    This is — if you recall my question, the visit to the

9  federal authority was on September the 23rd, 2002, sir.  So you

10  would have been referring to the last local election prior to

11  September the 23rd, 2002.  Do you understand my question?

12  A    The last election was '06, wasn't it?  '05, '06?  I guess

13  that's where I'm losing you.

14  Q    Yeah, go back four more years, 2002.

15  A    Okay.

16  Q    Go to Lexington, Kentucky, with a fellow by the name

17  Lambert.  Isn't it true that you traveled to Lexington,

18  Kentucky, and spoke with federal authorities and made a

19  complaint with Mr. Lambert, both of you indicating problems in

20  Clay County with vote buying in the last local election?

21  A    I remember we come down here, but I can't remember — Bob

22  Lambert was the man's name, not Joe, and we were coming down

23  here for meetings with Kentucky Agriculture Association, and we

24  stopped by someplace, I don't even know where it was at, because

25  he was the gentleman that wanted to stop, it really wasn't me.

1  Q    Isn't it true, Mr. Garrison, that you further explained
2  that the Fiscal Court had been deliberating the construction of
3  a new Justice Center and that you reported to the federal
4  authorities that you believed that the Board comprised of Cletus
5  Maricle, Circuit Clerk James Phillips, and Tommy Harmon, and a
6  private attorney named Scott Madden were privately vested in the
7  land in which this new construction was occurring?
8  A    Not where their Justice Center is located, the Justice
9  Center itself, no.
10  Q    So you don't recall making that report to federal
11  authorities on that date as well, sir?
12  A    I know I didn't want our old Clay County Courthouse torn
13  down because I had found a piece of property right across the
14  street where it could have been built, and for the historic
15  purposes of the old building, I hated to see it torn down.  My
16  uncle and some more people had helped build that back in the
17  days of the depression and lots more families in Clay County's
18  people had helped build the old courthouse there out of the
19  natural sandstone rock that we have locally there.
20  Q    Sir, isn't it also a fact that you reported to federal
21  authorities as recently as 2006 that voters in Clay County had
22  been duped by election officers and told they had finished
23  voting when, in fact, they hadn't and that their votes were
24  actually being changed by the machines before casting their
25  vote?

1          MR. BALDANI:  Objection, Your Honor.

2          THE COURT:  Overruled.  He's asking if this was a

3  prior statement that he made.  He may ask him, it goes to his

4  credibility.  Overruled.

5          THE WITNESS:  Answer — do I answer his question?

6  BY MR. SMITH:

7  Q    Isn't it a fact that you reported to federal officials as

8  recently as July the 31st, 2006, that there were problems in the

9  Clay County elections in 2006 in which elections officers were

10 actually advising voters that their votes had been cast after

11 they pressed the red "vote" button, and you further reported

12 that the voters would leave the machine after pressing the red

13 "vote" button and the election officers would then go to the

14 machine and change their vote before they had even cast their

15 vote?  Isn't that a fact?

16 A    Yes, I did.  But not buying votes, that's not what I was

17 talking about to whomever I was talking to, the gentleman there.

18 Q    So you do agree that you reported to federal authorities

19 vote stealing but not vote buying; is that your testimony?

20 A    It would be more appropriate in that form than it would

21 have been the buying.

22 Q    You just have no recollection of the 2002 meeting at the

23 Lexington federal official's office?

24 A    Not enough to really expound on it.  I remember Mr. Lambert

25 stopping here somewhere when we were down here and wanted to

1  talk to some people there.  I wouldn't have no idea who to even

2  think about talking to myself.

3  Q    Mr. Garrison, you testified in front of this jury that you

4  do not know who owns B&B Excavating; isn't that true?

5  A    Not really, I don't, sir.  Huh-uh, no.  It's just, as far

6  as I'm concerned, B&B Construction.  I don't know if that was

7  Mr. Stanley Bowling and his son.  His son's name is Steven, so I

8  have no idea.  It wasn't none of my business to ask someone, you

9  know, who is B&B Construction, that was not —

10  Q    You didn't associate B&B Excavating with Stanley Bowling?

11  A    I did that, yes, sir.

12  Q    You didn't ask who owned the company?

13  A    No.  Like I say —

14  Q    Wouldn't that be an important fact, sir, as a government

15  chief executive officer, to know whether a member of your Fiscal

16  Court actually is the person who you're going to be purchasing

17  property from?

18  A    Well, I assumed that it was Stanley and maybe his son.

19  Now, that was my assumption.

20  Q    In making that assumption, you are aware of the fact that

21  Kentucky Revised Statutes would prohibit a fiscal court from

22  buying from its own members property; wouldn't you agree?

23  A    Not under the circumstances, no.

24  Q    You see this was being an exception?  In what way, sir?

25  A    Well, sir, it would be impossible for any county to

1    possibly maybe follow all of the laws that's set against the

2    counties from state and federal government.  If we had been

3    buying a brand-new piece of equipment, I think I would even have

4    had to had permission from the LG before I could have -- if I'd

5    had money enough to bought a piece of new equipment before we

6    could have purchased a new piece of equipment.

7    Q    So you're not aware of Kentucky Revised Statutes which says

8    that an entity such as county government has a requirement that

9    anything that's purchased over the value of $20,000 must be open

10   to a public bid; is that your testimony?

11   A    Let me -- let me try to put it this way.  How many people

12   in Clay County, Manchester, Kentucky, would have a piece of

13   equipment of the nature of what we could use that if you would

14   have advertised for months, they would have had -- you would

15   have had nobody to turn in a bid.

16   Q    I assume the taxpayers will never know, because you never

17   advertised this bid, did you, Mr. Garrison?

18   A    Probably not.

19   Q    And where did you become an expert on the price of used

20   equipment on excavation equipment, sir?

21   A    Well, I worked with heavy equipment all my life, sir.  I

22   was a strip miner.

23   Q    I understand.  Okay.  But how does that make you an expert

24   on the value of heavy equipment on a used market at the time in

25   which you purchased this on October 22nd, 2004?

1   A    Well, my brother, for one thing, is still in the

2   construction business, he and his wife, and they are buying this

3   equipment all the time and stuff there, excavators, you know,

4   backhoes and —

5   Q    But you haven't testified to this jury that you consulted

6   anyone before making this purchase, including your brother, did

7   you?

8   A    No, I didn't, but I had talked with salesmans from Whayne

9   Supply, from Wilson Equipment, that's Corbin, we don't have any

10  equipment dealers in our county, we got to go three counties

11  over and it's tough to get to our dealers, and they didn't have

12  anything of that nature.  I mean —

13  Q    When did you call them?

14  A    Well, I talked to them for years.

15  Q    Well —

16  A    They were trying to help me find something, too.

17  Q    — when did you talk to them about this piece of equipment

18  before you authorized the purchase from one of your own Fiscal

19  Court members?  When did you talk to them before that?

20  A    Well, I can't say that, I mean, because I don't know.  I

21  talked to all the dealers —

22  Q    Is that the only equipment you bought from Stanley Bowling,

23  sir?

24  A    That I know of, yes, sir.

25  Q    You're not aware of the truck that was also purchased?

1    A    No, sir.

2    Q    You're not aware of a truck?

3    A    No.

4              MR. SMITH:  That's all I have.  Thank you.

5              THE COURT:  All right.  Let me ask if any of the other

6    attorneys have questions before we get back to redirect.

7              Mr. Hoskins?

8              MR. HOSKINS:  Your Honor, we may have a few questions

9    if we could have just a minute.

10             THE COURT:  Yes, sir.

11             MR. HOSKINS:  Just a couple of questions.

12             THE COURT:  Yes, sir, Mr. Hoskins.

13                        CROSS-EXAMINATION

14   BY MR. HOSKINS:

15   Q    Mr. Garrison, my name is David Hoskins and I represent

16   Cletus Maricle, and I have just a couple of questions about

17   something that was touched on with the old courthouse building.

18        There was a committee that was set up to deal with getting

19   a new courthouse in Clay County; right?

20   A    True enough.

21   Q    And you were on that committee because of your office at

22   the time of being judge executive, and the law said the judge

23   executive is on that committee?

24   A    Yeah, along with all the rest.

25   Q    Along with all the rest of the people that are on that

1  committee; correct?

2  A    Uh-huh, the law required it.

3  Q    In other words, there was — there's a number of people

4  that the law says have to be on that committee?

5  A    Right.

6  Q    And the county already owned that property that the old

7  courthouse was on?

8  A    Yes, sir.

9  Q    And the new courthouse was then built on that same piece of

10 property?

11 A    New Justice Center.

12 Q    New Justice Center, I should say.  The old courthouse had

13 the — all the county offices in it?

14 A    Yes, sir.

15 Q    And then the new building that's on that property is called

16 the Justice Center because it has — it has the offices that are

17 connected to the actual court system; is that fair to say?

18 A    And only the court system.

19 Q    Pardon?

20 A    Only the court system, Circuit Court Clerk's Office as

21 well.

22 Q    And some of the people on the committee wanted to buy

23 property of another — another piece of property and put the new

24 Justice Center on, some people wanted to keep it where it was;

25 correct?

1    A    Yes.

2    Q    And in the end, the majority was for putting it where it

3    was, where the old building was?

4    A    Evidently.  Uh-huh.  Worked out that way.

5    Q    And that was property that the county didn't have to buy

6    because the county already owned it?

