United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 23, 2010 |
| DOUGLAS C. ADAMS | ) 3:38 p.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 30-E |
| STANLEY BOWLING | ) |

TRANSCRIPT OF CLOSING ARGUMENTS
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                JASON D. PARMAN, ESQ.

On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:         MARTIN S. PINALES, ESQ.
                                CANDACE C. CROUSE, ESQ.

On behalf of the Defendant      R. KENT WESTBERRY, ESQ.
Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant      T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant      ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:             R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant      JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States:  STEPHEN C. SMITH, ESQ.
                                      JASON D. PARMAN, ESQ.
 3                                    Assistant U.S. Attorneys
                                      601 Meyers Baker Road
 4                                    Suite 200
                                      London, Kentucky  40741
 5

 6   On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:          107 East First Street
 7                                    Corbin, Kentucky  40701

 8                                    MARTIN S. PINALES, ESQ.
                                      CANDACE C. CROUSE, ESQ.
 9                                    150 East Fourth Street
                                      Federal Reserve Building
10                                    Cincinnati, Ohio  45202

11
     On Behalf of the Defendant       R. KENT WESTBERRY, ESQ.
12   Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.
                                      220 West Main Street
13                                    Suite 1900
                                      Louisville, Kentucky  40202
14

15   On behalf of the Defendant       T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:             133 West Short Street
16                                    Lexington, Kentucky  40507

17
     On behalf of the Defendant       ROBERT L. ABELL, ESQ.
18   William E. Stivers:              120 North Upper Street
                                      Lexington, Kentucky  40507
19

20   On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:              R. TUCKER RICHARDSON III, ESQ.
21                                    300 West Short Street
                                      Lexington, Kentucky  40507
22

23   On behalf of the Defendant       JERRY W. GILBERT, ESQ.
     William B. Morris:               212 North Second Street
24                                    Richmond, Kentucky  40475

25
```

```
1   On behalf of the Defendant       ELIZABETH SNOW HUGHES, ESQ.
    Debra L. Morris:                  201 West Short Street
2                                     Lexington, Kentucky   40507

3

4   On behalf of the Defendant       DANIEL A. SIMONS, ESQ.
    Stanley Bowling:                  116 West Main Street
                                      Suite 2A
5                                     Richmond, Kentucky   40475

6

7   Court Reporter:                  CYNTHIA A. OAKES, CRR
                                      Official Court Reporter
                                      United States District Court
8                                     560 Athens Boonesboro Road
                                      Winchester, Kentucky   40391
9                                     (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22

