1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                    SOUTHERN DIVISION at LONDON
                              - - -
3
    UNITED STATES OF AMERICA,        :  Docket No. CR 09-16-S
4                                    :
                     Plaintiff,      :  **Frankfort, Kentucky**
5                                    :Wednesday, February 3, 2010
        versus                       :  9:00 a.m.
6                                    :
    RUSSELL CLETUS MARICLE,          :
7   DOUGLAS C. ADAMS                 :
    CHARLES WAYNE JONES              :
8   WILLIAM R. STIVERS               :
    FREDDY W. THOMPSON               :    **Trial Day 2**
9   WILLIAM B. MORRIS                :
    DEBRA L. MORRIS                  :
10  STANLEY BOWLING,                 :
                                     :
11                   Defendants.     :

12

13                            - - -
                     TRANSCRIPT OF TRIAL
14                BEFORE DANNY C. REEVES
          UNITED STATES DISTRICT COURT JUDGE and a jury
15                            - - -

16  APPEARANCES:

17  For the United States:      STEPHEN C. SMITH
                                JASON D. PARMAN, ESQ.
18                              Assistant U.S. Attorney
                                601 Meyers Baker Road
19                              Suite 200
                                London, KY 40741
20
    For the Defendant           MARTIN S. PINALES, ESQ.
21  Russell Cletus Maricle:     CANDACE C. CROUSE, ESQ.
                                Strauss & Troy
22                              105 E. Fourth Street
                                Fourth Floor
23                              Cincinnati,OH  45202

24                              DAVID S. HOSKINS, ESQ.
                                107 E. First Street
25                              Corbin, KY  40701

2

| | | |
|---|---|---|
| 1 | For the Defendant | R. KENT WESTBERRY, ESQ. |
| | Douglas C. Adams: | KRISTIN N. LOGAN, ESQ. |
| 2 | | Landrum & Shouse, LLP |
| | | 220 West Main Street |
| 3 | | Suite 1900 |
| | | Louisville, KY 40202 |
| 4 | | |
| | | BENNETT E. BAYER, ESQ. |
| 5 | | Landrum & Shouse, LLP |
| | | 106 West Vine Street |
| 6 | | Suite 800 |
| | | Lexington, KY  40507 |
| 7 | | |
| 8 | For the Defendant | T. SCOTT WHITE, ESQ. |
| | Charles Wayne Jones: | Morgan & Pottinger, P.S.C. |
| 9 | | 133 West Short Street |
| | | Lexington, KY  40507 |
| 10 | | |
| 11 | For the Defendant | ROBERT L. ABELL, ESQ. |
| | William R. Stivers: | 120 North Upper Street |
| 12 | | Lexington, KY  40507 |
| 13 | | |
| 14 | For the Defendant | RUSSELL JAMES BALDANI, ESQ. |
| | Freddy W. Thompson: | R. TUCKER RICHARDSON, ESQ. |
| | | Baldani, Rowland & Richardson |
| 15 | | 300 West Short Street |
| | | Lexington, KY  40507 |
| 16 | | |
| 17 | For the Defendant | JERRY W. GILBERT, ESQ. |
| | William B. Morris: | Coy, Gilbert & Gilbert |
| 18 | | 212 North Second Street |
| | | Richmond, KY 40475 |
| 19 | | |
| 20 | For the Defendant | ELIZABETH SNOW HUGHES, ESQ. |
| | Debra L. Morris: | Gess, Mattingly & Atchison, PSC |
| 21 | | 201 West Short Street |
| | | Lexington,KY40507 |
| 22 | | |
| 23 | For the Defendant | DANIEL A. SIMONS, ESQ. |
| | Stanley Bowling: | Thompson, Simons, Dunlop & Fore |
| 24 | | 116 West Main Street |
| | | Suite 2A |
| 25 | | Richmond, KY 40476 |

3

1    Court Reporter:                LISA REED WIESMAN, RDR-CRR
                                    Official Court Reporter
2                                   35 W. Fifth Street
                                    P.O. Box 1073
3                                   Covington, KY  41012
                                    (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          (Proceedings commenced at 8:55 a.m.)

2          THE COURT:  Thank you.  The Court will recall the

3    matter of United States v. Russell Cletus Maricle and others,

4    London Criminal Case 09-16.  It appears that a couple of

5    attorneys aren't present at this time, Mr. Abell and Mr.

6    Bayer.

7          MR. WESTBERRY:  Mr. Bayer is here.  I've seen him.

8          THE COURT:  Well, I understand there's a matter that

9    needs to be taken up before 9:00.  I need to know what it is

10   before I can determine whether we need to wait for counsel to

11   be present.  Mr. Hoskins?

12         MR. HOSKINS:  Thank you, Your Honor.  I neglected to

13   notice this before, but I don't believe the Court has entered

14   an order on our motion in limine regarding the incident in

15   1970, when a man was shot and killed in a precinct in Clay

16   County.

17         THE COURT:  All right.  It's 1980?

18         MR. HOSKINS:  It was 1970.

19         THE COURT:  '70.  What's the position of the United

20   States with respect to that issue?  Mr. Smith, do you

21   anticipate this will be coming up?

22         MR. SMITH:  I'm not recalling, Your Honor, the motion

23   in limine that was filed and argued or responded to by the

24   government, but I do recall when we had a detention hearing

25   that this issue came up, and at this point, I do not

5

1    anticipate going into that topic during my opening.  And,

2    obviously, reserve the right to readdress that should it have

3    relevance in our trial.

4          THE COURT:  Mr. Hoskins, I will attempt to locate

5    that at a break.  It doesn't appear that it's going to be an

6    issue that's going to be coming up, at least not by the United

7    States today.  So that will give me a chance to find that

8    motion and look through that.  And then if we find any further

9    briefing or comments by counsel, then we'll take that up at

10   the time before the issue is presented in court.

11         MR. HOSKINS:  Thank you, Your Honor.

12         THE COURT:  Is that the only issue that needed to be

13   taken up?

14         MR. HOSKINS:  Yes.

15         THE COURT:  I think we're still waiting on two of our

16   jurors.

17         DEPUTY CLERK:  They're here now.

18         THE COURT:  All right.  Mr. Smith, I understand you'd

19   like to go straight through with your opening without taking a

20   break?

21         MR. SMITH:  I would like to, Your Honor.  I'm

22   anticipating that your preliminary jury instructions will only

23   take a few minutes and then I hopefully -- I don't want to put

24   the jury in a bad situation for a break, but if you're

25   breaking at 10:30 normally, that gives me an hour and a half,

6

1    short whatever the jury instruction takes.

2            THE COURT:  If you want to take a break or you feel a

3    break will be appropriate, you can let me know and we'll take

4    a break.   Otherwise, I won't stop you until you complete your

5    opening.

6            MR. SMITH:  Thank you.

7            THE COURT:  Let's see.  Are we ready to go?  Any

8    other issues that need to be taken up before the jury's

9    brought in?

10           MR. PINALES:  Your Honor, I believe this would be the

11   appropriate time to invoke the rule.

12           THE COURT:  Ordinarily, I would do it after the

13   preliminary jury instructions, but we can do it at this time.

14           MR. PINALES:  Thank you, Your Honor.

15           THE COURT:  If there's no objection, the Court will

16   invoke the rule on exclusion of witnesses at this time.  When

17   the Court invokes the rule, that means that a person who is

18   expected to testify in the case may not speak with,

19   communicate with anyone about any witness's testimony, either

20   directly or indirectly.  Mr. Westberry?

21           MR. WESTBERRY:  We plan on using a PowerPoint during

22   ours.  Whenever you would like us to set up, my I.T. fella is

23   here.

24           THE COURT:  I anticipate if we get started here in

25   the next few moments, Mr. Smith should be finished around

1    11:00.  We'll take a break, and then we'll have one other

2    opening before the lunch hour in all likelihood.  You would go

3    next, so you would have the lunch hour to set up your

4    PowerPoint.

5              MR. WESTBERRY:  That's fine.

6              THE COURT:  Mr. Hoskins, will you or Mr. Pinales be

7    giving --

8              MR. HOSKINS:  I will, Your Honor.

9              THE COURT:  All right.

10             MR. SMITH:  Your Honor, just for the record, the

11   United States would also request the same for the separation

12   of the witnesses.

13             THE COURT:  The rule on witnesses, exclusion of

14   witnesses, of course, applies to all parties in case.  That's

15   understood.  All right.  We can bring the jury in.

16             (The jury entered the courtroom at 9:02 a.m.)

17             THE COURT:  Good morning, everyone.  The record will

18   reflect that all members of the jury are present at this time.

19             Members of the jury, now that you have been sworn, I

20   will give you some preliminary instructions to guide you in

21   your participation in this trial.

22             It will be your duty to find from the evidence what

23   the facts are.  You and you alone will be the judges of the

24   facts.  You will then have to apply to those facts the law as

25   the Court will give it to you.  You must follow that law

1  whether you agree with it or not.  Nothing the Court will say

2  or do during the trial is intended to indicate, or should be

3  taken by you as indicating, what your verdict should be.

4       The evidence from which you will find the facts will

5  consist of testimony of witnesses, documents and other things

6  received into the record as exhibits, and any facts that the

7  lawyers agree to or stipulate to or that the Court may

8  instruct you to find.

9       Certain things are not evidence and must not be

10  considered by you.  I will list them for you now.  Statements,

11  arguments and questions by lawyers are not evidence.

12       Objections to questions are not evidence.  Lawyers

13  have an obligation to their clients to make objections when

14  they believe evidence being offered is improper under the

15  rules of evidence.  You should not be influenced by the

16  objection or by the Court's ruling on it.  If the objection is

17  sustained, ignore the question.  If it is overruled, treat the

18  answer like any other.  If you are instructed that some items

19  of evidence are received for a limited purpose only, you must

20  follow that instruction.

21       Testimony that the Court has excluded or told you to

22  disregard is not evidence and must not be considered.

23       Anything you may have seen or heard outside the

24  courtroom is not evidence and must be disregarded.  You are to

25  decide the case solely on the evidence presented here in the

1    courtroom.

2         There are two kinds of evidence, direct and

3    circumstantial.  Direct evidence is direct proof of a fact,

4    such as the testimony of an eyewitness.  Circumstantial

5    evidence is proof of facts from which you may infer or

6    conclude that other facts exist.  I will give you further

7    instructions on these as well as other matters at the end of

8    the case, but keep in mind that you may consider both kinds of

9    evidence.

10         It will be up to you to decide which witnesses to

11   believe, which witnesses not to believe, and how much of any

12   witness's testimony to accept or reject.  I will give you some

13   guidelines for determining the credibility of witnesses at the

14   end of the case.

15         As you know, this is a criminal case.  There are

16   three basic rules about a criminal case that you must keep in

17   mind.

18         First, the defendant is presumed innocent unless and

19   until proven guilty.  An indictment against a defendant

20   brought by the United States is only an accusation, nothing

21   more.  It is not proof of guilt or anything else.  A

22   defendant, therefore, starts out the trial with a clean slate.

23         Second, the burden of proof is on the United States

24   until the very end of the case.  A defendant has no burden to

25   prove his or her innocence, or to present any evidence, or to

1  testify.

2          Third, the United States must prove the defendant's

3  guilt beyond a reasonable doubt.  I will give you further

4  instructions on this point later, but bear in mind that in

5  this respect, a criminal case is different from a civil case.

6          Let me summarize the charges for you.  The indictment

7  contains eleven counts for your consideration.  Count 1

8  charges Defendants Russell Cletus Maricle, Douglas C. Adams,

9  Charles Wayne Jones, William E. Stivers, Freddy W. Thompson,

10  William B. Morris, Debra L. Morris and Stanley Bowling with

11  conspiracy to conduct and participate, directly and

12  indirectly, in the conduct of the affairs of an enterprise

13  through a pattern of racketeering activity, in violation of

14  the Racketeer Influence and Corrupt Organizations Act, also

15  known as RICO, in violation of Title 18 of the United States

16  Code, Section 1962(d).  To find a defendant guilty of this

17  charge, you must find that the government proved each of the

18  following three elements beyond a reasonable doubt.

19          First, that two or more persons, in some way or

20  manner, came to a mutual understanding to try to accomplish a

21  common and unlawful plan; namely, to engage in a pattern of

22  racketeering activity, as charged.

23          Second, that the defendant knowingly and willfully

24  became a member of such conspiracy.

25          Third, that at time the defendant knowingly and

willingly agreed to join in such conspiracy, the defendant did

so with the specific intent either to personally participate

in the commission of two predicate offenses, as elsewhere

defined in these instructions, or that the defendant

specifically intended to otherwise participate in the affairs

of the enterprise with the knowledge and intent that other

members of the conspiracy would commit two or more predicate

offenses as a part of a pattern of racketeering activity.

Count 2 charges Defendants Russell Cletus Maricle,

Douglas C. Adams, Charles Wayne Jones, William E. Stivers,

Freddy W. Thompson, William B. Morris, Debra L. Morris and

Stanley Bowling with conspiracy to commit money laundering, in

violation of Title 18 of the United States Code, Section

1956(h). For you to find a defendant guilty of this charge,

you must find that the government proved each of the following

two elements beyond a reasonable doubt.

First, that two or more persons conspired or agreed

to commit the crime of money laundering.

Second, that the defendant knowingly and voluntarily

joined the conspiracy.

Counts 3, 5, 6 and 7 charge defendants Charles Wayne

Jones and Freddy W. Thompson with honest service mail fraud,

in violation of Title 18 of the United States Code,

Sections 1341 and 1346. For you to find a defendant guilty of

this charge, you must find that the government proved each of

the following three elements beyond a reasonable doubt.

First, that the defendant knowingly devised or participated in a scheme to fraudulently deprive another of the intangible right of honest services, as charged.

Second, that the defendant did so willfully and with an intent to defraud.

And third, that the defendant used the United States Postal Service by mailing or by causing to be mailed some matter or thing for the purpose of executing the scheme to defraud.

Count 4 charges Defendants Charles Wayne Jones and William E. Stivers with attempting to extort under color of official right, in violation of Title 18 of the United States Code, Section 1951. For you to find a defendant guilty of this charge, you must find that the government proved each of the following four elements beyond a reasonable doubt.

First, that the defendant knowingly attempted to obtain money from another person.

Second, that the defendant did so by means of extortion by threat of fear or under color of official right.

Third, that the defendant believed the person would have parted with the money or property because of the extortion.

And fourth, that the conduct of the defendant affected, would have affected or would have the potential to

13

affect interstate commerce.

Count 8 charges defendants Russell Cletus Maricle and William Stivers with aiding and abetting in the obstruction of justice, in violation of Title 18 of the United States Code, Sections 2 and Section 1503.  For you find a defendant guilty of this charge, you must find that the government proved each of the following two elements beyond a reasonable doubt.

First, that there was a proceeding pending before a federal grand jury.

And second, that the defendant knowingly and corruptly endeavored to influence, obstruct or impede the due administration of justice in that grand jury proceeding as charged.

Count 9 charges defendant Freddy Thompson with obstruction of justice, in violation of Title 18 of the United States Code, Section 1503.  For you to find the defendant guilty of this charge, you must find that the government proved each of the following two elements beyond a reasonable doubt.

First, that there was a proceeding pending before a federal grand jury.

And second, that the defendant knowingly and corruptly endeavored to influence, obstruct or impede the due administration of justice in that grand jury proceeding as charged.

14

1          Count 10 charges Defendants Russell Cletus Maricle,

2     Charles Wayne Jones, William E. Stivers and Freddy W. Thompson

3     with conspiracy to deprive a person of their right to vote, in

4     violation of Title 18 of the United States Code, Section 241.

5     For you to find a defendant guilty of this charge, you must

6     find the government proved each of the following two elements

7     beyond a reasonable doubt.

8          First, that two or more persons conspired or agreed

9     to deprive a person of their right to vote.

10          Second, that the defendant knowingly and voluntarily

11     joined the conspiracy.

12          Finally, Count 11 charges Defendants Russell Cletus

13     Maricle, Charles Wayne Jones, William E. Stivers, Freddy W.

14     Thompson, William B. Morris and Debra L. Morris with

15     conspiracy to commit vote-buying, in violation of Title 18 of

16     the United States Code, Section 371 and also Title 42 of the

17     United States Code, Section 1973i.  For you to find a

18     defendant guilty of this charge, you must find that the

19     government proved each of the following two elements beyond a

20     reasonable doubt.

21          First, that two or more persons conspired, or agreed

22     to commit the crime of vote buying.

23          Second, that the defendant knowingly and voluntarily

24     joined the conspiracy.

25          That's a summary of the charges.  Now let me mention

1    a few things about your conduct as jurors.  First, during the

2    trial, you are not to discuss the case with anyone or permit

3    anyone to discuss it with you.  Until you retire to the jury

4    room at the end of the case to deliberate on your verdict, you

5    are simply not to talk about this case.

6         Second, do not read or listen to anything touching on

7    this case in any way.  If anyone should try to talk with you

8    about it, bring it the Court's attention promptly.

9         Third, do not try to do any research or make any

10   investigation about the case on your own.

11        Fourth, do not form any opinion until all evidence is

12   in.  Keep an open mind until you start your deliberations at

13   the end of the case.

14        Finally, you will be allowed to take notes during the

15   course of this trial.  Your notes should be used only as an

16   aid to your memory.  You should not give your notes precedence

17   over your independent recollection of the evidence.  Also, you

18   should not be unduly influenced by the notes of other jurors.

19   Notes are not entitled to any greater weight than the memory

20   or impression of each juror as to what the testimony may have

21   been.

22        The trial will now begin.  First, the Assistant

23   United States Attorney will make an opening statement, which

24   is simply an outline to help you understand the evidence as it

25   comes in.  Next, the defendants' attorneys may make an opening

16

1    statement or may reserve an opening statement.  Opening

2    statements are neither evidence or argument.

3         The United States will then present its witnesses,

4    and the attorneys for the defendants may cross-examine them.

5    Following the United States' case, the defendants may, if they

6    wish, present witnesses whom the government may cross-examine.

7    There may also be some rebuttal testimony or evidence.

8         After all the evidence is in, the attorneys will

9    present their closing arguments to summarize and interpret the

10   evidence for you, and the Court will instruct you on the law.

11   After that, you will retire to deliberate on your verdict.

12        Following your verdict, there may be an additional,

13   brief proceeding.

14        Those are your preliminary instructions, ladies and

15   gentlemen.  As I indicated, I'll be giving you other

16   instructions throughout the course of the trial and at the end

17   of the proceeding as well.  At this time, we will proceed with

18   opening statements.  Mr. Smith, are you ready to proceed?

19        MR. SMITH:  Thank you, Your Honor.  Please the Court,

20   Mr. Parman, counsel.

21        Good morning, ladies and gentlemen of the jury.

22   Certainly want to take this opportunity to thank you for a

23   gruelling day yesterday.  I know that was exhausting on all of

24   you, but on behalf of the United States, I'm sure counsel for

25   the defendants as well, I appreciate your careful attention

1    and patience as we now reach the point which the Court has

2    described to you already as our opening statements.

3           I like to consider the opening statements kind of

4    like a road map.  As the Court has indicated, give you an

5    overview, an outline to kind of help you put into context

6    evidence that's going to come in the following days.  And as

7    the Court's already advised you, this case could take several

8    weeks to complete.

9           The Court's going to give, as you have already heard,

10   both sides an opportunity to speak to you before this evidence

11   begins.  And afterward, hopefully, you'll be able to determine

12   what the government contends happened and what these

13   defendants contend happen.

14          As you've already been advised, attorneys' statements

15   are not evidence.  These opening statements are not evidence.

16   Evidence is going to come from the witness stand and what the

17   Court advises you is evidence at the conclusion of the case.

18          And when we have a case such as this where there are

19   numerous defendants -- in this case, eight defendants -- it's

20   very important that we take careful observation of the rule of

21   law that says that separate consideration should be given as

22   to each of these defendants.  I ask that you do that as you

23   listen and evaluate and judge the credibility of the evidence

24   in this case.

25          You've already been made aware several times that the

18

1    defendants are presumed innocent, and it's my burden, the

2    United States, to prove the case beyond a reasonable doubt.

3            These defendants are presumed innocent, and we'd ask

4    that you keep your minds open until the conclusion of all the

5    case.

6            You've had an opportunity already to hear read this

7    indictment, and I'd like to take an opportunity to kind of

8    break it down into some smaller bits and pieces to kind of

9    give you an understanding of what these charges are in the

10   case.  And as I do, I'm going to refer at times to some of the

11   language that you've already heard read from the indictment,

12   and I'm going to use a couple of charts, and I hope that if

13   you can't see a chart, if you would please just let me know,

14   and I'll try to better situate the chart.

15           MR. RICHARDSON:  Judge, may we move around so we can

16   see?

17           THE COURT:  You can move around to the back of the

18   courtroom here.

19           MR. SMITH:  Ladies and gentlemen, as you have already

20   been made aware, Count 1 of this indictment names each and

21   every one of these eight defendants, as well as, as you can

22   see, Count 2.  These two are the two primary conspiracy

23   charges that are alleged to have been committed by these

24   defendants in this case.

25           The first thing about, of course, these conspiracy

19

counts is you've got to understand that in this conspiracy,

these power players that sought to control political structure

in Clay County in Manchester, Kentucky, took upon themselves

different roles.  The evidence will tell you that they came in

at different times.  Some of them came in early and dropped

out sometime in the middle.  Others came in later and then

followed it to its conclusion.

In Count 1, it obviously helps us to understand what

is this enterprise?  Because it's alleged that this conspiracy

in Count 1 involved an enterprise.  Simply stated, ladies and

gentlemen, the Board of Elections, the Clay County Board of

Elections is no different than any other in Clay County,

Kentucky.  All of our counties have the same statutory

requirement that an election that is fairly administered each

election year is going to be administered by a Board of

Elections.  And that is in each of the counties in Kentucky.

Clay County is no different.

But it's alleged in this conspiracy that a legitimate

entity -- there's no allegation here that everybody in Clay

County in the Board of Elections and all the election officers

were corrupt.  That's not the allegation in the case.

Manchester's a town of about 1,500, 1,600 people.  Clay County

is a small county, a very poor county with a lot of poor

folks.

This enterprise was developed in order to carry out a

1    scheme for unlawful purposes.  Vote buying.  You see, in Clay

2    County, in order to come up through the ranks, the evidence is

3    going to show that it required a plan to deal with the votes

4    that could be bought in Clay County.

5         Cletus Maricle, in an early interview, admitted to a

6    reporter that 30% of the votes could be bought in Clay County

7    in any given election.  In fact, what had to happen in this

8    case, in order to make this enterprise work, is that when you

9    have an election, you're seeking to control it by vote buying,

10   you have lots of money.  It's alleged in this case that

11   hundreds of thousands of dollars were pooled in any given

12   election, and certainly in 2002.  And during that time period,

13   that money was being put in the hands of people who were

14   willing to take bribes for their vote.  They go to Citizen A

15   and Citizen B, and they had lists that got developed over

16   time.

17        This enterprise was going to be key to the success of

18   the scheme to control the electoral process through this

19   illegal scheme of vote buying.  Because one of the problems

20   confronted, besides the FBI, the state investigators, was the

21   ability to make sure that when you have factions that break up

22   in this thing, and you're fighting one side against the other

23   to use the same enterprise, you had to make sure that money

24   you put in the hands of the voter, whether it be $20, $50, or

25   $100, whatever that ended up having to be to bribe that voter

1    to vote for your slate -- and that's another key term in this

2    case, a slate.  It's alleged that there were these slates, and

3    these slates were basically candidates who came to the table

4    and brought something to contribute.  Some brought money.

5    Some brought influence.  Some brought protection.  But all of

6    them had something to contribute to put their name on the

7    slate.

8         So when the voter was approached on the street to buy

9    their vote, whether it be $20, $50, or $100, they wanted to

10   ensure that that voter got into the voting booth and pulled

11   the lever for the slate of candidates who had ponied up, come

12   to the table.

13        So this legitimate enterprise, this legitimate entity

14   established by statute and supposed to be a check and balance

15   to make sure we have fair elections, that their votes were

16   cast and counted properly, and that there was no fraud going

17   on at the polls, they sought to corrupt that.  And it's

18   alleged that in the course of this conspiracy, they were able,

19   basically, to get election officers, corrupt them, recruit

20   them and corrupt them, and they would go inside the poll,

21   inside the voting booth with the voter under the premise that

22   they were assisting the voter.

23        You'll hear about voter assistance forms.  Very

24   important part of this case.  The voter assistance forms would

25   be required by law if you were, for instance, blind or legally

22

1     blind, could not see or if you were elderly, unable to follow

2     and accomplish the task.  But they would use this process in

3     order to, again, cover up what was going to be the scheme, and

4     that is take these voters who had been bought -- they were

5     promised and bribed an amount of money, $20, $50, $100,

6     whatever it was -- then follow them into the voting booth and

7     then make sure that they turn the lever for the slate of

8     candidates that had ponied up to the table and were part of

9     the group.

10         Now, this, of course, accomplished a lot of things.

11    One thing is is that what went on behind the curtain,

12    observers independently could not see what was going on.  Law

13    enforcement had a tough time detecting these kinds of acts.

14    And then after they voted them, then they would take them

15    then, shuttle them to a vote payer, who would then check to

16    make sure whether they had their ticket, sometimes a mark on

17    their hand, sometimes they would signify by a nod.  And in all

18    these instances, they would be sent over to be paid, and

19    they'd be checked off on a list.

20         And this, of course, is what we're talking about.

21    When we're talking about this enterprise, we're talking about

22    a legitimate entity, the Clay County Board of Elections.  By

23    statute, there's people who get appointed that are in these

24    categories.  There are two commissioners, one for the

25    Republican party, and one for the Democrat party, your county

1    sheriff and your county clerk.  Those are the four people that

2    make up this legitimate entity.

3            The evidence that you're going to hear is that they

4    corrupted the Board.  Defendant Freddy Thompson, the county

5    clerk.  Commissioner Mr. Wayne Jones, his father-in-law.  Once

6    you had the county clerk and once you had the Democrat

7    commissioner, you had control.  You had control over the Board

8    of Elections.  You had control over who got appointed.

9            You got control over making sure that where you had

10   the need -- now, there's 21 precincts in Clay County.  Not all

11   21 precincts were that important.  We're going to focus on

12   some that these conspirators thought were very important,

13   where hundreds of votes could be influenced by bribery.  And

14   when you take an election where maybe 3,000 votes is at play

15   to get you elected in a county-wide office, and as Cletus

16   Maricle says, if 30% of them can be bought in Clay County,

17   that's 900 votes that are up for play to be bought in any

18   election.

19           So this was a very important, very important part.

20   900 votes in a 3,000-vote election is extremely important.  So

21   you have in this instance a circumstance where a legitimate

22   entity is being used by this group at different times.

23           Now, it's going to be alleged that again there's

24   three major elections, 2002, 2004, 2006.  Now, did every

25   member of this conspiracy come together for each and every one

24

1    of those primary and general elections, for each of those

2    elections?  No, that's not going to be the evidence.

3         The evidence will show that at the time that they

4    needed it, they would go to the well and they'd draw from the

5    well.  You made your deposit.  In Clay County, you scratch my

6    back and I scratch yours.  When I do my favors for you and I

7    need you, I'm going to come back to the table and I'm going to

8    ask you to produce for me.  And you're going to hear evidence

9    from witnesses who said that's the way it works in Clay

10   County.

11        Now, of course, Count 2 names again all these

12   subjects in the money laundering conspiracy.  Now, money

13   laundering conspiracy.  Money laundering, you hear it used in

14   a lot of different contexts.  Maybe you're thinking of money

15   laundering in terms of big drug conspiracies.  That's not what

16   we're talking about.  The evidence is going to show that

17   essentially what happened is that money that came from those

18   interested pooled it together to vote for candidates who then

19   would be elected, who then would make sure that the business

20   people, the Morrises -- it's alleged, and evidence will be

21   produced to show that Bart Morris and Debbie Morris, married.

22   Bart operated a company, B&J Transport, a sanitation company,

23   locked up a contract with the City of Manchester for maybe ten

24   years, a lucrative contract, all by his controlling the

25   electoral process ensured that he got this contract.

1          So the money that was brought to the table up here

2     went into the hands eventually to voters, who then turned

3     around and made votes for candidates, who then turned around

4     and returned those contracts.  You scratch my back, I scratch

5     yours.

6          Money that's pooled together up here eventually

7     through financial transactions -- it's pooled up here with the

8     intent to bribe voters, by the way.  That's why it's pooled.

9     It's pooled together with the intent to bribe people.  And

10    then when it's put in the hands of the operatives and finally

11    in the hands of the voter, it's then turned into contracts.

