1

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                   SOUTHERN DIVISION at LONDON
                              - - -
 3
      UNITED STATES OF AMERICA,        : Docket No. CR 09-16-S
 4                                      :
                      Plaintiff,        : Frankfort, Kentucky
 5                                      : Thursday, February 4, 2010
          versus                        : 1:15 p.m.
 6                                      :
      RUSSELL CLETUS MARICLE,           :
 7    DOUGLAS C. ADAMS                  :
      CHARLES WAYNE JONES               :
 8    WILLIAM R. STIVERS                :
      FREDDY W. THOMPSON                :        Trial Day 3B
 9    WILLIAM B. MORRIS                 :
      DEBRA L. MORRIS                   :
10    STANLEY BOWLING,                  :
                                        :
11                    Defendants.       :

12


13                            - - -
                      TRANSCRIPT OF TRIAL
14              BEFORE DANNY C. REEVES
           UNITED STATES DISTRICT COURT JUDGE and a jury
15                            - - -

16    APPEARANCES:

17    For the United States:      STEPHEN C. SMITH
                                  JASON D. PARMAN, ESQ.
18                                Assistant U.S. Attorney
                                  601 Meyers Baker Road
19                                Suite 200
                                  London, KY 40741
20
      For the Defendant          MARTIN S. PINALES, ESQ.
21    Russell Cletus Maricle:    Strauss & Troy
                                  150 E. Fourth Street
22                                Fourth Floor
                                  Cincinnati,OH  45202
23
                                  DAVID S. HOSKINS, ESQ.
24                                107 E. First Street
                                  Corbin, KY  40701
25
```

```
 1    For the Defendant          R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                               Landrum & Shouse, LLP
                                 220 West Main Street
 3                               Suite 1900
                                 Louisville, KY 40202
 4
                                 BENNETT E. BAYER, ESQ.
 5                               Landrum & Shouse, LLP
                                 106 West Vine Street
 6                               Suite 800
                                 Lexington, KY  40507
 7

 8    For the Defendant          T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
 9                               133 West Short Street
                                 Lexington, KY  40507
10

11    For the Defendant          ROBERT L. ABELL, ESQ.
      William R. Stivers:        120 North Upper Street
12                               Lexington, KY  40507

13
      For the Defendant          RUSSELL JAMES BALDANI, ESQ.
14    Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
                                 Baldani, Rowland & Richardson
15                               300 West Short Street
                                 Lexington, KY  40507
16

17    For the Defendant          JERRY W. GILBERT, ESQ.
      William B. Morris:         Coy, Gilbert & Gilbert
18                               212 North Second Street
                                 Richmond, KY 40475
19

20    For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:           Gess, Mattingly & Atchison, PSC
21                               201 West Short Street
                                 Lexington,KY40507
22

23    For the Defendant          DANIEL A. SIMONS, ESQ.
      Stanley Bowling:           Thompson, Simons, Dunlop & Fore
24                               116 West Main Street
                                 Suite 2A
25                               Richmond, KY 40476
```

3

Court Reporter:                    LISA REED WIESMAN, RDR-CRR
                                   Official Court Reporter
                                   35 W. Fifth Street
                                   P.O. Box 1073
                                   Covington, KY  41012
                                   (859) 291-4410


     Proceedings recorded by mechanical stenography,
transcript produced with computer.

*DAY - Cross (Mr. White)*                                                4

1          (The jury entered the courtroom at 1:20 p.m.)

2          THE COURT:  Thank you.  The record will reflect that

3    all members of the jury are present.  Parties and counsel are

4    also present.  Mr. Day has returned to the witness stand.

5    You're still under oath.  Mr. White, you may cross-examine.

6          MR. WHITE:  Thank you, Your Honor.

7                         CROSS-EXAMINATION

8    BY MR. WHITE:

9    Q.   Now, you were the Republican commissioner when you served

10   on the state board or the County Board of Elections; is that

11   correct?

12   A.   The Republican election commissioner of Clay County.

13   Q.   That's right.  You sat on the County Board of Elections?

14   A.   That's right.

15   Q.   And while you're on the County Board of Elections, you

16   all would meet from time to time?

17   A.   Yes.

18   Q.   And on that, that Board of Elections, it was whoever was

19   the county clerk, right?

20   A.   Right.

21   Q.   Whoever was the county sheriff?

22   A.   Right.

23   Q.   And the Democrat commissioner?

24   A.   That's right.

25   Q.   And when you all had these meetings, were those held over

1    in the Clay County municipal building, the old one?

2    A.   The clerk's office where they was always held.

3    Q.   The county clerk's office?

4    A.   Yes.

5    Q.   And that was an open meeting?

6    A.   Yep.

7    Q.   Meaning anybody could come in?

8    A.   That is right.

9    Q.   And you would have already provided to the county clerk,

10   as the Republican election commissioner, the list of names

11   that the Republicans proposed to be election officers in the

12   different counties, correct?

13   A.   Ask that question again now.

14   Q.   Okay.  The -- as the Republican election commissioner,

15   the Republicans would propose, for each precinct, all 20

16   precincts in Clay County, four names to be officers, and the

17   Democrats would propose four, and then the Board would pick

18   two for each, correct?

19   A.   Four or five names.  I don't remember exactly how many

20   names that each precinct turned in, but we picked from them

21   four or five names, whatever was turned in.

22   Q.   That's right.  And one from each party would have to be a

23   judge, correct?

24   A.   That is right.

25   Q.   And at least by the law as you understood it, they had to

*DAY - Cross (Mr. White)*                                              6

1    be in the precinct, the actual physical precinct in case

2    something came up and they had to do their job, correct?

3    A.   Do what now?

4    Q.   The judge, if I'm a Democrat judge, and you're the

5    Republican judge, we're down there in Burning Springs, and the

6    polls open, we are supposed to be inside the precinct the

7    entire time the polls are open, correct?

8    A.   That is right.

9    Q.   Okay.  Now, there's also two other election officers, and

10   that's the sheriff and the clerk, correct?

11   A.   That's right.

12   Q.   Now, this isn't the sheriff who wears a badge and carries

13   a gun and can arrest you.  It's just what they call that

14   person, and they've kind of got to keep the order.  They're

15   like a sergeant-of-arms?

16   A.   Something like that.

17   Q.   And the clerk is the person who takes down names and

18   checks people in, correct?

19   A.   That is right.

20   Q.   One's got to be a Democrat, one's got to be a Republican?

21   A.   That's right.

22   Q.   Okay.  And I believe or did you -- you remember

23   testifying at this hearing, we called it a 404(b) hearing, but

24   you were here.  We were all here last week.  You got up there

25   and testified.  You remember that?

*DAY - Cross (Mr. White)*                                                    7

1    A.   Yes.

2    Q.   Is it your memory that in your testimony then that you

3    testified that during the years that you were the Republican

4    election commissioner, on the County Board of Elections, that

5    you never disagreed with who the Democrats picked, and they

6    never disagreed with who the Republicans picked; is that

7    right?

8    A.   I said on the election that Cletus run for circuit judge,

9    they was no --

10   Q.   Disagreement?

11   A.   -- disagreement on.

12   Q.   Okay.  Now, I wanted to clear one thing up, if I could,

13   in your testimony to, I believe it was Mr. Bayer who

14   represents Superintendent Adams.  Now, you know that when

15   you're on cross-examination, it's just like being on direct

16   examination.  You're still under oath?

17   A.   I understand that.

18   Q.   You understand that, okay.  Now, back in -- you were

19   arrested when, back in 2005?

20   A.   That's right.

21   Q.   And those were on drug charges, weren't they?

22   A.   Yep.

23   Q.   Do you remember getting a visit from the FBI asking if

24   you wanted to cooperate after they arrested you?

25   A.   The day that they arrested me, they asked me if I wanted

*DAY - Cross (Mr. White)*                                                                8

1    to cooperate that day, and I told them no.

2    Q.   You wanted to think about it?

3    A.   I told them --

4    Q.   Wanted to sleep on it?

5    A.   Told them no.

6    Q.   That's right, and that was on -- now, they came back

7    again, it looks like couple months later, and you decided that

8    you did want to cooperate; is that correct?

9    A.   That's not right.  I called my daughter and had her to

10   call Briggs and tell him that I wanted to cooperate.

11   Q.   Okay.  And then did he then come see you?

12   A.   They brought me back to London.

13   Q.   I see.  So you met them in their office?

14   A.   At the federal building in London.

15   Q.   There on Main Street when you drive down London, off the

16   interstate?

17   A.   Yeah, the new building.

18   Q.   Right.  And I think to Mr. Bayer, you referred to them as

19   Tim and Buddy, but let's make sure we know who we're talking

20   about.  When you say Briggs --

21            MR. SMITH:  Your Honor, I'm going to object again to

22   the characterization of the testimony.  I don't believe that's

23   how he referred to the agents.

24            MR. WHITE:  That's what I wrote in my notes.

25            THE COURT:  I'll sustain the objection.  I think the

*DAY - Cross (Mr. White)*                                                9

1    reference was to "them."

2          MR. WHITE:  Thank you, Your Honor.

3    Q.   Let's make sure we know what we're talking about.  Is

4    Agent Briggs in the courtroom?

5    A.   Yes, he is.

6          MR. WHITE:  Agent Briggs, would you mind identifying

7    yourself?

8    Q.   Is this the gentleman that you spoke with?

9    A.   Yes, it is.

10   Q.   And then the other person was who?

11   A.   Buddy there.

12   Q.   Buddy who?

13   A.   I don't know his last name.

14   Q.   Do you call him Buddy?

15   A.   Yes, I do.

16   Q.   Is Buddy in the courtroom?

17   A.   Yes, he is.

18   Q.   Could he stand up, please, sir?  Is that Buddy?

19   A.   That's right.

20   Q.   Did you understand him to be a member of the FBI?

21   A.   Yes, I did.

22   Q.   And then you spent some time answering questions, telling

23   them about the drug business there in Clay County that you'd

24   been operating in, correct?

25   A.   That is right.

*DAY - Cross (Mr. White)*                                               10

1    Q.   And did they take any notes?  I mean, did you see any

2    paper or pencils?

3    A.   I think they did.  I'm not a hundred percent sure, but I

4    think they did.

5    Q.   Did they record you?

6    A.   I don't know that.

7    Q.   Mr. Bennett mentioned a document the lawyers call 302s,

8    and they'll probably come into evidence here, and those are

9    documents that the agents --

10            MR. SMITH:  Your Honor, I'm going to object again.

11            THE COURT:  I'll sustain the objection.  Admonish

12    counsel not to refer to documents not in evidence.

13            MR. WHITE:  Your Honor, may I approach?

14            THE COURT:  Yes, you may.

15            MR. WHITE:  Thank you, Your Honor.  I'll be very

16    brief.

17                    (A sidebar conference was held out of the

18                    hearing of the jury):

19            MR. WHITE:  Thank you, Judge.  Can I be allowed just

20    to alert everyone, to see if I can refresh his recollection

21    with the document?

22            THE COURT:  With a document he didn't prepare?

23    You're asking to try to refresh his recollection with a

24    document he didn't prepare and cross-examine him on something

25    someone else wrote down?

1           MR. WHITE:  Perhaps.  I want to see if he can

2      remember, if it refreshes his memory.

3           THE COURT:  All right.  You can show him a document

4      and ask him if that refreshes his memory.  You can't read from

5      the 302 in order to get the information into the record to ask

6      him if that refreshes his memory.

7           MR. WHITE:  I understand.  Thank you, Your Honor.

8           THE COURT:  If you do, you'll be admonished in front

9      of the jury.

10          MR. WHITE:  I understand.  Thank you, Your Honor.

11          MR. SMITH:  While we're here, one of the things he's

12     representing in his question is this 302 is going to come into

13     evidence.

14          MR. WHITE:  Exactly.

15          MR. SMITH:  That's not accurate.  He does not have

16     that in evidence.  How he's going to get it into evidence, I

17     don't know.  He's not represented in his opening statement how

18     he's going to do that.

19          MR. WHITE:  I don't need to.

20          MR. SMITH:  I would object to him representing that

21     in a question to this jury, suggesting that.

22          MR. WHITE:  I won't say that.

23          THE COURT:  You just did say it improperly so you're

24     admonished not to say it again.

25          MR. WHITE:  Thank you, Your Honor.  I won't say it

*DAY - Cross (Mr. White)*                                             12

1    again.  That's what I was trying to say.

2              THE COURT:  Do we need further discussion about this?

3              MR. WHITE:  No.

4              THE COURT:  All right.

5              MR. WHITE:  Thank you, Your Honor.

6                    (Sidebar conference concluded.)

7    Q.  Mr. Day, I am going to show you a document.  I don't want

8    you to read it out loud.  I've highlighted a blue bracketed

9    part I would like you to read, and I'm going to ask you if

10   that refreshes your memory, okay?

11             MR. SMITH:  Mr. White, do you mind --

12             MR. WHITE:  Oh, I'm sorry.

13   A.  (Reviewing document).

14   Q.  Without saying the substance, does that refresh your

15   memory as to whether you discussed that with the agents on

16   that date?

17   A.  I don't know if that's the right date, but I did discuss

18   that with them, yes.

19   Q.  Is that information accurate?

20   A.  Yes, it is.

21             MR. WHITE:  Your Honor, may I ask the witness about

22   that?

23             THE COURT:  You may question the witness.

24             MR. WHITE:  Thank you, Your Honor.

25   Q.  With that document having refreshed your recollection, is

*DAY - Cross (Mr. White)*                                                    13

1    it accurate, is this -- is it accurate to ask you, to say that

2    when you were meeting with the FBI, that you informed them

3    that it was your understanding that Kennon White had been

4    caught with cocaine in a hotel in London and Barbara Colter

5    White, Barbara White Colter got it taken care of?

6    A.   That is right.

7    Q.   Okay.

8              MR. WHITE:  Sir, if I could have that back.

9    Q.   I wanted to ask you too, I want to get a little bit of

10   timeline, if I could.  You had testified on direct examination

11   to Mr. Smith that you had purchased, I think you said several

12   ounces off of Wayne, meaning marijuana.  And it was back in

13   the '90s.  Is that --

14   A.   Do what now?  I didn't hear you.

15   Q.   I'm sorry.  It's my understanding that your testimony on

16   direct examination was that you had bought several ounces of

17   marijuana from Wayne Jones in the '90s.  Is that correct?

18   A.   That is correct.

19   Q.   Okay.  Now, we talked about you've been in prison,

20   what -- you're in prison now, correct?

21   A.   That's right.

22   Q.   Now, you're currently residing in the Franklin County

23   Detention Center; is that correct?

24   A.   That's correct.

25   Q.   Now, where were you before you were brought here for the

*DAY - Cross (Mr. White)*                                                   14

1    trial?  What facility?

