1

1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
2                    SOUTHERN DIVISION at LONDON
                              - - -
3
    UNITED STATES OF AMERICA,        :  Docket No. CR 09-16-S
4                                     :
                         Plaintiff,   :  **Frankfort, Kentucky**
5                                     :  Wednesday, March 3, 2010
         versus                       :  1:00 p.m.
6                                     :
    RUSSELL CLETUS MARICLE            :
7   DOUGLAS C. ADAMS                  :
    CHARLES WAYNE JONES               :
8   WILLIAM R. STIVERS                :
    FREDDY W. THOMPSON                :       **Trial Day 17B**
9   WILLIAM B. MORRIS                 :
    DEBRA L. MORRIS                   :
10  STANLEY BOWLING,                  :
                                      :
11                       Defendants.  :

12

13                            - - -
                    TRANSCRIPT OF TRIAL
14                 BEFORE DANNY C. REEVES
          UNITED STATES DISTRICT COURT JUDGE and a jury
15                            - - -

16  APPEARANCES:

17  For the United States:      STEPHEN C. SMITH, ESQ.
                                JASON D. PARMAN, ESQ.
18                              Assistant U.S. Attorney
                                601 Meyers Baker Road
19                              Suite 200
                                London, KY 40741
20
    For the Defendant           MARTIN S. PINALES, ESQ.
21  Russell Cletus Maricle:     CANDACE C. CROUSE, ESQ.
                                Strauss & Troy
22                              150 E. Fourth Street
                                Fourth Floor
23                              Cincinnati,OH  45202

24                              DAVID S. HOSKINS, ESQ.
                                107 E. First Street
25                              Corbin, KY  40701

2

```
 1    For the Defendant           R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:           KRISTIN N. LOGAN, ESQ.
 2                                Landrum & Shouse, LLP
                                  220 West Main Street
 3                                Suite 1900
                                  Louisville, KY 40202
 4

 5    For the Defendant           T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:        Morgan & Pottinger, P.S.C.
 6                                133 West Short Street
                                  Lexington, KY  40507
 7

 8    For the Defendant           ROBERT L. ABELL, ESQ.
      William R. Stivers:         120 North Upper Street
 9                                Lexington, KY  40507

10

11    For the Defendant           RUSSELL JAMES BALDANI, ESQ.
      Freddy W. Thompson:         R. TUCKER RICHARDSON, ESQ.
                                  Baldani, Rowland & Richardson
12                                300 West Short Street
                                  Lexington, KY  40507
13

14    For the Defendant           JERRY W. GILBERT, ESQ.
      William B. Morris:          Coy, Gilbert & Gilbert
15                                212 North Second Street
                                  Richmond, KY 40475
16

17    For the Defendant           ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:            Gess, Mattingly & Atchison, PSC
18                                201 West Short Street
                                  Lexington,KY40507
19

20    For the Defendant           DANIEL A. SIMONS, ESQ.
      Stanley Bowling:            Thompson, Simons, Dunlop & Fore
21                                116 West Main Street
                                  Suite 2A
22                                Richmond, KY 40476

23

24

25
```

3

Court Reporter:                    LISA REED WIESMAN, RDR-CRR
                                   Official Court Reporter
                                   35 W. Fifth Street
                                   P.O. Box 1073
                                   Covington, KY  41012
                                   (859) 291-4410


     Proceedings recorded by mechanical stenography,
transcript produced with computer.

*GRAY - Cross (Mr. Richardson)*                                          4

1          (The jury entered the courtroom at 1:01 p.m.)

2          THE COURT:  Thank you.  The record will reflect that

3     all members of the jury are present.  Parties and counsel are

4     also present.

5          Again, Miss Gray, you're still under oath.

6          Mr. Richardson, you may continue.

7          MR. RICHARDSON:  Thank you, Judge.  I'd like the

8     Court security officer to please hand this to the witness,

9     please.

10         THE COURT:  Yes, sir.

11                         CROSS-EXAMINATION

12    BY MR. RICHARDSON:

13    Q.   Miss Gray, I have given you what I've marked as Freddy

14    Thompson, FT Exhibit Number 1.  Do you recognize that?

15    A.   Yes.

16    Q.   And what is that?

17    A.   It's the County Board of Elections post-election report,

18    submitted by the Board of Elections for the May 16, 2006

19    primary election.

20    Q.   And is that a record kept in the normal course of

21    business?

22    A.   Yes, it is.

23         MR. RICHARDSON:  Your Honor, I move to introduce

24    Freddy Thompson Exhibit 1, please.

25         THE COURT:  All right.  Any objection?

1          MR. SMITH:  No, Your Honor.

2          THE COURT:  Thompson Exhibit Number 1 will be

3  admitted.

4                    (Thompson Exhibit No. 1

5                      was admitted into evidence.)

6          MR. RICHARDSON:  Your Honor, may I publish it to the

7  jury, please?

8          THE COURT:  Yes, you may.

9  Q.  Miss Gray, that indicates --

10         MR. RICHARDSON:  I'm going to have to move it a

11 little bit, Judge.  Excuse me.

12 Q.  -- that is a post-election report signed by Freddy

13 Thompson?

14 A.  Yes, it is.

15 Q.  And in that report, he indicates that he has some

16 problems with the -- at the bottom there, can you read that at

17 the bottom?

18 A.  Recommendations for improving election process.

19 Q.  Yes, ma'am.

20 A.  Change the program on the new machines that asks --

21 machines that makes the voter cast ballot after they hit the

22 vote button and better poll workers.

23 Q.  Yes, ma'am.  And that also indicates some of the problems

24 they had up at the top with some of the complaints they had?

25 That section that says, report of any irregularities.

*GRAY - Cross (Mr. Gilbert)*                                          6

1    A.   Yes, it said "almost all precincts reported machine

2    problems during the day."

3    Q.   Go ahead.

4    A.   "Workers from the county clerk's office were sent to the

5    precincts to help with the problems which were all handled in

6    a timely manner.  Numerous complaints concerning the election

7    officers and of people within 300 feet of the voting precinct

8    at Garrard were reported.  The attorney general's office

9    called the clerk Freddy Thompson and informed him that

10   complaints had been reported to them.  William H. Bishop,

11   Republican commissioner, and Wayne Jones, Democrat

12   commissioner, went to the location of the precinct and talked

13   with the state police, who were on site at the time."

14   Q.   Thank you, ma'am.

15            MR. RICHARDSON:  Pass the witness, Your Honor.

16            THE COURT:  All right.  Thank you.

17            MR. GILBERT:  Thank you, Your Honor.

18                         CROSS-EXAMINATION

19   BY MR. GILBERT:

20   Q.   Just have a few questions, Mrs. Gray.  I'm Jerry Gilbert,

21   and I represent Bart Morris.  You testified, I believe, in

22   response to Mr. Hoskins' questions about what precincts were

23   involved in city elections, and you -- I believe that you

24   stated you were unsure about Horse Creek?

25   A.   Yes.

*GRAY - Cross (Mr. Gilbert)*                                                      7

1    Q.   If you would look at PR43, and that is the tabulation
2    sheets for the November, 2006 election.
3    A.   Okay.
4    Q.   And I believe it indicates the precincts in which votes
5    were tabulated for the City election that year.
6    A.   Okay.
7    Q.   Okay.  And can you look at Horse Creek precinct and tell
8    the jury if any votes were cast in the City election during
9    the November, 2006 election?
10   A.   For Horse Creek, no, there wasn't.
11   Q.   Would that indicate that it is not a City precinct?
12   A.   It probably wasn't.  I wasn't exactly sure of those.
13   Q.   And also, Pigeon Roost, were there any votes cast in the
14   City election?
15   A.   No, none.
16   Q.   And I believe there were some in Portersburg, a few, some
17   in Whites Branch.  I believe there's one vote cast in Bright
18   Shade.
19   A.   That's what it says.
20   Q.   Okay.
21   A.   Must be an error.
22   Q.   A few in Garrard.  And primarily, the City election is
23   conducted in Manchester and East Manchester?
24   A.   That's correct.
25              MR. GILBERT:  That's all.

*GRAY - Cross (Mr. Simons)*                                              8

1          THE COURT:  Miss Hughes?

2          MS. HUGHES:  No, thank you.

3          THE COURT:  Mr. Simons?

4          MR. SIMONS:  I do.

5          THE COURT:  Yes, sir.

6                    CROSS-EXAMINATION

7    BY MR. SIMONS:

8    Q.   Miss Gray, my name is Dan Simons.  I represent Stanley

9    Bowling, who is behind me.  You know him, do you not?

10   A.   Yes, I do.

11   Q.   When you started yesterday afternoon, one of the first

12   documents that was put up for the jury to see, I thought I saw

13   Beverly Gray as an election officer in the Garrard precinct.

14   A.   I have been election officer before in Garrard precinct.

15   Q.   Have you done that many times or a few?

16   A.   Just a few.

17   Q.   Okay.  More than a handful?

18   A.   Oh, not even a handful.

19   Q.   Okay.  But more than once?

20   A.   Yes.

21   Q.   Okay.  And I think, my thanks to Mr. Westberry, the

22   Stanley Bowling that was shown in Burning Springs as an

23   election officer was the "Soup Bone" Stanley Bowling and not

24   this Stanley Bowling?

25   A.   To my knowledge.

*GRAY - Cross (Mr. Simons)*                                                   9

1   Q.   That's correct?

2   A.   That's correct.

3   Q.   And there are a lot of Bowlings in Clay County?

4   A.   Yes.

5   Q.   And there's also an election officer shown on one or two

6   of the documents named Sarah Bowling, and she's shown at Big

7   Creek.  Do you know my client's wife's name?

8   A.   Yes, she's Sarah Bowling.

9   Q.   Is that a different Sarah Bowling than the lady at Big

10  Creek?

11  A.   Yes, it is.

12  Q.   It's a different lady?

13  A.   Yes, it is.

14  Q.   Thank you.  Now, I hate to get back into the documents,

15  but I hope they're organized in a way we can look at them.  I

16  would like for you to look at PR39, if you could.

17  A.   Okay.

18  Q.   Got it?

19  A.   I have it.

20  Q.   Does that show -- I hope I've written this down

21  correctly -- the election results from May of '02?

22  A.   That's for November of '02.

23  Q.   Okay.  Let's start with May.  I guess that would be PR38.

24  A.   Okay.

25  Q.   Do you have that?

*GRAY - Cross (Mr. Simons)*                                    10

1    A.   Yes.

2    Q.   I'm just interested in the magistrate's race for

3    District 2, which is the one that Stanley Bowling sought in

4    the primary.  Okay?  Does it show that he won that election?

5    A.   Yes, he did.

6    Q.   And can you tell the jury, please, how many votes he got?

7    A.   660.

8    Q.   And could you please tell the jury the next closest

9    person, candidate?

10   A.   Was James Jimmy Marcum with 401.

11   Q.   And so he won by 259 votes would be my mathematics?

12   A.   Yes.

13   Q.   Okay.  And then there were also other persons in the race

14   that finished with less votes, correct?

15   A.   Yes.

16   Q.   All right.  Now, if we could go to 39, which is the

17   November election.  And that's the general election in

18   November of '02, correct?

19   A.   Yes, that's correct.

20   Q.   And Stanley had only one opponent in that race, correct?

21   A.   That's correct.

22   Q.   And who was his opponent in that race?

23   A.   Billy Jones.

24   Q.   Do you know whether or not Billy Jones is related to any

25   of the defendants here?

*GRAY - Cross (Mr. Simons)*                                          11

1   A.   He is a brother to Charles Wayne Jones.

2   Q.   Okay.  Mr. Jones, who is over on the other side of the

3   room.  It's his brother, correct?

4   A.   It's his brother.

5   Q.   And that race was reasonably close, I think.  Would you

6   please tell the jury the results of the November election?

7   A.   Stanley Bowling, 807.  Billy Jones, 721.

8   Q.   Okay.  Thank you.  Now, you may not need to refer to a

9   document to answer this.  Was Mr. Bowling involved in any,

10  running for any office in 2004, May or November?

11  A.   I don't -- I would have to check the records.  I think

12  the county election was in '02, and I don't think it was again

13  until '06.

14  Q.   I believe you're right, but let's just confirm it, if we

15  could, okay?

16  A.   Okay.

17  Q.   If you would look at PR40 and 41.  Those are the election

18  results for both May, '04 and November.  Just look at them and

19  see if Mr. Bowling was involved in either of those two

20  elections.

21  A.   Not in 2004, May or November.

22  Q.   Thank you.  Now if you could, lastly, if you could look

23  at PR42 and 43, pull those up, please.  42 is what election,

24  ma'am?

25  A.   May of 2006.

*GRAY - Cross (Mr. Simons)*                                          12

1   Q.   Okay.  And was Stanley Bowling a candidate in District 2

2   for magistrate in that May election?

3   A.   Yes, he was.

4   Q.   And would you tell the jury how many votes he received,

5   please?

6   A.   785.

7   Q.   And could you tell the jury who the next closest

8   contender was in that race?

9   A.   Roger Webb with 276.

10   Q.   Okay.  Thank you.  Now, would you please look at

11   Exhibit PR43?

12   A.   Okay.

13   Q.   And Stanley Bowling was a candidate for magistrate in

14   District 2 in the general fall election of '06?

15   A.   That's correct.

16   Q.   Okay.  Was he opposed in that election?

17   A.   He was unopposed.

18   Q.   And how many votes did he receive in that, without

19   opposition?

20   A.   900.

21   Q.   Thank you.

22        MR. SIMONS:  That's all the questions I have.

23        THE COURT:  Thank you.  See if there's any redirect.

24   Mr. Smith?

25        MR. SMITH:  Yes, Your Honor.

1                        REDIRECT EXAMINATION

2    BY MR. SMITH:

3              MR. SMITH:  Like to hand the witness PR86.

4              THE COURT:  Yes, sir.

5    Q.   Can you identify PR86, Miss Gray?

6    A.   It was a request from Daugh K. White, who was a candidate

7    for mayor, to ask that his son, Joseph White, be a challenger

8    in East Manchester precinct.

9    Q.   And was that record kept in the ordinary course of

10   business at the Clay County clerk's office?

11   A.   Yes, it is.

12             MR. SMITH:  I'd move for the introduction of PR86.

13             THE COURT:  Any objection?  PR86 will be admitted.

14                  (Government Exhibit No. PR86

15                   was admitted into evidence.)

16             MR. SMITH:  If I could display that.

17             THE COURT:  Yes, sir.

18   Q.   Ma'am, there seems to be on the upper right-hand corner

19   there a "Received" stamp.  Do you recognize that?

20   A.   Yes.

21   Q.   Is that a stamp that is kept at the Clay County clerk's

22   office?

23   A.   Yes, it is.

24   Q.   And are those the stamps that have the little rolling

25   numerals as well as letters for the office to use as the date

*GRAY - Redirect (Mr. Smith)*                                               14

1    changes?

2    A.   Yes, it is.

3    Q.   Are there more than one of those in the office?

4    A.   I think we have one that says received.  We also have one

5    that says filed.

6    Q.   And where is that normally stored, that stamp?

7    A.   The received stamp is usually on the front line.  The

8    filed stamp is in the back in the deed room.

9    Q.   And does Freddy Thompson, as county clerk, have access to

10   the area where the stamp was located?

11   A.   Yes.

12   Q.   Okay.  Now, you were asked about the placement of

13   important election records.  Do you recall those questions?

14   A.   Yes.

15   Q.   And you gave an answer that they were in the vault.

16   A.   Yes.

17   Q.   Or deed room?

18   A.   Yes.

19   Q.   Is your county clerk's office configured such that it has

20   an actual vault door with a combination lock on it?

21   A.   No, it does not.

22   Q.   Do you all have ability to restrict access to the deed

23   room?

24   A.   We can lock the door, and the door's usually locked at

25   night when the cleaning's done, but it's not by other means

*GRAY - Redirect (Mr. Smith)*                                      15

1    than that.

2    Q.   Now in a deed room, I would suppose that there's deed

3    books in that room, and they're identified as such, as deed

4    books; is that correct?

5    A.   That's correct.

6    Q.   Election documents, is there a book where you go to and

7    you see election documents and voter assistance forms, and

8    could you go there and open up a book that says voter

9    assistance form book and the public can get access to those

10   books off the shelf?

11   A.   No.  Voter assistance forms are not kept in a book.  The

12   things that are kept in the book are the minutes of the Board

13   meetings and the tabulation of votes.  The other records are

14   just stored in a box in the back part of the room.

15   Q.   And this wouldn't be available for public -- as a public

16   document, as a deed or mortgage is on the books; is that

17   correct?

18   A.   That's correct.

19   Q.   And, in fact, by law, you're required to keep those a

20   number of months at the county clerk's office, for

21   approximately 20 some months by law?

22   A.   That's correct.

23   Q.   And you're charged to do so.  And therefore, they're not

24   treated the same as a deed would be.  Is that accurate?

25   A.   That's correct.

*GRAY - Redirect (Mr. Smith)*                                      16

1    Q.   In fact, your deed books aren't able to be checked out of

2    the county clerk's office either, are they?

3    A.   No.

4    Q.   In fact, would it be accurate to say that there's persons

5    in your office that are charged with the safekeeping and watch

6    care of the deed room at all times it's open to the public?

7    A.   We have one staff member that's stationed back there most

8    of the time.

9    Q.   Would Freddy Thompson have access to those voter

10   assistance forms that were kept in the box back in the room?

11   A.   Yes.

12   Q.   And he has access to that room at all times during

13   business hours or after business hours?

14   A.   Yes.

15   Q.   Now, you were also asked about the public inspection of

16   the new voter machines that came out in 2006?

17   A.   Yes.

18   Q.   And I believe you gave an answer something that they --

19   there were opportunities for the public to come in when these

20   voter machines were displayed as inspection, advertised in the

21   paper?

22   A.   That's correct.

23   Q.   Did you all have a lot of interest in that open time

24   period?

25   A.   No.

*GRAY - Redirect (Mr. Smith)*                                          17

1   Q.   You were also asked about the position of deputy clerk

2   that was filled by Miss Melanda Adams.  Do you remember those

3   questions?

4   A.   Yes.

5   Q.   I believe you said her position wasn't created, but she

6   took the place of another person?

7   A.   That's correct.

8   Q.   Do you know who the person is she took the place of?

9   A.   I think it was Robyn Maricle.

10  Q.   Okay.  And is she related to Cletus Maricle?

11  A.   She was his daughter-in-law.

12          MR. SMITH:  That's all I have.  Thank you.

13          THE COURT:  Thank you.  Any further questions of this

14  witness?

15          MR. HOSKINS:  Could I have just a minute, Your Honor?

16          THE COURT:  Yes, sir.

17          MR. HOSKINS:  Judge, could we approach?

18          THE COURT:  Yes, sir, you may.

19              (A sidebar conference was held out of the

20              hearing of the jury):

21          THE COURT:  Yes, sir, Mr. Hoskins?

22          MR. HOSKINS:  Thank you, Your Honor.  At the lunch

23  break, I spoke with Mr. Smith about the absentee ballot

24  applications for 2006, and I think this would be the proper

25  witness to bring those in through, if we had to, but Mr. Smith

1    indicated the government might be in a position to stipulate

2    to the admissibility of those later on and we wouldn't have to

3    go into that right now, because I'm not certain they would

4    need to be introduced, but I guess that would just, if the

5    government is now in a position to do that, we can just leave

6    that now and I won't have any other questions for this

7    witness.

8         MR. SMITH:  Your Honor, I'm in agreement that we have

9    admitted some of those voter applications, and he wants the

10   complete, and I don't have an objection to doing that.  I

11   think it's a matter of us comparing, making sure we're in

12   agreement that that is complete, and I don't have an objection

13   to doing that after this witness is dismissed.

14        THE COURT:  It will be subject to the parties being

15   in agreement.  But those are the actual forms, the actual

16   records and, therefore, you would need a witness to lay the

17   foundation for their admission.  I think that's what your

18   position is with respect to this witness?

19        MR. HOSKINS:  That's correct, Your Honor.  That if we

20   had a stipulation, then we would not need a witness to lay a

21   foundation.

22        THE COURT:  Foundation, and there's the issue of

23   relevancy, and I think the parties are not disagreeing on

24   that, but you would need a witness for that.

25        MR. HOSKINS:  Yes.

1          MR. SMITH:  Your Honor, I do have another request.

2          THE COURT:  Okay.

3          MR. SMITH:  Next witness I intend to call is Jennings

4    White, and I have not had an opportunity to express to him

5    that he should not discuss a matter which was ruled in limine

6    not to come out in this trial.  I would ask the Court to do

7    that outside the presence of the jury.

8          THE COURT:  You want some time to --

9          MR. SMITH:  I'd rather ask if the Court would do it.

10         THE COURT:  I don't remember what it was.

11         MR. SMITH:  All right.  The '71 murder that --

12         THE COURT:  All right.

13         MR. SMITH:  -- was involving Cletus Maricle at the

14   polls, and that's the issue that I just would ask if the Court

15   would instruct him.

