1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                    SOUTHERN DIVISION at LONDON
                              - - -
3
     UNITED STATES OF AMERICA,        :   Docket No. CR 09-16-S
4                                     :
                         Plaintiff,   :   **Frankfort, Kentucky**
5                                     :   Friday, March 19, 2010
           versus                     :   9:00 a.m.
6                                     :
     RUSSELL CLETUS MARICLE,          :
7    DOUGLAS C. ADAMS                 :
     CHARLES WAYNE JONES              :
8    WILLIAM R. STIVERS               :
     FREDDY W. THOMPSON               :      **Trial Day 28A**
9    WILLIAM B. MORRIS                :
     DEBRA L. MORRIS                  :
10   STANLEY BOWLING,                 :
                                      :
11                       Defendants.  :

12

13                            - - -
                        TRANSCRIPT OF TRIAL
14                   BEFORE DANNY C. REEVES
              UNITED STATES DISTRICT COURT JUDGE and a jury
15                            - - -

16   APPEARANCES:

17   For the United States:        STEPHEN C. SMITH, ESQ.
                                   JASON D. PARMAN, ESQ.
18                                 Assistant U.S. Attorney
                                   601 Meyers Baker Road
19                                 Suite 200
                                   London, KY 40741
20
     For the Defendant            MARTIN S. PINALES, ESQ.
21   Russell Cletus Maricle:      CANDACE C. CROUSE, ESQ.
                                   Strauss & Troy
22                                 150 E. Fourth Street
                                   Fourth Floor
23                                 Cincinnati, OH  45202

24                                 DAVID S. HOSKINS, ESQ.
                                   107 E. First Street
25                                 Corbin, KY  40701

2

```
1     For the Defendant          R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
2                                Landrum & Shouse, LLP
                                 220 West Main Street
3                                Suite 1900
                                 Louisville, KY 40202
4

5     For the Defendant          T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
6                                133 West Short Street
                                 Lexington, KY  40507
7

8     For the Defendant          ROBERT L. ABELL, ESQ.
      William R. Stivers:        120 North Upper Street
9                                Lexington, KY  40507

10

11    For the Defendant          RUSSELL JAMES BALDANI, ESQ.
      Freddy W. Thompson:        Baldani, Rowland & Richardson
                                 300 West Short Street
12                               Lexington, KY  40507

13

14    For the Defendant          JERRY W. GILBERT, ESQ.
      William B. Morris:         Coy, Gilbert & Gilbert
                                 212 North Second Street
15                               Richmond, KY 40475

16

17    For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:           Gess, Mattingly & Atchison, PSC
                                 201 West Short Street
18                               Lexington, KY 40507

19

20    For the Defendant          DANIEL A. SIMONS, ESQ.
      Stanley Bowling:           Thompson, Simons, Dunlop & Fore
                                 116 West Main Street
21                               Suite 2A
                                 Richmond, KY 40476
22

23

24

25
```

3

```
 1    Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                   Official Court Reporter
 2                                 35 W. Fifth Street
                                   P.O. Box 1073
 3                                 Covington, KY  41012
                                   (859) 291-4410
 4

 5         Proceedings recorded by mechanical stenography,
      transcript produced with computer.
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1             (Proceedings commenced at 8:56 a.m.)

2             THE COURT:  Thank you, and good morning, everybody.

3    I understand Mr. Smith had an issue to take up before the

4    jury's brought up?

5             MR. SMITH:  Yes, Your Honor.  I wanted to update the

6    Court.  Last evening, we had an opportunity to assess the

7    rebuttal case of the government, and I believe that if Mr.

8    Simons' predictions hold true about noon, we intend at this

9    point to call very little, if any, rebuttal.  And so certainly

10   want the Court to know that.  There's still one or two

11   witnesses that are a slim possibility, but we're debating at

12   this point calling no witnesses.

13            THE COURT:  All right.  Appreciate that.

14            MR. SIMONS:  Your Honor, that puts a good deal of

15   pressure on me, but --

16            THE COURT:  All right.  We all operate better under

17   pressure.  So that will be good.  Yes, sir, Mr. White.

18            MR. WHITE:  Your Honor, good morning.  Based on what

19   Mr. Smith has forecast, if you would let me, then, I've almost

20   completed my proposed jury instructions.  I have just three.

21   I don't have access to a printer, but if I can just e-mail to

22   you over lunch and bring a hard copy Monday morning, would

23   that be okay?

24            THE COURT:  That would be fine.  Mr. Westberry.

25            MR. WESTBERRY:  Thank you, Judge, good morning.  We

1    talked about the possibility of bringing a sur-rebuttal

2    witness.  Based on the way we left it when we broke off

3    yesterday afternoon, I was thinking Monday morning.  If you

4    want me, depending upon how the schedule goes, I haven't made

5    a final decision yet, but we'll do our very best.  We were

6    going to get some subpoenas possibly served today on these

7    people with the idea that they would have been here Monday

8    morning, but I'll do -- of course, we'll do whatever the Court

9    wants.  We want to move this along too.  We've just got some

10   logistical issues.

11              THE COURT:  I understand.

12              MR. WESTBERRY:  Thank you.

13              THE COURT:  Anything else?  Are all of our jurors

14   here?

15              COURT SECURITY OFFICER:  Yes, sir.

16              THE COURT:  All right.  Let's bring them in.  I

17   believe Mr. Cann was still testifying.

18              MR. SIMONS:  Yes, Mr. Cann.

19              THE COURT:  We'll bring him in in just a moment.

20                  (The jury entered the courtroom at 8:59 a.m.)

21              THE COURT:  The record will reflect that all members

22   of the jury are present.  Parties and counsel are also

23   present.  If you could bring the witness back in, please.

24              Mr. Simons, if you'd like, you can come back around.

25              MR. SIMONS:  Thank you.

*CANN - Direct (Mr. Simons)*                                                    6

1        THE COURT:  Thank you.  The witness has returned to

2   the witness stand.  I will remind him he's still under oath.

3   Before you begin, I do want to remind all of the attorneys --

4   Mr. Simons, of course, you're using the podium so this doesn't

5   necessarily apply to you, but as we conduct examination, if

6   y'all are going to conduct from your tables, make sure that

7   you speak into the microphones.  I don't know if the jury can

8   hear you, but sometimes I can't hear you, and it would be

9   helpful if y'all could use those microphones on the tables.

10  Thank you, and you can proceed.

11        MR. SIMONS:  Thank you, Your Honor.

12             DIRECT EXAMINATION (continued)

13  BY MR. SIMONS:

14  Q.   Good morning, Mr. Cann.

15  A.   Good morning.

16  Q.   Yesterday afternoon, I had presented you with a lot of

17  documents that you had brought pursuant to my subpoena.  In an

18  effort to try to expedite things, I have pared that down into

19  some individual documents.

20        MR. SIMONS:  If I could have the Court security

21  officer, please.  They are marked for identification purposes,

22  Your Honor, as SB-2A through SB-2K.  They've all previously

23  been introduced.  It's a part of the collective exhibit.

24        THE COURT:  All right.  Let's see, I'm not sure

25  Exhibit 2 was introduced.  Exhibit 2 was introduced?

*CANN - Direct (Mr. Simons)*                                                        7

1          DEPUTY CLERK:  Yes, Your Honor.

2          THE COURT:  All right.  So those will be sub-parts.

3    Thank you.

4    Q.   Mr. Cann, 2A is what you are looking at right there.

5    That is the set of plans involved in what I'm calling the Big

6    Creek water line extension; is that correct?

7    A.   Correct.

8    Q.   And that extends on to Rocky Branch and Laurel Branch

9    Roads in Clay County, Kentucky, correct?

10   A.   Correct.

11   Q.   And that's a set of some several pages.  All of those

12   were prepared by Cann-Tech, and they would show the outline of

13   the project itself?

14   A.   Correct.

15   Q.   Would you describe for the jury, please, what the terrain

16   in the area is like where this project took place?

17   A.   Well, I would describe it as hilly, pretty rocky terrain.

18   Q.   Is the road narrow?

19   A.   Yes, it is.

20   Q.   Is there a ditch line on one side and a cliff on another,

21   much of it?

22   A.   Pretty much.

23   Q.   And on one side of the road, was there a high pressure

24   gas line?

25   A.   Yes.

*CANN - Direct (Mr. Simons)*                                             8

1    Q.   Okay.  Would that make it impossible to or impracticable

2    or dangerous to dig in that area where the high pressure gas

3    line was?

4    A.   I would think so, Dan.  To the best of my recollection,

5    yes, it probably would.

6    Q.   Okay.  And it would necessitate or at least call for a

7    deviation from the original plan in the ditch were that the

8    case; would it not?

9    A.   Yes.

10   Q.   Now, I want to move on for just a second, if I could.

11   You just set that aside, and I want to ask you about the

12   individual exhibits that I've put before you.  The first one

13   is 2B.  And could you tell the jury, please, what that is?

14   A.   This is an advertisement for bids.  It actually is an ad

15   that goes in the paper.  It was prepared by Cann-Tech, given

16   to the City to put in the local paper, and this advertisement

17   was also provided to the City of Manchester, the Dodge

18   Corporation, which is a clearinghouse agency for the

19   contractors, and then this ad should have appeared in the

20   local paper.

21   Q.   Okay.  So it was -- is that a reasonable advertisement

22   for projects such as this?

23   A.   Yes, it is.

24   Q.   Okay.  Now, Exhibit 2C, if you could look at that,

25   please.

*CANN - Direct (Mr. Simons)*                                                    9

1    A.   Okay.

2    Q.   Would you tell the jury what that is, please?

3    A.   Actually, this is a performance bond.  It's something

4    provided by the contractor as part of the contract documents.

5    It ensures that they perform their work in an appropriate

6    manner.

7    Q.   Okay.  Now, if you would look at 2D, please, and I will

8    have a question or two for you about that.  It's a series of

9    four pages, actually.  It appears to be -- well, you just tell

10   the jury what it is.

11   A.   Pardon?

12   Q.   Just tell the jury what that exhibit constitutes, please.

13   A.   This is actually a final engineering report.  It's a

14   report that's typically prepared by our company once we have

15   received bids and opened bids on a project.  We evaluate those

16   bids, make recommendations to the owners, funding agencies,

17   and so forth and put a project budget in there that's included

18   there.

19   Q.   The project budget in this case was what amount, please?

20   A.   The project budget, the total project budget is $232,367.

21   Q.   And the bid for the project, B&B's bid that was accepted

22   was how much, please?

23   A.   The bid that was accepted was $166,951.

24   Q.   Earlier in that letter, it indicates that the total base

25   bid was more than that, $197,240.  Do you see that?

*CANN - Direct (Mr. Simons)*                                             10

1   A.   That's correct.

2   Q.   And then why did -- why was that reduced to 166,951?

3   A.   Once we opened bids and that we had that bid price, it

4   was actually a little bit over budget.  Yesterday, I was

5   trying to explain that 10% contingency requirement.  So we had

6   to scale back the project, get the 10% contingency in there,

7   and that's why it was scaled back to that amount.

8   Q.   The project was actually reduced in scope.  Is that what

9   you're --

10  A.   That's correct.

11  Q.   And then the last two pages of that show the bids by B&B

12  Excavating.  First, in the larger intended project of 197.

13  And secondly, in the project that was actually done of 166 and

14  change.  Is that fair?

15  A.   That's correct.

16  Q.   Okay.  Now, if you would look at SB-2E, please, and tell

17  the jury what that is.

18  A.   It's actually an insurance certificate provided by the

19  contractor as part of his contract documents just making sure

20  his -- it's got the proper insurance.

21  Q.   And that's necessary for a contractor to be suitable in a

22  contract such as this?

23  A.   That's correct.

24  Q.   If you would look at SB-2F, please.  Could you tell the

25  jury, please, what that is?

*CANN - Direct (Mr. Simons)*                                              11

1    A.   This constitutes the contract agreement.  Basically, the

2    contract entered into, agreement between the City of

3    Manchester and B&B Excavating.  Basically just stating

4    performance of the work.

5    Q.   It's also signed by Cann-Tech, you on behalf of

6    Cann-Tech?

7    A.   Cann-Tech witness signatures.

8    Q.   And was that contract drafted by Cann-Tech?

9    A.   Yes.

10   Q.   Thank you.  I don't see a space there for a lending

11   agent.

12   A.   That's correct.  There may be another location.

13   Actually, there's not.  Not with this particular funding

14   agency, they do not sign the contract.

15   Q.   This was KIA; was it not?

16   A.   That's correct.

17   Q.   And what does KIA stand for, please?

18   A.   Kentucky Infrastructure Authority.

19   Q.   Okay.  And they don't sign the contract agreement?

20   A.   That's correct.

21   Q.   All right.  The next exhibit I want you to look at is

22   SB -- I think it's 2J.  And that's a bid schedule; is it not?

23   A.   Yes, I think it's 2G, looks like, on mine.

24   Q.   2G.  I can't read my own writing.

25   A.   Yes, it is a bid schedule.

1    Q.   And that is the bid that was placed by B&B that was

2    actually awarded on this particular job?

3    A.   That's correct.

4    Q.   Is that correct?  Okay.  H follows G.  The next document

5    you have before you is -- would you tell the jury what that

6    is?

7    A.   That's a notice of award.  That basically is a document

8    that says we reviewed your bid, got the proper performance

9    bonds and so forth in order, and the plan is to award this

10   project to B&B.  It's basically telling the contractor that we

11   are planning to award this project to you.  It's a notice of

12   award.

13   Q.   And was that the recommendation of Cann-Tech?

14   A.   Yes.

15   Q.   Okay.  Now, the next document is SB-2I.  And that is --

16   tell the jury what it is.

17   A.   It's a form that's provided by the funding agency, which

18   Kentucky Infrastructure Authority, and it basically is a form

19   on which you do the project budget.  It's got the breakdown of

20   where the costs are.

21   Q.   Okay.  Now, I'm looking at that document.  I would like

22   for you to explain one or two things to me.  It appears that

23   there is a total development fund of $750,000.  Is that

24   correct?

25   A.   That's correct.

*CANN - Direct (Mr. Simons)*                                          13

1    Q.   And this project was one portion of that; is that right?

2    A.   That's correct.  It's my understanding the City had some

3    debt, current debt at that time, and as part of this project,

4    $513,000 of those funds were earmarked to pay off debt.

5    Q.   Pay off debt --

6    A.   That the City had in place.

7    Q.   Okay.  Thank you.  Now, if you would look at SB-2J,

8    please, sir.

9    A.   Yes, sir.

10   Q.   Do you have that?

11   A.   Yes, I do.

12   Q.   Now, we talked a little bit yesterday about change

13   orders.  Does this reflect a change order of some type?

14   A.   Yes, it does.

15   Q.   Would you explain that, please, to the jury for me?

16   A.   This change order is -- I touched on this briefly

17   yesterday.  It is a summary adjustment change order.  And this

18   change order, because the contract was a unit price bid, you

19   get paid for what work you do at the end of the project.

20   There was a summary adjusting change order whereby some of

21   those contingency funds were expended, and the water line was

22   extended a little bit further than what the original contract

23   was.

24   Q.   Okay.  And the amount of the change order was $16,438.40?

25   A.   That's correct.

*CANN - Direct (Mr. Simons)*                                        14

1   Q.   And that reflected increased costs because of the

2   increased size of the project; is that fair?

3   A.   That's correct.

4   Q.   All right.  Is there anything at all unusual about that

5   change order that causes you some alarm?

6   A.   No, sir.

7   Q.   And that was approved, certainly, by Cann-Tech?

8   A.   Yes.  The back sheet of that contract kind of tells you

9   what the original quantities were and the original scope of

10  the project and then what the final quantities were that were

11  installed.

12  Q.   Okay.  If you could look, please, for me at SB-2K,

13  please, and that's a combined two letters.  Would you tell the

14  jury, please, what those two letters are?

15  A.   This is once the projects are complete, we call it our

16  project closeout letter, where we notify the regulatory agency

17  that the project has been completed in accordance with the

18  plans and specifications, and we set -- contracts are

19  typically bound by a one-year warranty period for their work.

20  This is notifying the regulatory agency the project has been

21  completed.  It's notifying the owner, as well, that the

22  one-year warranty period had started and providing that date.

23  Q.   Does the second page of that exhibit indicate that the

24  entire project has been constructed and tested in accordance

25  with the approved plans and specifications?

*CANN - Direct (Mr. Simons)*                                              15

1    A.   Yes, sir.

2    Q.   So it was satisfactorily concluded by B&B Excavating; is

3    that correct?

4    A.   That's correct.

5    Q.   All right.  If a warranty claim was made against this

6    work, would it come to your attention as engineering -- as the

7    consulting firm?

8    A.   Yes, that's correct.

9    Q.   Was there such a warranty claim made on this project?

10   A.   No, sir.

11   Q.   Thank you.  Now, the total bid with the change order, the

12   total payment to B&B, I think, was slightly in excess of

13   $183,000.  That sounds like a lot of money to me and perhaps

14   to several people, but with respect to sewer line and water

15   line work for a municipality, would you consider that a small,

16   medium or large project?

17   A.   Small.  Small project.

18   Q.   Okay.  Would you call it a -- well, all right.  That's

19   fair enough.  Would you be at all surprised that the larger

20   companies available in the area would not bid that project?

21   A.   No, I would not be surprised by that.

22   Q.   As a matter of fact, you would be surprised if they did

23   bid such a project; would you not?

24   A.   I think that's a fair statement, yes.

25   Q.   You're familiar with B&B Excavating and Mr. Bowling and

*CANN - Direct (Mr. Simons)*                                            16

1   his company; are you not?

2   A.  Yes, I am.

3   Q.  Would you think that it's the type of project that they

4   would be well suited for?

5   A.  Yes.

6   Q.  Now, I want to talk to you just for a second about the

7   other plans that you drew on another project for B&B.  You

8   didn't draw those for B&B.  You drew them for the City of

9   Manchester, as I recall?

10  A.  That's correct.

11          MR. SIMONS:  If I could have the Court security

12  officer --

13          THE COURT:  Yes, sir.

14  Q.  The Court security officer has just handed you three

15  exhibits.  They're numbered 3, 4 and 5.  And as I am wont to

16  do, I'm going to start at 5 and go backwards, if I could.  So

17  the large exhibit there is marked Defendant's Exhibit 5.

