1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    SOUTHERN DIVISION at LONDON
                               - - -
 3
      UNITED STATES OF AMERICA,      :  Docket No. CR 09-16-S
 4                                   :
                      Plaintiff,     :  Frankfort, Kentucky
 5                                   :  Tuesday, March 23, 2010
           versus                    :  9:00 a.m.
 6                                   :
      RUSSELL CLETUS MARICLE,        :
 7    DOUGLAS C. ADAMS               :
      CHARLES WAYNE JONES            :
 8    WILLIAM R. STIVERS             :
      FREDDY W. THOMPSON             :      Trial Day 30D
 9    WILLIAM B. MORRIS              :
      DEBRA L. MORRIS                :
10    STANLEY BOWLING,               :
                                     :
11                    Defendants.    :
12
13                             - - -
                 TRANSCRIPT OF CLOSING ARGUMENTS
14                 BEFORE DANNY C. REEVES
            UNITED STATES DISTRICT COURT JUDGE and a jury
15                             - - -
16    APPEARANCES:
17    For the United States:        STEPHEN C. SMITH, ESQ.
                                    JASON D. PARMAN, ESQ.
18                                  Assistant U.S. Attorney
                                    601 Meyers Baker Road
19                                  Suite 200
                                    London, KY 40741
20
      For the Defendant            MARTIN S. PINALES, ESQ.
21    Russell Cletus Maricle:      CANDACE C. CROUSE, ESQ.
                                    Strauss & Troy
22                                  150 E. Fourth Street
                                    Fourth Floor
23                                  Cincinnati, OH  45202
24                                  DAVID S. HOSKINS, ESQ.
                                    107 E. First Street
25                                  Corbin, KY  40701
```

2

```
 1    For the Defendant           R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:           KRISTIN N. LOGAN, ESQ.
 2                                Landrum & Shouse, LLP
                                  220 West Main Street
 3                                Suite 1900
                                  Louisville, KY 40202
 4
      For the Defendant           T. SCOTT WHITE, ESQ.
 5    Charles Wayne Jones:        Morgan & Pottinger, P.S.C.
                                  133 West Short Street
 6                                Lexington, KY  40507

 7
      For the Defendant           ROBERT L. ABELL, ESQ.
 8    William R. Stivers:         120 North Upper Street
                                  Lexington, KY  40507
 9

10    For the Defendant           RUSSELL JAMES BALDANI, ESQ.
      Freddy W. Thompson:         R. TUCKER RICHARDSON, ESQ.
11                                Baldani, Rowland & Richardson
                                  300 West Short Street
12                                Lexington, KY  40507

13
      For the Defendant           JERRY W. GILBERT, ESQ.
14    William B. Morris:          Coy, Gilbert & Gilbert
                                  212 North Second Street
15                                Richmond, KY 40475

16
      For the Defendant           ELIZABETH SNOW HUGHES, ESQ.
17    Debra L. Morris:            Gess, Mattingly & Atchison, PSC
                                  201 West Short Street
18                                Lexington, KY 40507

19
      For the Defendant           DANIEL A. SIMONS, ESQ.
20    Stanley Bowling:            Thompson, Simons, Dunlop & Fore
                                  116 West Main Street
21                                Suite 2A
                                  Richmond, KY 40476
22

23

24

25
```

3

1    Court Reporter:                LISA REED WIESMAN, RDR-CRR
                                    Official Court Reporter
2                                   35 W. Fifth Street
                                    P.O. Box 1073
3                                   Covington, KY  41012
                                    (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CLOSING ARGUMENT BY MS. HUGHES*                                    4

1              (The jury entered the courtroom at 2:10 p.m.)

2          THE COURT:  Thank you.  All members of the jury are

3      present, as are parties and counsel.  Miss Hughes, are you

4      ready to present your closing argument?

5          MS. HUGHES:  I am.

6          THE COURT:  You may proceed on behalf of Debra

7      Morris.

8          MS. HUGHES:  May it please the Court.

9          THE COURT:  Miss Hughes.

10         MS. HUGHES:  Mr. Smith, Mr. Parman, defense counsel.

11     Ladies and gentlemen of the jury.  Hasn't been that long for

12     me.  It occurs to me, as I've watched and listened today and

13     yesterday, especially yesterday, that what the prosecution has

14     done in this case is to put Clay County on trial.  They have

15     gathered up every corrupt and ugly thing about Clay County

16     going all the way back to the 1980s that they could find, and

17     they have deposited it in one big stinky mess right in the

18     middle of this courtroom.  And the pile is so big and the

19     smell is so bad that the task of actually picking through it

20     to figure out what is relevant to each defendant on each

21     charge is quite daunting.  It's daunting for us, creating a

22     closing argument.  It will be daunting for you.

23         But that is your task.  And it is a task I believe

24     that the prosecution itself has not tried to accomplish.  I do

25     not say that in an accusatory way.  These agents, especially

*CLOSING ARGUMENT BY MS. HUGHES*                                    5

1   Special Agent Briggs in particular, they have been working

2   knee-deep, waist-deep in this corruption for many years.  And

3   I cannot blame them for assuming the worst when they are

4   dealing with events in Clay County.  After all, these folks

5   have already sent to prison the mayor and the former county

6   clerk and the assistant police chief and all the different

7   witnesses you've seen, magistrate, councilmen.  They've seen

8   arson, they've seen extortion and it is easy, I think, under

9   those circumstances to assume the worst, to jump to a

10  conclusion.

11          But here in this courtroom, and in this

12  investigation, with respect to my client, it's served to make

13  the investigation a sloppy one.

14          I do not mean to be petty, but I mean to demonstrate.

15  Agent Briggs did not know my client's maiden name.  At the

16  beginning of this conspiracy, in 2002, she was not married to

17  Bart Morris.  And I submit to you that the agents didn't

18  realize that until we got started in this trial.

19          Agent Briggs didn't know her maiden name, didn't know

20  that she had family in the community.  That's maybe not a big

21  deal.  But I submit to you that a thorough investigation would

22  have looked into that, because isn't that one of the hallmarks

23  of the government's case?  That there's a pay to play, that

24  there's a quid pro quo, that you scratch my back, I'll scratch

25  yours.  Isn't that what Wanda White tells us?  That there are

1    favors to be had for her family members.

2          So wouldn't you think that a thorough investigation

3    would look into what is happening to family members.

4          We do know from the testimony of the city supervisor,

5    Mike White, that Debi Morris has the only house on Singleton

6    Road, off of Town Branch, that does not have a paved driveway.

7    It's gravel.  And this is one of the primary ways that the

8    alleged conspirators, Kennon White in particular, paid people

9    for past and future assistance in corruption.

10         I submit to you that the FBI probably didn't realize

11   that Debi even owned a separate piece of property to be able

12   to look into that.

13         Special Agent Sagrecy testified that he did not even

14   subpoena the Morris's tax returns until we were well into the

15   trial.  And again, perhaps it does seem petty, but the

16   prosecution doesn't even know -- didn't even know how to spell

17   my client's name.  It's D-e-b-i.  And that's what was on the

18   tax returns.

