```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    SOUTHERN DIVISION at LONDON
                               - - -
 3
       UNITED STATES OF AMERICA,    :  Docket No. CR 09-16-S
 4                                  :
                    Plaintiff,      :  Frankfort, Kentucky
 5                                  :  Thursday, February 25, 2010
            versus                  :  1:00 p.m.
 6                                  :
       RUSSELL CLETUS MARICLE,      :
 7     DOUGLAS C. ADAMS             :      Trial Day 13B
       CHARLES WAYNE JONES          :
 8     WILLIAM R. STIVERS           :
       FREDDY W. THOMPSON           :      Excerpted Transcript
 9     WILLIAM B. MORRIS            :  Testimony of Wanda White
       DEBRA L. MORRIS              :
10     STANLEY BOWLING,             :
                                    :
11                  Defendants.     :


12


13                             - - -
                       TRANSCRIPT OF TRIAL
14                  BEFORE DANNY C. REEVES
            UNITED STATES DISTRICT COURT JUDGE and a jury
15                             - - -

16     APPEARANCES:

17     For the United States:       STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
18                                   Assistant U.S. Attorney
                                     601 Meyers Baker Road
19                                   Suite 200
                                     London, KY 40741
20
       For the Defendant
21     Russell Cletus Maricle:      CANDACE C. CROUSE, ESQ.
                                     Strauss & Troy
22                                   150 E. Fourth Street
                                     Fourth Floor
23                                   Cincinnati,OH  45202

24                                   DAVID S. HOSKINS, ESQ.
                                     107 E. First Street
25                                   Corbin, KY  40701
```

```
 1      For the Defendant              R. KENT WESTBERRY, ESQ.
        Douglas C. Adams:              KRISTIN N. LOGAN, ESQ.
 2                                     Landrum & Shouse, LLP
                                       220 West Main Street
 3                                     Suite 1900
                                       Louisville, KY 40202
 4

 5      For the Defendant              T. SCOTT WHITE, ESQ.
        Charles Wayne Jones:           Morgan & Pottinger, P.S.C.
 6                                     133 West Short Street
                                       Lexington, KY  40507
 7

 8      For the Defendant              ROBERT L. ABELL, ESQ.
        William R. Stivers:            120 North Upper Street
 9                                     Lexington, KY  40507

10

11      For the Defendant              RUSSELL JAMES BALDANI, ESQ.
        Freddy W. Thompson:            R. TUCKER RICHARDSON, ESQ.
12                                     Baldani, Rowland & Richardson
                                       300 West Short Street
13                                     Lexington, KY  40507

14      For the Defendant              JERRY W. GILBERT, ESQ.
        William B. Morris:             Coy, Gilbert & Gilbert
15                                     212 North Second Street
                                       Richmond, KY 40475
16

17      For the Defendant              ELIZABETH SNOW HUGHES, ESQ.
        Debra L. Morris:               Gess, Mattingly & Atchison, PSC
18                                     201 West Short Street
                                       Lexington,KY40507
19

20      For the Defendant              DANIEL A. SIMONS, ESQ.
        Stanley Bowling:               Thompson, Simons, Dunlop & Fore
21                                     116 West Main Street
                                       Suite 2A
22                                     Richmond, KY 40476

23

24

25
```

3

1    Court Reporter:                LISA REED WIESMAN, RDR-CRR
                                    Official Court Reporter
2                                   35 W. Fifth Street
                                    P.O. Box 1073
3                                   Covington, KY  41012
                                    (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*W. WHITE - Cross (Mr. Baldani)*                                          4

1          (The jury entered the courtroom at 12:58 p.m.)

2          THE COURT:  Thank you.  The record will reflect that

3     all members of the jury are present.  Parties and counsel are

4     present.

5          Again, Miss White, you're still under oath.

6          THE WITNESS:  Okay.

7          THE COURT:  Mr. Baldani, you may continue.

8          MR. BALDANI:  Thank you, Judge.

9                          CROSS-EXAMINATION

10    BY MR. BALDANI:

11    Q.  Miss White, you've had a long time to read over all those

12    pages of handwritten notes.  Once again, those notes are a

13    chronology of or a summary of vote fraud activity from 2002 to

14    2006; is that fair to say?

15    A.  Some of it, yes.

16    Q.  All right.  And it's everything that you felt was

17    important, I suppose; is that fair to say?

18    A.  Yes.

19    Q.  And my question before we broke was I really want to

20    narrow it down, be very specific.  I'm talking about what I

21    refer to as these two schooling sessions, and my question is,

22    simply, in anywhere in those handwritten notes, did you

23    document your claim that Freddy Thompson engaged you in two

24    schooling sessions on how to manipulate the machine?

25    A.  No.

*W. WHITE - Cross (Mr. Baldani)*                                              5

1    Q.   Now, you testified first at the grand jury on May 3rd of

2    '07, correct?

3    A.   Yes.

4    Q.   And other people have already asked you, you know, were

5    you under oath, and obviously you were under oath at the grand

6    jury, right?

7    A.   Yes.

8    Q.   And isn't it true, Miss White, that when questioned about

9    vote fraud at the May 3rd, '07 grand jury, you still failed to

10   mention these two schooling sessions by Freddy Thompson?

11   A.   I answered the questions that they asked me, yes.

12   Q.   Okay.  Is your answer yes?  My question was that you

13   still failed to mention Freddy Thompson's two schooling

14   sessions.  Were you agreeing with me that you did fail to

15   mention that, or that you're saying that you weren't asked?

16   A.   I don't know if I was asked.

17        MR. BALDANI:  Judge, could I present her with the

18   grand jury testimony?

19        THE COURT:  If there's a place in there where it

20   shows she was asked the question, you can show it to her.

21   Otherwise, she's answered the question.

22        MR. BALDANI:  Okay.  There is.  Pass this up, please?

23        THE COURT:  Yes, sir.

24   Q.   Page 23 of the May 3rd grand jury, line 2.  And actually,

25   look just a little bit before line 2.

*W. WHITE - Cross (Mr. Baldani)*                                          6

1   A.   I'm sorry, what?

2   Q.   Are you on -- start on the very bottom of page 22.

3   A.   Okay.

4   Q.   Okay.  You see your very last answer on that page?

5   A.   Yes.

6   Q.   Basically, you say, you can steal people's votes.

7   A.   Yes.

8   Q.   Right?

9   A.   Yeah.

10  Q.   Okay.  Read the jury the next question asked to you.

11  A.   "Did someone direct you and show you how you could do

12  that?"

13  Q.   Still didn't mention Freddy Thompson?

14  A.   I'm sorry?

15  Q.   You still didn't mention Freddy Thompson, did you?

16  A.   I answered the question that was asked.

17          THE COURT:  I'm sorry.  What was your answer to the

18  question?  You read the question.  What was your answer to the

19  question?

20          THE WITNESS:  What was my question, Your Honor?

21          THE COURT:  You were asked to read a portion of your

22  grand jury testimony.  You read the question.

23          THE WITNESS:  My answer to that was "Wayne Jones

24  did."

25          THE COURT:  "Wayne Jones did"?

*W. WHITE - Cross (Mr. Gilbert)*                                           7

1              THE WITNESS:  Yes.

2              THE COURT:  All right.  If you need to further

3     explain, you may do so.

4     Q.  So my last question is, you were asked about who schooled

5     you to steal votes at the grand jury on May 3rd, 2007, and you

6     still failed to mention Freddy Thompson.  True or false?

7     A.  True.

8              MR. BALDANI:  Thank you, Your Honor.  That's all I've

9     got.

10             THE COURT:  Mr. Gilbert.

11             THE WITNESS:  Does he need this back?

12             THE COURT:  Yes, he does.

13             THE WITNESS:  It don't have a label on it.

14             THE COURT:  Give that to the security officer,

15    please.

16                          CROSS-EXAMINATION

17    BY MR. GILBERT:

18    Q.  Miss White, my name's Jerry Gilbert, and I represent Bart

19    Morris.

20    A.  Okay.

21    Q.  There are just a few things I'd like to go over with you,

22    if I may.  You and your husband consulted with various

23    political people in Clay County before he made the decision to

24    run for jailer in 2002?

25    A.  Yes.

*W. WHITE - Cross (Mr. Gilbert)* 8

1    Q.    Jennings White, you spoke with him?

2    A.    Yes.

3    Q.    And his advice to you was not to run -- or to Kennon?

4    A.    I think so.

5    Q.    Okay.  In fact, he was irate at Kennon for --

6    A.    He felt like it gave him competition, yes.

7    Q.    He felt like it would set him up, would give competition

8    to his ally, Charles Marcum?

