1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                    SOUTHERN DIVISION at LONDON
                            - - -
3
     UNITED STATES OF AMERICA,        :   Docket No. CR 09-16-S
4                                     :
                        Plaintiff,    :   **Frankfort, Kentucky**
5                                     :   Tuesday, February 2, 2010
          versus                      :   8:45 a.m.
6                                     :
     RUSSELL CLETUS MARICLE,          :
7    DOUGLAS C. ADAMS                 :
     CHARLES WAYNE JONES              :
8    WILLIAM R. STIVERS               :
     FREDDY W. THOMPSON               :      **Trial Day 1**
9    WILLIAM B. MORRIS                :
     DEBRA L. MORRIS                  :
10   STANLEY BOWLING,                 :
                                      :
11                      Defendants.   :

12

13                          - - -
                    TRANSCRIPT OF VOIR DIRE
14                 BEFORE DANNY C. REEVES
             UNITED STATES DISTRICT COURT JUDGE
15                          - - -

16   APPEARANCES:

17   For the United States:      STEPHEN C. SMITH
                                 JASON D. PARMAN, ESQ.
18                               Assistant U.S. Attorney
                                 601 Meyers Baker Road
19                               Suite 200
                                 London, KY 40741
20
     For the Defendant           MARTIN S. PINALES, ESQ.
21   Russell Cletus Maricle:     CANDACE C. CROUSE, ESQ.
                                 Strauss & Troy
22                               105 E. Fourth Street
                                 Fourth Floor
23                               Cincinnati,OH  45202

24                               DAVID S. HOSKINS, ESQ.
                                 107 E. First Street
25                               Corbin, KY  40701

2

```
 1     For the Defendant          R. KENT WESTBERRY, ESQ.
       Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                                Landrum & Shouse, LLP
                                  220 West Main Street
 3                                Suite 1900
                                  Louisville, KY 40202
 4
                                  BENNETT E. BAYER, ESQ.
 5                                Landrum & Shouse, LLP
                                  106 West Vine Street
 6                                Suite 800
                                  Lexington, KY  40507
 7

 8     For the Defendant          T. SCOTT WHITE, ESQ.
       Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
 9                                133 West Short Street
                                  Lexington, KY  40507
10

11     For the Defendant          ROBERT L. ABELL, ESQ.
       William R. Stivers:        120 North Upper Street
12                                Lexington, KY  40507

13
       For the Defendant          RUSSELL JAMES BALDANI, ESQ.
14     Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
                                  Baldani, Rowland & Richardson
15                                300 West Short Street
                                  Lexington, KY  40507
16

17     For the Defendant          JERRY W. GILBERT, ESQ.
       William B. Morris:         Coy, Gilbert & Gilbert
18                                212 North Second Street
                                  Richmond, KY 40475
19

20     For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
       Debra L. Morris:           Gess, Mattingly & Atchison, PSC
21                                201 West Short Street
                                  Lexington,KY40507
22

23     For the Defendant          DANIEL A. SIMONS, ESQ.
       Stanley Bowling:           Thompson, Simons, Dunlop & Fore
24                                116 West Main Street
                                  Suite 2A
25                                Richmond, KY 40476
```

3

```
1    Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                  Official Court Reporter
2                                 35 W. Fifth Street
                                  P.O. Box 1073
3                                 Covington, KY  41012
                                  (859) 291-4410
4

5         Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1          (Proceedings commenced at 8:49 a.m.)

2          THE COURT:  Thank you.  Madam Clerk, if you could

3    call the matter scheduled for trial, please.

4          DEPUTY CLERK:  Yes, Your Honor.  London Criminal

5    Action Number 09-16.  United States of America versus Russell

6    Cletus Maricle, Douglas C. Adams, Charles Wayne Jones,

7    William E. Stivers, also known as Al Man, Freddy W. Thompson,

8    William B. Morris, also known as Bart, Debra L. Morris, also

9    known as Debbie, and Stanley Bowling.  These matters being

10   called for jury trial, Your Honor.

11         THE COURT:  Thank you.  Rather than have counsel

12   state their appearances, let me just make sure that everyone

13   is present.  The parties are present.  The Court notes for the

14   record that Mr. Richardson is also appearing today on behalf

15   of Mr. Thompson.  All right.  And all defendants are present,

16   all counsel are present at this time.

17         Counsel, I will have you state your appearances when

18   we open with the jury present.  But to save a few moments, we

19   would just note your appearances at this time.

20         Couple of matters that were raised yesterday but were

21   not resolved.  The United States had asked about using a

22   summary chart during opening statements or its opening

23   statement.  I believe, Mr. Smith, you were going to provide

24   copies of that chart or charts to counsel?

25         MR. SMITH:  We did yesterday, following the hearing,

5

1    Your Honor.  I think everyone's got a copy.

2            THE COURT:  All right.  Do any of the defendants have

3    objections to the use of those materials during the opening?

4                        (No verbal response.)

5            THE COURT:  I don't see any.  Mr. White, you'd also

6    indicated that you may be reserving opening statement.  Have

7    you made a decision as to that?

8            MR. WHITE:  I have, Your Honor.  I'll be making a

9    very brief opening statement.  So I will not reserve.

10           MS. HUGHES:  Your Honor, I will, however, be

11   reserving.

12           THE COURT:  All right.  Mr. Smith, would you like me

13   to identify your expected trial witnesses during *voir dire*?

14           MR. SMITH:  That's fine, Your Honor.

15           THE COURT:  All right.  Yesterday, I also provided

16   the parties with a statement of the case, which tracks fairly

17   closely with what the parties had tendered, together with

18   preliminary jury instructions.  Let me ask if anyone has any

19   objection to either of those two materials.  Mr. Smith?

20           MR. SMITH:  No, Your Honor.  I did note it was a typo

21   on my part in the statement of the case tendered to the Court.

22   There was an "and" used solely, and I would ask the Court to

23   put and/or when it refers to the money laundering count,

24   "salaries and/or contracts," and I think as I tendered it to

25   the Court, it was "salaries and contracts."

6

1          THE COURT:  Where does it appear in the statement of

2     the case?  Page 2, third line, I believe?

3          MR. SMITH:  I believe -- yes, Your Honor, that's

4     correct.

5          THE COURT:  All right.  Do you have any other changes

6     or corrections?

7          MR. SMITH:  No, Your Honor.

8          THE COURT:  Do any of the defendants have any

9     corrections or changes to either of those documents?

10                              (No verbal response.)

11          THE COURT:  All right.  Thank you.  We reviewed the

12     selection process for the jury yesterday.  Does anyone have

13     any follow-up questions or issues about the process itself we

14     will follow?

15                              (No verbal response.)

16          THE COURT:  Finally, this morning, I believe we had

17     five jurors that didn't get the message that they did not need

18     to appear today.  So I think they're very pleased to be here,

19     and they've been included in the list.  But I asked the clerk

20     to make sure that you were given, since you may not have

21     brought those materials with you, the additional jury

22     information forms.  Did everyone receive those additional

23     forms?

24                              (No verbal response.)

25          THE COURT:  All right.  If you need a few extra

1    moments to look over those forms, if you'll just let me know,

2    I can certainly provide you with a few extra minutes to do

3    that.  We also have, I believe, two new jurors that will need

4    to be qualified this morning.  And we should have

5    approximately 90 jurors, Madam Clerk?

6              DEPUTY CLERK:  There's 93 here.  Two did not show up.

7              THE COURT:  All right.  So we'll have a full house

8    this morning.  We'll be bringing those jurors in here in just

9    a moment to begin the jury selection process.  Let's see.

10   We've reserved the back two rows for family and one row, I

11   believe, for press.  But we may need to -- sir, I may need to

12   have you move over to the other side.  We'll see when we bring

13   the jurors in.  I may need to have you move over to this other

14   side so we can use all the rows with the exception of that

15   back row for the jury once we get started, okay?  We'll see if

16   we need any additional seating once those jurors are brought

17   in.

18             The parties have any other issues that need to be

19   taken up before we recess?  Mr. Simons?

20             MR. SIMONS:  I do, Your Honor.

21             THE COURT:  Yes, sir.

22             MR. SIMONS:  Mr. Bowling's wife is here.  She may be

23   a witness.  Could she be here through the jury selection?  I

24   do not intend to keep her here beyond that.

25             THE COURT:  Yes, sir.  I think I mentioned this at

8

1    the pretrial conference, but I generally will invoke the rule

2    on witnesses before the parties give their opening statements

3    if requested to do so.

4         MR. SIMONS:  All right.

5         THE COURT:  But that would be the point that she

6    would then have to exit the courtroom.

7         MR. SIMONS:  Thank you.

8         THE COURT:  Any other issues that we can take up?

9    No?  All right.  Well, we'll take a few moments to get the

10   jurors in here, but once we bring the jury in, Madam Clerk, if

11   you could call the roll to make sure everyone's present.  You

12   can contact the jurors that do not appear before any show

13   cause orders are issued to see if they have a legitimate

14   reason for not appearing.  Once they come in, at that point

15   I'll ask the attorneys to state their appearances for the

16   record.

17        All right.  We'll be in recess for approximately ten

18   minutes.

19              (Recess from 8:57 a.m. until 9:10 a.m.)

20      (The prospective jury entered the courtroom at 9:00 a.m.)

21        THE COURT:  Thank you and good morning, everyone.

22   Madam Clerk, if you could call the matter scheduled for trial,

23   please.

24        DEPUTY CLERK:  Yes, Your Honor.  London Criminal

25   Action Number 09-16.  United States of America versus Russell

9

1    Cletus Maricle, Douglas C. Adams, Charles Wayne Jones,

2    William E. Stivers, also known as Al Man, Freddy W. Thompson,

3    William B. Morris, also known as Bart, Debra L. Morris, also

4    known as Debbie, and Stanley Bowling.

5         THE COURT:  Thank you.  And if counsel could state

6    their appearances for the record, please.  Mr. Smith, we'll

7    start with you.

8         MR. SMITH:  Good morning, Your Honor.  I'm Stephen

9    Smith, and I'm here on behalf of the United States.

10        THE COURT:  Thank you.

11        MR. PARMAN:  I'm Jason Parman, here on behalf of the

12   United States.

13        THE COURT:  Thank you.

14        MR. HOSKINS:  Good morning, Your Honor.  David

15   Hoskins for the defendant, Russell Cletus Maricle.

16        MR. PINALES:  Marty Pinales on behalf of Mr. Maricle.

17        THE COURT:  Thank you.  Miss Crouse?

18        MS. CROUSE:  Candace Crouse on behalf of Mr. Maricle.

19        MR. BAYER:  Bennett Bayer on behalf of the defendant,

20   Douglas Adams.

21        THE COURT:  Thank you.  Mr. Westberry?

22        MR. WESTBERRY:  Good morning, Judge Reeves.  Kent

23   Westberry on behalf of Doug Adams.

24        MS. LOGAN:  Kristin Logan on behalf of Doug Adams.

25        MR. WHITE:  Scott White, and I'm here on behalf of

10

1   Wayne Jones.

2          THE COURT:  Thank you.  Mr. Abell?

3          MR. ABELL:  Good morning, Judge.  Robert Abell, I'm

4   here representing William Stivers.

5          THE COURT:  Mr. Baldani?

6          MR. BALDANI:  Good morning, Judge.  Russ Baldani on

7   behalf of Freddy Thompson.

8          MR. RICHARDSON:  And Tucker Richardson, I'm here

9   representing Freddy Thompson also.

10          THE COURT:  Thank you.

11          MR. GILBERT:  Your Honor please, Jerry Gilbert on

12   behalf of Bart Morris.

13          MS. HUGHES:  Elizabeth Hughes on behalf of Debbie

14   Morris.

15          THE COURT:  Thank you.  Mr. Simons?

16          MR. SIMONS:  Your Honor, Dan Simons on behalf of

17   Stanley Bowling.

18          THE COURT:  Thank you, counsel.  Ladies and

19   gentlemen, as indicated earlier, of course, we're all here to

20   begin a trial this morning, a criminal case.  On behalf of all

21   of the judges for the United States District Court for the

22   Eastern District of Kentucky, I want to welcome you here this

23   morning.

24          Before we begin the jury selection process, I

25   understand that we have two new jurors that will need to be

11

1   qualified, Madam Clerk?

2          DEPUTY CLERK:  Yes, Your Honor.

3          THE COURT:  If you could please call their numbers.

4          DEPUTY CLERK:  Juror Number 27.

5          THE COURT:  If you could stand.  Yes, sir.

6          DEPUTY CLERK:  And Juror Number 121, if you would

7   stand.

8          THE COURT:  If you could administer the oath to these

9   two jurors to answer the questions.

10              (Prospective Jurors 121 and 27 were

11              sworn for qualification purposes.)

12         THE COURT:  I have just a couple of questions for you

13  before we begin with the full selection process.  And if you

14  could, just respond as I ask these questions.  Are each of you

15  citizens of the United States?

16         PROSPECTIVE JURORS 121 and 27:  Yes.

17         THE COURT:  Are each of you 18 years of age or older?

18         PROSPECTIVE JURORS 121 and 27:  Yes.

19         THE COURT:  Has your primary residence for the past

20  year been in this state and in the same county?

21         PROSPECTIVE JURORS 121 and 27:  Yes.

22         THE COURT:  Do each of you read, write, speak, and

23  understand the English language?

24         PROSPECTIVE JURORS 121 and 27:  Yes.

25         THE COURT:  Are any charges now pending against you

12

1      for a violation of state or federal law punishable by

2      imprisonment for more than one year?

3              PROSPECTIVE JURORS 121 and 27:  No.

4              THE COURT:  Have either of you ever been convicted,

5      either by your guilty or *nolo contendre* plea or by a court of

6      or a jury trial for a state or federal crime for which

7      punishment could have been more than one year in prison.

8              PROSPECTIVE JURORS 121 and 27:  No.

9              THE COURT:  Do either of you have any physical or

10     mental disabilities that would interfere with or prevent you

11     from serving as a juror if you are selected?

12             PROSPECTIVE JURORS 121 and 27:  No.

13             THE COURT:  All right.  Thank you.  Madam Clerk,

14     these two jurors are qualified to serve.

15             DEPUTY CLERK:  Yes, Your Honor.

16             THE COURT:  At this time, ladies and gentlemen, I'm

17     going to ask all potential jurors to stand so the clerk can

18     administer the oath so all of you can answer questions.

19                     (All prospective jurors were sworn

20                      for voir dire.)

21             THE COURT:  Please be seated.  Now, ladies and

22     gentlemen, we will begin the process of juror selection at

23     this time.  The purpose of the questions that I'm about to ask

24     you is to determine whether you know anything about the case

25     and whether you're otherwise qualified to serve as jurors in

1    this matter.  I do want to remind you of just a couple of

2    things before we get started.  First, of course, you have been

3    placed under oath, and as a result, you will need to give me

4    full and complete answers to the questions that I'm going to

5    ask you.

6         Now, we have a lot of jurors here today.  I know that

7    y'all are getting to know each other perhaps a little better

8    than you'd like.  You're squeezed into your seats, and so I'm

9    going to try to expedite this process just as best I can.

10        If you would help me, I would appreciate that.  And

11   several of the ways that you can help me would be, first, not

12   to talk among yourselves while we're going through this

13   process of jury selection.

14        Also, if you do need to give an answer to one of my

15   questions, I need for you to raise your hand until you're

16   called upon.  Now, with so many people in the courtroom, it's

17   going to be hard, sometimes, to see when someone has their

18   hand raised.  If you would, please make sure that your hand is

19   raised nice and high so I can see you and keep it up there

20   till I call on you.

21        When you are called on to give an answer, you need to

22   give me your juror number, and you need to do that every time

23   that you give an answer.  So if you stand up five times in a

24   row to answer a question, make sure that you give me your

25   juror number five times in a row, because I want to make sure

14

1    that all of the attorneys know exactly who's giving answers to

2    my questions.

3           Now, it may be that we'll need to take a couple of

4    breaks as we go through this process.  I'm going to try to

5    keep the breaks to a minimum, if I can, because every time we

6    exit the courtroom and come back in, we need to take the roll

7    again.  So we'll try to keep that to a minimum, but we may

8    need to take a break this morning, and I'm not going to try to

9    keep anyone here.  This is not an endurance contest so we

10   probably will not stay in session longer than about an hour

11   and a half at the longest.  Please, bear with me, and we'll

12   certainly try to expedite the process as best we can.

13          Now, let me begin by telling you a little something

14   about the case, about the charges that are made in the case.

15          Now, as I said, this is a criminal case.  The United

16   States alleges that the defendants conspired together and with

17   others to unlawfully conduct and to participate in the affairs

18   of the Clay County Board of Elections, directly and

19   indirectly, from on or about a day in March, 2002 through on

20   or about July 17, 2007, in Clay County in the Eastern District

21   of Kentucky and elsewhere.

22          In their involvement in the affairs of the Board of

23   Elections, the defendants are alleged to have engaged in a

24   pattern of unlawful conduct, including acts of theft of honest

25   services and mail fraud in each of the primary and general

1    elections in 2004 and 2006, extortion in September of 2004,

2    obstruction of justice in May of 2007, and multiple acts of

3    bribery.

4            The defendants are alleged to have conspired together

5    and with others to launder money, pooled for the purpose of

6    buying votes and money extorted from others in Clay County in

7    the Eastern District of Kentucky and elsewhere, from on or

8    about a day in March, 2002, through on or about July 17, 2007.

9            It's alleged that the defendants agreed to conduct

10   financial transactions by buying votes with the money and that

11   the money would later be unlawfully returned to them in

12   salaries and/or contracts to others to further conceal and

13   promote the alleged unlawful activity.

14           Defendants Maricle, Jones, Stivers and Thompson are

15   alleged to have conspired to have suppressed the

16   constitutional rights of qualified voters by diluting their

17   votes with votes cast by persons charged with safekeeping of

18   the polls in Manchester in Clay County in the Eastern District

19   of Kentucky from on or about a day in June, 2004 through on or

20   about November 7, 2006.

21           The United States further alleges that from on or

22   about a date in January, 2006 to on or about November 7, 2006,

23   at Manchester in Clay County in the Eastern District of

24   Kentucky, defendants Maricle, Jones, Stivers, Thompson,

25   William B. Morris, Debra Morris and others conspired to pay

16

1    and offered to pay voters for voting in an election held in

2    part to select a candidate for federal office.

3          Each of the defendants deny the allegations and

4    further denies that there was any illegal enterprise.

5          Now, ladies and gentlemen, let me begin by asking if

6    anyone has any direct knowledge of any of the allegations that

7    I've just outlined to you.  Anyone have any direct knowledge?

8    All right.  I see one hand -- a couple of hands raised.

9          Now, the way we'll proceed is I'm going to start from

10   my right and I'll work my way around the courtroom, front to

11   back, in calling on jurors.  So if I miss you, make sure that

12   you raise your hand so I can see that you need to give an

13   answer.  Sir, in the first row, in the blue shirt, if you

14   could give me your juror number, please.

15          PROSPECTIVE JUROR 124:  124.

16          THE COURT:  Do you have direct knowledge of any of

17   the information or any of the allegations that I've just read

18   to you?

19          PROSPECTIVE JUROR 124:  Yes, sir.

20          THE COURT:  How do you have that information?

21          PROSPECTIVE JUROR 124:  I left my employment with

22   Board of Elections in 2005.

23          THE COURT:  With the State Board of Elections?

24          PROSPECTIVE JUROR 124:  Yes, sir.

25          THE COURT:  And in your capacity with the State Board

1  of Elections, did you acquire some of this information of some

2  of these allegations?

3          PROSPECTIVE JUROR 124:  Yes.

4          THE COURT:  You learned about that --

5          PROSPECTIVE JUROR 124:  Yes, sir.

6          THE COURT:  -- through your work?  Did you take any

7  steps in your employment to do any type of investigation in

8  these matters?

9          PROSPECTIVE JUROR 124:  No.

10         THE COURT:  So this is just something you heard

11 through other people that you worked with?

12         PROSPECTIVE JUROR 124:  Yes, sir.

13         THE COURT:  Now, at the end of this process, I may

14 call you up and ask you specifically what it was that you

15 heard.

16         PROSPECTIVE JUROR 124:  Okay.

17         THE COURT:  But let me ask you at this time, is there

18 any information that you received in the course of your

19 employment that would prevent you from fairly and impartially

20 considering all matters in the case if you were selected as a

21 juror?

22         PROSPECTIVE JUROR 124:  No, sir.

23         THE COURT:  Let me ask the question a different way.

24 Regardless of what you heard -- and as I said, I may call you

25 up and ask you about that at the end of the selection process.

18

1    But regardless of what that might be, could you set all of

2    that information aside, completely set it aside and ignore it

3    and, if you're selected, render a verdict based only on what

4    you hear in this courtroom?

5              PROSPECTIVE JUROR 124:  Yes, sir.

6              THE COURT:  All right.  You could follow that

7    instruction if it's given?

8              PROSPECTIVE JUROR 124:  Sure.

9              THE COURT:  That's Juror Number 124.  Again, I may be

10   calling you back up at the end of the selection process.

11   There was one other hand.  Yes, ma'am?

12             PROSPECTIVE JUROR 8:  Juror Number 8.

13             THE COURT:  Yes, ma'am.  I'll ask you the same

14   question.  Do you have personal knowledge of any of the

15   allegations I just read to you?

16             PROSPECTIVE JUROR 8:  Yes, sir, I do.

17             THE COURT:  How did you acquire that information?

18             PROSPECTIVE JUROR 8:  I believe our office

19   investigated the matter.

20             THE COURT:  Which office are you with?

21             PROSPECTIVE JUROR 8:  Attorney general's office.

22             THE COURT:  Okay.  In your position in that office,

23   were you directly involved in any type of an investigation?

24             PROSPECTIVE JUROR 8:  No.

25             THE COURT:  Would all of the information that you

19

1    would have received come to you secondhand from someone else?

2            PROSPECTIVE JUROR 8:  Yes.

3            THE COURT:  And if you were selected as a juror in

4    this case, could you ignore any information that you've heard

5    outside the walls of this courtroom and reach a verdict based

6    only on the evidence that will be presented to you?

7            PROSPECTIVE JUROR 8:  Honestly, I don't know that I

8    could.

9            THE COURT:  All right.  You might have a hard time

10   doing that?

11           PROSPECTIVE JUROR 8:  Yes.

12           THE COURT:  Well, I may be calling you up at the end

13   of the selection process to ask you exactly what it was that

14   you've heard about the case, but I'll hold those questions for

15   now, okay?  That's Juror Number 8.  Anyone else that had an

16   answer to my question?

17                         (No verbal response.)

18           THE COURT:  Now, ladies and gentlemen, from time to

19   time, there may have been articles in newspapers or television

20   stories or articles on the radio stations about the

21   allegations that I've just read to you.  Let me ask if anyone

22   here has either read anything or heard anything or seen

23   anything about any of these allegations that I've just gone

24   through?  One juror in the jury box and a couple hands out in

25   the other section.

20

1              Ma'am, let me ask you first, what is your number?

2              PROSPECTIVE JUROR 127:  127.

3              THE COURT:  127.  And without describing what you

4    heard, can you tell me the source of the information?

5              PROSPECTIVE JUROR 127:  Newspaper.

6              THE COURT:  Newspaper.  Is there anything that you

7    might have read in a newspaper article that would prevent you

8    from being fair and impartial if you were selected in this

9    case?

10             PROSPECTIVE JUROR 127:  I don't think so.

11             THE COURT:  And do you understand that, of course,

12   from time to time, articles do appear in newspapers.  They may

13   tell one side of the story and not the complete story, and

14   that the duty of a juror is to listen to the testimony and

15   evidence that's presented here in this courtroom and reach a

16   verdict based only on that evidence.  Now, if you are

17   selected, you feel that you could do that?

18             PROSPECTIVE JUROR 127:  Yes.

19             THE COURT:  All right.  Is there anything that you

20   read in the newspaper article that you believe would prevent

21   you from being fair and impartial to the government and to

22   each defendant in the case?

23             PROSPECTIVE JUROR 127:  No.

24             THE COURT:  All right.  Let's see, we had a couple of

25   other hands raised.  Again, in the second row, yes, sir?

21

1          PROSPECTIVE JUROR 16:  16.

2          THE COURT:  Yes, sir, same question for you.  Where

3    was the source of the information?  What was the source?

4          PROSPECTIVE JUROR 16:  Newspaper and TV, news.

5          THE COURT:  Was that recent or was that some time

6    ago, if you know?

7          PROSPECTIVE JUROR 16:  I believe it's been the last

8    couple years.

9          THE COURT:  And do you have a specific memory of

10   anything that you read or heard?

11         PROSPECTIVE JUROR 16:  I just remember hearing about

12   it.

13         THE COURT:  Just generally?

14         PROSPECTIVE JUROR 16:  Not as far as specifics or

15   anything like that.

16         THE COURT:  My questions for you will be the same as

17   for this last juror.  That is that based on anything that you

18   might recall about newspaper or television articles, would

19   that information in any way influence your opinion, your

20   opinions if you were selected as a juror in the case?

21         PROSPECTIVE JUROR 16:  No, sir.

22         THE COURT:  Could you set aside anything that you

23   read or heard outside the courtroom and base a decision only

24   on the evidence that's presented here in this proceeding?

25         PROSPECTIVE JUROR 16:  Yes.

22

1          THE COURT:  All right.  That's Juror Number 16.

2     Thank you, sir.  I believe there was -- yes, ma'am?

3          PROSPECTIVE JUROR 132:  132.

4          THE COURT:  Same questions.  What is the source of

5     your --

6          PROSPECTIVE JUROR 132:  In the newspaper.

7          THE COURT:  Newspaper?

8          PROSPECTIVE JUROR 132:  Yes.

9          THE COURT:  Approximately how long ago?

10         PROSPECTIVE JUROR 132:  Last summer.

11         THE COURT:  Last summer?

12         PROSPECTIVE JUROR 132:  (Nodding affirmatively).

13         THE COURT:  Do you remember the newspaper?  Don't

14    remember which one it was?

15         PROSPECTIVE JUROR 132:  No.

16         THE COURT:  So you have a specific memory of an

17    article in the paper?

18         PROSPECTIVE JUROR 132:  Just about vote buying.

19         THE COURT:  Just the subject I've just gone over with

20    you?

21         PROSPECTIVE JUROR 132:  Yes, sir.

22         THE COURT:  And again, you understand that when you

23    read things in the newspaper, you may just be reading an

24    allegation or one side of the case.  You understand that?

25         PROSPECTIVE JUROR 132:  Yes.

23

1          THE COURT:  Now, if you are selected as a juror in

2     the case, could you put aside whatever you may have read and

3     base your decision only on the evidence that's presented here

4     in this courtroom?

5          PROSPECTIVE JUROR 132:  Yes, sir.

6          THE COURT:  All right.  Is there anything at all that

7     you believe that you may have seen or heard that would affect

8     your ability to do that?

9          PROSPECTIVE JUROR 132:  No, sir.

10         THE COURT:  All right.  Thank you.  Let me go back to

11    Juror Number 16.  I didn't ask you what newspaper that you

12    might have read.  Do you have a memory of the specific --

13         PROSPECTIVE JUROR 16:  I don't recall.  I believe it

14    was the Lexington Herald.

15         THE COURT:  Herald, all right.  And what about

16    television.  Do you recall the station?

17         PROSPECTIVE JUROR 16:  No.

18         THE COURT:  All right.  Thank you.  And again, let me

19    go back over here to Juror Number 127.  Do you recall the

20    newspaper article?

21         PROSPECTIVE JUROR 127:  I believe it was the Courier

22    Journal.  Pretty good section.

23         THE COURT:  You recall it was a lengthy article, but

24    you don't have a memory of exactly what was discussed?

25         PROSPECTIVE JUROR 127:  No.  I think it was in the

24

1    last -- it was in the last year.

2           THE COURT:  All right.  Thank you.  Did I miss

3    anyone?  Have I called on -- yes, hand in the back.  Yes,

4    ma'am.

5           PROSPECTIVE JUROR 37:  Juror Number 37.  I heard -- I

6    read about it on kentucky.com, which is the Lexington

7    newspaper, and I saw it on WKYT.  I can't give you the exact

8    time.  And there was some discussion in our office about it.

9           THE COURT:  All right.  Now, what office would that

10   have been?

11          PROSPECTIVE JUROR 37:  Secretary of State Trey

12   Grayson.

13          THE COURT:  Let me ask you some of the same questions

14   I asked the other jurors.  First, do you have a specific

15   memory of information contained in an article?

16          PROSPECTIVE JUROR 37:  The county was --

17          THE COURT:  You remember the county being mentioned?

18          PROSPECTIVE JUROR 37:  Yes, uh-huh.

19          THE COURT:  Do you have memory of any allegations

20   about any specific individuals?

21          PROSPECTIVE JUROR 37:  Some of the public officials

22   that were involved, yes.

23          THE COURT:  All right.  Now, with respect to

24   newspaper articles or television stories or things that you

25   may blog about, because I think you said you read it on the

25

kentucky.com, and sometimes there are those blog columns that
appear underneath stories.  Is there anything that you would
have read that would in any way prevent you from being fair
and impartial if you were seated in this case?

          PROSPECTIVE JUROR 37:  No, sir.

          THE COURT:  And again, I want to emphasize this.  Do
you understand that when you read something in the newspaper,
you may be reading one side of a story, and not both sides of
the story?

          PROSPECTIVE JUROR 37:  Yes, sir.

          THE COURT:  And you understand that if you're
selected as a juror that you have to set aside anything that
you've heard outside of the courtroom and base your decision
only on what you hear in this court?

          PROSPECTIVE JUROR 37:  Yes, sir.

          THE COURT:  With respect to blogs, let me ask you
this question.  Do you ever blog?  Do you ever respond to
stories that you read?

          PROSPECTIVE JUROR 37:  No, sir.

          THE COURT:  All right.  And you understand that if
you're selected as a juror in this case, one of the
instructions that you'll be given is you can't do that type of
activity.  Not only can you not read anything about the case
while it's ongoing, but you can't communicate about the case,
and that includes electronically through blogs, Blackberries,

26

1    anything of that nature.  You understand that?

2              PROSPECTIVE JUROR 37:  Yes, sir.

3              THE COURT:  All right.  Thank you.  Now, does anyone

4    else have an answer to my last question?  Now, for those of

5    you jurors that responded, let me ask if any juror has formed

6    any opinion about the guilt or innocence of any party in this

7    case based upon what you've read or heard or seen.  Anyone

8    that's formed an opinion about it?

9                             (No verbal response.)

10             THE COURT:  I assume since you haven't raised your

11   hands that the answer would be no.  Now, during the course of

12   this trial, there may be newspaper, radio or television

13   accounts of the case.  And if you are selected, you will be

14   admonished, instructed that you cannot read, watch or listen

15   to anything about the case.  And if you are selected, of

16   course, you will be required to follow that instruction.

17             You also will not be allowed to discuss the case with

18   anyone -- that includes friends and family members -- during

19   the course of the proceeding.  Is there anyone who could not

20   follow that instruction if you're selected and that

21   instruction is given to you?  You feel like you just couldn't

22   do that?

23                             (No verbal response.)

24             THE COURT:  All right.  I assume that since no one

25   raised their hand, your answer is that you could follow the

1    Court's instructions.

2            Now, as I mentioned earlier, the indictment in this

3    case alleges offenses involving conspiracy to commit

4    racketeering, vote buying and money laundering, and it's

5    derived for the purpose of buying votes.  Is there any

6    potential juror who's been exposed directly to any type of

7    activity such as what I've reviewed with you, what's been

8    alleged here, that you've been involved directly with any type

9    of activity such as that?

10                           (No verbal response.)

11           THE COURT:  Let me extend the question to your close

12   friends or family members.  Is there anyone that's had a

13   family member or a close friend that's been involved in the

14   type of activity that I've described or that's been alleged?

15                           (No verbal response.)

16           THE COURT:  Is there any potential juror or member of

17   your family or friend that, to your knowledge, has been asked

18   to participate in the type of activity that I've described

19   that's been alleged?

20                           (No verbal response.)

21           THE COURT:  Does any potential juror believe that it

22   should not be illegal to engage in the type of conduct that

23   has been -- yes, ma'am.  Yes?

24           PROSPECTIVE JUROR 36:  I have a family member --

25           THE COURT:  I'm sorry.  It's kind of hard to hear up

28

1    here.

2              PROSPECTIVE JUROR 36:  I have a family member on it.

3              THE COURT:  You have a family member that's -- tell

4    me what it is.

5              PROSPECTIVE JUROR 36:  That's in the case.

6              THE COURT:  That's involved in the case?

7              PROSPECTIVE JUROR 36:  Yes.

8              THE COURT:  What's your number again?

9              PROSPECTIVE JUROR 36:  36.

10             THE COURT:  36.  And you have a family member that's

11   one of the defendants?  Who is that?

12             PROSPECTIVE JUROR 36:  Debbie Morris.

13             THE COURT:  All right, Miss Morris.  What is your

14   relationship to Miss Morris?

15             PROSPECTIVE JUROR 36:  She's my aunt.

16             THE COURT:  All right.  Ma'am, I'll be excusing you

17   when we take our break here in just a few moments so you will

18   not need to respond to my questions.  I do appreciate your

19   bringing that to my attention.

20             PROSPECTIVE JUROR 36:  Thank you.

21             THE COURT:  All right.  Let's see.  Is there any

22   potential juror who believes it should not be illegal to

23   engage in the type of conduct that has been alleged in the

24   case?

25                              (No verbal response.)

29

1          THE COURT:  Is there any potential juror who believes

2     it should be legal or it is appropriate either to buy votes or

3     to sell votes?

4                              (No verbal response.)

5          THE COURT:  Has any potential juror worked on a

6     political campaign; that would be either in a paid or

7     volunteer capacity?  I assume there will be several of you

8     that worked on political campaigns.  We have any?  No one?

9     One or two?  Raise the hands up real high.  I'm just going to

10    ask your numbers first, so if we could go around and if you

11    could just give me your number, please.

12         PROSPECTIVE JUROR 156:  156.

13         THE COURT:  And you've worked on a political

14    campaign?

15         PROSPECTIVE JUROR 156:  Well, I could question what

16    you mean worked on.  I am politically involved.

17         THE COURT:  All right.  I really mean it as broadly

18    as possible.  I may ask some follow-up questions.  I really

19    just want to find out if anyone's been involved in a political

20    campaign.  If you have, if you could just describe generally

21    the activity you engaged?

22         PROSPECTIVE JUROR 156:  Participating in local

23    political rallies and fund-raising events and engaging in

24    political discussion and passing out bumper stickers and signs

25    and things like that.

30

1        THE COURT:  All right.  Can you tell me generally the

2   area that you engaged in those activities?

3        PROSPECTIVE JUROR 156:  Shelby County.

4        THE COURT:  In Shelby County, all right.  Thank you,

5   sir.  I may have follow-up questions for you in just a moment.

6   First row, second row.  Ma'am, we'll start with my left and

7   we'll work our way across.  Yes, ma'am?

8        PROSPECTIVE JUROR 44:  Number 44.  I have a brother

9   that's a magistrate for 20 years.  Just did phone calls and

10  door-to-door campaigning in Anderson County.

