```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
 2              SOUTHERN DIVISION AT LONDON

 3  UNITED STATES OF AMERICA,    .   Docket No. CR 09-16-S
                                 .
 4       vs.                     .   Frankfort, Kentucky
                                 .   February 18, 2010
 5  RUSSELL CLETUS MARICLE       .   1:00 p.m.
    DOUGLAS C. ADAMS             .
 6  CHARLES WAYNE JONES          .   Trial
    WILLIAM R. STIVERS           .
 7  FREDDY W. THOMPSON           .   VOLUME 9-B
    WILLIAM B. MORRIS            .
 8  DEBRA L. MORRIS              .
    STANLEY BOWLING              .

 9
                    TRANSCRIPT OF TRIAL
10          BEFORE THE HONORABLE DANNY C. REEVES
                UNITED STATES DISTRICT JUDGE
11  APPEARANCES:
    On behalf of the Plaintiff:  STEPHEN C. SMITH, ESQ.
12                               JASON D. PARMAN, ESQ.

13  On behalf of the Defendant   DAVID S. HOSKINS, ESQ.
    Russell Cletus Maricle:      MARTIN S. PINALES, ESQ.
14
    On behalf of the Defendant   R. KENT WESTBERRY, ESQ.
15  Douglas C. Adams:            KRISTEN N. LOGAN, ESQ.

16  On behalf of the Defendant   T. SCOTT WHITE, ESQ.
    Charles Wayne Jones:
17
    On behalf of the Defendant   ROBERT L. ABELL, ESQ.
18  William R. Stivers:

19  On behalf of the Defendant   RUSSELL JAMES BALDANI
    Freddy W. Thompson:          R. TUCKER RICHARDSON III
20
    On behalf of the Defendant   JERRY W. GILBERT, ESQ.
21  William B. Morris:

22  On behalf of the Defendant   ELIZABETH SNOW HUGHES,
    Debra L. Morris:                ESQ.
23
    On behalf of the Defendant   DANIEL A. SIMONS, ESQ.
24
    Court Reporter:              K. ANN BANTA, RPR, CRR
25
```

2

```
 1  Appearances of Counsel:

 2  On behalf of the Plaintiff:      STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, KY 40741
 5
    On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
 6  Russell Cletus Maricle:          107 East First Street
                                     Corbin, KY 40701
 7
                                     MARTIN S. PINALES, ESQ.
 8                                   150 East Fourth Street
                                     Federal Reserve Building
 9                                   Cincinnati, OH 45202

10  On behalf of the Defendant       R. KENT WESTBERRY, ESQ.
    Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.
11                                   220 West Main Street
                                     Suite 1900
12                                   Louisville, KY 40202

13  On behalf of the Defendant       T. SCOTT WHITE, ESQ.
    Charles Wayne Jones:             133 West Short Street
14                                   Lexington, KY 40507

15  On behalf of the Defendant       ROBERT L. ABELL, ESQ.
    William R. Stivers:              120 North Upper Street
16                                   Lexington, KY 40507

17  On behalf of the Defendant       RUSSELL JAMES BALDANI
    Freddy W. Thompson:              R. TUCKER RICHARDSON III
18                                   300 West Short Street
                                     Lexington, KY 40507
19
    On behalf of the defendant       JERRY W. GILBERT, ESQ.
20  William B. Morris:               212 North Second Street
                                     Richmond, KY 40475
21
    On behalf of the Defendant       ELIZABETH SNOW HUGHES
22  Debra L. Morris:                 201 West Short Street
                                     Lexington, KY 40507
23
    On behalf of the Defendant       DANIEL A. SIMONS, ESQ.
24  Stanley Bowling:                 116 West Main Street
                                     Suite 2A
25                                   Richmond, KY 40476
```

1  Appearances (Continued):

2  Court Reporter:                    K. ANN BANTA, RPR, CRR
                                      Official Court Reporter
3                                     United States District
                                        Court
4                                     101 Barr
                                      Lexington, KY 40507
5                                     (502) 545-1090

6  Proceedings recorded by mechanical stenography,
   transcript produced by computer-aided transcription.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         Thursday afternoon session,

 2                         February 18, 2010, 1:00 p.m.

 3                         - - -

 4            (The jury resumed their places in the jury

 5    box, and the following proceedings were had in open

 6    court.)

 7            THE COURT:  Thank you.  The record will

      reflect that all members of the jury are present.  The

 8    parties and counsel are also present.

 9            Let's see, Mr. White's returned to the

10    witness stand.  He is still under oath.

11            And Mr. White?

12            MR. WHITE:  Yes, sir.

13            THE COURT:  Attorney White is asking

14    questions.

15            I have given the witness some paper and a pen

16    if you want to ask him to make any drawings or

17    sketches.

18            You will have to give him the instructions to

19    what you would like.

