UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Criminal Action No. 6: 09-16-S-DCR |
| V. ) | |
| ) | |
| RUSSELL CLETUS MARICLE, ) | |
| DOUGLAS C. ADAMS, ) | |
| CHARLES WAYNE JONES, ) | |
| WILLIAM E. STIVERS, a.k.a. ) | |
| "AL MAN," and ) | **MEMORANDUM OPINION** |
| FREDDY W. THOMPSON, et al., ) | **AND ORDER** |
| ) | |
| Defendants. ) | |

\*\*\*   \*\*\*   \*\*\*

Defendant Douglas C. Adams has filed a Motion for New Trial Based on Juror Misconduct [Record No. 949] and a Motion to Allow Juror Contact [Record No. 950]. Defendants Russell Cletus Maricle, William E. "Al Man" Stivers, Charles Wayne Jones, and Freddy W. Thompson have also moved for a new trial and requested an evidentiary hearing, adopting the arguments set forth in Adams' motion. [Record Nos. 953, 956, 958, 960] The defendants argue that an evidentiary hearing and new trial are necessary because the jury that convicted them was exposed to extraneous information. Adams also seeks permission to interview a juror to learn more about any extraneous information that may have reached the jury. However, because the potential prejudice from the alleged juror misconduct is not serious enough to warrant the requested relief, the motions will be denied.

-1-

I.

The defendants were convicted on March 25, 2010, of various offenses relating to vote fraud in Clay County, Kentucky. The basis for the instant motions is an affidavit sworn by a relative of Defendant Adams. As set forth in the affidavit, while visiting the courtroom during the course of the trial, Adams' relative recognized one of the jurors ("Juror A") as an acquaintance.[1] Just over a week after the trial concluded, Adams' relative saw Juror A at Belterra Casino in Florence, Indiana. Juror A approached her and began a conversation by stating that he thought it was unfair that Adams and Defendants Thompson and Maricle had been convicted. He informed her that he wished to write a letter but was unsure to whom the letter should be addressed. Juror A indicated that he did not believe that Adams was guilty, but that the jurors were under the impression that if they found anyone guilty, they had to find all of the defendants guilty by association.

The affidavit further states that Juror A told Adams' relative about another jury member ("Juror B") who repeatedly mentioned during deliberations that Adams had taken a witness out to dinner, information that was not presented to the jury at trial. According to Juror A, it was obvious that Juror B had read a newspaper article about the case, in contravention of the Court's instructions. Adams believes that the newspaper article referred to by Juror A is one that

---

1   At some point after this initial recognition, Adams' relative encountered Juror A at Belterra Casino, and Juror A mentioned that he thought he had seen her in the courtroom. The incident was brought to the Court's attention, and following *in camera* voir dire in which Juror A stated that the relationship would not affect his impartiality, neither the United States nor any defendant objected to his continued service on the jury. [*See* Record No. 857, p. 17-18]

appeared on the front page of the *Lexington Herald-Leader* on March 17, 2010. The headline and pertinent contents of that article were as follows:

> **Ex-Clay official ordered to jail: Defendant in vote-fraud trial seen dining with witness**[2]
>
> Former Clay County school Superintendent Douglas C. Adams will spend the next several days in jail for having dinner at a Frankfort restaurant with a witness in the federal vote-fraud case against Adams and others.
>
> U.S. District Judge Danny C. Reeves on Tuesday ruled that Adams had had improper contact with a witness. Reeves ordered Adams jailed pending the outcome of the trial, which probably will continue into next week.
>
> Adams had been free under certain conditions since the day after he was arrested nearly a year ago. Those charged were under court order not to have contact with witnesses or potential witnesses.
>
> Monday night, however, Adams went to dinner with Ronnie Owens, a carpenter from Manchester who had been recognized in court as a witness that day, according to testimony.
>
> Two investigators and two prosecutors on the case went to the LongHorn Steakhouse in Frankfort and saw Adams there with Owens and a woman identified as Owens' fiancée, said Edsel "Buddy" Blair, one of the investigators. Blair said Adams and the two people at his table left separately, as if to avoid detection, though someone in Blair's group photographed them.
>
> Prosecutors told Reeves about the incident Tuesday. At a hearing, Owens testified that he and Adams — who paid for Owens' dinner — did not discuss the trial, but rather talked about education and other matters. Owens said Adams called him later to make sure he had found a place to stay that night.
>
> Adams' attorney, R. Kent Westberry, said putting Adams in jail would make it harder for them to confer on trial issues.

