**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON**

**CRIMINAL NO. 09-16-S-DCR**

**UNITED STATES OF AMERICA**                                            **PLAINTIFF**

**V.**          **UNITED STATES'S RESPONSE TO
DEFENDANTS' MOTIONS FOR NEW TRIAL**

**RUSSELL CLETUS MARICLE,
DOUGLAS C. ADAMS,
CHARLES WAYNE JONES,
WILLIAM E. STIVERS,
FREDDY W. THOMPSON,
WILLIAM B. MORRIS,
DEBRA L. MORRIS, and
STANLEY BOWLING**                                                       **DEFENDANTS**

\* \* \* \* \* \*

The United States objects to the defendants' motions for new trial. As shown by the United States's supplemental response to Thompson's and Jones's motion for acquittal and new trial, DE# 1029, and as further shown in this response, the defendants' motions, which are based solely upon the Supreme Court's recent decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010), fail as a matter of law.

**FACTS**

The evidence at trial showed, inter alia, that the defendants, by controlling the enterprise, the Clay County Board of Elections, were able to select corrupt election

officers[1] who would further their endeavor to buy and later to steal votes for their own

---

[1] Kenneth Day, former election officer, testified that, since the early 80's, the method of operation for the powers that be in Clay County was to use the election officers to buy votes inside the polls on election day. (DE 835: P. 21 Transcript 3A). Eugene Lewis, former election officer, testified that with the right people on your side in Clay County you could elect "Joe Donkey" or "Betty Pig" for office. (DE 870: P. 12 Transcript 4A). Corroborating this evidence, Richard Todd Roberts testified that in 2002 the method of operation on election day was to have election officers buy the votes. (DE 837: P. 75, 76, 81, 88 Transcript 5A.) Vernon Hacker testified that he as an election officer and Bart Morris paid between 250-300 voters on election day in 2002. (DE 837: P. 86 Transcript 5A.) Hacker went on to explain that in the fall 2004 election officers - including Defendants Charles Wayne Jones and William Stivers - worked out of Freddy Thompson's office paying voters. (DE 837: P. 120 Transcript 5A.) Hacker further testified that this method of operation basically remained the same in 2002, 2004, and 2006. (DE 837: P.116 Transcript 5A.)

Likewise, Kennon White testified that in 2002, Jones and Stivers approached him and wanted $60,000 to ensure him that he would be elected. (DE 840: P. 63 Transcript 6A.) White also testified that Jones and Stivers explained to him how in 2006 corrupt election officers would steal votes on the new machines to further their scheme. (DE 840: P.81, Transcript 6A.) In the Fall 2006 election, Defendant Cletus Maricle assured White that it would be Jones inside the polls voting on behalf of bribed voters during the absentee voting. (DE 925: P. 18 , Transcript 6B). Jones would mark voters on the hand after he voted them. (DE 925: P.27 Transcript 6B.) Stivers assured White that Jones and Thompson destroyed the voter assistance forms prepared by Wanda White. (DE 925: P. 76 Transcript 6B.) Moreover, Maricle advised Wanda White that it would be Stivers and Jones who would "school" her on what to do in vote buying and stealing as an election officer. (DE 931: P.32 Transcript 10B.)

Additionally, testimony established that in November 2004 the plan included that Charles Weaver and Stivers would buy the votes inside the polls while serving as election officers. (DE 873: P. 75-77 Transcript 13B.) Weaver and Stivers dispensed tickets to bought voters who redeemed them at Morris' for payment. (DE 873: P.80 Transcript 13B.) It was Jones who stepped in at the poll in 2004 to ensure that Stivers, rather than Glenn Rowland, served on election day. (DE 873: P.84 Transcript 13B.) Frank Roberts admitted that he and Sammy Gregory both worked as election officers buying votes inside the poll. (DE 875: P.35-36, Transcript 15B.) Jeff Farmer, was made an election challenger by Jones to give him access to the polls, and he testified that it was Jones and Stivers who laid out the plans to buy votes and directed Farmer on what to do. (DE 875:

purposes. Evidence of mail fraud was incidental to proving the defendants' plan to corrupt the political structure of an entire county for their personal and pecuniary gain. Indeed, out of thousands of pages of trial transcripts, the term "mail fraud" was only mentioned thirty-two times.[2]

---

P.124, Transcript 15B.) It was determined that Stivers would serve as election officer for the group during absentee voting. (*Id.*)

Furthermore, the evidence established that Mike Bishop was involved in vote buying all of his life and that he served as election officer to accomplish the task. (DE 849: P.47-48, Transcript 15A.) Bishop's father, Paul Bishop, and William Stivers teamed up as election officers during early voting 2002 to buy votes for Adams slate of candidates. (DE 849: P. 44-45, Transcript 15A.) Thompson admitted to Bishop that he paid over $140,000 into the pool to buy votes. (DE 849: P.60-61, Transcript 15A.)

