# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION
## LONDON

**CRIMINAL NO. 09-16-S-DCR**                    <u>**ELECTRONICALLY FILED**</u>

**UNITED STATES OF AMERICA**                                        **PLAINTIFF**

**V.**                    <u>**SENTENCING MEMORANDUM**</u>

**RUSSEL CLETUS MARICLE, et al.**                              **DEFENDANTS**

\* \* \* \* \* \*

The United States of America, by and through counsel, submits, pursuant to the Court's order, the following sentencing memorandum. The United States has not received the final PSR reports but anticipates several issues which pertain to all defendants including: (1) Does §2C1.1 or §2H2.1 apply? (2) Does the victim enhancment for targeting older voters apply? The United States requests leave to file a supplemental brief once the final reports are issued.

## A. <u>Dismissal of Counts 3-7 does not take offense outside §2C1.1</u>

In a RICO conspiracy, the goal is to punish the objective – participation in the enterprise – so each underlying act is relevant conduct to the central purpose. *United States v. Corrado*, 227 F.3d 528 (6th Cir. 2000). The dismissal by this Court of charged conduct, i.e., Count 4, the attempted extortion and Counts 3, 5, 6, and 7, mail fraud

counts, is not the end of the inquiry. Uncharged conduct is to be considered as well[1], and

the defendants need not have performed the activity personally, so long as the activity

was reasonably foreseeable to him as a member of the enterprise. *United States v.*

*Carrozza* 4 F.3d 70 (1st Cir. 1993). The offense conduct must encompass the RICO

conspiracy's "underlying racketeering activity" as required by §2E1.1(a)(2).

---

[1]Other courts have generally followed this principle, allowing not only uncharged conduct but even conduct for which a defendant has been tried and acquitted to be included as relevant conduct. *See, e.g.*, *United States v. Mercado*, 474 F.3d 654, 655-57 (9th Cir. 2007) (affirming sentences in RICO Conspiracy prosecution where sentences were based on criminal conduct charged in indictment, but found not proved beyond a reasonable doubt; moreover, such considerations were not problematic under Booker: "the constitutional propriety of a sentencing court's consideration of conduct which underlay an acquitted charge existed before creation of the Guidelines and continues to exist today, despite the possibility that it would not exist if the Guidelines were mandatory, which they are not."), *cert. denied*, 128 S.Ct. 1736 (2008); *United States v. Campbell*, 491 F.3d 1306, 1314-15 (11th Cir. 2007) (because defendant's sentence did not exceed maximum authorized by the jury verdict finding defendant guilty of tax violations, sentencing court may consider conduct underlying RICO and bribery charges on which defendant was acquitted); *United States v. Clay*, 483 F.3d 739 (11th Cir. 2007); *United States v. Thai*, 29 F.3d 785, 819-20 (2d Cir. 1994) (court properly considered acts of violence not charged as predicate acts as relevant conduct since they were in furtherance of the RICO Conspiracy); *United States v. Darden*, 70 F.3d 1507, 1544-45 (8th Cir. 1995) (murder with which others were charged but proven by a preponderance of evidence to have been aided and abetted by defendant held as "relevant conduct" of defendant for which he is accountable); *United States v. Hurley*, 374 F.3d 38, 39 (1st Cir. 2004) (district judge properly employed money laundering guideline in sentencing appellants on RICO Conspiracy count as the cross reference in § 2E1.1 could properly encompass relevant conduct for which a defendant had not been convicted); *United States v. Marino*, 277 F.3d 11, 38 (1st Cir. 2002) (district court's consideration of defendant's attempted murder of rival, for which the jury did not convict him, and finding that defendant's drug conspiracy involved over 500 grams of cocaine, where jury did not specify a quantity, was not problematic under Apprendi because defendant's sentence did not exceed statutory maximum), *cert. denied*, 536 U.S. 948 (2002); *United States v. Tocco*, 306 F.3d 279 (6th Cir. 2002) (in RICO Conspiracy case, racketeering activity by the defendant's coconspirators was relevant conduct for sentencing purposes), *cert. denied*, 539 U.S. 926 (2003); *United States v. Ruggiero*, 100 F.3d 284 (2d Cir. 1996) (court properly considered defendants' additional kidnappings not included in charge).

