UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal Action No. 6: 09-16-S-DCR |
| V. | ) | |
| | ) | |
| RUSSELL CLETUS MARICLE, | ) | |
| DOUGLAS C. ADAMS, | ) | |
| CHARLES WAYNE JONES, | ) | |
| WILLIAM E. STIVERS, a.k.a. AL MAN, | ) | |
| FREDDY W. THOMPSON, | ) | **MEMORANDUM OPINION** |
| WILLIAM B. MORRIS, a.k.a. BART, | ) | |
| DEBRA L. MORRIS, a.k.a. DEBBIE, | ) | |
| and | ) | |
| STANLEY BOWLING, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

A hearing was held in this matter on March 7, 2011, to resolve common objections to the defendants' presentence investigation reports (PSRs). The primary objection affecting all eight defendants is the application of sentencing guideline § 2C1.1 to their Count 1 convictions for RICO conspiracy. This Memorandum Opinion provides further explanation of the Court's oral decision during the March 7th hearing that § 2C1.1 is applicable to those convictions.

The sentencing guideline applicable to RICO violations is U.S.S.G. § 2E1.1, which provides that the base offense level for a RICO offense is 19 or "the offense level applicable to

the underlying racketeering activity," whichever is greater.[1]  The parties disagree as to what comprises the underlying racketeering activity in this case.  According to the United States, § 2C1.1 applies to Count 1 because the defendants' relevant conduct includes violations of certain state bribery and extortion statutes, in addition to Kentucky Revised Statutes (KRS) § 119.205 (voter bribery, a charged predicate act), that constitute underlying racketeering activity.[2]  The defendants, however, maintain that not all of the state laws cited by the government fall under RICO, and that even if they do, the evidence does not establish violations of those statutes.  They assert that § 2H2.1 is the appropriate guideline.[3]

## I.        Consideration of Relevant Conduct

The Court has previously explained why it is appropriate to consider the defendants' relevant conduct when calculating their base offense level for the RICO conspiracy.  [*See* Record No. 1158]  Those findings are summarized here to resolve any lingering concerns as to the process by which the Court found § 2C1.1 to be applicable.

---

[1] In cases where the underlying racketeering activity violates state law, courts must apply "the offense level corresponding to the most analogous federal offense."  U.S.S.G. § 2E1.1, Application Note 2.

[2] Section 2C1.1 covers the following offenses: "Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right; Fraud Involving the Deprivation of the Intangible Right to Honest Services of Public Officials; [and] Conspiracy to Defraud by Interference with Governmental Functions."  U.S.S.G. § 2C1.1.

[3] Section 2H2.1 applies to violations of the federal vote-buying statute, 18 U.S.C. § 597, the offense most analogous to state-law voter bribery under KRS § 119.205 (the charged RICO predicate underlying all eight defendants' Count One convictions).  The guideline for obstruction of justice, § 2J1.2, is also applicable to some (but not all) defendants.

Section 1B1.2 of the sentencing guidelines first directs the Court to "[d]etermine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction (*i.e.*, the offense conduct charged in the count of the indictment . . . of which the defendant was convicted)." U.S.S.G. § 1B1.2(a). After making this determination, the Court is to "determine the applicable guideline range in accordance with § 1B1.3 (Relevant Conduct)." U.S.S.G. § 1B1.2(b).

To determine the guideline applicable to the offense of conviction, the Court must "[r]efer to the Statutory Index (Appendix A)." U.S.S.G. § 1B1.2(a). In this case, all eight defendants were convicted under 18 U.S.C. § 1962(d) (RICO conspiracy) and 18 U.S.C. § 1956(h) (money-laundering conspiracy). According to Appendix A, the sentencing guideline applicable to violations of 18 U.S.C. § 1962 is U.S.S.G. § 2E1.1 — the guideline applied in the defendants' PSRs. As for Count Two, Appendix A provides that violations of 18 U.S.C. § 1956 are covered by U.S.S.G. § 2S1.1 (again, as applied in the PSRs). Thus, pursuant to § 1B1.2(a), the offense guidelines applicable to the defendants' offenses of conviction on Counts One and Two are § 2E1.1 and § 2S1.1, respectively.

