1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON
- - -

UNITED STATES OF AMERICA,          :   Docket No. CR 09-16-S
                                   :
                   Plaintiff,      :   **Frankfort, Kentucky**
                                   :   Monday, February 1, 2010
        versus                     :   2:00 p.m.
                                   :
RUSSELL CLETUS MARICLE,            :
DOUGLAS C. ADAMS                   :
CHARLES WAYNE JONES                :
WILLIAM R. STIVERS                 :
FREDDY W. THOMPSON                 :
WILLIAM B. MORRIS                  :
DEBRA L. MORRIS                    :
STANLEY BOWLING,                   :
                                   :
                   Defendants.     :


                         - - -
          TRANSCRIPT OF MOTION HEARING
          BEFORE DANNY C. REEVES
       UNITED STATES DISTRICT COURT JUDGE
                         - - -

APPEARANCES:

For the United States:        STEPHEN C. SMITH, ESQ.
                              JASON D. PARMAN, ESQ.
                              Assistant U.S. Attorney
                              601 Meyers Baker Road
                              Suite 200
                              London, KY 40741

For the Defendant            MARTIN S. PINALES, ESQ.
Russell Cletus Maricle:      CANDACE C. CROUSE, ESQ.
                             Strauss & Troy
                             150 E. Fourth Street
                             Fourth Floor
                             Cincinnati,OH  45202

                             DAVID S. HOSKINS, ESQ.
                             107 E. First Street
                             Corbin, KY  40701

2

```
 1    For the Defendant           R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:           KRISTIN N. LOGAN, ESQ.
 2                                Landrum & Shouse, LLP
                                  220 West Main Street
 3                                Suite 1900
                                  Louisville, KY 40202
 4
                                  BENNETT E. BAYER, ESQ.
 5                                Landrum & Shouse, LLP
                                  106 West Vine Street
 6                                Suite 800
                                  Lexington, KY  40507
 7

 8    For the Defendant           T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:        Morgan & Pottinger, P.S.C.
 9                                133 West Short Street
                                  Lexington, KY  40507
10

11    For the Defendant           ROBERT L. ABELL, ESQ.
      William R. Stivers:         120 North Upper Street
12                                Lexington, KY  40507

13
      For the Defendant           RUSSELL JAMES BALDANI, ESQ.
14    Freddy W. Thompson:         R. TUCKER RICHARDSON, ESQ.
                                  Baldani, Rowland & Richardson
15                                300 West Short Street
                                  Lexington, KY  40507
16

17    For the Defendant           JERRY W. GILBERT, ESQ.
      William B. Morris:          Coy, Gilbert & Gilbert
18                                212 North Second Street
                                  Richmond, KY 40475
19

20    For the Defendant           ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:            Gess, Mattingly & Atchison, PSC
21                                201 West Short Street
                                  Lexington, KY 40507
22

23    For the Defendant           DANIEL A. SIMONS, ESQ.
      Stanley Bowling:            Thompson, Simons, Dunlop & Fore
24                                116 West Main Street
                                  Suite 2A
25                                Richmond, KY 40476
```

3

1    Court Reporter:                LISA REED WIESMAN, RDR-CRR
                                   Official Court Reporter
2                                  35 W. Fifth Street
                                   P.O. Box 1073
3                                  Covington, KY  41012
                                   (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1              (Proceedings commenced at 1:56 p.m.)

2              THE COURT:  Thank you.  Madam Clerk, if you would

3       call the matter scheduled for 2:00, please.

4              DEPUTY CLERK:  Yes, Your Honor.  London Criminal

5       Action 09-16.  United States of America versus Russell Cletus

6       Maricle, Douglas C. Adams, Charles Wayne Jones, William E.

7       Stivers, AKA Al Man, Freddy W. Thompson, William B. Morris,

8       AKA Bart, Debra L. Morris, AKA Debi, and Stanley Bowling.

9       This matter's being called for hearing, Your Honor.

10             THE COURT:  Thank you.  If counsel could state their

11      appearances, please.  Mr. Smith?

12             MR. SMITH:  Good afternoon, Your Honor.  I'm Stephen

13      Smith.  Accompanying me today is Jason Parman, representing

14      the United States.

15             THE COURT:  Thank you.  Mr. Hoskins, if you could

16      identify co-counsel, please.

17             MR. HOSKINS:  Martin Pinales and David Hoskins on

18      behalf of Russell Cletus Maricle, seated here at the table

19      with us.

20             THE COURT:  Thank you.

21             MR. BAYER:  Good afternoon, Judge.  Bennett Bayer,

22      along with Kent Westberry, Kristin Logan for defendant Douglas

23      Adams, who is present in the courtroom.

24             THE COURT:  Thank you.

25             MR. WHITE:  Good afternoon, Your Honor.  Scott White.

1    I'm here on behalf of Charles Wayne Jones.  Mr. Jones is right

2    here.

3              THE COURT:  All right.  Thank you.

4              MR. WHITE:  Thank you, Your Honor.

5              THE COURT:  Mr. Abell.

6              MR. ABELL:  Your Honor, Robert Abell for defendant

7    William E. Stivers, sitting in the corner.

8              THE COURT:  Thank you.

9              MR. BALDANI:  Good afternoon, Judge.  Russ Baldani on

10   behalf of Freddy Thompson, seated to my right.

11             MR. GILBERT:  Jerry Gilbert on behalf of William Bart

12   Morris, seated behind me.

13             MS. HUGHES:  Elizabeth Hughes on behalf of Debra

14   Morris, seated behind me.

15             MR. SIMONS:  Dan Simons, Your Honor, for Stanley

16   Bowling, just behind me.

17             THE COURT:  All right.  Thank you.  This matter was

18   scheduled originally on the United States' request with regard

19   to defendants' designation of expert witnesses.  After that

20   motion was filed, there was also the notice filed of

21   compliance with discovery obligations and, also, captioned

22   motion/alternative motion to continue the trial of the case.

23             I asked the parties, the defendants to briefly

24   respond to the motion to continue so I'd have a general idea

25   of where everyone stood.  I've gotten a variety of responses.

1    So we'll be taking that issue up first, and then we'll turn to

2    the issue dealing with the expert witnesses.

3            I also have a couple of miscellaneous matters that I

4    do want to cover today that should hopefully speed things up

5    once we do proceed to trial.

6            Mr. Smith, let's first turn to your motion, notice

7    and motion for a potential continuance of the case.  I have

8    reviewed the information that has been filed.  As I understand

9    your position by virtue of, I suppose it's Department of

10   Justice's recent change of policy, internal policy, you

11   believe it's now your obligation not only for the agents to

12   review all discovery or raw material, all files and other

13   materials for potential Brady and Giglio material, but you

14   believe that you have that obligation to do that yourself

15   individually.  Is that a fair summary?

16           MR. SMITH:  That is, Your Honor.

17           THE COURT:  Where do you stand on that at this point?

18           MR. SMITH:  Well, as I tried to make clear in the

19   notice with the Court, this was not something that occurred to

20   me Friday that I had to be doing.  This is something that I've

21   been pursuing for several weeks with the department, with my

22   office and with the FBI.

23           And as the Court's aware, this is a very lengthy

24   investigation with lots of interviews.  And in the course of

25   preparing for this discovery, I found that the task was one

1  which I could not complete and announce to this Court that it

2  was complete before the beginning of the trial.  So I wanted

3  to bring this to the Court's attention and make the Court

4  aware that if we do proceed with tomorrow as the start date of

5  this trial, I do expect that there might be situations,

6  depending upon, again, the order in which these witnesses

7  flow, I could foresee an example where witnesses are on the

8  stand and then in the evening, there would be no reason for

9  the jury to be interrupted with a continuance if the Court

10  finds it sufficient to give it to counsel the day before.