7    A    Right.

8              MR. HOSKINS:  That's all, thank you.

9              THE COURT:  All right.  Thank you.

10             Mr. Westberry, any questions?

11             MR. WESTBERRY:  No.

12             THE COURT:  Mr. White?

13             MR. WHITE:  No questions, Your Honor.  Thank you.

14             THE COURT:  Mr. Abell?

15             MR. ABELL:  No.

16             THE COURT:  Mr. Baldani?

17             MR. BALDANI:  No questions.

18             THE COURT:  Anyone else?

19             MR. GILBERT:  No questions.

20             THE COURT:  Any redirect of the witness?

21             MR. SIMONS:  No, Your Honor.

22             THE COURT:  All right.  Thank you.

23             Mr. Smith, any cross based upon what Mr. Hoskins just

24    asked?

25             MR. SMITH:  Just a couple if I could --

1          THE COURT:  Yes, sir.

2                    RECROSS—EXAMINATION

3  BY MR. SMITH:

4  Q    This Justice Center which ended up being built was built on

5  property adjoining Cletus Maricle's; isn't that true?

6  A    Across the street, in the back across the street.

7  Q    And eventually he and his wife sold the property to the

8  County for purposes of this development; isn't that a fact?

9  A    I don't — I can't — I won't say exactly who owned the

10  property, but I'm — I know Cletus was a part owner of the

11  property.  Whether it was 100 percent or not, I don't know.  No.

12  Q    But you would agree with me he sold it for this development

13  to the County?

14  A    Yes, later after the Justice Center was built.

15  Q    And you were talking about your position on that committee.

16  You said the law required you to be on it?

17  A    Yes, sir.

18  Q    But you previously testified here that you found that laws

19  just really were impossible to follow down there in Clay County

20  and you didn't follow them to begin with.  Why did you follow

21  this one?

22  A    Well, the legislators had just changed the laws concerning

23  the Justice Centers throughout the state.  Several new Justice

24  Centers had already been completed, and their original cost that

25  was originally set up for the Justice Center to be complete, and

 1  by the time — we're going through a period of about four or

 2  five or six years there.  And by the time they got these centers

 3  built, instead of them costing what — they had gone in front of

 4  the AOC to receive money to build these centers.  The — well, I

 5  think Warren County was one I think I can remember, that instead

 6  of the building a costing what the projected cost would have

 7  been, like 8 million, it had run over to 16 million by the time

 8  they got it built.  And they had three or four or five of these

 9  throughout our state that had run like this based upon the AOC,

10  that's Administrative Office of the Courts, is what that means.

11  And so by the time we —

12          MR. SMITH:  Your Honor, I'm going to move, at this

13  time, that that answer be stricken.  I believe it's unresponsive

14  to the question.

15          THE WITNESS:  Well it will be —

16          THE COURT:  Yes, sir, I will —

17          THE WITNESS:  — if you let me finish.

18          THE COURT:  No, sir, you need to answer his question

19  first, and then you can explain if you need to.  But that was

20  not his question.

21          Mr. Smith, you can restate it.

22          THE WITNESS:  I thought that's what I was doing, sir.

23  Sorry.  Give me the question again, then.

24  BY MR. SMITH:

25  Q    Let me restate it this way:

1  A    Okay.

2  Q    You've previously testified before this Court and this jury

3  that it's impossible to follow all the laws; isn't that a fact?

4  A    Well, it is, sir.

5  Q    And that's what you testified?

6  A    Well, you're a lawyer, you'd have trouble, too.

7  Q    Basically, isn't it a fact what you're saying —

8  A    Changes, uh-huh.

9  Q    — is the law doesn't apply down in Clay County; is that

10 what you're saying?

11 A    No.  No, sir, I'm not saying that stuff at all.

12        MR. SMITH:  All right.  That's all I have.

13        THE WITNESS:  Okay.

14        THE COURT:  All right.  Let me see if there's any

15 other questions of the witness?

16        Back around, Mr. Simons, any questions?

17    (No audible response.)

18        THE COURT:  Sir, you may step down.  You're excused.

19        Ladies and gentlemen, we will take our recess before

20 we continue with the case.  Please keep in mind the admonition

21 that you've been given several times not to discuss the case

22 among yourselves while we are in recess.  The jury will be

23 excused for 20 minutes.

24    (Whereupon, the jury retired from the courtroom, after which

25 the following proceedings were had in open court.)

1        THE COURT:  Thank you.  Please be seated.

2        Mr. Simons, I want to get an estimate from you as to

3   when you anticipate closing your case in chief.

4        MR. SIMONS:  I have one more witness, Your Honor.

5        THE COURT:  How long do you anticipate that witness

6   will be on direct?

7        MR. SIMONS:  Fifteen minutes perhaps.

8        THE COURT:  All right.  Thank you.

9        Mr. Westberry, do you have your witness lined up for

10  what will be surrebuttal?

11       MR. WESTBERRY:  We do.  At the break we were going to

12  make a determination on just what we -- we were going to make a

13  determination on just what we were going to do with it.  We've

14  been moving quickly and I don't know what the government plans

15  on doing.

16       THE COURT:  All right.  Well, based on what I was told

17  earlier, little to nothing.  So you probably need to be prepared

18  with that witness or two if you plan to call those persons.

19       MR. WESTBERRY:  It would be one, if any at all.

20       THE COURT:  All right.  And according to counsel, it

21  may be as quick as -- well, a little after 3:00.

22       MR. WESTBERRY:  It will be a Judge Hood witness if we

23  do him.

24       THE COURT:  All right.  I appreciate that.

25       Mr. Smith.

1          MR. SMITH:  I just wanted to explain to the Court I
2   have reviewed our proposed jury instructions, and I want to
3   apologize to the Court, when I sent those in, I failed to clear
4   up some considerable typographical errors, and I want to, with
5   the Court's permission, submit those with some revisions and
6   also supplement those.  There were some additional instructions
7   that I found that I would like to also include in those, and I
8   would like to submit those before we resume our — from our
9   break if the Court would allow.
10          THE COURT:  All right.  Yes, sir, you can certainly do
11   that, and we can talk about those issues as we get closer to the
12   completion of all proof.  At this point, do you anticipate any
13   rebuttal to be presented?
14          MR. SMITH:  No.
15          THE COURT:  No?  All right.  Well, I'll call counsel
16   up and we'll have a bench conference before I excuse the jury
17   for the day.  I just wanted to check to see.  I didn't want to
18   catch Mr. Westberry off guard.  He's the only person that's
19   indicated that there may be some surrebuttal to be offered in
20   the case, and I haven't heard anyone else mention it, so I'm
21   assuming that's the situation that we're in.
22          Yes, sir, Mr. White.
23          MR. WHITE:  Your Honor, I went ahead and have e-mailed
24   to your chambers my supplemental.  I've got a hard copy as well
25   that the Clerk printed off, if I could — I'm not sure how you

JOEY RADER - DIRECT - MR. SIMONS                66

1  wanted me to get it to you.

2          THE COURT:  You can just provide that to Ms. Stoneking

3  when we take our break here in just a minute.

4          MR. WHITE:  Yes, Your Honor.

5          THE COURT:  All right.  We'll be in recess.

6      (Whereupon, a short recess was had, after which the jury

7  returned to the courtroom and the following proceedings were had

8  in open court.)

9          THE COURT:  All right.  Thank you.

10          The record will reflect all members of the jury are

11  present.  The parties and counsel are also present.

12          Mr. Simons, you may call your next witness.

13          MR. HOSKINS:  Your Honor, I call Joey Rader.

14          THE COURT:  Thank you.

15                          JOEY RADER,

16  having been first duly placed under oath, was examined and

17  testified as follows:

18                      DIRECT EXAMINATION

19  BY MR. SIMONS:

20  Q    Would you state your name for the jury, please?

21  A    Joey Rader.

22  Q    Mr. Rader, my name is Dan Simons, I represent Stanley

23  Bowling in this action.  Do you know Mr. Bowling?

24  A    Yes.

25  Q    Do you see him here in the courtroom?

1   A    Yes.

2   Q    Okay.  Joey, where do you live?

3   A    Excuse me?

4   Q    Where do you live?

5   A    Clay County.

6   Q    Okay.  And do you live in Manchester or out in the county?

7   A    Out in the county.

8   Q    All right.  Are you married?

9   A    Yes.

10  Q    Do you have children?

11  A    Two.

12  Q    And how old are you, sir?

13  A    Thirty-three.

14  Q    And what is your current employment?

15  A    Sand Hill Coal Processing.

16  Q    And what do you do for them?

17  A    I work on leases and permits.

18  Q    All right.  Have you been an inspector on sewer and water

19  line projects in the past?

20  A    Yes.

21  Q    When did you begin that?

22  A    2002.

23  Q    And how would -- who did you work for at that time?

24  A    I originally started as Quest Engineers and later it got

25  bought out by HDR, Incorporated, but it was the same company.

1  Q    Okay.  And what does an inspector do?

2  A    Basically when a contractor gets a contract with the City

3  or a private owner, an inspector gets a set of plans and

4  specifications, and when the contractor goes out to do the job,

5  you just make sure that the work he's doing matches the plans

6  and specs.

7  Q    Okay.  And you were an employee of Quest from 2004 to 2006;

8  would that be correct?

9  A    2002.  Oh, yeah, yeah.  I'm sorry.

10 Q    So from 2002 on through 2006 you would have been working

11 for Quest Engineering?

12 A    Yes, sir.

13 Q    And they were headquartered where, sir?

14 A    Lexington.

15 Q    Okay.  Now, were you assigned as the inspector on any jobs

16 that B&B Excavating did for the City of Manchester between 2004

17 and 2006 as an inspector for Quest?