23  Proceedings recorded by mechanical stenography,
    transcript produced by computer.
24

25
```

1      (Whereupon, the jury entered the courtroom, after which the

2  following proceedings were had in open court.)

3              THE COURT:  Thank you.

4              The parties, Counsel, and all jurors are present.

5  We'll continue at this time with the rebuttal argument of the

6  United States.

7              Mr. Smith, you may proceed.

8              MR. SMITH:  Thank you, Your Honor.  If it please the

9  Court.

10             THE COURT:  Mr. Smith.

11             MR. SMITH:  Again, Counsel.

12             Ladies and gentlemen of the jury, if nothing else, one

13 thing that has been promised to you in this case is that this is

14 the last argument you're going to hear.  So that's good news.

15             Harry S. Truman is attributed to saying one time that

16 if you cannot convince them, confuse them.  If you cannot

17 convince them, confuse them.  And I submit to you, ladies and

18 gentlemen, that this day has been filled with attempts, and

19 you'll decide whether or not these attempts were attempts to

20 convince you or confuse you.

21             One of the things that's interesting about the

22 arguments today is that despite the witnesses that the

23 defendants put up there, you know, so many of the defense

24 witnesses, the Bishops, you know, one of the chief prosecuting

25 officers in the county, would not admit to you, would not

1    concede to you, that there's vote buying going on in Clay

2    County.  All the evidence that you've heard, their witnesses,

3    no, don't know anything about vote buying, I've heard about it,

4    but, no, I don't know anything about it.  But you have heard

5    these parties concede that.  It's not been disputed.

6            See, there's a crime that's occurred.  You know, when

7    you steal a vote, well, it's just a vote, you know, common,

8    every day, it's just a vote, no big deal.  Cletus Maricle got up

9    there, yeah, I did it back in the '80s when I didn't have

10   anything to gain from it, I had no personal interest, just kicks

11   and giggles, I would go out and violate the law.  It's just a

12   vote.

13           Is it really?  Is it just a vote?  I submit to you,

14   ladies and gentlemen, it's not just a vote, it's a fundamental

15   right.  It's a fundamental right in this country, and it

16   preserves all your other rights.  You got the right to speech.

17   You know how that's protected?  I submit to you it's protected

18   by your right to vote.  It's the most sacred part of being an

19   American citizen, is your right to vote.  And voters have got a

20   right to be heard.  They have a right to have equal access at

21   the ballot box.  Otherwise, ladies and gentlemen, I would submit

22   to you that an election, that doesn't suggest the will of the

23   people.  That suggests the will of a few.  That's not the will

24   of the people.  I submit to you, ladies and gentlemen, that a

25   vote is a very valuable thing.  It took a civil war, it took

1    multiple amendments to the Constitution to establish that right

2    for every one of us.  And if one thing happens today and you

3    don't hear anything else I say, this case is about a fundamental

4    right in Clay County and it's not just a vote.

5          There are a lot of things that were challenged.  You

6    know, one of the things that we've heard over and over again is,

7    well, there's lack of evidence in this case.  Lack of evidence.

8    You know, if we had a dozen forms of evidence possible, if one

9    or more dozen forms don't exist, then they want you to ignore

10   what does exist.  You know, if we can get your attention on what

11   the government didn't prove, then maybe you won't pay attention

12   to what they did prove.

13         And one of the things that, you know, they want to try

14   to do is, of course, talk about these cooperators.  Many of them

15   have made statements such as this case is only supported by

16   cooperators; Wanda White, Kennon White.  They make those

17   statements to you, and, again, you-all heard the evidence.

18   You-all heard the testimony from many witnesses.  Mr. Doug Adams

19   made an argument to you that there was never no election

20   officers that gave testimony in this case.  Well, let's recall.

21         Mike Bishop was an election officer.  And what did he

22   say?  He said prior to the election, Doug Adams, Freddy

23   Thompson, Roy Morgan, Yancey White, and he thought Wayne Jones

24   brought an envelope to his daddy, it was given in his presence,

25   the money to buy votes.

REBUTTAL ARGUMENT - MR. SMITH                    7

1          What other election officer did you hear from?  Well,
2    you know, one they didn't want to talk about was Frank Roberts.
3    You remember little Frank Roberts?  You know, there was no
4    immunity deals, cooperation deals that they argued about against
5    Mr. Roberts.  They didn't even mention his name.  And what did
6    he say?  He was an election officer, and, yeah, in '02 and '04,
7    he was right there buying votes for Doug Adams.  In fact, he
8    said Doug Adams, William "Al Man" Stivers, and Yancey White, the
9    night before the election or the night — or two nights before
10   the election, they brought him $4,000 in cash.  $4,000 in cash.
11         You know, one of the things that they argue is, well,
12   look, they can't prove that was 140,000 — $150,000 on that
13   table that night.  Well, ladies and gentlemen, I would submit to
14   you that that is not required.  The amount of money that was
15   laundered during this conspiracy is not an issue that you've got
16   to decide.  The question you've got to ask yourself, if
17   everybody is in agreement that we're buying votes and all this
18   money is being spent, where's the money come from?  Did it come
19   off trees?  Ask yourself, where it did come from.  Frank Roberts
20   said it came from the hands of Doug Adams and Freddy Thompson.
21   They didn't talk to you about Frank Roberts.
22         You know, again, we'll talk about, well, you didn't
23   call — you didn't call Daugh White, you didn't call Darnell
24   Hipsher, you didn't call — there were a lot of witnesses the
25   government didn't call.  Do you remember those arguments?  Ask

REBUTTAL ARGUMENT — MR. SMITH                8

1  yourself, as Harry Truman said, does that convince you or
2  confuse you?
3        Oh, there were election officers involved.  And there
4  were other people involved.  You know, Stanley Bowling just got
5  up here through his attorney and argued to you that, well,
6  there's no evidence Stanley Bowling being involved in this
7  conspiracy, buying votes.  But, again, did we hear any
8  discussion about Mary Gail Roberts?  Do you remember Mary Gail
9  Roberts?  She didn't — I didn't hear any argument about her
10  being under some kind of immunity agreement and she's somehow in
11  prison and got some long record and she's trying to work herself
12  off a deal.  No, we didn't hear about that.  What did she say?
13  She said, "Well, I was asked by Bart Morris and Stanley Bowling
14  in 2002 to haul voters in the Harts Branch precinct."  And I
15  said, "What did you do with the voters?  After you voted them,
16  what did you do with them?"  She said, "Well, after they voted,
17  I drove them to Bart's house and we went to the garage and Debi