12         Stanley Bowling, owner of B&B Excavating.  Lucrative

13    contracts in water line projects.  Again, how do we get those

14    contracts?  City mayor, City Council vote to approve these

15    things.  How do we influence them?  You scratch my back, I

16    scratch yours.  I'm out there doing the work, I'm putting the

17    money in the hands of the voters and bribing those people.

18    When it comes up time for my contract, it's going to get

19    awarded to me.  You scratch my back, I scratch yours.

20         We go forward, as I said, with the indictment, it's

21    alleged in this racketeering conspiracy and this money

22    laundering conspiracy and in this extortion count that this

23    enterprise and this conspiracy affected interstate commerce.

24    And the evidence will show that during the course of this

25    conspiracy, those contracts, for instance, that were being

1    approved by the City Council and the mayor, some of those

2    contracts were funded by federal dollars.

3         Some of those contracts, of course, were up for bid

4    for people to be competitively bid.  You see, the citizens of

5    Manchester and Clay County were due fair and honest public

6    servants.  When you put up a dollar for a contract, it ought

7    to be a fair bidding process to get the best bargain for the

8    public.  And in this situation, not only do we have federal

9    elections that are involved in every one of the 2002, 2004,

10   2006 -- Congressional Fifth District, Congressman Hal Rogers

11   and those who sought to find a position in that office ran in

12   those elections.  And again, you got federal offices at stake.

13        You got an interstate commerce element in this thing,

14   and interstate commerce is affected, it will be shown, PRIDE

15   money.  It's another federal grant.  Bart Morris and his

16   company sought to control money that came through the PRIDE

17   program.  That's federal dollars; and again, affecting

18   interstate commerce.  We'll be talking again about the

19   evidence as that goes along.

20        Counts 3, 5, 6 and 7.  You've heard those described

21   to you.  It's called mail fraud.  It's alleged that during

22   these election cycles, 2004, 2006, that the county clerk,

23   Freddy Thompson, and the commissioner, Wayne Jones, committed

24   mail fraud.

25        Now, it's essential that in each of these substantive

27

counts that you remember that again, what's the conspiracy
about?  Conspiracy is that, again, the members agree that
we're going to work together to use the enterprise; that is,
the Board of Elections and its election officers, to perfect
this illegal scheme to buy votes.  And so they're going to
ensure that it happens.

And they knew, it's going to be shown to you, that it
was -- the group all understood that in order for a candidate
to actually be in office and be able to award those contracts
at the end, they had to be certified.  Who certifies?  It's
the Board of Elections.  And who were the two key members of
the conspiracy that signed off on those each and every time?
County Clerk Freddy Thompson, Commissioner Jones.

Now, as a part of the conspiracy, the defendant
doesn't have to commit those overt acts.  They don't have to
be the one that signs off and certifies those results, knowing
that they're corrupted.  But if a conspirator agreed that
another would commit at least two or more of these acts of
racketeering, it's sufficient.  The evidence is going to be
shown that hundreds of voters were bribed.  Hundreds of acts
of bribery.  And all those who pooled hundreds of thousands of
dollars together knew when they pooled that money together
that it was going to be used to buy votes, and the going rate
for votes was 20, 40, 50 dollars.

And so again, we have Counts 3, 5, 6 and 7 that

1    basically speak in terms of this scheme and that these

2    defendants named -- again, not all the co-conspirators are

3    named in the substantive acts, but it's alleged that as part

4    of the conspiracy, it was understood this was going to be a

5    requirement, that they have to commit these acts.

6            Documentation, certification of these elections

7    occurred, as I told you, in both primary and general

8    elections.  And although this is a bad copy, and I apologize

9    for that, you'll get an actual copy of the record from the

10   public record to view in our case that we present to you.  But

11   in each of these, these certifications of election results

12   were made by, as alleged, we believe the evidence will show,

13   Freddy W. Thompson and Charles Jones, the commissioner.  There

14   are two others you're going to hear about that were also

15   signing off on those.  And that, again, was the Republican

16   commissioner and also the sheriff in the county.

17           And obviously, as you're going to hear about in this

18   case, the 2002 sheriff was Edd Jordan, and he is an unindicted

19   co-conspirator.  He's someone that was involved in this but

20   hasn't been indicted yet.  So we have unindicted

21   co-conspirators, and there's going to be many that you're

22   going to hear about.  Not all of the players that were

23   involved in this conspiracy are seated here together.  They're

24   not all here.  Some of them are unindicted.  Some of them have

25   been convicted on other charges and are going to cooperate and

1    you're going to hear from them.

2         In 2006, again May and November, again those

3    certifications would have been made and would have been signed

4    by the county clerk and Commissioner Jones in each of these.

5    And these two, of course, charts here show what that's going

6    to look like.  And I again apologize for the quality.  Did not

7    transmit.

8         Count 4.  Count 4 is an allegation that there was an

9    attempt to extort.  And basically, Count 4 alleges that the

10   election officer, William, also known as Al Man Stivers, who

11   is a close associate of Cletus Maricle, who is also a close

12   associate of Commissioner Jones, that this person, William "Al

13   Man" Stivers, along with another named in Count 4, Charles

14   Wayne Jones, Commissioner Jones, that they aided and abetted

15   each other in the commission of, again, an act of an attempt

16   to extort money.

17        And again, what does that mean?  That means, again,

18   taking money that's not rightfully theirs.  They're in a

19   position of election officers, and the evidence will show that

20   a woman by the name of Carmen Webb Lewis, who was running for

21   City Council for the first time, she was out trying to seek

22   the office and in the course of that ran into two people,

23   Commissioner Jones and Election Officer Stivers.  And they

24   came to her and basically told her, you pay to play in

25   Manchester.  That's the way City Council works.  You pay at

least a thousand dollars to us, we make sure you get the votes, and you get the office.

They came to her multiple times, her and her husband. And in the course of that, she refused. She refused to pay that. In an election which, again, you'll hear about, there were openings for eight seats, she narrowly won by four or six votes to get the eighth seat, despite not paying to play with the attempt to extort money from her, again by the two election officers, Commissioner Jones and Officer William "Al Man" Stivers.

And again, affecting interstate commerce, as we have talked about.

Counts 8 and 9 are obstruction. Again, part of the racketeering conspiracy in this case, you know, again you have a situation where this spanned from 2002 to 2006. And in the course of that, it's alleged that these conspirators had as part of the conspiracy that was involved, they not only had the intent to commit multiple acts of bribery, multiple acts of mail fraud and honest services fraud, multiple acts of -- or at least an act of extortion that we have already mentioned, but also obstruction of justice. The cover-up to protect the sanctity, to protect the group.

And as a part of that, it's alleged that in Counts 8 and 9, that at the times alleged, that those individuals named individually actually committed the crime of obstruction of

1    justice.

2         And I believe we have reference to Count 8.  And in

3    that count, it's alleged that from a date about May the 2nd,

4    2007 through May 17, 2007 that Russell Cletus Maricle, one who

5    is alleged to be a political boss, an associate -- you see, as

6    you read the indictment, it's read to you that there's members

7    and there's associates.  Those are other key terms.

8         Thinking about RICO conspiracy, you don't have to be

9    a member of the Board of Elections to be guilty of the

10   conspiracy if you're an associate.  If you're Doug Adams,

11   superintendent of schools, and you're Russell Cletus Maricle,

12   the circuit judge, it's alleged in this case that they were

13   associates.  They weren't members.  They weren't the Democrat

14   or the Republican commissioner.  They weren't on the Board.

15   They weren't serving at the polls as an election officer,

16   either as a judge -- there's two judges, there's one sheriff

17   and one clerk that serve to protect and, again, administer

18   those elections fairly, make sure everything in the rules are

19   followed.  That wasn't their role.  They were playing the role

20   of director.  Controlling the strings, pulling the strings.

21        And as they are alleged again to have been a part of

22   the conspiracy as associates, as part of that again comes the

23   cover-up.

24        The investigation, we're going to talk about that in

25   just a few moments, about the FBI investigation, how it got

32

1    started and how it progressed.  But toward the end, it was

2    through two cooperators that they began to, again, tape

3    meetings with Russell Cletus Maricle and William Stivers and

4    Commissioner Jones and others of these defendants.

5         During the course of those recordings, it was brought

6    to the attention of the defendants that there was a grand jury

7    investigation ongoing.  In fact, one of these witnesses told

8    them she was under subpoena, and she went to Cletus Maricle

9    and she went to William "Al Man" Stivers, and it is alleged

10   that they aided and abetted each other in corruptly

11   influencing the grand jury investigation by corruptly

12   persuading and attempting to persuade this witness to testify

13   falsely.

14        Count 9, again Freddy Thompson, brought before the

15   grand jury, alleged on July the 12th, 2007.  Those important

16   voter assistance forms, he was ordered by subpoena to bring

17   those to the federal grand jury.  Bring those records.  When

18   those records, the FBI will tell you in their analysis, showed

19   up, many of those voter assistance forms that were filled out

20   by some of the election officers were not there.  And also,

21   those records from Manchester, that key, one of those key

22   precincts, not there.

23        Required by law to keep them for over 20 some -- 22

24   months, I believe, is required by law.  And within that time

25   period, a federal grand jury subpoenas those records to him,

1     and he again says I don't know where they are.  As far as

2     those Manchester records, I can't explain it.  This computer

3     printed this out, and it's not there.

4           It's alleged again that this was an act to corruptly

5     influence, obstruct a federal grand jury investigation

6     ongoing.

7           Counts 10 and 11.  Counts 10 and 11, I think, are

8     simply focusing on the 2006 election.  Because the 2006

9     election, as the investigation we're going to talk about, that

10    brought those cooperators, those within the inner circle,

11    those that were part of this conspiracy, some inside help came

12    about.  And in the course of that, they were able to flesh out

13    and expose what had gone on in 2006.  And part of that was,

14    again, a two-fold conspiracy in 2006, because of, again, the

15    active federal investigation going on in Manchester, a small

16    town, Clay County, a small county, there were again

17    adjustments made by the group.

18          See, in 2002, while it worked appropriately for the

19    enterprise as the election officers were corrupt and

20    recruiting those corrupt officers to play a part in this, it

21    was wide open.  The evidence will be that voters were lined up

22    in lines who had been bought and bribed by the group.

23          And in the course of 2004 and 2006, the federal

24    investigations began to become very obvious in town.  The

25    group had to change their methods.  And one of the things that

34

1    was alleged in 2006 is that they engaged in vote stealing.

2    Vote stealing.  Election officers who were supposed to be in

3    there protecting and promoting a just and fair election were

4    actually going on -- and they were coached.  It's alleged that

5    Freddy Thompson, county clerk, Commissioner Jones coached

6    these election officers on how to steal the votes.

7         Manchester, for the first time in May of 2006, was

8    introduced to a new technology for voting.  It's an electronic

9    machine that was selected in part, presented I believe to the

10   fiscal court shortly before the election in 2006.  And those

11   who had sought to figure out a way to ensure that they still

12   could get the votes and to promote the slate -- at this time

13   in 2002, evidence is going to be that Doug Adams orchestrated

14   the slate for at least one part of the faction.  Jennings

15   White, the sitting county clerk, was on the other side, and

16   they were opposed to each other.  Again, vying for use of the

17   enterprise.  Jennings White, you're going to hear, is already

18   convicted in a money laundering scheme.  He's going to

19   cooperate and testify.  He is an unindicted co-conspirator.

20   He's, again, part of the overall conspiracy to use this

21   enterprise.

22        And the enterprise, within that course of 2002, saw

23   them pitted against each other.  Jennings White vying for his

24   control, continuing to keep his control over Clay County.

25   Doug Adams fighting him with his organized effort with Wayne

35

1    Jones and Al Man Stivers.  And that happened in 2002.

2         2004, again, control relented over to Doug Adams.

3    Jennings White got beat.  He lost his hold on Clay County.

4    Got beat at his own game.

5         And then in 2006, Russell Cletus Maricle, the circuit

6    judge, sought to get his son-in-law elected as PVA, and he

7    injected himself completely and wholly into this thing and

8    began organizing this scheme again, it's alleged, to steal

9    votes.  These election officers sent to Freddy Thompson and

10   Charles Wayne Jones, they would then coach them on how the

11   process worked.  Nobody was familiar with this machine in town

12   so they had a duty to educate people.  Unfortunately, they

13   abused that authority.  They began to teach corrupt election

14   officers on how to steal votes.

15        And simply, the way the plan worked was that the

16   voter would be brought into the voting booth.  And in this

17   voting booth, they had an electronic machine in which the

18   voter had to press the "cast vote" button twice.  The election

19   officer would distract them, confuse them, influence them to

20   leave early, go back and review it and make sure they voted

21   for Phillip Mobley.  If they voted for Phillip Mobley, they

22   were okay.  They wouldn't change it.  If they didn't, they'd

23   change it to vote for Phillip Mobley they way Cletus Maricle

24   told them to.

25        They had other candidates that were involved in the

36

1    pooling and in the slate.  They had Republican Charles Dobber

2    Weaver on the Republican side and Wanda White, the Democrat,

3    on the other, both working together pursuant to this illegal

4    scheme, plan to steal votes.

5         The other count is vote buying.  Again during that

6    election cycle in 2006, they continued to buy votes.  You're

7    going to hear from voters.  You're going to hear from people

8    who actually sold their vote.  They're going to come in here

9    and they're going to tell you, yeah, I sold my vote.

10        These people that you're going to hear from, they're

11   poor people.  They're uneducated in many instances.  These

12   people that you're going to hear from weren't new to vote

13   buying in Clay County.  In fact, they grew up thinking that's

14   just the way it is.  Thinking that that's the way the rest of

15   the country -- that's just the way it is.  It's Clay County.

16        Now, the investigation in this case, the

17   investigation in this case has to go back many years, because

18   as the evidence is going to show, the FBI attempted to start

19   an investigation into the election fraud in Clay County as

20   early as 2002.  Seated here at the table is Special Agent

21   Timothy Briggs.  He eventually ended up with the case.  He

22   wasn't the original case agent.  Two other case agents worked

23   on the case before him.

24        They actually got the records in 2002 from the county

25   clerk's office.  At that time, not controlled by Freddy

37

Thompson.  Freddy Thompson got the seat in 2002, didn't take

over office until after that subpoena came.  That subpoena

went to an unindicted co-conspirator, Jennings White.

But at that time, the FBI in their investigation

found themselves lacking.  Lacking in cooperation.  Records

without witnesses to tell you what those numbers meant

resulted in no charges.

So the investigation by the FBI was continuing in

Clay County, but the investigation in Clay County was consumed

and became to be totally focused on the drug culture.  A

county so poor, but yet you're going to hear it is a county

that was prolific, filled with drug using, drug dealing, drug

trafficking, and marijuana growing.

Cletus Maricle, in his interview, told the press that

in his opinion, drugs in Clay County was a major significant

part of the whole economy.  Actually drove the economy in Clay

County.  That interview took place in 1989.  The FBI, in 2002

and the years following, '03, '04, '05, '06, found that to be

true.  Clay County was completely filled with drug

trafficking.

Investigation actually resulted in over 60 subjects

during that time period being convicted of federal drug

trafficking charges and related charges and corruption.  The

investigation followed and centered upon one of the key

figures in Clay County in 2005.  Former manager of a

1    successful business called White's Chevrolet in Manchester,

2    service manager, Republican commissioner of the Board of

3    Elections, Kenneth Day.

4            Kenneth Day had developed one of the most successful

5    drug trafficking businesses in the whole entire region,

6    centered in the heart of Clay County.  Kenneth Day was

7    convicted of trafficking millions of dollars in drugs;

8    marijuana, cocaine, methamphetamine.  Openly using a pawn shop

9    in the little community of Burning Springs, a place where

10   Cletus Maricle and Douglas Adams got their start.  It was

11   there that Kenneth Day became one of the most prolific drug

12   dealers in the entire area.

13           Using the pawn shop as a front, the FBI had to

14   utilize other means, including they found a way in which they

15   could get court authority to listen to the phone conversations

16   and found out that Kenneth Day was, in fact, a kingpin in Clay

17   County, operating wide open without regard for local law

18   enforcement.

19           Evidence will show that he had numerous associations

20   and relationships to ensure his success.  That success was

21   shown to be consistent for years in the '90s, before he was

22   ever caught the first time.  He wasn't caught in Kentucky.  He

23   was caught on a trip to South Florida to pick up eight

24   kilograms of cocaine.  He made a bad call.  Kenneth Day

25   slipped up, got caught, had to go to prison.

39

1          Up until that time, Kenneth Day was the Republican

2     election commissioner.  He was on the Board.  He was the man.

3     Kenneth Day had control.  He had influence.  He had Cletus

4     Maricle.  He had Douglas Adams.  He had Jennings White.  He

5     had the sheriff, Edd Jordan.  Kenneth Day was looking good,

6     till he got caught in Florida.

7          Kenneth Day then serves his time, pays his debts,

8     comes back to Clay County around 2001 and 2002.  He doesn't

9     miss a beat.  Goes into a newer pawn shop.  It was wide open.

10    The FBI is able, in 2005, to bring down Kenneth Day and about

11    14 others in his group.  People who were eventually caught up

12    in this conspiracy went to the southwestern United States,

13    Arizona, Texas, people supplying him tens of thousands of

14    pounds of marijuana.  He pled guilty to thousands of pounds of

15    marijuana, serving a lengthy 18-year sentence.  The FBI got

16    his cooperation, signed a plea agreement, agreed to cooperate

17    with the federal government and testify truthfully if called

18    upon to testify later in any proceedings.

19         One of Kenneth Day's main political pals and main

20    sources of influence was Jennings White.  Jennings White, of

21    course, had been defeated in 2002, so Jennings White was still

22    influential, very wealthy.  Businessman, operated games

23    machines for Wal-Marts throughout the east coast.  Had a huge

24    business.  Lots of cash.  Kenneth Day got him to agree to

25    launder some of his drug money.  Jennings White got convicted

40

1   with the federal investigation.  Jennings White is serving a

2   lengthy prison sentence.  Jennings White also signed an

3   agreement with the government to cooperate, testify

4   truthfully.

5            This organization, of course, had wide scope, many

6   years.  The investigation continued because the FBI, in its

7   focus investigation, knew that this drug environment, these

8   open drug dealers, these pawn shops covering up an open drug

9   market that sells millions of dollars of drugs a year out of

10  Clay County, there had to be something more to this, and they

11  continued to pursue and investigate and get cooperation and

12  found out in their investigation that drug dealers had

13  relationships with these politicians.

14           First politician that came to be convicted in Clay

15  County was the mayor.  Over 30 years, he'd served as mayor of

16  Clay County and his name was Daugh White.  He's affectionately

17  known in Clay County as Doug.  You'll hear about Doug.  Doug

18  White followed the footsteps of his father, longstanding

19  tradition in the White family, Clay County, Manchester.  Very

20  prominent family.  Owners of -- co-owners of White's

21  Chevrolet, one of the most successful, long-time businesses in

22  Clay County.  Chevrolet dealership right in the center of

23  town.

24           The FBI had found out in the course of their

25  investigation another prominent prolific drug dealer in Clay

County, known as Bobby Joe Curry, set up in one of the small

hollers outside of Manchester.  In the course of their

investigation, found out he was trafficking in multiple

kilograms of cocaine, pills, openly working this out for

years.  Again, believed to be by the protection of police.

Investigators found out in the course of this case

that, in fact, that was going on.  It was pled.  Vernon

Hacker, 911 director, city councilman and employee of Doug

Adams at the school board.  Vern Hacker and the police

assistant Todd Roberts, working to protect drug dealers.

Vernon Hacker admitted to this; that he, in fact, had given

Bobby Joe Curry calls before police would come with search

warrants, protecting him.

Todd Roberts pled guilty, the assistant police chief,

to corruption, racketeering, conspiracy.  He admitted that

he -- the motivation, of course, to protect this drug dealing

was that in 1999, they got the drug dealer to burn down a

building in town so they could build a new police 911 center.

And in the course, the mayor got caught in that as

well.  He pled guilty.  Doug White, Daugh White, he pled

guilty to racketeering charges.  In his case, both he and his

son, Kennon White, pled guilty to charges of corruption,

racketeering and in their case admitted to conduct of

basically using private driveway paving to get voters to vote

for them in the election, covering it up through a mail fraud

42

1    scheme by sending out false invoices, trying to show that
2    actually the voter was actually paying for these things.  They
3    tried to cover it up to show when the state auditors came in
4    to uncover it, they tried to cover it up with these mailings.

5          And then, of course, Kennon White also pled guilty to
6    extortion.  Kennon White, as the investigation uncovered in
7    about 2007, Kennon White was probably one of the later
8    members.  I guess he's one of the younger members of the
9    conspiracy, in this racketeering conspiracy.

10         The FBI got -- again, when he was brought to answer
11   those charges that extended out of his involvement of city
12   manager, and he got this job by his father's influence and
13   others influence, direction of Cletus Maricle.  He took the
14   position of -- really it's a position that was not a position
15   in Manchester.  They called it city manager.  In that
16   relationship there that he formed in that position of
17   authority, he was able to steer and to control contracts and
18   extort from others who were contractors money.  Kickbacks.  A
19   kickback scheme.

20         Kennon White became the FBI's first opportunity,
21   again without records alone, which records showed that those
22   absentee ballots down in Clay County, Manchester were out the
23   roof in 2004 and 2006.  Five, six hundred people signing up to
24   vote for early voting, saying that they were going to be out
25   of town and they were running through.  So the FBI had reason

43

to, obviously, be looking at the situation.  They had Kenny
Day and Jennings White to tell them about their involvement
and how they were involved in the election scheme and how
these folks were involved in it.

So it was in 2007 that Kennon White gets prosecuted,
and Kennon White brings to the table his cooperation.  And
along with him, he brings his wife.  And the FBI took these
two individuals, Wanda White and Kennon White, and began to
talk to them and understand that they had, in fact, been a
part of this conspiracy since 2002 itself.

Kennon White again in his testimony will tell you
that in 2002, he was a young man who sought a position of
county office, and he sought the position of jailer.  He came
to that only after meeting with Doug Adams.  Doug Adams was
the man who first Jennings White, Cletus Maricle, those were
the power brokers in Clay County, according to Kennon White,
and those were the people who you had to have involved if you
were going to be successful in Clay County in politics,
according to Kennon White.

And so it was in this 2002 election that Kennon White
and his wife, Wanda, got an education about politics in Clay
County, one that their father, who had been in politics for 30
years, probably shared with them in part but not in whole
about how it really worked.

First off, Kennon White, to go for his first advice,

1   he went to Jennings White.  Jennings White, of course, was

2   being opposed, knew the opposition was coming so he

3   discouraged Kennon White from running for office.  Doug Adams

4   encouraged him.  Kennon White will tell you that Doug Adams

5   said bring me 60, 70 thousand dollars, pool it in here with

6   us, and we'll get you elected.

7        Paul Bishop was one of those individuals that sought

8   in the investigation to cooperate as well.  He pled guilty,

9   and he gave testimony and will give testimony, rather, I

10  expect, to tell you that in 2002, that Doug Adams called a

11  meeting.  The meeting was at his house, at Paul Bishop's.  It

12  was at that meeting that Freddy Thompson, Charles Wayne Jones

13  and Al Man Stivers came together for some final decision

14  making that had to go on with the group.  That was what to do,

15  how to spend and where to put the money.

16       During that meeting, Paul Bishop will tell you that

17  hundreds of thousands of dollars were brought in by people

18  like Roy Morgan.  Roy Morgan, another unindicted

19  co-conspirator who was running for judge executive.  Yancey

20  White, lawyer in town.  Clay Bishop, county attorney.  All

21  these folks came together with Doug Adams at Paul Bishop's,

22  and they put together hundreds of thousand of dollars -- maybe

23  150, maybe 200,000 are the estimates -- for the purpose of

24  buying votes.

25       Kennon White was offered an opportunity to join in

45

that.  Kennon White will tell you that he was torn, because
Doug Adams assured him, look, I'm superintendent of the
schools.  I've got control over about 900 employees in the
county, the school board and as the superintendent of schools
and all employees that we have.  We're going to put together a
slate.  Jennings White's out.  You want on the slate, come
join my team.

So again, there's these factions forming.  Kennon
White's been there.  He's feeling -- he's being torn.  And
then, of course, has discussions with Jennings White.
Jennings White was trying to discourage him.  He said, look,
you're going to get us all beat.  Don't run.  Kennon White
took -- couldn't resist that opportunity.  He went to Cletus
Maricle, and Cletus Maricle told him run.  We'll do what we
can.

Kennon White then got in between two factions, the
Adams faction and the White faction, and he came up a loser.
He lost that election.  He put his money, instead of in the
hands of Doug Adams, he took his money to Jennings White.
Jennings White used whatever bit of his organization was
working together and using those officers that he had control
of, using that same enterprise.  Again, that same enterprise
being a legitimate entity, the Clay County Board of Elections,
using those officers to control, make sure those voters vote
for who they want to.  Of course, that created a great amount

1    of conflict, as you can imagine, in Clay County.

2           You'll see some photographs.  Assistant chief Todd

3    Roberts, who was a known loyalist to Jennings White, took

4    photographs downtown where early election voting was going on.

5    You'll see photographs of the lines and the people like the

6    jailer, Charles Marcum, who Paul Bishop said brought a bag or

7    a box of about $10,000 and shelled it out on the table to Doug

8    Adams at that meeting.

9           That 2002 election, there was a lot of stuff going

10   on.  People were flocking in to town, lines were being formed,

11   and people were being shuffled in and out, sheriff being

12   called out.

13          One of the witnesses you're going to hear from was

14   actually a late, kind of a late comer.  His name's Jeff

15   Farmer.  And he's one of many people -- you're going to hear

16   from a lot of different people who were playing parts in this

17   2002 election.

18          It's interesting, Jeff Farmer, he's now employed, got

19   a good job and trying to raise a family.  He had a checkered

20   past.  He got caught up with some drug abuse situations and

21   drug use, and he found a home for a while with William "Al

22   Man" Stivers and his brother Charles.

23          Jeff was kind of needing a place to stay, and they

24   made a place for him.  And this happened to be right during,

25   at least in part during the election.  He was approached by Al

47

1    Man Stivers and a fella by the name of Randy Craft.  And

2    you'll hear from him as well.  He's an election officer, one

3    of Doug Adams' school board employees.

4          Randy Craft was, along with Stivers on that date, he

5    approached Jeff and he asked him if he could come help in the

6    election.  So he later met up with Commissioner Jones, Wayne

7    Jones, and Mr. Jones had a conversation with him and said, I

8    need you to help our slate.  Doug Adams and Al Man Stivers,

9    who met with Doug Adams that night at Paul Bishop's, they knew

10   who the slate was.  The slate was Freddy Thompson.  Freddy

11   Thompson is going to be the man.  That's my son-in-law.  He's

12   going to be the county clerk of Clay County.

13         So Jeff was, he was persuaded.  Okay, who else do I

14   have to work for?  Well, there's some other people.  Let's put

15   some money up here.  Roy Morgan, now don't forget Roy Morgan.

16   Roy Morgan put money in here.  He brought it to Doug Adams.

17   Don't forget him.

18         And then Charles Marcum, of course, he's the man that

19   brought the box or bag, poured it on the table, Paul Bishop

20   told us about.  Don't forget him.

21         What you're going to do, Jeff, is you're going to go

22   out there and you're going to help us in this election, and

23   you're going to go right in the heart of Jennings White's

24   stronghold.  We're going to send you where Jennings White's

25   got a hold in this county.  That's over at Horse Creek.  We're

48

1    going to send you right down there to Horse Creek, and we're

2    going to put you to work, Jeff.  You're living out here with

3    Charles.  Me and my brother, we got a job for you to do.

4    We're going to send you to Horse Creek and try to offset

5    what's going on.  Jennings White has the election officers

6    over there.  We can't get to them.  So we're going to make you

7    a challenger.  That's provided, under law, a party can send a

8    challenger.  They sent Jeff Farmer as the challenger.

9         So he went over to the Horse Creek precinct.  Sure

10   enough, he said they were wide open.  Jennings White had them

11   lined up.  He said it was like David versus Goliath.  He said

12   I was the little man.  There's Jennings White and his

13   organization, they were full power, going at us full steam.

14   We had to do something.  So Jeff began working, and he started

15   trying to find all those voters that he rounded up.

16        See, Doug Adams was real good.  He's a hands-on man

17   in 2002.  You know, he's superintendent of the schools, but

18   now he didn't let that stop him in 2002.  He got to grab hold

19   of the reins, and he took Commissioner Jones, and he took Jeff

20   Farmer, and they went house to house, and they'd have lists.

21        Jennings White provided the FBI some lists that he

22   had.  They'd been passed on to Kennon White and passed around

23   in Clay County.  They had lists.  They knew these poor

24   families up in these hollers that they could go to year in,

25   year out.  They knew who would sell their vote if they paid

1    them enough money.