2    A.   I was at Grayson County, and then I come to London for a

3    week.  And from London, up here.

4    Q.   Did you spend any time in -- have you spent any time in a

5    federal facility?

6    A.   Yes.

7    Q.   And where is that?

8    A.   Lexington.

9    Q.   Okay.  Now, before that, you'd also been in prison; is

10   that correct?

11   A.   That is correct.

12   Q.   And is that the prison term that you were released from

13   in 2002?

14   A.   No.  2001.

15   Q.   I'm sorry, 2001.  And this was -- was this the cocaine

16   trafficking?

17   A.   That's right.

18   Q.   And you went into prison on that in, was it 1997 or '98

19   or '99?

20   A.   '97.

21   Q.   '97.  So at least we know between -- that this so-called

22   purchase of some ounces of marijuana occurred prior to 1997;

23   is that right?

24   A.   That is right.

25   Q.   And I thought you said you gave them $125 an ounce; is

1    that right?

2    A.   That's right.

3    Q.   And this was for this connoisseur of marijuana that you

4    were buying for up in Dayton; is that correct?

5    A.   I don't know what connoisseur means.

6    Q.   Means he likes good stuff.

7    A.   Well, that's right.  He liked good stuff.

8    Q.   You had plenty of stuff, but you wanted to get him the

9    good stuff?

10   A.   That's right.

11   Q.   I understand.  Now, this fella that you were talking

12   about on direct that was this guy that you kind of got in,

13   bought some stuff from, was a guy named King?

14   A.   What?

15   Q.   Was there an attorney named King, K-i-n-g?  Were my notes

16   wrong, that you had bought some -- let me start over, because

17   I think I'm jumping around too much on you.  There was a

18   gentleman, did you testify on direct examination that you had

19   bought marijuana from out in Arizona?

20   A.   That's right.

21   Q.   Okay.  Was that fella's name King?

22   A.   Cane?

23   Q.   King, I'm sorry, K-i-n-g.

24   A.   His real name was John Sherry.  He went by King is what

25   he -- identity he went by, but his real name is John Sherry.

*DAY - Cross (Mr. White)*                                                16

1    Q.   Right.  And he liked to be called King because he was

2    trying to hide his identity; is that correct?

3    A.   That's right.

4    Q.   And isn't true that Mr. King, that you were involved in a

5    marijuana transaction with Mr. King, this fella that goes by

6    King, and he got -- things got seized up in Dayton at that

7    time; is that correct?

8    A.   No.

9    Q.   You were never aware of a time Mr. King got involved with

10   the police up in Dayton involving marijuana?

11   A.   The only time I was aware of anything is that he told me

12   that he had a shipment coming in from Arizona, and it had got

13   stopped on the way.  He was waiting for the load to come, it

14   was a day late.  And what happened in Arizona, the agents put

15   it on a plane, truck and everything and flew it to Dayton, and

16   when it come in, it was a day late, and he got scared and run.

17   Q.   Um-hmm.

18   A.   That's what he told me.

19   Q.   I wanted to ask you about this $800 man.  You live in

20   Burning Springs; is that right?

21   A.   That's right.

22   Q.   Is that a neighborhood in the town of Manchester, or is

23   that outside the town limits?

24   A.   It's about ten miles north of Manchester on 421.

25   Q.   I see.  And is that also the name of a precinct?

1    A.  Burning Springs precinct, that is right.

2    Q.  And would it be fair to say it's one of the larger

3    precincts in Clay County?

4    A.  At that time, it probably was.

5    Q.  It had about, what, somewhere around 800 registered

6    voters?

7    A.  Somewhere in that neighborhood.

8    Q.  Okay.  And would it be fair to say that your memory is

9    that you knew about half those people on a first name basis?

10   A.  I knew the majority of them.  I didn't know them all, but

11   I knew -- I don't know what percentage was, but I knowed a

12   bunch of the people.

13   Q.  I think you testified last week it was 40 to 50 percent?

14   A.  That's probably right.

15   Q.  That's a lot of people.  Did you grow up there?

16   A.  Yes, I did.

17   Q.  Is that where you were raised up?

18   A.  Yes, I did.

19   Q.  And if you weren't living down at the Franklin County

20   Detention Center, that's where you'd be living today?

21   A.  I doubt that.

22   Q.  Oh, okay.  Is that where all your people are?

23   A.  All I've got left there now is a son and my daddy and

24   brother.

25   Q.  Your daddy and brother live in Burning Springs?

*DAY - Cross (Mr. White)*                                          18

1    A.   No, my son lives in Burning Springs.  My daddy and

2    brother lives north of Burning Springs, towards Manchester.

3    Q.   Oh, okay.  Now, this voter that you give $800 to was a

4    lot of money.  Was that the most you ever paid for a voter?

5    A.   That is the most.

6    Q.   Had you ever gotten -- had you ever paid a voter over

7    $500 before?

8    A.   Not to my knowledge.

9    Q.   And this was in -- was this the election involving Oscar

10   Gayle House?

11   A.   And Clay M.

12   Q.   That run for circuit judge?

13   A.   That's right.

14   Q.   And this was back in -- help my memory -- about 1990?

15   A.   No, it was early, middle '80s, something like that.

16   Q.   Middle '80s, okay.  And in your testimony on direct

17   examination to the United States, I think you testified that

18   you had been buying votes since you were basically -- got in

19   politics?

20   A.   That's right.

21   Q.   So you've done a lot of vote buying in Clay County?

22   A.   Well, I've done a lot, yes, I have.

23   Q.   Well, have you done it other than Clay County?

24   A.   Do what now?

25   Q.   Have you bought votes outside of Clay County?

*DAY - Cross (Mr. White)*                                               19

1    A.   No.

2    Q.   Okay.  And it's your -- now, last week, you couldn't

3    remember who you give that $800 to, which voter.  You couldn't

4    remember who it was.  Have you been able to remember who it

5    was?

6    A.   No, I have not.

7    Q.   The biggest sale you'd ever done as a career vote buyer,

8    you can't remember the boy or woman that you gave it to?

9    A.   No, I do not.

10   Q.   Now, you're a drug addict too, right?

11   A.   Do what?

12   Q.   You're a drug addict too, aren't you?

13   A.   I was.

14   Q.   You're in recovery now?

15   A.   I ain't done nothing in five years this coming April.

16   Q.   Because you've been locked up?

17   A.   That's right.

18   Q.   They drug test you in prison?

19   A.   Yes, they do.

20   Q.   That's because you can get drugs in prison, right?

21   A.   Do what now?

22        MR. WHITE:  I'll withdraw the question, Your Honor.

23   Q.   Since your arrest in 2005, it's your testimony you've not

24   done any drugs, correct?

25   A.   That is correct.

*DAY - Cross (Mr. White)*                                                    20

1   Q.   But before 2005, you did a lot of drugs?

2   A.   I did.

3   Q.   You testified, I think, to Mr. Pinales that crystal

4   methamphetamine was your, quote unquote, drug of choice?

5   A.   That is correct.

6   Q.   That's what you liked the best?

7   A.   That's right.

8   Q.   In fact, did you not testify to the United States, when

9   they called you as a witness, that it was your use of

10  methamphetamine that kind of got you into the whole drug

11  business?

12  A.   That's right.

13  Q.   And I believe Mr. Smith asked you what effect crystal

14  meth has on a man when he takes it.  Did you smoke it?

15  A.   No, I did not.

16  Q.   Did you shoot it?

17  A.   Nope.

18  Q.   How did you take it?

19  A.   I'd eat it, put it in coffee, and I snorted it some.

20  Q.   Um-hmm.  And what effect did it have on you?

21  A.   Just give you a high.  You never could go to sleep.  You

22  always wanted to work.

23  Q.   You were just -- it's just a speed freak habit?

24  A.   It's a speed, that's right.

25  Q.   That's right.  And you took it more than once a day,

*DAY - Cross (Mr. White)*                                                    21

1    didn't you?

2    A.   Yes, I did.

3    Q.   Took it a couple times a day?

4    A.   More than that, probably.

5    Q.   Probably.  Did it every day?

6    A.   Every day of my life.

7    Q.   That's right.  Is there any other illegal activities

8    besides vote buying and drug trafficking and drug taking that

9    you've done down in Clay County before you got arrested in

10   '05?

11        MR. SMITH:  I'm going to object, no good faith basis

12   for the question.

13        THE COURT:  Counsel approach.

14        MR. WHITE:  Thank you, Your Honor.

15        THE COURT:  Please.

16             (A sidebar conference was held out of the

17              hearing of the jury):

18        THE COURT:  Mr. White?  Prior conviction?

19        MR. WHITE:  This is cock fighting.

20        THE COURT:  Is this a prior conviction?

21        MR. WHITE:  No, not that I'm aware of.

22        THE COURT:  Sustain the objection.  Also, counsel,

23   when you question the witness and you keep saying, "that's

24   right," that's essentially you testifying.  You're

25   representing to the jury that that's your statement.  That's

*DAY - Cross (Mr. White)*                                                    22

1     improper so don't do that again.  Sustain the objection.

2                MR. WHITE:  Thank you, Your Honor.

3                MR. SMITH:  Your Honor, while we're here, I just want

4     to understand, I have considered making an objection, I mean,

5     I don't understand exactly how far the Court extended that,

6     but I know in a pretrial we talked about cross-examination

7     continuing to regurgitate what had already been covered, and I

8     guess for my own understanding, I don't want to object and

9     interrupt Mr. White continuously here, but it seems to me that

10    this drug use has been asked several times, and we continue to

11    go over things of that nature.

12               THE COURT:  Things that are pretty clear.  It's not a

13    question of an ambiguity.  I wanted to see how everybody would

14    do the first time around before I imposed any limitations on

15    counsel.  It looks like I may need to do that with witnesses

16    coming up.

17               MR. WHITE:  May I respond, Your Honor?

18               THE COURT:  Yes, you may.

19               MR. WHITE:  The reason, Your Honor, I decided to go

20    back into King with him, I think I established, when I could

21    refresh his memory, he did remember doing that.  When he

22    answered the questions of Mr. Pinales, all he said was he was

23    a meth user.  He got into nothing about the effects, anything

24    like that.

25               THE COURT:  Let me stop you.  That's not true.

1          MR. WHITE:  That's my recollection.

2          THE COURT:  Well, let me tell you about your

3    recollection.  It's not true.  His testimony was that he used

4    crystal methamphetamine, that he ate it, that he put it in his

5    coffee, and that he occasionally snorted it and that it gave

6    him a constant high where he would stay up 24 hours at a time.

7          MR. WHITE:  Yes, sir.

8          THE COURT:  And that was the clear part of the

9    testimony he testified to on direct and also, I believe, in

10   Mr. Pinales' cross-examination.  And I believe that's what Mr.

11   Smith was just referring to, correct or incorrect?

12         MR. SMITH:  That is.

13         THE COURT:  As well as other areas.

14         MR. SMITH:  I just, I raise this because, again, I

15   don't want to be continually objecting.

16         MR. WHITE:  Well, let me just bring one thing up,

17   because obviously I don't want us to have to run up here

18   again.  I intend to show him other parts of this 302, ask him

19   if he remembers, does that refresh his memory as to whether he

20   told -- I'm almost done -- the United States about it.  And if

21   he did, I plan to ask him about it.  Would you like me to show

22   you the ones I'm going to --

23         THE COURT:  I don't know what you're planning to do,

24   other than --

25         MR. WHITE:  I mean, I can show you.

1          THE COURT:  Well, we talked about the chicken

2    fighting.

3          MR. WHITE:  Right.

4          THE COURT:  That's not relevant.

5          MR. WHITE:  Well, I don't think you've made a

6    relevancy -- you just said I couldn't point to it based on no

7    prior conviction.  Are you holding it's not relevant?

8          THE COURT:  I am, in addition to my previous ruling.

9    What else do you want to go into with the witness?

10          MR. WHITE:  On the October 10, 2005 interview with

11    Agent Briggs, he said that they told him "Day is aware that

12    Eugene Lewis of Manchester, Kentucky was in possession of two

13    kilograms of cocaine which were located in a barn on a

14    property owned by Lewis.  Lewis wants redacted and sold this

15    cocaine and used the money to hire redacted and redacted to

16    kill redacted."

17          THE COURT:  Okay.  Not going to allow you to get into

18    that as well.  I don't know how that's relevant to what's been

19    brought up here on direct.

20          MR. WHITE:  Well, A, it goes to the nature of the

21    drug industry in Clay County that is to the level that people

22    are -- their lives are put at risk.  They are the ones that

23    have brought all this up in this so-called 106 that they're

24    arguing that the Court has agreed with.  I think I'm entitled

25    to ask him about this stuff.

*DAY - Cross (Mr. Baldani)*                                        25

1            THE COURT:  What's your next point?

2            MR. WHITE:  Well, that would be it, but I would like

3    to know just for the record the basis.

4            THE COURT:  It's not relevant to the testimony of

5    this witness, and it goes outside the scope of matters that

6    are at issue here.  Going pretty far afield of what's really

7    relevant in the case.

8            MR. WHITE:  Thank you, Your Honor.

9                  (Sidebar conference concluded.)

10           THE COURT:  Thank you.  Please proceed.

11           MR. WHITE:  Thank you, Your Honor.  Your Honor, thank

12   you, that's all I have.

13           THE COURT:  All right.  Thank you.

14           MR. ABELL:  Judge, I do not have any questions of

15   this witness.

16           THE COURT:  Mr. Baldani?

17           MR. BALDANI:  Judge, I've just got a handful.  Can I

18   do it from counsel table, please?

19           THE COURT:  You may.

20                        CROSS-EXAMINATION

21   BY MR. BALDANI:

22   Q.   I'm Russ Baldani.  I'm one of Freddy's attorneys.  You

23   testified about a couple of hotly contested elections in the

24   '80s.  I'm not going to go into details, but I'm talking about

25   the House versus Bishop and then the Corky McKeehan -- can you

*DAY - Cross (Mr. Baldani)*                                        26

1   hear me okay?

2   A.   Yeah.

3   Q.   And then the Corky McKeehan race, okay?

4   A.   Okay.

5   Q.   Freddy Thompson wasn't involved in either of those races,

6   was he?

7   A.   Not to my knowledge, no.

8   Q.   And he wasn't involved in the political scene at all back

9   in the '80s, was he?

10  A.   Not as far as I know or am concerned.

11  Q.   Okay.  And you talked about working juries.  Freddy

12  wasn't involved in any of that stuff, was he?

13  A.   No.

14  Q.   All right.  And, of course, all this drug dealing and

15  drug use and stuff that you've already been asked about all

16  morning long, he wasn't involved in any of that stuff, was he?