16         THE COURT:  Let's see how much more we have for this

17   witness.  Anything else?

18         MR. WESTBERRY:  I have just a couple.  The record

19   will [inaudible].  I meant that affectionately, Judge Reeves.

20         THE COURT:  Couple means different things to me than

21   it does to some of the attorneys in the case.  Sometimes when

22   I hear that, I count one, two, and that's a couple.

23         MR. WESTBERRY:  What about three?

24         MR. HOSKINS:  That's a few.

25         MR. RICHARDSON:  Your Honor, I also have a few

1    questions.

2         THE COURT:  We'll take a break after this witness is

3    finished so we can get these documents to the clerk, and we'll

4    bring in the next witness.  He's in custody so he probably

5    needs to be brought in anyway and placed on the witness stand.

6    So we'll take a break, and I'll give the instruction to the

7    witness when he comes in.

8         MR. SMITH:  Thank you.

9              (Sidebar conference concluded.)

10        THE COURT:  Mr. Hoskins, do you have any further

11   questions?

12        MR. HOSKINS:  No questions.

13        THE COURT:  Mr. Westberry, you have a couple.

14                   RECROSS-EXAMINATION

15   BY MR. WESTBERRY:

16   Q.   Hello again, Miss Gray.  You were asked some questions

17   before lunch about these election officer positions of the

18   clerk, the judge, and the sheriff that would be held or would

19   be occupied around the county at election time.  Do you

20   remember those questions, ma'am?

21   A.   Yes.

22   Q.   From time to time, if you know, would there be difficulty

23   in getting people to serve in those positions?

24   A.   I don't hardly know how to answer that, other than once

25   they appoint the election officers, they appoint alternates

*GRAY - Redirect (Mr. Westberry)*                                    21

 1   and then they try to get the alternates to serve in those
 2   positions.
 3   Q.   Are these the kind of positions that people are really
 4   competing with each other to get, or was it something
 5   different, if you know?
 6   A.   Well, no, there are only -- the election officers are
 7   only chosen by the names that are submitted by the Board, by
 8   the chairmans.
 9   Q.   You mentioned in 1985, I think you said Kenny Day served
10   as an election commissioner back in 1985.  Do you remember
11   that question?
12   A.   Yes, he was a commissioner.
13   Q.   Of course, you know who Kenny Day is?
14   A.   Yes, I do.
15   Q.   If you know, did Doug Adams have any influence over the
16   selection of election commissioners back in '85?  If you know.
17   A.   I don't have any knowledge of that.
18   Q.   Same question as to '02, '04 and '06.  If you know, did
19   Mr. Adams have any influence over the selection of election
20   commissioners in those three years, if you know?
21   A.   Not to my knowledge.
22            MR. WESTBERRY:  Thank you.  That's all I have.
23            MR. WHITE:  No questions, Your Honor.
24            THE COURT:  All right.  Thank you.  Mr. Richardson?
25            MR. RICHARDSON:  Yes, sir, Judge.  Thank you very

*GRAY - Redirect (Mr. Richardson)*                                          22

1    much.

2                        RECROSS-EXAMINATION

3    BY MR. RICHARDSON:

4    Q.   Miss Gray, Mr. White asked you a question about the

5    Bright Shade precinct.  Do you recall that?

6    A.   Yes.

7    Q.   And you said there was one vote from Bright Shade in the

8    city race?

9    A.   There's one listed on there.  That must have been an

10   error, an oversight on someone's part.

11   Q.   So errors do happen?

12   A.   Yes.

13   Q.   A lot of paperwork through that office?

14   A.   Oh, yes.

15   Q.   I want to talk to you about the challenger form,

16   Exhibit PR86.

17   A.   Okay.

18   Q.   Yes, ma'am, it's dated on the form for the 17th, I think,

19   of October?

20   A.   October 18th, 2006.

21   Q.   It's stamped October 18, but the actual letter is dated

22   October 17?

23   A.   That's correct.

24   Q.   And October 18 would be the day that you all received it

25   in the office?

*GRAY - Redirect (Mr. Richardson)*                                    23

1   A.   Yes.

2   Q.   Who would take that form?

3   A.   Just anyone working, any deputy clerk there in the office

4   or Freddy, anyone that's in the office that they give it to.

5   Q.   So if that form came in, whoever the clerk was would grab

6   it and stamp it when it was received?

7   A.   Yes, that's correct.

8   Q.   We talked about where everything was stored.  There's the

9   deed room in the back or on the side, I guess?

10  A.   Uh-huh.  That's correct.

11  Q.   And all the election stuff was put in boxes and put in

12  the back of the deed room?

13  A.   Yes.

14  Q.   On some metal shelving there?

15  A.   Yes.

16  Q.   And they were just placed in a box?  They weren't in a

17  locked cabinet or anything?

18  A.   They're not in a locked cabinet, no.

19  Q.   Just in a box?

20  A.   They're in a box.  We just store them back there.

21  Q.   Not a lot of interest in those things normally?

22  A.   Normally, no.

23  Q.   You talked about Freddy has a key to his office?

24  A.   Yes.

25  Q.   So he can get in there anytime?

*GRAY - Redirect (Mr. Richardson)*                                    24

1   A.   Yes.

2   Q.   You also have a key to that office, don't you?

3   A.   That's correct, um-hmm.

4   Q.   And all the deputy clerks have keys to office?

5   A.   Yes.

6   Q.   And the cleaning lady has a key to that office; does she

7   not?

8   A.   Yes.

9   Q.   And the county judge executive has a key to that office;

10  does he not?

11  A.   Yes.

12  Q.   So there are several people who have keys to that office?

13  A.   Correct.

14  Q.   You said that one employee was stationed back there most

15  of the time.  Who would that be?

16  A.   Debbie Edwards.

17  Q.   And when Miss Edwards is out for the day, does somebody

18  else go back there and sit?

19  A.   No, not unless one of the workers may go back there and

20  do the work that she normally does.  Or if a customer comes

21  in, needs something recorded in there, then we would go back

22  there.  But to have someone permanently stationed back there,

23  no.

24  Q.   Now, Robyn Maricle worked at Freddy's office?

25  A.   Yes.

*GRAY - Further Direct (Mr. Smith)*                                    25

1    Q.   Was she -- she was there when Freddy took office?

2    A.   That's correct.

3    Q.   Do you know a girl named Samantha Smith?

4    A.   Yes.

5    Q.   Did Melanda Adams take Robyn Maricle's place or Samantha

6    Smith's place, if you recall?

7    A.   Well, I can't recall which order they left.  I thought it

8    was Robyn Maricle's place, but I'm not sure.  They both left

9    within real close to each other.

10        MR. RICHARDSON:  No further questions, Judge.  Thank

11   you, Miss Gray.

12        THE COURT:  Anything else?

13        MR. SIMONS:  Nothing else, Your Honor.

14        THE COURT:  Anything else of the witness?

15        MR. SMITH:  Yes, Your Honor.

16        THE COURT:  All right.  You may follow up.

17                 FURTHER DIRECT EXAMINATION

18   BY MR. SMITH:

19   Q.   Miss Gray, you gave an answer to Mr. Adams' attorney that

20   I believe you said that to your knowledge, Mr. Adams had no

21   influence in the selection of election officers in '02, '04,

22   '06.  Is that based on your knowledge that he was not a

23   sitting member of the Board?

24   A.   That's the way I look at it.

25   Q.   So if he used influence outside of the legitimate

*GRAY - Further Direct (Mr. Smith)*                                      26

1    organization --

2            MR. WESTBERRY:  Objection as to form.

3    Q.  -- of the Board of Elections, you have no knowledge

4    whether he used his influence outside the Board?

5            MR. WESTBERRY:  Same objection, form.

6            THE COURT:  Overruled.

7    A.  I would have no knowledge of that.

8            MR. SMITH:  Thank you.

9            THE COURT:  Mr. Westberry?  All right.  Thank you,

10   ma'am.  You can step down.  You can leave all those documents

11   up there.  Thank you.

12           Witness will be excused.

13           Let's do this.  I want to make sure we have all these

14   exhibits in the proper order.  I'm going to give you all a

15   short break while we do that.  We'll give you about a

16   ten-minute recess.  Be ready, and I'll call you back at that

17   time.  Please keep in mind the admonitions given to you

18   previously.

19                   (The jury left the courtroom at 1:32 p.m.)

20           THE COURT:  We're going to bring the next witness in

21   in just a moment.  I'm going to advise him of one of my

22   pretrial rulings that we talked about up at the Bench.

23           Before we do that, Mr. Simons, question for you, for

24   my benefit.  How did Soup Bone get his name?

25           MR. SIMONS:  I don't know.  (Conferring with Mr.

1    Bowling).  They said his father was a fox hunter.

2           THE COURT:  That explains it.  Mr. Smith, will Mr.

3    White be the next witness?

4           MR. SMITH:  Yes, Your Honor.

5           THE COURT:  He'll need to be brought up.  He's in

6    custody.  Jennings White.

7           JENNINGS B. WHITE, GOVERNMENT'S WITNESS, SWORN

8           THE COURT:  Thank you.  The record will reflect that

9    the jury is not present at this time.  You're Jennings White;

10   is that correct?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Mr. White, you'll be presented as a

13   witness here in just a few moments.  At this time, we're

14   outside the presence of the jury.  The purpose of that is I

15   wanted to advise you of a pretrial ruling that I made on

16   certain evidence.  The attorneys can't ask you questions about

17   a certain matter, and you can't testify about a matter, and I

18   wanted to make sure I told you that before the jury was

19   brought in.

20          THE WITNESS:  Say this again now?

21          THE COURT:  Yes, sir.  I want to advise you of a

22   pretrial ruling that I made in the case so there's no

23   questions or no testimony offered about that.  Before trial, I

24   determined that an issue involving a shooting involving Cletus

25   Maricle, defendant Cletus Maricle, 1971 shooting incident

1    which he shot someone in Clay County could not be asked about

2    during the course of this trial.  So the attorneys aren't

3    going to ask you about that, and by the same token, you can't

4    volunteer that information in response to a question unless I

5    determine that it's relevant in the case.

6              At this point, I've determined that it's not relevant

7    and so you should not testify about it.  You understand that,

8    correct?

9              THE WITNESS:  Um-hmm.

10             THE COURT:  All right.  Thank you.  Are there any

11   other issues that we need to discuss?

12             MR. SMITH:  No.  We're ready.

13             THE COURT:  If you could check and see if the jury's

14   ready to come back in.  If they're not, we'll give them a few

15   extra minutes.

16             (The jury entered the courtroom at 1:40 p.m.)

17             THE COURT:  Mr. Smith, at this time, if you could

18   announce your next witness.  He's already come up to the

19   witness stand.  If you could announce him, please.

20             MR. SMITH:  Yes, Your Honor.  The United States would

21   call Jennings B. White.

22             THE COURT:  Thank you.  Madam Clerk, if you could

23   please administer the oath to Mr. White.

24             JENNINGS WHITE, GOVERNMENT'S WITNESS, SWORN

25             THE COURT:  Thank you.  Mr. Smith, you may proceed.

*J. WHITE - Direct (Mr. Smith)*                                          29

1                          DIRECT EXAMINATION

2     BY MR. SMITH:

3     Q.   Good afternoon.   State your name, please.

4     A.   Jennings White.

5     Q.   And Mr. White, are you married?

6     A.   Yes, sir.

7     Q.   And how long have you been married?

8     A.   Forty some years.

9     Q.   And where were you born and raised?

10    A.   Oneida, Kentucky.

11    Q.   And is that in Clay County, Kentucky?

12    A.   Yes, sir.

13    Q.   What part of the county is Oneida?   Is that outside

14    Manchester?

15    A.   Yes, sir.

16    Q.   Okay.   About how far outside Manchester would that be?

17    A.   About 11 or 12 mile.

18    Q.   Okay.   And have you taken up residence in Clay County?

19    A.   The entire life.

20    Q.   Where did you live?

21    A.   Greenbriar.

22    Q.   Let's talk a little bit about your background, Mr. White.

23    Were you educated in Clay County?

24    A.   Yes, sir.

25    Q.   And did you pursue, did you obtain a degree there?

*J. WHITE - Direct (Mr. Smith)*                                    30

1   A.   I got a high school.

2   Q.   Yes, sir.  And did you pursue any graduate --

3   A.   B.S. at Eastern, a Master at Union, and Rank 1 at Eastern

4   Kentucky University, Richmond, Kentucky.

5   Q.   Sir, did you teach school?

6   A.   Yes, sir.

7   Q.   And how long did you teach school?

8   A.   About seven years.

9   Q.   Prior to teaching, did you hold any other jobs?

10  A.   I was in the military.

11  Q.   And how long were you in the military?

12  A.   Around two years, about 21 months.  I got out three

13  months early to teach school.

14  Q.   Where did you teach school?

15  A.   Manchester Elementary.

16  Q.   Have you also been a business owner, sir?

17  A.   Yes, sir.

18  Q.   And what kind of businesses have you been engaged in?

19  A.   Used car business, amusement business.

20  Q.   And when you say amusement business, would you describe

21  for us what that is?

22  A.   We put the video games in various places, the cranes you

23  get toys out of, video games, bubble gum machines, kiddy

24  rides.

25  Q.   Now, these amusement machines that you described, are

*J. WHITE - Direct (Mr. Smith)*                                      31

1    they placed in just the local area there in Clay County?

2    A.   No.  At one time, we serviced four states, parts of four

3    states; Kentucky, Virginia, West Virginia and Tennessee.

4    Q.   Did you have any contracts with any major retailers?

5    A.   Wal-Mart.  Serviced them 25 years.

6    Q.   What was the name of that business, sir?

7    A.   J & B Amusement.

8    Q.   Did you have a partner in that business?

9    A.   Yes, sir.  My brother, Bill White.

10   Q.   How long were you two in partnership in that business?

11   A.   Twenty-five years.

12   Q.   Your wife, did she work out side the home, sir?

13   A.   She taught school.

14   Q.   And where did she teach school?

15   A.   Horse Creek Elementary, Paces Creek Elementary.

16   Q.   Is she retired?

17   A.   Yes, sir.

18   Q.   As a school teacher?

19   A.   Yes, sir.

20   Q.   Mr. White, we've heard about several people in public

21   office over there in Manchester and Clay County, and I want to

22   ask you, are you related to a fella by the name of Daugh White

23   or Doug White?

24   A.   Yes, sir.  Fourth cousin.

25   Q.   We've also heard the name Barbara White Colter.

*J. WHITE - Direct (Mr. Smith)* 32

1   A.   She's Daugh's sister.

2   Q.   We've also heard the name Yancey White.

3   A.   He's probably a fifth or sixth cousin.

4   Q.   Also heard the name Charles White.

5   A.   He's about a fourth or fifth cousin.

6   Q.   When did you enter into politics, Mr. White?

7   A.   '92.

8   Q.   And what --

9   A.   Wait, hold it.  '94.

10  Q.   Okay.  And what office did you seek?

11  A.   County clerk.

12  Q.   And were you successful?

13  A.   Yes, sir.  Two terms, nine years.

14  Q.   And when did you end your service for Clay County as

15  clerk?

16  A.   '02.

17  Q.   During your time period as county clerk and while

18  involved in politics there in Clay County, were you also

19  involved in schemes to buy votes?

20  A.   Yes, sir.

21  Q.   And when did you first get involved in schemes to buy

22  votes, Mr. White?

23  A.   Probably the early '80s.

24  Q.   And how easy or hard would you describe it to be to buy

25  votes in Clay County during the time period that you were

*J. WHITE - Direct (Mr. Smith)*                                    33

1    involved in politics?

2    A.   Very easy to buy them.

3    Q.   In 2002, did you have an opponent by the name of Freddy

4    Thompson?

5    A.   Yes, sir.

6    Q.   Did you engage in vote buying in that election?

7    A.   Yes, sir.

8    Q.   Could you describe for the Court and the jury generally

9    how much money you had to spend in your attempt --

10   A.   I spent somewhere around 80 to a hundred thousand

11   dollars.

12   Q.   And did you rely upon other people to help you put that

13   in the hands of the voters?

14   A.   Yes, sir.

15   Q.   While engaged in your attempt to hold this office of

16   county clerk and while engaged in your scheme to buy votes,

17   did you witness an organized effort to do the same thing on

18   the other side?

19   A.   Yes, sir.

20   Q.   And could you describe for us what you saw?

21   A.   Well, about everyone in the county that had a political

22   office or school board.

23   Q.   Who organized the effort against you that you saw?

24   A.   Doug Adams, Wayne Jones, Al Man Stivers.

25   Q.   And in this effort to win this office, sir, did the

J. WHITE - Direct (Mr. Smith)                                          34

1  election officers working inside the polls play a role in your

2  efforts to buy votes?

3  A.   Yes, sir.

4  Q.   Could you describe how they generally played a role?

5  A.   They would get a signal from an outside person sending

6  someone in.  They would pay them in the polls or give them

7  some proof that they had voted and got paid outside the poll,

8  polling place.

9  Q.   Did you see the other faction, led and organized by Doug

10 Adams and others as you've described, operating with a similar

11 method of operation?

12 A.   Yes, sir.

13 Q.   Have you ever heard the term slate or ticket in Clay

14 County?

15 A.   Yeah.

16 Q.   And could you tell us what that term means?

17 A.   Usually, a group of candidates go in, pool their money

18 together and have what they call a ticket or a slate that they

19 know who people should be voting for on that slate.

20 Q.   And did you organize a pool or slate on the 2002

21 election, sir?

22 A.   Well, I asked to vote for -- well, as far as writing it

23 down, no.  Edd Jordan --

24 Q.   Was there a pool of money that you were --

25 A.   There was only two people that gave me money that time in

*J. WHITE - Direct (Mr. Smith)*                                      35

1    '02.

2    Q.   Okay.  And who were they?

3    A.   Barb Colter and Edd Jordan.

4    Q.   Okay.  And did that approximate figure of 80 to 100

5    thousand dollars include the amounts of money that Barbara

6    Colter and Edd Jordan gave you in 2002?

7    A.   I think that's what made it a hundred.

8    Q.   Do you know a fella by the name of Roger "Bud" Smith?

9    A.   Yes, sir.

10   Q.   And was he involved in distributing some of the monies?

11   A.   Yes, sir.

12   Q.   Did you witness him receive any monies?

13   A.   Say this again now?

14   Q.   Did you see him receive or did you give him money?

15   A.   Yes, sir.

16   Q.   Did you see Kennon White give Roger Smith money?

17   A.   No, sir.

18   Q.   Did you talk to Roger "Bud" Smith about where he was

19   going to spend the money?

20   A.   Not really.

21   Q.   What precinct was he active, involved in at that time?

22   A.   Flat Creek.

23   Q.   How did the scheme operate during the 12 days of early

24   voting prior to election day?

25   A.   You mean the absentee voting?

*J. WHITE - Direct (Mr. Smith)*                                    36

1    Q.   Yes, sir.

2    A.   We had the old type voting machines where you have the

3    curtain, you turn the lever and the curtains close.

4    Electromechanical, I think, is the term for it.  We didn't

5    have the new computer voting machines so we had to have five

6    or six voting machines in the clerk's office for the people to

7    come and vote in, because of the different precincts in the

8    county.  Like I think you had five magistrates, and each one

9    of them required a different, you know, selection to vote, you

10   know, to cast their votes for.  Magistrates were only like

11   four precincts or something like that.  There's five

12   magistrate districts, I think five.  And you had to have the

13   different type.  They couldn't use just one, you had to have

14   four, five different voting machines.

15   Q.   Is that because your ballots would look different for

16   each precinct?

17   A.   Yeah, because each precinct ballot was different.

18   Q.   So how was it that you -- what was it that you saw going

19   on as far as votes being bought, or were they being bought

20   during the early voting?

21   A.   Well, I knew the school board was active.  They wanted to

22   wait a few days.  I said, well, let's just have it today.  We

23   had a meeting that morning with the election commissioners,

24   Democrat election commissioner, Republican election

25   commissioner, the sheriff and myself.

*J. WHITE - Direct (Mr. Smith)*                                        37

1      Then they just wanted to put it off for a few days.  So I

2    said, well, let's just have it right now.  Well, it wasn't 15

3    minutes till a dozen school board vehicles was in the roadway

4    of 421 with their workers, ready to buy votes.  Al Man came in

5    with both pockets full of money.

6      And I said, Wayne -- Wayne Jones and Al Man Stivers was

7    together.  I says, hold it, I said, if you're going to buy

8    votes, take your money outside.  Wayne says, oh, that's Al

9    Man's personal money.

10     During the process of that day, two people in the voting

11   machines.  When the curtains closed, two big guys, they have

12   to move around.  Every time they moved around to get his money

13   out of his pocket, the curtain would come open.  This is in

14   the clerk's office where, you know, the clerk's office was at.