18  Would you please tell the jury what that is?

19  A.  It's plans for a sewer line repair/replacement project.

20  These show plan and profiles of the sewer lines and manholes

21  that are in question.

22  Q.  And I think you told us yesterday that you drew those

23  plans for the City of Manchester at the request of the City,

24  and sometime in 2003; is that correct?

25  A.  Yes.  That's correct.

*CANN - Direct (Mr. Simons)*                                          17

1    Q.   What was the date?

2    A.   The date?

3    Q.   The date.  Is the date on the plans, sir?

4    A.   5/15/03 is the date on the plans.

5    Q.   And the intention at the time was that the City was going

6    to --

7         MR. SMITH:  Your Honor, I'm going to object to this

8    witness being able to speak to the City officials' intentions.

9         THE COURT:  It's leading, and I'll sustain the

10   objection.

11   Q.   At the time you drew the plans, you were not anticipating

12   doing the oversight work on this project; is that correct?

13   A.   That's correct.

14   Q.   Okay.  Now, you also have in front of you two smaller

15   exhibits, single pages.

16   A.   Yes, sir.

17   Q.   And those are, I think, Numbers 3 and 4, and there was a

18   floppy disk.  Are those smaller representations of the larger

19   plan documents?

20   A.   Actually, Exhibit 3 appears to me to be just some

21   information from the surveyor that's showing existing lines.

22   Q.   Okay.

23   A.   These plans have existing and proposed on them.

24   Q.   Okay.  And what is Exhibit 4, please?

25   A.   Exhibit 4 is just a profile of those plans as well.

1   Q.   Okay.  And are all those documents kept in the ordinary

2   course of Cann-Tech's business in connection with the work on

3   behalf of the City respecting this sewer repair project?

4   A.   Yes.

5        MR. SIMONS:  Your Honor, I'd move the introduction of

6   Exhibits 3, 4 and 5 at this time.

7        THE COURT:  Any objection?

8        MR. SMITH:  No, Your Honor.

9        THE COURT:  Exhibits 3, 4 and 5 will be admitted.

10  Those are Stanley Bowling Exhibits 3, 4 and 5.

11                    (Bowling Exhibit Nos. 3, 4 and 5

12                     was admitted into evidence.)

13  Q.   Mr. Cann, you, as you stated, you didn't intend to do any

14  oversight, and you didn't on that project; is that correct?

15  A.   That's correct.

16  Q.   Do you know whether it was done or not?

17  A.   Not for sure.

18  Q.   Okay.  Now, with respect to B&B Excavating generally,

19  you've worked with them a few times; is that correct?

20  A.   Yes, that's correct.

21  Q.   Have they always been timely in their performance of

22  their contracts?

23  A.   Yes, they have.

24  Q.   Have they always complied fully with the plans that

25  you've drawn and the specifications necessary?

*CANN - Cross (Mr. Smith)*                                               19

1    A.  Yes, sir.

2    Q.  All right.  Have you recommended them as a contractor on

3    occasion?

4    A.  Yes, I recommended them on this project.

5    Q.  Have you ever been asked to write a letter of

6    recommendation for B&B?

7    A.  Not aware.  I can't recall.

8    Q.  Okay.

9            MR. SIMONS:  I'd ask the Court security officer --

10           MR. SMITH:  I'm going to object to the relevance.

11           THE COURT:  If this is intended under Rule 608(b),

12   I'll sustain the objection, counsel.  If you want to come up

13   and explain if it's relevant for some other reason, you can

14   come up.

15           MR. SIMONS:  That's okay, Your Honor.

16           THE COURT:  Very well.

17           MR. SIMONS:  Your Honor, I'll pass the witness at

18   this point.

19           THE COURT:  All right.  Thank you.

20           Mr. Smith, you may question the witness.

21                     CROSS-EXAMINATION

22   BY MR. SMITH:

23   Q.  Good morning.

24   A.  Good morning.

25   Q.  I'm Stephen Smith, and I represent the United States, and

*CANN - Cross (Mr. Smith)*                                                     20

1    I have a few questions for you.  Sir, as I understand it,
2    you're a consultant and also one who draws up plans.  Is that
3    fair?
4    A.   Yes, that's correct.
5    Q.   And you're hired by the City, not by the contractor; is
6    that right?
7    A.   That's correct.
8    Q.   So your relationship is contractually with the City and
9    not private contractors such as B&B; is that fair?
10   A.   That's correct.
11   Q.   And when you described your overall process, I guess, of
12   jobs, I assume that there is a process in which you all
13   generally follow on water, sewer projects; is that fair?
14   A.   That's correct.
15   Q.   And I would assume that when you're overseeing a project
16   such as that, you have to do a lot of pre-planning.  Would
17   that be fair?
18   A.   Yes.
19   Q.   Before you start digging, there will be a lot of things
20   you have to have consulted before you start digging dirt; is
21   that fair?
22   A.   That is correct.
23   Q.   Would it be fair to say, sir, that you have occasion to
24   employ surveyors?
25   A.   Yes, we do.

*CANN - Cross (Mr. Smith)*                                                      21

1    Q.   Is that pretty common in a project where you're setting

2    water lines?

3    A.   For a water line project, it's not common, but it does --

4    I wouldn't call it common, but it does happen, yes.

5    Q.   And I assume that when you're drawing up plans that you

6    actually have to go on the ground?  You can't just draw this

7    thing up on a piece of paper and expect it to work, right?

8    You got to send people out on the ground?

9    A.   That's correct.

10   Q.   If you don't send a surveyor, who do you generally

11   contact on your projects, sir?

12   A.   If we don't send a surveyor?

13   Q.   Yes, sir.

14   A.   We pretty much do all that work in house.  I mean, with

15   ours -- we may contact some utility companies, some land

16   owners.  We assist our client in securing easements for the

17   project.

18   Q.   So in the pre-planning stage, it would be important, you

19   would agree, sir, that you contact utility companies, right?

20   A.   Yes.

21   Q.   And one of the main reasons is if you're going to run a

22   water line, you want to know where the electric poles are, I

23   guess, out there in the fields, right?

24   A.   That's correct.  We do a lot of visual observation where

25   the poles and so forth are located.

CANN - Cross (Mr. Smith)                                            22

1    Q.   And that kind of work is always done before you start

2    digging; is that fair?

3    A.   Supposed to be.  That's correct.

4    Q.   Now, you testified, I think, that there were two projects

5    that you worked on where B&B was employed by the city; is that

6    fair?

7    A.   I didn't.  There was only one project that I worked on

8    where B&B was employed by the project that I knew about.  The

9    sewer project, I didn't know --

10   Q.   You didn't know that B&B ultimately got that emergency

11   project on the sewer project?

12   A.   I don't think so.

13   Q.   And you're not -- I assume you weren't aware how they got

14   the Health Department to sign an emergency certificate there

15   in the attorney's office to get that awarded?

16   A.   No, sir.

17   Q.   And you're not aware that the Health Department never

18   even made a physical inspection, but just signed it because

19   the mayor wanted it to?

20   A.   No, sir.

21   Q.   And you're not aware of the relationship that Stanley

22   Bowling and Kennon White and Mayor Daugh White had during this

23   time period I assume either, are you?

24   A.   No, sir.

25   Q.   But you have testified, I believe, that the Laurel

*CANN - Cross (Mr. Smith)*                                              23

1    Branch, the Big Creek project is one in which you did have a

2    relationship with B&B, as far as them doing the work and you

3    being the oversight consultant for the City?

4    A.   That's correct.

5    Q.   And I believe you testified that in that project, there

6    was noted, I believe, that there was some rocky ground and

7    some situations where the sewer line had to be -- or the water

8    line had to be run down into the creek bank, creek bed.

9    A.   I don't -- I don't know -- I don't recall saying that.

10   Q.   Well, let me ask the question a little more clearer,

11   then.  It was my understanding you just testified this morning

12   that there was a project at the Laurel Branch water line

13   extension, which is again part of this Big Creek, this one

14   project, right?

15   A.   Correct.

16   Q.   And in that project, counsel asked you some questions

17   about was there a circumstance that you recall where there was

18   a plan to run this water line, and I believe that there was

19   question about whether or not it got rerouted up into the

20   road, and I believe that you indicated you recalled that.  Do

21   you remember that testimony?

22   A.   I do recall there being an issue with the gas line.

23   We've had to relocate the water line as a result of that.  I

24   don't recall the details of that, but I do recall there being

25   a gas line, and we had to move the water line.

*CANN - Cross (Mr. Smith)*                                                      24

1    Q.   It would be fair, sir, would it not, that a gas line

2    would be something that you should have known about before you

3    ever started digging dirt down there?

4    A.   Well, I would say in Clay County, there are a lot of gas

5    lines that are in the ground that nobody knows where they are.

6    They may be privately owned.  And it's, it's not terribly

7    uncommon in that area to locate a gas line that nobody knew

8    about till you started digging.

9    Q.   But as I heard the question, this was a gas line main

10   described in the question.  Do you recall whether it was a gas

11   line main, sir?

12   A.   No, sir, I do not.

13   Q.   So you don't know what kind of gas line it was; is that

14   your testimony now?

15   A.   That's correct.

16   Q.   Okay.  But you would agree with me that's something you

17   should be looking at before you start a project is where the

18   gas lines are before you start drawing up plans to direct a

19   water line along a certain route, wouldn't that be fair?

20   A.   It's a gas line main that's owned by a utility company,

21   that would be a fair statement, yes.

22   Q.   Now, as I understand your testimony, just so we're clear,

23   you, as a consultant, are not the sole person in charge of

24   approving change orders, are you?

25   A.   That's correct.  We really don't approve them.  We may

*CANN - Cross (Mr. Smith)*                                         25

1   recommend.

2   Q.   Okay.  So as far as whether or not Kennon White and Mayor

3   White had a relationship with Stanley Bowling where they were

4   working these change orders to get extra money so they could

5   pay kickbacks in these projects, you didn't have any idea what

6   was going on there, did you?

7            MR. SIMONS:  Your Honor, could I object, ask to

8   approach?

9            THE COURT:  You can approach, yes, sir.

10                   (A sidebar conference was held out of the

11                    hearing of the jury):

12            MR. SIMONS:  Dan Simons, Your Honor, for Stanley

13   Bowling.  As the Court well knows, and I've argued this many

14   times, Mr. Bowling did testify in January of '07 before a

15   grand jury about this entire scheme, and he was granted

16   immunity.  If it applies to anything at all, it applies to

17   this line of questioning by Mr. Smith on cross-examination,

18   and it's a direct use of his immunized testimony, and that's

19   the basis of my objection.

20            THE COURT:  All right.  Mr. Smith?

21            MR. SMITH:  Well, Your Honor, if the Court recalls

22   the hearing that the FBI agent testified, talked about the

23   quantity of evidence that was established in this case was

24   well beyond the need for Mr. Stanley Bowling's testimony.  He

25   called it, I think, icing on the cake.  And I think one of the

*CANN - Cross (Mr. Smith)*                                                    26

1    things counsel has done here is he's chosen to open this area

2    of questions by calling this witness.

3           He wants to bring in these contracts, and he wants to

4    make this witness vouch for what he believes to be above

5    board, everything is great and everything was fairly done with

6    the City of Manchester, and he wants to hand tie the

7    government where, basically, we can't -- mum's the word,

8    basically.  We can absolutely ask no questions of any

9    witnesses if it relates in any way to the kickback scheme, and

10   I do not believe that's the order of this Court.

11          I believe that for him to make this argument now,

12   after having weeks and weeks and weeks of testimony and

13   instances upon instances in which the defendant has brought

14   this into issue and now to hand tie the government and say,

15   well, you can't ask a question about whether this witness had

16   knowledge of the relationship between the kickback scheme,

17   that was put in Kennon White's plea agreement.  He pled guilty

18   to that.  That's in the record.  He didn't object to that.

19          This evidence is in the record.  This is not Stanley

20   Bowling's testimony.  This is a fact.  It's a fact that he has

21   not denied.  And now, for him to say that I can't question the

22   witness I think unfairly restricts the government's ability to

23   cross-examine the extent of this witness's knowledge and to

24   test his knowledge and his understanding of that relationship.

25          MR. SIMONS:  My objection, Your Honor -- Your Honor,

1    I think that I have raised this issue so many times, it's

2    almost gotten on the Court's nerves, if I may say so.  And

3    I've tried to protect the record each and every time that I've

4    had an opportunity to do so.  Mr. Smith opened the trial by,

5    in his opening statement, talking about kickbacks from city

6    contractors, and the only one that has been demonstrated into

7    evidence is Stanley Bowling, B&B Excavating that I have heard

8    about.

9             THE COURT:  All right.

10            MR. SIMONS:  And I think it's an improper area for

11   the argument, reasons that I've stated each and every time.

12            THE COURT:  All right.  I think it would unfairly

13   restrict the United States' cross-examination of the witness

14   to not allow inquiry into this area at this point of the

15   proceedings.

16            I will sustain the objection to the form of the

17   question.  If you want to rephrase it -- I forget now exactly

18   how you phrased the question, but you need to indicate that if

19   the evidence would indicate that kickbacks occurred, then he

20   wouldn't have any knowledge of it.  It's a matter that's in

21   issue, rather than a factual matter.  It's disputed.  There

22   may be a lot of evidence to support your position.  If you

23   would rephrase the question, I'll allow you to ask it in that

24   manner.

25            MR. SMITH:  Okay.

CANN - Cross (Mr. Smith)                                    28

1          MR. SIMONS:  It's a suitable time for me to follow up

2    on one thing, Your Honor.  It's a natural segue to the Court's

3    ruling.  We had a rather tense moment the other day, and I was

4    a little shaken when Officer Briggs was on the stand, and I

5    put in some testimony by avowal, if you will recall.

6          THE COURT:  I don't recall.  You'll have to remind

7    me.

8          MR. SIMONS:  It was immediately after the issue with

9    the envelope and the safe.

10         MR. SMITH:  I'm not hearing, I'm sorry.

11         MR. SIMONS:  There was an issue with the envelope and

12   the safe, and Agent Briggs was on the stand, and I put in some

13   testimony by avowal.  And I think what the Court ruled was

14   that the issue of immunity was irrelevant to this action,

15   which I understand.

16         But I don't -- I thought that the ruling might have

17   been broad enough to have made it impermissible to talk about

18   the extortion or kickback as Mr. Smith or I might explain it.

19   I'm taking it that that is not the case.

20         THE COURT:  I really do not remember the conversation

21   we had at that point, and I don't know how it fits in to this

22   particular question here.  Are you wanting to call, recall

23   Special Agent Briggs?

24         MR. SIMONS:  No, no.  I think you were saying that

25   it's argument, and it can be used in argument, and that's my

*CANN - Cross (Mr. Smith)*                                        29

1    concern --

2            THE COURT:  Well, what I was attempting to say, maybe

3    not very artfully, was that Mr. Smith can question this

4    witness about that issue, but I was sustaining the objection

5    to the form of the question, the manner in which he asked the

6    question.

7            MR. SIMONS:  Okay.

8            THE COURT:  That was all I intended to indicate.  I

9    don't recall how this would fit in with the avowal testimony

10   that was presented, but I don't think it would affect my

11   ruling in any way, based on the nature of the evidence that's

12   been presented in the case through a number of witnesses.  So

13   I'll, again, I'll sustain the objection to the form of the

14   question, but you can inquire as to this area.

15           MR. SIMONS:  I understand, Your Honor.

16           THE COURT:  Thank you.

17                   (Sidebar conference concluded.)

18           THE COURT:  Thank you, counsel.  I'll sustain the

19   objection to the form of the question, but you can rephrase,

20   Mr. Smith.

21           MR. SMITH:  Thank you.

22   BY MR. SMITH:

23   Q.   Mr. Cann, assuming there's evidence in the record that

24   Kennon White and Stanley Bowling were working together with

25   the mayor there in the course of their relationship to, again,

1  establish a means which they could pay kickbacks in these
2  change orders, would you have knowledge of that?
3  A.   No, sir.
4  Q.   And in the course of your testimony, you're not saying
5  that change orders aren't subject to abuse, if I understand
6  your testimony, are you?
7  A.   Could you ask that again, please?
8  Q.   Well, my question is, sir, that you're not saying that
9  it's impossible to abuse change orders in contracts, are you,
10 sir?
11 A.   I'm not saying it's impossible, no.
12 Q.   And you're just not aware -- again, if the evidence is to
13 show that there is an ulterior motive for these change orders,
14 you weren't aware of it; is that fair?
15 A.   That's correct.
16 Q.   Now, you were also talking, I think, earlier yesterday
17 about these engineering estimates?
18 A.   Um-hmm, that's correct.
19 Q.   And I believe that you said this was generally prepared
20 for your client, the City.
21 A.   That's correct.
22 Q.   And do you dictate how the City uses those estimates,
23 sir?
24 A.   No.
25 Q.   So if the City chooses to unfairly restrict some bidders

*CANN - Cross (Mr. Smith)*                                                31

1   in not giving them that estimate and unfairly gives

2   preferential treatment to one contractor, would you be in a

3   position to halt or stop that kind of practice by a city?

4   A.   I don't think so.  I mean, we, you know, we are the

5   City's representative on those projects, I guess would be the

6   best way to describe our relationship.  We don't dictate what

7   they do or how they do it.

8   Q.   Well, let's talk about the advertisement of the Big Creek

9   project.  Are you aware how long that project was actually

10  advertised for bids, sir?

11  A.   No, sir, I'm not.

12  Q.   Isn't it true, sir, that the City of Manchester only gave

13  seven days advance publishment [sic] of that advertisement for

14  this bid for this project?

15  A.   I'm not a hundred percent sure of that.

16  Q.   And you would agree with me, sir, that that would be

17  short notice for a project to have only seven days' notice

18  before you close the bids; isn't that fair?

19  A.   I would agree with that.  Typically, in our business,

20  it's required, I think, a minimum of seven days, typically a

21  maximum of 21 days that it should appear in the paper.  Not

22  less than seven, not more than 21 is the typical.

23  Q.   And are you aware, sir, that B&B Excavating, operated by

24  Mr. Bowling, was the only bidder on this project?

25  A.   Yes, sir, I was aware of that.

*CANN - Cross (Mr. Smith)*                                                    32

1   Q.   Now, when you were talking, testifying earlier about the

2   sewer line project, you're not giving us an opinion about

3   whether or not that was an emergency or not, are you, sir?

4   A.   No, sir.

5   Q.   You weren't asked to determine whether or not that was an

6   emergency by the City of Manchester or not, were you?