19         They did not know that the name of Bart Morris's

20   company was B&J Transfer, not B&J Transport.  The indictment

21   says transport.  That's not the be all end all of the

22   evidence, but it does indicate that there is a less than

23   thorough investigation.  These are small things that should be

24   verified before an indictment comes out.  They're small things

25   that can be determined from a tax return that an IRS agent,

1    one would think, would look at.  From a check that's been

2    introduced into evidence, written to B&J Transfer, from the

3    invoices, from Debi's beauty shop, Debi's Cutting Crew.  She

4    did not misspell her name on her sign or on her tax returns.

5         This particular phase of this investigation -- and

6    obviously, Clay County investigation has been going on for a

7    long, long time.  We've seen quite a bit of it.  They've been

8    coming in to testify, drug dealers, everything.  But this

9    particular phase, we know, has been going on for two years.

10        We know that Wanda and Kennon White started making

11   tape recorded -- tape recordings in March of 2007.  March of

12   2009 is when the indictments came down, the search warrants

13   were executed, and here we are, March of 2010.

14        I submit to you that in that period of time, it is

15   reasonable for us to expect law enforcement to seek

16   verification of at least the most basic facts, but they did

17   not.  You will recall, when Special Agent Briggs originally

18   testified, when the government called him, he testified about

19   the search of the Morris's home.  He said nothing was found

20   there, because they had already moved all of their personal

21   effects to their new home.

22        When asked why did you not seek a warrant for the new

23   residence, he said we didn't know where it was.  I submit to

24   you that with a little diligence, the FBI could have figured

25   out where it was.  And this testimony by Agent Briggs, that no

1   evidence was found at their home because there were no

2   personal effects, that also demonstrates a lack of

3   thoroughness, because he clearly had not reviewed the

4   photographs taken that day of the search warrant.

5            The house was filled with personal effects.  The

6   office was full of papers.  They had -- the Morrises had not

7   begun to move anything out.

8            When confronted with this, Agent Briggs changed his

9   testimony and said, well, they were too smart to leave

10  evidence around when they knew the FBI had been in town.  And

11  besides that, the methodology had changed by that time from

12  vote buying to substantially vote stealing.

13           And as Mr. Gilbert just noted, Count 11, the 2006

14  count, does not allege vote stealing against the Morrises.

15  They are charged with vote buying in 2006.

16           The lack of any evidence at the Morrises' home is

17  important.  Agent Briggs testified in hindsight, he wasn't

18  surprised not to find anything.  Yet, I submit to you that he

19  had enough of an expectation to go get the search warrant in

20  the first place.  And if he hadn't thought it reasonably

21  likely that he would find something there, he wouldn't have

22  gone to look.

23           The reason I think that's important, because it

24  raises the issue of corroboration.  Mr. Gilbert's already

25  talked about it.  But I'm really picking up on what Mr. Smith

1    said yesterday.  He pointed out when things were corroborated.

2    It's important to him.  It's important to his case.  It's very

3    important to me.

4          You need to look for corroborating proof.  Yet the

5    one time the FBI went out to go get some corroborating proof

6    with the search warrant, they found nothing.

7          Now, the Court has instructed you, I've mentioned it

8    before, the Court will instruct you again that what the

9    lawyers say is not evidence and thank goodness it's not,

10   because I will tell you that my notes and my recollection are

11   substantially different than some of what Mr. Smith said in

12   his closing argument yesterday.

13         In particular, I believe that he said that witness

14   after witness after witness came in and testified that Bart

15   and Debi Morris were involved in vote buying in 2002, 2004 and

16   2006.  My recollection is quite different.  I submit to you

17   that in order to assess the evidence against Debi Morris, you

18   must look to the testimony of only six people.  Somebody just

19   said how many witnesses we've all heard, it's been a million.

20   Six of them are important to me.

21         Of those six, Kennon and Wanda White are two of them.

22   And of those two, Wanda is the only one who says that Debi

23   Morris was involved in anything in 2006.  My recollection and

24   my notes of Kennon's testimony were that he had gone -- he did

25   not mention Debi in 2006.

1        And I raise this issue of 2006, obviously, because as

2   we've talked about before and as Mr. Gilbert has said,

3   Count 11 deals only with 2006.  The other four witnesses that

4   I believe that you need to be concerned about and that you

5   need to evaluate when it comes to my client are Vernon Hacker,

6   Mary Gail Roberts, Billie Jean Berry, and Tanya Davidson.

7   Those are the folks that say Debi Morris was involved.

8        Let me address Vernon Hacker first.  He specifically

9   says, I don't know anything about 2006.  As someone pointed

10  out, I think it was Mr. Gilbert, by the end of 2006, he was

11  already incarcerated.  But he said, I don't know anything

12  about 2006.

13       And then there are the other three.  I don't know if

14  you can remember them or not, Mary Gail Roberts, Billie Jean

15  Berry and Tanya Davidson.  These are three members of the same

16  family.  Two sisters and one daughter/niece, all in the same

17  family, testified one right in front of the other.  And it is

18  no surprise to me, in any event, that they all said the same

19  thing.

20       One thing they did all say consistently was their

21  involvement was limited to the Freddy Thompson/Jennings White

22  election, which, of course, is 2002.  As sort of an aside, I

23  also point out that in 2002, again, Bart and Debi were not

24  married.

25       And none of them, none of these three or Mr. Hacker,

1    for that matter, made mention of the fact that it was Debi

2    Smith, not Debi Morris.  That may not be the biggest deal in

3    the world, but I will point out when the attorney, Mr.

4    Charles, came in to simply authenticate the prenuptial

5    agreement, he did what I believe comes naturally, which is

6    Debi Morris, well, she was Debi Smith at the time.  These

7    witnesses that put Debi Morris -- then Debi Smith -- involved

8    in 2002 make no mention of it.

9         I think it is quite telling, because it's easy to put

10   someone in their own house if you don't remember the specific

11   dates and if you don't recall.  It's easy.  Debi was at the

12   house.  Sure.

13        I will also note, and I didn't list this gentleman in

14   my six, because he does not attempt to say that Debi had

15   anything involved.  But I do point out that Deshae Henson

16   testified, and he said that Debi was in the garage one time,

17   and Dobber Weaver testified that she was at the house in 2004.

18   I believe it was Mr. Henson's testimony, it was 2006; and

19   Dobber Weaver said she was at the house once in 2004 when

20   there was a meeting.  But neither of these men even tried to

21   offer any evidence that Debi was involved in anything.  She

22   was just at her home.

23        So with respect to Count 11, the alleged 2006 vote

24   buying conspiracy, I submit to you that your verdict with

25   respect to Debi Morris rests entirely upon the testimony of

1    Wanda White.  The uncorroborated testimony of Wanda White.

2         There are many reasons I could stand here and talk

3    all day about why Wanda White has some credibility problems,

4    but I want to focus on two things.  Two things that are

5    important to me, both of which demonstrate the lack of

6    corroboration of her testimony.