9    A.    What?

10   Q.    It would make him choose between supporting Kennon and

11   Charles Marcum?

12   A.    Yes.

13   Q.    And you also went to Yancey White, who is a lawyer there

14   in Manchester?

15   A.    Yes.

16   Q.    And he was not supportive?

17   A.    No.

18   Q.    James Phillips, who is an office holder, circuit court

19   clerk, you and Kennon went to him to seek his advice, and he

20   was not supportive?

21   A.    Yes.

22   Q.    In fact, he refused to sign his election filing papers?

23   A.    Yes.

24   Q.    And Kennon's aunt, Barbara Jo Colter, was not supportive

25   of his seeking election for jailer, was she?

1    A.   She supported him.

2    Q.   But initially --

3    A.   Initially, she had competition too.

4    Q.   And Jennings White supported, but he initially --

5    A.   Yes.

6    Q.   -- was against it?

7    A.   Yes.

8    Q.   And you also testified Cletus Maricle, you went to talk

9    to him?

10   A.   Yes.

11   Q.   And although he encouraged you or your husband to run, he

12   said it would be hard race; did he not?

13   A.   Yes.

14   Q.   Was there anyone else that you talked to prior to Kennon

15   filing?

16   A.   I'm sure there was people.

17   Q.   Now, you also testified in that election, in the 2002

18   primary, during the early voting period that there were

19   meetings at Bart Morris's residence after the day?

20   A.   Yes.

21   Q.   And were those held daily?

22   A.   They were held daily with different people, yes.

23   Q.   Okay.  And the people that you said were there were Bart

24   and Debbie Morris?

25   A.   Yes.  Generally, yes.

*W. WHITE - Cross (Ms. Hughes)*                                          10

1    Q.   Vernon Hacker, Darnell Hipsher?

2    A.   Yes.

3    Q.   Jennings White?

4    A.   Yes.

5    Q.   Your father-in-law, Doug White?

6    A.   Yes.

7    Q.   Your husband and yourself?

8    A.   Yes.

9    Q.   And you also testified that William Stivers and Doug

10   Adams were there?

11   A.   Yes.

12   Q.   And at these meetings, were they strategy meetings?

13   A.   Yes.

14   Q.   And voters were identified as to people that would sell

15   their votes?

16   A.   Yes.

17   Q.   Let me ask you this, Ms. White.  How did Jennings White

18   and Doug Adams get along?

19   A.   I'm -- to my knowledge, they didn't speak.

20             MR. GILBERT:  That's all.

21             THE COURT:  Thank you, Mr. Gilbert.  Miss Hughes.

22             MS. HUGHES:  Thank you, Your Honor.

23                            CROSS-EXAMINATION

24   BY MS. HUGHES:

25   Q.   Mrs. White, I'm Elizabeth Hughes.  I represent

1    Mrs. Morris.  As I understand your description of the vote

2    buying scheme, I think was your word, that did not involve,

3    did it, people voting more than once?  That wasn't part of the

4    plan, was it?

5    A.   No.

6    Q.   Okay.  You would agree with me that the procedures in

7    place at the polling place, the registration and the sign-in,

8    that that prohibits people from voting two times?

9    A.   Yes.

10   Q.   Okay.  As I also understand the scheme, a vote hauler

11   would go to a location to pick up vote sellers, people who

12   sold their vote?

13   A.   Yes.

14   Q.   Okay.  And in 2002, 2004 you acted as a vote hauler?

15   A.   Yes.

16   Q.   So you would go somewhere, I think you identified the

17   lane next to Barbara Jo Colter's home and your home as a place

18   you'd pick up --

19   A.   Two of the places, yes.

20   Q.   Sure.  And then the vote hauler would drive the vote

21   sellers to the polling place; is that correct?

22   A.   In some of the circumstances, yes.

23   Q.   Okay.  And then the vote hauler would watch the vote

24   seller, the voter go inside and be turned over, essentially,

25   to a corrupt election official that was inside the premises,

*W. WHITE - Cross (Ms. Hughes)*                                    12

1    right?

2    A.   In some of the instances.  I never went in.

3    Q.   But you would see the people that you hauled go inside,

4    right?

5    A.   I would, but I wouldn't take them inside.

6    Q.   Right.  But some people did take them inside, but you

7    would drop yours off and you would watch them go inside?

8    A.   Yes.

9    Q.   And then the corrupt election official who was inside --

10   and in 2006 that would be you, for example, you and Mr.

11   Weaver?

12   A.   Yes.

13   Q.   Would vote the person as they were supposed to vote,

14   correct?

15   A.   Yes.

16   Q.   And then the corrupt election official on the inside

17   would give a nod or a mark or a ticket or something like that

18   to the voter?

19   A.   Yes.

20   Q.   And then the voter would go back out to the vote hauler,

21   correct?

22   A.   Yes.

23   Q.   Because that's the voter's ride to and from the polling

24   place?

25   A.   Right, yes.

1    Q.   And then the vote hauler would haul the person over to

2    the payment place; for example, according to your testimony,

3    Bart Morris's house on Green Street?

4    A.   Exactly, yes.

5    Q.   Under those circumstances, there's really no opportunity

6    for a voter to be paid twice, is there?

7    A.   Yes.  If they come in and say Debbie, I've not voted, and

8    there becomes an altercation and there's a question, then yes,

9    you have to find -- you have to have a journal to who actually

10   did.

11   Q.   If you as the vote hauler picked up someone who claimed

12   they had not voted and you hauled the voter down to the

13   precinct, when the corrupt election official on the inside

14   brought that -- sent that person back out, the vote hauler

15   would never get the nod, there would never be the mark, there

16   would never be the ticket, because that person couldn't vote,

17   right?

18   A.   Yes.

19   Q.   As I understood your testimony last week, I believe it

20   was on Friday, you testified that you saw, personally, Debbie

21   Morris buy votes and keep a list?

22   A.   Yes.

23   Q.   And you saw that on election day in both the primary and

24   the general in 2002; is that correct?

25   A.   In 2002?

*W. WHITE - Cross (Ms. Hughes)*                                    14

1   Q.   Yes, ma'am.

2   A.   Yes.

3   Q.   And you testified that you saw Debbie Morris buying votes

4   and marking the list on both election day primary and general

5   in 2004, correct?

6   A.   Yes.

7   Q.   And you testified that you saw Debbie Morris on election

8   day for both the primary and the general in 2006; is that

9   correct?

10  A.   I saw Debbie prior -- the days before buying votes.  I

11  saw Debbie during the absentee process of 2006 buying votes.

12  When I left from my polling place where I worked, I then went

13  to the home of Bart and Debbie Morris and spoke with them both

14  there on election day.

15  Q.   And that would be both the primary and the general?

16  A.   Yes.

17  Q.   Of 2006?

18  A.   Yes.

19  Q.   Both elections?

20  A.   Yes.

21  Q.   You testified about Debbie Morris's son, Chris Duff.  You

22  mentioned him in your testimony; do you recall?

23  A.   I think did, yes.

24  Q.   Would you agree with me that Chris Duff is -- trying to

25  think of the best words to use.  A drug addicted knucklehead?

*W. WHITE - Cross (Mr. Simons)*                                    15

1    A.   I would agree that he's probably a drug addict.

2    Q.   Would you agree that he can definitely act fool?

3    A.   That's your opinion.  I mean --

4    Q.   I'm asking you if you would agree with that opinion.

5    A.   No, I don't agree with that.

6    Q.   Would you characterize him as upstanding?

7             MR. SMITH:  Your Honor, I'm going to object.

8             THE COURT:  Sustained.

9             MS. HUGHES:  That's all I have.  Thank you.

10            THE COURT:  Thank you.  Mr. Simons.

11            MR. SIMONS:  Thank you.

12                        CROSS-EXAMINATION

13   BY MR. SIMONS:

14   Q.   Good afternoon, Miss White.  My name's Dan Simons.  I

15   represent Stan Bowling here today.

16   A.   Good afternoon.

17   Q.   Back a few days ago, when you first started testifying,

18   you were talking about your husband's decision to run for

19   sheriff in 2002, and it seemed to me that the two of you

20   made --

21   A.   Jailer.

22   Q.   I'm sorry, jailer.  I misspoke.  My apologies.  And the

23   decision to run for jailer was made jointly by the two of you

24   as a team; is that fair to say?

25   A.   Yes.

*W. WHITE - Cross (Mr. Simons)*                                          16

1   Q.   And I think you said, told the jury that what you -- the

2   reason you made that decision was because you wanted to make a

3   change or to make a difference in the community?

4   A.   Yes.

5   Q.   Tell the jury, please, and me what the nature of that

6   change was that you wished to make.

7   A.   Of why he chose to run for jailer?

8   Q.   Yes, ma'am.

9   A.   Well, there was rumors there was drug activity in jail,

10  and we are definitely against drug activity.  That was the

11  greatest extent of it.