11       THE COURT:  That's your brother, and he's a

12  magistrate.  So you would have supported him as he would run

13  for election in these matters?

14       PROSPECTIVE JUROR 44:  (Nodding affirmatively).

15       THE COURT:  All right.  And is that a good summary of

16  your political activities?

17       PROSPECTIVE JUROR 44:  That's it.

18       THE COURT:  Other than voting, I assume.  All right.

19  Yes, sir?

20       PROSPECTIVE JUROR 38:  38.  I've helped in local

21  elections in Gallatin County and Carroll County over the last

22  20 years.

23       THE COURT:  All right.  Would you consider yourself

24  to be politically active?  In other words, do you go out and

25  campaign for folks, things of that nature?

1              PROSPECTIVE JUROR 38:  No, I don't do that.

2              THE COURT:  All right.  And yes, sir, just behind

3    Juror Number 38.

4              PROSPECTIVE JUROR 45:  45.

5              THE COURT:  What was your number?

6              PROSPECTIVE JUROR 45:  45.  Yes, my father-in-law, I

7    worked on his mayoral campaign, and my brother-in-law is a

8    councilman in the same town.

9              THE COURT:  You would support members of your family

10   as they would run for election?

11             PROSPECTIVE JUROR 45:  Yes, sir.

12             THE COURT:  Would you go out and campaign for family

13   members?

14             PROSPECTIVE JUROR 45:  Yes.

15             THE COURT:  Ask people to support?

16             PROSPECTIVE JUROR 45:  Right.

17             THE COURT:  Thank you, sir.  Yes, sir, on the end?

18             PROSPECTIVE JUROR 66:  66.  I participated with a

19   school board member running for office.  Also, I participated

20   in some for the governor, trying to raise a little money.

21             THE COURT:  All right.  So you did a little

22   fund-raising activity as well?

23             PROSPECTIVE JUROR 66:  Yeah.

24             THE COURT:  Was that for a -- I couldn't hear the

25   first part.  Was that for a state level position or was that

32

1    for a local --

2              PROSPECTIVE JUROR 66:  The first part was local.

3              THE COURT:  The first part was local?

4              PROSPECTIVE JUROR 66:  Anderson County.

5              THE COURT:  And did you do some for a statewide

6    candidate?

7              PROSPECTIVE JUROR 66:  In Anderson County.

8              THE COURT:  How long ago would those activities have

9    taken place?

10             PROSPECTIVE JUROR 66:  School board activities,

11   within the last two or three years.  Governor thing within the

12   last eight years.

13             THE COURT:  All right.  Thank you, sir.  I believe

14   there may have been another hand or two raised in the section

15   on the right over here.  No?  Yes, ma'am, let me go back to

16   the jury box.  I missed you.  I'm sorry.

17             PROSPECTIVE JUROR 126:  126.  Basically just some

18   fund-raising.

19             THE COURT:  Was it at a local level?

20             PROSPECTIVE JUROR 126:  I probably supported a few

21   local levels, but mostly statewide.  And it's been a couple

22   years back.

23             THE COURT:  So it's been a few years ago?

24             PROSPECTIVE JUROR 126:  (Nodding affirmatively).

25             THE COURT:  Did you do that on behalf of someone?

33

1      PROSPECTIVE JUROR 126:  Yeah.  I mean, just different
2  candidates.
3      THE COURT:  Let me ask the question this way.  Did
4  you do it because someone asked you to help, or did you feel
5  that you just wanted to help this person so you went out --
6      PROSPECTIVE JUROR 126:  Normally, someone asks you to
7  help.
8      THE COURT:  Someone asks you, all right.  And you
9  engaged in some fund-raising activities?
10      PROSPECTIVE JUROR 126:  Mostly just, you know, giving
11  money and sometimes volunteering at an event to just guide
12  people around or whatever.
13      THE COURT:  All right.  Thank you, ma'am.  I don't
14  see any other hands on this side.  Let me shift to the left
15  side of the courtroom.  We'll start with the front row.  Yes,
16  ma'am, on the end?
17      PROSPECTIVE JUROR 5:  Juror Number 5.
18      THE COURT:  Can you describe generally what type of
19  activity you would have participated in?
20      PROSPECTIVE JUROR 5:  It was on a local level,
21  Franklin County.
22      THE COURT:  Did you engage in any fund-raising
23  activities?
24      PROSPECTIVE JUROR 5:  I did a little bit of all of
25  it.  Fund raising, organizing.

1          THE COURT:  Was that on behalf of someone that asked

2     you to go out and help?

3          PROSPECTIVE JUROR 5:  It was volunteer.

4          THE COURT:  All right.  So you --

5          PROSPECTIVE JUROR 5:  I actually talked a candidate

6     into running.

7          THE COURT:  Oh, I see.

8          PROSPECTIVE JUROR 5:  And took it from there.

9          THE COURT:  All right.  Thank you.  That's Juror

10    Number 5.  Anyone else on the first row?  Let's go to the

11    second row.  Third row, I believe, ma'am, in the dark shirt?

12         PROSPECTIVE JUROR 135:  Juror Number 135.

13         THE COURT:  Uh-huh.

14         PROSPECTIVE JUROR 135:  All I did was just put flyers

15    on people's houses.  It was a family friend of my mother, and

16    that's all I did.

17         THE COURT:  All right.  So you didn't engage in

18    fund-raising activities, things of that nature?

19         PROSPECTIVE JUROR 135:  No, sir.

20         THE COURT:  You took these flyers around and put them

21    on doorknobs.  Someone opened the door, you said support my

22    candidate?

23         PROSPECTIVE JUROR 135:  I didn't knock on the doors.

24    I didn't want to.  I just put the flyer.

25         THE COURT:  All right.  Thank you.  Anyone else on

35

1    that row?  Yes, sir?

2             PROSPECTIVE JUROR 121:  121.  I was a campaign

3    manager for a state senator back in the '80s.  I also was on

4    the two governors' staffs to help them in Franklin County, and

5    I also had the ominous position of running here in the county

6    as a candidate back in the '80s.

7             THE COURT:  Back in the '80s?

8             PROSPECTIVE JUROR 121:  Yes, sir.

9             THE COURT:  Were you successful?

10            PROSPECTIVE JUROR 121:  No, sir.

11            THE COURT:  All right.  At any point during any of

12   those activities, did anyone ever ask you to do anything that

13   you thought was improper or illegal?

14            PROSPECTIVE JUROR 121:  No, sir.

15            THE COURT:  All right.  I'm going to be back and

16   asking that same question of everyone that's responded so far.

17            PROSPECTIVE JUROR 121:  I did do fund-raising, and I

18   was campaign manager so I was in charge of watching what

19   everybody else did.

20            THE COURT:  Thank you, 121.  Anyone else in that row

21   that I missed?  If not, keep going back.  Yes, ma'am.

22            PROSPECTIVE JUROR 1:  Juror Number 1.  The last two

23   elections, my husband and my uncle both ran for office so I

24   was campaigning for both of them.

25            THE COURT:  All right.  What county would that have

36

1   been?

2           PROSPECTIVE JUROR 1:  Henry County.

3           THE COURT:  So you supported the people in your

4   family that were running for office?

5           PROSPECTIVE JUROR 1:  Yes, sir.

6           THE COURT:  Thank you, ma'am.  Anyone else on this

7   left section of the courtroom that I missed?

8                               (No verbal response.)

9           THE COURT:  Anyone I didn't call on that had your

10  hand raised?

11                              (No verbal response.)

12          THE COURT:  Now, ladies and gentlemen, for those of

13  you that answered my question, this last question that I asked

14  about campaign activities, do any of you believe that at any

15  point during the course of your activities, as you've

16  described those, did you at any time or were you ever asked to

17  perform any activities that you believed were improper or

18  illegal?

19                              (No verbal response.)

20          THE COURT:  I assume since no one's raised your hand,

21  that your answer would be no.  Let me ask, generally, how many

22  people -- how many potential jurors have donated to a campaign

23  from time to time?  I assume that a lot of folks have.  And

24  there's an equal number or greater that have not donated to

25  campaigns.  Is there anyone who feels that donating to a

37

1    campaign shouldn't be done?  It just is not appropriate,

2    shouldn't be done?

3                              (No verbal response.)

4         THE COURT:  How many jurors have donated to what's

5    called Political Action Committees or PACs.  Has anyone made

6    that type of a donation from time to time?  Got a couple of

7    hands.  Again, I'm just going to ask you your numbers.

8         PROSPECTIVE JUROR 156:  156.

9         THE COURT:  156, to you've donated to a PAC from time

10   to time?

11        PROSPECTIVE JUROR 156:  Yes.

12        THE COURT:  Yes, sir?

13        PROSPECTIVE JUROR 38:  38.

14        THE COURT:  138?

15        PROSPECTIVE JUROR 38:  38.

16        THE COURT:  38, I'm sorry.  Yes, sir?

17        PROSPECTIVE JUROR 93:  Number 93.

18        THE COURT:  93.  And those of you that responded to

19   that question, do any of you feel like that anything improper

20   was done with the money that you donated to a PAC?

21                              (No verbal response.)

22        THE COURT:  All right.  Answers are no.  Now, I've

23   had a couple of answers to this question already, but let me

24   ask again, the jurors that either themselves have run for

25   office, for public office, or that have had a family member

1    run for public office.  Now, if you've already answered, you

2    don't need to answer again.  But those of you that didn't

3    respond earlier, is there anyone who has either themselves run

4    for public office or had a family member run for public

5    office?  Anyone else?  We got a couple of folks that didn't

6    respond.  Yes, ma'am?

7              PROSPECTIVE JUROR 90:  Juror 90.  My sister-in-law

8    ran for judgeship.

9              THE COURT:  What county would that be?

10             PROSPECTIVE JUROR 90:  Oldham.

11             THE COURT:  Oldham County?  Was it your sister or

12   sister-in-law?

13             PROSPECTIVE JUROR 90:  Sister-in-law.

14             THE COURT:  How long ago would that have taken place?

15             PROSPECTIVE JUROR 90:  I think two years ago.

16             THE COURT:  Two years ago?  And I assume that you

17   would have supported your sister-in-law to the extent that you

18   could?

19             PROSPECTIVE JUROR 90:  I'm sorry?

20             THE COURT:  I assume you would have supported your

21   sister-in-law to the extent you were able to support her?

22             PROSPECTIVE JUROR 90:  Yes.

23             THE COURT:  Yes, one in the back, sir, with the blue

24   shirt?

25             PROSPECTIVE JUROR 57:  57.  My brother-in-law in

39

1    Pulaski County.

2            THE COURT:  Your brother-in-law in Pulaski County,

3    down around Somerset?

4            PROSPECTIVE JUROR 57:  Yes, sir.

5            THE COURT:  What was the office your brother-in-law

6    was running for?

7            PROSPECTIVE JUROR 57:  County judge.

8            THE COURT:  Was it county judge executive?

9            PROSPECTIVE JUROR 57:  Yes.

10            THE COURT:  All right.  And were you living in

11    Pulaski County at the time?

12            PROSPECTIVE JUROR 57:  No, I was not.

13            THE COURT:  So you were just supporting to the extent

14    that you were able where you live?

15            PROSPECTIVE JUROR 57:  That's right.

16            THE COURT:  That's Juror 57.  Anyone else on the

17    right side?  All right.  Ma'am, in the first row?  On the end?

18            PROSPECTIVE JUROR 5:  Juror Number 5.  I ran for

19    magistrate early '90s.  I don't remember exactly when.  And my

20    father was a county attorney for 20 years.

21            THE COURT:  All right.  What counties were involved?

22            PROSPECTIVE JUROR 5:  McCracken.

23            THE COURT:  McCracken?

24            PROSPECTIVE JUROR 5:  Yes.

25            THE COURT:  Over in Western Kentucky?

1           PROSPECTIVE JUROR 5:  Yes.

2           THE COURT:  Anyone else on the first row that I

3   missed?  Yes, sir, on the second row?

4           PROSPECTIVE JUROR 93:  Number 93.  I've had a cousin

5   who ran for magistrate.  It's probably been in the 40 year ago

6   range, and an uncle about 20 years ago ran for magistrate.

7           THE COURT:  All right.  Did you support their

8   elections?

9           PROSPECTIVE JUROR 93:  Yes.

10           THE COURT:  All right.  Do you remember the counties?

11           PROSPECTIVE JUROR 93:  Owen.

12           THE COURT:  Owen County.  Thank you.  Anyone else on

13   the first two rows?  Yes, sir, in the first row?

14           PROSPECTIVE JUROR 33:  Juror 33.  It's the wife's

15   cousin, state Senate.

16           THE COURT:  Do you remember the county that was --

17           PROSPECTIVE JUROR 33:  Cumberland.

18           THE COURT:  Cumberland County down in the south

19   central part of the state?

20           PROSPECTIVE JUROR 33:  Um-hmm.

21           THE COURT:  All right.  How would you describe your

22   activities?  Were you involved in any way?

23           PROSPECTIVE JUROR 33:  I don't know him.  I just know

24   the wife's related to him.

25           THE COURT:  I see, all right.  Thank you.  I see one

41

1    other hand raised.  Yes, ma'am, in the back.

2              PROSPECTIVE JUROR 132:  132.  I have an aunt who's a

3    judge in Simpson County.

4              THE COURT:  All right.  Let me ask if any jurors have

5    ever worked in an election at a precinct as a precinct

6    official in any capacity.

7                             (No verbal response.)

8              THE COURT:  That could include as the precinct

9    chairman or vice chairman or secretary or an election officer.

10   Anyone worked in an election in any of those capacities?  I

11   see one hand in the back.  Yes, ma'am?

12             PROSPECTIVE JUROR 37:  Juror Number 37.  I was

13   assigned to a precinct as an election observer twice in the

14   early 1990s.

15             THE COURT:  Do you remember the county where you were

16   observing?

17             PROSPECTIVE JUROR 37:  I served twice.  The first

18   time was Clay County.  The second time was Leslie County.

19             THE COURT:  Do you know if any of the parties that

20   have been identified to this point in this case were running

21   for any offices in any of those elections?

22             PROSPECTIVE JUROR 37:  I can't remember.

23             THE COURT:  Can you describe generally what you did?

24   I know you said that you observed elections.  What was your

25   role there?

42

1          PROSPECTIVE JUROR 37:  Secretary of State's office

2    teamed with the office of the attorney general to visit

3    selected areas of Kentucky.  We were assigned to precincts

4    with training, and we were to look for evidence of vote buying

5    or other election irregularities.

6          THE COURT:  So you've had some training about

7    observing or attempting to detect vote buying or illegal

8    activities?

9          PROSPECTIVE JUROR 37:  Yes, Your Honor.

10          THE COURT:  You said that you were at polls in Clay

11   County and also in Leslie County?

12          PROSPECTIVE JUROR 37:  Yes, Your Honor.

13          THE COURT:  Do you remember the specific years that

14   you were in those counties?

15          PROSPECTIVE JUROR 37:  It would have been during the

16   Secretary of State Babbage administration.  It would have been

17   in the early 1990s.

18          THE COURT:  In the early 1990s.  Do you remember the

19   names of the precincts where you were located?

20          PROSPECTIVE JUROR 37:  Precinct in Leslie County was

21   Red Bush.  The precinct in Clay County was something with a

22   Brush, but I don't remember.

23          THE COURT:  I'm sorry, it was what?

24          PROSPECTIVE JUROR 37:  I don't remember the full

25   name.  It was something Brush, if I remember.  It's been a

1    while.

2         THE COURT:  And did you report any irregularities to

3    anyone in connection with your observations?

4         PROSPECTIVE JUROR 37:  No, sir, I didn't.

5         THE COURT:  All right.  I may have some further

6    follow-up questions for you later, ma'am.

7         Anyone else?

8                        (No verbal response.)

9         THE COURT:  Let me ask if any jurors or members of

10   your family or your close friends have lived in either the

11   City of Manchester or in Clay County.  A couple of folks.

12   What I want to ask you is who it was that lived in the area

13   and when the person lived there, whether you had any trips to

14   visit those individuals.  Ma'am, I'll start with you in the

15   jury box.

16        PROSPECTIVE JUROR 127:  127.  I have a girlfriend who

17   is from Clay County.  She lives in Woodford County.  Her

18   mother lives there, and I've gone with her to pick up her

19   mother for doctors' appointments and different things.

20        THE COURT:  All right.  Now, based upon your

21   relationship with your friend, do you believe that would in

22   any way affect your ability, if you were seated as a juror, to

23   be fair and impartial in this case?

24        PROSPECTIVE JUROR 127:  She jokes about Clay County

25   and tells me some, you know, things about home.  I would try

44

1    to look at things, the evidence.  But, you know, I have heard

2    stories.  That's why I took the newspaper article out and gave

3    it to her to read, because she doesn't take the newspaper that

4    I do.

5            THE COURT:  Now, from time to time, we all joke with

6    our friends about where we were raised, activities growing up

7    as a child.  But if you're seated as a juror, of course, your

8    duty is quite different.  Your duty is to listen to the

9    evidence in the case and reach a fair and an impartial verdict

10   based on what you hear and what you see in the courtroom.  Do

11   you believe that based on any of those conversations that you

12   might have had with your friend that you would be inhibited in

13   any way from acting as a juror in a proper way?

14           PROSPECTIVE JUROR 127:  No.

15           THE COURT:  You feel that you could be fair and

16   impartial?

17           PROSPECTIVE JUROR 127:  (Nodding affirmatively).

18           THE COURT:  And can you set aside that banter that

19   you have with your friend and base your decision only on what

20   you hear in the courtroom?

21           PROSPECTIVE JUROR 127:  Um-hmm, I think so.

22           THE COURT:  All right.  Thank you.  Anyone else in

23   the jury box?  Couple of other hands in the courtroom.  Sir,

24   in the back row in the blue shirt again.

25           PROSPECTIVE JUROR 57:  Number 57.

45

1           THE COURT:  Yes, sir.

2           PROSPECTIVE JUROR 57:  I have a brother-in-law that

3    lives in Manchester.

4           THE COURT:  Have you ever spoken with your

5    brother-in-law about any of the allegations that are made in

6    this case?

7           PROSPECTIVE JUROR 57:  No, I have not.

8           THE COURT:  Based on the fact that you do have a

9    family member that lives in the area that you'll be hearing

10   about in the course of this trial, would that in any way

11   prevent you from being fair and impartial if you were seated

12   in the case?

13          PROSPECTIVE JUROR 57:  No, it would not.

14          THE COURT:  Can you avoid discussing this case with a

15   friend or family member during the course of the trial if

16   you're selected?

17          PROSPECTIVE JUROR 57:  Yes, sir.

18          THE COURT:  All right.  Thank you, sir.  Yes, sir, in

19   the very back in the middle.

20          PROSPECTIVE JUROR 281:  281.  I served as a minister

21   in Laurel County for three years, and I had several members of

22   our congregation from Clay County.

23          THE COURT:  What part of Laurel County?

24          PROSPECTIVE JUROR 281:  London.

25          THE COURT:  London.  South London proper?

46

1          PROSPECTIVE JUROR 281:  Yes.

2          THE COURT:  Of course, Laurel County is adjacent to

3    Clay County.  You would have had members of your congregation

4    that were from Clay County?

5          PROSPECTIVE JUROR 281:  Correct.

6          THE COURT:  Did you ever discuss any of the

7    allegations that you've heard me describe to you --

8          PROSPECTIVE JUROR 281:  No, sir.

9          THE COURT:  -- with any of those individuals?

10         PROSPECTIVE JUROR 281:  No, sir.

11         THE COURT:  Do you still talk with those people from

12   time to time, those folks?

13         PROSPECTIVE JUROR 281:  Yes.

14         THE COURT:  If you were selected as a juror in this

15   case, do you believe that would present a problem for you?

16         PROSPECTIVE JUROR 281:  No, sir.

17         THE COURT:  And could you avoid any discussions about

18   the case till the case is over with any friends or family

19   members that you might have?

20         PROSPECTIVE JUROR 281:  Yes, sir.

21         THE COURT:  All right.  That's Juror Number 281.

22   Thank you.  Let me go to the left side of the courtroom.

23   Ma'am, about third row back.

24         PROSPECTIVE JUROR 56:  My mom's family is from Clay

25   County.

47

1           THE COURT:  What's your number again?

2           PROSPECTIVE JUROR 56:  56.  I currently have four

3    aunts and one uncle living in Manchester proper.

4           THE COURT:  Do you talk with those folks upon what I

5    would consider a frequent basis?

6           PROSPECTIVE JUROR 56:  Yes.

7           THE COURT:  You do.  And how often would you speak

8    with family members from the area?

9           PROSPECTIVE JUROR 56:  Three to four times a week.

10           THE COURT:  Do you ever talk about any of the

11    allegations that you've heard any describe involved in this

12    case?

13           PROSPECTIVE JUROR 56:  They have been discussed at

14    family events.

15           THE COURT:  I'm sorry?

16           PROSPECTIVE JUROR 56:  Yes, they have been discussed.

17           THE COURT:  Have you formed any opinions based on

18    what you've spoken with your family about?

19           PROSPECTIVE JUROR 56:  Possibly, yes.

20           THE COURT:  You may have formed opinions in the case.

21    I may call you back up to ask you further questions about that

22    at the conclusion of jury selection, but let me ask this

23    question for you.  Based on the conversations that you had in

24    the case, if you are selected as a juror, and you're told that

25    you are required to set aside anything that you may have seen

48

1    or heard outside the courtroom, and base a decision only on

2    what you hear in this proceeding, do you feel that you could

3    follow that instruction?

4              PROSPECTIVE JUROR 56:  Yes.

5              THE COURT:  All right.  So you can set all that

6    aside.  Whatever you've talked about, you could set it aside

7    and you could be fair and impartial if you're selected in this

8    case?

9              PROSPECTIVE JUROR 56:  I believe so.

10             THE COURT:  Another thing I mentioned earlier that

11   you would be required to do is not have any conversations

12   during the course of the trial.  You told me that you

13   sometimes speak with friends and family members several times

14   a week, and you may not be able to do that if you're selected

15   as a juror.  Will you be able to follow that instruction?

16             PROSPECTIVE JUROR 56:  Two of my family members are

17   quite ill so that may not be a possibility.

18             THE COURT:  May not be a possibility.  Do you

19   understand if you are selected, you could not talk about this

20   case in any way?

21             PROSPECTIVE JUROR 56:  Yes.

22             THE COURT:  That would be a friend, a family member,

23   anyone else you might run into?

24             PROSPECTIVE JUROR 56:  Yes.

25             THE COURT:  All right.  Thank you, ma'am.  That's

49

1    Juror Number 56.  Yes, in the middle?

2            PROSPECTIVE JUROR 8:  Juror Number 8.

3            THE COURT:  Yes, ma'am?

4            PROSPECTIVE JUROR 8:  A good friend of mine lives in

5    Clay County, grew up in Clay County and personally knew Mr.

6    Maricle.

7            THE COURT:  I couldn't hear the last part.

8            PROSPECTIVE JUROR 8:  She personally knows Mr.

9    Maricle.

10           THE COURT:  So you have a good friend that grew up in

11   Clay County and that knows one of the defendants in the case;

12   is that correct?

13           PROSPECTIVE JUROR 8:  Yes.

14           THE COURT:  Have you had any conversations with your

15   friend about Mr. Maricle?

16           PROSPECTIVE JUROR 8:  Yes.

17           THE COURT:  And have you formed any opinions about

18   him?  I don't want you to tell me what they are, but have you

19   formed any opinions based on your conversations with your

20   friend?

21           PROSPECTIVE JUROR 8:  Well, between our office's

22   involvement and her living there and our conversations, I

23   would have to say yes, I probably have.

24           THE COURT:  All right.  So you've formed opinions.

25   Now, I've already mentioned this to several jurors, but let me

1    ask you the same question.  We all have opinions as we come

2    into proceedings.  It's human nature that we form opinions,

3    and sometimes we've heard things about cases.  But a juror's

4    job is to set aside any information that you might have seen,

5    heard, read about, and base a decision only on what you hear

6    in the course of the case itself, the trial itself.  And that

7    comes in the form of exhibits that are introduced that are

8    admitted by the Court and testimony that's accepted by the

9    Court.

10          If you are selected as a juror, can you set aside

11    whatever personal opinions you may have formed and base your

12    decision only on the evidence that's presented in the

13    courtroom?

14          PROSPECTIVE JUROR 8:  It would be very difficult.

15          THE COURT:  All right.  Well, again, I do need

16    honest, candid answers from you, and you think it would be

17    very difficult to do that.  All right.  Thank you, ma'am.

18    There's one other hand raised close to -- yes, ma'am.

19          PROSPECTIVE JUROR 71:  71.  I just have a friend

20    that's from Clay County.

21          THE COURT:  All right.  You have some friends from

22    Clay County?

23          PROSPECTIVE JUROR 71:  Just one.

24          THE COURT:  Just one.  Have you talked about any of

25    the allegations that you've heard me describe with your

51

1    friend?

2            PROSPECTIVE JUROR 71:  No.

3            THE COURT:  How old is your friend, generally?

4            PROSPECTIVE JUROR 71:  She's 22.

5            THE COURT:  22?

6            PROSPECTIVE JUROR 71:  She's about 22, 21.

7            THE COURT:  Okay.  During the course of this

8    proceeding, of course, all jurors will be required to not have

9    any conversations about the case.  If you're selected as a

10   juror, can you follow that instruction?

11           PROSPECTIVE JUROR 71:  Um-hmm.

12           THE COURT:  All right.  Thank you.  That's Juror

13   Number 71.  Anyone else?  Yes, sir, in the back.

14           PROSPECTIVE JUROR 113:  113.

15           THE COURT:  Yes, sir?

16           PROSPECTIVE JUROR 113:  My ex-wife's aunt and uncle

17   from Manchester.

18           THE COURT:  I'm having a hard time hearing.

19           PROSPECTIVE JUROR 113:  My ex-wife's aunt and uncle

20   were from Manchester.  He was a judge and postmaster.

21           THE COURT:  All right.  Have you, at any point,

22   talked with either of those folks about any of the allegations

23   that I've described to you?

24           PROSPECTIVE JUROR 113:  They passed away in the early

25   '90s.

52

1          THE COURT:  Oh, I see, all right.  Is there anything

2     about your relationship, your relatives, that would prevent

3     you from being fair and impartial if you're selected?

4          PROSPECTIVE JUROR 113:  I don't think so, no.

5          THE COURT:  All right.  Thank you, sir.  Anyone else

6     that I missed?

7          Ladies and gentlemen, let me ask if any juror has an

8     opinion about public officials.  And this could be a positive

9     opinion or a negative opinion, such that you could not listen

10    to the testimony and consider the evidence that will be

11    presented by the parties and be fair and impartial if you are

12    selected.  Is there anyone that has any, either a positive or

13    a negative opinion such that you could not be fair and

14    impartial?  Yes, sir.

15         PROSPECTIVE JUROR 103:  I don't guess it would really

16    be my opinion.

17         THE COURT:  What's your number?

18         PROSPECTIVE JUROR 103:  103.  Sorry.  Family pretty

19    much, they just drive politicians into the ground.  They're

20    all crooks.

21         THE COURT:  So family members from time to time --

22         PROSPECTIVE JUROR 103:  That's just what I've heard

23    throughout my life.

24         THE COURT:  Make negative comments about officials?

25         PROSPECTIVE JUROR 103:  I don't know if it makes any

53

1    difference, but my mother's side of the family is from -- the

2    whole family is from Laurel, Clay County.  But, I mean, we

3    only go down there a couple times a year.  Very vague facts of

4    this case.

5         THE COURT:  Well, you know, from time to time, we all

6    hear comments that are made about public officials.  Seems

7    like everybody has an opinion.  But, of course, your job as a

8    juror would be to set aside all the clutter that you hear,

9    positive and negative, and base a decision only on the

10   evidence that's presented in the case.  Do you feel like you

11   could do that if you're selected?

12        PROSPECTIVE JUROR 103:  Yeah.

13        THE COURT:  Can you set aside those opinions of

14   family members that may be negative about officials in general

15   and base a decision -- base a decision only on what you hear

16   in this courtroom?

17        PROSPECTIVE JUROR 103:  The only thing that might

18   have anything to do with is my grandpa, we play cards and they

19   sit and they'll talk about, like, how crooked Laurel County is

20   and that conversation comes up.  But I don't know if that

21   would judge my opinion one way or the another.

22        THE COURT:  All right.  Well, this is an answer that

23   only the juror can give, and it comes down to this.  We have

24   to have fair and impartial jurors in the case for both sides

25   of the case.  Both the government and for the defendants.  And

1    those parties are entitled to have jurors that have not formed

2    opinions.  And so the question becomes whether you feel like,

3    in good conscience, you can set aside anything that you've

4    seen and heard from anybody about public officials or whatever

5    it might be and base your decision only on the evidence in the

6    case.  Do you feel like you can do that?

7              PROSPECTIVE JUROR 103:  Yeah.

8              THE COURT:  All right.  Now, you know, of course,

9    once you're sworn as a juror, you'll be obliged to do that, to

10   follow that instruction, and you'll follow that instruction if

11   given?

12             PROSPECTIVE JUROR 103:  Yes, sir.

13             THE COURT:  Anyone else?

14                        (No verbal response.)

15             THE COURT:  Ladies and gentlemen, I'm now going to

16   turn back to the attorneys that will be presenting this case

17   to you, and I want to introduce them again.  And after I've

18   gone through the introductions, I'm going to be asking if any

19   of you know the attorneys or you ever had any litigation

20   matters either with or against the attorneys.  So let me

21   start, first, with the United States.  Mr. Smith and Mr.

22   Parman.  Stephen Smith and Jason Parman will be presenting

23   this case on behalf of the United States.

24             And let's see.  I believe the case agents are here as

25   well.  Mr. Briggs, Special Agent Briggs, and Mr. Blair, Buddy

55

1    Blair and Mr. Sagrecy.  Thank you.  And Miss Poynter, I
2    believe, you'll be assisting counsel as well.  Thank you.
3          On behalf of the defendants -- and these attorneys
4    previously stated their appearances, but let me ask them to
5    again stand, the attorneys that represent Mr. Maricle.  That
6    would be Mr. Hoskins, Mr. Pinales and Miss Crouse.  David
7    Hoskins, Mr. Hoskins is from Corbin, and Mr. Pinales and Miss
8    Crouse are from Cincinnati.  Thank you.
9          On behalf of Mr. Adams, three attorneys, Mr. Bennett
10   Bayer, who is from Lexington, Kentucky.  Mr. Kent Westberry,
11   who is from Louisville, Kentucky, and Miss Kristin Logan, who
12   is also from Louisville.  Thank you.
13         And on behalf of Mr. Jones, Mr. Scott White.  Thank
14   you.
15         Mr. Stivers is represented in this case by Mr. Robert
16   Abell from Lexington.  Mr. White is also from Lexington.
17   Thank you.
18         We have Mr. Russ Baldani and Tucker Richardson, who
19   represent Mr. Thompson, and they're both from Lexington, I
20   believe.
21         MR. BALDANI:  That's right, Judge.
22         THE COURT:  Mr. Jerry Gilbert, who is from Richmond,
23   Kentucky, and he represents Mr. Morris.
24         Miss Elizabeth Hughes, who is from Lexington,
25   Kentucky, and she represents Mrs. Morris.

56

1          And Mr. Daniel Simons, who is from Richmond, and he

2     represents Mr. Stanley Bowling.

3          Let me ask, first, if any potential juror knows any

4     of the attorneys that I've identified?  We have a couple of

5     hands.  All right.  Ma'am, on my right, which would be your

6     left.

7          PROSPECTIVE JUROR 135:  135.

8          THE COURT:  135.  If you could tell me which attorney

9     or attorneys that you know and how you know that person?

10         PROSPECTIVE JUROR 135:  I believe Elizabeth Hughes

11    had some litigation that was against the partner that I worked

12    for.

13         THE COURT:  Were you directly involved in the

14    litigation yourself?

15         PROSPECTIVE JUROR 135:  I was at one time, but I was

16    the appointing authority designee for my division and then

17    went back to my old job and was no longer part of it.

18         THE COURT:  Oh, I see.  Now, this was not litigation

19    that you were directly -- you weren't named as a party in the

20    case?

21         PROSPECTIVE JUROR 135:  I don't recall if I was.  I

22    don't think I was.

23         THE COURT:  All right.

24         PROSPECTIVE JUROR 135:  I just was handling it

25    because of my duties in my position.

57

1            THE COURT:  That was a civil case?

2            PROSPECTIVE JUROR 135:  Yes.

3            THE COURT:  Is there anything about that case or the

4    way the case was handled that would prevent you from being

5    fair and impartial if you were selected as a juror in the

6    case?

7            PROSPECTIVE JUROR 135:  Absolutely not.

8            THE COURT:  Would you have any hard feelings toward

9    Miss Hughes or her client based upon that prior litigation?

10           PROSPECTIVE JUROR 135:  No, sir.

11           THE COURT:  All right.  Thank you.  Let's see.  There

12   was one other hand?  Yes, ma'am.

13           PROSPECTIVE JUROR 8:  Number 8.  If I'm not mistaken,

14   I believe Mr. White used to work for the attorney general's

15   office.

16           THE COURT:  All right.  Did you have direct

17   involvement with Mr. White?

18           PROSPECTIVE JUROR 8:  We may have been in a few joint

19   meetings together.

20           THE COURT:  All right.  Is there anything about that

21   relationship, that business relationship that would prevent

22   you from being fair and impartial if you were selected as a

23   juror?

24           PROSPECTIVE JUROR 8:  (Nodding negatively).

25           THE COURT:  Is there anything that happened during

58

1    the course of that employment that you would hold against Mr.

2    White?

3              PROSPECTIVE JUROR 8:  No.

4              THE COURT:  All right.  Would you overly favor his

5    side of the case based on the fact that you know him?

6              PROSPECTIVE JUROR 8:  No.

7              THE COURT:  And could you be fair and impartial to

8    both sides of the case if you were selected?

9              PROSPECTIVE JUROR 8:  Based upon -- yes.

10             THE COURT:  You've given me several answers.

11             PROSPECTIVE JUROR 8:  Based upon my knowing him, yes.

12             THE COURT:  I'm sorry?

13             PROSPECTIVE JUROR 8:  Based upon my knowing Mr.

14   White, yes.

15             THE COURT:  All right.  You could be fair and

16   impartial?

17             PROSPECTIVE JUROR 8:  (Nodding affirmatively).

18             THE COURT:  All right.  Thank you, ma'am.  Anyone

19   else that I've missed?

20                               (No verbal response.)

21             THE COURT:  Let me go back.  I want to identify the

22   law firms.  I identified the attorneys, and sometimes I forget

23   to identify the law firms.  And you may have been involved in

24   matters with some of these firms as well.  Mr. Hoskins

25   practices in Corbin, Kentucky.

1          Mr. Pinales and Miss Crouse, as I said, are in

2     Cincinnati at Strauss & Troy, I believe.

3          Mr. Bayer and Mr. Westberry are with the firm of

4     Landrum & Shouse.  Mr. Bayer is in the Lexington office and

5     Mr. Westberry is in the Louisville office, as is Miss Logan.

6          Mr. White is with Morgan & Pottinger in the Lexington

7     office.