20            MR. WHITE:  Very good, Your Honor, thank you.

21            THE COURT:  Yes, sir.

22                         - - -

23

24

25
```

D. Kennon White - Cross Examination

1      D. KENNON WHITE, PLAINTIFF'S WITNESS, SWORN

2                    CROSS EXAMINATION

3  BY MR. WHITE:

4  Q.   Well, good afternoon now.

5  A.   Good afternoon.

6  Q.   Hello, Mr. White.  Do you -- is that a blank

7  piece of paper in front of you?

8  A.   No, actually I have --

9  Q.   Did you kind of work on it over the lunch break?

10 A.   I attempted to, but it's not --

11 Q.   That's all right.  Can you just kind of hold it

12 up?

13 A.   I don't know how much good it will do, but

14 I'll --

15 Q.   Okay.  Could you hand that to Officer Bostrom,

16 please?  Thank you.  Excellent.

17      I am going to put this on called an ELMO, this

18 device over here.

19 A.   I don't know.

20 Q.   ELMO.  Okay, can you see that okay from there?

21 A.   Yes, that's --

22 Q.   Okay.

23          THE COURT:  Is it on your screen?

24          THE WITNESS:  No.

25          THE COURT:  No?

D. Kennon White - Cross Examination

BY MR. WHITE:

Q.   Now, right here we have got the courthouse entrance (indicating).

A.   Uh-huh.

Q.   And so right down here, this will be the parking area (indicating)?

A.   Yes.

Q.   Okay.  And you go in the courthouse entrance, and this is the clerk's office entrance (indicating)?

A.   Yes.

Q.   That's where there is a door, you just walk in (indicating).

A.   Uh-huh.

Q.   And is this what you have -- this thing right here (indicating), that's the L-shaped counter, if you will?

A.   Yes.

Q.   And it's about would you say, what, about two or three feet wide?

A.   Something like that.

Q.   I am going to draw, is it on this side of it (indicating)?

A.   Yes, that's where people sits.

Q.   So, in other words, this is the -- this would be the L-shaped counter (indicating)?

D. Kennon White – Cross Examination

1  A.   Uh-huh.

2  Q.   And this is Freddy's office here (indicating)?

3  A.   Uh-huh.

4  Q.   And when you come in, is this the area down here

5  where you recall the absentee voting machine being set

6  up (indicating)?

7  A.   I wasn't in there one or two days to see that.

8  Q.   Okay.

9  A.   But it was right down in the -- when I had, the

10  day I had seen them there, it was down more there

11  (indicating).

12  Q.   Down in -- oh, I see, where the voting machine

13  is.  Sorry about that, I didn't mean to surprise you.

14  A.   Okay.

15  Q.   So right here is where the voting machines were

16  (indicating)?

17  A.   It was in that general area there (indicating).

18  Q.   Okay.

19  A.   I don't know exactly where it was located, but I

20  -- they sit there -- they sit in that office there

21  (indicating).

22  Q.   So this was an -- this was an office here

23  (indicating)?

24  A.   Yeah, kind of -- kind of an enclosed office, but

25  they kept the door open to where it was open, to the

D. Kennon White - Cross Examination

1  best of my recollection.

2  Q.   Okay.

3  A.   I am not real good at that.

4  Q.   No, that's fine.  And are these -- like Freddy's

5  office, the walls or windows.

6  A.   Yeah.

7  Q.   Are these the windows as well do you know

8  (indicating)?

9  A.   No, don't recall.

10  Q.   Don't know one way or the other?

11  A.   No.

12          MR. WHITE:  Okay, I am going to mark this,

13  Your Honor, as -- if you will give me just a moment,

14  please.

15          THE COURT:  Yes, sir.

16          MR. WHITE:  I am going to mark this, Your

17  Honor, as CWJ, Defendant's Exhibit CWJ --

18          THE CLERK:  4.

19          MR. WHITE:  4.

20          THE COURT:  Jones Exhibit No. 4?

21          MR. WHITE:  Yes, sir.  Your Honor, we would

22  move the admission of CWJ4.

23          THE COURT:  All right, any objection?

24          MR. SMITH:  No objection.

25          THE COURT:  All right, Exhibit 4 will be

D. Kennon White - Cross Examination

1  admitted.

2          (DEFENDANT'S EXHIBIT NO. CWJ4 ADMITTED INTO

3  EVIDENCE)

4          MR. WHITE:  Thank you, Mr. Smith.

5  BY MR. WHITE:

6  Q.  Now, we got into the map when we were talking

7  about the absentee voting.

8      So that is where the voting machine was located,

9  if you wanted to vote absentee before the polls opened

10 in May of '06, correct?

11 A.  To my knowledge, I think that they moved it some,

12 but I am not sure exactly where else they moved it to.

13 Q.  Okay, but it would have been somewhere in the

14 clerk's office; is that right?

15 A.  Yeah, from my -- to my knowledge.

16 Q.  To your knowledge, have you, yourself, ever voted

17 absentee?

18 A.  I don't recall.

19 Q.  That's okay.  Is it -- do you know one way or the

20 other that -- of course, as you testified earlier on

21 direct examination, Mr. Jones was working that -- that

22 poll as an election official, correct?

23 A.  Yes, he was.

24 Q.  And to your knowledge there was also -- he was

25 there as the Democrat election judge.

D. Kennon White - Cross Examination

1    But there was also a Republican election judge

2 during that time as well; is that not right?

3 A.   That's what I understood.

4 Q.   Was that William U. Bishop?

5 A.   To my understanding.

6 Q.   And that's Clay Bishop's brother?

7 A.   That's correct.

8 Q.   I'm sorry, I need to take this off, I can't

9 speak.  And Clay Bishop was the county attorney,

10 correct?

11 A.   Yes.

12 Q.   To your knowledge -- you may have testified about

13 this -- based on your knowledge and involvement in

14 politics over there, did Mr. Bishop work -- did

15 William U. Bishop who was working as an election

16 office -- officer during the primary of 2006 absentee

17 voting, did he have anything to do with any of this

18 conspiracy or scheme?

19 A.   Wayne said all he did was sit there.

20 Q.   Okay.

21 A.   I mean --

22 Q.   So the answer would be no?

23 A.   Wayne --

24 Q.   To your knowledge?

25 A.   To my knowledge, Wayne said he just sat there

D. Kennon White - Cross Examination

1  most of the time.

2  Q.    Now, I am going to ask you a couple questions

3  that are repetitive, but I am going to give you some

4  context.  I want to ask you now about Carmen Webb

5  Lewis.

6  A.    Okay.

7  Q.    Okay?  So I am shifting on you.  Miss Lewis was

8  elected -- she is married, her husband is Charles

9  Lewis; is that right?

10 A.    Yes.

11 Q.    Okay, and Miss Lewis, did she go on the city

12 council before she became mayor?

13 A.    Yes, she did.

14 Q.    Was that in 2004 when she was first elected?

15 A.    I think that's correct.

16 Q.    And in the '06 election, she beat your father,

17 Mr. White, and when she came in, would she have taken

18 office on January 1st?

19 A.    Yes, that would have been --

20 Q.    So it was within a matter of days that you were

21 let go?

22 A.    It was the day -- I think it was either the first

23 day or the second day.

24 Q.    And how long -- was it within a few -- how long

25 was it before she also let your wife go?

D. Kennon White - Cross Examination

1  A.   Seems like maybe it was a couple months.

2  Q.   And she was -- hers was more of a layoff,

3  correct?

4  A.   Yes.

5  Q.   Okay.  Your testimony to the United -- to the

6  United States was that Dobber Weaver was in on the --

7  this vote buying and vote stealing deal in the '06

8  primary down at the Manchester precinct; is that

9  correct?

10  A.   That is correct.

11  Q.   Okay, but you knew, did you not, that Dobber

12  Weaver was playing both sides of the fence, that he

13  kind of created his own mini-ticket?

14  A.   I suspected that after the fact.

15  Q.   After the fact?

16  A.   After election day.

17  Q.   You didn't know until --

18  A.   After election day started, I could see something

19  going on.

20  Q.   When you had found out that a gentleman by the

21  name of Mr. Hensley had given them $5,000 for votes

22  for Carmen Lewis; is that right?

23  A.   That's what Wayne Jones said.

24  Q.   And he took money from Jamie Mills; is that

25  right?

D. Kennon White - Cross Examination

1  A.    Dobber took money from Jamie Mills every time.

2  Q.    And Jamie Mills was running for city council?

3  A.    Yes.

4  Q.    So Dobber wasn't necessarily in the same group as

5  you and who you claim, Judge Maricle, Wayne and Al

6  Man?

7  A.    Yes, he was in the same group, he just did some

8  sideline tickets to try to -- he played -- he dilly-

9  dallied on both sides.

10      He swapped votes off to -- but he wasn't 100

11 percent, but he was probably 85 or 90 percent.

12 Q.    Yeah, and that wasn't that unusual, was it, not

13 for Dobber but for other folks as well, correct?

14 A.    That's correct.

15 Q.    In other words, I think you testified, didn't

16 you, that in 2002, you had Jennings White and Freddy

17 Thompson, right?  Running for county clerk?

18 A.    Yes.

19 Q.    And so far as you knew, the folks that were for

20 Freddy Thompson were Doug Adams, and based on your

21 testimony, Wayne Jones and Al Man Stivers, correct?

22 A.    That's correct.

23 Q.    And based on your testimony, you have said that

24 Mr. Bowling and Mr. Morris were for Jennings,

25 correct?  Jennings White?

D. Kennon White – Cross Examination

1 A.   They were to the greatest extent of who they were

2 for.   I suspect that they did some things with both

3 sides.

4 Q.   Both sides too, okay.   Then in 2006, in the

5 sheriff's race, Doug Adams, you testified, was for

6 Mr. Johnson, correct?

7 A.   That's correct.

8 Q.   And that's a fellow that ended up winning, right?

9 A.   That's correct.

10 Q.   And your wife Wanda was working for Edd Jordan

11 for sheriff, correct?

12 A.   She was just not making a stand in that race.   It

13 was understood that she was to be for Phillip Mobley's

14 primary, Dobber Weaver was going to be for Crawdad

15 Sizemore primary and they were all going to get

16 along.

17     And Kevin Johnson and she agreed.   They had an

18 agreement that Edd -- that they would not steal Edd's