---

2     The same article appeared on the *Herald-Leader*'s website under the headline *Former Clay Official Jailed for Dining with Witness*. *See* http://www.kentucky.com/2010/03/17/1184077/former-clay-official-to-be-jailed.html.

> But Assistant U.S. Attorney Jason Parman said it was clear that Adams had violated the rule on not having contact with witnesses. What Owens and Adams discussed at dinner was "certainly suspicious at best," Parman said in urging Reeves to jail Adams.
>
> Reeves did so, citing the incident as the latest improper contact with witnesses by some of the defendants.
>
> Not long after charges were filed in the case, there was an allegation that one defendant, Charles Wayne Jones, a former county Democratic election commissioner, identified witnesses to another man who then sent them a threatening message.
>
> And after witnesses said defendant William Stivers, another former election officer, tried to intimidate them last year, U.S. Magistrate Judge Robert E. Wier ordered him jailed in December pending the outcome of the trial.
>
> At the end of the day Tuesday, a federal marshal took Adams and Stivers to jail.
>
> Owens was to have been a witness for Jones, but Jones' attorney ended up not calling him to testify.

Bill Estep, *Ex-Clay Official Ordered to Jail*, Lexington Herald-Leader, Mar. 17, 2010, at A1.

Juror A told Adams' relative that the topic of Adams having taken a witness to dinner was repeatedly raised by Juror B and discussed throughout the jury's deliberations.

II.

Adams' counsel seeks the Court's permission to contact Juror A pursuant to Local Criminal Rule 24.1(a).[3] Adams, Maricle, Jones, Stivers, and Thompson also request an evidentiary hearing to investigate potential juror misconduct in accordance with *Remmer v.*

---

3   Local Criminal Rule 24.1(a) provides:

   **Contact with Jurors.** Unless permitted by the Court, no person, party or attorney, nor any representative of a party or attorney, may contact, interview, or communicate with any juror before, during or after trial.

*United States*, 347 U.S. 227 (1954), and a new trial pursuant to Federal Rule of Criminal Procedure 33. None of these measures are warranted based on the juror misconduct alleged here, however.

### A. Motion to Allow Juror Contact/Request for *Remmer* Hearing

Admission of juror testimony to impeach a verdict is generally prohibited. The Federal Rules of Evidence provide that,

> [u]pon an inquiry into the validity of a verdict . . . , a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith.

Fed. R. Evid. 606(b). There are three exceptions to this bar on post-verdict juror testimony: "a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form." *Id.*

Rule 606(b) reflects "the common law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences." *Tanner v. United States*, 483 U.S. 107, 121 (1987). The rule is grounded in "'substantial policy considerations,' including the finality of verdicts and the avoidance of post-verdict juror harassment." *Doan v. Brigano*, 237 F.3d 722, 733 (6th Cir. 2001) (quoting *Tanner*, 483 U.S. at 119). An early Supreme Court explanation of the necessity of such a rule bears repeating here:

> Let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.

> Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation — to the destruction of all frankness and freedom of discussion and conference.

*McDonald v. Pless*, 238 U.S. 264, 267-68 (1915). Thus, in the interest of preserving the integrity of jury proceedings, post-verdict examination of jurors is limited to the three areas set forth in Rule 606(b).