Finally, it is important to note that Roger Webb, candidate for magistrate, witnessed voters lined up like "livestock" at the poll where Jones was working in 2006. (DE 878: P.17-18, Transcript 18A.) Jones assured Webb "they was doing [him] no wrong" after Webb called the clerk to request that the matter be investigated. (*Id.*) In response, Thompson apparently sent Jones, who was acting as the Democrat Commissioner at the time, to investigate his (Jones') own conduct after receiving the call from Webb. Moreover, it was Jones who repeatedly recruited others to assist in the scheme including Bobby Red Sams during each of the elections. (DE 933: P.16, Transcript 18B.)

[2]<u>Maricle Transcript Search</u>

The term "mail fraud" appears thirty-two times (not excluding arguments of counsel, court reading of the indictment, bench conferences, etc.) in eight documents on twenty-three pages:

| Document | Page | Line |
|---|---|---|
| Day 1 020210.PDF | 14 | 25 |
|  | 205 | 15 |
|  | 205 | 25 |
|  | 206 | 7 |
|  | 207 | 5 |
|  | 208 | 19 |

Moreover, throughout seven weeks of trial, the jury heard abundant evidence of widespread voter fraud in Clay County, Kentucky. The defendants were identified by

| Document | Page | Line |
|---|---|---|
| Day2 020310.PDF | 11 | 22 |
| | 26 | 21 |
| | 26 | 24 |
| | 30 | 19 |
| | 41 | 25 |
| | 165 | 24 |
| Day 5B Maricle02-08-2010 0607 Monday.pdf | 127 | 5 |
| Day 21B 031010.PDF | 51 | 25 |
| | 52 | 1 |
| | 52 | 16 |
| | 52 | 24, 25 |
| Day 29B 032210.PDF | 26 | 19 |
| | 47 | 4 |
| Day 30B 032310.PDF | 13 | 11 |
| | 13 | 12 |
| | 20 | 10 |
| Lon.09-16.ofltrans. maricle29A.pdf | 28 | 4 |
| | 41 | 5 |
| | 41 | 7 |
| | 44 | 17 |
| | 48 | 21 |
| Lon.09-16.ofltrans. maricle30C.pdf | 7 | 10 |
| | 16 | 7 |
| | 17 | 4 |
| | 17 | 5 |
| | 17 | 12 |

witnesses as being involved in bribing over 5,000 voters in 2002, 2004, and 2006[3].

---

[3] Bobby Sams testified that 160 to 250 voters were bribed in 2002, and that he hauled bribed voters to the poll in 2002, 2004, and 2006. [R. 933: Bobby Sams, TR (Trial Vol. 18-B) at 18-19, 34-44.] Deshae Henson testified that more than twenty voters were bribed in 2004. [R. 850: Deshae Henson, TR (Trial Vol. 16-A) at 59.] Billie Jean Berry testified that ten to twenty-five voters were bribed in 2002. [R. 876: Billie Jean Berry, TR (Trial Vol. 16-B) at 26-28.] Roger Webb said voters were lined up "like [live]stock" in 2006. [R. 878: Roger Webb, TR (Trial Vol. 18-A) at 17.] Tanya Davidson testified that thirty to thirty-five voters were bribed in 2002. [R. 850: Tanya Davidson, TR (Trial Vol. 16-A) at 111.] Other witnesses reported similar bribes. [R. 876: Mary Roberts, TR (Trial Vol. 16-B) at 8] (twenty to twenty-five voters bribed in 2002); [R. 878: Ella Wagers, TR (Trial Vol. 18-A) at 46-48] (ten to fifteen voters bribed in 2002); [R. 877: Jennings White, TR (Trial Vol. 17-B) at 33-39] ($80,000 to $100,000 spent bribing 2,000 to 5,000 voters in 2002); [R. 849: Michael Bishop, TR (Trial Vol. 15-A) at 50, 61] ($150,000 to $200,000 pooled to bribe 3,000 or more voters); [R. 880: Tim Briggs, TR (Trial Vol. 20-B) at 25-26] (716 absentee votes in 2002 election); [R. 850: James Coleman, TR (Trial Vol. 16-A) at 16] (bribed by Darnell Hipsher for $20-$25); [R. 850: Carl Curry, TR (Trial Vol. 16-A) at 72-73] (paid to bribe voters); [R. 878: Raleigh Downey, TR (Trial Vol. 18-A) at 63] (bribed voters for $40 to $50); [R. 878: Terry Smith, TR (Trial Vol. 18-A) at 110] (line of people waiting to be paid for their vote day before election); [R. 878: Robyn Pennington, TR (Trial Vol. 18-A) at 42] (bribed to vote in 2002); [R. 877: Ted Jones, TR (Trial Vol. 17-B) at 131-133] (Bart Morris hired him to haul bribed voters in 2002); [R. 874: Denver Sizemore, TR (Trial Vol. 14-A) at 54-56] (Jones at poll buying votes in 2002); [R. 850: Tanya Davidson, TR (Trial Vol. 16-A) at 110-111, 118] (paid to haul thirty to thirty-five voters and bribed by Debbie Morris in 2002); [R. 850: Woodrow Woods, Jr., TR (Trial Vol. 16-A) at 95-96] (Yancey White delivered $2,500 to $3,000 to precinct workers to bribe voters in 2002); [R. 853: Sarah Johnson, TR (Trial Vol. 19-A) at 87] (Attorney General ranked Clay County ahead of Fayette County in 2002 absentee ballots); [R. 870: J.C. Lawson, TR (Trial Vol. 4-A) at 51] (bribed fifty to sixty voters in 2002 for Stanley Bowling); [R. 836: Todd Roberts, TR (Trial Vol. 4-B) at 12-15] (van loads of voters each day in 2002 early voting); [R. 837: Vernon Hacker, TR (Trial Vol. 5-A) at 85-86, 106, 112, 115, 117-118, 120] (250 to 300 voters bribed in 2002 primary; city council members each pooled $1000 to $2000 to bribe voters in 2002 general election; witnessed more bribes in 2004 elections); [R. 840: Kennon White, TR (Trial Vol. 6-A) at 30, 32- 33, 36, 37] (delivered $50,000 to $60,000 to precinct workers in 2002 for bribes); [R. 840: Kennon White, TR (Trial Vol. 6-A) at 66-68] (picked up thousands of dollars in 2002 general election from council members); [R. 842: Kennon White, TR (Trial Vol. 8-A) at 27] (delivered $2500 to Stacey Perkins in 2006 for bribes); [R. 844: Wanda White, TR (Trial Vol. 10-A) at 100-04] (hauled voters