## §2E1.1

The guideline for a conviction under 18 U.S.C. § 1962(d)(hereinafter referred to as RICO) is §2E1.1. When analyzing a RICO conspiracy, the court determines the "underlying racketeering activity" by a preponderance standard. *United States v. Corrado*, 227 F.3d 528 (6th Cir. 2000). The goal is to punish the objective – participation in the enterprise – so each underlying act is relevant conduct to the central purpose. *Id.* It is not necessary for a defendant to be charged with an underlying activity, and the defendant need not have performed the activity personally, so long as the activity was reasonably foreseeable to him a member of the enterprise. *United States v. Carrozza,* 4 F.3d 70 (1st Cir. 1993). For example, in *United States v. Ruggiero*, 100 F.3d 284 (2nd Cir. 1996), a defendant was held responsible for three kidnappings that were not charged. The kidnappings determined the offense level rather than counts of conviction.

If the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used. See §2E1.1, comment. (n.2). Multiple forms of bribery, and "acts or threats" involving extortion were established during trial.

## §2C1.1

When "relevant conduct" including the totality of the "underlying racketeering activity" is considered, the most analogous guideline is U.S.S.G. §2C1.1, not §2H2.1. Background to §1B1.3 states "relying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for these offenses." The

guideline heading for §2C1.1 broadly covers "[o]ffering, giving, soliciting, or receiving a bribe," "extortion under color of official right," "[f]raud involving the intangible right to honest services of public officials," and "[c]onspiracy to defraud by interference with governmental functions."  Based upon the overall conduct of this enterprise which violated federal and state law, §2C1.1 applies.

Importantly, a "public official" is defined broadly under §2C1.1 and specifically includes "an officer or employee or person acting for or on behalf of a state or local government, or any department, agency or branch of government thereof in any official function" or any one who "participates so substantially in governmental operations as to possess de facto authority to make governmental decisions." §2C1.1, application note 1 (n.1(C), 1(E)).  The application note uses the example of a "state or local political party leader" as an example of a properly included defendant.  Further, application note 4(B) specifically includes "an election official" and "any other similarly situated individual" as a public official in a sensitive position.  Clearly, §2C1.1 is designed to cover election officers, challengers and similarly situated local or state actors engaged in corrupt practices related to elections.  The Clay County Board of Elections – the racketeering enterprise in question – is the hallmark example of a group of local officials involved in bribes, extortion, and interference with proper government function.

A guideline calculation under §2H2.1 covers only one aspect of the "racketeering activity."  The goal of the guideline construct is to punish the criminal agreement to participate in the affairs of the enterprise.  This includes charged and uncharged acts

defined as -- "all reasonably forseeable acts and omissions of others in furtherance of the jointly undertaken activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Reducing the overall "racketeering activity" to simple "vote buying" ignores the scope of the conspiracy, and leaves a wide array of criminal conduct unpunished.  "Vote buying" was simply one of the devices used to control an entire county.  This enterprise's goal was not just to buy votes, it was to "obtain, solidify, preserve and expand for the Defendants and their associates, political power and control within the county, and personal enrichment for themselves and their associates, through the use and misuse of the authority and power of the Board, and the offices of circuit judge, superintendent of schools, and county clerk, and the positions of election officers."  See, Indictment Count 1, paragraph 11.  For example, the fruits of the enterprise's labor included in its beginning years the ability to influence jury verdicts, jobs for associates, member enrichment through salaries, and member enrichment through million-dollar contracts.  None of this behavior is incorporated through §2H2.1.  Whereas §2C1.1 is purposefully constructed broadly and incorporates a wide array of corrupt practices by public officials – including local or state officers, employees, and election officials, and includes the value of the benefit received by virtue of the criminal behavior.

## B.  Relevant conduct includes other uncharged "underlying racketeering" acts

(1) *Bribes involving public servants:*  Wanda White, Charles Weaver, and Jeff Farmer were each bribed while serving as public servants as defined by state law with

jobs.   Wanda White was told by Circuit Judge R. Cletus Maricle she would get a job in his drug court if she would, while in her official capacity as a Democrat Election Judge for the Manchester precinct, buy and steal votes.  DE# 931,  p.28.  Charles Weaver was told by an un-indicted Circuit Clerk and County Judge candidate that he would get the emergency management job if he would serve as Republican Election Judge along with White and to assist in his official capacity in buying and stealing votes.  DE#873, p.98. Jeff Farmer was told by Superintendent of Schools Douglas C. Adams, and through Stivers and Jones, that he would get a school board job if he agreed to act in an official capacity as Democrat challenger at the Horse Creek precinct in 2002 to further the scheme of vote buying. DE# 875, p. 161.

KRS 521.020[2], Bribery of a Public Servant, was violated. The elements are: (1) offer, confer or agree to confer; (2) any pecuniary benefit; (3) upon a public servant; (4) with intent to influence his vote, opinion, judgment, exercise of discretion or other action in his official capacity.