Although the defendants acknowledge that § 2E1.1 applies to their Count One convictions, at least one defendant, Bowling, maintains that the Court would be taking the § 1B1.2 steps out of order if it considered relevant conduct as part of the § 2E1.1 analysis.[4] Defendant Bowling's position can be summarized as follows:

---

[4]To the extent other defendants joined in Bowling's argument, the Court's analysis herein, as well as in its previous Memorandum Opinion and Order [Record No. 1158], applies equally to them.

-3-

- Section 2E1.1 directs the Court to look to the base offense level for the underlying racketeering activity.

- Here, the only racketeering activity Bowling was found to have committed was vote-buying (*i.e.*, voter bribery in violation of KRS § 119.205).

- Thus, the guideline applicable to Bowling's Count One conviction is § 2H2.1.[5]

This argument is flawed in several respects. First, it assumes that § 2E1.1's reference to "underlying racketeering activity" includes only charged acts of which a defendant was convicted. As set forth in the Court's Memorandum Opinion and Order overruling Bowling's objections on this issue, however, it is entirely proper for the Court to consider uncharged predicate acts under § 2E1.1. [*See* Record No. 1158, p. 4 (citing *United States v. Ruggiero*, 100 F.3d 284, 292 (2d Cir. 1996) (finding that district court properly considered uncharged racketeering acts for purposes of § 2E1.1 calculation, even though uncharged acts ultimately determined defendant's total offense level); *United States v. Carozza*, 4 F.3d 70, 74 (1st Cir. 1993) (concluding that district court erred in considering only charged predicate acts when calculating base offense level for RICO conspiracy))] Moreover, Bowling was not found by the jury to have *committed* vote-buying, as he suggests. [*See* Record No. 1153, p. 3] Rather, the jury's guilty verdict on Count One represented a finding that Bowling *agreed to* the commission of two or more acts of voter bribery, which is all that is required for a RICO conspiracy conviction. *See United States v. Corrado*, 304 F.3d 593, 608 (6th Cir. 2002).

---

[5]Bowling's argument addresses both Count One and Count Two; however, the RICO conspiracy, not bribery, is deemed to be the "underlying offense from which the laundered funds were derived." U.S.S.G. § 2S1.1(a)(1). Thus, the base offense level for Count One will determine the base offense level for the money-laundering conspiracy.

Bowling seems to indicate that § 2H2.1 would displace § 2E1.1 as the "offense guideline . . . applicable to the offense of conviction." U.S.S.G. § 1B1.2(a). However, this is clearly not the case. Bowling was convicted of conspiring to violate RICO, not bribing voters. The fact that the evidence clearly supports a finding that Bowling engaged in vote-buying does not end the § 2E1.1 analysis. Rather, the guidelines direct sentencing courts to consider relevant conduct: § 1B1.3 provides that if "the applicable guideline specifies more than one base offense level," as the RICO guideline does, then relevant conduct should be taken into account when calculating the base offense level. U.S.S.G. § 1B1.3(a); *see* U.S.S.G. § 2E1.1; *Ruggiero*, 100 F.3d at 292 ("U.S.S.G. § 2E1.1[] specifies more than one offense level: it sets the base offense level as the greater of 19 or the offense level applicable to the underlying racketeering activity."); *Carozza*, 4 F.3d at 74-75 ("[T]he language of the relevant conduct section, § 1B1.3, and its application to the RICO guideline, § 2E1.1, are clear. . . . The RICO guideline . . . specifies more than one base offense level, including a cross reference to 'the offense level applicable to the underlying racketeering activity.'" (quoting § 2E1.1)); *see also United States v. Tocco*, 306 F.3d 279, 286 (6th Cir. 2002) ("Racketeering activity constitutes 'underlying racketeering activity' under U.S.S.G. § 2E1.1 for the purpose of calculating a defendant's base offense level for a RICO conviction if it constitutes relevant conduct as defined in U.S.S.G. § 1B1.3.").