11       But the timing of witnesses, of course, is

12  unpredictable.  We don't know how it's going to flow.  So I do

13  want the Court to know that the process is not complete.  We

14  are continuing to work on this.  We worked on it over the

15  weekend.  We're continuing to work on it, and it's still not

16  complete.  So I do want this issue to be brought to your

17  attention.

18       There's also, as the Court's aware from some of the

19  responses, a second issue that has cropped up.  Last week for

20  the first time in, well, it's been a little bit more than a

21  week now, I learned that there had been situations where two

22  of the cooperators had been text messaged, and I was not aware

23  that that had been a means of communication until that point.

24       So there's another issue there that needs to be

25  looked at.

1          THE COURT:  Let me stop you on that point, because I

2     do have some questions I want to ask.  With respect to any

3     text messages, at this point, do you have reason to believe

4     that the content of those messages would fall under either

5     Brady or Giglio?

6          MR. SMITH:  I do not have any way at this point,

7     other than just what I've been able to glean from my speaking

8     with the agents, and it appears that by and large, the way

9     they've represented to me, it was scheduling.  It was text

10     scheduling between them and the witnesses.  I've not been able

11     to, again, go further than just an initial inquiry in this

12     matter.

13          THE COURT:  All right.  I assume that would relate to

14     your, perhaps your first couple of witnesses that you'd be

15     calling in the case, or at least the first few days of

16     testimony?

17          MR. SMITH:  Well, it's my understanding, it's been

18     represented to me that it's contained to two witnesses so

19     that -- it's not pervasive throughout the whole case with all

20     the witnesses involved.  It's just the two.

21          THE COURT:  All right.  Thank you.  Let me see if any

22     of the defendants wish to add anything to what has been

23     outlined in the written materials?

24          Actually, I'm going to start, there were three

25     responses that were filed.  I think the initial response filed

9

1    on behalf of the Morrises and Mr. Bowling that essentially

2    state that their position is they'd like to proceed as

3    scheduled.  They believe, based on the information that's been

4    made available to them, that if there's any disruption in the

5    case, it would be minimal and that the United States would be

6    able to satisfy its obligations again, in their opinion, by

7    continuing to review these materials and produce anything if

8    it does become known to the United States and if it is

9    relevant under either <u>Brady</u> or <u>Giglio</u>.  I assume that

10   everybody doesn't have to speak, but is that essentially the

11   defendants' position?

12           MS. HUGHES:  Yes, sir.

13           THE COURT:  All right.  And I assume the defendants

14   would also, I guess as a footnote to that, would like the

15   Court not to release any witnesses until such time as the

16   United States has assured the Court that it's reviewed all

17   information and that there is no additional information that

18   should be provided.  Would that be a proper footnote?

19           MS. HUGHES:  That's fair.

20           THE COURT:  All right.  There's a mid ground that's

21   taken by, I think, Defendants Jones, Adams and Maricle that

22   they'd like to proceed to trial.  They're ready to proceed to

23   trial, but they have a little more of a concern about this

24   information, and they believe that perhaps a short continuance

25   might be appropriate.  They feel like they should not be

1    deprived of that information before a witness is

2    cross-examined.  I think I've stated it, fairly summarized

3    their position.

4           If the Court proceeds as I've just indicated to

5    counsel for the Morrises and for Mr. Bowling; that is, if we

6    proceed as scheduled with the trial starting tomorrow, but the

7    Court would not release any witnesses until such time as the

8    United States is able to represent that it has completed its

9    review of these materials, would the defendants object to that

10   procedure?  I'll let all three of you --

11          MR. BAYER:  Yes, sir, we would.

12          MR. HOSKINS:  Yes, Your Honor.

13          MR. WHITE:  Yes, Your Honor.

14          MR. BAYER:  And can I say one thing, Judge?  One of

15   the circumstances that's a little bit different for us, we're

16   on the front end.  They're on the tail end, which means that

17   they would have more opportunity during the course of the

18   trial to study 302s as they came in than we will.  By the

19   order of defendants, we're going to have to be put into the

20   box immediately.  So it's a little bit more difficult for us

21   than it would be for them.

22          Plus, we anticipate that probably the volume of the

23   material will be more intensive as it relates to the lead

24   defendants, rather than to the tail defendants.  And as a

25   result, it's a different circumstance, and that's why we would

1    prefer a short continuance, perhaps until next Monday, so the

2    United States could complete the search.

3            THE COURT:  All right.  Now, that's kind of a middle

4    ground among the defendants.  And then we have I guess the

5    more hard core defendants.  Counsel for Mr. Stivers takes the

6    position that United States isn't to be believed, that

7    spoliation of evidence has occurred, and that he would object

8    to a continuance but also would seek to exclude any testimony

9    or witnesses that would be the subject of this motion.  And it

10   relates primarily to this statement about text messages.

11           And also, I believe counsel for Defendant Thompson

12   takes a similar position, assumes that there is either

13   impeaching or exculpatory information that's contained in

14   these text messages and would seek to also exclude any

15   testimony or evidence.  Is that a fair summary?

16           MR. ABELL:  Judge, I believe with all candor to the

17   Court, it's highly likely that useful <u>Brady</u> or <u>Giglio</u> material

18   would be yielded as we move forward.  With all due respect, I

19   understand the United States is telling us we've turned over

20   everything we've got so far.  We've got more work to do.

21   We're told some materials have been destroyed, are

22   irretrievable or whatever.  I believe it's highly likely that

23   something useful is yet to come.

24           THE COURT:  Well, let me ask you a couple of

25   questions, because really this case is no different than any

12

1    other case, with the exception that the United States now

2    feels like it has an additional obligation for the assistant

3    U.S. attorney that's trying the case to actually review all

4    this material.

5         If we were starting this case a month ago, we didn't

6    have -- I guess this Ogden memo is the genesis of this whole

7    issue.  We'd be here, the United States would be ready to

8    proceed, they would be continuing to review materials, and if

9    they found anything, they'd have an obligation to produce it

10   to you.

11        It's essentially where we are right now with the

12   exception of this, I guess this issue of this text message.

13   But if the government doesn't have that text message, if it

14   is, in fact, gone, it wouldn't make a difference if we start

15   tomorrow or two weeks from tomorrow because we're still in the

16   same situation.  So I don't really see the need for any

17   lengthy -- I don't see the need, quite frankly, I don't see

18   the need for a continuance.  But I don't see the need for the

19   Court to even consider the type of sanctions that have been

20   outlined in your response.

21        You say that you believe that there is this

22   information out there that will fall under Brady or Giglio.  I

23   don't see anything other than the representation that you

24   believe that that will happen sometime in the future.

25        MR. ABELL:  Judge, I nonetheless feel and I agree

1    with counsel for Maricle, Adams and Jones that it is likely

2    additional materials will be received.  And I'm not satisfied,

3    based upon what I've done since Thursday afternoon, that text

4    messages are, in fact, irretrievable as we sit here.  It

5    depends, in part, when they were sent, what the providers were

6    and other factors as well, from what I've been able to gather.

7        THE COURT:  All right.  Thank you.  Mr. Baldani, do

8    you want to add anything?

9        MR. BALDANI:  Judge, there's not much for me to add,

10   other than I would simply say Mr. Thompson wants his day in

11   court.  This has had a great toll on him, and he wants his day

12   in court.  And the other alternative offered by the

13   government, the continuance, it's kind of hard to respond to

14   that because we don't really know how long a continuance he's

15   going to -- is it going to be an hour, two hours?  As you all

16   know from trying cases, Judge, our concern is it's a lengthy

17   trial, and the jury might hold the continuances and the delays

18   in the proceedings against us.  So that's why I was put in a

19   difficult position as far as responding to the alternative set

20   forth by the government.