18 A    Yes.

19 Q    If I use the — Actually, do you know how many different

20 jobs you were the inspector for?

21 A    I think there was three that B&B was contractor on.

22 Q    Okay.  If I use the term "Mill Pond Phase II-A," do you

23 know what I'm talking about?

24 A    Yes.

25 Q    What type of job was that?

1   A    Gravity sewer.

2   Q    Okay.  Explain to the jury what you mean by that.

3   A    It's basically where — when the contractor goes in, the

4   homeowners are on septic systems, and it's basically where they

5   put a new line in that is maintained and controlled by the City

6   that you can have City services.

7   Q    Okay.  Would it involve putting manholes in the street and

8   serving the houses to each side of the street?

9   A    Yes.

10  Q    All right.  Were you on the job every day?

11  A    Yes.

12  Q    And was it the job of the inspector to be there each and

13  every day while the contractor is working?

14  A    Yes.

15  Q    To ensure compliance with the plans and specs?

16  A    Yes.

17  Q    All right.  Was there also a pump station in connection

18  with that job?

19  A    Yes.

20       MR. SIMONS:  Okay.

21       If I could have the court security officer, please.

22       THE COURT:  Yes, sir.

23  BY MR. SIMONS:

24  Q    Mr. Rader, do you see what I've handed you marked as

25  Exhibits SB8 and SB13?

JOEY RADER - DIRECT - MR. SIMONS                    70

1  A    Yes.

2  Q    Okay.  Do those fairly and accurately portray the work on

3  the road, or a portion of it, that was done on the Mill Pond

4  Phase II-A and the pump station that was involved in that

5  project?

6  A    Yes, sir.

7        MR. SIMONS:  Your Honor, I would move that they be

8  introduced at this time.

9        THE COURT:  All right.  Any objection to the admission

10 of Exhibits Bowling 8 and 13?

11       MR. SMITH:  No, Your Honor.

12       THE COURT:  All right.  Those two exhibits will be

13 admitted.

14 BY MR. SIMONS:

15 Q    Joey, what is involved in putting the sewer line down the

16 street?

17 A    You just go in and -- First you survey it out.  A gravity

18 sewer has to be put on exact grades.  I mean, you want a

19 continuous grade from each manhole, there's not -- you know, you

20 don't want your pipe up and down to cause backup, you want it on

21 a steady grade where the flow is proper.  And you just go in,

22 you have to tie into an existing system, there was an existing

23 system at the end of Little Mill Pond, which is this road, and

24 this system was tied into it.  The gravity actually flowed back

25 into this pump station, and the pump station had a force

 1  mainline that run back into the existing system owned by the

 2  City.

 3  Q    So if I understand you correctly, the gravity line was put

 4  into the pump station and then it would be pumped back up —

 5  A    Correct.

 6  Q    — is that correct?

 7  A    Yes, sir.

 8  Q    Okay.  Now, were you the only inspector on this job and

 9  there every day while B&B was doing work?

10  A    Yes.

11  Q    Were they fully compliant with the plans and specs —

12  A    Yes.

13  Q    — of Quest Engineering?

14  A    Yes.

15  Q    Did they — were they there every day and working every

16  day?

17  A    Yes.

18  Q    Were they timely in their performance?

19  A    Yes.

20  Q    Did they work hard and do good work?

21  A    Yes.

22          MR. SIMONS:  If I could have the court security

23  officer.

24          THE COURT:  Yes, sir.

25  BY MR. SIMONS:

1   Q    Mr. Rader, I've just handed you three more photographs.  Do

2   you recognize those?

3   A    Yes.

4   Q    All right.  Do you know what job they're in connection

5   with?

6   A    Yes, this is Old Timers Road.

7   Q    Okay.  And would you describe the nature of that job for

8   the jury, please?

9   A    Pretty much the same, it's a gravity system.  There was an

10  existing system right in front of the Clay County Jail, and this

11  system ties into it and runs up throughout Old Timers Road and

12  the senior citizens home, it ended right in that area where

13  that's at.

14  Q    Was there also a pump station in connection with that?

15  A    No.

16  Q    No, I didn't think so.  Did the terrain cause any

17  particular problems for a contractor?

18  A    Normally, it would — I mean, the — there was a type of

19  rock — I mean, it was a type of sand rock, I don't know exactly

20  the type, but it was pretty hard, you know, excavating the

21  material out.  I mean, I know there was times that they had to

22  bring a hole ram machine in and bust the rock out, which, you

23  know, normally slows a contractor down quite a bit.  But, you

24  know, they worked at it every day and got it — got it actually

25  done in a pretty timely fashion.

1   Q     Okay.  And did they do it in a fashion that was fully

2   compliant with the plans and specifications that Quest

3   Engineering bid for them?

4   A     Yes.  Yes.

5   Q     On either of the jobs that I've now discussed with you, did

6   they — did you find any fault with their performance or did you

7   have to take any action to ensure performance or did you have to

8   take any corrective measures or report any problem to Quest or

9   to the City or to anyone else?

10  A     No.

11              MR. SIMONS:  Okay.

12              Your Honor, I would move the introduction of those

13  three, which would be 14, 15, and 16.

14              THE COURT:  Any objection to the admission of those

15  documents?

16              MR. SMITH:  No, Your Honor.

17              THE COURT:  All right.  Bowling Exhibits 14, 15, and

18  16 will be admitted at this time.

19  BY MR. SIMONS:

20  Q     Mr. Rader, I've handed you a photograph which is marked

21  Stanley Bowling Exhibit 17.  Can you tell from looking at that

22  what it represents?

23  A     Yes.

24  Q     And what is that?

25  A     It is a pump station located behind the County Maintenance

1  Garage.

2  Q    Okay.  And were you the inspector on that job?

3  A    Yes.

4  Q    Was it also performed by B&B Excavating, Inc.?

5  A    Yes.

6  Q    And was Quest Engineering also the firm that drew the plans

7  for that?

8  A    It was actually an existing pump station —

9  Q    Okay.

10 A    — but they — B&B actually went in and rehabbed it, which

11 means you go in, you replace the pumps, the rails, you know, it

12 was just — it was an outdated system that had problems and give

13 the City numerous problems in the past.

14 Q    So the City had had a lot of troubles with it; is that what

15 you're telling me?

16 A    Yes, my understand from the City, yeah.

17 Q    And you were the inspector on the rehabilitation of that

18 pump station?

19 A    Yes.

20 Q    Okay.  Again, was there any problem with B&B's performance,

21 the work that they did, the timeliness of it, or the effort that

22 they put into it?

23 A    No.

24 Q    Were there any reports made to Quest Engineering of

25 deficiencies in labor or attendance or performance?

1    A    No.

2              MR. SIMONS:  I would move the introduction of that.

3              THE COURT:  Any objection to the admission of Bowling

4    Exhibit No. 17?

5              MR. SMITH:  No, Your Honor.

6              THE COURT:  All right.  That document — or that

7    photograph will be admitted as well.

8    BY MR. SIMONS:

9    Q    Mr. Rader, you've been handed two photographs.  Do you

10   recognize, first of all, Defendant Stanley Bowling's Exhibit

11   No. 8?  Which one are you looking at there, Mr. Rader?

12   A    I'm looking at 18 here, I'm trying to figure out.  I can't

13   really tell exactly where it's at.

14   Q    Did you inspect a job done by B&B Excavating known as Muddy

15   Gap?

16   A    Yes, okay.

17   Q    Okay.

18   A    I just couldn't tell what was behind it there, but, yeah,

19   okay.

20   Q    And what was the Muddy Gap project, please?

21   A    It was pretty much the same as the last one we talked

22   about, it was a rehab of an existing pump station.

23   Q    Okay.  And that pump station had given the City problems in

24   the past?

25   A    Yes.

1  Q    And it was refurbished by B&B Excavating, Inc., and you

2  were the inspector on that job?

3  A    Yes.

4  Q    And Quest Engineering did the plans for that?

5  A    Well, like I said, it was an existing system, and he just

6  went in and replaced — you know, replaced existing parts, and

7  there wasn't really any plans.

8  Q    Again, was there any problem with B&B's job performance,

9  timeliness, work, or anything like that?

10 A    No.

11 Q    And the last photograph, do you recognize what that is?

12 A    Yes.

13 Q    What is it, sir?

14 A    That is a sewer replacement at East Manchester.

15 Q    Okay.  I've called that the Wayne Street sewer project?

16 A    Wayne Street, that's correct.  That's in the East

17 Manchester area.

18 Q    All right.  And what's the nature of that project?

19 A    That was a replacement of a gravity line sewer that had

20 given the City — I don't know if it was due to leak or just

21 being backed up, maybe undersized, but it was a replacement of a

22 gravity line.

23 Q    Okay.  Were there new manholes or anything in connection

24 with that?

25 A    I think there was one — at least one new manhole and new

1   PVC line.

2   Q    And you were the inspector on that job as well?

3   A    Yes.

4   Q    Okay.  Would the same hold true, did you have any trouble

5   with B&B's job performance, timeliness or the work that they

6   did?

7   A    No.

8   Q    Were they fully compliant with the plans that were provided

9   by Quest Engineering?

10  A    Well, there wasn't any actual plans, but it —

11  Q    Okay.

12  A    — was with spec of what we normally do with a replacement,

13  sir.

14          MR. SIMONS:  All right.  That's fine.  Thank you.

15          I would move the introduction of those two documents

16  through SB19.

17          THE COURT:  Any introduction to the admission of

18  Exhibits 18 and 19?

19          MR. SMITH:  No, Your Honor.

20          THE COURT:  Those two photographs will be admitted.

21  BY MR. SIMONS:

22  Q    Joey, in your work at Quest Engineering, did you inspect

23  work for other contractors for the City of Manchester?