18  Morris checked them off the list."
19        Billie Jean Berry, her sister, what did she say?  Debi
20  Morris and Bart Morris and Stanley Bowling approached her to
21  work for them in the election in 2002 and there were meetings at
22  Debi's beauty shop and at their house, and she was given a list
23  of voters by Debi to go pick up and take to the polls and then
24  return and have them paid.
25        Bobby "Red" Sams.  You-all had the opportunity — you

REBUTTAL ARGUMENT - MR. SMITH                    9

1   know, the jury instructions will tell you, look at the way a

2   witness acts.  How did they respond?  Did they have

3   relationships, and how did they act when they were on the

4   witness stand, because you-all are the judges of credibility.

5   Remember that handwriting expert?  We haven't heard about him.

6   Remember the handwriting expert Cletus Maricle brought up here.

7   You got to watch his body language when he was questioned.  How

8   believable did you find him?

9          What about Clay Massey Bishop when he tried to vouch

10  for his good friend, Doug Adams, the one that hosted the meeting

11  down there at Paul Bishop's?  How credible did you see him when

12  he was under the heat and questions?

13         Sometimes you can also, the instructions say, by

14  listening to their –– you know, you can listen to a person's

15  testimony and determine whether they might have been coached,

16  you know.  They might throw out an answer before the attorney

17  asks.  Did you hear any of that in the defense case?

18         Or what about those that had the great memory.  You

19  know, those who would tell you that they were for sure they were

20  at the corner of Fourth and Main on the 4th day of June or on

21  the day of election, and yet their friend, who's in a

22  professional school, comes in here and she couldn't give you

23  that kind of detail.  I wonder why.  I wonder why the lady with

24  the professional degree –– Do you recall her testimony?  She

25  said, "well, sometime in the summer."

1          But then you look at the relationships.  You know, do
2    you have relations — are they related to them?  Do they have a
3    motive to maybe shade their testimony?  Or maybe they've
4    practiced, you know?  Like the Maricles.  You know, they had an
5    opportunity, according to the expert, and he just let them sit
6    down there together.  And gave them an hour.  He said even
7    though the FBI requires four to six hours and the IRS, which he
8    says he's worked for, you determine whether or not he's cut a
9    few corners to get a quick job done here or not.

10         And then, you know, why do we go into such detail on
11   some issues that really don't matter?  I mean, think about it.
12   The handwriting on the list of people who Wanda White says that
13   Cletus Maricle gave her, but she never testified that Cletus
14   Maricle wrote it.  She was asked that.  She said, no, I don't
15   think Cletus wrote that.  Well, ask yourself, is Harry Truman
16   right?  They're trying to confuse us or trying to convince us?

17         So many things, so many things that we could argue
18   about this case.  Cletus Maricle came up and categorically
19   denied, categorically denied everything, except when it didn't
20   matter.  You know, when I'm not trying to get the job of my
21   life, a judicial retirement, a hundred plus thousand dollars a
22   year salary, you know, back in the day, yeah, I piddled around
23   in crime.  But when I had something to gain from it, no.  No, me
24   and, you know, my friend, Gayle House, who I bought votes for,
25   we made an agreement, you know.  That's his story.  And then

REBUTTAL ARGUMENT — MR. SMITH                                     11

1  further is, well, you know, were there any promises?  No, there

2  wasn't any promises, absolutely not —

3            He kind of reminds me of a thing that happened when I

4  was a young lawyer.  Young lawyers, sometimes you learn things

5  from hearing from other lawyers, and I can't attribute that any

6  of this story is true, but I think it's got a place here today.

7  I was a young lawyer.  One of the older lawyers in town was

8  quite popular, successful, and he tells a story on him.  He said

9  it was back in the day when they first put recorders in the

10 courthouse, you know, we've heard about how you record

11 testimony.  And apparently back in the day, the Judge had just

12 installed a new recording system.  This lawyer got his client

13 and had to argue in front of the Judge, and there was a recess.

14 And the Judge had taken himself off the bench and left the

15 recorder going.  Well, the lawyer started making some derogatory

16 comments about that Judge and how he was ruling in the case to

17 his client, thinking that nobody was going to hear it.  And

18 unfortunately, another recess occurs and the Judge comes out and

19 he's very inquisitive about what was said while the last recess

20 occurred.  And the lawyer was confronted, and he said, now,

21 Judge, I didn't say — the Judge started, now, lawyer, did you

22 say these bad things about me while I was on that last recess?

23 The lawyer said, no, sir, Judge, I would never say that about

24 you.  He said, well, you know I've got this new recorder here in

25 the courthouse and said I just went back there and played it,

REBUTTAL ARGUMENT - MR. SMITH                    12

1    and I can play it for you if you want to hear it.  And this

2    older lawyer says, now, Judge, who are you going to believe, me

3    or that lying old tape recorder?  Who are you going to believe,

4    me or that lying old tape recorder?

5           So you-all have got these tapes and you-all can listen

6    to them if you choose to.  You got the transcripts.  And, you

7    know, one of the things that, you know, made a big deal about in

8    Mr. Maricle's argument here today is that, you know, this Corky

9    Price thing, again, there wasn't — there wasn't any agreement.

10   There wasn't any agreement.  Page 61 of A13A on May the 2nd,

11   2007, this is the day before Wanda is going to go to the grand

12   jury, you know, and they're about to wrap up —— close to

13   wrapping up.  She says, "Speaking of put in jail, what about

14   Cork?  I know that Anthony didn't get his paperwork in."

15   Miracle says, "He needs to get in there so we'll see what I can

16   do for him.  We'll try to help him.  How much time has he been

17   in now?"  She said, "He's been in a long time."  "Because I know

18   what the agreement was," says, "I know what the agreement was."

19   They might argue, well, now, that's the plea agreement, that's

20   the plea agreement.  What plea agreement?  You-all have got the

21   court record, he was sentenced after the election.  Remember, I

22   showed you the date, after the election, after Wanda had done

23   her deeds, he got sentenced?  There's no plea agreement to deal

24   with, he's already been finally sentenced.  So what kind of

25   agreement is Cletus Maricle talking about?

REBUTTAL ARGUMENT - MR. SMITH                    13

1           He said, "Well, now, you know, she's also said about
2    that drug court job, you know."  There was no — he was talking
3    about real estate, talking about getting into other kinds of
4    areas, there wasn't anything about a job, there wasn't any
5    promise of a job, they were just out trying to be friendly; just