2        Sometimes they'd get in bidding wars.  Kenny Day will

3    tell you in the '80s when he was up there serving the

4    organization, Doug Adams and Russell Cletus Maricle,

5    Republican and Democrat judges, supposedly, in there actually

6    working together as Kenny Day hustled them up, the drug dealer

7    bringing them in, lining them up.  Pay to play, boys.  How

8    much is it gonna take?

9        Before they got on sides, Kenny Day said in '83, I

10    believe it was, he was actually, he and Doug Adams were

11    against Russell Cletus Maricle in one election over at Burning

12    Springs, and they were lined up against each other, and a

13    bidding war took out.  Sure enough, they started bidding on

14    the voter.  Kenny Day will tell you that it got up to $800,

15    and to beat Cletus Maricle he went ahead and bid that so he

16    could get that vote.  I'm going to bribe you with $800, if

17    that's what it takes.  Power play.  Show who's got the

18    strength, who controls this county.

19        Jeff Farmer said that Doug Adams rolled up his

20    sleeves and went to work in 2002, and he and Commissioner

21    Jones and Mr. Al Man Stivers, they took a little ride around

22    town and in the county.  They went to the precincts to visit

23    voters.  Jeff Farmer will tell you that they hauled those

24    voters in.  They offered about ten dollars a head if you would

25    be a vote hauler.  And that's kind of the way this thing, you

1   know, it started and just keeps on going.  That's the way a

2   racketeering enterprise does, you know.  It gets -- it seeds

3   itself.  It gets a grasp on a group, and it's going to

4   continue and continue till somebody stops it.

5           And that is, again, when we look at this chart here,

6   kind of helps me explain it.  Kind of like Jeff Farmer would

7   tell you.  Look, you get these meetings together, and you come

8   to an agreement about who is going to be on my slate.  And

9   you're going to have to have all -- you're going to have to

10  have some people handling the money.

11          So what we do is we line up people like Stanley

12  Bowling, Debra and Bart Morris.  Witnesses say that Debra

13  Morris was sitting right there with a list.  The list I was

14  telling you about, very important to this group, because they

15  wanted to make sure not only that they weren't getting cheated

16  by the voter, they had the election officer in there, see,

17  insurance.  Make sure that I paid this man $50, $100, they're

18  not going to be cheating this group.  My organization, my

19  group's got it together.  We're going to make sure you pull

20  the lever.

21          But there was another issue.  That's the vote hauler.

22  See, a lot of these people were so poor, they didn't have a

23  way out.  They had to get somebody to haul them in.  You know

24  what they did?  They'd take these people and they'd run them

25  through.  Run them through the hands of Stanley Bowling, Bart

1    Morris, Paul Bishop, Mike Hooker.

2            Now, again, a conspiracy, a racketeering conspiracy,

3    when you're dealing with an organization like this, it has

4    factions, okay?  They'll split in and they'll split out.

5            Interesting enough, evidence will show that Stanley

6    Bowling and Bart and Debbie Morris were actually on the

7    Jennings White team in 2002 but came back in the fold in 2004

8    and 2006.  You could count on them.  They had a lot of

9    influence over that City Council.  City Council knew you

10   didn't get elected in Manchester unless you paid to play, just

11   like Commissioner Jones and Al Man Stivers told that up and

12   coming Carmen Webb Lewis, who later became the mayor.  Told

13   her she better pay to play.

14           Who do you pay?  You put the money, that hundreds of

15   thousands of dollars you put on the table, you put it in the

16   hands of people who could make and shake.  In this 2002

17   election, we had, again, factions forming.  Jennings White

18   here on one side, he and Sheriff Edd Jordan working together

19   over here.  Over here on this side, you got Doug Adams and

20   Commissioner Jones and Al Man Stivers working themselves down

21   through here.

22           Cletus Maricle, of course, sitting back here and

23   watching.  Waiting for his turn.  He knows when he needs it,

24   he's going to go to the well.  He's going to draw on that well

25   in 2006, when his son-in-law is needing an office.  He's

52

1    unopposed.  He doesn't have any opposition.  How do you get

2    that powerful?  Kenny Day's going to tell you.  Kenny Day will

3    tell you when he testifies that Cletus Maricle was one of the

4    influencing members of him becoming the Republican election

5    commissioner of Clay County.  That Roy Morgan, that unindicted

6    co-conspirator, Roy Morgan came to Kenny Day and said I want

7    you to be the Republican election commissioner in Clay County.

8         Just so happens, Cletus Maricle is looking to be

9    circuit judge in the county.  Kenny Day is told by Roy Morgan,

10   first order of business is you go to Cletus Maricle and you

11   let him pick the election officers.  And that's what he did.

12   Cletus Maricle beat Oscar Gayle House in that election in

13   1990.  He's not had a lot of competition since.  In fact, I

14   don't know that he's had any, according to the evidence.

15        So we put this money in the hands of these folks.

16   Some of these indicted, some of them are unindicted.  Mike

17   Hooker, who's that?  That's one of the great friends of Doug

18   Adams.  He's in the family.  He's running for magistrate.

19   He's going to operate out of the store out there where Doug,

20   Paul Bishop and them all get together and plan these things.

21        Mike Hooker is going to be here hustling voters.

22   He's going to call into Paul Bishop.  See, Paul Bishop, a lot

23   of things when you control the Board of Elections, you control

24   who serves, you control where they serve, and you control when

25   they serve.  You're going to hear evidence in this case,

53

1    there's one election officer named Glenn Rowland, he gets a

2    call in 2004, he's going at 6:00 in the morning, he's there

3    early, 5:00 something in the morning to serve.

4         2002, he reported some wrongdoing up there.  2004,

5    Mr. Al Man Stivers comes with Mr. Commissioner Jones and said

6    man, you're not serving today.  You go home.  He said, what

7    are you talking about, go home?  He said, I'm not going home.

8    He said, I'm gonna call the county clerk.  I'm gonna call the

9    county clerk.  Picks up the phone.  He calls the county clerk,

10   son-in-law Freddy Thompson.  What's he tell him?  There's been

11   a mix-up here.  You need to go home.  We'll pay you, but

12   there's been a mix-up.  You go on home.  They put their man in

13   there.  Buying votes.

14        That's how it worked.  You got to have the money

15   handlers.  You got to have the election officers, then you got

16   to have the vote haulers to get them out of the hollers.  Then

17   you got to bring them to the voting booth, and then you got to

18   make sure they get paid.  That's where Bart and Debbie come

19   in, Stanley.  They're down there working at the end of the

20   day, they've got to be paid.  Now, you don't pay them normally

21   on the front end, because these people are untrustworthy.

22        These people, you're going to hear, are drug addicts.

23   They got drug problems.  That's the oil that makes the

24   machinery work in Clay County.  You use those people.

25        Those are the ones that you can control.  Look,

54

1    Cletus Maricle said thirty percent's up for bids every

2    election, and we got to get out there and get those votes.  We

3    can buy them.  We can bribe them.

4         So they goes to these people, they have to haul them

5    out of the hollers, bring them down to the election poll.

6    They turn the lever to ensure they vote for the slate.  Then

7    they're sent sometimes -- you're going to hear different

8    things.  I mean, I'm not saying that there's a consistent

9    pattern about how they marked these voters.  Some of them got

10   a carnival ticket, tear it in two.  They take it to Bart and

11   Debbie's and some of these other people.

12        Darnell Hipsher, another city councilman convicted in

13   the corruption scheme in 2006 by the FBI; Randy Craft, school

14   board employee of Doug Adams; Paul Bishop, of course, more

15   involved in 2002 and 2004; and then Bart and Debbie in 2002,

16   2004 and 2006.  Again, the same people.

17        And then, of course, once they're paid, they'd have

18   to present proof they'd been to see the election officer, and

19   sometimes they'd have actual observers there at the polls.

20   And then they'd send them on home, drive them on home.  And

21   they would get paid, according to Jeff Farmer, he got to see

22   it in 2002 when Doug Adams and the commissioner were taking

23   him around town that they were paying them ten dollars a head.

24        So if you're a vote hauler and you're going to do

25   your holler trips and you're bringing out the voters that will

be bribed, your get ten dollars a head.  That's where Debbie's job came in.  She kept a long list, and vote haulers would tell you Debbie would put your name on there if you were a vote hauler.  Steve Smith, they'd put SS.  They'd check the voter's name, highlight it.  Why?  Vote haulers said, they didn't want to pay us twice.  We're getting ten dollars a head.  They wanted to make sure they are didn't pay us twice.  They made this list.

Debbie and Bart kept the list.  They had a safe there at home.  They'd keep the important papers in the safe.  Of course, the FBI went there, didn't find the papers.  They found the safe.  The papers were already gone.  Papers were already gone.  FBI had been in town around Halloween, 2006 and searched City Hall.  They came with a search warrant in 2007, they were ready for them, had the safe cleaned out.

Jeff Farmer said that Adams and Jones and Stivers took him around to 50 different voters there that night, lined them up for the next day.  He was told that Commissioner Jones is going to line up Stivers, and Stivers was going to run the early voting so what he would do is basically he'd be given money in installments.  He'd get about $1,000 from Stivers or Jones, and he'd go out and pay the voters, pay them 30, 40 dollars a vote, and they got 50 voters that day.

You remember where he was sent.  He was sent in the fiercest of fire in Horse Creek, where Jennings White had the

same thing going on in his camp.  And, of course, they had

another key player that was helping Jeff that day.  His name

is Bobby Red Sams.  And Bobby Red was absolutely knocking the

lights out of it.  He was bringing in voters.  Everybody was

pleased.

So when Jeff would go in, he had to make sure in this

early voting that everything worked out.  So during the early

voting in 2002, Jeff says that he had a signal that was going

on, and that signal would happen and confirm, you know, again

that they had people voting for the slate.  And when that

signal was made, he'd pay the voter.

Interesting thing about it is that Al Man Stivers

came up with one of the more unique methods in 2002.  He came

up with the method of using a deck of cards.  He had actual

cards that he told Jeff Farmer couldn't be duplicated.  Told

Jeff Farmer that these were Caesar Palace cards.  And he said

they couldn't be duplicated.

So he manned him with those so that when he went to

take the voter and bribe the voter, that the voter would

actually have one of those Caesar Palace cards.  And Jeff was

doing a pretty good job.  Apparently, he was doing too good a

job, because Jennings White at that time was county clerk.  He

heard what Jeff was doing down there to offset his vote buying

and had him kicked out.  Jeff says he sent Edd Jordan down

there to threaten him.

57

1    So after he got threatened, he called Al Man Stivers'

2    brother, Charles, and they decided he better back off.  So

3    they backed him off for the rest of the day.

4    So they gave him other jobs to do.  He said that

5    during that time, that day, that a fella named Ricky

6    Whitehead, he was one of the county attorneys' helpers, he

7    came along with Al Man Stivers and Doug Adams and, of course,

8    some of these other people came together during that day and

9    worked with Jeff Farmer.

10    He said that after the election, he'd done all this

11    work, Doug Adams presented him with a job.  He was down and

12    out, looking rough, and everything wasn't doing so good, but

13    Doug Adams found him a job down at the school board.  School

14    janitor.  And things worked out pretty good for him after the

15    election.  Said Freddy Thompson personally thanked him for all

16    the good work he'd done down there for him.  He said, you

17    know, there were other things he had to do.  He'll tell you.

18    I mean, he was down there with a fella by the name of

19    Yancey.  Of course, I've told you about Yancey.  Yancey was

20    there at Doug's house when they gathered up all that money.

21    He's an attorney in town.  His son-in-law, Roy Morgan, the

22    unindicted co-conspirator.  Yancey picked up Jeff that

23    afternoon.

24    That's what I was trying to get to and I forgot.

25    Yancey said I need you to go to Big Creek with me.  That one

1   of the main precincts, one in which they had a lot of vote

2   buying, Jeff said he took about 4, 5 thousand dollars to one

3   of the family members of the election officers down there,

4   Mark Bowling, a guy named Jimmy Marcum.

5           Just examples, ladies and gentlemen, of what the

6   evidence is going to be as you hear again the relationships

7   that were formed with different people at different times, and

8   I think that, again, lots of these people you're going to hear

9   from and some of them you're not going to hear from.  Not all

10  of the witnesses in this case could be called.  Some of them

11  will be here and some of them will not.

12          Again, this is kind of giving you the general

13  outline, I think, about how this group operated on an election

14  year basis.  And then this enterprise, of course, it has a lot

15  of different people that play a lot of different parts.  Of

16  course, Cletus and Doug Adams, they worked themselves up the

17  ranks.  When Cletus was just a lawyer, Doug Adams just a

18  school teacher, they were there with Kenny Day at Burning

19  Springs and they were showing him how it was done.  In one

20  magistrate race there, they had fierce competition going on,

21  Kenny was there helping Doug and Cletus in that election.  And

22  that kind of got their start.  They got their start there

23  early on in Burning Springs and then they figured out that you

24  had to bring both sides together.  The Democrat and the

25  Republican election officer inside the poll, when you got a

59

1    judge for each party, if you had those people working

2    together, you had it all.

3            In fact, Cletus Maricle told Kennon White, he said,

4    money's important in these elections, but the election

5    officers are more important.  And that's the way it worked.

6    You see, these are the political bosses.  There are other

7    political bosses.  And Doug Adams and Cletus Maricle, they

8    weren't on the scene constantly, continually, every day.  They

9    didn't need it.  They came to the well and they drew from the

10   well when they needed it.

11           2002, Doug Adams needed it.  He wanted Freddy

12   Thompson, Commissioner Jones' son-in-law as county clerk.  He

13   wanted to get rid of Jennings White.  Jennings White was too

14   powerful.  Had too much power in Clay County.  Doug Adams

15   wanted to show him he's more powerful.  So we split up the

16   groups, see.  In the '90s, everything was good.  Jennings

17   White had the vote buying, everything worked fine.  Then upset

18   the apple cart.  We all fall out.

19           We all fall out, and there's little Kennon White,

20   he's running back and forth in between one big strong man

21   against the other big strong man.  Caught in the middle like a

22   ping-pong ball, back and forth.  End up giving his money, he

23   said, about 70 or 80 thousand dollars to Jennings White and

24   his group.  Went to his direction, where he told him to put

25   the money.

60

His aunt, Barbara, state representative, she was up for election that year, and she lost to Tim Couch, who was again the candidate of Doug Adams choice.  2004, she sought to get back into the fold.  Doug Adams called her while she was up here in session in Frankfort and told her, you bring $40,000, we'll put you back in office.

Continuing, 2002, 2004, and then 2006, we got to get our son-in-law -- Cletus needs Phillip Mobley, got to be elected.  He told Wanda White, I know you got allegiance to Edd Jordan and this one over here.  When it comes down to it, Wanda, you're going to have to do some things, all right? You're going to have to make sure Phillip Mobley gets the vote.  Whether you're stealing it or buying it, make sure he gets the vote.

Wanda White will tell you she met multiple times at the homes of Cletus Maricle and Al Man Stivers, generally present with Wayne Jones.  They would include Darnell Hipsher. Some of these other folks would get together, plan this thing out.  All right, where's the list?  Where's the hollers we can go to?  Where's the poor families we can draw on this time? How we going to do it this time?

You got those new machines.  Go down there, let Freddy and Charles, Commissioner Jones show you how they work. So she goes down there, and she's shown that machine.  They say now look, you know everybody in Clay County, you know

61

these people we're dealing with.  You know if we can get in

there and distract them a little bit, you can go in, change

these votes for them.  You tell them when they push the button

the first time, they've voted.  Send them out.  They come back

in the second time -- no, they don't come back in.  Send them

out the door when they press it the first time.  Then go back

in the booth, and you can review the ballot, make sure Phillip

Mobley is on it.  If he's not on it, change the vote to

Phillip and the rest of our slate.

Now Charles Weaver had to be brought into this.

Weaver wanted a job.  Golly, that's the way Clay County works,

right?  You scratch my back, I scratch yours, and the judge

executive wanted Charles Dobber Weaver to be his man.  So we

had to broker an agreement so we got, let's see, Cletus wants

Phillip in, the county judge, he wants Charles Dobber Weaver

in to help him make sure he gets his votes.  And so we come to

a compromise.  Phillip Mobley gets the vote.  We'll let

Charles Weaver vote for whoever else he wants to, just make

sure he gets -- just make sure he gets my son-in-law on there.

So that's what Weaver does.  He's also convicted by

the FBI's investigation.  He was brought forward and answered

to charges of doing this very thing, and he pled guilty, and

he will testify pursuant to that plea agreement that he was

right with Wanda White, taken before Mr. Freddy Thompson, the

county clerk, shown the machines.  He and Wayne Jones showed

62

him how to do it.  So the same mechanism, same operation, play
it for the Democrat.  Wanda had to switch her parties over.
She says that she was encouraged by Cletus Maricle.  He had
some things to offer, she says.

She said she was looking for a job.  Of course, her
daddy-in-law, Mayor White, got beat by Carmen Webb Lewis as
mayor.  Got her out of a job and her husband.  Of course, she
came to the FBI.  And at that time, FBI really didn't have any
evidence on her.  She came to the FBI, they said look, you
tell the truth, you cooperate with us fully and we'll not
prosecute you.  We've got your husband.  You cooperate with
us, you do the right thing, tell the truth when called to
testify and we're not going to charge you.  She took the deal.
She took the deal.

In 2002, we had all the records.  We didn't have any
witnesses.  We didn't have the inner circle.  When you're
doing things behind the curtain, there's not many witnesses
out there to that.  You don't have that election officer who
is behind that curtain, you don't have a witness unless your
voters cooperate.  And in this case, you're going to hear from
many of these voters who are going to cooperate, say yeah,
Wanda White and Dobber Weaver was right there with me, made
sure I voted.  They were looking right over my shoulder.

Now, are there going to be witnesses in here to say,
hundreds of witnesses to say yeah, they went in there and

63

1   changed my vote?  I don't expect it.  I don't think you do

2   either.  Those people went in, thought they voted, left and

3   went out.  Some of those complained and many of them probably

4   never knew.  Unsuspecting.

5         But both Dobber Weaver and -- Charles Dobber Weaver,

6   he went into this thing, as I was going to tell you, because

7   he had the expectation that he was -- the judge executive was

8   going to get the job of emergency services director.  See,

9   Vernon Hacker, he was the 911 director, employee of Doug

10  Adams.  He was also city councilman.  He was a power broker

11  down on that level.  So you got Darnell Hipsher, he's a city

12  councilman, Vernon Hacker, and you got the two side parties,

13  Stanley Bowling, Bart Morris and Debbie.  Those folks worked

14  City Council.

15        The evidence is going to be that that group worked

16  closely.  Jennings White, he had the opportunity in 2002, he

17  had the opportunity to use Stanley Bowling and the Morrises.

18  But then in 2004, 2006, the group came back into the fold and

19  Cletus Maricle used them in 2006 to do his work.

20        See, it works again, continuously, and will continue

21  as alleged unless stopped.

22        Investigations of this sort are going to call on a

23  lot of witnesses.  I hope you'll be patient.  I hope you'll

24  wait for this case.  I hope you'll wait.  Do as the judge

25  instructs you.  Wait till the conclusion of this thing, but be

64

1    patient.  It takes a lot of witnesses to put on a case like

2    this.  You're talking about 2002, 2004, 2006, a lot, a lot of

3    elections.

4          Wanda White, Kennon White became cooperators.  The

5    FBI equipped them with recorders.  They recorded a lot of

6    conversations that I told you.  There's a couple of them I

7    want to tell you about.

8          You see, it's alleged in this case Doug Adams and

9    Cletus Maricle, they decided in actuality who was going to

10   serve.  One of the very first recordings, Wanda White goes in

11   to meet William "Al Man" Stivers, and the first thing -- he

12   hadn't seen her in a while.  She walks in the door, and she

13   says, oh, I'm madder than fire over that.  What are you

14   talking about?  She wasn't selected as -- she was not selected

15   as the election officer for 2007.

16         She said, you know, they put David -- talking about

17   another person, Darnell, Darnell Hipsher.  Wanda said, oh,

18   God, it made me so mad.  Stivers said, well, I'm gonna tell

19   you who the daddy of that was.  Wanda says, who, Bart?  No.

20   Stivers said, nope, Cletus.  He said, don't ask.  He said,

21   they got too much going on right now.  See, father-in-law is

22   being convicted, prosecuted by the FBI.  Too much going on

23   right now.  Too much on their plate, I believe, is the word

24   Stivers used.  Got too much on their plate right now.

25         Well, they go on in their conversation, said, well,

65

he said, I'll tell you what Cletus said.  He said I'm putting

Darnell in there, because Mr. Adams, that's Doug Adams, he

wants to actually see who serves this time.  Clay Massey, who

is our county attorney who was up there at the meeting at

Bishop's garage that night when the money's being accumulated,

he's running for appeals judge.  Adams wants to see this

Darnell serve, help him.  And that's what came out of their

mouth when he first saw Wanda.

See, it's alleged Cletus Maricle, Doug Adams, they're

the bosses.  They're the king makers.  Want to have anything

to do in this county, you got to come through Cletus Maricle

or Doug Adams.  And that's not out of the mouth of Wanda

White, the cooperator.  That's out of the mouth of one of

their own, one of their most loyal, Al Man Stivers.  That's

out of his mouth that you're going to hear those words.

And then in that same conversation, toward the end,

Wanda gets an opportunity to bring up -- see, you got a crime

that's occurred, and you're coming back to talk to these folks

over a year later to get them to talk about things that we did

wrong.  Bad things that we did.  Crimes that we committed.

Not an easy thing, especially when you're dealing with a

circuit judge with over 40 years experience as a defense

lawyer.  Not an easy thing to do.

But in this first conversation with Al Man Stivers,

she says, now here's one thing I got to say, Al Man.  She

1    said, you know, I signed a bunch of them papers.  Do you think

2    he took care of them for me?  She'll explain to you she's

3    talking about those voter assistance forms.  Stivers said

4    yeah.  She said, he did?  Stivers said yeah.  She says, well,

5    I ain't gonna worry about it again, because that's the only

6    thing that's aggravating me about this whole thing.  She said,

7    him and Freddy took care of it?  Commissioner Jones and Freddy

8    took care of it when the FBI served Freddy Thompson,

9    subpoenaed told him to bring those records for 2006.  Missing

10   voter assistance forms.

11        Wanda White will tell you she signed numerous forms.

12   That's why she brought it up.  Only a couple did they find

13   even had her name on it.  Not out of her mouth, but out of the

14   mouth of one of their trusted, one of their own, he says him

15   and Freddy took care of it.  Don't worry.

16        She then is told by the FBI, look, you're going to

17   have to go to Cletus Maricle.  You'll have to talk to him.

18   Tell him you're subpoenaed to the grand jury.  Tell him you're

19   going to be a witness.  Tell him these things.  See what

20   happens.  She does.  She goes and tells him.

21        This is what he had to say, among other things.  And

22   listening to these conversations, they speak out of both sides

23   of their mouth, all right?  Al Man Stivers will tell her at

24   points, do the right thing.  And then on the other side, but

25   don't you admit to anything, Wanda.  That's the way they talk.

These people, these aren't newcomers.  These guys aren't first

time around the block.  Man with 40 years of experience in the

law and you go to him, you better expect it's not going to be

an easy thing to talk about, what you did wrong to get your

son-in-law elected last year in an election.

So on that first few recordings, you're going to hear

those things.  You're going to hear those comments out of

Cletus Maricle.  But in that first one, she was supposed to go

to the grand jury, I believe the records show that she was

supposed to go on May the 3rd.  The day before she goes up

there, she starts confiding in Cletus Maricle and she says,

telling him about her lawyer, you know, worried about what's

going to happen.  She says, do you think I can handle myself

down there, at one point in the conversation he says yeah.

She says, I'll fall to pieces.  He said, now just don't you go

off making statements like you did about Jennings and Vernon.

See, what she had done, she told him earlier, she

said, well, I got to meet with the FBI the other day and they

had some questions about this election.  Well, did you tell

them anything?  Didn't tell them anything, she said, except I

did tell them about Vernon, he's been convicted, and Jennings

has been convicted.  I tell him about them.  I tell what they

did.  Wait a minute, remember?  This is part of the fold.

Don't you go volunteering statements about them is what he

told her.

68

1       This was in the company of his wife.  Judy said,

2   well, now, you better listen to your lawyer.  Cletus says,

3   don't you make no statements like that.  Talking about

4   statements about Jennings and Vernon.  Wanda says, well, what

5   will they do about that?  Will they bring that back up?

6   Maricle said, just don't go volunteering stuff.  Judy said,

7   don't tell them nothing, Wanda.  Laughing.  Cletus said yeah.

8       They continued to talk.  Again, these conversations,

9   some of them are going to take your patience.  Some of these

10  conversations lasted over an hour.  But I think in listening

11  to these conversations, you'll be able to make a decision at

12  the end of this case.  You'll weigh it, I'm confident.  Right

13  in the middle of this conversation, she starts talking to him

14  about pleading the Fifth.  You know, pleading the Fifth.  It's

15  one of the things lawyers talk about.  It's lawyer talk.

16  Pleading the Fifth, you got the right to remain silent, not

17  make a statement.

18      That came up to Cletus.  What about me taking the

19  Fifth, she said?  She said, right now, how would a person

20  answer it is what I'm saying?  Do you say I plead the Fifth

21  Amendment on each individual question, or do you say I don't

22  know?  Cletus says now, you don't want to answer the question,

23  he said, plead the Fifth.

24      What was his motive?  What was his motive?  He's a

25  judge.  Circuit judge.  Not a lawyer.  What was his motive?

69

1     That will be your issue to decide.

2          He said, just don't go down there with any

3     vindication.  He said, Wanda, don't go down there and say I'm

4     going to lay it to this one, I'm going to lay it to that one.

5     Very end of the conversation, she said, I ain't gonna do that.

6     That's all you can do.  She said, I ain't gonna do nothing to

7     Dobber, talking about her counterpart over there.  He said,

8     I'm not saying don't tell the truth, but he said I'll tell you

9     what, I got confidence in you, Wanda.  I got confidence in

10    you.  She said I get it.  I got confidence in you.  Repeats it

11    again.  I ain't worried.  She says, by the way, I'm wanting my

12    job and Cork.

13         I told you that Cletus talked her into this situation

14    back before the election, years before.  She actually changed

15    her registration as a Democrat, moved into town.  They had a

16    plan.  They had all these big plans.  Cletus was going to

17    advise Kennon on you become city manager, and we'll appoint

18    some of our control people, like Judy and some of the other

19    family, we'll put them on the boards down there, and we'll

20    control the zoning in town, and we'll figure out ways to make

21    lots of money in town.  This would be good way for you to do

22    it, Keenon.

23         Wanda, you come over here, be a Democrat, be election

24    officer.  We'll get you in there to see Commissioner Jones.

25    You could go to work for us.  You do these things for us,

70

1    we'll do things for you.  She said, what's in it for me?  He

2    said, I'll tell you, you know, you need a job.  We'll get you

3    a job.  And you know that brother of yours is in a whole lotta

4    trouble.  See, there was girl down here got her throat cut.

5    He's charged in that crime.  He's gonna need some help.  I can

6    help him.

7         See, Cletus Maricle, Doug Adams not only used this

8    board, they used their positions.  Cletus Maricle in

9    particular had lots of power and influence.  Bobby Red Sams

10   will tell you how they got him out of jail with Wayne Jones

11   and Cletus Maricle's help and said go out there in 2006 and do

12   like you did in 2002, get those votes in here for us.  Sprang

13   him out of jail.

14        Frank Roberts, another election officer, will tell

15   you about favors he witnessed Cletus Maricle doing, getting

16   people out of jail at election time.  Of course, Corky Price,

17   he was the brother and he was in a mess.  And he got convinced

18   when he was out in Texas, he'd come in, make a statement, and

19   Cletus would give him a deal.  Commonwealth attorney made him

20   a deal, and he's supposed to get probation, and he reneged on

21   his deal to testify the way they thought he should, and so

22   they sent him away for five years in prison.

23        So when Wanda goes to Cletus and talks to him about

24   this, it's time to talk to him about doing something after the

25   sentence.  He'd already been sent to the pen.  And you'll hear

1    in these conversations about Cork.  Cletus saying no.  Al Man

2    said the only thing we're waiting on is the lawyer to bring

3    the paperwork over here.  We'll take care of you, Wanda.

4    We'll take care of Cork.  And I got you on that job, Wanda.

5    There's not one up yet, we're working on it.  Give us a few

6    days, we're working on the job.

7         And the third thing that he promised was he'd help in

8    reelecting Daugh White.  Daugh had this election coming.