17  A.   That is correct.

18  Q.   Never hung out at your pawn shop?

19  A.   Never.

20  Q.   All right.  And Mr. Bayer asked you all about the White

21  family, and I'm not going to go into that again, but bottom

22  line is the Whites were the political -- the political

23  powerful family in Clay County over the past '80s and '90s,

24  right?

25  A.   That is right.

*DAY - Cross (Mr. Baldani)*                                        27

1    Q.   And Freddy Thompson wasn't any kind of political power

2    player back then, was he?

3    A.   Not as far as I know, no.

4    Q.   Didn't come from a name, you know, the Thompson family

5    name wasn't anything like the Whites.  It wasn't a political

6    name, was it?

7    A.   That's right.

8    Q.   So basically, in 2002, he was a newcomer to the political

9    scene as far as you know, correct?

10   A.   That is right.

11   Q.   And, of course, he ran against Jennings White, who was

12   your friend?

13   A.   That's right.

14   Q.   And, I mean, in all fairness, Jennings White was dirty

15   and crooked, right?  Let me ask it this way.  He helped you

16   launder money, right?

17   A.   Yes, he did.

18   Q.   And he helped you get police protection from the police

19   chief and the sheriff, right?

20   A.   From Edd Jordan, he did.

21   Q.   Okay.  And he tried to get you to plant drugs -- or he

22   talked to you about planting drugs on Doug Adams?

23   A.   That's right.

24   Q.   So that is the man that Freddy Thompson, the newcomer,

25   ran against and beat in '02, correct?

*DAY - Redirect (Mr. Smith)*                                          28

1    A.   That is correct.

2              MR. BALDANI:  That's all.

3              THE COURT:  Thank you, Mr. Baldani.  Mr. Gilbert?

4              MR. GILBERT:  No question, Your Honor.

5              THE COURT:  Miss Hughes?

6              MS. HUGHES:  I have no questions, Your Honor.

7              THE COURT:  Mr. Simons?

8              MR. SIMONS:  I have no questions.

9              THE COURT:  Thank you.  Let me ask if there's any

10   brief redirect examination of the witness.  Mr. Smith?

11             MR. SMITH:  Yes, thank you.

12             THE COURT:  All right.

13                       REDIRECT EXAMINATION

14   BY MR. SMITH:

15   Q.   Mr. Day, you were asked about Mr. Thompson's involvement.

16   You weren't involved in politics after you got back out of

17   prison in 2001, were you?

18   A.   No, I was not.

19   Q.   Were people in Clay County on the inside of things a

20   little bit shy of Kenny Day being a federal convicted felon on

21   supervised release?

22   A.   I was a black sheep.  They didn't want nothing to do with

23   me when I come back.

24   Q.   So they shunned you?

25   A.   That is right.

*DAY - Redirect (Mr. Smith)*                                        29

1   Q.  So you weren't invited to any of those meetings if they

2   had any?

3   A.  I was not.  I was outcast.

4   Q.  You were asked about this offer, planting drugs on Doug

5   Adams.  Did you ever try to do that?

6   A.  No, I did not.

7   Q.  You never even made an attempt to do that, did you?

8   A.  Absolutely not.

9   Q.  You were asked about how many times you testified.  The

10  times that you've testified, I believe you said you counted

11  out five times?

12  A.  I think that's right.

13  Q.  And every time, you understood that you faced the penalty

14  of perjury if you were to give a false statement?

15  A.  That is correct.

16  Q.  And you testified in front of a judge, I assume?

17  A.  I did.

18  Q.  And which judges did you testify in front of in those

19  cases?

20  A.  Judge Reeves.

21  Q.  Now, the defense team asked you about this incident out

22  at the polls where they reported the numbers for the Hooker

23  and McKeehan race opposite the way they actually were?

24  A.  That's right.

25  Q.  Now, it was brought out that Doug Adams had you handle

*DAY - Redirect (Mr. Smith)*                                             30

1    the money.

2    A.   On which election are you talking about?

3    Q.   Well, I don't want to mix you up.  Let's talk first about

4    the McKeehan and Hooker race.

5    A.   Okay.

6    Q.   You were taking Mr. McKeehan's brother, I think you

7    said -- or Mr. Hensley.  Hensley gave the money, right?

8    A.   J.E. Hensley gave the money.

9    Q.   And you were taking his money, and you were negotiating

10   with voters to go vote for which candidate?

11   A.   For Mike Hooker.

12   Q.   Okay.

13   A.   Now wait a minute, wait a minute.  You're getting me --

14   Q.   I know I'm mixing you up.  Ask me to clarify.

15   A.   Okay.  Here was the deal.  Me and Cletus got the money

16   from J.E., and Doug and Clete was inside as election officers.

17   I was buying votes for Corky McKeehan, sending them in, and

18   they was a-votin' for Mike Hooker.

19   Q.   So a voter that you had negotiated and bribed to vote for

20   the other candidate gets sent into Doug Adams and Cletus

21   Maricle.  And when they get them in there, they vote them the

22   other way?

23            MR. PINALES:  Objection, Your Honor.  May I be heard?

24            THE COURT:  Do you need to be heard at the Bench on

25   this?

*DAY - Redirect (Mr. Smith)*                                    31

1          MR. PINALES:  Yes.

2          THE COURT:  All right.  If you need to be heard,

3    please come up.  I think I do understand the basis for the

4    objection.

5                    (A sidebar conference was held out of the

6                    hearing of the jury):

7          THE COURT:  All right.

8          MR. PINALES:  Your Honor, as I understood the

9    testimony, he's on the outside, he buys the vote, he goes in

10   and then comes out.

11         THE COURT:  I understand what Mr. Smith is asking.

12   It's for clarification of matters that were brought up on

13   cross-examination, what he understood the double-cross was

14   with respect to this particular deal.

15         MR. PINALES:  Well, my objection is there's been no

16   testimony that the judges on the inside did the double-cross

17   or the voters did a double-cross.  Clearly, he bought votes.

18   They said okay.  And clearly, the vote went the other way.

19   That is not in contention.  But the connotation that Cletus

20   Maricle and --

21         THE COURT:  That's not my understanding so I

22   certainly would allow Mr. Smith, if you have a different

23   understanding, I'll certainly allow Mr. Smith to clarify this

24   point, because I understood from the testimony on direct that

25   Mr. Maricle was directly involved in the double-cross.  Mr.

*DAY - Redirect (Mr. Smith)*                                    32

1    Smith, am I mistaken?

2        MR. SMITH:  Judge, it was twisted around, and I'm

3    trying to get clarification of what this man's testimony is.

4    My understanding is there was a double-cross.  Those two

5    judges got together and instead of being Republican and

6    Democrat on separate sides, they were drawn together, and

7    Kenny was representing money was going from McKeehan.  In

8    fact, they were turning the lever for the other guy.

9        THE COURT:  That's what I understood as well.

10       MR. PINALES:  Your Honor, the only other comment that

11   I had, I would ask that the question include the year or the

12   time frame.

13       THE COURT:  No, I'm not going to require Mr. Smith to

14   do that, because the witness has already testified that he's

15   not sure of the year.  I mean, y'all covered all that on

16   cross-examination.  So we've covered this year part.  But in

17   terms of the scope of recross-examination, it would be limited

18   to these areas.  I'm taking notes as to the areas that Mr.

19   Smith is covering from the cross-examination.  So we're not

20   going to go into everything else and try to reemphasize points

21   that were reemphasized earlier but are not subject to redirect

22   examination.  So it will be limited, if that answers your

23   question.

24       MR. BAYER:  I'd like to follow up on this first.  I

25   join in the objection.  But also, I have a sincere problem,

1    because my recollection of the direct testimony and the

2    cross-examination, he doesn't know what actually was going on

3    inside.  And I have a problem with him now explaining to the

4    jury what was going on inside when he was outside the whole

5    time.  He can't speculate.  We're not allowed to speculate.  I

6    would like to think the United States can't allow him to

7    testify about what was going on the inside.

8          THE COURT:  I don't think he's doing that.  I think

9    he's explaining what he understood the deal to be in going to

10   get the money from a person who provides money to vote for one

11   candidate, and he does that with Mr. Maricle.  He then goes to

12   the polls with his understanding being that there would be a

13   double-cross, and that the person for whom they received the

14   money was now being used to buy votes that were being voted

15   for the other candidate.

16         And then at the end of the day, his understanding to

17   confirm that was that he was then told to leave, because vote

18   totals would be announced incorrectly.  People who had their

19   votes bought were voted a different way, and that because of

20   the danger that presented, based on the acknowledgment of the

21   two people working the poll on the inside, he was told to

22   leave, and that certainly does support his understanding of

23   the double-cross that was taking place.

24         So if there's any confusion or misunderstanding with

25   respect to that, I think it's misunderstanding that was

*DAY - Redirect (Mr. Smith)*                                      34

1    created during cross-examination.  I certainly did understand

2    his testimony very clearly on direct, that defendants Maricle

3    and Adams were involved in this double-cross, and he certainly

4    did explain it.

5            So since there is some confusion, Mr. Smith, I'm

6    allowing you to clarify the point.

7            MR. BAYER:  As far as recross, if there is something

8    that he has stated under examination by separate defense

9    counsel, are we allowed to follow up on that?

10           THE COURT:  Yes.

11           MR. BAYER:  Okay.  Thank you, Judge.

12           THE COURT:  All right.

13                   (Sidebar conference concluded.)

14           THE COURT:  Thank you.  Mr. Smith, you may continue.

15   BY MR. SMITH:

16   Q.  Mr. Day, did you, Mr. Adams, Mr. Maricle reach an

17   understanding at some point during that day what was going to

18   happen?

19   A.  Are you talking about on the McKeehan race?

20   Q.  Yes, sir, we're talking about the McKeehan/Hooker race.

21   A.  Okay.  We reached an agreement that at the end of the

22   day, at 6:00, I was to be gone.  And when they come to the

23   door to call out the vote, that they was gonna switch Mike

24   Hooker's, and they was gonna -- Mike was gonna get Corky's and

25   Corky was gonna get Mike's at the end of the day when they

*DAY - Redirect (Mr. Smith)*                                            35

1    come to the door and called them out.  They was afraid that

2    Corky's brother there would kill 'em.

3    Q.  Now, Mr. Day, did you, in conversation with Mr. Maricle

4    and Mr. Adams, talk about who they were going to pull the

5    levers for inside that day?

6    A.  They was gonna pull 'em for Mike Hooker.  The other ones,

7    I do not remember who was running on the slate that day.

8    Q.  And did they understand that you were outside acting as

9    if you were paying money for the McKeehan side?

10   A.  Yes, they did.

11   Q.  Was that part of the agreement?

12   A.  Yes, it was.  It had to be that way, because Corky sent

13   his brother down.

14   Q.  So he had his brother watching what was going on?

15   A.  That's right.

16   Q.  Now, when counsel was asking you whether or not you had a

17   chance to review your testimony, you said you had gotten a

18   copy this morning to look at.  Was that referring to the

19   hearing you had in front of Judge Reeves here the other day,

20   404(b)?

21   A.  That's right, on Tuesday, the 19th.

22   Q.  Okay.  And all these attorneys were present at that

23   hearing?

24   A.  To the best of my knowledge, they was, yes.

25   Q.  And they got a chance to question you at that hearing?

*DAY - Redirect (Mr. Smith)*                                          36

1    A.   Yes.

2    Q.   All right.  Now, you were also asked about an incident

3    which Cletus Maricle was presented some cash or some money

4    that you had.  Do you remember those questions?

5    A.   Yes, I do.

6    Q.   How much money was it?

7    A.   $20,000 and a box of Cuban cigars.

8    Q.   Okay.  This box of Cuban cigars, you just had what,

9    hundred dollar bills in there?

10   A.   We had all hundred dollar bills.  But there was a box of

11   cigars plus the money.

12   Q.   And where was it that you presented him with this gift?

13   A.   At his house there in Manchester.

14   Q.   And how did you get, arrange to see -- at that time, was

15   he a circuit judge?

16   A.   Yes, he was.

17   Q.   And how would you get an opportunity to go see a circuit

18   judge at his house?

19   A.   Well, Ralph Hoskins is one that called him for us to

20   come.  Me and Cletus has always been, you know, close.  I

21   figured that I could go in as good as Ralph or anybody else

22   could, because --

23   Q.   Let me understand.  Ralph Hoskins, is that the Ralph

24   Hoskins you said earlier was the Democrat election

25   commissioner on the Board of Elections?

*DAY - Recross (Mr. Pinales)*                                         37

1   A.   That's right.

2   Q.   So you got the Republican election commissioner and the

3   Democrat election commissioner together that day?

4   A.   Well, I wasn't the Republican that day, but I was the

5   ex-Republican election commissioner.

6   Q.   Do you remember if this was before prison or after prison

7   that you got the appointment at the judge's house?

8   A.   This was 2003 or 4, something like that.

9   Q.   Was it pretty big news in Clay County that you'd now been

10  convicted in Miami, Florida with eight kilograms of cocaine

11  and served prison time?  Was that news in Clay County?

12  A.   Yes, it was.

13  Q.   Was it pretty widely known that once you got out, that

14  you were still being supervised by probation officers?

15  A.   Yes, it was.

16  Q.   And so even though you were on supervised release, you

17  still went up to see the circuit judge and gave him a gift?

18  A.   Yes, I did.

19          MR. SMITH:  Thank you.

20          THE COURT:  All right.  Thank you, Mr. Pinales.

21          MR. PINALES:  Just a couple.

22          THE COURT:  Yes, sir.

23                       RECROSS-EXAMINATION

24  BY MR. PINALES:

25  Q.   He didn't take the money and he didn't take the cigars;

1    is that right?

2    A.   That's right.

3    Q.   You never saw him smoke a cigar in his life?

4    A.   Yeah, I have.

5    Q.   You have?

6    A.   Yeah.

7    Q.   He didn't take them, though?

8    A.   He didn't take them.

9              THE COURT:  Mr. Bayer.

10                         RECROSS-EXAMINATION

11   BY MR. BAYER:

12   Q.   Mr. Day, under direct examination by Mr. Smith, you

13   indicated, if I understand this correctly, and I may be wrong,

14   and correct me if I am, you were advised that every time you

15   testified, you were under a threat of perjury if you didn't

16   tell the truth?

17   A.   Now, ask me that again, now.

18   Q.   I'm trying to understand what your answer was.  You were

19   advised by the United States that you had to come in to court

20   and be truthful why?

21   A.   Because I'd get a charge of perjury and that I wouldn't

22   have no chance of getting no sentence reduction.