15     They closed the courthouse, and we were at an old bank

16   building, and everything was in one room, just one room.  So

17   every time he got ready to pay, he would pull the money out.

18   That afternoon, there was no money in either pocket.

19     And when they started sending the votes in, the people

20   would come to vote, and I says, who are you voting for?  Well,

21   I'm voting for you, Jennings.  So they was paying some of

22   them, and I was voting them, plus the ones that my people were

23   sending in.  So I stole every vote I could from them.

24   Q.   What position did William Stivers have with the Board of

25   Elections at that early voting period, to your knowledge?

*J. WHITE - Direct (Mr. Smith)*                                    38

1    A.   During the absentee voting, the Republicans have the

2    choice to elect a person to represent them at those voting

3    machines, and the Democrats have a represent -- you know, put

4    a person there to represent them.  So those two are the ones

5    that supervise the voting that day.  And evidently, he was one

6    of those.

7    Q.   Do you know who the other was?

8    A.   Paul Bishop was for a while the Republican, which is a

9    school board guy.

10   Q.   Was he --

11   A.   Then --

12   Q.   Let me ask you this.  Was both Stivers and Bishop

13   sympathetic with Doug Adams?

14   A.   Well, both of them was -- the school board had both the

15   Democrat and the election -- both commissioners.  They had the

16   Republican and the Democrat both on their side.

17   Q.   What did you do to counteract that, Mr. White?

18   A.   I stole -- every time the people would come to vote, they

19   would line up, maybe 50 or 100 in the office.  I says --

20   they'd already paid them outside, lined up.  I said, who you

21   wanting to vote for?  We're going to vote for you, Jennings.

22   So I'd just take them in and vote.  While they's back there, I

23   was stealing theirs.  The people come in, most of them wanted

24   to vote -- some of them wanted to vote for me anyway.  To get

25   their vote, they just wanted the money.

*J. WHITE - Direct (Mr. Smith)*                                   39

1    Q.   How much money was voters being paid, to your knowledge,

2    at that early voting period per vote?

3    A.   20, 40 dollars, maybe.  This one poor lady standing

4    outside the voting booth says I went and voted, and says Al

5    Man wouldn't pay me.  She was crying.  I said, well, I don't

6    buy votes.  I usually give money to buy votes with.  I said,

7    here, if this will help you, I'll give you 20 dollars.  She

8    left smiling.

9    Q.   On election day of 2002, did you have continued effort to

10   buy votes as well in different precincts other than just the

11   one located downtown?

12   A.   You mean election day?

13   Q.   Yes, in the primary of 2002, were you also organized in

14   other precincts other than Manchester?

15   A.   I wasn't organized, but I gave a lot of money out.

16   Q.   Okay.  And you were unsuccessful?

17   A.   Yes, sir.

18   Q.   And there was a fall 2002 race, and I believe what we've

19   heard some testimony about maybe a race regarding Charles

20   "Dobber" Weaver?

21   A.   I don't remember.  I remember he ran for -- I don't

22   remember what office he ran for.

23   Q.   Okay.  During one of these elections, we have heard that

24   there was a dispute between you and Mr. Stivers at the poll?

25   A.   Yes, sir.

*J. WHITE - Direct (Mr. Smith)*                                    40

1   Q.   And was that involving, also, parents of Charles Weaver?

2   Were they a subject of the dispute?

3   A.   I don't remember exactly the details.  But the

4   situation -- I hadn't been in office for a few months.  I

5   would come in at night, do what I was supposed to do, left,

6   because I lost.  They didn't want me, so I didn't come back.

7   But I'd come in at night, sign, did what I had to do.

8        So I forget who it was.  One of the girls called early

9   that morning or something and said, you need to come.  We

10  think we're going to have a problem here.  So my office was

11  right directly behind the five voting machines.  Like where

12  this lady's setting here, the voting machines was here.  My

13  office is that door handle there, you know.  We was in the old

14  bank building they remodeled just for temporary until they

15  built a new building.

16       And so here comes someone in a-cussin', screaming, and it

17  was Al Man.  So I called the City police -- I asked the

18  Republican election commissioner, Paul Bishop, I says, do you

19  think that guy's drunk?  Paul Bishop says, he sure is,

20  Jennings.  I says, do you care if I call the City police, have

21  him arrested?  He says no.  He said, he needs to be arrested.

22  Says, he's drunk.

23  Q.   Did an arrest, in fact, follow?

24  A.   Yes, sir.

25  Q.   Do you know Stanley Bowling?

*J. WHITE - Direct (Mr. Smith)*                                          41

1    A.   Yes, sir.

2    Q.   Was he involved in the 2002 race that you, yourself, were

3    involved in?

4    A.   Yes, sir.

5    Q.   As magistrate?

6    A.   Yes, sir.

7    Q.   And did you have any involvement with him in regard to

8    distribution of money?

9    A.   Yes.

10   Q.   Would you tell us what that was?

11   A.   First, Stanley Bowling and I met with Charles Douglas

12   Bowling.  Each one of us gave him 2 to 3 thousand dollars

13   apiece, something like that.

14   Q.   Now, who is Charles Douglas Bowling?

15   A.   His mother -- he's from Big Creek, Kentucky.  His mother

16   was election officer.  I said, how many votes can you get us,

17   me and Stanley asked him.  Charles Douglas says, ever how much

18   money you want to give me.

19   Q.   Was that cash money that you and Stanley Bowling gave

20   him?

21   A.   Yes, sir.

22   Q.   Do you know a fella by the name of Johnny Brumley?

23   A.   Yes, sir.

24   Q.   Did you distribute any money to him in '02?

25   A.   Gave him $4,500.

*J. WHITE - Direct (Mr. Smith)*                                    42

1   Q.   And did he have a family member that was also an election

2   officer?

3   A.   Jonathan Brumley, he was election -- precinct election

4   judge at the Goose Rock precinct.

5   Q.   And what was that money for?

6   A.   To buy votes with.

7   Q.   Do you know a fella by the name of Dick Woods?

8   A.   Yes, sir.

9   Q.   Is he an election officer in the 2002 election?

10  A.   Yes, sir.  Bright Shade precinct.

11  Q.   Did you --

12  A.   Which -- excuse me.  Can I explain something to you?

13  Q.   Well, I think you need to make sure you're listening to

14  my questions and answering those.  Is it in response to the

15  question I just asked you?

16  A.   Yes, sir.

17  Q.   Okay.  Yes, sir.

18  A.   The Bright Shade voting precinct and the Goose Rock

19  voting precinct is in the same elementary school.  One is

20  right down just a few feet from the other one.  You can look

21  at one voting machine and see the other voting machines, or

22  that's the way it used to.

23  Q.   During the election day in 2002, did you have an

24  opportunity to make observations or, let me ask you this, it

25  may have been the night before election, did you make any

*J. WHITE - Direct (Mr. Smith)*                                            43

1    observations in the Bright Shade --

2    A.  Yes, sir.

3    Q.  -- precinct?

4    A.  I went to Dick Woods' home.  There was probably 15 cars

5    in the driveway.

6    Q.  Did you give money to anyone in that Bright Shade

7    precinct yourself?

8    A.  Yes, sir.  I gave a Jackson boy 3 or 4 thousand dollars.

9    Q.  And what was that money for?

10   A.  To buy votes with.

11   Q.  Do you know Eugene Mills?

12   A.  Yes, sir.

13   Q.  Is he in the Bright Shade area?

14   A.  I forgot.  Yes, sir.

15   Q.  Did you visit him that night?

16   A.  Yes, sir.

17   Q.  And what did you do?

18   A.  I gave him $1,500 or $2,000.  I don't remember where I

19   paid him, at his home or then he came down to the Cumberland

20   Valley National Bank at the Garrard Shopping Center.  I don't

21   remember whether I paid him there or at his home.

22   Q.  Had he served as an election officer?

23   A.  Yeah, he was a Dick Woods guy.  But he was going to shave

24   some points for me and Kennon.  Kennon paid him too, I think.

25   Q.  Kennon being Kennon White?

*J. WHITE - Direct (Mr. Smith)*                                          44

1    A.   Kennon White, sir.

2    Q.   Did Kennon White put out money in that election?

3    A.   Yes, sir.

4    Q.   Do you know how much money he put out?

5    A.   No, sir.

6    Q.   Did you see him deliver money other than this to Eugene

7    Mills?

8    A.   No, sir.

9    Q.   Do you know James Craft?

10   A.   Yes, sir.

11   Q.   And was he also employed by the Board of Education?

12   A.   Yes, sir.

13   Q.   What did he do for the Board of Education?

14   A.   He worked at the bus garage.

15   Q.   Is he related to Randy Craft?

16   A.   Father.

17   Q.   Did you see him at or about the election day of May,

18   2002?

19   A.   Yes, he brought his little Chevy S10 pickup, parked it

20   right in front of the clerk's office, came out with his school

21   board or his Clay County Maintenance Department on it, brought

22   another boy with him, and they blocked the -- the bank is in

23   what we call the Square of Manchester, 421, and then there's a

24   street that goes around.

25        Where the bank is is really like a -- you can travel

*J. WHITE - Direct (Mr. Smith)*                                    45

 1   through it, but it's not on main 421, but it's right next to

 2   it.  And they just pull right off 421 and block this street

 3   with their vehicles.

 4        Also had some fun by going out with the Clay County Board

 5   of Education after I said let's have the voting machines open

 6   now.

 7   Q.   Okay.

 8   A.   Well, I went to the --

 9   Q.   Let's follow along the questions right now.  I'm not sure

10   I'm following you, Mr. White.

11   A.   Okay.

12   Q.   So the opportunity that you saw James Craft active there

13   was in the early voting period?

14   A.   That was just a few minutes after we opened the voting

15   booths, probably 20 minutes.

16   Q.   Were you ever by the past location of the KD Pawn's Shop

17   at or about election day?

18   A.   Yes, sir.

19   Q.   Did you make any observations there on election day?

20   A.   Yes, sir.  Randy Craft, Larry Shepherd was there and

21   someone else in the auto.  Larry and Randy Craft had

22   California Hawaii shirts on, and Mr. Adams had the same type

23   shirt.  All three of them could have been the same color.  I

24   would say, why would all three of those be wearing California,

25   Hawaiian Beach Boy shirts?  I said, why would all three of

*J. WHITE - Direct (Mr. Smith)*                                        46

1   them be wearing the same color shirt, you know?

2   Q.  Who are you referring to as Mr. Adams?

3   A.  Doug Adams, superintendent.

4   Q.  Where did you see him on election day?

5   A.  Burning Springs Elementary School.

6   Q.  And what was he doing when you saw him at the Burning

7   Springs Elementary School?

8   A.  There was a line of people outside the voting precinct,

9   and he would go from -- walk up the line to the front and then

10  walk to the back and back up to the front, talking to them.

11  Q.  Is that the place where the voters vote?

12  A.  Yes, sir.

13  Q.  Burning Springs?

14  A.  Yes, sir.  Elementary school.

15  Q.  You recall when Cletus Maricle run for circuit judge back

16  in 1990?

17  A.  Yes, sir.

18  Q.  Do you know a fella by the name of Stevie Collins?

19  A.  Yes, sir.

20  Q.  Did you see Stevie Collins and Cletus Maricle together at

21  that time period, around election?

22  A.  Yes, sir.  They was in my van.

23  Q.  And what did you see?

24  A.  Stevie gave Cletus $5,000 for his election campaign.

25  Q.  Was Cletus Maricle someone that you consulted in

*J. WHITE - Direct (Mr. Smith)*                                    47

1    preparation for your races, county clerk?

2    A.   I would talk to him sometime.  That was about it.

3    Q.   Did you seek his support in the 2002 election?

4    A.   No, no.

5    Q.   Did you talk with Scott Madden about it?

6    A.   Yes, sir, talked to Scott.

7    Q.   What did Scott tell you?

8    A.   Scott said we don't need to get Cletus involved in

9    something like this, Jennings.  I was in Scott's vehicle.  I

10   don't know whether I was in it or standing out.  He had a big

11   stack of papers.  He said, we need to save Cletus for this.

12   Q.   You said he was pointing to a stack of papers?

13   A.   Yes, sir.

14   Q.   Did Scott Madden have a lawsuit or something in those

15   papers?

16   A.   I assume.  I don't know for sure, sir.

17            MR. HOSKINS:  Object.

18            THE COURT:  Sorry?

19            MR. PINALES:  Objection, Your Honor.  What he

20   assumes.

21            THE COURT:  Overruled.

22   Q.   Scott Madden a lawyer?

23   A.   Yes, sir.

24   Q.   Is he a former law partner of Cletus Maricle's?

25   A.   Yes, sir.

*J. WHITE - Direct (Mr. Smith)*                                        48

1   Q.   Were you also around the Horse Creek precinct on election

2   day?

3   A.   Yes, sir.

4   Q.   And did the school board have someone out there that you

5   had contending for the voters that were being bought?

6   A.   At the Horse Creek voting precinct, there's a -- right

7   across from it is a Ford dealership.  You know, Ford auto

8   dealership.  In the banking side, you look straight in to

9   where they were voting at.  They had a Farmer boy as a

10  challenger who was outside paying the voters or taking them in

11  to vote them.

12       And then Wayne Jones and Charles Stivers, with another

13  one of Charles's workers, were standing outside paying them.

14  And then the -- I saw them pay Elijah Gross, Lainie Gross, his

15  wife, and Elijah Gross's daughter, saw Wayne pay them.  Right

16  after he paid them, Gary Gregory, Wayne Gregory came up, the

17  commonwealth attorney and the commonwealth's detective, and

18  ran them off from the precinct.  I couldn't tell what they

19  were saying, but they got into an argument, like, and he ran

20  them off.  And then I left.

21  Q.   Is Charles Stivers, to your knowledge, related to William

22  "Al Man" Stivers?

23  A.   Brother.

24  Q.   Do you see William Stivers here this afternoon in the

25  courtroom?

*J. WHITE - Direct (Mr. Smith)*                                    49

1   A.   Yes, sir.  Just stood up.

2   Q.   Okay.

3        THE COURT:  The record will reflect the witness has

4   identified the defendant, William Stivers.

5   Q.   Like to ask you now to identify Charles Wayne Jones.  See

6   him here in the courtroom, identify him, please, for the

7   record.

8   A.   Sitting straight back there.

9   Q.   What's he wearing?

10  A.   Greenish, grayish suit.

11       THE COURT:  The record will reflect that the witness

12  has identified the defendant, Charles Wayne Jones.

13  Q.   Do you see Stanley Bowling?

14  A.   Yes, sir.

15  Q.   Could you point him out for the record?

16  A.   Standing, sir.

17  Q.   Okay.

18       THE COURT:  Again, the record will reflect that the

19  witness has identified the defendant, Stanley Bowling.

20  Q.   Do you see Douglas Adams in the courtroom this afternoon?

21  A.   Yes, sir.

22  Q.   Could you point out where he is, please?

23  A.   By Mr. Jones, sir.

24       THE COURT:  Record will reflect that the witness has

25  identified the defendant, Doug Adams.

*J. WHITE - Direct (Mr. Smith)*                                    50

1    Q.   Cletus Maricle, do you see him?

2    A.   Cletus sitting right directly to your right.

3    Q.   And what's he wearing?

4         MR. PINALES:  We'll stipulate, Your Honor.

5         THE COURT:  All right.

6    A.   Gray plaid or something, I guess.

7         THE COURT:  The record will reflect that the witness

8    has identified the defendant, Russell Cletus Maricle.

9         MR. SMITH:  Like to hand the witness Government's

10   Exhibit PA7.

11   A.   Okay.

12   Q.   Refer you to page 6 of 7.  Page 6, please.  You need to

13   take it out of that plastic holder.

14   A.   It's a little bit hard for me to do.

15        MR. SMITH:  Court security, would you mind helping,

16   please?  Thank you.

17   A.   Page 6 of 7?

18   Q.   Yes, sir.  Do you recognize your signature?

19   A.   Yes, sir.

20   Q.   And what date did you sign that agreement?

21   A.   25 October, '05.

22   Q.   Mr. White, could you describe generally what kind of

23   charges you pled guilty to?

24   A.   Pled guilty to marijuana and cocaine, money laundering.

25   Q.   And did you, as part of your plea agreement, agree to

*J. WHITE - Direct (Mr. Smith)*                                           51

1     cooperate and testify truthfully --

2     A.   Yes, sir.

3     Q.   -- if called as a witness?  Did you also have to forfeit

4     a substantial amount of money?

5     A.   Yes, sir.

6     Q.   Do you recall how much money?

7     A.   $650,000 cash.

8     Q.   Were you sentenced for your plea of guilty?

9     A.   Ninety months.

10    Q.   And what judge sentenced you?

11    A.   Judge Reeves.

12    Q.   Has the government made you any promises for your

13    testimony here today?

14    A.   No, sir.

15          MR. SMITH:  Can I have just a moment, Your Honor?

16          THE COURT:  Yes, sir, you may.

17    Q.   Mr. White, you said you got 90 months.  How much time

18    have you got left to serve?

19    A.   Twenty-five months, sir.

20    Q.   The FBI, before they arrested you, did they search your

21    property?

22    A.   Yes, sir.

23    Q.   And in that, did they take some documents from your --

24    A.   Yes, sir.

25          MR. SMITH:  Like to hand the witness document here,

*J. WHITE - Direct (Mr. Smith)*                                          52

1    D8.  Like to hand the witness documents from D8.

2              THE COURT:  D?

3              MR. SMITH:  D as in dog.

4              THE COURT:  D8.  Yes, sir, thank you.

5    Q.  Do you recognize those, Mr. White?

6    A.  Yes, sir, that's my handwriting.

7    Q.  Do you know when you would have made those notations?

8    A.  This would probably have been my --

9              MR. PINALES:  Objection to the word probably.

10             THE COURT:  Overruled.

11   A.  Tony Adams helped me the first time that I ever ran for

12   office.  He kept wanting me to see about -- he was a heavy

13   equipment operator, and he thought I could get him a job, and

14   I couldn't.  So after the first election, I never -- this had

15   to be the '94 election.

16   Q.  Okay.

17   A.  This had to be.  If all of them came from the same --

18   this Tony Adams.  Let me look at it a little bit further here.

19   "Call Paul Roberts."  That's my wife's uncle.  He's been dead

20   since probably the second election.

21   Q.  I'm not asking you to read them to us.  If you would,

22   just take a look at it.  I'm trying to get a time frame.

23   A.  Probably, probably I'm saying '94.

24   Q.  Did you consult Cletus Maricle in the '94 race?

25   A.  I don't think I would have consulted Cletus, because he

*J. WHITE - Cross (Mr. Westberry)*                                          53

1    was a Crawdad man and a Roy Morgan man.  So I wouldn't have

2    asked Cletus for anything in that election, I don't think.  I

3    was running against --

4    Q.   Do you know Robyn Maricle?

5    A.   When I see her, I know her.

6    Q.   Did you hire her to work in your office at the county

7    clerk's office?

8    A.   Robyn Maricle?  (Nodding negatively).

9    Q.   You'll need to make a verbal answer, sir.

10   A.   No, sir.

11            MR. SMITH:  Pass the witness.

12            MR. PINALES:  No questions.

13            THE COURT:  Thank you.  Mr. Westberry.

14            MR. WESTBERRY:  Thank you.  May I from here, Judge?

15            THE COURT:  That will be fine, yes, sir.

16                         CROSS-EXAMINATION

17   BY MR. WESTBERRY:

18   Q.   Mr. White, good afternoon.  Kent Westberry.  I'm here for

19   Doug Adams.

20   A.   Yes, sir.

21   Q.   Of course, you know Mr. Doug Adams?

22   A.   Yes, sir.

23   Q.   I want to take you back just a few years to the first

24   time that you ran for county court clerk.

25   A.   Yes, sir.

*J. WHITE - Cross (Mr. Westberry)*                                    54

1   Q.   I think you said that was in 1994?

2   A.   Yes, sir.

3   Q.   You ran --

4   A.   Ran in '93.  Took office in '94.

5   Q.   Thank you.  The actual election was in '93.  That's what

6   I thought.  Among your -- and this was in the Republican

7   primary was the principal election; is that correct?

8   A.   Yes, sir.

9   Q.   Because you're a heavily Republican county?

10  A.   Right.

11  Q.   Republicans typically win in the fall.  Candidates that

12  you were running against you were Mr. Sizemore, is that

13  correct, in the '92 primary?

14  A.   And Mr. Hooker.

15  Q.   Is that Crawdad Sizemore?

16  A.   Yes, sir.

17  Q.   And Mike Hooker?

18  A.   Yes, sir.

19  Q.   And you won that primary?

20  A.   Correct.

21  Q.   Mike Hooker is a relative of Doug Adams?

22  A.   Yes, first cousin.

23  Q.   First cousin, thank you.  Now, you had the plea agreement

24  up there in front of you, Mr. White; is that correct?