7   A.   That's correct.  I was not.

8   Q.   Do you all generally have a meeting where you're present

9   with city officials when the bids are closed and going to make

10  a decision about -- or evaluate those bids?

11  A.   When the bids are taken and opened?

12  Q.   Yes, sir.

13  A.   Yes, sir, we typically conduct the bid openings.  We're

14  actually there at that time.

15  Q.   I have a page out of your exhibit, I believe this was out

16  of the original Defendant's Exhibit 2.  I'd like to -- if Mr.

17  Simons wants, I can put that up on the projector.

18            MR. SIMONS:  Can I see it first?

19  Q.   Do you recognize that as being a page of Defendant's

20  Exhibit Number 2?

21  A.   Yes, sir.

22  Q.   Okay.  And do you know what that is, sir?

23  A.   That actually is a sign-in sheet that's signed at -- all

24  the people present at the bid opening are asked to sign that.

25  Q.   And by looking at those signatures, can you tell us who

*CANN - Cross (Mr. Smith)*                                                      33

1   was present when you all opened the bid on this Big Creek

2   project?

3   A.   Look like Pam Mathis, the City of Manchester, Daugh

4   White, City of Manchester, I think that's Kennon White, City

5   of Manchester, Steven Bowling, B&B Excavating, Mike White,

6   City of Manchester, and Larry Cann, Cann-Tech.

7   Q.   And down at the bottom, I believe there's a notation that

8   says something to the effect only one bidder.  Do you see

9   that?

10  A.   Yes, sir.

11  Q.   And, in fact, that was the case as you've testified,

12  correct?

13  A.   That is correct.

14  Q.   I believe yesterday, you were asked to look at the

15  engineer's estimate for this project, and you were

16  unsuccessful in finding it.  Have you been able to find that

17  since you testified yesterday?

18  A.   No, sir, I have not.

19  Q.   Would it surprise you to learn that the bid of B&B

20  Excavating was at or near the price of which you'd estimated

21  in your engineer's estimate?

22  A.   Would I be surprised at that?

23  Q.   Yes, sir.

24  A.   No, sir.

25         MR. SMITH:  If I could have just a moment.

*CANN - Redirect (Mr. Simons)*                                          34

1            THE COURT:  Yes, sir.

2            MR. SMITH:  Pass the witness.

3            THE COURT:  All right.  Thank you.  See if any of the

4    other attorneys have questions before we get back to redirect.

5    No, doesn't look like it.  Mr. Simons, back to you.

6            MR. SIMONS:  Yes, Your Honor.

7                         REDIRECT EXAMINATION

8    BY MR. SIMONS:

9    Q.   Mr. Smith asked you if change orders are subject to

10   abuse.  Correct?

11   A.   Yes.

12   Q.   Well, if your company is involved, they're not subject to

13   abuse unless you approve it; isn't that fair?

14   A.   We would -- if we felt like they were subject to abuse,

15   we wouldn't recommend them.

16   Q.   Correct.

17   A.   We don't approve.  We would recommend.

18   Q.   Oh, I understand.  But if you were hired by the City, and

19   you thought there was an abuse going on, you would strongly

20   recommend to the City that they not approve the change order,

21   would you not?

22   A.   That's correct.

23   Q.   And does that also include the lending agency, if there's

24   change order abuse?

25   A.   That's correct.

*CANN - Redirect (Mr. Simons)*                                        35

1    Q.   Do you often find that lending agents will extend their

2    money to people who are abusing change orders and doing

3    unnecessary work?

4    A.   No, sir.

5    Q.   Now, I thought you told the jury earlier that you

6    prepared the ad and you ran it in the Dodge report for this

7    case.

8    A.   I prepared the advertisement.  We prepared it.  We

9    typically give that to the owner and let them handle getting

10   it in the -- just physically taking care of getting it in the

11   papers, and it does go to those Dodge agency groups.

12   Q.   Yes, thank you.  Now, let me ask you this.  Is it at all

13   surprising to you that a project of this size, that there may

14   be only one bidder?

15         MR. SMITH:  Your Honor, I'm going to object.  I

16   believe that the question has been asked and answered.

17         THE COURT:  I'll overrule.  I'll allow you to repeat

18   the question on redirect.

19   Q.   Is it surprising in a project of this size that there may

20   have only been one bid received for it?

21   A.   It wasn't terribly surprising.  It is a bit unusual, but

22   it didn't surprise me because during that time period, there

23   was -- we went through a period, I think it probably could be

24   documented with other folks that we weren't getting a whole

25   lot of bidders on projects, period, and it wasn't unusual to

*CANN - Redirect (Mr. Simons)*                                    36

1    get two or three, two or three bidders.

2        This project, the size of this project kind of falls into

3    a slot that it's, it's too big for plumbers-type contractors,

4    and it's too small for typical water line contractors.  So it

5    wasn't terribly surprising, but it is a bit unusual, I guess,

6    maybe to have one bidder.  That's why we went through the

7    process, everybody okay with this.

8    Q.  Certainly.  And the people who were there on the screen

9    would have been -- do you know who Pam Mathis is?

10   A.  Yes, I do.

11   Q.  Who is she?

12   A.  She is employed by the City.  I'm not exactly sure what

13   her title is.  I think maybe she deals with the grant

14   administration, but I'm not exactly sure what her title is.

15   Q.  And the mayor?

16   A.  The mayor.

17   Q.  And do you know what Kennon White, what position he held?

18   A.  No, sir.  Not sure.

19   Q.  Mike White, do you know what position he held?

20   A.  His title, I do believe, is city manager or city

21   supervisor.

22   Q.  All right.  And he was in charge of water line and sewer

23   projects; was he not?

24   A.  That's correct.

25   Q.  Had you worked with him on other occasions?

*CANN - Redirect (Mr. Simons)*                                        37

1    A.   Yes, I have.

2    Q.   Do you find him to have sound judgment and to be a

3    good --

4            MR. SMITH:  Your Honor, I'm going to object as to,

5    again, 608(b).

6            THE COURT:  Sustained.

7    Q.   And the list is not longer because the only people that

8    show up at a bid opening are those who have made bids; would

9    that be correct?

10   A.   Typically, the owners, engineer, and the contractors who

11   are going to submit a bid typically are the ones who are

12   there.

13   Q.   The notation that was at the bottom of the page said only

14   one bidder.  It also said something, did you make that note on

15   it?

16   A.   Yes, sir, I think I did.

17   Q.   And did it say something about KIA on that?

18   A.   I think so.  It was kind of hard for me to see it, but I

19   think I have that document here; but yes, that's my

20   recollection.

21   Q.   Do you think you could put your hands on it very quickly?

22   A.   Try.  Give me a minute.

23   Q.   Okay.

24   A.   Yes, I have this document here.

25   Q.   What is the notation on the bottom, sir?

*CANN - Recross (Mr. Smith)*                                                  38

1    A.   It says, "per Pam Mathis, KIA okay with awarding to B&B."

2    And in parenthesis, "it has only one bidder."  And it's dated

3    and initialed by me.

4    Q.   So it was confirmed with the lender that there was only

5    one bid and that the lending agent was fine with it?

6    A.   Correct.

7    Q.   You were fine with it, correct?

8    A.   Yes.

9    Q.   Cann-Tech?

10          MR. SIMONS:  Thank you.  That's all.

11          THE COURT:  Thank you.  See if there are any other

12   questions of the witness.  Mr. Smith.

13          MR. SMITH:  Yes, Your Honor.

14                      RECROSS-EXAMINATION

15   BY MR. SMITH:

16   Q.   Mr. Cann, you didn't speak with the Kentucky

17   Infrastructure, did you?

18   A.   No, sir.  I didn't.  I guess the official document was

19   our final engineering report that was sent to the Kentucky

20   Infrastructure Authority.

21   Q.   It says per Pam Mathis.  That was not your communication.

22   That was Pam Mathis' communication?

23   A.   That's correct.

24   Q.   And you indicated that typically these are sent to Dodge,

25   but you don't know whether it was sent to Dodge in this case

1   or not.  Is that fair?

2   A.   I can't say that with 100% certainty, but I would -- I'm

3   pretty certain that it did.

4   Q.   And that would be a service provider which is basically

5   communicating with contractors throughout both Kentucky and

6   outside the state of Kentucky; is that fair?

7   A.   That's correct.  I would say if the advert, the contract

8   documents did go to those agencies, they are listed, and I

9   think I have a document in there that shows they were sent to

10  those clearinghouse groups.

11  Q.   And I believe you've already admitted you're not aware of

12  how much notice these contractors got, but if the record shows

13  it was seven days, you don't disagree with that?

14  A.   No, I do not disagree with that.

15  Q.   And Dodge would be, again, a means in which cities are

16  supposed to advertise these and get competition throughout the

17  region and even outside the state of Kentucky.  Isn't that

18  fair?

19  A.   That's correct.

20  Q.   And you said in this case, there was only one bidder?

21  A.   Correct.

22  Q.   And that you all had noticed there was a problem in

23  getting bids on projects?

24  A.   During that time frame, a little bit tougher to get a lot

25  of bids.

*CANN - Recross (Mr. Smith)*                                        40

1   Q.   Are you aware that this was the eighth contract that was

2   awarded to B&B by the City of Manchester?

3   A.   No, sir.

4   Q.   You're not aware that they had been awarded the contract

5   on the Burger King waste water sewer pump station?

6   A.   No, sir.

7   Q.   Or Mill Pond Phase 2A waste water pump station?

8   A.   No, sir.

9   Q.   Or the little Mill Pond on Old Timer's Road?

10  A.   No, sir.

11  Q.   Or the Littleton project?

12  A.   No, sir.

13  Q.   Or the Muddy Gap project, or the Wayne Street sewer

14  project?

15  A.   No, sir.

16  Q.   Or the Goose Creek River project?

17  A.   No, sir.  We pretty much have worked with the City on

18  their clean water, their drinking water, and it sounds like I

19  think all of those you reference were probably waste water

20  projects so I wasn't involved in those.

21          MR. SMITH:  Thank you.

22          THE COURT:  Let me see if there's any other questions

23  of the witness.  Mr. Simons?  Based on areas just covered.

24          MR. SIMONS:  I understand.

25          THE COURT:  In recross.

41

1                    FURTHER DIRECT EXAMINATION

2    BY MR. SIMONS:

3    Q.   The projects that Mr. Smith just mentioned, you didn't

4    serve as the consulting engineering company on those, did you?

5    A.   No, sir.

6    Q.   And what you did was the clean water projects for

7    Manchester, and that's what this was?

8    A.   Correct.

9         MR. SIMONS:  Thank you.  That's all.

10        THE COURT:  All right.  Thank you, Mr. Simons.  Mr.

11   Cann, I'll let you step down.  If you can leave those

12   documents that have been marked and admitted as exhibits.

13   You'll leave those at the witness stand there.  Otherwise,

14   you'll be excused at this time.  If you have other materials

15   that you brought that were not marked and admitted, you can

16   take those back with you.

17        THE WITNESS:  I don't think I did.

18        THE COURT:  Thank you, sir.

19        Mr. Simons, you may call your next witness.

20        MR. SIMONS:  I would call Sarah Bowling, please.

21        MR. SMITH:  Your Honor, may we approach?

22        THE COURT:  Yes.

23             (A sidebar conference was held out of the

24              hearing of the jury):

25        MR. SMITH:  Your Honor, I've been notified by

42

1    multiple individuals that Sarah Bowling spent significant time

2    in the courtroom during testimony of witnesses in this case,

3    and based on the rule of separation I believe the Court's

4    invoked in this case, I would move to exclude her testimony

5    completely and totally in this matter, based on the violation.

6            MR. SIMONS:  Sarah Bowling hasn't been in this

7    courtroom, Your Honor, at any time during the testimony of any

8    witness.  I asked specifically can she set in during jury

9    selection, and she left, and she has not been back till

10   yesterday, and she's not been in the courtroom at all.  I

11   would like to know who the witnesses are who have seen her

12   here.

13           MR. SMITH:  Well, we have court security and agents

14   that have advised me of that, Mr. Simons, and --

15           MR. SIMONS:  Sarah Bowling, in this courtroom?

16           MR. SMITH:  Well, they described a lady that fits the

17   description in my mind, Mr. Simons, and I feel -- I'll stand

18   on my representation that that's what the Court security

19   officer will say.

20           MR. SIMONS:  As an officer of the Court, Your Honor,

21   I can tell you she's been under my instruction not to be here,

22   and she has not been here.  And I know her personally and have

23   met with her at some length, and I have been exceedingly

24   careful that she not even be in Frankfort during this trial.

25   She hasn't been in town until yesterday.

43

1          THE COURT:  All right.

2          MS. HUGHES:  This is Elizabeth.  I'll add that I know

3    her also, and she was here for jury selection, I believe, but

4    left the courtroom thereafter.  She has not been in the

5    courtroom.

6          THE COURT:  Okay.  Well, we have two options.  We can

7    briefly *voir dire* the witness outside the presence of the jury

8    to satisfy any concerns, Mr. Smith, that you have before she

9    would testify.  Sounds like you have a good faith belief that

10   she may have been in the courtroom.

11         The other option would be to allow her to testify and

12   then to allow you to cross-examine her.  And if it's

13   determined that she was in the courtroom, that would present

14   more of a problem.  What I'll do is I'll excuse the jury just

15   for a few moments, we'll have her brought in.  And Mr. Smith,

16   I'll allow you to ask her questions about her location during

17   the course of the trial and any other potential violation of

18   Rule 615, I think it would be.

19         MR. SMITH:  Also give the United States an

20   opportunity to call an agent to testify and present evidence

21   on that, because if we have an issue of fact, of course --

22         THE COURT:  Yes.  If there's a factual dispute about

23   that, I'll need to resolve that.  It may take a little longer

24   so what I'll do is I'll go ahead and excuse the jury for their

25   usual 20 minutes.  That will take us to 10:20.  We'll take

44

1   longer than anticipated, so it will take us to 10:30 and then

2   we'll be able to go to the lunch hour when we come back.

3   We'll do that at this time.  I'll give the jury their morning

4   break, and we can take this up outside their presence.

5            MR. SIMONS:  Thank you, Your Honor.  It's unlikely

6   I'll finish by noon, though.

7            THE COURT:  Things happen during trial that tend to

8   delay things.  So that's fine.

9            MR. PINALES:  May I be excused during that for maybe

10  five minutes?

11           THE COURT:  Yes, sir.

12           MR. WESTBERRY:  That was my request too.

13                    (Sidebar conference concluded.)

14           THE COURT:  Ladies and gentlemen, we're going to take

15  our morning break a little bit earlier so I can resolve a few

16  issues.  Take our usual, hopefully we'll take our usual

17  20-minute recess.  May be a couple minutes longer, but we'll

18  call you back when we are prepared to proceed.  It will not be

19  any shorter than 20 minutes, and hopefully no longer than 30.

20           Please keep in mind the admonitions you've been given

21  several times not to discuss the case among yourselves while

22  we are in recess.  The jury will be excused until 10:20 this

23  morning.

24                    (The jury left the courtroom at 9:58 a.m.)

25           THE COURT:  Counsel, before the witness is called in,

*BOWLING - Cross (Mr. Smith)*                                    45

1  we're going to take a five-minute convenience break, and we

2  will return at 10:05 this morning.

3             (Recess from 9:59 a.m. until 10:05 a.m.)

4             THE COURT:  All right.  Mrs. Bowling can be brought

5  in.

6             SARAH BOWLING, DEFENSE WITNESS, SWORN

7             THE COURT:  Ma'am, the attorneys may have a few

8  questions for you before the jury is brought in.  I'm going to

9  allow the United States to proceed at this time.  Mr. Smith?

10                      CROSS-EXAMINATION

11 BY MR. SMITH:

12 Q.  Miss Bowling, I'm Steve Smith, United States.  I have a

13 few questions for you.

14 A.  Okay.

15 Q.  I recognize your face, but I'm not real sure how many

16 times you've been in the courtroom in this case, ma'am.  Could

17 you tell us?

18 A.  I've been to hearings, and I was here for jury selection,

19 not been back since.  Not in the courtroom.

20 Q.  Okay.  Now, jury selection occurred in this case almost

21 seven weeks ago.  So your testimony is you've not been back in

22 this courtroom in seven weeks?

23 A.  Correct.

24 Q.  Okay.  And have you been on the court property?

25 A.  Not until this week, until I came as far as being a

*BOWLING - Cross (Mr. Smith)*                                              46

1    witness.

2    Q.    Okay.  So your testimony is you've not even been on the

3    courthouse grounds in seven weeks?

4    A.    I don't think so.

5    Q.    I'm sorry.  What was your answer?

6    A.    I said I don't think so.  I was here that day, and I

7    left.  I've not been back here until this week, when Dan

8    wanted me to be here as far as being a witness.

9    Q.    And when did you arrive here this week, ma'am?

10   A.    Tuesday.  Is today -- today's Friday.  I guess Tuesday.

11   Q.    And did you come on to the courthouse grounds on Tuesday?

12   A.    Yeah, I came up and sat in the witness room.

13   Q.    Okay.  So other than the time spent in the witness room,

14   have you been in the courtroom since you got here on Tuesday?

15   A.    No.

16            MR. SMITH:  All right.  I think that's all I have.

17            THE COURT:  All right.  Ma'am, you were recognized by

18   the Court earlier, weren't you?  Did you come into the

19   courtroom and were recognized as a witness?

20            THE WITNESS:  I did.

21            THE COURT:  So you were in the courtroom that day?

22            THE WITNESS:  Yeah, that's true.  I'm sorry.

23            THE COURT:  That's fine.  I just wanted to make sure

24   I recognized you.  Any other questions for Mrs. Bowling?

25            MR. SIMONS:  No.

*BRIGGS - Direct (Mr. Smith)*                                              47

1          THE COURT:  All right.  Thank you, ma'am.  I'll let

2    you step down right now.  You'll be called back in here in the

3    next little bit when we resume from our break.

4          THE WITNESS:  Okay.

5          THE COURT:  Thank you, ma'am.  Mr. Smith, do you have

6    witnesses you'd like to present on this issue?