7         Number one, why is there no recording of Debi Morris?

8    If Wanda White's testimony is true and there are meetings that

9    Debi Morris is attending three days a week, every week for a

10   year, it was something crazy like that, then why didn't Wanda

11   White feel comfortable to go out and try to get her on tape?

12   Like other people were on tape.  Why didn't the FBI direct

13   Wanda White to do that?  There's a reason.

14        There's a lack of corroboration is what there is.

15        My second point about the corroboration and Wanda

16   White is if what she said was true and she testified from that

17   list, absolutely she had seen Debi Morris pay certain people

18   to vote repeatedly.  Absolutely.  Why didn't the prosecution

19   team, the FBI, why didn't they go out and find some of those

20   people?  Why was it that I had to go out and find some of

21   those people?  It's the government that has the burden of

22   proof.

23        Three of the people on Wanda White's list came

24   afterwards and were witnesses for the government.  Billy Ray

25   Sester, Deshae Henson, Ella Wagers.  None of them said Debi

1    paid them to vote.  They were people Wanda White said

2    absolutely she had seen.  And then I tracked down three more.

3    Saffy Hipsher, Mariana Smith and Eddie Davidson.  Like the

4    government's own witnesses that were on the list, they denied

5    what Wanda White said was the truth.

6            The government will, I'm sure, come back -- they get

7    to say the last word.  They will come back and say, well, of

8    course, these people were lying.  They're afraid to admit

9    wrongdoing.  Well, okay.  But the government, as we have

10   established here in this courtroom, certainly has the power to

11   give immunity and promises to witnesses that will come forward

12   and tell the truth.

13           Why didn't the government find someone to support

14   Wanda's testimony?  Again, it's the government that has the

15   burden of proof here.  And their own witnesses, Mr. Sester,

16   Mr. Henson and Miss Wagers, did not corroborate her

17   allegations.  Again, what this tells us is not any bad motive

18   on the part of the government.  What it tells us is that their

19   investigation was simply not thorough enough, and it tells us

20   that Wanda White has not told the truth.

21           I like to think that if the FBI's investigation had

22   been a bit more thorough and some of these leads had been

23   tracked down and investigated, perhaps Debi Morris and I

24   wouldn't be sitting here today.

25           Now, with respect to 2006, I believe that we

1    established, and I believe that Mr. Smith conceded in his

2    closing that the Morris family was in Gatlinburg in May.  I

3    believe that we've established that Bart Morris was on a job

4    site during the day of the November election.  We've seen that

5    in the newspaper.  And as Jessica Morris testified, there

6    wasn't anything going on on Green Street.

7          Now, I believe the government will argue, based on

8    listening to their questions and the previous argument, that

9    they didn't have to be here on election day.  They could leave

10   town to fabricate an alibi and all they had to do was get all

11   the voters lined up in advance.

12         I guess that's an argument, but it is one without

13   corroboration as well.  In fact, even Wanda White's testimony

14   doesn't corroborate that argument, because Wanda White told

15   you unequivocally that she was sending the voters to Green

16   Street to be paid in May and November of 2006.  That is just

17   not the truth, and Wanda White is not a credible witness.

18         Okay.  Enough of 2006.

19         At this point, I want to move on generally.  Most of

20   my points have been made.  But talk about Counts 1 and 2.

21   Again, Bart and Debi Morris are charged in the big RICO

22   conspiracy, Count 1, all eight defendants; the related big

23   money laundering conspiracy, all eight defendants.  That's

24   Counts 1 and 2, and then 11, which is 2006.

25         Mr. Smith conceded yesterday that Debi Morris is only

1    a minor participant, even under his analysis of the case.  I

2    submit to you that she is not a participant at all in any

3    agreement relating to Counts 1 or 2.  The instructions, I

4    predict -- and we are all going to be pretty good at

5    predicting, because we have discussed them before we've come

6    out to argue, although, you know, there could be some changes.

7    But I predict that the instructions will tell you that merely

8    being present at the scene of an event or merely acting in the

9    same way as others or merely associating with others does not

10   prove that a person has joined in an agreement or an

11   understanding.

12        A person who has no knowledge of a conspiracy but

13   happens to act in a way that advances some purpose does not,

14   thereby, become a member of the conspiracy.

15        As I said a few moments ago, there are very few

16   people who even mention Debi Morris in their testimony.  And a

17   couple of them, as I mentioned, fall squarely within this

18   category, people who put you in the proximity but don't

19   purport to have any knowledge or evidence that someone is

20   actually involved.  Deshae Henson, Dobber Weaver are two of

21   those people.  And again, that was prior to 2006.

22        Carmen Webb Lewis is another one of those people.

23   She's the mayor now of Manchester, and she came in and she

24   testified and she showed us the video of election day,

25   November, 2004.  She did not necessarily have anything to

1    offer about what Debi Morris was doing, but she identified her

2    in the video, and I would submit to you that she appeared to

3    be coming home from her beauty salon, carrying her styling

4    appliances.  But be that as it may, Carmen Lewis puts her

5    there, but doesn't have anything to offer on the -- that would

6    go to her involvement.

7          To me, Carmen Webb Lewis is an interesting witness.

8    She came here and presented herself as the outsider who was

9    trying to capture illegal activity on tape.  I found her to be

10   a little less than forthcoming.  She said she only videotaped

11   during a two-hour period, but, in fact when the rest of the

12   video was played, she had videotaped into the evening, and her

13   video actually corroborated that Bart Morris was, in fact,

14   somewhere else and voted late in the day.

15         She told you that the City was saving money on the

16   garbage, having cancelled the B&J Transfer contract, but

17   hadn't bothered to make a calculation of the cost of using the

18   City's own trucks.

19         She told you -- and this is what I think is pretty

20   interesting.  She told you that her father was close friends

21   with J. E. Hensley.  That is a man that Mr. Smith mentioned in

22   his opening statement.  Now, it didn't have to do with this

23   conspiracy, necessarily.  It was part of that big pile that

24   came in.  Had to do with somebody who funded vote buying back

25   in the '90s.  And Bobby "Red" Sams testified, and I'm not

*CLOSING ARGUMENT BY MS. HUGHES*                                    17

1    vouching for his credibility in any way, shape or form, even

2    though he said nothing about my client.  But Bobby "Red" Sams

3    said he was working for Carmen Lewis in the fall of 2006.

4           By the government's standards, I would submit to you

5    that Carmen Lewis -- there is as much evidence against Carmen

6    Lewis as there is against Debi Morris.  If you are in Clay

7    County and you associate with somebody who once upon a time

8    did something, aha, says the government, or aha, says the

9    investigators who are exhausted and have seen so much.  And

10   for anybody in Clay County, I would suggest to you that there

11   is a Bobby "Red" Sams that is ready to come and get in the

12   witness chair and say that you're involved.