12  Q.   Okay.  Was the only illegal activity that you were

13  looking to avoid drug activity, or was it -- was there --

14  A.   Well, you asked me why that we were -- our interest was.

15  Q.   Okay.

16  A.   And the county was flooded with drugs.  And when they got

17  in jail to be detoxed, they were still on drugs.

18  Q.   Okay.  Now, you sought the assistance and advice of a

19  number of people, some fairly close family members, in

20  deciding whether or not to make this effort to have Kennon

21  elected jailer.  And Mr. Gilbert's gone over those with you?

22  A.   Yes.

23  Q.   Fair enough.

24  A.   Yes.

25  Q.   Okay.  And your effort was -- your team effort and

*W. WHITE - Cross (Mr. Simons)*                                    17

1    Kennon's election didn't go well?

2    A.   No.

3    Q.   Matter of fact, Kennon was beat almost 2-to-1 in a

4    fairly -- in a landslide, as it's been described?

5    A.   There was three candidates, yes.

6    Q.   Yes, I understand, but -- okay.  Then after that defeat,

7    you reconsulted with a number of people to determine why the

8    effort turned out so poorly.  Fair enough?

9    A.   Yes.

10   Q.   All right.  And one of the people you consulted with was

11   Jennings White, and he said he lost his election officers; is

12   that fair?

13   A.   He never told me that.

14   Q.   Okay.  What did Mr. White tell you about losing his

15   election?

16   A.   Based -- his excuse to me was he'd just been

17   double-crossed.  He didn't elaborate to me.

18   Q.   Okay, that's fine.  And did you also learn or become

19   suspicious that Jennings White, in fact, had double-crossed

20   Kennon?

21   A.   Were we suspicious, or do we, in fact, know that?

22   Q.   Well, first, let's start with did you, in fact, know

23   that?

24   A.   Yes, yes.

25   Q.   Okay.  And you also learned that Charles Marcum was well

*W. WHITE - Cross (Mr. Simons)*                                         18

1  established in the position already, and he was a difficult

2  candidate to set aside?

3  A.   Yes.

4  Q.   And did you also learn that you didn't have enough

5  influence in the county precincts and decide then to move

6  Kennon's political future to the city?

7  A.   Yes.

8  Q.   Okay.  Now, you told the jury just a few minutes ago that

9  you were -- you and Kennon are smart, sensible people, right?

10  A.   I hope so.

11  Q.   Okay.  Did anybody that you consulted with after he got

12  beat 2-to-1 in the election look at you and say, Kennon's

13  future is --

14          MR. SMITH:  Objection to the hearsay.

15          THE COURT:  Sustained.

16  Q.   Being a smart, sensible person, did it ever dawn on you

17  that Kennon probably didn't have a political future because

18  he'd been soundly defeated in an election which he

19  acknowledged he spent a lot of money in and made every effort

20  to -- and you hauled votes for him?

21          MR. SMITH:  Argument.  Object.

22          THE COURT:  Overruled.  You can answer, if you

23  understand the question.

24  A.   I think he's asking for my opinion on that, and my

25  opinion of that is every office holder or every office in

*W. WHITE - Cross (Mr. Simons)*                                    19

1   Manchester, in my opinion, is a bought position.  So that's my

2   answer.

3   Q.  And I don't know that that answered my question or not --

4   A.  I tried to answer it for you.

5   Q.  I know you did, and I appreciate that.  Thank you.  Let's

6   talk about after that failed effort.  I think what you told

7   the jury was a repeat effort was out of the question.  You

8   just had enough of it.  Is that fair enough?

9   A.  That was my -- how I felt, yes.

10  Q.  And did Kennon share that opinion with you through at

11  least the fall election of 2002, the November election?

12  Neither one of you participated in that, did you?

13  A.  I'm sorry, what?

14  Q.  Neither of you participated in the fall election of 2002?

15  A.  Not that -- no.

16  Q.  That's correct, is it not?  Neither of you --

17  A.  To the best of my knowledge.

18  Q.  Thank you.  Now, I want to talk to you about a couple

19  things that I think I heard you say to the jury, and I want to

20  start with May of 2002, and you said that the absentee voting

21  was very important in that.

22  A.  Yes.

23  Q.  And you were involved in hauling voters for the absentee

24  portion of the 2002 primary ballot?

25  A.  Yes.

1    Q.   Okay.  And you said that with respect to my client,

2    Stanley Bowling, you picked people up at his garage and hauled

3    them to various precincts; is that true?

4    A.   Yes.

5    Q.   Okay.  And this is during the absentee period in 2002?

6    A.   Yes.

7    Q.   But Ms. White, that can't be so, can it?  Because

8    everybody voted at the same place in the absentee period.

9    A.   Yes.

10    Q.   You didn't go to various precincts in 2002.

11    A.   The absentee poll is for various places.  Everyone,

12    county-wide, votes absentee at the same place.

13    Q.   I understand that.  But what I understood you to say was

14    you hauled the voters to various precincts.

15    A.   From various precincts.  You took one word and twisted

16    it.  From and for.

17    Q.   All right.  Now, you talked about the 2004 election.

18    Stanley Bowling was not a candidate.  Kennon was not a

19    candidate in either election, correct?

20    A.   Right.

21    Q.   But in 2004, you were involved in vote hauling, vote

22    buying both, correct?

23    A.   Yes.

24    Q.   And that was on behalf of Kennon's aunt, Barbara Jo?

25    A.   Yes.

1   Q.   And there has been some confusion.  I think you testified

2   originally that you were also assisting Dobber Weaver at that

3   time in '04?

4   A.   Yes.

5   Q.   Okay.  I want to move ahead to the 2006 election.

6   A.   Okay.

7   Q.   Now, in the 2006 election, on election day, you were in

8   Manchester precinct; and according to you, you stole a lot of

9   votes.

10  A.   Yes.

11  Q.   All right.  But in that primary in May of 2006, you did

12  not see any money pool or change hands; is that correct?

13  A.   I was inside the polls working the May.

14  Q.   That's right.  You didn't see any money change hands?

15  A.   On election day, no.

16  Q.   Thank you.  Now, you never hauled any votes?

17  A.   On election day, no.

18  Q.   You were busy --

19  A.   Yes.

20  Q.   -- manipulating the machines and stealing votes; is that

21  fair?

22  A.   Yes.

23  Q.   You never visited any county precinct anywhere on

24  election day?

25  A.   On election day.

*W. WHITE - Cross (Mr. Simons)*                                          22

1   Q.   And then let's go to November of '06.

2   A.   Okay.

3   Q.   Same things are all true for the November election; are

4   they not?

5   A.   Yes.

6   Q.   Okay.  Now, we've tried to pin down when you first began

7   cooperating with the FBI, with the agents.  And it was, I

8   think we've established it was just a little bit before you

9   first wore the tape recording device in March of 2007.

10  A.   Yes.

11  Q.   Is that correct?

12  A.   Yes.

13  Q.   Okay.  Now --

14          MR. SIMONS:  Your Honor please, I would like to have

15  the witness look at an exhibit.

16          THE COURT:  Yes, sir.

17  Q.   You just look at that for a second.

18  A.   All the pages?

19  Q.   You can thumb through them.  I think you'll recognize

20  pretty quickly what it is.  Is that your handwriting?

21  A.   It's my handwriting, yes.

22  Q.   You recognize that as a list that you compiled during the

23  time that you were cooperating with the FBI; is that fair

24  enough?

25  A.   It's a listing that my husband and I compiled.

1    Q.   Okay.  Together, and you recorded it --

2    A.   I'm sorry?

3    Q.   You did that together, and this is your record of it; is

4    that correct?

5    A.   Yes.

6    Q.   Now, at the top of that, it says received 5/25/07?

7    A.   It does, yes.

8    Q.   Okay.  Is that about the time that you compiled the list,

9    ma'am?

10   A.   Yes.

11   Q.   Okay.  Do you remember doing this with your husband?

12   A.   I do.

13   Q.   And does it -- it is, in fairness, it is a list of all of

14   the bought votes and vote haulers that you can recall in Clay

15   County?

16   A.   No, not at all.

17   Q.   Okay.  What is it, then?

18   A.   It's a small list of the voters.

19   Q.   Okay.  Do they have a common element that it's the ones

20   that you can remember had some involvement in vote hauling or

21   vote -- or had their votes --

22   A.   Some form, yes.

23   Q.   Okay.  And this list you did at this time, correct?

24   A.   Yes.

25              MR. SIMONS:  Your Honor, this exhibit has been marked

*W. WHITE - Cross (Mr. Simons)*                                      24

1    as D13.  It was not introduced by the government, but I would

2    move that we introduce it at this time.