8          Mr. Abell, as I indicated, practices in Lexington.

9          Mr. Baldani and Mr. Richardson are with the firm of

10    Baldani, Roland & Richardson, both in Lexington, Kentucky.

11         Mr. Gilbert, as I mentioned, is in Richmond,

12    Kentucky.  And he's with the firm of Coy, Gilbert & Gilbert.

13         Miss Hughes is also in Lexington, Kentucky and she's

14    with the firm of Gess, Mattingly & Atchison.

15         And finally, Mr. Simons is in Richmond, as I

16    indicated, with the firm of Thompson, Simons, Dunlop & Fore.

17    Is there anyone who's had litigation or other matters

18    involving any of the law firms that I've just mentioned?  Yes,

19    ma'am?  In the first row.

20         PROSPECTIVE JUROR 127:  127.  What did you say about

21    Gilbert and Gilbert?  What was the firm?

22         MR. GILBERT:  Coy.

23         PROSPECTIVE JUROR 127:  Is that Jim Gilbert?

24         MR. GILBERT:  Yes, ma'am, that's my brother.

25         PROSPECTIVE JUROR 127:  He did something for me years

1    back.  I had a business in Richmond.  He did some paperwork

2    for me.  It wasn't litigation or anything.  It was just the

3    contract or something if I remember.

4              THE COURT:  All right.

5              PROSPECTIVE JUROR 127:  But that's probably been back

6    in the '80s.

7              THE COURT:  Would you have any feeling of favoritism

8    toward his firm based upon that prior representation?

9              PROSPECTIVE JUROR 127:  No.  I mean, he handled -- I

10   mean, took care of what I needed him to take care of.  It

11   wasn't -- I think it was just a contract.

12             THE COURT:  All right.  Well, of course, all my

13   questions are generally two parts.  The first part is would

14   you be unduly favorable to one side or would you be unduly

15   negative toward one side.  Is there anything at all about that

16   relationship that you would hold against counsel in this case?

17             PROSPECTIVE JUROR 127:  No.  I haven't seen him in

18   years.  You know, it was a long time ago.

19             THE COURT:  All right.  Thank you.  Now, I've

20   previously identified the attorneys for you.  The defendants

21   have also been identified earlier.  Let me ask if anyone other

22   than those that have already responded, if anyone knows any of

23   the defendants in the case.

24                            (No verbal response.)

25             THE COURT:  Has any juror participated in a trial in

1    which any of the attorneys have been involved?

2                        (No verbal response.)

3         THE COURT:  Now, one of the defendants, by profession

4    and training, Mr. Maricle, is an attorney.  And let me ask if

5    anyone has any feelings or opinions, either positive or

6    negative, such that you could not be fair and impartial based

7    on the fact that an attorney is involved in the case.

8                        (No verbal response.)

9         THE COURT:  Ladies and gentlemen, I do expect this

10   case will take several weeks to complete, and we will have a

11   number of witnesses.  What I'd like to do at this time is I

12   would like to review some of the witnesses that may be called

13   in the case, and this is a lengthy list.  So what I'll do, I'm

14   going to go through eight to ten witnesses, and then I'll find

15   out and ask if anyone knows any of these witnesses.  If you

16   do, I'll need to find out how you know the person, what your

17   relationship might be.  Most of these witnesses are from the

18   Clay County area.  If they're not, then I'll try to indicate

19   that to you as well.

20        Again, listen closely, and I will go through a number

21   of names and ask if you know any of these potential witnesses.

22   Kenneth Day, Eugene Lewis, J.C. Lawson, Todd Roberts, Vernon

23   Hacker, Glenn Rowland, Kennon White, Wanda White, Charles

24   Weaver, and Bobby "Red" Sams.  That would be the first ten.

25   Let me stop there and see if anyone knows any of these

62

1       potential witnesses in the case.

2                                    (No verbal response.)

3            THE COURT:  All right.  Let me go through the next

4       ten.  James Craft, Randy Craft, Carmen Webb Lewis, Jennings

5       White, Barbara Colter, Evelyn Dezarn, Gary Greenhalgh.  Mr.

6       Greenhalgh is apparently a consultant with ES&S Services, and

7       I don't think he lives in the Clay County area.  Anyone know

8       any of those witnesses so far?

9                                    (No verbal response.)

10           THE COURT:  Jeff Culver, William Goins, Jeffrey

11      Deaton, Michael Bishop, Paul Bishop, Jeffrey Farmer.

12                                   (No verbal response.)

13           THE COURT:  Next, Gary -- I think his nickname is

14      Ouchie.  Gary Ouchie Jackson, Terry Baker, Frank Roberts,

15      Mansell Baker, Deshae Henson, Billy Ray Sester.

16                                   (No verbal response.)

17           THE COURT:  Carl Curry, Tanya Davidson, Billie Jean

18      Berry, that's B-e-r-r-y.  Stacey Perkins, Mary Gail Roberts,

19      Woodrow "Dick" Woods, Darren Smith, or Amanda Smith.

20                                   (No verbal response.)

21           THE COURT:  None so far.  Lisa Buttrey, Ted Jones,

22      James Douglas Coleman, Ella Wagner -- I'm sorry, Ella Wagers,

23      Robyn Renee Combs-Pennington, Timothy Pennington, Billy Melton

24      Dobbs.  That's D-o-b-b-s, Dobbs.

25                                   (No verbal response.)

63

1           THE COURT:  Ray Chipman Adams, Terry Wayne Smith,

2      Richard Brian Hubbard, Richard Reedie Hubbard, or Brian Lewis.

3                          (No verbal response.)

4           THE COURT:  Angela Renee Lewis, Raleigh Downing --

5      I'm sorry, Raleigh Downey, D-o-w-n-e-y.  Robin Lynn Maricle,

6      Tommy Slone, Eugene Corky Price.

7                          (No verbal response.)

8           THE COURT:  Sarah Gregory, Mike White, Diana Reid,

9      Pamela Mathis.

10                         (No verbal response.)

11          THE COURT:  Robin Winkfield, who I believe is with

12     the Administrative Office of the Courts.  Beverly Gray.  I

13     introduced Special Agent Briggs and Task Force Officer Buddy

14     Blair.  Dana Crisman, who is also an FBI special agent,

15     Clarence Randall Jackson, Debra Parks, and then the final

16     four -- let's see if we have anyone here.  The final four that

17     may be called -- there may be more, but based on the

18     information I've been provided, Scott Rapoport, who is not

19     from -- yes, sir, in the back.  281?

20          PROSPECTIVE JUROR 281:  281.

21          THE COURT:  Yes, sir?

22          PROSPECTIVE JUROR 281:  Childhood friend of Dana

23     Crisman.

24          THE COURT:  Of Dana Crisman?

25          PROSPECTIVE JUROR 281:  Yes, sir.

1          THE COURT:  She's a special agent with the Federal

2    Bureau of Investigation.  When is the last time you would have

3    spoken with Miss Crisman?

4          PROSPECTIVE JUROR 281:  Approximately about three

5    years.

6          THE COURT:  Three years ago.  You say you were

7    childhood friends?

8          PROSPECTIVE JUROR 281:  Yes, sir.

9          THE COURT:  Do you still consider yourself to be a

10   friend?

11         PROSPECTIVE JUROR 281:  Yes, sir.

12         THE COURT:  If Miss Crisman is called as a witness,

13   would you be able to set aside any friendship that you might

14   have and be fair and impartial, listen to her testimony and be

15   fair and impartial?

16         PROSPECTIVE JUROR 281:  Yes, sir.

17         THE COURT:  Would you feel any sense of favoritism to

18   Miss Crisman because you do know her?

19         PROSPECTIVE JUROR 281:  No, sir.

20         THE COURT:  Could you also judge her credibility the

21   same as you would any other witness in the case?

22         PROSPECTIVE JUROR 281:  Yes, sir.

23         THE COURT:  All right.  That's Juror Number 281.

24   Let's see.  The last four I want to ask you about, Scott

25   Rapoport, who is not from the area, I believe he's a reporter,

65

1    but he's not from this area.  Deshana Rogers, who is also an

2    FBI special agent.  I've identified IRS special agent Jeff

3    Sagrecy, who is seated over to my right by the jury box, and

4    finally, Denver Sizemore, who is from the Clay County area.

5           Other than Juror Number 281, does any other potential

6    juror know any of the witnesses I've identified or potential

7    witnesses that I've identified?

8                          (No verbal response.)

9           THE COURT:  Now, ladies and gentlemen, this case was

10   investigated by the Federal Bureau of Investigation, the

11   Kentucky State Police, the Internal Revenue Service, and I

12   believe the London Police Department.  Let me ask if any

13   potential jurors have had any contact with any of these

14   agencies and their employees, other than what you've

15   identified previously.  Yes, ma'am, in the jury box?

16          PROSPECTIVE JUROR 79:  Number 79.  I was employed

17   with Kentucky State Police for 16 years.

18          THE COURT:  All right.  Were you in the Frankfort

19   office?

20          PROSPECTIVE JUROR 79:  Post 12.

21          THE COURT:  All right.  When did you cease your

22   employment with the KSP?

23          PROSPECTIVE JUROR 79:  I left there in 1995.

24          THE COURT:  1995.  During the course of your

25   employment with the Kentucky State Police, did you have any

66

1  activities that involved either Manchester or the Clay County

2  area?

3          PROSPECTIVE JUROR 79:  No, sir.

4          THE COURT:  Did you have interaction with any

5  troopers that were assigned to the post in that area?

6          PROSPECTIVE JUROR 79:  No, sir.

7          THE COURT:  That would be the London post, I believe.

8          MR. SMITH:  I do want to make the Court aware,

9  Gilbert Acciardo may be a witness.

10          THE COURT:  What was the name again?

11          MR. SMITH:  Gilbert Acciardo.

12          THE COURT:  C-h-a-r-d-o?

13          MR. SMITH:  I'm going to have to guess at the

14  spelling.  It's an A, A-c-c-h-i-a-r-d-o.  I'm going to say

15  that's wrong, but --

16          THE COURT:  All right.  I'll get back to you here in

17  a second.  Let me see if anyone knows the additional witness

18  that Mr. Smith has identified.  Yes, ma'am, in the front row.

19          PROSPECTIVE JUROR 88:  88.  I'm a former employee of

20  Kentucky State Police, and I've worked with him.

21          THE COURT:  You have worked with that individual?

22          PROSPECTIVE JUROR 88:  Yes.

23          THE COURT:  You no longer work with him?

24          PROSPECTIVE JUROR 88:  No.  I'm retired.

25          THE COURT:  When was the last time you would have had

67

1      any involvement or activity with --

2              PROSPECTIVE JUROR 88:  Over ten years ago.

3              MR. RICHARDSON:  Your Honor, I couldn't hear any of

4      that.  I'm sorry.

5              THE COURT:  I'm trying to repeat it here.  You would

6      have worked with Mr. Acciardo, but it would have been more

7      than ten years ago, and that was at the KSP post here in

8      Frankfort.

9              PROSPECTIVE JUROR 88:  I worked in the intelligence

10     office.

11             THE COURT:  Where is that located?

12             PROSPECTIVE JUROR 88:  It's downtown here now.  It

13     was behind Post 12 when I worked there.

14             THE COURT:  It was at Post 12, and they've moved it

15     to the downtown area recently?

16             PROSPECTIVE JUROR 12:  Uh-huh.

17             THE COURT:  If you could stand up.

18             PROSPECTIVE JUROR:  The office used to be behind

19     Post 12, and they have moved it to -- in the basement office

20     of the transportation building.

21             THE COURT:  All right.  Now, is there anything about

22     your work with Mr. Acciardo that involved any of the

23     allegations that you've heard about here so far?

24             PROSPECTIVE JUROR 88:  No.

25             THE COURT:  If he is called as a witness in the case

68

1    and if you're selected as a juror, would you be able to be

2    fair and impartial to everyone in the case?

3             PROSPECTIVE JUROR 88:  Yes.

4             THE COURT:  Could you listen to the testimony

5    presented by someone that you know and judge it by the same

6    standards as you would with any other witness?

7             PROSPECTIVE JUROR 88:  Yes.

8             THE COURT:  Would you tend to be either more

9    favorable or less favorable to a witness that you know?

10            PROSPECTIVE JUROR 88:  No.

11            THE COURT:  Neither?

12            PROSPECTIVE JUROR 88:  (Nodding negatively).

13            THE COURT:  You could fairly and impartially consider

14   the case?

15            PROSPECTIVE JUROR 88:  Yes.

16            THE COURT:  All right.  Thank you.  Juror Number 281

17   indicated that you knew Mr. Acciardo?

18            PROSPECTIVE JUROR 281:  No, not Mr. Acciardo, no,

19   sir.

20            THE COURT:  Anyone else who knows him?  Let me go

21   back to Juror Number 79.  You were an employee of the KSP for

22   approximately 16 years.  You're now retired.

23            PROSPECTIVE JUROR 79:  Yes, sir.

24            THE COURT:  But, of course, you did work with that

25   agency for a number of years.

69

1          PROSPECTIVE JUROR 79:  Yes, sir.

2          THE COURT:  I would assume you would have some sense

3    of loyalty to an agency that you worked for that length of

4    time.  If you were seated as a juror in that case, you could

5    not show favoritism to any witness based upon any past

6    employment relationship.

7          PROSPECTIVE JUROR 79:  No, sir.

8          THE COURT:  You couldn't show any favoritism toward

9    any police officer that might testify in the case.

10         PROSPECTIVE JUROR 79:  No, sir.

11         THE COURT:  You understand that?

12         PROSPECTIVE JUROR 79:  Yes, sir.

13         THE COURT:  Based upon your prior employment

14   relationship do, you feel you'd have a hard time doing that,

15   following those instructions?

16         PROSPECTIVE JUROR 79:  No, sir.

17         THE COURT:  Police officers, whether they be FBI or

18   whoever they may be, FBI agents were to testify in the case,

19   could you listen to their testimony, give it the same

20   considerations as you would the testimony of any other witness

21   in the case?

22         PROSPECTIVE JUROR 79:  Yes, sir.

23         THE COURT:  All right.  Let's see.  Do we have any

24   other individuals?  Yes, ma'am, in the back row.

25         PROSPECTIVE JUROR 17:  Number 17.  I'm employed by

70

1    the Frankfort City Police Department currently.  I've had no

2    dealings with any of the Manchester or Clay County.

3          THE COURT:  Based upon your employment relationship,

4    do you believe that you would show any favoritism toward

5    police officers if officers are called to testify in the case?

6          PROSPECTIVE JUROR 17:  No, sir.

7          THE COURT:  Could you listen to and give the same

8    considerations to the testimony of law enforcement officers

9    that you would any other witness in the case?

10          PROSPECTIVE JUROR 17:  Yes, sir.

11          THE COURT:  Would you have any problems judging

12    credibility of law enforcement officers?

13          PROSPECTIVE JUROR 17:  None at all.

14          THE COURT:  All right.  And you understand, of

15    course, that you have to judge the credibility of every

16    witness that testifies in the case.  In other words, no one

17    gets a pass, and you've got to evaluate the testimony of every

18    witness.  You understand that?

19          PROSPECTIVE JUROR 17:  Yes.

20          THE COURT:  All right.  Let me go back to the back

21    section here.  Anyone have their hand raised?  Yes, ma'am?

22          PROSPECTIVE JUROR 135:  135.  From '94 to '96, I was

23    the purchasing officer for Kentucky State Police.

24          THE COURT:  Same questions that I asked these other

25    potential jurors.  Would you show any favoritism or any bias

1    or prejudice toward law enforcement officers if you were

2    selected as a juror?

3        PROSPECTIVE JUROR 135:  No, sir.

4        THE COURT:  Would you show bias or prejudice against

5    law enforcement officers if you're seated?

6        PROSPECTIVE JUROR 135:  No, sir.

7        THE COURT:  Can you consider the testimony of the law

8    enforcement officer the same as you would any other witness in

9    the case?

10        PROSPECTIVE JUROR 135:  Yes, sir.

11        THE COURT:  All right.  That's Juror Number 135.

12   Anyone else?

13                        (No verbal response.)

14        THE COURT:  Now, other than the jurors that have

15   already answered, let me ask how many jurors have members of

16   your family or very close friends that are employed by any law

17   enforcement agency.  Now, I'm going to ask you the same

18   questions, and these will be the questions that I'm going to

19   ask.  What is the relationship -- and I'll call on you here in

20   just a moment.  What is the relationship, would that

21   relationship in any way prevent you from being fair and

22   impartial if you're selected in the case.

23        Sir, I'll start with you.  If you give me your

24   number, please.

25        PROSPECTIVE JUROR 19:  Juror 19.

72

1           THE COURT:  Number 19.

2           PROSPECTIVE JUROR 19:  Former supervisor at my

3    employment is a Frankfort City Police Officer.

4           THE COURT:  All right.  Would that in any way affect

5    your ability to be fair and impartial?

6           PROSPECTIVE JUROR 19:  No, sir.

7           THE COURT:  All right.  Thank you.  What was your

8    number again?

9           PROSPECTIVE JUROR 19:  19.

10          THE COURT:  Ma'am?

11          PROSPECTIVE JUROR 58:  Number 58.  My husband was the

12   warden at the Kentucky State Reformatory.  He is now retired.

13          THE COURT:  The same question.  Would that in any way

14   affect your ability to be fair and impartial if you were

15   seated?

16          PROSPECTIVE JUROR 58:  No, it would not.

17          THE COURT:  Would you show any favoritism in the case

18   based upon your husband's previous employment?

19          PROSPECTIVE JUROR 58:  No.

20          THE COURT:  All right.  That's Juror 58.  Yes, sir?

21          PROSPECTIVE JUROR 64:  64.  I have a few friends that

22   are city police officers here in town.

23          THE COURT:  In Frankfort?

24          PROSPECTIVE JUROR 64:  Yes.  I believe they're in

25   Frankfort.

73

1          THE COURT:  And the same question, would it in any
2     way affect your ability to be fair and impartial if you're
3     seated?
4          PROSPECTIVE JUROR 64:  It would not.
5          THE COURT:  Let me start in the jury box, and we'll
6     work our way across.
7          PROSPECTIVE JUROR 99:  99.  I have two nephews that
8     are in law enforcement.  One's a state policeman in Henderson
9     and one is a detective here in Franklin County.
10          THE COURT:  My question is the same.  Would it in any
11     way affect your ability to be fair and impartial based upon
12     those relationships?
13          PROSPECTIVE JUROR 99:  No.
14          THE COURT:  All right.  Go back, and I'll start with
15     the first row.  We'll work our way back.  Yes, ma'am, in the
16     middle in the gray.
17          PROSPECTIVE JUROR 50:  My sister's ex-husband --
18          THE COURT:  What's your number?
19          PROSPECTIVE JUROR 50:  Number 50.
20          THE COURT:  If you could stand up, I think we'll hear
21     you better.
22          PROSPECTIVE JUROR 50:  My sister's ex-husband used to
23     be a state trooper, and now he's a federal probation officer.
24          THE COURT:  Would it affect your opinion or your
25     ability to be fair and impartial if you're selected in the

74

1    case?

2            PROSPECTIVE JUROR 50:  No.

3            THE COURT:  All right.  Thank you.  Anyone else on

4    the first row?  Yes, ma'am.

5            PROSPECTIVE JUROR 88:  88.  My nephew's a KSP

6    trooper.

7            THE COURT:  Nephew is a KSP trooper.  Where is he

8    located?

9            PROSPECTIVE JUROR 88:  Richmond.

10           THE COURT:  Richmond post.  As far as you know, he

11   hasn't had any involvement in this case?

12           PROSPECTIVE JUROR 88:  No.

13           THE COURT:  Would the fact that you have a nephew

14   employed by law enforcement affect your ability to be fair and

15   impartial if selected in the case?

16           PROSPECTIVE JUROR 88:  (Nodding negatively).

17           THE COURT:  Thank you, ma'am.  Second row, yes,

18   ma'am?

19           PROSPECTIVE JUROR 44:  Juror Number 44.  I have a

20   brother-in-law, Marion County, who is a deputy sheriff.

21           THE COURT:  What county?

22           PROSPECTIVE JUROR 44:  Marion County.

23           THE COURT:  My question is the same, would it affect

24   your ability to be fair and impartial?

25           PROSPECTIVE JUROR 44:  No.

1          THE COURT:  All right.  Thank you.  Anyone else?
2     Yes, sir, on the end.
3          PROSPECTIVE JUROR 104:  104.  I got a friend that's a
4     retired state trooper.
5          THE COURT:  Would that affect your ability to be
6     seated in the case?
7          PROSPECTIVE JUROR 104:  No.
8          THE COURT:  Or to be fair and impartial?
9          PROSPECTIVE JUROR:  (Nodding negatively).
10         THE COURT:  Thank you.  Yes, sir, in the middle?
11         PROSPECTIVE JUROR 45:  45.  My brother-in-law and
12    nephew are both retired state troopers.
13         THE COURT:  And would that in any way affect your
14    ability to be fair and impartial if seated in the case?
15         PROSPECTIVE JUROR 45:  No, sir.
16         THE COURT:  On the end, in the blue shirt?
17         PROSPECTIVE JUROR 57:  57.  Retired --
18    brother-in-law, retired state trooper.
19         THE COURT:  Would it affect your ability to be fair
20    and impartial if you were seated in the case.
21         PROSPECTIVE JUROR 57:  No.
22         THE COURT:  All right.  Yes, in the corner here?
23         PROSPECTIVE JUROR 18:  18.  Long-time friends of a
24    Frankfort police officer.  We watch his kids for him.
25         THE COURT:  I didn't hear the part before watch his

76

1    kids for him.

2            PROSPECTIVE JUROR 18:  He's a local police officer

3    here in Frankfort.

4            THE COURT:  Would the fact that you know or have

5    friendships with a police officer affect your ability to be

6    fair and impartial if you were seated?

7            PROSPECTIVE JUROR 18:  No.

8            THE COURT:  It would not, all right.  I thank you,

9    sir.  Yes, sir, 281.

10           PROSPECTIVE JUROR 281:  281.  Brother is a policeman

11   here in Frankfort, and I'm currently employed by the Franklin

12   County regional jail as a deputy jailer.

13           THE COURT:  Your brother-in-law is employed --

14           PROSPECTIVE JUROR 281:  My brother.

15           THE COURT:  Your brother is employed.  Same question

16   for you that I asked these other jurors.  Would that in any

17   way affect your ability to be fair and impartial if you're

18   selected?

19           PROSPECTIVE JUROR 281:  No.

20           THE COURT:  All right.  Thank you.  Yes, sir?

21           PROSPECTIVE JUROR 65:  Yes, sir, Your Honor.  Juror

22   Number 65.  My cousin's married to a police officer.

23           THE COURT:  My question for you is the same as for

24   the others.  Would your answer be the same?

25           PROSPECTIVE JUROR 65:  Yes.

77

1          THE COURT:  All right.  Thank you.  Turn to the left

2     side of the courtroom.  Start with the first row.  On the end,

3     ma'am?

4          PROSPECTIVE JUROR 5:  Juror Number 5.  My son-in-law

5     is Lexington-Fayette County police officer.

6          THE COURT:  Would your answers be the same as the

7     answers to the questions I've asked of these other jurors?

8          PROSPECTIVE JUROR 5:  Yes, sir.

9          THE COURT:  All right.  Second row?  Yes, sir?

10          PROSPECTIVE JUROR 96:  My wife works for Department

11     of Corrections.

12          THE COURT:  What is your number again?

13          PROSPECTIVE JUROR 96:  Oh, 96.

14          THE COURT:  96.  Wife works for the Department of

15     Corrections.

16          PROSPECTIVE JUROR 96:  Yes.

17          THE COURT:  Would your answers be the same to my

18     questions as these earlier jurors answers?

19          PROSPECTIVE JUROR 96:  Yes.

20          THE COURT:  All right.  Anyone else in the second

21     row?  Third row?  Fourth row, ma'am, in the white.

22          PROSPECTIVE JUROR 77:  Number 77.  My cousin is a

23     police officer for Lexington.

24          THE COURT:  For Lexington.  Would your answers be the

25     same as well?

78

1          PROSPECTIVE JUROR 77:  Yes, sir.

2          THE COURT:  Thank you.  And yes, ma'am, just behind

3     her.

4          PROSPECTIVE JUROR 1:  Juror Number 1.  My uncle is

5     deputy jailer for the county of Henry, and my husband was the

6     former deputy sheriff.

7          THE COURT:  Your uncle was --

8          PROSPECTIVE JUROR 1:  He is currently deputy jailer.

9          THE COURT:  In Henry County?

10         PROSPECTIVE JUROR 1:  Yes.

11         THE COURT:  Would your answers also be the same?

12         PROSPECTIVE JUROR 1:  Yes, sir.

13         THE COURT:  All right.  Thank you.  Have I called on

14    everyone in this section?

15         Now, ladies and gentlemen, let me change the topic

16    just a bit and ask if any potential juror had a conflict or a

17    problem with any law enforcement officer or agency such that

18    you would not be able to be fair and impartial if you were

19    seated in this case.

20                         (No verbal response.)

21         THE COURT:  Has any potential juror or member of your

22    family or close friend been involved in a criminal matter

23    other than a traffic matter?  Got a couple of folks.  My

24    questions for you will be who is the friend or family member,

25    and the type of charge, and do you have any hard feelings

79

1    about it.  Let me first ask your juror number.

2              PROSPECTIVE JUROR 19:  Number 19.

3              THE COURT:  Who was the person?

4              PROSPECTIVE JUROR 19:  I have a niece who is

5    currently serving time in the Franklin County Jail for, like,

6    her third DUI offense.

7              THE COURT:  All right.

8              PROSPECTIVE JUROR 19:  And also my daughter has had a

9    couple of trips to court for drug charges.  She's not serving

10   time, but that's just been by the skin of her teeth.

11             THE COURT:  Those have been state court proceedings;

12   is that correct?

13             PROSPECTIVE JUROR 19:  Yes.

14             THE COURT:  Do you have any hard feelings about the

15   way any of those matters were handled?

16             PROSPECTIVE JUROR 19:  No, sir.

17             THE COURT:  Would you in any way have any bias or

18   prejudice toward any party in this case based upon these other

19   unrelated matters?

20             PROSPECTIVE JUROR 19:  No, sir.

21             THE COURT:  Do you understand that if you're seated

22   as a juror in this case, that you have to set aside any other

23   criminal matters involving friends or family members and

24   decide the case only on the evidence that you hear in the

25   courtroom?

80

1          PROSPECTIVE JUROR 19:  Yes, sir.

2          THE COURT:  And you're able to do that?

3          PROSPECTIVE JUROR 19:  Absolutely.

4          THE COURT:  Let me go to the back row.  Yes, sir?

5          PROSPECTIVE JUROR 95:  Juror Number 95.  My father is

6    currently in a maximum security prison in New York.  Drug

7    charges from New York.

8          THE COURT:  All right.  Do you know if that was a

9    state or a federal conviction?

10         PROSPECTIVE JUROR 95:  It was a state conviction.

11         THE COURT:  Do you have any hard feelings about the

12   way that matter was handled?

13         PROSPECTIVE JUROR 95:  No, I don't.

14         THE COURT:  Would you bring any feelings that you

15   have about the case into this matter if you were seated as a

16   juror?

17         PROSPECTIVE JUROR 95:  No, sir.

18         THE COURT:  Can you keep those matters separate in

19   your own mind?

20         PROSPECTIVE JUROR 95:  Yes, sir.

21         THE COURT:  All right.  Anyone else in the jury box

22   that I missed?  Anyone on the right side of the courtroom?

23   Got a couple of hands.  Yes, sir, in the maroon, I guess,

24   sweater.

25         PROSPECTIVE JUROR 152:  152.  My wife was found

1    guilty of fraud against a financial institution.  It was

2    before I -- as we were getting married.  We were engaged, she

3    was charged and then she just pled guilty and paid the money

4    back.  That was in Indiana over ten years ago.

5              THE COURT:  Was that in Indiana in a state

6    proceeding?

7              PROSPECTIVE JUROR 152:  Yeah, Indiana.  Madison,

8    Indiana.

9              THE COURT:  Is there anything about that case or that

10   matter that would prevent you from being fair and impartial if

11   you were selected in this case?

12             PROSPECTIVE JUROR 152:  No.

13             THE COURT:  Do you have any hard feelings about the

14   way the case was handled?

15             PROSPECTIVE JUROR 152:  No.

16             THE COURT:  All right.  Yes, ma'am?

17             PROSPECTIVE JUROR 126:  126.  My son was involved in

18   a criminal case in 2002, Henry County, and I do have hard

19   feelings on how it was handled.

20             THE COURT:  All right.  Now, that was a state

21   proceeding in Henry County?

22             PROSPECTIVE JUROR 126:  Yes.

23             THE COURT:  Would you feel that you would bring those

24   feelings into this case, you would consider that in this case

25   if you were seated as a juror?

1        PROSPECTIVE JUROR 126:  I certainly hope I wouldn't,

2   but I have hard feelings.  The crime didn't fit -- I mean the

3   punishment didn't fit the crime.

4        THE COURT:  If I were to instruct you, if you're

5   seated as a juror and I give you the instruction that you

6   cannot consider any matters other than what you hear in this

7   courtroom, do you feel that you would be able to follow my

8   instruction?

9        PROSPECTIVE JUROR 126:  Yes, sir.

10        THE COURT:  You may be able to or you may not be able

11   to, but your duty here is to tell me what you would do.

12        PROSPECTIVE JUROR 126:  I believe I would be able to.

13        THE COURT:  You believe you would be able to.  Thank

14   you, ma'am.  Yes, sir?

15        PROSPECTIVE JUROR 45:  45.  Just my son was also

16   involved in a criminal activity in Jessamine County, and I do

17   have hard feelings about that.

18        THE COURT:  Would you bring those feelings into this

19   case when you're seated as a juror?

20        PROSPECTIVE JUROR 45:  I would hope not.  Your

21   feelings are what they are.

22        THE COURT:  Would you be able to, as you set here

23   today, you feel that you could assure me that you can be a

24   fair and impartial juror if you're selected in the case?

25        PROSPECTIVE JUROR 45:  I can't say for sure.

1        THE COURT:  You can't say that at this point?

2        PROSPECTIVE JUROR 45:  I can't say that.

3        THE COURT:  All right.  Yes, ma'am.

4        PROSPECTIVE JUROR 28:  28.

5        THE COURT:  28?

6        PROSPECTIVE JUROR 28:  Yeah.  My father-in-law served

7    about eight or ten years for -- he was convicted of

8    trafficking cocaine.  Like I'm not sure exactly when it was,

9    probably like 2000, 2001.

10        THE COURT:  Were you married at the time?

11        PROSPECTIVE JUROR 28:  No.

12        THE COURT:  So this is before you were married to his

13   son?

14        PROSPECTIVE JUROR 28:  Yeah.

15        THE COURT:  From time to time, do you talk about that

16   event at family gatherings?

17        PROSPECTIVE JUROR 28:  No.

18        THE COURT:  Is there anything about that prior

19   conviction that would prevent you from being fair and

20   impartial if you were selected in this case?

21        PROSPECTIVE JUROR 28:  No, not at all.

22        THE COURT:  Thank you.  And yes, ma'am, just behind

23   her?

24        PROSPECTIVE JUROR 101:  101.  I have a family member

25   that's presently in criminal court in Davis County.

84

1              THE COURT:  Davis County?

2              PROSPECTIVE JUROR 101:  Owensboro, Kentucky.

3              THE COURT:  Owensboro, all right.  Davies.  I'm

4     sorry.  Is it someone very close to you?

5              PROSPECTIVE JUROR 101:  It's my nephew's son.

6              THE COURT:  Is there anything about that matter that

7     would prevent you from being fair and impartial if you were

8     seated in this case?

9              PROSPECTIVE JUROR 101:  No.  I don't know anything

10    about the case.

11             THE COURT:  Don't know anything about the case, and

12    you do understand that all cases are different, that you have

13    to decide each individual case based on the facts that are

14    presented?

15             PROSPECTIVE JUROR 101:  Yes.

16             THE COURT:  Thank you, ma'am.  Yes, sir?

17             PROSPECTIVE JUROR 100:  100.  My son is still in the

18    process of settling things with the Fayette County.

19             THE COURT:  I'm sorry.  Settling things with Fayette

20    County?

21             PROSPECTIVE JUROR 100:  Yes.  He stole my

22    mother-in-law's credit card and run up $10,000 worth of credit

23    on it there.

24             THE COURT:  Is there a case that's actually filed?

25             PROSPECTIVE JUROR 100:  I think they've settled it.

1   He's out of jail now and he's agreed to pay back if he ever

2   gets a job.

3            THE COURT:  Do you have any hard feelings about how

4   the case was handled?

5            PROSPECTIVE JUROR 100:  No, I don't.  My older

6   brother was convicted four years ago in Fayette County for

7   molesting his stepchild, and I felt like he was kind of

8   tricked into that.

9            THE COURT:  Do you have any hard feelings about the

10  way the case was handled?

11           PROSPECTIVE JUROR 100:  I kind of felt like the

12  officer -- my brother is very uneducated, and I felt like he

13  kind of tricked him into saying that he did something that I

14  felt like he didn't do.

15           THE COURT:  If you were seated as a juror in this

16  case, as I've said to all these other jurors so far, and

17  you're probably tired of hearing me say it, but I'll say it

18  again.  You would have to decide the case based solely on the

19  evidence that's presented and in the context of the law that

20  I'll be giving to you.  Do you feel like that you would bring

21  some of those feelings into this case if you were seated as a

22  juror?

23           PROSPECTIVE JUROR 100:  I think I can leave my

24  feelings out of it.

25           THE COURT:  You can separate the matters?

86

1          PROSPECTIVE JUROR 100:  I think I can.

2          THE COURT:  And if the Court gives you the

3    instruction as I will that you would be required to do that,

4    you can follow that instruction; is that what you're telling

5    me?

6          PROSPECTIVE JUROR 100:  I believe so.

7          THE COURT:  All right.  I thank you.  Anyone else on

8    the right side of the courtroom?  Let's move over to the left.

9    Left side.  First row, second row?  Yes, ma'am?

10          PROSPECTIVE JUROR 123:  My father --

11          THE COURT:  What's your number?

12          PROSPECTIVE JUROR 123:  123.

13          THE COURT:  Uh-huh.

14          PROSPECTIVE JUROR 123:  And he was convicted of a

15   criminal charge, serving federal.

16          THE COURT:  Was it in the Eastern District of

17   Kentucky, if you know?

18          PROSPECTIVE JUROR 123:  It was in Manchester, I

19   think.

20          THE COURT:  Manchester, all right.  Do you know who

21   handled the case?

22          PROSPECTIVE JUROR 123:  No.

23          THE COURT:  You don't know who the prosecuting

24   attorney would have been?

25          PROSPECTIVE JUROR 123:  (Nodding negatively).

87

1              THE COURT:  Do you know who the attorney that

2    defended him would have been?

3              PROSPECTIVE JUROR 123:  No.  We were not speaking at

4    the time.

5              THE COURT:  You're speaking now, though; is that

6    correct?

7              PROSPECTIVE JUROR 123:  Yeah.

8              THE COURT:  Do you have any hard feelings about the

9    way the case was handled?