19 votes that he bought down there.

20     And I think that they run that precinct within

21 just a few votes of one another, him and Kevin

22 Johnson.

23 Q.   Okay, so in other words, there was -- as late as

24 the 2006 race, not everybody was together, were they?

25 They were on some, they weren't on others.

D. Kennon White - Cross Examination

1  A.   On 90 percent they were together.

2  Q.   But they didn't agree on a single slate, did

3  they?

4  A.   They would deviate in certain locations to

5  satisfy certain people.

6  Q.   So they didn't agree on a single slate, correct?

7  A.   The majority they did, but in certain places and

8  in certain precincts of certain people that they did

9  deviate from that to get the votes for the ones that

10 they were most interested in electing.

11 Q.   Thank you.  Now, in fact, in 2006 -- again, this

12 is your testimony --

13 A.   Okay.

14 Q.   Or did you testify that you said Mr. Adams was

15 going to help you and your father in the mayor's race

16 in the general election, but he decided to lay out of

17 the mayor's race so he could focus on the sheriff's

18 race?

19 A.   That's correct.

20 Q.   Okay.  I mean, so it kind of makes one wonder,

21 doesn't it, that he must not be that much of a

22 Superman if all he can do is just take care of one

23 race.

24      He can't -- he can't deal with all these others,

25 can he?

D. Kennon White - Cross Examination

1  A.   Well, the reason he was taking care of one race

2  was because he was supposed to meet Kevin Johnson's

3  vote as sheriff for election officer along with Freddy

4  Thompson's would control the election of who was put

5  in as officers over there.

6  Q.   Well, so maybe he wasn't as powerful as you seem

7  to say; isn't that right?

8          MR. SMITH:   Your Honor, I am going to object

9  to that.

10         MR. WHITE:   I'll withdraw the question, Your

11 Honor.

12         THE COURT:   I'll sustain the objection.  The

13 jury may disregard that question.

14 BY MR. WHITE:

15 Q.   Now, I want to shift gears on you again.  I want

16 to talk to you about the 2002 -- well, let me -- I am

17 going to go back, okay?

18     Just with a quick question because I have written

19 this down, and I have lost it.

20     And I don't know -- I am not going to visit it

21 much, I am just going to ask you maybe one or two

22 questions.

23     When you went to work -- I am going to go back to

24 the Senture thing.

25     When you went to work at Senture, you weren't the

D. Kennon White - Cross Examination

1  only member of your family to get a job there, were

2  you?

3  A.   No, I was not.

4  Q.   Your wife got a job there?

5  A.   Yes, for about a week.

6  Q.   Okay, and who is Stephanie Price?

7  A.   That's my sister-in-law.

8  Q.   Okay, so they got jobs there as well?

9  A.   Yes, but let me explain that, if I can.

10 Q.   You may.

11 A.   They are needing to hire more people than what

12 they can get.

13      They hired -- when they get contracts, sometimes

14 they will need to hire 400 people in a certain time

15 frame.

16      So basically when they go to hiring like that,

17 they hire, you know, if you get -- you know, they hire

18 a lot of people.

19      So it's not like that it was any kind of, you

20 know, created thing there.

21 Q.   Uh-huh.  Now, I want to jump back, I'm sorry.  I

22 was looking at my notes.

23      Let's talk about the jailer race in '02.  That's

24 your one and only political race that you, yourself,

25 ever ran; correct?

D. Kennon White - Cross Examination

1  A.   I was running for council.

2  Q.   Right, but this is the one you actually filed,

3  you campaigned, you did everything you could to get

4  elected?

5  A.   Okay, I ran, yeah.

6  Q.   Yeah, and you ran as a Republican, correct, in

7  that primary?

8  A.   Yes.

9  Q.   And you threw in with Jennings White?

10  A.   Yes.

11  Q.   And you did that, and one of the precincts have

12  help from I think you said the school board over there

13  in the Oneida district; is that right?

14  A.   I had --

15  Q.   Or I'm sorry, the Oneida precinct.

16  A.   The Oneida precinct as it's referred to and the

17  South Fork precinct.

18  Q.   So you got -- you got a little bit of help from

19  -- from the school --

20  A.   Yeah, partial help in those precincts.

21  Q.   And one of the reasons that -- that you went with

22  Jennings White was he was your kin, and you didn't

23  necessarily want to split up the Whites, correct?

24  A.   I didn't want to cause hard feelings between

25  older relatives, that's correct.

D. Kennon White – Cross Examination

1  Q.   And but also another reason was that -- was that

2  Jennings White was the power of the county.

3       I mean, he had the juice.  Would you agree with

4  that?

5  A.   At that time.

6  Q.   Uh-huh.  Now, one of the reasons that he had the

7  juice was he controlled the Clay County Board of

8  Elections in 2002, didn't he?

9  A.   He did to a certain extent.

10 Q.   Well, I mean, there is four people on the board,

11 correct?

12 A.   Yes.

13 Q.   There is by law the county clerk, and that was

14 Jennings, correct?

15 A.   Uh-huh.

16 Q.   He had two votes.

17 A.   Yes, I think that's correct.

18 Q.   Then the sheriff, by law, the county sheriff was

19 also on the board, correct?

20 A.   Yes.

21 Q.   And the sheriff in 2002 was a fellow named Edd

22 Jordan, correct?

23 A.   That is correct.

24 Q.   And Edd Jordan was a Republican, correct?

25 A.   Yes.

D. Kennon White - Cross Examination

1  Q.   And then again by law, there was a Republican

2  commissioner and a Democrat commissioner, and each of

3  them had one vote each, correct?

4  A.   That's right.

5  Q.   So Jennings White, being Republican, essentially

6  controlled the Board of Elections?

7  A.   He could -- he could control through the names

8  that were submitted through the captains of these

9  precincts, to my understanding.

10     So he had -- he had people there in these

11 precincts that some of them that had worked for the

12 school board and active in these precincts had never

13 had any pressure before put on them in many years by

14 their employer to go a different way.

15     And when your job is threatened, a lot of people

16 will tend to -- tend to do things they normally

17 wouldn't do.

18 Q.   All those people, all those people told you that?

19 A.   That's --

20 Q.   That's what Jennings White told you?

21 A.   That's generally what everyone had talked about

22 in the county at that time.

23 Q.   Jennings White told you that.  That's why

24 Jennings White said he got beat, didn't he?

25          MR. SMITH:  Your Honor, I believe he is

D. Kennon White - Cross Examination

1  arguing with the witness.  I believe he's answered

2  his question.

3           THE COURT:  Sustain.

4           MR. WHITE:  I apologize, Your Honor.

5  BY MR. WHITE:

6  Q.  Is it accurate to state that Jennings White told

7  you that the reason he lost in '02 was because the

8  election officers and the magistrates had switched on

9  you?

10 A.  For the school board?

11 Q.  Yes.

12 A.  Yes.

13 Q.  I want to confirm something.  Did you not testify

14 on direct examination when asked does the clerk have

15 more than one vote that you confirm that in fact that

16 the clerk had two votes and so him and one more, him

17 and the sheriff could actually dictate who was the

18 election officers?

19 A.  The sheriff and the -- and the -- and the clerk

20 has enough -- has majority vote in that.

21 Q.  That's right.  So they could put anyone in they

22 wanted because they had the votes.

23 A.  After they was chosen and the people that were

24 already presented, there is names of people

25 presented.

D. Kennon White - Cross Examination

1    You know, you would have to go through the whole

2 process to see how it works.

3 Q.   And that process is that the Republicans and the

4 Democrats each submit either four or five names per

5 precinct to the election board, and the election board

6 then picks based on those names, correct?

7 A.   Yes.

8 Q.   Now, you testified on direct examination, did you

9 not, that -- about a week before the election that

10 Wayne Jones, my client, and Al Man Stivers, you said

11 that they came over and they offered to let you on the

12 slate and -- if you could put $60,000 on the table; is

13 that not correct?

14 A.   I didn't testify to that.  I testified that Al

15 Man Stivers and his brother, who is now deceased, came

16 to my house.

17 Q.   Okay.  They came over to your house?

18 A.   Yes.

19 Q.   Were you by yourself?

20 A.   My wife was there.

21 Q.   Anybody there but you and your wife?

22 A.   My children.

23 Q.   Were they -- how old were your children then?

24 A.   They were young.  They were under -- probably

25 about twelve and six, or something like that.

D. Kennon White - Cross Examination

1  Q.   So basically it's -- it's Al Man's word against

2  you and your wife as to what happened; is that not

3  correct?

4         MR. SMITH:  Your Honor, I am going to

5  object.  Again, he is arguing his case.

6         THE COURT:  Sustained.

7         MR. WHITE:  Thank you, Your Honor.

8  BY MR. WHITE:

9  Q.   So despite being in with Jennings White you lost,

10 correct?

11 A.   That's correct.

12 Q.   Now, you are the city manager for what, about

13 three years?

14 A.   Yeah, I worked at the city for about three years,

15 around there.

16      Well, probably not that long, about two and a

17 half years.

18 Q.   What would you say if you were to give us your

19 best estimate as the person, as the city manager of

20 Manchester, what that population was, say, in 2006?

21 A.   I would say the population was between 1,800 and

22 2,000 in Manchester.  I don't know that to be a fact,

23 but that's close.

24 Q.   Uh-huh.  You said 1,800 to 2,000?

25 A.   I think that's about correct.

D. Kennon White - Cross Examination

1  Q.   And I guess Manchester is like a lot of small