Adams argues that the first exception to the rule, allowing for juror testimony when "extraneous prejudicial information was improperly brought to the jury's attention," is applicable here.[4] [Record No. 950, p. 5] He asserts that the newspaper article read and discussed by Juror B constitutes extraneous prejudicial information that may have influenced the jury in returning a guilty verdict against him. Therefore, he argues, an evidentiary hearing is necessary to determine "(1) which articles were read by [Juror B], (2) when she read the article(s), (3) whether she read/heard any other media reports and the nature of those reports, and (4) precisely what extraneous information [Juror B] gave to the other jurors during deliberations." [*Id.*, p. 8]

In some cases involving allegations that jurors were exposed to extraneous information, a hearing may be necessary to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial."[5] *Remmer*, 347 U.S. at 229-30; *see also United States v.*

---

4   Adams also asserts that the "outside influence" exception to Rule 606(b) may apply, but he offers no evidence to support this assertion.

5   As discussed above, juror testimony is allowable only in cases of "extraneous influence." *See Tanner*, 483 U.S. at 117-18. Here, Juror A's comments regarding the jurors' belief that "if they found one defendant guilty, they must find all of the defendants guilty by association," as well as his personal feeling that Adams had been wrongly convicted, relate solely to matters internal to the jury's deliberations and thus clearly are not proper subjects of inquiry for purposes of a *Remmer* hearing or otherwise. *See Brigano*, 237

*Herndon*, 156 F.3d 629 (6th Cir. 1998) (remanding for an evidentiary hearing to determine whether the defendant was prejudiced by a juror's belated acknowledgment of possible prior dealings with the defendant). Not every allegation of extraneous influence necessitates a *Remmer* hearing, however. *United States v. Gonzales*, 227 F.3d 520, 527 (6th Cir. 2000). Rather, "[a] hearing is required only when there is a colorable claim of extraneous information that 'presents a likelihood of affecting the verdict.'" *Id.* (quoting *United States v. Frost*, 125 F.3d 346, 377 (6th Cir. 1997)). The Court "has large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial." *Marshall v. United States*, 360 U.S. 310, 312 (1959).

Adams has not demonstrated that the jury's alleged exposure to the *Herald-Leader* article presents a likelihood of affecting the verdict. *See Frost*, 125 F.3d at 377. To establish that the article was prejudicial, he relies primarily on *Goins v. McKeen*, 605 F.2d 947 (6th Cir. 1979).[6] In *Goins*, four jurors admitted to having read a newspaper article about the case during trial. *Id.* at 949. The article reported that Goins, who was on trial for murder and felonious assault, had attempted to plead guilty to negligent homicide in the case in exchange for information regarding another murder. *Id.* The Sixth Circuit decided that under the circumstances presented in Goins' case, deprivation of his constitutional right to a fair trial could be presumed. *Id.* at 952. Three

---

F.3d at 733 ("Whether the jury understood the evidence presented at trial or the judge's instructions following the presentation of the evidence . . . and even whether jurors were intoxicated during deliberations, are all internal matters for which juror testimony may not be used to challenge a final verdict."). Adams' motions therefore rest entirely on the *Lexington Herald-Leader* article that he presumes was read by Juror B and discussed by the jury during its deliberations. The Court does not understand Adams to argue otherwise.

6     Adams cites *Goins* in support of his argument that jurors' exposure to the *Herald-Leader* article was so prejudicial that a new trial is warranted "based solely upon the limited facts known at this time." [Record No. 949, p. 8]

factors influenced the *Goins* court's decision: (1) the timing of the article, (2) the nature of the information contained in the article, and (3) the steps taken by the trial court to prevent and ameliorate any tainting of the jury from exposure to the extraneous information. *Id.* at 953. Application of these factors to the instant case does little to bolster Adams' argument.

### 1. Timing of Article

The first factor found significant by the *Goins* court was when the exposure to extraneous information occurred. After noting that "during trial" publicity poses a greater threat to juror impartiality than pretrial media reports, *id.* at 952, the court concluded that because the article about Goins' case was published (and seen by jurors) on the second day of trial, it had likely tainted the jurors' ability to remain impartial throughout the proceedings. *Id.* at 953. Moreover, at the time the article appeared, the jury had not yet been admonished to ignore news stories about the case, *id.* at 949, and the court was "not convinced" that the trial judge's after-the-fact "standard admonition to disregard everything not heard in court" was sufficient to overcome the prejudicial effect of the article. *Id.* at 953.