## ARGUMENT

The defendants erroneously argue that since counts 3, 5-7 are invalid and the jury did not render a special verdict identifying the predicate acts that they relied upon, their RICO convictions are also invalid. The defendants attempt to blur the distinction between types of crimes as set forth in Count One and the substantive crimes set out in the indictment. The evidence revealed thousands of predicate acts separate from the four acts of mailing in issue. The Supreme Court has held that RICO conspiracy does not require proof of an agreement personally to commit two predicate acts of racketeering.

> A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense. It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable itself.
>
> It makes no difference that the substantive offense under subsection (c) requires two or more predicate acts. The interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provisions an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense.

---

to be bribed to Jennings White and to Bart and Debbie Morrises to be paid); [R. 873: Charles Weaver, TR (Trial Vol. 13-D) at 73, 80, 84, 91-92] (distributed money to bribed voters and hauled voters to polling place in 2002, 2004, and stole votes in 2006); [R. 875: Frank Roberts, TR (Trial Vol. 15-B) at 35-36, 38-39] (bribed seventy-five voters in 2002, and others with $3000 in 2004); [R. 875: Terry Baker, TR (Trial Vol. 15-B) at 57-58] (bribed to vote in 2002); [R. 875: Jeff Farmer, TR (Trial Vol. 15-B) at 115-25] (bribed sixty to 130 voters in 2002 for $3,000-$4,000); [R. 875: Randy Craft, TR (Trial Vol. 15-B) at 9, 12] (he and his father bribed voters with $15,000 supplied by Doug Adams).

*Salinas v. United States*, 522 U.S. 52, 65 (1997).

Thus, it is sufficient to allege and prove that the defendant agreed to further an endeavor, which if completed, would satisfy all the elements of a substantive RICO offense, and that the defendants agreed that at least one member of the conspiracy would commit at least two racketeering acts in furtherance of the enterprise's affairs. *United States v. To*, 144 F.3d 737, 744-46 (11th Cir. 1998) (holding government need only show defendant either personally agreed to commit two racketeering acts or agreed to an overall objective of the conspiracy ); *see also United States v. Neapolitan*, 791 F.2d 489, 498 (7th Cir. 1986) (holding agreement to proscribed objective is sufficient).