(a) offer, confer or agree to confer- The election officers, Weaver, White and challenger Farmer, were "offered" or promised jobs prior to joining the scheme.

(b) any pecuniary benefit- A job is a pecuniary benefit which is defined in KRS 521.010(2) as a  "benefit in the form of money, property, commercial interests, anything else the primary significance of which is economic gain."

---

[2]Under KRS 502.020 a person is also guilty of an offense commited by another if with intention of promoting or facilitating the commission of the offense he solicits, commands, or engages in a conspiracy with such other person to commit the offense.

(c) upon a public servant- An election officer is a  public servant as defined in KRS 521.010.  "[A]ny public officer or employee of the state or of any political subdivision thereof or of any governmental instrumentality within the state. . ."  Clay County Election officers are appointed pursuant to KRS 117.035 which delegates the authority to "administer the (State) election laws" to the county board of elections.  KRS 117.045 authorizes the appointment of election precinct officials, including judges, and KRS 117.315 authorizes the appointment of political party challengers.

(d) with intent to influence his vote, opinion, judgment, exercise of discretion or other action in his official capacity- It was essential to the scheme in 2006 that both the Democrat and Republican judges act together to buy and steal the votes.  In 2002, law enforcement, including the State Attorney General's office, were aware of the wiedespread voter fraud in Clay County.  The Horsecreek precinct was dominated by the Jennings White faction and only by the introduction of a "challenger" could Doug Adams and others provide someone in the polling place to ensure the bribed voters voted for their "slate."  The use of election officers inside the polls in 2006 kept the scheme going.  The promise of a job induced White and Weaver to deliberately steal votes and to vote bribed voters to ensure they voted for the "slate."  These acts were essential and could only be taken by an election officer inside the polls.  The  "use of public office" includes acts unrelated to the duties of the public official but which could only be undertaken because of his official position, thus, so long as the motivation for the payment focuses on the office of the recipient.  *United States v. Scacchetti*, 668 F.2d 643 (2d Cir. 1982)(Hobbs Act violated).  Only the election officer who had access to the voting machines, i.e., the

Democrat and Republican Judges, could access the machines to steal votes and vote the bribed voters for the "slate."  The prior ruling dismissing Count 4 of the indictment turned upon different facts.  The testimony of Carmen Lewis did not support that Jones or Stivers were going to be using the money to influence their acts as public servants.  In these instances, the scheme was clear that they were bribed with a job to steal votes and/or ensure bribed voters voted the "slate."

Moreover, the fact that vote buying and vote stealing is illegal and not within the normal prescribed job duties of an election officer or challenger is not dispositive.  For instance, one who conspires with a secretary of state employee to improperly grant CDL licenses to  unqualified applicants are within the ambit of Hobbs Act and "color of official right."  *United States v. Mcleczynsky*, 296 F.3d 634 (7th Cir. 2002).  A state employee who grants an unqualified CDL application or a legislator who votes for an unworthy bill would be acting outside their normal prescribed duties, as well as an election officer who steals a vote by changing a voter's ballot.  Both acts are wrong but only capable of execution by virtue of the official position. The motivation for Maricle's and Adams' payment was certainly access to the ballots by an election officer, namely the Democrat and Republican judges.

*(2) Extortion:* Vernon Hacker, an election officer in 2002, testified that he, William Bart Morris,and Stanley Bowling distributed bribes during the 2002 election for the Jennings White faction of the enterprise.  DE# 837,p.97.  Prior to the election, Douglas Adams threatened to use his postion as superintendent to affect Hacker's job adversely as a school board employee if he did not commit criminal violations, i.e.,

remove Hacker from bus and route if he did not commit criminal violations-vote buying for Freddy Thompson.  DE#837, pp. 100, 103.

KRS 514.080, Theft by Extortion, elements are:(1) intentionally; (2) obtain property of another; (3) by threatening to; (4) use wrongfully one's position as a public officer, servant, or employee in a manner affecting some person adversely. Class C felony if value of property over $10,000.

These elements are met by the fact that Circuit Judge Maricle and Superintendent Adams both intentionally sought  to obtain positions and salaries for their associates, Freddy Thompson and Phillip Mobley.  Both the PVA postion and County Clerk position paid in excess of $10,000 per year.  The jury's findings in forfeiture counts 12 and 13 included a finding that "but for" their involvement in the enterprise they would not have obtained the salaries.  Maricle was often less than direct and used the common "winks and nods" to get his point across.  However, Wanda White testified that she was expressly promised a job, help for her brother, and help with the Mayor's reelection if she joined the scheme.  These promises were affirmed in part by recorded statements of Maricle. Significantly, Maricle delayed the sentencing of her brother until after White did her part in the election in May 2006.  These facts and circumstances are sufficient to infer by a preponderance of the evidence standard that Maricle used or implied that he would use his position as a judge to affect White and her family adversely if she did not commit to the scheme.  White's brother originally faced a 30-year sentence before entering his plea agreement.  White expressed that she was induced by three promises and one included help with the pending case against her brother.  Intent can be inferred from the fact that

Maricle continued the sentence hearing of her brother beyond the May 2006 election. These facts suffice to "imply" Maricle would affect White adversely if she did not commit and follow through with the scheme to buy and steal votes as an election officer.