Thus, the Court is not jumping ahead by considering relevant conduct when calculating the defendants' base offense level for Count One. The "guideline . . . applicable to the offense of conviction" on that count is § 2E1.1, which requires examination of relevant conduct. U.S.S.G. § 1B1.2(a). As will be explained, the defendants' relevant conduct in this case includes

bribery of public servants. Those acts were in furtherance of the conspiracy and reasonably foreseeable to all the defendants. *See* U.S.S.G. § 1B1.3(a). Therefore, they are properly taken into account under § 2E1.1. *See Tocco*, 306 F.3d at 286.

## II. Underlying Racketeering Activity

The United States cited three Kentucky laws that were allegedly violated by the defendants' relevant conduct: KRS §§ 521.020 (Bribery of Public Servant), 514.080 (Theft by Extortion), and 524.090 (Jury Tampering). To count as underlying acts of racketeering, these offenses need only be proven by a preponderance of the evidence. *See United States v. Corrado*, 227 F.3d 528, 542 (6th Cir. 2000).

KRS § 521.020 provides:

A person is guilty of bribery of a public servant when:

(a) He offers, confers, or agrees to confer any pecuniary benefit upon a public servant with the intent to influence the public servant's vote, opinion, judgment, exercise of discretion, or other action in his official capacity as a public servant; or

(b) While a public servant, he solicits, accepts, or agrees to accept any pecuniary benefit upon an agreement or understanding that his vote, opinion, judgment, exercise of discretion, or other action as a public servant will thereby be influenced.

KRS § 521.020(1). The first three examples offered by the government of bribery of a public servant involve Wanda White and Charles "Dobber" Weaver, who served as election officers in Clay County, and Jeff Farmer, who served as a challenger. All three participated in the scheme to buy and steal votes.

The defendants argued that election officers and challengers are not public servants within the meaning of the bribery statute. "Public servant" is defined as follows:

(a)     Any public officer or employee of the state or of any political subdivision thereof or of any governmental instrumentality within the state; or

(b)     Any person exercising the functions of any such public officer or employee; or

(c)     Any person participating as advisor, consultant or otherwise in performing a governmental function, but not including witnesses; or

(d)     Any person elected, appointed or designated to become a public servant although not yet occupying that position.

KRS § 521.010(1).

Under KRS § 117.035, the county board of elections has the authority to "administer the election laws" with the direction and supervision of the state board of elections. KRS § 117.035(1). Election officers are appointed by the county board of elections pursuant to KRS § 117.045 and are likewise charged with the administration of state election laws. *See* KRS §§ 117.045(1) (describing appointment process), (8) (providing for removal by the state board of elections of any election officer appointed by the county board "who the [state] board finds would not fairly administer the state election laws"). Their duties and authority are extensive. *See* KRS §§ 117.205, .215, .227, .235, .255, .275, .318 (describing various duties of election officers). Moreover, election officers are paid by the county for their services. *See* KRS § 117.045(11). Therefore, election officers are public servants for purposes of KRS § 521.020. *See* KRS § 521.010(1)(a).