21       And so I guess I'm a little less hard core than my

22   colleague next to me, but my response is if the government

23   cannot certify that we've done a review like they're required

24   to do in the DOJ memo --

25       THE COURT:  That's not an obligation they have to the

14

1    defendant.  It's their own internal procedures.

2          MR. BALDANI:  That is right.  It doesn't create a

3    right in a third party.  Mr. Smith feels bound by it.  We

4    appreciate him bringing this issue up.

5          THE COURT:  In fact, he may be reading more into this

6    Ogden memo than I read into the memo, and I want to ask him in

7    just a moment about the availability of other counsel to

8    assist in this process.

9          Let me do that at this point.  Mr. Smith, I think

10   this issue actually came up in a case that Judge Forester just

11   completed last week, just on the eve of trial, and I believe

12   Judge Forester turned to the assistant U.S. attorney and said,

13   you've got 25 attorneys over there across the street in that

14   big building.  Why don't you add a few more people to the

15   case?  I guess that's the initial question I've got for you

16   here.

17         MR. SMITH:  Well, Your Honor, I think that certainly,

18   I've looked at this issue and spent some time with the memo

19   itself.  And I share the Court's interest in trying to

20   evaluate this for purposes of keeping this case on track.  One

21   of the things that I did, of course, was to communicate

22   through the chain of authority that I operate under, and I

23   have done that diligently for approximately ten days of

24   working with the folks that I have to answer to in my office.

25   And I do think that the memo does anticipate that there are

1    circumstances which present where it's not that the prosecutor

2    himself may personally be available, but there have to be, I

3    think, parameters set in place, and it's certainly encouraged

4    by the memo.  And my office has communicated to me even

5    stronger than that.

6          So I'm operating under an interpretation which

7    obviously I don't ask the Court to engage in, because I'm

8    certainly here, ready and willing to start this case tomorrow.

9          I do see that we have concerns about delay, and I

10   would hope that we could present this information before the

11   witness testifies and we could avoid Mr. Thompson's concern

12   about the jury being inflamed by delay by, obviously, giving

13   this over early, before the witness testifies.  And then if

14   there's a situation where they need an extra hour the morning

15   following, that the Court have the jury come in at 9:30

16   instead of 8:30, or whatever the Court's schedule may end up

17   being in this case.

18         THE COURT:  All right.  What we're going to do is

19   we're going to start the trial tomorrow as scheduled.  If it

20   does appear that we need to take a break in order to allow

21   additional information to be reviewed either by the United

22   States or by counsel for the defendants, we will take a break

23   if we need to do that.

24         I believe that the approach that's set forth, as I

25   indicated earlier, by the Morris defendants and counsel for

16

1    Mr. Bowling is the appropriate approach to take in the case.

2    But if we need to take breaks, then we'll certainly do that.

3         Mr. Smith, I will ask you to pass my comments along

4    to the chief of the criminal section that the Court expects

5    that he will provide you with sufficient manpower in order to

6    complete this task.

7         MR. SMITH:  Yes, Your Honor.  Certainly.

8         THE COURT:  All right.  So we will -- I will deny the

9    motion to continue, but if we do need additional time during

10   the course of trial, if you make me aware of that, then we'll

11   certainly take those issues up as they do occur.

12        I'm not going to impose any type of sanctions at this

13   time for any delay.  And it really isn't a good idea for the

14   Court to start telling the jury that this delay is caused by X

15   party, because invariably in a trial that's going to last as

16   long as this one's going to last, everybody's going to have a

17   finger pointed at them at some point for causing some type of

18   delay.

19        As a matter of fact, we're about to get to that issue

20   on the expert witnesses, and so that's a good place to turn at

21   this time.

22        Let's go to the issue of expert witnesses.  I do have

23   a couple of questions on this point.  I asked the United

24   States to file the discovery requests first, requests that had

25   been made by the defendants, the reciprocal discovery requests

1    that had been made by the United States, and then the various

2    responses, the actual expert witness information that was

3    provided.

4         Now, according to what's been submitted to this

5    point, it looks like all eight defendants submitted requests

6    for discovery and that six of the eight defendants submitted

7    requests for expert information.  I don't see in the requests

8    that were submitted by Defendants Bowling and Stivers that

9    they requested expert information.  Is that correct, or did I

10   miss something?

11        MR. SIMONS:  That is correct.

12        MR. ABELL:  That's correct, Judge.

13        THE COURT:  All right.  So we have six of the eight

14   defendants requesting expert witness information.  And the

15   expert witness information that has to be provided is, of

16   course, the background information of the witness, how they're

17   qualified, as well as the opinions they're going to express

18   and the basis for the opinions.

19        So we have six of eight making the request.  And then

20   it appears that the United States requested reciprocal

21   discovery, expert discovery from four of those six defendants.

22   Reciprocal discovery, expert discovery was requested from

23   Defendants Maricle, Adams, Jones and Debra Morris.

24        Were there other defendants on which the United

25   States served reciprocal discovery requests that I haven't

1  seen?  Mr. Smith, as far as you know, you just served the four

2  requests; is that correct?

3       MR. SMITH:  Your Honor, I'm confident that each of

4  these defendants got the same -- the problem was we exchanged

5  these by e-mail.  Some counsel signed those and returned those

6  to me; and some, I could not find where they had.  So I don't

7  represent to the Court something that I can't certify.  I can

8  certify that these were signed and returned to me, but I can

9  also state that each defendant got a similar receipt.  And

10 whether or not it was received by them, I don't know.

11      THE COURT:  All right.  Well, it's an important

12 issue, because unless the United States asks for the expert

13 witness information, then the defendant was not obligated to

14 provide it.

15      Let me ask counsel for -- I guess it would be

16 Defendants William Morris and Thompson whether they received

17 reciprocal discovery requests from the government?

18      MR. BALDANI:  Judge, I would have to say that as far

19 as -- basically, it comes in a document entitled discovery

20 inventory, and even though I didn't see where we had signed

21 and returned, I don't state to the Court -- I mean, I've been

22 under a belief that we're obligated and that they've

23 requested.  So the fact that I didn't sign it and return it,

24 I'm not hiding behind that.

25      THE COURT:  All right.  I'm just trying to find out

1    where we stand in terms of the requests that were made.

2         MR. GILBERT:  I have a similar position, Your Honor.

3    There was a delay in receiving initial discovery, and I had

4    received the disk from other counsel.  So when they complied

5    with the discovery request, I just had my staff check.  I

6    received the receipt, but I did not return it.

7         THE COURT:  Well, we'll proceed, then, with the

8    understanding that the six defendants that requested expert

9    information from the United States, that the government served

10   reciprocal requests on those same six defendants.

11        And then I have the disclosures that were made by

12   several of the defendants.  Not every defendant disclosed

13   expert witnesses, but it looks like, perhaps, four.  One of

14   these may be a joint response, but the Court received these

15   Rule 16 disclosures by the defendants, and that's what

16   prompted the motion of the United States.

17        Now, there are several issues that are raised through

18   the United States' request for a hearing.  The United States

19   has requested a hearing on the issue of whether proper notice

20   has been given and whether the information would be sufficient

21   or would be appropriate expert witness information.

22        With respect to the first issue, I believe that the

23   parties will look back at the discovery order that was entered

24   by the magistrate judge in the case, Judge Weir.  I believe

25   that discovery order indicates that expert witness information

1    should be provided in a timely manner, and the Court considers

2    one week prior to trial to be timely.

3           So it would appear that the timeliness has been met

4    if the appropriate information has been provided.  Of course,

5    if the parties haven't provided the appropriate information,

6    then that's a separate issue.

7           Mr. Smith, what is the position of the United States

8    with respect to these various disclosures that have been made?

9           MR. SMITH:  Your Honor, I think that as we have

10   reviewed these, number one, the first question, obviously, is

11   whether or not these particular notices and declarations offer

12   us someone who is, number one, offering information that is

13   opinion in nature and that that individual has qualifications

14   to render to the Court information which would be helpful to

15   this jury.