24  A    Yes.

25  Q    Would it be many or few?

1   A     Manchester, few.

2   Q     Okay.  Did you do inspection in places other than

3   Manchester for Quest?

4   A     Yes.

5   Q     Did you inspect many or few sewer and water line

6   contractors' work?

7         MR. SMITH:  Your Honor, I'm going to object as to the

8   relevance.

9         THE COURT:  Sustained.

10  BY MR. SIMONS:

11  Q     In the jobs that did you for Quest, did you ever find B&B

12  noncompliant in the work that they did?

13  A     No.

14  Q     Did you find them timely, energetic, and that they did good

15  work on all of those projects?

16  A     Yes.

17  Q     Did you ever report them to Quest or to the City or to

18  anyone else for doing something wrong, not following plans or

19  cutting corners in any way fashion whatsoever?

20  A     No.

21  Q     Were you ever — did Stanley Bowling or anyone with B&B

22  ever try to exercise any influence over you to do a job in an

23  easier fashion than was called for in the plans?

24  A     No.

25  Q     Did B&B or Stanley Bowling or anybody else try to influence

1  you to do things in a different way?

2  A    No.

3  Q    Did anybody at -- Stanley or anybody at B&B try to

4  influence you to get Quest to approve something that they wanted

5  to do?

6  A    No.

7  Q    I have one last little series of questions for you.  Did

8  you serve as the inspector -- did Quest -- excuse me.  Did Quest

9  Engineering serve as the inspector for a river project?

10 A    Yes.

11 Q    Okay.  What was the nature of that project, if you recall?

12 A    It was a gravity sewer replacement.

13 Q    Okay.  And that project was approved, I believe, as an

14 emergency by the City?

15 A    Yes.

16 Q    All right.  And you, as a representative of Quest, served

17 as the inspector on that job?

18 A    Yes.

19 Q    Okay.  With respect to that job, did B&B Excavating, Inc.,

20 perform -- did they perform in accordance with the plans and

21 directives of the job?

22 A    Yes.

23 Q    Again, did they do the work in a timely and workmanlike

24 fashion?

25 A    Yes.

1  Q    And was their work of good quality?

2  A    Yes.

3  Q    Was there any problem with the work or was there any

4  problem reported by you about that work to anyone?

5  A    No.

6        MR. SIMONS:  Your Honor, I pass the witness.  Thank

7  you.

8        THE COURT:  All right.  Thank you.

9        Mr. Smith.

10                      CROSS-EXAMINATION

11 BY MR. SMITH:

12 Q    Mr. Rader?

13 A    Yes.

14 Q    My name is Stephen Smith and I represent the United States.

15 I have a few questions for you.

16 A    Okay.

17 Q    If I understand your testimony, you were an inspector, you

18 were not an engineer; is that right?

19 A    That's correct.

20 Q    And had you worked as an inspector before you got your job

21 with Quest?

22 A    No.

23 Q    So that was the first time you had any job experience as an

24 inspector would have been at Quest?

25 A    Yes.

1   Q    And you're from Clay County.  What's your father's name?

2   A    David.

3   Q    David Rader?

4   A    Yes.

5   Q    And what about Gilbert Rader?

6   A    My uncle.

7   Q    And as I understand it, you and –– you described Stanley

8   Bowling as your friend?

9   A    Yes.

10  Q    How long have you known Stanley Bowling?

11  A    Oh, probably –– I've known of him pretty much all my life,

12  but, you know, probably known him for probably less than ten

13  years, you know, pretty good.

14  Q    Do you-all socially visit each other in any way?

15  A    Not really, no.

16  Q    Hunt and fish or do anything like that?

17  A    No.  No.

18  Q    Just consider him a friend based on your-all's relationship

19  in this work you're doing?

20  A    Well, I –– you know, I'd known him a little bit before we

21  worked, but, you know, not real good.  But, I mean, like I said,

22  I've known of him all my life, but I got to be a little bit

23  better friends with him after we worked together every day, yes.

24  Q    Do you know a fellow named Larry Cann?

25  A    Yes.

1  Q    And are you friends with him as well?

2  A    No.

3  Q    Where did you meet him?

4  A    I met him in Manchester.  I know he's another engineer.

5  But, I mean, pretty much we just was introduced is all, I don't

6  know him real good at all.

7  Q    Who introduced you to him?

8  A    I think I might have seen him maybe at one of the City

9  meetings for the water projects.

10 Q    Now, you said in all these projects that you worked on at

11 Manchester that you would agree with me that B&B was primarily

12 the one that did these jobs?

13 A    Yes.

14 Q    And you don't —— do you recall any other companies that you

15 inspected?

16 A    In Manchester?

17 Q    Yes.

18 A    Yes.

19 Q    But the one that you mainly worked on were B&B projects?

20 A    Yes.

21 Q    And I think you described those as being numbered as few?

22 A    Yes.

23 Q    And you said that during your time period inspecting those

24 jobs that you never had any issues with Stanley Bowling's

25 company?

1   A    No.

2   Q    You never had any problems where he was requesting

3   something that was improper?

4   A    No.

5   Q    You never had any situation where Quest Engineering denied

6   him anything?

7   A    No.

8   Q    Did Quest Engineering ever deny making approval of payment

9   for anything for him?

10  A    No.

11  Q    Mr. Rader, are you aware of giving an interview to the

12  federal officials on November the 27th, 2006?

13  A    Yes.

14  Q    Do you recall telling them that Stanley Bowling was

15  responsible for blacktopping a City supervisor's family member's

16  driveway and garage area?  Do you remember telling federal

17  officials about that?

18  A    Yes.

19  Q    Didn't you also, sir, warn Stanley Bowling that he should

20  not be blacktopping and Stanley Bowling said he would go ahead

21  and do it anyway?

22  A    Well, the situation was I told him that we could not pay

23  for it through the contract and that, you know, what he done

24  besides that, I really didn't think that I had any, you know,

25  business in.  I just — I told him that we could only be paid

1  for what was in that contract.

2  Q    And you don't consider that denying a request that he's

3  making, sir?

4  A    I'm not sure I understand.

5  Q    You don't consider that being a denial to Stanley Bowling

6  if he's wanting to pave a private driveway with blacktop and

7  Quest saying they're not going to pay for it, that that's, in

8  your opinion, not a denial?

9  A    I don't — I don't know how to answer that.  I mean, I

10 really don't know.

11 Q    You wouldn't consider that denying Stanley Bowling

12 something he's asking you-all to approve, sir?

13 A    I guess.  Can I explain the situation?  I mean, there was a

14 road going in front of where Mike White lived, it was kind of up

15 on a — up on the bank just a little bit.  And the road in front

16 of it, that's where the sewer — the sewer line went, right

17 along that road.  Well, the driveway kind of come down, and when

18 the pavement was done on the road, it was going to raise that

19 road up about an inch and a half, which would have created just

20 a little bit of a drainage problem unless he would actually

21 blacktop that driveway.  So when he — when he mentioned

22 blacktopping the driveway, I just told him, I said, the only

23 thing that the contract is going to be paid for is what actually

24 is under the sewer line, that's what the contract called for.

25 But when — you know, when he done the driveway by itself, you

1  know, I've got a — like an estimate total sheet, and I measure

2  the footage on the blacktop.  When I measured the footage of the

3  blacktop, I didn't take the footage off for that driveway, I

4  only counted the footage where the actual sewer line went, and

5  that was on Old Timers Road.  And so I didn't — that was pretty

6  much the last conversation we had had about the driveway

7  blacktop.

8  Q    Are you aware that the City of Manchester had involved a

9  lot of people getting private driveways paved, are you not?

10  A    Yes.

11  Q    And isn't it true, sir, that you reported to a federal

12  official on November the 27th, 2006, quote, I warned Stanley

13  Bowling that we would not pay for the blacktopping?  Isn't that

14  a fact?

15  A    Yes.

16  Q    You told federal officials that on that date?

17  A    Yes.

18  Q    You also indicated that in the time period that these

19  contracts were going on that you were aware of a relationship

20  between Stanley Bowling and Kennon White, did you not?

21  A    Yes.

22  Q    And, sir, are you telling this Court and this jury if the

23  evidence showed that there were kickbacks going back — from

24  Stanley Bowling back to Kennon White for these payment — or to

25  obtain these projects, if there's evidence to establish that,

1   sir, are you saying you're not aware of it?

2   A    I'm not aware of it.

3   Q    Well, sir, you did report to federal officials that you

4   were aware that Kennon White was overly concerned, in your

5   opinion, about when the checks were going to be sent to Stanley

6   Bowling, did you not?

7   A    Well, I got two phone calls from Pam Mathis, and she's with

8   the City of Manchester and —

9   Q    You can explain your answer, but I need you to answer yes

10   or no to my question.

11   A    I'm sorry.

12   Q    Isn't it true that you reported to federal officials that

13   Kennon White appeared to be overly concerned about the timing of

14   payment of checks going to B&B Excavating?

15   A    Yes.

16   Q    But your testimony here today under oath is that you're not

17   aware of his paying kickbacks to Kennon White and his father,

18   Daugh White?

19   A    Yes.

20           MR. SMITH:  That's all I have.

21           THE COURT:  All right.  Let me see if anyone else has

22   questions prior to redirect.

23           Mr. Simons.

24           MR. SIMONS:  Briefly, Your Honor.

25           THE COURT:  Yes, sir.  On matters covered on cross-

1    examination.