6    trying to be friendly.

7           Page 70, we're still on that same conversation, Kennon
8    says, "I mean, you sit back and say, 'Well, I mean, here I put
9    my ass on the line and I've got no help back.'  You know, here I
10   am, don't have a job, you know."  Wanda says, "He's got me
11   covered on a job."  Cletus says, "You'll get a job."  "I mean,
12   worry about that, I'm covered on a job.  Have I got a job?"
13   Cletus says, "You'll get a job.  You'll get a job."

14          Are they trying to convince you or are they trying to
15   confuse you?  Is there no corroboration in this case?  You know,
16   Doug Adams and Cletus Maricle said, well, now, there's no
17   evidence that we were directing this enterprise, this trying to
18   control the voting process in Clay County through the Board of
19   Elections.  There's no evidence of that.  Said, you've got your
20   own recording.  The instructions are going to say that
21   statements of one of your co-conspirators is just as much
22   implying or implicating you in the crime if you're part of that
23   conspiracy as if you've said they're an agent of yours.  And the
24   agent of theirs was William Stivers.  And what did he say?  He
25   said, "I'll tell you who the daddy of that is, Wanda, that was

REBUTTAL ARGUMENT - MR. SMITH                    14

1    Cletus."  And why did we do it?  Just because we wanted to

2    satisfy Doug Adams.  Well, there's no indication that those two

3    cross paths.  Well, is there not?

4              You will also recall during the conversations that

5    were recorded that Wanda White was -- you know, they were down

6    to the point where Cletus says, "Yeah, I'm going to be

7    indicted."  You remember that?  "I'm going to be indicted, I

8    know they've been after me for 30 years, I've been active in

9    politics and I know they're coming after me."  She said, "Who

10   else do you think they're going to indict?"  He said, "Well, I

11   think they'll get Doug Adams and I think they want Freddy

12   Thompson.  And I'm sure there's some others there that they

13   want, too."

14             I mean, these are their words.  And Cletus Maricle

15   said, "I was just joking when I cross-examined him on certain

16   points, you know.  You remember the points.  Al Man Stivers and

17   Wayne Jones, you know, and they were there talking about that

18   court case that's getting ready to come up, and they said,

19   "We're going to make a killing."  And Jones says, "Yeah, if it's

20   in circuit court, we will."  Cletus said, "Aw, they were just

21   joking."  They were just joking.

22             So what reason would they have to make money in a

23   case, a circuit court case down there in Clay County?  They're

24   not lawyers, what way would they have to make money?  Cletus

25   said, "Well, bail bondsmen."  Bail bondsmen.  I submit to you,

REBUTTAL ARGUMENT - MR. SMITH                     15

1  ladies and gentlemen, they're not bail bondsmen in Kentucky.

2  And he had to admit it.  He said, "Well, it was the jury fee, it

3  was the jury fee."

4          "How much is the jury fee?"

5          "$12.50 a day."

6          Again, are they trying to convince you or confuse you?

7          So much time has been  — time has been spent upon,

8  again, these things that go throughout are day to day.  One of

9  the things that, you know, they want to talk about is the

10 evidence that we called.  And, you know, just roughly go over

11 the case of the defense, you know, we talked about Mr. Maricle's

12 case and he categorically denied everything, although he

13 committed crimes before, he never did it again.  And then

14 Mr. Adams' case, you know, it was essentially, you know, let's

15 put up Clay Bishop and his brother, William Hugh, and then

16 Brother Roy Allen who tried to be the torpedo on the case of the

17 government as it's been represented that he's this silver

18 bullet.  You-all recall the testimony.  I mean, here's a man who

19 takes a witness stand and says, "I can tell you that Doug Adams

20 didn't do anything wrong."

21         "How can you say that, sir?"

22         "Well, there was a window out there and I could see

23 out that window."

24         "Well, you were a sheriff; right?"

25         "Yeah."

1      "And you had hundreds of people at times, a very busy
2   ――"

3      "Yeah."  But he said, "I can see all the way out
4   through there and I can tell you Doug Adams didn't do anything."
5   And, you know, that almost got past us.  Do you remember?  He
6   got almost off the stand, and guess what we learned?  That
7   Denver Sizemore voted on the backside of the schoolhouse.  And
8   then he was caught.  "Well, I couldn't see.  No, I couldn't see
9   that line."

10     "You're telling us that for 12 hours that day you kept
11  your eye fixed on that line and you could tell us that Doug
12  Adams" ―― and, you know, and he was going to go that way.  But
13  then he got caught and there's a line that's in the back of the
14  school building, which was the other precinct that voted in the
15  school at Burning Springs.  We're talking about Burning Springs
16  schoolhouse.  I mean, that's the ―― you know, and then we call
17  the Board members, the people who Doug Adams has had as his
18  associates.  I mean, Charles Keith had a race in 2002, they were
19  buying votes for him.  The evidence is there.

20          MR. WESTBERRY:  Objection.

21          THE COURT:  Objection overruled.  The jury will recall
22  what the testimony was.

23          MR. SMITH:  Dobber Weaver testified to that, I submit
24  to you.

25          Bobby "Red" Sams testified.  He said, "I worked the

1  fall of 2002 for Charles Keith against Dobber Weaver."

2  Corroboration.  Corroboration.  And these are the witnesses

3  that, you know, again, would come in here and tell you that,

4  well, you know, the superintendent made a fair salary, did a

5  fair job.  You know, this case is not about whether or not any

6  of these individuals had a job and whether they did a fair job

7  or not, whether they had a contract, whether it was a fair

8  contract or whether they did, you know — whether they hauled

9  garbage or whether they didn't haul garbage, whether they dug a

10 ditch or they didn't dig a ditch.  That's not the issue in the

11 case, ladies and gentlemen.  The issue is whether or not these

12 individuals came to an agreement to utilize the Board of

13 Elections to control the election in Clay County.

14         Now, I submit to you, ladies and gentlemen, that there

15 is in this case attempts to try to divide and conquer.  Let's

16 try to make an issue where there is none.  According to the law,

17 if you come to an agreement within any of the time period

18 between 2002 to 2006 and you reach an agreement with one other

19 member, I submit to you the jury instructions will instruct you

20 that you do not have to have every member of this indictment

21 sitting at a table in agreement as it's sometimes been portrayed

22 here this afternoon.  That's not, I submit to you, what the law

23 requires.  The law requires that you agree with another, and the

24 agreement is not as to who's going to be finally on our slate.

25 Ask yourself when you read those instructions and when they're

1   read to you, where in there does it say there has to be an

2   agreement on the slate?  The agreement was that we're going to