9    Carmen Webb Lewis, young woman that showed some promise in the

10   legitimate vote, we'll call that the -- there was the solid

11   vote in Clay County and there was the bought vote.  That solid

12   vote, you got to deal with sometimes, and they had to deal

13   with it with Carmen Webb Lewis.  They knew it was coming.

14        And sure enough, when Carmen Webb Lewis ran, she beat

15   Daugh White, but it was not without Cletus Maricle's help.  He

16   helped him every way he could.  Wanda will tell you how he

17   helped him.  And he, while he doesn't really talk about his

18   helping Daugh White so much, he does talk about that job,

19   about helping Cork.  It's pretty plain when you hear those

20   conversations about what they're talking about.

21        See, this man is very, very paranoid about what was

22   going on in Clay County.  The FBI was doing search warrants of

23   City Hall, people getting searched in their home.  Kenny Day,

24   he was untouchable, and they take him down.  Even beyond

25   touchable was Jennings White.  Boy, he bit the dust.  Things

72

1    were getting tight in Clay County.

2            Cletus Maricle, you know what he told Wanda?  He

3    said, I tell you what.  They've got 40 people working here.

4    Says they're everywhere, Wanda.  He said, there's 40.  She

5    said, how many?  He said, there's 40 of them.  40 FBI people?

6    He said, yeah, that's my opinion.  It's my opinion, Wanda.

7    Forty of them.

8            She went to talk to him on the day before the grand

9    jury testimony, then she went the day after.  She had some

10   news for him.  See, they talked about pleading the Fifth.

11   That didn't work out, see, because she was working with the

12   FBI.

13           The FBI said, now, I'll tell you how you can get him

14   to talk a little bit more about this.  Go tell him that the

15   prosecutor has granted you immunity, and the judge is going to

16   order you to testify.

17           So she goes back the day after, and she sits down and

18   talks with Cletus in this conversation and it's a long one.

19   Down toward the end of it, she says, she starts telling him,

20   and they start talking about, about this possibility.  What if

21   they give me immunity?  And said well, you know, Bill Clinton

22   back in the day had a witness that was sitting in a position

23   to testify against him.  What was her name?  Susan McDougal.

24   Susan McDougal, that was her, yeah, Susan McDougal.  Cletus

25   said that was her name.

73

1          Wanda says, what did she do?  What did she do, get

2     put in jail?  Maricle said she refused to testify.  He said --

3     Kennon was there with her.  Said refused to testify?  Yeah,

4     refused to testify.  She said, they let her sit in jail for a

5     year and a half?  Cletus said yeah, she sit her time.  And

6     Clinton, Kennon said, couldn't even pardon her because she was

7     in there.

8          Wanda said to Cletus, she looked at him and said,

9     would you sit in jail that long for somebody?  Cletus said,

10    yeah.  You would?  He said yes.  Yes, sir.  Yes, ma'am.  Sure

11    would.  She said, that's a long time.  She said, would you sit

12    that long in there for me?  He said, that's right.  That's

13    right.  Okay, she said.  Absolutely.  Absolutely.  She says

14    okay.  He said, I'll be very honest with you.  He said, if

15    I've ever seen somebody shoot somebody -- right, she says.

16    But as far as any of these other things, no, if that's what

17    you gotta do, that's what you gotta do, he said.

18         Kind of talks a little bit in riddles there, but

19    Wanda will tell you she fully understood his communication.

20    I'm a grand jury witness.  Only way I'm going to testify to a

21    grand jury is if I see somebody shoot somebody.  Otherwise,

22    I'm not saying a word.  Yeah, I'll go to jail for you.

23         He's got confidence in her.  Doesn't work out.  It

24    doesn't work out.  She was cooperating with the FBI.  It's all

25    on recording.  You'll have a chance to listen to it.

74

1        Use your patience.  I'm confident in each one of you

2    that you'll listen to this evidence, that you'll evaluate

3    these witnesses, you'll look at it for what it is, and you'll

4    do as instructions call you to do.  That is, I don't like this

5    person.  This person entered a plea of guilty to drug

6    trafficking and all these awful things, and I don't want to be

7    a neighbor to this person.

8        Listen, these are Doug Adams and Cletus Maricle's

9    friends.  We didn't choose them.  They did.  You evaluate

10   their testimony and I'm confident, as instructed, evaluate it

11   with caution and at the end of this case, ladies and gentlemen

12   of the jury, I'm going to be asking each of you to vote guilty

13   on each of the counts alleged in this indictment and to stop

14   what's going on in Clay County.  Thank you.

15       THE COURT:  Thank you, Mr. Smith.

16       Ladies and gentlemen, before we continue with further

17   opening statements, we'll take a break at this time.  We'll

18   take about a 20-minute recess.  Please keep in mind the

19   admonition that you were given previously not to discuss the

20   case among yourselves while we are in recess.  The jury will

21   be excused for 20 minutes.

22                    (The jury left the courtroom at 11:01 a.m.)

23       THE COURT:  Counsel, any matters to take up outside

24   the presence of the jury?

25       MR. WESTBERRY:  No, Your Honor.

1          MR. BAYER:  Yes.

2          MR. WESTBERRY:  Excuse me, I'm sorry.

3          THE COURT:  Please be seated.

4          MR. WESTBERRY:  Could I have just one second?

5          THE COURT:  Yes, sir.

6          MR. WESTBERRY:  Excuse me, thank you, Judge.  Mr.

7    Bayer would like just a moment.

8          THE COURT:  Mr. Bayer?

9          MR. BAYER:  Judge, in the Court's pretrial ruling,

10   when we had made a motion in limine regarding certain aspects

11   of the evidence that was raised within the 404(b) hearing,

12   this Court very clearly articulated that there would be no

13   link between drugs and Mr. Adams, and I also indicated to you

14   that I saw that as a potential problem when we were in the

15   hearing.  Monday, I believe, we were talking about it as well.

16         During the course of the opening by the United

17   States, there were several references to linking Mr. Adams

18   with either drug dealers, drug dealings, over and over

19   references.  And I've got some of these highlighted.  I'd like

20   to be able to go through some of them quickly with you, if I

21   could, because I think it is important.  I think the inference

22   that has now been given is that Mr. Adams is part of this drug

23   dealing culture and drug dealing operation.

24         He was talking about Vernon Hacker, a drug dealer, an

25   employee of Doug Adams who had protection for his drug

1    dealing.  That was one of his comments.

2          Drug hooked people are the ones who are used, and

3    this is the oil that makes this whole enterprise work.  And it

4    was talking about that in reference to Mr. Adams and others.

5          At the very end, he talked about the drug traffickers

6    are Doug's friends.  And the other issue that I have a serious

7    problem with also is at one point, when he was addressing the

8    jury, he made the comment about somebody getting their throat

9    cut and then he immediately said, "and these are the people

10   who came to Cletus Maricle and Doug Adams for their

11   influence."

12         The inference then is now linking Doug Adams to this

13   person who got his throat cut.

14         THE COURT:  I think it was her.

15         MR. BAYER:  Sorry?

16         THE COURT:  I think it was a her, a female that got

17   her throat slit.

18         MR. BAYER:  It may have been.  The Court will

19   remember that reference and how he transitioned immediately to

20   talking about Cletus Maricle and Doug Adams.  Throughout the

21   opening, there were these constant links and references to

22   drug dealers, drug dealing and drug operations, immediately

23   associated with Doug Adams.

24         Judge, your ruling that you gave specifically said at

25   this point in time, it was not to come up until there was some

1    proof that was going to be presented.  There has been no

2    proof.  Based upon that, Judge, I would like to move for a

3    mistrial, because I think that the United States has violated

4    this Court's order, and certainly it's something that we

5    couldn't prepare for.

6              THE COURT:  Well, first, I'll overrule your motion.

7    I don't think Mr. Smith did anything that violated the Court's

8    order with respect to 404(b) evidence.  The hearing that we

9    had on 404(b) evidence was very specific as to certain

10   individuals.  And listening to Mr. Smith's opening statement,

11   it in no way violated my ruling.  So your motion is overruled.

12             MR. BAYER:  Thank you, Judge.

13             THE COURT:  All right.  Let's see.  We have 15

14   minutes.  Everyone needs to take a break.  Mr. Smith, would

15   you provide copies of the charts to opposing counsel that you

16   were using?

17             MR. SMITH:  I did, Your Honor.

18             MR. WESTBERRY:  We've seen them.  We had a disk.

19             MR. SMITH:  I thought that was the reason Mr. Smith

20   asked to do that so we didn't need to have everybody move

21   around the courtroom.

22             MR. WHITE:  We couldn't tell which ones he was using.

23             THE COURT:  We'll take a recess for 15.

24             (Recess from 11:06 a.m. until 11:21 a.m.)

25             THE COURT:  Thank you.  The record will reflect that

78

1    the jury is not present at this time.  Parties and counsel are

2    all present.  It was reported to me during the break that one

3    of the jurors wished to report something to the Court, conduct

4    of one of the defendants in the case that they felt needed to

5    be reported to the Court.

6           What I will do at this time is I will go back in

7    chambers and conduct an *in camera* hearing with whichever juror

8    wishes to bring matters to my attention.  I'll have that

9    placed on the record.  It will be filed under seal, pending

10   further orders.  And then I will report back to counsel as

11   soon as I have *voir dired* the juror in the case.  We'll take a

12   recess.

13                      (An in-chambers hearing with a juror

14                       was conducted, and transcript of same is

15                       filed separately under seal.)

16       THE COURT:  All right.  Thank you.  The record will

17   reflect, once again, the jury's not present.  All parties are

18   present.  All counsel are present.  During Mr. Smith's opening

19   statement, as he was turning at one point, one of the

20   defendants was observed by one of our jurors saying to Mr.

21   Smith, "fuck you."  That was Mr. Stivers that was observed

22   saying that by this juror.

23           Now, observations that jurors make in the courtroom

24   are not grounds for exclusion of the jurors, but if parties

25   wish to place any matters on the record at this time, they can

1    certainly do so.  Mr. Abell?

2           MR. ABELL:  Could I have a couple moments to confer

3    with my client?

4           THE COURT:  Yes, sir, you may, certainly.  Want to

5    take a brief recess while we do that?

6           MR. ABELL:  I think that would be best, Judge.

7           THE COURT:  Take about five minutes.  If you need

8    more, let the security officer know that.

9           MR. ABELL:  Thank you.

10          MR. WHITE:  Your Honor, may we also leave the

11   courtroom with our own clients to discuss this with them as

12   well?

13          THE COURT:  Yes.

14          MR. WHITE:  Thank you, Judge.

15          THE COURT:  You may.  We'll be in recess for

16   approximately five minutes unless, Mr. Abell, if you need more

17   time, you can advise the security officer.

18                 (Recess from 11:29 a.m. until 11:37 a.m.)

19          THE COURT:  Thank you.  The record will reflect the

20   jury's not present at this time.  Make sure everyone's here.

21   All right.  All counsel are present.  Mr. Abell?

22          MR. ABELL:  Judge, there's a juror that's reported to

23   the Court his or her belief that Mr. Stivers has done

24   something that offends them and they consider improper.  My

25   suggestion, most directly, is two parts.  First, I think it

80

1    would be fairest and best that that juror be excused.

2         Second, if the Court examined or if it's inclined to

3    consider addressing that matter more directly with Mr.

4    Stivers, that that be done in a separate proceeding at a

5    different time.

6         Third --

7         THE COURT:  I'm sorry.  I didn't pick up on your

8    second request.

9         MR. ABELL:  Second part, if that's something the

10   Court's inclined to examine further, we take that up at some

11   separate proceeding.

12        THE COURT:  All right.

13        MR. ABELL:  Judge, respectfully, I would suggest that

14   we would be well advised if the Court were to poll the

15   remainder of the jury and determine, as best as it can,

16   whether there's been a taint created amongst the rest of the

17   jurors sitting in this case.

18        THE COURT:  All right.

19        MR. ABELL:  And beyond that, instructions that the

20   Court would expect to be given to Mr. Stivers from his

21   attorney have been given.

22        THE COURT:  All right.  Thank you.  Let's see if any

23   other attorneys wish to offer any comments or suggestions,

24   motions or otherwise?  Mr. Hoskins?

25        MR. HOSKINS:  Thank you, Your Honor.  I guess I would

1    be very interested to know in if the Court asked this juror if

2    there had been any discussion among the jury about that,

3    mentioned to other any other jurors.

4         THE COURT:  I did instruct the juror, as usual, he

5    should not discuss the matter with any other jurors.  He's

6    aware of that.

7         MR. HOSKINS:  And had not done so before that?

8         THE COURT:  My understanding was no, but I did not

9    press the issue.  Mr. Smith or Mr. Parman, what's the position

10   of the United States with respect to this issue?

11        MR. SMITH:  Well, Your Honor, I believe that this is

12   not improper contact with a juror, where I think there's a

13   Court analysis that might trigger some further analysis.  I

14   believe that the jury can be instructed or presumed to be able

15   to follow instructions.  You know, when we've got eight

16   defendants here, jury's going to be instructed, look, you

17   don't hold the evidence -- you look at the evidence

18   individually.  The Court's going to instruct them in that way.

19   I believe, like I said, that this is not a circumstance where

20   we have -- you know, this was not a contact with a juror.

21   This was an observation within the court.

22        THE COURT:  Similar to an outburst in court where a

23   defendant attempts to disrupt proceedings by saying something

24   in open court, essentially.

25        MR. SMITH:  Exactly.  And I would be looking at this

82

1    from the standpoint of what to do with a disruptive defendant.

2    I'm at this point not going to ask the Court to gag him or to

3    do any of those steps.  I don't think that that's necessary,

4    but I do think an admonition under the circumstances is

5    appropriate.  I think the jury's certainly -- the Court's

6    conducted an inquiry.  If further inquiry is needed, of

7    course, I'll leave it to the discretion of the Court, but we

8    certainly believe the jury can follow any instructions the

9    Court gives and that this in no way has prejudiced the panel

10   or the pool.

11        THE COURT:  Thank you.  Well, with respect to, first,

12   with Mr. Abell's suggestions, first to excuse the juror, I'm

13   not going to excuse the juror based on an observation that's

14   been made in open court.  If a defendant becomes disruptive in

15   court, that does not give the defendant an opportunity to

16   essentially create a mistrial by the disruption.  There are

17   certain extreme cases where defendants are gagged in court,

18   and there are other circumstances where defendants are placed

19   in other rooms and required to view the proceedings from a

20   different location than the courtroom if they choose to be

21   disruptive, if they disrupt the proceedings.

22        In this particular case, Mr. Stivers was not observed

23   by me to disrupt the proceedings.  This was something that was

24   observed by a juror.

25        Now, I think with respect to the second issue,

1    further examination, I don't believe further examination would

2    be appropriate.  It may be more prejudicial to engage in

3    further examination of this particular juror, and that would

4    also be my feeling with respect to asking all other jurors the

5    same question, based on the response that this juror gave me

6    that -- or my instructions to him that he was not to talk

7    about matters with other jurors.

8            Same instruction I've given throughout the entire

9    jury selection process, and it's an instruction that I will

10   continue to give, and I also will remind counsel that during

11   the *voir dire* process, I was very careful to instruct the jury

12   on several occasions that the testimony and evidence, that all

13   matters should be considered individually.  As a matter of

14   fact, Mr. Smith has already made that point in his opening

15   statement.

16           So I don't believe it would be appropriate to excuse

17   the juror at this stage of the proceedings.  I don't believe

18   further examination will be necessary, and I don't see a taint

19   to the jury panel that would require either this juror or any

20   other jurors to be excused at this time.

21           Essentially, by making a comment in -- that can be

22   observed by a juror, Mr. Stivers places himself in peril by

23   doing that.  I don't know how the juror would take that.  I

24   can't necessarily conclude that this juror would reach any

25   decisions based on observation at this stage of the

84

1    proceedings.

2         But to the extent that there is any prejudice that's

3    created by the comment, it's prejudice that Mr. Stivers has

4    created for himself.  And if he continues to engage in that

5    type of conduct, it's likely that the same consequences will

6    result.  If any party in this proceeding becomes disruptive,

7    if any attorney acts inappropriately in this proceeding, rest

8    assured I will take actions to make sure that it doesn't

9    happen again.  You can rest assured that that will happen.

10        So I will deny the motion to the extent that it's a

11   motion for the relief that Mr. Stivers has requested.  And

12   also, I don't believe it's appropriate to conduct further

13   inquiry.

14        While the jury's not present, there was an issue that

15   was raised earlier with respect to the motion in limine

16   concerning evidence of murder charges against Mr. Maricle in

17   1971, which were ultimately dismissed.  To the extent that Mr.

18   Maricle were to testify in the case, dismissed charges could

19   not be used for impeachment purposes.  Dismissed charges in a

20   murder conviction could not be used for impeachment purposes.

21        However, if the United States were able to somehow

22   establish to the Court's satisfaction that the actual conduct

23   itself had occurred which has been several years ago, 40 years

24   ago, if the United States is able to establish to the Court's

25   satisfaction that it's somehow relevant to issues in the case,

85

1    then I could at that time consider whether the United States

2    would be allowed to elicit such testimony from witnesses.

3           So the ruling on the motion, to the extent that it's

4    not been made previously, is that the motion in limine would

5    be sustained as to any attempt to impeach the defendant if he

6    testifies on murder charges that were dismissed in 1971.  The

7    United States may not elicit testimony from a witness with

8    respect to those charges.  But if the United States is able to

9    establish to the Court's satisfaction that the action itself,

10   not the charges, but the action would be relevant to any issue

11   in the case, then I can certainly take that up at the

12   appropriate time.  So the motion will be sustained in part but

13   denied in part as moot with respect to the activities that are

14   alleged.  Is that sufficiently clear, Mr. Hoskins?

15          MR. HOSKINS:  Yes, Your Honor.  I understand the

16   government would have to demonstrate that to the Court outside

17   of the jury's presence.

18          THE COURT:  The United States wouldn't be allowed to

19   elicit it, couldn't ask questions of the witness that would

20   result in that information being provided.  Of course, we

21   don't have control over what a witness might blurt out.  If

22   that were to happen, I'll have to deal with that at the

23   appropriate time.  But if the United States believes at some

24   point in the proceedings that that action is relevant, the

25   United States would have to show to me outside the presence of

1    the jury how it is relevant before they could seek to use that

2    information.

3    MR. HOSKINS:  Your Honor, I would ask for the

4    additional instruction to the United States, there are only

5    two or three witnesses, at least in their reports of their

6    interviews, that have mentioned things, and it's all second or

7    thirdhand.  But those witnesses that the government knows has

8    already said something about it should be cautioned before

9    they get on the witness stand that that's off limits.

10    THE COURT:  I don't know who the witnesses are, Mr.

11    Hoskins, obviously.  Mr. Smith, will you be able to caution

12    your witnesses?  I assume you and Mr. Hoskins can get

13    together, he can identify the witnesses and you can provide

14    proper instructions, either yourself or Mr. Parman can provide

15    proper instructions before the person testifies?

16    MR. SMITH:  Certainly, I can do that.

17    THE COURT:  I don't anticipate we're going to be

18    having witnesses today.  It will probably be tomorrow before

19    we get started with testimony.  You can take that up with Mr.

20    Smith.  If you're not satisfied, if you can report back to me

21    on that.

22    MR. HOSKINS:  Thank you, Your Honor.  And if I could

23    go back to the first topic we've addressed today.  I would

24    just like to point out that what in this case Mr. Stivers has

25    alleged to have done doesn't just affect Mr. Stivers.  He was

1    linked repeatedly in the government's opening statement to my

2    client, Mr. Maricle, and we know that the testimony will

3    continue to do that.  And so actions of other defendants here

4    impact all of the defendants.

5         THE COURT:  Certainly can.  It certainly can have an

6    impact.  But so far, the actions that have been taken are not

7    actions that would cause the Court to sever any parties from

8    the case or to excuse any jurors that we have in the case.

9         MR. HOSKINS:  I understand, Your Honor.  I would just

10   like to join in that request that that juror be excused.

11        THE COURT:  I understand.  And my point at this stage

12   of the proceedings is to make sure that everyone

13   understands -- two points, really -- that when you engage in

14   that type of conduct, you may be throwing hot water on

15   yourself, but you're also maybe spilling it on to some other

16   folks as well.  So defendants should be warned.

17        I've attempted to warn everyone at this point about

18   talking to potential jurors.  We had that issue that came up

19   yesterday, and now we've had this incident.  And I know that

20   the attorneys will continue to work with their respective

21   clients and caution them about the impact of those activities.

22   And Mr. Abell, I know that you certainly have done that at

23   this point.  I don't certainly imply in any way that you knew

24   about the activity that was just described here.

25        But I'm sure that you'll continue to caution, each of

1    you will continue to caution your respective clients about

2    actions that take place both inside and outside the courtroom.

3              MR. BALDANI:  Judge, could I?

4              THE COURT:  Yes, sir.

5              MR. BALDANI:  On behalf of Mr. Thompson, I'm really

6    concerned about this.  I think you hit the nail on the head

7    where you said Mr. Stivers stands to prejudice himself

8    greatly, but I'm extremely concerned, because it's not so much

9    did it happen or not, because the juror thinks it happened.

10   So even if he didn't say that, we've got a juror now that

11   believes that a co-defendant, who is linked to my client, made

12   just extremely an disrespectful and vulgar comment to a

13   federal prosecutor at the earliest stage of the trial.

14             And I guess I have a couple -- number one, you said

15   you didn't get the impression that he didn't communicate to

16   the others, but you didn't press it.  So I guess I would

17   want -- I've never had this come up before, Judge.  I don't

18   have a case to cite to you.  I guess the main thing I would

19   ask is, number one, can I revisit this, perhaps, in the

20   morning after doing some research?

21             THE COURT:  No, you can't.  Because I've looked at

22   this, and I've got a couple of duties in the case, and one of

23   the duties that I have is to keep this case running along

24   smoothly and efficiently as possible.  And that's very

25   difficult to do when we have this many attorneys in the case

1     that sometimes have the same intent, and sometimes they don't

2     have the same intent.  And so I've got to keep the railroad

3     running.

4            I've had issues similar to this that have come up in

5     the past.  Not in cases in which this many defendants have

6     been involved, but I do feel like I know what the law is in

7     this area.  It's similar to you raising the issue earlier

8     about the jury selection process.  We talked about that.  I

9     followed Rule 24.  I didn't ask you if you knew or had ever

10    read Rule 24 with respect to selecting a federal jury.  We

11    talked about that several times in the course of the case.

12    You objected to it, we had all that taken care of at the

13    pretrial conference, and your co-counsel comes in yesterday,

14    apparently unaware that we'd already talked about this issue,

15    and attempts to raise the issue again.

16           When that kind of activity takes place, you've

17    already protected the record.  So you've got your issues

18    preserved in the record, but the Court has to move on.  We

19    have to keep the case moving.

20           MR. BALDANI:  Okay.  Well, then, with respect to this

21    issue, Your Honor, I mean, I haven't stated my position.  I

22    would move that the juror, even though he didn't -- he or she

23    didn't do any wrongdoing, be excused.  And an alternative,

24    since I don't know for sure whether it was communicated to the

25    rest, move for a mistrial on that.

1         THE COURT:  Your request is denied.  As I indicated

2    earlier, the Court has instructed the jury several times

3    already that they are not to have any communication with each

4    other.  So the jury members already know that they're not

5    supposed to have communication with each other.  They've

6    already been told that.

7         MR. BALDANI:  Okay.  One last question.  The

8    transcript of what happened, is that going to be available to

9    us?

10        THE COURT:  It will be filed under seal, because I'm

11   not going to disclose the identity of the juror to you.

12        MR. BALDANI:  Thank you, Your Honor.

13        THE COURT:  Anyone else want to join in the motions

14   for the reasons already stated?

15        MR. WHITE:  Yes, Your Honor, thank you.

16        THE COURT:  Mr. White.  Anybody else?  No?  Okay.

17   We're at noon.  We've used about 30 minutes on this issue.  We

18   consumed 30 minutes of our time.  What I'm going to do is

19   we'll take our lunch break at this point.  I'm not going to

20   have the jury set here waiting to take a lunch break while

21   we're having opening statements, Mr. Hoskins.  So what we'll

22   have to do is we'll have to take another break after you

23   finish so Mr. Bayer and Mr. Westberry can set up their laptop.

24        MR. WESTBERRY:  Would you like us to do that at lunch

25   hour, Judge?

1          THE COURT:  I don't want it to be in the way of Mr.

2     Hoskins.  If he doesn't mind, that's fine.  If it will be in

3     his way, you'll have to defer to him on that.  I will remind

4     counsel, again, if you have charts or laptops or whatever that

5     you have that you're going to be displaying to the jury, you

6     can set your charts up like Mr. Smith did.  If you remember,

7     Mr. Smith stayed within about an arm's reach of the podium.

8     You know what my rule is.  I think we talked about that

9     earlier in the case at pretrial conference, not to move around

10    the courtroom without permission.

11         MR. WESTBERRY:  Of course.

12         THE COURT:  Not everyone was at the pretrial

13    conference.

14         MR. WESTBERRY:  I was there.

15         THE COURT:  I know you were.  You get points for

16    that.  Mr. Hoskins, anything?

17         MR. HOSKINS:  I was going to say I'm happy to let

18    them set that up, Judge.

19         THE COURT:  I'm not going to bring the jury back into

20    the courtroom to excuse them for lunch.  I'm going to allow

21    the security officer to excuse them.  You'll need to stay in

22    the courtroom until the jury's left the building if they

23    choose to leave the building for lunch.  Mr. White?

24         MR. WHITE:  Your Honor, one thing I was going to ask,

25    if you don't mind.  Given that this is a smaller courthouse

92

1   than some, if you wouldn't just mind, at some point today,

2   asking the jurors that when they get here in the morning,

3   before they start walking up, if they can put their juror tags

4   on.  I just want to be very, very careful that there's not

5   even inadvertent contact, because we'll have our clients and

6   ourselves walking from all points.  So if they could just

7   stick that out so we can make sure we don't --

8          THE COURT:  That may be above my pay grade, so I'm

9   going to ask the clerk to take care of that.  She can handle

10  that in the morning.  We'll let her take care of that.

11         MR. WHITE:  Thank you, Your Honor.

12         THE COURT:  Any other matters we can take up outside

13  the presence of the jury?

14         MR. WESTBERRY:  No.

15         THE COURT:  You can advise the jury they'll be

16  excused until 1:15 this afternoon.

17              (Recess from 11:55 a.m. until 1:14 p.m.)

18              (The jury entered the courtroom at 1:14 p.m.)

19         THE COURT:  The record will reflect that all parties

20  and counsel are present.  All members of the jury are present.

21  We finished with the opening statement by the United States

22  before lunch.  At this time, we'll proceed with opening

23  statements by those defendants that wish to present openings.

24         Mr. Hoskins, we'll start with you on behalf of Mr.

25  Maricle.

93

1          MR. HOSKINS:  Thank you, Your Honor.  May it please
2     the Court, Mr. Smith, Mr. Parman, colleagues.

3          Ladies and gentlemen of the jury, I will also thank
4     you for the time you've already given us, all of you, with the
5     realization you're going to be giving us a whole lot more
6     time.  We're going to be here for a couple of months.  We'll
7     try to make it is a painless as possible.

8          I'm representing Cletus Maricle in this case.  When I
9     read the indictment, they call him Russell Cletus Maricle.
10    That's his full name.  But in the community where he's lived
11    and worked, he's generally known by his middle name, Cletus,
12    or Clete.

13         Cletus Maricle was born and raised in Clay County,
14    Kentucky.  His father passed away when he was about a year
15    old.  He was raised as an only child by his mother, who was a
16    schoolteacher, and she taught him the values of hard work,
17    education and community service.  And Miss Maricle's efforts
18    paid off.  Cletus Maricle was a top student in high school,
19    college.  Graduated in the top 10% of his class in law school.

20         Now, when he graduated from law school, he didn't go
21    join a big firm, go to a big city.  He went back home to Clay
22    County, a small, rural town in a small county in the mountains
23    of Eastern Kentucky.  Not a whole lot of lawyers there, just
24    10 or 12 maybe.  And with Cletus Maricle's intelligence and
25    personality and his abilities, he pretty quickly rose to the

1    top of the legal community in Clay County.

2          He had his practice there in Manchester when he first

3    started practicing law.  He married, had four children, three

4    daughters and a son.  His son followed in his footsteps and

5    became a lawyer and very tragically and unexpectedly passed

6    away about a year ago, just before this case started.

7          Cletus Maricle is a life-long Democrat.  When he went

8    back to Clay County, he was going back to a county where

9    Republicans far outnumbered the Democrats.  But from the

10    beginning of his career as a lawyer, he was active in the

11    Democratic party.  He became the county chairman of the

12    Democratic party for Clay County.  And by 1989, in that

13    capacity, you'll see he was interviewed and the interview that

14    the prosecutor talked about earlier is something that was on

15    television program "Inside Edition," national TV back in 1989.