23   Q.   So knowing that there's a chance for new charges to be

24   brought against you compels you to do the right thing?

25   A.   That is right.

*DAY - Recross (Mr. Bayer)* 39

1   Q.   Well, you got out of prison in 2002, correct?

2   A.   '01.

3   Q.   '01.  You were on what was called supervised release?

4   A.   That is right.

5   Q.   And supervised release is where you're responsible to the

6   Court to make sure that you never break the law again, right?

7   A.   For five years, that's right.

8   Q.   And during that period of supervised release, what

9   happens to you if you break the law again?

10   A.   Go back to jail.

11   Q.   So you knew that there was a problem with you being sent

12   back to jail if you broke the law again, right?

13   A.   That is right.

14   Q.   But you broke the law again, didn't you?

15   A.   Sure did.

16   Q.   Because that was what you wanted to do, right?

17   A.   You know, I don't know if I want to say it like that, but

18   I did.  I broke the law.  May not been what I wanted to do,

19   but I did.

20   Q.   So the mere fact that you knew that there was a problem

21   that if you did something wrong you were going to go back to

22   prison, that didn't stop you, did it?

23   A.   Not once I got on the drugs, it didn't stop me.

24         MR. BAYER:  If I could have just a moment, Judge.

25   I'm looking for something specific.

*DAY - Recross (Mr. Bayer)*                                          40

1      THE COURT:  Yes, sir.  Certainly.

2   Q.  In the cross-examination by Mr. White regarding Barbara

3   White, if you remember in my cross-examination, I specifically

4   asked you whether or not you had done anything with Barbara

5   White to get some money back and charges dropped.  You told me

6   no.

7   A.  Do what now?  What did you say now?  Ask me again.

8   Q.  When I was cross-examining you, I asked you specifically

9   about the issue that Mr. White asked you when he showed you

10  the 302, and you told me it never happened.  And then when Mr.

11  White showed it to you, your memory was refreshed and then you

12  said it happened.

13  A.  What I remember you asking me is if I had a meeting with

14  Barbara Colter, and I told you I did not have no meeting with

15  her.  That's what I understand that you asked me.

16  Q.  But I also asked you whether or not you had anything to

17  do with helping to get the money back and the charges dropped.

18  A.  I did not.

19  Q.  Did you ever talk with Barbara Colter White?

20  A.  Absolutely not.

21  Q.  But when Mr. White showed you that section from out of

22  your summary, you agreed with the summary.

23  A.  But I didn't talk to Barbara Jo Colter.

24  Q.  Who did you speak with?

25  A.  I didn't speak to nobody.

*DAY - Recross (Mr. Bayer)*                                          41

1    Q.   Well, then, how do you know about that meeting?

2    A.   Jennings White told me about the meeting.

3    Q.   What did Jennings tell you?

4    A.   You know, it's been so long that I don't recollect it,

5    exactly what all went down, but Jennings told me about it.  I

6    didn't ever speak to Barbara Jo and I never did speak to

7    Kennon, or I never did speak to Doug about none of it.

8    Q.   Is it your understanding that Jennings, when he told you

9    about this meeting in which Barbara White Colter or Colter

10   White, whatever her name is, was involved, do you believe

11   Jennings?

12           MR. SMITH:  Your Honor, I'm going to object.

13           THE COURT:  Sustained.

14           MR. BAYER:  I don't have any other further questions.

15   Thank you, Judge.

16           THE COURT:  All right.  Thank you.

17           MR. WHITE:  Nothing further, Your Honor.

18           THE COURT:  Mr. Baldani?

19           MR. BALDANI:  No, Your Honor.

20           THE COURT:  Anyone else based on what's been asked?

21   All right.  Thank you.  Mr. Smith, anything else before this

22   witness is released?

23           MR. SMITH:  No, Your Honor.  Thank you.

24           THE COURT:  Thank you.  Mr. Day, you can step down,

25   sir.  Thank you.

1      See if any of our jurors need to take a break before

2 of the next witness is called.  Ordinarily, we'd wait another

3 30 minutes.  Does anybody need to take a break now?  Thank

4 you.

5      You may call your next witness.

6      MR. SMITH:  United States would call Eugene Lewis.

7      THE COURT:  Counsel, before the next witness is

8 brought up, we discussed a matter earlier.  Would counsel like

9 for me to give the jury the instruction we had discussed?

10      MR. PINALES:  Yes, please.

11      MR. WHITE:  Yes, thank you, Your Honor.

12      THE COURT:  All right.  Before the next witness is

13 brought in, let me give the jury an instruction on background

14 evidence.  Ladies and gentlemen, the United States has

15 introduced certain testimony and evidence which the Court has

16 admitted as background evidence.  Background evidence includes

17 an act or acts other than the specified acts charged in the

18 indictment, which is intertwined with the offense or the

19 offenses charged.

20      The introduction of background evidence is offered to

21 complete the story of the charged offense or offenses.  Here,

22 the United States is offering this evidence to show the

23 origins of the enterprise; that is, the inception of the

24 conspiracy that has been alleged and the roles of the

25 respective members of the alleged enterprise.

LEWIS - Direct (Mr. Smith)                                    43

1        With respect to Mr. Day's testimony, you are

2   cautioned that the United States does not assert that the

3   alleged conspiracy, which is the subject of the indictment,

4   occurred in the 1980s with Mr. Maricle and Mr. Adams

5   participating in vote buying.  Instead, the United States

6   offers this testimony as evidence of activity that allegedly

7   was the origin of Maricle and Adams joining the enterprise and

8   their respective roles in the enterprise.

9        You're further advised that Mr. Jones is not charged

10  in this matter with drug crimes.  However, Mr. Day's testimony

11  has been admitted as evidence of Mr. Jones' alleged marijuana

12  activities.

13       You are so instructed.

14        EUGENE LEWIS, GOVERNMENT'S WITNESS, SWORN

15       THE COURT:  Thank you.  Mr. Smith, you may proceed.

16                   DIRECT EXAMINATION

17  BY MR. SMITH:

18  Q.  State your name, please.

19  A.  Eugene Lewis.

20  Q.  Mr. Lewis, tell us about yourself.  Where were you born

21  and raised?

22  A.  Manchester, Kentucky.  11/2/39.

23  Q.  Okay.  I didn't ask you when you were born, but I

24  appreciate that.  You're appearing here today in a jumpsuit.

25  Where are you living right now?

*LEWIS - Direct (Mr. Smith)*                                              44

1    A.   They've got me at Franklin County Detention Center, sir.

2    Q.   Okay.  And are you serving a sentence of imprisonment,

3    Mr. Lewis?

4    A.   Yes, I am.

5    Q.   And what was your conviction for?

6    A.   Cocaine trafficking.

7    Q.   And how much time did you get?

8    A.   144 months.

9    Q.   And do you recall which judge sentenced you, Mr. Lewis?

10   A.   Yes, sir.  Judge Reeves.

11   Q.   I'd like to hand to you now what's marked as Government's

12   Exhibit PA4.  Did you enter into a plea agreement, Mr. Lewis?

13   A.   Yes, sir.

14   Q.   I'd like to have you take a look at that exhibit, please.

15   A.   (Reviewing document).

16   Q.   Direct your attention, Mr. Lewis, to the last page.  Is

17   that your signature?

18   A.   Yes, sir.

19   Q.   And is that your plea agreement that you recall entering

20   into?

21   A.   Yes, sir, but I really never read it much.  But that's

22   it, my signature.

23   Q.   That's your signature?

24   A.   Yes, sir.

25   Q.   And you recognize that to be your plea agreement now?

1    A.   Yes, sir.

2         MR. SMITH:  I'd move for the introduction of

3    Government's Exhibit PA4, Your Honor.

4         THE COURT:  Any objection?

5                              (No verbal response.)

6         THE COURT:  The exhibit will be admitted at this

7    time.

8                   (Government Exhibit No. PA4

9                   was admitted into evidence.)

10   Q.   After taking a look at that, Mr. Lewis, when did that

11   plea agreement get filed in court?  Is there a date appearing

12   on the front page telling you when it was filed in court, or

13   do you have an independent recollection of when you were

14   sentenced in front of Judge Reeves?

15   A.   January 23, '06.

16   Q.   And is that the day you were sentenced, Mr. Lewis?

17   A.   I guess so, sir.

18   Q.   And that's when you recall at that time getting your

19   sentence of 144 months; is that right?

20   A.   Yes, sir.

21   Q.   Did you agree, as part of your plea agreement, Mr. Lewis,

22   to cooperate and testify truthfully if called as a witness?

23   A.   Yes, sir.

24   Q.   And has the government promised you anything?

25   A.   No, sir.

LEWIS - Direct (Mr. Smith)                                      46

1   Q.   Who, to your understanding, would determine whether or

2   not you get a reduced sentence or not, Mr. Lewis?

3   A.   That judge that sentenced me, sir.

4   Q.   And what judge is that?

5   A.   Judge Danny Reeves.

6   Q.   Now, you said that you understood it to mean that you

7   were required to testify truthfully, Mr. Lewis?

8   A.   Repeat, please?

9   Q.   I said you understood that the plea agreement required

10  you to testify truthfully?

11  A.   Yes, sir.

12  Q.   And what's your understanding would happen if you were

13  not to testify truthfully, Mr. Lewis?

14  A.   I would receive perjury and get more time.

15  Q.   Are you needing some time to look over that document some

16  more?  You seem to be reading it.

17  A.   I was just reading one here that I'd never looked at

18  before.  In fact, I never fully read it.  That's not true, but

19  that's beside the point.

20  Q.   Well, maybe you need to clarify that for me, because I

21  don't really understand your comment.

22  A.   It was just --

23  Q.   The question that I had for you earlier, Mr. Lewis, is do

24  you recognize that to be your plea agreement that you entered

25  into?

LEWIS - Direct (Mr. Smith)                                          47

1    A.   Yes, sir.

2    Q.   Is there any confusion, Mr. Lewis, right now in your mind

3    that you're required to testify truthfully here today if

4    you're called to testify?

5    A.   Yes, sir.

6    Q.   You understand that?

7    A.   Yes, sir.

8    Q.   Okay.

9    A.   I was just looking at an article in there.  I never

10   really read that.  I just pled guilty and went on about the

11   cocaine.  You know, the -- it's way off.  Several ounces.  But

12   I'm here.  Go ahead.

13   Q.   Okay.  We'll talk about that maybe.  Maybe you'll give us

14   a chance to talk about that some more.  Tell us a little bit

15   about yourself.  What did you do for a living, Mr. Lewis, when

16   you were back in Clay County?

17   A.   The last few years, I had some bulldozers.  I was working

18   for the gas company in eastern Kentucky, Clay, down around

19   there, drilling locations for natural gas wells and pulling

20   the trucks in and out so the trucks could crack the wells and

21   stuff.  And I was farming too.

22   Q.   Now, this was a business that you started yourself?

23   A.   Yes, sir.

24   Q.   And how many employees did you have at that time, Mr.

25   Lewis?

LEWIS - Direct (Mr. Smith)                                48

1    A.   There was only a couple guys helping me.

2    Q.   And say you were laying some kind of a gas line?

3    A.   We -- I was drilling the locations in the mountains for

4    the drill rigs to drill natural gas wells, and some of it was

5    very bad and dangerous and getting the trucks back in --

6    pulling the trucks back in and out when it's muddy and stuff.

7    Sometimes you'd have to use two or three bulldozers to get

8    them in and out, it's so steep and dangerous.

9    Q.   What other kinds of jobs have you held, Mr. Lewis?

10   A.   I went to the Air Force.  Graduated from high school in

11   '57, went in the Air Force a week later.  Stayed four years.

12   Got out in 1960.  1961, I went to work for the State Highway

13   Department.  Worked there till '66 or '67, ever when Louie

14   Nunn went in, and they kind of cleaned the house.

15        And from there, I was following construction work,

16   bulldozers and backhoes.  I started out with Brothers & Young

17   on Interstate 75.  Followed that on several different jobs,

18   even went to Virginia, West Virginia.  And I filled an

19   application for a federal coal mine inspector in the '70s, and

20   I was hired as a federal safety coal mine inspector with MSHA,

21   Mine Safety and Health Administration in the '70s.  Stayed

22   there till 1994 and took an early retirement.

23   Q.   All right.  That's a federal mine inspector job you had?

24   A.   Yes, federal mine inspector.

25   Q.   And that's the folks that go in and check to make sure

LEWIS - Direct (Mr. Smith)                                    49

1    safety regulations are followed?

2    A.   Yes, sir.  It's mostly strictly safety regulations and

3    safety training.  Consists of a lot of things, sir.

4    Q.   And you held that job until 1994?

5    A.   Yes, sir.

6    Q.   Mr. Lewis, have you been convicted prior to the case

7    you've just talked about in U.S. District Court in London?

8    Had you been convicted previously to that?

9    A.   Yes.

10   Q.   And what were you convicted of prior?

11   A.   Cocaine trafficking.

12   Q.   And when did you get convicted of cocaine trafficking?

13   A.   '95, sir.

14   Q.   Okay.  And what court was that in, Mr. Lewis?

15   A.   London.  London federal court.

16   Q.   Federal case?

17   A.   Yes, sir.

18   Q.   And any other convictions that you've had?

19   A.   Yes.  In -- I got just a little bit added to one in

20   Lincoln County, the farm in Lincoln County that I had bought,

21   and Judge Forester, I believe it was Judge Forester give me, I

22   don't know, six months or something.  It was stuff that was

23   there, that I had just got out, and I don't know, they had

24   missed and it was added to it.

25   Q.   So you have three federal convictions for drug

LEWIS - Direct (Mr. Smith)                                          50

1    trafficking?  Is that accurate?

2    A.  Yes, sir.

3    Q.  Okay.  And all those were in federal court?

4    A.  Yes, sir.

5    Q.  Okay.  Now, you held these jobs as recently as 1994,

6    federal mine inspector, and you took early retirement in '94?

7    A.  Yes, sir.

8    Q.  And this drug business that you say that you got caught,

9    involved in, when did you start dealing or involved in any way

10   with drugs?

11   A.  In the late '80s is when I fooled with a little

12   marijuana, we started growing a little marijuana.

13   Q.  Okay.  And tell us about that.  Did you have anybody to

14   help you with the marijuana business?

15   A.  Yes, sir.

16   Q.  And would you tell us who that was?

17   A.  I had a couple of gentlemen, named Mansell Baker and a

18   gentleman -- let's see if I can see him.