25  A.   Yes, sir.

*J. WHITE - Cross (Mr. Westberry)*                                        55

1    Q.   I think this is PA, plea agreement number 7?

2    A.   Yes, sir.

3    Q.   And you signed that back, what, in 2007, I believe?

4    2005?

5    A.   October 25th, 2005, I think.

6    Q.   I wanted to ask you just some of the specific things that

7    you admitted to doing in the plea agreement.  So --

8    A.   Repeat that?

9    Q.   Yes, some specific things that you've admitted to in the

10   plea agreement.

11   A.   Okay.

12   Q.   You indicated that you had conspired with others to

13   distribute marijuana; is that correct?

14   A.   I money laundered for Kenneth Day.

15   Q.   Do you have paragraph number A in front of you of that

16   plea agreement?  It's on the very first page.  What I'm going

17   to do, Mr. White, is just ask you some of the specific things

18   that are in your plea agreement and see if you agree with

19   them.

20        One other question.  You appeared in front of Judge

21   Reeves back in 2005 when you entered your plea; is that

22   correct?

23   A.   Yes, sir.

24   Q.   And, of course, you swore, you raised your right hand,

25   similar to today, and you swore to tell the truth?

*J. WHITE - Cross (Mr. Westberry)*                                    56

1   A.   Um-hmm.

2   Q.   Is that correct?

3   A.   Yes, sir.

4   Q.   And the statements that are contained in the plea

5   agreement are acknowledgment by you of things you actually

6   did, criminal conduct that you did.  Correct?

7   A.   Yes, sir.

8   Q.   It says that, in the first paragraph, A, in terms of the

9   amount of marijuana, it says that you distributed over 1,000

10  kilograms of marijuana, correct?

11       MR. SMITH:  Your Honor, I'm going to object.

12  Mischaracterization.

13       THE COURT:  Sustained.

14  Q.   Could you take a look at that first sentence in

15  paragraph A, Mr. White?  Take a look at it, read it, see if

16  the amount of marijuana that I just indicated is correct.

17  A.   Sir, if you ask me how much a thousand grams of marijuana

18  was in size, I wouldn't know.

19  Q.   But you did admit in the plea agreement to a thousand

20  kilograms, correct?

21  A.   Um-hmm.

22  Q.   You also said that you money laundered by taking a couple

23  of automobiles from Kenny Day, I believe; is that correct?

24  A.   I wrote him a check, three checks.

25  Q.   Right.  And the whole idea in that was to, you know,

*J. WHITE - Cross (Mr. Westberry)*                    57

1    disguise the true ownership of the automobiles; is that

2    correct?

3    A.   No automobiles on that, sir.  That was a loan.

4    Q.   Just a loan.  But the idea was to try to deceive law

5    enforcement; is that correct?

6    A.   You're going to have to rephrase that question.  The

7    checks wasn't written for three automobiles.

8    Q.   Right.  Take a look, then, on the sentence of the

9    paragraph that begins "on or about April 10, 2005."  Do you

10   see that sentence in there?

11   A.   Yes, sir.

12   Q.   It then goes on to say "Jennings White conducted a

13   financial transaction by receiving two automobiles and title

14   to the automobiles from Kenneth Day for the purposes of

15   promoting, concealing and disguising their nature, ownership

16   and control from law enforcement."  Have I read that right?

17   A.   I stored two vehicles for -- I stored two vehicles for

18   Kenny Day.

19   Q.   Let me back up.  Of course, you know who Kenny Day is,

20   correct?

21   A.   Yes, sir.

22   Q.   And you know where Kenny Day is right now?

23   A.   Yes, sir.

24   Q.   Serving a lengthy drug sentence; is that correct?

25   A.   Yes, sir.

*J. WHITE - Cross (Mr. Westberry)*                                    58

1    Q.   Go down a little bit further.  The next portion of that

2    paragraph says, you see where it begins "on or about April 14,

3    2005"?  Do you see that portion at the bottom of the page?

4    A.   Yeah.

5    Q.   It goes on to say "the defendant," you, Jennings White,

6    "conspired with Kenny Day to approach Vernon Hacker, the 911

7    director of Clay County, and offered Hacker a bribe to obtain

8    30 pounds of marijuana that was seized from somebody named

9    Thomas Eifert on April 9, 2005."  Do you see that sentence as

10   well?

11   A.   Yes, sir.

12   Q.   Now, the plan didn't work, according to the rest of the

13   plea agreement?

14   A.   Right.

15   Q.   Because later found out it was not the Manchester police

16   that was keeping 30 pounds of marijuana, but it was the

17   Kentucky State Police; is that correct?

18   A.   Right.

19   Q.   Now, Vernon Hacker, of course, you know Vernon Hacker

20   too; is that correct?

21   A.   Yeah.

22   Q.   In addition to being the 911 director of Manchester, Clay

23   County, he also served on city council, I believe, at one

24   time?

25   A.   Right.

*J. WHITE - Cross (Mr. Westberry)*                                    59

1   Q.   And he's serving a fairly lengthy sentence as well for

2   drug offenses; is that your understanding?

3   A.   Right.

4   Q.   Mr. White, the rest of the plea agreement goes on to --

5   you know, it's introduced into evidence and describes other

6   instances of money laundering that you did with Kenny Day, K&D

7   Pawn Shop, correct?  Paragraph number B, you exchanged $20,000

8   in checks for $24,000 in U.S. currency that were drug

9   proceeds?

10  A.   Yes, sir.

11  Q.   And you did that for Kenny Day; is that correct?

12  A.   Yes.

13  Q.   And Mr. Day and a fella named Terry Holland each paid you

14  $12,000 each; is that correct?

15  A.   Show me what you're talking about.

16  Q.   I'm sorry.  I don't mean to read so fast.  I'm just

17  trying to -- in the middle portion of that paragraph B, you

18  see the sentence that says "Kenneth Day and Terry Holland each

19  paid the defendant," that's you --

20  A.   Oh, yeah.

21  Q.   -- "$12,000 each"?

22  A.   They were equal partners.  Each one of them gave me

23  $2,000.

24  Q.   Or 12,000?

25  A.   Yeah, they owed me -- they gave me 24.

*J. WHITE - Cross (Mr. Westberry)*                                60

1   Q.   Okay.  They paid you 12 apiece?

2   A.   Right.

3   Q.   Okay.  Thank you.  Shift a little bit, Mr. White, from

4   what's in the plea agreement.  I want to ask you about the

5   number of seats that the clerk of the county court has on the

6   Board of Elections.  You served as two votes on the Board of

7   Elections; is that correct?

8   A.   I only had -- the clerk only has a vote when the Democrat

9   and the Republican can't agree about who's -- the clerk has no

10  votes.  If those two agree to do something, the clerk has no

11  vote.

12  Q.   But if they don't agree, the clerk breaks the tie?

13  A.   The clerk can break the tie.

14  Q.   So in those circumstances, the clerk could actually have

15  a couple of votes, correct?

16  A.   I think so.

17  Q.   Okay.  Thank you.  You said back in May of the '02

18  primary, you toured the county?

19  A.   Yes, sir.

20  Q.   Went to a number of different precincts.  Did you carry a

21  weapon with you?

22  A.   Yes, sir.  I have a weapon permit.

23  Q.   Okay.

24  A.   Conceal weapon permit.

25  Q.   A .357 Magnum?

*J. WHITE - Cross (Mr. Westberry)*                                    61

1    A.   Can I defend my answer?

2    Q.   Well, of course.

3           THE COURT:  You can explain your answer if you need

4    to.

5    Q.   Explain your answer.

6           THE WITNESS:  Is that what you're supposed to say,

7    explain?

8           THE COURT:  Yes, sir.

9    A.   I deposit $3 million a year in cash money in a bank at

10   Manchester through Wal-Mart.  And when I deposit my money, I

11   need a weapon.  So I have a conceal weapons permit.

12   Q.   Were you carrying -- were you depositing cash that

13   morning on election day?

14   A.   We deposit money five or six days a week.

15   Q.   Did you also have another kind of a weapon called a --

16   A.   Yeah, I keep a mini 14 in my vehicle.

17   Q.   I think you knew that was coming.  You said at the

18   Burning Springs precinct, you drove by; is that correct?

19   A.   Um-hmm, yes, sir.

20   Q.   Was anybody in the car with you when you drove by?

21   A.   Denver Sizemore.

22   Q.   You said you saw Doug Adams at the Burning Springs

23   precinct?

24   A.   Yes, sir.

25   Q.   You said he was wearing a Hawaiian shirt?

*J. WHITE - Cross (Mr. Westberry)*                                    62

1    A.   Yes, sir.

2    Q.   Something real colorful?

3    A.   Right.

4    Q.   You're sure about that?

5    A.   Right.

6    Q.   Did you get out at the Burning Springs precinct?

7    A.   No, sir.

8    Q.   Or did you drive by?

9    A.   I don't think so.

10   Q.   Just drove by?

11   A.   Set for a while in the parking lot.

12   Q.   Doug Adams opposed you in that 2002 primary, correct?

13   A.   Yes, sir, right.

14        MR. WESTBERRY:  Just one second, please, Your Honor.

15        THE COURT:  Yes, sir.

16   Q.   Thank you.  I want to ask you again --

17   A.   I want to ask you, what do you mean opposed?  You mean

18   that he was a candidate against me?

19   Q.   No, he opposed your reelection effort in 2002.

20   A.   Oh, yeah, that's true.

21   Q.   No question about that.  Back to the -- excuse me.  To

22   the primary when you said that you were -- had drove by

23   Burning Springs that day, Denver Sizemore was in the car with

24   you.  You said you observed Mr. Adams wearing a colorful -- a

25   Hawaiian type shirt?

*J. WHITE - Cross (Mr. Westberry)*                              63

1   A.   Um-hmm.

2   Q.   Can you give us some names of other people who you

3   recognized in the line that -- some specific names, if you

4   can?

5   A.   I'm not from that area.

6   Q.   But you served --

7   A.   As clerk, right.

8   Q.   Since, what, about '94?

9   A.   I couldn't, I couldn't, I couldn't answer that question.

10  Q.   How about any familiar faces, anybody that just a --

11  somebody that we might possibly call as a witness to see if

12  they remember the same thing.

13       MR. SMITH:   Your Honor, I'm going to object to

14  counsel's characterization.

15       THE COURT:   Sustained.

16  Q.   Any familiar faces that you recognized?

17  A.   You're asking me about something that happened eight

18  years ago.

19  Q.   Correct.  Do you remember who the election officers were

20  in the Burning Springs precinct that day, sir?

21  A.   A Sparks or Shark, Sparks.

22  Q.   Sparks?

23  A.   Bennie, Thumb Davidson.

24  Q.   These are election officers we're talking about, sir?

25  A.   Harks, Sparks or something.  There's a Davidson, Thumb

*J. WHITE - Cross (Mr. Westberry)*                          64

1    Davidson was there.  Larry Sizemore was there.

2    Q.  Okay.

3    A.  Larry Sizemore.  I think Thumb Davidson.  Parks.  Was

4    there a Parks or Sparks?

5    Q.  What time of day were you talking about when Denver

6    Sizemore were there?  Rough estimate.  Early morning, late

7    day?

8    A.  8:00 to 10:00, I'd say.  Between 8:30, 10:30, something

9    like that.  Don't know for sure.

10   Q.  All right.  Any other names that you recognize?  Any

11   other names that you can recall before I set down?

12   A.  Of the --

13   Q.  Being at the Burning Springs precinct.

14   A.  In the line?

15   Q.  Yes.

16   A.  No, sir.

17        MR. WESTBERRY:  Just one second.

18   Q.  When you saw Mr. Adams wearing the Hawaiian shirt that

19   you've described, if you know, could you see if the election

20   officers were also watching him?

21   A.  The election officers were inside the building.  They --

22   the line was on the outside.  I didn't go in the building.

23   Q.  But I think you said you recall that Mr. Adams in this

24   Hawaiian shirt, he was sort of working the line?

25   A.  Um-hmm.

*J. WHITE - Cross (Mr. White)*                                    65

1    Q.  A lot of different people?

2    A.  Um-hmm.

3            MR. WESTBERRY:  Thank you very much.  That's all,

4    Judge.  Thank you.

5            THE COURT:  All right.  Thank you.  Mr. White.

6            MR. WHITE:  Yes, Your Honor.  I don't have very many.

7                          CROSS-EXAMINATION

8    BY MR. WHITE:

9    Q.  My name's Scott White.  I represent Wayne Jones.  Can you

10   hear me okay from here?

11   A.  (Nodding affirmatively).

12   Q.  Sir?

13   A.  Um-hmm.

14   Q.  Just a few questions.  One, you testified or did you

15   testify on direct that there were only two people in 2002 that

16   had given you money.  That was Barbara White Colter and Edd

17   Jordan?

18   A.  Yes, sir.

19   Q.  Kennon White did not also give you money?

20   A.  No, sir.

21   Q.  Was that the election he ran for jailer?

22   A.  Yes, sir.

23   Q.  Does the county clerk, is that person chairperson of the

24   County Board of Elections?

25   A.  Right.

*J. WHITE - Cross (Mr. White)*                                    66

1  Q.   And in 2002, County Board of Elections would have been

2  yourself, correct?

3  A.   Um-hmm.

4  Q.   Was Edd Jordan on at that time as the sheriff?

5  A.   Well, the sheriff has sort of got an honorary thing.

6  He's not even allowed to serve on it, but they let him serve.

7  He's not got in with the law, he doesn't have no position on

8  that board, I don't think.  I'm not an attorney.  I even had

9  the discussion with Wayne.  He says, we'll let Edd serve.  He

10 says, I like Edd so we'll let Edd serve on the committee.

11 Four-person committee.

12 Q.   So it's your testimony that Mr. Jones had to agree to let

13 Mr. Jordan serve on the election commission?  I'm sorry, the

14 Board of Elections.

15 A.   Well, when I came to be clerk, the sheriff and the clerk

16 and the Democrat and Republican all four served.  Come to find

17 out, Edd didn't want no -- for certain things maybe.  But when

18 it come down to voting on who was going to be officers, if the

19 Democrat and the Republican chairman voted together, the clerk

20 had no vote.

21 Q.   And is it your testimony that's your understanding of the

22 law?

23 A.   Sir, this has been eight years ago.

24 Q.   Let me ask you this.  Is it the Board of Elections that

25 selects where the precincts are located, if you know?

*J. WHITE - Cross (Mr. Abell)*                                    67

1    A.   The Board of Elections.  No, that is left up to your

2    county government to select the precincts.

3    Q.   Fiscal court?

4    A.   Fiscal court selects the precincts.  They can rearrange

5    the precincts.

6    Q.   In the 2002 primary election, when you were running for

7    county clerk, did you testify that you saw Elijah Gross's wife

8    sell her vote at the Horse Creek?

9    A.   They pulled right in front of the voting precinct, where

10   you walked in the school with the line, parked their pickup

11   truck, went in and voted.  The three came back.  Wayne came up

12   to the truck and paid them in money.  I saw that.

13   Q.   Did you have any relatives at the Horse Creek precinct

14   that day?

15   A.   My uncle was election officer inside.  That's Earl White.

16   Q.   Mr. White, was your mother at that precinct, if you

17   recall?

18   A.   She votes at that precinct.  I didn't -- I don't think --

19   I didn't see her.

20        MR. WHITE:  I have no further questions, Your Honor.

21   Thank you, Mr. White.

22        THE COURT:  Thank you.  Mr. Abell?

23                    CROSS-EXAMINATION

24   BY MR. ABELL:

25   Q.   Mr. White, my name is Robert Abell, and I represent

*J. WHITE - Cross (Mr. Abell)*                                           68

1    William Stivers in this case.

2    A.   Yes, sir.

3    Q.   Prior to the fall election in 2002, you appointed as

4    deputy clerks Pauline and Homer Weaver; is that correct?

5    A.   I appointed --

6    Q.   As deputy clerks in your office, Pauline and Homer

7    Weaver?

8    A.   Deputy clerks.

9    Q.   Mother and father of Dobber Weaver.

10   A.   A deputy clerk can be anyone that you -- you can make

11   anyone a deputy clerk to sign papers.

12   Q.   Well --

13   A.   That doesn't mean if they -- I don't know where you're

14   coming from.  You'll have to explain yourself.

15   Q.   That's my question.  I'm not coming from anywhere except

16   asking the question.  Is it correct -- I'll try again.  Is it

17   correct that prior to the November 2002 election, you, as Clay

18   County clerk, appointed Pauline and Homer Weaver as deputy

19   clerks of your office?

20   A.   Deputy clerk of my office.  A deputy clerk -- can I try

21   to explain?  I may not know.  I never tried to be a very --

22   Q.   It's intended to be a yes or no question.  So yes or no,

23   did you appoint Mr. and Mrs. Weaver as deputy clerk?

24   A.   I don't -- I can't remember that.

25   Q.   Do you recall, Dobber Weaver, do you know if his real

*J. WHITE - Cross (Mr. Abell)*                                    69

1    name's Charles?

2    A.   I didn't know his real name.

3    Q.   Okay.  Do you recall that Charles Dobber Weaver was

4    running for school board in the November, 2002 election?

5    A.   The fall election?  After the May election, sir, I never

6    came to the office during the day until the day of the voting

7    in the fall election.  My clerks could make anyone -- my clerk

8    could have made anyone a deputy clerk.  A deputy clerk is

9    someone who sort of signs a paper.  It's got no position.  I

10   don't know what you call a deputy clerk.

11   Q.   All right.  Is it your --

12   A.   We didn't pay them.  They didn't work in my office.  The

13   girl in the office could have made them deputy clerk.  As far

14   as I know, I just don't understand what -- I know what a

15   deputy clerk is.

16        One old guy comes up every time, and he wants us to make

17   him deputy clerk so he can take this little thing and show his

18   people, I'm a deputy clerk.  We don't pay him.  He don't work

19   in our office.  He's got nothing to do with us.  I don't know

20   why the state allows you to do such a thing.

21   Q.   Tell me if this is fair --

22   A.   I can't remember signing any paper.  Show me the paper,

23   let me see my signature.

24   Q.   Tell me if this is fair.  As best you can recall today,

25   you don't know whether Pauline or Homer Weaver served or

*J. WHITE - Cross (Mr. Abell)*                                    70

1    worked as deputy clerks in your office prior to the November,

2    2002 election; is that fair?

3    A.   Like I say, when the votes were counted in May, I never

4    came back till the day they voted in the fall.

5    Q.   And to be clear about that point, from primary election

6    day in May 2002 until general election day in November 2002,

7    you were at no time --

8    A.   Best I remember --

9    Q.   Let me finish --

10   A.   -- I don't think I was.  If I did, it was over one time.

11   If they were made deputy clerks, I don't remember it.  You

12   would have to show me where I signed the paper myself to make

13   them deputy clerks before I could say that I made them deputy

14   clerks.

15   Q.   Do you remember being in your office, Clay County clerk's

16   office shortly before the November, 2002 election when my

17   client, Mr. Stivers, got arrested by Todd Roberts?

18   A.   When the drunk came in, yes, I was there, sir.

19   Q.   So one day, at least, between the two election days, you

20   were.

21   A.   The morning --

22   Q.   And that was when Mr. Stivers was arrested?

23   A.   The morning of the election.

24   Q.   Okay.

25   A.   I think.

*J. WHITE - Cross (Mr. Abell)*                                          71

1    Q.   Do you recall having a discussion that day that Mr.

2    Stivers was arrested with Mr. Stivers regarding Mr. and Mrs.

3    Weaver serving as deputy clerks?

4    A.   I do not remember that, sir.

5    Q.   Okay.  On primary election day in 2002, did you drive

6    around the county to various precincts with Denver Sizemore?

7    A.   I think I drove maybe by the Horse Creek, Pigeon Roost,

8    Whites Branch precinct, which is in one building.  I drove by

9    the pool room at the Paces Creek precinct.  I drove to the

10   Burning Springs precinct.  I drove by the Manchester, Harts

11   Branch precinct, which is in front, which is in the middle

12   school.  Then, of course, the precinct where my office was at.

13   That's the ones that I went to.

14   Q.   Okay.  So not every precinct, but quite a number of

15   precincts that you just described?

16   A.   Well, there's --

17   Q.   Is that fair?

18   A.   Well, let's count them.  There's one, four, seven, eight

19   precincts out of 20.

20   Q.   At the Horse Creek precinct, you saw Charles Stivers

21   there?