7          MR. SMITH:  Call Special Agent Briggs.

8          THE COURT:  All right.  Thank you.

9          TIMOTHY S. BRIGGS, GOVERNMENT'S WITNESS, SWORN

10         THE COURT:  Thank you.  Mr. Smith, you may proceed.

11                       DIRECT EXAMINATION

12   BY MR. SMITH:

13   Q.   Special Agent Briggs, state your name, please.

14   A.   Timothy S. Briggs.

15   Q.   And we have just heard Miss Sarah Bowling testify that

16   she has not been in the courtroom in seven weeks, other than

17   the time she appeared here as a witness.  Did you hear that?

18   A.   Yes, sir, I did.

19   Q.   Have you been notified by members of the court security

20   about her presence here before this morning?

21         MR. SIMONS:  Your Honor, I'm going to object.  That's

22   hearsay.  We need to call the court security officer if he saw

23   someone in the courtroom.

24         THE COURT:  We'll get to that.  For the purposes of

25   this hearing, the Court can accept hearsay to make preliminary

*BRIGGS - Cross (Simons)*                                              48

1    determinations.  You can proceed.

2    A.   Yes, sir.

3    Q.   And what was reported to you?

4    A.   One of the court security personnel said they saw her in

5    here during the proof, and two others said they think they saw

6    her in here during the proof.

7    Q.   Did you make any observations yourself?

8    A.   I did not, but Task Force Officer Blair did.

9    Q.   And were they also consistent with what you've been told

10   by the court security?

11   A.   That's correct.

12   Q.   And that that was also an appearance by her in the

13   courtroom during our proof?

14   A.   Yes, sir.

15   Q.   Have you learned how long she was here?

16   A.   I believe a couple, a couple of days during proof.

17   Q.   Do you know what witnesses would have been called by the

18   government that she would have observed or what days of our

19   proof?

20   A.   I don't recall the days, sir, no.

21              MR. SMITH:  Pass the witness.

22              THE COURT:  All right.  Mr. Simons.

23                        CROSS-EXAMINATION

24   BY MR. SIMONS:

25   Q.   You didn't see her here, did you?

BRIGGS - Cross (Simons)                                          49

1    A.   Excuse me?

2    Q.   You did not see her here, did you?

3    A.   Yes, I did.

4    Q.   You saw her in the courtroom?

5    A.   I saw her at some point.

6    Q.   At what point was it, Agent Briggs?

7    A.   It was early on in the case.

8    Q.   During the government's case?

9    A.   I saw her in the courtroom.

10   Q.   What witness was on the stand, Agent Briggs?

11   A.   Sir, I don't recall.

12   Q.   Was it early in the government's case?

13   A.   Yes, it was.

14   Q.   Okay.  You have no idea what witness was on the stand?

15   A.   No, sir.

16   Q.   And you saw her in this courtroom.  That's your

17   testimony?

18   A.   Yes, sir.

19   Q.   And you can't remember a date, a witness, or the

20   substance of any testimony in which she was present in this

21   courtroom for?

22   A.   No, sir, because at the time I didn't know she'd be

23   called as a witness, so I didn't keep track of that.

24   Q.   Were you here when I asked the Court and announced that

25   she was going to be a witness and how long she could stay in

BRIGGS - Cross (Simons)                                          50

1    the court during *voir dire*?  You've been here during the

2    entire time.

3    A.   I don't recall, sir, if you mentioned her as a potential

4    witness or not.

5    Q.   You don't recall that I stood up and asked the Court

6    would it be permissible for my client's wife to sit here

7    during *voir dire* before the rule of exclusion of witnesses was

8    invoked?

9    A.   I don't recall that, sir.

10   Q.   Where was she sitting in this courtroom?

11   A.   The back left-hand side of the courtroom.

12   Q.   Back in that area?

13   A.   Yes, sir.

14   Q.   And you're sure that it was Sarah Bowling that was here?

15   A.   Yes, sir.

16   Q.   And you're sure it was during the presentation of the

17   government's case-in-chief?

18   A.   As reported to me by Task Force Officer Blair and the

19   court security.

20   Q.   I'm asking you if you saw her back there during the

21   government's case.

22   A.   I saw her early on during the case.

23   Q.   You saw her sitting in this courtroom.  That's your

24   testimony today, that you saw Sarah Bowling in this courtroom?

25   A.   Yes, sir.

*BLAIR - Direct (Mr. Smith)*                                        51

1    Q.   During the government's case?

2    A.   Yes, sir.

3            MR. SIMONS:  Nothing further.

4            THE COURT:  All right.  Thank you.  Anyone else?

5    Agent Blair, you may step down.  Mr. Smith, additional

6    witnesses?

7            MR. SMITH:  Task Force Officer Blair.

8            THE COURT:  Yes, sir.

9          EDSEL VINCENT BLAIR, GOVERNMENT'S WITNESS, SWORN

10                       DIRECT EXAMINATION

11   BY MR. SMITH:

12   Q.   State your name.

13   A.   Edsel Vincent Blair.

14   Q.   You've been present here for the moments in which we've

15   heard testimony about Miss Bowling's presence in the

16   courtroom.  Did you see her in the courtroom?

17   A.   Yes, sir, I did.

18   Q.   Do you know when it was that you saw her?

19   A.   Exact date, no.  I know it was early on in our case.

20   Q.   Okay.  Do you know if it was after witnesses were being

21   called?

22   A.   Yes, it was.

23   Q.   And have you reported that to Agent Briggs?

24   A.   Yes, I did.

25   Q.   Has anyone else reported also seeing her here during the

*BLAIR - Cross (Mr. Simons)*                                              52

1    government's case to you?

2    A.   Not directly to me, no.

3             MR. SMITH:  Pass the witness.

4             THE COURT:  Thank you.  Mr. Simons.

5                      CROSS-EXAMINATION

6    BY MR. SIMONS:

7    Q.   Like Agent Briggs, you've been here the entire trial?

8    A.   Yes, sir.  We've been in and out some, but yes.  Majority

9    of the trial.

10   Q.   Your testimony is you've seen Sarah Bowling in this

11   courtroom during the trial of this case?

12   A.   It was at the beginning of the trial, yes, sir.

13   Q.   You're sure it wasn't during the *voir dire* examination of

14   the jurors?

15   A.   I remember her here during the first *voir dire* also.

16   Q.   I'm saying are you sure it wasn't limited to that, as I

17   requested of the Court that she be admitted to stay here for

18   that and then she left?

19   A.   It was other than the first day of the *voir dire*.

20   Q.   Who was on the stand?

21   A.   I don't recall, sir, who was on the stand.

22   Q.   So both you and Agent Briggs have this memory of Miss

23   Bowling here, but neither one of you can tell me what day of

24   trial or who the witness was that she may have heard?

25   A.   Agent Briggs and I had both commented to one another that

*BLAIR - Cross (Mr. Abell)*                                          53

1    we were wondering why she was in the courtroom, because we

2    thought she may at one point be called as a witness.

3                MR. SIMONS:  That's all.

4                THE COURT:  Mr. Abell?

5                MR. ABELL:  May I, Judge?

6                THE COURT:  Yes, sir.

7                          CROSS-EXAMINATION

8    BY MR. ABELL:

9    Q.  Mr. Blair, are you clear, is it your testimony that Miss

10   Bowling was in the courtroom while a witness was testifying?

11   A.  It was at the first of our case is when the government

12   put the case on.

13   Q.  I'm asking a real specific question.  We need a real

14   specific answer.  Is it your testimony that Ms. Bowling was in

15   the courtroom while a witness was testifying?

16   A.  As I stated earlier, I don't recall who the witness was,

17   but she was in the courtroom.

18   Q.  Is that a yes or a no?

19   A.  Yes.

20   Q.  And you don't recall what witness it was?

21   A.  No, sir, I don't.

22               THE COURT:  Anyone else?  All right.  Thank you.  You

23   may step down.  Mr. Smith?

24               MR. SMITH:  Your Honor, I don't know the Court's

25   policy.  I've never had to ask a court security officer to

54

give testimony, and I will proffer to the Court that I've been
advised that there has been at least three court security
officers that have been questioned about this, and one had
specific recollection consistent with what these two agents
have testified to.

And again, I don't know, based on where we are with
this issue, and whether or not the Court will permit calling a
court security officer on this limited issue or not.  But
that's where we are.

THE COURT:  I don't know what the security officer
would testify to, but my ruling, I don't think, would be
altered by whether additional testimony were presented on this
issue.  If the officer testified that he recalled a specific
witness testifying and recognized Miss Bowling being present
at this time, it would certainly lend further support for your
position, but it would not result in the Court excluding this
witness entirely from testifying in the case.

You obviously can question her as you can question
any witness in the proceeding about whether they were present
in the courtroom after *voir dire* proceedings occurred.  I
think we know what the witness, this witness's testimony will
be.  And then if the United States wishes to present testimony
on that issue in rebuttal that would contradict that, that
would go to the witness' credibility if she were present in
the courtroom.

1           If the Court is able to make a finding when the facts

2    are not disputed -- of course, they're disputed here.  If it's

3    clear, if the Court observes a witness being present, that's

4    another matter.

5           I think under the circumstances of this case, under

6    Rule 16, the Court does have some latitude, and the Court

7    would not necessarily exclude the witness based upon competing

8    statements of witnesses in the case.  I'm not able to make a

9    conclusive determination as to whether she was or was not

10   present.

11          There are so many people who have been present in the

12   courtroom, I'm not able to determine who is who.  Didn't know

13   Miss Bowling at the time that opening statements were made or

14   *voir dire* proceedings were commenced, but we had quite a few

15   folks in the courtroom that day, as I recall.  So I can't make

16   that independent determination myself.  But I will allow her

17   to testify, and then she'll be subject to cross-examination.

18   Then if you wish to put on witnesses at that point, you can

19   put on your witnesses, and you can call court security

20   officers as witnesses if you choose to do so.  They're not

21   precluded from testifying as witnesses to observations they

22   make during the course of a proceeding, but that will be a

23   determination you can make at the appropriate time.  That

24   would be my determination on that issue.

25          All right.  Let's see.  We took a five-minute recess

56

1    earlier.  Let me see if we need to take a little bit longer

2    recess before the jury comes back in.  Anyone?  No?  We're in

3    good shape.  All right.  Let's bring the jury in, please.

4              MR. WESTBERRY:  Judge, may I?  One thing.

5              THE COURT:  Yes, sir.

6              MR. WESTBERRY:  I was trying to get an idea on

7    today's schedule, with the sur-rebuttal issue.  We had planned

8    on making that decision over the weekend based upon, again,

9    what we talked before we broke last night.  I don't know how

10   much more proof Dan has got, what the United States intends to

11   do, but I stand ready, willing and able --

12             THE COURT:  We're really not off schedule based on

13   this, because we've just taken our 20-minute recess a little

14   earlier than usual.  So I would assume Mr. Simons would be

15   completing his case around the lunch hour, a little bit

16   afterwards.

17             MR. SIMONS:  It's going to be after, Your Honor.

18             THE COURT:  A little bit afterwards.  I'm not sure

19   about rebuttal at this point.  There may be some additional

20   rebuttal now, but Mr. Smith, based on where we stand at this

21   point, what would you anticipate?

22             MR. SMITH:  I'd anticipate if Mr. Westberry has a

23   witness, he better have him here about 1:00.

24             THE COURT:  All right.

25             MR. WESTBERRY:  That's a little ambitious.  I think

57

1    1:00 is a bit ambitious from a logistical standpoint.

2         THE COURT:  Do you think it's possible to have your

3    witness here today?

4         MR. WESTBERRY:  Yes, I think if Miss Logan can step

5    out while we continue the proof, that helps a lot.

6         THE COURT:  Why don't we do that.  Why don't we

7    attempt to have any witnesses that might testify on rebuttal

8    or sur-rebuttal at least on their way here this afternoon.

9         MR. WESTBERRY:  If we have a problem, I'll certainly

10   let you know just as soon as I can.

11        THE COURT:  I appreciate that.  If we can complete

12   the proof today, it will make it easier in terms of

13   scheduling.  If we, for some reason, can't complete the proof

14   today -- and I told you I would allow you to call a

15   sur-rebuttal witness.  I'll do that.

16        If it's impossible to do that today, probably what we

17   would do, if everyone's in agreement, we would have our

18   instructions conference Monday morning, with the understanding

19   that you would have some sur-rebuttal, and I would bring the

20   witness in at lunch time.  We could have that proof and then I

21   would probably instruct, as opposed to argue and then

22   instruct.  I started to say obstruct, but maybe that's what

23   instructions are.

24        In this particular case, I may actually instruct

25   first, and that might result in me instructing the jury Monday

1  afternoon, with arguments to take place on Tuesday.

2          MR. WESTBERRY:  We do the sur-rebuttal before?

3          THE COURT:  You would have the sur-rebuttal before we

4  would do that, but that way I wouldn't have the jury setting

5  in here three hours while we argue about jury instructions.

6          MR. WESTBERRY:  Precisely, yes.

7          THE COURT:  I'm just thinking out loud right now, but

8  that's one possibility.

9          MR. WESTBERRY:  Thank you.

10          THE COURT:  All right.  Miss Logan, if you need to

11  step out, you're certainly free to do so.

12          MS. LOGAN:  Thank you, Your Honor.

13          THE COURT:  Let's bring the jury in.

14          MS. LOGAN:  And Your Honor, if I may, is it all right

15  if I come back in once I get things resolved?

16          THE COURT:  Yes, ma'am.

17          (The jury entered the courtroom at 10:24 a.m.)

18          THE COURT:  Once again, all members of the jury are

19  present.  Parties and counsel are also present.  At this

20  point, Mr. Simons, you can call your next witness.

21          MR. SIMONS:  Thank you, Your Honor.  I'd call Sarah

22  Bowling, please.

23          THE COURT:  Ma'am, you'll need to be administered the

24  oath in the presence of the jury.

25                  SARAH BOWLING, DEFENSE WITNESS, SWORN

*BOWLING - Direct (Mr. Simons)*                                        59

1          THE COURT:  Thank you.  You may proceed.

2                      DIRECT EXAMINATION

3    BY MR. SIMONS:

4    Q.   Good morning.

5    A.   Good morning.

6    Q.   If you need to move that microphone a little closer, you

7    can do that.

8    A.   Okay.

9    Q.   Would you tell the jury your name, please?

10   A.   Sarah Bowling.

11   Q.   And Sarah, where do you live?

12   A.   Manchester.

13   Q.   And are you married?

14   A.   Yes, I am.

15   Q.   And who is your husband?

16   A.   Stanley Bowling.

17   Q.   Do you see him here in the courtroom?

18   A.   He's behind the computer screen.  Yes.

19   Q.   Okay.  Let me ask you this.  Are you employed?

20   A.   Yes, I am.  Baptist Regional Medical Center in Corbin.

21   Q.   And what is your occupation, ma'am?

22   A.   I'm a nurse.  I work in critical care unit.

23   Q.   And how long have you been a critical care nurse at the

24   Baptist Regional Medical Center in Corbin?

25   A.   Since May of 2001.

BOWLING - Direct (Mr. Simons)                                    60

1    Q.   Okay.  Now, when did you and Stanley get married?

2    A.   October of '94.

3    Q.   Okay.  Had you been married previously?

4    A.   No, I had not.

5    Q.   Okay.  How did you and Stanley meet?

6    A.   At a conference in Owensboro in '92.

7    Q.   And how did you come to be there?

8    A.   It was a water, waste water treatment conference.  If you

9    have a license to treat water or waste water, you have to have

10   so many continuing education hours every so many years.  So

11   it's just a conference for that.  Suppliers are also there,

12   and I met him at one of those.

13   Q.   The jury's heard about Stanley's experience with waste

14   water treatment.  Why would you be at a waste water treatment

15   conference?

16   A.   At the time, I worked for the City of Versailles and had

17   a license for a waste water treatment plant and worked in one.

18   So I was there to get my hours to keep my license.

19   Q.   Met him there, developed a relationship and got married,

20   what did you say --

21   A.   October the 1st, '94.

22   Q.   What sort of -- what attracted you to Stanley?

23   A.   He was nice.  He was friendly.  He was gentlemanly.  And

24   there was people there that worked for him and people there

25   that were colleagues of his and it was obvious, rather

BOWLING - Direct (Mr. Simons)                                         61

1   quickly, that they, you know -- he was well thought of.

2   Q.   Okay.  Now, at that time, you lived in Woodford County?

3   Before --

4   A.   No, no, I did not.

5   Q.   Where did you live?

6   A.   I lived in Mercer County on the farm where I was born and

7   raised.

8   Q.   I was going to say, that's home for you, Mercer County?

9   A.   It was then.  Home's Manchester now.

10  Q.   I understand.  You were a farmer as a child?

11  A.   Yeah, I grew up on a farm, yes.

12  Q.   All right.  And do you have any particular hobbies or

13  vocations that have developed from that?

14  A.   Addicted to horses from age 2 or 3, I suppose.  Early on.

15  Q.   Okay.  And when you married Stanley, did you relocate?

16  A.   Yes, I did.  Moved to Manchester.

17  Q.   And moved to Manchester?

18  A.   To where we live now.

19  Q.   And was that an adjustment for you in any way?

20  A.   Yeah, it was different.  Lay of the land is different,

21  landmarks are different.  Different.

22  Q.   It's more hilly?

23  A.   Yeah.  Can't see as far.

24  Q.   Do you consider that to be home now?

25  A.   Absolutely.

BOWLING - Direct (Mr. Simons)                                    62

1   Q.   Okay.  When you moved to Manchester with Stanley and

2   began your life together, what was his job?

3   A.   He was the city supervisor.

4   Q.   Okay.  And what did that entail as far as you know?

5   A.   Water, sewer, streets, parks, sewer leaks.  Water line

6   breaks, power outage at the water plant.  Lots of telephone

7   calls, lots of stop what you're doing and go fix something

8   right now.

9   Q.   Was it a 40 hour a week job?

10  A.   Oh, more than that, easy.  It was, like I said, all plans

11  were subject to change when the telephone rang.

12  Q.   Okay.

13  A.   To go fix something or find the water leak or gather up

14  the crew and fix it or whatever needed to be done.

15  Q.   Was it similar to being on call as a nurse or a doctor?

16  A.   Well, he -- yeah, it was.

17  Q.   Okay.

18  A.   Like I said, he checked out every phone call he got.

19  Q.   Now, when you married Stanley, did he have a company

20  called B&B Excavating?