13          I am not suggesting that Mayor Lewis is involved in

14   anything.  I am suggesting that no matter who you are, you

15   will have come into contact with somebody who has done

16   something bad.  It is not a big county.  And no matter who you

17   are, somebody will come in and say you're involved with vote

18   buying.  That's just the way it is.  That's what we've seen.

19          For Carmen Lewis, it was Bobby "Red" Sams.  For Debi

20   Morris, it's this family of Mary Gail Roberts, Billie Jean

21   Berry and Tanya Davidson.  Of course, Miss Davidson, you may

22   or may not recall, she denied her own grand jury testimony

23   when she testified at the grand jury that she'd worked in 2006

24   for Bobby "Red" Sams or with Bobby "Red" Sams.  She denied

25   that as she was testifying before you.

1    I submit to you that these people have a lack of

2    credibility.  They, along with Vernon Hacker, were willing to

3    tell the government what they wanted to hear.  Forgetting, of

4    course, that Debi Morris or Debi Smith was not married to Bart

5    Morris the years that they place her in.

6        But even if you do believe these people, and I do not

7    concede that they have any credibility whatsoever, but even if

8    you believe that Debi Morris wielded the highlighter, the

9    famous highlighter, at least in my world it's famous.  The

10   famous highlighter or paid voters, that's not what the charge

11   is.

12       The charge is not did you buy votes in 2002.  The

13   charge is conspiracy for both Count 1 and Count 2, and for

14   that there has to be an agreement.

15       Other defense counsel have talked about this, and I'm

16   not going to dwell on it too long, except to say that it

17   defies reason that there was an overriding -- to find beyond a

18   reasonable doubt that there was an overriding common agreement

19   or common objective with these folks sitting behind me.

20       Mr. Smith argues that the overriding goal was to

21   control Clay County politics.  I ask you this.  Control by

22   whom?  If it was controlled by the school board, then you have

23   to ask yourself next, what evidence is it that Bart or Debi

24   Morris in their wildest dreams endeavored or agreed to work to

25   put the school board in control of the county politics in Clay

1   County?

2          Mr. Smith attempts to paint some picture of two

3   factions under the same umbrella.  Mr. Gilbert talked about

4   people, you can't fall out with people you've never fallen in

5   with.  And that they -- that each of these factions allowed

6   each other to operate, that there is some sort of live and let

7   live attitude.  I submit to you that there is no evidence to

8   support that; that the evidence is exactly the contrary.

9          In 2002, Jennings White testified that he stole votes

10  from people who had already been paid.  That's no live and let

11  live.  Jennings White had his minion, Todd Roberts, arrest Al

12  Man Stivers.  Wrongfully, it sounds like from the testimony.

13  Al Man sues the county over it.

14         Denver Sizemore testified that Jennings put out a

15  contract on a guy who spread rumors about him during the

16  election.  I have no way of knowing whether that's true or

17  not.  Someone else got up and talked about that.  But that is

18  big stuff that you don't get over.  There is evidence and

19  admitted evidence that Jennings White staged a fake

20  assassination attempt.

21         Todd Roberts was out photographing the other side at

22  the clerk's office during the preelection voting period and

23  sending it to the FBI.  Trying to get the other side arrested,

24  just like Al Man was then arrested.  Todd Roberts did say that

25  he took some investigators from the AG's office up to

*CLOSING ARGUMENT BY MS. HUGHES*                                    20

1    Y Hollow.  Didn't take any pictures there.  We don't see any

2    pictures of that, interestingly.  Nor do we see any evidence

3    from the AG's office that there was ever such a ride.  Todd

4    Roberts was out to get the other side.

5           There was at least -- there's testimony of at least

6    one physical fight, according to Bobby "Red" Sams.  Not that

7    I'm vouching for him again.

8           And then we've got this Billie Jean Berry and Mary

9    Gail Roberts who testified they saw guns being drawn.  These

10   are not people who are conspiring together to control Clay

11   County politics.  At best, the government has proven two

12   different groups working at cross purposes, and the Court will

13   instruct you, as Mr. Gilbert pointed out on the overhead, that

14   if you believe the evidence establishes multiple conspiracies,

15   rather than one gigantic racketeering and money laundering

16   conspiracy, then you must find these folks not guilty.

17          With respect to Debi Morris, I suggest that when you

18   sift through the mountain of evidence that you will have with

19   you -- I'm sorry about that, I'll just tell you.  The mountain

20   of evidence that you all are going to have with you when you

21   go back to the jury room and you look at who really says what

22   about whom, taking into account what is corroborated, and when

23   you study the instructions, you will return a verdict of not

24   guilty with respect to Debi Morris with respect to Counts 1, 2

25   and 11.  Those are the ones she's charged with.  Thank you

*CLOSING ARGUMENT BY MR. SIMONS*                                        21

1    very much for your time.  I know it's late.

2              THE COURT:  Thank you, Miss Hughes.

3              MS. HUGHES:  Thank you.

4              THE COURT:  Mr. Simons.

5              MR. SIMONS:  May it please the Court, Mr. Smith, Mr.

6    Parman, colleagues.  It's been several weeks now since I've

7    gotten to speak with you directly.  I'm sure you're happy to

8    know that I'm the last around the table to stand up here and

9    get a chance.

10             I'm going to take just a second to remind you what I

11   told you several weeks ago, what I was going to show to you,

12   and particularly what I was going to tell you about Stanley

13   Bowling.

14             Told you that Stanley Bowling was a hard working

15   fella.  After returning from Korea, spent 28 years working for

16   the City of Manchester.  Worked his way up the blue collar

17   way, became city supervisor.  For the last several years

18   before he retired in 2000, he was the supervisor in charge of

19   water, sewers and streets, and he worked primarily for Mayor

20   Daugh White.

21             And in the year 2000, he retired from City service,

22   and he had already established a company, B&B Excavating,

23   which did private work, and he began to develop that company.

24             From time to time, the City supervisors who succeeded

25   him with the City of Manchester needed advice or intervention,

*CLOSING ARGUMENT BY MR. SIMONS*                                    22

1   and they would call him, and you heard Mike White testify

2   about that.  When he needed something, he'd called Stanley,

3   and Stanley would tell him where things were and what needed

4   to be done.  It's no doubt, and you heard from multiple

5   witnesses that the person in Clay County most knowledgeable

6   about water and sewers and streets in 2000 and thereafter in

7   Manchester, Kentucky, was my client, Stanley Bowling.

8           Now, Stanley, after 28 years in service to the people

9   of Manchester, found that he missed the opportunity to serve

10  the public, and he decided to run for magistrate from

11  District 2 in the year 2002.

12          Now, I want to kind of be clear about this.  The

13  proof has come in, but you guys have, indeed, heard a mountain

14  of proof.  The District 2 magisterial district in Clay County

15  is comprised of three precincts.  They are Harts Branch,

16  Greenbriar, and Big Creek.  That's it.  None of those are city

17  precincts.  They have nothing to do with the City.  They are

18  in the county, outside of town.