3              THE COURT:  All right.  Any objection?

4              MR. SMITH:  No.  I would ask that the original be

5    used, if we could.

6              THE COURT:  That will be fine.  You can substitute

7    the original in the record, D13.

8              THE WITNESS:  Do you want me to keep this?

9              THE COURT:  You can hang on to that for now.  D13

10   will be admitted.

11                    (Government Exhibit No. D13

12                         was admitted into evidence.)

13             THE WITNESS:  Do you want me to refer to this list,

14   Your Honor?

15             THE COURT:  If he has questions.

16   Q.  I don't have any more questions about that, ma'am.

17   A.  Okay.

18   Q.  I'm going to move on, okay?

19   A.  Okay.

20   Q.  Now, when you began cooperating with the FBI, you were

21   aware that Stephen Bowling had been subpoenaed to the grand

22   jury; were you not?

23   A.  No, I wasn't.

24   Q.  You were not?

25   A.  No, I wasn't.

*W. WHITE - Cross (Mr. Simons)*                                    25

1    Q.   Did you visit my client's home on Thanksgiving day and

2    take some dessert to Stanley and his wife, Sarah, to talk

3    about Stephen's appearance before the grand jury?

4    A.   I visited him on Thanksgiving, but I never talked to him

5    about Stephen.  No, that's not true.

6    Q.   Okay.  Now, we've been through and through the hours of

7    taped recordings, and you've talked about -- we've all heard

8    some of them, and some of them haven't been heard.  And would

9    you agree with me that you never wore a recording device,

10   ever, in an interview with my client, Stanley Bowling?

11   A.   Yes.

12   Q.   You're agreeing with me on that?

13   A.   Yes.

14   Q.   Now, would it be fair to say that the last time that you

15   ever visited with or spoke with Stanley Bowling was that

16   Thanksgiving day in 2006?

17   A.   I don't think I could agree with you on that.  I don't

18   remember when, but I don't remember that was the last time

19   either.

20   Q.   Okay.  Do you remember a time since then that you spoke

21   with Mr. Bowling and/or his wife?

22   A.   I've seen Sarah at the hospital since I've moved to

23   London.  So yeah, I would have spoken to her.

24   Q.   Okay.  You remember the substance of any conversation you

25   might have with --

*W. WHITE - Redirect (Mr. Smith)*                                    26

1    A.  No, no.

2           MR. SIMONS:  Your Honor, if I could have just a

3    minute.

4           THE COURT:  Yes, sir, you may.

5           MR. SIMONS:  I don't have any more questions, thank

6    you.

7           THE COURT:  Thank you, Mr. Simons.

8           THE WITNESS:  Thank you.

9           THE COURT:  Let's see if there are any questions on

10   redirect.  Mr. Smith?

11          MR. SMITH:  Yes, I have several, Your Honor.

12          THE COURT:  All right.  You can proceed.

13          MR. SMITH:  I'd like to request of the clerk what was

14   marked earlier as Defendant's Exhibit 1.

15          THE COURT:  Yes, sir.

16          MR. SMITH:  I'd like to have that on the projector.

17          THE COURT:  Let me have that document first.  You can

18   return those exhibits to the clerk.  She can put those in the

19   proper order, and if you could give Exhibit 1 to Mr. Smith.

20   What document is this?

21          MR. SIMONS:  That's a copy of D13.

22          THE COURT:  The original's been admitted.

23                        REDIRECT EXAMINATION

24   BY MR. SMITH:

25   Q.  Miss White, you should have in front of you -- I don't

1    know if your screen is showing that in front of you or if you

2    have to look at the --

3    A.   There's nothing on it.  I can see that, I think, though.

4    Q.   Mr. Maricle's attorney, he sought to introduce this

5    earlier, and I believe it has been introduced as your change

6    of your voter registration.  This first page of this document,

7    is that, in fact, your change of registration?

8    A.   Yes.

9    Q.   Okay.  If you could follow along with me, I'm going to

10   direct your attention to this document up here at the top.

11   It's got your name, your Social Security number and your

12   precinct name up here; is that correct?

13   A.   Yes.

14   Q.   And it gives your party affiliation here as what?

15   A.   Republican.

16   Q.   Okay.  And it's signed by you?

17   A.   Yes.

18   Q.   And witnessed by Gail White?

19   A.   Yes.

20   Q.   And this appears to have been signed on October the 3rd

21   of 1990.  Is that when you changed your registration to

22   Democrat, ma'am?

23   A.   No.

24   Q.   Okay.  Would this have been the date when you registered

25   to vote?

1    A.   Yes.

2    Q.   And do you know approximately how old you were in 1990?

3    I shouldn't ask that question.

4    A.   No.

5    Q.   I'll move on.  It's got your date of birth as 7/14/71.

6    We can do the math.  Is that your date of birth?

7    A.   Yes.

8    Q.   All right.  And in the -- again, this is page 2 of this

9    exhibit.  It has here what looks to be a check for an address

10   change.  Do you see that?

11   A.   Yes.

12   Q.   And what date did you change your address for your voter

13   registration, ma'am?

14   A.   July 7, '03.

15   Q.   Okay.  So 2003 was not the date which you changed your

16   registration from Republican to Democrat.  Is that what you're

17   saying?

18   A.   Yes.

19   Q.   Page 3 of this exhibit has in front of you again another

20   registration filing in the court records, and it appears here

21   that you have indicated that I believe the date on this is

22   June 7, 2004; is that correct?

23   A.   Yes, it is.

24   Q.   And I believe this is, in fact, saying in the check mark

25   up here in this box that this is a party change.

*W. WHITE - Redirect (Mr. Smith)*                                          29

1    A.   Yes.

2    Q.   And you changed your party, according to this, to

3    Democrat?

4    A.   Yes.

5    Q.   And this would have been, in fact, June of 2004,

6    following the spring election of 2004?

7    A.   Yes.

8    Q.   Okay.  Now, Miss White, you have also been shown

9    Exhibit D16.  Do you have that in front of you?

10   A.   No.

11        MR. SMITH:  Court please, I'll publish that.

12        THE COURT:  That's fine.  It has been introduced.

13   Q.   I think I have the complete document in front of you.  Do

14   you see that, ma'am?

15   A.   I do, yes.

16   Q.   Do you recall earlier having questions by counsel about

17   these list of names that is presented here in D16?

18   A.   Yes.

19   Q.   You previously testified that that was a list that Cletus

20   Maricle delivered to you?

21   A.   Yes.

22   Q.   And he represented to you that these people had testified

23   in front of the grand jury?

24   A.   Yes.

25   Q.   And you were asked to look at this list for people who

1    were working for the City of Manchester.  Do you remember

2    those questions?

3    A.   Yes.

4    Q.   Doug Adams here at the top, does he work for the City of

5    Manchester?

6    A.   No.  He was a school board superintendent.

7    Q.   All right.  And in the course of again looking over these

8    names, you listed many of these people who we've heard

9    testimony of already.  For instance, James Phillips.

10   A.   Yes.

11   Q.   And he was a circuit clerk.  He wasn't employed by the

12   City of Manchester, was he?

13   A.   No.

14   Q.   And to your knowledge, ma'am, it was again suggested that

15   these were just grand jury witnesses that were giving

16   testimony against your father-in-law.  To your knowledge, at

17   this point, do you know if Doug Adams ever gave testimony

18   against your father-in-law?

19           MR. WESTBERRY:  Objection.

20           THE COURT:  Overruled.

21   A.   I don't know.  I don't think so.

22   Q.   Also, James Phillips, the circuit clerk, to your

23   knowledge, did James Phillips present himself as a witness

24   against your father-in-law?

25   A.   No.

1    Q.    To your knowledge, ma'am, was James Phillips and Doug

2    Adams intimately involved in this voter fraud scheme that you

3    were a part of?

4    A.    Yes.

5    Q.    Okay.    Now, to your knowledge, ma'am, are grand jury

6    witnesses a secret thing as far as who testifies in front of a

7    grand jury?

8    A.    Yeah, I think so.

9    Q.    You don't read about federal -- you haven't read about

10   federal grand jury witnesses that testified in this

11   investigation in Clay County in any of your newspapers in Clay

12   County, have you?

13   A.    I haven't.

14   Q.    And to your knowledge, that's a secret matter; is that

15   your understanding?

16   A.    I guess.    I mean, yes.

17   Q.    All right.    And when Mr. Maricle gave this to you, were

18   you all discussing the investigation relating to the election,

19   or were you discussing the investigation relating to your

20   father-in-law?

21   A.    Both.    A little bit of both.

22   Q.    Okay.    When he gave this to you, did he represent to you

23   as to who these particular people he believed had testified in

24   front of the grand jury and in which investigation?    Did he

25   specify to you?