10             PROSPECTIVE JUROR 123:  No.

11             THE COURT:  And, of course, the attorneys in this

12   case may have been involved.  I don't know.  May have been

13   involved in that particular matter.  If you were to learn

14   somehow, some way, one or more of the attorneys were involved,

15   would you have hard feelings toward those attorneys?

16             PROSPECTIVE JUROR 123:  No.

17             THE COURT:  And could you set aside any feelings that

18   you have about that case, listen to the evidence in this case,

19   and be fair to all parties?

20             PROSPECTIVE JUROR 123:  Yes.

21             THE COURT:  All right.  Thank you, ma'am.  Yes, next

22   to her.

23             PROSPECTIVE JUROR 48:  48.  I wouldn't be -- I

24   wouldn't bring my family members into what is with this case.

25             THE COURT:  All right.  Can you tell me just

1  generally the nature of the proceedings?

2          PROSPECTIVE JUROR 48:  My brother, domestic violence.

3          THE COURT:  All right.

4          PROSPECTIVE JUROR 48:  And my niece's son was

5  murdered.

6          THE COURT:  But you could separate those matters and

7  be fair and impartial in this case; is that what you're

8  telling me?

9          PROSPECTIVE JUROR 48:  (Nodding affirmatively).

10          THE COURT:  All right.  Thank you.  Anyone else on

11  that row?  Yes, sir.

12          PROSPECTIVE JUROR 96:  96.  My son has an ongoing

13  case, assault four, that involves me.  Scheduled this month.

14          THE COURT:  All right.  It's scheduled to actually go

15  this month?

16          PROSPECTIVE JUROR 96:  Yes.

17          THE COURT:  And you don't know the date at this

18  point?

19          PROSPECTIVE JUROR 96:  February 11, I think.

20          THE COURT:  So you would need to be a witness in that

21  proceeding if --

22          PROSPECTIVE JUROR 96:  As far as I know.

23          THE COURT:  Where is the matter scheduled?  What

24  court is it in?

25          PROSPECTIVE JUROR 96:  Shelby County.

1          THE COURT:  Shelby County.  Assuming that we don't

2     have a conflict based on that court date, would you be able to

3     set aside that matter, whatever has happened in that case, and

4     if you're seated as a juror here, base your decision only on

5     what you hear in this proceeding?

6          PROSPECTIVE JUROR 96:  Yes.

7          THE COURT:  All right.  Yes, we'll go back.  Ma'am?

8          PROSPECTIVE JUROR 91:  Number 91.

9          THE COURT:  What's your number again?

10         PROSPECTIVE JUROR 91:  91.

11         THE COURT:  I'm sorry.

12         PROSPECTIVE JUROR 91:  My daughter was involved with

13    contraband back a couple years ago.  But they put her into a

14    drug program, and she's doing better, and she found out that

15    she has bulimia, and she's being treated for bulimia.

16         THE COURT:  She's being treated for what?

17         PROSPECTIVE JUROR 91:  Bulimia.

18         THE COURT:  Thank you, ma'am.  Next to her.

19         PROSPECTIVE JUROR 77:  I have a cousin in Owen

20    County.

21         THE COURT:  What's your number again?

22         PROSPECTIVE JUROR 77:  I'm sorry, 77.  Who was

23    accused of taking money from the company that she worked for,

24    and that was dropped to a misdemeanor charge, and she paid

25    that back.

1          THE COURT:  All right.  And can you set aside any

2     feelings that you have about that case if you're selected

3     here?

4          PROSPECTIVE JUROR 77:  Yes.

5          THE COURT:  All right.  Thank you.  Yes, ma'am?

6          PROSPECTIVE JUROR 1:  Juror Number 1.  My former

7     brother-in-law has criminal charges against him, and he was

8     convicted in state and federal court.

9          THE COURT:  How long ago about that occur?

10          PROSPECTIVE JUROR 1:  200 -- I believe it was 2001.

11          THE COURT:  You said he was convicted in both state

12     and federal court?

13          PROSPECTIVE JUROR 1:  Yes.

14          THE COURT:  Do you recall the federal court which was

15     involved?

16          PROSPECTIVE JUROR 1:  I can't.  It was district five,

17     but I cannot remember the attorneys' names, no.

18          THE COURT:  All right.  Do you have any hard feelings

19     about either of those matters?

20          PROSPECTIVE JUROR 1:  No, sir.

21          THE COURT:  Would you carry any feelings into this

22     case if you were selected?

23          PROSPECTIVE JUROR 1:  No, sir.

24          THE COURT:  All right.  Thank you, ma'am.  Anyone

25     that I missed?  Ladies and gentlemen, I see a few folks that

91

1    are squirming around a little bit so we're going to take a

2    short recess.  We'll try to keep our recess brief at this

3    time, to about 15 minutes.  But if you're not able to take an

4    appropriate break in 15 minutes, the security officer can

5    advise me if we need to take a little bit longer, we can.  But

6    when you come back in 15 minutes, we'll need to call the roll

7    again.  We'll be in recess for 15 minutes.

8                    (Recess from 10:47 a.m. until 11:11 a.m.)

9                THE COURT:  Thank you.  The record will reflect that

10   all parties are present.  Madam Clerk, I assume we didn't lose

11   any jurors when we were taking our break?

12               DEPUTY CLERK:  Only the one that was excused for

13   cause, Your Honor.

14               THE COURT:  All right.  Thank you.  We'll proceed

15   with additional questions.  And ladies and gentlemen, I do

16   appreciate your attention and the patience that you've shown

17   to me so far, and I will make every effort to complete the

18   process just as quickly as we can.

19               When we took our break, I was asking about friends or

20   family members with criminal matters, and I want to change the

21   topic now to ask if either you or a family member or a close

22   friend has been involved in a litigation matter with any

23   agency of the United States government.  Anyone been involved

24   in litigation with the federal government?  Yes, ma'am in the

25   back.

92

1          PROSPECTIVE JUROR 91:  I am going to be appearing in

2     court in Indiana on March 9.

3          THE COURT:  What's your number again?

4          PROSPECTIVE JUROR:  91.

5          THE COURT:  In Indiana?

6          PROSPECTIVE JUROR 91:  Yes, sir.  It's in court in

7     Indiana for my granddaughter.

8          THE COURT:  I'm sorry.

9          PROSPECTIVE JUROR 91:  It's regarding my

10    granddaughter, an illegal adoption by my ex-husband.

11         THE COURT:  Is that a federal matter?

12         PROSPECTIVE JUROR 91:  No, uh-uh.

13         THE COURT:  You say it's an adoption matter?

14         PROSPECTIVE JUROR 91:  Yes, where he illegally

15    adopted by granddaughter in June of last year.

16         THE COURT:  What's the date again?

17         PROSPECTIVE JUROR 91:  March the 9th at 1:30.

18         THE COURT:  All right.  Well, I may need to follow up

19    on that in just a moment when we talk about the length of the

20    trial.  But in terms of any litigation with the federal

21    government, you don't have any litigation with the federal

22    government?

23         PROSPECTIVE JUROR 91:  No, sir.  This is the state of

24    Indiana, Harrison Circuit Court.

25         THE COURT:  All right.  Thank you.  Anyone else have

93

1    their hand raised?  Yes, ma'am.

2              PROSPECTIVE JUROR 127:  127.  My father's had some

3    litigation.  It's mostly probably been with right-of-way type

4    things.

5              THE COURT:  All right.  Such as an easement?

6              PROSPECTIVE JUROR 127:  Yeah, eminent domain, taking

7    properties for highways and stuff.

8              THE COURT:  Do you have any hard feelings about any

9    of those matters at all?

10             PROSPECTIVE JUROR 127:  No.

11             THE COURT:  Thank you, ma'am.  Anyone else?

12                            (No verbal response.)

13             THE COURT:  Does any juror have any strong feelings,

14   and that would be negative or positive feelings, toward the

15   federal government, the United States attorney's office, the

16   Federal Bureau of Investigation, or the Kentucky State Police

17   or any local law enforcement agency, such as you could not be

18   fair and impartial if you were selected to participate in this

19   case?

20                            (No verbal response.)

21             THE COURT:  May I ask how many of our potential

22   jurors have previously been selected to serve as a juror in a

23   proceeding, in a state or federal proceeding?  If you could

24   just give us a show of hands as a general number.  How many

25   have never been selected as a juror in a case?  Vast majority

94

1    have not.  How many potential jurors have testified as a

2    witness in a proceeding, either a civil or criminal

3    proceeding?  Couple folks that have testified as witnesses.

4            I want to ask you some questions at this point about

5    witnesses in the case.  One or more witnesses may be called to

6    testify in this matter that will admit to engaging in illegal

7    conduct.  Is there anyone who would automatically disregard

8    the testimony of such a witness if that person is called?  And

9    if you're selected as a juror, you just couldn't listen to a

10   juror that had that type of background?

11                              (No verbal response.)

12            THE COURT:  Now, one or more witnesses in the case

13   may admit to drug use or drug addiction or even transactions

14   involving drugs, could involve buying or selling drugs.  And

15   I'm sure that most of you would find the conduct offensive,

16   but is there anyone here who could not listen to the testimony

17   of such a witness and fairly weigh the testimony according to

18   the instructions that you'll be given?  Anyone here who just

19   would completely disregard the testimony of such a witness?

20                              (No verbal response.)

21            THE COURT:  Ladies and gentlemen, one or more

22   witnesses may testify pursuant to an agreement with the

23   government in exchange for not being indicted or charged with

24   criminal conduct.  And again, I will be giving you

25   instructions as to how you should consider that testimony, as

1    I will with the testimony that I've just described.  But is

2    there anyone here who would automatically disregard the

3    testimony of such a witness?

4                            (No verbal response.)

5         THE COURT:  Now, on a related matter, one or more

6    witnesses may testify in the case in the hope of receiving a

7    reduced sentence.  They've been previously convicted and are

8    hoping to be receiving a reduced sentence.  Again, I'll be

9    giving you instructions on how you should consider that

10   testimony.  But is there anyone here who would completely

11   disregard the testimony of such a witness?  In other words,

12   you could not listen to that testimony?

13                           (No verbal response.)

14        THE COURT:  Now, ladies and gentlemen, as I've

15   mentioned previously, bias, sympathy and prejudice have no

16   place in the courtroom.  If selected as a juror, you will be

17   required to set aside any personal feelings if they conflict

18   with the law that I'll be giving to you.  Is there anyone here

19   who feels that you could not follow such an instruction and

20   that you would allow bias, sympathy or prejudice to enter into

21   your decision making process?

22                           (No verbal response.)

23        THE COURT:  Also, ladies and gentlemen, in federal

24   court, if a defendant is found guilty, punishment is reserved

25   for the Court to administer.  Do each of you understand that

96

1    any verdict that you would return could not be affected in any

2    way by any concern that you may have regarding what any

3    punishment might be in the case.  Everyone understand that?

4                              (No verbal response.)

5            THE COURT:  Now, earlier, I mentioned some of the

6    charges in the case.  With respect to the issue of conspiracy,

7    the United States will be required to prove that a person

8    charged with a conspiracy knew the conspiracy's main purpose

9    and that he or she joined it intending to help advance or

10   achieve its goal.  This does not require that a person charged

11   knew everything about the alleged conspiracy or that he or she

12   was a member of it from the very beginning.  Likewise, the

13   United States will not be required to prove that a particular

14   defendant played a major role.  Instead, a slight role need

15   only be shown.  If this instruction is given to you, is there

16   anyone who could not follow it?

17                              (No verbal response.)

18           THE COURT:  Now, the law also recognizes criminal

19   responsibility for those who aid and abet others in the

20   commission of crimes.  If proven, is there any juror who could

21   not follow the Court's instructions regarding individuals who

22   might be found to be an aider or an abettor?

23                              (No verbal response.)

24           THE COURT:  Also, ladies and gentlemen, as you know,

25   this is a criminal case, and, of course, criminal cases are

1     different from civil cases.  Some of you raised your hands

2     earlier that you participated in trials, either as witnesses

3     or as jurors.  But as I said, cases, criminal cases are

4     different from civil cases.  In a civil case, the party with

5     the burden of proof, and that's generally the plaintiff, must

6     prove the case by preponderance of the evidence.

7            Now, in criminal matters, the government must prove

8     the elements of the crimes charged beyond a reasonable doubt.

9     Is there anyone here who doesn't understand that the burden in

10    a criminal case is different and it's a higher standard than

11    in a civil case?  Anyone who doesn't understand that?

12                        (No verbal response.)

13         THE COURT:  Is there anyone who believes that just

14    because a person has been charged with a crime, that he or she

15    must be guilty?

16                        (No verbal response.)

17         THE COURT:  Is there anyone here who would hold the

18    United States to a lesser burden than I've described to you

19    because of something that you may have seen or heard about

20    this case?

21                        (No verbal response.)

22         THE COURT:  Now, in a criminal case, a defendant has

23    an absolute right not to testify.  A defendant has no burden

24    of proof and the defendant is presumed innocent of the charges

25    against him or her.  Instead, as I've just explained, the

98

1    United States must prove that the defendant is guilty of the

2    charge brought against him or her.

3           Is there any juror who doesn't understand these

4    fundamental rules or who disagrees with any of the rules that

5    I've outlined?

6                              (No verbal response.)

7           THE COURT:  Also, ladies and gentlemen, as you know,

8    there are eight defendants in this proceeding.  If selected as

9    a juror, you will be called upon to determine whether each

10   defendant is or is not guilty of the charges that have been

11   brought.  In addition, you will be instructed that the

12   possible guilt or innocence of anyone else is no defense to a

13   criminal case.  It's a criminal charge and it's not a proper

14   matter for you to consider.

15          Is there anyone who could not follow that

16   instruction?

17                              (No verbal response.)

18          THE COURT:  Let me ask if any juror has any

19   religious, philosophical or other reason that would prevent

20   you from sitting as a juror and returning a fair and impartial

21   verdict based on the evidence if you are selected?  Anyone who

22   feels that you cannot do that for religious, philosophical or

23   for any other reason?

24                              (No verbal response.)

25          THE COURT:  Ladies and gentlemen, the charges in this

1    matter are brought by way of an indictment.  Now, an

2    indictment is not evidence.  At this time, you've not heard

3    any evidence.  All you've heard are a bunch of questions from

4    me.  Is there anyone who believes that just because a person

5    has been charged with a crime by the return of an indictment

6    that the person must be guilty?

7                         (No verbal response.)

8         THE COURT:  Next, ladies and gentlemen, as you know,

9    as you've been advised, this case is expected to take

10   approximately eight weeks to complete.  Now, undoubtedly, this

11   will present an inconvenience and a hardship for those that

12   are selected.  But let me ask at this time if the length of

13   the trial would present a unique hardship such that if you

14   were selected, you could not serve as a juror.  Couple of --

15   yes, sir.

16        PROSPECTIVE JUROR 85:  I was supposed to went to the

17   doctor today.  I changed the appointment till tomorrow.  I

18   don't know how long I'll be on crutches.

19        THE COURT:  I notice you're on crutches.  Are you

20   going to have to have surgery on your foot?

21        PROSPECTIVE JUROR 85:  I don't think so.

22        THE COURT:  What's your juror number?

23        PROSPECTIVE JUROR 85:  85.

24        THE COURT:  I don't want to pry too much about your

25   injury.  But you're going to go back to the doctor tomorrow?

1          PROSPECTIVE JUROR 85:  (Nodding affirmatively).

2          THE COURT:  Was this a slip and fall you had

3 recently?

4          PROSPECTIVE JUROR 85:  Fell out of a barn two weeks

5 before Thanksgiving.

6          THE COURT:  So you've been incapacitated for a couple

7 of weeks now?

8          MR. WESTBERRY:  Excuse me.  It's hard to hear him.

9          THE COURT:  Juror Number 85, having a hard time

10 standing up because he fell out of a barn and hurt his leg or

11 his foot, I guess.  He's going to the doctor tomorrow.

12 Originally, the appointment was for today, and he's moved it

13 to tomorrow.  You're not sure what the doctor is going to say

14 tomorrow?

15          PROSPECTIVE JUROR 85:  MRI results and all that

16 discussion.

17          THE COURT:  So he'll have a doctor's appointment

18 tomorrow.  That's his situation.  Thank you, sir.

19          MR. WESTBERRY:  Thank you, Judge.

20          THE COURT:  And what was your number?

21          PROSPECTIVE JUROR 103:  103.  If this was to last

22 eight weeks, I'm the sole provider, and I'd probably lose my

23 house and car.

24          THE COURT:  All right.

25          PROSPECTIVE JUROR 103:  $40 a day just wouldn't --

1           THE COURT:  All right.  It's not much, but it's
2      better than state court.
3           PROSPECTIVE JUROR 103:  I got another question.
4      Could your employer, by any type of law, are they required to
5      do anything?
6           THE COURT:  I'll have to take that up with you after
7      we finish this proceeding.
8           PROSPECTIVE JUROR 103:  Okay.
9           THE COURT:  But you're the sole provider for your
10     family, and you have financial concerns if you were selected
11     in the case?
12          PROSPECTIVE JUROR 103:  It's just scary, because my
13     boss said you got to pay $1,200 a month for your insurance.
14          THE COURT:  We have a couple of additional hands
15     coming up here.  Start on the first row, ma'am, in the gray.
16          PROSPECTIVE JUROR 50:  Number 50.  I'm an elementary
17     classroom teacher, and it would be really hard for me to miss
18     up to eight weeks of school.
19          THE COURT:  Thank you, ma'am.  We'll work our way
20     back.  Couple hands in the back row.  Ma'am, I'll start with
21     you on my left.
22          PROSPECTIVE JUROR 67:  67.
23          THE COURT:  Uh-huh.
24          PROSPECTIVE JUROR 67:  I'm scheduled to be out of
25     state the first week and a half of March.  First for a wedding

102

1    and then I work occasionally for a Lifeway Christian

2    Resources, and I'm going to be working a week-long camp in

3    North Carolina.

4            THE COURT:  In North Carolina.  What is that week?

5    What week of the month?

6            PROSPECTIVE JUROR 67:  It would be March 11 through

7    16.

8            THE COURT:  And that's something that's already

9    scheduled?

10           PROSPECTIVE JUROR 67:  Um-hmm.

11           THE COURT:  So in other words, you can't change weeks

12   with someone else?

13           PROSPECTIVE JUROR 67:  Uh-uh.  It's just that one

14   week.

15           THE COURT:  All right.  Yes, sir?

16           PROSPECTIVE JUROR 14:  Number 14.

17           THE COURT:  Uh-huh.

18           PROSPECTIVE JUROR 14:  I'm a maintenance supervisor

19   at a facility that we're getting ready to move the production

20   line in the next couple of weeks, and this would definitely be

21   a big hindrance for our company.

22           THE COURT:  When are you scheduled to start that

23   move?

24           PROSPECTIVE JUROR 14:  Actually, going to start it

25   Friday.

1          THE COURT:  This coming Friday?

2          PROSPECTIVE JUROR 14:  Yes, sir.

3          THE COURT:  And how long do you think it's going to

4     take once you start?

5          PROSPECTIVE JUROR 14:  About a month.

6          THE COURT:  All right.  Thank you, sir.  And next to

7     him?

8          PROSPECTIVE JUROR 18:  18.  When would the trial

9     start?  Because if I miss very much of April, I do a bunch of

10    federal reports.  I work for the state.

11         THE COURT:  We're starting as soon as we finish jury

12    selection.  So I expect the case will take -- I'm sorry.  I

13    was talking over you.  I can't hear you.

14         PROSPECTIVE JUROR 18:  It wouldn't be a problem if

15    it's done early April.

16         THE COURT:  All right.  Couple of hands.  Yes, ma'am,

17    on the end of the row there.

18         PROSPECTIVE JUROR 110:  Juror 110.  I work for the

19    Kentucky Department of Education as a consultant.  And with

20    the Senate passing legislation, there's quite a bit of work

21    that has to be done.  And as I'm the only consultant in that

22    particular area, I have some traveling I have to do as well.

23    So that would really --

24         THE COURT:  All right.  Thank you, ma'am.  Yes, sir?

25         PROSPECTIVE JUROR 18:  18.  I forgot my wife and I

1    share one car, and I have to pick her up at her job at 4:00

2    every day.  What time would we be done?

3          THE COURT:  We generally would not finish here until

4    4:30.  That might present a problem for you.  How far do you

5    have to drive to pick her up?

6          PROSPECTIVE JUROR 18:  We live in Frankfort.

7          THE COURT:  Okay.  If we finish at 4:30, how much of

8    a problem would that be for you?  She'd have to wait 30

9    minutes, wouldn't she?

10          PROSPECTIVE JUROR 18:  She wouldn't be happy, but --

11          THE COURT:  You know what they say, if mama's not

12    happy.  All right.  So that's a problem for you if we go

13    beyond 4:00.  Thank you, yes, sir, in the front.

14          PROSPECTIVE JUROR 100:  Juror 100.  I'm applying for

15    another position with a company in Louisville.  I'm out of

16    Lexington, and I'm waiting for --

17          THE COURT:  I couldn't hear the last part.

18          PROSPECTIVE JUROR 100:  I'm waiting for my interviews

19    to be set up.

20          THE COURT:  You're waiting for interviews, so you may

21    be called for an interview during the course of this trial if

22    we proceed for eight weeks?

23          PROSPECTIVE JUROR 100:  Yes.

24          THE COURT:  And you haven't heard anything about when

25    that might happen?

1          PROSPECTIVE JUROR 100:  Not yet.

2          THE COURT:  If you are called in for an interview,

3     how long would it be?  Would it be a one-day process?

4          PROSPECTIVE JUROR 100:  Normally, they take three

5     interviews.

6          THE COURT:  All right.  Anyone else on the right side

7     that I missed?  If not, let me go to the left side of the

8     courtroom.  First row.  Second row.  Third row, I think,

9     ma'am?

10         PROSPECTIVE JUROR 91:  Except for the March the 9th

11    that I have to appear --

12         THE COURT:  Are you Number 91?

13         PROSPECTIVE JUROR 91:  Number 91.  Yes, sir.  Except

14    for the one day that I have to appear in court in Harrison

15    Circuit Court, I can be here the rest of the time.

16         THE COURT:  And that was the --

17         PROSPECTIVE JUROR 91:  March the 9th at 1:30.

18         THE COURT:  All right.  There's a couple of hands

19    next.  Got a couple more now.  Let me start over here on the

20    left.  Sir?

21         PROSPECTIVE JUROR 121:  121.  I'm the owner of a

22    small business.  I'm a sole proprietor and the bread winner of

23    my family.  Although it's in Frankfort, it might cause a

24    problem.

25         THE COURT:  Do you have any other employees?

1          PROSPECTIVE JUROR 121:  I have a new administrative

2     aide, yes, sir.

3          THE COURT:  All right.  Are you at your business on a

4     daily basis?

5          PROSPECTIVE JUROR 121:  Yes, sir.  Five and a half

6     days a week.

7          THE COURT:  All right.  Let me work across the row.

8     I think I may have -- yes, ma'am.

9          PROSPECTIVE JUROR 71:  71.  Me and my mom share a

10    car, and she goes to work Monday through Friday at 3:30.  And

11    my dad's car just got fixed, and it's really undependable and

12    breaks down all the time.

13         THE COURT:  Sounds like my car.  So you're sharing a

14    car with your mother, and she goes to work at 3:30 in the

15    afternoons?

16         PROSPECTIVE JUROR 71:  Um-hmm.

17         THE COURT:  So you would need to get the car to her

18    so she could go to work?

19         PROSPECTIVE JUROR 71:  Um-hmm.

20         THE COURT:  All right.  Thank you.  Yes, ma'am?

21         PROSPECTIVE JUROR 77:  Yes, sir, number 77.  I just

22    want to clarify, since I've not done this before, when you say

23    eight weeks, this trial will take eight weeks, how many days a

24    week are you expecting it to be?

25         THE COURT:  Eight weeks.  Eight calendar weeks.  We

1    generally will start -- today is a little bit of an exception

2    because everyone had to come in a little bit earlier, but

3    generally we will start at 9:00.  The jury will be here at

4    9:00, and we will go until about 4:30 in the afternoons.  We

5    do that Monday through Friday unless I have other proceedings

6    that I have to schedule.  I'm aware now of two days in the

7    next two months that we won't be able to have -- we won't be

8    in session.

9              PROSPECTIVE JUROR 77:  Okay.

10             THE COURT:  But otherwise, I would expect the case

11   would go February and March.

12             PROSPECTIVE JUROR 77:  Okay.

13             THE COURT:  Other than those couple of exceptions.

14             PROSPECTIVE JUROR 77:  That may be a financial

15   hardship for me as well.

16             THE COURT:  All right.  And are you a sole --

17             PROSPECTIVE JUROR 77:  Yes.

18             THE COURT:  Sole bread winner for your family?

19             PROSPECTIVE JUROR 77:  Yes.

20             THE COURT:  Does your employer reimburse you while

21   you're in jury service?

22             PROSPECTIVE JUROR 77:  They reimburse me 20 days.

23             THE COURT:  All right.  So if we go beyond 20

24   calendar days, then you would essentially be reduced to your

25   jury salary?

1       PROSPECTIVE JUROR 77:  Yes, sir.

2       THE COURT:  Yes, next to her, Juror 77.

3       PROSPECTIVE JUROR 56:  56.

4       THE COURT:  Uh-huh?

5       PROSPECTIVE JUROR 56:  My grandmother's passing away

6  right now.

7       THE COURT:  All right.  Ma'am, do you need to be

8  excused right now?

9       PROSPECTIVE JUROR 56:  If possible.  I have documents

10  if you want to see them.

11       THE COURT:  No, I'm going to excuse you.  You can be

12  excused right now.  You can leave.  Thank you, ma'am.  Go

13  ahead and leave the courtroom.

14       Let me shift back up here.  I'll come up here for a

15  second.  Yes, sir.

16       PROSPECTIVE JUROR 69:  69?  I work through a

17  temporary service.  I don't know if I can miss eight weeks or

18  not.  They probably won't pay me, because I work for a

19  temporary service, Adecco.

20       THE COURT:  You don't know if they would pay you for

21  the eight weeks?

22       PROSPECTIVE JUROR 69:  No, they won't do it.  I

23  already called and asked.  They said no.

24       THE COURT:  All right.

25       PROSPECTIVE JUROR 69:  Thank you.

1          THE COURT:  Yes, sir.  And sir, next to him.

2          PROSPECTIVE JUROR 46:  46.  I work for the Kentucky

3    National Guard.  I'm on military orders quite often.  And I'll

4    be on two days next week, two days the week after that, three

5    after that and a week in March to Ecuador.

6          THE COURT:  So these are matters already scheduled

7    that you know you would not be able to be here because of your

8    Guard service?

9          PROSPECTIVE JUROR 46:  Yes.

10          THE COURT:  Thank you, sir.  Go back to the left side

11    of the courtroom.  I'm not sure I was finished with that -- I

12    have another gentleman here in the front row.  Sir, if you

13    could stand up and give me your number, please.

14          PROSPECTIVE JUROR 40:  Number 40.  Financial burden.

15    Also, 20 days is all my work allows.

16          THE COURT:  All right.  Thank you, sir.  Let me make

17    sure I haven't skipped anyone in the first three -- I think

18    we're on the fourth row at this point.  Going back to the

19    fifth -- sir, I think you had your hand up in the back?

20          PROSPECTIVE JUROR 27:  Number 27.

21          THE COURT:  Uh-huh.

22          PROSPECTIVE JUROR 27:  I work a job where they will

23    not reimburse me pay for me.  I provide for myself so I will

24    definitely lose my job, and I'm currently processing for the

25    U.S. military.

110

1           THE COURT:  So you're processing now?

2           PROSPECTIVE JUROR:  Yes, sir.

3           THE COURT:  All right.  Do you have any call-up date

4    that you're aware of?

5           PROSPECTIVE JUROR 27:  Hm?

6           THE COURT:  Do you have a call-up date?

7           PROSPECTIVE JUROR 27:  Unsure right now.

8           THE COURT:  Unsure.  Thank you, sir.  Anyone else?

9    Yes.

10          PROSPECTIVE JUROR 113:  We have 17 animals outside to

11   take care of, and it would be a burden on my wife to carry

12   water and --

13          THE COURT:  What is your juror number?

14          PROSPECTIVE JUROR 113:  117 [sic].

15          THE COURT:  And you do some farming?

16          PROSPECTIVE JUROR 113:  Yes.

17          THE COURT:  Anyone else that I missed?  Yes, sir.

18          PROSPECTIVE JUROR 41:  Juror 41.  I've got two V.A.

19   appointments as far as I know of right now.  And MRIs has to

20   be done to see what's going on with my hip.

21          THE COURT:  All right.  What are those dates of those

22   appointments?

23          PROSPECTIVE JUROR 41:  The 10th, and I think the

24   other one is the 16th or 17th.

25          THE COURT:  Of February?

1        PROSPECTIVE JUROR 41:  Yes.

2        THE COURT:  And those are matters that are already

3   scheduled that you would have a hard time rescheduling, right?

4        PROSPECTIVE JUROR 41:  Yep.

5        THE COURT:  All right.  Thank you.  Now, ladies and

6   gentlemen, if selected to serve as a juror, you will be

7   required to return a verdict based solely on evidence in this

8   case and in the context of the law that I'll be giving to you.

9   You've heard me say that several times today, to several

10  jurors.

11       Is there anyone here who, for whatever reason, cannot

12  disregard whatever personal feelings that you may have and

13  reach a verdict based only on the facts presented and in the

14  context of the law that I'll be giving to you?

15                         (No verbal response.)

16       THE COURT:  Is there anyone who feels that you just

17  cannot do that?

18                         (No verbal response.)

19       THE COURT:  Let me ask again if there's any potential

20  juror who has a difficulty either seeing or hearing such that

21  you believe it would be difficult or impossible to serve if

22  you are selected.

23                         (No verbal response.)

24       THE COURT:  Let me ask another, a catch-all question,

25  and that is if any potential juror has anything else going on

112

1    in your life right now that I haven't asked you about that

2    would prevent you from paying attention in the case, paying

3    attention to the witnesses and listening to the attorneys, if

4    you are selected as a juror.

5                           (No verbal response.)

6         THE COURT:  Now, having heard the questions that I've

7    asked so far, is there anyone who has any other reason which

8    you believe would make it difficult or impossible to serve if

9    you are selected as a juror?

10        At this time, I'm going to ask the attorneys to come

11   up, and I'm going to ask if there are any supplemental

12   questions you want to ask.

13                    (A sidebar conference was held out of the

14                     hearing of the gallery):

15        THE COURT:  Rather than excuse the jury again, I want

16   to get your supplemental questions so we'll be able to take

17   our lunch break.  I want to go ahead and get the supplemental

18   questions if anybody has any before we take another break.  I

19   also want to, what I'm planning to do is I want to -- there

20   may be some follow-up questions with a couple of the early

21   jurors.  But I want to be able to excuse everyone else before

22   we take our next break, and I could have those in the

23   courtroom, I can call those up one at a time, it will be

24   easier.  If there's any follow-ups that anyone has at this

25   time?

113

1              MR. ABELL:  Judge, as a general topic, can we just

2       touch on people's interaction with civil litigation,

3       litigation in general?  I think it would be appropriate to

4       follow up if they have litigation.

5              MR. SMITH:  I can't hear that.

6              THE COURT:  Try to do this one at a time, if we can.

7              MR. ABELL:  If they've had civil litigation they've

8       had a bad experience with.  The Court can ask with regard to

9       hard feelings about criminal cases.  Also, there's a juror

10      with Franklin County Jail that I have concerns with that may

11      cross paths with Mr. Stivers.

12             THE COURT:  What's the number?

13             MR. ABELL:  281.

14             THE COURT:  281 is the fella in the back that I think

15      is a minister or something.  I know the fella you're talking

16      about.

17             MR. WHITE:  Is that the one who mentioned he's

18      employed as a jailer, 281?

19             THE COURT:  That's the one Mr. Abell asked me about.

20      I didn't think it was 281, but I may be wrong.  I'll bring him

21      up and follow up if it is 281.  I'll bring him up for sure and

22      double check.

23             MR. BAYER:  281, his brother is a police officer in

24      Frankfort and he's also got one employed as a jailer,

25      something like that.  It is 281.

1          THE COURT:  Mr. Abell is asking about a juror that

2    responded he was employed by the Franklin County Jail.  And

3    his concern is with Mr. Stivers currently being housed at the

4    Franklin County Jail.  I'll follow up on that.

5          MR. PINALES:  It is 281.

6          THE COURT:  It is?

7          MR. PINALES:  Yes.

8          THE COURT:  I'll bring him up individually, ask him

9    questions at the Bench.  Is that the areas you wanted me to

10   cover?  Thank you, Mr. Abell.  Mr. Hoskins or Mr. Pinales?

11         MR. HOSKINS:  I was going to ask the same thing Mr.

12   Abell asked.

13         THE COURT:  So we're okay there.

14         MR. RICHARDSON:  Your Honor, I would like to ask the

15   jury panel as a whole if they have ever, they or a family

16   member or close personal friend are employed or currently

17   employed by an elected official, appointed official, political

18   action committee.

19         THE COURT:  An elected official or a PAC?

20         MR. RICHARDSON:  Yes, sir.

21         THE COURT:  Okay.

22         MR. RICHARDSON:  I don't have anything else at this

23   point.

24         THE COURT:  All right.  Let's see.  Mr. White?

25         MR. WHITE:  Yes, sir.  I just have one.  The

1    gentleman, Number 124, who indicated he worked at the Board of

2    Elections, I was just going to ask when he started.  I was

3    general counsel Board of Elections in 2003, and he didn't say

4    he knew me.

5        The second thing I was going to ask is one of our

6    experts is Kay Gabhart, if you could just maybe identify her

7    as the general counsel.  Did he work with her, is there

8    anything about that experience that would create a problem.

9        THE COURT:  Okay.

10        MR. WHITE:  And if you think it's appropriate, I kind

11    of like to know what he actually did at the Board of

12    Elections, because there are people who worked as experts in

13    certain areas.

14        THE COURT:  All right.

15        MR. RICHARDSON:  The lady back in the back in the

16    corner, on your right side, she had worked for the Secretary

17    of State.  She had discussed this case --

18        THE COURT:  Number 37.

19        MR. RICHARDSON:  Number 37, she discussed this case,

20    and you didn't follow up more --

21        THE COURT:  I want to follow up with her at the

22    Bench.  It may be she'll be excused for cause, based on what

23    she knows.  If she's --

24        UNIDENTIFIED COUNSEL:  Frankly, Your Honor, I think

25    she oversaw Harts Branch.

1          THE COURT:  Does anyone object to her being excused

2     right now?

3          MR. BAYER:  No.

4          THE COURT:  Mr. Smith, do you have any objection to

5     that?  It's not for me to bring her up if anyone wants to

6     strike her from the panel.

7          MR. SMITH:  I would like deal with the strikes for

8     cause at one time.

9          THE COURT:  That's fine.  I need to bring her in and

10    do some additional.

11         MR. WHITE:  Judge, I had one thing I needed to

12    discuss.

13         THE COURT:  Okay.

14         MR. WHITE:  That has to do with juror -- I left it

15    back there.  The lady that worked in the A.G.'s office.