2  towns where there is a lot of people that knows a lot

3  of people and there is a lot of common things in

4  common?

5  A.   I suppose.

6  Q.   I mean, you testified earlier that you would run

7  into Wayne Jones or some -- or Judge Maricle at like a

8  high school sports event?

9  A.   You would run into them at different locations,

10 ball games or other things, grocery store.

11 Q.   Now, you testified that the -- that the FBI

12 raided the clerk's office right before the 2006

13 election; is that correct?

14 A.   Yes.

15 Q.   You were aware, though, that they had -- the FBI

16 had been around town for sometime before that; is that

17 not accurate?

18 A.   Yes.

19 Q.   And you were concerned that the FBI was in town,

20 weren't you?

21 A.   Of course.

22 Q.   Yeah, I mean, you had engaged in election fraud

23 in 2002 and 2004, correct?

24 A.   Yes.

25 Q.   In fact you testified that you first got involved

D. Kennon White - Cross Examination

1 in election fraud for your aunt back in '94?

2 A.   Yes, and then there was a period of time I was

3 absent from politics.

4 Q.   Okay, you have been extorting money for

5 contractors for this kickback scheme, so that gave you

6 reason to be worried about the Feds?

7 A.   I took bribes, that's correct.

8 Q.   So there was a lot of talk and rumor going around

9 town about what the FBI was after, correct?

10 A.   There was a whole lot of rumors circulating.

11 Q.   Would you agree with me that when you went and

12 met with some of these folks that you were playing on

13 the fact that there was a lot of unknowns and that

14 there were a lot of rumors going around, and you were

15 trying to -- to play on that fear, that concern out

16 there that just anybody could have; is that not right?

17 A.   I don't know.

18 Q.   Let me ask you real quick about that 2004.  You

19 had -- you had filed -- you would come back home from

20 London where you had been in business with the mobile

21 homes.

22     Were you living over in London then, or were you

23 commuting back and forth?  Because I know it wasn't

24 very far.  Were you commuting?

25 A.   I was driving back and forth.

D. Kennon White - Cross Examination

1  Q.   So you came back home, and your first inclination

2  was you were going to run for City Council, correct?

3  A.   That was not right --

4  Q.   I'm sorry, in '04.

5  A.   In '04?  I ran for city -- was going to run for

6  City Council and came off.

7  Q.   Right, and that's what I was getting at.  You did

8  that after you came back from London, correct?

9  A.   You mean after I closed the business in London?

10  Q.   Yes.

11  A.   Or was in the process of closing it?

12  Q.   Yes.

13  A.   I really don't know, but it was close to that

14  time period.

15  Q.   About that time period?  But when you moved --

16  were you living in the City of Manchester when you

17  filed to run for City Council?

18  A.   Yes.

19  Q.   Did you have to move to get into the city?

20  A.   Yes, I did.

21  Q.   Where had you been living?

22  A.   I had been living out in Greenbriar.

23  Q.   Okay, out in Greenbriar, is that out by the

24  Greenbriar Church, Greenbriar Presbyterian?

25  A.   It's Louisville.  Yeah, that's Greenbriar.

D. Kennon White - Cross Examination

1  Q.  Yeah, and so you were out in the county, and you

2  couldn't run for City Council if you lived out there,

3  correct?

4  A.  No.

5  Q.  So you moved into town to run for City Council?

6  A.  At the direction of some others, that's correct.

7  Q.  And was it your testimony that Yancey White

8  talked you out of running for City Council?

9      In other words, to get out of the race because,

10 in his view, you could hurt your aunt's chances of

11 winning back her state house seat; is that correct?

12 A.  Yes.

13 Q.  Now, where did that discussion take place?

14 A.  It took place at my home in Manchester, where I

15 moved to.

16 Q.  Uh-huh, was your wife there?

17 A.  I think she was there.  I don't know if she was

18 actually in the room or not when that conversation

19 took place.

20 Q.  Was there anyone in the room besides you and

21 Yancey?

22 A.  No.

23 Q.  Yancey is a lawyer?

24 A.  Yes, he is.

25  Q.  Let me ask you, I wanted to ask you a question

D. Kennon White - Cross Examination

1 about this.

2      You gave testimony, did you not, about a five-

3 year Statute of Limitations, when you were talking

4 about the 2002 election; is that correct?

5 A.   I would have to look at the transcript.  I don't

6 remember.

7 Q.   Do you remember -- let me ask you this, I mean,

8 we can dig for it, but let me see if I can get there

9 just a little more efficiently.

10      Do you recall during your testimony of last week

11 in which in discussing the 2002 election, that some of

12 the folks were not worried about the 2002 election

13 because the five-year statute of limitations had run?

14 A.   I recall that was discussed I think.

15 Q.   So that was something you were aware of.

16 A.   Something that was discussed, yes.

17 Q.   Is that something you were aware of, though, when

18 you were making these recordings?

19      Or is that something someone has told you about

20 since then?

21 A.   It was something that was discussed when I did

22 those recordings.

23 Q.   And is that a federal or a state statute of

24 limitations, do you know?

25 A.   I have no idea.

D. Kennon White - Cross Examination

1 Q.   Either way.  Do you know if they are the same?

2 A.   I don't.

3          MR. SMITH:  Your Honor, I object.

4          THE COURT:  Sustain.

5          MR. WHITE:  May I approach, Your Honor?

6          THE COURT:  Yes, you may.

7          MR. WHITE:  Thank you very much.  That's

8 okay, Your Honor.  I'll withdraw.

9          THE COURT:  The jury will disregard the

10 question.

11          MR. WHITE:  Thank you.  Your Honor, we are

12 going to need to approach on a different matter.

13          THE COURT:  All right, come on up.

14          MR. WHITE:  Can I get A12, please?

15          (Thereupon, a discussion was had at the bench

16 between the Court and counsel and out of the hearing

17 of the jury.)

18          MR. WHITE:  Thanks, Judge.  Judge, on page --

19 on page 6 of A12A, Mr. -- this is a meeting that

20 occurred on -- this is Scott White on behalf of Wayne

21 Jones.

22          This is recording date of May 1st, 2007

23 involving Bart Morris, Cletus Maricle, Wanda and

24 Kennon White.

25          On page 6 towards the bottom -- and I don't

D. Kennon White - Cross Examination

1 think any of this is -- I wanted to bring it up

2 because I want to use the transcript.

3           He says at the bottom, about four lines down,

4 "I'll tell you what, Wayne Jones told me there a

5 minute ago, he said, well, it's hard to remember stuff

6 back then."

7           "But, he said, "seem to me a lot of stuff

8 back then," he said, "if they go back to '02, there

9 are a lot of people going to have problems, you know."

10           And I want to ask him about that because he

11 actually recorded his meeting with Mr. Jones that

12 occurred right before this.

13           And Mr. Jones didn't say anything about that,

14 so I want to ask him about that.

15           THE COURT:  Okay.

16           MR. WHITE:  And so I am going to ask him, he

17 may need to look at this exhibit, but I was looking on

18 this page, which is page 6, I didn't see any

19 redacted.

20           And then he is going to also have to look at

21 11A, and I think there are some redactions in 11A.

22           And all I have got in terms of -- all I have

23 got is a digital copy of the redacted.  I don't have

24 an unredacted.

25           THE COURT:  You mean the exhibit?

D. Kennon White - Cross Examination

1          MR. WHITE:  Oh, I'm sorry, yes, sir, Exhibit
2   11A.
3          MR. SMITH:  Your Honor, I may need to go get
4   my copy from my desk.
5          I didn't know what exhibits he was going to
6   talk about.
7          THE COURT:  All right.  I don't see the
8   redactions.  Mr. Smith, do you have some?
9          MR. SMITH:  Page 7.
10          MR. WHITE:  I didn't see any.
11          THE COURT:  All right.  What's the -- I am
12   not sure I know what the question is.
13          MR. WHITE:  All I wanted to do was I am going
14   to need to give him 11A and 12A to refer to, if he
15   needs to.
16          And I didn't have an un-- a redacted copy to
17   give to him, because all I have got is the digital
18   copy.
19          THE COURT:  This has not been redacted.
20          MR. SMITH:  Yes, Your Honor, we --
21          THE COURT:  I'm sorry?
22          MR. SMITH:  We still have not had a chance to
23   meet with defense counsel and have him go over that.
24          But I recognize and acknowledge that page 7,
25   that last line is Court Exhibit -- Government's

D. Kennon White - Cross Examination

1 Exhibit that's introduced as hard copy, it's

2 unredacted.

3          MR. WHITE:  Can I make a suggestion?

4          MR. SMITH:  I have failed to hear from

5 counsel whether he is going to be questioning about

6 page 7.  It may not be an issue.

7          MR. WHITE:  I am not going to -- here's what

8 I was going to ask him.

9          I was going to ask him -- here's basically

10 what I was going to do.

11          I am going to say, "Now, when you met with

12 Mr. Morris, you told him, did you not, that just a few

13 minutes earlier that you had met with Mr. Jones?"

14          And he said, "If they go back to '02

15 everybody's in trouble."

16          And in fact we have that transcript, and you

17 can just review it and tell me, the fact that he

18 didn't say that at all, it's nowhere in that

19 transcript; is that not accurate?

20          So in that sense I am asking to look at the

21 entire thing.

22          What I was going to suggest, maybe we just --

23 maybe just take a pen and knock out that one line

24 since you are going to be replacing it later anyway.

25 Is that a possibility?

D. Kennon White – Cross Examination