The timing of jurors' exposure to extraneous information was also deemed relevant in another case cited by Adams, *United States v. Bruscino*, 662 F.2d 450 (7th Cir. 1981). In *Bruscino*, the Seventh Circuit found that extraneous information linking the defendant to the Mexican Mafia was "all the more prejudicial because the jurors evidently saw it near the beginning of the trial," before Bruscino had put on any proof and before the government's chief witnesses had testified. *Id.* at 458-59. The timing of the jury's exposure to the extraneous material thus "tainted the entire proceeding":

> Not only could the material have destroyed Bruscino's version before he had a chance to present his case, but it added sinister overtones to the government's emphasis on Bruscino's alleged statements to the effect that he needed "to take care of business for my people." Exposure to the Mexican Mafia allegation could also have supplied the jurors with a more credible motive for the murder, as the only theory provided by the government was that Bruscino thought [the victim] was a "rat."

*Id.* at 459 (footnote call numbers omitted).

In this case, the *Herald-Leader* article appeared approximately one week before the end of a two-month trial. At that point, Adams had completed his presentation of proof, and the jury had been admonished not to consider any news reports on the case no fewer than twenty-five times.[7] Thus, although extraneous information may have reached the jurors during trial, it was not at a "crucial time" such that Adams or any other defendant was likely to be prejudiced by it. *See id.* Moreover, since Owens did not testify, the fact that he had improperly met with Adams did not affect evidence presented in the case.

### 2. Admissibility and Probative Value of Article Contents

The *Goins* court next noted that the newspaper article at issue in that case "contained information which was both inadmissible and strongly probative of guilt." 605 F.2d at 953. Neither of these considerations points in the defendants' favor here. Although Adams maintains that the information reported in the *Herald-Leader* article would have been inadmissible at trial, the Court ruled that if Owens were to testify, the United States would be permitted to question him about his dinner meeting with Adams, as such questions would be relevant to Owens'

---

7   The article appeared in the *Herald-Leader* on March 17, 2010, which was the twenty-sixth day of trial. The jurors were admonished at least once daily that they were not to read, watch, or listen to any accounts of the case.

credibility as a witness. [*See* Record No. 858, p. 20] Adams' counsel did not object to this ruling. The jury therefore could have heard most of the information contained in the article if Jones had opted to call Owens to the stand. Moreover, testimony regarding previous improper contact between defendants and potential witnesses was deemed admissible and in fact had already been presented to the jury at the time the article appeared.[8]

Furthermore, it is well-settled in the Sixth Circuit that evidence of a defendant's attempt to influence witness testimony is admissible to show consciousness of guilt. *United States v. Blackwell*, 459 F.3d 739, 768 (6th Cir. 2006) (quoting *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986) (per curiam)). Thus, even if the evidence had conclusively shown, and the newspaper had reported, that Adams took Owens out to dinner with the intent of influencing him to testify a certain way (rather than merely implying that scenario), such evidence could have been properly admitted. *See id.*

Nor was the information in the *Herald-Leader* story sufficiently probative of guilt to raise constitutional concerns. Adams contends that two matters discussed in the article are particularly probative of guilt: first, that there had been previous incidents involving improper contact between defendants and potential witnesses in the case, and second, that his bond had been revoked as a result of his contact with Owens. [Record No. 949, p. 9] Together, Adams contends, these two pieces of information create the implication that he had attempted to influence Owens' testimony and, therefore, must be guilty. [*Id.*, p. 9-10] However, as noted

---

8    Richard Brian Hubbard testified on March 4, 2010, regarding threats he made to a witness after having had a discussion with Defendant Charles Wayne Jones about this case. Brian and Angela Lewis testified the same day as to acts of intimidation by Defendant William "Al Man" Stivers. [*See* Record No. 878, p. 79-86, 95-99, 103-05]