In *United States v. Glecier*, 923 F.2d 496 498-500 (7th Cir.1991), the RICO conspiracy count did not allege that the defendant committed, or personally agreed to commit, any specific predicate racketeering act. Rather, the RICO conspiracy count alleged that during the specified time period, the defendant agreed "to conduct and participate in the conduct of the affairs of [the enterprise], directly and indirectly, through a pattern of racketeering activity, as that term is defined in [18 U.S.C. § 1961], said racketeering activity consisting of multiple acts involving bribery under [the applicable state statute]." *Id.* at 498 (emphasis added). The Seventh Circuit held that these allegations were sufficient to allege a RICO Conspiracy and that the indictment need not allege "overt acts" or "specific predicate acts that the defendant agreed personally to commit." *Id.* at 500 (citing *United States v. Neapolitan*, 791 F.2d 489, 495-98 (7th Cir. 1986)). The Seventh Circuit reasoned that "[b]y specifying the time period during which

7

the alleged conspiracy operated, the locations and courts, the principal actors, and with some detail, the specific types of predicate crimes to be committed and the modus operandi of the conspiracy, the indictment adequately enabled [the defendant] to prepare a defense." *Id.*

Similarly, in *United States v. Phillips*, 874 F.2d 123, 127-28 & n.4 (3d Cir. 1989), the Third Circuit held that a RICO conspiracy count need not allege specific racketeering acts the defendant agreed to commit; but rather, the count was sufficient because it alleged "a pattern of racketeering activity consisting of multiple acts of bribery and extortion . . . that occurred within the time frame of the conspiracy." *Id.* at 127. The Third Circuit added that the jury was not limited to consideration of the specific racketeering acts listed in the substantive RICO count, but rather "the jury was free to consider any act of bribery and extortion that occurred within the time frame of the conspiracy." *Id.* at 127. The court also stated that it was "initially troubled by the sufficiency "of [the RICO Conspiracy count] because of its failure to "allege specific racketeering acts; however, the court found that the indictment provided adequate notice by its references to the statutory violations, the specific time period of the crimes, and inclusion of the conduct underlying the racketeering offenses in overt acts alleged in the RICO Conspiracy count." *Id.* at 127-28, nn. 4 & 5.

In *United States v. Sutherland*, 656 F.2d 1181, 1197 (5th Cir. 1981), the Fifth Circuit, likewise, rejected a "lack of specificity" challenge to a RICO Conspiracy count where it identified the pattern of racketeering activity as "a number of bribes that

8

occurred between November 1975 and January 1980," "to have occurred in the Western District of Texas," and the count cited and tracked the applicable bribery statute.

Here, the United States presented sufficient evidence to establish that each of the defendants conspired with another to violate RICO as required by law. The bulk of the evidence at trial centered on the defendants and their associates "pooling" money for the purposes of buying or bribing voters to vote for their "slate" of candidates. It was crucial that when these monies were pooled that the defendants ensure that voters voted as bribed. In order to accomplish this goal, the defendants used the enterprise in selecting corrupt election officers to further this endeavor. The defendants Jones and Thompson were eventually given fraudulent election results, which they forwarded, as members of the Clay County Board of Election, by the mails to the Secretary of State. It was not even required that any of the other defendants have knowledge of these mailings. *See e.g., United States v. Castro*, 89 F.3d 1443, 1451 (11th Cir. 1996) (holding government need not prove each conspirator agreed with every other conspirator, knew of his fellow conspirators, was aware of all details of the conspiracy, or contemplated participating in the same related enterprise.) Thus, it is clear that all of the essential elements of RICO were met by the thousands of acts of bribery, attempted extortions, extortions and later acts of obstruction to cover up their deeds.

Some of the defendants argue that it was the four acts of mail fraud named in the indictment that provided the "unifying" act among the factioned group. However, the evidence detailed clearly that while others used this same enterprise for their purposes,

these defendants worked together. For example, Bobby Red Sams detailed how Bowling and the Morrises were brought into the scheme along with the remaining five defendants. Moreover, the city council races in the fall of 2002, 2004, and 2006, were central to the group and represented a time when the defendants were unified. Nevertheless, the fact that the enterprise was used by others or other factions existed does not undermine the RICO violation. *See United States v. Valera*, 845 F.2d 923, 929 (11th Cir. 1988) (holding evidence defendant was aware other persons were using same enterprise to import drugs into the United States and defendant's agreement to participate in these activities by using services of the enterprise for his own drug smuggling venture sufficient to uphold RICO conspiracy conviction).

     Here, the evidence against the defendants was so overwhelming as to their involvement in a RICO conspiracy involving thousands of acts of bribery, extortion and obstruction of justice that this Court can find beyond a reasonable doubt that the jury's verdict would have been the same without these four acts of mail fraud committed by these two defendants.

## CONCLUSION

The defendants' motions for a new trial should be denied.

                              Respectfully submitted,

                              KERRY B. HARVEY
                              UNITED STATES ATTORNEY

BY:    s/Stephen C. Smith
         Assistant United States Attorney
         601 Meyers Baker Road, Suite 200
         London, KY 40741
         Tel: (606) 864-5523
         Fax: (606) 864-3590
         stephen.smith4@usdoj.gov

## CERTIFICATE OF SERVICE

On October 18, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System, which will send notice of filing to all counsel of record.

                              s/Stephen C. Smith
                              Assistant United States Attorney