Adams likewise told Vernon Hacker, his employee, to switch to the Thompson faction or lose his bus. Hacker refused to switch even though Maricle also told him "the tide had changed." The result was Hacker lost his bus route. Adams, as Superintendent of Schools, had the ability to affect Hacker adversely in his employement as a bus driver and in fact followed through for a time. These facts constitute acts involving extortion as defined by KRS 514.080.

In addition, Bobby Red Sams was released from prison after he agreed to help elect Daugh White in 2006. Sams was told by Maricle and Jones to get votes for Daugh White like he did in 2002. DE#933, p.48. Again the implication was that Maricle as Circuit Judge would adversely affect Sams if he did not commit to and follow through with the scheme to buy votes.

Maricle as Circuit Judge and Jones met Sams immediately after his release from jail and expressed that he was to buy votes for Daugh White. What is the implication if Sams did not agree to commit the criminal acts? Was there any money or other incentive offered for Sams? Clearly the facts support the inference that if Sams did not commit vote buying as suggested by Maricle he would be adversely affected as a defendant in his court.

Jeff Farmer testified that he, William Stivers, Doug Adams, and the County Attorney Clay Bishop's detective, Ricky Whitehead, induced Ronald Jackson to join the

scheme with a promise that his marijuana charges would be dismissed if he would help. DE#875, p.134-135. The Clay County Attorney, Clay Massey Bishop's, detective was present and used his influence to imply that he had the authority to act in Jackson's favor if he would join the scheme. Hobbs Act violations can be committed by one acting in coordination with public officers. See, *United States v. Margiotta,* 688 F.2d 108, 130-133 (2d. Cir. 1982)*; United States v. Collins*, 78 F.3d 1021, 1035 (6th Cir. 1996); *United States v. Mcleczynsky*, 296 F.3d 634 (7th Cir. 2002).

It may be offered that *Godby v. Commonwealth*, 187 S.W.3d 857 (2006) has narrowed the definition of threat to physical injury only in extortions. Any attempt to such application to KRS 514.080 is misplaced. Godby was charged for intimidating a legal participant under KRS 524.040. The cross reference was eliminated by a change in law in KRS 514.080 and *Godby* held that based upon the rule of lenity threats are limited to threats of physical force under 514.080. Obviously, to read a physical injury requirement into 514.080 would eviserate the 6 predicates in paragraphs (a)-(f). However, it is no longer a violation of 524.040 for threats to legal participants unless the threat is to physically injure, i.e., after reviewing *Godby,* it appears 524.040 no longer applies to the threat to William Goins'[3] job if he appeared in court against Morris' employee.

*(3) Bribery in the form of Jury Tampering*: Jury tampering occurred many times while Kenneth Day acted as Republican Election Commissioner. These cases, prior to

---

[3]The United States initially offered the threat of Kennon White to William Goins as a violation of 524.040. This is not consistent with *Godby*'s holding and we will withdraw our argument.

1997, involved Cletus Maricle at times acting as lawyer and as judge with large jury verdicts rendered for his close associates, i.e., former law partners Scott Madden and Ricky Bailey. Kenneth Day testified how that he received benefits from the enterprise. Day was the plaintiff seeking over $1 million dollars in damages as the representative of the estate. Cletus Maricle and others indirectly approached a juror and sent a message not to return a verdict for less than $1 million. DE# 3a, pp. 40-41. Day also described jury tampering in the Kennedy law suit against Honda Motors, and a lawsuit against Ford Motor which rendered a multi-million dollar verdict. DE# 835, pp. 38-41. Jones and Stivers admitted that they helped "pick" juries in Maricle's court. Jones boasted "we'll fix it if its in circuit court." Stivers claimed that they expected to make a "killing" if Mary Betty was drawn for jury duty. DE#841, pp. 41-44, Ex. A6A and April 11, 2007 recording at 15:00 minutes.