Challengers, on the other hand, are designated by individual candidates or political parties, and their authority is limited to challenging the eligibility of voters. *See* KRS §§ 117.315 (providing that political parties and certain candidates may designate challengers to be present during elections), .316 (describing duties of a challenger). They are subject to removal by election officers. *See* KRS § 117.318. Challengers thus do not qualify as public servants under KRS § 521.010(1), and the incident involving Farmer does not constitute bribery of a public servant.[6]

The parties also disputed whether vote-stealing constitutes "action in [one's] official capacity as a public servant." KRS § 521.020(1)(a). According to the defendants, the Court has already answered this question. In granting Stivers' motion for acquittal on Count 4 (attempted extortion), the Court did note that vote-buying was not an "official act," in part because it did not require access to a public office.[7] [*See* Record No. 947, p. 11 & n.5] Here, however, the evidence shows that Weaver and White *stole* votes, and that they were able to do so by virtue of their positions as election officers. The defendants' argument on this point is therefore

---

[6]The evidence is insufficient to establish bribery of a public servant with respect to Farmer in any event. Farmer testified that he served as a challenger during elections in 2002 and participated in the vote-buying scheme. [Record No. 875, pp. 114-15, 129] After the election, Farmer was hired by the school board as a custodian; according to his testimony, "Doug Adams [was] the one that got [him] the job." [*Id.*, p. 135] On re-direct examination, Farmer testified that prior to the election, he "was told about it may be [sic] a possibility of getting a job" with the school board. [*Id.*, p. 161] He did not specify who told him of that possibility, nor did he state that there was a *quid pro quo* as to his assistance in the vote-buying scheme.

[7]This was not the basis for the Court's decision to grant Stivers' motion for acquittal. Instead, the Court found insufficient evidence that Stivers (or Jones) improperly wielded his influence as a public official. [*See* Record No. 947, pp. 10-11]

unpersuasive, and the Court must next determine whether the incidents involving Weaver and White satisfy the remaining elements of KRS § 521.020.

Weaver testified that he was asked by James Phillips to serve as an election officer in the May 2006 primary.  [Record No. 873, pp. 85-86]  He also served as an election officer in the November 2006 general election.  [*Id.*, p. 96]  During both elections, Weaver stole votes by manipulating the new electronic voting machines.  [*Id.*, pp. 92, 96]  He testified that "in a way," he hoped to get something in exchange for participating in the scheme because Kenny Price, a candidate for jailer, held a job — emergency management coordinator — that Weaver was interested in.  [*Id.*, p. 98]  According to Weaver, "I thought if Kenny won the jailer's job, . . . that job's available, and I thought I had a pretty good chance of getting it with my qualifications." [*Id.*]  Weaver further testified that people from "different sides" told him that participating in the scheme would increase his chances of getting the job he desired.  [*Id.*]  Bart Morris told Weaver that he "might be able to help [him] with" the emergency management job if Weaver helped — or at least wasn't "too hard on" — James Garrison, who was running for county judge executive: the position that controlled hiring decisions for the emergency management job.  [*Id.*, p. 99; *see id.*, p. 101]  James Phillips, a candidate for circuit court clerk, also told Weaver that he might be able to help get him that job.  [*Id.*, pp. 100-01]

The Court did not find either Garrison or Phillips to be a member of the conspiracy for purposes of the 801(d)(2)(E) determination regarding admissibility of coconspirator statements.[8] [*See* Record No. 881, pp. 29-30]  The question, then, is whether Bart Morris's statement that he

_____

[8]The preponderance standard also governed the Court's 801(d)(2)(E) determination.  [*See* Record No. 881, p. 29]

"might be able to help" Weaver in exchange for Weaver's assistance as an election officer constitutes bribery of a public servant under KRS § 521.020.[9] Although Morris did not personally have the power to hire Weaver for the emergency management position, he sought Weaver's help on behalf of Garrison, who — if he won the election — would have such power. It is more likely than not that Morris would have held some sway in Garrison's hiring decisions after helping secure his victory. Thus, Morris could, and did, "offer[] . . . to confer" the job upon Weaver. KRS § 521.020(1)(a).