16          And I think that as has been described in these

17   notices, it's difficult for us to ascertain the relevance as

18   to a couple of these issues that have been framed by these

19   notices.  And in discussing this with Miss Hughes, she made a

20   suggestion that maybe this should be taken up after conclusion

21   of the government's case as we look at the substance of this

22   issue.  And I'm not necessarily opposed to that, as some of

23   these issues may, frankly, be better framed after the

24   government's case has been presented.

25          But I think that the purpose of the notice provision,

1    obviously, is not to write a blank check and fill it in later,

2    but to hold them at least in part to this notice so that, you

3    know, we don't get at the last minute additional issues thrown

4    in.  So if we can rely upon this, I would not be opposed to,

5    again if the Court resolves the timeliness issue, that we hold

6    the issue as to the substance after the conclusion of the

7    government's case.

8            THE COURT:  All right.  Well, let me take up a couple

9    of these.  The first one, I believe, that was disclosed was by

10   Defendant Adams.  One potential expert, James Gravitt.  Mr.

11   Bayer, first, you would have to agree, wouldn't you, that you

12   haven't disclosed what the opinions are that this person is

13   expected to testify to?

14           MR. BAYER:  Well, there's a couple components.  The

15   disclosure specifically does state that he's going to offer

16   testimony regarding conclusions and opinions of Mr. Sagrecy,

17   of Agent Sagrecy.

18           THE COURT:  All right.  We'll stop right there.  He's

19   going to offer opinions about something, but you don't say

20   what the opinions are that he's going to offer so you haven't

21   disclosed what the opinions are with respect to that issue.

22           MR. BAYER:  Well, because we don't know for sure what

23   Agent Sagrecy's going to testify to, Judge.  The disclosure

24   that we received in supplemental discovery on December 30th is

25   very vague.

1        THE COURT:  I don't necessarily agree with that.

2   It's not as vague as you would make it out to be.  We can get

3   into some of the specifics in just a moment, but I'm focusing

4   more on Mr. Gravitt.  For example, you say he's expected to

5   testify regarding financial records, financial position and

6   income of the defendant.

7        MR. BAYER:  Also, the second sentence says in

8   particular, Mr. Gravitt is expected to testify concerning his

9   review of Mr. Adams' banking records and whether or not there

10   are deposits from unknown sources, which he's going to testify

11   there's not.

12        THE COURT:  That's not what you say here.  "Whether

13   or not," it can go two ways.  So you haven't identified the

14   opinion he's going to express, and you haven't identified the

15   basis for the opinion that he's going to express.

16        MR. BAYER:  The basis of the opinions, I think, as

17   set out is he's reviewed all the banking records, he's gone

18   through the financial records, and let me say this, Judge.

19   This goes back to what I've said before.  We're not entirely

20   sure what the money laundering count is all about.  We're

21   still very much in the dark on what they're going to prove.

22        So to the extent that we're able to provide a

23   complete summary of what our expert's going to testify to,

24   we're not yet understanding the United States' case as to what

25   subjects they're going to go into.  So in our disclosure,

1    where we say in particular Mr. Gravitt is expected to testify

2    concerning his review of Mr. Adams' banking records and

3    whether or not there are deposits from unknown sources, that

4    is in response to some of the language we believe is inherent

5    within the Sagrecy disclosure.  In other words, that no, there

6    are not these unknown sources, that there is not this money

7    that is filtering through his accounts.  And we're trying to

8    frame what we think is going to be the defense for the money

9    laundering count based upon the financial records that we've

10    got.

11           And while I understand the Court may be looking at

12    this with a very tight scrutiny, I'm asking the Court to

13    indulge me a little bit --

14           THE COURT:  No, I'm really not doing that.  I'm

15    looking at it fairly broadly.  And I look at this and say

16    okay, what's the opinion he's going to express?  Because I

17    have to determine whether a *Daubert* hearing is necessary with

18    respect to these opinions that are going to be expressed.  And

19    if I don't know what the opinions are, and if I don't know

20    what the basis for the opinions are, I can't make that

21    determination, number one.  And number two, you don't satisfy

22    the requirements of Rule 16.

23           MR. BAYER:  Well --

24           THE COURT:  So you've told me more while you've been

25    standing here, certainly, than is outlined in your notice.

1          MR. BAYER:  I apologize if we're not completely

2     clear, but where it says Mr. Gravitt is expected testify and

3     offer conclusions regarding the opinions of Mr. Sagrecy, Mr.

4     Sagrecy, in their disclosure, talked about the normal practice

5     of dealing with drug money, so on and so forth, they filter it

6     and how they filter it.  Mr. Gravitt will testify regarding

7     that.  Of course, we have a little bit of a collateral issue

8     with that, Judge, because you have ordered that the drug issue

9     shall not relate to Mr. Adams, and we're somewhat concerned

10    about that.  That's a little bit different issue.

11          And then it goes on, Mr. Gravitt --

12          THE COURT:  Let me stop you there.  Wait a second.

13    You're the one that sought to exclude that testimony as to Mr.

14    Adams, and the Court sustained that.

15          MR. BAYER:  That is correct.

16          THE COURT:  Do you want me to revisit that issue?

17          MR. BAYER:  No, sir.  What I'm saying is that I'm

18    concerned that if all this testimony about drugs and money

19    comes in through Mr. Sagrecy, how will that impact Mr. Adams,

20    when the Court has just said you're not supposed to be talking

21    about drugs with Mr. Adams.  So I hoped to visit that issue

22    with the Court separately, as to how we're going to protect

23    Mr. Adams.

24          THE COURT:  So we don't get too far afield here, what

25    I'd like to do is stay on the issue of whether these

1    disclosures are appropriate under Rule 16.  And so far, I

2    don't think your disclosure is appropriate.

3         So let me go on to the next one, the disclosure filed

4    on behalf of Jones and Thompson.  Two people are listed, James

5    Lewis and Kathryn Gabhart.  And again, there's information,

6    background information that's provided with respect to both

7    witnesses, and there's a general disclosure or discussion of

8    subject matter of the testimony, but there are no opinions

9    that are listed as to what these individuals are going to say

10   or basis for the opinions.  I've got the same problems with

11   these two witnesses as I did with Mr. Gravitt.

12        MR. WHITE:  Yes, Your Honor.  And, in fact, no

13   opinions have been disclosed, because neither will be

14   testifying to opinions.  In fact, I was back and forth as to

15   whether even any disclosure was required under Federal

16   Rule 702.  I erred on the side of disclosure, because the rule

17   says that if a witness with specialized knowledge will assist

18   the trier of fact to understand the evidence, and I'm skipping

19   over the next phrase, a witness qualified as an expert by

20   knowledge, skill, experience, training or education may

21   testify thereto in the form of an opinion or otherwise.

22        It's the "otherwise" that we're focused on.  What

23   these two witnesses are going to testify to, Your Honor, is

24   basically, one of the things that had been put at issue in

25   this case are the selection of election officers; that is, the

1   folks who work in the precincts as well as how the county

2   party commissioners and County Board of Election are chosen,

3   and then how certain reporting requirements occur, how certain

4   documents are maintained.  And so what I did not see in the

5   United States' case was any witness that was going to provide

6   that context.

7          In fact, the three times -- I'm sorry, two times that

8   I've examined Special Agent Briggs, on both occasions, my

9   recollection is he testified he had a general understanding of

10  Kentucky election law but not specifics.  In fact, when I

11  tried to go into some specifics, he just was not sure.  That

12  had to deal with primarily how certain precinct officers were

13  proposed to the County Board of Election.