2              MR. SIMONS:  Yes, sir.

3                         REDIRECT EXAMINATION

4    BY MR. SIMONS:

5    Q    You've known Stanley for a long time.  You feel like he's a

6    friend of yours now; correct?

7    A    Yes.

8    Q    But when he suggested that you blacktop and do away with

9    that dropoff by Mike White's, you told him Quest is not going to

10   pay for that, we won't do it, did you not?

11   A    Yeah, and ─

12   Q    Go ahead.

13   A    He didn't ─ when I done the footage, you know, he didn't

14   get paid for that out of that contract.

15   Q    Right.  That's my next question.  No matter how friendly

16   you were with him, you weren't going to bend the rules one ounce

17   for him, you were going to do what your employer required?

18              MR. SMITH:  Your Honor, I'm going to object as to ─

19              THE COURT:  Overruled.

20              MR. SMITH:  ─ argument.

21              THE COURT:  Overruled.

22   BY MR. SIMONS:

23   Q    Is that correct?

24   A    Correct.

25   Q    And Mr. Bowling felt badly about having the drainage

1  problem and he paid for the blacktop, he was not —

2          MR. SMITH:  Your Honor, I'm going to object.

3          THE COURT:  I will sustain the objection to that

4  statement, Counsel.

5          MR. SIMONS:  All right.

6  BY MR. SIMONS:

7  Q    Mr. Rader, was he reimbursed by Quest for the blacktop that

8  he put on Mike White's driveway?

9  A    No.

10          MR. SIMONS:  Thank you.  That's all.

11          THE COURT:  Any further questions of this witness?

12          MR. SMITH:  Just one point to clarify there.

13          THE COURT:  Yes, sir.

14                          RECROSS-EXAMINATION

15  BY MR. SMITH:

16  Q    Isn't it true it wasn't Mike White's driveway, it was his

17  father-in-law's driveway?

18  A    That's correct.

19  Q    And that would have been a person who would have been in a

20  position of decision-making within the City at the time, and

21  that would have been Mike White?

22  A    Correct.

23  Q    And isn't it true that Stanley Bowling was doing that in

24  order to try to gain influence with another member of the City

25  government, including Mike White?

1  A    I don't understand.

2             MR. SMITH:  That's all I have.

3             THE COURT:  All right.  Anything else of this witness?

4             MR. SIMONS:  No.

5             THE COURT:  All right.  Mr. Rader, you may step down.

6  Thank you.  You're excused.

7             You may call your next witness.

8             MR. SIMONS:  Could you give me one second?

9             THE COURT:  Yes, sir.

10             MR. SIMONS:  Your Honor, at this time Defendant

11  Stanley Bowling announces closed.

12             THE COURT:  All right.  Thank you.

13             All defendants having announced close in their case in

14  chief, let me ask, Mr. Smith, if you have any rebuttal testimony

15  to present or if you need some time to make that determination?

16             MR. SMITH:  We can announce the United States is

17  finished with its proof, Your Honor, and announce closed.

18             THE COURT:  All right.  Thank you.

19             Let's see, will any of the defendants be offering any

20  surrebuttal based upon information presented during any of the

21  other defendants' cases?

22             MR. PINALES:  No, Your Honor.  Thank you.

23             MR. WESTBERRY:  No, Your Honor.

24             MR. WHITE:  No, Your Honor.

25             MR. ABELL:  No, Your Honor.

1          MR. BALDANI:  No, Your Honor.

2          MR. GILBERT:  No, Your Honor.

3          MS. HUGHES:  No, Your Honor.

4          MR. SIMONS:  No, Your Honor.

5          THE COURT:  All right.  No one?  All right.  Thank

6    you.

7          I do want to speak with counsel briefly at sidebar

8    before I excuse the jury for the evening.  If you could come up,

9    please.

10      (Whereupon, the following discussion was had between the

11   Court and counsel at the bench, out of the hearing of the jury.)

12          THE COURT:  All right.  This is my plan at this time.

13   I want to make sure that this is going to fit within what the

14   attorneys are thinking.  I need to get a rough estimate from

15   counsel as to how long they would like to take for their closing

16   arguments.

17          Mr. Pinales?

18          MR. PINALES:  Your Honor, I'm asking for 45 minutes.

19          THE COURT:  Okay.

20          MR. PINALES:  And maybe five over, five under.

21          THE COURT:  That's fine.

22          MR. WESTBERRY:  Same.

23          THE COURT:  All right.

24          Mr. White?

25          MR. WHITE:  Thirty, Your Honor.

1              THE COURT:  All right.

2              MR. ABELL:  About 30, Judge, give or take a few either

3    way.

4              MR. WHITE:  I'm kind of in the same boat, too.

5              THE COURT:  All right.  That's fine.

6         Mr. Baldani?

7              MR. BALDANI:  We would like to have the option of

8    going as long as an hour and a half, and we don't want to go

9    that long and we'll be working on it this weekend, but there's a

10   lot of ground to cover.  And I know that's more than the others

11   have asked for and I hope we don't need it, but I would like to

12   at least be able to.

13             THE COURT:  All right.

14             MR. GILBERT:  Forty-five minutes.

15             MS. HUGHES:  We'll take 45 minutes.

16             MR. SIMONS:  That sounds like a popular number.

17             THE COURT:  All right.  Six hours.

18        Mr. Smith, it appears that the defendants have

19   requested about six hours for closing arguments.  How long would

20   you like to take for your case?

21             MR. SMITH:  Six hours.

22             MR. WESTBERRY:  May I ask if that's —— I mean, is that

23   serious or —— I'm assume it is.

24             MR. SMITH:  It sounds fair, eight against one.

25             MR. WESTBERRY:  I said serious, not fair.

1              THE COURT:  What we'll do is we will have our

2   instructions conference — what I want — this is the plan.  If

3   you—all have additional instructions that you want me to

4   consider, I want you to send those to my e-mail address by noon

5   tomorrow.  I will be working on draft jury instructions over the

6   weekend, I'll have a draft available for the attorneys to pick

7   up in the Clerk's Office at 8:30 on Monday morning.  We'll have

8   our instructions conference at 10:30 on Monday morning.  We'll

9   iron out any issues with jury instructions, I will, before 1:00.

10  I'll have the jury come in at 1:00, we will start with closing

11  arguments.  This is assuming I don't grant renewed motions under

12  Rule 29, those will be made in a few moments after the jury is

13  excused, so this is all assumption.  We'll start with closing

14  arguments at 1:00.

15             Mr. Smith, I'll ask you how much of your time you

16  would like to take in your initial argument?  We will go until

17  4:30.  We'll resume again on Tuesday morning with the remainder

18  of closing arguments, we'll complete those, and then I'll give

19  the jury the instructions.  I believe that will take most of the

20  day, so the jury will get the case late in the afternoon on

21  Tuesday.  I'm — I usually give them the option to continue

22  deliberating, staying here as long as they want, or returning in

23  the morning.  They will probably decide they want to return on

24  Wednesday morning.  So that's the rough schedule of the way I

25  see where we are at this point.

1          Mr. Westberry, did you want to say something else?

2          MR. WESTBERRY:  When you're done.  If the Court's

3   done, I have some — it only involves by noon tomorrow to submit

4   supplemental instructions to what we've already submitted.  I

5   think I have a few.  I just have some logistical problems with

6   secretaries and there's something going on I've been told in

7   downtown Louisville, the streets will be blocked.

8          THE COURT:  At 4:00?

9          MR. WESTBERRY:  That's perfect.  Thank you, Judge.  I

10  do appreciate that very much.

11          THE COURT:  All right.

12          MR. BALDANI:  I have similar support staff issues.

13          THE COURT:  That will be for everybody, one for all

14  and all for one, you don't have to wait.  And I do appreciate

15  Mr. White has already admitted his additional instructions.  But

16  if you want me to really consider these, the earlier obviously

17  the better, but I'll be working on these probably most of the

18  day Sunday so I can make sure that I get you-all a draft on

19  Monday morning.  I want to give you time to look at those

20  instructions before we have our instructions conference so that

21  will be meaningful.  So that's the plan at this point.  Anyone

22  see a problem with that?  Otherwise, I'm going to excuse the

23  jury until 1:00 on Monday.

24          MR. PINALES:  I should be prepared Tuesday morning

25  for the —

1          MR. SMITH:  I would say you need to be prepared if

2    we're going to start my opening, I don't expect that I would

3    take the whole afternoon.

4          THE COURT:  You want to split your time, I'm assuming.

5          MR. SMITH:  I will.

6          THE COURT:  So I'll ask that you be prepared and be

7    ready to go in the afternoon.

8          MR. WESTBERRY:  We all would be, that's my plan.

9          MR. BALDANI:  I've got a question about schedule.  Do

10   you want me to raise it now or do you want to get the jury —

11         THE COURT:  I would prefer to go ahead and excuse the

12   jury.  I just wanted to touch these issues before I sent the

13   jury home so I didn't send them home and tell them to be back at

14   1:00 and then we have a problem with that, so —

15         MR. WHITE:  If I could ask some quick questions.  Did

16   you say you would e-mail us the instructions or pick them up?

17         THE COURT:  No.  It will be at 8:30 in the Clerk's

18   Office, I'll have a big old stack, and there may be as much as

19   120 pages times ten or 12, so it will be a big stack for you to

20   look through.

21         MR. WHITE:  As CJA, I was hoping I won't be charged a

22   copy charge.

23         THE COURT:  I know that $8,600 doesn't go far.  Thank

24   you.

25        (Whereupon, the following proceedings continued in open

1  court.)