3   access the Board of Elections, we're going to take a legitimate

4   entity and we're going to corrupt it, we're going to use

5   officers, corrupt election officers, those sworn to protect the

6   process, those sworn to protect that fundamental right of your

7   vote, those who take that oath, we're going to use those people

8   who are sworn to protect the process, but use influence to

9   corrupt it.  We're going to use them to corrupt it.  That's

10  their purpose.  And we're going to enrich ourselves, we're going

11  to enrich our families, we're going to enrich our associates,

12  and we're going to build ourselves and we're going to make

13  ourselves, and that's what this case is about.

14          Whether or not Jennings White or Freddy Thompson were

15  on the same ticket in 2002 is not the issue, I submit to you.

16  These individuals came in disagreement in 2002 as to who's going

17  to be eventually put on the slate.  But there was so many

18  instances where they came together.  You know, when you go to an

19  election officer, such as down there where the Jones boy is,

20  Jackie Jones and Crystal Bowling, and Bobby "Red" Sams goes down

21  there in 2006 and they're hauling the votes in and they have a

22  disagreement about who's going to do what, what's the election

23  officer do, those sworn to protect this fundamental right, to

24  protect this process?  He said, "Okay, we're going to work out

25  an agreement here, we're going to use the Board of Elections,

REBUTTAL ARGUMENT — MR. SMITH                    19

1    our elections officers, and we're going to compromise, we'll
2    vote your way as long as you vote ours.  We'll all buy them,
3    we'll all take that fundamental right away from the people in
4    Clay County, we'll all agree that's okay, and we'll all agree as
5    election officers that my sworn duty that I raise my hand up and
6    I swear to protect this process, I will abrogate, I will deny
7    it, I will forget it, I'll turn my head and I'll allow you to
8    buy these votes, bribe these voters, and bring them in lines,
9    just like Roger Webb said.  Roger Webb said when he was down
10   there at the polls at Harts Branch he said they were lining them
11   up like cattle.  And he called Freddy Thompson and he told him
12   about it, and Freddy Thompson did not say one thing to that
13   grand jury about Roger Webb's report.  No, he sent a fox out
14   after the henhouse.  He sent Wayne Jones, who's already at the
15   election poll, and that's how he takes care of it.  Sworn to
16   protect a fundamental right, and that's how we're going to do it
17   in Clay County.  That's an example of how it's done.  There's
18   where the agreement is.  We're going to corrupt the process.  We
19   don't care about the slate, as long as we get what we want.
20           Take the fundamental rights of the people away from
21   them.  Buy it, and if that don't work, FBI comes in town in
22   2006, steal it from them.  Steal it.  That's something arcane.
23   You would think you would hear about it in the days we voted and
24   put our ballot in a shoe box, where they take the shoe box and
25   run away with it and destroy it.  No, this group is

1   sophisticated enough that we can figure out a way to do it even

2   when you use the best computerized Help America Vote Act

3   machine.  Put Al Man Stivers and Wayne Jones in the room

4   together with Cletus Maricle and they can even get Freddy

5   Thompson on board and coach these officers on how to steal it.

6   That's how we protect the process in Clay County.  That's where

7   the agreement is.  That's where the agreement is.

8           A lot of things weren't mentioned in their arguments

9   today.  Did you hear any mention about Doug Adams' interview

10  with Jeff Culver?  You haven't heard that mentioned either, have

11  you?  Jeff Culver, chief of police, a friend of the family,

12  asked by the FBI at the last minute to show up to escort some of

13  these arrested people, and what does Doug Adams do while they're

14  outside smoking?  Talking about frog gigging, and he looked over

15  at Jeff and he said, "Jeff, you know, I did what I had to do in

16  the 2002 election."  Talk about not bringing stuff up.  Well,

17  why didn't they bring that up?

18          Where is the government's witnesses?  You've heard

19  that over and over again today.  They're asking me basically to

20  testify for you.  I can't testify.  Did you know that?  Lawyers

21  can't testify.  In my opening statement, I told you when I gave

22  it to you, that's not evidence.  I said this is where I hope to

23  go, it's a road map, if you-all recall.  Now they want me to

24  explain all these witnesses that they say that's been brought up

25  in this case and they want me to tell you-all what they would

REBUTTAL ARGUMENT - MR. SMITH                                     21

1    say.  Well, I'm not permitted to testify, that's against the

2    rules.  I wonder why they're asking me to do something that's

3    against the rules.  I wonder why.

4              You know, when you ask them about these missing

5    witnesses of the government, you know, that assumes a lot of

6    things, you know.  First of all, it assumes that that witness is

7    available.  You know, we issued a subpoena by the order of this

8    Court.  Now, there's some witnesses brought in here wouldn't

9    testify.  You recall who those were.  They were brought in here

10   that wouldn't testify.  So, first of all, it assumes they're

11   available.

12             Second of all, it assumes they're credible.  Paul

13   Bishop was one of the life-long family friends of the Adams

14   family, his wife worked for Doug Adams as a secretary.

15             And then, thirdly, it also makes you ask the question,

16   you know, well, would that be favorable to the defendants, you

17   know?  If the government could get them, if the government could

18   locate them, if the government could get them up here on the

19   witness stand, if they testified, they really would want you to

20   speculate and say it would have been good for us.  But, again,

21   the amount of money on that table is not something you're going

22   to decide according to the law.

23             You know, another witness that they don't want to talk

24   about is Jeff Farmer.  You know, I talked about him in the

25   opening statement, and he testified.  You know, Jeff Farmer was

 1  down and out in 2002, he got his life back together, he's been
 2  working for years at Toyota, living down there, driving back and
 3  forth, a man making an honest living, a hardworking man.  Did
 4  you hear them attack him today?  Well, there's no corroboration
 5  for this scheme.  They're all crooks singing for their supper.
 6  You can't believe them.  You got no honest folks in here.
 7  Mr. Bowling, well, the only one I can remember was Reecia
 8  Samples.  They didn't mention Jeff Farmer, did he?  No, because,
 9  again, if we can get you to think about what the government
10  hasn't shown and Stanley Bowling would have been on that
11  recording, then I would be all right, you know?  The defense
12  counsel, I have never been in a case where they're satisfied
13  with the government's proof.  I have never seen that happen.
14  They're always looking for something else, they're always
15  wanting you to say, well, what if that had been there or why