16          I think you'll get to see that whole program pretty

17    much.  You'll get to see Cletus Maricle talk about his

18    community and talk about problems going on in his community.

19    It was known by many people that marijuana was a big part of

20    the cash crop, a big cash crop, a big part of the economy in

21    Clay County, and he very forthrightly told that.  He said

22    another problem they have is vote buying, and he talked about

23    that.

24          He speculates about a percentage of how many bought

25    votes there were in that county.  Now, this was on national

95

television back in 1989.  At that point, Cletus Maricle was a lawyer practicing in Manchester, Clay County.  You know, if he was doing anything illegal, if he'd been involved in that stuff, he wouldn't have put his name, his face out there on national TV, but he did.  You'll see that he's -- it will say his name on there, it will identify who he is, and there he is.

Cletus is smart enough that he wouldn't have done that if he'd have been involved in any of that stuff.  Being in a courthouse all the time, living in a small community, you know what's going on a lot of times, even if you're not personally involved.  All of us know how bad of a problem drugs are in our whole country.  Doesn't mean everybody's involved in it.

Cletus Maricle was a leader in his community, in that small town in Manchester in a lot of ways.  And he wasn't afraid to talk about the problems that faced his community because throughout his career, he was doing what he could to solve some of those problems.

He continued to be a leader.  He was a defense lawyer for a while.  As a small town lawyer, you've got to do a lot of different things.  You can't just do one thing.  You've got to do some criminal defense work.  You've got to do some workers' comp., some divorces.  And at the beginning of his career, that's what Cletus Maricle did.

96

1          Later on, he became a prosecutor.  And finally, he

2     became the circuit judge.  Not just for Clay County, but also

3     for Jackson County, Kentucky, and Leslie County, Kentucky.

4     They're three counties that make up that circuit.

5          We've heard the term "political boss" several times

6     already today, but I would submit to you that that word is

7     loaded, and the correct label to put on Cletus Maricle is a

8     political leader, a community leader.  He was prominent, he

9     was successful, and that's why he became a target for the

10    unscrupulous.  He was circuit judge for Clay County, Leslie

11    County and Jackson County for nearly 20 years.  A circuit

12    judge, he handles all the felony cases, all the serious

13    criminal cases.  Murders, burglaries, drug charges.  But, of

14    course, he also had to be the divorce judge.  He had to handle

15    property line disputes, lawsuits of every kind.  That was his

16    job as circuit judge.

17         And in every one of those lawsuits, every time

18    there's a court case that goes to trial where a judge has to

19    make a ruling on it, somebody loses.  Somebody is not happy

20    with the result that they got, and every one of those people

21    wanted to win their case.  Most of them believed in their

22    heart that they should win.

23         As a circuit judge, Cletus Maricle was called upon to

24    deal with the worst of the worst in Clay County.  A lot of

25    those people are going to be paraded in front of you as

1    witnesses in this case, people that Cletus Maricle sent to

2    prison.  And guess what?  A lot of those people don't like

3    him.

4         When the government gave them a chance to get back at

5    Judge Maricle, they jumped at it.  And some of these folks by

6    their testimony aren't just trying to get back at Judge

7    Maricle, they're trying to get a benefit for themselves.

8    They're trying to get their sentence reduced.  Some of these

9    people are hoping that their testimony will be a get out of

10   jail free card.  They're thinking, you scratch my back and

11   I'll scratch yours.  They're thinking that if they can do

12   something to help the prosecutor there, he'll help them.  Ask

13   the judge to reduce their sentence.

14        Now, when you're a circuit judge in a small town, or

15   you're a person who has any type of power or position, your

16   name gets dropped.  Your name gets used.  People who are

17   perceived to be friends will throw your name around, and

18   you'll see evidence of that happening to Judge Maricle.

19   You'll see that it sure is used by criminals who are in

20   trouble who are wanting to get themselves out of trouble.

21        Ladies and gentlemen, the evidence will show you that

22   one of the things that is most troubling, that hurts Judge

23   Maricle the most about allegations that have been made in this

24   case are to suggest that he is in any way tied to drug dealers

25   or drug activity.

98

1          Like far too many families, Judge Maricle and his

2     family have experienced personal dealings, personal sorrow and

3     pain because of drugs.  Their youngest daughter, Linsey

4     Maricle, has had a drug problem for years.  And as judge,

5     Cletus Maricle did what he could to put a stop to that stuff.

6     Linsey was arrested several times, and I'll tell you more

7     about that a little bit later.

8          But now I want to talk about another family in Clay

9     County, Kentucky, and that's the Whites.  Now, we've already

10    gone back a lot of years in some of the stuff we've talked

11    about in this case.  But to really understand Clay County and

12    to really understand the White family, you have to go back to

13    the beginnings of Clay County, because those folks were

14    prominent people.  There were a whole lot of leaders in the

15    White family.  They were powerful in politics and business and

16    education ever since the county was created.

17         There have been a lot of talented and outstanding

18    members of that family.  One was John White, who was a Supreme

19    Court justice for the state of Kentucky for a number of years,

20    and he was a Presbyterian preacher.

21         Cletus Maricle always considered himself a friend and

22    political ally of the Whites.  He counted that family among

23    his supporters.  But by 2006, the White's family star had

24    burned out.  Jennings White was in prison.  Doug White had

25    been the mayor of Manchester for 30 years, but he was in

trouble.  He had been indicted, and he's now in prison.
Jennings White came to ruin when his connection with Kenny
Day, notorious drug kingpin in Clay County, came to light.
Kenny Day drug him down with him.  As you've already heard,
Kenny Day was the service manager for the White's family
automobile dealership in Clay County.

So in 2006, after the November, 2006 election, the
White family is just on really hard times.  Doug White, who
has been the mayor of Manchester for 30 years or more, had put
his son, Kennon White, in as city manager.  And that probably
was a made-up job, daddy giving it to his son so his son would
have an income.  Kennon's wife, Wanda White, had a city job
too.  Well, when Doug White finally got beat in that mayor
election in 2006, Kennon and Wanda were out of jobs, and they
were in a state of disgrace.  Most of the people in Clay
County turned their backs on Kennon and Wanda White and the
White family.  Didn't want to be associated with what was
going on.

But you will hear a ton of evidence that shows Cletus
Maricle and his wife, Judy, were not fairweather friends to
the Whites.  They welcomed Kennon and Wanda White into their
home day after day for hour after hour.  They sat there and
they talked about their problems.  Some of these recordings
you'll hear, you can hear the sounds of Cletus Maricle fixing
food for Kennon and Wanda as they're in their house visiting,

1    dropping in, staying for hours.

2         Most of the people in Clay County were turning their

3    backs on Kennon and Wanda White.  Cletus Maricle and Judy

4    Maricle had their door open when the Whites needed help.  And

5    yes, you will hear conversations about jobs, and you will hear

6    Cletus Maricle talking about trying to help Wanda White get a

7    job.  This was a woman he's known for a number of years, and

8    he knows she's lost her job.  As circuit judge, he had some

9    say in who got to be working in what's called the drug court,

10   which is a counseling education program for drug offenders,

11   and there was a possibility that there would be a job open up

12   in drug court.  And Cletus Maricle would have helped Wanda

13   White get that job if he could have, because she was down and

14   out, and he was a friend.

15        But that's not the only job they talked about.  Judy

16   Maricle does real estate, has done real estate, and she

17   encouraged Wanda to try to get into that.  They also knew that

18   Wanda was talented as a hair dresser and could cut hair.  And

19   one of the things on the recordings is a suggestion from the

20   Maricles, well, why don't you go over to so and so's shop and

21   get a chair and just cut hair.  You'll do well.

22        There was nothing unsavory or improper about Cletus

23   Maricle and Judy Maricle wanting to help these people, wanting

24   to get them a job.  And the White family's troubles were

25   common knowledge in Clay County.  It was well known that there

1    had been a raid on City Hall.  By this point, Doug White is

2    indicted.  Kennon White was indicted, and the Whites came to

3    people who thought they were friends, Cletus and Judy Maricle,

4    and they talked about their problems.

5           Cletus and Judy Maricle had no idea that Wanda and

6    Kennon White had tape recorders hidden on them, had no idea

7    that they were going back to meet with FBI agents, law

8    enforcement agents who were saying, all right, ask this

9    question.  Let's see if we can get him to steer you to another

10   lawyer, so talk about your lawyer.  Talk about you're not

11   happy with your lawyer.  Maybe he'll try to steer you to

12   somebody that will do what he wants him to do.  He doesn't do

13   that.  They tell him who their lawyer is, he says, well, he's

14   a good lawyer.

15          Kennon White is talking about his unemployment and

16   tries to get Judge Maricle to say I'll take care of that.  I

17   can fix that for you.

18          But the big thing that the prosecutors talked to you

19   about is this grand jury testimony that Wanda White was going

20   to give.  Time after time, day after day, Kennon and Wanda

21   White come to Cletus and Judy, and that's all they would talk

22   about.  Cletus doesn't bring it up.  Judy doesn't bring it up.

23   Wanda and Kennon bring it up.  And they come in with a list of

24   questions, and they lie to Cletus and they say our lawyer drew

25   up this list of questions.  Want to tell us how to answer

102

1   these questions?

2           In reality, the FBI had drawn up the list of

3   questions.  Cletus Maricle didn't have any intentions of

4   answering questions, telling her how to testify in front of

5   the grand jury.  He says, tell the truth.  Time and again, he

6   says, tell the truth.

7           The government wanted Cletus Maricle, and they sent

8   Wanda and Kennon back time after time after time for hours.

9   And you'll hear part of the conversations, not all of it,

10  because some of it had nothing to do with anything.  But

11  you'll hear them use every kind of pressure they can.  They

12  know that Cletus Maricle cares about them.  They know that he

13  wants to help them.

14          And so one day, Kennon White goes to Cletus's house,

15  and it's supposed to be the day before Wanda goes in front of

16  the grand jury, and he just presses and presses and presses.

17  And he says, Wanda trusts you so much and she's just, she's a

18  basket case.  She's so upset, she just needs some guidance.

19  Trying to get him to tell, trying to get Cletus Maricle to say

20  how to answer the grand jury.  Give me some guidance.  Cletus

21  Maricle quotes a verse from the Bible.  He did not obstruct

22  justice.

23          Now, Wanda White is mad at Cletus for one thing.  Her

24  brother, Corky Price.  Now, when Wanda starts telling these

25  stories to the FBI, to the U.S. attorney, she pulls bits and

103

1    pieces from different places, and she gets some things out of

2    order.  Thank goodness, we can prove to you all that she got

3    some things bad out of order, because here's what happened.

4         Back up a little bit.  There was a murder in Clay

5    County.  A man named Collins killed another man named Collins.

6    There was a young woman who was present there and would have

7    been a witness in that trial.  One night, in April of 2005,

8    Wanda White's brother, Corky, gets this young woman, they ride

9    around taking drugs.  And when she's in a bad way, he delivers

10   her into the hands of three other people who cut her throat

11   and left her to die on the side of the road that night.

12   Fortunately, she was found before she bled to death.  That's

13   April of 2005.

14        Within a month of that happening, Corky Price,

15   Wanda's brother, has made a deal with the prosecutor and the

16   state police.  So before the end of the month of April, Corky

17   comes into court, Judge Maricle's court -- and this is on

18   video.  This is recorded.  Comes into court to plead guilty,

19   and he tells Judge Maricle -- because when a person pleads

20   guilty, they have to say here's what I did that made me

21   guilty.

22        He tells Judge Maricle, under oath, what he did that

23   night and what his role was in that case.  Now, the prosecutor

24   and the state police had signed an agreement with Corky Price

25   to let him out of jail.  They were going to give him probation

1    for that.  Judge Maricle said no.  It was too heinous a crime

2    for anybody to get probation, and he did not give Corky Price

3    probation.  He did not let Corky Price out of jail back in

4    April of 2005.

5         Now, it's a common practice, and you'll see it in

6    this case, a common practice for people who make deals and

7    plead guilty and are going to testify against other people,

8    for their sentencing to be put off until after the other

9    people have their trial, and you'll see it with one of the

10   government's star witnesses, Kennon White.  He's pled guilty

11   to extortion.  He's going to come in here and testify, but

12   he's not been sentenced yet.

13        Same thing happened with Corky Price back then.

14   Corky pled guilty, admitted to his role in that crime, that

15   attempted murder of a witness in another murder case.  But he

16   wasn't sentenced until after the other guys went to trial.

17   Corky testified in that trial, and he basically told it the

18   same way he told it to Judge Maricle that day.  Judge Maricle

19   had nothing to do with Corky Price's testimony.  He heard it

20   in April, right after the event happened, when Corky pled

21   guilty, and he heard it again in the trial several months

22   later.

23        Now, I said I'd come back to the drug problems of

24   Judge Maricle's daughter Linsey had.  Because here's another

25   thing.  Here's another little tidbit that Wanda White tried to

1    pull in to use against the man who was trying to help her.

2    Wanda White says a guy named Bubba Collins wrote a letter to

3    Judge Maricle threatening to name his daughter as being

4    involved with this stuff.

5            Bubba Collins is one of the three guys that cut that

6    girl's throat, one of the three guys that went to trial, and

7    Corky Price testified against him, and they were all found

8    guilty.  Remember that event was April, 2005.  The trial of

9    these other people doesn't happen until roughly a year later.

10   After they're found guilty, this Collins boy, who was been

11   found guilty of doing this, does write Judge Maricle a letter.

12   Judge Maricle mentioned it.  Wanda had heard him say that.

13           Wanda tells the FBI, the reason he had Corky lie is

14   because of this letter.  Well, Corky had told his story in

15   April of 2005 and the letter that, thank goodness, we were

16   able to produce was written in January of 2006.  Now, far from

17   trying to brush that under the table, Judge Maricle received

18   that letter.  It was written January 6th.  Within a week, he

19   turned it over to some defense attorneys who were doing --

20           Remember, I said it all started with the murder case,

21   Harold Collins and Stevie Collins.  Well, that case hadn't

22   been tried yet so that's still in front of Judge Maricle.  So

23   doing the right thing, he does exactly what a judge should do.

24   He gives it, he says, look, I've had this letter I received

25   mentioning my daughter.  He turns it over to them, and they're

1    able to use that in their case representing their client.

2         Judge Maricle never tried to conceal.  Judy Maricle,

3    his wife, never tried to conceal Linsey's drug problem.  She

4    was arrested several times.  One of the painful ironies of

5    this case, you heard the name Bobby Joe Curry mentioned.  He

6    was a drug dealer.  He was being protected by some of the

7    police in Manchester and Clay County.  One night, the police

8    come to Judge Maricle to get a search warrant for his house,

9    for Bobby Joe Curry's house.  Judge Maricle signs that

10   warrant.  The police go to search Bobby Joe Curry's house, the

11   drug dealer's house.  Guess who's there?  Linsey, the judge's

12   daughter.

13        The police call Judge Maricle and say, we got Linsey

14   here.  And he says, treat her like you would anybody else.

15   She was arrested.  Linsey had a drug problem.  The Maricles

16   have dealt with it the best they could.  They didn't try to

17   conceal it.  They had her put in jail at times.  She would

18   steal things from them to get drug money.  They had her put in

19   jail.  They didn't try to conceal that.

20        You'll hear some things on these tapes about Corky

21   Price, and you'll agree that Judge Maricle did the right thing

22   when he did not give Corky Price probation.

23        But what you'll also hear is something you need a

24   little background on.  In a small town, 15 or 16 hundred

25   people, everybody knows everybody, or they think they do.  So

107

1   if you're the circuit judge in Manchester, Kentucky, you can't

2   live in a shell.  You run into people.  People are always

3   asking you for favors, always asking you to do this or that.

4   Judge Maricle had kind of a standard response to that.  When

5   somebody came and asked him to do something, he would say, get

6   your lawyer to file papers, and we'll see.

7       And that's basically what you hear him say on these

8   recordings to Wanda White, because she keeps talking about

9   Corky.  She wants Corky out of jail.  Cletus Maricle won't let

10  him out of jail, doesn't give him probation.  Sentences him to

11  five years in prison, which is the maximum he could have given

12  him on that charge.  Wanda brings it up, he says, well, you

13  got to get some papers filed.

14      Ladies and gentlemen, I've told you about the

15  obstruction of justice charges that the folks, Kennon White

16  and Wanda White, came to Judge Maricle's house day after day,

17  spent hours there trying to get him to tell them what to do.

18  To help the FBI.  He wouldn't do it.

19      I do need to talk about one other witness that you're

20  going to hear from, and that's Kenny Day.  Now, again, Kenny

21  Day was a long-time employee of the White family's car

22  dealership.  He was the service manager for a long time.  He

23  seemed to be a respectable member of the community.  He

24  advanced in the Republican party in Clay County.

25      From all appearances, he was a decent guy until he

108

1    got caught in Florida with a huge amount of cocaine.  And he

2    got sent to federal prison because it was a Florida case.

3    Now, he didn't get nearly the sentence you might expect in the

4    Florida case for having a huge amount of cocaine.  The

5    evidence will show that he told on other people then to get

6    his sentence reduced.

7           He got out of federal prison, and when you get a

8    sentence in federal prison, you get something called

9    supervised release.  It's like being on probation after you

10   get out of jail, out of prison.  And Kenny Day was on federal

11   supervised release, but he did go right back to his drug

12   dealing when he got back to Clay County.

13          Now, you won't hear anything about Cletus Maricle

14   having any dealings with him after his drug dealing behavior

15   became well known.  They may have dealings in the early days

16   when Kenny Day appeared to be respectable, but you won't see

17   anything about it after he got out of federal prison.  But he

18   did go right back to it, and now he's serving 18 years, and he

19   wants out again.  He wants out early, and he's willing to lie

20   for the government to fool you, to hurt Cletus Maricle or to

21   hurt whoever he can to get his sentence reduced.  He's another

22   one who has pulled out some tidbits and details and gotten

23   them wrong.

24          Just a few months ago, Kenny Day came into federal

25   court, he swore an oath to tell the truth, and he lied.  He

1    told a tale about Judge Maricle being the judge in a case

2    where his sister-in-law was killed and there was jury

3    tampering.  He said Cletus Maricle was the judge in that case.

4    He swore to that.  We went to look at the court file, and it

5    was very easy to see Cletus Maricle was not the judge in that

6    case.  There had been a case where a woman was killed, Kenny

7    Day's sister-in-law was killed by a driver who was on drugs or

8    alcohol or something.  Killed this woman.  She'd been a nurse.

9    There was a lawsuit, and the jury brought back a big verdict.

10   But there was no need for jury tampering in a case like that,

11   and Judge Maricle had nothing to do with that case.  But Kenny

12   Day, the government's -- one of the government's star

13   witnesses walked into court, raised his hand and swore to tell

14   the truth, and he lied about that.

15         When that lie was found out, he came up with a

16   totally different story.  This time, he didn't have any

17   details.  But he turned it around, and he's still trying to

18   sell that same old thing.

19         Ladies and gentlemen, Cletus Maricle was a leader in

20   his community, and he was active politically in the Democratic

21   party.  Once he became circuit judge around 1990, he wasn't

22   active in politics like he had been.  Now, he did what he

23   could to some degree to help his son-in-law in 2006, but he

24   didn't do anything to violate the law.

25         The government's case will not hold up, because one

1    of the most important things here is these people were

2    supporting different candidates in these elections.  And the

3    most important -- let's again talk about the White family.

4    The most important indication, most important example of this

5    situation was that 2002 election for the Clay County court

6    clerk.  And that pitted Jennings White, one of the Whites, who

7    Cletus Maricle always supported, and another person whose

8    criminal activity was unknown to most of the folks who dealt

9    with him.  Judge Maricle supported Jennings White against

10   Freddy Thompson.

11          Others who are here today supported Mr. Thompson, but

12   not Cletus Maricle.  These folks weren't even on the same

13   side.  Cletus Maricle was a political leader and a community

14   leader.  There's plenty of room in our society for legitimate

15   political activity.  Our form of government and our way of

16   life wouldn't exist without it.  You have these election

17   officers at every precinct.  You know, those people have to be

18   there the whole time the polls are open, from 6:00 in the

19   morning to 6:00 in the evening.  They have to get there early

20   to get things set up and they have to be there late.

21          It's not the easiest thing to find people to do so

22   somebody has to get people to do that.  The fact that Judge

23   Maricle may at times have asked people to do that is not any

24   indication of any illegal activity on his part.  By the same

25   token, you'll hear recordings with Cletus Maricle present with

some of the other folks in this room.  And they were friends.
It's a small town, and people might be politically opposed on
things.  They might be together on this thing or that thing,
but they're friends, and there's nothing wrong with that.

You'll hear evidence in this case about people, other
people close to Cletus Maricle who ran for election.  Kennon
White was one, he ran for jailer, and Cletus Maricle supported
him.  One of Cletus' good friends is a lady named Jo Davidson.
She used to work for him.  He supported her when she ran for
office.  She lost.  Jennings White loss.  He's a political
kingpin, powerhouse.  Those people would have won those
elections.

Ladies and gentlemen, I've tried to give you a brief
overview of our side of the case.  You're going to hear a
whole lot more over the next weeks.  I've tried to shine a
light on a couple of the government's witnesses, Wanda White,
Kenny Day, who can be proven to be untruthful.  Showed the
quality of the government's witnesses in this case.

And when this long ordeal is over, you've heard all
the evidence in the case, I submit that you will find that
Cletus Maricle is an innocent man, an innocent man, and return
a verdict of not guilty.  Thank you.

THE COURT:  Thank you, Mr. Hoskins.  Mr. Westberry,
do you need a moment to set up your laptop?

MR. WESTBERRY:  Just one moment, thank you.  I think

1    we've got it pretty well done.

2            THE COURT:  Mr. Westberry, you may proceed.

3            MR. WESTBERRY:  May it please the Court, Judge

4    Reeves, Mr. Smith, Mr. Parman, colleagues.  Members of the

5    jury, good afternoon.  Thank you has been said many times by

6    the people that have appeared before you so far.  My name is

7    Kent Westberry.  Together with my partner, Kristin Logan and

8    Mr. Bennett Bayer, it's our privilege to represent Mr. Doug

9    Adams in this trial that's being brought before you.  Doug,

10   could you please stand and address the men and women of the

11   jury one more time?  Thank you.

12           Members of the jury, we're going to try to use this

13   projection screen.  I hope it helps.  I believe it's readable

14   from the jury box.  If anybody has any problem, I sure with

15   the judge's permission wouldn't mind trying to make some

16   adjustments.  I would also say please feel free to look at the

17   screen as much or as little as you want to.  You don't have to

18   keep your eyes glued to me when I talk.  I hope that this will

19   serve as an aide as we deliver the opening statement to you

20   over the next few days.

21           Members of the jury, in opening statement, we would

22   agree with this portion of what the government said is a

23   little like a road map.  By road map, we mean it's where we

24   think the evidence will take us.  But stated a little

25   differently and perhaps more importantly, it takes us to where

1  we think the truth will lead us, the complete truth.

2          One of the questions we may ask is why are we here?

3  Clay County, Kentucky.  You've heard that it's in the

4  southeastern portion of the state.  It's a small county.

5  Manchester is the county seat.  It's rural, it is --

6  historically, it is below the poverty line.  That's just a

7  simple fact that we have to deal with, a reality, when

8  understanding this case.  And we'll speak to that to you in a

9  little bit more detail in my opening statement on behalf of

10 Doug Adams.

11         The point that the government seems to be making is

12 that during the time frame that's mentioned in this case

13 that's being brought before you that Doug Adams was some kind

14 of political boss, some kind of political kingpin, I think,

15 were the terms used by the prosecution.

16         Members of the jury, the evidence is going to show

17 quite to the contrary.  That was not the case with Doug Adams

18 during this time frame.  Perhaps the best way to understand

19 what was really going on in Clay County, Manchester, Clay

20 County at this time, is to look to see who was in charge of

21 the county at that time.

22         You've heard the name Jennings White.  At the time,

23 was a long-time county court clerk in Clay County.  Daugh

24 White -- you're going to hear the name White a lot in this

25 trial -- the Manchester mayor.  Kennon White, son of Daugh

114

1    White.

2          Todd Roberts, not a White, but an assistant police

3    chief.  We'll speak to him.  The government has already

4    mentioned him in their opening statement.  Had close

5    connections, a close ally of Jennings White and others down

6    here as well.

7          Bobby Joe Curry.  A large, long-time drug dealer in

8    Clay County.

9          Kenny Day, we'll hear more about Kenny Day, as you

10   have, in just a few minutes.  Vernon Hacker.  At one time was

11   a city council member and 9/11 director.  And Darnell Hipsher,

12   a member of the City Council.  These are just representative,

13   members of the jury, of some of the names that you'll be

14   hearing.  They are either Whites or people who are closely

15   connected and in contact on a regular basis with the White

16   family.

17         Where are they now?  Jennings White, the former

18   county court clerk, serving a seven-year drug conviction in

19   the federal penitentiary.  We expect he will testify.  As my

20   colleague, Mr. Hoskins, mentioned just a few minutes ago, we

21   anticipate he hopes for a reduction of his sentence.

22         Daugh White, likewise in federal penitentiary.

23   Kennon White, awaiting sentencing before this court.  Todd

24   Roberts.  Todd Roberts was the assistant police chief in

25   Manchester in Clay County.  He, as well as Bobby Joe Curry and

1    Vernon Hacker, actually burned down a building in Manchester

2    in order that a 911 center could be built.  Vernon Hacker,

3    likewise, in a federal prison.  And Darnell Hipsher, he may be

4    released.  I'm not entirely sure.  He may be serving at a

5    halfway house.

6           Members of the jury, we anticipate among one of the

7    beginning witnesses, perhaps, that the government will call is

8    Kenny Day.  As Mr. Hoskins mentioned a moment ago, serving an

9    18-year drug sentence.  He's a three-time convicted felon for

10   drug offenses.  That's a credibility fact that you will have

11   to take into account when you evaluate his testimony.

12          Now, the question will be asked, how did Doug Adams

13   feel about these people that have been identified on this

14   screen and their conduct?  He opposed them.  The evidence will

15   clearly establish that Doug Adams was opposed to this conduct.

16   He fought against it for reasons we'll describe in a little

17   bit more detail.  He had very personal reasons, members of the

18   jury, to oppose this White family, this clan, if you will,

19   that had dominated Clay County politics for so many years.

20   And we'll speak to that in just a little bit more detail.

21          Who is Doug Adams?  First, members of the jury, he's

22   an educator, and a good one.  Much was made, I think, by the

23   government, as we heard their opening statement, about how

24   perhaps he tried to work his way up through the system.  Let's

25   take a look at what the evidence will show in terms of how

1    Doug Adams worked through the years in the Clay County School

2    System.

3            Beginning in 1975, for about 11 years, he was a

4    teacher and a bus driver at the Laurel Creek Elementary School

5    in Clay County.  For the next three years, he was assistant

6    principal and athletic director at the high school in Clay

7    County.  For about six years after that, he actually served as

8    principal at Clay County High School.  Slow down just to let

9    everybody write this down.  For about a year, slightly more

10   than a year, he worked at the Board of Education as supervisor

11   of instruction.  Then for about a three-year period, he was

12   the assistant superintendent of the Clay County schools.

13           Then for ten years, 1999 through just this past year,

14   he served as superintendent of the Clay County schools.  Then

15   he retired last July, after about 34 years, good years for the

16   Clay County school system.

17           That's what the evidence will show that Doug Adams

18   did in terms of his education, his work as an educator in the

19   Clay County school system.  Who else is he?  Actually, members

20   of the jury, in 1990, he applied for the job of superintendent

21   of schools in Clay County.  He didn't get the job.  Who did?

22   Charles White.

23           Incidentally, the name Vernon Hacker was mentioned by

24   the government in their opening statement.  The government

25   seemed to imply that perhaps Mr. Hacker will offer some

1    testimony critical of Doug Adams during this trial.  Members

2    of the jury, the evidence will show that Vernon Hacker, and we

3    mentioned him just a moment ago, among those on the screen

4    that were associated with Whites, was actually hired by

5    Charles White, the superintendent, then superintendent of the

6    schools in the Clay County school system.

7            Doug has earned numerous awards and achievements.

8    Actually, what that really should say, members of the jury, is

9    that the school system has earned numerous awards and

10   achievements during the period of time that Doug Adams served

11   as the superintendent of schools.

12           CATS.  Any of us that have school-aged children in

13   Kentucky are generally familiar well what the term CATS mean.

14   Commonwealth Accountability Testing.  It measures how our

15   children learn in the public school systems here in Kentucky.