19   Q.  Do you recall his name?

20   A.  Wayne Jones.

21   Q.  Wayne Jones.

22   A.  Do I see him?  He may be hiding from me.

23           MR. WHITE:  No, Wayne --

24   A.  There he is, that's Wayne.  And we first leased a farm,

25   me and 30 more people from Clay County, from a lady in Henry

LEWIS - Direct (Mr. Smith)                                          51

1    County to hunt on.  And from there, the lady passed away after

2    the first year or so.  And there was a tract of land that came

3    up in the back of this big farm that us guys had leased to

4    just deer hunt and squirrel hunt on.

5        Well, it came available, 148 acres I think was the

6    correct amount.  So me and Mr. Baker and Wayne -- knowing

7    Wayne was a good marijuana grower through the years, that was

8    the talk, we purchased this farm around 55,000, I believe, is

9    what I borrowed from the First State Bank.  And he stayed with

10   it, growed marijuana for a couple years there.  He got out,

11   and I kept the farm and wound up paying it off in '93, 4,

12   somewhere in there, sir, and sold it in '95.

13   Q.   So what was the understanding that you all -- what was

14   the goal, I guess, for you and Mr. Baker and Mr. Jones?  What

15   were you planning to do?

16   A.   To grow marijuana, sir.

17   Q.   And did you make any effort to actually follow through

18   with that plan?

19   A.   Yes, we did.

20   Q.   And what did you do?

21   A.   We growed several hundred marijuana plants.

22   Q.   And where did you actually place this marijuana in the

23   ground out, in the field somewhere?

24   A.   Yes, sir.  We dug in several little pot patches that were

25   a good place to grow.  A lot of cedar thickets and pine

LEWIS - Direct (Mr. Smith)                                        52

1    thickets that accounted pretty well for camouflage.  And we

2    put small patches in, 40, 50 in a patch.  We put in somewhere

3    around 500 plants.

4    Q.  And this was put on the farm in Henry County?

5    A.  Most of it was.  Some of it was on another people's farm,

6    sir.

7    Q.  And what were your plans to do with the marijuana once it

8    had grown to maturity?

9    A.  To sell it, profit.

10   Q.  And did you follow through on those plans?

11   A.  Yes, sir.

12   Q.  And what did you do with the marijuana you harvested?

13   A.  We sold it.

14   Q.  Okay.  Did you divide it among yourselves, or did you

15   divide the profits, or how did that work?

16   A.  Yes, we divided some of the marijuana in three different

17   piles, and then sometimes I'd take it and hire some people to

18   clean it for us and split the money.

19   Q.  And where did this process take place?

20   A.  Most of the time, in Clay County.

21   Q.  Okay.  So you grow the marijuana in Henry County, but you

22   bring it back to Clay County?

23   A.  Yes.

24   Q.  Where did you sell the marijuana from?

25   A.  Pardon?

LEWIS - Direct (Mr. Smith)                                        53

1    Q.   Where did you sell the marijuana from?  Was it from the

2    Henry County farm or at Clay County?

3    A.   These other two guys got some.  What they done with

4    theirs, I don't know.  Most of it, I sold it, and I sold it to

5    a couple gentlemen, and I distributed money to them.

6    Q.   Did you distribute the marijuana there from Clay County?

7    A.   Yes, sir.

8    Q.   And how long did this relationship with these two

9    gentlemen last?

10   A.   Wayne was two years.  Mansell was, I believe, three

11   years.  And I finally bought him out and wound up with the

12   farm myself.

13   Q.   Now, the farm, did you all make a deed, or did a deed get

14   made for the farm?

15   A.   Yes, there was a deed made.  I know my name was on it.

16   Q.   Okay.  Do you recall if Mr. Jones and Mr. Baker's names

17   were on there too?

18   A.   Sir, I thought that both of them was named on there, but

19   I was told later that Wayne didn't even sign it.  Whether

20   that's true or not, I'd have to go back and check it.  Didn't

21   matter.  I was worried about my name.

22   Q.   Okay.  So you don't have recollection of whose names were

23   on it exactly?

24   A.   No, sir.

25   Q.   But you do remember your name being on it?

*LEWIS - Direct (Mr. Smith)*                                    54

1    A.  Yes, sir.

2    Q.  And when you paid, you say you bought their share out,

3    how did you all make that transaction?  Did you go make

4    another deed, or did you just pay money, or how did that work?

5    A.   When I bought the farm out, I went to the bank and paid

6    the First State Bank off.  I believe I borrowed $30,000 that

7    was maybe what was owed against it.  I believe it was $30,000,

8    and my name and my wife's name were put on the deed.  And then

9    I eventually paid that off, the 30,000 in a year or two.

10   Q.   You indicated that you bought your two partners, Baker

11   and Jones, out?

12   A.  Yes, sir.

13   Q.  Did you pay them with cash or check, or how did you pay

14   them?

15   A.  C-a-s-h, cash.

16   Q.  Okay.  And those were drug proceeds, I assume, that you

17   made money from your drug business?

18   A.  Yes, sir.

19   Q.  What were you selling marijuana for at that time, Mr.

20   Lewis?

21   A.  Around $2,000 a pound.

22   Q.  And that first year that you had this partnership with

23   Mr. Jones and Mr. Baker, do you know how much you all made

24   that year from your marijuana?

25   A.   No, sir.  But in a couple years together, just a low

LEWIS - Direct (Mr. Smith)                                    55

1    estimate, we made at least 50,000 apiece.

2    Q.   Now, this business that you were doing in Henry County,

3    growing marijuana, bringing it back to Clay County and selling

4    it there, was that all the while you were still being employed

5    at these jobs that you've talked about, federal mine

6    inspector?

7    A.   Yes, sir.

8    Q.   Okay.  And were you also involved in politics in Clay

9    County?

10   A.   Yes, I was.

11   Q.   And how were you involved in politics in Clay County, Mr.

12   Lewis?

13   A.   Well, sir, I've served as election officer many times on

14   the Democratic side.  I've also bought, traded -- bought votes

15   for different candidates, for several times through the '70s,

16   through the '80s, and through the -- up in the '90s.  '94, I

17   think, was my last time.

18   Q.   '94 was the last time you served as election officer?

19   A.   I'm pretty sure that's it.

20   Q.   And what positions do you recall that you served in for

21   the Board of Elections there in Clay County?

22   A.   I was Democratic judge.

23   Q.   And did they give you an assigned precinct, Mr. Lewis?

24   A.   Yes, they did.

25   Q.   And what precinct did you work in?

LEWIS - Direct (Mr. Smith)                                    56

1    A.   It's called Pin Hook.

2    Q.   And could you tell us how you got -- who got you into the

3    business of being election officer, Mr. Lewis?

4    A.   Sir, there's probably several guys on the Democratic

5    committee and stuff, but I know the main one was Mr. Maricle

6    asked me did I care to be a judge.  And I was a judge for

7    several, for several times, about all through the '80s.

8    Q.   You say Mr. Maricle?

9    A.   Yes, sir.

10   Q.   Do you see him --

11   A.   He asked me to be, if I cared to be a judge.

12   Q.   Do you see him here this afternoon?

13   A.   Yes, sir.  The gray-headed guy.

14   Q.   Okay.

15        THE COURT:  The record will reflect that the witness

16   has identified the defendant, Cletus Maricle, and previously

17   identified defendant Wayne Jones.

18   Q.   Now, you indicated that you worked for many of these

19   elections at Pin Hook; is that right?

20   A.   Yes, sir.

21   Q.   And did you work generally the same position as being a

22   Democrat judge?

23   A.   Every time, sir.

24   Q.   Every time.  And during those times, did you actually

25   engage in vote buying yourself?

LEWIS - Direct (Mr. Smith)                                    57

1    A.   Yes, I have.

2    Q.   And could you tell the jury and the Court how that

3    worked, generally speaking?

4    A.   If I had money myself that some candidates gave me and I

5    knew some of the people, I would pay them right in the booth.

6    But most of the time, other candidates would have people on

7    the ground, and they would come in with a list, like one, two,

8    three, like say judge executive, sheriff.  Now, I'm always

9    honest and I made sure those people voted for who they come in

10   with the ticket for, and I'd walk back to the door and give

11   them a nod that they voted correct.

12   Q.   And when you stay you'd give them a nod, who were you

13   nodding to?

14   A.   Sir, over the years, there have been many, many people

15   out there that was buying votes I worked with that had their

16   particular candidate, you know.

17   Q.   Okay.  So there's a person that you knew on election day

18   was the vote handler or the vote buyer?

19   A.   That's true.

20   Q.   And you would nod to him or her?

21   A.   Yes.

22   Q.   After you'd voted the voter?

23   A.   Yes, sir.  And then if there's some come in that they

24   didn't know or didn't have and I knew them, I would buy them

25   myself.  And I watched them vote to make sure I got the vote,

LEWIS - Direct (Mr. Smith)                                          58

1    till my money run out that the candidates had gave me.

2    Q.   Generally, when did you get that money, Mr. Lewis?   When

3    would the candidates bring that money to you?

4    A.   It would always be a night or two before the election.

5    Q.   And do you recall any instances where Cletus Maricle was

6    along when money was delivered to you?

7    A.   One time, sir.

8    Q.   Can you tell us when that happened?

9    A.   In the '94 election for county judge executive, a guy by

10   the name of Roy Morgan called me at my home, said I'd like to

11   meet you.  He talked about it maybe two or three weeks, but I

12   told him I would, because nobody else could come to me.  And

13   he knew I would be honest and straight so he called me.

14       And he owned a filling station there at Garrard County

15   right where 11 and 421 meets, and I pulled in there, and I

16   seen him, and I got in the car with him.  And he give me a

17   thousand dollars to be on his party, to be for him.

18   Q.   And what did you do with the thousand dollars that Mr.

19   Morgan brought to you that night in the company of Mr.

20   Maricle?

21   A.   I stuck it in my pocket and used it on the precinct the

22   next day or next two days later of buying votes, sir.

23   Q.   And when you bought votes in that election, was that --

24   when you had the money yourself, is that when you would go

25   behind the curtain with the voter and pay them?

1  A.   Yes, sir.

2  Q.   So that thousand dollars you used behind the curtain?

3  A.   Sometimes it don't go far, when they're going for $50 or

4  $100 a vote.

5  Q.   Was there pretty much a constant number of people you

6  could count on each election that were going to be showing up

7  to -- that were bribed or bought for their votes?

8  A.   Sir, in our county, you would not believe the percentage

9  of people from school teachers down that I have bought their

10  vote from.  It's unbelievable.

11  Q.   Were there times, Mr. Lewis, when you actually took money

12  to Cletus Maricle around election time yourself?

13  A.   No, sir.

14  Q.   Delivered to him?  Did you ever contribute to him and any

15  of his campaigns that you recall?

16  A.   Yes, I did.

17  Q.   And tell us about that.

18  A.   The time he run for circuit judge, I guess it was the

19  first time he ran -- the year, I can't tell you exactly what

20  date, time he came.  He came by my house, and I don't know

21  whether I -- whether I initiated the contact.  I would say it

22  was the Democratic people wanting to make a collection for a

23  candidate, and he came by my house, stood in my house, and I

24  reached him a donation of cash.

25  Q.   And how much money do you recall giving him?

*LEWIS - Direct (Mr. Smith)*                                              60

1    A.   $2,000, sir.

2    Q.   And that was at your house?

3    A.   Yes.

4    Q.   And you believe that was a time when he was running for

5    office?

6    A.   Circuit judge.

7    Q.   Circuit judge.  Do you recall which race it would have

8    been that he was running?

9    A.   That I can't pinpoint.  It would be his first one.  Was

10   that '92?  '90, '92.

11   Q.   Do you recall who his opposition was at that time?

12   A.   I think Gayle House, the present circuit judge.

13   Q.   Gayle House is the present circuit judge?

14   A.   I think that's who he was running against.

15   Q.   Now, this relationship with Mr. Jones and the marijuana

16   business ended in what year; do you recall?

17   A.   Probably the late '90 -- the late '80s, could be '90,

18   somewhere in that vicinity, sir.

19   Q.   Did you and Mr. Jones ever catch back up with old times

20   and talk about marijuana after that?

21   A.   Hundreds of times.

22   Q.   And you've talked to him hundreds of times?

23   A.   Yes, I saw Wayne almost every day at the pawn shop there

24   of a night.  We discussed marijuana and trading knives and

25   guns and things like that.

LEWIS - Direct (Mr. Smith)                                             61

1    Q.   You went off for your first service of sentence, I
2    believe you told us, somewhere about '95?
3    A.   Yes, sir.
4    Q.   When did you return back to Clay County, Mr. Lewis?
5    A.   '99.
6    Q.   And then you had another service of imprisonment after
7    that?
8    A.   No, this other one -- the second one is when I was
9    convicted on the first one, when they came back to the farm
10   and found a little stuff that I didn't even sell none.   I
11   don't know, if it's something they missed and how they came
12   back, I don't know.   So they added to my sentence, the
13   relevant conduct.
14   Q.   So those sentence ran together and you served them all
15   out at one time?
16   A.   Yes, sir.
17   Q.   So when you were released in '99, you had served for both
18   convictions?
19   A.   Yep.
20   Q.   Now, there's been some talk about a 2002 election.   Were
21   you chosen as election officer after your convictions?
22   A.   No, sir.
23   Q.   Did anybody come to you that you recall, Mr. Lewis, and
24   ask you to come join them or help them in an election?
25   A.   Yes, they did.

LEWIS - Direct (Mr. Smith)                                    62

1    Q.    Could you tell us who that was?

2    A.    One of them was Mr. Jones back there.

3    Q.    Okay.  And what did he ask of you, Mr. Lewis?

4    A.    Asked me did I care to work the Pin Hook precinct for his

5    son-in-law that was running for county court clerk.

6    Q.    And what was your understanding he meant when he said,

7    asked you whether you'd work for him at the Pin Hook precinct?

8              MR. WHITE:  Objection as to speculation, Your Honor.

9              THE COURT:  All right.  I will overrule it.  Of

10   course, this is just his understanding.  Go ahead, sir.  You

11   can answer.

12             THE WITNESS:  Can I answer?

13   Q.    What was your understanding, Mr. Lewis, he meant by the

14   words work?

15   A.    Work the election for his son-in-law, Mr. Thompson, and

16   buy votes out on the ground, but I couldn't be election

17   officer.

18   Q.    And why couldn't you be election officer?

19   A.    I was a felon, sir.  I hadn't got my voting rights back.

20   Q.    And did you agree to help him buy votes for Freddy

21   Thompson in 2002?

22   A.    No, sir.

23   Q.    And why did you not agree to help him?

24   A.    Because me being on parole, I didn't want to get

25   involved.  In fact, I didn't have nobody that election.

1    Q.   All right.

2    A.   I was asked by another person too, but I didn't -- I

3    turned it down.