22   A.   Yes, sir.

23   Q.   And you saw Jeff Farmer?

24   A.   Charles Stivers, not Al Man.  Charles Stivers.

25   Q.   Yes, sir, that's right.  Charles Stivers.

*J. WHITE - Cross (Mr. Abell)*                                      72

1    A.   Charles Stivers, Wayne Jones, Jeff Farmer.

2    Q.   Denver Sizemore was with you?

3    A.   With me, yes, sir.

4    Q.   Did you suggest at the Horse Creek precinct that day,

5    primary election day 2002, that Denver Sizemore shoot Charles

6    Stivers?

7    A.   No, sir.

8    Q.   Did your van get shot up shortly before --

9    A.   Yes, sir.  Can I explain that, sir?

10   Q.   It's a yes or no question.  I'll ask you another

11   question.

12   A.   I'll answer the question if I can explain my answer.

13   Q.   But your van did get shot up shortly before the May, 2002

14   election?

15   A.   Yes, sir.

16   Q.   And it was, in fact, a shooting you staged with a guy

17   named Uncle Bud, Roger Smith, correct?

18   A.   Yes, sir.

19   Q.   All right.  Did you offer Denver Sizemore $25,000 to

20   shoot a man named Billy Rowland Phillips?

21   A.   No, sir.

22   Q.   My client, Mr. Stivers, opposed your reelection for clerk

23   in May, 2002?

24   A.   Yes, sir.

25            MR. ABELL:  That's all, Judge.

*J. WHITE - Cross (Mr. Richardson)*                           73

1            THE COURT:  Thank you.  Mr. Richardson.

2            MR. RICHARDSON:  Thank you, Judge.

3                      CROSS-EXAMINATION

4     BY MR. RICHARDSON:

5     Q.  Mr. White, my name is Tucker Richardson, I'm one of the

6     attorneys who represents Freddy Thompson.  I have just a

7     couple questions.  Do you recall being asked on direct who

8     organized the resistance to your reelection bid?

9     A.  Yes, sir.

10    Q.  And you mentioned Doug Adams, Wayne Jones and Al Man?

11    A.  Yeah.

12    Q.  You didn't mention Freddy Thompson, did you?

13    A.  No, sir.

14            MR. RICHARDSON:  No further questions.  Thank you

15    very much.

16            THE COURT:  Mr. Gilbert?

17            MR. GILBERT:  No questions, Your Honor.

18            THE COURT:  Miss Hughes?

19            MS. HUGHES:  No, sir, thank you.

20            THE COURT:  Mr. Simons?

21            MR. SIMONS:  Your Honor, I don't have any questions

22    for Mr. White.

23            THE COURT:  Thank you.  See if there's any direct of

24    the witness.  Mr. Smith?

25            MR. SMITH:  No.  Thank you, Your Honor.

*J. WHITE - Cross (Mr. Richardson)*                                    74

1           THE COURT:  Let me ask if any of the defendants have

2    questions on matters raised by the other defendants?

3           MR. WHITE:  None.

4           THE COURT:  No?

5           MR. ABELL:  No, Your Honor.

6           THE COURT:  Thank you.

7           THE WITNESS:  Is that it?

8           THE COURT:  You can step down, sir.  Thank you.  Mr.

9    Smith, we're going to take another break in just a moment

10   before the next witness is called.  We've already taken one

11   afternoon break.  We'll take a shorter break until 3:00,

12   ladies and gentlemen.  Please keep in mind the admonition that

13   you were given previously not to discuss the case among

14   yourselves, and the jury will be excused until 3:00.

15           (The jury left the courtroom at 2:45 p.m.)

16           THE COURT:  Anything to take up outside the presence

17   of the jury?  We'll be in recess until 3:00.

18           (Recess from 2:46 p.m. until 2:59 p.m.)

19           (The jury entered the courtroom at 2:59 p.m.)

20           THE COURT:  Thank you.  The record will reflect that

21   all members of the jury are present.  The parties and counsel

22   are also present.  Mr. Parman, will you be calling the next

23   witness?

24           MR. PARMAN:  Yes, Your Honor.

25           THE COURT:  You may proceed.

*M. WHITE - Direct (Mr. Parman)*                                    75

1              MR. PARMAN:  United States calls William Michael

2     White.  While the witness is being brought in, the United

3     States did not move to enter into evidence Government's

4     Exhibit PA7.  I want to do so at this time.

5              THE COURT:  Any objection?  That's the plea

6     agreement.

7              MR. PINALES:  No.

8              THE COURT:  PA7 will be admitted at this time.

9                    (Government Exhibit No. PA7

10                    was admitted into evidence.)

11        WILLIAM MICHAEL WHITE, GOVERNMENT'S WITNESS, SWORN

12             THE COURT:  You may proceed.

13             MR. PARMAN:  Thank you, Your Honor.

14                    DIRECT EXAMINATION

15    BY MR. PARMAN:

16    Q.  Good afternoon, sir.

17    A.  Good afternoon.

18    Q.  Could you state your name for the record?

19    A.  William Michael White.

20    Q.  Sir, how old are you?

21    A.  Forty-four.

22    Q.  Where do you live?

23    A.  Manchester.

24    Q.  What county is Manchester in?

25    A.  Clay County.

*M. WHITE - Direct (Mr. Parman)*                                      76

1    Q.  How long have you lived there in Manchester?

2    A.  All my life.

3    Q.  Are you married?

4    A.  Yes.

5    Q.  Do you have any kids?

6    A.  Yes.

7    Q.  How many kids have you got?

8    A.  Three.

9    Q.  Sir, where do you work?

10   A.  City of Manchester.

11   Q.  What do you do for the City of Manchester?

12   A.  General supervisor.

13   Q.  What role does the general supervisor play for the City

14   of Manchester?

15   A.  Oversee all the water, sewer and garbage and city

16   streets.

17   Q.  How long have you worked in that capacity?

18   A.  Going on eight years.

19   Q.  Sir, while working in that capacity, did you become aware

20   that private driveways were being paved there in the City of

21   Manchester?

22   A.  Yes.

23   Q.  Could you share with the jury the circumstances

24   surrounding the paving of those private driveways?

25   A.  I don't understand your question.

*M. WHITE - Direct (Mr. Parman)*                          77

1   Q.   Well, let me rephrase.  You said you became aware that

2   private driveways are being paved?

3   A.   Yes.

4   Q.   Were those private driveways being paved with City money?

5   A.   Yes.

6   Q.   How many of those driveways were being paved in such a

7   manner?

8   A.   I think there was 14 to 16, somewhere in that number.

9   Q.   Are you familiar with private driveway leading up to the

10  house of Ella Wagers?

11  A.   Yes.

12  Q.   Was that private driveway paved with City money?

13  A.   Yes.

14  Q.   Who was in charge of seeing that these private driveways

15  were paved with City money?

16  A.   I couldn't hear you.

17  Q.   Who was it that led the effort to have these private

18  driveways paved with City money?

19  A.   Darnell Hipsher.

20  Q.   What position did Darnell Hipsher hold at the time?

21  A.   He was a city council member.

22  Q.   Was there anybody else there within the City of

23  Manchester that helped Mr. Hipsher in those efforts?

24  A.   Kennon White and the mayor at the time, Doug White.

25  Q.   So Kennon White, Doug White and Darnell Hipsher were all

*M. WHITE - Direct (Mr. Parman)*                                    78

1    involved?

2    A.   Yes.

3    Q.   Are you aware of whether or not this scheme to pave the

4    private driveways was found out or that others outside of the

5    City became aware of it?

6    A.   I couldn't hear you.

7    Q.   Were you aware of whether or not the scheme to pave

8    private driveways was learned of by state officials or anybody

9    else?

10   A.   Yes.

11   Q.   Explain or share with the jury what you found out.

12   A.   The state auditors come in and started doing the audit,

13   and they got to questioning about the driveways.

14   Q.   What happened then?

15   A.   The people that got the driveways blacktopped was sent a

16   bill for the blacktop.

17   Q.   What was the bill amount?  Was the bill amount for the

18   full value of the blacktop?

19   A.   No.

20   Q.   Based on your job, what percentage, in your estimation of

21   the value of the actual blacktop, was actually billed to the

22   people who had their driveways paved?

23   A.   Less than half.

24   Q.   Sir, to your knowledge, why was the driveways of these

25   individuals being paved?

*M. WHITE - Direct (Mr. Parman)* 79

1   A.   Best of my knowledge?

2   Q.   Yes, sir.

3   A.   Favoritism.

4   Q.   Do you know what favoritism they were doing it for?

5   A.   To get the people to vote for them.

6   Q.   Are you aware of how many people live in the house of

7   Ella Wagers?  Is that a large family up there on that land?

8   A.   Yes, there's quite a few people live there.  I think

9   there was -- I'd heard there's about 14 people live there.

10   Q.   Now, sir, also by virtue of your employment there at the

11   City of Manchester, do you oversee private contracts that are

12   awarded to individuals or businesses working for the City?

13   A.   Yes.

14   Q.   Have you overseen contracts that have been awarded to B&B

15   Excavating?

16   A.   Yes.

17   Q.   And who owns B&B Excavating?

18   A.   Stanley Bowling.

19   Q.   What are some of the contracts that B&B Excavating has

20   been awarded since you've been working there, supervising in

21   the City?

22   A.   They've done water line jobs, sewer line jobs and pump

23   station replacement.

24   Q.   Now, on the sewer line job that you're referencing, was

25   there an emergency declared when that bid was awarded?

*M. WHITE - Direct (Mr. Parman)*                                        80

1    A.   On one of them, yes, sir.

2    Q.   Now, when emergencies are declared, who declares these

3    emergencies?

4    A.   The mayor.

5    Q.   And when there is an emergency declared, does the normal

6    bidding process occur?

7    A.   No.

8    Q.   What happens?

9    A.   They find somebody to do the job, and they go do it.

10   Q.   Now, on this sewer line job that B&B Excavating did, I

11   believe you testified an emergency was declared; is that

12   right?

13   A.   Yes.

14   Q.   In your mind, was there actually an emergency that caused

15   that?

16   A.   No.

17   Q.   Why?

18   A.   Because they had the same problem out there for the last

19   two or three years, a little while longer.

20   Q.   What was the problem with the sewer line?

21   A.   Sewer line kept stopping up and running over.

22   Q.   And it had been doing that for a long period of time?

23           MR. SIMONS:  Your Honor please, I can't hear.

24           THE COURT:  You'll need to adjust that microphone a

25   little bit closer to you, if you could.  You can pull it in.

*M. WHITE - Direct (Mr. Parman)*                                            81

1    Thank you.

2    Q.   Sir, if you could, maybe move a little forward and speak

3    into the microphone so everybody can hear you.

4    A.   Okay.

5    Q.   We were talking about the sewer line project that was

6    performed by Stanley Bowling through B&B Excavating?

7    A.   Yes.

8    Q.   And you were answering whether or not you thought it was

9    an emergency.  If you could answer?

10   A.   The sewer line had been running over for two or three

11   years on and off.  They probably could have waited a little

12   longer, my opinion.

13   Q.   So it wasn't a situation where you had a sudden breakage

14   or anything like that?

15   A.   No.

16   Q.   Now, on the contracts through B&B Excavating, did you

17   ever notice an incident where B&B Excavating was using City

18   equipment on the B&B Excavating job?

19   A.   Yes.

20   Q.   And what instance was that?

21   A.   It was on a sewer line project.

22   Q.   On what, sir?

23   A.   Sewer line project.

24   Q.   And what equipment was B&B Excavating using that was the

25   City's equipment?

*M. WHITE - Direct (Mr. Parman)*                                    82

1    A.   Excavator.

2    Q.   And what was the excavator doing in the project?

3    A.   It was hammering rock.

4    Q.   Now, is it normal for a private contractor to use City

5    equipment on a job?

6    A.   No.

7    Q.   Have you ever seen a private company or a private

8    individual use City equipment on a job they were performing?

9    A.   Not that I remember.

10   Q.   Now, you oversaw other projects that was done by B&B

11   Excavating; is that accurate?

12   A.   Yes.

13   Q.   Are you also then familiar with change orders?

14   A.   Yes.

15   Q.   What is a change order, sir?

16   A.   Change order is when you have a project and need to add

17   something to the project, you have to do a change order to do

18   that.

19   Q.   And does change orders entail asking for more money?

20   A.   Yes, it's the same thing.  Just doing more work for more

21   money.

22   Q.   And when a private company that's doing work for the City

23   is requesting more money for the project, then they -- that's

24   accomplished through a change order?

25   A.   Yes.

*M. WHITE - Direct (Mr. Parman)*                                    83

1   Q.   Was it common on jobs performed by B&B Excavating for

2   change orders to be requested?

3   A.   On sewer line -- sewer pump station repairs, they done

4   some change orders on them.

5   Q.   Were there a lot of change orders?

6   A.   Three.  Three different pump stations.

7   Q.   Is change orders a common occurrence on all contracts?

8   A.   No.  Less change orders you have, the better the job

9   goes.

10  Q.   Through your employment at the City of Manchester, have

11  you seen any company that had more change orders than B&B

12  Excavating?

13  A.   More?

14  Q.   Yes.  That requested more change orders than B&B

15  Excavating.

16  A.   Not that I remember.  Sometimes you have a lot, sometimes

17  you don't.

18  Q.   But did you find that in contracts that were being

19  performed by B&B Excavating that there was, in your opinion,

20  an uncommon amount of change orders that were requested?

21  A.   They done three on that one job.

22  Q.   And were they all approved?

23  A.   Yes.

24  Q.   Through who?

25  A.   I can't hear you.

*M. WHITE - Direct (Mr. Parman)* 84

1    Q.   Who approved them?

2    A.   Who approved the change orders?

3    Q.   Yes, sir.

4    A.   I would say the mayor and probably me.

5         MR. SIMONS:  Your Honor, I'm sorry.  I still couldn't

6    hear the last answer.

7         THE COURT:  If you could repeat that, please.

8         THE WITNESS:  Repeat what I said?

9         THE COURT:  Yes.

10   A.   Me and the mayor probably approved it.

11   Q.   Sir, are you aware of an incident where City equipment

12   was retrieved from the residence of Doug Adams?

13   A.   Yes.

14   Q.   What type of equipment was retrieved from his residence?

15   A.   Bulldozer.

16   Q.   And why was it retrieved from his residence?

17   A.   Go get it worked on.

18   Q.   Do you know how it got there to begin with?

19   A.   Yes.  We took it.

20   Q.   The City?

21   A.   Yes, the City.

22   Q.   Do you know what purpose it was going to be used for?

23   A.   I don't know.  Only thing what I heard, make deer roads

24   or something.

25   Q.   Now, was the diesel and the repairs -- start with the

*M. WHITE - Direct (Mr. Parman)*                                    85

1    diesel.  The fuel that was in the bulldozer, who provided

2    that?

3    A.   When we took it down there, it was filled up by the City.

4    Q.   And there were repairs that were necessary after you

5    picked it up?

6    A.   Yes.

7    Q.   Who paid for the repairs?

8    A.   The City of Manchester.

9    Q.   Do you know who authorized it to be taken down there to

10   begin with?

11   A.   Down to --

12   Q.   Doug Adams.

13   A.   Kennon White called and told me to have it sent down

14   there.

15   Q.   To your knowledge, do you know why that was done?

16   A.   No.

17   Q.   In the course of your employment, did you also oversee a

18   contract for garbage collection?

19   A.   Yes.

20   Q.   And who collected the garbage for the City of Manchester?

21   A.   We collected garbage and took it to B&J Transfer.

22   Q.   Do you know who owns B&J Transfer?

23   A.   Bart Morris.

24   Q.   Has the City recently changed the method by which they

25   dispose of their garbage?

1    A.   We take it all to London now.

2    Q.   Sir, are you aware of savings that has occurred since the

3    City of Manchester now directly hauls their garbage to London?

4    A.   Yes.

5    Q.   How much does the City save annually?

6    A.   60 to 65 thousand.

7    Q.   Do you know how much per ton B&J Transfer was charging

8    for the collection of garbage and to transfer it?

9    A.   Yeah, it was around $50.

10   Q.   Fifty dollars a ton?

11   A.   Yes.

12   Q.   And how much does London charge once you take it there?

13   A.   It's between 26 and 27 dollars.

14   Q.   Now, you said the savings was 60 to 65 thousand dollars.

15   Does that also take into consideration the wear and the tear

16   on your garbage trucks, driving to London?

17   A.   No.

18   Q.   How much wear and tear -- what's the value of the wear

19   and tear that occurs on your vehicles from directly

20   transporting the garbage to London?

21        MR. GILBERT:  Objection, Your Honor.

22        THE COURT:  Counsel, I'll sustain the objection, but

23   you'll be precluding cross-examination on the issue.  So

24   sustained.

25   Q.   How far is it from the city to the landfill in London?

*M. WHITE - Cross (Mr. Westberry)*                                   87

1   A.   It's less than 20 miles one way.

2   Q.   And by your estimation, the City saves $65,000 per year

3   by doing the new method?

4   A.   Yes, that's average savings.

5           MR. PARMAN:  Your Honor, may I have just a moment?

6           THE COURT:  Yes.

7   Q.   Sir, one further question.  While you were employed there

8   with the City, did you oftentimes see Kennon White with

9   Stanley Bowling?

10  A.   Yes.

11  Q.   And did you see Kennon White and Stanley Bowling together

12  while Mr. Bowling was bidding for -- or not rather bidding

13  for, but was performing contracts for the City?

14  A.   Yes.

15          MR. PARMAN:  That's all I have, Your Honor.  Thank

16  you.

17          THE COURT:  All right.  Thank you.  Mr. Hoskins?

18          MR. HOSKINS:  No questions, Your Honor.

19          THE COURT:  Mr. Westberry?

20          MR. WESTBERRY:  Just a couple from here, if I may.

21          THE COURT:  Yes.

22                        CROSS-EXAMINATION

23  BY MR. WESTBERRY:

24  Q.   Good afternoon, Mr. White.  I'm Kent Westberry.  I'm one

25  of the attorneys for Doug Adams.

*M. WHITE - Cross (Mr. Westberry)*                               88

1   A.   Yes.

2   Q.   I want to ask you some questions about the bulldozer that

3   you were talking about just a minute ago.  Mr. White, is it

4   your understanding that the bulldozer that you took out to Mr.

5   Adams' farm, that was a privately owned dozer owned by Daugh

6   White?

7   A.   Yes.

8   Q.   It wasn't a City-owned dozer; is that correct?

9   A.   No, the City didn't own it, no.

10  Q.   Were the tracks on that dozer fairly worn before they got

11  out to Mr. Adams' farm?

12  A.   Yes.

13  Q.   Okay.  Do you know whether Mr. Adams had to make some

14  repair work on his own?

15  A.   I don't know.

16  Q.   After the dozer was used at the Adams farm, is it your

17  understanding that it was taken then to Mike Bishop's place?

18  Do you know?

19  A.   I don't know.

20  Q.   Do you know if it was taken to Brad Stephens' place, to

21  his farm or property to do some dozer work as well?

22  A.   I don't know.

23  Q.   Did you say that it was Kennon White, did I hear that

24  right, it was Kennon that sent the dozer out to the Adams

25  farm?

*M. WHITE - Cross (Mr. Gilbert)*                                89

1    A.   Yes, sir.

2    Q.   Do you know if Mr. Adams ever asked that that dozer be

3    brought out there anyway, or do you know?

4    A.   I don't know.

5              MR. WESTBERRY:  Thank you, sir.  Appreciate it.

6              MR. WHITE:  No questions, Your Honor.

7              THE COURT:  Thank you.

8              ABELL:  No questions, Judge.

9              MR. RICHARDSON:  No questions.

10             THE COURT:  Thank you.  Mr. Gilbert?

11             MR. GILBERT:  Just a few, Your Honor.

12                       CROSS-EXAMINATION

13   BY MR. GILBERT:

14   Q.   Mr. White, I'm Jerry Gilbert.  I represent Bart Morris.

15   You testified that the price paid B&J Transfer was $50 a ton?

16   A.   Yes.

17   Q.   Are you sure about that?  Is it $46 a ton?

18   A.   Last one I figured for was right around 50 dollars, 49 or

19   50 dollars.

20   Q.   How long has it been $50 a ton?

21   A.   We ain't took any over since May of last year.

22   Q.   How long was it $50 a ton before the City stopped taking

23   the trash to the transfer station?

24   A.   I don't know for sure.

25   Q.   As far as you know, it's always been $50 a ton?

*M. WHITE - Cross (Mr. Gilbert)*                                          90

1    A.   I think original contract started out as 46, like you

2    said, but it goes up so much after that.

3    Q.   But that would be reflected in the records; would it not?

4    A.   Yes.

5    Q.   Have you reviewed the records before you came and

6    testified here today?

7    A.   Not since last year, I haven't.

8    Q.   Does the $27 that's charged by the landfill include the

9    state fee?

10   A.   Yes.

11   Q.   Are you aware of any cost benefit analysis that's been

12   undertaken by the City with respect to the savings that you

13   testified here today?