21  A.   B&B Construction at the time, yes.

22  Q.   Okay.  And that became B&B Excavating, Inc.?

23  A.   He already had it when I met him.  He incorporated it in

24  '93, I think, and the name changed from B&B Construction to

25  B&B Excavating, because that name, B&B Construction, was

*BOWLING - Direct (Mr. Simons)*                                          63

1    already taken, I think.

2    Q.   Okay.  It wasn't available at the time?

3    A.   Correct.

4    Q.   Do you know who owns that business?

5    A.   Stanley does.

6    Q.   Do you have any ownership interest in it?

7    A.   No, I do not.

8    Q.   Now, do you have any role, formal or informal, with B&B?

9    Have you had through the years, and how did it develop?

10   A.   Secretary.  I think that's on the little cards you get

11   from Trey Grayson, maybe, that you pay the $15 corporation fee

12   every year, and it lists -- at that time, I'm secretary.

13   Q.   You think you're listed as an officer of the corporation?

14   A.   Correct.

15   Q.   Okay.  Can you sign checks for B&B?

16   A.   Yeah, I balance checkbooks, pay the bills, keep the

17   ledger.

18   Q.   Make deposits?

19   A.   Yes.

20   Q.   Does B&B have a credit card?

21   A.   Yes.

22   Q.   Can you sign the -- are you a signatory on it?

23   A.   Yes.

24   Q.   Do you make any -- let me ask you this.  When you first

25   moved to Manchester, Stanley was a city supervisor.  Was B&B

BOWLING - Direct (Mr. Simons)                                        64

1    doing any business?

2    A.   Yes.  He did small stuff.  Evenings, weekends, holidays.

3    Q.   Okay.

4    A.   You know, maybe a service line or a septic tank or a dig

5    a ditch for somebody wanting to lay their own line in it.  You

6    know, he stayed busy.

7    Q.   Did you participate in any of that?

8    A.   Sometimes I went and helped him, you know.

9    Q.   Actually do the work?

10   A.   Yeah, rocks out of a ditch before he backfilled it or

11   shoot grade with the transit.

12   Q.   Were you paid for that?

13   A.   No.  No.

14   Q.   Now, did -- when did Stanley retire from city government,

15   if you know?

16   A.   The end of 2000.  December the 31st, 2000 would have been

17   his last day.

18   Q.   Would -- when he retired, I understood that working for

19   the City as supervisor was pretty much full-time?

20   A.   Yes.

21   Q.   And he did some weekend stuff for B&B?

22   A.   Correct.

23   Q.   All right.  Did the B&B efforts increase when he retired

24   from the City?

25   A.   Yes.  I mean, he'd been turning down work prior to that

BOWLING - Direct (Mr. Simons)                                    65

1   just for lack of time to do it.  Couldn't do both.

2   Q.  You mean that he was in more demand than he had time for?

3   A.  Yeah.  There was people that wanted things down that he

4   didn't have time to do.

5   Q.  Would you describe Stanley as a workaholic?

6   A.  Um-hmm.  And a perfectionist about his work.

7   Q.  Okay.  And you said you could write checks and balance

8   the checkbook and things like that.  Did you do payroll or

9   anything like that for B&B?  Have you ever?

10  A.  Well, I mean, you know, just the odd check for contract

11  labor if it was a here and there kind of thing.  But any kind

12  of payroll, the CPA did.

13  Q.  And who was the CPA for B&B?

14  A.  Charles Stivers.

15  Q.  And who is Mr. Stivers, for the jury, please?  Who is he?

16  Is he a CPA?

17  A.  He's a CPA there in Manchester, yes.

18  Q.  Okay.  And does he do all of the B&B tax returns?

19  A.  Yes, he does.

20  Q.  Does he do your personal tax returns?

21  A.  Yes, he does.

22  Q.  Do you understand whether -- do you know what kind of

23  legal entity B&B is?

24  A.  It's an S corporation so its income passes through,

25  filters to a personal tax return.  The monetary liability is

1   personal.

2   Q.   Okay.  Do you know whether or not Stanley took any salary

3   or any money from the company as he worked for it?

4   A.   No, he didn't draw a salary.

5   Q.   Okay.  Now, when Stanley decided to retire from the City

6   in 2000, did he consult with you, or was that a joint

7   decision?

8   A.   Yes.  We talked about it.

9   Q.   And what were the considerations that you -- what did you

10  think about in making that determination whether he would

11  retire or not?

12  A.   When I was within six months, less than six months of

13  finishing nursing school and going back to work, he was

14  turning down work that he didn't have time to do because of

15  still having the City job.  And he wanted to get that

16  developed so maybe it would be, you know, viable, we could get

17  Steven back at home.  He was working for another contractor

18  and gone four, five days a week and was missing out on

19  watching his kids grow up.

20  Q.   When you say Steven, you mean his son Steven?

21  A.   Correct.

22  Q.   And how many children does Steven have?

23  A.   He has two daughters.

24  Q.   And what are their names?

25  A.   Emily and Stephanie.

BOWLING - Direct (Mr. Simons)                                    67

1   Q.   And what would their ages have been in 2000 when Stanley

2   retired?

3   A.   Steph would have been 7 and Emma would have been a baby.

4   She was born in July of '99.  So she was very small.

5   Q.   Now, between 2000 and 2002, did Stanley devote his full

6   energies to B&B?

7   A.   Um-hmm.

8   Q.   That's true?

9   A.   Yes.

10  Q.   Okay.  Now, had Stanley ever run for any political office

11  ever --

12  A.   No, not --

13  Q.   -- prior to 2002?

14  A.   No.

15  Q.   And he made a decision in 2002 to run for magistrate?

16  A.   Correct.

17  Q.   All right.  Was that again a decision that the two of you

18  made together as a family?

19  A.   Yes.

20  Q.   All right.  What were the things that you talked about or

21  thought about when he decided to run?

22  A.   He missed the people.  He missed the PR part of it,

23  and --

24          MR. SMITH:  Your Honor, I'll object to the hearsay.

25          THE COURT:  Sustained.

BOWLING - Direct (Mr. Simons)                                    68

1    Q.   Don't tell me what he told you, just if you could tell me

2    your impressions of the reasons that why you decided and what

3    your thoughts were that he decided to run for magistrate.

4    A.   Well, I mean, I could tell that he missed the public

5    service.  He wanted back where he felt like he was making a

6    difference, and that was a way to be able to do that.

7    Q.   Okay.  Were you in favor of or against him running for

8    magistrate?

9    A.   If that's what he wanted to do, I was in favor of it.

10   And, I mean, I knew what we were getting ourselves into.  My

11   dad did it for 29 years.  It wasn't an alien concept.

12   Q.   Okay.  Excuse me?

13   A.   I said it wasn't -- I mean, I knew what we were getting

14   ourselves into.  My dad was a magistrate for 29 years.

15   Q.   In what county?

16   A.   Mercer County.

17   Q.   Mercer County.  Had you lived in Clay County long enough

18   by 2002 to have a feel for how popular or unpopular Stanley

19   was in the area in which he was going to run?

20   A.   I'd been there for, what, eight years by then.  A little

21   over.

22   Q.   What was your impression of his standing in the

23   community?

24         MR. SMITH:  Your Honor, I'm going to object as to the

25   relevance.

BOWLING - Direct (Mr. Simons)                                    69

1           THE COURT:  Sustained.

2    Q.  All right.  So he decided to run for magistrate in '02,

3    correct?

4    A.  (Nodding affirmatively).

5    Q.  Do you know the magisterial district in which he ran?

6    A.  It's District 2.

7    Q.  Okay.  And do you know how many precincts are in that

8    district?

9    A.  Three.

10   Q.  Can you name them for me?

11   A.  Greenbriar and Harts Branch and Big Creek.

12   Q.  Okay.  And in which of those three precincts do you and

13   Stanley live?

14   A.  Harts Branch.

15   Q.  Have you lived in the Harts Branch precinct ever since

16   you first moved to Manchester?

17   A.  Yes.

18   Q.  And is that in the city, Sarah?

19   A.  No.  It is not.

20   Q.  Those three precincts do not involve city property at

21   all; is that correct?

22   A.  No, they do not.

23   Q.  Okay.  Now, once you decided to run or once Stanley

24   decided to run, did you play any role in the campaign and

25   help?

BOWLING - Direct (Mr. Simons)                                    70

1    A.   I filled out the financial reports that have to be

2    periodically sent to Frankfort, and I think filed at the

3    clerk's office.  I opened the campaign account and paid the

4    bills and helped make signs, helped hang signs.

5              THE COURT:  Could you move that microphone down a

6    little bit?

7              THE WITNESS:  Yes, sir.  I have a cold.  I'm sorry.

8    Q.   When you say paying bills, what kind of bills would you

9    have?

10   A.   Newspaper ads, radio ads, bills for printing for bumper

11   stickers or, you know, calling cards, business card type

12   things.

13   Q.   To your memory, was the campaign self-funded by Stanley

14   and yourself?

15   A.   Yeah, the huge majority.

16   Q.   Okay.  Well, how much money are we talking about putting

17   into the campaign account in May and November of 2002?

18   A.   Collectively?

19   Q.   Yeah.

20   A.   The two elections?

21   Q.   Yeah.

22   A.   I'd say probably, and I'm guessing, maybe 4,000 in the

23   spring and half again that much in the fall.

24   Q.   Okay.  And that was used to get yard signs and make

25   signs, hang signs and advertisements?

1   A.   Um-hmm.

2   Q.   Did you have -- seems like everybody from Clay County has

3   fish fries or cookouts or barbecues or something like that.

4   Did you have anything like that?

5   A.   We had one, yes.

6   Q.   Okay.  And was that a fundraiser, or just a get-together?

7   A.   No, it was just a get-together.

8   Q.   And where was that?

9   A.   At the recreation center.

10  Q.   And where is the recreation center, for the benefit of

11  the jury here?

12  A.   It's as you enter the dead-end hollow where we live, it's

13  at the very beginning of it.  It's a brick building with, you

14  know, inside bathroom, and then there's shelters and a big

15  parking lot and --

16  Q.   Fairly close to your home?

17  A.   Yes.

18  Q.   Yes, okay.  Now, there has been some testimony in this

19  case about meetings that involved picking slates of candidates

20  or groups of candidates --

21  A.   Um-hmm.

22  Q.   -- tickets of candidates.  Are you aware of any such

23  meetings that would involve people like Jennings White, Edd

24  Jordan, Kennon White, anything like that?

25  A.   No, I'm not.

BOWLING - Direct (Mr. Simons)                                      72

1   Q.  Are you aware, were there any -- describe for the jury
2   the nature of your property.  You said at the end of the
3   dead-end holler where we live, I think.
4   A.  You know, as you come in the holler, the recreation
5   center would be on your left.  There's two or three picnic
6   shelters with picnic tables.  There used to be tennis courts.
7   I think they've torn those down.  There's a big parking lot
8   with lots of, you know, room to park vehicles, and then
9   there's a brick building where you can, you know, have
10  something inside if it's raining, and there's a bathroom and a
11  swimming pool adjoins that.  You can rent just the rec center,
12  or just the pool or the both.
13  Q.  Let me ask you this.  Did --
14  A.  Ooh, I'm sorry.
15  Q.  No, go ahead.
16  A.  And it's probably, and I'm not good at distances here,
17  it's probably three football fields between that and our home.
18  You can see the recreation center, parts of it, from our home
19  and vice versa.
20  Q.  Okay.  Does B&B Excavating have an office location other
21  than home?
22  A.  No.
23  Q.  Does B&B Excavating have a garage and a place to store
24  its equipment?
25  A.  Yes.

BOWLING - Direct (Mr. Simons)                                    73

1   Q.   Is that also on your property?

2   A.   Yes.

3   Q.   Do you also have a barn where you have your horses?

4   A.   Yes.

5   Q.   Okay.  In the spring and summer months, how do you and

6   Stanley and other family members spend your time?  Are you in

7   the house or outside?

8   A.   Outside.  He and I are always outside.  The oldest

9   grandchild's kind of quit the outside.  She stays cooped up on

10  the cell phone and the computer.

11  Q.   Is the garage a place that is frequented and frequently

12  visited and busy all the time?

13  A.   Yes.

14  Q.   Okay.  Now, who were you promoting for -- to be elected

15  in the May primary of 2002?

16  A.   Stanley.

17  Q.   Okay.  Well, I'm sorry.  Was there any other election

18  that you were concerned about?

19  A.   Not really.  I can't remember now who else was running

20  for what.

21  Q.   Did Stanley try to influence you to vote for any person

22  other than --

23          MR. SMITH:  Objection to hearsay.

24          THE COURT:  Sustained.

25  Q.   Okay.  Well, let me ask you straight out this question.

BOWLING - Direct (Mr. Simons)                                    74

1    Are you aware of any cash money that was received by your

2    husband or spent by your husband in May of 2002 for the

3    purpose of buying votes or getting voters to the polls outside

4    of the campaign fund that you talked about?

5    A.   No, I'm not.

6    Q.   Okay.  In May of 2002, where did you spend election day?

7    That would be Stanley's first race.

8    A.   Went and voted and then probably at home for the

9    remainder of the day.

10   Q.   And would you have been in the garage or in the house?

11   A.   Outside doing something.

12   Q.   Now, prior to that May election, was there any meetings

13   of candidates at your garage or your house?

14   A.   No.

15   Q.   What were the results of Stanley's first election, the

16   May primary, the Republican primary for magistrate of

17   District 2?

18   A.   I think that one, he won comfortably.  I don't think it

19   was really close.

20   Q.   And were there people that gathered at your home after

21   that election?

22   A.   Yes.

23   Q.   And was it a large crowd or a small crowd?

24   A.   I mean, quite a few.  I'd be guessing at a number, 25,

25   30, a lot of which would have been family.

*BOWLING - Direct (Mr. Simons)*                                      75

1    Q.   And was that -- I'll call it a victory party, I guess,

2    was that in the garage?

3    A.   Yes.

4    Q.   And did it last until late into the evening?

5    A.   Yes.

6    Q.   Was Stanley there the entire time with you --

7    A.   Yes.

8    Q.   -- and with the other people?  Did he ever leave to go

9    somewhere else after the election once the results were in and

10   he was home?

11   A.   No, not until we left and went home to go to bed.

12   Q.   Was he home at the time the polls closed?

13   A.   We all listened to the election returns together on the

14   radio.

15   Q.   Okay.  Now, where did you vote that day?

16   A.   Harts Branch precinct.

17   Q.   And at what time of day?

18   A.   Probably would have gone early.

19   Q.   Okay.  Is that your routine?

20   A.   Yeah, I'm an early riser.  I get up early.

21   Q.   Now, when you went to vote, did you see anything at the

22   Harts Branch precinct?  Did you see anybody buying votes?

23   A.   No.

24   Q.   Did you see anybody bribing people?

25   A.   No.

BOWLING - Direct (Mr. Simons)                                    76

1   Q.   Did you see anything that you thought was unusual at all?

2   A.   No.

3   Q.   Was there a line when you got there to vote?

4   A.   I don't remember.

5   Q.   Okay.  But nothing stands out?  It was just a normal

6   voting day for you?

7   A.   Yeah, nothing stands out in my mind, no.

8   Q.   Okay.  Now, I want to move to the November election of

9   the same year, 2002.

10  A.   Okay.

11  Q.   Do you know who Stanley was running against in that

12  election?

13  A.   Billy Jones.

14  Q.   Okay.  Do you know Mr. Jones?

15  A.   Yes, I do.

16  Q.   Do you know whether he has a relative that is one of the

17  defendants in this case?

18  A.   Yes.  He's Wayne's brother.

19  Q.   Do you know Mr. Wayne Jones?

20  A.   Yes, I do.

21  Q.   Can you point him out to the Court?

22  A.   He's right there.

23  Q.   All right.  Now, in the fall election, did you also vote?

24  A.   Yes, I did.

25  Q.   And did you again vote at Harts Branch?

BOWLING - Direct (Mr. Simons)                                    77

1    A.   Yes, I did.

2    Q.   Do you know whether Wayne Jones was an election officer

3    at that election or not?

4    A.   Yes, I think he was.

5    Q.   You think that he was?

6    A.   Yes.

7    Q.   Did you again vote early in the morning?

8    A.   Yes.  Not real early.  I had the girls.  I would have

9    kept Stephanie and --

10   Q.   So the two granddaughters?

11   A.   After they got awake.  Emma was still little.  I would

12   have gone in the morning early, and then I would have went to

13   the grocery store.

14   Q.   You would have had to take Emma with you?

15   A.   I would have had to take both of them with me, yes.

16   Q.   So you took the two girls with you and voted?

17   A.   Correct.

18   Q.   In the November election, did you see anybody buying

19   votes?

20   A.   No, I did not.

21   Q.   Did you see anything unusual going on?

22   A.   No.

23   Q.   In that November election, are you aware of any money,

24   cash money that your husband received or spent for the purpose

25   of buying votes or illegally paying voter transportation?

1   A.   No, I'm not.

2   Q.   Do you know the results of the November election?

3   A.   I think that one was really close.  Like less than a

4   hundred maybe.

5   Q.   Okay.  The election between Billy Jones and Stanley was

6   fairly close?

7   A.   Correct.

8   Q.   What did you do after you voted the day of the election

9   in November?

10  A.   The girls and I went to the grocery store and, you know,

11  I figured one way or the other we'd either have a pity party

12  or a victory party.  So we went to the grocery store, went

13  home, took groceries to the garage and left them, then went

14  back to the house and was back and forth between the two

15  places all day.

16  Q.   You mean the house and the garage?

17  A.   The house and the garage, which are -- I don't know how

18  far apart they are.  Not far.  And until probably 5:00,

19  5:30-ish, and I went to the garage.  I made homemade hot dog

20  chili, and I took it up there and stayed again until we went

21  home to go to bed late, late, late that night, if not early

22  morning.

23  Q.   Okay.  Did you have about the same number of people

24  showed up, friends and family?

25  A.   Yes.

BOWLING - Direct (Mr. Simons)                                    79

1   Q.   Now, I'm going to sort of move along a little bit here.

2   The next cycle of elections that the jury has heard about in

3   this case occurred in 2004.