19          Now, the government is contending that when Stanley

20  decided to run for a magistrate's position in 2002, that he

21  agreed to participate as an associate in the Board of

22  Elections and that they agreed to engage with all of these

23  defendants and others known and unknown to work toward a

24  common goal or a common purpose.  Common plan.  That's what

25  the instructions will tell you.  That's what most of these

1    fine lawyers, capable people have argued to you already.  And

2    I won't go into that too much, but I do want to talk about the

3    common goal or purpose.

4         The first thing I want to do, however, is live up to

5    a promise that I told you weeks ago.  And that was simply

6    this.  When I stood up next and had a chance to talk to you, I

7    was going to tell you about what you failed to hear in the

8    course of this trial from the government's proof and what you

9    failed to see from the government's proof that will mandate a

10   verdict of not guilty on behalf of Stanley Bowling.

11        Now, I want to start and I want to go through it

12   quickly.  It's a short -- it's a fairly lengthy list.  The

13   first thing you saw from Mr. Smith in his opening and again

14   yesterday were a couple of big charts.  There were two big

15   charts that were very similar.  They detail 25 years in a

16   timeline of events.  And they are benchmark items as it goes

17   along in the presentation of the government's case.  You won't

18   see Stanley Bowling's name on any of those things.  He's not

19   mentioned on either of those charts.

20        The second thing you saw is another big chart, and it

21   was the Board of Elections, and it detailed who it was and

22   people up there and people below.  You won't see Stanley's

23   name on that chart either.  You will see Crystal Bowling's

24   name.  That's his daughter-in-law.  I'll talk about that in a

25   minute, as an election officer.

1      You will not hear, did not hear any evidence from

2   anybody that Stanley Bowling put money into a pool of money

3   that was distributed for any purpose.  I think Mr. Smith

4   acknowledged that in his argument yesterday.  He conceded that

5   point.

6      You will -- you did not hear from one person who

7   testified that Stanley Bowling ever bought a vote.  Not one.

8   You didn't hear testimony from one person that Stanley Bowling

9   ever stole a vote.  Not one.

10      Now, I tell you something else that was missing from

11   the case.  I told you there were three precincts.  There was

12   Harts Branch, Big Creek, and Greenbriar.  Each of those, as

13   you've heard time on end, there are four elections in each

14   precinct.  So in those three precincts that Stanley runs in,

15   there are 12 election officers in each election.

16      Stanley ran only four times.  One was unopposed.  So

17   the last, November of '06, he didn't even have any opposition.

18   So he really only ran three times.  He had a primary election

19   in May of '02, he had a general election in the fall of '02,

20   and he had a primary election in May of '06.

21      So there are 36 election officers that participated

22   in his district in the elections in which he had that were

23   contested.

24      Now, you heard much proof in the government's case

25   that having somebody on the inside as election officer was a

1    pivotal thing.  It was key.  Yet, you didn't hear one bit of

2    testimony from an election officer in any of those three

3    precincts.  There's 36 chances to do it.  You didn't hear from

4    a person.

5          Now, you did hear some comment that Crystal Bowling

6    served as an election officer in the Harts Branch precinct.

7    There's nothing wrong with that.  It's not a crime to be

8    married to Stanley Bowling's son and to be his

9    daughter-in-law.  And she's perfectly qualified to sit as an

10   election officer.

11         Now, the government did not present to you one voter

12   from Big Creek or Greenbriar who said they ever sold a vote.

13   Not a person.

14         Now, I want to move on to connections.  My client is

15   charged with only two counts.  And there's another poster that

16   the government has used, and it's effective and very

17   instructive.  It has all of the people listed, all the

18   defendants listed and all of the charges against them.  And

19   Stanley only appears in Count 1 and Count 2.  Both of those

20   are conspiracy charges, and that's what I want to talk about,

21   primarily.

22         You have not heard that Stanley Bowling has the

23   remotest connection to Cletus Maricle in this case.  Now,

24   you've never heard that he's so much as appeared, in that he's

25   never been involved in a civil lawsuit in Judge Maricle's

*CLOSING ARGUMENT BY MR. SIMONS*                                    26

1    court as a plaintiff or a defendant.  You never heard anything

2    about that.  You've never heard that he's been even in the

3    district court.  There were other things involved.  It was

4    alleged that he kind of controlled the district court as well.

5    Stanley Bowling has never been mentioned in connection with

6    any court case.  He's never asked for a favor.  He's never

7    sought influence.  There's -- we're devoid of proof on those

8    issues.  You've not heard a peep.

9          The only connection that I can determine that Mr.

10   Bowling has with Mr. Douglas Adams is they happen to be

11   charged with the same crimes before you.  You've never heard

12   about a meeting, so much as even a conversation between them.

13   It is patently obvious from the proof that's coming in that

14   they were in direct opposition on most candidates in most

15   elections.

16         Now, everybody pretty much that's talked to you prior

17   to me has talked to you about using your common sense.  It's

18   part of the instructions.  I would urge you, along with the

19   rest of them, and that includes Mr. Smith and most of these

20   lawyers.

21         Let me talk to you just for a second about Wayne

22   Jones.  Now, in 2002, when Stanley first ran, Mr. Jones was a

23   member of the Board of Elections.  Stanley won in the primary.

24   And in the fall, he runs.  It defies logic and common sense to

25   say that he would be a part of a conspiracy to work within the

1   Board of Elections when he is running against Billy Jones, who

2   is Wayne Jones' brother.  That makes no sense.

3          You have heard no testimony whatsoever that Stanley

4   Bowling has any association with Mr. William Stivers.  None.

5   As a matter of fact, what you did hear was that in November of

6   2004, when Stanley's wife, Sarah, went to vote absentee so

7   that -- because she had to work on election day, that William

8   Stivers was working the absentee booth and he didn't even know

9   her.  He sent her back to the car to get a picture ID.

10         There has been no proof of a meeting, a talk, a

11  conference, or an association of any sort between Stanley

12  Bowling and Mr. Freddy Thompson.  Ever.  There's just no

13  common plan or purpose here among these people that involves a

14  participation of my client, Stanley Bowling.

15         Now, I want to go back and talk -- I also told you at

16  the beginning of this case that when Stanley decided to run

17  for office, the election in '02 was a little bit more robust

18  than he anticipated and, in fact, it was.  And you've heard a

19  good deal of testimony from a lot of people that may be

20  exaggerated, maybe not, about 2002.

21         What you heard about Stanley, what you heard from

22  three or four people, that he paid them to haul votes.  Miss

23  Hughes mentioned two or three ladies who were related, and you

24  heard -- well, you didn't hear he paid them by check.  Voter

25  transportation is okay, but you're supposed to do it by check.

1      You heard one person who testified that they gave

2 Stanley Bowling money in 2002 for an illicit purpose, even

3 though there's no common plan among these people, and I've

4 explained that to you.  That person was Kennon White.  And I'm

5 going to have to talk about Kennon for just a minute.  Mr.