1    A.   I can't recall.

2    Q.   During your testimony, ma'am, you were asked to recite

3    for counsel at different times the list of people that you

4    assisted to vote or that you stole their vote.  Do you recall

5    those questions?

6    A.   Yes.

7    Q.   Now, this is approaching March of 2010, and it's

8    approaching four years, I believe, from the date which you

9    first served as an election officer for your very first time;

10   is that right?

11   A.   It's been a long time.

12   Q.   Okay.  Now, you were also asked about your grand jury

13   testimony?

14   A.   Yeah.

15   Q.   And when you gave your grand jury testimony, did you get

16   an opportunity to review the voter sign-in sheet, and did you

17   explain to the federal grand jury the people who you -- after

18   looking at that list -- recalled that you had either bought

19   their vote or had assisted them in their vote?

20   A.   Yes, that's how I was able to remember.

21   Q.   And, in fact, ma'am, if we go to page 27 through page 50

22   of your July, 2007 testimony, we can find that whole list of

23   people that you gave the grand jury the information as to all

24   the names of the people that you had known were either selling

25   their vote or you were assisting their vote pursuant to this

1    scheme?

2    A.   Right, yes.

3    Q.   Okay.  Now, D13, which has been introduced, if I could

4    have that from the clerk, please, to publish on the overhead

5    projector.

6              THE COURT:  D13?

7              MR. SMITH:  Yes, Your Honor.  D13.  I'm sorry.

8    Q.   In fact, it's already been pointed out, ma'am, I believe

9    that D13 is a list that you made; is that right?

10   A.   Yes.

11   Q.   And that's a list that you made on May the 27th of 2007,

12   listing people that you recalled at that time, people who had

13   sold their votes?

14   A.   Yes.

15   Q.   And at the top, in fact, you've got a listing saying --

16   what does that say?

17   A.   It says Bart's organized bought vote.  Darnell's bought

18   vote.

19   Q.   And when it says Bart, who is that referring to?

20   A.   Bart Morris.

21   Q.   And Darnell, who is that referring to?

22   A.   Darnell Hipsher.

23   Q.   And was he a city councilman at that time?

24   A.   Yes.

25   Q.   And was he also the person you've mentioned many times in

1    your testimony as Darnell assisting in the scheme you were

2    involved in?

3    A.   The same person, yes.

4    Q.   Now, in this list, again this was given May the 25th,

5    2007, approximately one year after you had been involved for

6    the first time as an election officer?

7    A.   Yes.

8    Q.   Okay.  And this list goes on for several pages, as I see;

9    is that correct?

10   A.   Yes.

11   Q.   And these are again names that you passed on to the

12   federal grand jury and to the FBI?

13   A.   Yes.

14   Q.   Now, during this time period you were, again, your first

15   experience as an election officer asked to, as you've

16   described, in part, steal votes?

17   A.   Yes.

18   Q.   And then you were asked about the necessity for having, I

19   guess, Debbie Morris offering the assistance of checking off

20   voters to make sure they didn't vote twice?

21   A.   Right.

22   Q.   Is it fair -- well, let me ask you this.  Were there

23   multiple vote haulers that you were having to recognize

24   throughout the day of election day?

25   A.   There was numerous vote haulers, yes.

*W. WHITE - Redirect (Mr. Smith)*                                        35

1    Q.   And was it hard to keep up with who was bringing who?

2    A.   Very hard, yes.

3    Q.   So was it an assistance and a help to you to have Debbie

4    Morris making sure that they were checking off, you didn't

5    have to worry about that?

6    A.   Yes, that's everybody's request.

7    Q.   Now, before we broke for lunch, you were given multiple

8    things to look at, but you were left with just this one

9    packet; is that correct?

10   A.   Yeah.

11   Q.   Are these all the notes you made in this case?

12   A.   Not even close to all the notes.

13   Q.   You were asked by counsel for Mr. Thompson just to look

14   at these?

15   A.   Yeah, and a majority of those were my husband's notes.

16   Q.   When you say it was your husband's notes, was that notes

17   you were being the scribner?

18   A.   Yes.

19   Q.   Or you were writing it for him?

20   A.   Yes.

21   Q.   So all these notes here, the notes that you got an

22   opportunity to review during our lunch hour wasn't all your

23   notes?

24   A.   The notes that he chose were not even close to all of my

25   notes, and what he chose was mostly my husband's notes.

*W. WHITE - Redirect (Mr. Smith)*                                            36

1    Q.   In fact, ma'am, when you testified in front of the grand

2    jury, you had an opportunity to explain Freddy Thompson's

3    assisting you and teaching you how to cheat votes?

4    A.   Yes.

5    Q.   In fact, on page 4 of your testimony --

6              MR. BALDANI:  Objection, Your Honor.

7    Q.   -- it says clearly --

8              MR. BALDANI:  Objection, Your Honor.

9              THE COURT:  Overruled.

10             MR. BALDANI:  May we approach?

11             THE COURT:  You can approach, yes.

12                  (A sidebar conference was held out of the

13                  hearing of the jury):

14             THE COURT:  Mr. Smith, is this a prior consistent

15    statement being offered to rebut the charge of recent

16    fabrication?

17             MR. SMITH:  It is, Your Honor.

18             MR. BALDANI:  My objection, Your Honor, is I think a

19    prior consistent statement offered to rebut a recent charge,

20    it also has to establish that the motive to fabricate predated

21    and the motive to fabricate has been there all along.  So the

22    fact that she made a consistent statement at the July, '07

23    that Freddy Thompson did, I don't think falls under the prior

24    consistent statement exception, because her motive to

25    fabricate and motive to implicate Mr. Thompson has existed all

*W. WHITE - Redirect (Mr. Smith)*                                    37

1    along, since the beginning of her cooperation.

2            THE COURT:  You asked her during her

3    cross-examination whether she mentioned Freddy Thompson.

4            MR. BALDANI:  Right.

5            THE COURT:  During grand jury.  And you stopped her

6    after she said Mr. Jones.  Now, I don't know what this

7    particular part of the grand jury testimony is, Mr. Smith, but

8    I'm assuming it implicates Mr. Thompson?

9            MR. BALDANI:  She does say it --

10           THE COURT:  It's admissible.  Go ahead, Mr. Smith.

11           MR. SMITH:  I said, are you saying Freddy Thompson

12   was in on the scheme to change votes?  He showed me how to

13   manipulate the machine outside his office door.  He had one of

14   these set up in the clerk's office that stayed there 30 days

15   prior to the vote elections.

16           THE COURT:  You're reading from the grand jury

17   testimony.  I've determined that it's admissible, Mr. Smith.

18   You may proceed.  Objection is overruled.

19           MR. SMITH:  Thank you, Your Honor.

20                   (Sidebar conference concluded.)

21           THE COURT:  Thank you, counsel.  Objection is

22   overruled.  Mr. Smith, you may review a portion of the grand

23   jury testimony.

24   Q.  Miss White, on page 4 of your testimony, you were asked:

25   Who was present when you had this meeting explaining to you

*W. WHITE - Redirect (Mr. Smith)*                                       38

1    how to cheat the voters?

2        Answer:  We were at the clerk's office.  Freddy

3    Thompson's office.

4        Question:  Are you saying Freddy Thompson was in on the

5    scheme to change votes?

6        Answer:  He showed me how to manipulate the machine

7    outside his office door.  He had one of these set up in the

8    clerk's office that stayed there 30 days prior to the vote

9    elections.

10   A.   Yes.

11   Q.   Is that your answer to the grand jury?

12   A.   Yes.

13           MR. SMITH:  That's all the questions I have, Your

14   Honor.

15           THE COURT:  All right.  Thank you.  Mr. Hoskins, you

16   need just a moment?

17           MR. HOSKINS:  Could I have just a minute, Your Honor?

18           THE COURT:  I'm going to remind counsel I'm going to

19   allow limited redirect on matters covered by other counsel

20   that you didn't have a chance to ask about or that was just

21   asked by Mr. Smith.  Not to replow ground we've already

22   covered.  Thank you.

23           MR. SMITH:  Your Honor, while they're taking a

24   conference, may I shut this down and hand the clerk her

25   exhibit?

*W. WHITE - Recross (Mr. Hoskins)*                                    39

1          THE COURT:  Yes, you may.  You can do that Mr. Smith.

2    Thank you.  Mr. Hoskins, you may proceed.

3          MR. HOSKINS:  Thank you, Your Honor.

4                    RECROSS-EXAMINATION

5    BY MR. HOSKINS:

6    Q.  Miss White, real quick, back to Exhibit D16.

7    A.  I don't have anything up here.

8    Q.  It's the list of names that were supposed to be witnesses

9    before the grand jury.