16         MR. RICHARDSON:  Number 8.

17         MR. WHITE:  She was in a different division, consumer

18    protection.  They weren't under me, but I did a joint thing

19    with them, and I believe she was in some meetings that I was

20    involved in that had to do with a quasi criminal

21    investigation.

22         THE COURT:  All right.  I'll follow up at the Bench

23    with her.

24         MR. RICHARDSON:  Number 37 worked at the precinct two

25    times in -- oh, okay.  That's the one we're going to follow up

1    on.

2              MR. BAYER:  Judge, I've got a couple.

3              THE COURT:  At this point, we're just going over

4    follow-up questions, Mr. Bayer.

5              MR. BAYER:  Yes, sir.  You asked them some questions

6    about relations to law enforcement officers, but you didn't

7    ask anybody if they had any time worked in law enforcement

8    themselves.  Had they worked for any kind of investigative

9    agencies, police.  That question, I would like to have asked.

10             Also, considering that we've moved the venue of the

11   case, could we talk about general notions about Clay County or

12   Eastern Kentucky, because we're in central Kentucky.  Some of

13   these people may have some preconceived notions about that.

14             And then the only other thing I wondered if the Court

15   would inquire as to whether or not any of the jurors thought

16   it was improper for someone to solicit from them for campaign

17   contributions.

18             THE COURT:  Okay.

19             MR. BAYER:  Do you do any follow-up questions on

20   those people who have served as jurors before as to what kind

21   of case or anything?

22             THE COURT:  No.

23             MR. BAYER:  Okay.

24             THE COURT:  No, I don't.  There are so many that have

25   served, it's literally impossible to ask everyone the kind of

1       case they've served.  So the issue is whether they have any

2       preconceived notions based on that prior jury service, and I

3       don't think any of these, other than what's been outlined, I

4       don't think they do.

5              MR. RICHARDSON:  I've got a couple more.  Number 127,

6       in the jury box, when she was in Clay County, she said her

7       mother was there.  You tried to rehabilitate her, she said she

8       would try.  I thought that that kind of led us to the point

9       where she would be a strike for cause.

10             THE COURT:  Well, again, again, maybe.  We're not

11      taking up strikes for cause now.  This is follow-up questions

12      so I can make sure that all these areas have been covered, and

13      we can talk about those that need to be stricken for cause.

14      What I want to do is I want to be able to do that in an open

15      setting with you all when the jurors aren't present.  So I

16      need to get all this information from the jurors first, these

17      follow-up questions from the jurors.

18             MR. RICHARDSON:  I didn't know if you were talking

19      about bringing people up to the Bench to follow up.

20             THE COURT:  The ones I'm going to bring up to the

21      Bench were the ones that responded early in my questions that

22      they had read something about the case.  In other words, they

23      have some additional information about the case that I haven't

24      asked them about in open court because of my concern of what

25      they might say that would affect the other jurors and there

119

1    may be some others that need individual follow-up.

2         MR. WESTBERRY:  The lady that works for the attorney

3    general's office currently.  Number 8.

4         THE COURT:  The ones that I have listed for follow-up

5    would include -- I had Number 124, that worked for Board of

6    Elections.  I could have the wrong number.  Number 8, that

7    works at the attorney general's office.  Number 127 -- these

8    next three heard or read something about the case.  127,

9    Number 16, Number 132 and Number 37 read something on

10   kentucky.com.  She also has these other issues that I will

11   follow up for investigation, her status as an observer in the

12   two precincts in Clay and Leslie Counties.

13        Do the parties have any other jurors that they want

14   me to follow-up here at the Bench?

15        MR. SMITH:  Judge, I want to bring something to the

16   Court's attention.  My co-counsel advised me that during the

17   last break, that two defendants were engaged in conversation

18   and there was some kind of an embrace and a wish of good well

19   and good luck to Mr. Adams and Mr. Bowling.

20        One of the jurors that was -- I assume might have

21   been the one the Court excused for her previous answer.  And I

22   don't know how many jurors witnessed that and whether or not

23   that's going to have any affect on this process.

24        THE COURT:  The problem is that if no one noticed it,

25   then it highlights it.

120

1          MR. SMITH:  Well, I just wanted to bring it to your

2     attention.

3          THE COURT:  If you want me to follow up, I will.  I

4     didn't see it, but if you want me to follow up and ask if they

5     observed any conversations about any potential jurors and

6     parties in the case, I'll do that.

7          MR. SMITH:  Well, the only thing I'm going to request

8     of the Court is that these parties, I think, have already been

9     told by the Court at the pretrial conference, but it seems

10     fairly inappropriate for a party to be having discussions with

11     any potential juror, and I would say there may be some

12     misunderstanding here that because she was excused, that maybe

13     it's okay and it's fair game to embrace her in conversation in

14     front of the other jury pool, but I would like to ask the

15     Court to issue an admonition to these parties to make sure

16     there's no confusion here about the rule.

17          THE COURT:  If that's what you're asking, then I can

18     do that outside the presence of the jury without --

19          MR. SMITH:  Certainly.

20          THE COURT:  -- potentially impacting other jurors

21     that may not have observed any types of activity.

22          MR. RICHARDSON:  Are you talking about number 36,

23     that was excused?

24          THE COURT:  Mr. Simons indicated he didn't hear what

25     the conversation was that was alleged to have occurred.

1    Apparently, I guess Mr. Parman witnessed Mr. Adams and Mr.

2    Bowling speaking with a juror that was excused that I guess

3    had a grandmother that was dying, and they embraced or wished

4    each other good luck or whatever it may be.

5             MR. BAYER:  Was it the one related to the defendant?

6             MR. RICHARDSON:  No, that was the one that was

7    related, 36.

8             MR. BAYER:  The aunt.

9             MR. SMITH:  Debra Morris was her aunt is what she

10   reported.

11            THE COURT:  So it was the one before that?

12            MR. RICHARDSON:  And relatives in Clay County.

13            THE COURT:  So what I'm going to do is at a break,

14   I'll review with the parties, make sure they understand that

15   we can't have that type of activity taking place.  I'm not

16   going to ask a follow-up question about that, because I think

17   it would do more harm than good at this point.

18            MR. BAYER:  I agree.

19            MS. HUGHES:  Your Honor, may I say, first of all,

20   Mrs. Morris and I did not get a jury list, so I would have

21   advised everybody if I had known that was happening.  We

22   intentionally didn't get one.  I rode down the elevator with

23   her, and she was chatting with people as she was leaving.  I

24   didn't see anybody else respond.  She was saying things.  I

25   don't want the Court to have the impression the parties were

1    doing something.  She was chatting.

2         THE COURT:  I'll just reinforce with everyone at the

3    break so we don't have this as an issue.  Let me see if

4    there's any other general follow-up questions before I bring

5    these individual jurors up to ask.

6         MR. BALDANI:  I've got some.

7         THE COURT:  Mr. Baldani has a couple of questions.

8         MR. BALDANI:  Your Honor, you did touch on this, but

9    it's an important issue to us, and I would ask that you follow

10   up a little more in detail about each defendant's right to an

11   individual determination as to each count.

12        THE COURT:  I've already covered that.  Two points.

13   One, I've already covered it.  Two, who's handling *voir dire*

14   for Mr. Thompson.  Is it you?

15        MR. BALDANI:  I thought we were together.  I'm sorry.

16        THE COURT:  For future reference, let's try to limit

17   this or we're going to have 17 discussions.  All right.

18        MR. WESTBERRY:  We understand.

19        THE COURT:  Thank you.  I think I have Mr. Hoskins?

20        MR. HOSKINS:  Judge, no other area.  Did you tag

21   Juror 103 in for follow-up?

22        THE COURT:  I think I did.

23        MR. HOSKINS:  I think he said he was from Clay County

24   or his grandfather -- Juror Number 103 talked about his

25   grandfather from Clay County or near Clay County.  All

1    politicians are crooks.

2            THE COURT:  Family has a general negative opinion.

3    I'll ask him to follow up at the Bench.

4            MR. HOSKINS:  I think you covered this as a general

5    question, but if anybody works a third shift job and might

6    still be wanting to work their job and come to court, it would

7    be kind of difficult.

8            THE COURT:  That may open up too many cans of worms.

9    I think the general catch-all probably includes that.  What

10   I'm going to do is I'm going to follow up in these general

11   areas that -- if I can read my notes, let me make sure I'm

12   clear here.

13           Mr. Abell asked about jurors' involvement or

14   interaction in civil cases, whether they had a bad experience.

15   I'm going to follow up with Juror Number 281 at the Bench on

16   employment in the Franklin County Jail.

17           Mr. Richardson asked about anyone that's currently

18   employed by an elected official or by any type of a PAC,

19   political action committee.  That would include family and

20   friends.

21           I'm also going to follow up with Juror Number 124 at

22   the Bench on her employment through Board of Elections, when

23   it started, and if she knows Katie Gabhart and what

24   relationship she might have with Miss Gabhart and what this

25   juror's job was at the Board of Elections.

124

1          I'm going to follow up with 37 at the Bench.  That's

2     the juror that has worked as an observer.

3          Juror Number 8, I'm going to follow up at the Bench.

4     Worked in the attorney general's office, but in the Consumer

5     Protection Division, and to find out if he had any meetings

6     with Mr. White or had any involvement with Mr. White in that

7     capacity.

8          Let's see.  Mr. Bayer wants me to ask the general

9     question about whether any jurors have actually worked

10     previously for law enforcement.  Ask about friends or family

11     members now or ever.

12          General perceptions about Clay County and Eastern

13     Kentucky.  I'm going to say generally, negative perceptions

14     about individuals in Clay County or in Eastern Kentucky.

15          Whether a juror feels that it's generally improper to

16     solicit campaign contributions.

17          Juror Number 127, I'm going to follow up at the

18     Bench.  And at the break, I'll discuss with the defendants

19     their obligation not to speak with potential jurors in the

20     case.  All right.

21          MR. SMITH:  Judge, I had requested Juror Number 45.

22     Son that's been charged in criminal court, convicted.  She

23     says that she has hard feelings about the way the case was

24     handled.  She said she couldn't be sure that she could be fair

25     and impartial.

1        THE COURT:  I'm not going to do any more follow-up

2   with her.  I need to look back at my notes, but there are

3   several jurors that expressed reluctance based on charges

4   against family members, and I'll have to consider that as a

5   challenge for cause at the appropriate time, but I'm not going

6   to follow up on it at this point, okay?

7        MR. WHITE:  Your Honor, Number 37, the lady that went

8   to Clay County, would you mind asking her if the reason they

9   went to Clay and Leslie was based on a county draw, or were

10  those specifically selected?  If you could do that at the

11  Bench.  Because there's two ways they do that.  Thank you,

12  Judge.

13       THE COURT:  Sure.  All right.  What I'd like to do is

14  I want to get through these follow-up questions and then the

15  individual questions at the Bench.  What I'm going to do is

16  after I go through all these questions, I'm going to excuse

17  the jurors except those that I'm going to follow up with at

18  the Bench.

19       So let's make sure we have those numbers everyone

20  understands the ones I'm going to hold back and ask follow-up

21  questions.  281, 124, 8, 103, who is the juror who had the

22  negative impressions of Clay County, and then those that heard

23  something about the case or read something about the case,

24  which is 127, 16, 132 and 37.

25       Okay.  So in other words, I'll be able to release

1    those jurors after I ask these follow-up questions, and I'll

2    be able to call these individual jurors up here at the Bench

3    and I can talk a little bit louder so everyone can hear once

4    we do that, okay?

5            MR. WHITE:  Do you want us to stay at our tables?

6            THE COURT:  If you could do that, it will take me

7    just a few moments to ask those questions.

8            MR. RICHARDSON:  One more issue for the record.

9    You've looked at our proposed jury instructions.  We would ask

10   the Court to ask about the proposed transcripts that are going

11   to be introduced in this case.

12           THE COURT:  No, not getting into transcripts right

13   now.

14           MR. RICHARDSON:  For the record, I'd like to

15   incorporate in my objection every other question that wasn't

16   asked that was in our *voir dire* question that we submitted,

17   just for the record.

18           THE COURT:  Thank you.

19           MR. BAYER:  Would you be willing to follow up with

20   Juror 17?  She indicated she's employed by the Frankfort City

21   Police and she maybe came in contact with Mr. Stivers or may

22   have some knowledge about the case.

23           THE COURT:  Mr. Abell.  Where is Mr. Abell?  Mr.

24   Bayer wanted me to ask about Juror Number 17, who is employed

25   by the Frankfort City Police, about whether he's had any

1    contact or -- to determine whether or not he may have had any

2    contact with Mr. Stivers.  That relates really more to your

3    client than anyone else, and I'm not going to ask it unless

4    you want me to ask whether he's had any contact or

5    involvement.  I can ask it in a general way, whether he's had

6    any involvement with any defendants in the case --

7              MR. ABELL:  Ask in a general way.

8              MR. BAYER:  It's a she.

9              THE COURT:  She.

10             MR. BAYER:  Thank you, Judge.

11             THE COURT:  I'll follow up.  I wanted to make sure

12   you understood I was going to do that.

13             MR. ABELL:  Thank you, Judge.

14                  (Sidebar conference concluded.)

15             THE COURT:  Ladies and gentlemen, again, thank you

16   for your patience with me.  I do have a few follow-up

17   questions.  What I want to do is ask some follow-up questions,

18   and then I have a few jurors that I want to ask individually

19   some questions.  I want to ask individually here at the Bench.

20   So I want to get through these follow-up questions, then I

21   want to tell the jurors that will need to stay here just a

22   moment while we take our lunch break, and I'll ask the

23   follow-up questions, and then I can release everyone for the

24   lunch break.

25             Gentleman in the back had his hand raised.  Do you

128

1    have a question, sir?

2          PROSPECTIVE JUROR 65:  Yes, sir.  It's about for the

3    future serving as a jury.  I think that my mom's health might

4    be an issue.

5          THE COURT:  All right.  Do you live with your mother?

6          PROSPECTIVE JUROR 65:  65.

7          THE COURT:  Are you the care-giver of your mother?

8          PROSPECTIVE JUROR 65:  No.

9          THE COURT:  All right.

10          PROSPECTIVE JUROR 65:  I do have three other sisters,

11    but --

12          THE COURT:  I don't want to pry too much about what

13    her condition might or might not be, but does she have a

14    terminal condition?

15          PROSPECTIVE JUROR 65:  Yes, she's in hospice.

16          THE COURT:  All right.  Where is she currently

17    residing?

18          PROSPECTIVE JUROR 65:  Harrodsburg.  Right now,

19    she's, you know, she's stable.  But I'm not really sure on the

20    future.

21          THE COURT:  All right.  I'll certainly take that into

22    account as well.  Thank you.

23          Let me ask a few follow-up questions, ladies and

24    gentlemen.  First, I asked you a lot of questions about

25    criminal cases in which either you or friends or family

1   members might have been involved and whether anyone had any

2   bad experiences in any of those matters, and I want to broaden

3   the question a bit and include civil cases.  Is there anyone

4   that's been involved in a civil case in which you've had a bad

5   experience with the justice system in this country?  Got one

6   hand in the back.  Yes, ma'am?

7          PROSPECTIVE JUROR 37:  Juror Number 37.

8          THE COURT:  Yes, ma'am.

9          PROSPECTIVE JUROR 37:  It wasn't civil.  It was

10  criminal.  It was back in 1997, and it ran a couple of years.

11  My stepsister-in-law murdered my father-in-law and my

12  stepmother-in-law in Harrodsburg.

13         THE COURT:  And I assume that you followed that case

14  very closely?

15         PROSPECTIVE JUROR 37:  Very closely, yes.

16         THE COURT:  And I don't want to ask about the

17  outcome, but you were not happy with the outcome?

18         PROSPECTIVE JUROR 37:  No.

19         THE COURT:  Were you dissatisfied with the criminal

20  justice system in general?

21         PROSPECTIVE JUROR 37:  Yes.

22         THE COURT:  Were you dissatisfied with the attorneys

23  in the case?

24         PROSPECTIVE JUROR 37:  Yes.

25         THE COURT:  Now, would you feel that you would bring

1    those opinions or those feelings into this case if you were

2    selected as a juror?

3            PROSPECTIVE JUROR 37:  No.

4            THE COURT:  In other words, you've heard me talk a

5    lot about having to separate cases and separate facts and only

6    deciding cases based on what you hear in this court.

7            PROSPECTIVE JUROR 37:  I would be able to separate

8    it, yes.

9            THE COURT:  Are you able to do that?

10           PROSPECTIVE JUROR 37:  Yes, sir.

11           THE COURT:  All right.  Thank you.  Does anyone else

12   have an answer to my question about civil litigation,

13   involvement in civil litigation?

14                              (No verbal response.)

15           THE COURT:  Let me ask if any potential juror or

16   family member or close friend is currently employed by an

17   elected official or by a political action committee, a PAC.  A

18   few folks.  If you could, if you could tell me your juror

19   number and who it is that may be employed by the official.

20   Yes, sir?

21           PROSPECTIVE JUROR 121:  Juror 121.  My daughter is

22   employed by a legislator in Frankfort.  Juror 121.

23           THE COURT:  All right.  That's current employment

24   with a legislator here in Frankfort?

25           PROSPECTIVE JUROR 121:  That's correct.  My wife does

1    work the legislative session.

2            THE COURT:  I'm sorry?

3            PROSPECTIVE JUROR 121:  My work works the legislative

4    session.

5            THE COURT:  All right.  There were a couple of other

6    hands raised?  Yes, ma'am.

7            PROSPECTIVE JUROR 8:  Number 8, I'm employed by the

8    attorney general, and I have some friends who are employed by

9    the LRC.

10           THE COURT:  Can you tell me, generally, how you're

11   employed at the attorney general's office, tell me the kind of

12   work that you do.

13           PROSPECTIVE JUROR 8:  I'm a branch manager in our

14   Consumer Protection Division.  I've also worked in the

15   criminal division.  We handle complaints, you know.

16   Currently, I register various types of businesses and look

17   into any complaints and refer those to our investigators.  I

18   get those ready to go to them.

19           THE COURT:  All right.  Now, earlier, there was some

20   reference made as to Mr. White, one of the attorneys, having

21   previously worked in that office.

22           PROSPECTIVE JUROR 8:  Yes.

23           THE COURT:  Did you ever work -- I've asked you this

24   previously, but let me ask a couple of follow-ups here.  Did

25   you ever work directly with Mr. White on any matters?

1    PROSPECTIVE JUROR 8:  Not that I can recall.  I know

2  I've been in meetings with him, but I'm sure it involved the

3  same subject.  But off the top of my head, I can't recall.

4    THE COURT:  If you were selected as a juror, if

5  during the course of the case a light were to go off in your

6  head and you would say, ah, I remember what it was that we

7  worked on, do you think that would affect your ability to be

8  fair and impartial if you're seated in the case?

9    PROSPECTIVE JUROR 8:  No.

10   THE COURT:  It's not the fact that you can't remember

11  the matter, in other words?

12   PROSPECTIVE JUROR 8:  Right.

13   THE COURT:  All right.  Thank you, ma'am.  Let me

14  finish on this left side over here.  Yes, ma'am?

15   PROSPECTIVE JUROR 1:  Juror Number 1.  My uncle is

16  employed by the county jailer in Henry County.

17   THE COURT:  Your uncle is employed by the jailer in

18  Henry County?

19   PROSPECTIVE JUROR 1:  Yes.

20   THE COURT:  Anyone else on the left side?  If not,

21  let me switch over to the right.  I saw one hand.  Yes, ma'am,

22  in the back.  Number 37.

23   PROSPECTIVE JUROR 37:  37.  Sorry about that.

24   THE COURT:  That's okay.

25   PROSPECTIVE JUROR 37:  Right.  I work for Secretary

1    of State Trey Grayson.  Two primary responsibilities,

2    actually.  I work with the original land patents for mineral

3    rights access and research title and so forth.  But I also

4    work with the annexation filings for Kentucky cities.

5    Collaterally, that means I work with the county clerk's office

6    in the filing of KRS 818.4705.  I've been working with

7    Manchester in the last two weeks.

8            THE COURT:  I'm sorry.  You will be or have been?

9            PROSPECTIVE JUROR 37:  I have been working.

10   Actually, I've been doing that for about a year.

11           THE COURT:  Yes, sir in the back, 281.

12           PROSPECTIVE JUROR 281:  Currently work with the

13   Franklin County Regional Jail under the jailer, Billy

14   Robertson.

15           THE COURT:  You currently work under the jailer here

16   in Franklin County?

17           PROSPECTIVE JUROR 281:  Yes, sir.

18           THE COURT:  And being here in Franklin County, have

19   you had any interaction with any of the parties in this case

20   whatsoever?

21           PROSPECTIVE JUROR 281:  No, sir.

22           THE COURT:  Any of the defendants?

23           PROSPECTIVE JUROR 281:  No.

24           THE COURT:  Do you have any interaction with any of

25   the government attorneys or any of the agents that are

134

1     assigned to the case?

2              PROSPECTIVE JUROR 281:  No, sir.

3              THE COURT:  So as far as you know, you don't know

4     anything about this case or any of the parties in the case?

5              PROSPECTIVE JUROR 281:  No, sir.

6              THE COURT:  All right.  Thank you.  How many jurors

7     currently are working in some type of a law enforcement

8     capacity or previously, you've worked in some type of law

9     enforcement capacity?  Now, this would be in addition to those

10    answers that were given previously.  Let me go around and ask

11    again what the law enforcement capacity was when you held that

12    office.  And ma'am, on the front row, I know you previously

13    worked for the Kentucky State Police.  What's your number

14    again?

15             PROSPECTIVE JUROR 79:  79.

16             PROSPECTIVE JUROR 88:  88.

17             THE COURT:  Let me get this lady in the jury box.

18             PROSPECTIVE JUROR 88:  I'm sorry.

19             THE COURT:  Juror Number 79, you worked previously

20    for the Kentucky State Police, and that is your experience in

21    law enforcement?

22             PROSPECTIVE JUROR 79:  Right.

23             THE COURT:  Have you held any other positions?

24             PROSPECTIVE JUROR 79:  No.

25             THE COURT:  All right.  Back row, yes, ma'am?

1          PROSPECTIVE JUROR 17:  17.  Employed by the Frankfort

2     City Police.

3          THE COURT:  And that's currently.  How long have you

4     held that employment?

5          PROSPECTIVE JUROR 17:  Eleven years.

6          THE COURT:  Are other members of your family employed

7     by law enforcement?

8          PROSPECTIVE JUROR 17:  No, sir.

9          THE COURT:  Thank you.  Now let me get to front row,

10    ma'am, I'm sorry.  What was your number again?

11         PROSPECTIVE JUROR 88:  88.

12         THE COURT:  88.  How have you been employed by law

13    enforcement?

14         PROSPECTIVE JUROR 88:  I worked for KSP intelligence

15    for 31 years.

16         THE COURT:  And you told me about that earlier, I

17    think.

18         PROSPECTIVE JUROR 88:  (Nodding affirmatively).

19         THE COURT:  Have you been employed in other

20    capacities in law enforcement?

21         PROSPECTIVE JUROR 88:  No.

22         THE COURT:  Anyone else on the first row?  Let me

23    make sure I've -- okay.  No one else on the right side.  Let

24    me go to the left side of the courtroom.  Juror Number 5.

25         PROSPECTIVE JUROR 5:  Retired lieutenant, Kentucky

136

1      Correctional Complex, Franklin County.

2              THE COURT:  Franklin County.  Have you had any other

3      law enforcement positions?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Thank you, ma'am.  Yes, sir.

6              PROSPECTIVE JUROR 96:  96, Department of Corrections

7      from 2000 until 2002.

8              THE COURT:  I'm sorry?

9              PROSPECTIVE JUROR 96:  Kentucky state.

10             THE COURT:  And is that LaGrange?

11             PROSPECTIVE JUROR 96:  Yes.

12             THE COURT:  Yes, ma'am?

13             PROSPECTIVE JUROR 135:  135.

14             THE COURT:  Uh-huh.

15             PROSPECTIVE JUROR 135:  I was purchasing officer at

16     the Kentucky State Police.

17             THE COURT:  You told me previously that you worked

18     for the Kentucky State Police.  Have you held any other law

19     enforcement positions?

20             PROSPECTIVE JUROR 135:  No.

21             THE COURT:  Anyone else I missed?  Ladies and

22     gentlemen, you'll be hearing a lot of testimony in this case

23     about the area of Clay County.  We've heard some jurors who

24     indicated they're from the area, they have friends or family

25     members from the area.  I was raised in the area.  A number of

137

1    the attorneys in the case have been raised in the area or are

2    from the area.  I want to ask if anyone has any negative

3    opinions either of Eastern Kentucky or Clay County or of the

4    area, southeastern Kentucky, that you believe would prevent

5    you from being fair and impartial if you're selected in the

6    case.  Anyone just have general negative perceptions of the

7    area?

8                         (No verbal response.)

9         THE COURT:  Now, ladies and gentlemen, there are a

10   few jurors that I'm going to ask to stay while I excuse

11   everyone else for our lunch break here.  I want to ask some

12   follow-up questions here at the Bench, but I don't want to

13   keep everyone here while we do that.

14        So let me go over these numbers.  If you would,

15   please remain, and I'm going to excuse the other jurors here

16   so they can take their lunch.  What we'll do is we'll take a

17   lunch break until about 1:15 this afternoon.  So I'll give you

18   about an hour for our lunch break.  If it takes longer than I

19   expect when I do some follow-up questions here at the Bench,

20   when you come back, we may not start until a little bit later.

21   But if you could please plan to be back by 1:15.  The

22   following jurors, though, should remain.  281, 124, 8, 127,

23   Number 16, Number 132, 37, 103, and 17.  That should be nine

24   jurors.  Remaining jurors will be excused.

25        Now, before I excuse you, I do want to remind you of

1    a couple of things.  I want to give you a brief admonition of

2    what you should and should not do.  Of course, we haven't

3    selected the jury yet, but it's very important that you not

4    have any contact or communication with any parties, witnesses,

5    or attorneys in the case.

6         Now, attorneys are by their very nature very

7    friendly.

8                              (Laughter)

9         THE COURT:  But they have been instructed by me that

10   they can't have contact with potential jurors.  So if you see

11   one of the attorneys or maybe one of the case agents or one of

12   the other people here involved in the case, and they're not

13   friendly to you or they're not as friendly as you think they

14   should be, it's not because they're trying to be rude or

15   they're not generally friendly people.  It's because they're

16   trying to follow my instructions.  I have to instruct the

17   attorneys that they can't have any contact with jurors while

18   the case proceeds.

19        You shouldn't read, watch or listen to any accounts

20   of the case, if there should be any.  In other words, until

21   the case is over, you can't have any -- you can't listen to

22   anything about the case.  You can't read anything, read

23   anything about the case.  You just should not have any, any

24   interaction whatsoever with the parties, the attorneys, and

25   you should stay away from any information about the case.

139

1          You should not allow anyone to approach you to

2     discuss the case.  Now, if that should ever occur, either in

3     this case or any other case in which you are participating as

4     a juror, you should report that to the Court promptly, because

5     that's a matter that the Court should deal with.

6          And, of course, we haven't even started this trial.

7     We haven't selected the jury.  So you shouldn't be making any

8     decisions about anything that you've heard.  All you've heard

9     so far are my questions and some of the responses from some of

10    the potential jurors in the case.  So don't be making up your

11    mind about this matter at this point.

12         With that admonition, I will excuse the jury until

13    1:15.  But if those nine jurors, if you could remain please, I

14    would appreciate that.

15              (The prospective jurors left the courtroom

16              at 12:15 p.m.)

17         THE COURT:  Everyone can be seated.  Let's proceed

18    with some follow-up questions.  There were a number of jurors

19    that indicated that they had either read or had seen something

20    about the case and so what I want to do is I'm going to call

21    those jurors up first, and I want to ask you specifically

22    about whatever information that you might have seen, read or

23    heard about the case.

24         Now, what I'm going to do is I'm going to ask you

25    questions over here, and the attorneys will need to come up

1    and they'll be able to listen to your answers as well.  So if

2    you'll just bear with me.  We'll try to do this individually

3    and I'll try to move this just as quickly as we can so you all

4    can go on to your lunch as well.

5         I believe the first juror that responded to that

6    particular question was Juror Number 127.  Attorneys, if you

7    all can just come on up as well here.

8                   (A sidebar conference was held out of the

9                   hearing of the jury):

10   THE COURT:  What I want to do is I want to talk loud

11   enough so you can hear me and the attorneys can hear me.

12   Since I don't know what you may have read or seen or heard

13   about the case, I don't want your answers to in any way affect

14   anyone else's answers and so that's why I'm doing this here at

15   this sidebar conference.

16        So let me just start out by asking you kind of an

17   open-ended question of what, if anything, you recall that you

18   might have read, seen or heard about the case.

19   PROSPECTIVE JUROR 127:  The vote buying, and

20   something about a school superintendent, but I don't recall.

21   THE COURT:  Just generally that a school

22   superintendent was charged or that the article related to a

23   school superintendent?

24   PROSPECTIVE JUROR 127:  Yeah.

25   THE COURT:  Something along those lines?  Do you

141

1    remember anything about anybody else that was charged in the

2    case?

3              PROSPECTIVE JUROR 127:  I remember one was the judge.

4              THE COURT:  Okay.  School superintendent.  You

5    remember anything about specific charges?

6              PROSPECTIVE JUROR 127:  No.

7              THE COURT:  Do you remember anything about a party's

8    position in the case?  In other words, charges were made.  Do

9    you remember what the response was or anything of that nature?

10             PROSPECTIVE JUROR 127:  Well, I assume they all

11   pleaded not guilty.  That's what you said earlier.

12             THE COURT:  I guess my point is, do you recall any

13   specifics about anything that you might have read in the case?

14             PROSPECTIVE JUROR 126:  Not really.  I just saved the

15   article for my friend because she's from there and doesn't

16   take that newspaper.

17             THE COURT:  I see.  So you receive the local

18   newspaper --

19             PROSPECTIVE JUROR 127:  I think it was the -- I

20   don't -- just started taking the local lately.  So it would

21   have been the Louisville newspaper.

22             THE COURT:  So it would have been a Courier Journal

23   article, probably?

24             PROSPECTIVE JUROR 127:  Yes.

25             THE COURT:  You have a friend who lives in the area?

142

1          PROSPECTIVE JUROR 127:  She lives here, but she's

2     from there and her mother lives there.

3          THE COURT:  She doesn't take the newspaper?

4          PROSPECTIVE JUROR 127:  No.

5          THE COURT:  So you would have saved the article for

6     her and given it to her?

7          PROSPECTIVE JUROR 127:  Um-hmm.

8          THE COURT:  Do you recall having any follow-up

9     conversations with her about the case?

10          PROSPECTIVE JUROR 127:  Yes, I do.

11          THE COURT:  In the course of the conversations, did

12     she express opinions to you?

13          PROSPECTIVE JUROR 127:  She basically kind of figured

14     out what trial it was.  She knew I had been called to jury

15     duty.  Her mom knew it had been postponed so she knew it was

16     this trial.

17          THE COURT:  So you would have talked to your friend,

18     and she would have said that based on that article, that's the

19     case that you're going to be called in for jury service?

20          PROSPECTIVE JUROR 127:  Actually, she found one in

21     her bird cage too.

22          THE COURT:  Let me ask you this, and I may have some

23     follow-up for you as well.  Is there anything about the

24     conversation that you would have had with your friend that

25     would lead you to believe that a party in this case is guilty

1    or not guilty, just based on your conversation or what you

2    read?

3              PROSPECTIVE JUROR 127:  She would have opinions, yes.

4              THE COURT:  Okay.  And is she the kind of friend that

5    you trust or you believe opinions that she would express?

6              PROSPECTIVE JUROR 127:  Yes.

7              THE COURT:  Let me ask you, what opinions did she

8    express to you?

9              PROSPECTIVE JUROR 127:  Well, I think she says half

10   of her relatives are in jail up there.  So --

11             THE COURT:  So they're negative opinions?

12             PROSPECTIVE JUROR 127:  No.  I mean, that's where

13   she's from.  It's just more a family type thing.  She knows my

14   family and I don't -- she just has her mother.  But I mean

15   cousins, that's where she was raised, and she just says that

16   it was different being raised there.

17             THE COURT:  So this is a long-held perception that

18   she's had?

19             PROSPECTIVE JUROR 127:  Yes.

20             THE COURT:  And she's told you about that?

21             PROSPECTIVE JUROR 127:  Um-hmm.

22             THE COURT:  Now, if you are selected as a juror in

23   the case, you would have to be able to totally ignore opinions

24   like that expressed by friends, family members, relatives.

25   You would have to make a decision and not feel like that you

1    would have any type of pressure or bad feelings brought

2    against you from friends or family members based on a verdict

3    that you would return.

4              PROSPECTIVE JUROR 127:  She would never do that.

5              THE COURT:  Let me ask the question this way.  If the

6    evidence in the case did not support a verdict of guilt

7    against one or more defendants, would you have a problem

8    returning a not guilty verdict with respect to those

9    defendants?

10             PROSPECTIVE JUROR 127:  So they will all be

11   different --

12             THE COURT:  The case has to be considered against

13   every defendant individually.

14             PROSPECTIVE JUROR 127:  I wouldn't have a problem

15   with that.

16             THE COURT:  Okay.  Now, let me ask the reverse of

17   that.  If the evidence supported it, would you have any

18   difficulty returning a guilty verdict against one or more

19   defendants?

20             PROSPECTIVE JUROR 127:  No, I don't think so.

21             THE COURT:  Would you be able to separate and

22   consider the evidence as it relates to each individual

23   defendant?

24             PROSPECTIVE JUROR 127:  Yes.  I don't think they

25   should all --

1      THE COURT:  So you understand that evidence has to be

2  presented that meets the --

3      PROSPECTIVE JUROR 127:  Yes.

4      THE COURT:  -- appropriate standard as to each

5  defendant?  All right.  Now, again, you've got a close friend

6  that's from the area and has relatives in the area.  In the

7  course of this trial, you will be instructed that you can't

8  have any conversations about this case.

9      PROSPECTIVE JUROR 127:  About the trial.  I can have

10  conversations with her, but just not about the trial, correct?

11      THE COURT:  That's correct.  But you cannot have

12  direct or indirect communications about the case.  Such as --

13      PROSPECTIVE JUROR 127:  She knows that.

14      THE COURT:  -- how's the case going?  You can't give

15  any impressions about the case.  You can't give body language

16  that would indicate a view about the case.  You just can't

17  talk about it.  It's really for your protection more than

18  anything else.  Do you understand that you have to follow that

19  instruction?

20      PROSPECTIVE JUROR 127:  Yes, I do.

21      THE COURT:  You could not talk about this matter

22  while it's proceeding.  All right.  Thank you, ma'am.  Let me

23  call up a couple of the other jurors here.

24                  (Sidebar conference concluded.)

25      THE COURT:  Juror Number 16.

1          (A sidebar conference was held out of the

2          hearing of the gallery):

3          THE COURT:  All right.  I think you'd indicated that

4    you might have read something in the Herald or maybe seen

5    something on television about the case.