1           THE COURT:  It's my version without the

2 written word in it that I noticed was missing from the

3 original version.

4           We'll just take a break, and we will redact

5 that one page, page 6 of Exhibit 11A.

6           MR. RICHARDSON:  Your Honor, Tucker

7 Richardson on behalf of Freddy Thompson.

8           On my cross examination, I have probably got

9 7 or 8 of them that I am going to go into those

10 tapes.

11          So just letting the court know, but I am

12 willing to use -- I am only going to go for a short

13 little thing because I have got mine redacted.

14          If I can use the ELMO, I think I can throw it

15 up there and get it done without going, you know -- I

16 think that would be the easiest and quickest way to do

17 it.  That would be my suggestion.

18          THE COURT:  Well, we'll cross that bridge

19 when we come to it.

20          We'll take a -- take a break to allow this

21 exhibit to be properly redacted pursuant to the

22 order.

23          And -- would the parties agree for me to go

24 back and white this line out of this exhibit, or do we

25 need to use this document?

D. Kennon White - Cross Examination

1           MR. WHITE:  No objection, Your Honor.

2           THE COURT:  Go back, to save time, I will

3  white it out, let you see what I have whited out

4  before you show it to the witness.

5           MR. WHITE:  Okay.

6           THE COURT:  Okay, we will take about a five-

7  minute recess.

8           (End of bench conference.)

9           THE COURT:  Ladies and gentlemen, we are

10 going to take just a short recess, about five minutes

11 to allow me to go back and review one of these

12 transcripts.

13           Please keep in mind the admonition that you

14 were given previously, but you will be in recess for

15 five minutes.

16           The court will be in recess for that period

17 as well.

18           (The jury was excused from the courtroom at

19 1:43 p.m. for five minutes.)

20           (After recess.)

21           (The jury resumed their place in the jury

22 box, and the following proceedings were had in open

23 court.)

24           THE COURT:  All right, thank you, the record

25 will reflect the jury is present, all members are

D. Kennon White - Cross Examination

1  present.

2         Counsel and parties are also present, and

3  Mr. White, of course you are still under oath.

4         THE WITNESS:  Thank you, Your Honor.

5         THE COURT:  And Mr. Scott White, you may

6  proceed.

7         MR. WHITE:  Thank you, Your Honor.

8  BY MR. WHITE:

9  Q.  I would like to ask the clerk to hand you

10  Exhibits 12A and 11A.

11         MR. WHITE:  Please, ma'am.

12  BY MR. WHITE:

13  Q.  If you could get 12A in front of you, sir, and

14  take a look at page 6.

15     I am going to ask you a question.  You are not

16  going to maybe have to read that after all.

17     But do you recall on May 1st, 2007 -- I am

18  getting that date from one of the recordings -- that

19  you went over and visited with Bart Morris?

20  A.  Yes.

21  Q.  Was that at his house?

22  A.  Yes.

23  Q.  And before you had gone there, you had been over

24  to Al Man Stivers's house and were there with Al Man,

25  my client, Wayne Jones, and Betty Stivers; is that

D. Kennon White - Cross Examination

1 right?

2     If you take a look at A, Exhibit A11 that's in

3 front of you, I think that will say that on the top of

4 the page.

5 A.   Yeah, I don't know exactly, let me see.  Yeah, I

6 was there with Al Man and Wayne and -- yeah, my wife

7 and some unidentified people.

8 Q.   Okay, it was your wife, I'm sorry.  When you met

9 with Mr. Stivers, do you recall telling him that -- do

10 you recall telling him that you had just been to Wayne

11 Jones's a minute before, a minute or so before?

12 A.   I don't -- I don't remember.

13 Q.   Take it -- I'll tell you what, take a look at the

14 very last paragraph on page 6 of Exhibit A12A, which

15 is the recording of May 1st, 2007 with Mr. Morris.  It

16 begins, "Kennon," that was in May.

17 A.   Okay.

18 Q.   Have you read that whole paragraph?

19 A.   Uh-huh.

20 Q.   Now, is it accurate to say -- does that refresh

21 your memory?

22 A.   Yeah, that refreshes.

23 Q.   Okay, so in that recording of that conversation,

24 you had indicated to Mr. Morris that you had just seen

25 Wayne Jones and that Wayne had told you that, "If they

D. Kennon White - Cross Examination

1  go all the way back to 2002, there's a lot of people

2  going to have problems;" is that accurate?

3  A.   Yes.

4  Q.   Now, take Exhibit A11.  And if you could show me

5  where -- do you remember, was -- was that statement

6  that you made that we just talked about, about Wayne

7  saying that a whole lot of people -- a lot of people

8  are going to have problems, was that something that --

9  that you made up or was that something that you had

10 actually heard Wayne Jones say in the prior meeting?

11 A.   I believe I heard Wayne Jones say that, but I

12 don't see the -- without being able to look at all of

13 it, I can't tell you.

14 Q.   Okay, is it -- I mean, you have got the

15 transcript there in front of you, which is Exhibit

16 11A.

17     Do you want to go through that, or you are just

18 saying you are not sure?

19 A.   Now, that is -- that's a partial transcript.

20 Q.   We have taken out the partial part.

21 A.   Okay, I have not looked at -- I mean, the partial

22 part has been taken out of this?

23 Q.   Yes, sir, it has.

24 A.   Okay, I would have to look over the whole thing.

25 I know Wayne has told me that before.

D. Kennon White - Cross Examination

1 Q.   Okay, well, then let me ask you this.  I just

2 wanted to ask you a few more questions.

3      But you don't have a recording of him saying

4 that, do you?

5 A.   I don't know.

6 Q.   Okay.  Now, did you testify that Gayle Stevens

7 hauled votes for -- or hauled voters for Wayne Jones

8 in 2006?

9 A.   She was hauling them to Wayne Jones.  He was the

10 man voting them.

11 Q.   Was that absentee?

12 A.   That was absentee.

13 Q.   Was that in the primary or in the general?

14 A.   That was in the general election.

15 Q.   And is that information that you personally know,

16 or is that something that somebody told you?

17 A.   I personally knowed it because I talked with him

18 daily at that time and met with him, showed him the

19 people.

20      We confirmed with each other almost on a nightly

21 basis a lot of times that -- you know, that they had

22 -- who had came and voted and that sort of thing so

23 that they wouldn't be paid twice.

24 Q.   But my question is -- and I don't want to be

25 argumentative, I just want to make sure I am clear.

D. Kennon White - Cross Examination

1      Other than someone telling you that Gayle Stevens

2  hauled voters to Wayne Jones, which would include

3  Mr. Jones telling you that, or so you say, what I am

4  curious about is do you personally know that -- that

5  Gayle Stevens hauled voters?  I mean, did you see her

6  do it?

7  A.    I watched her pick voters up.  I watched her drop

8  them off at the clerk's office.  Did I walk in there

9  and watch Wayne vote them?

10 Q.    No, I just want to know if they hauled them.

11 A.    Yeah, she did.

12 Q.    Did she tell you who she was hauling for?

13 A.    She gave me names.  And she was hauling for me.

14 My dad was running.

15 Q.    Okay.

16 A.    And Wayne was voting, and they were a ticket that

17 we agreed upon that we were helping.

18      And the record, if you look at the records of

19 what the totals was for absentees, you will see that

20 the absentees was carried by my father by about 7 --

21 well, there was quite a few that he did carry, a

22 significant amount.

23 Q.    That would have been in 2006 --

24 A.    Yes.

25 Q.    -- when you all substantially agreed on the

D. Kennon White - Cross Examination

1  slate?

2  A.   When Wayne and I --

3  Q.   Right.

4  A.   -- worked together with the absentee along with

5  some other people helping us.

6  Q.   Right, now, I don't want to go into really any

7  depth on this, I have just got a couple questions.

8       Let me ask you, you are talking about vote

9  totals.

10      When you ran for jailer in 2002, that was -- and

11  that's the only race you actually ran all the way

12  through.

13      Do you know -- do you know what precincts -- do

14  you remember, did you carry any precincts?

15  A.   Yes, I carried -- to my recollection, I carried

16  Manchester, Flat Creek and Harts Branch.

17  Q.   Harts Branch?

18  A.   I think I carried Harts Branch.

19  Q.   Do you know where Wayne Jones's home precinct is?

20  A.   Yes, it's Harts Branch.

21  Q.   So you beat Wayne Jones in his --

22  A.   Wayne Jones and Stanley Bowling take care of

23  Harts Branch.

24  Q.   I see.  I just want to ask you a last couple

25  questions, so I can alert my colleague to get ready.

D. Kennon White - Cross Examination

1    In -- you had testified, I think, at the very

2  beginning of your testimony that -- that you had a

3  drug problem and you were in recovery.  Did you have

4  any relapses between 2000 and 2006?

5  A.   No

6  Q.   Okay, and when you became a cooperating witness

7  with the FBI, have they required you to have random

8  drug testing?

9  A.   No, they have not.

10 Q.   Has your probation officer had you have random

11 drug testing since you entered your plea?

12 A.   No, they have not.

13          MR. WHITE:  Your Honor, may I have just a

14 moment?

15          THE COURT:  Yes.

16          (Mr. White conferring with his client at this

17 time.)

18          MR. WHITE:  Your Honor, that's all I have.

19          Mr. White, thank you, sir, for your time.

20          THE WITNESS:  Thank you for your time.

21          MR. WHITE:  CWJ4, can I have --

22          THE COURT:  Yes, you can hand it up here,

23 please.  Thank you.

24          Mr. Abell?

25                              - - -

D. Kennon White – Cross Examination