-10-

above, the jury had already heard testimony regarding other defendants' prior improper contact with witnesses. Furthermore, the article made clear that Adams' bond conditions included a prohibition on contact with witnesses and that his bond was revoked because he had violated that prohibition. Thus, although the jury was "not privy to the specific conditions of Adams' bond" [*Id.*, p. 10], the article itself reveals the condition that was relevant: Adams was not to have contact with witnesses. The reporting is evenhanded and does not suggest that Adams' bond was revoked as a result of anything more sinister than a simple violation of that straightforward condition.[9]

As observed in the government's response, the cases cited by Adams all involved extraneous information far more prejudicial than the article at issue here. For example, in *Goins*, the jurors were aware that the defendant had offered to plead guilty to a lesser offense and was linked to another murder. Likewise, in the case upon which the *Goins* court relied, *United States v. Williams*, 568 F.2d 464 (5th Cir. 1978), two jurors saw a television news report that revealed that the defendants had been convicted before on the same charges but the verdict had been overturned as a result of "erroneous testimony" — a description the Fifth Circuit found "could easily be interpreted by a layman as meaning that 'the defendants got off on a technicality.'" *Id.* at 470.

Adams' reliance on *Bruscino* is similarly unavailing. In that case, during Bruscino's trial on charges of murder and conspiracy to commit murder, the jury learned of his suspected

---

9    The article presented Owens' testimony about what he and Adams discussed at dinner — "education and other matters" — as well as the United States' position that the meeting was "suspicious at best," without hinting that the government's position was correct.

involvement with the Mexican Mafia from an official Bureau of Prisons document that was apparently sent to the jury room by accident. 662 F.2d at 456-57. In addition, jurors saw a newspaper article stating that two of Bruscino's co-defendants had pleaded guilty to conspiracy to commit the murder with which he was charged, and that a third co-defendant had also entered a guilty plea in the case, after one juror cut out the article and brought it to court to share with the rest of the jury. *Id.* at 457.

Clearly, these cases involved extraneous information of high probative value. The information contained in the *Herald-Leader* article, by contrast, has little probative worth. The mere fact that Adams was spotted dining with a witness does not strongly suggest that he was guilty of the charged offenses. Moreover, to the extent the article implies that Adams attempted to influence a witness, the implication arises from information that was already known to the jury or that would have been admissible under Federal Rule of Evidence 404(b) or to attack Owens' credibility if he had been called to testify.

### 3. Preventive and Remedial Measures Taken by the Court

Finally, the *Goins* court found that the trial judge had failed to "take all appropriate steps to assure the integrity and dignity of the trial." *Id.* In this case, however, the Court admonished the jurors on a daily basis, for the duration of the two-month trial, that they were not to read, watch, or listen to any accounts of the case. Moreover, on the day the article about Adams appeared in the *Herald-Leader*, Adams' counsel requested a more extensive instruction, which the Court gave both prior to the lunch recess and again at the end of the day. The Court made

abundantly clear to the jurors that they were to abstain from reading anything pertaining to the case.

Adams acknowledges that the Court "gave strict and repeated admonitions" to the jury concerning news reports about the case. [Record No. 949, p. 10] In fact, the Court's admonitions were so strong, Adams argues, that "[i]f . . . a juror would read this specific article, it is highly likely that this same juror viewed other media reports as well." [*Id.*] According to Adams, the fact that a juror apparently ignored the Court's repeated admonitions regarding media exposure "leads one to wonder — how many media reports did this juror (and potentially other jurors) view?" [*Id.*] However, such speculation is improper in a case such as this one, where the circumstances are not so "inherently prejudicial" as to allow a presumption that Adams' constitutional rights were violated; "a defendant who claims he was denied a fair trial because the jury was not sufficiently 'indifferent' generally must sustain that claim 'not as a matter of speculation but as a demonstrable reality.'" *Goins*, 605 F.2d at 951 (quoting *United States v. Haldemann*, 559 F.2d 31, 60 (D.C. Cir. 1976)).