KRS 524.090, Jury Tampering, elements are (1) with intent to influence a juror's vote, opinion, decision or other action in a case; (2) communicate, directly or indirectly, with a juror; (3) other than part of the proceedings. Clearly, these elements are met as Maricle and others approached Preston Henson and instructed him to contact a juror and request that she return a verdict of not less than $1 million. Relevant conduct includes charged and uncharged acts defined as- "all reasonably forseeable acts and omissions of others in furtherance of the jointly undertaken activity, that occurred during the commission of the offense of conviction, ***in preparation for that offense***, or in the course of attempting to avoid detection or responsibility for that offense." The United States offered this evidence as other acts relevant under FRE 404(b). Maricle used these acts in

preparation for the RICO offense which led to his personal enrichment and promotion as leader of the enterprise.

KRS Chapter 524 includes many forms of bribery including jury tampering. As this Court has previously held in DE#1081, the state's classification of bribery offenses does not control but "the inquiry is whether the particular activity fits within the generic definition . . .and 'whether the particular state involved prohibits the . . . activity charged." (Internal citations omitted). Federal statutes, i.e., 18 U.S.C. § 1503, also prohibit jury tampering and is included in 1961(1) as a proper RICO predicate. Moreover, jury tampering has been admitted in RICO prosecutions as charged and in uncharged predicate acts. *See e.g., United States v. Gambino*, 838 F.Sup. 749 (S.D.N.Y. 1993); *United States v. Gotti*, 2009 WL 928308 (S.D. N.Y. 2009).

*(4) Other solicitations to commit bribery by defendants*: Jeff Deaton, candidate for city council in 2004, was told by Doug Adams that he must pay $1,000 into a "pool" to become a city councilmember. DE#849, p.17. William Stivers attempted to solicit bribe money from Ray Adams, candidate for magistrate, (told to pay $6,000 or lose race-Adams did not pay and was defeated), DE#850, pp. 6-7. Jones and Stivers also approached Kennon White for $60,000 in bribe money in 2002. DE#840, p. 63. Doug Adams also directly solicited bribe money from Wanda White in 2002. DE#844, p.93. Maricle suggested to Kennon White that to ensure victory that he should pay both factions at a cost of $120,000. DE#840, p.24. Stivers and Jones also attempted to solicit bribe money from Carmen Webb Lewis. Both were election officials and made the attempt to solicit bribes in the amount of $1,000 from Lewis in the 2004 council race.

KRS 502.020 states that a person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he "solicits, commands or engages in a conspiracy with such other person to commit the offense; or aids, counsels, or attempts to aid such person in planning or committing the offense . . ."  It is uncontroverted that in each of the above instances the purpose and plan of the members of the conspiracy was to use the money to bribe voters, in violation of KRS 119.205.  Therefore, anyone who "solicits," "aids," or "counsels" another to commit this offense is guilty of the offense of voter bribery.

(5) *Victim Related Adjustment*: Votes were stolen from approximately 150 voters in the 2006 elections in Clay County pursuant to a deliberate scheme of the enterprise. DE#873, p.91; DE# 931, p.63.  Members of the enterprise, including Wayne Jones, William Stivers, Freddy Thompson, and Cletus Maricle, were interested in gaining votes for a slate of candidates including Phillip Mobley.  DE#873, pp.90-91.  Wanda White was approved by the members including Doug Adams.  DE# 840, pp.84-85.  Jones and Thompson instructed both Wanda White and Charles Weaver, election officers, how to steal votes from unsuspecting voters using the two step voting process to their advantage. DE# 873, p.88; DE# 840, pp.81-82.  White and Weaver deliberately distracted voters and/or mislead them to walk away from the machine before finalizing their vote. DE#873, pp.91-92.  Once the voter walked away, White or Weaver reviewed and if necessary changed the ballots to satisfy Maricle and others. *Id*.  It was clear from the testimony that aged and disabled voters were targets of this scheme.  Charles Dobber Weaver testified that "a lot of older people" were afraid of the new voting machines.

DE# 873, p.132.  Lists procured by members from Freddy Thompson's office included "bought votes" and "older" people.  DE# 925, p.14.  FBI searched Maricle's residence and found a list of elderly residents at the Manchester Heights complex, designed exclusively for the elderly.  DE#881, pp.26-27.  Wayne Jones commented they are too "stupid" to detect what was going on. DE#931, p.46.  The members of the enterprise were also targeting residents of government assisted housing known to be occupied by the elderly, Manchester Heights and Beech Creek Apartments. DE#933, p.83; DE# 931, pp.24, 47. These complexes are especially designed for the disadvantaged, including the aged, disabled, and low income.  DE#885, pp.73-74.  Carl Curry described his job in the scheme of hauling residents from these apartment residents for the enterprise.  DE#850, p.71.  In addition, testimony described how voter assistance forms were used to cover up the scheme to buy votes and some voters were completing voter assistance forms legitmately due to disability prior to being victimized.  DE#931, p.57-58.  These forms require an oath of disability. DE#931, p.52; Trial exhibit PR 17.  Moreover, members of the enterprise, Bart Morris and Darnell Hipsher, were collecting mail-in absentee ballots from aged and disabled voters.  Kennon White described the events and how he was invited to join Hipsher and Morris in marking these ballots.  DE# 840, p.87.