The proof is even stronger as to Wanda White. White testified that shortly after the fall 2004 election, Maricle asked her to serve as an election officer in 2006 so that she could help ensure victory for his son-in-law, Phillip Mobley, in the race for property valuation administrator. [Record No. 931, p. 25] During their second or third discussion on the subject, Maricle told White that in exchange for her help she would receive a job in drug court, for which Maricle controlled the hiring. [*Id.*, pp. 28, 42-43] White agreed to Maricle's proposal shortly after Christmas in 2004. [*Id.*, p. 30] At Maricle's direction, she applied for the drug court job in February 2005. [*Id.*, pp. 43-45] Maricle and White continued to discuss their plan until April 2006, when White was officially appointed as an election officer.[10] [*Id.*, pp. 30-31; *see* Record

_____

[9]The emergency management job amounts to a "pecuniary benefit" for purposes of KRS § 521.020. That term is defined in KRS § 521.010 as meaning "benefit in the form of money, property, commercial interests or anything else the primary significance of which is economic gain." Presumably, Weaver was interested in the job because of the economic gain he would realize as a result. The Sixth Circuit has held that a promise of future employment constituted a "thing of value" in the context of the analogous federal statute, 18 U.S.C. § 201. *See United States v. Gorman*, 807 F.2d 1299, 1305 (6th Cir. 1986).

[10]Although White was not officially appointed until April 18, 2006, she testified that by the time she received the letter confirming her appointment, she had already known for "months" that

No. 844, pp. 130-31 (introduction and admission of Government's Exhibit D4, notice to White of her appointment dated April 18, 2006)]  Maricle instructed White to meet with Stivers and Jones so that they could "school" her on what to do.  [Record No. 931, p. 32; *see id.*, p. 33]  She then began meeting with Stivers and Jones at Stivers' home, where they instructed her how to identify and assist voters who had sold their votes.  [*Id.*, pp. 32-34]  White further testified that she and Weaver received training from Jones and Thompson on how to steal votes by manipulating the new voting machines.  [*Id.*, pp. 37-38]  She also attended meetings held at the homes of Maricle, Stivers, and Morris for the purpose of putting together a slate of candidates.  [*Id.*, pp. 40-41]  White cleared the slate with Maricle before she went to perform her job on election day.  [*Id.*, p. 66]

It is clear from White's testimony that Maricle "offer[ed] . . . or agree[d] to confer[]" the drug court job with the intent to influence her action as an election officer.  KRS § 521.020(1)(a).  His actions — which were taken as part of, and in furtherance of, the RICO conspiracy to control the political process in Clay County — therefore constitute bribery of a public servant under Kentucky law.

Moreover, the bribery of White and Weaver was reasonably foreseeable to the other defendants.  Based on White's testimony, Jones, Stivers, and Thompson were obviously aware that she and Weaver were joining the conspiracy, as were the Morrises and Bowling.  [*See* Record No. 931, pp. 35-36]  In addition, White's husband, Kennon White, testified that he visited Adams to get Adams' blessing for Wanda to serve as an election officer.  [Record No.

---

she would be an election officer because Maricle had told her.  [Record No. 844, p. 132]

840, pp. 84-85] Additionally, the other defendants could have reasonably foreseen that new members would expect something in exchange for their participation in the scheme. Maricle's and Morris' violations of KRS § 521.020(1)(a) are therefore attributable to the other six defendants. *See* U.S.S.G. § 1B1.3(a)(1)(B).

In summary, the Court finds by a preponderance of the evidence that the defendants' relevant conduct includes at least two acts of bribery of a public servant in violation of KRS § 521.020.[11] Section 2C1.1 of the sentencing guidelines is therefore applicable to their RICO convictions.

This 10th day of March, 2011.

Signed By:

*Danny C. Reeves* DCR

United States District Judge

---

[11]Because the incidents involving White and Weaver are sufficient to establish racketeering activity covered by § 2C1.1, the Court need not address the remaining instances of alleged bribery cited by the government. Nor is it necessary to analyze extortion by theft and jury tampering, the two other asserted bases for application of § 2C1.1.