14         So these two witnesses are going to be offered just

15  to provide that context.  So I think our notice is sufficient

16  in that respect, and I would also add that in interviewing

17  Miss Gabhart, the moment we -- within a week of interviewing

18  Miss Gabhart and Mr. Lewis, we went ahead and gave notice to

19  the United States.  I did that by e-mail, quite frankly, Your

20  Honor.  I thought that was an appropriate notice.  I've never

21  filed notices before.  But when everyone else started, I did

22  as well.

23         THE COURT:  Let me ask you this.  Have you provided

24  information to the United States, in addition to what you set

25  out here in this pleading, that would state, for example, the

1    opinions to be expressed and basis for those opinions?  And if

2    you're relying upon statutes or regulations, have you

3    identified those statutes and regulations?

4              MR. WHITE:  No, Your Honor, but we're not going to

5    offer any opinion testimony.

6              THE COURT:  Well, see, I think you are, because I

7    think what you've listed here by both witnesses would be

8    opinion testimony.  If they're going to testify about matters

9    that are not related directly to the facts of the case, but

10   just generally how you select officers in the Kentucky,

11   whatever it may be, that would be in the nature of opinion

12   testimony so you would need to comply with Rule 16.

13             Let me move on to the next defendant here.  Actually,

14   there are two that are filed on behalf of Debra Morris, and

15   then I believe Mr. Morris joined in with one of those

16   witnesses.  Let's go to proposed witness Stephan Charles

17   first.  I think he's been designated on behalf of Mrs. Morris

18   only; is that correct?

19             MS. HUGHES:  That's correct, Your Honor.

20             THE COURT:  All right.  Now, I understand that you

21   would like Mr. Charles to testify about a prenup and the

22   effect of the prenup under Kentucky law --

23             MS. HUGHES:  That's correct.

24             THE COURT:  -- correct?  Now, I recall that Mr.

25   Charles attempted to appear as counsel at some point for some

1    party in this case and was disqualified by the magistrate

2    judge.  I have an issue whether a person disqualified as an

3    attorney participating in the case can come in and testify as

4    an expert witness is my first concern.

5        My second concern, I think Mr. Charles certainly

6    could testify about any prenup that he drafted, but wouldn't

7    the effect of any prenup, wouldn't that be the proper subject

8    of a jury instruction?

9        MS. HUGHES:  Well, as a matter of fact, Your Honor, I

10   would prefer a jury instruction.  Mr. Smith, as he said, we

11   spoke on the telephone about this.  Mr. Charles is primarily a

12   fact witness.  He prepared and can authenticate the prenuptial

13   agreement that was attached to the notice.  In an abundance of

14   caution, I did include the opinion evidence about -- or the

15   opinion testimony about, under KRS 403, the rights of the

16   parties.  But I recognize that the Court would probably not be

17   inclined to have a lawyer come on the stand and give opinion

18   testimony about what the law is, that that is, in fact, the

19   province of the Court.  So that being -- I just was trying to

20   be extra careful.

21       THE COURT:  I appreciate that.  There's a second area

22   that relates to general principles of corporate law.

23       MS. HUGHES:  Right.

24       THE COURT:  I assume you'd be able to provide a jury

25   instruction on that issue as well?

1          MS. HUGHES:  Yes.

2          THE COURT:  Rather than just general testimony from

3     the attorney about stock ownership?

4          MS. HUGHES:  I will get the appropriate authority

5     that evidence of ownership in a corporation is evidenced by

6     shares of stock.

7          THE COURT:  All right.  Now, the last witness is Mr.

8     Craft, and he is listed as perhaps testifying, providing

9     opinions concerning the financial records, income and business

10    practices of B&J Transfer, as well as enterprises of a similar

11    size in surrounding counties in southeastern Kentucky.  I have

12    the same problems with that proposed testimony, that it

13    doesn't state what the opinions are or the basis for the

14    opinions.

15         And then the second area he's expected to testify

16    about, ownership interest in the corporation, its treatment as

17    a taxable entity, its operation as a corporate entity, and

18    certain leases of the corporation, costs associated with the

19    production of revenue and the reasonableness of its earnings

20    and profits.

21         Mr. Gilbert, do you see my problem with this

22    designation?

23         MR. GILBERT:  I do, Your Honor, but one of the

24    problems that we've had in the case is that with the

25    government's disclosure, we didn't receive their summary until

30

1    late Friday, the 22nd.  So when we received that information,

2    we forwarded that to Mr. Craft, and he is in the process of

3    going through that information and analyzing that information,

4    and so he's not prepared to give those opinions.  I was unable

5    to put that type of information in the motion at this time,

6    just because of the fact that we did not receive it until that

7    day.

8         THE COURT:  I appreciate that.  Thank you.

9         Well, this is what I'm going to do with respect to

10   these disclosures.  I think, as I've indicated through my

11   questions, the disclosures are incomplete.  They wouldn't

12   withstand a challenge under Rule 16.  What I'm going to do is

13   I'm going to give the parties until Monday to supplement their

14   disclosures, your expert witness disclosures, those of you

15   that have designated experts.  Two of you haven't.  Two of you

16   aren't required to do this because you didn't make the request

17   earlier.  I understand that.

18        But in the event you seek to call experts, please

19   understand that I may have to go through the same type of a

20   *Daubert* analysis before that type of opinion testimony could

21   begin.

22        So with respect to the six defendants -- well, I'm

23   sorry, Mr. Hoskins, you didn't file any expert information.

24   But with respect to the other defendants that we've discussed,

25   if you filed these notices, Rule 16 notices, you can have --

1   this will give you the weekend to work on this and to get

2   these supplements ready.  You can have until Monday to provide

3   supplementary information, and this would include the United

4   States' designation of experts or expert witnesses.

5           You can supplement your information by Monday of next

6   week, and I will schedule a hearing on Friday of next week,

7   which is the 12th, I believe, a *Daubert* hearing.  If there is

8   a challenge to the information that has been provided -- in

9   other words, if the parties believe that the information is

10  not sufficient under Rule 16 or that the witness is not

11  qualified to give an opinion as to those areas that have been

12  designated, then we will proceed with a *Daubert* hearing.  And

13  I think we have five witnesses, perhaps, or six.  Anyway,

14  we'll have a *Daubert* hearing on Friday.

15          So we will not be in session on Friday.  In the event

16  the parties work this out, get these issues worked out, then

17  that's going to give an additional day to review these other

18  files, Mr. Smith, that you may need to continue to review.

19          So what we'll plan to do then is we'll keep Friday

20  open of next week.  Parties can supplement by Monday of next

21  week, and we'll proceed from there.  I'm not going to strike

22  the designations at this time.  I think the Sixth Circuit has

23  indicated in the 2007 opinion the Court should consider other

24  alternatives other than striking expert testimony when there's

25  a deficiency in the notice that has been provided.  So I'm not

1   going to strike the witnesses from testifying in the case.

2          Any questions about expert issues?  Mr. Bayer?

3          MR. BAYER:  It's just a housekeeping measure, Judge,

4   help clarify things.

5          THE COURT:  Yes, sir.

6          MR. BAYER:  I don't want to be obstreperous, Judge.

7   During the course of testimony given by Special Agent Sagrecy,

8   there may come up topics which we're not prepared to provide

9   the Court a summary on by Monday.  In that case, would the

10  Court allow to us supplement our opinion?

11         THE COURT:  No.  This is your opportunity to

12  supplement.

13         MR. BAYER:  Because I don't know entirely what all

14  they're going to be --

15         THE COURT:  I think Sagrecy's opinions are adequately

16  set forth in the notice that has been provided.  If the United

17  States attempts to go beyond that by supplementing, then

18  that's a separate issue.  If the United States stays with the

19  information that's listed in their supplemental discovery

20  response, then I'm not going to keep opening this up for

21  further supplementation.  This is your chance to supplement,

22  because you didn't file proper information the first time.