2  THE COURT:  All right.  Thank you.

3  Ladies and gentlemen, thank you for your patience

4  again, I do appreciate that.  I wanted to check on scheduling

5  before I excused you for the evening and tell you when you'll be

6  coming back next week and what our schedule is going to be.

7  At this point, I'm going to excuse you for the weekend

8  and ask you to be back here at 1:00 on Monday.  That will give

9  me time to do the work that I need to do in preparation for the

10  closing arguments and the jury instructions in this case.  I do

11  anticipate that we'll commence the arguments of counsel Monday

12  afternoon, and that will continue into Tuesday, and after the

13  arguments are concluded, I'll give you the jury instructions.

14  At that point, you'll begin to deliberate on the case.

15  I tell you that for a couple of reasons.  Again, one

16  is to give you an idea as to what the schedule will be for next

17  week.  And also to remind you that while you've heard the proof

18  that's been presented in the case, the case isn't ready to be

19  submitted to you.  So you should not be discussing the case with

20  anyone at all, you shouldn't allow anyone to approach you to

21  discuss the case.  And, again, and I always remind you of the

22  fact that you should not go — I go through this quickly, but

23  this is very serious, you should not read, watch, or listen to

24  any accounts of the case if there should be any.  So you should

25  avoid any type of communication or contact with or about the

1  case in any forms, and, of course, you shouldn't communicate

2  with anyone about the case.

3         Don't do any type of research at any point during the

4  course of this case.  Don't visit the locations that you've

5  heard about, as I've mentioned to you several times.  And, of

6  course, don't make up your mind about the case until it is

7  finally submitted to you.  That time will come after I give you

8  the instructions in the case.  So we're a couple of days away

9  for you to start to deliberate on the case.

10         Now, deliberate means that you all get together as a

11  group and decide.  You can't talk with one or two people in

12  groups, you can't do that.  Again, you can't talk with friends

13  or family members.

14         So I'll excuse you at this time until, again, now,

15  1:00 on Monday.  That's important for another reason.

16  1:00 means that you probably should have your lunch before you

17  come in, and it probably means that the Clerk may not have some

18  doughnuts or other snacks available for you.  So if you get here

19  early, I can't guarantee that there will be those other — there

20  may be something else, but I'm not sure it will be what you've

21  been accustomed to.

22         So with that admonition, again, and I appreciate

23  throughout the course of this lengthy proceeding you've been

24  here timely, every one of you.  We've had 16 jurors and we

25  haven't lost anyone, which is unusual in a case.  But I do

1    appreciate the diligence that you've shown throughout the course

2    of this proceeding.  So you'll be excused at this time until

3    1:00 on Monday.  Thank you.

4         (Whereupon, the jury retired from the courtroom, after which

5    the following proceedings were had in open court.)

6              THE COURT:  Thank you, and please be seated.

7              At the close of all proof in the case, the Court may

8    entertain any motions or renewed motions for —— motion for

9    judgment of acquittal pursuant to Rule 29 of the Federal Rules

10   of Criminal Procedure.  Of course, the Court will certainly

11   consider the arguments that were previously made, but let me

12   ask, at this time, if the parties wish to make any additional

13   arguments or renew any arguments at this time.

14             Mr. Hoskins and Mr. Pinales?

15             MR. PINALES:  We are submitting a Rule 29, but we'll

16   stand on our previous.

17             THE COURT:  Renew what was previously argued?  All

18   right.

19             MR. WESTBERRY:  Adopt and incorporate the previous

20   arguments of Rule 29.  In addition, there's insufficient

21   evidence to link Douglas Adams with any illegal activity

22   involving the Board of Election, Election Commissioners, or the

23   use or misuse of his office or that there's been insufficient

24   evidence to indicate with regard to Count Two that his salary

25   was initially —— in position of superintendent was initially

1  obtained or any contracts were renewed by illegal activity which

2  we believe serves as the basis for the money laundering count as

3  Count Two.  And there were no proceeds of any illegal activity

4  that resulted in him obtaining and keeping the salary that he

5  received.  Thank you.

6         THE COURT:  All right.  With respect to that

7  additional argument, it does appear to the Court, based on the

8  evidence that has been presented by the United States, that the

9  theory of the money laundering count pertains — the proceeds of

10  the money laundering count pertain to the contracts with B & J

11  and B&B.  That would be the proceeds of the illegal activity

12  that's been alleged, the RICO charge as outlined in the Court's

13  previous ruling and also the memorandum opinion that was filed

14  today on that ruling.  I understand the government's position

15  with respect to the RICO forfeiture charge to include the salary

16  issue, and I'm going to ask Mr. Smith to clarify if my

17  understanding is incorrect, but I understand that's the position

18  as to the RICO forfeiture issue, it relates to salaries and

19  those proceeds that would come in through the money laundering

20  charge as well, which is a conspiracy charge.  So if —

21         Mr. Smith, am I correct on that, or is my

22  understanding incorrect?

23         MR. WESTBERRY:  May I add — and forgive me.

24         THE COURT:  Yes, sir, that's fine.

25         MR. WESTBERRY:  In addition to what I just mentioned,

1  no evidence to link Mr. Adams to any City contract.

2        THE COURT:  All right.

3        MR. WESTBERRY:  Thank you.

4        THE COURT:  Thank you.

5        MR. SMITH:  Your Honor, I believe that the United

6  States has articulated throughout our case that the money

7  laundering — of course, the fact that this money was put

8  together was put together with the anticipation and expectation

9  that it would return both for the businesses, the contracts that

10 would later be awarded or maintained by, again, the political

11 votes that were going to be bought by these candidates,

12 positions that were going to be bought by this money.  And it's

13 still our position, Your Honor, that the salaries, of course, of

14 all these public officials that have been involved in this

15 case — of course, the superintendent, while he wants to remove

16 himself from the political process, I think the evidence showed

17 clearly that he was involved in defeating Dobber Weaver in his

18 attempt to get on the Board of Education and used the illegal

19 mechanism that is the racketeering enterprise to accomplish that

20 objective, along with many other candidates which he put

21 together along this long conspiracy.

22       So I fail to see — at this point, we have a

23 forfeiture count which I believe does articulate as the

24 forfeiture mechanism, it does separate out and clearly defines

25 the proceeds as the contract, and I would admit that that is in

1   stage two as we look at that.  But in a 56(h) conspiracy, it is

2   not necessary that the act be completed.  It is that there was

3   an agreement to engage in this unlawful activity in a plan.

4   Whether or not it's ever carried out or not, it's still illegal

5   under 56(h), no overt acts are required.  And I believe that

6   what counsel wants to try to bootlace upon the government's

7   burden in this case is not required by the law, and that is to

8   show completed substantive acts of money laundering, and this --

9   again, this conspiracy, it is our argument and it has continued

10  to be our position that Mr. Adams, whether or not he was a

11  holder of a contract or an elected official, he was still part

12  of the agreement and was necessary and a very intimate part of

13  that in accomplishing the illegal purpose of this conspiracy.

14  And so I, again, stand an our arguments that we've made earlier

15  and incorporate these as well.

16          THE COURT:  All right.  Well, with respect to this

17  particular issue, as it relates to Defendant Adams, I do believe

18  the reasons that were previously stated and those that have been

19  argued at this point, that there is sufficient evidence to

20  present the issue to a jury.  Of course, much of this is for

21  argument to the jury, and the Court's analysis under Rule 29 is

22  whether there is sufficient evidence that would sustain a

23  conviction by a reasonable juror, and I believe at this point

24  that there is sufficient evidence for the government to carry

25  that burden under Rule 29.  So the motion as to Defendant Adams

 1   will be overruled as well.

 2         Mr. White?

 3         MR. WHITE:  Yes, Your Honor.  Thank you.  On behalf of

 4   Defendant Wayne Jones, we will reincorporate and restate and do

 5   not need to be heard any further.  Thank you.

 6         THE COURT:  All right.  Thank you.

 7         Mr. Abell?

 8         MR. ABELL:  Your Honor, on behalf of my client,

 9   William Stivers, I renew the motion pursuant to Rule 29 for

10   judgment of acquittal as to Count One, Two, and Four.  I do want

11   to make some additional comments with regard to Count Four —

12         THE COURT:  Yes, sir.

13         MR. ABELL:  — which is the 1951 extortion charge.

14         Judge, that statute can be violated in two ways.  One

15   is by inducing fear, but that fear has to be an economic or

16   commercial fear.  If the Court were to view the evidence as

17   substantiating a finding that any fear was created by any

18   actions taken by Mr. Stivers, it would be fear by a Ms. Lewis,

19   that her political prospects may not be as good as they might

20   otherwise be, a political fear, that noneconomic, noncommercial

21   fear —

22         THE COURT:  Well, but doesn't that vest into an

23   economic fear if a person isn't elected there is some salary

24   that's associated with the position and other benefits

25   associated with the position?

1          MR. ABELL:  I understand the mayor's position is

2     unpaid.  But I think the expression is as to her political

3     prospects, and I don't believe that type of fear comes within

4     the scope of that statute, especially since there has to be a

5     link to interstate commerce, and there is no proof that

6     Mr. Stivers offered to exercise or withhold to exercising

7     official power, which is the other related statute that's been

8     violated.  And I touched on those issues before.  And renew

9     them, at this time, with those additional remarks.

10          THE COURT:  All right.  Thank you.

11          Mr. Smith, would you like to briefly respond to this

12    issue?