16  isn't that there or wouldn't it have been nice?  Because, again,
17  if I can get your attention off what the government didn't
18  prove, then maybe you won't think about what they did prove.  If
19  I can get you to thinking that all their witnesses are a bunch
20  of crooks singing for their supper and no cooperation over here
21  from the good people, then maybe you'll forget it.

22          Jeff Farmer, a powerful witness.  I mean, here's a
23  guy, he comes in here and he just tells it the way he recalls
24  it.  He said, look, man, I was down and out and William Stivers
25  and Charles Stivers took me in and I went from there.  In 2002 I

REBUTTAL ARGUMENT - MR. SMITH                                    23

1    went wide open.  And he testified, I will submit to you, that he

2    was promised that if he did this that he would be repaid.  He

3    testified that he would tell that Wayne Jones was going to tell

4    him who he was voting and coming to get paid, he said the voters

5    were paid 30 to $35, he said on the day of election, he handed

6    between $3,000 and $4,000.  He said he was told that he was

7    going to get a job on Doug Adams if he did what they asked him

8    to do.  You see, Doug Adams don't want you to hear about that,

9    he wants to talk about Vernon Hacker because Vernon Hacker has

10   got a plea agreement.  A guy who's sitting here subject to the

11   penalty of perjury, subject to getting more time in jail, and

12   the only way his sentence is going to be reviewed or reduced

13   will be if a federal judge agrees that it should be.  That's who

14   they want to talk to you about.

15           Farmer was told that he might get Darnell Hipsher's

16   job or a job such as that following the 2002 from Doug Adams.

17   You see, Jeff Farmer was there.  He was there in 2002, he was

18   there handling 3- or $4,000.  Where did that money come from?

19   He said, "Stivers gave it to me."  Where did Stivers get the

20   money?  Where did Stivers get the money?  William Stivers is

21   claiming a pauper here today, he doesn't have any money.  Where

22   did he get the money?

23           I submit to you, ladies and gentlemen, that there is

24   overwhelming proof that these individuals pooled their money in

25   2002, just as you have been told.  Who have you been told that

REBUTTAL ARGUMENT — MR. SMITH                                      24

1    by?  Well, Mike Bishop and Freddy Thompson told me after the

2    election that he had put $100,000 in.  He said, "My dad told me

3    that they had over $150,000 on the table."  Dick Woods says they

4    were talking about money.  I heard Charles Marcum say that he

5    was going to be a poor man, he had $10,000 or something to that

6    effect.  But he said, I was only at the table about ten or 12

7    minutes.  And then he said, I talked to those other guys and I

8    wasn't paying attention to what was going on, and then I left.

9              See, what they don't want you to put together is, who

10   ended up serving as election officer?  Paul Bishop and William

11   Stivers.  Where were they serving?  Early voting.  You see, when

12   you start putting the pieces of the puzzle together, there's

13   only one conclusion that you can reach, and that is that there

14   was money in 2002 put together and that there was an agreement

15   to buy votes and that if you've got an agreement to buy votes

16   and you've got money put together for that purpose, you've got

17   money laundering, I submit to you.  If you've got money and

18   you're going to buy votes with it, then you've got money

19   laundering if you've agreed to it.  Whether or not you spend one

20   penny of it or not yourself, if you're part of the agreement,

21   you knowingly and voluntarily join it and you do agree to

22   advance its purposes and its goals. You say, what do you mean by

23   that?  I mean, there are many ways to advance the goals of the

24   money laundering conspiracy.  I mean, you could be the one like

25   Doug Adams going out, you know, the night before and taking it

REBUTTAL ARGUMENT – MR. SMITH                              25

1   to Frank Roberts and Freddy would go out there the night before

2   and deliver to it Frank Roberts.  That's —

3            MR. BALDANI:  Objection, Your Honor.

4            MR. SMITH:  I would submit to you that that is —

5            THE COURT:  Overruled.

6            MR. SMITH:  — (continuing) that is an act in

7   furtherance of the conspiracy to launder money.

8            Or you could be, again, lined up hauling voters,

9   paying voters after they've voted, if you have come to the

10  agreement that that's the purpose of the overall plan.  And you

11  don't have to have everybody indicted that's involved, folks.

12  Everybody that's — the instructions, I submit to you, will tell

13  you that everybody that was involved in this conspiracy does not

14  have to be here charged in this one indictment.  You consider

15  the evidence against the ones that are.

16           Now, when you talk about where are the witnesses, you

17  know, you're not only questioning whether the witness is

18  available, you're not only questioning whether they testify

19  positively for me as a defendant, but really what they're saying

20  is — what they're saying is that I am a part of a conspiracy to

21  knowingly prosecute an innocent person, that I've got some

22  evidence that I'm holding back that would show their innocence.

23           These people that they have castigated, thrown

24  derogatory comments throughout this whole trial, accused them of

25  all kinds of unkind things, people like, you know, Doug Adams,

REBUTTAL ARGUMENT - MR. SMITH                    26

1   for instance, who's he seated here next to?  Darnell Hipsher,

2   Vernon Hacker, Joe Swafford.  You remember Joe Swafford, he's

3   the one that Gary Gregory prosecuted down there in Clay County

4   for his involvement supposedly in a conspiracy of misused

5   information.  Mary Betty, you remember her bragging about on the

6   tapes that, "Oh, Clarence, he pulled one on the federal

7   government this time."

8         "What are you talking about, Mary Betty?"  She said,

9   "Oh, did you see what he did?  He went out there and beat the

10  federal government and charged Joe Swafford and they ran him

11  down to the courthouse and got him to plead guilty before they

12  could get him to federal court."

13        They go to Washington, D.C.  You know, you got the

14  photographs, P42, call it the Capitol Gang in one article down

15  here, making a solid case.  So many of these people have been

16  convicted; so many of the people have been convicted.

17        Ladies and gentlemen of the jury, these convicted

18  felons, the ones that you've heard from from the witness stand,

19  they're not my friends.  That's their friends.  That's their

20  friends.  That's not my friends.

21        Now, I'm not here today trying to promote any of these

22  folks that testified that have done wrong things.  You know, I'm

23  not going to ask you to take them home with you, I'm not asking

24  you to approve your child marrying one of them, I'm not asking

25  you to do that.  What I'm asking you to give is a fair

REBUTTAL ARGUMENT — MR. SMITH                          27

1   determination based on the totality of the evidence of whether