16   There are 720 elementary schools, an approximate 720

17   elementary schools around Kentucky.  There are eight

18   elementary schools in Clay County.  Of those eight in Clay

19   County, during 2007, during the period that Doug Adams served

20   as superintendent, three of those eight elementary schools in

21   the system actually ranked in the top five percent of CATS

22   tests.  Another three ranked in the top 13%.

23           While at the same time, as the evidence will show,

24   the school system was forced to increase their free lunches or

25   reduce lunches, based on the reasons that we mentioned a

1    moment ago, the county still was below the poverty level.

2        Clay County may be one of the least wealthy counties

3    in the country, as the evidence will show, but their kids are

4    among the best educated, at least in Kentucky.

5        So why are we here?  Members of the jury, the

6    government in Count 1 has alleged that Doug Adams conspired

7    with other defendants to control politics in Clay County.

8    Specifically with regard to Count 1 -- and Mr. Adams is

9    mentioned only or named only in Counts 1 and 2 of the

10   indictment.  Particularly, the government claims that they

11   used the Clay County Board of Elections to control local

12   politics.

13       Now, members of the jury, the evidence will show

14   there's some very real problems with the theory advanced by

15   the government in that regard.  First, Doug Adams was never a

16   member of the Board of Elections.  Second, and I realize this

17   is a lot of election terminology to try to be throwing on an

18   afternoon after you've heard hours of discussion from the

19   attorneys, but bear with me.

20       I'll give you what the evidence will show would have

21   been the composition of the Board of Elections at that time.

22   Fella named Edd Jordan, a former sheriff in Clay County.

23   Bitter political enemy of Doug Adams.

24       Jennings White at the time was not only the county

25   court clerk but also a member of the Board of Elections.  He

1    actually controlled two votes.  He could break ties on the

2    Board of Elections at this time.  Charles Wayne Jones, another

3    member of the Board of Elections, was actually a member of a

4    different political party than Doug Adams.  Doug Adams was a

5    Republican.  Charles Wayne Jones was a Democrat.  And then

6    finally, William Hugh Bishop, perhaps the only consistent

7    ally, if you will, that Doug Adams would have had on the Board

8    of Elections at this time.

9            So the point we are making in terms of what the

10   evidence will show is no matter how you count the votes on the

11   Board of Elections, Doug Adams would have been outvoted in

12   every instance and almost every time at this particular time.

13           That's important, because in order to find someone

14   guilty of that first count, which Doug Adams is named, this

15   thing we call RICO, you've got to have an enterprise that

16   controlled politics in Clay County for the purposes as stated

17   by the government.

18           We believe the evidence will show that there is no

19   way Doug Adams, for the reasons we just mentioned, because of

20   the composition of the votes on the Board of Elections or the

21   fact that he didn't even have a seat on the Board of

22   Elections, could have exerted or had any control over this

23   thing, this so-called enterprise, as Judge Reeves will define

24   in a lot more detail as we go closer to the end of the trial.

25           And as Mr. Hoskins said just a minute ago, which is

120

so very, very true, the evidence is going to show, and I ask you to remember again, please, members of the jury, not everybody seated at this table behind me were supporting the same candidates, and some of these people had strong disagreements with each other.

The only reason that Doug Adams, as the evidence will show, even got involved in the 2002 election was for one reason and one reason only. He wanted to defeat Jennings White. And as I alluded to just a moment ago, the evidence will show that there were very personal reasons why, very, very personal reasons why Doug Adams wanted to see Jennings White and the rest of that crowd out of politics in Clay County. That had to do with one of his daughters, Melanda. And we'll speak to that in just a minute.

I want to speak to the members of the jury a little bit about Doug Adams' family. He's been married for 36 years. His wife's name, he calls her Sissy. She taught for over 30 years in Clay County School System herself. They have two daughters. They have grandchildren as well. The oldest daughter, Danielle, is 34 years old, graduated from Eastern Kentucky University, is married with three children.

The youngest daughter, Melanda is now living back in Clay County, in the Manchester area. She owns and operates her own convenience store.

Mentioned just a moment ago, in remarks in opening

1    statement to you, a very personal reason why Doug Adams wanted

2    the White clan, Jennings White in particular, out of office.

3         Some of the people who were identified earlier,

4    including Jennings White, assistant police chief Roberts,

5    Kenny Day, Vernon Hacker, among others, it's been established,

6    and we are in agreement that they were either selling drugs or

7    protecting those who did.  Melanda Adams, in her teens, while

8    she was a high school student, became addicted to drugs.  It's

9    not an altogether uncommon ordeal, but it was a terrible one

10   for the Adams family.

11        Evidence will show, members of the jury, there would

12   be days if not weeks would go by they did not know where she

13   was, did not know what the condition of her health was, did

14   not know if she was alive, didn't know if she was going to

15   return home; and if she did, what condition she would be in.

16        Through the hard work of Doug and Sissy Adams, she's

17   now been drug-free for six years.  That involved Doug

18   insisting on her arrest, her incarceration, Melanda's own stay

19   in various rehabilitation centers.  But members of the jury,

20   this is the deeply personal reason why Doug Adams got involved

21   in that 2002 election and wanted Jennings White and the White

22   croneys out of office.  That's what the evidence will show as

23   we present this case to you.

24        What will the evidence show?  Doug Adams was not in

25   involved in a conspiracy to control politics in Clay County.

1    At the end of the day, members of the jury, what we believe

2    you'll be asked to decide with regard to the RICO count, the

3    first count of the indictment, is whether these people, seated

4    at the table before you, were working together to control

5    politics in Clay County.

6         It's not enough that they knew each other or may have

7    talked with each other from time to time.  That certainly

8    would not be unsurprising in a community the size of

9    Manchester or a county the size of Clay.

10        What the government must show in order to get a

11   conviction, to convince you, the members of the jury, that

12   Count 1 of the indictment has been proven is that they

13   conspired with each other for a common purpose, to use this

14   Board -- this enterprise called Board of Elections to control

15   politics in Clay County.

16        We submit at the conclusion of the trial, in the

17   weeks to come, the government will fall far short,

18   particularly with regard to Doug Adams.

19        Again, members of the jury, the evidence will show

20   that Doug Adams got involved in the 2002 election for one

21   reason and one reason only.  To get Jennings White out of

22   office.

23        We will test Mr. White's credibility from that stand

24   in the event that the government chooses to call him.  Proof

25   will also show, members of the jury, that prior to 2002, the

123

1    government will not be able to show that Doug Adams even had

2    an association with Mr. Freddy Thompson such that there was

3    this conspiracy to control politics in Clay County.

4            He's a good man.  He's a good father, as the evidence

5    will show.  He's a good educator, as the evidence will show.

6    We'll be standing before you at the conclusion of this trial

7    and ask you each to return a verdict of not guilty as to both

8    counts with regard to Doug Adams.  Thank you all very much.

9    Appreciate your attention.

10           THE COURT:  Thank you, Mr. Westberry.  Mr. White,

11   we'll give you just a moment.  Mr. White, you may proceed.

12           MR. WHITE:  Your Honor, Mr. Smith, Mr. Parman,

13   colleagues.  Good afternoon.  I finally get to say something

14   to you.  First thing I want to say to you is, though, my name

15   is Scott White.  I'm not from Clay County.  I'm not the mayor

16   of Manchester.  All my people are from Pike County.  I grew up

17   in Lexington.

18           I want to be brief because you've heard a lot of

19   lawyers talk.  I want to highlight a few things that are

20   important to my client.

21           Before I do that, I was in a trial about a month or

22   so ago, and I heard a prosecutor say, an assistant U.S.

23   attorney say something that I never really heard in a court

24   before and it made a lot of sense.  That was that the

25   government, the federal government can kind of make you do two

1    things.  They can draft you, send you to war, or they can

2    draft you, make you sit on a jury and decide a case.  And in a

3    lot of respects, that's kind of funny.  But in a lot of

4    respects, it's the same kind of thing.  I mean, lives aren't

5    at risk, but you are here as a protecter of freedoms of our

6    constitution.

7         The government, as you heard yesterday, as Judge

8    Reeves read to you a very lengthy indictment, charging these

9    folks with very, very serious crimes, that we have 12 folks

10   that will decide the facts and the evidence and then make

11   their decision.  And so on behalf of Wayne Jones, I want to

12   thank you.  I've been doing this a long time, and we do

13   understand what you're going through.  We appreciate it.  It's

14   going to be a long trial.

15        Speaking of Wayne, like everybody else, I'm going to

16   ask him to stand up for you.  Wayne.  Thank you, sir.  And his

17   wife is all the way in the back.  Jen, would you mind standing

18   so they can see you?  She won't be a witness.  Wayne, like

19   Judge Maricle, was born and raised in Manchester.  Born in the

20   hospital there in Manchester in 1939.

21        After 32 years working for the state down there, he

22   retired.  He was a social worker and at the end of his career,

23   he ran what's basically called the Clay County Welfare office

24   was doing that when he retired.  His wife, as I've already

25   pointed out, is Judy.  They have three adult children.  His

1    oldest daughter is Lisa.  Lisa is the proud wife of Freddy

2    Thompson, who is the Clay County clerk.  And I will let Mr.

3    Richardson tell you all about that family.  Freddy's a good

4    man.  He sure married up, I can tell you that.

5         His other, next child is Christopher.  Christopher

6    lives down there in Manchester as well.  He works for the

7    transportation cabinet.  And his daughter, who I think is

8    probably the apple of his eye, like my daughter is mine,

9    she -- I'm a little surprised she's not here; they seem to be

10   joined at the hip, is Martha Anne.  She is a Center College

11   graduate, and unlike a lot of Center College graduates who

12   join the Center Mafia and go off to make their fortune, she

13   went back home to Manchester as well.  And she is the director

14   of housing for a public housing nonprofit down there.

15        And like a lot of Kentuckians, like most Kentuckians

16   I know, at least all the Kentuckians in my family, anyway,

17   they're dead interested in politics.  And from a little boy,

18   Wayne has been involved in politics.  He's a Democrat.  Unlike

19   most Clay Countians, Wayne is a Democrat, not a Republican.

20   Clay County is as Republican as they come.

21        He got involved in politics and like all people

22   involved in politics, he tried to elect Democrats.  Now, let

23   me kind of transition real quickly to this notion of a Board

24   of Elections, and I was looking to see if the United States

25   left their exhibit up here.  Remember the exhibit that they

1    showed?  It showed the Clay County Board of Elections.  And

2    Mr. Smith is right, in all 120 counties, they operate the

3    exact same way, and there's no mystery to it.

4              It's all set out by statute or by regulation, by the

5    State Board of Elections.  And what I want to do is just walk

6    you through that a little bit.  It's kind of tech -- it's not

7    technical, I think it will help just a tad.  You've got four

8    members.  You've heard you've got whoever's the elected county

9    clerk is automatically on the Board of Elections.  Automatic.

10   The county sheriff, by statute, is automatic is on the county

11   board.  Then the other two, the two major parties of that

12   county, in Clay, as in every other county in Kentucky is the

13   Democrats and the Republicans.  They each have a

14   representative on the Clay County Board of Elections, and the

15   reason why I think our legislature wanted that is because

16   political parties run an election, so it makes sense to have

17   the opposing political parties be on the Board of Elections.

18             Now, so you got the two by statute, the sheriff and

19   the county clerk.  How does the Democrat and Republican get on

20   there?  Well, those two members are chosen by the county

21   executive committee of that county's party.  In other words,

22   here in Franklin County, the Franklin County Republican party

23   and the Franklin County Democrat party essentially send up

24   names to the State Board of Elections, and the State Board of

25   Elections picks one.  And that person gets a commission from

1    the Secretary of State, who then sits on that county as that

2    party's commissioner.

3           So when you hear Wayne Jones referred to as

4    Commissioner Jones, he wasn't elected.  He was appointed, if

5    you will.

6           Now, in 2002, the Board of Elections was comprised

7    of, as you already heard, Jennings White, a Republican, who is

8    the county clerk.  That's who Freddy Thompson was running

9    against.  Edd Jordan, who was the Republican sheriff.  Hugh

10   Bishop, who was chosen as the Republican commissioner, and

11   then my client, Wayne Jones, was the Democrat commissioner.

12   Those were the folks in 2002 that comprised the Board of

13   Elections, okay?

14          Now, as you heard in the opening statement of Mr.

15   Smith, that is the entity that they claim is this enterprise.

16   And at the beginning, before we even got started, Judge

17   Reeves -- in fact, I think it may have been the first thing

18   that happened after y'all got sworn in, Judge Reeves read you

19   that long indictment.  I'm not going to read it to you again,

20   don't worry, but I want to tease out a couple quick things.

21          Here's what we're defending against.  The United

22   States presents facts to or allegations to a grand jury.  The

23   grand jury then meets and issues what's known as an

24   indictment, and this is the indictment that then we're called

25   upon to defend against.

128

1          And here's what they say the enterprise is.  At all

2     times material to this indictment, the Clay County Board of

3     Elections was an enterprise and all these folks, all these

4     defendants participated in the operation and management of the

5     enterprise.  At all times material to this indictment, which

6     would be from March, 2002 until -- well, let's see.  March,

7     2002 until sometime at the end of 2006, that's the period.

8          Well, in March of 2002, the only person of all these

9     folks who have been accused of a crime that were involved in

10    the operation and management of the Clay County Board of

11    Elections is Wayne Jones, my client.  And Wayne Jones had

12    three people against him, three Republicans who controlled --

13    in fact, Mr. Smith in his opening statement, remember he told

14    you whoever's got the county clerk's got the Board of

15    Elections.  The Republicans had the Board of Elections in

16    2002.  And if there were a tie, say a 2-2 vote, the county

17    clerk gets to cast the deciding vote.  That means when they

18    walk into that meeting, Wayne Jones is outvoted 4-1.  I submit

19    he had no ability to participate, operate and manage the Board

20    of Elections, the Clay County Board of Elections in 2002.  It

21    just doesn't make sense.

22         And you know what, when you get into that jury box,

23    the one thing you don't need us to tell you or be instructed

24    on is common sense.  Y'all got plenty of common sense.

25         Now, the thing that I learned for the first time

129

1    today was that Jennings White was given a title, and that

2    title was an unindicted co-conspirator in the RICO enterprise.

3    That is the racketeering activity and the operation of the

4    enterprise.

5         What they have said in their opening statement as an

6    unindicted co-conspirator is Jennings White agreed with all

7    these folks on running the Board of Elections.  I will fall

8    out of my chair, which I've been known to do, if anybody gets

9    up here and testifies that Wayne Jones would agree with

10   Jennings White to do anything in 2002.  They were dead set

11   against each other.  My client was trying to help his

12   son-in-law, Freddy Thompson, become elected.  It's probably

13   the only Republican he supported in his life, because he was

14   married to his daughter.

15        But the United States is trying to tell you that they

16   conspired together.  Common sense.  That's what I'm asking you

17   to apply in this case when you listen.

18        Now, as you've heard, much of the United States' case

19   depends on convincing you that the election officers were also

20   corrupt and that they were selected by these people.  I think

21   they said that Judge Maricle and Superintendent Adams may have

22   told them who to pick.  I was fuzzy on my notes on that.

23   Again, bear with me a moment.  I want to unpack that process

24   too.

25        It's not like the Clay County Board of Elections

1    comes into session and they all get around a conference table

2    there in the Clay County municipal building and they say, oh,

3    let's get Scott White, let's get Kristin Logan, let's get

4    Robert Abell to be our election officers down in Manchester

5    precinct.  That's not how it works.  It works the same way in

6    all 120 of our counties.

7            Let me tell you how it works.  It's kind of

8    interesting.  And if you're a -- I guess a government history

9    buff like me, you really find it interesting.  If you're not,

10   I'm about to bore the dickens out of you.  I apologize.  Here

11   are how they're picked.  We have the Kentucky Republican

12   party.  We have the Kentucky Democrat party.  And those

13   parties have bylaws, and they tell how they operate.  This is

14   how we're going to elect our State Board.  Here's how we're

15   going to have our officers.  Here's how we're going to have

16   our primaries.  But it all starts at the grass roots; that is,

17   at the county level.

18           Here's what happens.  It's tied to when we elect our

19   governor.  Every four years, the county party has its own

20   convention; that is, the Clay County Democratic party and the

21   Clay County Republican party get together and they have a

22   convention.  Well, who goes to this convention?  Well, Clay

23   County is divided up not into 21, but into 20 precincts.

24   Every one of those precincts holds an election, and they elect

25   anybody that's a registered Democrat.  I'm just going to talk

131

1    about the Democrats.  It's the same for the Republicans.

2         All the registered Democrats in that Manchester city

3    precinct, what they do is they'll go down to like a school or

4    wherever the precinct, wherever you vote, they'll get together

5    and they elect a captain, a co-captain, a youth member; that

6    is, somebody 35 or under, and they elect a woman.  And so you

7    have those four people are then the party officials for that

8    precinct.  Those four people then go to the county convention.

9    Are you with me?  Gets kind of weird.  I probably should have

10   done audio visual.

11        At any rate, those four people from that precinct

12   join with the four people from the other 19 precincts.  They

13   then have the Clay County Democrat convention, okay?  They

14   then elect the Clay County executive committee for the

15   Democratic party.  Same for the Republicans.  It's real

16   simple.

17        That then group essentially manages the Clay County

18   Democratic party.  Here's what they do.  The first thing they

19   do is they select the county chair.  They elect the county

20   chair.  From 2002 to 2006, the Democratic county chair was Don

21   Nolan, okay?  The Republican, I believe, was Clay Bishop.  It

22   kind of changed a couple times.  Mr. Bishop is the county

23   attorney for Clay County.  I think he'll come in and testify,

24   talk to y'all about some things.  I'm not sure yet.  But at

25   any rate, Clay was the Republican chair.

1        Now, that gives you that backdrop, okay?  And it's

2   the executive committee, the Democratic executive committee

3   that takes its five nominees and mails those to the State

4   Board of Elections in Frankfort, and the State Board of

5   Elections picks one of those to be the county commissioner for

6   that party for the County Board of Elections.  I know I lost

7   you five minutes ago, but that's basically the deal, okay?

8        In other words, it's not a bunch of guys sitting

9   around chewing tobacco and drinking L-8s trying to figure out

10  who we gonna put, da, da, da.  That's how that works.  Here's

11  how the election officers are picked.  In every precinct, by

12  statute, you have four election officers.  You have two

13  judges.  They're not judges like Judge Reeves or Judge Maricle

14  or, you know, a law judge.  They're just called judges.  You

15  have two.

16       You also have a sheriff, but they don't carry a gun

17  and a badge.  They have certain duties they have to do in

18  terms of just monitoring the line so that when 6:00 hits,

19  whoever is last in line, that's the last person who votes.

20  And then you also have a clerk, and they have certain duties.

21  Our statutes, Kentucky statutes define and explain what those

22  duties are.

23       What happens is in all 120 counties, the county, the

24  county chairperson -- I'm just going to talk about Democrats

25  again.  The Democratic county chair gets 20 forms, one for

1    each Clay County precinct.  That form is then given by the

2    county chairperson to each of the captains who have been

3    elected in those precincts.  You with me?  And then they go

4    out and they get four people that are willing to be Democrat

5    officers in that precinct.  They get two judges.  They get one

6    clerk and they get -- well, they actually get four names.

7    They have to sign their name on this form themselves.

8         That then is given to the county clerk, and then when

9    the Board of Elections meets as a group, the County Board of

10   Elections, they then put together, they then select the county

11   or the precinct officers that go out on election day.

12        Here's what's interesting.  The Board of Elections

13   can't just go out and pick their own folks.  They've got to

14   select from the people that are given to them by the two

15   parties, the Democrats and the Republicans.

16        For instance, the Manchester precinct that Mr. Smith

17   wanted to talk about, great example.  You've got four

18   Democrats that are nominated, you got four Republicans who are

19   nominated to be the four pre-election officers in that

20   precinct.  One judge has to be a Republican.  One judge has to

21   be a Democrat.  So you got those two right off the bat.  One

22   has -- you need a clerk and you need a sheriff.  One's got to

23   be a Republican, one's got to be a Democrat.  The County Board

24   of Elections, which is again county clerk, county sheriff,

25   Democrat commissioner, Republican commissioner, they then

1    select that group.  Then they go do it.

2         Now, you've got some extra names, those are the

3    alternates, and I think there will be testimony as to why you

4    have alternates.  It can be hard to get election officers.

5    Sometimes they don't show up.  Or sometimes they show up, but

6    they weren't picked, and they just want to do it.  So you need

7    alternates to cover that contingency.

8         And our again Kentucky statutes talk about how all

9    that works.  You know, in other words, these are the four

10   people that the county has selected to do it, the County Board

11   selected to do it.  Scott White doesn't show up.  What do you

12   do next?  The statute tells you.  The expert on that is the

13   county clerk, in conjunction with the county attorney, in

14   conjunction with the County Board of Elections.  They advise

15   these folks during the day, as necessary.  They may have to

16   call up to the State Board here in Frankfort on election day

17   if it gets confusing.

18        So that's how that's picked.  There's nothing

19   mysterious about it.  There is nothing sinister about it.

20   That's how it works.  These meetings, they're open meetings.

21   They're subject to Kentucky Open Meetings Act.  Minutes are

22   kept.  You're going to see all the minutes.  I think you got

23   to see some at the very beginning of Mr. Smith's opening.

24   There are no secrets here.  This is how it's done.  It's how

25   it's done in Franklin County, Anderson County.  It's the same

135

1   way here as it is down in Clay County.

2          Now, I want to touch on two more quick things.  And I

3   know I'm being repetitive, but it bears repeating.  By the

4   time the United States finished its opening, I got the feeling

5   that every person who lived in Clay County was a drug addict

6   or corrupt or in federal or state prison, and that is not the

7   case.  But I suspect just about everybody -- well, that's too

8   broad of a statement.  Some of the United States' key

9   witnesses are the worst kind of drug traffickers.  They are

10  corrupt.  They are admittedly corrupt, and they're trying to

11  save their own skin where they're sitting in federal prison or

12  state prison, and they're hoping that you'll convict these

13  folks so they'll get a reduction in their own sentence.

14         So part of the facts of the case are you have to

15  judge why, and the motives behind people as to why they're

16  testifying.

17         Kennon White, who is one of their star witnesses,

18  basically couldn't get a job.  His daddy, who was the mayor,

19  the reason they call him Doug White is because he doesn't like

20  being called Daugh, because he thinks it's kind of fancy,

21  spelled D-a-u-g-h.  Doug White, his daddy, who was the mayor,

22  basically made him a job.  You know what Kennon turned around

23  and did?  He immediately started this kickback scheme where if

24  you wanted a contract with the city, you had to give me not a

25  hundred bucks.  A couple thousand bucks.  That's the kind of

1    people you're going to hear from.  That's the kind of people

2    they're bringing in to talk to y'all.  I want y'all to bear

3    that.

4         Second, you're going to hear testimony about a 2002

5    meeting that Mr. Smith mentioned in his opening statement

6    where a bunch of folks got together over at Mr. Stivers' for a

7    fish fry and a meeting in which they were having this last

8    meeting to figure out going into the 2002 primary who we're

9    going to vote for.  And I think they said it was Roy Morgan,

10   fella that was running for sheriff who I can't remember -- I'm

11   sorry; I'm getting lost in the names -- and Freddy Thompson.

12   We're going to pool all our money and that's going to be our

13   money to go out and buy votes with.

14         Buying votes and hauling votes are different.  We're

15   going to talk about that during the trial.  But they're going

16   to go buy votes, and I think he said the going price was 10,

17   25 dollars.  But the source of this money were hundreds of

18   thousand of dollars.  Again, common sense.  They are

19   suggesting through the testimony of Paul Bishop, who has pled

20   guilty to a RICO conspiracy, has not been sentenced yet --

21   they haven't given him a sentence yet.  They still got the

22   hammer over his head.  Hundreds of thousands of dollars so

23   they can win the Clay County county clerk's race, the Clay

24   County sheriff's race.  Hundreds of thousands of dollars.

25         Paul Bishop has got a son, Mike Bishop.  He worked

137

1    for the city police.  Sworn police officer.  He's supposed to

2    be fighting -- the one thing that we can almost all agree on

3    is we got a major drug problem in eastern and southeastern

4    Kentucky.  If you're from there, if you got people down there,

5    you know that.  That's not a secret in our state.

6          Mike Bishop, policeman, was trained with our tax

7    dollars to go out and protect our kids.  Part of the deal they

8    gave him, he's not going to be prosecuted.  Because Paul

9    Bishop, his daddy, his daddy's jumping in front of a train for

10   him.

11         At the end of this case, I get to come back and talk

12   to you again.  Mr. Smith made a couple of great points, but

13   I'd like to reiterate, because I think Judge Reeves said

14   something very similar.  This is going to be a long trial.

15   Judge Reeves has already told you eight weeks.  We all hope it

16   won't last that long.  You know what's going to last a long

17   time?  You're going to get tired.  I'm already tired.  You're

18   going to get testy and annoyed.  I'm certain I'm going to do

19   something that you're going to say God, I wish that guy would

20   just shut up.  Hang in there.  Be patient.  You are, in fact,

21   the people that are going to decide this case.  This is a

22   very, very, very serious case.

23         When I come back, I'm going to ask you to acquit my

24   client on every count.  I'll go into detail on each one of

25   those counts.  The United States will not prove their case.  I

1    believe that in my heart, and I'm going to argue it to you

2    then.  And until then, I don't get to talk to you.  I'll talk

3    to you then.  Thank you.  Thank you, Your Honor.

4         THE COURT:  Thank you.  Ladies and gentlemen, before

5    the next opening statement, we will take a recess till

6    approximately 3:00.  Please keep in mind the admonition that

7    you were given previously not to discuss the case among

8    yourselves while we are in recess.  We'll call you back at

9    3:00 p.m.

10                   (The jury left the courtroom at 2:38 p.m.)

11        THE COURT:  Thank you.  Before we recess, do any of

12   the attorneys wish to reserve their opening statement?  No?

13   All right.

14        MR. BALDANI:  Judge, could I mention something?

15        THE COURT:  Yes.  Please be seated.

16        MR. BALDANI:  I'll try to be brief.  Judge, in the

17   government's opening when it related to Count 9, they talked

18   about Mr. Thompson not bringing voter assistance forms to the

19   grand jury and destroying them.  And Count 9 alleges that he

20   testified falsely.

21        I think that opens the door to the -- if you

22   remember, in his statement, he said something to Mr. Kennon

23   White.  "I can't get rid of those forms, that's my butt if I

24   do."  You excluded that.  But the things, the exculpatory

25   statements you didn't exclude, you let in because they

1    rebutted the obstruction of justice, the instructions from

2    Cletus Maricle.  And I think in light -- and we've got an

3    issue of variance that I have to talk about.

4         The prosecutor didn't talk about any false statements

5    to the grand jury in his opening.  He said Mr. Thompson didn't

6    bring these voter assistance forms.  What happened to them --

7    and he referred to a co-conspirator's statements about them

8    getting rid of them.  And that's critical to our case, Judge.

9    And I don't know if you remember each detail of every

10   statement, but in an exculpatory evidence chart, Mr. Kennon

11   White says what about these voter assistance forms?  I got to

12   keep them 22 months.  That's my butt if I get rid of them.

13   The government sought to exclude, we objected, and you ruled.

14        I realize there has to be finality to your rulings.

15   When the government gets up and changes course midstream and

16   your basis for allowing some of those exculpatory statements

17   was they rebut this obstruction of justice, I think that

18   changes things, Judge.  So I'd like to ask you to reconsider

19   that, and hopefully you can look at it before our opening

20   statement.

21        THE COURT:  All right.  Mr. Smith, would you like to

22   respond briefly?

23        MR. SMITH:  Well, Your Honor, I beg to differ with

24   the characterization of what the opening statement, number

25   one, is.  It's not evidence.  Number two is --

1        THE COURT:  It's also not supposed to be argument,

2   but --

3        MR. SMITH:  It's not supposed to be argument, and the

4   federal rules, I think, do not even recognize that as a part

5   of a case.  And yet, we're now trying to argue about the

6   Court's ruling on a prior matter which, you know, essentially,

7   he's trying to characterize the opening statement that I don't

8   choose to follow, and I would disagree.

9        I mean, Freddy Thompson, I think I clearly

10  communicated, testified to the grand jury he brought the

11  forms, and the FBI analyzed them, and the witnesses say they

12  destroyed them, and on tape his co-conspirator says that's

13  what happened with them.  That's a false statement to the

14  grand jury, a federal grand jury.  He's subpoenaed by law to

15  bring them.  He represents that he did.  In fact, he didn't.

16  We're going to prove that he didn't.

17       All I can state, that's what the evidence we suggest

18  would show.  What it ends up showing hasn't started yet.  And

19  I believe that it's been mischaracterized.  I don't think

20  we've opened up any new issues here that would cause the Court

21  to have to reevaluate tapes and transcripts that we've

22  litigated already.