4    Q.   Who was that other person that asked you?

5    A.   Well, this other person, not directly, but this

6    gentleman, he run for county judge, and he come to me, would

7    you want to help this guy?  And I said no.  In fact, the guy

8    passed away last week.  Lee Sizemore.

9    Q.   Okay.  Now, there was also election of 2004.  Would you

10   have been out from a prison sentence at that point?

11   A.   Yes, I was.

12   Q.   You didn't begin your service of this sentence until, I

13   guess, sometime in '05 or '06?

14   A.   No, sir, I did not do nothing in 2004.

15   Q.   You weren't involved in the election.  Did anybody ask

16   you to get involved?

17   A.   Not to my knowledge, sir.

18           MR. SMITH:  If I can have just a moment, Your Honor.

19   Q.   Before I conclude, Mr. Lewis, I told you earlier I wanted

20   to go back to the plea agreement that we had referenced here.

21   Do you have that still in front of you?

22   A.   Yes, sir.

23   Q.   And I believe that we had -- have you had an opportunity

24   to read that now?  I don't want to cut you off short.  Have

25   you had an opportunity to read through it completely?

LEWIS - Direct (Mr. Smith)                                    64

1    A.   I just glanced at it, sir.  Section 3, paragraph A, I was

2    just reading an article here, and B, that most likely, sir, I

3    never read that till right then.

4    Q.   It's been about four years ago since you entered this

5    plea, and you were sentenced by Judge Reeves; is that correct?

6    A.   Yes, sir.

7    Q.   Okay.  So I want to give you a chance to look at it now.

8    A.   In section B, on 3B --

9    Q.   Why don't we do it this way, Mr. Lewis.  The question

10   that I have is, after having taken a look at this plea

11   agreement, Mr. Lewis, is this your understanding, is this the

12   plea agreement that you entered in front of Judge Reeves?

13   A.   Yes, sir.

14   Q.   I don't want there to be any confusion with the Court or

15   the record as to whether or not this is your plea agreement.

16   A.   Yes, sir.

17   Q.   Okay.  And it says that according to again if you

18   reference there paragraph 3, it says in here that you have

19   admitted those facts that the United States could prove, and

20   they were listed in paragraphs A, B, C, D, E and F.  And you

21   signed on page 7, admitting and acknowledging that that was

22   your agreement and that you were admitting to those facts; is

23   that correct?

24   A.   Yes, sir.  (Reviewing document).  Waiting on me?

25   Q.   Now, I'll ask you a question, Mr. Lewis.  I said in

LEWIS - Direct (Mr. Smith)                                          65

1   looking at your plea agreement, when you signed the plea

2   agreement, it acknowledges that those facts that are set forth

3   in paragraphs 3A, B, C, D, E and F are correct.  Is that

4   right?

5   A.    Paragraph B is not correct.  But sir, I signed it, but I

6   know I never even read it because I was guilty, sir.

7   Q.    Okay.  Well, let's look at paragraph B, Mr. Lewis.  It

8   says there that Sizemore admitted to agents that -- Sizemore,

9   I assume that's referring to a witness, admitted to agents

10  that he purchased from Eugene Lewis and sold to others cocaine

11  on previous occasions, totaling approximately 96 ounces or 2.7

12  kilograms of cocaine, including seven ounces of cocaine on

13  August the 11th, 2004.

14      And since you have brought this up, Mr. Lewis, I want to

15  give you a chance to explain what is your concern about that

16  particular paragraph, because you voiced some concern about

17  that.

18  A.    Like I said, sir, even though I signed that, I know I

19  never read that.  But it don't matter.  Because this 96

20  ounces, 2.7 kilograms, I mean, I don't know where he got that

21  at.

22  Q.    Okay.  Are you saying, Mr. Lewis, that the quantity could

23  have been more, could have been less?

24  A.    The bottom part, the seven ounces now is more correct.

25  Q.    Okay.  Well, so you're saying that the quantity on that

1   occasion should have read something less than what it says?

2   A.  Oh, yes.  That's all, sir.

3   Q.  Okay.  Are you denying that you were a cocaine dealer and

4   you sold cocaine?

5   A.  No, sir.

6   Q.  What did you sell that cocaine for, Mr. Lewis?  How much

7   did you get for it?

8   A.  Thousand dollars a pound -- a pound.  I mean thousand

9   dollars an ounce, sir.

10  Q.  And you made transactions with a fella by the name of

11  Sizemore?

12  A.  Yes, I did.

13  Q.  What was his first name?

14  A.  Denver.

15  Q.  Denver Sizemore.  And is a Clay Countian too?

16  A.  Yes, he is.

17  Q.  And he was one of your customers?

18  A.  One time.

19  Q.  Okay.  He was --

20  A.  The man that got me involved.

21  Q.  Okay.  Says here that he was one of the persons that told

22  that he had actually sold cocaine to you.  Had he supplied you

23  with cocaine?

24  A.  Sir, the first time I ever saw cocaine in the late '80s,

25  a person asked me to buy, if I could find some cocaine.  And I

LEWIS - Direct (Mr. Smith)                                        67

1   knew Mr. Sizemore had been a cocaine dealer for several years,

2   my ex-brother-in-law.  And I called him on the phone, I met

3   him at the -- on the Daniel Boone Parkway between London and

4   Manchester, Kentucky at the Laurel Clay County line with one

5   ounce of cocaine.  I give him $1,100.  I took it to the person

6   who asked me to buy it for them.  I never got my $1,100 back.

7       Then I had never fooled with Mr. Sizemore other than at

8   the farm.  I hadn't seen him for 12 years till he come and

9   wore a wire on me.

10  Q.  You've had a chance to read your plea agreement?

11  A.  Um-hmm.

12  Q.  Is that your plea agreement, Mr. Lewis?

13  A.  Yes, sir.

14  Q.  Other than this correction that you think needs to be

15  made about the amount of cocaine that was sold by -- or

16  mentioned in there as being sold, are there any other points

17  of that plea agreement that you believe you didn't understand

18  or you seek to clarify here today?

19  A.  I'd say the rest of it's correct, sir.

20          MR. SMITH:  Just a second.

21  Q.  Do you ever recall Doug Adams stopping you in the road

22  sometime in 2004, Mr. Lewis?

23  A.  Yes, I do.

24  Q.  And what was the reason that he stopped you in the road

25  that day, if you recall?

LEWIS - Direct (Mr. Smith)                                    68

1    A.   Well, sir, he did not stop me.  I came up the back road

2    from where I live approximately one mile from my house.  And

3    this white Chevrolet or GMC Suburban was sitting in the road,

4    a country road.  He was talking to a gentleman.  I pulled up

5    beside him.  I was driving a 2000 Silverado pickup.  I

6    probably been down there and need it from where the bulldozers

7    was working.  I pulled up and I recognized who it was.  It was

8    Mr. Doug Adams, Clay County school superintendent, and a guy

9    by the name of Ralph Hoskins, the Jackson County school

10   superintendent.

11        And I spoke to them, asked me how I was doing and

12   everything.  And a conversation came up, when was I gonna get

13   off parole and be a Democratic election officer.

14   Q.   Who asked that question?

15   A.   Mr. Adams did.  I said, well, I'm still on parole, and

16   when I get off and get my voting rights back, I will go back

17   in.  He said, well, the guy that's down there most of the time

18   now, a guy by the name of Mike Miller that's usually down

19   there, he said I can't deal with him, but he said, I know I

20   can deal with you.

21   Q.   And you're talking about Mike Miller serving at Pin Hook

22   at that time?

23   A.   Yes, sir.

24        MR. SMITH:  I'll pass the witness.

25        THE COURT:  Thank you.  We'll take a break before

LEWIS - Cross (Mr. Hoskins)                                    69

1    we -- ladies and gentlemen, we will take our evening break at

2    this time.  We'll take a 20-minute recess.  Please keep in

3    mind the admonitions you were given previously not to discuss

4    the case among yourselves.  The jury will be excused for 20

5    minutes.

6                    (The jury left the courtroom at 2:52 p.m.)

7              THE COURT:  Counsel, any matters to take up outside

8    the presence of the jury?  Mr. Smith, any additional materials

9    to provide to the defendants?

10             MR. SMITH:  No, Your Honor.

11             THE COURT:  We'll be in recess for 20 minutes.

12                   (Recess from 2:53 p.m. until 3:17 p.m.)

13                   (The jury entered the courtroom at 3:17 p.m.)

14             THE COURT:  Thank you.  The record will reflect that

15   all members of the jury are present.  All parties and counsel

16   are also present.  Witness will be reminded, of course, he's

17   still under oath.

18             Mr. Hoskins, you may proceed.

19             MR. HOSKINS:  Thank you, Your Honor.

20                         CROSS-EXAMINATION

21   BY MR. HOSKINS:

22   Q.  Mr. Lewis, you are 70 years old now?

23   A.  Yes, sir.

24   Q.  How much more time do you have left to serve on your

25   144-month sentence?

*LEWIS - Cross (Mr. Hoskins)*                                              70

1   A.   With good time reduction, around five years, sir.

2   Q.   So you'd be 75 when you get out?

3   A.   Yes.

4   Q.   Unless you get your sentence reduced?

5   A.   Yes, sir.

6   Q.   You are registered as a Democrat, or were?

7   A.   The last time I checked, sir.

8   Q.   Well, and the first time that you registered to vote, you

9   registered as a Democrat, didn't you?

10  A.   Yes.  I worked on the state department so I had to be a

11  Democrat back then.

12  Q.   Had to be a Democrat to be hired by the state?

13  A.   Even though you got fired by the Republicans.

14  Q.   And that's what happened to you, wasn't it?

15  A.   Yeah.

16  Q.   So you started out as a young man working for the state

17  of Kentucky, you were registered as a Democrat?

18  A.   Yes.

19  Q.   And that was -- you're a number of years older than

20  Cletus Maricle, aren't you?

21  A.   Very little.  He graduated with my wife in 1960, I

22  believe.

23  Q.   But at the time you registered as a Democrat, went to

24  work for the state, Cletus Maricle was maybe in college or law

25  school, something like that?

*LEWIS - Cross (Mr. Hoskins)*                                          71

1    A.    Yes, sir.

2    Q.    He didn't have anything to do with you becoming a

3    Democrat?

4    A.    No, sir.  At that time, no, sir.

5    Q.    In fact, your mother and Burt Combs, governor of

6    Kentucky, Democrat, were cousins, weren't they?

7    A.    First cousins, yes, sir.

8    Q.    And he's also from Clay County?

9    A.    Originally, yes.

10   Q.    You lived in Pin Hook precinct of Clay County?

11   A.    Yes, sir.  It's called Island Creek, the neighborhood.

12   Only a couple miles from Manchester.  But that's what the

13   precinct's called, you know.

14   Q.    You lived in Island Creek?

15   A.    Yes, sir.

16   Q.    And that was within the Pin Hook precinct?

17   A.    Yes, sir.

18   Q.    Now, most of your family were Republicans?

19   A.    All my family were Republicans.  In fact, I'm a

20   Republican at heart but a registered Democrat, and could I run

21   one thing by you?

22   Q.    Well, let me just ask you to answer my questions for now,

23   please.  You were registered as a Democrat, despite the fact

24   that your family was Republican?

25   A.    (Nodding affirmatively).  Yes, sir.

LEWIS - Cross (Mr. Hoskins)                                            72

1   Q.   And in the Pin Hook precinct, just about everybody's a

2   Republican?

3   A.   Yes, sir.  A big percentage.

4   Q.   Pardon?

5   A.   A big percentage.

6   Q.   In Clay County, percentages are way more in favor of

7   Republicans?

8   A.   Yes, sir.

9   Q.   So when you were approached to be an election officer,

10  was this back in the '70s?

11  A.   Probably around '80 to be an election officer.  I worked

12  on the ground in the '70s and late '60s.

13  Q.   Around in the '80s, you were approached to be an election

14  officer?

15  A.   Yes, sir.

16  Q.   You were a Democrat in a precinct that didn't have many

17  Democrats?

18  A.   That's true.

19  Q.   So there weren't a whole lot of people to pick from, and

20  they had to recruit you, right?

21  A.   That's true.

22  Q.   Back then, you hadn't started your drug dealing, had you?

23  A.   No, sir.

24  Q.   And I think when we were here last time, you and I agreed

25  that when you started in the drug business, you tried to keep

*LEWIS - Cross (Mr. Hoskins)*                                          73

1   that under wraps.  You didn't make a big production out of it.

2   You wanted to keep it secret, right?

3   A.   That's true.

4   Q.   Because that's the way drug dealers operate, right?

5   A.   Especially a little bitty fella like me.

6   Q.   You didn't want anybody to know that you were doing

7   something that could send you to prison?

8   A.   No, sir.

9   Q.   And you didn't want Cletus Maricle to know that, did you?

10  A.   No, sir.

11  Q.   Never said anything to him about being involved in drugs

12  in any way?

13  A.   No, sir.

14  Q.   As far as Cletus Maricle knew, you worked for the state,

15  and you'd been a mine inspector?

16       MR. SMITH:  Your Honor, I'll object to asking the

17  witness about what Mr. Maricle knew.

18       THE COURT:  Sustained.

19  Q.   Let me rephrase that, please, Mr. Lewis.  You never said

20  anything to Cletus Maricle about any of your illegal

21  activities, did you?

22  A.   No, sir.

23  Q.   And until you got caught the first time, the only people

24  who knew about it were the people you were buying and selling

25  drugs with; isn't that true?

1    A.   I would say that's true, but probably guys suspected it,

2    you know.  Different people might have suspected, you know.

3    Q.   You don't think Cletus Maricle suspected it, do you?

4    A.   I wouldn't think so.

5    Q.   Okay.  Thank you.  You talked about a time that Roy

6    Morgan gave you some money to buy votes.

7    A.   Yes, sir.

8    Q.   What he asked you to do was to help him in the election,

9    didn't he?

10   A.   Yes.

11   Q.   He didn't say, Roy Morgan didn't say to you I want you to

12   buy votes?

13   A.   What do you think the money's for, sir?

14   Q.   I'm asking you, did Roy Morgan say to you --

15   A.   Yes.  Spend the money for votes.

16   Q.   Oh, he did tell you that?

17   A.   Yes.

18   Q.   Cletus Maricle didn't say anything about that?

19   A.   No, sir.

20   Q.   What you were asked to do was to help in the election,

21   weren't you?

22   A.   Yes.

23   Q.   And the only way you know to help in an election is to

24   buy votes?

25   A.   To buy votes, yes, sir.

1   Q.   You're not aware of any legitimate thing a person could

2   do to help in an election, are you?

3   A.   In Clay County, it would be pretty hard.

4   Q.   As far as you know?

5   A.   Yes.

6   Q.   When you gave a campaign contribution to Cletus Maricle,

7   nobody knew about your drug dealing then, did they?