14   A.   Excuse me?

15   Q.   Are you aware of any cost benefit analysis that's been

16   done by the City with respect to the savings that you've

17   testified here today?

18   A.   I don't understand your question.

19   Q.   Well, are you aware of any study that's been done to

20   compare the cost of using the trucks or using the transfer

21   station to haul the garbage to the landfill?

22   A.   Saving $65,000 a year.

23   Q.   And was there a study done or an analysis done by anyone

24   to arrive at that?

25   A.   No.  You can subtract it and figure it out.  I figured it

*M. WHITE - Cross (Ms. Hughes)*                                    91

1    out on the paper, the bills.

2            MR. GILBERT:  Thank you.

3            THE COURT:  Miss Hughes?

4            MS. HUGHES:  Thank you, Your Honor.

5                     CROSS-EXAMINATION

6    BY MS. HUGHES:

7    Q.  Mr. White, you testified when you first were asked

8    questions about paving.  Do you recall that?

9    A.  Yes.

10   Q.  Are you familiar with the people whose driveways were

11   paved in addition to Miss Wagers?

12   A.  Yes.

13   Q.  Are you familiar with Mr. Rader and the people on

14   Singleton Road having their driveways paved?

15   A.  Yes.

16   Q.  All right.  Do you know my client, Debbie Morris?

17   A.  Yeah, I know her when I see her.

18   Q.  Are you aware that she also has a home on Singleton Road,

19   Town Branch area?

20   A.  Yeah, I think she has a rental house there.

21   Q.  And are you aware she has the only house on Singleton

22   Road whose driveway is not paved?

23   A.  She's probably right about that.

24           MS. HUGHES:  Thank you.

25           THE COURT:  Mr. Simons?

*M. WHITE - Cross (Mr. Simons)*                                      92

1          MR. SIMONS:  Your Honor please, I'm going to use the

2    podium.

3          THE COURT:  Yes, sir, that's fine.

4                    CROSS-EXAMINATION

5    BY MR. SIMONS:

6    Q.   Afternoon, Mr. White.  My name is Dan Simons.  I

7    represent Stanley Bowling.  You know Stanley --

8    A.   Yeah.

9    Q.   -- correct?  Your job title now is city supervisor?

10   A.   Yes.

11   Q.   And you've held that position since what year, '02?

12   A.   Yes.

13   Q.   And just prior to your holding that position, it was held

14   by Wes Hacker --

15   A.   Yes.

16   Q.   -- is that correct?  And is it a fair statement to say

17   that Kennon White kind of leap-frogged ahead of you into a

18   city manager job?

19   A.   Yes.

20   Q.   Okay.  Did you consider Kennon White to be your boss?

21   A.   I had to.

22   Q.   Understood.  If he told you to do something, you had to

23   do it?

24   A.   Yes.

25   Q.   Is that fair enough?  And you didn't feel any freedom to

*M. WHITE - Cross (Mr. Simons)*                          93

1    deviate from what he told you to do --

2    A.   No.

3    Q.   -- as a City employee, did you?

4    A.   No.

5    Q.   Okay.  Now, I want to talk for just a second about the

6    sewer line that was declared an emergency.  Okay?

7    A.   Okay.

8    Q.   Now, you said that the plan -- do you know who did the

9    plans for that job?

10   A.   Sewer line job?

11   Q.   Yes, sir.

12   A.   One on the river?

13   Q.   Yes, sir, the one that was declared an emergency.  Do you

14   know who did the engineering plans?

15   A.   I can't remember.  I think it was Larry Cann.

16   Q.   I think that's correct.  That was done --

17        MR. SMITH:  Object.

18        THE COURT:  Sustained.

19   Q.   Do you know when the plans were done?

20   A.   No.

21   Q.   You know it was a substantial time, though, before the

22   work was actually done by B&B Excavating; was it not?

23   A.   I don't know when the plans were done.

24   Q.   I'm sorry.

25   A.   I don't know when the plans was actually drawed up.

1    Q.   Do you know the nature of the problem on Goose Creek

2    River?

3    A.   With the sewer line?

4    Q.   Yes.

5    A.   Yes.

6    Q.   What was it?  Tell the jury what the problem was.

7    A.   It would stop up, run over, run into the river.

8    Q.   And raw sewage ran directly into the river; did it not?

9    A.   Right.

10   Q.   In fact, you took pictures of that; did you not?

11   A.   Someone did.

12   Q.   Do you know where those pictures are?

13   A.   Do I know where they are?

14   Q.   Yes, sir.

15   A.   No, I don't.

16   Q.   Is it not true that the raw sewage rolls right into the

17   river, and just downriver the City's intake is for city water?

18   A.   Yes.

19   Q.   So raw sewage was dumping out into the river, flowing

20   shortly downstream and being sucked into the intake for people

21   to cook with, wash their clothes with, take their baths out,

22   right?

23   A.   When the pumps were on, yes.

24   Q.   I'm sorry?

25   A.   When the river pumps were on, yes.

*M. WHITE - Cross (Mr. Simons)*                                    95

1    Q.   And that happened frequently, didn't it?

2    A.   Line run over?

3    Q.   Yes, sir.

4    A.   Yes.

5    Q.   Now, would you not consider that an emergency?

6    A.   It's based on how many times it runs over during a period

7    of time.

8    Q.   Would you agree with me that it's reasonable that some

9    people might consider that an emergency?

10   A.   Yes, some people would, yes.

11   Q.   Thank you.  Now, during the years 2004 to 2006, you were

12   the city supervisor at all times; were you not?

13   A.   Yes.

14   Q.   Okay.  And you retain that position today?

15   A.   Yes.

16   Q.   Okay.  Now, between 2004 and 2006, B&B Excavating was not

17   the only contractor in the city doing sewer line and water

18   line work, were they?

19   A.   No.

20   Q.   Okay.  Who else did some?

21   A.   Simon Construction did some.

22   Q.   Did Laurel Construction do some?

23   A.   They done water line.

24   Q.   How about Clay Pipeline?

25   A.   Water line.

*M. WHITE - Cross (Mr. Simons)*                                    96

1    Q.   Okay.  But there were multiple contractors working for

2    the City, correct?

3    A.   Yes.

4    Q.   Now, when you first became the city manager in 2002 --

5    city supervisor, I'm sorry.  That's the wrong title.  City

6    supervisor.  You were in charge of water, sewer, streets,

7    garbage also?

8    A.   Yes.

9    Q.   Okay.  And you didn't have anything to do with the

10   police, right?

11   A.   No.

12   Q.   And still don't?

13   A.   No.

14   Q.   Okay.  Now, you were new to that job.  Did you have

15   experience in water lines and sewer lines and things like

16   that?

17   A.   I had background in survey.

18   Q.   Okay.  In surveying?

19   A.   Yeah, used to work for a coal company.

20   Q.   Did you find it, on occasion, necessary to consult

21   someone about problems that the City had with sewer and water

22   lines?

23   A.   Yes.

24   Q.   And did you call on Stanley Bowling for advice?

25   A.   Few times I did, yes.

M. WHITE - Cross (Mr. Simons)                                    97

1   Q.   Did he help you when you called and asked him to help

2   you?

3   A.   Yes, he did.

4   Q.   Was he responsive every time you needed help on fixing

5   the sewer --

6              MR. PARMAN:  Going to object, Your Honor.

7              THE COURT:  Sustained.

8   Q.   All right.  You talked about a little bit about change

9   orders.  You mentioned that on one job, that there was a

10  series of three change orders on a job, correct?

11  A.   Yes.

12  Q.   And I think you said that that required the approval of

13  the City or the mayor, and it also required your approval.

14  Did you say that?

15  A.   Yes.

16  Q.   And you approved every one of those; did you not?

17  A.   Yes.

18  Q.   Okay.  So Stanley Bowling and his company weren't doing

19  anything behind your back, certainly, correct?

20  A.   No.

21  Q.   Okay.  You mean I am correct, he was not doing

22  anything --

23  A.   Yes.

24  Q.   Now, you talked a little about change orders.  When a

25  change order is requested, doesn't the lending agent have to

1   approve it?

2   A.   Yes.

3   Q.   The City has to approve it.  You've told us that?

4   A.   Yes.

5   Q.   And also the engineering firm has to approve it; do they

6   not?

7   A.   Yes.

8   Q.   And that was done on every change order that B&B obtained

9   that we've talked about; was it not?

10  A.   Yes, it was.

11  Q.   Okay.  Are you familiar with all of the jobs that B&B did

12  for the City between 2004 and 2006?

13  A.   Yes.

14  Q.   Okay.  Did B&B do good work?

15  A.   Couldn't hear you.

16  Q.   Did they do good work?

17  A.   Yes.

18  Q.   The pump stations that Stanley put in, are they still

19  there and working?

20  A.   Yes.

21  Q.   How about the manholes and the sewer lines, are they

22  still there and working?

23  A.   Yes.

24  Q.   If there's maintenance issues with those in the city,

25  you'd be the man responsible for taking care of them, wouldn't

M. WHITE - Redirect (Mr. Parman)                                    99

1    you?

2    A.   Yes, sir.

3    Q.   And that's not been a problem for you, has it?

4    A.   No.

5           MR. SIMONS:  That's all I have.  Thank you.

6           THE COURT:  Thank you.  See if there's any redirect.

7           MR. PARMAN:  Yes, Your Honor.

8                       REDIRECT EXAMINATION

9    BY MR. PARMAN:

10   Q.   Sir, I believe you were asked about the number of private

11   contractors that did work for the City.  You remember that

12   line of questioning?

13   A.   Yeah.

14   Q.   There are people or businesses other than Mr. Bowling's

15   that does work for the City?

16   A.   Yes.

17   Q.   Who, however, received the vast majority of the contracts

18   that were not bid out?  That didn't -- when the City had

19   contracts that needed to be done that didn't go through the

20   bidding process, who received those contracts?

21   A.   B&B.

22   Q.   Did they receive them every time, to your knowledge, when

23   it didn't go through a bidding process?

24   A.   Best I can remember they did, yeah.

25           MR. PARMAN:  That's all I have, Your Honor.  Thank

MATHIS - Direct (Mr. Parman)                                    100

1    you.

2              THE COURT:  All right.  Thank you.  Anything else?

3    All right.  Thank you.  You can step down.  You're excused.

4              Mr. Parman?

5              MR. PARMAN:  Yes, Your Honor.  The United States

6    calls Pamela K. Mathis.

7              THE COURT:  Yes, sir.

8                PAMELA K. MATHIS, GOVERNMENT'S WITNESS, SWORN

9              THE COURT:  Thank you.  Mr. Parman, you may proceed.

10             MR. PARMAN:  Thank you, Your Honor.

11                          DIRECT EXAMINATION

12   BY MR. PARMAN:

13   Q.  Good afternoon, ma'am.

14   A.  Good afternoon.

15   Q.  Would you state your name, please?

16   A.  Pamela K. Mathis.

17   Q.  Miss Mathis, where do you live?

18   A.  I live in Burning Springs, Manchester, Kentucky.

19   Q.  What county is that in?

20   A.  Clay.

21   Q.  How long have you lived there in Burning Springs?

22   A.  Thirty-two years.

23   Q.  How long have you lived in Clay County?

24   A.  I've lived in Clay County 32 years.

25   Q.  Thirty-two years, okay.  Are you married?

*MATHIS - Direct (Mr. Parman)*                                        101

1    A.   No.  Divorced.

2    Q.   Do you have any kids?

3    A.   No.

4    Q.   What is your occupation?

5    A.   I'm deputy clerk for the City of Manchester.

6    Q.   How long have you worked in that capacity?

7    A.   I've been there 13 years.

8    Q.   What are some of your duties as deputy clerk for the City

9    of Manchester?

10   A.   I work with the projects that the City has.  I work with

11   the recycling.  I work with the PRIDE program now.

12   Q.   Let's talk about the PRIDE program.  What is the PRIDE

13   program?

14   A.   PRIDE program is a federal program.  Money's allocated by

15   the federal government, and that is for roadside cleanup and

16   dump site cleanup.

17   Q.   Now, you said you work for the recycling.  What goes on

18   now with the recycling?

19   A.   With the recycling now, we have 62 customers that, in the

20   city that recycles instead of disposing and going into the

21   garbage.

22   Q.   When did this program start?

23   A.   In 2007, when Mayor Lewis took office.

24   Q.   As part of your duties as deputy clerk, are you also

25   working with the water bills?

*MATHIS - Direct (Mr. Parman)*                                    102

1    A.   Yes.

2    Q.   Prior to working for the City of Manchester, where did

3    you work?

4    A.   I worked at B&J Transfer for a while.  That's where the

5    garbage was taken to.

6    Q.   Who is the owner of B&J Transfer?

7    A.   Bart Morris.

8    Q.   Ma'am, do you know Stanley Bowling?

9    A.   Yes, I do.

10   Q.   Do you know if Mr. Bowling operates a business?

11   A.   Yes, he does.

12   Q.   What is the name of that business?

13   A.   B&B Excavating.

14   Q.   Now, are you aware of the contracts that B&B Excavating

15   has with the City of Manchester?

16   A.   Yes.

17   Q.   What are some of those contracts?

18   A.   Those contracts were water line extension projects, sewer

19   line extension projects and pump station projects, which was

20   sewer as well.

21   Q.   Miss Mathis, what is a change order?

22   A.   A change order is where it changes the scope of work in

23   their original project.

24   Q.   Does a change order entail asking for additional money?

25   A.   Yes.

*MATHIS - Direct (Mr. Parman)*                                           103

1   Q.   Did you notice a disproportionate amount of change orders

2   on contracts with B&B Excavating?

3   A.   Yes.

4   Q.   How so?

5   A.   During one project, we were given a change order in

6   regards to additional gravel for moving a line.

7   Q.   Is that the only incidents where you're aware of change

8   orders being asked for on contracts with B&B?

9   A.   No.  We had a change order regarding a project regarding

10  a sewer line.

11  Q.   Is it normal to receive change orders when contracts are

12  performed?

13  A.   No.  That's something you don't want, because that makes

14  your project exceed the amount that it came in for bid.

15  Q.   So if I understand a change order correctly, it's bid at

16  a certain amount.  And then if a change order comes in after a

17  company is awarded the contract, then that is extra money the

18  City has to pay out?

19  A.   Yes.

20  Q.   When these contracts were being awarded, who was your

21  supervisor there at the City?

22  A.   I had two supervisors.

23  Q.   Who were they?

24  A.   I had a city manager was Kennon White, and William Mike

25  White.

*MATHIS - Direct (Mr. Parman)*                                    104

1   Q.   What did Kennon White say or do in relation to these

2   contracts?

3   A.   He would come to me and tell me that Stanley needed the

4   work, that he needed the job.

5   Q.   Did Mr. White, Mr. Kennon White pressure you to push

6   these change orders through?

7   A.   Yes.

8   Q.   How so?

9   A.   That I was to get it done.

10  Q.   To your knowledge, ma'am, do you know why Kennon White

11  wanted to push through these contracts for Stanley Bowling?

12          MR. SIMONS:   Judge, object.

13          THE COURT:   Objection overruled.   You can explain

14  what your understanding was and how you had that

15  understanding.

16  Q.   Proceed.   You can answer.

17  A.   Okay.   I do so believe that Kennon White was getting a

18  kickback --

19          MR. SIMONS:   Objection, Your Honor.   She's talking

20  about what she's believing.   She has no basis --

21          THE COURT:   What is the basis for your understanding,

22  ma'am?

23  A.   The basis for the understanding is these projects were --

24  the funding would come in, a contractor is supposed to get

25  their pay request and their payment within a 30-day period.

MATHIS - Direct (Mr. Parman)                                    105

1    But sometimes monies would be -- when the funding come in,

2    electronic transfer, sometimes it might be two weeks,

3    sometimes it might be three weeks, and they can get their

4    check earlier.  But Kennon would come to me and want me to

5    rush it up and get the pay -- get his check quicker than those

6    30 days.

7    Q.   Did Kennon ever tell you why he wanted that to occur that

8    way, why he wanted to rush the payment up for Stanley?

9    A.   No.

10   Q.   Are you familiar with a business that's referred to as

11   Cann-Tech?

12   A.   Yes.

13   Q.   What is the full name of Cann-Tech?

14   A.   It is Cann-Tech.  And the owner of -- it's owned by Larry

15   Cann.  It's an engineering firm in Lawrenceburg, Kentucky.

16   Q.   What role does an engineering firm play as it pertains to

17   the awarding of contracts?

18   A.   They're the ones that puts together the plans and the

19   specs for the project that is going to go for bid, and they

20   also put together all bid documents and contracts documents.

21   Q.   Are you aware of whether or not Mr. Bowling had access to

22   these engineering plans before anybody else would have?

23   A.   Yes.

24   Q.   How so?

25   A.   We had a cost estimate to come in that was -- it came in

*MATHIS - Direct (Mr. Parman)*                                    106

1    to my computer, and Kennon said that he was taking it to

2    Stanley Bowling so he could bid the job.

3    Q.   Why would it be beneficial -- please explain to the

4    jury -- for an individual that's bidding for a contract to

5    have this information.

6    A.   So they could get closer to the bid price.

7    Q.   Is that estimate that's provided by Cann-Tech designed or

8    intended for the bidders to receive?

9    A.   I'm sorry?

10   Q.   Is the estimate that Cann-Tech provided to the City, is

11   that supposed to go to the private businesses that are bidding

12   it?

13   A.   No.  They can get a projected cost.

14   Q.   But not the actual --

15   A.   But not the actual cost, no.

16   Q.   Does the City use this engineering estimate as a tool to

17   compare the private bids?

18   A.   Yes.

19   Q.   Miss Mathis, are you also aware of how the City disposes

20   of its trash?

21   A.   Yes.

22   Q.   How does the City currently dispose of its trash?

23   A.   It's taken to the City of London for disposal.

24   Q.   When did the City start taking its trash to the city of

25   London?

*MATHIS - Direct (Mr. Parman)*                                    107

1   A.   About a year ago.

2   Q.   Where did -- or how did the City dispose of its trash

3   before then?

4   A.   It was taken to B&J Transfer.

5   Q.   Are you aware, ma'am, of how much per ton the City was

6   charged by B&J Transfer?

7   A.   We was charged almost $50 a ton.

8   Q.   How much are you being charged per ton to transport to

9   the city of London?

10  A.   It's somewhere around 22, 23, somewhere in there.

11  Q.   22 --

12  A.   22 to 23 dollars a ton.

13  Q.   Are you aware of how much the City of Manchester will

14  save by directly transporting their trash to London?

15  A.   The first year, we saved around $80,000.

16  Q.   Would that have been last year?

17  A.   Yes.

18  Q.   Have you ever been asked during the course of your

19  employment as deputy clerk to check the City's records for any

20  bids on sanitation services?

21  A.   Yes.

22  Q.   Could you find any records that any other sanitation

23  service had bid, rather than B&J?

24  A.   No.

25  Q.   Have you ever been present when Mr. Morris complained to

MATHIS - Direct (Mr. Parman)                                     108

1    the City about a change in what he was going to receive for

2    collecting trash?

3    A.   Yes, it was at a council meeting.

4    Q.   Could you share with the jury what the complaint was at

5    the council meeting by Mr. Morris?

6    A.   The complaint was going from yardage to tonnage.  So --

7    Q.   What did Mr. Morris want?

8    A.   He wanted it to go to tonnage.

9    Q.   And it was currently being billed by the yard?

10   A.   Yes.

11   Q.   Did he find support on the city council to get it

12   changed?

13   A.   Yes.

14   Q.   Where did he find his support?

15   A.   From Vernon Hacker and Darnell Hipsher.

16   Q.   Was the billing then changed to the tonnage?

17   A.   Yes.

18   Q.   Do you recall what year that would have been?

19   A.   2002, 2001, 2002.

20   Q.   Ma'am, did you ever check the rates in London to

21   determine whether you could actually have a benefit by taking

22   the trash somewhere other than B&J Transfer?

23   A.   Yes, I did.

24   Q.   Did somebody confront you because you did that?

25   A.   Yes.  Kennon White.

1   Q.   And what did Mr. White say to you?

2   A.   He was upset because I was calling someplace else to

3   check the rates.

4        MR. PARMAN:  May I have one moment, Your Honor?

5        THE COURT:  Yes, sir.

6   Q.   Miss Mathis, are you aware of the relationship between

7   the owner of Cann-Tech and Stanley Bowling?

8   A.   Yes, they're hunting buddies.

9   Q.   Have you seen them together on multiple occasions?

10  A.   Yes.

11  Q.   Did you ever become concerned about how much the City was

12  being billed per the weight of the garbage going to B&J

13  Transfer?

14  A.   Yes.

15  Q.   How so?

16  A.   We done a survey of taking in how much garbage we had

17  collected versus how much we was being charged.

18  Q.   Did you ever try to get the City garbage trucks weighed

19  before they went to B&J Transfer?