4   A.   Um-hmm.

5   Q.   Was Stanley a candidate in 2004?

6   A.   No, he was not.

7   Q.   He runs on -- magistrates run only every four years?

8   A.   Correct.

9   Q.   Did you have any involvement other than as a voter in the

10  2004 election?

11  A.   No.

12  Q.   Now, sometime in the year of 2004, Stanley developed an

13  illness.

14  A.   Correct.

15  Q.   Would you tell the jury about that, please?

16  A.   Starting in late August of '04 on through the tail end of

17  '05, he got sick.  We didn't know what was wrong.  They hunted

18  and hunted and hunted.  And one diagnostic test after another,

19  one doctor's office visit after another.  He was hospitalized

20  on October the -- early in October, it was right at our

21  anniversary, and they finally did a lumbar puncture and

22  decided that he had Guillain-Barre syndrome.  He couldn't feel

23  his feet.  He couldn't walk.  He quit driving for a while and

24  he had three rounds of IV/IG infusions which are five days in

25  a row when it takes all day long.  He had to set in the

BOWLING - Direct (Mr. Simons)                                        80

1    hospital the first couple days of it in the hospital, the next

2    three days of it as an outpatient.  We did that again in the

3    middle of December, did that again sometime tail end of

4    January and continued neurology appointments for nerve

5    conduction studies and EMGs to see where we were on slowing it

6    down or stopping it or reversing it.

7    Q.  Okay.  What's the epilogue to that story?  Is he doing

8    better?

9    A.  It's an autoimmune thing.  His was atypical instead of

10   just destroying your myelin sheath that sends nerve impulses,

11   he also had axon damage, and that is that your nervous system

12   can't regenerate that.  So he will always have the

13   paresthesias and the sensation problems and not being able to

14   feel his feet well.

15   Q.  Is it safe to say that he was not active in any political

16   effort during that time, other than maybe voting when the

17   elections came up?

18   A.  We weren't worried about anything except for, you know,

19   making sure they made a correct diagnosis and making sure he

20   was better.  We stayed on the road to the doctor somewhere.

21   Q.  I do have one other question for you.  Was he able to

22   make the fiscal court meetings as magistrate?

23   A.  He probably missed a couple.  But I think, you know, he

24   didn't miss many.

25   Q.  Okay.  I do want to ask you one question before I leave

BOWLING - Direct (Mr. Simons)                                   81

1   the '04 election cycle.  In November of '04, do you recall

2   voting absentee?

3   A.   Yes.

4   Q.   And why was that?

5   A.   I had to work election day, and I leave home 5:30 in the

6   morning and don't get back till 7:00 or 8:00 at night so I'm

7   not there when the polls are open.

8   Q.   Where did you go to vote absentee?

9   A.   To the clerk's office, which at the time was where City

10  Hall is now.

11  Q.   Okay.

12  A.   Kind of crazy, but it was.

13  Q.   Okay.  And do you remember who the election officer was

14  at the time you voted?

15  A.   Freddy was there and Mr. Stivers was there.

16  Q.   Mr. William Stivers?

17  A.   Yeah, Al Man, he was there.  There was some other guy

18  there, but I don't know who he is.

19  Q.   Okay.  Was there any unusual development in your effort

20  to vote that morning?

21  A.   They wouldn't let me vote because they said they didn't

22  know who I was.  I had to go back to my car and get my purse,

23  get my wallet, driver's license and provide that to him before

24  he would let me sign the book and vote.

25  Q.   When you say "he," who are you talking about?

*BOWLING - Direct (Mr. Simons)*                                          82

1    A.   Mr. Stivers.

2    Q.   And you see him here in the courtroom?

3    A.   Sir?

4    Q.   Do you see him here in the courtroom?

5    A.   Yes, right there in the corner.

6    Q.   Okay.  Now, I want to switch gears with you entirely for

7    just a minute.

8    A.   Okay.

9    Q.   At some point, there was a gentleman came in to your

10   life, I guess, by the name of Mansell Baker.

11   A.   Yes.

12   Q.   Do you remember that name?  You know that name?

13   A.   Yes.

14   Q.   All right.  How did Mansell Baker become involved in your

15   life experience?

16   A.   He was kind of one of those odd job deals.  He was

17   putting concrete forms, forming up to pour concrete for a

18   driveway at Steven's house.

19   Q.   Let me stop you a second.  Where is Steven's house

20   relative to your home?

21   A.   Just behind us, a little bit catty corner, but not much.

22   And then the garage is off to the left of his house.

23   Q.   Okay.  And he was forming up the driveway.  Is that what

24   you're telling me?

25   A.   Yes.

BOWLING - Direct (Mr. Simons)                                    83

1   Q.   Do you have any idea where he worked at the time or --

2   A.   I'm not sure.  I think he was working for somebody doing

3   something, but I'm not exactly sure where.  What he was doing

4   for Stanley was evenings, weekends, nights kind of stuff.

5   Q.   Odd jobs around the --

6   A.   Yeah.  As far as I know, he was working somewhere else.

7   Q.   At some point, he came to be given shelter and live in

8   your garage.  Is that fair?

9   A.   Apparently, his arrangements were already tenuous, and

10  he --

11  Q.   What do you mean by that?

12  A.   He was living in a garage or a shack or something at

13  somebody else's place, and those people lost their home to

14  foreclosure so he didn't have anywhere to go.

15  Q.   Okay.  And --

16  A.   And Stanley let him move in at the garage.  He felt sorry

17  for him because he didn't -- we all -- I felt sorry for him.

18  He didn't have anywhere to go.

19  Q.   Okay.  And what accommodations did you make for him in

20  the garage?

21  A.   Well, we got him a roll-away bed and bedding, sheets,

22  pillows, blankets, a little chest of drawers.  There's already

23  a half bath up there; not a shower, but a bathroom.  And I did

24  his laundry.  He ate with us, which I cook up there nine times

25  out of ten anyway, versus --

*BOWLING - Direct (Mr. Simons)*                                         84

1   Q.   You cook --

2   A.   At the garage instead of cooking at the house, yeah.

3   Easier to clean up.

4   Q.   Okay.

5   A.   So gave him -- or loaned him something to drive if he

6   needed to go somewhere.  Didn't have a car.  Eventually gave

7   him something to drive.

8   Q.   What do you mean?

9   A.   An old truck that we were getting ready to junk out.  It

10  wasn't worth much, but Stanley gave it to him.

11  Q.   Did Stanley give him a job at B&B?

12  A.   Yeah, when B&B was doing work.  And when they weren't,

13  just odd job stuff, you know; mow, weed eat, something to keep

14  him going.

15  Q.   Okay.  Was there any indication to you when Mr. Baker

16  first moved in and for some time that he had a drug problem?

17  A.   No.

18  Q.   Okay.  Were your grandchildren allowed around him?

19  A.   Yeah.  They actually enjoyed him.  He played with them,

20  acted like one of them sometimes.

21  Q.   Okay.  Sometime in 2006, and I'm not going to -- you tell

22  me when, there was a problem that arose with Mansell Baker.

23  Would you tell the jury about that?

24  A.   I don't know exactly when it was.  It was in 2006, and it

25  was relatively warm weather.  I mean, it wasn't freezing.  And

*BOWLING - Direct (Mr. Simons)*                                    85

1    Todd Roberts came to our front door.

2    Q.   Who is that?

3    A.   He used to be a policeman.

4    Q.   Okay.

5    A.   And he told Stanley that --

6            MR. SMITH:  Objection.

7    A.   Or told us.  I was there too.

8            THE COURT:  Sustained.

9    Q.   You can't say what other people told you.

10   A.   I'm sorry.

11   Q.   Tell generally what happened without getting into the

12   conversation.  Officer Roberts came.

13   A.   Yes.  He iterated to us that --

14           MR. SMITH:  Same objection.

15           THE COURT:  Sustained.

16   Q.   Were they looking for Mr. Baker?

17   A.   Yes.

18   Q.   Okay.  And did they need assistance in finding Mr. Baker?

19           MR. SMITH:  I'll object to leading.

20           THE COURT:  Sustained.

21   Q.   All right.  Without saying what the nature of every

22   conversation, could you tell the jury, please, what happened

23   when the police arrived with respect to Mr. Baker?

24   A.   Stanley went with Todd Roberts to the garage to get

25   Mansell.  Todd took Mansell with him in a cruiser.  Mansell

BOWLING - Direct (Mr. Simons)                                86

1    was back the next morning and said it was kind of a mistake --

2              MR. SMITH:  Object.

3              THE COURT:  Sustained.

4    Q.  You're not allowed to tell what was told to you.  Are you

5    aware of what the allegation was against Mr. Baker?

6              MR. SMITH:  Calls for hearsay.  Object.

7              THE COURT:  Sustained.

8    Q.  Okay.  At some point after Mr. Baker returned the next

9    day, after Officer Roberts had whisked him away, did he depart

10   your garage for good, or was he removed from the premises by

11   Stanley and Steven?

12   A.  He was asked to leave a few months later.

13   Q.  Why was that?

14   A.  He was doing drugs, and evidence was found that he was

15   doing drugs in the garage, and they told him he had to leave.

16   Q.  Okay.  Do you know where he went when he left?

17   A.  No, I do not.

18   Q.  Mr. Baker has described for this jury, he told the jury

19   that at some point, that Stanley was involved in some

20   marijuana trade with him, and I'm going to ask your impression

21   of that.

22             MR. SMITH:  Your Honor, I'm going to object.

23   A.  No way.  No way, no how.

24             THE COURT:  Hold on.  Mr. Smith?

25             MR. SMITH:  Outside the time frame of her

*BOWLING - Direct (Mr. Simons)*                                     87

 1  relationship, and also I would object to the relevancy of her

 2  impression.

 3              THE COURT:  I'll sustain.

 4              MR. SIMONS:  Your Honor, could we approach?

 5              THE COURT:  Yes, sir, you may.

 6                    (A sidebar conference was held out of the

 7                    hearing of the jury):

 8              MR. SIMONS:  I may have a very faulty memory here,

 9  but I do not recall there ever being a time frame that Mansell

10  Baker --

11              MR. SMITH:  You have to keep your voice up.  I'm

12  having ear problems again.

13              MR. SIMONS:  I'm sorry.  I do not -- the first nature

14  of the objection was outside the time frame.  At the time it

15  came in, I was trying to establish when it was.  I don't think

16  that ever was established.  So --

17              MR. SMITH:  When what was?

18              MR. SIMONS:  When Mansell Baker said Stanley was --

19              MR. SMITH:  We have deeds and record and the mortgage

20  that showed exactly when they were partners in the drug

21  business.

22              MR. SIMONS:  That had nothing to do with Stanley.

23  That was not his testimony.

24              MR. SMITH:  That was his testimony.  The drugs he

25  got, Stanley helped him sell from that partnership.

*BOWLING - Direct (Mr. Simons)*                                        88

1          MR. SIMONS:  That's not the testimony as I recall it.

2     It was many years after that that he wanted -- that Mansell

3     Baker said that Stanley approached him to sell marijuana, move

4     some of the marijuana through his half brother, Ronny

5     "Buzzard" Hacker, which was long after the marijuana Henry

6     County property thing is what I remember.  So I don't remember

7     a date, one, ever being established, and I had objected to it

8     at that time, and I associated it was outside --

9          THE COURT:  Let's get to the point here.  You're

10    asking this witness for her impressions about whether her

11    husband was involved in drug activities with Mr. Baker.  So

12    it's basically 608(a), attempting to show good character,

13    because there's no information that she would have knowledge

14    of that in the record.  Regardless of the time frame, there's

15    no indication she would have knowledge of that.

16          The time frame isn't important for purposes of a

17    character question, and it's not a proper character question

18    to ask for her impressions of whether he was dealing with

19    drugs or not, because that would be a specific instance of

20    conduct, as opposed to good character.

21          So I'll sustain the objection.

22          MR. SIMONS:  The next question I would have asked is

23    since she's been married to him, has she ever known her

24    husband to use any illegal drug of any type, to have ever

25    observed him or --

*BOWLING - Direct (Mr. Simons)*                                    89

1    THE COURT:  Well, there's no indication in the record

2    that he uses illegal drugs.  There's a difference between

3    using and transactions.  But again, that's a specific instance

4    of good conduct that you would attempt to be showing as

5    opposed to reputation for truthful and veracity.  So I'll

6    sustain the objection to that question as well.

7         MR. SIMONS:  I'll move on.  Thank you.

8              (Sidebar conference concluded.)

9         THE COURT:  Thank you.  Please proceed.

10        MR. SIMONS:  Thank you, Your Honor.

11   BY MR. SIMONS:

12   Q.  As a result of the discovery of Mr. Baker's drug use on

13   your property, he was asked to leave?

14   A.  Correct.

15   Q.  And was never invited back to the property; is that

16   correct?

17   A.  Not that I know of, no.

18   Q.  Okay.  Have you seen him since?

19   A.  I saw him once leaving the grocery store.

20   Q.  Okay.

21   A.  And I saw him once a few weeks after he left.

22   Q.  Tell the jury the circumstances of that, please.

23        MR. SMITH:  Object as to the relevance.

24        THE COURT:  Overruled.

25   A.  Not long after he left --

*BOWLING - Direct (Mr. Simons)*                                                90

1   Q.  Yes, ma'am.

2   A.  His vehicle was found on the side of the road abandoned.

3   His daughter would call --

4          THE COURT:  I'll sustain as to this.

5   Q.  All right.  Let's move on to the May, 2006 election.

6   A.  Okay.

7   Q.  Did Stanley run for reelection in the Republican primary

8   in May of 2006?

9   A.  Yes, he did.

10  Q.  Okay.  And the night before the May election of 2006, do

11  you recall what you did?

12  A.  Mowed grass, washed a vehicle, got ready to leave to go

13  out of town.

14  Q.  Okay.  Was Stanley there with you on the Monday night

15  before the May primary in 2006?

16  A.  Yes.

17  Q.  Were you, the two of you together there the entire time?

18  A.  Yes.

19  Q.  All right.  There's been some testimony in this case by a

20  fella named Bobby "Red" Sams.  Do you know him?

21  A.  I just know who he is.  I don't know him.

22  Q.  Okay.  And Mr. Sams testified --

23         MR. SMITH:  Your Honor, I'm going to object.

24         THE COURT:  Improper question.  Sustained.  It's

25  improper to repeat what another witness has stated to a

BOWLING - Direct (Mr. Simons)                              91

1   witness.  It would violate the rule of exclusion of witnesses

2   under Rule 615.

3         MR. SIMONS:  I apologize.

4   Q.  In the evening before the May primary election on

5   Tuesday, was there ever a time that Bobby "Red" Sams, Mansell

6   Baker, Daryl Collins and Wayne Jones came upon your property

7   and had a meeting with respect to that election?

8   A.  No.

9   Q.  You said you were home preparing to leave to go

10  somewhere.

11  A.  Yes.

12  Q.  Okay.  Where were you going to go on election day?

13  A.  Gatlinburg.

14  Q.  All right.  Now, did you, in fact -- tell me what

15  happened.  Did you go on election day to Gatlinburg?

16  A.  Yes.  We voted very early and left and went to

17  Gatlinburg.

18  Q.  And did you vote at the Harts Branch precinct?

19  A.  Yes, we did.

20  Q.  And when you say very early, was it --

21  A.  The sun was coming up.  We were probably one of the first

22  few there.

23  Q.  And then you went on to Gatlinburg?

24  A.  Yes.

25  Q.  Did you have an intention when you left of meeting anyone

BOWLING - Direct (Mr. Simons)                                    92

1   down there?

2   A.   Yes.

3   Q.   And who was that?

4   A.   Bart and Deb and their family.

5   Q.   Now, when you say Bart and Deb, who do you mean?

6   A.   Bart Morris, Debi Morris and their family.

7   Q.   And their family includes?

8   A.   Chris and Bartley and Jessica.

9   Q.   Okay.  Did they have others as well in their entourage?

10  A.   Yeah, the kids had friends or girlfriends, significant

11  others with them.

12  Q.   And were they already in Gatlinburg, to your knowledge?

13  A.   Yes.

14  Q.   Okay.  Now, when you left, when did you arrive in

15  Gatlinburg?

16  A.   Mid to late morning.  We ate lunch with them.  Whatever

17  time we ate lunch, we were already with the Morrises.

18  Q.   And where did you eat?  Do you recall?

19  A.   Hard Rock Cafe.

20  Q.   Okay.  And what did you do that evening, if you remember?

21  A.   Roamed the streets of Gatlinburg, those little shops, and

22  visited, you know.

23  Q.   Do you remember where you stayed?

24  A.   Oh, the name of it.  Greystone something or 'nother

25  maybe.

BOWLING - Direct (Mr. Simons)                                      93

1    Q.   Is that a hotel?

2    A.   Yes.

3    Q.   And you spent the night --

4    A.   Yes.

5    Q.   -- there.  Do you know whether Mr. and Mrs. Morris spent

6    the night there?

7    A.   They were there very late.  They were gone the next

8    morning when we got up.  They had already left.  We slept in,

9    but they checked in a room and, you know, late that night,

10   dark, we were all still visiting and talking and outside on

11   the patio things in front of our rooms.

12        MR. SIMONS:  Your Honor, may we approach again,

13   please?

14        THE COURT:  Yes, you may.

15              (A sidebar conference was held out of the

16              hearing of the jury):

17        MR. SIMONS:  I wanted to avoid a misstep.  These are

18   receipts from the trip to Gatlinburg on that day.  We visited

19   this issue with Miss Hughes previously.  There are some

20   receipts here that -- I provided them to Mr. Smith already.

21   These are some credit card receipts, and they show what they

22   did and the dates of purchases and proof that they were in

23   Gatlinburg.  They were charged to a credit card that was a B&B

24   credit card of which she had signature authority over.  And

25   there are some in Sevierville, some in Gatlinburg.  Greystone

*BOWLING - Direct (Mr. Simons)*                                    94

1    Lodge is where they stayed, the aquarium and some other

2    documentation.  I would tender those as a collective exhibit

3    and thought I should approach before I did so.

4            THE COURT:  All right.

5            MR. SIMONS:  I think they ate in Corbin enroute.

6            MR. SMITH:  What does it show it was charged on here,

7    company credit card?