6 Gilbert has detailed a lot of things, but Kennon has a special

7 place in Stanley's defense, and I want to speak about it.

8      Now, as you know, Kennon dropped out of high school

9 because he was addicted to drugs.  That didn't start because

10 he was underprivileged or anything.  His daddy was the mayor,

11 but he didn't finish high school.  I think he wound up getting

12 a GED, he said.

13      He went to treatment.  He had two major drug relapses

14 that lasted for a year or more.  He worked for his dad as a --

15 his dad's shop and then started a mobile home sales business

16 in London that went down over a short period of time, and his

17 dad bailed him out of that.  And he came home, and he launched

18 a political career.

19      And his political career, his determination was to

20 ask the good people of Clay County -- and there are good

21 people in Clay County -- for the keys to the jail.  With that

22 background, can we be surprised that he was trounced soundly

23 in that election?  It's not like the people didn't know him.

24      Now, Mr. Gilbert has gone through the discussions

25 that he had and the people that he confided in to seek advice.

1    And in the course of that, he told you that Stanley Bowling,

2    he gave Mr. Bowling and Mr. Morris $12,000 in the May primary

3    of 2002.

4           Now, he also told you, as I was cross-examining him,

5    that Stanley Bowling was responsible for bailing a man out of

6    jail named Jimmy Mills, and Jimmy Mills wound up getting shot

7    a couple days later and was upset by that.  I'm not going to

8    show it to you right now, but when you get back, if you look

9    at Stanley Bowling Exhibit 1, SB-1, it is the bail bond for

10   Jimmy Mills, and it was a $50,000 property bond signed by his

11   father, by Jimmy Mills' father.  Doesn't have anything to do

12   with Stanley Bowling.

13          If Mr. Kennon White will misstate that to you, what

14   is his trustworthiness on anything else he has to say?

15          Now, Kennon lost in a landslide.  Then he looked

16   around everywhere for an excuse.  Oh, Jennings said we lost

17   our election officers.  We got double-crossed.  Charles Marcum

18   was such a good candidate, he was impossible to beat.  He was

19   looking for any kind of excuse.

20          Then he decided to run for city council in 2004.

21   Well, his father was smarter than that and gave him a job,

22   invented a position for him as city manager so that he, for

23   God's sakes, wouldn't get back in another election.  He

24   leapfrogged Mike White for that job and came in ahead of him.

25          And then the city went to -- things fell apart.  What

*CLOSING ARGUMENT BY MR. SIMONS*                                    30

1    would you expect?  It took him within months, he was marching

2    down the street behind Elmo Greer's blacktopping trucks like

3    Augustus Caesar trying to get private driveways paved for

4    personal and political gain.  He was cutting the water bills

5    of people in town that were personal friends that did

6    political favors for him.

7         He was losing evidence from the police room, which he

8    was in charge of the Manchester Police Department.

9         MR. SMITH:  Your Honor, I don't believe that's in

10   evidence at all.  I believe counsel is simply misstating.

11        THE COURT:  All right.  The jury will recall what the

12   evidence was.  This is argument, counsel.  You may proceed.

13        MR. SIMONS:  And most importantly to me, he started

14   extorting money from city contractors.  The reason that's

15   important to me is because B&B Excavating was applying for and

16   bidding for City contracts.  And Kennon White extorted $67,000

17   from him, and there was evidence in this case that he tried to

18   extort others, Jackie Robinson -- or Jackie Jones, Scott

19   Robinson, Nordy Harris, I think.

20        Now, to finish up with Kennon's reason for perhaps

21   fabricating things against Stanley Bowling, in November of

22   2006, Stanley's son testified in front of a grand jury.  It

23   was in November, just before Thanksgiving, and then Kennon and

24   Wanda White show up at Stanley's house with some dessert.  You

25   heard this testimony from Sarah Bowling.  They want to talk

*CLOSING ARGUMENT BY MR. SIMONS*                                          31

1    about that.  The meeting there is very short.  They're removed

2    from the property and it's the last time that Stanley and

3    Sarah ever saw Kennon and Wanda.

4           January the 12th of 2007, Stanley testified in front

5    of a grand jury at a time when he was battling prostate

6    cancer.  He had to undergo a surgery, and he was sick, and for

7    the next three months had a very hard time getting around.

8           Now, that, I want to suggest to you, is the reason

9    for the biggest hole on the government's case, at least as far

10   as Kennon White's concerned.  You don't hear Stanley Bowling

11   on any audio tape.  He's not interviewed by Wanda or Kennon

12   White.  There is no recording of anything by him.  There's no

13   visit.

14          You heard that he removed them from their property in

15   November.  They didn't come back.  Kennon White told you from

16   the stand that Stanley worked under the mayor from the time

17   Kennon was small.  He knew him growing up.  He was very

18   familiar with Stanley Bowling.  Why would he not come back?

19   Why would he not interview Stanley Bowling and talk about any

20   of the allegations that have been displayed to you in this

21   case, whether it was the City contracts or whether it was any

22   election problem?

23          I'm going to suggest to you that the answer to that

24   question was displayed, even though Stanley's not on it, on

25   the very first tape recording that Kennon White made with

*CLOSING ARGUMENT BY MR. SIMONS*                                                    32

1    Cletus Maricle.  It wasn't anything Mr. Maricle said.  But on

2    the very first tape, Kennon says, hope they haven't got

3    Stanley.  Stanley's the only thing that bothers me.  Be a

4    shame to get beat to the punch.

5         Those are comments from Kennon White about my client

6    on March 27th, 2007.  I suggest to you that he had a

7    motivation to come in here and to tell things that are not

8    true.

9         Now, the government has talked about corroboration.

10   We could have done that.  Where is Daugh White?  I've been

11   talking about him for months, trying to learn about him.

12   Frankly, I don't know whether it's Daugh or Doug.  I think he

13   goes by either.  But he has pled guilty.  He is within the

14   control of the government.  You did not hear from him.  You

15   could have.

16        MR. SMITH:  Your Honor, I'm going to object as to

17   characterization that this is a witness under the control of

18   the government.

19        THE COURT:  Sustained.

20        MR. SIMONS:  My apologies.  Daugh White, you didn't

21   hear from Daugh White.  Kennon told you that Daugh White went

22   with him in 2002 when he turned his money over to Stanley, but

23   you didn't hear from Daugh White.

24        Now I want to move on from Kennon White, and I want

25   to talk about the actual elections that Stanley participated

*CLOSING ARGUMENT BY MR. SIMONS*                                      33

1    in.  If you give me just one moment, I'm going to turn this

2    machine on.  I forgot to do that.

3            Your Honor, how much time do I have?

4            THE COURT:  You have 23 minutes.

5            MR. SIMONS:  Thank you.  As I said, Stanley was only

6    in four elections.  The May and general election in 2002 --

7    and I have capsulated the results.  The formal results are in

8    the exhibits.  And I just want to put them up for you.