10   A.  Yes.

11   Q.  So you know what I'm talking about?

12   A.  Yes, I do.

13          THE COURT:  Here we go.

14          THE WITNESS:  Thank you.

15   Q.  You've testified that Cletus Maricle gave you that list,

16   but that it's not in his handwriting?

17   A.  Yes.

18   Q.  Okay.  And you testified that he gave you this list once

19   you had already started cooperating, right?

20   A.  I don't know if I testified to that or not.

21   Q.  Well, was it after you started cooperating or before?

22   A.  You have to refer back to when I turned it over to them.

23   I can't give you a date of when he gave it to me.

24   Q.  You don't remember?

25   A.  I can't give you a date when he gave it to me.

*W. WHITE - Recross (Mr. Hoskins)*                                    40

1   Q.   Well, without giving us a date, can you relate it to a

2   day and time?

3   A.   No, I can't.

4   Q.   You have no idea, then, when that list was given to you?

5   A.   No, there's -- I mean, no.

6   Q.   Okay.  That list is never discussed on any of the

7   recordings that you made, is it?

8   A.   I don't recall that it has been.

9   Q.   Okay.  Who else was present when you were given that

10  list?

11  A.   My husband.

12  Q.   Anybody else at all?

13  A.   Not that I recall.

14  Q.   Where were you?

15  A.   In his home.

16  Q.   And why did he give you that list?

17  A.   Turn around and ask him that.  I have no idea.

18  Q.   I'm asking you what you understand.

19  A.   I don't know.  I don't know.

20  Q.   Did he talk about it as he gave it to you, or did he just

21  kind of pass it to you, wink?

22  A.   He gave it to my husband and said, this is who has been

23  down -- this is the grand jurors that we know -- or the

24  witnesses been to the grand jury.

25  Q.   Okay.

1    A.   I didn't go in in-depth conversation about it, if that's

2    what you're asking me.

3    Q.   I'm asking -- I was trying to ask you if you had any idea

4    when this happened, and you're telling us that you don't.

5    A.   I don't.

6    Q.   Did you give it to the agents as soon as you got it?

7    A.   They would have that date down when I gave it to them.  I

8    don't know when I gave it to them.

9    Q.   Did you hold on to it for a while?

10   A.   No.

11   Q.   So you did give it to them as soon as you got it?

12   A.   Yes.

13   Q.   Okay.  So if you gave it to them as soon as you got it,

14   it must have been when you were cooperating, right?

15   A.   It must have been.

16   Q.   Okay.  Thank you.  And there is no recording of that, is

17   there?

18   A.   Not that I know of.

19   Q.   Okay.  Mr. Smith asked you a minute ago about pages.  I

20   think he said 27 to 50 of your grand jury testimony of

21   July the 12th, 2007.  Do you have a copy of that up there with

22   you?

23   A.   I don't, no.

24   Q.   Okay.  But he asked you if you looked at that, that would

25   be where you listed all these people that were bought and had

*W. WHITE - Recross (Mr. Hoskins)*                                          42

1   their votes stolen from, right?

2   A.   Can I have a copy of it, because I'm not following you

3   real well.

4   Q.   Well, I'm going to ask you about if you recall what he

5   asked you just a few minutes ago.

6   A.   Okay.  Ask me again.

7   Q.   All those pages that he referred to in your grand jury

8   testimony, what did you understand him to be asking you about?

9   A.   I don't understand what you're asking me that he asked

10  me.  I'm sorry.

11          MR. SMITH:  I think the question is confusing.  I'm

12  going to object to the question.

13          THE COURT:  All right.  If you can rephrase the

14  question.

15          MR. HOSKINS:  I'll try to simplify this, Judge.  I'm

16  sorry.

17  Q.   Mr. Smith first asked you if you had been able to

18  remember the names of the people whose votes you bought or you

19  helped to buy?

20  A.   Yes.

21  Q.   And when I asked you that question yesterday, you came up

22  with five names.

23  A.   Yes.

24  Q.   Right?  And when I asked you yesterday how many votes or

25  whose votes you could remember stealing, you couldn't come up

*W. WHITE - Recross (Mr. Hoskins)*                                      43

1    with a single one, right?

2    A.   Um-hmm.

3    Q.   And when I asked you yesterday how many absentee voters

4    you had helped that were bought voters, you couldn't remember

5    any?

6    A.   Yes.

7    Q.   And when I asked you about who had filled out voter --

8              MR. SMITH:  I'm going to object as being outside the

9    scope of what I believe was redirect, and I'm not sure, but

10   this has been asked and answered twice already.

11             THE COURT:  Sustained.

12   Q.   Mr. Smith asked you about that, and then he asked you

13   about your grand jury testimony in July of 2007.

14   A.   Yes.

15   Q.   Okay.  And he referred to certain pages in your grand

16   jury testimony, didn't he?

17   A.   Yes.

18   Q.   But you didn't have that to look at, did you?

19   A.   No.

20   Q.   Okay.  You haven't looked at it today or yesterday, have

21   you?

22   A.   No.

23   Q.   Do you remember giving names to the grand jury of people

24   that you bought --

25   A.   I can remember several now, because he just flipped

*W. WHITE - Recross (Mr. Hoskins)*                                    44

1    through three pages on this screen.

2    Q.   Do you remember giving -- telling the grand jury those

3    names?

4    A.   Yes.

5    Q.   All right.

6            MR. HOSKINS:  Your Honor, I'm going to ask that the

7    witness be shown a transcript of her grand jury testimony.

8            THE COURT:  All right.

9            MR. SMITH:  Which transcript, and what page?

10           MR. HOSKINS:  July 12, 2007.

11           MR. SMITH:  Your Honor, I believe that this is again

12   covering the same ground that's previously been covered by

13   counsel's questions earlier in the week and also outside the

14   scope of recross at this time.  I will object.

15           MR. HOSKINS:  Your Honor, if I could respond.

16           THE COURT:  To save time, why don't you all come up

17   here.

18                      (A sidebar conference was held out of the

19                      hearing of the jury):

20           THE COURT:  Okay.

21           MR. HOSKINS:  I believe the jury might mistakenly

22   infer from Mr. Smith's question that 23 pages of this lady's

23   grand jury testimony were a list of names of bought and stolen

24   votes, and that's not accurate.

25           THE COURT:  Do the pages reflect her testimony about

*W. WHITE - Recross (Mr. Hoskins)*                                45

1    individuals --

2             MR. HOSKINS:  Yes.

3             THE COURT:  -- that were engaged in buying or selling

4    votes?

5             MR. HOSKINS:  Some, they do.

6             THE COURT:  But it's contained in those sections of

7    the transcript?

8             MR. HOSKINS:  Essentially, yes.

9             THE COURT:  Are you now intending to go through and

10   identify each of those people from those 23 pages?

11            MR. HOSKINS:  I'm going to ask her -- I want to ask

12   her to go through those and point out that on many of these

13   pages, there are no names listed whatsoever; that there are

14   not, in fact, 23 pages worth of names.

15            THE COURT:  Well, recross would be the issue of

16   whether she identified individuals at a time and point where

17   she had a better memory.  The inference or gist of your

18   cross-examination earlier was she wasn't able to identify

19   anyone subject to the scheme.  Mr. Smith then showed us that

20   there were individuals that she did identify after being shown

21   the voter rolls or whatever she was shown, and she did

22   identify those individuals.

23            So the question is whether that is correct or

24   incorrect, that she did or she did not know that at the time.

25   So that is the issue for recross.

*W. WHITE - Recross (Mr. Hoskins)*                                    46

1          MR. HOSKINS:  I think I should also be allowed to

2    clarify that this is not a 23-page list of names, because that

3    could quite conceivably be the 250 people that she talks

4    about.

5          THE COURT:  You can ask her if names are listed on

6    those pages, but not on every page.  If you want to do it that

7    way.  We start going into picking out specific people, then it

8    does go beyond the scope of redirect.

9          MR. HOSKINS:  Okay.

10          THE COURT:  Okay?  Anything else while we're here?

11          MR. SMITH:  Well, Your Honor, I think the witness's

12    testimony, D13 was, in fact, a list that she made out and gave

13    contemporaneous with this grand jury investigation.  That's

14    been put on the projector, and I believe that again to go

15    through here and go over these names individually --

16          THE COURT:  I've already indicated we're not going to

17    do that.

18          MR. SMITH:  He says that's not where he's going.

19          THE COURT:  Since she wasn't shown the grand jury

20    transcript when you were examining her, I am going to allow

21    him -- or allow Mr. Hoskins to show her that, see if, in fact,

22    there are names that were mentioned before the grand jury.