6          PROSPECTIVE JUROR 16:  Correct.

7          THE COURT:  I want to ask you at this time if you can

8    give me a little more detail about what you might have seen or

9    heard?

10         PROSPECTIVE JUROR 16:  Basically what I remember is

11   there's something going on with maybe voting fraud or money

12   laundering.  Don't remember any real specifics.  I do know

13   that the more that I sit in the courtroom for some particular

14   reason, at first I came in, seemed like I recognized a couple

15   defendants.  I don't know where from, I don't know if it's

16   from TV or where it might have been.  There's a couple more.

17   They're getting more familiar.  I don't know if it's from

18   sitting in here today or what.

19         THE COURT:  You've sat here today, you've listened to

20   my questions.  Do my questions in any way affect your ability

21   to be fair and impartial in the case?

22         PROSPECTIVE JUROR 16:  No.

23         THE COURT:  Do you feel, based on my questions, that

24   there is a greater or a lesser likelihood that any person

25   charged with a crime is guilty of the crime, just based on my

1    questions?

2              PROSPECTIVE JUROR 16:  No.

3              THE COURT:  Do you have any memory -- I know you've

4    had a chance to think about this -- of any details of any of

5    those articles that you might have seen?

6              PROSPECTIVE JUROR 16:  No, just basically the facts

7    that you've stated.  I mean, I recognize those.

8              THE COURT:  Okay.  Do you feel like based on what you

9    might have seen, that you would have a hard time setting as a

10   juror in the case?

11             PROSPECTIVE JUROR 16:  No, sir.

12             THE COURT:  Could you be fair and impartial to

13   everyone in the case if you're selected?

14             PROSPECTIVE JUROR 16:  Yes, sir.

15             THE COURT:  All right.  Thank you.

16             PROSPECTIVE JUROR 16:  Okay.

17                  (Sidebar conference concluded.)

18             THE COURT:  Juror Number 132.

19                  (A sidebar conference was held out of the

20                  hearing of the gallery):

21             THE COURT:  I think you'd indicated you might have

22   read something in the newspaper about the case.

23             PROSPECTIVE JUROR 132:  Yes, sir.

24             THE COURT:  Do you have any specific memory of

25   anything contained in an article that you read?

1          PROSPECTIVE JUROR 132:  I can tell you that I seen

2     their pictures, but that's about it.  It was basic about Clay

3     County and some of the allegations that you alluded to

4     earlier, but that was all.

5          THE COURT:  Is there anything about seeing an

6     article, seeing someone's picture in the newspaper that would

7     cause you to feel that, aha, that person's picture's in the

8     paper, they must be guilty of something.

9          PROSPECTIVE JUROR 132:  No.  It's hey, I know you.

10    I've seen you before.

11         THE COURT:  It's just recognizing someone whose

12    picture's been in the newspaper?

13         PROSPECTIVE JUROR 132:  Yes.

14         THE COURT:  Do you recall any details of what you

15    might have read?

16         PROSPECTIVE JUROR 132:  No, sorry.

17         THE COURT:  Is there anything that I've asked -- I've

18    asked a lot of questions here today.  The attorneys haven't

19    had a chance to ask any questions.  I've asked a lot of

20    questions.  Is there anything in my questions that would cause

21    you to believe that the defendant, a defendant either must be

22    guilty or must not be guilty in the case?

23         PROSPECTIVE JUROR 132:  No.

24         THE COURT:  Okay.

25         PROSPECTIVE JUROR 132:  You haven't told me anything

1    yet.

2              THE COURT:  Okay.  I just want to make sure that I

3    haven't influenced your opinion in any way.

4              PROSPECTIVE JUROR 132:  No, no.

5              THE COURT:  Thank you, ma'am.

6                        (Sidebar conference concluded.)

7              THE COURT:  Juror Number 37.

8                        (A sidebar conference was held out of the

9                        hearing of the gallery):

10             THE COURT:  I have a couple of questions for you.

11   You were employed previously, and you were working in a

12   position where you were assigned to observe some elections in

13   Leslie and Clay County?

14             PROSPECTIVE JUROR 37:  Yes, sir.

15             THE COURT:  Do you know how you were selected for

16   those particular counties?

17             PROSPECTIVE JUROR 37:  The State Board of Elections

18   worked with the Secretary of State's office and asked for

19   volunteers for this, and I thought it would be interesting,

20   and I thought it would be my civic duty.

21             THE COURT:  So you volunteered to go to an area that

22   they selected for you.  Do you know how the area was selected?

23             PROSPECTIVE JUROR 37:  No, sir, I don't.  We had been

24   told there may have been problems in the past, but they were

25   sending out teams into -- the first time we went, it was

150

1    nothing but Clay County.  And then the second time, we

2    scattered.

3              THE COURT:  So you were there two times, you said, in

4    the early --

5              PROSPECTIVE JUROR 37:  Early '90s.

6              THE COURT:  Okay.  You told me earlier that you

7    didn't observe any problems.

8              PROSPECTIVE JUROR 37:  I didn't.

9              THE COURT:  I'm sorry?

10             PROSPECTIVE JUROR 37:  I didn't.

11             THE COURT:  You didn't, but do I assume from your

12   question or your response that someone else may have observed

13   some problems?

14             PROSPECTIVE JUROR 37:  Yes, Your Honor.

15             THE COURT:  Is it part of your team?

16             PROSPECTIVE JUROR 37:  Part of the staff at the

17   Secretary of State's office were called back to testify in

18   court.

19             THE COURT:  Okay.  Now, they were called back to

20   testify in court?

21             PROSPECTIVE JUROR 37:  Yes, because they did observe

22   some irregularities, and they had to testify about what they

23   saw.

24             THE COURT:  And this would have been activities in

25   the '90s?

151

1          PROSPECTIVE JUROR 37:  Yes, sir.

2          THE COURT:  In this particular case, I do anticipate

3    that there will be some historical information that will be

4    provided, put charges in some context for the jury, and it may

5    relate back to that same time period in the '90s.  The fact

6    that you were there during that time, do you believe it would

7    prevent you from listening to the testimony and being fair and

8    impartial?

9          PROSPECTIVE JUROR 37:  No.

10         THE COURT:  Okay.  If you're seated in the jury box

11   and a witness comes on the stand and starts talking about

12   activities that occurred in the '90s or sometime when you

13   might have been in Clay County, will you be able to separate

14   the fact that you were there when the testimony was presented?

15   In other words, you can't add or subtract to the witness's

16   testimony.  You have to base a decision on what you hear from

17   the witness stand.

18         PROSPECTIVE JUROR 37:  Um-hmm.

19         THE COURT:  Without adding to it or taking anything

20   away from it, based on your own experience.

21         PROSPECTIVE JUROR 37:  Right.

22         THE COURT:  Do you think you're going to be able to

23   do that, since you did work in these -- worked as an observer

24   for these elections?

25         PROSPECTIVE JUROR 37:  My coworkers were very prudent

152

1    in their instructions, in following their instructions.  They

2    did not talk about the case.  That doesn't mean that we

3    weren't aware that they were spending a lot of time down

4    there, and there was concern about their safety.

5             THE COURT:  Okay.

6             PROSPECTIVE JUROR 37:  Whether it was justified or

7    not, I'll never know.

8             THE COURT:  All right.  Now, again, if you are

9    selected as a juror, those are factors that you couldn't even

10   take into account.  You could not even consider it.  If you

11   did consider something like that, it would be a violation of

12   your duty as a juror.  Do you think it would be difficult for

13   you to separate those past activities from what's going to be

14   presented here in court?

15            PROSPECTIVE JUROR 37:  No, I don't think it would be

16   difficult for me to do it.

17            THE COURT:  You feel like that you'd be able --

18            PROSPECTIVE JUROR 37:  I'm afraid it might be

19   difficult.

20            THE COURT:  You think it would be?

21            PROSPECTIVE JUROR 37:  It might be difficult.  One of

22   the ladies is still working with me.

23            THE COURT:  Well, I appreciate your candor.  I do.

24   And, you know, the attorneys are standing here, and they want

25   to select jurors that will be fair and impartial to everyone

153

1    in the case.  And the only way we can do that is to have

2    jurors that really express what they're honestly feeling about

3    issues, and you think that it would be difficult to serve?

4         PROSPECTIVE JUROR 37:  I had a very good experience

5    in Clay County.  Everything went very well.  When I came back

6    and I heard that there were teams that had problems, I was

7    very disappointed and saddened.

8         THE COURT:  Okay.

9         PROSPECTIVE JUROR 37:  Those feelings I haven't

10   forgotten.

11        THE COURT:  All right.

12        PROSPECTIVE JUROR 37:  I'm sorry.

13        THE COURT:  That's all right.  You also indicated

14   that you have read one or more articles about the case and you

15   think you did some reading online on kentucky.com?

16        PROSPECTIVE JUROR 37:  Yes, um-hmm.

17        THE COURT:  Do you recall anything specifically about

18   this case that you might have read?

19        PROSPECTIVE JUROR 37:  I was trying to determine if

20   this had something to do with the new E-vote, E-slate type of

21   voting that we were having.  I just scanned the article.  I

22   didn't read it all in its entirety.  And then secondly, I was

23   trying to determine if the county clerk may have had to endure

24   two classes that I teach annually for county clerks.

25        THE COURT:  That's what I was going to ask about, do

154

1       you teach any classes.

2              PROSPECTIVE JUROR 37:  I teach classes.  They're not

3       related to elections, but they are related to legal

4       requirements for city annexations, and I was trying to

5       match -- and I looked on our website to match up the county

6       clerk's name.

7              THE COURT:  I see.  All right.  Thank you, ma'am.

8       That's all the questions that I have for you at this time.

9       Thank you.

10             PROSPECTIVE JUROR 37:  Thank you, and I'm sorry if I

11      seem like I go on and on.  I feel like that's what you're

12      asking for.

13             THE COURT:  I appreciate that.

14             PROSPECTIVE JUROR 37:  Thank you.

15             THE COURT:  I was able to ask Juror 281 follow-up

16      questions about an informant in the Franklin County jail.

17      I'll ask him follow up if you want me to.

18             MR. ABELL:  Perhaps as a chaplain --

19             THE COURT:  I'll ask him what he does.

20             MR. ABELL:  I don't want him to cross paths with Mr.

21      Stivers --

22             THE COURT:  I'll call him up.

23                    (Sidebar conference concluded.)

24             THE COURT:  Juror 281.

25                    (A sidebar conference was held out of the

155

1                  hearing of the gallery):

2              THE COURT:  All right.  I just had a few follow-up

3     questions.  You told me at one point, you lived in Laurel

4     County.

5              PROSPECTIVE JUROR 281:  Correct.

6              THE COURT:  And you're a minister, and you had some

7     people in your congregation that were from Clay County?

8              PROSPECTIVE JUROR 281:  From Clay County, correct.

9              THE COURT:  Do you know what areas of Clay County

10    they may have lived in?

11             PROSPECTIVE JUROR 281:  Manchester and then outer

12    areas of Clay County.

13             THE COURT:  Do you know the specific areas?

14             PROSPECTIVE JUROR 281:  I do not.

15             THE COURT:  If I give you a name of an area in Clay

16    County, would you --

17             PROSPECTIVE JUROR 281:  I don't know that I'd be able

18    to tell you.

19             THE COURT:  How long were you in Laurel?

20             PROSPECTIVE JUROR 281:  We were there for three

21    years.

22             THE COURT:  What was your church?

23             PROSPECTIVE JUROR 281:  Community Christian Church in

24    London.

25             THE COURT:  You're currently employed by the Franklin

1    County jailer; is that correct?

2          PROSPECTIVE JUROR 281:  Correct.

3          THE COURT:  You're still a minister, though?

4          PROSPECTIVE JUROR 281:  Yes.

5          THE COURT:  Do you work there at the jail?

6          PROSPECTIVE JUROR 281:  Yes.

7          THE COURT:  Tell me the kind of work that you do.

8          PROSPECTIVE JUROR 281:  I'm a deputy jailer so I've

9    worked as a guard.

10          THE COURT:  So you do a little bit of everything.

11    What I was going to ask you if you also -- I know that there's

12    religious services that are held as well there are ministers

13    that come in.

14          PROSPECTIVE JUROR 281:  Right.

15          THE COURT:  And provide some religious guidance to

16    the people that are housed in the jail.  Do you do that as

17    well?

18          PROSPECTIVE JUROR 281:  I do not.  Not through the

19    jail.

20          THE COURT:  So you're just a deputy jailer?

21          PROSPECTIVE JUROR 281:  Correct.

22          THE COURT:  What shift do you usually work?

23          PROSPECTIVE JUROR 281:  Third.

24          THE COURT:  Okay.  That's another question I want to

25    follow up.  So you work at night, and then if you're selected

157

1    as a juror, would you continue to work or would you --

2            PROSPECTIVE JUROR 281:  I'm currently part-time so

3    I'm basically on call there.  I have the opportunity to

4    decline to come in.

5            THE COURT:  If you're called in, if you're selected

6    as a juror and you tell me you work usually third shift, would

7    that change if you're here in court during the day?  Would you

8    be called in just for night duty or however that worked?

9            PROSPECTIVE JUROR 281:  It could.  On that -- that is

10   typically, because I came from third shift, so that being the

11   case, they usually call me back for third shift work.

12           THE COURT:  Are you paid while you're serving as a

13   juror?

14           PROSPECTIVE JUROR 281:  Not through the jail.  That

15   is only the days that I work.  But through the church that I

16   minister with, I am.

17           THE COURT:  I'm trying to find out if this would be a

18   financial hardship for you if you are selected.

19           PROSPECTIVE JUROR 281:  It would not.

20           THE COURT:  The church would continue to pay you?

21           PROSPECTIVE JUROR 281:  Yes, sir.

22           THE COURT:  What is the church?

23           PROSPECTIVE JUROR 281:  Fox Creek Christian Church in

24   Lawrenceburg.

25           THE COURT:  It's in Lawrenceburg, Anderson County.

1   Okay.  Thank you.

2               PROSPECTIVE JUROR 281:  Okay.

3                    (Sidebar conference concluded.)

4               THE COURT:  Juror Number 103.

5                    (A sidebar conference was held out of the

6                    hearing of the gallery):

7               THE COURT:  You told me earlier, I think, that your

8    mother's family is from Clay County area.

9               PROSPECTIVE JUROR 103:  Um-hmm.

10              THE COURT:  And you told me about some, basically,

11   negative comments or negative opinions that family members

12   might have expressed to you from time to time.

13              PROSPECTIVE JUROR 103:  Yeah.  About politicians in

14   general.

15              THE COURT:  Politicians in general?

16              PROSPECTIVE JUROR 103:  Yeah, that's just how I was

17   raised pretty much.  That's all I heard.  Like they'd come up

18   on the TV, and grandpa would say another one of them crooks

19   got caught, you know.

20              THE COURT:  Was it just politicians in general, or

21   was it politicians from the Clay County area or from the

22   Laurel County area?

23              PROSPECTIVE JUROR 103:  In general.

24              THE COURT:  Just in general?

25              PROSPECTIVE JUROR 103:  Yeah, I would say.  I didn't

1    pay a whole lot of attention to the comments, you know.  It's

2    just something I remember throughout my upbringing, I guess

3    you'd say.

4              THE COURT:  Do you feel like that there are good

5    politicians and then there are bad politicians, or do you

6    think that everybody -- kind of like your grandfather, do you

7    think all politicians can't be trusted?

8              PROSPECTIVE JUROR 103:  Pretty much, yeah.

9              THE COURT:  All right.  You do?

10             PROSPECTIVE JUROR 103:  Pretty much.

11             THE COURT:  So if you were selected as a juror in

12   this case, and we do have a number of public officials that

13   are defendants in the case, it sounds like you would have a

14   hard time being fair and impartial in terms of weighing the

15   evidence.  Am I --

16             PROSPECTIVE JUROR 103:  Pretty much would have to be

17   proven innocent, if that makes any --

18             THE COURT:  You do understand that a defendant has no

19   burden of proof at all in a case, that the government has the

20   burden to prove whatever crime has been charged?  The

21   government has the burden to prove that charge or charges

22   beyond a reasonable doubt.

23             PROSPECTIVE JUROR 103:  Yeah.

24             THE COURT:  But you feel like, based on the fact that

25   this case involves politicians, that you would maybe apply a

160

1  different standard in the case?  That you, yourself, would do

2  that?

3        PROSPECTIVE JUROR 103:  I mean, it's hard to answer

4  yes or no, but, I mean, it's just opinionations [sic] of --

5        THE COURT:  That's kind of a heartfelt belief that

6  you have, is that a good summary?

7        PROSPECTIVE JUROR 103:  I guess, I mean, from just

8  upbringing.  I think there's a lot of stuff that's happened in

9  my family that's sent them in that direction, I would say.

10       THE COURT:  Okay.  But you've been told that as you

11  were growing up and you kind of feel that way at this point in

12  your life?

13       PROSPECTIVE JUROR 103:  Yeah, pretty much.

14       THE COURT:  All right.  Thank you.

15            (Sidebar conference concluded.)

16       THE COURT:  Juror Number 17.

17            (A sidebar conference was held out of the

18            hearing of the gallery):

19       THE COURT:  Yes, ma'am.  You had indicated earlier

20  that you are currently employed by the Frankfort police, city

21  police department?

22       PROSPECTIVE JUROR 17:  Yes, sir.

23       THE COURT:  Now, what exactly do you do?  Are you a

24  dispatcher?

25       PROSPECTIVE JUROR 17:  No, no, no, no.  Like an

1    office flunkie, you know.  I answer the phone, distribute the

2    calls, do accident reports.  I don't actually do them, I just

3    put them -- print them off from KSP website and put them

4    together and put them in a folder.

5         THE COURT:  So if someone has an accident and they

6    need a copy of the accident report, they come to you?  Do you

7    ever have interaction with defendants in cases?

8         PROSPECTIVE JUROR 17:  No, sir.

9         THE COURT:  For example, if a city police officer

10   were to arrest someone, would you ever have any interaction

11   with the person?

12        PROSPECTIVE JUROR 17:  No, no.  We're in a glassed-in

13   cage, like.

14        THE COURT:  But you might deal with the paperwork?

15        PROSPECTIVE JUROR 17:  I don't deal with, like, the

16   citations and -- I just deal with the accidents.  That's the

17   only paperwork I really deal with.

18        THE COURT:  Okay.  Now, in your position, do you ever

19   have any interaction with attorneys that handle cases?  I

20   asked earlier if you knew any of the fellas that are kind of

21   surrounding you now.  I think you said you didn't know

22   anybody.

23        PROSPECTIVE JUROR 17:  No.  The only would be like

24   local attorneys and that would be if they called in and they

25   left a message.  And that would be it.  You know, they don't

1    tell me anything.

2        THE COURT:  Okay.  So you don't know any of the

3    attorneys, and I think you said earlier you don't know any of

4    the defendants in the case as well?

5        PROSPECTIVE JUROR 17:  No.

6        THE COURT:  Don't know any of the case agents?

7        PROSPECTIVE JUROR 17:  No.  I'm just in a glassed-in

8    cage.

9        THE COURT:  Okay.  Thank you.

10        PROSPECTIVE JUROR 17:  Thank you.

11            (Sidebar conference concluded.)

12        THE COURT:  Juror Number 8.

13            (A sidebar conference was held out of the

14                hearing of the gallery):

15        THE COURT:  All right.  Let's see now.  You currently

16    work in the attorney general's office, and I've asked you

17    quite a few questions about that already.  I've asked you

18    about whether you work with Mr. White.  Now, from time to

19    time, he may have worked on matters in that office, and you

20    said that you might have been in meetings with him, but you

21    don't really remember.

22        PROSPECTIVE JUROR 8:  What they were about, right.

23        THE COURT:  Let's see.  What do you actually do in

24    the attorney general's office?

25        PROSPECTIVE JUROR 8:  I am a branch manager in our

163

1    Consumer Protection Division right now.

2            THE COURT:  Okay.

3            PROSPECTIVE JUROR 8:  We handle consumer complaints.

4    We regulate certain industries like cemeteries, funeral homes,

5    business opportunities, telemarketers.

6            THE COURT:  Do you have any involvement with any type

7    of election activities at all?

8            PROSPECTIVE JUROR 8:  No.

9            THE COURT:  Do you have any interaction with people

10   that engage in that type of activity?

11           PROSPECTIVE JUROR 8:  In elections?  No.

12           THE COURT:  Okay.  Do you ever work with the Board of

13   Elections, the State Board of Elections?

14           PROSPECTIVE JUROR 9:  No.

15           THE COURT:  So you don't know anyone in that

16   department as well?

17           PROSPECTIVE JUROR 8:  No, sure don't.

18           THE COURT:  Mr. Westberry?

19           MR. WESTBERRY:  She had some familiarity, I think, if

20   I recall, with this case and expressed some reservation, and I

21   wanted the Court to follow that up.

22           THE COURT:  Okay.  Tell me what it is that you've

23   heard about this case, read about the case or seen.

24           PROSPECTIVE JUROR 8:  Okay.  Well, I interact with

25   our investigators back in our special investigation division,

1    and I've done, like, they send us out sometimes -- I haven't

2    done that since probably the early 2000s, but like sting

3    operations, they put a wire on me and send me with a car to a

4    repair shop.  So interact with our investigators some.  So

5    I've just heard them.

6           Plus, my friend, who works for our office as well,

7    she is from Clay County.  So I've heard her say things.  I

8    believe she said that her brother-in-law is related to Mr.

9    Maricle.  And so Mr. Maricle was at family gatherings with her

10   and that sort of thing.  So she knows him fairly well.  I've

11   heard comments.  I don't know if you want to hear the

12   particulars --

13          THE COURT:  Well, I --

14          PROSPECTIVE JUROR 8:  -- of what I've heard.

15          THE COURT:  I do want to know what you've heard, and

16   then I want to ask you if it would in any way affect your

17   ability to be a juror in the case.

18          PROSPECTIVE JUROR 8:  Okay.

19          THE COURT:  This is information you would have heard

20   from a friend?

21          PROSPECTIVE JUROR 8:  And possibly --

22          THE COURT:  Possibly investigators, but the friend

23   first.

24          PROSPECTIVE JUROR 8:  It's kind of hard to

25   differentiate at this point which one I may have heard it

1    from, quite honestly.

2            THE COURT:  Just tell me what it is and we'll try to

3    figure it out.

4            PROSPECTIVE JUROR 8:  I've heard that he's known as

5    the Godfather of Clay County.

6            THE COURT:  Okay.

7            PROSPECTIVE JUROR 8:  I've heard that it was looked

8    into that he'd had someone murdered, and I've heard that he

9    pretty much has a drug cartel.  Whether all that's true, I

10   don't know, but I've heard those things --

11           THE COURT:  From time to time --

12           PROSPECTIVE JUROR 8:  -- from one source or another.

13           THE COURT:  -- people can say incorrect, nasty things

14   about other folks.  Just because someone says it doesn't

15   necessarily mean that it's true.  But when you hear something

16   from a friend, sometimes you give it more meaning, perhaps,

17   than you would from other people.

18           Do you feel like that any of the information that you

19   just told me about would have an impact on you being able to

20   serve as a juror in the case?

21           PROSPECTIVE JUROR 8:  You know, I have -- of course,

22   it's hard to answer until you're sitting there to know whether

23   you're going to be able to get that out of your head.  I think

24   I may be able to.  But to be able to tell you 100% fer sure I

25   could put all that aside, I probably can't say yes, that I

1    could.  I honestly don't know.  I'm sorry.

2            THE COURT:  That's fine.

3            PROSPECTIVE JUROR 8:  In doing what we do, of course,

4    our office only hears when people are breaking the law so we

5    get possibly kind of tainted in that way as well, because

6    that's all I ever hear is from people who have had something

7    done to them that is wrong and they're calling to complain.

8            THE COURT:  You told me about some of these comments

9    that were made, and you said you weren't able to tell whether

10   they were from your friend that has a brother-in-law that's

11   related to Mr. Maricle or from, perhaps, an investigator that

12   works in your office.  Regardless of who it came from, is

13   there any other information that you've received related to

14   either the defendants or the case in general?

15           PROSPECTIVE JUROR 8:  Not that I can recall.

16           THE COURT:  So you've told me pretty much what you've

17   heard?

18           PROSPECTIVE JUROR 8:  Right.

19           THE COURT:  And you said that while you may be able

20   to set it aside, you can't be sure at this time that you can

21   do that?

22           PROSPECTIVE JUROR 8:  I mean, I have to be honest,

23   because I would hate to be up there judging somebody if I

24   couldn't be completely fair about it.

25           THE COURT:  You have to be honest with me about this,

1    and I appreciate it.

2              PROSPECTIVE JUROR 8:  I know I sound indecisive.

3              THE COURT:  I understand.  Thank you, ma'am.

4              PROSPECTIVE JUROR 8:  You're welcome.

5              MR. WESTBERRY:  Thank you, Judge.

6                   (Sidebar conference concluded.)

7              THE COURT:  124.

8                   (A sidebar conference was held out of the

9                   hearing of the gallery):

10             THE COURT:  How are you?  You're our last juror, 124;

11   is that right?

12             PROSPECTIVE JUROR 124:  Yes, sir.

13             THE COURT:  You work for Board of Elections?  You

14   currently work for Board of Elections?

15             PROSPECTIVE JUROR 124:  No, sir.  I left Board of

16   Elections in 1995.  There for six years.

17             THE COURT:  While you were employed by the Board of

18   Elections, did you ever have any involvement with matters

19   involving elections in Clay County?

20             PROSPECTIVE JUROR 124:  Yes.

21             THE COURT:  To your memory?

22             PROSPECTIVE JUROR 124:  Yes.

23             THE COURT:  Do you remember who might have been

24   involved in terms of any type of allegations or things of that

25   nature?

1          PROSPECTIVE JUROR 124:  Now, my role in this would be

2     to gather election night totals, speak with county clerks as

3     far as what they need or their staff.  The only investigations

4     I ever did were in the Lake Cumberland area.

5          THE COURT:  All right.  That's down Pulaski County in

6     that area?

7          PROSPECTIVE JUROR 124:  Yes, sir.  Pulaski County is

8     what I was assigned to.  I also took federal court documents

9     to the federal court in Covington if we had a case being

10    pursued on somebody.  I was the one that would transport that.

11         THE COURT:  So you had to actually go up for a grand

12    jury matter?

13         PROSPECTIVE JUROR 124:  I never had to present before

14    that.  I had to drop it off to make sure it got in by the time

15    limit in order to get the case in court.

16         THE COURT:  I see.  As far as you know, did you ever

17    have any type of involvement with any of the matters that I've

18    described here?

19         PROSPECTIVE JUROR 124:  Just dropping the documents

20    off, I believe, in Covington's court, if I'm not mistaken.

21         THE COURT:  Okay.  Did those documents relate to

22    this --

23         PROSPECTIVE JUROR 124:  I don't know what the

24    documents were.  I was just told the matter at hand, what I

25    was transporting.

169

1      THE COURT:  You were told to transport documents and

2  you did your job?

3      PROSPECTIVE JUROR 124:  Right.

4      THE COURT:  You didn't read the documents?

5      PROSPECTIVE JUROR 124:  No, sir.  Closed and sealed,

6  confidential.

7      THE COURT:  Based upon your position with Board of

8  Elections, would you feel like that you would be able to sit

9  in judgment of what I've described to you here, cases

10  involving claims of election fraud, vote buying, things of

11  that nature?

12      PROSPECTIVE JUROR 124:  Sure.  Yes.

13      THE COURT:  You feel like you would be either more

14  inclined or less inclined to render a guilty verdict in the

15  case?

16      PROSPECTIVE JUROR 124:  To be honest, more inclined

17  after being trained on investigation procedures and what to

18  look for and things of that nature and what it takes to

19  actually be --

20      THE COURT:  So you might, because you know a little

21  bit about the election process, you feel like you might be a

22  little more inclined to return a guilty verdict.  Now, let me

23  ask you this question.  If the United States presented its

24  case and you believed that the evidence did not support,

25  beyond a reasonable doubt did not support a conviction on one

1    or more charges against one or more defendants, would you have

2    a -- do you feel like you would have a difficult time

3    returning a not guilty verdict?

4            PROSPECTIVE JUROR 124:  If there's no evidence, no, I

5    wouldn't have --

6            THE COURT:  Now, you also understand that a defendant

7    has no burden of proof whatsoever in a case.  That it's the

8    government's burden to prove all the elements of the crime,

9    and the government has that obligation with respect to each

10   individual defendant.

11           PROSPECTIVE JUROR 124:  Yes, sir.

12           THE COURT:  Now, in telling me that you do understand

13   that burden, that conflicts with what you told me earlier.

14           PROSPECTIVE JUROR 124:  I agree.  Under the

15   investigative process, we were trying to see certain telltale

16   signs.  With that being told, I was trained to say if there

17   were telltale signs, you end up making a phone call back to

18   Board of Elections.  They call the state police.  There's

19   reason enough to believe there's something going on.

20           THE COURT:  Essentially what you're describing to me

21   is starting an investigation to determine whether any type of

22   criminal activity or other improper activity has taken place.

23   You're not making that final determination yourself?

24           PROSPECTIVE JUROR 124:  No, sir.

25           THE COURT:  You're just passing it up the chain?

1          PROSPECTIVE JUROR 124:  Yes, sir.

2          THE COURT:  You understand if you were seated as a

3    juror in this case, you essentially would have to listen to

4    the evidence presented, and then you'd have to consider the

5    instructions, the legal instructions that I'll be giving to

6    you and you have to consider the evidence in the context of

7    those instructions.

8          PROSPECTIVE JUROR 124:  Yes, sir.

9          THE COURT:  And that may be similar to what you've

10   been trained in the past.  It may be something different than

11   what you've been trained in the past.

12         PROSPECTIVE JUROR 124:  Yes, sir.

13         THE COURT:  If it's different, you would have to

14   follow the instructions I give you and disregard what you've

15   been trained.

16         PROSPECTIVE JUROR 124:  Totally understand.

17         THE COURT:  Do you feel like you would do that as

18   well?

19         PROSPECTIVE JUROR 124:  Yes, sir.

20         THE COURT:  All right, thank you.

21              (Sidebar conference concluded.)

22         THE COURT:  Before we get into challenges for cause,

23   do you all need to collect your notes on these matters?

24   Otherwise, we can go ahead and do challenges for cause now, if

25   you want.  I told the jury to come back at 1:15.  We're not

1    probably going to be ready to do that until 1:30.  We'll need

2    to go through a number of these jurors that have responded.

3    Does anyone need time to look through your notes before we do

4    that?  Do you need a bathroom break, anybody?

5           MR. WESTBERRY:  A couple of minutes.  I think I know

6    our requests for cause.

7           THE COURT:  Why don't we take about five minutes.  If

8    anyone does need to run to the restroom, this would be a five

9    minute recess.  We'll come back, and we'll be able to take up

10   your challenges for cause.  And then when the jury comes back,

11   what I'll be able to do is have the clerk -- I'll excuse those

12   jurors.  We'll have room in the courtroom at that point.

13   We'll be able to call up the 36 jurors, and we'll be able to

14   take another break so you can exercise your preemptory

15   challenges.

16                    (Multiple people talking.)

17          THE COURT:  Why don't we take 30 minutes now.  Is 30

18   minutes enough for everybody?

19                    (Multiple people talking.)

20          THE COURT:  I'll let you all worry about that.  There

21   are a few places around here.  There's a sandwich shop and a

22   few other places that will be available now.

23          MR. PINALES:  Jurors should be finished.

24          THE COURT:  We'll come back at 1:30.  I'll give you

25   30 minutes.  We'll come back at 1:30.  I'll tell the marshals

173

1    that the jury will not need to be ready until 1:45.  So that

2    will give us 15 minutes to take up challenges for cause.

3                MR. PINALES:  Will the jurors be coming into this

4    room so we can't talk?

5                THE COURT:  No, they're not going to be able to come

6    into this room.  I want to do this in open session.

7                MR. PINALES:  Thank you.

8                        (Sidebar conference concluded.)

9                THE COURT:  Madam Clerk, as I just advised the

10   attorneys, what we're going to do is we're going to take a

11   30-minute recess so the attorneys can get lunch.  The security

12   officers can advise the jury when they come back at 1:15 that

13   they will not need to be back and ready to go until 1:45.

14   I'll give them an additional 30 minutes.  They won't need to

15   be in the building until that time.  Once we do start back at

16   1:30, we don't need any of the jurors in the courtroom.  At

17   that time, we'll take up challenges for cause at 1:30.

18   Everyone clear on that, the way we're going to proceed?

19               MR. WESTBERRY:  Yes.

20               THE COURT:  Let's see.  I just have one other matter.

21   Miss Hughes, if I could see you just for one second, please

22   and then I'll announce the recess in just one moment.

23                    (A sidebar conference was held out of the hearing

24                        of the gallery and off the record.)

25               THE COURT:  We'll be in recess.

1        (Recess from 12:59 p.m. until 1:38 p.m.)

2           THE COURT:  The record will reflect that the parties

3    and all counsel are present.  Of course, the jury's not

4    present at this time.  At this time, I'll take up the issue of

5    jurors being excused for cause.  I'm sorry.  I missed Miss

6    Logan.

7           MR. WESTBERRY:  I'm sorry, Judge.

8           THE COURT:  Mr. Smith or Mr. Parman, do you have

9    jurors that you would suggest be excused for cause?

10          MR. SMITH:  We have Juror Number 45.  In response to

11   questions regarding experience with the criminal justice

12   system, indicated that his son had been prosecuted.  He

13   expressed very deep hard feelings towards the prosecution, and

14   when asked by the Court whether he could be fair and

15   impartial, I wrote in my notes he said he could not be fair

16   and impartial.

17          THE COURT:  All right.  Next juror?

18          MR. SMITH:  Also, in that same vein, Juror

19   Number 100.  This juror indicated that his son had been

20   prosecuted in Fayette County.  Also held deep feelings, felt

21   that an older brother had been convicted of child molestation

22   charges, had been tricked by the police.

23          THE COURT:  All right.  Next juror.

24          MR. SMITH:  Said could not leave feelings out.

25          THE COURT:  Next?

1          MR. SMITH:  126.  Also, son being charged with a

2     crime.  And had very deep, hard feelings about the way it was

3     handled and indicated that the punishment did not fit the

4     crime.

5          THE COURT:  All right.  Next juror?

6          MR. SMITH:  Your Honor, there were a couple of jurors

7     that had what I would consider to be circumstances which I

8     think it's implied that they're going to have difficulty.

9     Juror Number 95 said his father was convicted of drug charges

10    and I believe had been put in maximum security in New York.