```
 1                    CROSS EXAMINATION
 2  BY MR. ABELL:
 3  Q.   Mr. White, my name is Robert Abell, and I
 4  represent William Stivers in this case.
 5       You know him, I think, and often refer to him as
 6  Al Man, right?
 7  A.   Yes.
 8  Q.   In Manchester, there is at least one other
 9  William Stivers?
10  A.   That's correct.
11  Q.   The other William Stivers was a long term City of
12  Manchester employee I think worked in public works?
13  A.   Yes.
14  Q.   And I believe he was laid off in 2007 by Mayor
15  Lewis?
16  A.   I don't think he ended up being laid off.  I
17  think that they worked it out he went back to work.
18  Q.   All right, in any event, two William Stiverses,
19  one works for the city, apparently maybe still does
20  for all we know, right?
21  A.   Yes.
22  Q.   Now, I am talking about the William Stivers I am
23  here to represent today so -- okay?
24  A.   That's fine.
25  Q.   All right, you have known my client, William
```

D. Kennon White - Cross Examination

1 Stivers, seven, eight years or so?

2 A.    I have known him closer in the last seven or

3 eight years.  I have known of him before.

4 Q.    Okay, known of him going back maybe twenty years?

5 A.    A long time.

6 Q.    Okay.  Probably you are aware he's worked in

7 principally, not only, but mostly for a coal company

8 and in the construction industry?

9 A.    I wasn't aware of where he worked.  I know that

10 he worked, you know, in construction.

11 Q.    Okay, not the specific company?

12 A.    Road work and stuff.

13 Q.    Okay, heavy equipment operation, civil

14 construction?

15 A.    I don't know exactly what he done.

16 Q.    All right.  Now, you have -- with regard to

17 Raleigh Downey, he had a boy John?

18 A.    His brother.

19 Q.    His brother, John Boy Raleigh?

20 A.    I don't know about John Boy.  His brother's name

21 is John Downey.

22     That was the one that was in jail that they

23 helped to get out and -- and Raleigh was the man that

24 was going to assist me in Whites Branch hauling voters

25 for the favor that was done by Cletus Maricle and Al

D. Kennon White - Cross Examination

1 Man.

2 Q.   You don't claim to have been present at anytime

3 when my client, William Stivers, talked with Cletus

4 Maricle about Raleigh Down -- Raleigh Downey or

5 anybody in his family, correct?

6 A.   We were not together when we talked about it.  I

7 talked with him on separate occasions.

8 Q.   At least at one time, at around the time of these

9 recordings, you felt you were good enough friends with

10 Mr. Stivers to drop by his residence unannounced?

11 A.   I went to Al Man's a whole lot during the

12 election to go over election lists.

13      And yes, I had become to where I was welcome

14 anytime.

15 Q.   And apparently frequently dropped by unannounced

16 and uninvited?

17 A.   There was times that I came by, but he always

18 made me feel welcome when I came over.

19 Q.   You had dinner there a few times?

20 A.   Not much, few times.

21 Q.   Few times, all right.  On the recordings, we have

22 listened to a portion of them, correct?

23 A.   Yes.

24 Q.   There is gossip about people in the town.  For

25 instance, people who had been arrested, we heard about

D. Kennon White – Cross Examination

1 those the other day.

2 A.   There was I guess some gossip.

3 Q.   Okay.  Talk about issues in the town, for

4 instance, whether or not this new mayor lived inside

5 the city boundaries?

6 A.   Yes.

7 Q.   Sometime there was some joking going on.

8 A.   I guess occasionally.

9 Q.   Because we heard some laughter on the tapes we

10 have heard these last few days, correct?

11 A.   Yes, there was.

12 Q.   Some of the participants, including yourself and

13 Mr. Stivers, sometimes were cutting up and joking,

14 that's fair to say, isn't it?

15 A.   There wasn't a whole lot of that, but there was

16 some.

17 Q.   But at times there was some.  Okay.  There at the

18 Stiverses' had a couple of dogs?

19 A.   Yes.

20 Q.   And sometimes on the recordings we hear somebody

21 talking to one of the dogs.

22 A.   Probably a time or two.

23 Q.   Probably a time or two.  Okay.  Now, let me focus

24 some questions on your circumstances and those of your

25 wife in early 2007, around the time of the

D. Kennon White - Cross Examination

 1  recordings.

 2     By that time your cousin, Jennings White, had

 3  lost his spot as clerk, and he had been indicted in

 4  Federal Court as you have talked about already,

 5  correct?

 6  A.  He lost his spot as the clerk in 2002, and he was

 7  I think in trouble, yes, at that time.

 8  Q.  Okay.  Your father had lost his spot as mayor

 9  after over twenty years the previous November 2006?

10  A.  Yes, he had lost it.

11  Q.  You had mentioned earlier today that the phrase

12  "Whiteout" I believe was used in 2002 with reference

13  to you and other members of the White family that were

14  running for office that year of 2002?

15  A.  Yes, that was a term that some people used to --

16  that was political opposition to the Whites, that's

17  correct.

18  Q.  And it would seem to me, it is fair to include

19  there were more than a few people in Manchester that

20  were happy to see the decline in the White family

21  fortunes?

22  A.  In the White family fortunes?

23  Q.  Well, in terms of the White family holding

24  offices and the decline of their political power and

25  influence in Manchester in Clay County.

D. Kennon White - Cross Examination

1  A.   I am sure there was some people against the

2  Whites, yes, I am sure of that.

3  Q.   And probably -- or surely from time to time, what

4  are at least unkind comments were made to you or about

5  you regarding the decline, this decline in the White

6  family fortunes?

7  A.   Not that many.

8  Q.   But some.  But some.

9  A.   Uh-huh.

10 Q.   Okay, and by early 2007 you were unemployed,

11 correct?

12 A.   Yes.

13 Q.   Okay.  And there was some discussion regarding

14 aggravation that Mr. Stivers I think explained wanted

15 to be avoided for Wanda serving as an election officer

16 in 2007.  Do you recall that?

17 A.   I remember a tape some that was discussed on.

18 Q.   Okay.  Would you agree that given the

19 circumstances that you and your wife were in at the

20 time that a reasonable and well-intentioned person

21 might think fairly that it was best not to have her

22 serve in a public position such as an election officer

23 and to spare her aggravation that might come out of

24 it?

25          MR. SMITH:  Objection.

D. Kennon White - Cross Examination

 1            THE COURT:  Sustain.  Argumentative.

 2  BY MR. ABELL:

 3  Q.   Back in 2002, Doug Adams was a supporter of

 4  Freddy Thompson; is that correct?

 5  A.   Yes.

 6  Q.   Against Jennings White, correct?

 7  A.   That's correct.

 8  Q.   My client, Mr. Stivers, was also a Freddy

 9  Thompson supporter?

10  A.   That is correct.

11  Q.   Wayne Jones was a supporter of Freddy Thompson?

12  A.   That is -- yes, that's correct.

13  Q.   And of course Freddy supported himself as well?

14  A.   I am sure.

15  Q.   On the other hand, supporting Jennings White, I

16  believe I understand it, correct me if this is wrong,

17  Mr. Bowling and Mr. Morris were supporting Jennings

18  White and the other people he was helping in 2002; is

19  that correct?

20  A.   To a large extent.

21  Q.   Okay, and among the people in 2002 that helped

22  you were yourself, correct?

23  A.   What's that?

24  Q.   Among the people that were helping you in 2002

25  was yourself?

D. Kennon White - Cross Examination

1 A.   YES, I helped myself in 2002.

2 Q.   In 2006 there was in May a primary for judge

3 executive?

4 A.   What?

5 Q.   2006, primary for county judge executive?

6 A.   Yes.

7 Q.   The main candidates -- there were I think

8 actually five candidates, but the leading three

9 candidates were James Garrison, the incumbent,

10 correct?

11 A.   Uh-huh.

12 Q.   The other two leading candidates were Crawdad

13 Sizemore and Johnny Poss Gregory?

14 A.   That is correct.

15 Q.   It's fair to say those were the three leading

16 candidates?

17 A.   Those were the three leading candidates, yes.

18 Q.   My client in that 2 -- my client, William

19 Stivers, in the 2006 primary for judge executive

20 supported Johnny Poss Gregory?

21 A.   He stayed out of it.  He was -- he was

22 discouraged.

23      If I can explain that, he was discouraged because

24 he said that Johnny Poss had been visited by the FBI

25 and was scared to participate in any election fraud as

D. Kennon White - Cross Examination

1  far as vote buying and stealing votes and that sort of

2  thing, election fraud, and that Johnny Poss was not

3  going to do anything illegal to win but that he was

4  not going to go against Johnny Poss, he would just

5  stay out of it and say nothing, that he would vote for

6  Johnny Poss.

7  Q.   So he -- but a fair answer is my client,

8  Mr. Stivers, was a supporter and voted for Johnny Poss

9  Gregory in the 2006 primary for judge executive,

10 correct?

11 A.   That's -- you know, I don't know if he voted for

12 him.  He was for him, though.

13 Q.   Okay.  And I think I understand that, for

14 instance, Mr. Morris and Mr. Bowling supported

15 Mr. Sizemore, Crawdad Sizemore in that same 2006

16 primary; is that correct?

17 A.   Yes.

18 Q.   Okay.  The mayor's race in 2006, the last one, my

19 client, Mr. Stivers supported your father in that

20 race; is that correct?

21 A.   He told me that he did, but he said that he could

22 not get involved, that he was sick at the time.

23      But he did send Stacey Perkins to the house to

24 help arrange for her to buy some votes and haul them

25 into the precinct.

D. Kennon White - Cross Examination

1   Q.   You would agree that to the extent that he could,

2   you would -- first let me back up.

3        He was sick, he had been involved in a vehicle

4   accident?

5   A.   A four-wheeler wrecked I think.

6   Q.   He was laid up in bed at the time?

7   A.   Yes.

8   Q.   Would you agree that Mr. Stivers, my client,

9   supported your dad in the 2006 mayor's race in

10  November?

11  A.   I will put it this way, he never supported him

12  like he did Freddy Thompson, if that's what you are

13  wanting to --

14  Q.   All right, and I think Wayne Jones also supported

15  your dad in 2006?

16  A.   He supported some votes to help get Crawdad

17  Sizemore votes because he was for Crawdad Sizemore.

18       He supported us in the absentee, you know, he

19  allowed us to be able to vote our votes on the

20  absentee machine that we could buy and send there so

21  that Crawdad would get the votes.

22       But no, he never supported my father other than

23  to that extent.

24  Q.   I think I understand, from your testimony, that

25  Doug Adams, however, did not support your father in

D. Kennon White - Cross Examination

1 2006 mayor's race, correct?

2 A.   He basically did not care.  He just did not make

3 a fight for my father like he said he was going to try

4 to help.

5     He was concerned about Kevin Johnson and made

6 whatever kind of deal he could to help Kevin Johnson

7 become elected.

8         MR. ABELL:  Pass the witness, Judge, at this

9 time.

10         THE COURT:  All right.  Thank you.  Thank

11 you.

12         Mr. Richardson.

13         MR. RICHARDSON:  Thank you, Judge.  If I can

14 have just a minute here, Judge, to get organized.