In summary, the jury's alleged exposure to extraneous information in this case does not present a likelihood of affecting the verdict. Thus, no *Remmer* hearing is necessary. *See Frost*, 125 F.3d at 377. The evidence presented by Adams shows only that the jury was potentially exposed to one newspaper article. The incident occurred near the end of trial; the information was largely admissible and was not strongly probative of guilt; and the Court gave ample admonition throughout the trial. There is likewise no need for Adams' counsel to interview Juror

A.  The Court will not authorize a fishing expedition to allow the defendants to seek out additional means by which to attack the verdict.  *See McDonald*, 238 U.S. at 267-68.

   B.    **Motion for New Trial**

Adams' motion for a new trial is seemingly dependent upon his request for a *Remmer* hearing.  However, he also suggests that the Court could grant a new trial "based solely upon the limited facts known at this time, i.e.[,] the statements made by Juror [A] to [Adams' relative]." [Record No. 949, p. 8-9]  A new trial is not warranted based solely on jurors' exposure to publicity surrounding the case.  *See Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation."); *United States v. Barlow*, 693 F.2d 954, 959-60 (6th Cir. 1982) ("A defendant's [S]ixth [A]mendment right to an impartial jury is not infringed automatically by the jury's exposure to publicity.").  Because the alleged extraneous information is not sufficiently prejudicial to require a *Remmer* hearing, it clearly does not necessitate a new trial.

In any event, the Court notes that the Sixth Circuit standard for granting a new trial is not the lenient "reasonable possibility" test employed by some other circuits and cited repeatedly by Adams.  *See, e.g.*, *United States v. Rosenthal*, 445 F.3d 1239, 1245 (9th Cir. 2006) (new trial should be granted "if there is a reasonable possibility that the [extraneous] material could have affected the verdict" (internal quotation marks omitted)); *United States v. Bolinger*, 837 F.2d 436, 439 (11th Cir. 1988) ("Juror exposure to extrinsic evidence mandates a new trial only if the evidence poses a reasonable possibility of prejudice to the defendant."); *United States v. Bruscino*, 687 F.2d 938, 940 (7th Cir. 1982) ("[T]he standard for deciding whether the jury's

exposure to documents not in evidence requires a new trial[] . . . is whether there is a 'reasonable possibility' that the documents may have affected the verdict."). In fact, the Sixth Circuit has expressly declined to adopt the reasonable-possibility standard. *See United States v. Orlando*, 281 F.3d 586, 597-98 (6th Cir. 2002) (finding that well-established Sixth Circuit precedent left court with "no authority to consider the defendants' argument" in favor of adopting reasonable-possibility standard); *United States v. Corrado*, 304 F.3d 593, 603 (6th Cir. 2002) (citing *Orlando* as having "reaffirm[ed] that the burden is on the party claiming juror bias and that a reasonable possibility of taint is insufficient to carry that burden"). Instead, to establish that a new trial is needed, a defendant must prove that juror exposure to extraneous information resulted in actual prejudice. *Frost*, 125 F.3d at 377. Based on the analysis set forth above, the Court is satisfied that Adams cannot not make such a showing.

III.

The allegations presented by Adams of juror exposure to extraneous information do not warrant a *Remmer* hearing or a new trial. Moreover, the requested juror contact is not necessary, nor would it be appropriate. Accordingly, it is hereby

**ORDERED** that Adams' Motion for New Trial Based on Juror Misconduct [Record No. 949] and Motion to Allow Juror Contact [Record No. 950], Defendant Maricle's Motion for New Trial Based on Juror Misconduct [Record No. 953], Defendant Stivers' Motion for New Trial [Record No. 956], Defendant Jones' Motion for New Trial Based on Juror Misconduct [Record No. 958], and Defendant Thompson's Motion for New Trial [Record No. 960] are **DENIED**.

This 14th day of July, 2010.



Signed By:
*Danny C. Reeves* DCR
United States District Judge