The trial testimony revealed that the elderly residents of government subsidized housing were largely targeted by this enterprise.  Some were easy targets to having their votes stolen by the members of the enterprise. The testimony revealed a concerted attempt by the members of the enterprise to target those citizens of Clay County that were most vulnerable to their scheme.  Elderly voters were less likely to notice the scheme to steal

their vote and easily led to believe their vote had been properly cast, thereby giving enterprise members an opening to cast the ballot in favor of the group.

Under §3A1.1, the United States asserts that a four-level adjustment applies. First, §3A1.1(b)(1) requires a two-level increase in the defendant's offense level if the defendant knew or should have known[4] that a victim of the offense was "vulnerable." A "vulnerable victim" is defined as "a person (A) who is a victim of the offense of conviction and conduct for the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to *age,* physical or *mental condition*, or who is *otherwise particularly susceptible* to the criminal conduct." (emphasis added). The members of this enterprise clearly targeted the elderly and at times the mentally infirm to steal votes from, and further targeted the poor and illiterate– a group particularly susceptible by virtue of their financial status – for bribes in exchange for their right to vote.

The number of vulnerable victims stemming from the actions of this enterprise warrant an additional two-level adjustment. §3A1.1(b)(2) directs a two-level increase if the offense involved a large number of victims. The trial testimony revealed hundreds of "vulnerable victims" who were the target of this scheme. The guideline specifically requires an <u>additional</u> two-level increase in this instance.

*(6) Obstruction of Justice:* Charles Wayne Jones was recorded in numerous conversations with the federal grand jury witness, Wanda White. On May 1, 2007, Jones

---

[4]See United States v. Sims, 329 F.3d 937 (7th Cir. 2003)(elderly victims of investment fraud scheme were targeted because they were less sophisticated in financial matters); United States v. Myers, 481 F.3d 1107 (8th Cir. 2007)(holding district court was aware that it could impose the enhancement if the defendant "should have known" of the victim's vulnerable status.)

and Stivers were made aware by Wanda White that she had been subpoened to testify before a federal grand jury in regard to their election schemes.  Jones attempted to obstruct by unlawfully attempting to influence testimony of a witness when he made numerous attempts to get Wanda White to testify untruthfully that she could not remember facts called for by the question of the grand jury.  These included comments, i.e., "You (Wanda White, FGJ Witness) do not have to talk to them;"  P. 29, Transcript Exhibit A11a;  "Just say I can't recall." Id. at p.36; and Wanda stated- "I'll just say I don't know" and Jones replied  "No, that you can't remember." Id. at  p.37.

       According to §3C1.1, application note 4 (a) lists as an example "threatening, intimidating or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly; or attempting to do so."  Also, conduct prohibited includes "concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation..."

### C.  Other enhancements and sentencing issues:

**a. Role in the Offense**

       It is anticipated that each of the defendants will be assessed with an enhancement for role in the offense.  Obviously, a common sentencing enhancement in RICO prosecutions is the "role in the offense" enhancement set forth in USSG § 3B1.1. *See, e.g.*, *Gotti*, 459 F.3d at 347-350; *United States v. Hanhardt*, 361 F.3d 382, 393-394 (7th Cir. 2004) (upholding defendant's "organizer/leader" enhancement where he and another defendant "exercised decision-making authority," organized and planned the activities of the enterprise, and "recruited and supervised knowing accomplices and unknowing participants to assist" in the illegal activities). Moreover, such enhancements are imposed

based on the defendant's position or role in the overall conspiracy or RICO enterprise
—not necessarily on any specific underlying conduct. *See, e.g.*, *United States v. Damico*,
99 F.3d 1431, 1435-38 (7th Cir. 1996) (even though RICO defendant's base offense level
was calculated by reference to underlying extortion conduct (which carried the highest
offense level of the defendant's underlying offenses), and defendant was not a
manager/leader with respect to those charges, "role in offense" adjustment was based
upon defendant's leadership role in the overall RICO Conspiracy); *United States v. Coon*,
187 F.3d 888, 899 (8th Cir. 1999) (§ 3B1.1 adjustment is applied to a RICO offense by
looking at the overall RICO Conspiracy and all its relevant conduct).