23         So this is your chance.  Monday is your chance to

24  supplement.  You've told me through your oral responses that

25  you know what your expert's going to say.  You've already told

1    me that.  So I know you've got more information than you

2    disclosed to me.

3            MR. BAYER:  Thank you, Judge.

4            THE COURT:  Okay.

5            MR. WHITE:  Your Honor, may I?

6            THE COURT:  Yes, sir.

7            MR. WHITE:  Just real quick.  As I understood your

8    ruling and direction to us, you had indicated that the other

9    side, once we supplement on Monday, that the United States

10   then needs to let us know if they want a hearing on Friday.

11   Could we have a deadline for that?  The reason I ask is one of

12   my experts will be coming up from Heiden.  My other expert is

13   involved in the legislative session.  So I'm just trying to

14   work with their schedule.

15           THE COURT:  The government could advise -- I'm sorry,

16   the parties can advise the Court Tuesday morning, a week from

17   tomorrow, before we start, before the jury's brought in.  You

18   can advise me if anyone asks for a *Daubert* hearing, and that

19   way I'll know and everybody will know what we're dealing with.

20           MR. WHITE:  You want us just to let you know orally

21   in court when we convene Tuesday morning?

22           THE COURT:  That will be fine, before the jury's

23   brought in Tuesday morning.  That will let us know who needs

24   to be here, and that will give us sufficient time to get that

25   person or persons here to court.

1           MR. WHITE:  Thank you very much, Your Honor.

2           THE COURT:  All right.  Mr. Smith?

3           MR. SMITH:  Your Honor, I just anticipate that this

4    disclosure should be done by 5:00 p.m. on Monday, the 8th, or

5    is there going to be --

6           THE COURT:  That would be my preference, if we could

7    do that.

8           MR. SMITH:  Okay.

9           THE COURT:  Of course, we're going to be in session

10   Monday.  So I'm assuming, and what I wanted to do is I wanted

11   to give everyone the weekend to be able to work on this so

12   hopefully, most of this will be done before we get into trial

13   on Monday.  But yes, 5:00, and that will give you the night to

14   look this over and let me know Tuesday morning where we stand.

15          Ordinarily, I give the attorneys on morning of trial

16   a statement of the case and the preliminary jury instructions.

17   I have those finished and I'm going to hand those out when we

18   conclude the hearing.  We're not ready to conclude yet.  I'll

19   hand those out this afternoon so you can be looking over

20   those, and you'll have those for tomorrow.

21          In all likelihood, what I will do tomorrow after we

22   have selected the jury, and I don't know what time we'll

23   finish the process of selecting the jury, but before opening

24   statements are given, because of the length of this

25   indictment, I'm probably going to read it to the jury before

1    any opening statements begin.  It probably will take a good 30

2    minutes to do that.  So just be forewarned that that will take

3    some time.

4         Also, if the attorneys wish to question witnesses

5    from counsel table, if you stand up, you can do that.  Okay?

6    So you don't have to be moving around.  We tried to move the

7    tables a little bit so you've got a little more room, but let

8    me just tell everybody, the reason we don't move these tables,

9    we have to have I.S. people come in every time these wires are

10   turned loose.  So try not to move the tables.  There are

11   enough speakers that are on the tables that you can move those

12   around, and the monitors can be moved around a little bit.

13   Try not to move the tables because when you do that, you move

14   the wiring and it just messes everything up.  You can question

15   from counsel table if you want to do that, or you can use the

16   podium, certainly.

17        With respect to objections, let me just remind

18   everyone again, I hope that we don't have a ton of Bench

19   conferences in the case.  We won't be able to avoid some Bench

20   conferences.  But with respect to objections, I will remind

21   you not to make speaking objections, and I think everyone

22   knows what that is.  Don't argue your case through your

23   objections.  State the basis of an objection if you have one,

24   and I will rule on it.  If I don't understand your objection,

25   if I need to have a Bench conference, then we'll do that.  If

36

1    I need to excuse the jury, then we'll do that as well.

2         Also, I think I mentioned this earlier, but in terms

3    of talking with opposing counsel, there are times in the case

4    where you do need to confer with counsel to make sure that

5    your opposing counsel has received a document or that you have

6    the right document, things of that nature, but try to keep the

7    discussions and the banter to a minimum.  The one thing that I

8    don't want to see in the case is arguments back and forth in

9    front of the jury.  And so if you need to talk with counsel,

10   the best way to do is just to ask me if you could confer

11   briefly with counsel.

12        We've talked about moving in the courtroom.  With

13   respect to exhibits and other materials, the security officers

14   will provide the documents that you have, exhibits to the

15   witnesses to review.

16        The schedule we're going to follow.  We've already

17   talked about next Friday.  We will not be in session on

18   Friday, February 12th, for the reasons that have been stated,

19   in the event we do need to have the *Daubert* hearing or

20   hearings.

21        Also, I've been contacted by the Sixth Circuit.  Mr.

22   Pinales, I believe you have a hearing on the 5th of March in

23   the Sixth Circuit?

24        MR. PINALES:  Yes, Your Honor.

25        THE COURT:  I've advised the Circuit we will not be

37

1    in session on that day so you will not miss your argument.

2         MR. PINALES:  Thank you, Your Honor.

3         THE COURT:  Those are the two dates I know now we

4    will not be in session, February 12th and March 5th.  Both of

5    those are Fridays.

6         Jurors.  Has everyone received your jury information

7    packets?  Mr. Hoskins, you picked those up for all the

8    defendants?

9         MR. HOSKINS:  I picked up seven copies, Your Honor.

10   I distributed those to counsel.

11        THE COURT:  As I understand, the clerk is going to

12   call in first -- well, we're going to call in 90 jurors

13   tomorrow morning, and I believe we start with number 1 and

14   then we'll go through 135, I believe.  There are some that

15   have been excused previously so that should take us up through

16   90 jurors.  So we'll have 90 jurors here.  I wanted to make

17   sure you knew which section of the panel was being called in.

18        I have designated a couple of areas in the courtroom

19   for tomorrow morning.  One row in the very back of the

20   courtroom we'll use for friends and family members.  The other

21   row, I have to reserve for members of the press in the event

22   that we have members of the press here.  They will be seated

23   there as well.

24        I will ask you to speak to any friends or family

25   members that are going to be here and remind them that they

1    should not speak with jurors.  They should not speak with each

2    other in a tone or in a voice that's loud enough for jurors to

3    overhear the conversations.  That will not help.  Believe me,

4    that will not help if that occurs in the case.  We will have

5    the two rows that will be made available for tomorrow morning

6    for the jury selection.  And then after the jury is selected

7    and we don't need as much space in the courtroom, then, of

8    course, we won't have that problem.

9         One of the things that I try to do is I try to

10   restrict entry into the courtroom when the attorneys are

11   giving an opening statement, a closing argument or

12   cross-examining witnesses.  If you're standing up doing

13   something, you don't need a lot of disturbance in the

14   courtroom.  So I will ask friends and family members not to

15   come in and out of the courtroom when we're -- when a witness

16   is being questioned or when one of the attorneys is making a

17   statement, an opening statement or a closing argument.

18        I will allow the press to come in and to go out while

19   statements are being made, statements are being presented.  So

20   that's the only exception.  But with respect to friends and

21   family members and other people not directly associated with

22   the case, we will restrict access into the courtroom.

23        Any questions about any of the matters I've just gone

24   through?  Mr. Smith, anything on behalf of the United States?

25        MR. SMITH:  No, Your Honor.  I do have a couple of

39

1    other things when the Court has an opportunity.

2              THE COURT:  Yes, sir.  We can take those up.

3              MR. SMITH:  First of all, Your Honor, I had

4    intentions of maybe relying upon a couple of summary charts

5    that have been prepared, and I'll share those with counsel

6    after the hearing today in hopes that I could refer to those

7    in the opening statement.  If there's any objections to that,

8    we could obviously take that up, if the Court would allow,

9    before we begin the opening.