13          MR. SMITH:  Well, Your Honor, I would cite the Court

14    to the *United States v. Collins* case and also *U.S. v. Margiotta*,

15    688 F.2d 10 — or 108, Second Circuit.  And essentially, you

16    know, the fact pattern here is one in which I think Mr. Stivers

17    would like to make distinguishing himself from two ways, he

18    wants to say that he was not the official — I think the *Collins*

19    case says that even a private citizen may be found guilty of

20    extortion if he aided and abetted a public official's attempt in

21    receiving money which he's not entitled.  Clearly Wayne Jones

22    and Al Man Stivers were not entitled to this money.

23          THE COURT:  This is the $1,000 they were attempting to

24    extort from Carmen Webb Lewis?

25          MR. SMITH:  Exactly.  And they were acting under the

 1    color of official right, and that is all that is required under

 2    1951, is that they're acting under —— color of official right

 3    and they're seeking money to which they're not entitled.  They

 4    don't have to have a gun to her head, they don't have to pull

 5    out a knife.  They were in a position which they have —— and

 6    which she reasonably believed that they were in a position to

 7    carry through with the threat, that is, if you pay to play in

 8    Manchester, you do not get elected in Manchester unless you pay,

 9    and you pay the man.  Charles Wayne Jones, he's the man.  And

10    Al Man Stivers, he's the election officer.  And that is the

11    threat, it is clearly economic, it's cash money they're asking

12    for.  And I do not see a legal reason for this matter not to go

13    to the jury on this basis.

14              THE COURT:  All right.

15              MR. SMITH:  We would object.

16              THE COURT:  All right.  Well, I will overrule the

17    motion on behalf of Defendant Stivers for the reasons previously

18    stated, and I believe Mr. Smith has correctly stated the law in

19    the Sixth Circuit with respect to this issue, acting under color

20    of official right would be —— would be sufficient to proceed to

21    the jury.  The Court will overrule the motion.

22              Let's see, Mr. Baldani, any additional arguments?

23              MR. BALDANI:  The only additional argument I would

24    make aside from reincorporating my original, Your Honor, would

25    be with respect to Count 9, obstruction.  The government in its

1  opening statement stated that Freddy Thompson obstructed justice

2  by not bringing voter assistance forms to the grand jury.  And

3  as you recall, we — the indictment alleged that he obstructed

4  justice by testifying falsely at the grand jury.  We asked for

5  some specificity, the Court overruled the motion.  Then in open

6  statement, it seemed to us, the defense, that the government had

7  shifted its theory from testifying falsely to not bringing those

8  important voter assistance forms.

9        THE COURT:  Well, there's testimony in the case that

10  election officers were told, Wanda White specifically, don't

11  worry about those forms that were filled out, that Mr. Jones and

12  Mr. Thompson would take care of that.

13        MR. BALDANI:  True.

14        THE COURT:  So there is testimony that would link the

15  two defendants to the destruction of those forms.  The forms

16  were then produced to the grand jury with a representation that

17  those were the forms.  Now, if the jury believed, as they could,

18  based upon the testimony, that Mr. Thompson or Mr. Jones working

19  together or in concert or with the knowledge of the other was

20  doing this, that would be sufficient to sustain a conviction

21  under that particular count.  So really it's a factual question,

22  isn't it?  I mean, it's a two-step process, but it's still a

23  factual question and it still meets the charge that's been made

24  in the indictment.

25        MR. BALDANI:  I agree with that there was that

1  testimony, Judge, but it's also a due process notice argument

2  that we're making.  I mean, we don't know exactly what the

3  government —— all the proof is in, we don't know exactly how the

4  government is alleging that Freddy Thompson obstructed justice.

5  Is it by not bringing forms, is by saying the only complaints

6  that were made were from losing candidates, because the

7  government cross-examined Agent Briggs about various different

8  things.  And I think at this point in the trial we need to know

9  whether —— is it the voter assistance form, is it the testimony

10 on page 12?  So that's the nature of my additional objection.

11         THE COURT:  Well, there is sufficient evidence to

12 present this count, Count 9, to the jury, but I will allow

13 Mr. Smith to respond briefly on these points.

14         Again, Mr. Smith, I'm looking at the evidence in the

15 case, but if you would like to respond further, you may.

16         MR. SMITH:  Your Honor, the crime which the indictment

17 alleges is 18, U.S.C., Section 1503.  The elements are that,

18 first, there was a pending proceeding before a federal grand

19 jury, which I think we've met.  The second one is the defendant

20 knew there was a pending proceeding, which I think we've met,

21 and that he influenced, obstructed, impeded, or endeavored to

22 influence or obstruct or impede the due administration of

23 justice in that proceeding and that those acts were done

24 corruptly.

25         If Mr. Thompson wants to argue there's additional

1    elements to that crime, then I think he ought to cite some legal

2    authority for it.  But the fact of the matter is, that is the

3    crime, those are the elements, and the evidence now that the

4    government has established, we introduced his federal grand jury

5    testimony.  Mr. Thompson cannot say that he does not know what

6    he said in front of that grand jury.  That was given to him

7    before this pretrial discovery.  For this notice requirement,

8    again, we're going back to argue our Rule 12 motions, which he

9    made and the Court denied.  He wants to continue to make that

10   argument.  I believe that the argument should fail, I think

11   clearly we have met by our proof the elements of 1503, and we

12   would ask that it go to the jury.

13         THE COURT:  All right.  I will deny the motion to --

14   for a judgment of acquittal under -- for Count 9 as to Defendant

15   Thompson.  Based upon the evidence presented and the responses

16   of the United States, there is sufficient evidence to submit the

17   case -- or that count to the jury.

18         Mr. Gilbert, do you have additional arguments?

19         MR. GILBERT:  If Your Honor please, on behalf of

20   William Bartley Morris, I would renew our motion for judgment of

21   acquittal in that there's insufficient evidence to sustain the

22   convictions of the Counts One, Two and 11, as alleged in the

23   indictment.

24         THE COURT:  All right.

25         Ms. Hughes?

1              MS. HUGHES:  Your Honor, I would like to add a few

2      things to the original motion.

3              THE COURT:  Yes, ma'am.

4              MS. HUGHES:  Obviously I'm moving for judgment of

5      acquittal under Rule 29.  I would like to speak very briefly

6      about the money laundering issue that we discussed yesterday.

7              THE COURT:  Yes, ma'am.

8              MS. HUGHES:  As the Court noted yesterday, this is not

9      a money laundering scenario or pattern that we could —— that

10     easily fits within any of the cases that we all have been

11     reading.  And I don't believe —— and I cannot cite the case, so

12     Mr. Smith can get up and tell me that I haven't cited a case

13     because I cannot find one, that mirrors our situation.  Nor can

14     I find one that authorizes these proceeds to go from financial

15     to —— it does authorize a change in a property, but the

16     government's theory requires it to transmute into a vote.  And

17     so we talked about that yesterday somewhat, but I don't think

18     that the statute contemplates that sort of tracing of the

19     proceeds of unspecified unlawful activity.

20              In addition, I would also like to move for judgment of

21     acquittal with respect to Count 11.  Count 11 is the conspiracy

22     to violate the Voting Rights Act in 2006.  The indictment is

23     actually rather detailed and specifically alleges vote buying,

24     not vote stealing, and yesterday I do believe Special Agent

25     Briggs testified that by the time of 2006 the methodology had

1   changed from vote buying to vote stealing, and so I would move

2   for a judgment of acquittal on that basis as well.  Thank you.

3           THE COURT:  All right.  Well, with respect to the last

4   issue, let me address that one first, there is sufficient

5   evidence in the record for a reasonable juror to conclude that

6   one of the things that changed prior to the 2006 election was

7   that the defendants were aware or should have been aware that

8   they were being watched.  And that does not necessarily mean

9   that they didn't do other activities, and there's been testimony

10  of other illegal activities, including vote buying in 2006,

11  extensive vote buying in 2006, and it apparently expanded to

12  vote stealing when the opportunity was presented through these

13  new voting machines, looking at the evidence in the light

14  favorable to the United States which has been presented.  And so

15  certainly the opportunities to violate the law expanded, but

16  that doesn't mean that the Court or that the jury should turn a

17  blind eye on the testimony that has been presented.  I think

18  Agent Briggs did explain in part — of course, as you'll recall,

19  I did limit his testimony based on the fact that I understood he

20  was going to be presented as a rebuttal witness, and so it

21  wasn't expanded upon, but there certainly is sufficient evidence

22  in the case for a reasonable juror to conclude that Defendant

23  Debra Morris is guilty of the offense that's charged in Count 11

24  of vote buying.  So I'll overrule the motion for judgment of

25  acquittal as to that count.

1           As to Count Two, money laundering, the United States
2    has presented substantial evidence that more than meets the
3    burden under Rule 29 that would establish or that a reasonable
4    juror could conclude that individuals align themselves to vote
5    for slates of candidates in order to influence outcome of
6    elections, and that as a result of influencing the outcome of
7    those elections through this money that was pooled and spent to
8    buy votes, that as a result of that those people were placed in
9    positions of influence and contracts were awarded.  Contracts
10   were awarded to people that had placed those individuals in
11   positions of influence.  And so this really is more of a classic
12   example of money laundering where certain money is obtained
13   illegally and it is transferred into contracts by virtue of the
14   activity that takes place, by virtue of the fraud and the
15   extortion that has been alleged in the case and the vote buying
16   that has been shown to have occurred here.