2   or not they're telling the truth.  That's what I'm asking for,
3   is a fair determination of whether they're telling the truth.
4   They're not my friends.  That's their friends.  They chose —
5   you know, Cletus Maricle, he chose to make friends with Wanda
6   and Kennon White a long time before this case was ever birthed.
7   You heard that on those tapes.  You decide.  Who are you going
8   to believe, me or that lying old tape recorder?

9          You know, when you look at the evidence that's
10  presented and the totality of the circumstances, what you see is
11  Kenny Day's testimony — you know, for instance, Kenny Day's
12  testimony, here's a man that's been in prison since 2005.  He's
13  not been out there hanging out at Freddy Thompson's office doing
14  research on the web, checking out all the election results back
15  in the 1980s.  And corroboration right down to the detail
16  about — I mean, it was uncanny the recall this man had.  Well,
17  he's a drug addict, you can't believe anything.  Let me ask you
18  this:  Where did we get all the consistency?  You know, the
19  records backing him up about these races, him being appointed as
20  Republican election commissioner.  Well, where did all those
21  corroboration details come from?  He testifies about
22  circumstances in which he was in a relationship with these
23  people and the records prove it out.  Their stories are
24  consistent.  They're consistent.  These people have testified
25  and you heard them, they testified in pretrial hearings, they

1  testified before this case started, they were brought up here

2  and questioned again.  How many inconsistent stories did you

3  hear?  You think if there had been inconsistencies they wouldn't

4  have been brought out with all these lawyers to defend this

5  case?  Where's the inconsistencies?

6          Cletus Maricle said, well, now, look, you know, there

7  was — there was Kenny Day, and, you know, he's — you can't

8  believe him.  But now he did say that — remember, he did say

9  that — he was talking about 2004, 2005, he brought a cigar box

10 with some money in it and he said Cletus didn't take it.  If

11 Kenny Day is going to lie, why don't you lie big, Kenny?  Why

12 don't you lie big?  Why don't you say, yeah, man, bring me the

13 money, Cletus Maricle took it, went out shopping and bought the

14 family Christmas presents.  Why, yeah, he did that.  If we're

15 going to lie, folks, let's lie big.  Kenny Day, the big liar.

16 Why don't you lie big, Kenny, you're a smart man.  There were

17 all those details, manager, service manager at White's Chevrolet

18 for all those years.  You're a smart man, lie big.  No, Kenny

19 Day said, no, look, they black-sheeped me in 2002.  Do you

20 remember that?  He said, they black-sheeped me in 2002.  He

21 said, man, I had just come out of that federal prison, I had

22 served that time for that Florida conviction, and he said, there

23 wasn't anybody that would touch me.  They didn't even ask me to

24 get involved in the 2002 election.  Kenny Day is a liar, let's

25 write a big check.  Absolutely I was in the 2002 election.  I

1  saw Doug Adams and Cletus Maricle both, they was right out there

2  at my pawnshop and I was giving them drug money and they went

3  out there and bought votes in front of my pawnshop.  If you're

4  going to lie, why not lie big?

5          MR. WESTBERRY:  Objection, he said 2002.

6          THE COURT:  He wasn't summarizing the facts, as I

7  understand it, he was making a point.

8          MR. SMITH:  No, we don't want to hear about what other

9  evidence there is, because, again, you didn't hear about Carl

10  Curry.  The Bowlings and the Morrises, they don't want you to

11  hear about that, because you know what Carl Curry testified to,

12  he was the middle-aged gentlemen that lived out there at the

13  Beech Creek Apartments, and his testimony was, well, now, in '02

14  Stanley Bowling got me to go around and get as many voters as he

15  could to vote on a ticket.  That's my job.  And he said, they

16  were vote haulers there, Mary Gail Roberts and Billie Jean Berry

17  and Tonya Davidson.  "How much money did they give you?"  "Well,

18  Stanley gave me a hundred dollars."  And he said Bart Morris was

19  with him when he came to see him.  And Bart Morris gave me

20  another $150 after the election.  I said, "What about the '06?

21  There's no evidence about that '06 vote buying."  Carl Curry and

22  others testified that, yeah, in 2006 Carl Curry did the same

23  thing as he said he did in 2002, Bart Morris and Stanley, and

24  they told him who was on the ticket.

25          Tonya Davidson, she said, yeah, Stanley approached her

REBUTTAL ARGUMENT — MR. SMITH                    30

1   in 2006 to work in the election.  Again, James Douglas Coleman,

2   yeah, I sold my vote in the general election, 2006, 20, $25,

3   and, yeah, Darnell Hipsher was the one that bought it and it was

4   at Bart Morris's garage on Green Street.  And, yeah, he said,

5   there was a slate that I was supposed to vote for.

6          Ladies and gentlemen, you have an opportunity to

7   deliberate, to review, you recall what the evidence is.  I

8   submit to you, ladies and gentlemen, that the case of the United

9   States is a case in which is built upon the totality of the

10  evidence, and I would ask you to consider all of the evidence.

11         You know, many of the witnesses that you heard, and

12  I'll agree with counsel, there's not a case that the United

13  States is trying to make against the citizens of Clay County.

14  There's some really nice people in Clay County; some really

15  smart people in Clay County.  What the United States is bringing

16  is bringing a case that is indicting those and charging those

17  whom they believe to be violating the process; an organized

18  effort.  We're not indicting the good people of Clay County.

19  But what you got to ask yourself is all this relationships and

20  all this corruption, how did it get there and how is it staying

21  there?

22         Now, what I'm asking you to do is think about Chief

23  Culver, think about Carmen Webb Lewis, think about the promise

24  and the hope that Manchester and Clay County has.  Think about

25  Ray "Chipman" Adams, the man who worked 30 years on a chip

REBUTTAL ARGUMENT – MR. SMITH                                    31

1  truck, now for the first time, in 2006, although he passed up

2  bribes and extortion attempts of this organization, he did it on

3  his own, he got up there and told you how he refused it,

4  rejected it, and now he's in office.  Think about those people.

5  I want you to think about them.

6         And while you're deliberating back there, I want you

7  to think about your verdict.  Think about your verdict.  Because

8  a verdict, ladies and gentlemen, is the Latin term which in its

9  root meaning means to speak the truth.  And that's what I'm

10  asking your verdict to be, I'm asking your verdict in this case

11  to speak the truth.  I'm asking your verdict to speak as to what

12  Clay County and Manchester will look like tomorrow.

13         Ladies and gentlemen, you're part of a very important

14  American justice system.  America can be trounced for a lot of

15  things, but one of the things that America cannot be trounced

16  for is our justice system.  It's held as one of the greatest in