23       THE COURT:  I tend to agree with that.  I'll overrule

24  the -- whether it's an objection or how it's stated, the

25  Court's not going to revisit the prior rulings to that issue

141

1    at this time.  So that request will be denied.

2              We'll be in recess until 3:00.

3                   (Recess from 2:43 p.m. until 3:02 p.m.)

4                   (The jury entered the courtroom at 3:02 p.m.)

5         THE COURT:  Thank you.  The record will reflect that

6    all members of the jury are present.  All parties and counsel

7    are also present.  Mr. Abell, are you ready to proceed with

8    your opening?

9         MR. ABELL:  I am, Judge.  Thank you.  May it please

10   the Court, my opposing counsel.

11             Speaking fourth for the defense presents some unique

12   challenges, and I don't need to repeat much of what you've

13   already been told about the background and history in this

14   case.  You don't want me to do that, and I don't need to do

15   that.  But to refresh your memories, my name is Robert Abell.

16   I represent William Stivers.  When I met him, I asked him if I

17   could call him Bill, and he said I may.  I'll probably refer

18   to him during this case, during this trial as Bill Stivers.

19             You'll hear him referred to by some witnesses as Al

20   Man, which apparently is a nickname that comes from his

21   childhood.  He is a native, was born and raised in Clay

22   County.  Work took him away.  He's a construction worker, and

23   he lived outside of Clay County for about 20 years, from the

24   late '70s to the late '90s leading a modest, hard-working

25   life.

142

1        Most of what I want to say now is to summarize what I

2    believe the evidence will show in this case.  First, it's

3    going to show you that Mr. Stivers is interested and involved

4    in Clay County public affairs, politics.  It's going to show

5    you that he is a Democrat in a heavily Republican county.

6        During this case, there will be exhibits that will

7    show election returns, some of which will show the Republicans

8    winning 70, and I'm pretty sure I saw even up to 80 percent of

9    the vote.  When I say heavily Republican, I'm not talking

10   about 55 to 60 percent.  In some instances, the majority is

11   far larger than that.  It's a heavily Republican county.

12       As has already been mentioned today, Mr. Stivers, the

13   evidence will show, is friends with some of these folks who

14   set over here with me at the table.  In particular, Judge

15   Maricle and Wayne Jones.  It's a small town.  Manchester and

16   Clay County, we're talking about a few thousand people in the

17   whole county.  Of course, he knows and has crossed paths and

18   is acquainted with rest of these folks, and the evidence is

19   going to show that too.  But in terms these friendships,

20   you'll see that he's friends with Wayne and Judge Maricle.

21       There will be some recordings played in this case.

22   You've heard about those already.  A number of them took place

23   at Mr. Stivers' home in which the Whites, Kennon and Wanda,

24   went to his home in the evening and they sat around talking

25   with Mr. Stivers.  You'll hear, I believe, on some of the

1    tapes Mr. Stivers' wife, a lady named Mary Betty.  A few of

2    them, Mr. Jones drops in as well.

3        The conversation covers all types of things that

4    people that get together fairly often talk about.  Food,

5    gardening, family members who are ill, local issues that have

6    come up, politics in Clay County, some discussion of troubles

7    the White family was having in early 2007.  You've already

8    heard about Doug White/Daugh White, the mayor was under

9    indictment, Kennon's getting investigated, et cetera.  Those

10    discussions you'll hear on these tapes.  And you'll get the

11    sense, these are casual conversations among people who feel

12    comfortable enough to drop into one another's homes.

13        You'll find from them, I think, the evidence will

14    show that Mr. Stivers enjoys conversation.  He is a lively

15    conversationalist, likes a good discussion.  Not hesitant to

16    share his opinions or his views on whatever comes up.  The

17    tapes will show you that.

18        The evidence with regard to the charges in the case

19    will show that Mr. Stivers, at times, supported candidates

20    that some of the other folks over here did not support, that

21    they were opposed.  At times, they agreed and supported some

22    of the same people.  At times, there was as many as three

23    different candidates being supported in a race.  The other

24    folks that have spoken suggest that does not support a charge

25    that you had two king makers, Mr. Adams and Mr. Maricle, who

1    called the shots and said who was going to win and who was
2    going to be elected.

3            The evidence will show, rather, that groups of people
4    reached their -- individuals, including Mr. Stivers, reached
5    their own conclusions about who to support, as we are all free
6    to do in the United States.  Supported the candidate that he
7    most preferred, rather than falling in line and following the
8    dictates of some political boss or anything like that.

9            You will conclude from tapes, he's a fully capable,
10   very opinionated man, able to reach his own conclusions about
11   what he wanted to do, who he wanted to support.

12           There is a money laundering charge against Mr.
13   Stivers as well.  In listening to the evidence, I think it
14   will fail to show, I expect, that even a nickel of any
15   proceeds or anything of any money laundering ever went to Mr.
16   Stivers.  Nonetheless, he's charged in that count along with
17   everybody else.

18           The government -- this point's already been
19   discussed -- will bring in a number of witnesses who have,
20   shall we say, checkered pasts.  One, for instance, is Kenny
21   Day.  Kenny Day's 59 years old.  He's got an 18-year sentence,
22   and there's no way I can be graceful about saying this.  He's
23   a smart man, and he knows that he's looking at the terrifying
24   prospect of dying in prison because of crimes he's committed
25   that have put him there.  And being a smart man, he has

1   decided that the only way he's going to avoid that terrible

2   fate is to find some way to get himself out, somehow, some

3   way, and to come up with something to implicate my client and

4   the others sitting over at this defense table.

5         He's emblematic of a number who have reached that

6   type of decision.  You'll evaluate those witnesses as they are

7   presented.

8         There is, as has been discussed, an obstruction of

9   justice charge against Mr. Stivers.  There is a key tape

10  recording, dated May 17, 2007 would be the date on that.  Pay

11  particular attention to that.  On that tape, you will hear Mr.

12  Stivers a dozen or so times tell Wanda White, who has told him

13  she's going to speak before the grand jury, Mr. Stivers tells

14  her a dozen or more times, "Tell them the truth.  You can't

15  lie to them.  Tell them the truth."  Over and over again, 12,

16  13, 14 times in what is roughly a half hour conversation.  It

17  touches on other topics as well.

18        There are other charges against Mr. Stivers in this

19  indictment.  I'm not going to go into detail about those, but

20  I will tell you that along with the other charges against him,

21  there will not be evidence sufficient to support them, and I'm

22  going to ask that you find him not guilty on all the charges.

23  Thank you.

24        THE COURT:  Thank you, Mr. Abell.  Mr. Richardson,

25  you may proceed.

146

1          MR. RICHARDSON:  Opposing counsel, colleagues.  Thank

2     you, ladies and gentlemen, for agreeing to serve.  I don't

3     know if agree is quite the right word, but appreciate you

4     being here.  My name is Tucker Richardson, and I have the

5     pleasure of representing Freddy Thompson here today.  And I

6     agree that the opening statement is a road map to what the

7     evidence will be, and that road map is going to lead you to

8     the town of not guilty and to where Freddy Thompson resides.

9          And like when I was a young boy, I always listened to

10     the radio, and there was Paul Harvey who would come on and

11     tell you the rest of the story.  I always liked that, the rest

12     of the story.

13          The story begins in 1998.  An unknown female by the

14     name of Nicole Hacker or Hatcher ran against Jennings White,

15     the all-powerful Jennings White for county clerk.  She got

16     2,000 votes with almost no help.  2,000 votes.  I think

17     Jennings White got like 4,000.

18          Freddy thought, those weren't votes for her.  Those

19     were votes against Jennings White.  And that planted a seed.

20     So 2002 comes along, and he decides that I'm going to take on

21     Jennings White.  I'm going to run for county clerk.  And

22     Jennings White, as has been described, was a crooked

23     politician in the words of everybody.  Had his fingers in

24     every little pie around town, not the least of which was

25     protecting drug dealers.  Had a little money laundering scheme

1   with Kenneth Day that I always thought was kind of

2   interesting.  Kenneth Day would give him $22,000, and Jennings

3   White would give him a cashier's check for 20.  A little 10%

4   add-on.

5          He was buddies with Todd Roberts, the assistant

6   police chief in their little doings; and basically, a lot of

7   people came to view him as a real problem, and people were

8   willing to do what they had to do to get him out of office.

9          And Jennings White knew how to play the game.  He was

10   a vote buying guy.  I think you'll see a lot of the vote

11   buying that's talked about here is Jennings White and his crew

12   of crooks as they ran through the county buying votes.

13          So along comes Freddy Thompson.  Who is Freddy

14   Thompson?  Hometown boy, born and raised, went to school

15   there.  His dad owned a coal supply building -- equipment

16   supply building, and when Freddy got out, started working in

17   the family business, he said why don't we put some nuts and

18   bolts in here, and we'll just go ahead and sell a few other

19   items.  We're here all day anyway.  And it grew into a little

20   hardware business.  And through hard work, that hardware

21   business prospered.

22          But Freddy was a political novice.  He was a breath

23   of fresh air.  No axe to grind.  So in 2002, Freddy decides,

24   I'm going to run against Jennings White.  And immediately, it

25   became the political race of the year.  And you have two

1    camps.  You got Jennings White.  And on Jennings White's team

2    are the Morrises and Mr. Bowling.  They're over here.  And on

3    Freddy's side, we have Doug Adams, Wayne Jones, and Al Man

4    Stivers and others.

5            So as far as there being a political agreement,

6    collection in '02, it ain't there.  No way they can prove

7    that.  They're on different sides of the fence.  And also on

8    the Jennings White team, you're going to hear about this cast

9    of characters.  Darnell Hipsher, who was on the City Council,

10   now in prison.  Vernon Hacker, ran the 911 call center,

11   federal prison.  Todd Roberts, assistant police chief, federal

12   prison.  Clinton Johnson, council member, federal prison.  Edd

13   Jordan, unindicted co-conspirator.  Kenneth Day, convicted,

14   federal prison.  And also, Kennon and Wanda White lined up

15   against Freddy and his supporters.

16           Now, the main way in Clay County to get elected is to

17   go out and press flesh, okay?  They don't have a lot of --

18   they don't spend a lot of money on advertisements on TV and

19   stuff like that.  You got to go out to these fish fries, these

20   community events and you got to press flesh and you got to say

21   hey, vote for me.  I'm the right candidate.

22           And, of course, you and your supporters are going to

23   get together and talk about who we need to get us to go out

24   and talk us up around town.  The government's going to say

25   that there was one such political meeting at a guy named Paul

Bishop's house.  Paul Bishop pled guilty.  We'll talk about

him in a minute.  But Paul Bishop's house has a garage out

back, one of those big metal buildings, and there's a number

of fish fries, and it was kind of just a hangout place in Clay

County.  Run by, you see somebody's there, hey, we'll go up

there.  They're sitting around chitchatting.

So supposedly, Paul Bishop tells the government at

this meeting there was Doug Adams, Al Man, Wayne, and Freddy.

Also, Charles Marcum, who is running for jailer, Mike Hooker,

Roy Morgan, Clay Massey Bishop, the county attorney, and Dick

Woods.  That's who he says is at this meeting.

Now, he talks to them twice, once in '07 and once in

'08, and the names kind of jump around a little bit, but

that's basically the lineup at this political meeting at his

house.  And it's funny, because the meeting's supposedly

chaired by Doug Adams and Clay Massey Bishop.  Clay Massey

Bishop will say, I wasn't there.  I think the evidence will

show you that he doesn't like Roy Morgan.  They had a big

falling out, and they don't even speak.  So I think that's

interesting, that Paul says that he's there and chaired the

meeting.

And Paul Bishop will tell you that Clay -- Charles

Marcum came into the room with $10,000 cash, threw it on the

table in a red bag or something like that.  Threw ten grand

cash, and everybody brought cash to the meeting.  There was

150

1   $150,000 there.  Wow.  $150,000 was gathered and distributed

2   at that meeting.  Paul Bishop will be the only one to tell you

3   that.

4        Now, Paul Bishop, he's got some reason to tell you

5   that.  On April 14, 2008, his son, Mike Bishop, assistant

6   police chief for Manchester, goes and speaks to the FBI.  And

7   he tells the FBI, yeah, I did some bad things back in '02.  I

8   supported Kennon White, who is on the other side of his dad,

9   but I supported Kennon White, and I took money and bought

10  votes.

11       The next day, April 15, 2008, Paul Bishop goes over

12  to them and rescues his son and tells them I was at this

13  meeting, there was all this money, da, da, da, da, da, da.

14  And you'll hear that the government isn't going to charge Mike

15  Bishop.  Paul did the parental instinct to save his son.

16       You're also going to hear about Paul's mental

17  evaluation.  Paul is on disability, and there's some things in

18  there that will cast credibility on his ability to remember

19  events six years ago.  So I want you to listen to that

20  evidence carefully.  You got to remember, unless this money is

21  thrown out on the table and they talked about buying votes,

22  then it's perfectly legal.

23       In fact, if you're a candidate for office, you're

24  going to meet with your supporters, and hey, let's get a

25  little gang bang going here and think about what we need to

151

1    do, and let's get some rah-rah going and go out and talk to

2    people.  That's what political parties do.

3        Well, you're going to hear evidence that in 2002, the

4    votes were bought.  And some of that evidence will be that

5    people sitting at this table participated in that vote buying.

6    But you will not hear anybody say that Freddy Thompson gave me

7    a dollar for my vote, and you will not hear anybody tell you

8    that Freddy Thompson gave me a dollar to go buy a vote.

9        Now, Steve Smith in his opening statement said it was

10   wide open.  Drug dealers being protected, walking through the

11   streets, kids are getting doped up and ruining their lives.  I

12   submit to you there was people out there willing to do what

13   they had to do to get Jennings White out of power.  They might

14   have had a good reason.  They knew Jennings White was going to

15   buy votes.  They might have had a reason to buy votes.  But

16   this case isn't about vote buying in 2002.

17       This case is about RICO.  Remember, the government's

18   got to convince you that this enterprise -- they picked the

19   enterprise -- is the Board of Elections.  Okay?  So in 2002,

20   the Board of Elections is Jennings White, the county clerk,

21   Edd Jordan, the sheriff, Clay Massey Bishop, the Republican

22   party chairman, and Wayne Jones.  So the Board of Elections in

23   '02 had only one of the people charged, okay?

24       So, you know, I don't know how they're going to bring

25   that all together.  That's their burden, and I'll let them

152

1    worry about that.

2           Now, so the election goes down May 16, 2002.

3    Freddy's running as a Republican, Jennings White's a

4    Republican because basically if you're a Democrat, you can't

5    get elected in Clay County.  The big race is a primary.

6    Freddy gets voted in, beats Jennings White by 1,300 votes.

7    Evidence will be that Jennings White lost his job, his power,

8    and soon his freedom.

9           Freddy doesn't have opposition in November.  Results

10   are tabulated from that May primary and the general election

11   in November, and they are mailed to the State Board of

12   Elections by the Clay County Board of Elections.  The

13   enterprise, once again.  Freddy's not on there.  Still the

14   lineup I told you.

15          We're going to talk a little bit about how that is

16   composed.  The Board of Elections is the county clerk, the

17   sheriff, the Republican commissioner and the Democrat

18   commissioner, and the county clerk gets two votes, okay?

19   Tiebreaker votes.  We're also going to talk about how -- and

20   Mr. White touched on this, how the election officers are

21   chosen and what a pain it is to get these election officers to

22   show up and do their job.

23          You know, and there is a process that goes down the

24   steps how to get election officers until, finally, the law

25   allows you to grab a voter off the street and say hey, you

153

1    voted?  Come here, we need some help here.  Sit down and help

2    us out.  They can even call the State Board of Elections and

3    say hey, I need some Democrats, or I need some election

4    officers over here.  So it is not like anybody's lining up to

5    do this, I think, 60 bucks a day for a 12-hour day.  It's hard

6    to get.

7         So the RICO conspiracy at the end of '02, has got

8    Bart and Debbie Morris and Stanley Bowling on one side,

9    Freddy, Doug Adams, Wayne Jones and Al Man Stivers on the

10   other, and Cletus Maricle sitting on the sideline.  Here's our

11   political kingpin, he's sitting on the sideline.

12        Well, get to January '03.  Freddy's sworn in as the

13   new clerk.  Clerk's job in every county is, like, car titles,

14   marriage license, property deeds, stuff like that.  And you

15   get to employ people.  Evidence will be there were six people

16   employed by Jennings White while he was a county clerk.  It's

17   time for Freddy to come in, clean house, make way for the

18   political favors he needs to pay back.

19        Didn't happen.  People had jobs, people had families.

20   Kept every one of them.  Didn't fire a soul.  No nepotism, no

21   paying off political allies, no retribution against political

22   enemies.

23        Now, he did at one point, I think the government will

24   bring this out at some point, hire Cletus Maricle's daughter,

25   Melanda.  I mean, Doug Adams' daughter.  They're going to say

154

1    that's sinister.  Had an opening in the staff, '05.  Hired
2    her.  That's a sinister thing.  Y'all make your minds up about
3    that.

4         So we come to the '04 election, all right?
5    Everything's going.  Freddy's settled down.  Freddy is not
6    running in '04.  Basically, the only big race is Tim Couch
7    versus Barbara White Colter, and that's Daugh White's sister.
8    And in the fall is the presidential election, Bush and Gore.
9    Hanging chads.  You've all heard the hanging chads.

10        Once again, you all are going to hear evidence and
11   people will get up there to testify, and it's up to you to
12   judge their credibility.  You're going to hear evidence that
13   the votes have been bought.  And the evidence might be that
14   some of the people at this table bought votes.  Once again,
15   there will be no evidence that Freddy Thompson gave anybody a
16   dollar to vote for him, and there will be no evidence that
17   Freddy Thompson gave somebody else a dollar to buy a vote for
18   him.

19        There will be no evidence that he attended any
20   meetings.  There will be no evidence that he used his
21   influence on the election.  There will be no evidence that he
22   was involved in the vote buying.  There's only one thing the
23   government's going to give to you to say Freddy Thompson is
24   involved in this.  The Board of Elections meets, they have a
25   list of the election officers.  And they decided early on,

1    when Freddy got in, because there was some stuff going on with

2    Jennings White about how to get the election officers, they

3    said, listen, the parties send these people up.  The parties

4    give me four Democrats, four Republicans.  We're taking the

5    first two.  All right?  We'll appoint judge, judge, clerk,

6    sheriff.  And then switch the clerk and sheriff between

7    Democrat and Republican.  They figured that's the best way to

8    do it.  The parties have given us these people.  So that's the

9    way they do it.

10           In one of the precincts, and I'm not sure if it's in

11   the spring or the fall, it's confusing by the testimony, but a

12   fella named Glenn Rowland shows up one morning.  He's not one

13   of the first four, all right?  He's an alternate.  A guy

14   named, I think, Larry Henson was supposed to be one of the

15   election officers, and he doesn't show up.  And after that,

16   they have a -- the Board of Elections, he said Larry Henson

17   never shows up, we're never gonna put him on there again.  All

18   right?

19           So I think it's the spring.  I think it's the spring

20   that happens.  They say we're never putting Larry Henson in

21   there again because he never shows up.

22           All right.  So Don Nolan, who is the party chairman,

23   now, he's not on the Board of Elections who appoints the

24   election officers.  That's important to note.  But the party

25   chairman for Clay County asked his son-in-law, Glenn Rowland,

1     says hey, we got a problem over there.  Larry Henson didn't

2     show up.  You go show up.  He's on the alternates approved.

3     He says okay, I'm going over.

4           He shows up.  A little bit later, Wayne Jones and Al

5     Man Stivers show up and Wayne says, no, Al Man's the alternate

6     here today.  And Glenn says, no, I can't do this until I call

7     Freddy Thompson.  He calls Freddy Thompson, and Freddy's words

8     are not as the United States says.  Freddy's words are, "this

9     is a mess."  Glenn Rowland says, "I'll just leave.  I'll go

10    home."  Freddy says, "Thank you.  I'll pay you for today."

11    There is the only thing they're going to show you from 2004

12    that Freddy Thompson is involved in this corruption.

13          But Freddy Thompson and the Board of Elections

14    originally appointed the four officers.  So if they wanted Al

15    Man there to begin with, why didn't they put him there to

16    begin with?  So it's a non-issue.  Don't be rolled by this.

17          So the May and November elections go down.  Results

18    are sound, signed by the Board of Elections.  Freddy as clerk,

19    Edd Jordan as the sheriff, Clay Massey Bishop and Wayne Jones.

20    They sign the election returns and mail them to Frankfort.

21          Now, it's important for the RICO that this is the

22    enterprise here, okay?  And that's where Freddy Thompson's so

23    important to the government's case.  The government has to

24    have Freddy Thompson here in this enterprise, because he's got

25    two votes.  And with his father-in law, they got three and

1    they can control it, okay?  So they gotta have Freddy.  If the

2    enterprise fails, the whole house of cards comes crumbling

3    down.

4         The evidence will be that there is no enterprise, no

5    evidence that the defendants were working together.  You'll

6    see some scurrying and back stabbing and all kind of stuff

7    going on in these elections.  You know, I promise y'all, go

8    someplace else.  Once again, you got Freddy on the sidelines,

9    he's not running, and where's Cletus Maricle again?  He's not

10   there.

11        And then the money laundering.  No proof that Freddy

12   got any of this money and spit it out so -- or bought any

13   votes so there's no money laundering.  Then they want you to

14   say we're going to convict him under Counts 3 and Counts 5 for

15   mailing of the false returns.

16        They got to prove to you, beyond a reasonable doubt,

17   that he knew those returns were false before you can convict

18   him of that.  So I think that they're not going to make that

19   burden.

20        We get to the 2006 elections.  Hanging chad problem,

21   Congress passes the Help America Vote Act.  And in the Help

22   America Vote Act, you have to have these new electronic

23   machines.  So these machines are mandated by all counties.

24   Freddy goes to the fiscal court and says, hey, we have to buy

25   these new machines.  We're going to get federal money, but we

1    need to put a bid in the newspaper so we can get bids for

2    these new machines.  I think the evidence will show you there

3    were four machines approved in Kentucky.  One of them nobody

4    used.  Two of them -- the second one, only Jefferson County

5    used.  There was two other machines that basically were used

6    in the rest of the 119 counties.

7         They put an ad in the paper.  It's not a big account

8    by any means, there's 40 some machines.  They get one bid, and

9    the fiscal court takes that bid.

10        So they have new voting machines.  The first time

11   they're going to be used, in '06, they get these machines in,

12   and Freddy goes on a personal campaign to educate the voters

13   about how these machines are used.  He takes them to community

14   events.  He takes them to senior citizen homes.  He takes them

15   and stands outside of Wal-Mart for a day.  Takes it, has one

16   outside his office so people can come by and practice on it so

17   everybody understands how to use these machines.  Okay?  And

18   Freddy's not required to do that.  He could have kept that

19   machine in the back, not done a thing.

20        Freddy also on May 4, May 11 and May 15 put an ad in

21   the Manchester newspaper, full-page ad, how to use the

22   machine.  Not required to do that either.  But Freddy did it

23   because he didn't want the voters confused on this new

24   machine.  Also -- and this he was required to do -- he had a

25   thing printed up that basically he got from the manufacturer

1    of the machine showing everybody how to use this machine that

2    was placed at every voting poll.  These are the instructions

3    how to use this machine.

4         Now, the machine had a problem.  The machine had two

5    bugs.  Once you got done picking your vote, your votes, you

6    hit a button up here, red, that said Vote button.  And next, a

7    page came up and said confirm your selections, and then you

8    had to hit another button that said Cast Ballot.

9         Freddy didn't design that machine.  Freddy didn't

10   purchase that machine.  The fiscal court did.  There was a

11   problem, and people talked before the May primary about how

12   this machine can be manipulated if you're smart.  If you can

13   get in between the voter between the time he hits the Vote

14   button and that thing comes up and Cast Ballot, if you can get

15   in there, you can move them out of there and you can change

16   their votes.  Okay?  So there will be evidence that people

17   were talking before the May primary that you could manipulate

18   the machine.

19        Now, the U.S. will say in '06, I'm going to show you

20   two things that indicate that Freddy Thompson is dirty and he

21   is in this syndicate or conspiracy.  And that brings us to

22   Wanda White, wife of Kennon, who has pled guilty already about

23   kickbacks and buying votes and all this other dirty stuff.

24   And he's guilty, and he's awaiting sentence.

25        She's the daughter-in-law of Doug White, who we're

1    going to hear about him.  No choir boy.  He's pled guilty.

2    He's already sentenced.  She was assistant to Doug White, as a

3    matter of fact, prior to the election, old nepotism, and she's

4    now been granted immunity, provided she comes up here and

5    testifies truthfully for the government.  She will not be

6    prosecuted for stealing people's votes.

7         So Wanda White will tell you in her testimony that

8    Freddy Thompson showed her how to manipulate the machine.  All

9    right?  Serious accusation.  But I've got a little problem

10   with that.  I think that the evidence is going to show you

11   that you might too.  Because Wanda White testified twice to

12   the grand jury, two months apart.  May 3rd, '07, and then she

13   came back July 7, '07.

14        And on May 3rd, she talks about the manipulation of

15   the machines.  She says, yeah, yeah, Wayne Jones showed me how

16   to manipulate the machine, and they talk about that a little

17   while.  And she reiterates a few times, Wayne Jones showed me

18   how to manipulate that machine.  Mentions Freddy by name

19   twice.  Doesn't say that Freddy Thompson showed me how to

20   manipulate the machine.

21        But then she comes back two months later, I submit to

22   you.  Government doesn't, according to the agent -- I don't

23   think they're going to say they talked to her in the meantime,

24   because there's no Form 302 that they have to fill out when

25   they're, you know, discussing with witnesses.  So but in the

161

opening statement, in the grand jury on July 7, 2007, the
first thing out of the United States attorney's mouth is, so
who taught you how to manipulate this machine?  Freddy
Thompson.  It's up to you guys.  All of a sudden, it's both of
them.

So that brings us to Dobber Weaver, who is in the
Manchester precinct.  There was Wanda White and Dobber Weaver,
they were the election judges, Democrat and Republican.  And
Dobber will tell you that -- he's already pled guilty, voter
fraud.  He's sentenced, hoping to get some time off his
sentence.  He first talks to the FBI in May of '07 and denied
everything, except he was election officer.

Talked to the FBI again October 2nd, 2007, told the
FBI that there was talk -- in quotations, there was talk
around town that the election officers could change people's
votes, and they will determine the outcome of the election.
That's what he told them on October 2nd, 2007.

Didn't mention Freddy Thompson showed me how to do
it.  And in this statement, he implicated himself so he knows
he's in trouble.

He comes back on the 10th, eight days later, and
says -- told the FBI, the word was out about the voting
machines being able to be manipulated to steal votes, and his
guy that Dobber Weaver wanted, the guy named Crawdad Sizemore,
he wanted Crawdad to win because if Crawdad won, Crawdad was

1    going to give him Vernon Hacker's old spot, $60,000 a year

2    job.  So he wanted Crawdad to win.  He said Crawdad Sizemore

3    and his supporters decide to run with it, this manipulating

4    the machines.  Oh, and by the way, Freddy Thompson and Wayne

5    Jones showed me how to do it.

6           Enough time for him to call his buddy Wanda and say,

7    oh, the cat's out of the bag.  And Wanda say, well, tell them

8    this.  It's amazing, though, if you're going to start telling

9    the truth, you tell it.  It's when you start waiting and you

10   start adding stuff that you got to question that.

11          And he told them another thing too that I thought was

12   important.  He told FBI agents that they showed several others

13   how to manipulate the machines.  Showed several others.  Where

14   are they?

15          So that's the first issue that they're going to say

16   Freddy Thompson is involved.  It's not very strong.  So Wanda

17   White comes up and says, well, the voter assistance forms are

18   missing.  And the law requires that a voter needs

19   assistance -- they come in because they're blind, they're

20   physically disabled or the inability to read English, okay?

21   Those are the three things the voter can request assistance

22   for.  Each precinct gets an election bag from the county

23   office.  In there are voter affirmation forms, pencils, stuff

24   and voter assistance things.  And we'll talk about that.

25   There are about 40 or so voter assistance forms in there,

1    okay?

2         Now, what happens when you get to the precinct?

3    Wanda White will tell you, I knew if they were a bought vote

4    because they would come to me and ask for me by name.  I

5    submit to you I don't think she's going to testify and say

6    they walked in here and said hey, Wanda, here.  Going to flag

7    that.  Got to remember Wanda White's committing a crime,

8    doesn't think she's going to be caught at this point, and the

9    voter's committing a crime.

10        When you walk in, the sheriff kind of keeps order of

11   the place.  The clerk sits at the desk and fills out, says

12   okay, you're a voter here, you got to sign here.  Y'all voted.