8   A.   They might have suspected it.

9            MR. SMITH:  Your Honor, I'm going to object to the

10   question calling for speculation.

11           THE COURT:  It does call for speculation.  I will

12   sustain the objection as to what someone else -- some other

13   person may have known.

14           MR. HOSKINS:  I'm sorry.  It was a poorly worded

15   question.

16   Q.   Let me try again, Mr. Lewis, see if we can get to this

17   point.  When you made a contribution to Cletus Maricle, you

18   were working as a federal mine inspector then, weren't you?

19   A.   Yes.

20   Q.   You had not been sent to prison even the first time on

21   drugs at that point, had you?

22   A.   No, sir.

23   Q.   Okay.  And you certainly didn't say to Cletus Maricle,

24   here's money I made selling drugs.  I want you to have it, did

25   you?

1   A.   No, sir.

2   Q.   Nothing along those lines, did you?

3   A.   No, sir.

4   Q.   Mr. Lewis, the first time that you got in trouble for

5   drugs was 1995; is that correct?

6   A.   Yes.  July of '95.

7   Q.   And the second time that you got in trouble for drugs was

8   when?

9   A.   That was that same year, I believe, sir, while I was out

10  waiting to be sentenced.  I had a heart attack in '95.  And I

11  had a little stuff buried at the farm that they hadn't got

12  and, you know, you think well, I'm going to lose this big

13  farm.  The federals already closing in to take my big farm in

14  Lincoln County.  Beautiful place.  And I got just a little dab

15  that you can hold right there in your hand.  And the law came

16  in that day.  And how they knew, I didn't sell none.  I don't

17  know, unless they had another wire in there like they got me

18  the first time.

19  Q.   If I'm understanding this right, you got charged with

20  cocaine trafficking?

21  A.   Yes.

22  Q.   But you got to stay out of jail for a while?

23  A.   Yes, I did.

24  Q.   And while you were out of jail, you remembered that you

25  had some more cocaine on your farm in Lincoln County?

*LEWIS - Cross (Mr. Hoskins)*                                                77

1    A.   Yes.

2    Q.   And you decided I might as well not let that go to waste,

3    I ought to do something with it, right?

4    A.   Yes.

5    Q.   And so what you did was you went and dug it up, and the

6    very day that you dug it up, you got caught again?

7    A.   That's true.

8    Q.   Even though, when you went to court the first time on the

9    first charge, you were told not to violate the law in any

10   other way?

11   A.   That's true.

12   Q.   You were told that by a federal judge?

13   A.   I suppose he did.

14   Q.   You were in a federal courthouse, weren't you?

15   A.   Yes.

16   Q.   It was a judge who told you?

17   A.   I can't say that he told me that, sir.

18   Q.   Okay.  You knew you weren't supposed to?

19   A.   Well, I know I wasn't supposed to, that's true.

20   Q.   Didn't stop you, though, did it?

21   A.   (Nodding negatively).

22   Q.   Didn't stop you, though, did it?

23   A.   Didn't stop me from getting that out, no, sir.

24   Q.   And you knew when you got out of prison the first time

25   not to violate the law again or you could go back to prison?

LEWIS - Cross (Mr. Hoskins)                                    78

1   A.   That's true.

2   Q.   Now, have you had a good chance to look at your plea

3   agreement?

4   A.   I probably, I probably had plenty of chances but really

5   never dug into it deep.  Because, sir, I was guilty, and the

6   way I look at that, you plead guilty in a timely manner, you

7   get usually a three-point reduction, and that's the best way

8   to go.

9   Q.   You're able to read and write clearly, aren't you?

10  A.   Yes.

11  Q.   Do you have that plea agreement in front of you still?

12  A.   Yes, sir.

13  Q.   Turn to page 3 of that plea agreement, please.

14  A.   Page 3 of 7?

15  Q.   Yes, sir.

16  A.   Okay.

17  Q.   Look at paragraph 4.

18  A.   Yes, sir.

19  Q.   You see that, and you've read it?

20  A.   Yes, sir.

21  Q.   And it says the maximum statutory punishment is not less,

22  if you have two or more felony convictions, not less than life

23  in prison.

24  A.   Yes.

25  Q.   And you had two felony drug convictions.

*LEWIS - Cross (Mr. Hoskins)*                                    79

1    A.   Yes.

2    Q.   And that's the count you pled guilty to?

3    A.   Yes.

4    Q.   So the law said that you would get mandatory life in

5    prison, but you got 144 months.

6    A.   That's what it says.

7    Q.   Well, you know what you got, don't you?

8    A.   I know what I got, yes, sir, 144 months.

9    Q.   So you got your sentence reduced for cooperating before?

10   A.   That's what it is.

11   Q.   That's what happened, isn't it?

12   A.   You mean this time, right?

13   Q.   Yes.

14   A.   Yes, sir.

15   Q.   Do you know that when the police came and searched your

16   place, your son called your drug partner?

17   A.   I can't say that.

18   Q.   You told the police that once before, didn't you?

19   A.   No.

20   Q.   That he called Mr. McClure?

21   A.   Not as I know of, I've ever said that.

22   Q.   You don't recall telling them that was a stupid mistake?

23   A.   Not as I know of.

24   Q.   But you wanted to cooperate, you wanted to try to get him

25   in trouble to get yourself out of trouble, didn't you?

1    A.   Well, I wound up doing it after I found out that I

2    thought he might have been the one that got me in trouble the

3    second time in Lincoln County, see.  That's why I did it.

4    Q.   But now, Denver Sizemore wore a wire on you; is that

5    right?

6    A.   That's what this thing says.

7    Q.   Denver Sizemore was somebody you dealt in cocaine with?

8    A.   Can I repeat this?  My first ounce of cocaine I bought

9    for a person came from Denver Sizemore in the late '80s.  When

10   he moved to Henry County and I had that farm down there, we

11   become friends.  He was my brother-in-law at that time.  And

12   he got divorced from my sister, who lives in Florida.  We did

13   not fool with no cocaine.

14        And in 1992 -- let's see, '92.  In 2004 that I picked

15   this charge up, I had never seen the man until one day I was

16   working for the gas company, and I broke my foot the day --

17   about two or three days before.  The one day I was driving

18   with a D6 dozer on the back, the routes came down, and I got

19   out and stopped in the middle of the road to put the route

20   back up, it was real heavy, probably weighed 150, 200 pounds.

21   It slipped out of my hand, fell and broke my foot.  I had to

22   run to the V.A. Hospital in Lexington that night, get my foot

23   fixed.

24        The next day at 6:00 with a broke foot, the gas company

25   called me and said we need you to do some bulldoze work.  So

*LEWIS - Cross (Mr. Hoskins)*                                               81

1    with crutches, I crawled up on that D6 dozer to fix the

2    location with a drill rig.  And about 12:00 -- my son was with

3    me that day -- I said, I can't take it no more.  Let's quit

4    and go home.

5        We stopped at the Subway in Manchester, Kentucky.  I'd

6    give him $20, said go in there get us one of those diet 7

7    grams of turkey.  That Denver Sizemore was coming out of the

8    Subway with the gas station there and asked my son, said,

9    where's your dad at?  He said, he's out there in the truck a

10   broke foot.

11       He come spoke to me, the first time in 12 years.  That's

12   '92 to 2004.  He said, you got anything?  I said no.  I quit.

13       But the next weekend or two, me and my wife went to the

14   Laurel Lake, they was camping out over there, and I run into

15   my nephew.  And I said, tell your dad that I may have a little

16   stuff.  That put me in this chair today.  I think it was seven

17   ounces of cocaine I sold him altogether.

18   Q.  So you bought cocaine from him in the past?

19   A.  One ounce 13 -- let's see, 16 years before that.

20   Q.  Just an ounce, but you bought cocaine from him?

21   A.  One ounce.

22   Q.  Okay.

23   A.  I don't even use drugs, sir.

24   Q.  But it was cocaine?

25   A.  That's true.

LEWIS - Cross (Mr. Hoskins)                                          82

1    Q.   And you knew it was a drug, knew it was illegal?

2    A.   Yes, sir.

3    Q.   And then later on, you sold cocaine to the same guy?

4    A.   Yes, sir.

5    Q.   And you sold cocaine to other people?

6    A.   Very few.

7    Q.   Mr. Lewis, when you first sat down and looked at that

8    plea agreement, you said, well, there's something in here

9    that's not right, didn't you?

10   A.   Yes.

11   Q.   But now you had signed that plea agreement.  You don't

12   deny signing it?

13   A.   No, sir.

14   Q.   Back in 2005, right?

15   A.   Yes.

16   Q.   So you signed it without bothering to see what was in it?

17   A.   I sure did.

18   Q.   You didn't care whether it was true or not, did you?

19   A.   It wouldn't done me no good, because I knowed I was going

20   to prison.

21   Q.   So it didn't matter to you whether it was the truth or

22   not?

23   A.   That's true.

24   Q.   Okay.  But you signed it?

25   A.   I sure did.

*LEWIS - Cross (Mr. Hoskins)*                                      83

1    Q.   The government wrote it up and you signed it?

2    A.   That's true.

3    Q.   Because you wanted to get your deal?

4    A.   Pardon?

5    Q.   You wanted to get your deal?

6    A.   Well, I guess that's true.

7    Q.   So you would sign what they wanted you to sign?  You

8    signed the agreement that they gave you?

9    A.   I never agreed to testify against nobody, sir.  I decided

10   if they needed me, that I would testify in a truthful manner.

11   Q.   You wanted your deal, and you signed the plea agreement?

12   A.   What deal are you talking about?

13   Q.   The deal that you got back then.

14   A.   Sir, when I went before this gentleman, I didn't know

15   what I was getting.

16   Q.   You knew you were getting a plea agreement with a --

17   A.   I didn't know if I was getting 20 years or life, sir,

18   until that right there.

19   Q.   Okay.  But you knew you were making an agreement with the

20   government, didn't you?

21   A.   Did I make an agreement with the government?

22   Q.   Does that not say plea agreement?

23   A.   Oh, that's the plea agreement, yes, sir.  That's the plea

24   agreement, yes, sir.

25   Q.   That's an agreement between you and the federal

1    government?

2    A.   Yes, sir.

3    Q.   Okay.  You made an agreement with the government, right?

4    A.   Yeah, but they didn't make me no deal that I'd get no --

5    nobody ever told me that I'd get 144 months is what I'm trying

6    to say.

7    Q.   What happened is your lawyer said here's the document the

8    government wants you to sign it.  You want to sign it, you

9    sign it?

10   A.   If you want to know the truth, sir, a very high profile

11   lawyer that needs to be in prison his self, he had never read

12   nothing to me.  Warren Scoville from London, Kentucky, a

13   high-priced lawyer.  Never read nothing to me, and that's the

14   truth.

15   Q.   And you didn't ask him to read it to you?

16   A.   I was guilty, sir, and I wanted to get this over with and

17   go to prison.

18   Q.   You didn't care what it said.  You just wanted to sign it

19   and get your deal?

20   A.   That's true.  But I was guilty.

21   Q.   All right.

22   A.   And sometimes, when you're wore out, heart attack, you

23   maybe think die and get it over with, you know what I mean?

24   But I didn't.  I'm still here.

25   Q.   And you don't want to die in prison, do you?

1   A.   No, sir.

2            MR. HOSKINS:  That's all.  Thank you.

3            THE COURT:  Thank you, Mr. Hoskins.  Mr. Bayer?

4                         CROSS-EXAMINATION

5   BY MR. BAYER:

6   Q.   Mr. Lewis?

7   A.   Yes.

8   Q.   Do you need to take a break, sir?

9   A.   Pardon?

10  Q.   Are you okay?  Do you need to take a break?

11  A.   No, I'm all right.

12  Q.   I just want to follow up quickly right now on some of the

13  questions that Mr. Hoskins was asking you.  What was it that

14  the government told you they would do for you if you came in

15  and testified?

16  A.   Nothing.

17  Q.   Well, then, why is it you're testifying?

18  A.   Sir, on August the 24th, and I would say something to

19  that to reiterate what you said, but the Court probably

20  wouldn't want me to say that.  On August the 24th of 2009,

21  where I'm in a prison camp in Ashland, Kentucky, at 4:00 every

22  day they have a call out sheet, what people supposed to do, go

23  and so on.

24       On August the 25th of 2009, they called me to R&D to pack

25  out.  I had no idea where I was going to.  The Carter County

*LEWIS - Cross (Mr. Bayer)*                                          86

1    Sheriff's Department picked me up, brought me to Carter

2    County.  I stayed there six hours, about roughly six hours.

3    About six hours later, the Grayson County Detention Center,

4    where a lot of federal holdovers is down there, keep a lot of

5    people.  They took me a three hour drive from Carter County to

6    Grayson County.

7         I stayed there approximately two or three weeks.  On

8    sometime in September, you've got the date there, I don't

9    remember, they transported me to the federal courthouse in

10   London, Kentucky.  I had no idea where I was going.  No

11   federal agent had talked to me at that time.  And I met an

12   agent, a gentleman he's setting back there, Buddy Blair.  And

13   he questioned me, asked me some questions.

14        I had no idea that I was coming to -- leaving prison

15   camp, coming back to Grayson County and to London.  I had no

16   idea.  Nobody had informed me in no way, and they questioned

17   me about some of this that's going on.

18        And approximately two months later, I set in -- I was

19   called back to London again, and they was four guys that asked

20   me some questions.

21   Q.   Who were those four guys?

22   A.   Sir, back there sets Mr. Smith, U.S. attorney.  And I

23   think Mr. -- other guy's a U.S. attorney, and FBI Agent

24   Timothy Briggs and his agent with him, Buddy Blair.

25   Q.   Well, then, why is it that you're under the impression

*LEWIS - Cross (Mr. Bayer)*                                                   87

1    that you think it will do you benefit if you testify?

2    A.   I don't want to get caught up in something.  I thought it

3    might have been something they was charging me for too, and I

4    wanted to tell the truth.

5    Q.   Do you remember talking to the FBI back in August of '04?

6    A.   Yes.

7    Q.   Do you remember talking to the FBI back in November of

8    '04?

9    A.   I may have.  I'm not for sure, sir.

10   Q.   Do you remember talking to the FBI in June of '05?

11   A.   June of '05?

12   Q.   Yes, sir.

13   A.   Now just a minute --

14   Q.   They did an interview with you in June of '05?

15   A.   They could have, but I can't recollect.

16   Q.   So, I mean, this is not just out of the clear blue that

17   somebody just came up to you just recently and said I want to

18   talk to you about all that's going on in Clay County?