20  A.   Yes.

21  Q.   Did you find discrepancies then?

22  A.   Yes, there was some.

23       MR. PARMAN:  Thank you.

24       MR. PINALES:  No questions, thank you.

25       MR. WESTBERRY:  None, Your Honor.

MATHIS - Cross (Mr. Baldani)                                    110

1          MR. ABELL:  I don't have any questions for Miss

2     Mathis, Judge.

3          THE COURT:  Thank you.  Mr. Baldani?

4                         CROSS-EXAMINATION

5     BY MR. BALDANI:

6     Q.  Miss Mathis, do you know an individual named Marcus

7     McKissic?

8     A.  I know him when I see him.

9     Q.  Okay.  Do you know anything about him?  Where does he

10    live now, to your knowledge?

11         MR. PARMAN:  Your Honor, I'm going to object.  I

12    believe this is outside the scope of direct.

13         MR. BALDANI:  Can we come up, Judge?

14         THE COURT:  You can come up, sure.

15                    (A sidebar conference was held out of the

16                    hearing of the gallery):

17         MR. BALDANI:  Judge --

18         THE COURT:  Mr. Baldani, I'm not sure how this is

19    relevant to anything brought up on direct.

20         MR. BALDANI:  Well, I mean, this issue about related

21    to the subject matter, I think it kind of -- to me, the

22    subject matter for direct is voter fraud, in a lawyer sense.

23         THE COURT:  No, no, no.  No, no, no.  Try again.  Try

24    something else.  That's not the subject of her --

25         MR. BALDANI:  All right.  Well, I mean, I felt it

MATHIS - Cross (Mr. Baldani)                                      111

1    was, but obviously you disagree.

2          THE COURT:  Tell me what she said about voter fraud

3    in her direct testimony.

4          MR. BALDANI:  Well, about --

5          THE COURT:  I've got the notes here.  She talked

6    about the PRIDE program, recycling, water billing, B&J

7    Transfer, Bart Morris, Stanley Bowling, contracts with B&B.

8          MR. BALDANI:  Okay.  I think --

9          THE COURT:  Disproportionate charges, Kennon White

10   giving her instructions, checks to be issued more frequently,

11   the business with Cann-Tech, the relationship between

12   Cann-Tech and Mr. Bowling, trash disposal, per ton cost versus

13   yardage.  I don't think she mentioned voter fraud.

14         MR. BALDANI:  Well, I think that the whole idea about

15   the water billing is to curry favor, you know, and get votes.

16   I mean, the bottom line is, Judge, she's made a statement that

17   Marcus McKissic came back and voted himself, contrary to what

18   Marcus McKissic said.  I mean, if you say that's beyond the

19   scope of her direct, then we just call her in our

20   case-in-chief.

21         THE COURT:  Well, you'll have to do that.

22         MR. BALDANI:  Okay.

23         THE COURT:  Sustained.  Objection sustained.

24         MR. BALDANI:  Okay.  Thank you, Your Honor.

25                   (Sidebar conference concluded.)

*MATHIS - Cross (Mr. Gilbert)*                                    112

1              MR. BALDANI:  Judge, I don't have any other

2       questions.

3              THE COURT:  All right.  Thank you.  Mr. Gilbert, you

4       need just a moment?

5              MR. GILBERT:  Yes, Your Honor.  Just a moment.

6              THE COURT:  Yes, sir.

7              MR. GILBERT:  Thank you.

8                          CROSS-EXAMINATION

9       BY MR. GILBERT:

10      Q.  Miss Mathis, my name is Jerry Gilbert, and I represent

11      Bart Morris.  Have you been deputy city clerk for 13 years; is

12      that correct?

13      A.  No, sir.

14      Q.  And during that period of time, B&J Transfer was where

15      the City's trash was taken to?

16      A.  Yes.

17      Q.  And as I understand it, a transfer station, the City has

18      compactor trucks?

19      A.  Yes.

20      Q.  And there's mandatory garbage pickup within the City of

21      Manchester?

22      A.  We have an ordinance.

23      Q.  Right.  And everybody gets their trash picked up?

24      A.  Yes.

25      Q.  And the City charges for that service?

*MATHIS - Cross (Mr. Gilbert)*                                           113

1    A.   Yes.

2    Q.   And prior to last year, the compactor trucks would take

3    the garbage to the transfer station where it would be

4    unloaded.  Is that true?

5    A.   Yes.

6    Q.   And loaded into a long haul truck which B&J Transfer

7    owned and took the trash to the landfill in Laurel County?

8    A.   Yes.

9    Q.   Now that's changed; has it not?

10   A.   Yes.

11   Q.   The compactor trucks no longer go the short distance

12   there in Clay County, but they go all the way to London?

13   A.   No, they don't go to B&J Transfer anymore.

14   Q.   That's the point.  They go -- the compactor trucks which

15   are used to pick up the trash in the city now travel out of

16   the county to London to dispose of the trash?

17   A.   Yes.

18   Q.   And that's 20 miles or so?

19   A.   Yes.  May I explain?

20        THE COURT:  Yes, ma'am.  If you need to explain your

21   answer, you may.

22   A.   The reason is, it's cheaper in London.  Even though we

23   are traveling 20 miles, and we do have wear and tear and

24   maintenance on the truck, versus 50, 48 to 50 dollars a ton,

25   versus 23, 22, 23 a ton, that's how we're saving.

*MATHIS - Cross (Mr. Gilbert)*                                    114

1    Q.   And that's an immediate saving, not considering wear and

2    tear?

3    A.   That is considering wear and tear.

4    Q.   Now, well, have you had to replace any trucks?

5    A.   No.

6    Q.   Now, you are aware that surrounding counties employ

7    transfer stations, aren't you?

8    A.   Yes.

9    Q.   Jackson County, Perry County, Leslie County, Rock Castle

10   County, Knox County, they all employ that type of a disposal

11   service; do they not?

12   A.   Yes.

13   Q.   Have you checked around in terms of what those rates

14   are --

15   A.   Yes, we have.

16   Q.   -- for those transfers?  Now, the change from compacted

17   yard to tonnage actually occurred in 2004?

18   A.   No.

19   Q.   You say 2002?

20   A.   It was 2002, 2003.  Yes.

21   Q.   All right.  The change would be reflected in the minutes

22   of the Board meeting, the commissioner's meeting; would it

23   not?

24   A.   Yes.

25   Q.   And whatever that is is when it was changed over?

*MATHIS - Cross (Mr. Gilbert)*                                          115

1    A.   Well, whether it was recorded the way it was supposed to

2    or not.

3    Q.   If it's in there, that's when it was changed over?

4    A.   Yes.

5    Q.   And you say that Mr. Morris appeared at a council

6    meeting?

7    A.   Yes.

8    Q.   And it was changed at that time; was it not?

9    A.   Yes, it was voted on.

10   Q.   And his complaints that he made about the compacted yard

11   versus the tonnage, those were made in an open meeting; were

12   they not?

13   A.   Yes.

14   Q.   They weren't made behind closed doors?  He made those in

15   A public meeting; did he not?

16   A.   Yes.

17   Q.   And the entire council voted on it; did they not?

18   A.   Yes.

19   Q.   Do you know these other counties that I mentioned, do you

20   know whether or not they charge by compacted yard or whether

21   they charge by tonnage?

22   A.   They charge by ton.

23   Q.   By tonnage?

24   A.   Yes.

25   Q.   Now, Mr. Morris, when he got these contracts, he

*MATHIS - Cross (Mr. Simons)*                                    116

1    submitted a bid; did he not?

2    A.   I have seen no bids.

3    Q.   If it's in the minutes that there's a bid advertised, you

4    wouldn't dispute that, would you?

5    A.   Not if it was in the minutes.

6    Q.   Now, Mr. Morris's scales at his transfer station are

7    state certified; are they not?

8    A.   I don't know that.

9    Q.   Well, when you operate a set of scales, doesn't the

10   Division of Weights and Measures come around and certify those

11   every year?

12   A.   I do not know that.

13           MR. GILBERT:  Just a minute, Your Honor.

14           THE COURT:  Yes, sir.

15   Q.   Do you know what the standard gate rate at the transfer

16   station at the city of London is?

17   A.   The gate rate?

18   Q.   Yes, ma'am.

19   A.   No, I don't.

20           MR. GILBERT:  That's all.

21           MS. HUGHES:  No, thank you.

22           THE COURT:  All right.  Thank you.  Mr. Simons?

23                        CROSS-EXAMINATION

24   BY MR. SIMONS:

25   Q.   Afternoon, Miss Mathis.  I have to come over here.  Just

MATHIS - Cross (Mr. Simons)                                        117

1    couldn't see you from where I was.  My name is Dan Simons.  I

2    represent Stanley Bowling.  I just have, I think, a very few

3    questions for you, okay?

4         The first thing I want to talk to you about is you

5    mentioned that some pressure was being applied to you in terms

6    of getting money in, paid, and approval of change orders,

7    correct?

8    A.   Yes.

9    Q.   And the person that applied that was Kennon White?

10   A.   Yes.

11   Q.   Okay.  Stanley Bowling never applied any pressure to you

12   at all, did he?

13   A.   No.  If Stanley hadn't have gotten his check, Stanley

14   would have called.

15   Q.   Did Stanley Bowling ever put any pressure on you, ma'am?

16   A.   No.

17   Q.   Thank you.  Now, if I refer to a job as Mill Pond

18   Phase 2A, do you know what I'm talking about?

19   A.   Yes.

20   Q.   Okay.  Do you know what the engineering estimate for that

21   job was originally?

22   A.   No, I don't recall.

23   Q.   Okay.  I'll come back to that in a second.  Let me ask

24   you, when a contractor submits a bid for consideration, do you

25   know whether or not they have to have a bid bond?

*MATHIS - Cross (Mr. Simons)*                                                118

1    A.   Yes, they do.

2    Q.   Okay.  And isn't the engineering estimate made available

3    to them for purposes of securing of that bid bond?

4    A.   I do not know that.

5    Q.   Okay.  But I thought you told this jury that that was a

6    secret and that you didn't let that out.

7    A.   No.  The secret is, is being able to provide a projected

8    cost, not an exact cost per foot.

9    Q.   So the engineering estimate, the one that is prepared by

10   the engineers hired by the City, is available to contractors

11   so that they can secure a bid bond; isn't that correct?

12   A.   It's supplied to the City but not to the contractor.

13   Q.   Well, the contractor is the person who has to get the bid

14   bond; is it not?

15   A.   They don't get the bid bond until they have actually

16   received that bid.  They have to turn in a copy.

17   Q.   Ma'am, is it your understanding that when you place a

18   bid, you don't have to have a bond with it?

19   A.   You have to have a bond.

20   Q.   Yes.  And to set the amount of the bond, you have to have

21   the engineering estimate; do you not?

22   A.   But most contractors are bonded up to a million dollars

23   anyway.

24   Q.   Okay.  I do want to talk with you for just a minute about

25   the Mill Pond job.

*MATHIS - Cross (Mr. Simons)*                                    119

1   A.   Okay.

2   Q.   Do you remember a meeting with the FBI agents back in

3   November of '06?

4   A.   Yes.

5   Q.   Okay.

6        MR. SIMONS:   Your Honor, I'd like to show her a

7   document, see if it refreshes her memory about that bond.

8        THE COURT:   About --

9        MR. SIMONS:   About the engineering estimate.

10  Q.   Ma'am, do you remember what the engineering estimate was

11  for the Mill Pond job?

12  A.   No, I don't.

13       THE COURT:   All right.   You can show her a document,

14  see if that refreshes her memory.   Ma'am, when you're shown a

15  document to refresh memory, you can look at the document to

16  determine if it refreshes your memory.   If it does, then you

17  testify based on what you recall but not based on what you're

18  reading in the document.

19  Q.   Now, ma'am, I'd ask you to read that to yourself,

20  particularly the first full paragraph that's highlighted on

21  that page, please.   See if that refreshes your memory.

22  A.   Yes.

23  Q.   Okay.   Do you remember telling the agents what the

24  engineer's estimate was for the Mill Pond Phase 2 job?

25  A.   The estimated cost of $700,000 --

*MATHIS - Redirect (Mr. Parman)*                                    120

1    Q.   Okay.

2    A.   -- for the project.

3    Q.   Okay.

4    A.   But that was to do two areas.  That wasn't just one area.

5    Q.   Is it true, Miss Mathis, that my client, Stanley Bowling,

6    through his company, B&B Excavating, did that job and three

7    others for $622,000?

8    A.   I don't recall the amount.

9              MR. SIMONS:  Thank you.  Your Honor, that's all I

10   have.

11             THE COURT:  All right.  Thank you.  See if there's

12   any redirect.

13             MR. PARMAN:  Yes, Your Honor, if I may from here.

14             THE COURT:  Yes, sir.

15                        REDIRECT EXAMINATION

16   BY MR. PARMAN:

17   Q.   Miss Mathis, you was asked about the amount other

18   counties around Clay charged that had transfer stations.

19   A.   Yes.

20   Q.   And did you do research into what they paid their

21   transfer stations?

22   A.   Yes.

23   Q.   Was it more or was it less than what B&J Transfer was

24   charging City of Manchester?

25   A.   It was less.

*MATHIS - Redirect (Mr. Gilbert)*                                        121

1    Q.   Was it less in all instances?

2    A.   Yes.

3    Q.   Now, we talked about the wear and tear on the vehicles to

4    travel to London.  What was the savings that the City gets for

5    traveling to London to dump their trash?

6    A.   The first year was around almost $80,000.

7    Q.   Did that take into consideration the wear and tear on the

8    vehicles?

9    A.   Yes, it did.

10           MR. PARMAN:  That's all I have, Your Honor.

11           THE COURT:  All right.  Anything else on these areas?

12   Mr. Gilbert, do you have anything?

13           MR. GILBERT:  Yes, Your Honor.

14                         RECROSS-EXAMINATION

15   BY MR. GILBERT:

16   Q.   What were the amounts of the other tonnage?

17   A.   The other tonnage?

18   Q.   Yes, ma'am.

19   A.   Laurel landfill, you can take it to the gate right now

20   for 46.

21   Q.   And --

22   A.   And the reason I know that is because we're putting in a

23   recycling facility, and we've had to check all the rates at

24   these transfer stations.

25   Q.   What about Leslie County?

*PARKS - Direct (Mr. Smith)*                                          122

1    A.   Leslie County is -- that is dumped over there at Popp

2    Brothers, and it was somewhere probably, I think neighborhood

3    of 32.

4    Q.   What about Perry County?

5    A.   I don't recall.

6    Q.   Jackson County?

7    A.   Jackson County's is 28.

8    Q.   And Rock Castle County?

9    A.   Don't recall that one.

10             MR. GILBERT:  That's all.

11             MR. SIMONS:  Nothing further.

12             THE COURT:  Thank you.  Anything else?

13             MR. PARMAN:  No, Your Honor.  Thank you.

14             THE COURT:  Thank you, ma'am.  You may step down.

15             Mr. Smith, will you be calling your next witness?

16             MR. SMITH:  Debra Parks.

17             THE COURT:  Thank you.

18              DEBRA PARKS, GOVERNMENT'S WITNESS, SWORN

19             THE COURT:  Thank you.  Mr. Smith, you may proceed.

20             MR. SMITH:  Thank you.

21                          DIRECT EXAMINATION

22   BY MR. SMITH:

23   Q.   State your name, please.

24   A.   Debra Parks.

25   Q.   And Miss Parks, are you currently employed with the Clay

PARKS - Direct (Mr. Smith)                                    123

1    County government?

2    A.   Yes.

3    Q.   And what position do you hold?

4    A.   County treasurer.

5    Q.   How long have you been the county treasurer?

6    A.   Since about '93, I believe.

7    Q.   And as part of your duties as county treasurer, ma'am,

8    are you also a custodian of various records including amounts

9    paid?

10   A.   Yes.

11   Q.   And are those accounts receivable, accounts payable,

12   those types of accounts that the county has to maintain?

13   A.   Yes.

14   Q.   And are those records that are kept under your

15   supervision as well?

16   A.   Yes.

17        MR. SMITH:  Like to hand to the witness what's marked

18   Government's Exhibit M10.  M as in Mary.

19        THE COURT:  Yes, sir.

20   Q.   Can you identify M10?

21   A.   Yes.

22   Q.   What is that, ma'am?

23   A.   It's a check register from payments made to B&B

24   Excavating.

25   Q.   And are those records kept in the ordinary course of

PARKS - Direct (Mr. Smith)                                    124

1    business?

2    A.   Yes.

3           MR. SMITH:  I'd move the introduction of Government's

4    Exhibit M10.

5           THE COURT:  Any objection?

6           MR. SIMONS:  No.

7           THE COURT:  Exhibit M10 will be admitted.

8                    (Government Exhibit No. M10

9                    was admitted into evidence.)

10   Q.   Ma'am, from that document, can you give us a range of

11   years of what are represented as to, again, amounts payable to

12   B&B Excavating?

13   A.   11 of '03 through June of '06.

14   Q.   Okay.

15          MR. SMITH:  Hand to the witness M11.

16   Q.   Can you identify that for the court and the jury, ma'am?

17   A.   Yes, it's payments payable to B&J Transfer.

18   Q.   And again, ma'am, are those records kept in the ordinary

19   course of business?

20   A.   Yes.

21          MR. SMITH:  I'd move for their introduction at this

22   time.

23          THE COURT:  Any objection?

24          MR. GILBERT:  No objection, Your Honor.

25          THE COURT:  Exhibit M11 will be admitted.

PARKS - Direct (Mr. Smith)                                      125

1                    (Government Exhibit No. M11

2                     was admitted into evidence.)

3   Q.   I'll ask you the same question for this document, ma'am.

4   What range of dates does this cover?

5   A.   December of '02 through July of '03.

6   Q.   And again, who are these amounts payable to?

7   A.   B&J Transfer, Incorporated.

8           MR. SMITH:  Like to hand to the witness now what's

9   been marked as Government's Exhibit M12.

10  Q.   Ma'am, we're going to need you to move a little bit

11  closer to the microphone and speak into that, if you could,

12  please.

13  A.   Okay.

14  Q.   You now should have in front of you M12.

15  A.   Yes.

16  Q.   Can you identify that for the court and jury, please?

17  A.   It's a copy of the W-2, Stanley Bowling.

18  Q.   And is that a record also kept in the ordinary course of

19  business?

20  A.   Yes.

21          MR. SMITH:  I'd move the introduction of Government's

22  Exhibit M12.

23          MR. SIMONS:  No objection.

24          THE COURT:  Exhibit M12 will be admitted.

25

*PARKS - Direct (Mr. Smith)*                                          126

1              (Government Exhibit No. M12

2              was admitted into evidence.)

3    Q.   Can you tell from that document, ma'am, what years are

4    represented by the W-2s?

5    A.   The front page is 2003.

6    Q.   Do you want to open it up, and if you could just peruse

7    through there and give us the other years represented, if you

8    could?

9    A.   2003, 2004, 2006, 2007, 2008, and this is a yearly

10   printout, January to December of '04.  January through

11   December of '05, January through December of '06, January

12   through December of '07, January through December of '08,

13   January through December -- I'm sorry, through June of '09.

14              MR. SMITH:  I'd move for their introduction at this

15   time.

16              THE COURT:  Objection?  Exhibit M12 will be admitted.

17   Q.   Ma'am, could you describe for us what your understanding

18   is of a W-2 and what it represents?

19   A.   It's the wages paid to an individual that shows the taxes

20   deducted from their wages.

21   Q.   And on these documents that you're referring to, ma'am,

22   what work is that representing?

23   A.   As a magistrate for the county.

24   Q.   Okay.  Thank you.

25              MR. SMITH:  Now like to hand to you what's marked as

*PARKS - Direct (Mr. Smith)*                                                127

1   PR85.

2   Q.   You should have in front of you PR85.

3   A.   Yes.

4   Q.   Can you identify that for the Court and the jury, please?

5   A.   It's a list of election officers.

6   Q.   And the dollar amounts that are indicated there, are

7   those amounts that have been paid by the county government to

8   these officers?

9   A.   Yes.

10  Q.   Is that also a record kept in the ordinary course of

11  business?

12  A.   Yes.

13        MR. SMITH:  I'd move for the introduction of PR85 at

14  this time.

15        THE COURT:  Any objection?  PR85 will be admitted.

16              (Government Exhibit No. PR85

17              was admitted into evidence.)

18  Q.   Ma'am, for purposes of the record, can you again look at

19  this record and tell me what years are represented by PR85, as

20  to amounts paid to election officers in the county of Clay.

21  A.   From May of 2002, November of 2002, May of 2003,

22  November, 2003, May of 2004, November, 2004, May, 2006,

23  November, 2006.

24  Q.   Thank you.

25        MR. SMITH:  Pass the witness.

*PARKS - Cross (Mr. Gilbert)*                                         128

1              THE COURT:  Thank you.

2              MR. HOSKINS:  No questions.

3              MR. WESTBERRY:  No questions.

4              THE COURT:  Anybody have any questions of this

5    witness?