8            MR. SIMONS:  It shows 8:25 in the morning is when

9    they left.  I think that was the -- I don't think -- frankly,

10   I don't care about that one.

11           MR. SMITH:  This is Stanley Bowling's credit card.

12   It doesn't say B&B.  I can't read this one.  There's no credit

13   card identifying number.  Does she know the identifying number

14   of her credit card for the business?  These don't show their

15   numbers.  There are different numbers.  Does she have more

16   than one credit card?

17           MR. SIMONS:  Credit card number for B&B is this.  I

18   can tell you that.  4802 is the beginning and 0878 is the

19   finish.  And that would be that one and that one but not be

20   that one.  It may be her credit card.  I'm uncertain.  Those

21   two are one.  These two are B&B.

22           MR. SMITH:  Well, I guess one of the things, Your

23   Honor, maybe there's duplication that this is the credit card

24   for the company and that's the statement.  She's the record

25   keeper of the company.  This would be the record.  Whether or

*BOWLING - Direct (Mr. Simons)*                                    95

1    not these receipts match up to that or not are subject to

2    dispute.  So I would have no objection to him introducing them

3    if he can lay the proper foundation.  If that's the credit

4    card for the company and she's the custodian of the records,

5    then I don't have any objection.

6              MR. SIMONS:  And these two receipts that match here.

7    $102.92 and -- oh, that says cancelled sale.  That receipt

8    matches this.  Would that be agreeable?

9              MR. SMITH:  I mean, I don't know about the others.

10   Unless there's another credit card that you want to establish.

11             MR. SIMONS:  I'm saying this credit card is this

12   account, Steve, is what I'm saying.  Check the account number.

13   It's the same.  Also, this one.  This is the same thing that's

14   shown on the bill.  Greystone Lodge of Gatlinburg, Tennessee.

15             What I will do, Your Honor, is just proffer these as

16   a group exhibit.

17             THE COURT:  Establish foundation first, if you would.

18             MR. SIMONS:  I will.

19             THE COURT:  How much more will you have of this

20   witness after this area?

21             MR. SIMONS:  Not very much.

22             THE COURT:  Mr. Smith, how much will you have on

23   cross?

24             MR. SMITH:  Not much.

25             THE COURT:  I have some questions I'm going to need

BOWLING - Direct (Mr. Simons)                                    96

1    to ask the witness based on my observations of some of her

2    answers that relate to the issue we took up outside the

3    presence of the jury.  So if we get to the point that we

4    complete this witness before 12:00, I'll excuse the jury

5    early, and then I'll follow up with questions before I finally

6    excuse her from the case.

7              MR. SIMONS:  Okay.

8              THE COURT:  Thank you.

9                   (Sidebar conference concluded.)

10             MR. SIMONS:  If I could have the Court security

11   officer, please.

12             THE COURT:  Yes, sir.

13   BY MR. SIMONS:

14   Q.   Sarah, first of all, do you recognize those documents in

15   front of you?

16   A.   Yes.

17   Q.   The larger document with the exhibit marking on it is not

18   yet numbered.  Is that a credit card receipt or statement?

19   A.   Credit card bill, yes, statement.

20   Q.   From the B&B credit card?

21   A.   Yes.

22   Q.   And is that one you have signatory authority over?

23   A.   Yes.

24   Q.   And does it show that on May 16th of 2006, a charge for

25   Greystone Lodge in Gatlinburg, Tennessee?

BOWLING - Direct (Mr. Simons)                               97

1    A.   Yes.

2    Q.   Does it show a charge for Smoky Mountain Knife somewhere

3    in Tennessee that same day?

4    A.   Yes.

5    Q.   And does it have a charge on May 16 for Cracker Barrel in

6    Corbin, Kentucky?

7    A.   Yes.

8    Q.   And does it have one for Bass Pro Shops in Kodak,

9    Tennessee?

10   A.   Yes.

11   Q.   And on May 17, does it show Shoney's in Sevierville,

12   Tennessee?

13   A.   Yes, it does.

14   Q.   And were those charges incurred on your trip to

15   Gatlinburg?

16   A.   Yes, they were.

17   Q.   Now, the other two slips in front of you, can you

18   identify those for the jury, please?

19   A.   This is the motel receipt, and it matches the charge on

20   the bill, and this is the receipt from the Smoky Mountain

21   Knife Works, which the amount also matches the credit card

22   bill.

23        MR. SIMONS:  Your Honor, that exhibit has not been

24   marked, but I would ask that the court clerk mark it as the

25   next exhibit for Bowling and move its entry at this time as a

*BOWLING - Direct (Mr. Simons)*                                           98

1    collective exhibit.

2            THE COURT:  All right.  That would be Stanley Bowling

3    Exhibit Number 6?

4            DEPUTY CLERK:  Yes.

5            THE COURT:  Any objection?

6            MR. SMITH:  No.

7            THE COURT:  Bowling Exhibit Number 6 will be

8    admitted.

9                    (Bowling Exhibit No. 6

10                    was admitted into evidence.)

11   Q.   Now, did Stanley prevail in the primary in May of '06?

12   A.   Yes.

13   Q.   Do you recall, without specific numbers, whether he won

14   easily or whether it was a close race?

15   A.   I don't think it was real close.

16   Q.   Okay.  Were you particularly concerned about the outcome

17   of that election?  Were you comfortable with his position in

18   the election?

19   A.   Yes.

20   Q.   Now, in the fall -- in November election, was he opposed

21   by a Democrat?

22   A.   No.  He did not have an opponent.

23   Q.   So I feel certain he won fairly easily without

24   opposition; is that fair?

25           MR. SMITH:  Your Honor, that's speculation, I

BOWLING - Direct (Mr. Simons)                                    99

1    believe.

2              THE COURT:  Sustained to the form of the question.

3              MR. SIMONS:  Thank you, Your Honor.  I'll move on.

4    Q.  He did win?

5    A.  Yes.

6    Q.  Okay.  Now, sometime after that fall election, was

7    Stanley's son Steven subpoenaed to testify to a grand jury?

8    A.  Yes.

9    Q.  Do you remember when that was?

10   A.  I mean, November, couple weeks, three weeks prior to

11   Thanksgiving.

12   Q.  Okay.  And following that, did you receive a visit at

13   your home from Kennon and Wanda White on or about

14   Thanksgiving?

15   A.  Yes, day before Thanksgiving.

16   Q.  Would you tell the jury, please, about that visit?

17   A.  I was at the garage setting up tables and stuff getting

18   ready for Thanksgiving dinner.  Stanley was working on a piece

19   of equipment to get it out of the way for Thanksgiving dinner.

20   Wanda and Kennon pulled up.  She had fudge in her hand.  He

21   wanted to know what the grand jury asked Steven --

22             MR. SMITH:  Your Honor, I'm going to object to the

23   hearsay again.

24             THE COURT:  I'm going to sustain the objection unless

25   this is a recorded conversation in which Mr. Bowling made

1    statements on the tape.  It would be inadmissible hearsay and

2    I'll sustain the objection.

3    Q.   How long did Kennon and Wanda stay at the house, at the

4    garage?

5    A.   Briefly.

6    Q.   And after they left, have you seen them since?

7    A.   No, I have not.

8            MR. SIMONS:  Your Honor, may I approach again, just

9    quickly?

10           THE COURT:  Yes, sir, you may.

11                       (A sidebar conference was held out of the

12                        hearing of the jury):

13           MR. SIMONS:  The only thing --

14           THE COURT:  Mr. Simons?

15           MR. SIMONS:  Yes.  Dan Simons for Stanley Bowling.

16   The last question I want to ask of this witness, I just wanted

17   to get clarification, I think it's proper, but I didn't want

18   to do it without asking the Court.  Is on a couple of the

19   tapes, there are -- and Mr. Smith has alluded to them in

20   presentation that there are questions about Stanley, how's

21   Stanley doing, Stanley doing all right.  And the inference is

22   that it has to do with this investigation.

23           At the time Stanley Bowling testified -- here was

24   going to be my line of questioning.  Stanley Bowling testified

25   in front of the grand jury in January of '07.  Not ask

*BOWLING - Direct (Mr. Simons)*                                      101

1     anything about that, and ask if at that same time he was very

2     ill with prostate cancer and had surgery, which he did just a

3     few days later, and he had at least a three-month recovery

4     period.

5             And the tapes, when the tapes are asking, there's

6     inquiries made about is Stanley all right, it seems to me to

7     be clear that they're talking about his health and not about

8     his status in connection with this investigation.

9             And that's what I want to elicit.  I will not address

10    immunity or anything else.

11            THE COURT:  So your question basically goes to the

12    issue of whether at the time the tape was made, which would

13    have been March of '09 -- I'm sorry.  March of '07.

14            MR. SIMONS:  Yes, sir.

15            THE COURT:  March of '07, that Mr. Bowling was either

16    suffering from or was recovering from an illness.

17            MR. SIMONS:  Yes.  Cancer surgery.

18            THE COURT:  All right.  And then that's your

19    question.  And that will allow you then to argue the inference

20    to the question is that they're asking about his physical

21    condition as opposed to his status following grand jury

22    appearance?

23            MR. SIMONS:  That's correct.

24            THE COURT:  All right.  Any objection if that's as

25    far as we go with this?

BOWLING - Direct (Mr. Simons)                                    102

1          MR. SMITH:  No.

2          MR. SIMONS:  Thank you.

3          THE COURT:  All right.  Thank you.

4                  (Sidebar conference concluded.)

5          THE COURT:  Thank you, counsel.  You may continue.

6    BY MR. SIMONS:

7    Q.   In January of 2007, did your husband Stanley testify in

8    front of a grand jury?

9    A.   Yes, he did.

10   Q.   Okay.  At the time that he was doing that or there about

11   that time, did he also have a second serious medical condition

12   of which you're aware?

13   A.   Yes, he did.

14   Q.   And would you tell the jury, please, what that was?

15   A.   We knew in December that his PSA level had taken a big

16   jump between June and December.  He had already seen a

17   surgical urologist for exploration of, you know, whether he

18   had prostate cancer or not.  He had seen him on the 9th.  He

19   testified in front of the grand jury on the 12th of January of

20   '07.  He had a prostate biopsy on the 17th of January.  We got

21   the results that it was, in fact, prostate cancer on the 31st

22   of January.

23       He had a radical prostatectomy on March the 19th of 2007,

24   was pretty much incapacitated for the next week or ten days,

25   even after he got out of the hospital.

*BOWLING - Cross (Mr. Smith)*                                               103

1   Q.   What was the date of that proceeding, did you say?

2   A.   The surgery itself was the 19th of March.

3   Q.   Okay.

4   A.   It's actually, what, three years ago today.

5   Q.   Okay.  It is.  Thank you.

6   A.   And that requires he had a urinary catheter and a leg bag

7   for a week or ten days.  Couldn't drive, couldn't lift, no

8   stairs.  And was probably even after that was removed, he was

9   still restricted activity for another week or two and a good

10  60, 90 days before he was 110% from a physical, you know, back

11  to his baseline activity level.

12          MR. SIMONS:  Your Honor, pass the witness.  Thanks.

13          THE COURT:  Thank you.  Mr. Smith, you may question

14  the witness.

15                       CROSS-EXAMINATION

16  BY MR. SMITH:

17  Q.   Good morning.

18  A.   Good morning.

19  Q.   My name's Steve Smith, and I represent the United States.

20  A.   Yes.

21  Q.   I have a few questions for you.

22  A.   Earlier, you asked me about not being here before --

23          THE COURT:  No, ma'am.  You're not allowed to ask a

24  question at this point.  You have to wait for Mr. Smith to ask

25  you a question and you can respond to it.

BOWLING - Cross (Mr. Smith)                                    104

1           THE WITNESS:  I'm sorry.

2           THE COURT:  Mr. Smith, you may proceed.

3   Q.  Miss Bowling, as I understand it, you and Mr. Bowling

4   joined in marriage in October of '94, and y'all have no

5   children?

6   A.  Correct.

7   Q.  The grandchildren you're referring to are Steven's, and

8   he's not your child; is that right?

9   A.  Correct.

10  Q.  And you indicated that during the time period that you

11  lived there, that y'all made a home near the rec center there,

12  Beech Creek area of Manchester; is that right?

13  A.  Yes.

14  Q.  And y'all lived in that same place for how long?

15  A.  I've been there ever since we were married.  He was

16  already there.

17  Q.  Okay.  So when did rec center get built there, ma'am?

18  A.  I have no idea.  It was there when I moved to Clay

19  County.  I don't know.

20  Q.  So whatever arrangements that Stanley Bowling had with

21  the Mayor White in getting that property deeded over to him,

22  you're not aware of it, are you?

23  A.  No.

24  Q.  Now, you indicated that you were familiar with the

25  bookkeeping of B&B, because, I believe you said you conducted

1    bookkeeping for the company; is that fair?

2    A.   I balanced the book and kept a ledger and paid bills.

3    And above and beyond that, I took things to Charles.

4    Q.   And I believe you understand the taxing of a

5    sub-chapter S corporation because you explained that to the

6    jury, how that works, right?

7    A.   Only to the extent it passes through.  I wouldn't

8    consider that a thorough understanding of it.

9    Q.   And it would be fair to say, ma'am, if the company made

10   money, whether or not Mr. Bowling took a salary is really

11   inconsequential because you all realize the profit of the

12   company as an individual; isn't that fair?

13   A.   I suppose so.

14   Q.   So if the company makes money, you all make money; isn't

15   that fair?

16   A.   Yes.

17   Q.   Now, you're a nurse with Baptist Regional; is that right?

18   A.   Yes.

19   Q.   And you've been working there full-time for how many

20   years?

21   A.   Since I was hired in June of 2001.

22   Q.   And your shift, have they changed over the years, or have

23   you worked a regular shift for some period of time?

24   A.   I worked orienting on day shift for a while, then I

25   worked night shift very briefly, and then back to day shift.

BOWLING - Cross (Mr. Smith)                                    106

1    Q.   Do you recall when those intervals occurred?

2    A.   Oh, gosh.  I probably did the night shift thing for a

3    couple of months in the fall of 2001 and then went back to day

4    shift on a permanent basis, aside from the occasional night

5    shift to help them out when they were short.

6    Q.   I believe you said that normally, that keeps you away

7    from home from about 7:30 in the morning till about -- no,

8    about 5:30 in the morning till about 7:30 in the evening.  Is

9    that what you testified to?

10   A.   Some days.  Some days we're slow.  I get off early.  Some

11   days, we're not full and census is down, and I take call and

12   stay at home even when I'm scheduled to work unless they call

13   me in.

14   Q.   If you're scheduled to work at the hospital on a normal

15   shift, it would be between 5:30 and 7:30 you'd be away from

16   home?

17   A.   Correct.

18   Q.   And I believe your testimony is that that day shift has

19   basically been consistent since two months in '01?

20   A.   Yes.

21   Q.   Now, of course, during the time period that you

22   testified, you were asked some questions about, again, the

23   home there, and you indicated that there was a garage on the

24   property?

25   A.   Yes.

*BOWLING - Cross (Mr. Smith)*                                             107

1    Q.   And this was a place where you said it was a very active

2    place where a lot of people come in, and I think you said you

3    cook there and a lot of activity goes on there?

4    A.   Yes.

5    Q.   I'd like to hand to you what's marked as P38.  Do you

6    recognize that?

7    A.   Yes.

8    Q.   And is that the garage at your place?

9    A.   Yes, it is.

10          MR. SMITH:  I'd move for the introduction of

11   Government's Exhibit P38.

12          THE COURT:  Any objection?

13          MR. SIMONS:  I don't think so, Your Honor.  I'd like

14   to see it first.

15          THE COURT:  All right.  If you could let Mr. Simons

16   take a look at that photograph.  Appreciate it.

17          MR. SIMONS:  I don't have it.

18          THE COURT:  That's fine.  Show it to you.  Thank you.

19          MR. SMITH:  May I publish.

20          THE COURT:  Yes.  I will admit the document as an

21   exhibit, P38, and it may be published on the overhead.

22                      (Government Exhibit No. P38

23                       was admitted into evidence.)

24   Q.   Okay.  That's P38.  Do you see that in front of you,

25   ma'am?

BOWLING - Cross (Mr. Smith)                                    108

1    A.   Yes.

2    Q.   And this would be directly behind the house in which

3    Steven Bowling lives; is that correct?

4    A.   To the side of Steven's house.

5    Q.   And your house is in front of Steven's?

6    A.   Yes.

7    Q.   And then there's a black barn that you indicated that's

8    on the back side of the property over to the right?

9    A.   It's behind that, up a little ways.

10   Q.   And that would have been in existence there since how

11   long, ma'am?

12   A.   The garage?

13   Q.   Yes, ma'am.

14   A.   I don't remember off the top of my head when it was

15   built.

16   Q.   But it's been there for some time, you would agree?

17   A.   Yes.

18   Q.   And I believe that you indicated that on election day of

19   May of 2002 that you voted?

20   A.   Yes.

21   Q.   And who went with you to vote?

22   A.   I don't know.  I may have gone by myself.  I don't

23   recall.

24   Q.   You indicated that you do recall that day, though?

25   A.   I know I didn't work and I went and voted, but I don't

*BOWLING - Cross (Mr. Smith)*                                     109

1    know that anybody went with me.

2    Q.   Okay.  You know you didn't work that day?

3    A.   No, I wouldn't have been able to go -- I would have had

4    to vote absentee if I'd been working.  Three days a week at

5    the hospital's a full-time schedule.  So the other four, I'm

6    home.

7    Q.   Now, you are not aware of, I believe you said that you

8    didn't see any meetings going on at the garage?

9    A.   That's correct.  I did say that.

10   Q.   But you're not there 24/7, are you, ma'am?

11   A.   No.

12   Q.   So you can't say what went on at that building when you

13   were at work, can you, ma'am?

14   A.   No.

15   Q.   And likewise, in November, 2002, you said you recall

16   voting that day?

17   A.   Yes.

18   Q.   Who went with you to vote that day?

19   A.   Stephanie and Emma.  I had them with me.

20   Q.   Stephanie -- the children?

21   A.   The grandchildren, yes.

22   Q.   And you specifically recall having the children at the

23   voting poll that day?

24   A.   Yes.

25   Q.   What did you do with them while you went in the poll and

BOWLING - Cross (Mr. Smith)                                    110

1   voted, ma'am?