9            You can see Magistrate District 2, Stanley Bowling

10   was the winner with 660 votes.  The next closest contender had

11   401 votes, then 269 and 202.  Those are the total votes that

12   were placed in the three precincts I've described to you here.

13   Doing quick math, looks like about 1,500 or so.  Maybe a

14   little more.  1,550.  And Stanley won easily.

15           I would also, if you look just above that, you will

16   see how Kennon White fared in his effort to win the jailer's

17   race.  He was beaten soundly, 4,194 by Charles Marcum to

18   2,351.

19           Now, in the November race against the Democrat, Billy

20   Jones, in the general election, Stanley received 807 votes to

21   721 for Billy Jones, again roughly 1,500 votes.  The same

22   turnout.

23           Now, in that May election, I wanted to put one more

24   thing up.  The county clerk's race, Jennings White versus

25   Freddy Thompson, Freddy Thompson has 5,100, a little over.

1    Jennings White is soundly defeated.

2            The reason that I point that out to you is that if,

3    as has been alleged, there was some ticket involving Kennon

4    White and Jennings White that Stanley Bowling was on, they got

5    soundly thrashed, and he won easily.  The reason for that has

6    to be something.  I would suggest to you that it's because

7    that for 28 years, he was known as somebody who was a hard and

8    productive worker and people liked and wanted him to hold the

9    office of magistrate.

10           Now I want to talk about 2004 for a minute.  Stanley

11   didn't run in 2004.  He didn't have any participation in any

12   election of any sort.  I don't think I've heard a word about

13   him being involved in elections.  He was not a candidate.  You

14   didn't see him on videotape by Carmen Webb Lewis.  You didn't

15   see him in any pictures.  You didn't -- what he was doing,

16   frankly, was trying to develop B&B Excavating and try to have

17   diagnosed and treated a Guillain-Barre syndrome, which is a

18   disease he contracted in August of '04 that bothered him and

19   stayed with him for more than a year, as his wife, Sarah,

20   testified.

21           The next elections that Stanley was participated in

22   was the 2006 elections.  And in May of 2006, there is only one

23   witness that remotely hints that Stanley did anything

24   inappropriate in that election, and that was none other than

25   the infamous Bobby "Red" Sams, whom you had seen a lot about

*CLOSING ARGUMENT BY MR. SIMONS*                                    35

1    and heard quite a bit about before he testified.

2           And first of all, he was a notorious vote hauler,

3    buyer, whatever.  You heard testimony from several witnesses

4    that he worked for whatever side it took.  You saw his picture

5    that was taken by Todd Roberts and displayed to you by the

6    government down in the absentee voting.  He acknowledged all

7    that.  You heard in 2004 that although he was supposed to be

8    hauling votes for Tim Couch, he approached Barbara Colter

9    White and offered to work for her.  You've heard already Miss

10   Hughes talking about him hauling voters, which he admitted,

11   for Carmen Webb Lewis.

12          But the one thing he certainly said was that he did

13   everything he could conceivably do to work against Stanley in

14   2002 and the people that he was for.  He'd had a run-in with

15   Stanley's best friend or good friend, Bart Morris.

16          Now, he also testified that he came to Stanley's

17   garage the night before the May election and met with Mansell

18   Baker.  You also heard from Mansell.  That's the fella that

19   had the terrible drug problem that was -- got off drugs, and

20   Stanley gave a job, put him in his garage and fed and gave him

21   shelter and then found out he was back on drugs and kicked him

22   out of the house.  That was Mansell.

23          And you heard he met there with Darrell Collins and

24   Wayne Jones and Stanley Bowling.  Not only does that not make

25   sense, because Stanley Bowling wouldn't be around Bobby "Red"

1   Sams for any reason, based upon their history, Sarah Bowling

2   testified to you that they were both together that night

3   getting ready to go to Gatlinburg, where they voted when the

4   polls opened the next morning and went to Gatlinburg and there

5   was no such meeting.

6          Now, all of that becomes a little immaterial for this

7   reason.  The government has charged a number of these

8   defendants with a vote buying conspiracy in 2006.  Stanley

9   Bowling's not charged with that.  The government didn't even

10  bring that charge against him.

11         So I submit to you -- and, well, Bobby "Red" Sams

12  acknowledged he didn't pay any voters even then.  It's just,

13  it's an extremely, extremely weak connection to 2006, and it's

14  been disproven.

15         Now I want to move on and talk -- I do want to

16  reiterate and thank my colleagues for detailing the conspiracy

17  instructions and going through them and showing how there was

18  no connection and no common plan.  I've tried to follow up

19  only factually on that.

20         I want to talk for a minute or two about the only

21  other charge pending against Stanley Bowling.  And that is the

22  money laundering allegation.

23         Now, as best I can determine it, there is a

24  contention that Stanley's political efforts were designed to

25  enrich himself personally; i.e., get contracts as a result of

*CLOSING ARGUMENT BY MR. SIMONS*                                    37

1    bad activities.  Well, that just doesn't follow, and this is

2    why.  There is not a shred of evidence that Stanley Bowling

3    was ever involved in a City election.

4            Agent Jeff Sagrecy talked about a million dollars in

5    gross receipts from City contracts.  That's where the money

6    came from.  That's where it came from.  Work for the City.

7    Sewer work, primarily, and a water line.  There is not a bit

8    of evidence that Stanley Bowling had any connection with any

9    city council race ever.  The government has completely failed

10   to produce that for you.  Now, Stanley's only races put him in

11   the position as a county magistrate.  That's a very different

12   thing.

13           You did, however, hear from two city council members

14   from the witness stand during the government's presentation.

15   The first was Vernon Hacker.  Vernon Hacker was never asked a

16   question about Stanley Bowling's City contracts.  The second

17   was Carmen Webb Lewis, who, if anything, was extremely

18   vigilant about local politics to the extent she went out and

19   videotaped a voting poll and Green Street in 2004 when she was

20   elected, and she held the position of city councilwoman for

21   two years, and it's the very two years in which all of my

22   client's contracts were let by the City.

23           She didn't testify that there was anything wrong with

24   those contracts or that any work was done that was improper.

25           Now, there were lots of other city council people on

1    the voting sheet I just put up there in November of '06.

2    There are eight city council persons that run.  You didn't

3    hear from Darnell Hipsher.  You didn't hear from Ouchie

4    Jackson.  You didn't hear from Penny Robinson.  You didn't

5    hear from anybody.  Nobody came on and said that Stanley did

6    anything in any way that influenced his award of those

7    contracts.

8           Now, there was some talk about there being no -- that

9    contracts were put out without bids.  In order to save time,

10   there were -- proof was actually this, that there were some

11   change orders off the largest job that Stanley did which was

12   bid.  There was another -- and there was a series of four

13   jobs.  And what I want to do is I want to put the bid up on

14   the board that comprised a portion of four of his largest

15   contracts.

16          This shows the bid, and it shows that B&B Excavating

17   was one bidder and Laurel Construction Company, Inc., was the

18   other bidder.  I asked one of the witnesses about Laurel

19   Construction Company.  It's a larger company than Stanley's

20   and also bids and is awarded City contracts.