23    But we're not going to go through each page.  We're not going

24    to go through 23 pages and then pick out --

25          MR. HOSKINS:  We won't have to, Judge, because a lot

1    of those pages don't have any names.

2            THE COURT:  And then if he wants to ask about this

3    other exhibit, he can ask about the other exhibit that was

4    covered on redirect.  So --

5            MR. HOSKINS:  And I do want to ask a couple questions

6    about that, because I think that is a list of people who

7    hauled votes.  It's a list of different things.  It is not a

8    list of, as I understand it, it is not a list of votes that

9    she bought or stole.

10           THE COURT:  I understand.  I'm giving you a shovel

11   with a little bit longer handle.  Dig away.

12           MR. HOSKINS:  Thank you, Judge.

13           MS. HUGHES:  This is Elizabeth.  It is my intention

14   to take that deeper when it gets to be my turn, if y'all would

15   speed it up, and ask her to review D13 and identify any of

16   those persons that she saw Debbie Morris pay.  That wouldn't

17   be beyond --

18           THE COURT:  That's fine.

19           MS. HUGHES:  Just wanted to make sure so we wouldn't

20   have to come back up here.

21           THE COURT:  I've got notes of four areas that Mr.

22   Smith covered.  I'm not prohibiting you from asking questions

23   about questions from co-defendants if they said something that

24   affected your client, but not everything in general.

25   Otherwise, we'll be here forever.

1              MR. WHITE:  Your Honor, can I ask a quick question

2        about that, to make sure I don't run afoul?  I have one area

3        of recross that I think does affect my client in terms of the

4        credibility of this witness, and that has to do with the house

5        that she purchased.

6              She testified that she bought a house from her

7        relatives when she moved into Manchester from Greenbriar.  She

8        gave testimony about that to Mr. Baldani on cross.  That was

9        the only area I was going to ask anything in.

10             I have a deed on that particular document that I've

11       produced to the United States, and I'd like to ask some

12       questions about that, because that deed will show that her

13       testimony is inconsistent, and she did not --

14             THE COURT:  In what way?

15             MR. WHITE:  My recollection, she testified -- I'm

16       sorry.  This is Scott White.  I represent Mr. Jones.  What

17       I've written down in my notes with my memory of her testimony

18       is that she said when she moved from Greenbriar into

19       Manchester, that she and her husband bought an historic house

20       that was owned by his grandmother for a couple hundred

21       thousand dollars.

22             The deed that I've got shows that the property was a

23       gift, and that it had a fair market value of 5,000, and her

24       and Kennon's name both signed it and their notarized

25       signatures.  So I believe that's a prior inconsistent

*W. WHITE - Recross (Mr. Hoskins)*                                49

1    statement that I can use to impeach, and I think it goes to

2    her credibility.

3             THE COURT:  It's not relevant.  I don't think it goes

4    to credibility.  That would be beyond the scope.

5             MR. WHITE:  Thank you, Your Honor.

6                      (Sidebar conference concluded.)

7             THE COURT:  Give the attorneys a moment to get back

8    to their chairs.  Thank you.  Mr. Hoskins, I believe you

9    wanted to ask about the grand jury testimony and wanted to

10   show her the transcript then ask any questions that are

11   relevant.

12            MR. HOSKINS:  Thank you.

13   Q.  Miss White, have you had a chance to look through that as

14   we've been --

15   A.  No, I didn't look at it.

16            THE COURT:  I think you have it.

17            MR. HOSKINS:  She has it.

18            THE COURT:  Okay.

19   A.  What do you want me to look at?

20   Q.  Mr. Smith asked you about pages 27 through 50.

21   A.  27?

22   Q.  Start with 27 through page 50.

23   A.  50?

24   Q.  Yes, ma'am.  At the bottom of page 27, you're asked about

25   Bonnie Barnes?

*W. WHITE - Recross (Mr. Hoskins)*                                    50

1    A.   Yes.

2    Q.   And you said that you had -- her vote had been bought?

3    A.   Yes.

4    Q.   And that you voted her at the precinct?

5    A.   Do you want me to read it?

6    Q.   Well, is that accurate?  You voted her because her vote

7    was bought?

8    A.   Yes.

9    Q.   Okay.  And you talked about household -- you talked about

10   Lynn Spencer Gilbert and Victor Gilbert?

11   A.   What page are you on now?

12   Q.   On page 28.

13           THE COURT:  I'm sorry, Mr. Hoskins, but we discussed

14   at the Bench how you can use this to refresh her memory as to

15   whether she, in fact, identified individuals between pages 27

16   and 50, and the Court instructed you that we were not going to

17   go through each person listed.  But you are allowed to ask as

18   a follow-up to Mr. Smith's questions if, in fact, she

19   identified individuals at those pages of that grand jury

20   transcript.

21           MR. HOSKINS:  I'm sorry, Your Honor.  I'll withdraw

22   that question.

23   Q.   You identified some names on some of those pages,

24   correct?

25   A.   Yes.

1  Q.   Okay.  Look through those pages.  That's not a big,

2  long -- those pages do not consist of just a list of names of

3  bought voters and stolen votes, do they?

4  A.   No.

5  Q.   Okay.  There are not 250 names on those pages, are there?

6  A.   No, I don't think so.

7  Q.   Far short of that.  Would you take a minute and look and

8  see?

9  A.   Well, there's only one name on page 29.  Is that what

10  you're wanting me to refer to?

11  Q.   There are some pages where there are no names?

12  A.   There is, yes.

13  Q.   You were being asked questions for quite a long time?

14  A.   I was, yes.

15  Q.   And you would agree that that's not just a 23-page list

16  of names, right?

17  A.   Yes.

18  Q.   Okay.

19        MR. HOSKINS:  Your Honor, I'd ask that the witness be

20  shown Exhibit D13 once more.

21        THE COURT:  Yes, sir.

22  Q.   Do you recognize that now?

23  A.   I do.

24  Q.   Just real quick, that is a list that you made, right?

25  A.   Yes.  My husband and I, yes.

*W. WHITE - Recross (Mr. Baldani)* 52

1  Q.  It's a list of a lot of different people that were

2  involved in vote hauling and other things, correct?

3  A.  Yes.

4  Q.  Okay.  That, just to be clear, that is not a list of

5  votes that you -- people that you voted, that you bought,

6  right?

7  A.  Right.

8        MR. HOSKINS:  That's all.  Thank you.

9        MR. WESTBERRY:  We have no additional questions, Your

10 Honor.

11       THE COURT:  Thank you.  Mr. White?

12       MR. WHITE:  No questions, Your Honor, thank you.

13       THE COURT:  Let's go around the table.

14       MR. ABELL:  Judge, I don't have any questions either.

15       THE COURT:  Thank you, Mr. Abell.  Mr. Baldani?

16       MR. BALDANI:  Hopefully very brief, Judge.

17       THE COURT:  Yes, sir.

18                    RECROSS-EXAMINATION

19 BY MR. BALDANI:

20 Q.  Just want to touch on a couple things the prosecutor

21 brought up.

22 A.  Okay.

23 Q.  We kind of belabored this, but -- and we've talked

24 about -- I'm waving something.  This is the summary that we

25 talked about and the chronology, right?

1    A.   Yes.

2    Q.   Now, when Mr. Smith asked you questions, you mentioned

3    that some of this is things that you wrote down in your

4    handwriting but things told to you by your husband, Kennon?

5    A.   Yes.

6    Q.   Right?

7    A.   Yes.

8    Q.   So in a sense, it's kind of a chronology that you -- and

9    a summary that you all jointly prepared, right?

10   A.   I did the handwriting, yes.  I wrote it.

11   Q.   Okay.  Well, some of the entries are things that you did

12   yourself.  Let me give you an example, okay?

13   A.   Okay.

14   Q.   And I'm going to pinpoint right to this issue that I

15   brought out about the manipulation.

16   A.   Okay.

17   Q.   Okay?  Do you remember reading in there, "Cletus advised

18   me to get with Wayne Jones so I would know how to manipulate

19   the machine"?

20   A.   Yes.

21   Q.   So to me that, obviously, would be you?

22   A.   Yes.

23   Q.   So that's you writing in your own voice, not Kennon's?

24   A.   Yes.

25   Q.   And that's a specific reference in here to machine

*W. WHITE - Recross (Mr. Baldani)*                                   54

1    manipulation?

2    A.   Yes.

3    Q.   And then a little bit later, "Cletus placed me as an

4    election officer, advised me who to see, promised me favors,

5    instructed me to see Wayne Jones on how to manipulate the

6    machine."  So that, obviously, is yourself talking there?

7    A.   That's what Cletus instructed me to do.

8    Q.   Right.

9    A.   That doesn't mean that I didn't meet with Freddy

10   Thompson.

11   Q.   I'm asking you a question.  This is --

12   A.   Yes.

13   Q.   -- you talking about your own role --

14   A.   There's very few entries in that that are referring to

15   me, but that is one of them.