11    Again, one would imply in that situation, I think the Court

12    did ask him one or two follow-ups about that, and my notes

13    don't reflect whether or not he was ambivalent.  I recall him

14    being a little bit ambivalent when asked by the Court about

15    whether or not that experience was one which he had negative

16    feelings about the prosecution.  So I bring that to the

17    Court's attention in that same vein.

18         THE COURT:  All right.

19         MR. SMITH:  I believe, Your Honor, that there were --

20    as media exposed topics were discussed, there were a couple of

21    jurors, I believe Juror Number 37 was one of the last ones to

22    come to the Bench, and I believe that she indicated that she

23    really just couldn't give us a confidence that she could be

24    fair and impartial.  Based in part, I think, more a part based

25    on her experience with the Secretary of State's office

176

1    investigations.

2                THE COURT:  All right.  Next juror?

3                MR. SMITH:  And same way with Juror Number 8.  I

4    believe she also said she couldn't be confident.  She'd have a

5    hard time, said she didn't know when asked by the Court.

6                THE COURT:  She's the juror that also expressed

7    information that she had received from a friend or from a

8    coworker about one of the defendants in the case as well.

9                MR. SMITH:  Right.

10               THE COURT:  All right.

11               MR. SMITH:  And also Juror 127.  I believe she's also

12   got a girlfriend in Clay County and expressed similar

13   reservations, I think, when pressed about those.

14               I think, Your Honor, we had also 103 listed.  He

15   apparently had also family in Clay and Laurel Counties; had, I

16   believe, predisposed to beliefs that politicians couldn't be

17   trusted.  I think that's all I have, Your Honor.

18               THE COURT:  All right.  Did you believe there was

19   reason to excuse Juror Number 124, who is a former employee of

20   Board of Elections?

21               MR. SMITH:  I did have him question mark on him, Your

22   Honor.  I think he gave some indication early that he was more

23   inclined to vote in a case for guilty.  And then when pressed,

24   he was I think giving answers relating to his investigative

25   knowledge and how he determined whether an investigation was

1    worthy.  So I do have a question mark about him.

2            I don't know how Your Honor plans to look at the

3    hardship cases, but I had a number of those.

4            THE COURT:  I've listed all of those that I would

5    place under hardship.  You know what my practice is, and that

6    is if we have a hardship in a case and we have sufficient

7    jurors, I'm inclined to excuse those jurors for cause.  And I

8    can go ahead and give you the ones that I've placed in that

9    category.  That may expedite the process.

10            Before I get to those, let me ask if any of the

11   defendants object to the nine individuals, the nine jurors

12   that Mr. Smith has recommended be excused for cause.  Mr.

13   Hoskins?

14            MR. HOSKINS:  Yes, Your Honor.  I would object to

15   Number 45 being excused for cause.  He said he had some hard

16   feelings, but I think he was rehabilitated and can judge this

17   case on the evidence in this case.

18            Same thing with Juror Number 100.  I would object to

19   him being excused for cause.  He talked about a couple of

20   particular incidents, but they're very different from this

21   kind of case.

22            THE COURT:  He also said that he couldn't set aside

23   his feelings about prosecution and a conviction against his

24   brother who I think he described as not being very well

25   educated.  He couldn't set those feelings aside.

1      MR. HOSKINS:  He did, Your Honor.  He said he thought

2  his brother had been tricked into saying he had done something

3  that he hadn't done.  I think that's a very different kind of

4  case than what we have here.

5      THE COURT:  So you object to 45 and 100.

6      MR. HOSKINS:  Also object to number 126, because I

7  believe she said that while the punishment didn't fit the

8  crime in her son's case, that she can follow the Court's

9  instructions.

10      THE COURT:  All right.

11      MR. HOSKINS:  I would object to Juror Number 95 being

12  stricken for cause just because his father has been convicted

13  in state court in New York.  He didn't portray any animosity

14  towards the law in general.

15      Those are the only of the government's challenges

16  that I object to, Your Honor.

17      THE COURT:  Let's see if anyone else has either any

18  additional reasons or any additional objections to these other

19  five jurors.

20      MR. WESTBERRY:  On behalf of Mr. Adams, Your Honor,

21  we have no additional points other than those made by counsel.

22      MR. WHITE:  Same thing from Mr. Jones, Your Honor.

23      THE COURT:  Mr. Abell?

24      MR. ABELL:  Judge, I concur.  With regard to Juror

25  Number 100, I believe that he said, quote, I think I can leave

179

1     my feelings out, end quote.

2              THE COURT:  I'm sorry?

3              MR. ABELL:  I believe the bottom line is he said "I

4     think I can leave my feelings out" is the bottom line.

5              THE COURT:  This is Juror Number 100?

6              MR. ABELL:  Yes, sir.

7              MR. RICHARDSON:  Yes, sir.  Tucker Richardson on

8     behalf of Defendant Thompson would join in the objections to

9     100, 126.  As to number 100, we have in our notes we had he

10    rehabbed and could set those feelings aside.  We object to 100

11    and the general objection to 126, 45 and 95 also, Judge.

12             MR. GILBERT:  Would join with no further objection.

13             THE COURT:  Thank you.

14             MS. HUGHES:  I also have nothing else to add.

15             MR. SIMONS:  Nor do I, Your Honor.

16             THE COURT:  All right.  Thank you.  Well, having

17    heard the jurors' responses and having considered the manner

18    in which they presented their responses, I am going to excuse

19    for cause Jurors Number 45, 100, 126.  I concur with the

20    statements that were made by Mr. Smith.  I believe that they

21    would have a difficult time setting aside any personal

22    feelings and rendering a verdict in the case without those

23    feelings coming to bear.

24             I am not going to excuse Juror Number 95.  I believe

25    that based upon the fact that he only indicated he has a

180

1   father that's serving time on federal charges in New York

2   would not be a sufficient reason and he did not give me other

3   reasons to be concerned so he'll be left in.

4        I will excuse as well Jurors Number 37, Number 8,

5   Number 127, Number 103 and Number 124.  Those jurors will be

6   excused for cause at this time.

7        Now, let's set aside the hardship excuses for just a

8   moment, and let's focus on other excuses for cause.  Other

9   than the ones we've just gone through, do any of the

10  defendants have additional reasons that you would like to ask

11  that a juror be excused.  Mr. Hoskins?

12       MR. HOSKINS:  Yes, Your Honor.  I would ask that

13  Juror Number 281 be excused for cause.  I think in his

14  situation, it's kind of a combination of problems.

15  Combination of factors that would, taken as a whole, render

16  him not the right person.

17       THE COURT:  He's also an employee of the Franklin

18  County Jail.

19       MR. HOSKINS:  Correct.

20       THE COURT:  Everyone doesn't have to repeat, unless

21  you disagree with it.  Do any of the defendants disagree with

22  Mr. Hoskins with respect to 281?

23                         (No verbal response.)

24       THE COURT:  Mr. Smith, what's your position on

25  Juror 281?

1          MR. SMITH:  Your Honor, he has no idea about the

2     case, apparently has no information from his contacts in Clay

3     County or Laurel County about the case.  He knows none of the

4     parties.  He's worked at the jail but doesn't recognize anyone

5     here.  He seemed to have no problem in following the Court's

6     instructions.  I would object.

7          THE COURT:  All right.  Well, the problem that I have

8     is the fact that he's a deputy jailer, and if he is called in

9     in the course of this proceeding, Mr. Stivers is currently

10    being held in the Franklin County Jail, and I'm concerned that

11    we could lose a juror in the middle of the case if that

12    occurs.  And so I will excuse Juror Number 281 for cause for

13    those reasons.  Mr. Hoskins?

14         MR. HOSKINS:  Thank you, Your Honor.  I would also

15    ask the Juror Number 88 be excused for cause.  She was a

16    long-time employee of the Kentucky State Police in the

17    intelligence division and also has a personal acquaintance

18    with Gilbert Acciardo, who is a retired state trooper and

19    potential witness in this case.

20         THE COURT:  All right.  I assume that all other

21    defendants join in that objection as well?  I don't think that

22    there was sufficient reason that she gave me to excuse her for

23    cause.  I think that's more in line of a preemptory challenge.

24    She answered all the questions that she wouldn't have any

25    problem so I don't think a for-cause challenge will be

1    appropriate for her.

2        MR. HOSKINS:  Your Honor, the last juror I would ask

3    to be excused for cause may move into the hardship category.

4    But my concern is Juror Number 91 has a court appearance in

5    Indiana during the trial, and it has to do with a custody of a

6    grandchild, and that's obviously a very emotional thing for

7    her, and I think that's something that's going to be on her

8    mind in the days leading up to that.  So I think that she

9    should be excused.

10        THE COURT:  I have her on my hardship list.  Let's

11    see if anyone objects to that juror.  I'll get to those in

12    just a moment.  Let's see if anyone objects to that juror

13    being excused for the reasons stated.  No?  All right.  Thank

14    you.  Mr. Westberry?

15        MR. WESTBERRY:  Thank you, Judge.  Only one.  Juror

16    Number 88 is the woman who sat over in the jury box.  I recall

17    she's been retired for a number of years from the Kentucky

18    State Police.  I do recall her specifically stating that she

19    had a sense of loyalty to the KSP based on the years that she

20    had been.  --

21        THE COURT:  I think I actually asked the question in

22    that way.  That may be the reason she gave that answer.

23    That's in addition to the reasons that Mr. Hoskins just

24    requested.  That was the same juror, I believe.

25        MR. WESTBERRY:  She was 79, I believe.  I'm sorry.  I

1    apologize.  79, I was confused.  Sat on the front row, worked

2    for many years in intelligence for the Kentucky State Police.

3    I recall she may have known some of the troopers as well, if

4    my memory is correct.

5              MR. BAYER:  That's 88.

6              MR. WESTBERRY:  I apologize to the Court.  I'm

7    getting 79, 88.  I think you know my point.

8              THE COURT:  I do.  Let me look back at my notes

9    quickly.

10              MR. WESTBERRY:  I apologize.

11              THE COURT:  That's all right.  I don't have any

12   questions in my notes about excusing that juror.  I'm not

13   going to excuse her for cause at this time, Juror Number 79.

14              MR. WESTBERRY:  Thank you.

15              MR. WHITE:  That is the one I was going to cover.  As

16   I understand, you've already ruled, Your Honor.

17              THE COURT:  Thank you.  Mr. Abell?

18              MR. ABELL:  Judge, I join in requesting 79 and 88 for

19   the reasons stated by other counsel.

20              MR. RICHARDSON:  Join in 79 and 88 and move for cause

21   on Juror Number 5.  She's a retired lieutenant of the Franklin

22   County Jail.  Her son is currently an officer with the Metro

23   Police Department.  We didn't really get into anything that I

24   felt it was -- that I could explore a little bit more, but I

25   certainly felt like seeing as we have a number of jurors, I

1    would move to strike her for cause.

2            THE COURT:  She was the lady seated in the front row

3    in white over on my left?

4            MR. RICHARDSON:  Yes, sir.

5            THE COURT:  I didn't hear anything in her statements

6    that would lead me to believe she should be excused for cause,

7    so I'll deny the request that Juror Number 5 be excused for

8    cause.  Mr. Gilbert, do you have any additional?

9            MR. GILBERT:  I have no others.

10           THE COURT:  Miss Hughes?

11           MS. HUGHES:  I also have nothing else.

12           THE COURT:  Mr. Simons?

13           MR. SIMONS:  Nothing else.

14           THE COURT:  Let me go over the list of individuals

15    that have hardships, what I consider to be financial hardships

16    or hardships with a particular employer that would give the

17    Court reason to consider excusing that juror for a lengthy

18    case such as the one that we have.  Let me just go through

19    this list, and then we can discuss these in more detail.  I'll

20    give you just a brief summary of what their statements were.

21           We have one juror, Number 85, who is on crutches who

22    was over to my right.  He has a doctor's appointment tomorrow.

23           Juror Number 67, who is scheduled to be out of the

24    state during a portion of this case.  I believe for two

25    reasons.

1          Juror Number 14, a maintenance supervisor, who is

2     involved in moving a line at this time.  That work is to start

3     this Friday.

4          Juror Number 18, who shares a car with his wife and

5     is supposed to pick her up at 4:00 every day.

6          We talked about the conflict with the case in

7     Indiana, Juror Number 91.  I had that on my list for hardships

8     as well.

9          Juror Number 121, who is a sole proprietor, owns a

10    business, and a financial hardship would certainly be caused

11    if he's seated as a juror.

12         Juror Number 71, who shares a car with her mother.

13    Her mother goes to work at 3:30 in the afternoon.

14         Juror Number 69, who was employed as a temporary

15    employee and does not receive reimbursement for jury service

16    past 20 days.

17         Juror Number 46, a member of the National Guard and

18    has already received certain assignments.

19         Juror Number 40, who is similar to Number 69, argues

20    for financial burden and does not receive reimbursement for

21    time spent on jury service.

22         Juror Number 27, self-provider, his job will not

23    reimburse him for jury service, and he's also a member of the

24    military, subject to being called up.

25         We have a farmer, Number 117, who has a number of

1    animals that he is required to care for.

2         Juror Number 41, who indicated he has two

3    appointments at the V.A., two medical appointments at the V.A.

4    that have been scheduled.

5         We have Juror Number 96, who indicated that he's

6    scheduled to testify at an assault case involving a family

7    member and that's, I believe, scheduled for this month as

8    well.  I believe he said perhaps next week.

9         Juror Number 77, who has an employer that will not

10   reimburse.

11        And then the last two I have question marks about

12   whether they should be excused for hardship.  One is employed

13   by the Department of Education, that's Number 110, as a

14   consultant, who claims that this is a very busy time for her

15   work schedule.  And Juror Number 50, who is an elementary

16   school teacher and expresses strong reservations about being

17   away from her classroom for a two-month period of time.

18        Those are the ones I list generally as hardships.  We

19   can take these up as a group or we can take these up

20   individually, if anyone has a strong feeling that they -- that

21   one or more should not be excused.  Mr. Smith, let me, if I

22   could, get your reaction.  Again, we can take these up as a

23   group or individually.

24        MR. SMITH:  Apologize, Your Honor.  I dropped off at

25   the very end here.  110 and 100 and 91, did you include those

187

1    in the group?

2            THE COURT:  I included 110.  100 I've already

3    addressed.  What was the last number?

4            MR. SMITH:  91.

5            THE COURT:  I believe I've already addressed 91.  Mr.

6    Hoskins raised that.  That's the person with the conflict up

7    in Indiana.

8            MR. SMITH:  Yes, sir, okay.

9            THE COURT:  That's that juror.  The elementary

10   teacher is number 50.

11           MR. SMITH:  No, Your Honor.

12           THE COURT:  No objection to those?

13           MR. SMITH:  No objection.

14           THE COURT:  Mr. Hoskins?

15           MR. HOSKINS:  No objection.

16           MR. WESTBERRY:  No objection.

17           MR. WHITE:  No objection, Your Honor.

18           MR. ABELL:  None for me either, Judge.

19           MR. RICHARDSON:  Your Honor, we would object to

20   Number 18 and Number 71, the car sharing arrangements.  We

21   feel that that could be worked out and they could be part of

22   our jury pool.  So we'd object to that.  Didn't know if I

23   would ask the Court about Number 55.  He was not in the

24   original group that asked for a hardship, then he came back

25   and said his mother's health, she lives in Harrodsburg,

1     hospice.  I am concerned about him having to leave.

2              MR. WESTBERRY:  65.

3              MR. RICHARDSON:  I'm sorry.  I had 55.  That would be

4     65, Judge.  Mom's in hospice.

5              THE COURT:  I'll take that one up separately here in

6     a moment.  You object to excusing 18 and 71 for the reasons

7     I've given.  Let me see if anyone else has any objections to

8     the ones I've listed.

9              MR. GILBERT:  No, Your Honor.

10             MS. HUGHES:  No, sir.

11             MR. SIMONS:  No, your Honor.

12             THE COURT:  Thank you.  I certainly considered the

13    answers that were given by Number 18 and Number 71 who have

14    transportation problems.  71 is a younger lady who shares a

15    car with her mother, and I do believe it presents a hardship

16    for a family for a two-month period of time to have to make

17    other arrangements when they are in that situation.  Same

18    thing with Juror Number 18.  So I will overrule the objections

19    and will excuse those jurors.

20             Now, with respect to Juror Number 65, whose mother is

21    being treated by hospice, Mr. Smith, what's the position of

22    the United States regarding that juror?

23             MR. SMITH:  No objection.

24             THE COURT:  All right.  I'll add 65 to the list.  Let

25    me double check my numbers here.  Let me go through these

189

1    numbers once again, make sure that we're all on the same page

2    in terms of the jurors that are going to be excused for cause.

3            Mr. Smith requested Jurors Number 45, 100, 126, 37,

4    8, 127, and 103.  I agreed with him with regard to those

5    jurors.  He also requested 95, and I declined to excuse that

6    juror for cause.

7            Several defendants requested Juror Number 281 be

8    excused.  I agreed with that request over the objection of the

9    United States.

10            I also agreed to excuse Juror Number 124.  I believe

11    Juror Number 124 should be excused as well.  I'm not sure if

12    we've addressed 124.  Have we addressed 124?

13            MR. WHITE:  Which number, Your Honor?

14            THE COURT:  124, Board of Elections employee.

15            MR. WESTBERRY:  Yes.

16            THE COURT:  Okay.  Now, on the hardship list.

17            MR. RICHARDSON:  Judge, I think you mentioned 192 and

18    71.

19            MR. WHITE:  Hardship.

20            MR. RICHARDSON:  They're both on the hardship, okay.

21    Excuse me, Judge.

22            THE COURT:  Yes, both of those are on the other list

23    I was about to go over.  Let me go through those numbers

24    again.  85, 67, 14, 18, 91, 121, 71, 69, 46, 40, 127, 117, 41,

25    110, 96, 50, 77 and 65.

190

1          MR. WHITE:  Your Honor, can I interrupt real quick.

2     You said 127 on hardship.  Did you mean to say 27?  I'm sorry.

3          THE COURT:  Let me go back and check that.  I did say

4     127 on the --

5          MR. WHITE:  I'm sorry, Your Honor.

6          THE COURT:  I did.  I included 127.  That was one of

7     the requests that Mr. Smith had made, and there wasn't any

8     objection to it by any of the defendants.

9          MR. WHITE:  Right.

10          MR. BAYER:  Judge, 127 was the strike for cause.  27

11     was the fella who was in the military.

12          THE COURT:  That's correct.  127 was one of the

13     jurors Mr. Smith originally requested.  There was no

14     objection.  I'm sorry if I misspoke.  27 was on the list of

15     hardship excuses, and there wasn't any objection to that juror

16     being excused.

17          MR. BAYER:  Yes, sir.

18          THE COURT:  That's 28, according to my list.  I think

19     we have 92 jurors at this point, Madam Clerk, is that correct?

20          PROSPECTIVE JUROR:  Yes, 92.

21          THE COURT:  What we'll do is we'll call the jurors

22     back here in just a moment.  I'll excuse these 28 that we've

23     just gone through for cause, and then I'm going to have the

24     clerk call 36 jurors.  After we call the 36, we'll need to

25     take another break so you can exercise your preemptory

1    challenges, and I'll give you 30 minutes to do that.  Mr.

2    Richardson?

3         MR. RICHARDSON:  Your Honor, I just wanted, before

4    they call the jury back in, on behalf of Defendant Thompson,

5    we'd object to the jury selection process that has gone on

6    here today.  When the trial was moved, change of venue from

7    London to Frankfort, we were told that we'd have an ample

8    opportunity to question the jury.  That hasn't been done.  We

9    were told that we would have a jury questionnaire.  Of course,

10   that hasn't been presented.

11        I've counted up in my notes.  I think out of all of

12   the jurors that were called in today, I think we had 46 or 47

13   responses by different individuals.  So less than half of the

14   jury panel responded to any questions submitted by the Court.

15   We've now struck eight or ten of those people.  So we're left

16   with -- of 92, I've got maybe 40 individuals, I'm going to be

17   comprised with a jury panel of individuals that I haven't

18   heard from, have no knowledge about them, and I'm not going to

19   be able to effectively exercise my strikes.  So note my

20   objection.

21        THE COURT:  Your objections are noted.  Mr.

22   Richardson, let me point out one thing to you.

23        MR. RICHARDSON:  Yes, sir.

24        THE COURT:  You were required to attend the final

25   pretrial conference if you were going to participate in this

1    trial.  You didn't do it, did you?

2              MR. RICHARDSON:  No.  I was required --

3              THE COURT:  You should have been to some of the

4    hearings in the case.  I believe if you talk to your

5    co-counsel, you'll find out, some were urged rather strongly

6    by the Court what would happen if they didn't attend hearings.

7    Now, this is your first appearance in the case, and we've gone

8    over these matters at length at the pretrial conference and

9    previously.  And for you to give the impression that we

10   haven't is incorrect.  Now, your objections -- sit down.

11             MR. RICHARDSON:  Yes, sir.

12             THE COURT:  Your objections are noted for the record.

13   Is there anything else you'd like to put on the record about

14   the jury selection process?

15             MR. RICHARDSON:  No, sir.  I made my objection.

16             THE COURT:  All right.  We'll be in recess to bring

17   the jury in.

18                  (Recess from 2:10 p.m. until 2:22 p.m.)

19             THE COURT:  Thank you.  Madam Clerk, are all the

20   jurors present?

21             DEPUTY CLERK:  Yes, Your Honor.

22             THE COURT:  The record will reflect parties and

23   counsel are present as well.  There's one number that I had --

24   I may have written it down incorrectly in response to one of

25   the jurors responded.  Number 117, I believe, had given me a

193

1    response.  Who responded earlier as Juror Number 117?

2    Indicated that you had some animals at home, and it would be a

3    problem --

4              PROSPECTIVE JUROR 113:  113.

5              THE COURT:  113, I'm sorry.  I wrote your number down

6    as 117.  Ladies and gentlemen, at this time I'm going to

7    excuse 28 jurors.  If you would wait until all numbers have

8    been called before you leave the courtroom.

9              The following jurors will be excused from further

10   participation in the case.  The clerk, of course, will advise

11   you as to when you should report.  Before I do excuse you, I

12   want to again tell you how much I appreciate you're being here

13   today and how much attention you've given to this process.

14   The following jurors will be excused.  Number 8, 124, 103, 37,

15   281, 45, 100, 126, 127.  Also, jurors number 85, 67, 14, 18,

16   91, 121, 71, 69, 46, 40, 27, 113, 41, 110, 96, 50, 77, and 65.

17   Those jurors will be excused at this time.  And again, thank

18   you, ladies and gentlemen.

19             Ladies and gentlemen, for those of you seated in the

20   jury box, what we'll do in a moment, as soon as the jurors

21   I've excused have left the courtroom, I'm going to ask you to

22   move back into the back of the courtroom.  What we'll do is

23   fill the jury box up first.  I'm going to call 36 potential

24   jurors in the case, and we'll need to fill the jury box up

25   first.  If you wouldn't mind, if you could move back into the

1    back of the courtroom.

2              (Jurors excused for cause left the courtroom.)

3              THE COURT:  Now, ladies and gentlemen, the procedure

4    that we're going to follow now is I'm going to ask the clerk

5    to call the numbers of 36 potential jurors in the case.  After

6    we've called those 36 jurors, I'll be able to excuse the

7    remainder of those that are present.  What we'll do is we'll

8    fill the jury box up first.  And we have a couple of extra

9    chairs up here so we'll put 16 people up here, and then I'll

10   need to put the remaining 20 jurors in those first couple of

11   rows here so after we fill the jury box, I'm going to have to

12   ask you to move again if you've already moved one time.  We're

13   dealing with limited space here.  I'm sure you do understand

14   and appreciate that, and I apologize for asking you to move so

15   often.

16             Madam Clerk, at this time, if you could please call

17   the numbers of the 36 jurors.

18             DEPUTY CLERK:  Yes, Your Honor.  Juror Number 130,

19   Number 129, 152, 106, 94.

20             THE COURT:  We need to make sure we get the jurors in

21   the right order here.

22             DEPUTY CLERK:  104, 99, 21, 19, 93, 87, 125, 12,

23   number 2, 62, 16, 24.

24             THE COURT:  All right.  Now, what we'll need to do,

25   if I could have the folks seated in the first two rows, if you

195

1    could move back, please.

2          DEPUTY CLERK:  Number 82, Number 79, Number 78,

3    Number 108, Number 17, Number 43, Number 3, Number 44, Number

4    15, Number 119, Number 9, Number 33, Number 28, Number 123,

5    Number 118.

6          THE COURT:  I'm going to need to have that third row

7    move back, if you could, please, or move over to the other

8    side, thank you.

9          DEPUTY CLERK:  Number 11, Number 60, and Number 57.

10   That's 36 jurors, Your Honor.

11         THE COURT:  All right.  Ladies and gentlemen, for

12   those of you who did not have your -- Mr. White?

13         MR. WHITE:  Your Honor, I'm sorry.  I think we've

14   only counted 35.  I think maybe we missed one.

15         THE COURT:  I think I missed one too.  I only have

16   35.  Let's double check.  Let me call the numbers, 130, 129,

17   152, 106, 94, 104, 99, 21, 19, 93, 87, 125, 12, 2, 62, 16, 24,

18   82, 79, 78, 108, 17, 43, 3, 44, 15, 119, 9, 33, 28, 123 --

19         DEPUTY CLERK:  I had 29, Your Honor.  29 is before

20   28.

21         THE COURT:  Has 29 been seated?  29 was drawn but not

22   called.  Juror Number 29 will be our juror that should be

23   seated --

24         MR. WHITE:  We don't have a 29.

25         THE CLERK:  That's my miscount, Your Honor.

196

1          THE COURT:  We need one additional juror.

2          DEPUTY CLERK:  Need one more, yes.  Been a long day.

3   Number 6.

4          THE COURT:  Thank you.  According to my count, that

5   is 36 jurors.  Any issues to be taken up before the remaining

6   jurors are excused?  All right.  Ladies and gentlemen, for

7   those of you that did not have your number called, I

8   appreciate the fact that you've been here all day with us and

9   you've listened very closely to my questions.  However, you

10  will not be seated as a juror in this case.  The clerk will

11  advise you as to when you should report again.  Again, thank

12  you very much for being here today.  You'll be excused at this

13  time.

14          (Prospective jurors not drawn in

15           left the courtroom.)

16         THE COURT:  Thank you and please be seated, everyone.

17  Ladies and gentlemen, for the remaining 36 jurors, those that

18  are still with us, what we need to do at this point is we're

19  going to take another recess to allow the attorneys to

20  exercise what's called preemptory challenges.  Those are

21  challenges for which no reason need be given.

22         I'm going to give the attorneys approximately 30

23  minutes to exercise those challenges and then when we come

24  back in 30 minutes, it will be ten after 3:00.  We will seat

25  the 16 jurors that will be called for the case.  I'm going to

197

1    seat four alternates, but the alternates won't be designated

2    until the end of the trial.  So we'll call 16 of the remaining

3    36, and that will be the jury that will actually be seated in

4    the case.

5         It's important that I again remind you of the

6    admonition that I gave you earlier, not to discuss the case

7    while we are in recess.  We'll be in recess for 30 minutes.

8    And I will ask you to be back promptly, and we'll go ahead and

9    call the numbers who will try the case at that time.  Keep in

10   mind the full admonition I gave you earlier not to discuss the

11   case amongst yourselves and not to let anyone approach you and

12   attempt to discuss the case.  Of course, if that should

13   happen, report that to the Court promptly.  Potential jurors

14   will be excused for 30 minutes at this time.

15        ( All prospective jurors left the courtroom at 2:39 p.m.)

16        THE COURT:  Counsel, any matters to take up outside

17   the presence of the jury?

18        MR. BAYER:  No.

19        THE COURT:  We'll take approximately 30 minutes.  If

20   you need a couple additional minutes, I'll give it to you, but

21   not any longer.

22        MR. BAYER:  Where do you want to send us?

23        MR. PINALES:  Don't answer that, Judge.

24        MR. BAYER:  It's an open-ended question.

25        MR. WHITE:  Your Honor, we need to find another

1    spokesperson.

2         THE COURT:  Mr. Smith, are there any witnesses that

3    are already in the witness room over here?

4         MR. SMITH:  I have one witness.  We can move him.

5         THE COURT:  If you can do that, the room is

6    relatively small, but it's probably the only area.  We have

7    the grand jury room, but we have jurors that are going to be

8    in there.  This is probably the best option we have.  We'll be

9    in recess for 30 minutes.

10         (Recess from 2:41 p.m. until 3:15 p.m.)

11         THE COURT:  Thank you.  The record will reflect that

12    all parties and counsel are present.  Madam Clerk, have the

13    attorneys exercised their preemptory challenges?

14         DEPUTY CLERK:  Yes.  I'm just separating them out

15    right now, Your Honor.  Ladies and gentlemen, as I call your

16    number, if you'd come forward and be seated as directed by our

17    CSO.  129, 94, 21, 19, 93, 87, number 12, 16, 24, 82, 78, 43,

18    119, number 9, 33, and number 28.  Sixteen jurors, Your Honor.

19         THE COURT:  Thank you.  Let me ask the attorneys if

20    there are any matters to be taken up before the remaining

21    jurors are excused.

22         MR. WESTBERRY:  No, Your Honor.

23         MR. HOSKINS:  One second.

24         MR. BAYER:  Could we have just a moment, Judge?

25         THE COURT:  Yes, sir.

1        MR. BAYER:  Judge, may we approach?

2        THE COURT:  Yes, you may approach.

3                    (A sidebar conference was held out of the

4                    hearing of the gallery):

5        THE COURT:  Mr. Bayer?

6        MR. BAYER:  Judge, on behalf of the defendants, the

7    only black juror was struck, and the question is whether or

8    not we need to make a Batson challenge and an inquiry.  If we

9    could at least do that --

10       THE COURT:  Was the juror stricken by the defendants

11   or by the United States?

12       MR. BAYER:  No, sir.  We don't know if the United

13   States struck her or it came out by lot.  We did not strike

14   her.

15       THE COURT:  Mr. Smith, are you able to confirm

16   whether the United States exercised a preemptory challenge

17   against the black juror?

18       MR. SMITH:  I don't have her number.

19       THE COURT:  106.

20       MR. SMITH:  Yes, we did.

21       THE COURT:  Can you state to the Court a *prima facie*

22   reason for striking the juror?

23       MR. SMITH:  She was sleeping during the questioning.

24       THE COURT:  All right.  Counsel?

25       MR. BAYER:  We have nothing further.

1          THE COURT:  All right.

2          MR. BAYER:  Did you notice she was sleeping, Judge?

3          THE COURT:  I noticed she was not paying attention.

4    She was looking down several times.  I didn't know if she was

5    sleeping or not.  I thought she may just be bored by my

6    questions.  That's a legitimate reason, if a juror is not

7    paying attention.

8          MR. WHITE:  We're fine, Your Honor.  Thank you.

9                (Sidebar conference concluded.)

10         THE COURT:  Thank you.  Ladies and gentlemen, for

11   those jurors who were not selected for participation in this

12   trial, again I do want to tell you how much I appreciate your

13   being here today.  You've been here the majority of the day

14   and paid attention to my questions.  I know the attorneys

15   appreciate it, the parties appreciate it, and I certainly do.

16   The clerk will advise you as to when you should report again.

17   At this time, of course, you will be excused.  Thank you.

18               (All prospective jurors not drawn in for the

19                jury left the courtroom.)

20         THE COURT:  Thank you and please be seated.  Madam

21   Clerk, at this time, if you could administer the oath to the

22   jury to try the case, please.

23         DEPUTY CLERK:  Yes, Your Honor.

24            (The jury panel was sworn by the deputy clerk.)

25         THE COURT:  Thank you.  Please be seated.  Ladies and

1    gentlemen of the jury, the way we'll proceed this afternoon is

2    I'm going to read to you the charges that are contained in the

3    indictment.  It is a lengthy indictment.  It will take me

4    several minutes to do that.  Before I read an indictment to

5    you, I do want to remind you that an indictment contains

6    charges, but it's not evidence in the case.  But it will

7    assist you as the attorneys present their opening statements

8    to you, and that will take place beginning tomorrow.  They'll

9    begin with their opening statements in the morning.

10          Also, in the morning, I'm going to give you some

11   preliminary jury instructions.  So when you come in at 9:00

12   tomorrow, I'll be giving you some brief instructions to assist

13   you as you participate in the case, and then the attorneys

14   will begin with their opening statements.  Again, at this

15   time, I will advise you of the nature of the charges by

16   reading the indictment.

17          Count 1 of the indictment states at all times

18   relevant hereto, the Clay County Board of Elections, also

19   known as the Board, was a public entity within Clay County, in

20   the Eastern District of Kentucky.  The Board is formed and

21   required by state law to administer the election laws for both

22   state and federal elections, including the registration and

23   purging of voters, all under the supervision of the State

24   Board of Elections.  The Board consists of the county clerk,

25   the sheriff, and two members appointed by the State Board of

202

Elections, selected from a list of five names submitted by the Republican and Democratic parties in the county.  The Board is required to appoint officers, including two judges, one clerk and one sheriff for each precinct in each election by March 20 of every year in which a primary and general election is held.

Defendant Russell Cletus Maricle, at all times relevant hereto, was a resident of the county, an elected circuit court judge for the 41st Judicial Circuit of the Commonwealth of Kentucky, and was active in the political affairs of the county by, among other acts, supporting candidates for office and exerting influence over the selection of precinct workers for local elections.  He held the position of circuit judge from January, 1991 through July, 2007.

Defendant Douglas C. Adams, also referred to as Adams, at all times relevant hereto, was a resident of the county, the appointed Clay County Superintendent of Schools and was active in the political affairs of the county by, among other acts, supporting candidates for office and exerting influence over the selection of precinct workers in local elections.  He held the position of superintendent from 1999 to present.

Defendant Charles Wayne Jones, at all times relevant hereto, was a resident of the county, was active in the political affairs of the county by, among other acts, serving

1    as election officer and exerting influence over the selection

2    of other precinct workers.  He was appointed as the Democrat

3    election commissioner in 2002.  He continues to serve in that

4    position.  Jones served on the Clay County Board of Elections

5    during the election cycles of 2002, 2004 and 2006.

6           Defendant William E. Stivers, at all times relevant

7    hereto, was a resident of the county, was active in the

8    political affairs of the county, and was appointed as election

9    officer by the Clay County Board of Elections in 2002 and

10   2004.  Stivers served for the Board as the Democrat judge for

11   the Manchester precinct in 2002 and 2004.  Stivers also served

12   in place of Charles Wayne Jones as officer for 2004 absentee

13   early voting.

14          Defendant Freddy W. Thompson, at all times relevant

15   hereto, was a resident of the county, was active in the

16   political affairs of the county, and was elected as Clay

17   County Court Clerk in 2002, and continues to serve in that

18   position.  Thompson, by virtue of his elected position, also

19   serves as a member of the Clay County Board of Elections,

20   including elections held in 2004 and 2006.

21          Defendants William B. Morris and Debra L. Morris, at

22   all times relevant hereto, were residents of the county, were

23   active in the political affairs of the county, and are the

24   owners and operators of B&J Transport, Inc., a sanitation

25   company, in Manchester and Clay County which contracts with

204

1    the city and county to provide sanitation services.

2         Defendant Stanley Bowling, at all times relevant

3    hereto, was a resident of the county and was active in the

4    political affairs of the county by, among other acts, elected

5    as magistrate in 2002 and continues to serve in that position,

6    and is the owner and operator of B&B Excavating, an excavating

7    company, in Manchester and Clay County which contracts with

8    the city and county to provide excavation services.  Bowling

9    also distributed money to bribe voters and exerted influence

10   over the selection of precinct workers in local elections.