15         THE COURT:  Yes, sir.

16                     - - -

17             CROSS EXAMINATION

18 BY MR. RICHARDSON:

19 Q.   Kennon White, my name's Tucker Richardson, and I

20 have the pleasure of representing Freddy Thompson here

21 today.

22 A.   Hi, Tucker.

23 Q.   You grew up in Manchester.

24 A.   Yes.

25 Q.   And lived there almost all your life.

D. Kennon White - Cross Examination

1  A.   Yes, almost all my life.

2  Q.   And you had your father living there in the home

3  with you.

4  A.   Part of the time I lived there.

5  Q.   And you learned a lot from your daddy, didn't

6  you?

7  A.   I learned some.

8  Q.   Learned how to buy votes from him, didn't you?

9  A.   Learned more from Jennings White how to buy

10 votes.

11 Q.   Yeah, but you learned from your daddy too, didn't

12 you?

13 A.   Some.

14 Q.   And it started back in the early '90s?

15 A.   Yes, whenever my aunt run for representative.

16 Q.   And that's supposedly when you made this list,

17 D14.

18         MR. RICHARDSON:  Can I hand D14 to the

19 witness?  It's a pink piece of paper.

20         THE WITNESS:  I don't have it -- yeah, it's

21 at the bottom here.

22         MR. SMITH:  Your Honor, I am going to object

23 to counsel misstating evidence in the record at this

24 time.

25         MR. RICHARDSON:  How is that --

D. Kennon White - Cross Examination

 1              THE COURT:  Just one moment.  I am not sure

 2    there is a question pending.

 3              But you may -- you may ask or rephrase the

 4    question.

 5              MR. RICHARDSON:  Yes.

 6    BY MR. RICHARDSON:

 7    Q.  So you either made this list in mid-'90s or 2002

 8    I think is what you --

 9              MR. SMITH:  Your Honor, again, I am going to

10    object.

11              This witness has clarified, admitted that he

12    may have misspoke.

13              Now counsel is attempting to mischaracterize

14    the evidence.

15              THE COURT:  All right, the jury will recall

16    the witness's testimony.

17              You may proceed with your question.

18              MR. RICHARDSON:  I may proceed?  Okay.

19    BY MR. RICHARDSON:

20    Q.  So you said you either made this list you think

21    in 2002, correct?

22    A.  I think this list was made in the '90s.

23    Q.  In the '90s?

24    A.  Yes.

25    Q.  Okay.

D. Kennon White - Cross Examination

1  A.   And yes, I did make a mistake earlier, and --

2  when I said it was in 2002, so if that's where you

3  are --

4  Q.   Okay.  All right.  And Freddy Thompson isn't on

5  this list, is he?

6  A.   I don't see his name on it, no.

7  Q.   No.  And as far as you know, Freddy Thompson has

8  never served as election officer?

9  A.   I don't know.

10 Q.   And you made this list to help you in the future

11 elections, correct?

12 A.   Yes.

13 Q.   Or you made this list in case you got in trouble?

14 A.   In case anything happened, it could serve two

15 purposes, that's correct..

16 Q.   Yeah, so back then when you made this list, you

17 are already thinking about selling other people to get

18 yourself out of trouble, right?

19 A.   Well, I did not realize the extent of how much

20 corruption and how much things was going on.

21      And I'll just tell you, it kind of scared me back

22 then.

23      And if you would look, I was not involved in

24 politics after this was done for many years.

25 Q.   So while you were making the list -- let me

D. Kennon White - Cross Examination

1 repeat my question here.

2     You are already thinking about selling people out

3 to get yourself out of trouble, correct?

4 A.  I don't know what you are referring to.

5 Q.  Your testimony is that you made this list, you

6 kept it to get yourself out of trouble, right?

7 A.  So I am -- so I am selling people out if I tell

8 the truth and testify before it actually happens --

9 Q.  Yeah, you --

10 A.  -- is that what I am doing?

11 Q.  Yes, you kept it so if you got in trouble you

12 would have a list to give to the authorities so you

13 could get yourself out of trouble, that's what you

14 testified to, isn't it?

15 A.  I kept this list for that reason because it could

16 come to that, yes.

17 Q.  So you kept it to sell people out to get yourself

18 out of trouble if it came down to it?

19       MR. SMITH:  Your Honor, I am going to

20 object.  I think the witness has attempted to answer

21 counsel's question, now he is arguing.

22       THE COURT:  It has been asked and answered.

23 Sustain.

24 BY MR. RICHARDSON:

25 Q.  Now I want to talk about the 2002 May election,

D. Kennon White - Cross Examination

1 all right?

2 A.   All right.

3 Q.   That was the election you ran for jailer?

4 A.   Yes.

5 Q.   And after some discussions, you decide to join

6 Jennings White?

7 A.   That's correct.

8 Q.   And basically the lineup was Jennings White,

9 Kennon White, Vernon Hacker, Todd Roberts, Darryl

10 (sic) Hipsher, that was the team?

11 A.   No, that was -- that was not the team, it was --

12 may have been some people that were involved in it,

13 but that was not everyone that was in it, but --

14 Q.   Not everyone, but they were all lined up behind

15 Jennings White and yourself, right?

16 A.   They were -- can you repeat -- can you repeat

17 what you said?

18 Q.   Jennings White, yourself, Vernon Hacker, Todd

19 Roberts and Darnell Hipsher.

20 A.   I think with the exception of Vernon Hacker that

21 that might be correct.

22 Q.   And then also on that team was Bart Morris and

23 Debbie Morris and Stanley Bowling, right?

24 A.   Yes, they helped.

25 Q.   Uh-huh, and on the other side was Doug Adams, Al

D. Kennon White - Cross Examination

1 Man, Wayne Jones and Freddy Thompson, correct?

2 A.   There was Doug -- well, yeah, Doug Adams, Wayne

3 Jones, Freddy Thompson, Al Man and a lot of other

4 people.

5 Q.   Okay, but they were on one team, and you all were

6 on the other team, right?

7 A.   Yes.

8 Q.   And in fact you talked to both sides before you

9 made your decision to go with Jennings White, didn't

10 you?

11 A.   Yes, I did.

12 Q.   And you went to Doug Adams?

13 A.   After -- yes, I did.

14 Q.   And in fact Doug Adams told you he wanted you to

15 run for county clerk.

16 A.   He told me that if I would run against Jennings

17 White, that he would get Freddy not to run and Freddy

18 would do what he told him to do.

19 Q.   So Doug Adams wanted you to run for county clerk

20 rather than Freddy Thompson, correct?

21 A.   He told me that he -- well, I answered your

22 question.

23     That's what he told me.  Whether that's -- you

24 know, whether he meant that, I don't know.

25 Q.   Listen to the question.  Doug Adams wanted you to

D. Kennon White - Cross Examination

1  run for county clerk instead of Freddy Thompson, yes

2  or no?

3  A.   He told me that.

4  Q.   So that's a yes?

5  A.   Yes.

6  Q.   Okay.  But you decided to go with Jennings White?

7  A.   That is correct.

8  Q.   And you need 60 grand?

9  A.   I needed 60 grand to get on the school board's

10 ticket with Doug Adams.

11 Q.   But you needed about 60 grand to get on Jennings

12 White's ticket too, didn't you?

13 A.   I needed -- from what I was told by Cletus

14 Maricle, I would need $120,000 to ensure my election

15 and a win.

16 Q.   You ended up, you said you needed $60,000,

17 correct?

18 A.   I needed --

19 Q.   $60,000 is what you told this jury.

20 A.   Okay, 60,000 for what now, for --

21 Q.   To get on the Jennings White team?

22 A.   Yeah, somewhere around that amount.

23 Q.   And in fact you ended up giving directly to

24 Jennings $18,000, seventeen, eighteen thousand dollars

25 right?

D. Kennon White - Cross Examination

1  A.   I give him 17,000 but he directed me some other

2  places to take money.

3  Q.   So you gave him $17,000?

4  A.   Around seventeen to eighteen thousand dollars.

5  Q.   So you gave him seventeen to eighteen thousand

6  dollars, yes or no?

7  A.   Yes.

8        MR. SMITH:  I am going to object.  I think --

9        THE COURT:  That is sustained.  You have

10  asked him the same question three times.  He has given

11  you the same answer three times.  Objection is

12  sustained.

13  BY MR. RICHARDSON:

14  Q.   All right, but you also gave a lot of other

15  people money, right?

16  A.   Yes, I gave some other people money.

17  Q.   Okay, you gave Mike Bishop $2,000, didn't you?

18  A.   Around about that, yes.

19  Q.   Uh-huh.  And now, Paul Bishop is Mike's Daddy?

20  A.   That's correct.

21  Q.   And Paul Bishop supposedly had this meeting in

22  his garage?

23  A.   At a later date, yes, that was in --

24  Q.   Uh-huh.

25        MR. SMITH:  Your Honor, I am going to object

D. Kennon White - Cross Examination

1  to counsel testifying when he goes "uh-huh."  He is in

2  fact interjecting himself into the record.

3          THE COURT:  Sustained.

4  BY MR. RICHARDSON:

5  Q.   So Paul -- Paul Bishop is Mike Bishop's daddy?

6  A.   That's correct.

7  Q.   And there was this supposed meeting at Paul

8  Bishop's house?

9  A.   I am -- I don't know which meeting you are

10 referring to, or a meeting -- if you are referring to

11 one that I am at there, yes, I was there one time and

12 met with Paul and his dad.

13 Q.   No, I am talking about the meeting where Mike

14 Bishop told you in 2005 about a meeting that happened

15 at Paul Bishop's garage prior to the 2002 meeting or

16 election.

17      You told this jury that -- that Mike Bishop told

18 you about a meeting they had at Paul Bishop's garage

19 where -- where they came in and threw down a bunch of

20 money, do you recall that?

21 A.   I didn't -- I don't recall that, but he did tell

22 me that, so --

23 Q.   Uh-huh, and you testified to it on direct?  You

24 don't recall that?

25 A.   You can show me, if you would like to, sir.

D. Kennon White - Cross Examination

1  Q.   Okay.  I don't have that -- but supposedly at

2  this meeting, Charles Marcum threw down $10,000?

3  A.   Now, you are getting into something that I didn't

4  -- I don't recall testifying to about Charles Marcum

5  throwing down $10,000.

6       I don't know -- you know, I don't know where you

7  are coming up with what you are saying, and I would

8  really appreciate it if you would give me a

9  transcript --

10 Q.   All right.

11 A.   -- of what you are trying to get me to say.

12 Q.   All right, well, was Paul Bishop for Charles

13 Marcum in that election?

14 A.   Paul Bishop at the end ended up being for Charles

15 Marcum.

16      Mike said that Charles came to their house that

17 morning and that his mother had gotten into it with

18 Charles because Charles was jumping on Mike.

19      And I hadn't testified to that yet, but that's

20 what Mike told me and that his dad was in a terrible

21 dilemma because he had used to work for Charles

22 Marcum.

23 Q.   So Paul Bishop was on the side of Charles Marcum?

24 A.   That precinct was split when the votes was

25 counted.

D. Kennon White - Cross Examination

1  Q.   But Paul Bishop was on the side of Charles

2  Marcum?

3  A.   To my understanding, that is correct.

4  Q.   All right, and Mike Bishop --

5  A.   And that was in 2002.

6  Q.   Right, May of 2002.  And Mike Bishop took money

7  from you to buy votes?

8  A.   He did.

9  Q.   So father was against son?

10 A.   It was like what they have done in other

11 precincts.

12      They have give me so many of the bought votes,