On rare occasions, some courts have held that RICO defendants may qualify for a
minor or minimal role sentencing adjustment.  Importantly, however, the Guidelines
indicate that such reductions apply only to the defendant "who plays a part in committing
the offense that makes him substantially less culpable than the average participant"
(USSG § 3B1.2 Commentary Note 3(A)), and the courts have been clear that "[t]he intent
of the Guidelines is not to 'reward' a guilty defendant with an adjustment merely because
his coconspirators were even more culpable." *United States v. Lopez*, 937 F.2d 716, 728
(2d Cir. 1991). Often, courts reject invitations, or reverse decisions, to reduce a
defendant's sentence on such a basis for RICO defendants.[5]

---

[5]See, e.g., United States v. Ali, 508 F.3d 136, 152 (3d. Cir. 2007)(noting that the sentencing court failed to explain how the defendant's minor role in offense was exceptional); United States v. Hanhardt, 361 F.3d 382, 395 (7th Cir. 2004)(upholding denial of 3B1.2 reduction for RICO defendant and noting that defendant's claim "that he is significantly less culpable than the others because he did not participate in all of the conspiratorial activity is not enough to meet his burden.)

Moreover, the defendant bears the burden of proof in qualifying for a mitigating role reduction. *See, e.g.*, *United States v. Carpenter*, 252 F.3d 230, 234 (2d Cir. 2001); *United States v. Hanhardt*, 361 F.3d 382, 394-95 (7th Cir. 2004); *Posada-Rios*, 158 F.3d at 880.

## b. Consecutive Sentencing

Courts have upheld consecutive sentences for RICO substantive and conspiracy offenses, as well as for violations of two substantive RICO subsections. Likewise, courts have permitted consecutive sentences for a RICO conviction as well as for a conviction of an underlying predicate offense[6]. Indeed, one court has commented that "Congress clearly intended to permit, and perhaps sought to encourage, the imposition of cumulative sentences for RICO offenses and the underlying crimes." *United States v. Kragness*, 830 F.2d 842, 864 (8th Cir. 1987) (citing *United States v. Sutton*, 700 F.2d at 1081); and *United States v. Truglio*, 731 F.2d 1123, 1129-30 (4th Cir. 1984); *see also United States v. Deshaw*, 974 F.2d 667, 672 (5th Cir. 1992) ("each provision [RICO and the underlying predicate] is unambiguous and authorizes punishment for a violation of its terms."); *United States v. Baker*, 63 F.3d 1478, 1494 (9th Cir. 1995); *United States v. Grayson*, 795

---

[6]*See, e.g.*, *Nascimento*, 491 F.3d at 48; *Kehoe*, 310 F.3d at 587-88; *Marino*, 277 F.3d at 39; *Diaz*, 176 F.3d at 115-16; *United States v. Sessa*, 125 F.3d 68, 71-73 (2d Cir. 1997), *cert. denied*, 522 U.S. 1065 (1998); *United States v. Masters*, 978 F.2d 281, 285-86 (7th Cir. 1992), *cert. denied*, 508 U.S. 906 (1993); *Coonan*, 938 F.2d at 1566-67; *Pungitore*, 910 F.2d at 1115-17; *United States v. West*, 877 F.2d 281, 292 (4th Cir.), *cert. denied*, 493 U.S. 869 (1989); *United States v. Yarbrough*, 852 F.2d 1522, 1545 (9th Cir.), *cert. denied*, 488 U.S. 866 (1988); *United States v. Benevento,* 836 F.2d 60, 72-73 (2d Cir. 1986); *United States v. Callanan*, 810 F.2d 544, 545-48 (6th Cir.), *cert. denied*, 484 U.S. 832 (1987); *Biasucci*, 786 F.2d at 515-16; *Watchmaker*, 761 F.2d 1477; *United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir. 2985); *United States v. Marrone*, 746 F.2d 957, 959 (3d Cir. 1984); *Bagaric*, 706 F.2d at 63; *Cagnina*, 697 F.2d at 923; *Rone*, 598 F.2d at 569-71.

F.2d 278, 286 (3d Cir. 1986) ("Congress intended to permit the imposition of cumulative sentences for both RICO and the underlying predicate offense."); *United States v. Thomas*, 757 F.2d 1359, 1369-1370 (2d Cir. 1985) (same); *United States v. Mitchell*, 777 F.2d 248, 264 (5th Cir. 1985).