10             THE COURT:  Have those charts been shown to this

11   point?

12             MR. SMITH:  They have not.  They've been put on disk

13   or will be put on disks shortly for them to take home with

14   them.  And if there is an objection, maybe we can address that

15   at some point.

16             THE COURT:  If there's any objection to the

17   materials, we can take that up tomorrow morning at 8:30.  I

18   think we're scheduled to -- the attorneys will be present at

19   8:30, and then the jury to be brought in at 9:00.  So we can

20   add that to the list of matters to be taken up tomorrow.

21             MR. SMITH:  The only other thing, Your Honor, that I

22   know that we have had this issue come up a couple of times,

23   and I believe that the Court addressed it in the last motions

24   in limine regarding Ed Jordan, and I think there was some

25   communication in that tape where he indicated that he was kin

1   or thought he was kin to my family.

2          I don't expect that that's going to come up in this

3   case, but I would like the Court to address that issue before

4   the opening statement.  We don't believe there's any relevance

5   that's been shown whatsoever that he had the belief that he

6   was kin to me or my family in some way.

7          We've addressed that, I think, in pleadings in other

8   issues and how it's come up before the Court.  I would like to

9   go ahead and again finally dispose of that issue.

10         THE COURT:  All right.  Well, let me -- we'll see

11  here in just a moment if anyone's planning to raise that as an

12  issue.  Any other matters that you need to bring up, Mr.

13  Smith?

14         MR. SMITH:  Not at this time.

15         THE COURT:  Mr. Hoskins, do you have any

16  miscellaneous issues that you'd like to bring up?

17         MR. HOSKINS:  No, Your Honor.

18         THE COURT:  What is your position with respect to

19  this relationship with Mr. Jordan?  Are you planning to raise

20  that as an issue in trial?

21         MR. HOSKINS:  Judge, I'm not prepared to say that

22  it's not an issue at this point.

23         THE COURT:  What I'll do is it shouldn't be raised

24  until such time as you bring it up with me outside the

25  presence of the jury.  If you feel like it's going to be an

41

1    issue, then you need to raise it with me as quickly as

2    possible so we can address it.  If it's not going to be

3    raised, it's not an issue, all right?  Thank you.

4          Mr. Bayer, any other issues?

5          MR. BAYER:  I've got just a couple of housekeeping

6    things.

7          THE COURT:  Before you get to those, let me ask you

8    your position with respect to this relationship with Ed

9    Jordan.

10         MR. BAYER:  We don't intend to raise that during the

11   opening.  May go into it during the course of trial, but

12   certainly not during opening.

13         THE COURT:  All right.  What are your other issues?

14         MR. BAYER:  One is personal to me, Judge.  Due to

15   circumstances right now with my mother, I need some guidance

16   with the Court as far as whether or not you would allow me to

17   use chambers as an emergency telephone number?

18         THE COURT:  Yes.

19         MR. BAYER:  I didn't want to do that without

20   permission.

21         THE COURT:  That's fine.  You can certainly do that.

22         MR. BAYER:  We're not allowed to bring phones in.

23   That would be the only way they could get to me.

24         THE COURT:  That's fine.

25         MR. BAYER:  Secondly, when you're calling in the

1    jurors for *voir dire*, if you can help me understand how you're

2    going to configure the jurors so that we can keep track of

3    them.  Are you going to do it as a block of 90 people and I've

4    got to try to figure them out where they're sitting and so

5    forth?

6            THE COURT:  Pretty much.

7            MR. BAYER:  Okay.  I figured you were going to do

8    that.

9            THE COURT:  Here's the issue that we have.  To

10   expedite the jury selection, we really need to do this in one

11   block, as opposed to two separate groups.  We can fit

12   approximately 90 jurors in the courtroom.  We called in 90,

13   and we'll probably have a few that will not show up tomorrow.

14   So we're going to have between 80 and 85 jurors that will be

15   present for the jury selection.

16           We will put probably 14 to 16 up here in the jury

17   box, and the remainder will have to squeeze into the rear

18   portion of the courtroom.

19           As I go through *voir dire*, one of the things that I

20   do is I emphasize to potential jurors that every time they

21   answer, they need to give me their number.  Sometimes I'll

22   forget to do that, and I'll be reminded when I forget.  But I

23   will ask every time an answer is given, give me your juror

24   number.

25           We will have some people that will answer a lot, and

43

1    we will have some people that will never answer a question.

2        MR. BAYER:  I understand.

3        THE COURT:  But what we're going to have to do is

4    after I've gone through all these questions with the jury, I'm

5    going to need to go over challenges for cause.  I'll probably

6    have to excuse the jury to do that because it's not really

7    feasible to bring all of you up here to sidebar and have you

8    tell me the reasons that you think some juror should be

9    excused when we're squeezed in as tightly as we're going to be

10   squeezed in.

11       So we'll probably have to take a break while you go

12   through your challenges for cause.  Then when we come back,

13   I'm going to have to -- I'm going to ask the clerk to call 36

14   jurors from those that are not excused for cause.  So out of

15   the 90, minus a few, we're going to call 36, and we're going

16   to have to empty the box to do that.  The jury box will be

17   filled first.  So we are going to have people stuffed into the

18   back of the courtroom as we call 14 or 16 up here and after we

19   fill the jury box up, then we'll have to use two to three

20   rows, the first two or three rows.  So we have to move folks

21   around to do that.

22       So the clerk will call by number 36 jurors after

23   we've gone through challenges for cause.  We'll then have to

24   take another break.  I'll excuse everyone that's remaining,

25   that hasn't been excused already except those 36.  We'll have

44

1    to take another break while you exercise your preemptory

2    challenges.  When we come back, those 36 jurors will be back

3    in the courtroom and we'll call the first 16 that were called

4    but not stricken, and they'll be placed in the jury box and

5    they'll have two other chairs up here on my side of the box

6    for those.  We'll have four alternates total.  We'll have room

7    for 14 in the box.  We'll have two others.  Then we'll have

8    the 16 that will be seated for the trial.

9        Again, I do want to remind everyone that I'm not

10   going to designate the alternates until the end of the case,

11   so jurors are not going to know who is -- we're not going to

12   know who are the alternates until the end of the case.  Does

13   that help to answer the question?

14        MR. BAYER:  Yes, sir.  Generally what I like to do

15   during *voir dire* is keep a chart.  Doesn't sound like I'll be

16   able to do that here.

17        THE COURT:  When we take breaks, I tell everybody to

18   sit in the same place.

19        MR. BAYER:  Can't guarantee it.

20        THE COURT:  We have to call the numbers.  Every time

21   we take a break, we have to call the numbers to make sure the

22   someone hasn't escaped for us.

23        MR. BAYER:  If the Court would allow us spending some

24   time to write down the information.  Couple other little

25   things.  I guess will we be responsible for putting the

1    correct name up in front of us, or do we have the marshals do

2    that?

3            THE COURT:  Well, those name tags, I guess we'll call

4    it, name plates are really for me and for the court reporter

5    more than anything else, and hopefully she'll learn everyone's

6    name as we proceed to trial.  But if you want to switch that;

7    for example, if you need to be out for a while, we talked

8    about that issue earlier.  And if you want to have another

9    name up there, Mr. Westberry, for example, I think his name is

10   actually under yours.

11           MR. BAYER:  I'll probably tee him up first, then.

12           THE COURT:  The problem is you'll have to get a

13   security officer to help you do that.  If you lift that glass,

14   if you don't lift it from both sides, it's going to split down

15   the middle.

16           MR. BAYER:  I'll have somebody do it.

17           THE COURT:  That's the only problem.  It's very

18   heavy.