17          And so I did address that in the memorandum opinion
18   that was filed this morning, but in this particular case, just
19   because it's complicated to explain or to understand, doesn't
20   mean that the United States hasn't offered sufficient proof in
21   support of that particular count.  We certainly have been here
22   for a long time, I think going on eight weeks, and the Court
23   believes that based upon the testimony that has been presented
24   there has been more than sufficient evidence to -- that a
25   reasonable juror could conclude that an offense has occurred as

1   outlined in Count Two, money laundering, by all of the

2   defendants that are charged in this case.  So that motion as to

3   that count will be denied as well.

4         The Court will also deny the motions up to this point

5   that have been made with respect to the other defendants that

6   have renewed their motions for the reasons previously stated, as

7   well as those that I've stated here this afternoon.

8         We'll proceed on with final defendant in the case,

9   Defendant Bowling.

10        MR. SIMONS:  Your Honor, on behalf of Stanley Bowling,

11  I would renew the motions for directed verdict of acquittal that

12  were made at the conclusion of the case.  I think the Court

13  recognizes that Ms. Hughes was the main person responsible for

14  the authorship of our recent brief on the matter.  I would join

15  her arguments.  I have heard the Court's commentary.

16        THE COURT:  All right.  Thank you.  The Court's ruling

17  would be the same, obviously.  I'll also note that after

18  considering all the testimony and evidence presented by the

19  defendants during their case in chief, the United States case is

20  significantly — it was strong before, it's significantly

21  stronger now, even after hearing the testimony presented by the

22  defendants' witnesses.  And so with respect to the weight of the

23  evidence, it certainly more than meets the standard under

24  Rule 29.

25        All right.  With respect to scheduling, we were

1  talking at the bench, I understand that the attorneys are going

2  to submit additional proposed jury instructions prior to

3  4:00 p.m. tomorrow.  So I'll be looking for those prior to

4  4:00 p.m. tomorrow.  The attorneys will be able to pick up draft

5  jury instructions at 8:30 a.m. on Monday in the Clerk's Office.

6  We will have a jury instructions conference at 10:30.  The jury

7  will be brought in at 1:00 for arguments to commence.

8         Mr. Smith, on Monday morning, I'm going to ask you at

9  10:30 how much time you would like for your initial argument in

10 the case.  If you'll be prepared to tell me that at that time,

11 you know the procedure that I follow, as you get close to using

12 your time in your initial argument, if it looks to me as if

13 you've lost track of time, I'll tell you that you have a few

14 additional minutes in your additional argument.  If you want to

15 use more than that, you can do so, and you have a substantial --

16 you have a substantial amount of time that you can use in the

17 case if you choose to do so, but that would be helpful to the

18 defendants if it looks like you're going to use two hours or

19 whatever portion you're going to use.  You can tell me that on

20 Monday, and if you want to use more time, you'll just need to

21 tell me that if I give you the two-minute warning, you can

22 advise me of that at the appropriate time.

23        I will give the defendants the time that they have

24 requested at our bench conference, and I'll give you the same

25 essentially two-minute warning before you get to the end of your

1    argument.  If you go over a minute or two, that's not going to

2    be a major problem, but I try to do that really just to help you

3    kind of focus your arguments as you get close to the end of your

4    time.

5          After arguments are completed, that should be on

6    Tuesday, I will give the instructions to the jury and they'll

7    retire to deliberate.  Of course, I'll need to excuse the four

8    alternates prior to the time deliberations begin.  So that's how

9    we'll be proceeding next week.

10          Let me see if there are any questions before we recess

11    for the evening.

12          Mr. Smith?

13          MR. SMITH:  Your Honor, the United States would like

14    to tender amended instructions at this time.

15          THE COURT:  All right.  I'll tell you what, we're

16    going to recess here in just a moment.  You can provide those to

17    the Clerk and she'll pass those along to me.

18          Any other issues, though, before we recess?

19          MR. SMITH:  No, Your Honor.

20          THE COURT:  I'll just go across.  You don't have to

21    say anything if you don't have an issue, but if you do —

22          Yes, sir.

23          MR. WESTBERRY:  Will we be getting copies as we work

24    over the weekend?

25          MR. SMITH:  We haven't yet, but I certainly will.

1          MR. WESTBERRY:  Thank you.  That's all.

2          MS. HUGHES:  I have a question about the alternate

3    jurors.

4          THE COURT:  Yes, ma'am.

5          MS. HUGHES:  We do have the one juror that we moved

6    to — we had in that incident early on.  Are we going to take

7    that into consideration or has the Court thought about that yet?

8          THE COURT:  I'm not planning to — the parties can

9    request that.  I'm not — based on actions of a party during the

10   course of the case, that should not affect a juror's ability to

11   serve if that jurors observes certain contact in the course of

12   the case.  Unless you have additional authority that would

13   indicate otherwise — I'll take the Mr. Smith approach on this

14   one.  If you have additional authority, you'll need to give it

15   to me, but I'm not aware of any that would indicate that that

16   would be a reason to excuse that alternate.

17         MS. HUGHES:  I'll look at it, and I appreciate that

18   with respect to that particular defendant, but with respect to

19   the rest of us, it wasn't my client's fault that that happened.

20   So I'll look for it if I can find it.

21         THE COURT:  Well, I think what you're suggesting

22   perhaps is that the Court should give a cautionary instruction

23   narrowly tailored about activities that occurred during the

24   course of the case as it relates to one defendant versus other

25   defendants.

1              MS. HUGHES:  That wasn't really what I was suggesting,

2    but I'll think about that, too.  Thank you, Your Honor.

3              THE COURT:  All right.  And that leads me to my last

4    point before we recess, and I will tell you a story before we

5    recess.  Last year I had a case that was tried about this time

6    of the year, Mr. Pinales I think you may be working on the

7    appeal now, so you may be familiar with it.

8              MR. PINALES:  That's the one I argued last Friday.

9              THE COURT:  Was that the argument on Friday?  Well, we

10   had an incident that occurred in that case, that's the Gallion

11   and Cunningham case, where the brother of Mr. Gallion was

12   observed attempting to influence a witness in the case.  I'll

13   summarize it that way.  And we had contempt proceedings based

14   upon that improper attempt to influence a juror — I'm sorry, a

15   witness.  That was — it was during a lunch break, and it — the

16   United States decided not to pursue that issue, but here's my

17   point:  I advised the person that engaged in that improper

18   activity of the potential for contempt for doing that at the

19   time it occurred.  And, again, that was a relative of the party.

20             And it's come up today that I observed Mr. Jones — a

21   person described as Mr. Jones' daughter, shaking her head from

22   side to side, up and down, back and forth, as questions were

23   being asked by the witness.  And I want to make sure that

24   everyone in this courtroom understands that I do not tolerate

25   that type of activity, that is attempting to influence a witness

1    as the witness is testifying, and I will not have any hesitancy

2    whatsoever to hold a person in contempt and place that person in

3    jail, if necessary, to prevent that from occurring in my

4    courtroom.

5            Now, is there any person here in this courtroom that

6    does not understand that I will do that if necessary?  If

7    there's any questions about that, raise your hand and I'll make

8    sure that we do understand; okay?

9        (No response.)

10           THE COURT:  All right.  We'll be in recess until 10:30

11   on Monday morning.

12               MR. WHITE:  Your Honor?

13               THE COURT:  Yes, sir.

14               MR. WHITE:  Can I just briefly say one thing?

15               THE COURT:  Yes, sir, absolutely.  Before you do, I'll

16   say the same thing to you that I said to Ms. Hughes a couple of

17   times.  If you want a shovel with a little longer handle, I'll

18   give it to you.  Go ahead.

19               MR. WHITE:  If they'll give a chance.  I have nothing

20   further, Your Honor.  Thank you, and I'll see you Monday.

21               THE COURT:  Good response.  Thank you.  We'll be in

22   recess until 10:30 on Monday.

23        (Whereupon, the proceedings were adjourned for the day at

24   4:00 p.m., to be reconvened on the following Monday as ordered

25   by the Court.)

1
2            (Proceedings concluded at 4:00 p.m.)
3                 C E R T I F I C A T E
4      I, Cynthia A. Oakes, certify that the foregoing is a
5  correct transcript from the record of proceedings in the
6  above-entitled matter.
7
8  3/20/2010                    s/CYNTHIA A. OAKES
      DATE                      CYNTHIA A. OAKES, RPR, RMR, CRR
9
10
11                        I N D E X
12                                              PAGE
13 Testimony of PHILLIP BENTON HANSON:
       Direct Examination by Mr. Simons:          5
14     Cross-Examination by Mr. Smith:           30
       Redirect Examination by Mr. Simons:       34
15
16 Testimony of JAMES GARRISON:
       Direct Examination by Mr. Simons:         35
       Cross-Examination by Mr. Smith:           46
17     Cross-Examination by Mr. Hoskins:         58
       Recross-Examination by Mr. Smith:         61
18
19 Testimony of JOEY RADER:
       Direct Examination by Mr. Simons:         66
20     Cross-Examination by Mr. Smith:           80
       Redirect Examination by Mr. Simons:       87
       Recross-Examination by Mr. Smith:         88
21
22 Motions:                                      97
23
24
25

1

2

3

E X H I B I T S

4

5

| Defendant Stanley Bowling Exhibit No. | Identified | Page Admitted |
|---|---|---|
| 7 | 42 | 43 |
| 8 | 70 | 70 |
| 9 | 18 | 30 |
| 10 | 18 | 18 |
| 11 | 18 | 18 |
| 12 | 29 | 30 |
| 13 | 29 | 70 |
| 14 | 71 | 73 |
| 15 | 71 | 73 |
| 16 | 71 | 73 |
| 17 | 73 | 75 |
| 18 | 75 | 77 |
| 19 | 76 | 77 |