17  the world.  And I submit to you it's the greatest in the world

18  because you are a part of it.  Only a jury can decide guilt or

19  innocence.

20         You know, the FBI, the London Police Department, the

21  IRS, the police officers that work the streets down there in

22  Manchester, Chief Culver, you know, they don't enforce the law.

23  Police officers merely arrest people and charge people with

24  crimes.  Judges, judges are — they've got their role.  They're

25  to give you the law and the instructions in this case to apply.

1    But they're not the ones to enforce the law.  The prosecution,

2    the prosecution, we don't enforce the law, we merely present the

3    evidence.

4              No, ladies and gentlemen, in this great system of

5    justice of ours, only you can decide guilt or innocence.  And in

6    this case, ladies and gentlemen, based on this evidence, I ask

7    you to vote guilty, guilty on all counts.  Guilty, ladies and

8    gentlemen, because the evidence requires it.  Guilty, ladies and

9    gentlemen, because justice requires it.  Thank you.

10             THE COURT:  Thank you, Mr. Smith.

11             Ladies and gentlemen, we will recess for the evening

12   before I give you the jury instructions, we'll do that tomorrow

13   morning.  I do want to remind you before we recess that, of

14   course, the admonition is still in effect and you should not

15   discuss the case with anyone or allow anyone to approach you to

16   discuss the case.  I anticipate that it will take approximately

17   two hours to read the instructions to you tomorrow, you'll be

18   given a set of instructions — actually, I'll give you a couple

19   of copies to go back with your — with the exhibits and other

20   materials when you begin your deliberations.  But we will start

21   again tomorrow at 8:30.  I'll have lunch ordered in for you, of

22   course.  And so as soon as I complete reading the instructions

23   to you, then you'll be excused to commence your deliberations.

24   And before we do that, of course, I'll need to excuse four

25   alternates that will be selected at random from the case.  So,

1  again, please keep in mind the admonitions that I've given to

2  you several times, and I will also not only have lunch brought

3  in for you tomorrow, but if you want to continue with your

4  deliberations into the evening and if you choose to deliberate

5  and have dinner here, of course, you'll need to advise me of

6  that at the appropriate time.  But it takes awhile once you tell

7  me that you want to order dinner, so I just will remind you of

8  that in advance.

9          Again, please keep in mind all of the admonitions that

10  you have been given not to discuss the case and every other

11  admonition that's been given to you throughout the course of

12  this proceeding.  The jury will be excused until 8:30 tomorrow

13  morning.

14      (Whereupon, the jury retired from the courtroom, after which

15  the following proceedings were had in open court.)

16          THE COURT:  Thank you.

17          Before we recess for the evening, I do want to note

18  that in just a few moments I'm going to have one of my clerks

19  bring some additional instructions for you to be looking over in

20  the event the case proceeds.  I do want to give you some

21  additional instructions to review as to Counts 12 and 13.  So if

22  you would remain for a little while, we'll have those available

23  for you.

24          Mr. Pinales, did you have a question?

25          MR. PINALES:  May it please the Court, I know it may

 1  be difficult to believe that I have a granddaughter that's going

 2  to be Bar Mitzvahed this weekend, that old, but if the Court

 3  would so permit, Mr. Hoskins would be present and I would be out

 4  on Friday and Monday.

 5          THE COURT:  Yes, sir.

 6          MR. PINALES:  Monday is also the first night of

 7  Passover.

 8          THE COURT:  Yes, sir, certainly.  Thank you.

 9          MR. BALDANI:  Judge, I had an issue I wanted to bring

10  up, if I could.

11          THE COURT:  Yes, sir. if it's going to take a minute,

12  everyone just have a seat.

13          MR. BALDANI:  It'll take just a minute.

14          THE COURT:  Yes, sir.

15          MR. BALDANI:  It has to do with our objection during

16  Mr. Smith's closing, and Mr. Smith stated twice during his

17  closing that Frank Roberts testified that Freddy Thompson

18  brought him money, and we didn't object the first time because I

19  was going to my notes and actually to the transcript.  Then, as

20  you noticed, when it was said again I did object.  And, of

21  course, I know you don't recall all the evidence off the top of

22  your head, but we do have a transcript, Your Honor, and

23  Mr. Roberts was asked on direct who came to his house, and he

24  didn't mention Freddy Thompson at all.  And then on cross-

25  examination, I specifically asked him if Freddy Thompson, was he

1    present, did he give you any money, and he said no.  So I do

2    think that the evidence was misstated.  That was our objection.

3    And I would like to —

4            THE COURT:  Well, with respect to four objections that

5    were made during the course of arguments, I did advise the jury

6    that they would need to recall what the evidence was in the

7    case.  I think with respect to several of the defendants, there

8    were objections raised and I made the — I advised jury that it

9    was their determination as to what the evidence was,

10   Mr. Baldani.

11           MR. BALDANI:  I understand that, Judge.  But my point

12   is, this — those were matters that were open to interpretation

13   and this wasn't.  And I would like to submit the transcript to

14   you in the morning just so you can —

15           THE COURT:  You can file a brief on the issue by 8:00

16   tomorrow morning.

17           MR. BALDANI:  Judge, I don't have any support staff

18   and ability —

19           THE COURT:  You'll need — Listen to me.  You will

20   need to file a brief on the issue by 8:00 tomorrow morning.

21           MR. BALDANI:  I have made my argument, I can't file a

22   brief.

23           THE COURT:  Well, you'll have to give me some

24   authority, Mr. Baldani, is what I'm asking you.  If you want me

25   to do more than what I've done at this point, you need to give

1  me authority by 8:00 tomorrow morning.  Okay?

2          MR. BALDANI:  I understand, Your Honor.

3          THE COURT:  I can't make it any simpler for you than

4  that.

5          MR. BALDANI:  I understand.

6          THE COURT:  But if you have authority, you need to

7  give it to me before we resume tomorrow at 8:30.  Okay.

8          All right.  Thank you.  We will be in recess until

9  8:30 tomorrow morning.

10     (Whereupon, the proceedings were adjourned for the day at

11  4:39 p.m., to be reconvened on the following day as ordered by

12  the Court.)

13                   C E R T I F I C A T E

14     I, Cynthia A. Oakes, certify that the foregoing is a

15  correct transcript from the record of proceedings in the

16  above—entitled matter.

17

18  3/24/2010                    s/CYNTHIA A. OAKES
        DATE                     CYNTHIA A. OAKES, RPR, RMR, CRR
19

20

21                       I N D E X

22                                              PAGE

23

    Rebuttal argument on behalf of
24      Government by Mr. Smith:                   4

25