13   Y'all see that.  You sign in.  And at the table are the voter

14   assistance forms.

15        So the person signs in, and then they walk to the

16   back, and there's Wanda and Dobber.  Hey, supposed to ask for

17   you.  They're not blaring it out.  And certainly Wanda is not

18   going to go oh, wait a minute, hold on, let me go get you a

19   voter assistance form and go back up to the front and alert

20   the clerk, hey, and they're going heck, he just signed his

21   name, he's not blind, he's not physically disabled.  So

22   they're not going to fill out voter assistance forms.

23        In fact, Wanda will tell you that she was told by

24   certain people, don't fill out the voter assistance form.

25   There's, you know, there's -- you're going to leave a paper

1    trail.  So if you're going to do this, don't fill out voter

2    assistance forms.  Yet now, she says, all right, we filled out

3    voter assistance forms and they were destroyed.  It doesn't

4    make sense.  You got to bring your common sense in here.  If

5    she's committing a crime, she's not going to fill out these

6    voter assistance forms.

7         So you're going to have her saying that, and I am

8    going to have people here who are going to say, hey, I didn't

9    fill out a voter assistance form.  She voted for me.  I didn't

10   fill out that voter assistance form.  I'm going to have people

11   come up and say, hey -- assisted people -- Wanda laughingly

12   told me that I had to fill out a voter assistance form, but I

13   never did.  She's not even filling them out for ones that

14   legitimately need them.

15        So the forms are gathered up at the end of the day,

16   along with the other supplies, and they're put in a bag and

17   they're sent to Freddy Thompson's office where they're locked

18   up overnight.  The next morning, they come in there and the

19   clerks got them out and count them.  What's there is there.

20   They're going to say, I guess, that Freddy snuck in in the

21   middle of the night and destroyed these forms.

22        MR. SMITH:  I'm going to pose an objection just for

23   the record for the arguments.

24        THE COURT:  I'll sustain the objection.  It is

25   argumentative.  You have about five minutes remaining.

1        MR. RICHARDSON: Yes, sir.  Okay.  So I submit to you

2    that the evidence will convince you that Wanda White didn't

3    use a voter assistance forms.

4        Now, the United States has already said in their

5    opening that there was a recording where Al Man Stivers told

6    Wanda White when this thing was starting to unravel, him and

7    Freddy took care of it.  She asked about the voter assistance

8    forms, because she's wanting to plant this seed.  I think the

9    evidence is going to convince you at this point, this whole

10   ball of wax is unrolling, according to Wanda White, and

11   they're just saying, hey, don't worry about that.  I think

12   it's a -- I think it might be a way to steady the ship.

13   Wanda's thinking about going and blowing and telling these

14   stories.  Hey, don't worry about that.  So at that time that

15   that supposedly is said, Al Man Stivers said this about Freddy

16   and Wayne.  It's up to you to determine what credibility to

17   give that evidence.

18       So in the end of '06, once again, there's no evidence

19   that the defendants are working together.  They got to have

20   this conspiracy.  They got to have Freddy in the middle of

21   this, or else the Board of Elections doesn't float, and the

22   Board of Elections, if you don't believe Freddy was involved,

23   then the whole thing comes stumbling down.  No evidence.  They

24   got him for mail fraud on 6 and 7 for mailing in the election

25   results, primary in November.

166

1          And then they have him charged with conspiring to

2     mislead the voters in the voting machine.  That's Count 10.

3     Unless you believe Wanda White and Dobber Weaver, then that's

4     going to have to be not guilty.

5          And there's no evidence that Freddy was involved in

6     this slate of candidates or controlling the election of the

7     election officers.  That's Count 11, so that's out.

8          So now they're going to hang their hat on Count 9,

9     which is the obstructed justice by lying to the grand jury.

10    Evidence will be that on July 31st, '06, the FBI came and

11    wanted to talk to Freddy Thompson.  Freddy didn't lawyer up,

12    didn't say hey, I got to get a lawyer.  Said what do you need?

13    Talked to them.

14         Came back on August 24th, '06 and subpoenaed him to

15    the grand jury.  Didn't lawyer up, went to the grand jury.

16         Came back on 6/21/07 and said we want to talk to you

17    again.  He said, I'll talk to you.  Didn't lawyer up.

18    Answered all their questions.

19         Came back and said you need to come to the grand jury

20    again on July 12th, '07.  Didn't lawyer up, went to the grand

21    jury, answered all their questions.

22         Came back a final time in September of '07, said we

23    need to talk to you again.  He said sure.  Didn't lawyer up,

24    talked to them, answered all their questions.  And then he's

25    arrested.

1          The government will tell you there's one more thing I

2     can tell you that is going to convince you that Freddy is

3     guilty.  That in May 1 of '07, we sent Kennon White, wired up,

4     to go talk to Freddy Thompson.  Freddy being the good boy --

5     they're not real close, but Freddy talked to him, and you'll

6     hear some of that conversation.  But the bottom line is Kennon

7     White's there to get the dirt on Freddy Thompson, and he's

8     there to get him to confess to whatever he can get him to

9     confess to.

10         Now, the tape is terrible.  You're going to hear the

11    tape.  There's going to be a transcript.  You're going to hear

12    some of the tape.  They're not going to play all of it.  But

13    the tape itself is 23 minutes long.  About 18 minutes into

14    this 23-minute tape, supposedly, Freddy Thompson says, I think

15    I'm in trouble.  You can hear the word trouble.  But

16    supposedly he says "I think I'm in trouble."  And that, the

17    government will tell you, is an admission against guilt.  But

18    what does Kennon White do, who has waited 18 minutes to get to

19    this?  Does he go, well, why are you in trouble?  No.  Starts

20    talking about his daddy, his asthma and some other stuff.  You

21    wait 18 minutes to get him to finally admit something, you

22    follow up.  Conversation goes in a different direction.

23         So Freddy is charged lying to the grand jury for the

24    July 12, '07 incident, supposedly because he did not admit to

25    the grand jury that he taught Wanda White how to manipulate

168

1    the machine, and he did not admit that he destroyed voter

2    assistance forms, and I submit to you the evidence is going to

3    convince that that he didn't do either of those things, and he

4    was telling the truth.

5         So on March 9, '09, Freddy Thompson was arrested by

6    the FBI and taken to jail.  Came back to this court a few days

7    later and said I am not guilty.  And he has maintained this

8    entire time that he is not guilty.  So at the close of this

9    case, I'm going to come before you again and I'm going to ask

10   you all to find him not guilty.

11        One other thing.  Freddy Thompson is an individual,

12   and the judge will tell you you must judge every defendant

13   independently of the others.  You are the jury for Cletus

14   Maricle, Doug Adams, Freddy Thompson and the rest of them, but

15   each of them deserves their own verdict.

16        I'm here for Freddy Thompson, and I'm proud of it.

17   Thank you very much.

18        THE COURT:  All right.  Thank you, counsel.  Mr.

19   Gilbert, do you need just a moment to set anything up?

20        MR. GILBERT:  No, Your Honor.

21        THE COURT:  All right.  Thank you.

22        MR. GILBERT:  May it please the Court, Mr. Smith, Mr.

23   Parman, colleagues.  My name is Jerry Gilbert.  I practice law

24   in Richmond, and I represent Bart Morris.  I want to try to be

25   brief, because it's late in the day and a lot of my comments

1    are going to echo about what's been said about some of the

2    government witnesses.  I do want to take this opportunity to

3    tell you about Bart Morris.  He is the owner and operator of

4    B&J Transfer, Incorporated.  He's also the husband of Debbie

5    Morris, who is seated there beside him.  Debbie is a

6    hairdresser in Manchester.  She runs Debbie's Cutting Crew.

7            Bart started B&J back in 1994.  It is named after his

8    two children, Bartley, who is now 28 years old, and Jessica,

9    who is now 22 years old and a student at Eastern Kentucky

10   University.  It is a duly organized and chartered corporation.

11   Chartered by the Commonwealth of Kentucky.  And Bart Morris is

12   the sole owner and shareholder of that corporation.

13           The main purpose of that corporation and his business

14   is to operate a transfer station and to transport garbage from

15   Clay County to the landfill in Laurel County.  That's what a

16   transfer station does.  Individuals, whether it be the city,

17   the county or individuals, may bring their trash to this

18   transfer station that is owned by B&J.  The garbage is loaded

19   on to trucks, and it's transported to the landfill in Laurel

20   County.

21           He started this business back in 1994.  There was a

22   transfer station that operated on the site by individuals.

23   One was HSI; and later, Popp Brothers.  But they had a crude

24   and inefficient type operation, and Bart thought he could do

25   it better and more efficiently.  And rather than having a

1   small compacter like the previous operators had, he got a

2   hopper that's loaded and filtered the trash down into the

3   trailer to be transported to London.

4        Now, he has since refined that system by developing a

5   two-tiered unloading system where the trucks, whether they be

6   compacter trucks from the city or individual garbage haulers,

7   they drive up on the top level and back up and dump the trash

8   down into the trailers for an easy unloading process.

9        This process worked well, and in 1994, he was awarded

10  the contract for the City of Manchester, who had garbage

11  pickup.  The contract that he entered into was the same rate

12  of pay was the previous operator.  Now, the garbage business

13  is not easy work.  It's hard, it's dirty work, it's garbage,

14  and it's daily work.  And the proof will be that the

15  compensation that B&J Transfer has received over the years for

16  providing the services of transferring and transporting the

17  trash to the landfill was fair and reasonable.  It was

18  reasonable pay for a hard day's work.

19       In the mid '90s, he had the contract for the City.

20  And in the mid '90s, the state of Kentucky passed laws which

21  either encouraged or mandated county-wide garbage pickup.  In

22  the mid '90s, the county became interested in various routes

23  that went out into the county to pick up the garbage.  And the

24  reason why this was encouraged and mandated was to eliminate

25  the burning of trash by individuals, the throwing of trash out

171

1   on the road by individuals and placing your trash in the

2   illegal dump sites.

3        And so mandatory pickup was enacted.  And so the

4   county was interested in using Bart Morris, B&J Transfer to

5   transport those pickups to the Laurel landfill.  And he got a

6   contract with the county, which he has operated since.

7        But let me get back to the ownership issue just a

8   little bit.  As I said, it was founded in 1994.  Bart went

9   through a divorce in the late '90s and early 2000s.  It wasn't

10  a particularly nasty divorce, but it was a protracted divorce.

11  And he was in his early 40s at that time.  And then he met

12  Debbie later, and they decided to get married in 2003.  He

13  didn't want to go through that type of process again so he

14  went to a lawyer and had prepared a prenuptial agreement which

15  states that his business is his business and Debbie's business

16  is her business in the event of any type of divorce or

17  separation or their death.

18        So Bart Morris is the sole owner of B&J Transfer, and

19  his wife Debbie has absolutely no interest in it.

20        In addition to the transfer for both the city and the

21  county, and the hauling of that garbage to the landfill, there

22  are also other business opportunities through PRIDE.  What is

23  PRIDE?  It's an acronym that stands for Personal

24  Responsibility In a Desirable Environment.

25        This is a federal initiative, which picked up on the

172

1    mandatory garbage pickup, because in the counties without

2    mandatory garbage pickup, the roads had trash on them and

3    numerous illegal dumping sites.

4         Now, this federal program is operated out of PRIDE's

5    office in Somerset.  PRIDE officials would come to the county

6    and they would evaluate and estimate the cost of cleanup of

7    these various dump sites, and then they would authorize the

8    county's solid waste coordinator to solicit bids for those

9    cleanups.  Two things are important that you'll hear about.

10   Number one is the bids had to come in under the estimate.  And

11   number two is the sites had to be cleaned up properly.

12        And the PRIDE officials would come not only at the

13   end of the job, but as the job was proceeding to make sure

14   that every bit, every piece of trash was removed from those

15   illegal dumps.

16        Bart Morris, through his company, B&J, bid on those

17   projects.  He bid on them in Clay County.  He bid on them in

18   Jackson County.  He bid on them in Breathitt County, and I

19   believe he bid on them in Lee County.  Some of those

20   contracts, some of those bids he got.  Some of those bids he

21   didn't get.  But the work that he did on that was under the

22   direction and under the approval of the PRIDE organization.

23        Bart Morris, like most, is interested in politics.

24   He lived, formerly he lived on Green Street in Manchester.

25   And Bart is sort of a jack-of-all -- he's a jack-of-all-trades

173

1    mechanic.  Out of his garage prior to getting into the

2    transfer business, sanitation business, he rebuilt wrecks.

3    He's a certified racing engine rebuilder, and for a period of

4    time he was involved in drag racing not only on a regional

5    level, but on a national level.  And he had a shop there at

6    his house, and as he would work on vehicles, as he would work

7    on his race cars, people would come by and visit.

8            His garage was a gathering place.  People would stop

9    by, shoot the breeze, maybe on occasion even drink a beer.

10           There are three elections that we're concerned about

11   in this case.  Three election years that are concerned about

12   in this case, 2002, 2004, 2006.

13           With respect to 2002, which is the year which is

14   important on the RICO charge, you will hear conflicting

15   testimony, if not confusing testimony regarding that election

16   and the operation of people in that election.  But what will

17   not be confusing, the proof will show, is that Bart Morris was

18   not with Doug Adams, was not with Wayne Jones, was not with

19   William Al Man Stivers or with Freddy Thompson.  He supported

20   Jennings White.

21           And although in some opening statements you've heard

22   statements about Jennings White, that's not the Jennings White

23   that Bart Morris knew.  Jennings White was Bart Morris's sixth

24   grade teacher.  Jennings White's father and Bart Morris's

25   father were in the same business when Bart was growing up.

174

1          So the interest that Bart had in Jennings White was

2    not in corruption or any alleged corruption, but it was a

3    generational affinity amongst his family.

4          In terms of the RICO charge, the proof will be that

5    Bart Morris was not engaged in any conspiracy with these

6    people.  He was not engaged in any type of enterprise with

7    these people, nor did he share any common goals or common

8    candidates with these people.

9          In terms of the 2004 election, Bart Morris was not

10   involved in those elections.  He did not actively participate

11   in those elections.  He didn't have an interest in those

12   elections.

13         With respect to the 2004 election, we expect that

14   you'll hear primarily from Vernon Hacker, Darnell Hipsher.

15   You've heard those individuals are convicted felons currently

16   serving their sentences, and the effect that their testimony

17   and the credibility that their testimony will have.  Be

18   particular in listening to these witnesses in terms of the

19   election as to their inconsistent statements and even the

20   inconsistent statements amongst themselves.

21         And in the same regard, 2006, we expect you'll hear

22   primarily from Kennon White and Wanda White with respect to

23   Bart Morris's alleged involvement.  And again, it will be

24   important to listen to their testimony not only as it

25   conflicts with other witnesses, but amongst themselves as to

1    who put up the money.  It wasn't Bart Morris, because he did

2    not participate in that.

3         You can be, as the government has asked you in this

4    case, you can be patient over this extended trial in listening

5    to the evidence.  But as patient as you may be, you will not

6    hear that Bart Morris or Debbie Morris are linked to any of

7    these other defendants.  There will be no credible evidence as

8    to his involvement in any conspiracy or vote buying in 2000 --

9    in these elections.  And at the conclusion of the case, we'll

10   ask you to find him not guilty.  Thank you.

11        THE COURT:  Thank you, Mr. Gilbert.  Miss Hughes, you

12   wish to reserve?

13        MS. HUGHES:  Yes, Your Honor, I'd like to reserve my

14   opening.

15        THE COURT:  Thank you.  You may do so.  Mr. Simons?

16        MR. SIMONS:  Thank you, Your Honor.  May it please

17   the Court, Mr. Smith, counsel.  Ladies and gentlemen of the

18   jury, my name's Dan Simons.  Like Mr. Gilbert who just spoke,

19   I'm from Richmond, Kentucky.  I have the privilege of

20   representing Mr. Stanley Bowling, who's seated behind me.

21        And I'm going to try to be very brief with you.

22   You've heard most of the varying sides speak, but I couldn't

23   leave here today without telling you a little something about

24   what you're going to hear about Stanley Bowling, him as a

25   person.

1          It's been almost 60 years now since Stanley's mother

2     gave birth to him in Oneida, Kentucky.  Oneida is a little

3     bitty town in Clay County, and Stanley has lived in Clay

4     County all the years of his life.  When he was drafted, he's

5     old enough to have been drafted into the service, and he spent

6     some time overseas in Korea.  He was raised with a bit of a

7     hard-scrabble life.  Things weren't easy for him.  His father

8     was not involved in his life.  He was raised by his

9     grandparents in a little place called Cotton Bend, which is in

10    Clay County as well.

11         Stanley grew up as a hard-working fella.  He

12    graduated from Clay County High School in 1968.  He got

13    married just after that.  He had a daughter in 1970, which

14    delayed his entry into the service for a bit.  When he got

15    back from overseas, he went to work for the City of

16    Manchester.

17         He didn't have the most attractive job in the City.

18    He worked in the sewer department.  He put on Red Wing boots

19    every day, and he went to work, and he tackled stopped sewers,

20    broken sewers, broken water mains.  He did the leg work,

21    physical work.  And he was good at it, and he stuck it out.

22    He started that in 1972.  In 1983, he was elevated to be

23    someone known as general supervisor over water and sewer.

24         Now, when he was first hired by the City, and this

25    will be important in a minute, he was hired by the then mayor,

1   a fella named Jack White.  There's a lot of Whites.  You

2   haven't heard Jack's name before, I don't think.  And that's

3   the gentleman who hired him.  And the next mayor in the City

4   was Doug White.  He's been referred to as Daugh White somewhat

5   here today.  I call him Daugh White.  I think that's the

6   correct pronunciation.  And Stanley, after he was named

7   general supervisor other sewer and water, he continued to

8   work, continued to do good work.

9        And in 1990, after 18 years with the Department of

10  Sewers and Water, he was named something called general

11  supervisor over the City, and what that did was he was in

12  charge of all sewer, all water and roads.  And he stayed in at

13  that position until the year 2000, when he retired.

14       So he was 28 years with the City of Manchester in

15  charge of sewers, water and streets.  Now, he did a good job.

16  In the course of this trial, no matter how long it takes, I

17  don't believe you will hear one shred of evidence that he did

18  less than a super job at that job, tending to the City of

19  Manchester.

20       Now, you're going to find and you're going to hear

21  testimony that when Stanley left that position of employment

22  with the City in 2000, he knew more than any person alive

23  about the sewer and water delivery systems in Manchester,

24  Kentucky.  And having had some foresight -- got to back up

25  just a minute for the timeline.

1          Two things happened in Stanley's life that were

2     important that I've missed.  In 1974, he was blessed with a

3     son, Stephen Bowling.  And in 1992, he was divorced.  His son

4     was 20 years old.  He had the foresight at that time to start

5     a little company called B&B Excavating.  At first, it was a

6     weekend kind of a company.  It was actually incorporated in

7     1993.  It is a legitimate corporation.  Stanley did a little

8     excavating work with it on the side on weekends.  And his

9     vision was to work with that company as he retired and develop

10    the business with his son in it with him as a family business.

11         Now, Stanley leaves the City in the year 2000, and he

12    starts developing B&B.  As it turns out, in 28 years, when

13    you're working for the City of Manchester, Stanley's a very

14    extroverted guy.  He's just a friendly guy.  He talks to

15    everybody.  He knew everybody.  Everybody liked him.  And you

16    know what?  He decided to enter the political arena.   In

17    hindsight, this was a terribly unwise thing.  But he did, and

18    he was encouraged by the people that knew him and liked him to

19    run for the position of magistrate.

20         He ran for magistrate in District 2 of Clay County.

21    That is one of six magisterial districts.  It consists of

22    three precincts, Harts Branch, Big Creek and Greenbriar.  It's

23    in the eastern part of the county.  There's 20 precincts total

24    in Clay County, and his consisted of three.

25         Now, you're going to hear he ran in 2002, and you're

1    going to hear a lot of stuff about 2002.  Stanley believed he

2    was getting into a race where it was a door to door, shaking

3    hands, howdy neighbor, vote for me kind of things.  And it

4    turned out the election in 2002 in May was much more robust

5    than that.

6         Now, you'll hear, as Mr. Gilbert said, you'll hear

7    some conflicting and some confusing testimony.  But there's

8    one thing that you will not be confused about.  And that is

9    that Stanley Bowling was a supporter of Jennings White.

10   Stanley Bowling never supported these gentlemen on this side.

11   Mr. Maricle supported Jennings White.  I did not know that

12   until today.  Now, Stanley won the May primary.  Submit to you

13   that the evidence will show that he won it, and he won it

14   because he was the best liked candidate.

15        Now, in November, in the general election, he won

16   again.  His opponent in the November election was Wayne Jones'

17   brother, Billy Jones.  It's hard to imagine that that proof

18   would support the fact that these people were collectively

19   acting in a group.

20        Now, want to jump ahead.  First of all, we've talked

21   about a 2004 election.  Stanley wasn't involved in that.  He

22   didn't run.  He didn't need to run and he was not involved in

23   that election.  He won again in 2006 in landslide because, I

24   submit to you, and the evidence will demonstrate that he was

25   extremely popular.  He did a good job as a magistrate.

180

1          Now, 2004 had another feature of it that was a

2     pivotal moment in the history and development of Manchester.

3     Doug White, who is still the mayor -- well, I want to back up

4     just a second.  The person who replaced Stanley in 2000 was a

5     young man named Wes Hacker, and he came in as a supervisor of

6     sewer and water and streets.

7          And Wes is a good guy.  You may hear from him.  I

8     don't know.  But he was a little young, probably didn't handle

9     the job perfectly.  The gentleman who replaced him in 2002 was

10    a fella named Mike White.  No relation to the other Whites.

11    There's a lot of Whites.  And Mike did a pretty good job and

12    still does, and you might hear from him.

13         The problem is neither one of those guys really knew

14    a lot about the sewers and the water lines in Manchester.  So

15    when they had a question, what do you think they did?  They

16    called Stanley Bowling, asked his advice, asked him what to

17    do.

18         Now, in 2004, the mayor, Doug White, invents a

19    position of authority for his son, Kennon White, and they

20    start a new title called city manager.  In 2004, Kennon White

21    is brought in above Mike White, who is the supervisor.  And

22    Kennon White is put in charge of sewer, water, streets, and

23    police, and that happened in 2004.

24         By 2006, within two years of that, all chaos has

25    broken loose.  You will hear testimony that there were water

1    bills cut, reduced for people in exchange for political

2    support.  Kennon White was in charge of that.  You're going

3    hear proof that Kennon White extorted money from contractors

4    who worked for the City, particularly my client, Stanley

5    Bowling.

6         Stanley Bowling bid several contracts, or was awarded

7    several contracts, a series of five, with B&B Excavating with

8    the City of Manchester.  Now, when he started that seeking

9    City work, Kennon White shook him down.  He extorted funds

10   from him.  Said if you want any work in this city, you're

11   going to have to pay me, put some money in my pocket.  Okay?

12   Stanley Bowling testified to this in front of the grand jury.

13   The sum total that Kennon White extorted from Stanley Bowling

14   was $67,000.

15        Now, streets were also under the charge of Kennon

16   White.  We're going to hear lots of evidence that there were

17   driveways blacktopped in exchange for votes.  That was all the

18   doing of Kennon White.  You're going to -- police that Kennon

19   was in charge of, you're going to hear about missing evidence,

20   money missing.  You're going to hear all kinds of stuff.  All

21   of those things, everything that Kennon White was in charge of

22   became a mess in less than two years.  That is going to be one

23   of the chief witnesses for the government, particularly

24   against my client, Stanley Bowling.

25        Now, what I'm going to show you, ladies and

1    gentlemen, as the case goes along is that Stanley Bowling is

2    as good a contractor in excavating, sewer and water lines as

3    you're going to find anywhere.  You will find that contracts

4    that he did for City of Manchester were not only reasonable,

5    they were done timely, professionally, well.  They complied

6    with every plan done by the engineers.  You will hear

7    testimony that his work was truly excellent.

8            Now, you will also hear some evidence, I believe,

9    that Stanley Bowling unloaded an excavator that he owned on

10   the county.  He sold them a used excavator for $40,000.  Well,

11   what you're going to hear about that excavator is that the

12   City had used it for some months for free.  That the then

13   judge executive needed it for emergency.  That Stanley sold it

14   to him at a price below what it should be.  He gave it to him

15   interest-free and took $2,000 a month for 20 months for the

16   excavator.  The county still uses it today.

17           Ladies and gentlemen, I've asked you to listen.

18   You've been very patient.  I'm going to wrap up the day with

19   you right now.  I've tried to tell you what I think the

20   evidence is going to show about Stanley Bowling.  I've not yet

21   figured out how he's involved in any collaboration with the

22   co-defendants.

23           Having told you what I think you'll hear, at the

24   conclusion of this case, I'm going to stand back up, and I'm

25   going to tell you what you didn't hear, and it will be an

183

1  entirely different list.  It will be just as important, but

2  I'm convinced by that time that you will know that Stanley

3  Bowling is innocent of the two counts with which he's charged.

4  Thank you.

5       THE COURT:  Thank you, Mr. Simons.  Thank you,

6  counsel.

7       At this time, ladies and gentlemen, we'll take our

8  break for the evening.  I will remind you that we will start

9  tomorrow morning at 9:00 with testimony.  So tomorrow morning,

10  we'll be starting with the testimony in the case.

11       Please keep in mind the admonition I've given to you

12  a couple times.  Let me repeat some of that now.  Of course,

13  you should not discuss the matter with each other or members

14  of your friends or family.  I'm sure when you go home, members

15  of your family will be interested in hearing what you've heard

16  today.  But as always, your response should be that you cannot

17  talk about the case until it's finally over.  So you should

18  not talk with each other.  You should not talk with friends or

19  family about the case.

20       Likewise, you should not allow anyone to approach you

21  in an attempt to discuss the case with you.  And as I've

22  reminded you earlier, if that should ever happen, you should

23  report to that the Court promptly.  Don't read, watch or

24  listen to any accounts of the case if there should be any.

25  Don't engage in any types of electronic communication or chats

184

1    with anyone, whether it be by Blackberry or any type of device

2    some of you may have.  Don't do any type of investigation or

3    research about the case and, of course, don't make up your

4    mind about the case until it is finally submitted to you.

5         With that admonition, the jury will be excused until

6    9:00 a.m. tomorrow morning.

7              (The jury left the courtroom at 4:24 p.m.)

8         THE COURT:  Thank you.  Before we recess, let me ask

9    if anyone has any matters to take up outside the presence of

10   the jury.  Be seated, please.  Mr. White?

11        MR. WHITE:  Yes, Your Honor, just one.  It's personal

12   to me, I'm sorry.  You had indicated next Friday, unless we

13   have Daubert hearings, that we're going to be in recess.  I

14   just wanted to alert the court that I've scheduled a

15   sentencing for next Friday afternoon with Judge Caldwell at

16   1:30.  I'm going to go ahead and file my document.  Actually,

17   I've been trying to do it over the weekend so that Mr. Smith

18   and Mr. Parman can have it.  I'll see where they're at.  If

19   we're going to have a Daubert hearing on my experts, I was

20   going to try to get a sense from you if I can do it in the

21   morning, and I can alert Judge Caldwell --

22        THE COURT:  If we have five witnesses, I imagine it

23   will take all day with the number of questions y'all will

24   likely ask.  I would imagine it will be all day.  Without

25   knowing where we stand on that, it's hard to predict.  I don't

1     know how many witnesses may be called in the matter.  I'm

2     sorry, I can't provide you any more assistance than that.

3            MR. WHITE:  That's fine, Your Honor.  I'll alert

4     Judge Caldwell.

5            THE COURT:  Any other issues we need to take up?  I

6     believe the parties were supposed to let me know by yesterday

7     about the status of the Daubert issues.  Days are running

8     together.  Where do we stand on that?

9            MS. HUGHES:  You gave us till Monday to do our

10    supplements and so that would be then next week.

11           THE COURT:  I'm a week ahead of myself.  I apologize.

12    Any other issues we need to take up?  No?  Mr. Smith, anything

13    on behalf of the government?

14           MR. SMITH:  No, Your Honor.

15           THE COURT:  We'll be in recess until 9:00.  Again,

16    counsel, if there are matters to take up outside the presence

17    of the jury, you will need to notify me by 8:30 tomorrow

18    morning.  Otherwise, we'll be in recess until 9:00.

19           (Proceedings adjourned at 4:27 p.m.)

20                        - - -

21              C E R T I F I C A T E

22           I, LISA REED WIESMAN RDR-CRR, certify that the
      foregoing is a correct transcript from the record of
23    proceedings in the above-entitled case.

24
       \s\ Lisa Reed Wiesman              February 13, 2010
25    LISA REED WIESMAN, RDR-CRR          Date of Certification
      Official Court Reporter