19   A.   They -- it could be.

20   Q.   I mean, this has been going on with you for years, right?

21   A.   I can't say that.

22   Q.   You can't deny it, though, can you?

23   A.   I could say that I was asked a few questions.  Yes, sir.

24   Q.   And you think that by testifying here today, you're going

25   to be able to get out of prison a little bit earlier?

1   A.   I would hope so, but possibly not.

2   Q.   Well, then, who was it that told you if you committed

3   perjury you'd go to prison for a longer period of time?

4   A.   Mr. Smith.

5   Q.   When did Mr. Smith tell you that?

6   A.   Mr. Smith told me that, he said today too, today, I mean.

7   Q.   Before today, when did he tell that to you?

8   A.   Probably when I was interviewed a couple months ago.

9   Q.   Okay.  So they've talked to you about what they're

10  expecting you to testify to at trial?

11  A.   Very little.

12  Q.   But they've talked to you?

13  A.   Yes, they have.

14  Q.   Thank you.  And that was how you came to the concept that

15  it would help you if you testified, that it might get you out

16  of prison?

17  A.   There's a slight possibility, sir.

18  Q.   Do you know who is Kenny Day?

19  A.   Yes.

20  Q.   Tell me how you know Kenny Day, because the jury's

21  already met Mr. Day.

22  A.   About 40 years worth, 45.

23  Q.   How did you meet him?

24  A.   How did I meet him?

25  Q.   Yes, sir.

1   A.   Kenny was a service manager for White's Chevrolet Pontiac

2   for many years, and I've known Kenny.  His wife and my wife

3   went to church together.  I've probably seen Kenny in a church

4   house just before this happened, deal came down at a revival

5   of all places.  But I've knowed Kenny for many years.  His dad

6   and my dad were big fox hunters.  I knowed him several years.

7   Never no kind of dealings with him.  Just personal friends.

8   Q.   No drug dealings?

9   A.   No, sir.

10  Q.   But you would consider yourself personal friends with

11  Kenny Day?

12  A.   We're friends.  I don't know how close that would be.

13  We're friends, I'd say.  I'll be friends with you.

14  Q.   We'll see.  Maybe after the trial.  Mr. Lewis?

15  A.   Yes, sir.

16  Q.   Did you know Kenny Day was in drugs?

17  A.   No, sir.

18  Q.   You actually spent some time in a jail cell with Kenny

19  Day, though, didn't you?

20  A.   Yes, I did.

21  Q.   Tell the jury about that.

22  A.   When I got charged, they took me to April the 27th of

23  2005; is that right?

24  Q.   Yes, sir, I think that might be right.

25  A.   I got arrested.  I came in, I was riding one of my

LEWIS - Cross (Mr. Bayer)                                        90

1    Peterbilt trucks with a dozer on the back, and they was a lot

2    of people at my house.  I got arrested.  They took about

3    everything I had, but I went to -- let me back up.

4         When the state police got me, the FBI gave me to the

5    state police, they put me in the back of a cruiser.  And they

6    left one of my pieces of property, go down U.S. 421, goes

7    right through Frankfort, goes to Manchester.  And I said, why

8    you going this away?  He said, you'll see.

9         I thought they'd go down by the parkway to London to put

10   me in the jailhouse.  Well, Kenny's shop was approximately

11   six, seven, eight miles from where I turn out.

12   Q.   Mr. Lewis, let me interrupt you for a second.  Could you

13   move your microphone, because you're not speaking into the

14   microphone.

15   A.   Sorry.

16   Q.   That's all right.  Thank you, sir.

17   A.   Kenny's shop was approximately seven, eight miles where I

18   came out.  And when the state police gets there, I look,

19   U.S. 421 is blocked, seems like there's ten million police

20   officers.  They take me in the back of his shop, and the FBI

21   agent from London photos me and, you know, I guess

22   fingerprints and all that stuff.  And I didn't stay there very

23   long.  Then the state police takes me to London, Kentucky

24   jail.  But in the meantime, that next morning or something, I

25   seen or I heared that Kenny and them was in jail too.  He was

LEWIS - Cross (Mr. Bayer)                                        91

1    at another pod.

2        Approximately, what, a week later, they come and packed

3    me up and took me to Somerset, Kentucky, me and Kenny Day.

4    Q.   To the Pulaski County jail?

5    A.   Sorry, Pulaski County jail.  And we stayed there

6    approximately April to -- sometime in July, sir.  And they

7    took me to Grayson County.  So I stayed over there with him

8    probably couple months or somewhere in that vicinity, and they

9    took me to Grayson County.  And I haven't seen Kenny for a

10   long time.

11   Q.   Now, when you were in jail with Kenny Day, did he tell

12   you about the drugs that he had coming in from Canada?

13   A.   Not that I knowed of.

14   Q.   You don't remember that discussion?

15   A.   No.

16         MR. BAYER:  Judge, I would like to allow the witness

17   to look at something and perhaps it will refresh his memory.

18   Would that be okay?

19         THE COURT:  Yes.  Show him documents and ask him if

20   it refreshes his memory on questions pending.

21   Q.   Mr. Lewis, when you get that, don't read it out loud, but

22   read to yourself the portion that is highlighted in yellow.

23   A.   (Reviewing document).  Okay.

24   Q.   Do you remember in June of 2005 meeting with FBI Special

25   Agent Timothy Briggs?

*LEWIS - Cross (Mr. Bayer)*                                                    92

1    A.   I met with him if that's the date, you know.  I don't

2    know about the date's correct.

3    Q.   Do you remember him interviewing you?

4    A.   Yes, sir.

5    Q.   You've now had an opportunity to read that portion which

6    I highlighted in yellow.  Does that help you remember anything

7    now?

8    A.   It seems like I can remember some of this, a little bit.

9    Q.   All right.  Do you remember now Mr. Kenny Day telling you

10   that he had marijuana that was coming in to the United States

11   from Canada, concealed in a milk truck?

12   A.   He might have, sir.  But now you know, you can't believe

13   everything you hear.

14   Q.   Well, I understand that.  That's part of the problem.

15   And then do you remember Kenny Day telling you that he had

16   information and that he intended to help the law enforcement

17   with information regarding several people?  Do you remember

18   having discussions with Kenny Day about that?

19            MR. SMITH:  Your Honor, I'm going to object as to the

20   relevance of these out-of-court statements.

21            THE COURT:  Sustained.

22            MR. BAYER:  Judge, can we --

23            THE COURT:  Yes, you can come to the Bench.

24                 (A sidebar conference was held out of the

25                  hearing of the jury):

1      THE COURT:  All right.  Mr. Bayer, you're doing

2  exactly what I told counsel earlier that you couldn't do, read

3  the 302 into evidence and then ask him if he agrees with it.

4      MR. BAYER:  I wasn't --

5      THE COURT:  I've sustained the objection as to

6  relevancy, but you have violated my order.

7      MR. BAYER:  I'm sorry, Judge.  I did not read it.

8      THE COURT:  You didn't read it?

9      MR. BAYER:  I don't think I read it, no, sir, I was

10  asking --

11      THE COURT:  We're going to take a break, and I'm

12  going to ask the reporter to go back, and we'll go over that

13  and see if you read that.

14      MR. BAYER:  Just a moment.  I would never, ever

15  violate a direct order of the Court.

16      THE COURT:  You just did.

17      MR. BAYER:  If the Court thinks I did, I want to

18  apologize.

19      THE COURT:  We're going to find out if you did,

20  because I'm going to get the 302, and I'll ask the reporter to

21  read back your last question, and I'll see if you read it or

22  not.

23      MR. BAYER:  If I violated your order, Judge, I had no

24  intention of doing it.  That's number one.  Please believe me,

25  I would never, ever do that.  The point I'm trying to make

94

1  with him is multiple purposes.  If the Court will indulge me

2  just a moment, I'd like to explain it to you.

3          Mr. Day, when on cross-examination, I specifically

4  tried to elicit from him testimony as far as what he said

5  regarding what he could provide information regarding.  This

6  witness was the recipient of that information, that specific

7  testimony.  I would like to be able to use him to some degree

8  to impeach the testimony of Mr. Day.  That's number one.

9          Number two, it also goes to his credibility because

10  of the fact that I think that they did, in fact, in jail

11  discuss the concept of what they could do to earn points that

12  might reduce their jeopardy in their sentence.  And that's the

13  only, the only issue I'm trying to get at with him.  I'm not

14  trying to break the Court's order.  I would never do that,

15  please.

16          THE COURT:  Well, you did, number one.  I'm going to

17  confirm whether you did or not, because you just told me that

18  you didn't, and there's one way to find out.  That's for Mr.

19  Smith to give me a copy of the 302 and for me to have the

20  reporter read back the last question, and then we'll be clear

21  as to whether you did or not.

22          Now, I sustained the objection.

23          MR. BAYER:  Okay.

24          THE COURT:  Okay?  Mr. Smith objected.  I sustained

25  it.  You asked the question the wrong way.  You used that

1   document to refresh his memory.  The question is then what he

2   remembers, not for you to read the document.  Now, I'm going

3   to take a break for the evening, and we're going to go back

4   and we're going to read this.

5        MR. BAYER:  Okay.  That would be fine.  Thank you,

6   Judge.  Again, Judge, I apologize.

7             (Sidebar conference concluded.)

8        THE COURT:  Thank you, counsel.  Ladies and

9   gentlemen, I do have a hearing this afternoon at 4:30 so we're

10  going to break a little bit earlier today.  We'll break at

11  this time.  I do want to remind you of the admonition given to

12  you previously not to discuss the case among yourselves while

13  we are in recess.  Also, don't let anyone else attempt to

14  approach you to discuss the case.  Don't read, watch or listen

15  to any accounts of the case if there should be any.  Don't try

16  to perform any type of research or investigation and, of

17  course, don't make up your mind about the case until it is

18  finally submitted to you.  We'll ask the jury to be back and

19  ready to go tomorrow morning at 9:00.  Jury will be excused.

20            (The jury left the courtroom at 3:54 p.m.)

21       THE COURT:  Thank you and please be seated.  When the

22  jury has left, you can take Mr. Lewis.  We'll wait for that.

23  Mr. Smith, do you have a copy of the 302?

24       MR. SMITH:  Yes, Your Honor.  Your Honor, just for

25  the record, this is an unredacted copy.

96

1         THE COURT:  All right.  Thank you.

2         MR. BAYER:  Judge, the reference I was making to is

3    on page 2 of 302, second full paragraph on the June 14, 2005.

4    There would be one provision that I did read --

5         THE COURT:  Before we start, I'm going to wait until

6    the witness has left the courtroom.

7         MR. BAYER:  All right.

8         THE COURT:  Please.

9         MR. BAYER:  Yes, sir.

10              (Mr. Lewis was escorted from the courtroom.)

11        THE COURT:  All right.  Mr. Bayer, where were you

12   referencing in the 302?

13        MR. BAYER:  Judge, if you like, my copy is up there

14   on the witness stand, and it's highlighted in yellow.  The

15   Court may very well be correct that there was some words that

16   I did read, because I was asking him whether or not Mr. Day

17   had told him about marijuana being shipped into the United

18   States from Canada concealed in a milk truck.  I did ask him

19   that specifically.

20        Where Mr. Smith objected was where I asked him did

21   you talk about giving information regarding any people in Clay

22   County.  That was how I remember phrasing that question.

23        THE COURT:  You certainly did read from the 302 after

24   you were instructed on how to handle these matters, counsel.

25        MR. BAYER:  I apologize.

1          THE COURT:  Mr. Bayer, your actions have

2    consequences.  You need to understand that.

3          MR. BAYER:  Yes, sir.  I do.

4          THE COURT:  When we resume tomorrow morning, just so

5    we're clear, when you show a witness a document to refresh the

6    witness's memory that's not his document, not something that

7    he prepared, you can show a witness a document.  You can show

8    a witness anything to refresh memory.  A cup may refresh

9    someone's memory.  Once their memory is refreshed, their

10   testimony is what they recall.  It's not what you then read

11   from a document to them.  Because what you're attempting to do

12   is you're trying to get into evidence something that's not his

13   statement, something that's recorded by a third party, and I

14   believe it's improper when you do that.

15         Now, I've instructed the attorneys on this procedure

16   previously in the case, and if you violate my order again,

17   there will be serious consequences.

18         MR. BAYER:  I understand.

19         THE COURT:  Do you understand?

20         MR. BAYER:  Very much so.  I would say, Judge, when I

21   asked him after he read that, I said do you remember making

22   those statements.  He said, I remember some of this, as I

23   remember him testifying, and that was when I read that

24   specifically to him to see if that was what he remembered.  I

25   tried to go through the process.  If I did it wrong, I

1    apologize.

2         THE COURT:  Hopefully, we're clear at this point.

3         MR. BAYER:  I understand.  It will not happen again,

4    Judge.

5         THE COURT:  Counsel, I don't fall for a lot of cute

6    tricks.

7         MR. BAYER:  It wasn't, Judge, sincerely.

8         THE COURT:  I'm speaking to everyone.  I don't fall

9    for a lot of cute tricks in cases.  Okay?

10        MR. BAYER:  And I appreciate that.

11        THE COURT:  That's enough.  That's enough.  You don't

12   need to say anything else.  You can only get yourself in

13   deeper and hotter water if you say anything else at this

14   point.

15        I do have a hearing at 4:30 this afternoon.  We will

16   be back in session tomorrow at 9:00.  Are there any other

17   matters that need to be taken up outside the presence of the

18   jury?  No?  We'll be in recess in this case until 9:00.

19             (Proceedings adjourned at 4:00 p.m.)

20                        - - -

21             C E R T I F I C A T E

22        I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
23   proceedings in the above-entitled case.

24
      \s\ Lisa Reed Wiesman                    February 9, 2010
25   LISA REED WIESMAN, RDR-CRR           Date of Certification
     Official Court Reporter

99

1                              INDEX

2       GOVERNMENT WITNESS

3       KENNETH DAY
        Cross-examination by Mr. White................... Page  4
4       Cross-examination by Mr. Baldani................ Page 25
        Redirect examination by Mr. Smith............... Page 28
5       Recross-examination by Mr. Pinales.............. Page 37
        Recross-examination by Mr. Bayer................ Page 38

6

7       EUGENE LEWIS
        Direct Examination by Mr. Smith................. Page 43
8       Cross-examination by Mr. Hoskins................ Page 69
        Cross-examination by Mr. Bayer.................. Page 85

9

10      GOVERNMENT EXHIBITS                           ADMITTED

11      Exhibit No. PA2, Eugene Lewis Plea Agreement
        Admitted....................................... Page 45
12

13                              - - -

14

15

16

17

18

19

20

21

22

23

24

25