6              MR. RICHARDSON:  No questions, Judge.

7              MR. GILBERT:  I just have one question.

8              THE COURT:  Okay.  Mr. Gilbert.

9                        CROSS-EXAMINATION

10   BY MR. GILBERT:

11   Q.  Miss Parks, on this exhibit that you've just testified

12   to, does the check marks that appear on there mean that the

13   checks were written?

14   A.  Not necessarily.  It could mean, I'm looking on some of

15   these others, that when we were going through our computer,

16   checking the addresses to make sure that we had them in our

17   computer, whether or not we might needed to went back and got

18   addresses for them.

19   Q.  So that doesn't mean, the check marks doesn't necessarily

20   mean that they were paid for their service?

21   A.  Not necessarily.  Or either as we were putting them in

22   our computer, we check marked them off as we put them in.  But

23   all these were paid, if that was the question.

24             MR. GILBERT:  That's all I have.

25             THE COURT:  All right.  Thank you.  Mr. Simons.

*PARKS - Cross (Mr. Simons)*                                        129

1                          CROSS-EXAMINATION

2    BY MR. SIMONS:

3    Q.  Miss Parks?

4    A.  Yes.

5    Q.  It's Parks, correct?

6    A.  Um-hmm.

7    Q.  I'm Dan Simons.  I represent Stanley Bowling.  You know

8    Mr. Bowling; do you not?

9    A.  Yes.

10   Q.  Does the county treasurer attend the fiscal court

11   meetings in Clay County?

12   A.  No, sir.

13             MR. SIMONS:  That's all I have.  Thank you.

14             THE COURT:  Anything else of Miss Parks?

15             MR. SMITH:  No, Your Honor.

16             THE COURT:  Thank you, ma'am.  You may step down and

17   leave any documents up there.

18       Mr. Smith, we've got about ten, twelve more minutes.

19   Would you like to start another witness now, or would you like

20   to recess for the evening?

21             MR. SMITH:  We can start one.  I'm not sure we'll

22   finish it.

23             THE COURT:  Let's get started.

24             MR. SMITH:  Ted Edward Jones.

25             THE COURT:  Thank you.

*JONES - Direct (Mr. Smith)* 130

1      TED JONES, GOVERNMENT'S WITNESS, SWORN

2              DIRECT EXAMINATION

3  BY MR. SMITH:

4  Q.  Good afternoon.

5  A.  Good afternoon.

6  Q.  State your name, please.

7  A.  Ted Jones.

8  Q.  And Mr. Jones, where do you live?

9  A.  In Manchester, Kentucky.

10 Q.  And how long have you lived in Manchester?

11 A.  Sixty-two years.

12 Q.  And do you work down there?

13 A.  Yes, sir.

14 Q.  Who do you work for?

15 A.  City of Manchester.

16 Q.  How long have you been working for the City of

17 Manchester?

18 A.  25 1/2 years.

19       MR. ABELL:  Excuse me, Judge.  May we have the

20 witness pull the microphone closer?

21       THE COURT:  Either get a little closer, or you can

22 pull that microphone down.  Make sure everybody can hear you.

23 The chair doesn't move.

24 Q.  What kind of jobs do you do for the City of Manchester,

25 sir?

*JONES - Direct (Mr. Smith)*                                                131

1    A.   Right now, I drive a garbage truck.

2    Q.   Do you know a gentleman by the name of Bart Morris?

3    A.   Yes, sir, I do.

4    Q.   And do you recall having a conversation with him sometime

5    before the November election back in 2002?

6    A.   Yes, sir.

7    Q.   And at that time, was Stanley Bowling running for

8    magistrate?

9    A.   Yes, sir.

10   Q.   Did Mr. Morris ask you to help him in some way in that

11   election, sir?

12   A.   Yes, sir.

13   Q.   Could you tell the ladies and gentlemen of the jury what

14   he asked you to do?

15   A.   He asked me to haul votes.

16   Q.   And what did you tell him?

17   A.   I told him I would.

18   Q.   And when you hauled votes, what did you do?

19   A.   I went -- he told me, he said go and haul votes and get,

20   just get the stragglers, you know, off the street.

21   Q.   Okay.  And so did you do as he asked?

22   A.   Yes, sir.

23   Q.   And where did you take them?

24   A.   To his place.

25   Q.   Whose place?

*JONES - Direct (Mr. Smith)*                                    132

1    A.   Bart Morris's.

2    Q.   And where was his place at that time, sir?

3    A.   On Green Street.

4    Q.   And what would happen when you'd take them to Green

5    Street at the Morris's?

6    A.   I would let them out and they'd go in.

7    Q.   And then what would happen?

8    A.   They would come back out, and I would take them, drop

9    them off where they wanted to.

10   Q.   How did they get to the voting polls?

11   A.   I took them.

12   Q.   And did you take them before you went to see the Morrises

13   or after?

14   A.   After.

15   Q.   So you'd take them to the polls after they'd gone to the

16   Morris's?

17   A.   No, I took them to the polls and then took them to

18   Morris's.

19   Q.   Okay.  Was there somebody there looking for you when

20   you'd bring those voters to the polls?

21   A.   I don't know, sir.  I never -- I just told them go in

22   there, who to vote for and come back out, and I'd take them up

23   there and drop them off.

24   Q.   And did somebody tell you who these voters were to vote

25   for?

*JONES - Direct (Mr. Smith)*                                               133

1    A.   No, sir.

2    Q.   How did you know what to tell them?

3    A.   Well, yeah, they told me to vote -- I can't hardly hear.

4    Yeah, they told me to vote for Stanley Bowling.

5    Q.   All right.  And is that what you told the voters?

6    A.   Yes, sir.

7    Q.   Did you haul voters also from Bridge Street downtown area

8    and the housing project in Littleton?

9    A.   Yes, sir.

10   Q.   Did you also take those to Morrises on Green Street?

11   A.   Yes, sir.

12   Q.   How did you encourage these voters to get in the vehicle

13   with you?  Did you tell them anything?

14   A.   I just asked them did you want to vote?  Want to make a

15   little extra money?

16   Q.   And how did you know that these voters were going to make

17   'em some money?

18   A.   Well, I guess because they said to bring them out there

19   and they'd pay 'em.

20   Q.   And who told you they would pay them, sir?

21   A.   Bart Morris.

22   Q.   Do you know how much he was paying these voters?

23   A.   No, sir.

24   Q.   What kind of vehicle were you driving on the day of the

25   election in that November, '02 election?

*JONES - Cross (Mr. Gilbert)*                                        134

1    A.   I believe it was a Geo tracker, I'm sure, or a truck.  I

2    can't remember, sir, back up there.

3    Q.   Was it your own vehicle?

4    A.   Yes, sir.

5    Q.   Have you been approached in 2006, during that election,

6    to haul voters?

7    A.   Yes, sir.

8    Q.   Who approached you in that election, if you know?

9    A.   Bart and Stanley.

10   Q.   And what did you tell them?

11   A.   I told them I wasn't gonna do it no more.  I wasn't

12   gonna --

13   Q.   Did you explain to them why?

14   A.   I wasn't going to jail for nobody.

15              MR. SMITH:  Pass the witness.

16              MR. PINALES:  No questions.

17              MR. WESTBERRY:  No questions.

18              MR. WHITE:  No questions.

19              MR. ABELL:  No questions.

20              MR. RICHARDSON:  None, Your Honor.

21              THE COURT:  Mr. Gilbert.

22              MR. GILBERT:  Thank you.

23                          CROSS-EXAMINATION

24   BY MR. GILBERT:

25   Q.   Mr. Jones, I'm Jerry Gilbert, and I represent Bart

1    Morris.  You say you picked these voters up on Bridge Street

2    in downtown Manchester?

3    A.   Yes, sir.

4    Q.   Do you know what -- and you took them to vote in Harts

5    Branch?

6    A.   No, I took them -- I took to the middle school.

7    Q.   So the middle school there in Manchester?

8    A.   Yes.

9    Q.   And that would be Manchester precinct?

10   A.   Yeah.  Yeah, Manchester and -- yeah, it would be the

11   Manchester precinct at the middle school.

12          MR. GILBERT:  That's all.

13          THE COURT:  Okay.  Miss Hughes.

14                       CROSS-EXAMINATION

15   BY MS. HUGHES:

16   Q.   Sir, my name is Elizabeth Hughes, and I represent Debbie

17   Morris.  Can you tell me which election that was in 2006?

18   A.   No, I can't, ma'am.

19   Q.   You don't know whether it was the spring or the fall?

20   A.   It was fall, I think.

21   Q.   Do you know who was running?

22   A.   Only one I know was running was Stanley in the 2000 --

23   no, Kennon White and somebody, I think.  Now I can't remember

24   back that far.

25   Q.   If you can't remember, you feel free to tell me that, all

*JONES - Cross (Mr. Simons)*                                    136

1   right?  I do want to press you a little bit.  When you turned

2   down the opportunity to buy votes, or to haul votes, excuse

3   me, because you weren't going to jail for anybody --

4   A.   Yes, ma'am.

5   Q.   -- do you remember who was running other than Stanley

6   Bowling?

7   A.   No, ma'am, I don't.

8   Q.   But you think Kennon White might have been on the --

9   A.   I think he was.  I ain't for sure, ma'am.

10  Q.   Now, is it your understanding that the voters in the

11  Manchester precinct, where you took these voters -- you took

12  them to the Manchester precinct, right?  Yes?  No?

13  A.   Yes, ma'am, at the middle school.

14  Q.   All right.  At the middle school.  So is it your

15  understanding the voters at the middle school can vote for the

16  District 2 magistrate?

17  A.   Well, I can't hardly hear you, ma'am.

18  Q.   Okay.  Is it your understanding that the voters in the

19  Manchester precinct can vote for the District 2 magistrate?

20  A.   I guess, ma'am.

21          MS. HUGHES:  Thank you.

22          THE COURT:  Mr. Simons.

23                      CROSS-EXAMINATION

24  BY MR. SIMONS:

25  Q.   Mr. Jones, my name is Dan Simons.  I represent Stanley

*JONES - Redirect (Mr. Smith)*                                    137

1    Bowling, okay?  Can you hear me okay?

2    A.   Yeah.

3    Q.   These things that you're talking about, they happened a

4    long time ago; did they not?

5    A.   Yes, sir.

6    Q.   It's really hard for you to remember it with any

7    accuracy; is it not?

8    A.   And really the action of it, yes, sir.

9         MR. SIMONS:  That's what I thought.  Thank you.

10        THE COURT:  Any redirect of the witness?

11        MR. SMITH:  Thank you.

12                        REDIRECT EXAMINATION

13   BY MR. SMITH:

14   Q.   Mr. Jones, you said that when they approached you in the

15   2006 election, I believe is what we were talking about, but

16   you say now you don't remember which year, the last time you

17   were approached, you told them no?

18   A.   Yes, sir.

19   Q.   And you said you didn't want to go to jail for anybody?

20   A.   Yes, sir.

21   Q.   Was there some reason that you were more afraid of going

22   to jail at this time than you were the first time you did

23   this?

24   A.   No, sir.  I just didn't want to get involved in it

25   because of where I work and, you know, you know you work with

JONES - Redirect (Mr. Smith)                                    138

1    them, you have to do what they tell you to do or go home, and

2    I didn't want to get involved in it.

3    Q.   Had you heard the FBI was watching?

4    A.   Yes, sir.

5    Q.   And that made it even more serious to you?

6    A.   Yes, sir.

7    Q.   Now, you said you thought it was Kennon White that was

8    running?

9    A.   Yes, sir.

10   Q.   Do you know Daugh White?

11   A.   Yes, sir.

12   Q.   Is he the mayor?

13   A.   He was the mayor at the time, yes, sir.

14   Q.   Did he get beat?

15   A.   Yes, sir.

16   Q.   Do you know who beat him?

17   A.   Carmen Lewis.

18   Q.   And could it have been that election is when you got

19   approached the last time and you told them you weren't

20   interested?

21   A.   I think so, sir.

22   Q.   Well, could it have been the primary election?

23   A.   Primary, I think.

24   Q.   You think it was the primary?

25   A.   Yes, sir.

JONES - Redirect (Mr. Smith)                                       139

1   Q.   But you're sure it was because you had heard that the FBI

2   was in town watching this thing that made you more concerned?

3          MR. WHITE:   Objection.   Asked and answered, Your

4   Honor.

5          THE COURT:   Overruled.

6   A.   No, not really, sir.   I just didn't want to get involved

7   into it no more.

8   Q.   Well, let me ask you this.   The time that you did get

9   involved, you had an understanding that Stanley Bowling was a

10  candidate; is that right?   He was running for an office?

11  A.   Yeah, he was running for office.

12  Q.   And you told the voters to vote for him?

13  A.   Yes, sir.

14  Q.   Okay.   And these voters that you picked up, you picked

15  them up in more than just one location, if I understand it?

16  A.   Yes, sir.

17  Q.   It wasn't all at the Bridge Street downtown location?

18  A.   No, sir.

19  Q.   There were other locations you picked up voters?

20  A.   Yes, sir.

21  Q.   And you took them to the polls?

22  A.   Yes, sir.

23  Q.   Did you take them to other polls other than just the one

24  poll?

25  A.   No, sir.   I just got the one that went out there.

*JONES - Redirect (Mr. Smith)* 140

1    Q.   And it was at what school?

2    A.   Middle school.

3    Q.   What's the name of the middle school?

4    A.   Clay County Middle School.

5    Q.   Okay.  And when you dropped these voters off, are you

6    satisfied that they were getting paid as you represented to

7    them?

8    A.   I guess they was.

9    Q.   Did any of them complain to you that they weren't getting

10   paid when they came out of the Morrises?

11   A.   No, sir.

12            MR. SMITH:  That's all I have.

13            THE COURT:  Anything else of this witness?

14            MR. GILBERT:  No, Your Honor.

15            MS. HUGHES:  No.

16            MR. SIMONS:  No.

17            THE COURT:  Thank you.  Mr. Jones, you may step down,

18   sir.  Witness will be excused.

19            Ladies and gentlemen, we will recess for the evening.

20   We'll resume again tomorrow morning, which is Thursday, and I

21   do want to remind you again that we will not be in session on

22   Friday.  We will resume tomorrow at 9:00.

23            Of course, please keep in mind the admonition that

24   I've given to you several times.  You understand that you

25   should not discuss the case with anyone, including friends or

1     family members, shouldn't allow anyone to approach you to

2     discuss the case.  Should not read, watch or listen to any

3     accounts of the case if there should be any.  You should not

4     do any type of research or investigation on your own.  You

5     should not communicate electronically about the case.  And, of

6     course, you should not make up your mind about the matter

7     until it is finally submitted to you.

8              Jury will be excused until 9:00 a.m. tomorrow

9     morning.

10                    (The jury left the courtroom at 4:29 p.m.)

11          THE COURT:  Let's see if we have any matters to take

12    up before we recess?

13          MS. HUGHES:  Would you like my daily update on the

14    DVD?

15          THE COURT:  Please be seated.

16          MS. HUGHES:  Neither Miss Poynter nor I have been

17    successful.  I was actually secretly happy that she failed

18    like I did on getting the clip out.

19          THE COURT:  Failure is contagious.

20          MS. HUGHES:  So we've given the original DVD to the

21    clerk marked as the exhibit.  It has four tracks on it.  It's

22    Track 4 that's my supplement.  It does have the sound, but if

23    the jury asks to play it, we'll know it's Chapter 4 and the

24    sound can be turned down and muted as it was done originally.

25    We may still work on it, but I think everybody's too busy if

1    that's okay with the Court.

2              THE COURT:  Any witnesses that need to be identified

3    tomorrow morning before we get started?  Nobody has any?  I

4    would anticipate the United States would be completing its

5    case hopefully by the beginning of the week.

6              Mr. Hoskins, you'll be going first for the

7    defendants.  Will you be ready to proceed on Monday, if we

8    finish with the Government's case at that time?

9              MR. HOSKINS:  Yes, Your Honor.

10             THE COURT:  About how long would you anticipate your

11   case would take?

12             MR. HOSKINS:  We're trying to hold it to two days,

13   Judge.

14             THE COURT:  All right.  Just want to make sure that

15   the next defendant understands that they'd be up.

16             MR. WESTBERRY:  We're bringing witnesses in Monday,

17   you'll recall, to be recognized.  I would say about two days

18   too.  It may be less than that.  Hard to estimate at this

19   point.

20             THE COURT:  When they're brought in on Monday, we'll

21   have a much better idea at that time as to when you'll be

22   starting.

23             MR. WHITE:  Your Honor, I would expect less than half

24   a day for me.

25             THE COURT:  That will get us through next week, then.

1        MS. HUGHES:  I didn't want the Court to forget I

2   still have an opening to give.

3        THE COURT:  Yes.  And Miss Hughes, would you prefer

4   to give your opening before all the defendants present their

5   witnesses or before you would present your case?

6        MS. HUGHES:  I'd like to do it at the break before.

7        THE COURT:  Beginning of all the defense?

8        MS. HUGHES:  At the beginning of all the defendants.

9        THE COURT:  You'll need to remind me of that.

10        MS. HUGHES:  I will.  Thank you.

11        THE COURT:  Thank you, counsel.  If there's nothing

12   else to take up, we'll be in recess until 9:00 a.m. tomorrow

13   morning.

14                (Proceedings adjourned at 4:32 p.m.)

15                        - - -

16                C E R T I F I C A T E

17        I, LISA REED WIESMAN RDR-CRR, certify that the
    foregoing is a correct transcript from the record of
18   proceedings in the above-entitled case.

19

20    \s\ Lisa Reed Wiesman              March 9, 2010
    LISA REED WIESMAN, RDR-CRR        Date of Certification
21   Official Court Reporter

22

23

24

25

1                              INDEX

2

GOVERNMENT'S WITNESS

3

BEVERLY GRAY
4    Cross-examination by Mr. Richardson.............. Page  4
     Cross-examination by Mr. Gilbert................. Page  6
5    Cross-examination by Ms. Hughes.................. Page  8
     Cross-examination by Mr. Simons.................. Page 13
6    Redirect Examination by Mr. Smith................ Page 13
     Recross-examination by Mr. Westberry............ Page 20
7    Recross-examination by Mr. Richardson........... Page 22
     Further direct examination by Mr. Smith.......... Page 25

8

9    JENNINGS WHITE
     Direct Examination by Mr. Smith.................. Page 29
10   Cross-examination by Mr. Westberry.............. Page 53
     Cross-examination by Mr. White.................. Page 65
11   Cross-examination by Mr. Abell.................. Page 68
     Cross-examination by Mr. Richardson.............. Page 73

12

13   WILLIAM MICHAEL WHITE
     Direct Examination by Mr. Parman................. Page 67
     Cross-examination by Mr. Westberry.............. Page 87
14   Cross-examination by Mr. Gilbert................. Page 89
     Cross-examination by Ms. Hughes................. Page 91
15   Cross-examination by Mr. Simons................. Page 92
     Redirect Examination by Mr. Parman.............. Page 99

16

PAMELA K. MATHIS
17   Direct Examination by Mr. Parman................. Page 100
     Cross-examination by Mr. Baldani................ Page 110
18   Cross-examination by Mr. Gilbert................. Page 112
     Cross-examination by Mr. Simons................. Page 116
19   Redirect Examination by Mr. Parman.............. Page 120
     Recross-examination by Mr. Gilbert.............. Page 121

20

DEBRA PARKS
21   Direct Examination by Mr. Smith................. Page 122
     Cross-examination by Mr. Gilbert................. Page 128
22   Cross-examination by Mr. Simons................. Page 129

23   TED JONES
     Direct Examination by Mr. Smith................. Page 130
24   Cross-examination by Mr. Gilbert................. Page 134
     Cross-examination by Ms. Hughes................. Page 135
25   Cross-examination by Mr. Simons................. Page 136
     Redirect Examination by Mr. Smith............... Page 137

145

GOVERNMENT EXHIBITS                                    ADMITTED

Exhibit No. PR86, 10/17/06 letter from Daugh White
Admitted........................................ Page  13

Exhibit No. PA7, Jennings White plea agreement
Admitted........................................ Page  75

Exhibit No. M10, record of payments to B&B Excavating
Admitted........................................ Page 124

Exhibit No. M11, record of payments to B&J Transfer
Admitted........................................ Page 126

Exhibit No. M12, W-2 for Stanley Bowling
Admitted........................................ Page 126

Exhibit No. PR85, record of election officer payments
Admitted........................................ Page 127


DEFENSE EXHIBITS                                       ADMITTED

Thompson Exhibit No. 1, 5/16/06 post-election report
Admitted........................................ Page 5

                           - - -