2   A.  I just let them stand there.

3   Q.  You let them stand where?

4   A.  In the vestibule there at the, I guess that's at the

5   middle school.

6   Q.  And how old are these children?

7   A.  Steph would have been nine, and she could have hung on to

8   Emma long enough for me to vote.

9   Q.  She could have?

10  A.  Yeah.

11  Q.  Do you recall her doing that?

12  A.  No, I don't.

13  Q.  All right.  Now, you indicated again that you witnessed

14  nothing going on wrong at the polls and that you returned home

15  that day?

16  A.  Yes.

17  Q.  And again, you testified you didn't know about any

18  meetings?

19  A.  Correct.  I did not see any meetings.

20  Q.  But again, ma'am, you weren't there 24/7, were you?

21  A.  Not when I was at work, no.

22  Q.  And you can't testify what went on at that garage when

23  you were at work, can you, ma'am?

24  A.  No, I cannot.

25  Q.  Now, you indicated that you and your husband talked

1    considerably about his candidacy for magistrate in May of

2    2002.  Do you recall that?

3    A.   Yes.

4    Q.   And I believe your testimony was is that he was convicted

5    of the need to serve the public and that that's really what

6    motivated him to pursue this candidacy.  Is that fair?

7    A.   I said he missed it.  He missed the people contact and

8    missed feeling like he was making a difference is what I said.

9    Q.   All right.  So he missed interacting with the public and

10   he missed making a difference in the world?

11   A.   Yes.

12   Q.   And so that's why he ran for public office in May of

13   2002?

14   A.   Yes.

15   Q.   Now, you indicated that in 2002, you voted at the Harts

16   Branch precinct?

17   A.   Yes.

18   Q.   And that you recall that Billy Jones was the opponent of

19   your husband, right?

20   A.   Yes.

21   Q.   And that this was a very close race, because you said

22   less than 100 votes separated, I believe you said, your

23   husband and Billy Jones?

24   A.   Yes.

25   Q.   Did you all discuss the vote buying that was going on in

*BOWLING - Cross (Mr. Smith)*                                      112

1    2002 in Manchester?

2    A.   No.  I've never discussed any such thing with anybody nor

3    have I ever seen that.

4    Q.   You've never heard it mentioned in your house?

5    A.   No.

6    Q.   You've never even heard your husband say, wow, I can't

7    believe the other side over there has been buying votes, and I

8    don't know how we're gonna counteract it?

9    A.   No, I have not.

10   Q.   He never did express any concern about anybody buying

11   votes in Clay County?

12   A.   He's never talked about vote buying to me.

13   Q.   He's never mentioned it?

14   A.   No.

15   Q.   Not one word?

16   A.   No.

17   Q.   Never?

18   A.   No.

19   Q.   Ever?

20   A.   No.

21         MR. SIMONS:  Asked and answered, Your Honor.

22         THE COURT:  Overruled.

23   Q.   So you said there was not much going on in '04.  Health

24   problems, things limited the husband from pursuing anything

25   other than attending his court meetings, which I believe you

1    said he missed a couple that year?

2    A.   I think he may have missed a couple because of what was

3    going on.  I couldn't be sure of that either.

4    Q.   Now, you said that you knew Al Man Stivers.  How long

5    have you known Al Man Stivers?

6    A.   I just knew who he was.  I'd met him maybe at a cookout.

7    Q.   Where was the cookout?

8    A.   Probably at Ralph Hollin's house.  He has one once a

9    year.

10   Q.   Ralph who?

11   A.   Ralph Hollin.

12   Q.   Holland with a D?

13   A.   I think it's H-o-l-l-i-n.  Not sure of that either.

14   Q.   Where is his place?

15   A.   Somewhere out on Greenbriar.

16   Q.   And you say you met Mr. Stivers there when?  When did you

17   meet him?

18   A.   Can't recall.  The first time I ever met him, that's

19   where it was.  And that happened, you know, not a long time

20   ago.

21   Q.   That was a long time ago?

22   A.   I said not a long time ago.

23   Q.   Not a long time ago.  Was that after you voted absentee

24   in November '04 that you saw him at this party?

25   A.   Probably before, but I can't be sure of that either.

BOWLING - Cross (Mr. Smith)                                          114

1    Q.  You're not sure?

2    A.  No.  Ralph -- that's an annual thing.

3    Q.  So it could be the first time you ever saw him was the

4    day you voted November, '04, absentee when he and Freddy

5    Thompson greeted you.  Is that possible?

6    A.  Could be, but I don't think so.

7    Q.  You don't think so?

8    A.  I think Ralph has that annual bluegrass festival two- or

9    three-day cookout thing every year.  Most years we go.  That's

10   where I met Al Man the first time several years back.

11   Q.  Now, again, you all were in Gatlinburg in May of '06?

12   A.  Yes.

13   Q.  And when did you leave for Gatlinburg?

14   A.  Early that morning, election day.

15   Q.  And when did you arrive in Gatlinburg?

16   A.  Around lunch time.

17   Q.  How long does it take to drive to Gatlinburg?

18   A.  I don't know.  From our house, hour and 45 minutes, maybe

19   two.  We stopped and ate at the Cracker Barrel in Corbin and

20   stopped at -- it's not Cabela's.  What it the fishing place?

21   Bass Pro Shops.

22   Q.  If I understand it, first thing you got to Gatlinburg,

23   you met up with the Morrises and ate at the Hard Rock Cafe?

24   A.  First thing we did is check into the hotel.

25   Q.  Greystone?

*BOWLING - Cross (Mr. Smith)*                                          115

1    A.   Yes.

2    Q.   Greystone Hotel, big one on the mountain?

3    A.   No, it's in town.

4    Q.   But it's a motel?

5    A.   Yes.

6    Q.   And you met at the Hard Rock Cafe?

7    A.   Yes.

8    Q.   You had lunch with who?

9    A.   Bart Morris, Debra Morris, Bartley, Chris, Jessica, had

10   the baby with them, Jessica's daughter, and their satellite

11   friends, significant others.  I don't remember their names.

12   Q.   And then what did you do?

13   A.   Walked around the streets of Gatlinburg.  There's shops

14   and stuff there.

15   Q.   Are you sure that's when you had lunch with them was at

16   the Hard Rock Cafe?

17   A.   I'm 99% sure we ate lunch at the Hard Rock Cafe.

18   Q.   And you shopped after you went to the Hard Rock Cafe?

19   A.   We may have done some before and some after.  I know we

20   shopped before.  We shopped at the Knife Works place.

21   Q.   But you said you walked around in the area of Gatlinburg

22   and that would have been after lunch, according to your --

23   A.   Probably some of both.

24   Q.   Some of both?

25   A.   Yeah.  We wandered around Gatlinburg.

*BOWLING - Cross (Mr. Smith)*                                              116

1    Q.   What do you mean both?

2    A.   We went in shops and looked around and ate and went in

3    shops and roamed the streets some more.

4    Q.   Did you all talk about election on that trip?

5    A.   I don't remember any specific conversations about it,

6    other than maybe somebody calling after it was over that day

7    and, you know, telling us who won.

8    Q.   No other conversations?

9    A.   Not that I recall, no.

10   Q.   Did y'all talk about vote buying going on in '06?

11   A.   No.

12   Q.   So it's your testimony, ma'am, that you and your husband,

13   concerned about serving the public in Manchester and concerned

14   about making a difference in the world in which you live, that

15   you take off to Gatlinburg and go with your friends, you go to

16   Hard Rock Cafe, and you never even as much talked about

17   election day, about who's going to win this election?  Is that

18   your testimony, ma'am?

19   A.   We didn't talk.  We talked about who won.

20   somebody called and told us who won.  Stanley was not -- you

21   know, I don't know how concerned we were with that election.

22   I think he thought that we would be okay in the primary.

23   Q.   You didn't consider Roger Webb a threat at all.  Is that

24   what your testimony is?

25   A.   I didn't say that.  Anybody can win, anybody can lose.

BOWLING - Cross (Mr. Smith)                                    117

1  Q.   Isn't it a fact, ma'am, that the reason that you all felt

2  so good about leaving town is because that was a cover for

3  you, and you'd already planned the election, you'd already

4  made all the votes that you hadn't bought, you'd already taken

5  care of the absentee, and there wasn't a bit of need for you

6  to be around town that day other than to get caught by the FBI

7  or the attorney general's office around looking for vote

8  buying.  Isn't that a fact?

9  A.   This is not true.  I'm not aware of any of that going on

10  beforehand or that day or after.

11  Q.   You and the Morrises had already discussed that you were

12  going to be out of town, you were going to stay out of the way

13  of the attorney general's office and the FBI being around in

14  either May or November of 2006.  Isn't that a fact?

15  A.   I was never part of a discussion of that nature.

16  Q.   You talked nothing about elections whatsoever with these

17  people; is that what your testimony is?

18  A.   We talked about, you know, maybe who might be for who

19  because of who they were related to or who they were married

20  to.

21  Q.   Oh, so you did have conversations about the election now?

22  Is that your testimony?

23  A.   We talked about politics.  I was never part of any

24  discussions with anybody about vote buying, vote selling,

25  planning, anything of that nature.

1    Q.   Now, you testified that your husband was subpoenaed

2    before a grand jury in, I believe you said, January '07?

3    A.   Correct.

4    Q.   And isn't it a fact that his son, Steven, was also

5    subpoenaed that same day?

6    A.   Correct.

7    Q.   And yet you testified that Wanda and Kennon White came by

8    on Thanksgiving and asked about Steven Bowling being at the

9    grand jury.  Which one is it, ma'am?  Is it Thanksgiving, or

10   is it January?

11   A.   They were asking him about being subpoenaed to the grand

12   jury back in '06.  He was subpoenaed to the grand jury in '06

13   and never testified.

14   Q.   Oh, so you have recollection that Steven was subpoenaed

15   to another grand jury?

16   A.   Correct.

17   Q.   So there was two grand juries he's subpoenaed to?

18   A.   Correct.

19   Q.   All right.  And just to clarify, when you went down there

20   to vote at the Harts Branch, Stanley's daughter-in-law would

21   have been your election officer there at Harts Branch,

22   Crystal.  Isn't that a fact?

23   A.   Yes.

24   Q.   She'd have been there in '02, isn't that a fact?

25   A.   Yes.  That's why I had her children.

1    Q.   And she was there in '06?

2    A.   Yes.

3    Q.   And she was an election officer?

4    A.   Yes.

5    Q.   At the Harts Branch precinct?

6    A.   Yes.

7          MR. SMITH:  Thank you.

8          THE COURT:  All right.  Before we continue, we're

9    going to take our lunch break.  Ladies and gentlemen, I'm

10   going to excuse you until 1:00 this afternoon.  Please keep in

11   mind the admonition that you've been given previously not to

12   discuss the case among yourselves while we are in recess.  The

13   jury will be excused until 1:00 p.m. this afternoon.

14          (The jury left the courtroom at 11:54 a.m.)

15         THE COURT:  Thank you and please be seated.

16   Mrs. Bowling, you're still under oath.  I have a few questions

17   for you.

18          THE WITNESS:  Yes.

19          THE COURT:  Other than the parties and the attorneys

20   in this proceeding, you recognize anyone here in the

21   courtroom?  Are you familiar with anyone that's present in the

22   courtroom other than attorneys or parties?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Tell me who you identify, who you can

25   identify.

1          THE WITNESS:  I know Cletus.

2          THE COURT:  Other than parties.  Other than folks

3     here in front of the rail, do you recognize anyone in the

4     courtroom seated in the courtroom?

5          THE WITNESS:  I think the gentleman in the light blue

6     shirt works for the newspaper.

7          THE COURT:  All right.  Anyone else?

8          THE WITNESS:  I don't know his name.  The gentleman

9     in the suit and tie on the back row, I met back there a little

10    while ago.

11         THE COURT:  All right.  You can stand up if you need

12    to.

13         THE WITNESS:  I think the lady in the black coat

14    might be Wayne's daughter.  She introduced herself to me.

15         THE COURT:  She's the one that's been nodding as

16    you've been answering questions, as Mr. Smith's been asking

17    you questions, correct?

18         THE WITNESS:  Oh, I don't know.  I couldn't see her

19    sitting down.

20         THE COURT:  You didn't notice that?  Okay.  Let me

21    ask you a few other questions, ma'am.  You started to correct

22    an answer you had given to Mr. Smith outside the presence of

23    the jury about how many times you'd been present in this

24    building during the course of the trial, correct?

25         THE WITNESS:  Yes, sir.  I'm sorry.

1        THE COURT:  You have a correction you need to make?

2        THE WITNESS:  Yes.  I told him it was this past

3   Tuesday I was here.  It was not.  It was Wednesday.

4        THE COURT:  All right.

5        THE WITNESS:  I had my days wrong.

6        THE COURT:  Do you receive the newspaper?

7        THE WITNESS:  No, sir, we do not.

8        THE COURT:  You don't receive the newspaper at all,

9   either the Lexington Herald, the Courier Journal or the

10  Manchester Enterprise.  Do you receive any of those

11  newspapers?

12       THE WITNESS:  Years and years ago we got a Sunday

13  Herald Leader, but we stopped because it went to waste.

14       THE COURT:  During the course of this proceeding,

15  have you read any of those newspapers that I've just

16  mentioned?

17       THE WITNESS:  I have read the Manchester Enterprise

18  one time.

19       THE COURT:  When was that?

20       THE WITNESS:  It was when it had the article in it

21  before the hearing where Kenny Day and J.C. Lawson and what's

22  the other guy's name was here?

23       THE COURT:  You tell me.  You tell me what you

24  remember reading in the newspaper.

25       THE WITNESS:  It was like a your side/our side thing.

122

1    It was in the Manchester Enterprise.

2                 THE COURT:  Was that after February 2nd of this year?

3                 THE WITNESS:  I don't remember when it was.

4                 THE COURT:  The trial commenced with jury selection

5    on February 2nd.

6                 THE WITNESS:  It was before that, because it was

7    prior to the hearing on the 19th.

8                 THE COURT:  Let me again ask you, the jury selection

9    commenced on February 2nd of this year.

10                THE WITNESS:  Correct.

11                THE COURT:  I'm asking you if you reviewed in any way

12   a newspaper article after that date.

13                THE WITNESS:  No, sir.

14                THE COURT:  Did anyone communicate with you the

15   contents of any newspaper articles?

16                THE WITNESS:  No, sir.

17                THE COURT:  Have you spoken with any of the parties

18   about any testimony that's been given in this proceeding?

19                THE WITNESS:  No, sir.

20                THE COURT:  Has anyone communicated directly or

21   indirectly with you about any testimony that's been presented

22   in this case since February 2nd of this year?

23                THE WITNESS:  No, sir.

24                THE COURT:  You're telling me that you've lived in

25   Manchester, and you've commuted back and forth, correct, to

1   this trial?  You've not been living up here?

2            THE WITNESS:  No, sir.

3            THE COURT:  You've been commuting?  When you come up,

4   you drive up?

5            THE WITNESS:  Yes.

6            THE COURT:  And then you go home, you've told me that

7   you have not reviewed any newspaper articles about the case

8   since it commenced, that's what you're telling me?

9            THE WITNESS:  Yes, I've not read them.

10           THE COURT:  Haven't read an article.  As Mr. Simons

11  started to ask you questions about testimony in the case,

12  about slates of candidates, you nodded your head, uh-huh, that

13  you did understand that there had been that testimony in the

14  case.  What did you intend to mean by that, by nodding in

15  agreement that you understood what the testimony was?

16           THE WITNESS:  Well, I knew what he meant by the word

17  slate.

18           THE COURT:  That's all you intended to mean by that?

19           THE WITNESS:  Yes, sir, it is.

20           THE COURT:  All right.  Were you advised at the

21  beginning of this case that you were not allowed to speak with

22  any person, directly or indirectly, about any testimony that

23  was given in the course of the proceeding?

24           THE WITNESS:  Yes, sir.

25           THE COURT:  Who told you that?  Who told you you

124

1    couldn't talk to anybody about the case or any testimony in

2    the case?

3         THE WITNESS:  Mr. Simons.  I think you said that from

4    the Bench in a hearing.

5         THE COURT:  So you were fully aware of it, correct?

6         THE WITNESS:  Yes.

7         THE COURT:  All right.  Thank you.  Any further

8    questions along these lines.  Mr. Smith, first you?

9         MR. SMITH:  No.

10        THE COURT:  Anyone else?  Be in recess until 1:00.

11             (Proceedings recessed at 12:00 p.m.)

12                         - - -

13             C E R T I F I C A T E

14        I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
15   proceedings in the above-entitled case.

16

17    \s\ Lisa Reed Wiesman              March 20, 2010
     LISA REED WIESMAN, RDR-CRR          Date of Certification
18   Official Court Reporter

19

20

21

22

23

24

25

1                                INDEX

2

3      DEFENSE WITNESS

       LARRY CANN
4      Direct Examination by Mr. Simons.................. Page   6
       Cross-examination by Mr. Smith.................... Page  19
5      Redirect examination by Mr. Simons............... Page  34
       Recross-examination by Mr. Smith................. Page  38
6      Further direct examination by Mr. Simons......... Page  41

7      SARAH BOWLING (out of jury's presence)
       Cross-examination by Mr. Smith................... Page  45
8
       TIMOTHY S. BRIGGS (out of jury's presence)
9      Direct Examination by Mr. Smith.................. Page  47
       Cross-examination by Mr. Simons.................. Page  48
10
       EDSEL VINCENT BLAIR (out of jury's presence)
11     Direct Examination by Mr. Smith.................. Page  51
       Cross-examination by Mr. Simons.................. Page  52
12     Cross-examination by Mr. Abell................... Page  53

13     SARAH BOWLING
       Direct Examination by Mr. Simons................. Page  59
14     Cross-examination by Mr. Smith................... Page 103

15
       GOVERNMENT EXHIBITS                              ADMITTED
16
       Exhibit No. P38, photo
17     Admitted........................................ Page 107

18     DEFENSE EXHIBITS

19     Exhibit No. 3, surveyor info of sewer line project
       Admitted........................................ Page 18
20
       Exhibit No. 4, profile of sewer line plans
21     Admitted........................................ Page 18

22     Bowling Exhibit No. 5, Sewer line plans
       Admitted........................................ Page 18
23
       Exhibit No. 6, credit card printout
24     Admitted........................................ Page 98

25                         - - -