21          B&B bid $439,300.  Laurel Construction bid $522,804.

22   My math's not anywhere perfect, but that's about 82 or 83

23   thousand dollars.  That was a competitive bid.  I think you

24   would agree that B&B's bid was substantially lower than the

25   competitor.

1    Then there was -- that bid turned in to award, which

2    ultimately resulted in payments to B&B, where there were three

3    change orders done on that bid, all of which I brought in

4    engineers to prove to you to show you how that works.  All

5    change orders are approved by the engineer, the City, the

6    contractor, and the funding agency.

7    It's not an under the table, sideways deal.  That's

8    how they're done.  Now, the ultimate receipt for B&B on that

9    one job -- want to show you two more things.  This is one of

10   the change orders to put in a pump station at Muddy Gap.  The

11   engineer's estimate for the job was $92,500.  Stanley

12   Bowling's company put it in for $85,000.

13   It was approved by all of the parties that I just

14   acknowledged, which is shown by this.  There is the change

15   order signed by Mike White on behalf of the city, signed by

16   Quest Engineering, that's P. Bit Hanson, by Stanley Bowling

17   and reviewed by the lending agency and approved.

18   I would submit to you, you have heard no evidence

19   that my client did anything but good work.  You haven't heard

20   he did shoddy work.  You haven't heard that he -- well,

21   Mansell Baker tried to tell you that he cut corners on a

22   project by cutting through the road and using county gravel.

23   That was explained to you by affirmative proof that there was

24   a high pressure gas line so that he couldn't put in a water

25   line above it.  He had to go through the road, and the gravel

1    was put in by agreement of all the county, because it would be

2    impossible to drive up and down the road in rain without

3    regraveling.

4            Now, I put on or tried to put on good, reliable,

5    affirmative proof of the quality of Stanley's work with B&B

6    for the City of Manchester.  I want to show you two

7    photographs and then I'll try to wrap up.

8            How much time, Your Honor, do I have?

9            THE COURT:  You have till 3:25 so you have about

10   eight minutes.

11           MR. SIMONS:  Thank you.  It's a little hard to see.

12   You're welcome to look at these back in the jury room when you

13   retire, but this is one of the sewer projects that B&B did.  I

14   put this in there, because you can see the first manhole there

15   that was put by B&B.  Goes up a winding hill there.  There are

16   several manholes.  The plans for this and all the jobs have

17   been introduced if you wish to look at them.

18           That is what's called a pump station.  That is

19   another pump station.  I suggest to you that those are sizable

20   undertakings, that the work was done well.  That's been

21   demonstrated to you, and that Stanley Bowling's acquisition of

22   that work had absolutely nothing to do with his position as a

23   county magistrate.

24           Now, Mr. Westberry, I think, was the first among us

25   to suggest that the evidence may have been so widespread that

1  you might get the impression that because so many persons from

2  Clay County have been styled as corrupt that just because

3  you're from Clay County, you must be corrupt.  I know that

4  you, the group of you is smarter than that.  That theme has

5  been sort of passed around.

6       But it is a concern.  I do want to point out to you

7  that you did hear from some smart, well-intentioned,

8  knowledgeable people from Clay County, and I want to just

9  point out two or three of them to you.

10      The first one that comes to mind for me is Reecia

11 Samples.  She has succeeded Doug Adams as superintendent of

12 schools, and she testified for you, and I thought she did a --

13 well, she testified.  You heard her.  At the end, I stood up

14 and I had two questions for her.  I asked her if she was a

15 voter, and she said that she was and she had voted in all the

16 elections for several years.  I asked her where she voted, and

17 she said Harts Branch.  That's one of my client's precincts.

18 And I said have you ever seen anybody buy a vote or do

19 anything illegal at Harts Branch?  And she said no, I have

20 not.

21      Secondly, I submit to you Sarah Bowling, a critical

22 care nurse.  My client's wife was a viable and smart witness.

23 She testified as she did.

24      I'd also put up, suggest to you that Joey Rader, who

25 I would point this out for you.  Joey Rader was the inspector

1   who originally worked for Quest, now with HBR.  He inspected a

2   lot of the work that Stanley did.  Not all of them, a lot of

3   them.  He was the inspector on the emergency job that Stanley

4   did that kept raw sewage from spilling into the Goose Creek

5   River just upstream from the intake for the water supply for

6   the City of Manchester.

7          I asked Mike White while he was on the stand.  First,

8   he said that wasn't an emergency, but he did acknowledge

9   sewage spilled into the river just up from the intake valve on

10  many occasions, that it happened frequently, and some people

11  might consider that to be an emergency if you're getting your

12  drinking water and the water you wash your clothes with and

13  cook with just out of the river upstream or downstream from

14  where sewage has spilled in.

15         Now, Joey Rader inspected that job.  I would suggest

16  to you that the plans were drawn in late 2003.  The job wasn't

17  done, but I'd also point out that Kennon White took over in

18  2004 as the city manager, responsible for that type of thing.

19         Now, I would suggest to you that Mary Sue Hensley,

20  the City clerk who testified or the City employee who worked

21  under Stanley for many years was a knowledgeable and good

22  witness.

23         The proof, ladies and gentlemen, I'll wrap up, is

24  simply this.  The government has failed in every way to show

25  that there was a conspiracy, a common plan among any of these

*CLOSING ARGUMENT BY MR. SIMONS*                                         43

1   defendants to control politics in Clay County.  Certainly, the

2   evidence has fallen far short that Stanley Bowling had such a

3   desire or made such an effort or was so involved.  The proof

4   has failed to show that Stanley Bowling laundered any money.

5           In fact, the proof has been the opposite, completely.

6   Stanley Bowling earned and deserved every dollar from every

7   contract that he had with the City, and the proof has shown

8   that he has earned and deserves his freedom.

9           I would ask that you restore him to his family and to

10  the Clay County mountains that he loves and find him not

11  guilty on both counts with which he's charged.  Thank you.

12          THE COURT:  Thank you, Mr. Simons.

13          Ladies and gentlemen, we're going to go till about

14  4:45 this afternoon.  But before we continue, we'll take

15  another short recess, about ten-minute recess.  Please keep in

16  mind the admonitions you've been given previously.  The jury

17  will be excused until 3:35 this afternoon.

18          (The jury left the courtroom at 3:24 p.m.)

19                              - - -

20              C E R T I F I C A T E

21          I, LISA REED WIESMAN RDR-CRR, certify that the
    foregoing is a correct transcript from the record of
22  proceedings in the above-entitled case.

23

24   \s\ Lisa Reed Wiesman                    March 23, 2010
    LISA REED WIESMAN, RDR-CRR              Date of Certification
25  Official Court Reporter

1                                    INDEX

2
    Closing argument by Ms. Hughes...................... Page 4

3
    Closing argument by Mr. Simons...................... Page 21
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25