16   Q.   Well, those are two of them?

17   A.   Two of them.

18   Q.   And those are two specific entries relating to machine

19   manipulation?

20   A.   Yes.

21   Q.   And you've already agreed with me that nowhere in here

22   does it say that Freddy taught you to manipulate the machine?

23   A.   In that --

24   Q.   Okay.

25   A.   -- what you showed me.  In what you showed me, yes.

*W. WHITE - Recross (Mr. Baldani)*                                    55

1   Q.   That's what I'm getting to next.  Mr. Smith asked you

2   about that this isn't all of your handwritten documents?

3   A.   No, that's not all of them.

4   Q.   Well, I'm going to ask you a simple question.  Are you

5   telling the jury that in some of these other handwritten

6   documents, it's documented that Freddy did this schooling that

7   we're talking about?  Is that what you're saying?

8   A.   I'm telling the jury that, that I don't know.  I'd have

9   to review.  My answer to you is I don't know.

10  Q.   So if there were, you could review and always tell us

11  about it, couldn't --

12  A.   I could.

13          MR. SMITH:  Your Honor, I'm going to object.  I

14  believe the question has been asked several different ways.

15          THE COURT:  Sustained.

16  Q.   Now, the only other thing I want to ask you about, Miss

17  White, is we established that in the May 3rd grand jury

18  testimony, you were asked about stealing votes and who taught

19  you, and you didn't mention Freddy Thompson?

20  A.   Yes.

21  Q.   All right.  You testified again on July 12th, '07, at the

22  grand jury.  That's your two times, right?

23  A.   Yes.

24  Q.   And the second time is the one the prosecutor asked you

25  about?

*W. WHITE - Recross (Mr. Baldani)*                                56

1   A.   Yes.

2   Q.   And that would be roughly, there's roughly nine weeks in

3   between, right?  May 3rd --

4   A.   Yeah.

5   Q.   -- to July 12th?  I mean, give or take a couple days,

6   roughly nine weeks?

7   A.   Yeah.

8   Q.   Did you meet with any FBI agents in between May 3rd of

9   '07 and 7/12/07?

10  A.   I have no idea.

11  Q.   You don't know?

12  A.   I would think they'd have it document -- this is 2010.  I

13  can't -- I have no idea.

14  Q.   Okay.  So you started to say you would think if you did,

15  it would be documented?

16  A.   I don't have documentation of that.

17  Q.   What happened between May 3rd of '07 and July 12th of '07

18  that caused you to remember --

19       MR. SMITH:  Your Honor, I'm going to object.  That's

20  misleading.

21       THE COURT:  Sustained.

22  Q.   Do you have an explanation why you didn't mention that on

23  May 3rd?

24       MR. SMITH:  Same objection.

25       THE COURT:  Sustained.

*W. WHITE - Recross (Ms. Hughes)*                                    57

1   Q.   Bottom line is, you acknowledge you didn't mention it

2   May 3rd and didn't -- July 12th, your grand jury testimony, is

3   that the first time that you mentioned this Freddy Thompson

4   schooling?

5   A.   I can't answer that, but I can tell you that Freddy

6   Thompson showed me how to use the machine.  I can tell you

7   today that.

8   Q.   I understand that's your testimony.  My question is, is

9   there any note --

10  A.   I don't have anything, sir.  I turned everything that I

11  had over.  I have nothing.

12  Q.   Listen to my question.  Do you believe you can produce

13  any note, any statement, any transcript to show --

14          MR. SMITH:  Your Honor, I'm going to object.  I

15  believe that this has been asked and answered.

16          THE COURT:  Sustained.

17          MR. BALDANI:  I'll sit down, Judge.  Thanks.

18          THE COURT:  All right.  Thank you.  Mr. Gilbert, do

19  you have any follow-up?

20          MR. GILBERT:  No questions.

21          THE COURT:  Miss Hughes, you have a few.

22          MS. HUGHES:  I do, thank you.

23                          RECROSS-EXAMINATION

24  BY MS. HUGHES:

25  Q.   Mrs. White, could you pick up Exhibit D13?  It was not

*W. WHITE - Recross (Ms. Hughes)*                                    58

1   introduced when I asked you questions last time, so that's why

2   I'm back.

3   A.   I have it.

4   Q.   All right.  Thank you.  Could you look at the first page

5   of that document?  I'm not as efficient as Mr. Smith.  I can't

6   post it.  I don't know how to work that machine.

7   A.   I see it, yes.

8   Q.   All right.  Could you tell me, look at that list of names

9   and tell me, did you see Debbie Morris pay money to any of

10   those people on the first page?

11   A.   Absolutely.

12   Q.   All right.  Tell me who it was.

13   A.   Deshae Henson.

14   Q.   You saw her pay money to him for his vote?

15   A.   Absolutely.

16   Q.   All right.  Keep going.

17   A.   What do you mean keep going?  Keep reading?

18   Q.   I want you to tell me everyone on that first page that

19   you saw personally Debbie Morris pay money to.

20   A.   Antwan Henson.  This is over a period of all the

21   elections.  Is that what you're -- which specific election?

22   Q.   Thank you, because I was going to come back and ask you

23   those things.  But if you want to start with Deshae Henson,

24   you saw her pay money to Deshae Henson?

25   A.   Deshae Henson.

*W. WHITE - Recross (Ms. Hughes)*                                      59

1    Q.   And which election would that have been?

2    A.   I couldn't tell you that.  That's why I asked you if you

3    was going to try to --

4    Q.   All right.  If you know which election --

5    A.   Okay.

6    Q.   -- as you name someone, then you can volunteer that for

7    me.  If you don't know the election, the jury and I will

8    assume you don't know the year.

9    A.   Okay.  Ella Wagers.

10   Q.   All right.

11   A.   The next one's her daughter, Bill Sester, Antwan Henson.

12   Q.   Well, now, I think you've gotten away -- oh, no, that's

13   on that list, okay.

14   A.   Stacey Perkins.

15   Q.   Um-hmm.

16   A.   James Goins and Chris Duff.

17   Q.   She paid her son?

18   A.   She paid her son, yes.

19   Q.   Let's go to the next page.

20   A.   Ralph Bowling, Marianne Smith, Anthony "Pepper" Gilbert,

21   Vic Gilbert, Saffey Hipsher, Sophie Sizemore.

22            THE COURT:  Slow down just a little bit.

23   A.   Amy Abner, Mary Gail Roberts, Lisa Buttery, Sam Buttery,

24   Sarah Gilbert, Tim Pennington.

25   Q.   I don't see Tim Pennington.  Have you gone on to page 3?

*W. WHITE - Recross (Ms. Hughes)* 60

1    A.   Yes.

2    Q.   All right.

3    A.   Eddie Davidson.

4    Q.   Are you on page 4?

5    A.   Yes.

6    Q.   Thank you.

7    A.   Gail Roberts, it says Gail Roberts' daughter, Carol

8    Hacker.

9    Q.   Do you know Gail Roberts' daughter's name?

10   A.   No.

11   Q.   But she lives at Beech Creek, if I'm --

12   A.   She did at that time, yes.

13   Q.   I'm sorry.  Keep going.

14   A.   Christina Hacker Riley, Carol Hacker.

15   Q.   Hold on.  You're faster than I am.  I see Carol Hacker,

16   okay.

17   A.   That's the end of the list.

18   Q.   And so it's your testimony that you witnessed Debbie

19   Morris pay money for their vote to each of those people that

20   you just identified for the jury?

21   A.   I have seen her, yes.

22   Q.   So if asked, you believe that those people would testify

23   that they received money --

24   A.   I believe they would.

25        MR. SMITH:  Your Honor, I'm going to object.

*W. WHITE - Recross (Ms. Hughes)* 61

1      THE COURT:  Sustained to what they may or may not

2  testify.

3      MS. HUGHES:  I understand.  Thank you.

4      THE COURT:  Mr. Simons, any additional questions?

5      MR. SIMONS:  No further questions.

6      THE COURT:  All right.  Thank you.  I've given back

7  all those exhibits.

8      THE WITNESS:  I've given it to him, yes.

9      THE COURT:  You may step down at this time.

10                          * * *

11                 C E R T I F I C A T E

12      I, LISA REED WIESMAN RDR-CRR, certify that the
   foregoing is a correct excerpted transcript from the record of
13  proceedings in the above-entitled case.

14

15   \s\ Lisa Reed Wiesman              March 9, 2010
    LISA REED WIESMAN, RDR-CRR         Date of Certification
16  Official Court Reporter

17

18

19

20

21

22

23

24

25