11        It is further alleged that in discharging their

12   public duties, the circuit judge, the superintendent of

13   schools, county magistrate and the officers of the Board,

14   including the county clerk and election officers, owed to the

15   citizens of the county a duty of honest services to include

16   the duty to act in the best interest of the citizens without

17   corruption and self-dealing.

18        Now, it's alleged that at all times material to this

19   indictment, the Clay County Board of Elections, also referred

20   to as the Board, a legal entity, including its various

21   executive departments, offices and employees, was an

22   enterprise, as that term is defined in Title 18 of the United

23   States Code, Section 1961, Subsection 4, which was engaged in,

24   and the activities of which affected interstate commerce.

25   Defendants Russell Cletus Maricle, Douglas C. Adams, Charles

1    Wayne Jones, William E. Stivers, Freddy W. Thompson,

2    William B. Morris, Debra L. Morris and Stanley Bowling

3    participated in the operation and management of the

4    enterprise.

5         It's alleged that the purpose of the defendants were

6    to obtain, solidify, preserve and expand for the defendants

7    and their associates political power and control within the

8    county and personal enrichment for themselves and their

9    associates, through the use and misuse of the authority and

10   power of the Board, and the offices of the circuit judge,

11   superintendent of schools and county clerk, and the positions

12   of election officers.

13        It's alleged the defendants accomplished their

14   purposes through a pattern of, among other things, bribery,

15   extortion, and mail fraud designed to corrupt and affect the

16   outcome of the elections by the following acts, among others.

17        Defendants Russell Cletus Maricle and Douglas C.

18   Adams were directors and associates of the enterprise who

19   directed other members and associates of the enterprise in

20   carrying out, among other things, activities in furtherance of

21   the defendant's unlawful purposes.  The defendants Russell

22   Cletus Maricle and Douglas C. Adams were considered political

23   bosses in the county and used their influence to appoint

24   corrupt members of the Board to cause its election officers to

25   commit acts of extortion, mail fraud, and bribery.  The

1    defendants Maricle and Adams recruited persons to run for

2    county offices on a slate that would benefit from the

3    collective efforts of members of the enterprise.

4           The defendant, Charles Wayne Jones, as Democrat

5    election commissioner, used his position as commissioner to

6    appoint election officers who would assist in corrupting the

7    election process through acts of extortion, mail fraud and

8    bribery.  The defendant, Charles Wayne Jones, instructed other

9    election officers on how to purchase votes, how to mark voters

10   who had sold their votes, and how to change votes at the

11   voting machines in furtherance of the scheme to elect their

12   slate of candidates.  The defendant, Charles Wayne Jones,

13   would use his position as an election commissioner to enrich

14   himself personally by extorting money from candidates.  The

15   defendant, Charles Wayne Jones, was required in his position

16   as commissioner and member of the Board to certify the

17   accuracy of the election results, knowing same to be false.

18          It's alleged that the defendant, William E. Stivers,

19   as election officer, would use his position as election

20   officer in committing acts of extortion and bribery.  The

21   defendant, William E. Stivers, and other election officers

22   would mark voters or issue a ticket to voters who had sold

23   their votes and change votes at the voting machines in

24   furtherance of the scheme to elect their slate of candidates.

25   The defendant, William E. Stivers, would use his position as

1    an election officer to enrich himself personally by extorting

2    money from candidates.

3            It's alleged that the defendant, Freddy W. Thompson,

4    as county clerk and member of the Board, would use his

5    position as clerk in committing acts of mail fraud.  The

6    defendant, Freddy W. Thompson, provided large sums of money to

7    be distributed by election officers to buy votes at the voting

8    machines in furtherance of the scheme to elect their slate of

9    candidates.  The defendant, Freddy W. Thompson, also

10   instructed election officers on how to change votes at the

11   machines.  The defendant, Freddy W. Thompson, was required in

12   his position as county clerk and member of the Board to

13   certify the accuracy of the election results, knowing same to

14   be false.  The defendant, Freddy W. Thompson, further

15   obstructed justice by testifying falsely before a federal

16   grand jury.

17           It's alleged further that defendants William B.

18   Morris and Debra L. Morris, as associates of the enterprise,

19   distributed funds pooled by members of the scheme of the

20   enterprise in order to buy votes for the slate and to enrich

21   themselves personally.

22           It's further alleged that the defendant, Stanley

23   Bowling, as an associate of the enterprise, distributed funds

24   pooled by members of the scheme of the enterprise in order to

25   buy votes for the slate and to promote himself politically and

1    enrich himself personally.

2         It is further alleged that on or about a day in

3    March, 2002, the exact date unknown, and continuing through on

4    or about July 17, 2007, in Clay County, in the Eastern

5    District of Kentucky and elsewhere, Russell Cletus Maricle,

6    Douglas C. Adams, Charles Wayne Jones, William E. Stivers,

7    Freddy W. Thompson, William B. Morris, Debra L. Morris and

8    Stanley Bowling, together with other persons known and

9    unknown, being persons employed by and associated with the

10   Clay County Board of Elections, an enterprise, which engaged

11   in and the activities of which affected interstate commerce,

12   knowingly, willfully and unlawfully agreed and conspired to

13   violate Title 18 of the United States Code, Section 1962(c);

14   that is, to conduct and participate, directly and indirectly,

15   in the conduct of the affairs of the Board through a pattern

16   of racketeering activity, as that term is defined in Title 18,

17   United States Code, Section 1961(1) and 1961(5), consisting of

18   multiple acts indictable under Title 18 of the United States

19   Code, Sections 1341 and 1346, honest services mail fraud, and

20   Title 18 of the United States Code, Section 1951, extortion,

21   and Title 18 of the United States Code, Section 1503,

22   obstruction of justice, and multiple acts involving bribery in

23   violation of state law KRS 119.205.

24        It was part of the conspiracy that each defendant

25   agreed that a conspirator would commit at least two acts of

1    racketeering activity in the conduct of the affairs of the

2    enterprise, all in violation of Title 18 of the United States

3    Code, Section 1962(d).

4             Count 2 alleges that on or about a day in March,

5    2002, the exact date unknown, and continuing through on or

6    about July 17, 2007, in Clay County, in the Eastern District

7    of Kentucky and elsewhere, Russell Cletus Maricle, Douglas C.

8    Adams, Charles Wayne Jones, William E. Stivers, Freddy W.

9    Thompson, William B. Morris, Debra L. Morris, and Stanley

10   Bowling did conspire together and with others to commit

11   certain offenses under Title 18 of the United States Code,

12   Section 1956, to wit, to knowingly conduct and attempt to

13   conduct financial transactions affecting interstate commerce,

14   which transactions involved the proceeds of specified unlawful

15   activity as defined by Title 18, United States Code,

16   Section 1956(c)(7); that is, bribery chargeable under state

17   law and punishable by imprisonment for more than one year and

18   extortion in violation of Title 18, United States Code,

19   Section 1951, with the intent to promote the carrying on of

20   such specified unlawful activity and knowing that the

21   transaction was designed in whole or in part to conceal and

22   disguise the nature, location, source, ownership and control

23   of the proceeds of said specified unlawful activity, in

24   violation of 18 United States Code, Section 1956(a)(1)(A)(i)

25   and 18 United States Code, Section 1956(a)(1)(B)(i), all in

1    violation of 18 United States Code, Section 1956(b).

2              Count 3 alleges that on or about a date in January,

3    2004, until on or about May 19, 2004, in Clay County, in the

4    Eastern District of Kentucky and elsewhere, Charles Wayne

5    Jones and Freddy W. Thompson did knowingly devise and intend

6    to devise a scheme and artifice to defraud and to deprive

7    citizens of Manchester, Clay County, of the right of honest

8    services, utilizing the following manner and means.

9              It is alleged that as part of the scheme to defraud,

10   the defendants participated with others in the May, 2004

11   primary election in pooling funds for the purpose of buying

12   votes.

13             As part of the scheme to defraud, the defendants

14   instructed election officers to buy votes and to mark voters

15   or present tickets to voters for purposes of identifying

16   voters who had sold their votes.

17             As part of the scheme to defraud, the defendants

18   instructed election officers to assist the voters who sold

19   their votes and to destroy voter assistance forms which may

20   have resulted so as not to report the number of people they

21   assisted at the voting polls as required by law.

22             It is further alleged as part of the scheme to

23   defraud the defendants assisted in the preparation of an

24   election report that falsely reported as valid fraudulent vote

25   totals in the county to the Kentucky Secretary of State and

1    Kentucky Board of Elections.

2            It is further alleged that in furtherance of the

3    scheme to defraud, and in order to effect the objects thereof,

4    on or about May 19, 2004, the defendants did place, deposit

5    and cause to be deposited in an authorized depository for mail

6    matter and did cause to be delivered in accordance with the

7    instructions thereon, mail matter consisting of a

8    post-election report, addressed to the Secretary of State,

9    State Capitol Building, 700 Capitol Avenue, Frankfort,

10   Kentucky, 40601, from the Clay County Board of Elections, all

11   in violation of Title 18 of the United States Code,

12   Sections 1341 and 1346.

13           It is alleged in Count 4 that on or about a date in

14   September, 2004 in Clay County, in the Eastern District of

15   Kentucky and elsewhere, Charles Wayne Jones and William E.

16   Stivers did knowingly affect interstate commerce by extortion;

17   that is, the defendants attempted to obtain money not due them

18   or their office in the amount of $1,000 from CWL, a candidate

19   for City Council, induced by wrongful use and threat of use of

20   fear and economic harm, and under color of official right, all

21   in violation of Title 18, United States Code, Section 1951.

22           Count 5 charges that on or about a date in mid-2004

23   until on or about November 3, 2004, in Clay County, in the

24   Eastern District of Kentucky, Charles Wayne Jones and

25   Freddy W. Thompson did knowingly devise a scheme and artifice

to defraud and to deprive citizens of Manchester, Clay County,
of the right of honest services, utilizing the following
manner and means.

It is alleged that as part of the scheme to defraud,
the defendants participated with others in the November, 2004
general election in pooling funds for the purpose of buying
votes.

As part of the scheme to defraud, the defendants
instructed election officers to buy votes and to mark voters
or present tickets for voters for purposes of identifying
voters who had sold their votes.

As part of the scheme to defraud, the defendants
instructed election officers to assist voters who sold their
votes and to destroy voter assistance forms which may have
resulted so as not to report the number of people they
assisted at the voting polls as required by law.

It further alleged as part of the scheme to defraud
the defendants assisted in the preparation of an election
report that falsely reported as valid fraudulent vote totals
in the county to the Kentucky Secretary of State and Kentucky
Board of Elections.

It is further alleged that in furtherance of the
scheme to defraud, and in order to effect the objects thereof,
on or about November 3, 2004, the defendants did place,
deposit and cause to be deposited in an authorized depository

1    for mail matter, and did cause to be delivered in the

2    accordance with the instructions thereon, mail matter

3    consisting of a post-election report, addressed to the

4    Secretary of State, State Capitol Building, 700 Capitol

5    Avenue, Frankfort, Kentucky, 40601, from the Clay County Board

6    of Elections.  It is alleged that this was all in violation of

7    Title 18 of the United States Code, Sections 1341 and 1346.

8         Count 6 alleges that on or about a date in January,

9    2006, until on or about May 17, 2006, in Clay County, in the

10   Eastern District of Kentucky and elsewhere, Charles Wayne

11   Jones and Freddy W. Thompson did knowingly devise and intend

12   to devise a scheme and artifice to defraud and to deprive

13   citizens of Manchester, Clay County, of the right of honest

14   services, utilizing the following manner and means.

15        It is alleged that as part of the scheme to defraud,

16   the defendants participated with others in the May, 2006

17   primary election in pooling funds for the purpose of buying

18   votes.

19        As part of the scheme to defraud, the defendants

20   instructed election officers to buy votes and to mark voters

21   or present tickets to voters for purposes of identifying

22   voters who had sold their votes.

23        As part of the scheme to defraud, the defendants

24   instructed election officers to assist the voters who sold

25   their votes and to destroy voter assistance forms which may

214

1    have resulted so as not to report the number of people they

2    assisted at the voting polls as required by law.

3            It is further alleged that as part of the scheme to

4    defraud, the defendants assisted in the preparation of an

5    election report that falsely reported as valid fraudulent vote

6    totals in the county to the Kentucky Secretary of State and

7    Kentucky Board of Elections.

8            In furtherance of the scheme to defraud and in order

9    to effect the objects thereof, on or about May 17, 2006, the

10   defendants did place, deposit and cause to be deposited in an

11   authorized depository for mail matter, and did cause to be

12   delivered in accordance with the instructions thereon, mail

13   matter consisting of a post-election report, addressed to the

14   Secretary of State, State Capitol Building, 700 Capitol

15   Avenue, Frankfort, Kentucky, 40601, from the Clay County Board

16   of Elections, all in violation of Title 18 of the United

17   States Code, Sections 1341 and 1346.

18           On or about a date in mid-2006 until on or about

19   November 8, 2006, in Clay County, in the Eastern District of

20   Kentucky, and elsewhere, Charles Wayne Jones and Freddy W.

21   Thompson did knowingly devise and intend to devise a scheme

22   and artifice to defraud and to deprive citizens of Manchester,

23   Clay County, of the right of honest services, utilizing the

24   following manner and means.

25           It is alleged that as part of the scheme to defraud,

1    the defendants participated with others in the November, 2006

2    general election in pooling funds for the purpose of buying

3    votes.

4            As part of the scheme to defraud, the defendants

5    instructed election officers to buy votes and to mark voters

6    or present tickets to voters for purposes of identifying

7    voters who had sold their votes.

8            As part of the scheme to defraud, the defendants

9    instructed election officers to assist the voters who sold

10   their votes and to destroy voter assistance forms which may

11   have resulted so as not to report the number of people they

12   assisted at the voting polls as required by law.

13           It is further alleged that as part of the scheme to

14   defraud, the defendants assisted in the preparation of an

15   election report that falsely reported as valid fraudulent vote

16   totals in the county to the Kentucky Secretary of State and

17   Kentucky Board of Elections.

18           In furtherance of the scheme to defraud and in order

19   to effect the objects thereof, on or about November 8, 2006,

20   the defendants did place, deposit and cause to be deposited in

21   an authorized depository for mail matter, and did cause to be

22   delivered in accordance with the instructions thereon, mail

23   matter consisting of a post-election report, addressed to the

24   Secretary of State, State Capitol Building, 700 Capitol

25   Avenue, Frankfort, Kentucky, 40601, from the Clay County Board

216

1    of Elections, all in violation of 18 United States Code,

2    Sections 1341 and 1346.

3            In Count 8, it's alleged that on or about May 2, 2007

4    and continuing through May 17, 2007, in Clay County, in the

5    Eastern District of Kentucky, Russell Cletus Maricle and

6    William E. Stivers, aided and abetted by each other, did

7    corruptly endeavor to influence, obstruct, and impede the due

8    administration of justice by communicating with and

9    instructing a witness, WW, to testify falsely before a federal

10   grand jury in Lexington, Kentucky, while a grand jury

11   investigation in the Eastern District of Kentucky was pending,

12   all in violation of Title 18 of the United States Code,

13   Sections 1503 and Section 2.

14           It's alleged in Count 9 that on or about July 12,

15   2007, in Clay and Fayette Counties, in the Eastern District of

16   Kentucky, that Freddy W. Thompson did corruptly endeavor to

17   influence, obstruct and impede the due administration of

18   justice in the Eastern District of Kentucky, to wit, by

19   testifying falsely before a federal grand jury in Lexington,

20   Kentucky, while an investigation in the Eastern District of

21   Kentucky was pending, all in violation of Title 18 of the

22   United States Code, Section 1503.

23           In Count 10, the allegations contained in

24   paragraphs 1 through 12 of Count 1 are restated and

25   incorporated herein by reference.

1          It's further alleged that on or about May 16, 2006,

2     and on or about November 7, 2006, pursuant to the laws of the

3     United States and the Commonwealth of Kentucky, primary and

4     general elections were held in Manchester, Clay County, in the

5     Eastern District of Kentucky, for the purpose of selecting

6     candidates for state, local and federal offices.

7          On said date, many persons in Clay County were duly

8     registered as voters and possessed the necessary

9     qualifications as provided by law to entitle them to vote in

10    said primary election.  These persons will hereafter be

11    referred to as qualified voters.

12         Each of the qualified voters possessed the right and

13    privilege guaranteed and secured by the constitution and laws

14    of the United States to vote at said election for the

15    candidates described in paragraph 2 and the further federal

16    right and privilege to have their votes tabulated fairly and

17    given full effect; that is, the right to have the worth and

18    value of their votes and expression of choice not be impaired,

19    lessened, diminished, diluted or destroyed by illegal votes

20    falsely or fraudulently cast, tabulated and certified.

21         Many of the qualified voters duly voted for one or

22    more of the aforementioned candidates and their votes were

23    counted and certified as part of the total number of votes

24    cast for such candidates.  Other voters had their votes

25    destroyed by the defendants and their co-conspirators.

1       It's alleged that from on or about a date in June,

2   2004, to on or about November 7, 2006, at Manchester, Clay

3   County, in the Eastern District of Kentucky, Russell Cletus

4   Maricle, Charles Wayne Jones, William E. Stivers and Freddy W.

5   Thompson did unlawfully conspire and agree with each other and

6   others, known and unknown, to injure and oppress qualified

7   voters in the free exercise and enjoyment of certain rights

8   and privileges secured to them by the constitution and laws of

9   the United States; that is, the right of all qualified voters

10  under the equal protection and due process clauses of the

11  Fourteenth Amendment to vote and have their votes tabulated

12  fairly and given full effect and free from dilution by ballots

13  illegally and improperly cast by a person charged under state

14  law with the operation and safe-keeping of the poll, in

15  violation of Title 18 of the United States Code, Section 241.

16      It's alleged that the object of the conspiracy was to

17  deprive the aforesaid qualified voters of their federally

18  secured right to vote and to have their votes given full force

19  and effect, by misleading them regarding the operation of a

20  voting machine and then changing the votes that they selected,

21  in order to secure the election of the candidates supported by

22  the defendants and their co-conspirators.

23      It is further alleged it was part of the conspiracy

24  that the defendants and their co-conspirators agreed to take

25  advantage of voter unfamiliarity with new voting machines by

219

1    misleading voters as to the mechanics of casting their votes

2    once they were selected.

3             It was part of the conspiracy that WW serve as the

4    Democrat election judge in Manchester precinct.  It was

5    further part of the conspiracy that CW serve as Republican

6    election judge in the Manchester precinct.  Both WW and CW

7    were instructed by defendants Freddy W. Thompson and Charles

8    Wayne Jones to tell voters that when they had pushed a button

9    labeled Vote that their votes had been cast when, in fact,

10   that function merely provided a review screen of the voter's

11   selections in each race and that the further step of pushing

12   the Cast Ballot button was required.  This review screen gave

13   the voter the opportunity to change any candidate selections

14   prior to casting the ballot.

15            It was part of the conspiracy that when the misled

16   voters left the voting booth after pushing the vote button, WW

17   and/or CW entered the booth, changed their votes to candidates

18   selected in part by defendant Russell Cletus Maricle and cast

19   the ballot by pushing the Cast Ballot button, all in violation

20   of Title 18 of the United States Code, Section 241.  Count 11

21   first contains the allegations in paragraphs 1-12 of Count 1

22   are restated and incorporated herein by reference.

23            It is further alleged that for purposes of

24   representation in the United States House of Representatives,

25   the Commonwealth of Kentucky is divided into seven

1    geographical divisions known as Congressional districts.  At

2    all relevant times, Clay County, Kentucky, was located in the

3    fifth Congressional district.

4         In primary and general elections in Kentucky on

5    May 16, 2006 and November 7, 2006, there were election races

6    in the fifth Congressional district to select a candidate for

7    the office of member of the United States House of

8    Representatives.  As such, the primary election in those

9    precincts was held in part to select a federal candidate for

10   the office of member of the United States House of

11   Representatives.

12        From on or about a date in January, 2006, the exact

13   date unknown, to on or about November 7, 2006, at Manchester,

14   Clay County, in the Eastern District of Kentucky, Russell

15   Cletus Maricle, Charles Wayne Jones, William E. Stivers,

16   Freddy W. Thompson, William B. Morris, Debra L. Morris

17   conspired and agreed together and with numerous other persons,

18   known and unknown, to violate laws of the United States, to

19   wit, to pay and offer to pay persons for voting in an election

20   held in part to select a candidate for federal office.

21        It is alleged that it was the purpose of the

22   conspiracy to corrupt the election process by buying votes in

23   order to cause and to insure the election of a group of chosen

24   candidates for local office, hereinafter referred to as the

25   slate.

1        It was part of the conspiracy that on various

2   occasions between on or about a date in January, 2006, to on

3   or about November 7, 2006, various defendants met at various

4   times and places to discuss which candidates for local office

5   would comprise the slate and what methods could be used to

6   illegally influence the outcome of the election.

7        It's further alleged it was part of the conspiracy

8   that the defendants agreed that one method of influencing the

9   election would be to collect and pool money from the slate of

10  candidates, which could be used to pay persons to vote.   The

11  defendants reviewed voter lists to determine which voters were

12  likely to agree to sell their votes and who among the

13  co-conspirators would solicit each such voter.

14       It's alleged that it was part of the conspiracy that

15  the defendants discussed and agreed to buy votes also during

16  the early voting absentee voters in favor of the slate.   This

17  plan involved having defendants William E. Stivers,

18  William B. Morris and Debra L. Morris pay absentee voters for

19  their vote and then sending them to defendant Charles Wayne

20  Jones, who was acting as operator of the voting machine at the

21  Clay County clerk's office.   Voters who sold their votes were

22  given a mark or otherwise told to signal to the defendant

23  Charles Wayne Jones by defendants William E. Stivers,

24  William B. Morris, or Debra L. Morris and, based upon the mark

25  and/or signal, defendant Charles Wayne Jones would cast their

222

1    vote for the slate.

2            It is alleged it was part of the conspiracy that the

3    defendants discussed and agreed that in order to implement the

4    method of corrupting the voting process described above, it

5    would be necessary to cause to be appointed as precinct

6    workers for both major parties persons who were in the

7    conspiracy.  It was further necessary that their assignment to

8    respective precincts be coordinated so that no one outside the

9    conspiracy would be in place to observe their actions.

10           It is alleged that in furtherance of the conspiracy

11   and in order to effect the objects thereof, the following

12   overt acts, among many others, were committed in the Eastern

13   District of Kentucky.

14           Over numerous days during on or about a date in

15   January, 2006 to on or about November 7, 2006, a list of

16   voters who agreed to sell their votes was compiled by

17   defendants Russell Cletus Maricle and William E. Stivers, and

18   other co-conspirators made arrangements with these persons for

19   voting and payment.  On numerous occasions, voters were

20   brought to the courthouse during normal voting and early

21   voting period for absentee voters and paid to vote for

22   candidates on the slate by defendants William E. Stivers,

23   William B. Morris and Debra L. Morris.

24           On or about May 16, 2006, defendants William E.

25   Stivers, William B. Morris, and Debra L. Morris paid voters to

1    vote for members of the slate, as described above.  They

2    informed these voters to ask for assistance from selected

3    precinct workers who then took them into the voting booth and

4    selected the votes for them.

5            Finally, it's further alleged that on or about

6    November 7, 2006, defendants William E. Stivers, William B.

7    Morris and Debra L. Morris paid voters to vote for members of

8    the slate, as described above.  They informed these voters to

9    ask for assistance from selected precinct workers, who then

10   took them into the voting booth and selected candidates for

11   them, all in violation of 18 United States Code, Section 341

12   and 42 United States Code, Section 1973i.

13           Those are the 11 counts that will be presented to

14   you, ladies and gentlemen.  As I indicated earlier, we will

15   not be proceeding with opening statements this afternoon.

16   What I'm going to do in a moment is I'm going to excuse you

17   for the evening.  I do want to give you further admonition

18   before I excuse you.  I want to remind you that we'll start

19   tomorrow at 9:00.  You need to be here in time to come into

20   the courtroom at 9:00.

21           As we take our break for this first evening, it is

22   important that I again remind you of some of the admonitions

23   that were given to you earlier.  I want to expand on those

24   just a bit.  First, as we take our breaks, you're reminded you

25   should not talk with each other about the case or with anyone

1    else involved in the case.  That includes friends or family

2    members.

3              Outside the courtroom, you should not let anyone tell

4    you anything about this case or anyone involved with the case.

5    If someone should attempt to approach you to discuss the case,

6    mention the case, or make any reference to it, you should

7    report that to the Court promptly.

8              As I told you earlier, you should not speak with any

9    of the parties, lawyers, or any witnesses that may be involved

10   in the case.  Don't read, watch or listen to any accounts of

11   the case if there should be any.

12             Don't do any type of research or perform any type of

13   an investigation.  Don't do any type of investigation

14   whatsoever.  Don't do any type of blogging.  So if you're

15   computer literate and you like to send blogs to folks or if

16   you Tweet, if you're one of these Tweeters, don't Tweet about

17   the case.  In other words, don't have any contact, don't have

18   any type of communication about the case and don't read

19   anything about the case.

20             And, of course, ladies and gentlemen, finally, don't

21   make up your mind about the case until it is finally submitted

22   to you.  You've been here all day.  You've heard lots of

23   questions from me, but you haven't heard the first bit of

24   evidence in the case.  And you should never make up your mind

25   about a case until it's finally submitted to you, and that

225

1    applies to this case and every other case that you'll be

2    involved with.

3             Let me ask the attorneys if there is anything to take

4    up at this time before I excuse the jury for the evening.

5             MR. BAYER:  No, Your Honor.

6             MR. HOSKINS:  No.

7             MR. SMITH:  No.

8             THE COURT:  Ladies and gentlemen, again, you'll be

9    excused for the evening.  Please be back and be ready to go at

10   9:00 tomorrow morning.  At that time, I'll give you some

11   preliminary instructions to be followed by the attorneys'

12   opening statements.  Jury will be excused.

13                      (The jury left the courtroom at 4:01 p.m.)

14            THE COURT:  Counsel, before we recess for the

15   evening, I want to remind you of a couple of things.  Of

16   course, everyone's aware that you can't have any contact with

17   any jurors in the case.  An issue was raised earlier about one

18   of our potential jurors having communications with one or more

19   of the defendants in the case.  I want to remind you that that

20   should never occur in a case, and I don't think it's necessary

21   to take any further action at this time, but I do want to

22   remind everyone that you can't have any contact whatsoever

23   with any juror.

24            When we start tomorrow, we'll start at 9:00, and I

25   will give the preliminary jury instructions that each of the

226

1    attorneys have a copy of.  I do want to make one correction.

2    I don't know if you have those in front of you.  There's one

3    typographical error on page 4.  That's the count that charges

4    violation of the money laundering statute.  Subparagraph A at

5    the bottom of the page, the words wire fraud should be changed

6    to money laundering, obviously.  It's the bottom of page 4,

7    very last line.  That's the only typographical error that I

8    was able to find in the instructions.

9         Finally, I assume that the attorneys will want to use

10   the podium for their opening statements.  We'll need to get

11   the security officer to help you turn that around, place that

12   in front of the jury box before the openings are given.

13   Otherwise, those cables that connect the speakers, the

14   microphones will be torn.  So make sure you have the security

15   officers help with that.  Any other matters to take up before

16   we recess?  Mr. White?

17        MR. WHITE:  Just a quick one, Your Honor.  My notes

18   from, I think, our January 4th pretrial, we were to return the

19   jury things.  I just want to find out what the clerk's office,

20   how they want us to do that.

21        THE COURT:  I'll leave to you.  You can either return

22   those -- I believe we discussed either returning those to the

23   clerk or you can certify that you destroyed the originals or

24   any copies that you might have made.  In other words,

25   everything either comes back to the clerk or you can certify

227

1    that they've been destroyed.

2            DEPUTY CLERK:  I don't want their copies,

3    necessarily, but I do want our original books.

4            THE COURT:  She needs the original books but not

5    necessarily the copies.

6            MR. WHITE:  Very good, Your Honor.

7            THE COURT:  If you need an additional day to get

8    those materials to the clerk, that will be fine.

9            MR. WHITE:  Just bring them in the morning, okay.

10           THE COURT:  That will be fine.  Mr. Hoskins?

11           MR. HOSKINS:  Your Honor, I have a question.  The

12   people that I had to review juror information with me, I have

13   two or three of those, but I don't have all.  Is there a

14   particular time you want those in by?

15           THE COURT:  I don't want you to do that while

16   preparing for an opening statement.  If you need a couple days

17   to get that together, that will be fine as well.  You can let

18   me know at the end of the tomorrow.

19           MR. HOSKINS:  Your Honor, I guess I could ask if I

20   can have until next Monday.  I won't be back in my office

21   until Friday evening.

22           THE COURT:  That will be fine.

23           MR. SIMONS:  Your Honor, I have one question to take

24   up at this time.  I suspect at some point in the trial, my

25   client's grand jury testimony is going to come up, and I would

228

1    intend to ask him about his grant of immunity at that time and

2    just wanted to make sure that was okay with the Court.

3              THE COURT:  All right.  Well, I'm not sure of the

4    context that it's going to come up.

5              MR. SIMONS:  I'll call it to your attention.

6              THE COURT:  We'll need to take that up off the

7    record.  That reminds me of a good point.  That is that as

8    issues come up during the trial, I would much prefer to know

9    at 8:30 rather than 9:00 that we have something we need to

10   take up outside the presence of the jury.  And the reason for

11   that is if I'm asking the jurors to drive in from all parts of

12   central Kentucky and asking them to be here at 9:00, and

13   they're pretty good about that.  I don't want to leave them

14   sitting back here for 30 minutes, from 9:00 to 9:30, if we're

15   taking up an issue that comes up at the last minute.

16             If you do know something that will be raised in

17   advance, raise it at the end of the day.  We'll either take it

18   up then, or if you can raise it by 8:30 in the morning, I'm

19   usually here no later than 8:30, usually much earlier than

20   that.  You also need to advise opposing counsel and co-counsel

21   if you have an issue so everyone can be here.

22             MR. SIMONS:  Thank you.

23             MR. ABELL:  And if that were the case, Judge, what is

24   the best way to get word to you that there is something we

25   need to talk to you about?

229

1          THE COURT:  The best way is to leave a message on the

2     phone in chambers if it's past hours that you have an issue

3     that needs to be brought up and make sure that, again,

4     opposing counsel knows about that.  And then that way, I can

5     let the security officers know that we'll have to start at

6     8:30, as opposed to 9:00.

7          MR. WHITE:  Your Honor, if it please the Court, would

8     you prefer me to file something in the record on ECF?

9          THE COURT:  File something in the record on ECF?

10         MR. WHITE:  Rather than calling your chambers.

11         THE COURT:  No.  If it's something that comes up in

12    the course of trial if you just leave a --

13         MR. WHITE:  I understand.

14         THE COURT:  -- very brief message that the attorneys

15    have an issue that needs to be taken up before we start,

16    whatever morning it happens to be, that will alert me, and I

17    can alert the security officers.

18         MR. WHITE:  Thank you very much.

19         THE COURT:  Mr. Bayer?

20         MR. BAYER:  From the standpoint of helping to

21    expedite the entire trial, perhaps facilitate some of this

22    inquiry, and I've discussed this with Mr. Smith, one of the

23    things that would help us a whole lot, Judge, is if we could

24    have some sort of notion as far as what witnesses might be

25    called.  Not necessarily the exact order, but considering that

230

1    we're dealing with hundreds of people here and tens of

2    thousands of pages of material, I think it would expedite

3    matters for everybody if we could at least have some sort of

4    snapshot of where we might be going on a day by day or two-day

5    basis.

6          THE COURT:  All right.  Mr. Smith, how were you

7    planning to handle that?  Are you in a position to be able to

8    notify the defendants of witnesses a day in advance, or do you

9    believe that would jeopardize your case?

10         MR. SMITH:  I don't really see how that could aid

11   facilitating the case that much.  I've tried, as best I can,

12   to give very good discovery in the case.  I think that it was

13   even organized and put in some fashion for some instances.  So

14   I really don't see how I can do that at this point.  If the

15   Court orders me to, obviously, I will make an effort to do

16   that.  But at this point, I'm not willing to.

17         THE COURT:  All right.  Well, I'm not going to

18   require you to do that unless you want to do that.  But, of

19   course, if the defendants need additional time after a witness

20   has been called to review any material that's been turned

21   over, Government isn't obligated to turn over 3500 material

22   until the witness testifies.  But if a particular defendant

23   needs additional time to review that material, then we'll take

24   the time to do that.

25         MR. BAYER:  Thank you, Judge.

1          THE COURT:  All right.  Any other miscellaneous

2     matters that we can take up at this time?

3          MR. WHITE:  Your Honor, I apologize.  I feel like a

4     popinjay today.  I've got a lot, as I think many of us do,

5     trial notebooks and whatnot.  Given that we've just got the

6     one entrance, would it be all right if we left our books maybe

7     on this first row?  Would that be okay?

8          THE COURT:  It's fine with me.

9          MR. WHITE:  I understand it can't be secured.

10          THE COURT:  I can't guarantee it, but if you could --

11     what we may do is actually mark off or block off the first row

12     so you'll be able to use that for your materials and we won't

13     have people sitting on top of it.  It does remind me of a

14     couple of points and as you know, of course, I've had to

15     schedule a number of matters in the afternoons.  And the next

16     hearing, let's see, right now I have a hearing on Friday of

17     this week at 4:30 that I'll need to take up here.  Single

18     defendant case.

19          Then I have a sentencing on the 9th.  On the 9th,

20     next Tuesday, I would suggest, for the hearing on the 9th,

21     that you move your materials away from counsel table.  I don't

22     think it will be an issue on the 5th, but I think the 9th, you

23     might want to secure your materials away from the tables.

24          MR. WHITE:  But you still want us here at 9:00 that

25     morning, though?

232

1    THE COURT:  Yes.  These are both 4:30 in the

2  afternoon periods.

3    MR. WHITE:  Oh, I'm sorry.  I misunderstood.

4    THE COURT:  I'm just mentioning it now.  When we

5  leave on the 9th, you may want to move your materials for that

6  particular proceeding.

7    All right.  Any other miscellaneous matters we can

8  take up while the jury's not present, while we have an extra

9  few minutes?  Mr. Hoskins?

10    MR. HOSKINS:  No.

11    THE COURT:  All right.  Thank you, counsel.  If

12  there's nothing else to take up, we will be in recess, again,

13  until 9:00 in the morning.  If you have anything to take up

14  before we start, of course, you need to advise me at 8:30.

15  We'll be in recess until tomorrow.

16    (Proceedings adjourned at 4:11 p.m.)

17    - - -

18    C E R T I F I C A T E

19    I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
20  proceedings in the above-entitled case.

21

22   \s\ Lisa Reed Wiesman                February 14, 2010
     LISA REED WIESMAN, RDR-CRR              Date of Certification
23  Official Court Reporter

24

25