13 and they give the other side so many of the bought

14 vote.

15      They split that precinct up to satisfy both

16 sides.

17 Q.   Okay, and you also gave Todd Roberts $2,000 to

18 give to Tommy Baker -- or Tommy Butler?

19 A.   Dick -- Tommy Dick Butler was a constable, that

20 is correct.

21 Q.   So you gave that to Todd Roberts to buy votes.

22 A.   I give that -- around or about that amount of

23 money for him to take to Tommy Dick Butler, which Mike

24 Bishop and myself had already talked to Dick Butler,

25 and he was going to help also.

D. Kennon White - Cross Examination

1  Q.  So you gave Todd Roberts $2,000 to give to Tommy

2  Butler to buy votes?

3         MR. SMITH:  Your Honor, again, I am going to

4  object to counsel -- this has been asked and answered.

5         THE COURT:  It has, but if you understand the

6  question, you can answer it.

7         THE WITNESS:  Okay.

8         THE COURT:  Do you understand the last

9  question?

10         THE WITNESS:  No, I didn't.

11  BY MR. RICHARDSON:

12  Q.  Could you read that back, please?

13         (Last question read.)

14         THE WITNESS:  Yes.

15  BY MR. RICHARDSON:

16  Q.  And Todd Roberts was the assistant police chief

17  at this point?

18  A.  I think so.

19  Q.  And Todd Roberts also was investigating ss voter

20  irregularities in the May 2002 election, wasn't he?

21  A.  I don't know.

22  Q.  Did -- did Todd Roberts show you some pictures he

23  took of Charles Marcum out -- and his supporters

24  outside the voting?

25  A.  He had some pictures down there that he had

D. Kennon White - Cross Examination

1   snapped.

2   Q.   And you saw those, right?

3   A.   He showed me that a few years later.  He didn't

4   show me right after the election that he had them.

5   Q.   And he was using these pictures to tell the

6   Attorney General about voting irregularities, wasn't

7   he?

8   A.   I do not know.

9   Q.   Uh-huh.  And then while he is doing this he is

10  actually working the other side, too, isn't he?

11  A.   I don't know what -- who he talked to.  I don't

12  know that he was working with the Attorney General.

13       I know that I give him around or about $2,000 to

14  take to Tommy Dick Butler who was constable at that

15  time to buy votes.

16  Q.   And you also testified that you gave money to

17  Tommy Harmon.

18  A.   I did.

19  Q.   In 2002, May 2002?

20  A.   Uh-huh.

21  Q.   And to Clinton Johnson?

22  A.   I did.

23  Q.   Okay.  And you also gave money to Terry Davidson,

24  did you not?

25  A.   Yes, I did.

D. Kennon White - Cross Examination

1  Q.   And about $1,000?

2  A.   Yes, around there, about $1,000.

3  Q.   And he was in the Oneida precinct?

4  A.   There are three precincts down there, which is

5  the Oneida, Allen and South Fork precinct.

6       And those -- and really the way that those

7  boundaries run, there is -- I mean, that's generally

8  about the same area, even though there are three

9  different precincts.

10 Q.   You gave Terry Davidson $1,000 to buy votes for

11 you in the Oneida precinct?

12 A.   I did.

13 Q.   You also gave Johnny Poss Gregory three to four

14 thousand dollars to buy votes in the Horse Creek

15 precinct?

16 A.   Somewhere around that amount, around there about

17 that amount.

18 Q.   And Jonathan Brunley, three to four thousand

19 dollars in the Goose Creek precinct?

20 A.   Seems like it was around about that amount, yes,

21 sir.

22 Q.   And Samuel Gregory, two to three thousand dollars

23 in the Pigeon Roost precinct?

24 A.   That's around about that, that's  correct.

25 Q.   And you gave him this money to get on, quote,

D. Kennon White - Cross Examination

1  "his ticket"?

2  A.  Get on Jennings White's ticket, that's correct.

3  Q.  Well, no, you -- you recall giving the FBI, you

4  and Wanda, a bunch of paperwork, notes and stuff in

5  May of '07?  Do you recall that?

6  A.  I -- there was different times, I don't recall

7  exactly when.

8  Q.  Well, and in some of that paperwork --

9          MR. RICHARDSON:  I think I want to have the

10  court officer come up and show him what I have got

11  here, and I'll show you.

12          (Mr. Richardson conferring with Mr. Smith at

13  this time.)

14          MR. RICHARDSON:  Thank you.

15  BY MR. RICHARDSON:

16  Q.  I want you to look at that page there, then turn

17  it over and look at the back of the page.

18  A.  Okay, the one you are wanting me to look at's

19  marked with the blue?

20  Q.  Yes, sir, go over to that page.

21  A.  Okay.

22  Q.  And on there, it says you gave Terry Davidson

23  money, at the top of the page there again on his

24  ticket, correct?

25  A.  I got on his ticket, but it was also Jennings's

D. Kennon White - Cross Examination

1  ticket.  He also organized that.

2  Q.   And gave -- and then go on down to the next one,

3  as to Dick Butler, and you already talked about that.

4  It says get on his ticket, correct?

5  A.   Uh-huh.  Jennings was on these tickets.

6  Q.   It says, quote, "his ticket," right?

7  A.   Yes, it says, "his ticket."

8  Q.   It doesn't say Jennings White's ticket, does it?

9  A.   It says, "Todd Roberts and Jennings White pulled

10  me over and stated that Constable Dick Butler needed

11  $1,000 to be placed on his ticket."

12  Q.   And the quote --

13  A.   However, I gave him around or about $2,000.

14  Q.   Yeah, it says in quotation marks, "his ticket,"

15  right?

16  A.   Uh-huh.

17  Q.   Doesn't say Jennings White ticket, does it?

18  A.   It says, "his ticket."

19  Q.   His ticket.  And the next one below it, "Johnny

20  Poss Gregory, three to four thousand dollars at Horse

21  Creek," correct?

22  A.   Yeah, and it was his ticket also.

23  Q.   His ticket.

24  A.   But they were also for Jennings's ticket.

25  Q.   Right.

D. Kennon White - Cross Examination

1  A.   And he was the one telling me to go see these

2  people, okay?

3  Q.   Okay.  Could I have my exhibit back, please?

4  Now, you wanted to get on Dan Roberts's ticket also,

5  didn't you?

6  A.   Yes, I did.

7  Q.   But Dan Roberts said, "No, my sister works for

8  Charles Marcum" --

9  A.   I don't think he said his sister, I think he said

10  his daughter.

11  Q.   His daughter works for Charles Marcum, so I am --

12  you can't get on my ticket, correct?

13  A.   That's right.

14  Q.   Now, you also said that in this document that

15  Bart Morris and Stanley Bowling --

16          MR. SMITH:  Your Honor, I am going to object

17  as to counsel's use of this supposed statement of the

18  witness.

19          I am not sure that we have established that

20  it is a statement.  I believe it's an improper

21  impeachment method.

22          THE COURT:  Sustain.

23          MR. RICHARDSON:  All right.

24  BY MR. RICHARDSON:

25  Q.   Did Stanley Bowling and Bart Morris in the 2002

D. Kennon White - Cross Examination

1 primary general construct their ticket?

2 A.   I don't really -- what do you mean, "construct

3 their ticket"?

4 Q.   Well, did they have their own ticket?

5 A.   They had a ticket that they bought votes, and

6 they had a slate of candidate that they bought votes

7 for.

8 Q.   Uh-huh, so they had their ticket?

9 A.   Where -- I don't understand, you are confusing me

10 with their and his and all that.

11      I mean, you are trying to put words in my mouth,

12 and you are doing it -- and you're doing it in a way

13 that -- I mean, I apologize for saying that, but

14 that's what you are doing, sir, you are trying to --

15 Q.   All right, well --

16           MR. SMITH:  Let's approach, please.

17           MR. RICHARDSON:   Sure.

18           (Thereupon, a discussion was had at the bench

19 between the Court and counsel and out of the hearing

20 of the jury.)

21           MR. RICHARDSON:  This is getting

22 into discovery as a statement of him and Wanda White.

23 I will utilize that to impeach him if I need to.

24      If he does it again -- if he doesn't recall, then

25 I guess I'll have to introduce it, but it's his

D. Kennon White - Cross Examination

1 statement that he wrote out.

2          MR. SMITH:  Your Honor, first of all, this is

3 not a part of the copy, and I believe counsel has

4 admitted he has written it out in this information.

5          I don't believe he can establish and go on

6 that this is the witness's statement.

7          I believe that what he is attempting to do is

8 to front load every question with making an assumption

9 upon this jury that this is the witness's statement.

10          Number two, is I don't think the witness has

11 been given the opportunity, number one, to be asked

12 about the matter.

13          And if he doesn't recollect, he can refresh

14 it as the court has instructed counsel before.

15          But at this point, we are about passing those

16 measures and going straight to interject argument,

17 basically.

18          And I just -- I think it's admissible use --

19 if this is a statement, it's admissible use of the

20 statement, and I object to the procedure.

21          MR. RICHARDSON:  I didn't make it up, it's

22 from you guys, and it was given to us as Wanda and

23 Kennon White's statement.

24          MR. SMITH:  Looks like a female's --

25          MR. RICHARDSON:  I'll ask him --

D. Kennon White - Cross Examination

 1          THE COURT:  All right, let's do this.  First,
 2   you haven't established it's his statement.

 3          MR. RICHARDSON:  Okay.

 4          THE COURT:  Second, you haven't established
 5   -- you haven't properly attempted to impeach him by
 6   showing an inconsistent statement if this is his
 7   statement.

 8          So the objection of the United States will be
 9   sustained on both grounds.

10          We are going to take a -- about a fifteen-
11   minute recess.

12          And I am also going to admonish counsel that
13   you are not to testify in this case.

14          Uh-huh and all these other comments that you
15   make after the witness, you may think they are cute;
16   but they are not.

17          They are grating on the court, and I am sure
18   they are grating on the jury.

19          Now, you have been warned once already not to
20   do that.  This is your second and your final warning.
21   Understood?

22          MR. RICHARDSON:  I understand.

23          (End of bench conference.)

24          THE COURT:  All right, ladies and gentlemen,
25   we are going to take our afternoon break at this

D. Kennon White - Cross Examination

1 time.

2            We will take approximately a twenty-minute

3 recess.

4            Please keep in mind the admonition that you

5 were given previously not to discuss the case among

6 yourself while we are in recess.  The jury will be

7 excused for twenty minutes.

8            THE MARSHAL:  Please rise for the jury.

9            (Jury excused from the courtroom for

10 afternoon recess.)

11            THE COURT:  We will be in recess for twenty

12 minutes.

13            (Afternoon recess taken from 2:37 to

14 2:57 p.m.)

15            (After recess.)

16            (The jury resumed their places in the jury

17 box, and the following proceedings were had in open

18 court.)

19            THE COURT:  Thank you.  The record will

20 reflect that all members of the jury are present.

21            The parties and counsel are also present.

22 Mr. White is still under oath.  Mr. Richardson, you

23 may continue.

24

25