Under the Guidelines, there is a preference for concurrent sentences unless consecutive sentences are necessary to achieve the applicable Guideline range. *See* § 5G1.2(c)-(d); *see also Morgano*, 39 F.3d at 1365-69; *United States v. Velasquez*, 304 F.3d 237, 241 (3d Cir. 2002) ("Generally, sentences imposed at the same time run concurrently unless a statute mandates or a court orders otherwise."); *United States v. Becker*, 36 F.3d 708 (7th Cir. 1994). Nevertheless, despite this preference, "undoubtedly a sentencing court enjoys broad discretion in deciding whether Guidelines and pre-Guidelines sentencing will run concurrently or consecutively." *Morgano*, 39 F.3d at 1366.

### c. Sentencing for RICO Conspiracy Count

Section 1B1.2(d) of the Sentencing Guidelines provides that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." USSG § 1B1.2(d). Additionally, Comment 4 to this subsection further states that "[p]articular care must be taken in applying subsection (d)" because of certain cases which do not specify the object, or objects, of the conspiracy. *Id.* cmt. n4. In such cases, the commentary provides, Section 1B1.2(d) "should only be applied with respect to an object offense alleged in the conspiracy count if the court, were

it sitting as trier of fact, would convict the defendant of conspiring to commit that object offense."*Id.*

It may be argued that as this jury convicted the defendants of a RICO Conspiracy offense by a general verdict, it cannot be determined which specific predicate acts the defendant agreed would be committed in furtherance of the conspiracy.   In *United States v. Corrado*, 227 F.3d 528, 541 (6th Cir. 2000), the Sixth Circuit held that U.S.S.G. § 1B1.2 did not apply because a RICO Conspiracy offense is "not a multi-object conspiracy." *Id.* Rather, a "RICO conspiracy ... is considered a single object conspiracy with that object being the violation of RICO." *Id.* at 541-42. (*quoting United States v. Carrozza*, 4 F.3d 70, 79 (1st Cir. 1993)). The Sixth Circuit further explained:

> Thus, the underlying acts of racketeering in a RICO conspiracy are not considered to be the objects of the conspiracy, but simply conduct that is relevant to the central objective—participating in a criminal enterprise. The existence of relevant conduct is determined at sentencing by a preponderance of the evidence.

*Corrado*, 227 F.3d at 542; *accord Carrozza*, 4 F.3d 70, 77-80; *cf. United States v. Darden*, 70 F.3d 1507, 1545 (8th Cir. 1995) (holding that the sentencing court considers uncharged relevant conduct proven by a preponderance of the evidence)[7].

---

[7]The Eleventh Circuit has concluded that the beyond a reasonable doubt standard applies. In *United States v. Farese*, 248 F.3d 1056 (11th Cir. 2001), the Court of Appeals for the Eleventh Circuit explained that Sentencing Guideline 2E1.1 provides that the base offense level for a RICO conviction is the larger of nineteen or the offense level applicable to the underlying racketeering activity. *Id.* at 1059. However, "[i]t will not always be clear what the underlying racketeering activity is under U.S.S.G. § 2E1.1(a) for the purpose of calculating the defendant's offense level, because the jury's verdict or the guilty plea may not specify which of the offenses listed in the indictment was the object of the conspiracy." *Id.*

# CONCLUSION

USSG §2C1.1 should be used in the RICO conspiracy calculation, as it incorporates the bulk of underlying activity related to the conspiracy. The victim related adjustment applies based on the targeted efforts of the enterprise to steal votes from the elderly. The role adjustments contained within the presentence report are appropriate, given each defendant's conduct in the offense.

Respectfully submitted,

KERRY B. HARVEY
UNITED STATES ATTORNEY

BY:    s/ Stephen C. Smith
Assistant United States Attorney
601 Meyers Baker Road, Suite 200
London, KY 40741
Tel: (606) 864-5523
Fax: (606) 864-3590
Stephen.Smith4@usdoj.gov

---

at 1060. In such situations, reasoned the court, the sentencing court should turn to Section 1B1.2(d), and Comment 4 of that section, which instructs that where the verdict (or plea) does not establish the offense which was the object of the conspiracy, "subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense." *Id.* at 1061 (quoting U.S.S.G. § 1B1.2(d), cmt. n.4). Finally, the court interpreted the phrase "were it sitting as trier of fact" to demand that "the district court must find beyond a reasonable doubt that the defendant conspired to commit a particular object offense before the court can sentence the defendant on the basis of that offense." *Id.* at 1060-61.

CERTIFICATE OF SERVICE

On February 16, 2011, I electronically filed this Sentencing Memorandum with the Clerk of the Court by using the CM/ECF System, which will send notice of filing to all counsel of record.

s/Stephen C. Smith
Assistant United States Attorney