19           MR. BAYER:  The last housekeeping measure.  I've

20   asked the Court about this.  We're intending to use a

21   PowerPoint presentation during the course of opening.  We

22   wanted to clarify with the Court and let the Court know that.

23   I believe we've gone through the with the I.T. people in the

24   court to do that.  We don't anticipate doing any submission of

25   exhibits during the course of the PowerPoint.  We're following

46

1    the Court's instructions on that.  But we will be using a

2    PowerPoint, if that's acceptable.

3          THE COURT:  It would essentially be the statements

4    you're making, you're just going to put up a summary?

5          MR. WESTBERRY:  Identifies the witnesses by name that

6    may or may not be called.  After we recess today, Judge, can I

7    stick around and do a dry run myself?

8          THE COURT:  Yes, certainly.

9          MR. BAYER:  Thank you, Judge.

10          THE COURT:  All right.  Thank you.

11          MR. WHITE:  Your Honor, just a couple things.  First

12    of all, I will not be mentioning Mr. Smith's situation during

13    opening.  I'll reserve as well.

14          Just two quick housekeeping.  One, I have not made a

15    decision whether to reserve opening.  When would the Court

16    like me to inform it?

17          THE COURT:  Tomorrow morning, when we meet at 8:30.

18    That would be sufficient.  If you plan to reserve, you can let

19    me know at that time.  That way, I don't give the jury the

20    wrong information when I ask you to go ahead with your opening

21    statement and you decide you don't want to do that.

22          MR. WHITE:  Thank you, Your Honor.  That's all I

23    have.  Thank you.

24          MR. ABELL:  Judge, I don't have any housekeeping

25    issues or anything to discuss with you now.  I understand the

47

1    Court's admonition regarding Mr. Jordan.

2         THE COURT:  All right.  Thank you.  Mr. Baldani?

3         MR. BALDANI:  Very briefly, Judge.  We don't have any

4    intention getting into what I call the Jordan situation, but I

5    do have a question.  You talked about who can come in and out.

6    We mentioned to you, those of us fortunate enough to have

7    co-counsel, if I'm not -- if I'm talking to a witness or doing

8    something else, can I come in as a witness is testifying, or

9    do you want the attorneys to wait until a break in the action?

10        THE COURT:  No.  What I meant -- if I didn't say this

11   clearly, I apologize.  What I meant to convey is that that

12   rule doesn't apply to the attorneys.  For example, the United

13   States will have someone assisting with documents and other

14   things and she may need to leave the courtroom to get other

15   materials, and I understand that you all may need to do the

16   same thing with co-counsel.

17        What I'm referring to are people that are friends,

18   family members, other people that have an interest in the

19   case.  What I'm trying to do is I'm trying to prevent -- I'm

20   trying to allow you to present your case without a lot of

21   interruption.

22        MR. BALDANI:  I understand.

23        THE COURT:  And it works both ways in the case, for

24   both the government and for the defendants to be able to do

25   that.  So I try to cut that down as much as I can.  But some

1    folks feel like it's their right to come in and out as they

2    please, into the courtroom, and I try to make some adjustments

3    for that.  But I do ask you, if it's friends, family members,

4    other people that just want to come over and observe, that we

5    do need to have some limitations.  So I just ask you to remind

6    folks of that.  If you do have people in that situation that

7    are going to be coming and going, just remind them that's what

8    the limitations are.

9         MR. BALDANI:  Okay.  One other question, Judge.  When

10   we talked about time limits for openings, you inquired if 40

11   minutes would be enough.  At that time, we had just received

12   quite a bit of Jencks material, and I said it was hard to say

13   at that point.  Actually, my co-counsel is going to do the

14   opening, but my question is, are we strictly limited as in

15   once 40 minutes comes, we're off, or do we have a little bit

16   of leeway?

17        THE COURT:  Generally what I'll do in openings is

18   I'll give you a little bit of leeway.  As you get close to the

19   40 minutes, I'm likely to say Mr. Baldani or whoever, you've

20   got a couple of minutes left in your opening.  And if you take

21   a couple minutes and it looks like to me that you're not

22   concluding, then I may remind you again that your time is

23   about up.  So I give you a little bit of leeway, but if you go

24   over too much, then we have to have some limitations.  So if

25   you go over too much, I will cut you off.  But I'll give you a

1    warning before I do that.

2            MR. BALDANI:  That's all the questions I have.

3            THE COURT:  Is that helpful?

4            MR. BALDANI:  It is, thanks.

5            THE COURT:  Mr. Gilbert?

6            MR. GILBERT:  I understand the Jordan admonition,

7    Your Honor, and I have nothing to take up.

8            THE COURT:  Thank you.

9            MS. HUGHES:  I also, Your Honor, understand.  This

10   won't come up for a couple of days.  Mr. Simons and I cannot

11   see the witness because of that computer screen from where

12   we're seated.  And it was problematic when we had the 404(b)

13   hearing so just maybe ask Court security or somebody to move

14   that around once we start?

15           THE COURT:  Yes, I do recall that was a problem.

16   When we moved it to the side -- Mr. Simons, you're there on

17   the end -- were you able to see when we moved it at the last

18   hearing?

19           MR. SIMONS:  Your Honor, if I scoot over close to

20   Elizabeth, I can see pretty well.

21           THE COURT:  Sounds like an ulterior motive to me, but

22   if that's your excuse, you can stick to it, okay?  All right.

23   We will make sure -- if you have a problem, just let me know.

24   You don't have to make a big issue of it, but just let me know

25   and I'll make sure we move the screen around.  There's going

1    to be a time when the witness is going to have to look at the

2    screen to look at a document or whatever that may be showing

3    on it.

4        MR. SIMONS:  I understand.

5        THE COURT:  And if you need to move, of course, you

6    can get up and move down or stand up and move down.  You don't

7    need permission to do that.

8        MR. SIMONS:  I understand.

9        THE COURT:  We'll try to make sure you can see the

10   witness while he or she is testifying.  We've gone around one

11   time.  Let's see if any of the questions raised by the

12   attorneys engendered any questions by anyone else.  We in good

13   shape till tomorrow morning?

14       All right.  Tomorrow morning, the jury is expected to

15   be here at 8:00.  We will have a bottleneck at the front door.

16   It may take the jury longer than we anticipate to get them

17   into the building and get them checked in, but we will start

18   at 8:30.  And the jury, hopefully, will be ready to go by

19   9:00, but it may take a few extra minutes the first day

20   because of cell phones and other issues that we have to deal

21   with when we have a group of jurors that are coming in.

22       The clerk advises me she has an updated list for our

23   jurors she'll be giving you when we finish here as well.

24       One other matter.  After I finish *voir dire*, the list

25   of questions that I have to go over with the jury, I will be

1    asking the attorneys if they have any additional questions

2    they would like me to ask based on either what I've asked or

3    any responses that have been given.  And I'll certainly

4    consider anything that I think is a reasonable request, if I

5    need to follow up or supplement any of my questions.  But it

6    doesn't mean that you can come up with an additional list of

7    eight or ten pages of questions to try to start the process

8    anew.  It really is supplementary at that point.  I've

9    certainly considered all of the questions that everyone

10   submitted for me to include in my list of questions.

11           But if there are, again, if there are supplements,

12   then I'll certainly ask you at that point to advise me of any

13   additional questions you'd like me to ask.  All right?

14           Counsel, thank you for being here this afternoon, and

15   we will see you tomorrow morning.  If there's nothing else to

16   take up, we'll be in recess until 8:30 tomorrow morning.

17           (Proceedings concluded at 3:06 p.m.)

18                           - - -

19                   C E R T I F I C A T E

20           I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
21   proceedings in the above-entitled case.

22

23    \s\ Lisa Reed Wiesman                April 27, 2010
     LISA REED WIESMAN, RDR-CRR           Date of Certification
24   Official Court Reporter

25