United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 7, 2011 |
| DOUGLAS C. ADAMS | ) 8:58 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) |
| STANLEY BOWLING | ) |

TRANSCRIPT OF HEARING ON OBJECTIONS
TO PRESENTENCE REPORT
BEFORE THE HONORABLE DANNY C. REEVES

Appearances of Counsel:

On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                   JASON D. PARMAN, ESQ.

On behalf of the Defendant         DAVID S. HOSKINS, ESQ.
Russell Cletus Maricle:            MARTIN S. PINALES, ESQ.

On behalf of the Defendant         R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                  KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant         T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant         ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant         RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:

On behalf of the Defendant         JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant         ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant         DANIEL A. SIMONS, ESQ.
Stanley Bowling:                   JASON R. BARCLAY, ESQ.

1   Appearances of Counsel:

2   On behalf of the United States:   STEPHEN C. SMITH, ESQ.
                                      JASON D. PARMAN, ESQ.
3                                     Assistant U.S. Attorneys
                                      601 Meyers Baker Road
4                                     Suite 200
                                      London, Kentucky  40741
5

6   On behalf of the Defendant        DAVID S. HOSKINS, ESQ.
    Russell Cletus Maricle:           P.O. Box 1185
7                                      Corbin, Kentucky  40702

8                                      MARTIN S. PINALES, ESQ.
                                       150 East Fourth Street
9                                      Federal Reserve Building
                                       Cincinnati, Ohio  45202
10

11  On Behalf of the Defendant        R. KENT WESTBERRY, ESQ.
    Douglas C. Adams:                 KRISTEN N. LOGAN, ESQ.
12                                     220 West Main Street
                                       Suite 1900
13                                     Louisville, Kentucky  40202

14
    On behalf of the Defendant        T. SCOTT WHITE, ESQ.
15  Charles Wayne Jones:              133 West Short Street
                                       Lexington, Kentucky  40507
16

17  On behalf of the Defendant        ROBERT L. ABELL, ESQ.
    William E. Stivers:               120 North Upper Street
18                                     Lexington, Kentucky  40507

19
    On behalf of the Defendant        RUSSELL JAMES BALDANI, ESQ.
20  Freddy W. Thompson:               300 West Short Street
                                       Lexington, Kentucky  40507
21

22  On behalf of the Defendant        JERRY W. GILBERT, ESQ.
    William B. Morris:                212 North Second Street
23                                     Richmond, Kentucky  40475

24
    On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
25  Debra L. Morris:                  201 West Short Street
                                       Lexington, Kentucky  40507

1

2  On behalf of the Defendant              JASON R. BARCLAY, ESQ.
   Stanley Bowling:                        11 South Meridan Street
3                                          Indianapolis, Indiana   46204

4                                          DANIEL A. SIMONS, ESQ.
                                           116 West Main Street
5                                          Suite 2A
                                           Richmond, Kentucky   40475
6
   Court Reporter:                         CYNTHIA A. OAKES, CRR
7                                          Official Court Reporter
                                           United States District Court
8                                          560 Athens Boonesboro Road
                                           Winchester, Kentucky   40391
9                                          (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Proceedings recorded by mechanical stenography,
    transcript produced by computer.

1          THE COURT:  Thank you.  And good morning, everyone.

2          Madam Clerk, if you could call the matter scheduled

3    for 9:00, please.

4          THE CLERK:  Yes, Your Honor.  London Criminal Action

5    No. 09-16, United States of America v. Russell Cletus Maricle,

6    Douglas C. Adams, Charles Wayne Jones, William E. Stivers, also

7    known as Al Man, Freddy W. Thompson, William B. Morris also

8    known as Bart, Debra L. Morris, also known as Debbie, and

9    Stanley Bowling, these matters being called for hearing on

10   objections to the PSR, Your Honor.

11         THE COURT:  Thank you.

12         Let's go around and have counsel state their

13   appearances.  Mr. Smith, we'll start with you.

14         MR. SMITH:  Good morning, Your Honor.  Steven Smith,

15   I'll be representing the United States.  And accompanying me

16   also is Jason Parman.

17         THE COURT:  All right.  Thank you.

18         Mr. Hoskins.

19         MR. HOSKINS:  David Hoskins for the defendant, Russell

20   Cletus Maricle.  Also seated with me is Mr. Pinales.

21         THE COURT:  All right.  Thank you.

22         DEFENDANT MARICLE:  Your Honor, I will be appearing

23   today and I have a motion that needs to be heard before anything

24   else, motion for U.S. qualification.

25         THE COURT:  All right.  We'll get to that in just a

1    moment.

2            Mr. Westberry and Ms. Logan.

3            MS. LOGAN:  Good morning, Your Honor.  Kristen Logan

4    and Kent Westberry for Douglas C. Adams.

5            THE COURT:  Thank you.

6            MR. WHITE:  Good morning, Your Honor.  Scott White on

7    behalf of Charles Wayne Jones.

8            THE COURT:  Thank you.

9            Mr. Abell.

10           MR. ABELL:  Judge, Robert Abell on behalf of William

11   Stivers.

12           THE COURT:  Thank you.

13           MR. BALDANI:  May it please the Court, Russ Baldani,

14   Judge.  I'm here for Freddy Thompson.

15           THE COURT:  Thank you.

16           MR. GILBERT:  Your Honor, Jerry Gilbert on behalf of

17   William Bart Morris.

18           THE COURT:  All right.  Thank you.

19           Ms. Hughes.

20           MS. HUGHES:  Elizabeth Hughes on behalf of Debra L.

21   Morris.

22           THE COURT:  Thank you.

23           MR. BARCLAY:  Good morning, Your Honor.  Dan Simons

24   and Jason Barclay for Mr. Bowling.

25           THE COURT:  All right.  Thank you.

1          All right.  All parties are present and represented by

2  counsel.

3          Let's see.  Mr. Hoskins, you want to proceed on the

4  motion that your client wishes to make.

5          MR. HOSKINS:  Your Honor, I think Mr. Maricle has —

6          DEFENDANT MARICLE:  I will be appearing pro se for

7  that motion.

8          THE COURT:  I'm sorry?

9          DEFENDANT MARICLE:  I will be appearing pro se on that

10  motion and I'm ready for the hearing.

11          THE COURT:  Well, I believe inasmuch as you're

12  represented by counsel in the case that you'll need to present

13  that through counsel.

14          DEFENDANT MARICLE:  Your Honor, I believe that I have

15  a constitutional right to appear on my own behalf.

16          THE COURT:  If you waive counsel.

17          DEFENDANT MARICLE:  Your Honor, I would object to

18  that.  I think that only applies —

19          THE COURT:  Objection's overruled.

20          DEFENDANT MARICLE:  All right.  Then I'll represent

21  myself and Mr. Hoskins and Mr. Pinales will be excused.

22          THE COURT:  Very well.  We'll hear from you at this

23  time.

24          DEFENDANT MARICLE:  At this time, Your Honor, I would

25  like to file a memorandum in support of my affidavit and

1  objection to you proceeding as the judge in this case because of

2  the demonstrated hostility, bias, and prejudice that you have

3  shown for the defendants and the alignment that you have made

4  with the United States in this case.

5          I have a memorandum and an affidavit for the Court's

6  consideration.

7          THE COURT:  Very well.  You can pass it up.

8          DEFENDANT MARICLE:  And if I may proceed now, I'll

9  make my argument, or if you want to review it and then make my

10 argument, either way.

11         THE COURT:  Let me look over it first.

12         Mr. Maricle, you may proceed.

13         DEFENDANT MARICLE:  There's several things that I

14 think need to be brought out in this particular matter that are

15 of grave concern to me and should be of concern to everyone

16 here, quite frankly, Your Honor.  The *Anderson* case sets forth

17 the rule I think that has to be followed in this matter

18 regarding the hostility of the Court and the alignment of the

19 Court with the United States that has been demonstrated in this

20 case.  I want to briefly go through those things, and then I'm

21 going to come back and concentrate on one thing which I think is

22 most vital to this particular motion and most vital to what's

23 about to happen here today.

24         The hostility that was demonstrated by the Court

25 involved, first of all, your statement in the record that I shot

1   someone in admonishing Mr. White what he could say and couldn't

2   say.  You made the statement that I shot someone.  Then you also

3   made the statement that Mr. Hoskins had done something improper,

4   that his mode of operation was that when he did something

5   improper he tried to attack someone else.

6           The fact is, at that point in time, Your Honor,

7   Mr. Hoskins had not done anything improper, and I would ask the

8   Court if he had to make specific findings of what those

9   improprieties were.  You told him it was not in good faith.  You

10  told him he was hiding the ball and his motion was not well

11  taken and it was under circumstances involving the witness where

12  we had to get a handwriting expert at the last minute after

13  Ms. White had testified to something we did not anticipate on

14  the stand.  You referred to him -- his actions as dilatory.  He

15  referred -- made a statement regarding a juror being asleep, you

16  never had a defendant object to a juror being asleep before.

17  That indicates to me, Your Honor, that you don't think that the

18  defendant wants the jury to hear what everybody has got to say.

19          You jumped on Mr. White at the beginning of the trial,

20  called him into chambers.  You gave Mr. Bayer - I don't believe

21  he's here today - a tongue lashing.  You referred to a culture

22  of corruption.  Your Honor, I need to speak just a little bit in

23  detail about that, because in that statement -- And I'm sure you

24  remember it because it's been brought to your attention several

25  times.  In that particular statement, you said nothing like this

1  happens at the local level unless the local people are turning

2  their head and the FBI comes in or the federal government comes

3  in.  And certainly the impression is left with what's happened

4  here that I think it's fair to say that everybody thinks that

5  person was me that you were referring to.  And it probably was.

6  But let's talk about that culture of corruption and who was at

7  fault.

8          Mr. Smith's cousin, Edd Jordan, was Kenny Day's

9  protection.  But what's more important, Your Honor, in that

10 culture of corruption is Mr. Day at all times was under

11 conditional release, he was under supervised conditional

12 release, supposedly subject to random drug samples, random

13 visits, and somebody, if it was the federal government, let the

14 ball out, they dropped the ball.  If anybody dropped the ball,

15 his probation officer dropped the ball, because they were the

16 ones that had a right to go there anytime to do a drug test, had

17 a right to go there anytime just to visit and see what was going

18 on.

19          Then we come to the themes of your alignment with the

20 United States, and I'll speak to several and I will end with the

21 last one.  First of all, the way you handled the transcripts.

22 You denied — you handled them in an ex-parte fashion.  You took

23 the transcripts that were prepared by the United States, which

24 were unattested at that time, should have been attested under

25 the case of *Robinson*, but you took those transcripts and you

1  compared what was on those transcripts to the clips that

2  Mr. Smith had submitted to you.  You never paid any attention to

3  the transcripts of the defendants.  You never compared them at

4  all.  You made the statement you weren't going to allow the

5  transcripts in when we had the hearing.  Then you did let the

6  transcripts in, you let them get their transcripts in by Kennon

7  White and Wanda White attesting them after the fact, after

8  you've gone through them, thereby making yourself a witness in

9  this case and you being the arbitrator as to what the facts

10  were.  We tried to get our transcripts in.  I testified and they

11  certainly should have been admitted.

12          The *Robinson* case does not hold for the proposition

13  that you can never submit two transcripts.  They didn't submit

14  the two transcripts in the *Robinson* case because both the

15  recordings were illegible.  And then it also made the comment

16  about you might have a problem with the right of counsel to

17  assert the Fifth Amendment.  Well, in this case I didn't assert

18  the Fifth Amendment.

19          Plus you never listened to the transcripts that we

20  submitted on the 14th of December, never read the transcripts

21  that we submitted to see if there was anything in those

22  transcripts that we wanted to use and we were asking to use that

23  wouldn't be admissible.  You just ruled them all out. You said,

24  I decided it would be too burdensome, it will be just more

25  insurmountable and it's inadmissible.  You never heard those,

1   Your Honor.

2          Then we thought we were going to have a hearing on

3   December 22nd.  We prepared for that.  We had for several months

4   exchanged transcripts with the United States numerous times in

5   trying to arrive at what the correct transcription was.  Set

6   aside a two-day hearing, which that was the appropriate thing to

7   do.  Well, then we had the hearing, everybody present and

8   everybody heard and everybody had their input.  But when we got

9   here, the hearing was aborted.  There was no hearing whatsoever.

10  You already had an ex-parte situation in chambers where you read

11  what Mr. White had to say.  We think we should have had an

12  opportunity to have presented our transcripts to go to the jury.

13         Then we filed a motion for a judicial

14  disqualification.  You scheduled a hearing.  No hearing was had.

15  When it changed from 11:00 to 3:00, the hearing was cancelled on

16  one date and your order overruling the motion for

17  disqualification was entered the next day before our time to

18  even file a reply to the response.  And you relied upon what was

19  in the response of the United States in your opinion to which

20  there was a very good reply.  In fact, their reply was

21  erroneous.

22         We asked for a disqualification of Mr. Smith.  Well,

23  that went before Judge Wier.  We asked for an evidentiary

24  hearing on the face of that motion.  Magistrate Judge Wier

25  entered an order before our time —— immediately after the

1   response filed by the United States before our time to reply

2   finding we hadn't even asked for an evidentiary hearing, and it

3   was apparent on the face of the hearing, face of our motion,

4   that we wanted an evidentiary hearing.  Then when he did that,

5   we filed objections to it and asked for the Court to consider

6   it, and the Court never considered that, our objection.

7          At trial, on one occasion when it was — appeared that

8   Mr. Briggs was getting in bad trouble with his lack of knowledge

9   of Clay County and Clay County politics, everybody was at the

10  bench and you volunteered to give to the United States an

11  admonition to the jury that they didn't have to prove that all

12  supported the same candidate.  That was your admonition, Your

13  Honor.  The indictment in this case said "slate," it did not say

14  "slates."  And in essence, what we did was created a variance

15  allowing the United States of America to not meet the burden of

16  proof that they were required to submit.

17         Other instances – and I'll move fast on these – is the

18  way that the expert was handled.  You indicated that you

19  shouldn't have to have a hearing, a *Daubert* hearing, on

20  Mr. Sagrecy because you had had him in a previous case and

21  unless the United States filed an amendment to what he was going

22  to prove that there wouldn't be any necessity for having a

23  hearing.  I did request counsel to have a hearing, but they

24  didn't.  And the fact is Mr. Sagrecy got on the stand and

25  testified to something that Donna Brazile, James Carville, Mary

1    Matalin, or nobody could have testified to because he had
2    absolutely no political experience at all, he had nothing that
3    was shown, and I don't know care how much experience he had,
4    nobody can go back and say that somebody in 2006 would not have
5    had an opponent.  That is just — that is ridiculous.

6              Then the other thing was — another thing is always
7    referring to Kenny Day as a related case.  Kenny Day as a
8    related case.  I see no relation in the cases whatsoever, Your
9    Honor.  You found when we were questioning Mr. Day's credibility
10   that you had to be responsive to Mr. Hoskins.  That was not your
11   position, Your Honor, to be responsive to Mr. Hoskins, that was
12   Mr. Smith's position.

13             Now I come to the most serious matter in this case.
14   It deals with the background evidence.  And I have charts, you
15   can look at the charts that are in the memorandum, the affidavit
16   that I have filed, that shows what happened on the background
17   evidence.  And it's quite astonishing.

18             THE COURT:  I'm sorry, it's what?

19             DEFENDANT MARICLE:  It's quite astonishing what has
20   happened.

21             THE COURT:  Astonishing.

22             DEFENDANT MARICLE:  And I think all the other things
23   I've said support what I'm going to say with respect to this,
24   too.  Mr. Smith wrote in his December 30th memorandum, "In 1988
25   Cletus Maricle and Roy Morgan secured Kenny Day the appointment

1  as Republican Election Commissioner for Clay County Board of

2  Elections."  That was the allegation made.  Mr. Day did not

3  testify to that at trial.  Mr. Day's testimony at trial was he

4  was first approached by Roy Morgan.  But the Court, which

5  entered — it's in record 671 on January 21st, parroted the

6  language of Mr. Smith, "According to Day, in 1988 Maricle and

7  Roy Morgan secured for Day the appointment as Republican

8  Election Commissioner for the Clay County Board of Elections."

9  Surely there must be some explanation for that, because it's not

10  in what Mr. Day testified.  That record, I believe, is of the

11  hearing at 679, Your Honor.

12          But what makes it even worse on this particular one is

13  the statement that appears in the PSR.  And I think all PSRs

14  read basically the same except personal information.  And in

15  mine Senior Probation Officer Diane C. Bowling wrote, "In 1988

16  Maricle secured Day's appointment as Republican Election

17  Commissioner for the Board of Elections."  So it went from

18  Mr. Day saying he was approached by Roy Morgan to Mr. Smith and

19  you saying that Roy Morgan and Cletus Maricle secured the

20  appointment for Mr. Day to Ms. Bowling saying that I secured the

21  appointment for Mr. Day.

22          Even if we look to the testimony of Kenneth Day at

23  trial, he still says Roy Morgan was the one who talked to him

24  about being Republican Election Commissioner.  The fact of the

25  matter is, Your Honor, with all due respect, you made a false

1   finding on a material issue in this case, because the background

2   evidence was vital to this case.  I think it's evident by the

3   fact it was vital, because if you read Mr. Smith's memo, that's

4   basically what he says.  So what we have here is this is part of

5   what you used in order to justify background evidence, and it is

6   a false finding.

7          It does not stop there, though, Your Honor.  We'll go

8   to the next witness who was called, Mr. Eugene Lewis.  Again, I

9   will read, and that's chart number three, chart number three,

10  Smith wrote on December 30th, 2009, "Maricle and Jones brought

11  candidates to Lewis prior to elections, including Roy Morgan and

12  Freddy Thompson, with money to purchase votes."  Not so.  Eugene

13  Lewis never testified to that.  But you, Your Honor, two days

14  later wrote, "According to Lewis, Defendants Maricle and Jones

15  brought candidates to him, including Roy Morgan and Freddy

16  Thompson, prior to elections with money to purchase votes; a

17  parroting of what Mr. Smith said, not what Mr. Lewis testified.

18         Again, at trial Mr. Lewis's testimony is consistent

19  with what he testified on January the 19th.  And again, the

20  senior probation officer writes, "Maricle and Jones brought

21  candidates to Lewis prior to the election, including Roy Morgan

22  and Thompson, with money to purchase votes."  Again, not true, a

23  false finding.

24         Then we go to Mr. J.C. Lawson.  J.C. Lawson's

25  testimony, quite frankly, is quite confusing.  He testified he

1    contributed 8- or $9,000 to either Maricle or Gayle House, that

2    he gave it to Alan Roberts, the allegation of the United States

3    being that he gave the money to Alan Roberts.  But what bothers

4    me, Your Honor, is there's no allegation that I had Mr. Roberts

5    solicit money for Mr. Lawson.  That's not even alleged in the

6    pleadings filed by the United States of America.  But here's the

7    words you took:  "In other words, the assertion that Maricle had

8    Roberts solicit money from Lawson after the newspaper article

9    appeared in the Lexington Herald-Leader is allegedly relevant to

10   show Maricle's willingness to enlist the help of known drug

11   dealers in exchange for the protection and assistance that he

12   could provide."

13          As best I can discern from the record of Mr. Lawson's

14   testimony and from the PSR that I've got and the case number for

15   Mr. Lawson, which is a 1989 case, Mr. Lawson said he went to

16   jail in 1989 and he spent 24 months.  That puts him past the

17   election of 1990 between me and Mr. House.  He was in prison.

18   How did he get out of the penitentiary to make that

19   contribution?  He said in '89 he went to prison.  He said he

20   spent 24 months.  How did he get out of prison to make that?

21          Then we go back to the attempt to make contact or

22   forge connections between the three drug dealers that came in

23   here and testified and myself.  And I want, with respect to

24   Kenny Day, to submit to you that if you look at the record - and

25   this is chart number two, and I have it in a timeline, basically

1  a timeline – you will not find any connection between me and

2  Mr. Day past 1990, after 1990, other than one attempt to give

3  me, he said, $20,000 – I assume that that's what it was – and a

4  box of cigars, which I refused to accept.  In 1990 Mr. Day was

5  not a drug dealer.  Mr. Day testified he started dealing drugs

6  in '93, '94, or '95.  In 1990, he was not addicted to drugs, he

7  testified he became addicted in '95, '96, and '97 and he was

8  caught with drugs in '97.

9         With respect to Mr. Lewis, somewhat a similar

10  situation, and that will be chart number four.  Mr. Lewis says

11  he gave me a contribution, 2,000-dollar contribution, in 1990.

12  His testimony, at that time, was that he did not –– Let me read

13  just a minute.  He tried to keep his drug dealings secret, that

14  he didn't tell everybody he ran into about it, that he didn't

15  want everybody to know he was growing and selling marijuana,

16  that he was keeping his cocaine business secret and it was best

17  to keep anybody from knowing about.  Further testified that he

18  did not tell Maricle that the contribution was drug money and

19  Maricle probably had no way of knowing it.

20         I think he retired in 1994.  At trial he testified

21  that he tried to keep his drug business under wraps, that he

22  didn't make a big production about it, that he wanted to keep it

23  secret because that's the way little bitty fellows like me

24  operate, that he didn't want anybody to know that he was doing

25  something that could send him to prison, that he didn't want

1   Cletus Maricle to know that he was a drug dealer, that he never

2   said anything to Cletus Maricle about being involved with drugs,

3   that he never said anything to Cletus Maricle about any illegal

4   drug activity, and that when he got caught the first time —

5   when he got caught the first time, who knew about it was buying

6   and selling drugs with him and that he didn't think Cletus

7   Maricle suspected he was dealing drugs.  That was his testimony

8   at trial, Your Honor.  Of course, that was post filing of your

9   memorandum in here, but it is consistent with what he testified

10  at trial.

11          Mr. Lawson testified also and his testimony was that

12  he had had no contact with me politically, period, at all.

13          Your Honor, what the situation we face today, with the

14  background evidence being what it was, being a crucial part of

15  what the United States presented in this case, being vital to

16  their case, being, as he said, inextricably intertwined with

17  this case, which I submit is false, the problem that we face

18  today, Your Honor, is and that you face, these findings.

19  They're just not there.  You made findings that you parroted

20  from Mr. Smith, not from the evidence.

21          Now, what assurance today does Mr. Morris or

22  Ms. Morris or Mr. Bowling have over here the same thing is not

23  going to happen to them when this issue comes up about the

24  amount of money, what was debt and what was wasn't.  What

25  assurance do I have that the same is not going to happen to me

1    again?  We have to look at what the perception of the judiciary

2    is and what is going to be the perception of the people in here.

3    What is going to be their objective analysis.  Their objective

4    analysis, quite frankly, is, Your Honor, that you ought not be

5    the judge in this case.  There's three things that make an

6    objective analysis, and it's a violation of due process if it

7    shows that you're probably biased.

8             The second test is the one set forth and its

9    impartiality might reasonably be questioned.

10            The third one is set out in *United States v. Whitman*

11   by Justice Judge Siler in that case, and Mr. Siler, Judge Siler,

12   in sending the case back for reassignment noted that there had

13   been intemperance on the part of the judge and that there had

14   been nothing that appeared to have provoked him and, therefore,

15   that it should be reassigned.

16            But in that case, in the *Whitman* case, is what's the

17   assurance going to be.  What assurance do people sitting back

18   here today who are going to have hearings before you in July in

19   which you literally can take their property, what assurance have

20   they got this isn't going to happen again?  What assurance does

21   Mr. White have that he can turn around to his client, Mr. Jones,

22   and say, oh, well, this was just an accident?  What assurance

23   does the public have, Your Honor?  We have to look at this very

24   strictly.

25            Mr. Day testified in this case.  Mr. Day testified,

1    along with Mr. Lewis and Mr. Lawson.  At the hearing on January

2    the 19th, they didn't testify what the United States said they

3    were going to testify.  We have to look at what the people are

4    going to think that you reduced a man's sentence, a drug lord's

5    sentence, by 100 months, another drug dealer's by 44 months and

6    another one by 40 months, not on the basis of their testimony, I

7    submit, Your Honor, but on the basis of what you thought their

8    testimony was.  I ask that you recuse from this case so we can

9    have a fair trial.

10                THE COURT:  All right.  Thank you.

11                Before I ask for a response from the United States,

12   let me see if any of the other defendants wish to join in the

13   motion.

14                All right.  Mr. Smith, would you like to respond?

15                MR. SMITH:  Well, Your Honor, I just —— I believe that

16   what's been stated here before the Court is somewhat fabricated

17   in some instances, and I don't want to get into a factual

18   dispute with Mr. Maricle and what his recollection is of the

19   trial record.  I do know what the standard is for

20   disqualification for this, Judge.  It's not been met, it's not

21   been met even in a close showing.  We object to that.  If the

22   Court wants to engage in further discussion about what the

23   pretrial records said and compare that to the jury and what the

24   jury heard and whether a comment that this Court might have made

25   at a closed bench conference, you know, we can stand up here and

1   make — again, he's bringing facts from all different parts of

2   the record to try to assimilate some kind of argument that this

3   Court's biased, and I strongly object to that, I think that

4   that's not representative of the record.  We have a full copy of

5   the record and can brief it and supply this Court with

6   sufficient, I believe, rebuttal to all of these factual

7   allegations that have been made by Mr. Maricle.  And much of

8   what he says is not even supported at all in the record,

9   claiming, again, many things and relationships and connections

10  that just do not exist.

11          And so for me to be able to adequately I guess respond

12  to all these inaccurate factual assertions that are in 41 pages

13  of an affidavit he's filed here this morning, I would just — if

14  the Court would allow and sees a need for it, obviously we would

15  be glad to brief and respond to it, but I'm not going to be able

16  to at the spur of the moment at this time.

17          THE COURT:  All right.  Thank you.

18          In terms of the standard that's applied in a motion to

19  recuse, that standard is set forth in this Court's prior

20  memorandum opinion that was filed in this case in response to

21  motions to disqualify that were filed by, I believe —

22          Mr. Hoskins, I believe you filed a motion on behalf of

23  Mr. Maricle at one point; is that correct?

24          MR. HOSKINS:  Yes, Your Honor.

25          THE COURT:  And, Mr. White, I believe you filed one as

 1  well?

 2          MR. WHITE:  I did, Your Honor.

 3          MR. BALDANI:  We did, as well, on behalf of Freddy

 4  Thompson.

 5          THE COURT:  All right.  I took quite a bit of time in

 6  responding to that, drafted a memorandum opinion that outlines

 7  the relevant case law and cites the statutes that apply in the

 8  case.

 9          The current motion that's before the Court is a

10  frivolous motion.  It's based upon primarily rulings that this

11  Court made in the course of this judicial proceeding and, as the

12  cases indicate that were cited in that earlier opinion, that's

13  an insufficient basis for recusal.

14          As much as I would like to be able to hand this case

15  off to someone else, it would be improper for me to do so.

16  Simply put, sometimes when the only tool that you have is a

17  hammer, you see every problem as a nail, and that appears to be

18  what Mr. Maricle has done in this particular case by attempting

19  to attack the Court improperly for rulings that were made in

20  this particular case.  His remedy for the arguments that he's

21  made here today, although misguided and factually incorrect, is

22  a remedy of direct appeal to the United States Court of Appeals

23  for the Sixth Circuit.  The Court again will adopt the citations

24  to the various cases that are cited in the memorandum opinion,

25  as well as the statutory authority that's given in that opinion

1  as well, which sets out the basis for recusal that hasn't been

2  shown in this case.

3                DEFENDANT MARICLE:  May it please the Court?

4                THE COURT:  The motion is overruled.  At this point,

5  the Court —

6                DEFENDANT MARICLE:  I have another motion.

7                THE COURT:  What is your motion, Mr. Maricle?

8                DEFENDANT MARICLE:  My motion, Your Honor, would be as

9  to the matter involving the background evidence that you review

10  transcript 581, 671, 679, and determine that the facts that I

11  have set forth in my motion are true and correct and are not

12  contradicted by that record, despite what Mr. Smith said.

13                THE COURT:  That request will be denied.  This is not

14  the appropriate place to ask the Court to review information

15  with respect to rulings that were made during the course of the

16  trial.  If you want to raise those issues during your individual

17  sentencing hearing, you may certainly do so.  As a matter of

18  fact, if you wish to retain counsel in this case going forward

19  now that the Court has ruled on your motion, you can certainly

20  continue with your present counsel, and if you fail to do so or

21  if you refuse to do so, this Court would appoint Mr. Hoskins as

22  standby counsel to proceed in the sentencing proceeding.  So

23  that choice will be yours, Mr. Maricle, you can either proceed

24  pro se or you can proceed with standby counsel to assist you at

25  this point going forward.

1    All right.  Now, with respect to the reason that we're

2    here today, there were three issues that I identified that were

3    issues that the parties have raised that would affect all of the

4    sentencing proceedings.  The first issue that has been

5    identified is whether -- or the guideline section that applies

6    to calculate the base offense level for the defendants'

7    guideline calculations, whether 2C or 2H would apply in this

8    particular case.

9    Of course, there are two separate issues under this.

10   The first is whether that section applies, whether the predicate

11   offenses have been established in the case, whether the parties

12   wish to present any evidence on those predicate offenses.  If

13   two or more predicates are established such as bribery of a

14   public official, then 2C1.1 would apply.  Also, there's the

15   issue of extortion which has been outlined in the parties'

16   objections and the United States' sentencing memorandum.  If the

17   Court decides to apply Section 2C1.1, then the question would

18   become the enhancement under subsection (b)(2).

19   The other issue that the Court has raised -- or that

20   the parties have raised and the Court has noticed for today is

21   the issue of vulnerable victim.  The Probation Office has

22   determined that the vulnerable victim enhancement should not be

23   applied in this case.  The United States has objected to that,

24   and, of course, they may present evidence on that issue if they

25   wish to do so.

1          Mr. Smith, are you prepared to proceed on the first

2    issue, and that is whether Section 2C1.1 or 2H would apply?

3          THE COURT:  Yes, we are.

4          THE COURT:  All right.  Thank you.  You may proceed.

5          MR. SMITH:  Would the Court mind if I speak from

6    counsel table to access materials?

7          THE COURT:  That'll be fine.  Yes, sir.

8          MR. SMITH:  Thank you.

9          May it please the Court, Counsel.  We have — as the

10   Court has outlined the issue this morning, we have, of course,

11   an objection to the most recent presentence report, and that

12   objects to the application of 2C1.1.  We filed a brief which I

13   believe touches on the details of I guess our position, so I

14   want to briefly go to what I think is the crux of the matter,

15   Your Honor.

16         THE COURT:  Before you do that, do you plan to present

17   any additional testimony or are you relying upon testimony at

18   trial?

19         MR. SMITH:  We'll be relying upon testimony at trial

20   for our argument, Your Honor.

21         THE COURT:  All right.

22         MR. SMITH:  I believe that the Court has already set

23   forth what the standard is, it's a preponderance of the evidence

24   standard.  The Court has also identified that we can — and I

25   believe the Sixth Circuit endorses the fact that the *Skillings*

1    decision resulted in a dismissal of some counts and the
2    attempted extortion was later dismissed does not, again,
3    prohibit or prevent the Court from looking at uncharged conduct.
4    The case law supports that.
5           The question is, then, what is the uncharged conduct
6    and whether or not that would qualify under 1961 as a RICO
7    predicate offense.  It's the United States' position, Your
8    Honor, that we could look at — we laid out several offense
9    conduct patterns and relationships that we thought should be
10   included in the offense conduct.  But I would like to give the
11   Court this morning what I believe to be the strong, forthright
12   presentation of what was presented at trial and ask the Court to
13   consider that as a basis for 2C1.1 application.
14          Essentially, Your Honor, we argued to this jury, we
15   argued to this Court, that this vote buying scheme could not
16   exist without the assistance of the elections officers inside.
17   In fact, that's what Cletus Maricle told Kennon White, because
18   he testified that you could have the money that you want,
19   Kennon, but without the election officers you can't control
20   these elections in our county.  And so that was the crux, the
21   pendulum which, again, had to be in place in order for this to
22   actively participate as a scheme and racketeering enterprise.
23          The record supports there were three key players,
24   three key players, Wanda White, Charles "Dobber" Weaver, and
25   Jeff Farmer.  These spanned elections from 2002 through 2006.

27

1   And in each of these occasions, the record will support that
2   they were offered jobs in order to induce them or solicit them
3   to engage in this illegal activity.  We cited to the record, the
4   transcripts and portions of the transcripts, in our memo, which,
5   again, we believe supports that fact.
6          We look at Wanda White.  Wanda White, I think,
7   specifically testified at trial and her testimony, I believe
8   that it supported clearly that Cletus Maricle was the person who
9   approached her, and, again, it was her testimony and also the
10  testimony of her husband that they were induced by the promise
11  of a job.  Cletus Maricle led them to believe that he had
12  control over a drug court job and that it was her job if she
13  would help him in perpetuating a scheme to steal votes and also
14  to continue where possible to buy votes and mark the voters for
15  purposes of facilitating the scheme.  Again, an essential part
16  of this operation, this scheme, was to have control of the
17  election officer.  And it wasn't just to have one, because you
18  had to have access to the polling place.  You had to have access
19  to the polling place.
20         And the only two officers, as the evidence supported,
21  that had access to that particular place was your Democrat judge
22  and your Republican judge.  So it was important that at the
23  Manchester precinct, for instance, that we had Charles "Dobber"
24  Weaver appointed, because, again, he was approached early on,
25  and again with the promise of a job, emergency management job.

1   If you will do this, you will have the emergency management job

2   in effect, I would argue.  And so Charles "Dobber" Weaver agrees

3   to act as the operative on the Republican side.  And so we have

4   both the Democrat and Republican.  And as we argued, it's the

5   fox guarding the henhouse.  We have complete control now over

6   that position, over that polling place.  And why is that

7   important?  Because we're going to steal votes and we're going

8   to buy votes when we can.

9          A similar circumstance occurred with Jeff Farmer.

10  Jeff Farmer was, again, promised a job by Doug Adams, a school

11  board job.  Took up residence with the Stivers during the days

12  and weeks leading up to the election, and he was put in the

13  position at the Horse Creek precinct for what?  For a Democrat

14  election challenger.  That's important because, again, that

15  provided them access to that polling place.

16         THE COURT:  Well, but a challenger doesn't really fit

17  within the definition of a public servant under KRS 521.010,

18  does he?

19         MR. SMITH:  Well, let's take a closer look at the

20  definition, Your Honor.  I believe that in terms of what KRS

21  521.010(1)(a) defines a public servant as any public officer or

22  employee of state or any political subdivision.  He is by

23  statute, under KRS Chapter 117, it is a statutory created

24  position, one in which a political subdivision has control over

25  and is the entity in which the legislature gives the authority

29

1   to appoint such a person.

2           THE COURT:  Well, what is he or she able to do as a

3   challenger within the precinct?  My understanding of a

4   challenger is that they really can't take any official action

5   inside the precinct.

6           MR. SMITH:  Well, it gives them access to the polling

7   place, and here's why, here's what I base that upon:  The

8   election challenger is there for purposes —— under the statute,

9   was to give them the right and authority to challenge the

10  eligibility of a voter.  If a voter comes in and lists a

11  residence at Goose Rock and you know he lives at Pigeon Roost,

12  you got an argument, the challenger can make that argument as to

13  whether or not the voter is qualified.  Where does that put that

14  person?  That puts the person at the polling place.

15      Now, the difference in 2002 is, is that we did not have the

16  election vote stealing going on.  That was not necessary.  It

17  was wide open.  The Attorney General's Office said, based on the

18  statistics and the reports of abuse of the polling place, we

19  have testimony that Jennings White had control over the Horse

20  Creek precinct.  What was going on was, again, there was a

21  battle within this racketeering enterprise as to who's going to

22  get control over the Horse Creek precinct during the 2002

23  election.

24      Jeff Farmer testified that in order to try to combat what

25  Jennings White was doing, which he had the election officers

1   inside doing, they put him as a Democrat challenger because

2   that's the only way they could get somebody at the polling

3   place.  And he said while he was there, he bought votes wide

4   open for the Doug Adams faction and warred against the Jennings

5   White faction until he was arrested by the sheriff and taken

6   from the polls.

7              THE COURT:  Do you have the specific reference to his

8   testimony where he said that?

9              MR. SMITH:  Docket Entry No. 875, Your Honor.  I have

10  quoted from page 161 beginning there where, again, he talks

11  about the inducement, which was the job.  I certainly can access

12  the subsequent pages in which his testimony I believe would

13  support that.  I don't have that in front of me at this moment.

14             THE COURT:  All right.  But you believe it begins at

15  161?

16             MR. SMITH:  Yes.

17             THE COURT:  As opposed to 134 and 135?  134 and 135 is

18  the reference that's contained in the addendum to the

19  presentence reports.

20             MR. SMITH:  Okay.  It appears that there was

21  clarification about his promise of a job in the redirect

22  testimony on page 161.  So Your Honor is correct, it would have

23  been during his direct testimony that he gave the details of

24  which he was placed at the Horse Creek precinct.

25             THE COURT:  All right.

1          MR. SMITH:  Your Honor, the argument could be made,

2    again, whether or not he's a public servant of KRS Section

3    521.010.  We believe that it is a broad definition, one in which

4    includes not only people who are employed and getting a check

5    from the government, but also any employee of the state or any

6    political subdivision.  And we don't have any evidence that Jeff

7    Farmer received a salary as a Democrat election challenger and

8    we don't believe that it requires that under the definition.

9    Political subdivisions very rarely give salaries within the

10   positions that they establish in the political hierarchy.

11   Unless you go to a national chairmanship, you rarely see

12   someone — and so I think the legislature clearly intended to go

13   beyond just the heads of political parties in defining it in the

14   way in which they have.

15          THE COURT:   to this particular predicate offense — I

16   know some of the defendants have argued that some of these

17   predicate offenses wouldn't constitute a RICO predicate offense,

18   but with respect to KRS 521.020, bribery of a public servant,

19   with respect to all of the defendants except Defendant Adams,

20   you rely upon the testimony of Wanda White and Dobber Weaver to

21   establish that predicate act, and with respect to Defendant

22   Adams, you're relying upon the testimony of Jeff Farmer;

23   correct?

24          MR. SMITH:  That's correct.

25          THE COURT:  And I don't want to — I don't know if you

1  were finished with that particular argument, but I do want to

2  get to the next issue, which is the issue of extortion as one of

3  the predicate offenses.  And let me tell you what my concern is

4  with respect to your argument under 514.080 and the examples

5  that are set forth in the addendum to the presentence report.

6        The first paragraph of 514.080 says that a person is

7  guilty of theft by extortion when he intentionally obtains

8  property of another by threatening to do a variety of different

9  things.  It would appear to me that the problem with your

10 argument here is that the individual defendants, it does not

11 appear that they obtained property of another person.  They may

12 have threatened jobs.  For example, Vernon Hacker testified

13 about he was threatened to lose his job, but there's no

14 testimony that any of the defendants obtained any property of

15 the person that was being extorted.  Isn't that one of the

16 elements that you would have to show in this case to establish

17 extortion, theft by extortion as a predicate act?

18       MR. SMITH:  I believe it is, Your Honor, and if I

19 could beg the Court's indulgence just briefly before we leave

20 the bribery of a public servant --

21       THE COURT:  All right.  That's fine.

22       MR. SMITH:  -- I do want to indicate that, you know,

23 in Wanda White's testimony, for instance, she talks about her

24 recruitment and how that Cletus Maricle said on page 32, "He

25 told me to get with William Stivers and Wayne Jones and they

would school me on anything I needed to know and rely and depend
on them, that they had done it before and they always done what
was expected and the heat was on them too much, that William
Stivers had to back off a little bit and somebody had to take
his place."

        She goes on in her testimony to say that, "What was
this schooling about and who else was involved in this?"  Pages
33, she says that it was significant, again, that they told her
that "I was then to take care of them, meaning the sellers or
voters who had been bribed when they come in to vote."

        "And who told you this was going to be utilized in May
of 2006?"  She said, "All three of them, Wayne Jones, William
Stivers, and Cletus Maricle."

        Then she talks about going over lists of voters and
identifying vote sellers.  And I said, "Who else, to your
knowledge, was going to help in this effort?"  She said, "Bart
Morris, Stanley Bowling, Freddy Thompson was helping Williams
Stivers and Wayne Jones."

        "Let's talk about Bart Morris."  She said, "How was
Bart Morris going to assist?  He was going to continue his vote
buying as he had always done."

        Stanley Bowling?  He's going to continue to line up
his vote sellers as he had always done.  Debbie Morris?  She was
going to continue to pay voters and do the same.  William
Stivers?  "Schooled me on what to do inside the polls."

1              She identified all of the defendants.  And then later

2    her testimony and the testimony of Kennon White, we learned that

3    Doug Adams was also involved in selecting.  You know, it was

4    alleged that Doug Adams and Cletus Maricle were essentially

5    puppeteers and that they were selecting and handpicking and

6    giving blessings, in other words.  They were going to give their

7    blessing on Wanda White.  And Kennon testified that he went to

8    Doug Adams and said, "Do we have your blessings, Doug Adams," in

9    effect, and Doug Adams said, "Well, Darnell Hipsher wants Earl

10   Pennington in there.  Well, I'll tell you what, if he'll be for

11   Kevin Johnson, I'll be okay with it."  And so in 2006 we have

12   all eight defendants again involved in this particular act

13   again, which puts them all together in bribery of a public

14   servant, and that would put, I believe, all eight defendants —

15   and to this one particular — now we go to the extortion.

16              Extortion, if there is — again, as we outlined in our

17   memorandum, Your Honor, we identified what the elements of

18   extortion were, and as the Court identified, where is the

19   property?  Well, what is the property of another?  And, again,

20   it was the government's position in this case from the inception

21   and up and through the closing argument, Your Honor, that

22   basically we had two objectives that were primarily addressed in

23   the forfeiture.  But for the involvement of all eight of these

24   defendants, they would not, the jury found, have benefited and

25   have obtained and sustained these salaries but for their

1  participation in the racketeering scheme.  That's a jury

2  finding.

3        We also have a jury finding as to money laundering.

4  And, again, we have the jury finding as alleged, we proved that

5  approximately $2.1 million in contracts and $1.5 million was

6  alleged and that's what the jury verdict was.

7        Again, we have consistently argued throughout the

8  case, again, what was the motivation of their involvement, and

9  we have, for instance, the Vernon Hacker circumstance, again

10 where you've got Doug Adams and his position as a public

11 official and having within his position the ability to adversely

12 affect someone under his supervision and under his authority.

13 Who is Vernon Hacker?  A school board employee.  And then we

14 have again, what is the motivation for this?  It's, again, to

15 obtain property of another, which in our argument, Your Honor,

16 is basically consistent with the jury finding, it was but for

17 their involvement they could not have obtained the salaries of

18 Freddy Thompson.  So we're obtaining a salary, and — And I

19 believe this is not a stretch.  I believe that when we hear from

20 the testimony and look back at the record, it was clear that

21 this group organized and believed and, in fact, did control who

22 was going to get that salary.  They had such control over the

23 election process by infiltrating the County Board of Elections,

24 they had that ability.  They could look at somebody like Vernon

25 Hacker or they look at somebody like Freddy Thompson and they

1   could say, if you come with me, as Doug Adams would invite

2   Kennon White at one point, I'll make you county clerk.  And they

3   had the ability, again, to recruit people to participate in

4   pooling their money that way.  Freddy Thompson brought 140 to

5   $150,000 to the table based upon that representation.

6           And so it's our argument, Your Honor, that the

7   extortion, the property of another, it is — the motivating

8   issue with the extortion was to obtain the salary and that was

9   his salary for the county clerk's position as it related to the

10  Vernon Hacker incident.

11          And I think that the other —

12          THE COURT:  The third area was tampering with juries,

13  which the Court allowed as background evidence, as Mr. Maricle

14  likes to say, inextricably intertwined with his criminal conduct

15  in the case.

16          MR. SMITH:  Yes, Your Honor.  I believe that the third

17  category of evidence which we asked to be included in the

18  offense conduct and what we've proffered for the Court for the

19  purposes of looking at whether or not it could be sufficient to

20  support predicate act is the fact that jury tampering, number

21  one, I believe that the circuit cases that we cited to the Court

22  show that there have been occasions where the Court had looked

23  at, for instance, in the *Gotti* case and some of the other cases,

24  that jury tampering is a form of bribery and it falls within the

25  broad generic definition of bribery.

1          THE COURT:  While that may apply to Mr. Maricle, would

2    that be reasonably foreseeable to the others at the time that

3    the testimony was that it actually happened?

4          MR. SMITH:  Well, in the record —

5          THE COURT:  It's prior to the time charged in the

6    indictment.  The Court allowed it in as background evidence, not

7    404(b), but background evidence.

8          MR. SMITH:  I agree completely with the Court as to

9    that.  I think that in the course of the trial and in the

10   recordings that were of Mr. Maricle and Jones and Stivers, I

11   think that there is consistent corroborative evidence to support

12   that the control of the county included the control of the

13   judge's office and that it was utilized — as Mr. Jones said, if

14   it's in circuit court, quote-unquote, we'll fix it.  Those are

15   his words.  Those are the words of Mr. Jones.  "We'll fix it."

16         And then, again, to Mr. Stivers, you know, it was

17   offered to this Court and to the jury that he was just boasting

18   or puffing when he made the statement in the presence of

19   Ms. Wanda White that the fact that Mary Betty is going to be

20   selected in the jury pool, that she had been selected to

21   participate, he made the comment, and I believe that the record

22   will support he made it multiple times, not one time, but

23   multiple times, he made a statement that "We're going to make a

24   killing."  And Mr. Maricle, in his testimony on the witness

25   stand, tried to explain that away and say, well, it was just a

38

1   joke.  But I believe that in the context of listening and

2   reviewing that recording that it is the position of the United

3   States it wasn't a joke.  In fact, they talked about how that a

4   criminal case was going on, and that was during this time period

5   of the conspiracy where Mr. Jones and Mr. Stivers were in

6   Mr. Maricle's office and they were, in fact, colluding with each

7   other and discussing how they're going to pick the jury, and

8   they talked about that.

9          So, again, do we have within this a reasonable

10  foreseeability?  Our argument, Your Honor, is that jury

11  tampering, the evidence of jury tampering, the Court is exactly

12  right, it occurred early in the formative stages of the

13  enterprise.  But 1B1.3 includes as relevant contact acts which

14  are in preparation of the offense.  So we believe that acts that

15  are in preparation of the offense could include these acts,

16  which were I think clearly jury tampering.  When you take Cletus

17  Maricle and Kenny Day and you go to a juror and you tell that

18  juror through a common friend, do not come back with a verdict

19  of less than $1 million, that is indirect contact with a juror,

20  which under the Kentucky Revised Statute indirect contact is

21  just as culpable as direct contact.  So we would argue that

22  these are acts under 1B1.3 that led to the formative stages, the

23  preparation of controlling Clay County.

24         I mean, we had Kenny Day, the Republican Election

25  Commissioner, who we had to satisfy in order to get his

1  involvement in line with Cletus Maricle to select election

2  officers.  This was all motivated and tied in with the scheme to

3  control Clay County.  And then I think when you hear from the

4  recordings themselves where Jones most competently says if it's

5  in circuit court, we'll fix it, and Cletus Maricle, looking to

6  Kennon White when he's trying to determine whether to appeal his

7  unemployment, and he looks at Kennon White and he says, "You

8  know you've got an appeal to circuit court.  You know you can

9  appeal it to me."  In other words, wink-wink, nod-nod, as Cletus

10 Maricle is known to do.  You know, Kennon White said he would do

11 gestures a whole lot.  You know, when he didn't like somebody he

12 would point a finger at them and do that.  You know, that kind

13 of thing was common for Cletus Maricle to do, and that kind of

14 thing is what he was doing with Kennon White when he was telling

15 him about his circuit court appeal rights on his unemployment.

16 It's the wink-wink nod-nod, let me communicate to you, you

17 appeal it to me and we're going to fix it.

18         So, again, I think that the common scheme and plan

19 that we offered as background evidence can also be looked at

20 under 1B1.3.  And Your Honor is correct, we cannot attribute,

21 unless it's reasonably foreseeable, to each defendant.  And I

22 would like to be able to argue that at the individual

23 sentencings and address that as it applies to each defendant.

24 But I think in the context of today's setting I'm prepared to

25 offer that as, again, conduct which the Court could consider

1    under 2C1.1.

2            THE COURT:  Mr. Smith, backing up just a bit to your

3    first argument under 521.020, you had referred to the

4    conversation that Wanda White testified that she had with Doug

5    Adams to get his blessing.

6            MR. SMITH:  Yes.

7            THE COURT:  Do you have the page reference to that

8    particular part of the transcript?

9            MR. SMITH:  Yes.  I'll cite to Docket Entry No. 840,

10   pages 84 and 85.

11           THE COURT:  All right.  Thank you.  Did you have any

12   additional citations that you wanted to provide before I get

13   responses from the defendants on these issues?

14           MR. SMITH:  No.  Thank you.

15           THE COURT:  All right.  Counsel, what I'm going to do

16   is I'm going to take a short break, because I know —

17           Mr. Barclay, for example, I know you weren't at trial

18   and you may want to consult with Mr. Simons —

19           MR. BARCLAY:  I appreciate that, Judge.

20           THE COURT:  — before getting your response.

21           And Mr. Pinales and Mr. Hoskins, you'll need to

22   discuss the matter with Mr. Maricle and make a determination as

23   to who wants to respond on these issues.

24           Mr. Hoskins, if you wish to continue, you're certainly

25   free to continue in the case if Mr. Maricle continues to retain

1  you in this matter.

2          Mr. Pinales, the same for you.  But I want to give you

3  a chance to speak among yourselves before I get your responses.

4  So we'll take about a ten-minute recess at this time.

5      (Whereupon, a short recess was had, after which the

6  following proceedings were had in open court.)

7          THE COURT:  All right.  Thank you.

8          We'll continue with the hearing.  Let's see, all

9  parties and counsel are present.

10          Mr. Hoskins, do you plan to proceed on behalf of

11  Mr. Maricle?

12          MR. HOSKINS:  Your Honor, with the Court's permission,

13  I would be re-entering my appearance generally as counsel.

14          THE COURT:  All right.  Yes, sir.

15          MR. PINALES:  And I will too, Your Honor.  I'll still

16  stay at the children's table back here, but I'd enter my

17  appearance.

18          THE COURT:  All right.  Very well.

19          MR. PINALES:  Thank you, Your Honor.

20          THE COURT:  Mr. Hoskins, would you like to respond

21  really to the three issues on this first question under 2C1.1?

22  The first is whether there are two predicate acts that would

23  involve theft by extortion, 514, or bribery of a public servant,

24  521.010 and 020.  And then, of course, the next issue would be

25  this jury tampering issue that Mr. Smith just addressed just

1    before we took our break.  If you could address those, I would

2    certainly like to hear from you.

3             MR. HOSKINS:  Thank you, Your Honor.  Just briefly, I

4    would submit that Jeff Farmer does not qualify under the

5    Kentucky statute as a person who would be a public servant, so

6    that —

7             THE COURT:  And that would be the definitional section

8    of 521.010.  We wouldn't be looking at the guideline section of

9    a definition of a public servant or a public official?

10            MR. HOSKINS:  My argument would be that would be

11   determined by Kentucky state law.

12            THE COURT:  Yes, sir.

13            MR. HOSKINS:  Insofar as the theft by extortion, I

14   would submit that the salaries paid by the Administrative Office

15   of the Courts or by the Commonwealth for public office is not

16   what's contemplated by the theft by extortion statute, that

17   that's just too far of a leap to say that that was extortion

18   that would allow conviction under Kentucky law.

19            As to jury tampering, while I would have to accept

20   that the government has put in proof as to this 1989 incident,

21   while we certainly don't concede that that is truly what

22   happened, there's evidence in the record of that.  But that's

23   1989 or thereabouts, it's way before the activity charged in the

24   indictment.  As to any jury tampering thereafter, I don't

25   believe the record contains any evidence of that.  These

1    comments are not sufficient to get us there by a preponderance

2    of the evidence, comments of Mr. Jones or Mr. Stivers or whoever

3    made have made.

4            THE COURT:  And those are the comments that appear on

5    the transcripts, and I know there have been some objections to

6    the transcripts, but it doesn't matter in terms of whether it's

7    your version of the transcript or the government's version, you

8    believe that the statements that were made would not be

9    sufficient for jury tampering, number one; and, number two, it

10   wouldn't be reasonable to attribute those to your client.  Is

11   that fair?

12           MR. HOSKINS:  That's fair to say, Your Honor.  I would

13   also point out that the government has not, in any — at any

14   point in these proceedings, brought in evidence in which

15   Mr. Stivers' wife actually sat on a jury and there was anything

16   improper or untoward that appeared to happen in those cases.  So

17   I don't think there's evidence to support jury tampering at this

18   point.

19           THE COURT:  All right.  Thank you.

20           Counsel, as we did at trial, we'll just move down the

21   table.  Ms. Logan, will you be responding for —

22           MS. LOGAN:  Yes, Your Honor, with your permission,

23   I'll just speak from here.

24           THE COURT:  That'll be fine.

25           MS. LOGAN:  First, as a preliminary matter, I

1    understand from the Court's ruling this morning on Mr. Bowling's

2    PSR objections, but just for the record's sake, we just want to

3    join in it, and I'll just leave it at that, given that the Court

4    has already ruled.

5          As to the specific issues, the bribery, the jury

6    tampering, and extortion, to start with, on the extortion I

7    think that seemed to be one the Court had the most problem with

8    as far as the property of another issue.

9          THE COURT:  I wouldn't read too much into my

10   questions.

11         MS. LOGAN:  Well, you had questions about it, we'll

12   put it like that.

13         THE COURT:  Yes, ma'am.

14         MS. LOGAN:  The property and the other issue, I think

15   that that's one of the primary things the government has failed

16   to show here.  I think it's implicit within the state statute

17   that you extort someone to obtain that property.  So in other

18   words, if someone is trying to extort, say, Bobby "Red" Sams or

19   Vernon Hacker to obtain their property, so I don't think that

20   Mr. Adams' salary or anyone else's salary, for that matter,

21   would constitute the property of that person they supposedly

22   tried to extort.

23         Additionally, I think that a salary such as Doug

24   Adams', Cletus Maricle's, or whoever else's, does not constitute

25   the property of another anyway, whether it's -- you know, one of

1   these they extorted or anyone else.  I think it's kind of

2   analogous to the *Turner* case that was cited in Mr. Bowling's PSR

3   objections that talked about how salaries aren't a loss to the

4   government, it's going to be paid to somebody anyway.  So I

5   don't see how you get to the point that a salary is something

6   that belongs to somebody else.

7           As to the bribery issue, the only one — there are two

8   instances mentioned as far as Doug Adams, and, of course, it's

9   all going be relevant conduct determined to a specific

10  defendant.  So as to Mr. Adams, the Jeff Farmer instance, I

11  don't want to get too in-depth in this, because I think I tried

12  to do a pretty thorough job of addressing how the facts cited by

13  the government failed to establish the actual elements of the

14  offense.  If you have anything you would like me to address,

15  I'll be happy to do it, but I think our brief pretty much

16  covered our position on that.

17          And also the same situation goes with the jury

18  tampering and the intimidation of a witness.  I think our brief

19  fairly outlined what our position is on those issues.  And,

20  again, I would be happy to discuss anything you might have a

21  question on, but I think just as a preliminary matter the jury

22  tampering and the intimidation aren't proper RICO predicates and

23  the evidence just simply fails to establish that any of those

24  occurred and, as a result, it wouldn't allow for a 2C1.1

25  calculation, it would have to still be a 2H2.1.

1              THE COURT:  All right.  Thank you.

2              Mr. White?

3              MR. WHITE:  Thank you, Your Honor.

4              THE COURT:  And I know some of you may want to join in

5    the arguments that have been made, but you're free to -- if you

6    want to expand on any of those arguments, you're certainly free

7    to do so.

8              MR. WHITE:  Thank you, Your Honor.  And with that

9    invitation, I'm going to be very brief.  I just want to make a

10   couple quick points.

11             First, I want to harken back briefly to the argument

12   that the United States has made with respect to 521.020, bribery

13   of a public servant, as one of the non-indicted but proven by a

14   preponderance of the evidence RICO acts.  As I understood their

15   argument, they are arguing that because challengers are

16   appointed by a political party, they are, therefore, public

17   servants because that becomes a political subdivision of the

18   state.  I believe it is pretty clear in election law -- well,

19   not even election law, but just in state law, that a political

20   subdivision is not a political party.  What a political

21   subdivision would be -- of the state would be the central state

22   government, would be a county, it would be the various executive

23   branch agencies.  If Your Honor would like, I'll be happy to do

24   some quick research on that tonight and submit something to you

25   if you would like.

1          THE COURT:  On the issue of challenger?

2          MR. WHITE:  Yes.

3          THE COURT:  That really relates more to Mr. Farmer,

4    who's the connection for Mr. Adams, more than Mr. Jones.  With

5    Mr. Jones, really the issue is whether the Court accepts the

6    testimony of Wanda White and Kennon White with respect to what

7    she was asked to do in, let's say, the '06 election, for

8    example.

9          MR. WHITE:  Right.

10          THE COURT:  And if the Court accepts that testimony,

11    as the jury did obviously in this case, the question becomes

12    does that meet the statutory definition under 521.020?  And I

13    know that some of the defendants have argued that the person —

14    that Ms. White would have to be in position as a Democrat judge

15    at the time that the offer was made for this to be a violation

16    of the statute.  But that doesn't appear to be the better

17    reading of the statute.  To me, it would appear — well, if that

18    were the case, you could always circumvent the statute by making

19    an offer to someone who's about to become an election official

20    and the next day they become an election official and they

21    perform the illegal act.  And if we look at the definition

22    section, 521.010(1)(d), it clearly would apply to someone such

23    as Ms. White who was approached prior to the time that she was

24    placed in that position to induce her to take action after she

25    was put in the spot as a Democrat judge.

1          So really, if the Court accepts the testimony of Wanda

2   White, it would appear to me that it would meet the definitional

3   section of 521.020.  And, of course, we would have to — the

4   government has to establish two predicate offenses.  It could be

5   the two acts of bribery, which could involve Dobber Weaver and

6   Wanda White without even considering Jeff Farmer because of his

7   position as a challenger, and if the Court accepted the

8   government's position with respect to extortion and one of those

9   acts, if that was attributable to Mr. Jones, then that would be

10  sufficient.

11         But as I understand your argument, with respect to

12  those that I've just mentioned, it's that the actions wouldn't

13  fit within the definition of the statute.

14         MR. WHITE:  That's correct, Your Honor.  That's what I

15  argued in my filing.

16         THE COURT:  Yes, sir.

17         MR. WHITE:  You're exactly right.  And, again, giving

18  the statute's strict reading, I believe, obviously, your points

19  are well taken, but we would just simply say that based on the

20  plain terms of the statute, that's how it would apply.

21         I would adopt what Mr. Hoskins and Ms. Logan have

22  already said with respect to the property of another as to the

23  extortion issues, and what Mr. Hoskins — the points Mr. Hoskins

24  have made, again, they're made in my brief, which is that the

25  jury tampering, again, that there is evidence, we have to live

1    with it, I understand that, but that that occurred prior to the

2    conspiracy began as charged.

3            THE COURT:  And it would be not reasonably foreseeable

4    to your client to — if the Court found that it occurred, it

5    would — it may apply to Mr. Maricle, but wouldn't extend to

6    your client?

7            MR. WHITE:  Exactly.  And everything that occurred

8    during the conspiracy period that was captured on the

9    recordings, again, is statements being made, but the United

10   States has failed to come forward with any proof that would even

11   meet the lower — the civil standard of what they would have to

12   do.

13           THE COURT:  All right.

14           MR. WHITE:  If there's anything else, Your Honor —

15           THE COURT:  Well, I may have questions — as I hear

16   from everyone, I may have to come back to you on specific

17   points, but I do believe I understand your argument.

18           MR. WHITE:  Thank you, Your Honor.

19           THE COURT:  Yes, sir.

20           Mr. Abell.

21           MR. ABELL:  Judge, first, I adopt the argument

22   previously made that the challenger for a political party is not

23   qualified as a public servant under 521.010 and 521.020.

24           Second, with regard to bribery of a public servant,

25   I'm understanding the argument to be made today that the issue

1   is whether or not there was a violation of 521.020(1),

2   subsection (a) rather than (b), and subsection (a) differs

3   significantly from subsection (b).  And more specifically and

4   most materially, at present (a) has limiting language, and

5   that's in the concluding clause.  It goes on and talks about the

6   vote, opinion, et cetera, et cetera, et cetera, quote, or other

7   action in his official capacity as a public servant, end of

8   quote.

9           Subsection (b), by significant material contrast, does

10  not include that type of limiting language and has a much more

11  general and broader way to violate that subsection, because it

12  refers to, quote, or other action as a public servant would

13  thereby be influenced.

14          They are materially different language, they are to be

15  given some different meaning.  The government has basically

16  argued that -- well, I think the correct reading of

17  subsection (a), which is what we're dealing with, is an actual

18  true exercise of their official authority, not criminal action.

19  Criminal action that they're not authorized to take may trigger

20  a violation of subsection (b), but in (a) we're talking about

21  action that they're officially and truly authorized by law to

22  take.  Election officers aren't authorized to steal votes or buy

23  votes or anything like that.  We have limiting language.  And as

24  a matter of law, the evidence presented can't substantiate a

25  violation of subsection (a), which is what we're dealing with

1  here.

2          Regarding property, *Turner* has been referred to and

3  *Turner* is *United States v. Turner*, which is 465 F.3d 667.

4          THE COURT:  That was Judge Caldwell's case, I believe,

5  from Pikeville, if I'm not mistaken.

6          MR. ABELL:  It was, Your Honor.

7          THE COURT:  I believe Mr. Mackey's firm handled that

8  case on appeal, so I am somewhat familiar with it.

9          MR. ABELL:  It says, "In the context of election

10  fraud, the government and citizens have not been deprived of any

11  money or property because the relevant salary would be paid to

12  someone regardless of the fraud."  Also, quote, but if the

13  scheme is successful, its effect must be to deprive the victim

14  of money or property.  Successful election frauds have no such

15  effect, end quote.  Now, that's construing a different statute,

16  but I think it's powerful material and persuasive authority with

17  regard to 514.080 of the state statute and should lead the Court

18  to conclude as a matter of law that salaries that were drawn or

19  contracts that were won could not be the type of property that

20  must be obtained to trigger 514.080.

21          Finally, with regard to jury tampering, I submit to

22  the Court that the only evidence that was presented by the 110

23  witnesses that testified at trial regarding the incident in

24  September of 1989 that there was in fact indirect contact with a

25  juror.  Statements on these recordings, however you may

1  characterize them, provide no basis to make a finding by a

2  preponderance or otherwise that there was any communication,

3  indirect or otherwise, by Mr. Stivers or Mr. Jones with an

4  actual or potential juror.  And I think that type of finding

5  would be necessary for a violation of 524.090.  So as a matter

6  of law, there's just not sufficient evidence.  Thank you.

7          THE COURT:  All right.  Thank you, Mr. Abell.

8          MR. ABELL:  Thank you, Judge.

9          THE COURT:  Mr. Baldani.

10          MR. BALDANI:  Judge, I believe you hit the nail on the

11  head when you questioned the government about the foreseeability

12  issue.  Rather than repeat I would just join in the objections

13  or arguments of my colleagues regarding the challenge or issue

14  and the salary is not property of another issue and as to

15  whether these acts that the government refers to even constitute

16  valid RICO predicates.  Those arguments have all been made in

17  all pleadings and you've heard them.

18          But the one thing that I would add, Your Honor, as it

19  relates to Mr. Thompson is this whole issue kind of got rolling

20  with the government's January 20th letter, the letter with their

21  objections.  And they talked about theft by extortion, bribery

22  of public servants, jury tampering, and really if you look at

23  the acts that they pick from the record to support these

24  supposed state law violations, they relate to our co-defendants

25  and, with possibly one or two exceptions, not Mr. Thompson.  And

53

1    when it comes to relevant conduct, Your Honor, I think that

2    there has to be a finding that Mr. Thompson participated, had

3    knowledge, aided, and, of course, reasonably foresaw, if that's

4    the right —

5           THE COURT:  Yes, sir.

6           MR. BALDANI:  — word.  And that's why I say you hit

7    the nail on the head when you questioned the government about

8    that.  Obviously, acts of jury tampering in '89, he was a young

9    man, never even considered a political career at that point.

10          So my main point, in addition to what the

11   co-defendants have said, Your Honor, would be even if you

12   rejected all those arguments, I still think that Freddy Thompson

13   is not — that's not relevant conduct for his purpose, because

14   there's no evidence he participated or foresaw.

15          THE COURT:  Well, with respect to 521, bribery of a

16   public servant, there is the testimony of Wanda White that she

17   was trained to steal votes —

18          MR. BALDANI:  Right.

19          THE COURT:  — by Mr. Jones and by Mr. Thompson.

20   There is that testimony.

21          MR. BALDANI:  Right.  And I think Dobber Weaver

22   similar, but I don't think that that was definitely their

23   testimony, Your Honor.  Of course, subject to a lot of challenge

24   from us unsuccessful, but I don't think even if it's credited or

25   accepted that that amounts to bribery of a public servant,

1    assuming that they're public servants.  I mean, teaching
2    somebody how they can take advantage of voter unfamiliarity with
3    this new machine I don't think is anywhere close to equivalent
4    to bribery of a public servant.  He didn't offer them a job or
5    there was no evidence that he had knowledge or participated or
6    foresaw anybody else offering them the inducements.

7            The other thing I would add, as I think Ms. Logan did,
8    Your Honor, in the ruling we got today you noted that Bowling is
9    the only one that raised this particular objection.

10           THE COURT:  I think that's correct.  Was it raised by
11    other defendants as well?

12           MR. BALDANI:  Well, maybe not in exactly the same way.
13    In our sentencing memorandum we addressed that tangentially, but
14    if I could, I would like to be considered as having joined in
15    that.

16           THE COURT:  Yes, sir.  That'll be fine.

17           MR. BALDANI:  Thank you, Your Honor.

18           THE COURT:  Mr. Gilbert, you're next.

19           MR. GILBERT:  I'll be short.  In terms of extortion,
20    the government has referred to an incident with a participant in
21    a legal proceeding when Mr. Kennon White testified that he tried
22    to induce the officer not to appear in court.  I would submit
23    that that doesn't meet the requirements of the state law, which
24    requires a threat, and I don't believe there's any testimony
25    about any threat.

55

1          With respect to the bribery, I think that Mr. Morris
2    is not alleged to have participated in that, and the issue is
3    whether it's reasonable and foreseeable that those two
4    individuals would be offered jobs in exchange for their actions.
5          Jury tampering also is a reasonable and foreseeable
6    standard on that.  Mr. Morris's participation is alleged in 2002
7    and this occurred substantially before that.
8          THE COURT:  Thank you.
9          Ms. Hughes?  I know at this point we may be running
10   out of things to talk about, but —
11         MS. HUGHES:  Just like when I filed my objection.
12         THE COURT:  Understood.
13         MS. HUGHES:  Without wasting the Court's time, I'll
14   just incorporate the arguments that all of my colleagues have
15   made and say, in particular with respect to Ms. Morris, it seems
16   to me that there's a problem with the issue of foreseeability.
17   Even if the Court were to accept the government's arguments with
18   respect to all of them, bribery, extortion, jury tampering,
19   Mr. Smith did today recite some evidence that actually related
20   to Ms. Morris and that was that Wanda White testified she paid
21   voters just like she always did before.  That testimony, in my
22   opinion, does not necessarily lead one to the conclusion that it
23   was foreseeable that the bribery of a public official — that it
24   would take a bribery to get people to participate in what was
25   going on.  They could have been voluntarily.  Of course, why

1  would Wanda need be promised anything during certain elections,

2  you know, she had people running.  So I think there's an element

3  of foreseeability vis-a-vis my client that is not present

4  because of the lack of testimony.  The same goes for the

5  extortion and the jury tampering, if the Court were to accept

6  those theories.  Thank you.

7            THE COURT:  All right.  Thank you.

8            Mr. Barclay?

9            MR. BARCLAY:  Judge, would you mind if I use the

10 podium?

11           THE COURT:  That'll be fine.  Yes, sir.

12           MR. BARCLAY:  I appreciate it.

13           Again, good morning.

14           THE COURT:  Yes, sir.  Good morning.

15           MR. BARCLAY:  On behalf of Mr. Simons and Mr. Bowling,

16 may it please the Court.  We first want to acknowledge,

17 obviously, the difficulty of these legal questions.  We

18 personally struggled with them, we know the Court has as well,

19 and we appreciate also the Court's order this morning in giving

20 us that in writing so we could review it prior to today's

21 hearing.

22           We do want to renew one point we made in our written

23 motion that was addressed in this morning's order, and that is a

24 process-related question, Your Honor, because we do believe the

25 Court is required to make certain findings.  And if I could,

1  Your Honor, if I could analogize to my two-and-a-half-year-old

2  daughter, who is the apple of her daddy's eye, she is very

3  precocious and she makes me laugh and smile every day.  And one

4  day she came home, Your Honor, from preschool and told me she

5  had learned the game of hock scotch, and I, of course, had to

6  correct her and it was actually a game of hopscotch.  But she

7  wanted to go down to the local school and she wanted to play a

8  game of hopscotch.  And we walked through the process of

9  hopscotch where before you can get to box two you have to jump

10 through box one and before you get to box three you have to jump

11 through boxes one and two.  And we would submit, Your Honor,

12 that the Guidelines require the same of the Court, that before

13 you can get to the relevant conduct question, the Court must

14 first make a finding on the record of what the offense of

15 conviction was and what guideline applies to the offense of

16 conviction.

17          So we do want to address the relevant conduct issues

18 that the Court has addressed today, but we would add and we

19 would join in our colleagues' comments and arguments today, we

20 would extend upon them by asking the Court to make a finding as

21 to the offense of conviction and the applicable guideline.  And

22 we believe if you do, Your Honor, that the only offense of

23 conviction that the Court can find with regard to Mr. Bowling on

24 Counts One and Two is the vote buying predicate act.  And we

25 believe that, Your Honor, because of not only the fact that the

58

1    jury's verdict was a general verdict, but because of this
2    Court's findings on the post scheduling briefing in which you
3    found, Your Honor, that if there was an honest services fraud
4    conviction, then there must necessarily have been also a vote
5    buying conviction.  And if that's the case, then that would be a
6    valid basis for which to sentence upon.  And, of course, we
7    re-assert that the *Johnson* line of cases, although we understand
8    the Court's ruling this morning, would also require that the
9    offense of conviction be the vote buying offense.

10          And with regard to the relevant conduct discussion,
11    Your Honor, first we would note that as you have noted it is the
12    Government's burden to prove, first, that Mr. Bowling either
13    committed the offense or aided and abetted in the offense.  And
14    with regard to each of the three offenses that have been
15    discussed this morning, there is no evidence in this record and
16    none that the government has offered today or in his argument
17    Mr. Smith has offered that would tie Mr. Bowling to any of these
18    three offenses.  And I think — Let me make two points, Your
19    Honor.

20          The first is the record itself, which is that
21    Mr. Bowling was involved in vote buying in the 2002 election, we
22    would submit, and perhaps in the 2004 and 2006 elections.  We
23    would contend that there isn't credible evidence as to 2004 and
24    2006, but if the Court sees it differently, we understand.

25          First, Your Honor, there is no evidence in this record

1    that Mr. Bowling committed the acts of bribery, extortion, or

2    jury tampering that the government is submitting as relevant

3    conduct.  So as to this first point of whether or not

4    Mr. Bowling committed any of the proffered relevant conduct, we

5    think the record on that front is clear.

6            The question then is, it reasonably foreseeable, and,

7    Your Honor, we would submit that there is an important

8    distinction to make between vote buying and vote stealing.  And

9    Mr. Smith argued this morning, Your Honor, that what Wanda White

10   said during the vote stealing episode was that Mr. Bowling was

11   told to continue to line up vote sellers.  Well, there's nothing

12   in this record to suggest that Mr. Bowling knew that Wanda White

13   was instructed to steal votes.

14           THE COURT:  Well, we have lots of testimony from Wanda

15   White that there were lots of meetings that took place during

16   this entire time period prior to the May '06 election, including

17   your client.  He was involved in those meetings, along with the

18   other defendants.

19           MR. BARCLAY:  Well, we would submit, Your Honor, that

20   the record does not reflect that Stanley Bowling was ever part

21   of a meeting where there was vote stealing involved, that the

22   extent of Mr. Bowling's involvement in this case was vote

23   buying, that he was instructed to pool money and then distribute

24   that money to vote buyers.  And so if the Court finds credible

25   the issue of vote stealing and that Ms. White was bribed,

1  provided an election position, in order to steal votes, we would
2  submit that that is not reasonably foreseeable to a defendant
3  who entered into an enterprise to buy votes.  And the case law,
4  as you know, Your Honor, distinguishes between two as well.  So
5  we would join in the arguments of our co-counsel and also extend
6  upon them by suggesting that the government has not satisfied
7  its burden as to Mr. Bowling.

8          The last point I would make with regard to relevant
9  conduct, Your Honor, is the one that was not mentioned by the
10 government, and that is the Kennon White kickback scheme.  And
11 the reason I raise it now — And I'm happy to address it later
12 if you would like, Your Honor.  But the reason I raise it now is
13 because it's part of the PSR calculation.  And as you're aware,
14 the B&B Excavating contracts are part of the PSR calculation.
15 And we would submit, Your Honor, that before the Court may rely
16 upon the B&B Excavating contracts as a basis for sentencing, it
17 must make a finding that Stanley Bowling participated in the
18 Kennon White kickback scheme by a preponderance of the evidence.
19 And we would submit that while this Court has made many *Kastigar*
20 findings with regard to Mr. Bowling's immunized grand jury
21 testimony, it has never precisely addressed the question of did
22 Mr. Bowling commit the Kennon White kickback scheme.  And we
23 believe that's the central question in deciding relevant conduct
24 in this case.

25          Now, I think it's notable that the government doesn't

1  raise it, it's not proffered to the Court as relevant conduct in

2  this case.  And I think that's because they realize that it's

3  immunized testimony that cannot be used.  If, however, it is

4  used, Your Honor, we would submit that it would violate 18

5  U.S.C. 6002 and the *Kastigar* line of decisions, because there

6  are only two sources that the Court can rely upon to find that

7  Mr. Bowling committed the Kennon White kickback scheme.  One

8  would be Mr. Bowling's grand jury testimony or two would be the

9  testimony and plea agreement of Kennon White, which we believe

10  was derived, directly or indirectly, from Mr. Bowling's grand

11  jury testimony.

12         And we would point the Court to Agent Briggs' grand

13  jury testimony that was submitted to the Court at Docket Entry

14  592-1.  And that's the grand jury testimony that takes place

15  immediately after Kennon White's cooperation.  And he says, he's

16  asked the question:  "How did you find out about the Kennon

17  White kickback scheme?"  And he testifies that Stanley Bowling

18  was called before the Covington grand jury, that he agreed to

19  testify before that grand jury as a result of immunity, and that

20  based upon that testimony they discovered the details behind the

21  kickback scheme; not only that it occurred, but which contracts

22  it occurred upon, the amounts of money that were paid, when

23  those amounts of money were paid, what locations they were paid,

24  who the other individuals were that were involved.  So we would

25  submit, Your Honor, that if the B&B Excavating contracts become

1  a part of the Court's analysis today that the Court must first

2  reach the conclusion that Stanley Bowling committed that

3  conduct, and the only way to reach that conclusion, Your Honor,

4  by a preponderance of the evidence would be to rely upon clearly

5  immunized testimony, either directly or indirectly.

6          So that's what we have, Your Honor, on those issues.

7  We appreciate your consideration.

8          THE COURT:  All right.  Thank you, Mr. Barclay.

9          Thank you, Counsel.  I don't have any follow-up

10 questions of counsel at this point.  I do need to make some

11 findings before we move to the next issue.

12         In this particular case, I believe that the United

13 States has established by the requisite burden of proof,

14 preponderance of the evidence, that each of the defendants, each

15 of the eight defendants that are here today, engaged in two

16 predicate acts of bribery of a public servant under KRS 521.020.

17 The Court has reviewed the testimony of Wanda White, also

18 Charles "Dobber" Weaver, the Court has also looked at the

19 testimony of Mr. Farmer.  But with respect to White and Weaver,

20 it's clear from listening to all the testimony in the case that

21 Wanda White was approached by Cletus Maricle in order to serve a

22 as a Democratic judge in the Manchester precinct for the

23 upcoming election in 2006.  He approached Wanda White for the

24 purpose of getting her to work for him in connection with his

25 son-in-law being installed as PVA.  It's clear that -- and this

1  evidence certainly exceeds the preponderance of the evidence

2  standard, but it's clear that Maricle approached Wanda White and

3  the scheme was for her to then use Mr. Stivers and Mr. Jones to

4  become acquainted with how you handle voters that had sold their

5  votes.

6       At a later point, it extended to Mr. Jones and

7  Mr. Thompson teaching Ms. White how to steal votes on new voting

8  machines.  All four of those individuals, Maricle, Mr. Stivers,

9  Mr. Jones, and Mr. Thompson, participated directly in that

10 activity.  It's also clear to the Court that Mr. Maricle made it

11 known to Ms. White that at the very least she would be given a

12 job with drug court, which would constitute a pecuniary benefit

13 to her, a better job.  She had a job at the time, but she was

14 promised a better job in exchange for illegal activities within

15 the polls themselves, and that activity expanded from the vote

16 buying activity to vote stealing.

17      It's also clear that a number of meetings were held

18 after it became clear what Ms. White was being asked to do and

19 those meetings included meetings at Mr. Maricle's home, or with

20 Mr. Maricle, Mr. Stivers' home, as well as the Morrises' home.

21 And as part of this entire scheme that was being developed to

22 put these two new people in place, Ms. White and Mr. Weaver, the

23 last three defendants here were to engage in that same conduct.

24 They were to — the same conduct that they had engaged in

25 previously, and that is that Mr. Bowling was to line up voters

1   and the Morrises were to then pay those voters.  And it's

2   certainly foreseeable that this information would have been

3   supplied that these two new people were put in place in order to

4   carry out the scheme.  It's also clear that putting two new

5   people in place would require something to them, something of

6   pecuniary interest to them.  The Court believes that it was

7   discussed at the meetings, it's certainly reasonably foreseeable

8   that it was discussed, but these parties certainly had knowledge

9   of the scheme that was going to be continued through the 2006

10  election.

11          There's further evidence that Mr. Morris had knowledge

12  of the scheme because he directly contacted Charles "Dobber"

13  Weaver to get his assistance.  And it's reasonably foreseeable

14  that Ms. Morris would have that information as well, that this

15  scheme was going to be taking place within the polls using Wanda

16  White and Charles "Dobber" Weaver.

17          The Court is not as certain with respect to the

18  position of a challenger and believes that that individual would

19  not fit the definition of a public servant under 521.010.  But

20  having reviewed the additional testimony that was cited by

21  Mr. Smith, Kennon White's testimony at Docket Entry 840,

22  beginning at page 84, it's clear to the Court that the Whites

23  had to get the blessing of Douglas Adams and the school board

24  before she could carry out this scheme.  And so it's certainly

25  foreseeable that Mr. Adams would have known what was going to

1  take place within the polls, this continuation of illegal

2  activity that would be undertaken by Dobber Weaver and by Wanda

3  White.

4        So the Court finds that there are at least two acts of

5  bribery of a public servant under 521.020.  Under that statute

6  there is two subparts.  The first part, subpart (a), would

7  relate to these defendants who offered or conferred something of

8  pecuniary benefit upon a public servant.  Public servant for

9  this subsection is defined in KRS 521.010 and would include

10 persons that had not yet taken the position of Democratic judge

11 but were intending to do so.

12       And it's also apparent to the Court that she was being

13 asked to undertake illegal activity, to use her official office

14 in carrying out this scheme that she was initially approached by

15 Mr. Maricle to do.  But it's clear to the Court that all the

16 defendants, by the point of the election, had knowledge that she

17 was going to be acting in that capacity and she was going to be

18 receiving something of value and she was going to be stealing

19 votes and she was going to be assisting in the paying of voters

20 to have certain persons on the slate elected.

21       With respect to the issue of extortion, the Court,

22 having found two predicate acts under 521.020, does not believe

23 it's necessary to reach a final decision as to extortion.  But

24 at this point, the Court would not believe that the salaries

25 that would be received would be sufficient under the statutory

1    section of 514.080.

2          And, likewise, the Court does not need to make a final

3    determination as to jury tampering, but it would not appear that

4    the tampering issue would apply to others —— to defendants other

5    than Defendant Maricle, if it applied at all with respect to

6    him.  But having found the two predicate acts occurred, the

7    Court believes that those two predicate acts under 521.020 would

8    cause the Court to apply Section 2C1.1 in terms of the offense

9    level calculation for all defendants.  The base offense level of

10   14 would be applied if the defendant was a public official.

11   With respect to others that were not public officials, then a

12   base offense level of 12 would apply.

13          That will cause the Court, then, to consider the

14   additional issues, specifically under Section (b)(2), the value

15   of the benefit received.  Of course, there are two methods of

16   making that determination.  One is the net value of the

17   contracts that were awarded to the individuals engaged, if it

18   was reasonably foreseeable to a particular defendant.  Another

19   method of making that determination, and the Court will refer

20   the parties to the background section, and that is in

21   determining the net value of the benefit received or to be

22   received, the value of the bribe is not deducted from the gross

23   value of such benefit; the harm is the same regardless of the

24   value of the bribe paid to receive the benefit.  In a case in

25   which the value of the bribe exceeds the value of the benefit,

1   or in which the benefit cannot be determined, the value of the
2   bribe is used because it's likely that the payer of such bribe
3   expected something in return that would be worth more than the
4   value of the bribe.

5          So the Court will receive evidence at this point,
6   testimony and evidence, with respect to the net profit
7   calculation.  And I will note for the record that the Court
8   certainly has reviewed the exhibits that have been tendered by
9   the parties during the trial.  The calculation that's contained
10  in those documents, including the expert witness designation
11  materials, define profits differently.  Under this particular
12  section of the guideline and under the case that the Court cited
13  earlier, in terms of profitability of contracts, the Court would
14  subtract direct costs from those contracts but would not
15  subtract indirect costs.  And in the information that the
16  parties produced at trial, that included indirect costs.  And so
17  when the Court looks at the contract value, and the parties have
18  argued that the net value to Defendants Bowling and to
19  Mr. Morris was approximately $327,000, that would not include
20  indirect costs, which would have to be added to that.

21         The Court has also reviewed all of the information
22  about the value of the bribes that were paid, and it would be
23  reasonably foreseeable to the defendants, and the Court will
24  certainly entertain any arguments on that or any additional
25  proof with respect to that issue.

1            Mr. Smith, are you ready to proceed with respect to

2    the second issue that I've identified?

3            MR. SMITH:  Your Honor, the United States has reviewed

4    the Third Circuit case, which I believe defined for us what the

5    analysis should be if we fall under 2C1.1, and it's our

6    position, Your Honor, that we've met our burden when we came

7    forth with evidence to this jury and at the conclusion,

8    including the forfeiture stage, in establishing what we have as

9    evidence.  I believe that the Third Circuit case says that it's

10   the burden of the defendant then to produce documentation to the

11   government for purposes of determining if that amount should be

12   reduced.  And at this point, we've not been provided any.  And

13   so I believe that we stand on the record as we've provided at

14   our trial and that would be our position, that that's the bench

15   mark at which we start.  It's up to the defense now to produce

16   any documents that would reduce that amount.

17           THE COURT:  All right.  Thank you.

18           Mr. Hoskins?

19           MR. HOSKINS:  Your Honor, just briefly, it's not

20   really in my defendant's –– my client's ability to produce

21   evidence about what the net profits would be, but I would submit

22   that the government has not met its burden, that clearly just

23   showing the gross amount of contracts doesn't reflect what had

24   to have been involved in that case, which would be equipment

25   rental and fuel and materials that would be involved in any

1    business, and I don't believe the government has met its burden.

2                THE COURT:  All right.  Thank you.

3                Ms. Logan?

4                MS. LOGAN:  Thank you, Your Honor.  I would adopt what

5    Mr. Hoskins has said and just a couple of points.  Again, I

6    agree with him that the burden is on the government and that

7    they failed to meet that burden.

8                I would also note that as far as Mr. Adams is

9    concerned, I think it's pretty uncontested, his dispute with the

10   White family, at least certain members of the White family.  So

11   I think that the contracts involved here, for the most part, if

12   not entirely, were not reasonably foreseeable to him and are not

13   attributable to him, given the fact that he and the Whites, I

14   guess you could say, were on the outs.  And so anything that

15   they may have been doing or any contracts they may have been

16   giving to other people would certainly not be something he was

17   either involved in or that was foreseeable to him.  Thank you.

18               THE COURT:  All right.  Thank you.

19               Mr. White.

20               MR. WHITE:  Thank you, Your Honor.  Just real brief,

21   and it's more if I could ask you a question.

22               THE COURT:  Yes, sir.

23               MR. WHITE:  I don't know that I understood one thing

24   that you did say was you had said the evidence as to the value

25   of the bribes.

1          THE COURT:  Yes, sir.

2          MR. WHITE:  Are you talking about the bribes –– the

3  monies that were paid to the voters?

4          THE COURT:  The money that was collected that was

5  assembled to be paid to the voters ––

6          MR. WHITE:  Oh, okay.

7          THE COURT:  –– for purposes of voting illegally,

8  improperly, as bribe to voters.  There was testimony, for

9  example, that in the 2002 election, of course, everyone was

10  going around and soliciting money.  It continued through 2006.

11  There's testimony, for example, that at the meeting that took

12  place at Paul Bishop's garage, there's testimony from Mike

13  Bishop that Mr. Thompson had a certain amount of money that was

14  available.  There's also testimony from Jennings White that he

15  spent between 80,000 and $100,000 in the 2002 primary election.

16  There's testimony from Kennon White that he spent between 60 and

17  $80,000 for his race for jailer in 2002 and that he approached

18  Mr. Maricle who said, it will take you 60- to $80,000 to win the

19  race, but it will take you 120 if you want to approach both

20  sides of the slate, including Mr. Adams.  There's also testimony

21  from Wanda White and Kennon White that they later approached

22  Mr. Adams and actually he sent people, his emissaries, to the

23  Whites prior to the election to see if they were going to

24  contribute to his slate.  The contribution amount for Mr. White

25  was $60,000 to get on that slate.

1          Now, while that testimony relates to the 2002

2     election, but there was another election in 2004 involving Couch

3     versus Barbara White Colter and there was testimony that

4     Mr. Adams supported Mr. Couch in that race, Jennings White and

5     Kennon White supported a family member, Barbara Colter, there

6     was testimony from Mr. White as to the amount of money that was

7     raised for her race in 2004.  And then, of course, there was

8     testimony about the solicitations in 2006 of the various

9     individuals from several people.  So it would be what would be

10    reasonably foreseeable to a particular defendant with respect to

11    the money that was being raised to continue with this illegal

12    enterprise that was taking place.

13          MR. WHITE:  Thank you, Your Honor.  I understand.  So

14    basically you calculate the total of those numbers that came in

15    from the evidence during that period, but we're not going — but

16    the Court is not going to then, if you will, also count any

17    monies that go out to particular voters, as I understand your

18    ruling?

19          THE COURT:  That's correct.

20          MR. WHITE:  Thank you, Your Honor.

21          THE COURT:  That's correct.

22          MR. WHITE:  You clarified.  I would then just simply

23    adopt what Mr. Hoskins and Ms. Logan have said, and I anticipate

24    also Mr. Mackey.

25          THE COURT:  Mr. Barclay?

1          MR. WHITE:  Yes, Your Honor.  Thank you.

2          THE COURT:  Yes, sir.  Thank you.

3          Mr. Abell?

4          MR. ABELL:  Judge, I'll be very brief.  I will also

5   likewise adopt the points made by Mr. Hoskins and Ms. Logan and

6   most recently by Mr. White.  Thank you.

7          THE COURT:  All right.  Thank you.

8          Mr. Baldani?

9          MR. BALDANI:  Judge, I think the issue is a little

10  more complicated than what the government would have you

11  believe.  Under 2C1.1(b), when there's multiple acts of bribery,

12  Application Note 2 requires the Court to basically evaluate each

13  bribe individually and the value.  And in Mr. Thompson's case,

14  the government has to demonstrate Freddy Thompson's actual

15  knowledge of participation and benefit from each and every

16  individual bribe.  And I think in response to Scott White's

17  question you mentioned some of the individual bribes, but I

18  think that — I don't think that just because there was evidence

19  of them at trial and in the record that they're attributable to

20  Mr. Thompson.  The fact of the matter is, Your Honor, he was

21  elected in 2002 and I don't think anybody that testified at

22  trial seriously claimed or anybody in this courtroom can

23  seriously argue that he didn't do the job of county clerk far

24  better than his predecessor, who was a drug dealer and a money

25  launderer.  He did his job, albeit, according to the

1  government's theory that was accepted by the jury, with some

2  improprieties, but the fact of the matter is he earned his

3  salary, he was paid a salary and he earned a salary and his

4  conduct of that office, as evidenced by all the letters attached

5  from his co-workers in our sentencing memorandum, I think

6  anybody who's being credible about it would agree that there was

7  a drastic improvement.

8          But the bottom-line argument I'm trying to make, Your

9  Honor, is he earned his salary there, and I don't think that it

10 could be painted with as broad a brush as the government

11 contends.  I mean, basically they say take this number from the

12 RICO forfeiture verdict, and whether -- I think it's $4 million,

13 and then lump that into the 2C1.2 -- or plug that into the fraud

14 table and hit him with a, whatever it was, 16- or 18-point

15 increase.  And I don't think that you can just accept that, I

16 think that it takes more of an analysis of what he did, what he

17 foresaw, what he participated in.  So that would be my statement

18 or my objection, however you take it.

19          THE COURT:  All right.

20          Mr. Gilbert?

21          MR. GILBERT:  If Your Honor please, we likewise do not

22 believe that the government has met their burden of proof.  We

23 have filed our expert disclosure back the first of -- the first

24 week in February and had the attachment on it, which was in

25 summary form, and later during the trial, Mr. Craft, our expert,

1   did testify and —

2         THE COURT:  He did, and I went back and looked at that

3   chart again this weekend, that exhibit, I think it was admitted

4   as an exhibit.  But that exhibit and his testimony included —

5   under this case that I've pointed you-all to, it included direct

6   costs and indirect costs.

7         MR. GILBERT:  Yes, Your Honor.

8         THE COURT:  Now, I know that I overruled some of the

9   testimony you wanted to present on that issue, but if I just

10  look at the chart in terms of determining the number, I'm going

11  to have to determine what would be direct costs to the contracts

12  that he obtained from the city or from the county.

13        MR. GILBERT:  Is the Court able to make that

14  determination by what we have in the record at this time?

15        THE COURT:  Well, not based on what we have in the

16  record, no, sir.

17        MR. GILBERT:  I do want to reemphasize the burden.

18  When we filed that disclosure back at the start of the trial, we

19  also made a reference to the rule of evidence with respect to

20  providing testimony by summary, which is what that exhibit is,

21  and according to the rule, when we make that we have to give

22  them sufficient time and give them notice of where the core

23  information is upon which that summary is based.  We did that,

24  the United States availed themselves of that opportunity, and I

25  know that the records were at Mr. Craft's office.  An agent from

1    the government came and I know that they inspected it.  I

2    believe that they made copies of the tax returns at that time.

3    So in terms of them not having the information or making the

4    claim with respect to B & J Transfer that we did not provide

5    that information to them, they had that information.

6         THE COURT:  Is there a way — based on what was

7    provided, is there a way to determine what would be direct costs

8    associated with these contracts without any further explanation

9    or would they have the same problem that I would when I look at

10   the chart and I see — let me just go through some of these

11   operating expenses.  Accounting, advertising, automobiles, bank

12   fees.  Then we get down to items such as insurance, interest.

13   Now, those items would appear to be indirect costs, which would

14   have to be added to the number that the Court would consider.

15   But then we get to other expenses, such as landfill, I guess

16   that would be a tipping fee that may not be included, because we

17   don't know what was taken to the landfill based on a particular

18   contract.  And that's why I say it's hard for me to make that

19   determination.

20        So the question is, is it just because I don't have

21   the background or the underlying information or is it something

22   that if the documents are provided that that could be done?

23        MR. GILBERT:  It is very difficult to make a direct

24   analysis with respect to the landfill.  The only way to do that

25   would be for these numerous years to go back and look at every

1  invoice to see where it comes from.  The government has that

2  information and they provided it to us in discovery.  If they

3  wanted to spend the time to do it, they could very well have

4  done that.

5          THE COURT:  Okay.

6          MR. GILBERT:  Mr. Craft tells me that the only way to

7  make an allocation between non-city and non-county hauls is to

8  do it based upon a percentage of income received, and he's

9  prepared to do that.  But, again, that's the government's job.

10          THE COURT:  I understand that part of it, but I'm just

11 trying to figure out, based on my chart, whether I can make that

12 determination with any degree of certainty.

13          MR. GILBERT:  I think you could.  I think you could.

14 I mean, Mr. Craft is here, he could pull those items out, but

15 it's still based upon these figures that we submitted back last

16 year.

17          THE COURT:  All right.  Thank you.

18          Ms. Hughes?

19          MS. HUGHES:  I would submit to the Court, only

20 building upon what Mr. Gilbert said, if the Court can't do it

21 from what the Court hasn't got, that's because the government

22 has failed to give you that.

23          THE COURT:  All right.  Thank you.

24          Mr. Barclay?

25          MR. BARCLAY:  Yes, your Honor.  We would point out

77

1  again, Your Honor, that the contracts in question are unrelated
2  to the offense conduct in this case, the offense of conviction,
3  and the relevant conduct that the Court just found.  So our
4  first argument would be that it's in inappropriate to consider
5  these contracts as a basis for sentencing based upon the Court's
6  earlier findings.
7          The second argument would be, Your Honor, that as the
8  United States points out and my colleagues have pointed out, and
9  we join in those arguments, it's the government who bears the
10  burden of showing benefit received.  So it's not enough for the
11  government to stand up and say, well, we dumped into the record
12  the gross revenues of these contracts and, therefore, that
13  should be the starting point for sentencing.  The government, as
14  you know, Your Honor, had the subpoena power before trial,
15  during trial, and up till today, and they did not issue a
16  subpoena for B & B Excavating records.
17          And so our third argument would be it would be
18  inappropriate for the Court to consider the proffer that
19  Mr. Bowling made with regard to B & B Excavating, because as you
20  pointed out, Your Honor, that is a net profits analysis.  The
21  *Lianidis* case is a different analysis.  It defines net benefit
22  differently and, frankly, it's not a position that's been
23  directly adopted in the Sixth Circuit anyway, so there's the
24  possibility that net benefit means something else because it's
25  not really been decided in this circuit.

1          THE COURT:  Well, there's one Sixth Circuit case that

2     would lead you to believe that it would adopt that approach.

3     Now, it didn't have the thorough analysis that the *Lianidis* did,

4     but it certainly would follow along those same lines.

5          MR. BARCLAY:  And I guess our point would be that

6     rather that the Court performing the calisthenics and gymnastics

7     it needs to do to reach that conclusion, the government had the

8     ability to present evidence today, had the ability to present

9     evidence at trial, failed to do so, so the Court should not go

10    to great lengths to do the government's job for it.

11         We would lastly point out, Your Honor, that if it is

12    the Court's inclination to rely upon the net profits analysis of

13    either the Morris contracts or the Bowling contracts, that

14    because that is a faulty analysis, 2C1.1 also suggests that you

15    may consider the benefit received, the value of anything

16    obtained or to be obtained by a public official.  So rather than

17    considering 300-plus thousand dollars, what we would argue, Your

18    Honor, is that if you're not going to consider zero, because the

19    government hasn't presented evidence, that the other possible

20    consideration is the value of the kickbacks themselves in the

21    kickback scheme.  And Kennon White's plea agreement says that

22    number is $67,000.

23         THE COURT:  Well, I thought you just argued a moment

24    ago that the Court shouldn't consider any evidence of kickbacks.

25    And you're the one that raised it.  I mean, I haven't raised the

1    issue of kickbacks and —

2            MR. BARCLAY:  And I'm raising it as an alternative

3    argument, Your Honor, because 67,000 is less than $300,000, and

4    it puts him in a different fraud calculation.

5            THE COURT:  I understand.

6            MR. BARCLAY:  If the Court considers kickbacks at all,

7    we would argue, Your Honor, you should do it in that fashion.

8            THE COURT:  All right.  Thank you, Counsel.

9            Inasmuch as the United States has indicated it wishes

10   to stand on the proof that has been presented at this point, the

11   Court will make a determination under 2C1.1(b)(2).  Looking at

12   the value of the contracts and are they reasonably foreseeable

13   to all defendants, it's — the number that would be used for

14   those particular contracts would be some number in excess of

15   $327,000, but that number would include some indirect costs,

16   which the Court has not calculated.  But that number is — or

17   that value is relevant for other reasons, and that is because

18   the Court believes that it can look to the value of the bribes

19   that were solicited from various individuals.  And I've

20   mentioned some of the testimony that relates to that issue, and

21   I'm referring to the background section of the application

22   notes, and it's reasonably foreseeable because these defendants

23   were engaged in this vote-buying issue beginning with the

24   May 2002 election and they knew that money was being raised and

25   that slates were being formed and various sides had to raise

1   significant amounts of money in order to participate.  And they

2   all participated.  The Morrises were paying voters, they were

3   keeping records, keeping track of what was actually being spent,

4   so it was certainly foreseeable to them that these significant

5   sums of money were being raised in terms of this RICO count,

6   Count One, the overall RICO conspiracy.

7           I mentioned the amount of money that was raised by

8   Jennings White, I mentioned the amount of money that was raised

9   by Defendant Freddy Thompson, which according to Mike Bishop was

10  between $100,000 or greater than $100,000, but that that part of

11  the slate raised between 150 and $200,000.  Jennings White

12  testified that he spent about 80 to $100,000 of his own money.

13  Kennon White was spending at least $60,000 of his own money.  We

14  know that the Whites were raising significant amounts for

15  Barbara Colter in the 2004 election and that Mr. Adams was

16  raising money and was working for the opponent.

17          Also in the 2006 election, the testimony was from

18  various witnesses that significant numbers of voters were being

19  paid to vote, and while it may have been somewhat less than the

20  amount that was raised and spent in the 2002 election, it was

21  still significant.

22          Under those circumstances, when the Court looks at the

23  value, what's a reasonable number, and the Court considers the

24  cross-reference of 2B1.1, clearly the United States has

25  established the amount of those bribes exceeded $400,000, and

1  that number was reasonably foreseeable to all defendants that

2  were engaged in this scheme.

3          I didn't mention Mr. Maricle earlier, but when the

4  Whites approached him, he certainly told them how much he

5  thought it would take to win the 2002 election, and so he was

6  certainly knowledgeable of this as the puppet master behind this

7  entire scheme or parts of the scheme.  The Court finds that at

8  least $400,000 would be attributable to the bribes that were

9  raised.  The next number on the chart would be more than a

10 million dollars, and based upon the testimony, the Court can't

11 make a finding that would support a million dollars being raised

12 in bribes, and so, therefore, the Court will sustain in part the

13 objection raised by the defendants to the 18-level enhancement

14 under 2C1.1 and will instead apply a 14-level increase as to all

15 defendants.

16         The next issue that I do want to take up before we

17 take our lunch break is the vulnerable victim enhancement.  The

18 probation office has not included that enhancement, has agreed

19 with the defendants that particular vulnerable victims were not

20 targeted with respect to the vote stealing scheme.  There is

21 case law that's been cited that would indicate that a person

22 that sells their vote would not be a vulnerable victim under

23 this particular enhancement.

24         Mr. Smith, do you have additional proof that you would

25 like to offer with respect to that issue?

1          MR. SMITH:  Your Honor, I'm going to include

2     Mr. Parman in this aspect of this morning's proceedings, and I

3     do believe that we do have some proof to offer.

4          THE COURT:  All right.  Very well.

5          Mr. Parman.

6          MR. PARMAN:  Yes, Your Honor.  The United States would

7     call Special Agent Timothy Briggs.

8                    TIMOTHY S. BRIGGS,

9     having been first duly placed under oath, was examined and

10    testified as follows:

11         THE COURT:  Thank you.

12         Mr. Parman, you may proceed.

13                    DIRECT EXAMINATION

14    BY MR. PARMAN:

15    Q    Sir, state your name.

16    A    Timothy S. Briggs.

17    Q    How are you employed?

18    A    As a special agent with the Federal Bureau of

19    Investigation.

20    Q    Sir, in preparing for this sentencing hearing, were you

21    asked to tabulate the number of elderly voters that were present

22    and that voted in the primary election in the Manchester

23    precinct in 2006?

24    A    Yes, sir, I was.

25    Q    And what documents did you evaluate in making that

1    determination?

2    A    I utilized Government's Exhibit PR-23, which is the

3    Democrat and Republican May 16th primary sign-in for the

4    Manchester precinct.

5    Q    And, sir, based on your knowledge of the investigation, is

6    that the same polling place where Dobber Weaver and Wanda White

7    worked?

8    A    Yes, sir.

9    Q    Based on your evaluation of the evidence, how many elderly

10   voters voted in that May 2006 primary?

11   A    At the poll or absentee?

12   Q    At the poll.

13   A    Eighty-two.

14   Q    And how are you defining an elderly voter?

15   A    I calculate and counted everyone 60 years of age or older.

16   Q    So there were 82 individuals 60 years of age or older that

17   voted in the May 2006 primary at the Manchester precinct?

18   A    Correct, yes, sir.

19   Q    Did you also evaluate the voter assistance forms?

20   A    Yes, sir.

21   Q    How many voter assistance forms were you able to evaluate?

22   A    I believe there were only 12.

23   Q    And based on your knowledge of the investigation, why were

24   there not more?

25   A    Evidence was presented at trial that voter assistance forms

TIMOTHY S. HAGUE - DIRECT - MR. PARMAN          84

1   were destroyed to do away with the paper trail of the acts that

2   occurred, such as the Democrat and Republican judges voting for

3   the individual.

4   Q    Of the 12 voter assistance forms that you were able to

5   evaluate, how many of those were elderly?

6   A    One was in their 60s and four — or, I'm sorry, three were

7   in their 80s.  So a total of four that were 60 or above.

8   Q    And do you recall what they put on the form for why they

9   needed assistance?

10  A    Two of the individuals said they had an inability to read

11  English and two of the individuals said they had a physical

12  disability of the four elderly voters 60 or above years of age.

13  Q    And, sir, based on your knowledge of the investigation, why

14  would individuals that have that type of disability and be of

15  that age be especially vulnerable to the scheme to steal votes?

16  A    Well, it was testified to by witnesses, but that they are

17  not familiar with the new electronic voting machines, they had

18  an unfamiliarity with that and, therefore, they were targeted as

19  easy victims to steal votes from.

20          MR. PARMAN:  Thank you, sir.

21          THE COURT:  Thank you.

22          Mr. Hoskins, do you have any questions of the witness?

23          MR. HOSKINS:  Just briefly.

24                    CROSS-EXAMINATION

25  BY MR. HOSKINS:

TIMOTHY S. BRIGGS – CROSS – MS. LOGAN

1  Q    Mr. Briggs, the only criteria that you utilized was age?

2  A    With regard to these numbers, yes, sir.

3         MR. HOSKINS:  That's all.

4         THE COURT:  Ms. Logan?

5         MS. LOGAN:  Yes, Your Honor, just briefly.

6                    CROSS-EXAMINATION

7  BY MS. LOGAN:

8  Q    Good morning.  Just one quick question.  You mentioned, I

9  think, a total of –– was it four to five voter assistance forms

10 for elderly individuals?

11 A    What I –– 60 years of age or above, there were four.

12 Q    Okay.  And were you able to, one way or another, determine

13 whether that person's vote was stolen from those forms?

14 A    You can't tell from the forms, no, ma'am, but we had

15 testimony that the elderly were targeted because of their

16 unfamiliarity with the machines.

17 Q    What I'm saying is, with those particular individuals whose

18 forms you reviewed, you weren't able to tell?

19 A    No, ma'am, I couldn't tell you that.

20        MS. LOGAN:  Thank you.  That's all.

21        THE COURT:  Mr. White, any questions?

22        MR. WHITE:  None, Your Honor.  Thank you.

23        THE COURT:  All right.  Mr. Abell, do you have any

24 questions?

25                    CROSS-EXAMINATION

1   BY MR. ABELL:

2   Q    Mr. Briggs, it was the case that in 2006 that that was the

3   first round of elections that the new election machines were

4   used; is that correct?

5   A    Yes.

6           MR. ABELL:  Thank you.

7           THE COURT:  Mr. Baldani?

8           MR. BALDANI:  Thanks, Judge.

9                       CROSS-EXAMINATION

10  BY MR. BALDANI:

11  Q    Agent Briggs, your testimony is that in preparation for

12  this hearing you went back and looked at the voter assistance

13  forms that existed from the '06 election?

14  A    Yes.

15  Q    And before you got into the details of that, you stated

16  that there was testimony that voter assistance forms were

17  destroyed; is that correct?

18  A    Yes, sir.

19  Q    And destroyed by who?

20  A    I believe it was Freddy Thompson and Wayne Jones.

21  Q    Do you recall testimony that Anthony Short destroyed them

22  there at the precinct?

23  A    Yes, sir, I do.

24  Q    And that came from Wanda White?

25  A    I don't recall that, sir.

1   Q    So you can't say who destroyed them then; correct?

2   A    I wasn't there.  No, I'm just going on what the witness

3   testimony was.

4   Q    But you're testifying about evidence that you are

5   summarizing for the Court from the trial, aren't you?

6   A    Yes, sir, I said there was evidence presented at the trial

7   that some of the voter assistance forms were destroyed.

8   Q    Okay.  And recalling the evidence, as you sit there now,

9   you recall Wanda White saying that Anthony Short balled them up

10  and threw them away at the end of the day, didn't she?

11  A    I don't recall that specifically, sir, no.

12  Q    All right.  You say there were four voter assistance forms

13  that were prepared regarding elderly voters; correct?

14  A    Yes, sir.

15  Q    And who signed these voter assistance forms?  Who assisted

16  these elderly voters?

17  A    I don't have that information at hand.

18  Q    So you can't say whether it was Dobber Weaver, you can't

19  say whether it was Wanda White; correct?

20  A    I don't have that information up here, no, sir.

21  Q    And, in fact, a person other than an election officer can

22  assist an elderly person; correct?

23  A    That's correct.

24  Q    In other words, if an elderly person is disabled or can't

25  read, his or her daughter or granddaughter can assist them;

1  right?

2  A    That's correct.

3  Q    Now, you made kind of a blanket statement that elderly

4  people were targeted as easy victims, referring to the trial

5  testimony; is that correct?

6  A    Correct.

7  Q    And what trial testimony are you referring to when you say

8  that?

9  A    Well, specifically, I know Charles Weaver said that.

10  Q    Charles Weaver said that?

11  A    Uh-huh.

12  Q    Anybody else that you can recall?

13  A    Not off the top of my head, sir, no.

14  Q    Okay.  And you sat at counsel table for most all of the

15  testimony in this case, didn't you?

16  A    Yes, sir.

17  Q    With just a few exceptions when you had to leave for some

18  purpose?

19  A    Correct.

20  Q    All right.  And you recall the testimony of Mayor Carmen

21  Webb Lewis, don't you?

22  A    I remember she testified.

23  Q    Okay.  Do you understand or do you recall her testifying

24  that she, in addition to being the mayor, ran a retirement

25  center?

1  A    Yes.

2  Q    Okay.  Do you recall her testifying that Freddy Thompson

3  either offered or she asked Freddy Thompson to bring the new

4  machine to the retirement center to show it to elderly voters?

5  A    I recall there being testimony about Mr. Thompson taking

6  the machine to multiple locations for I guess practice sessions,

7  if you will, but I don't recall specifically that portion that

8  you're referring to.

9  Q    Okay.  Where do you recall the testimony being that he took

10 them to?

11 A    I believe it was fish fries and gatherings and so forth

12 surrounding the elections.

13 Q    Reading Fair?

14 A    I believe so, yes.

15 Q    A young women's Republican club?

16 A    I believe so.

17 Q    You recall those, but you don't have specific recollection

18 of Mayor Lewis saying when she heard about this she had

19 either -- she asked him or he offered to bring it to the

20 retirement home?

21 A    I don't recall that specifically, sir, no.

22 Q    You don't have any reason to doubt that, do you?

23 A    If I could refresh my recollection by looking at her

24 testimony, that's the only way I could answer that -- you know,

25 solidify my answer.

1  Q    Well, you're offering these facts based on your

2  recollection of the trial testimony, aren't you, Agent Briggs?

3  A    What facts?

4  Q    I'm sorry?

5  A    What facts?

6  Q    That elderly people were targeted.

7  A    Correct.

8  Q    Can you give any examples of testimony that Freddy Thompson

9  targeted elderly people?

10  A    He wasn't an election officer in the polls, so, no.

11  Q    Okay.  And you don't deny that he took this machine to the

12  retirement center and showed it to as many elderly people as

13  wanted to look at it, according to Mayor Lewis; correct?

14  A    I don't recall that, sir, I'm sorry.

15            MR. BALDANI:  That's all we have, Judge.

16            THE COURT:  All right.  Thank you.

17            Mr. Gilbert?

18            MR. GILBERT:  I have no questions.

19            THE COURT:  Ms. Hughes?

20            MS. HUGHES:  Thank you.

21                    CROSS-EXAMINATION

22  BY MS. HUGHES:

23  Q    Why 60?  Why age 60?  Why is that elderly to you, Special

24  Agent Briggs?

25            THE COURT:  Touchy-touchy.

1          THE WITNESS:  I will rephrase it.  I tried to rephrase

2    it after I initially said it.  I chose people that were 60 and

3    above who may have difficulty utilizing computers and machines

4    that they weren't associated with growing up, so —

5    BY MS. HUGHES:

6    Q     Okay.  So you're saying that anyone over the age of 60 is

7    necessarily vulnerable because of their age, in your opinion, I

8    guess?

9    A     No, what I'm suggesting is testimony was presented that the

10   elderly was targeted because of their unfamiliarity with the

11   machines, the new voting machines, and they were electronic in

12   nature, computer-based, so oftentimes individuals of that age

13   don't have a lot of familiarity with computers.

14   Q     And you say that based upon what?

15   A     Life experience, personal experience, knowledge of talking

16   to the voters, interviewing voters.

17   Q     Why 60 and not 65?  The government uses 65, for example.

18   A     That's just the age I chose to utilize.

19   Q     Based on your personal experience about when that knowledge

20   of computers kicks in?

21   A     I also based it upon conducting interviews of individuals

22   that had difficulty with the machines while voting and many of

23   them, many, many of them, were well under 60.

24   Q     Okay.  So those people who had difficulty with the machines

25   would have been targeted because — not because of their age,

1   many, many of them?

2   A    I guess anyone could be targeted that's not familiar with

3   the machine and was confused and walked away without pressing

4   the button the second time to actually cast their vote.

5   Q    Right.  It could have been anybody, not necessarily people

6   over the age of 60 or 55, younger than that, or 65, isn't that

7   true, anybody who was unfamiliar?

8   A    Correct.

9            MS. HUGHES:  Thank you.

10           THE COURT:  Mr. Barclay?

11           MR. BARCLAY:  Briefly.

12                    CROSS—EXAMINATION

13  BY MR. BARCLAY:

14  Q    I'm going to come around so I can see you, sir.

15       Good morning, my name is Jason Barclay.  We haven't had the

16  opportunity to meet before.

17  A    Good morning.

18  Q    But nice meeting you.  Did any of the evidence you

19  collected throughout your investigation or during trial indicate

20  that there was a particular voter that was targeted?

21  A    I'm not following your question, sir.  Like a particular

22  singular voter, one person?

23  Q    Particular singular voter, yes, sir.

24  A    Yes.

25  Q    And who was that person?

1  A    I don't recall the name of the voter.

2  Q    And does any of your evidence suggest that there was a

3  particular vote stolen?  Can you today trace whether or not

4  there was a particular vote stolen in that precinct?

5  A    Witness testimony, Wanda White, who worked the Manchester

6  precinct made a list for us of individuals that stole their vote

7  and had their vote stolen, and there were many people on there,

8  I don't recall the name of a specific person.

9  Q    But in this particular precinct, can you point to a voter

10 who had their vote stolen?

11 A    Can I name one right now, here today?

12 Q    Yes, sir.

13 A    No, sir, I can't.

14 Q    And you mentioned these conversations that occurred about

15 targeting elderly voters.  Was Mr. Bowling ever a part of any of

16 those conversations?

17 A    Not that I'm aware of, sir, no.

18           MR. BARCLAY:  Thank you, Your Honor.

19           THE COURT:  Thank you, Mr. Barclay.

20           Mr. Parman, anything else?

21           MR. PARMAN:  No, Your Honor, that's all the testimony

22 I have.  We'll just proceed by argument following.

23           THE COURT:  All right.  Thank you.

24           And you can step down.  Thank you.

25           Any other testimony you wish to offer on this issue?

1          MR. PARMAN:  No, Your Honor.

2          THE COURT:  All right.  Thank you.

3          MR. PARMAN:  Your Honor, what I think is important to

4   take into consideration here, there's been a lot of talk about

5   targeting, both in writing and in the pleadings, before this

6   hearing and even today where they targeted — there is evidence

7   and we didn't mention even in our own sentencing memorandum that

8   there was an intent to target elderly voters.  That's based upon

9   Mr. Weaver's testimony.  There's been a lot of the older people

10  who were afraid of the machine, afraid of how it operated.  Of

11  course, we have a list that was taken from Mr. Maricle's house

12  that had identified elderly people on it and you've got

13  Mr. Jones's statement that these people were going to be too

14  stupid to detect what's going on in the scheme.  But I think

15  what's important —

16         THE COURT:  Well, he was referring to all voters, he

17  wasn't really talking about elderly or any particular group or

18  suspect class.

19         MR. PARMAN:  That's absolutely accurate, Your Honor.

20  And we're not here saying that the only people that were

21  targeted were elderly people.  There's no question from the

22  testimony that if they could steal a vote, they stole it, and

23  that was — if you were a 30-year-old lawyer, if you were a

24  50-year-old person, they stole the vote from whoever they could

25  get away with stealing it from.  No question about it.  But,

1  Your Honor, I don't think that's what's required.  In fact, *U.S.*
2  *v. Robinson*, a Sixth Circuit case, 152 F.3rd 507, says
3  essentially all victims don't have to be vulnerable victims,
4  just if a portion of the victims were in fact unusually
5  vulnerable then the enhancement can apply.

6          When we look at the application note, I think it's
7  Application Note 2 of 3A1.1, we've got two things we look at.
8  Is the person a victim of the offense, and through the
9  testimony of Agent Briggs, we know in fact that there were
10 elderly people at the poll and that did vote, I believe by his
11 testimony in '82.  And, of course, the Court is well aware of
12 the scheme to destroy the voter assistance forms, so we don't
13 know how many people that had such a disability that they had to
14 require assistance to actually vote.  We don't know how many of
15 those there were.  But what we do know is that 12 filled out a
16 voter assistance form and of those 12, three were over 80 and
17 one was over 60.  So clearly the first part of the two-part test
18 is met.  We have victims of the offense.

19         Second, is the person unusually vulnerable due to age,
20 physical or mental condition, or otherwise particularly
21 susceptible to the criminal conduct.  Your Honor, I believe it's
22 clear from the testimony that based on how this scheme operated,
23 we had a new machine.  If you've got elderly voters that for the
24 past 30 or 40 years have voted one particular way, they have,
25 you know, a one-step process, a two-step process, they vote in

1   one particular manner a hundred times over the course of their

2   lifetime, then it changes all of a sudden, then it changes to a

3   new electronic machine where you have to review a ballot, that

4   created an in-road, that created a specific opening for this

5   scheme to operate, for them to particularly cause this group of

6   individuals to be especially vulnerable.

7           A Third Circuit case I would like to call your

8   attention to, it's *United States v. Hawes*, H-a-w-e-s, 523 F.3d.

9   245.  The Third Circuit actually — and the Sixth Circuit does

10  not appear to, but it actually lays out a three-factor analysis,

11  and the third portion of it I thought was particularly telling

12  as it applies to our case here.  And the third step of their

13  process was, did vulnerability facilitate the defendant's crime

14  in some manner; in other words, was there a nexus between the

15  victims' vulnerability and the crime's ultimate success.  And

16  here, Your Honor, because we have elderly voters that have voted

17  a certain way for a period of time and, of course, for instance,

18  these 80-year-old people, their ability to recognize and to see

19  what's going on around them and to understand, okay, you have to

20  review this, when the very people that are supposed to be

21  explaining to them how this operates are purposely confusing

22  them, when they go in there and say, "Okay.  Have I voted or

23  have I not?"  "Yeah, you have voted.  Yeah, you voted.  You

24  pushed the button, you voted."  When, in fact, that was simply

25  the review screen, therefore giving the members of this

1   organization the opportunity, the in-road, to go in there,

2   review the ballot and change it consistent with the will of the

3   entire enterprise.

4          Your Honor, the second portion of the vulnerable

5   victim enhancement that we asked for was for the large number of

6   victims.  I believe from Agent Briggs' testimony if the first

7   part applies, we certainly have a large number.  We've got 82

8   elderly voters just in 2006.  And for purpose of this argument,

9   Your Honor, we limited it to only the 2006 May primary where

10  we've got Dobber Weaver's testimony, we've got Wanda White's

11  testimony, we know exactly what the scheme was, we know it

12  involved stealing votes, we have that direct testimony, and just

13  from that one incident, that one precinct, that one poll, we've

14  got 82 elderly voters and we've got four voter assistance forms

15  that people had actually sought out the assistance of these same

16  co-conspirators, and three of those were over 80 years of age,

17  Your Honor.

18         So we believe, when applying the two-part test under

19  3A1.1 we have a victim of the offense, and certainly the elderly

20  were unusually vulnerable based upon the operation of this

21  scheme.

22         THE COURT:  All right.  I didn't want to cut off any

23  of the defendants from presenting any proof on this issue if

24  they chose to do so, but, quite frankly, I'm not inclined to

25  sustain the government's objection to include this in.  But if

1  anyone wants to address it ––

2          Mr. Hoskins?

3          MR. HOSKINS:  Your Honor, I wanted one point

4  clarified ––

5          THE COURT:  That's fine.

6          MR. HOSKINS:  –– and I don't know if we need to recall

7  Mr. Briggs or not, but we had tried to ascertain during the

8  trial the identity of anybody whose vote was stolen, and Wanda

9  White was not able to testify as to one single person whose vote

10 was stolen in this case.  But she also talked about buying votes

11 in that same election.  For this enhancement to apply, the

12 government would have to show that there was, in fact, a

13 vulnerable victim, and if we don't ––

14         THE COURT:  Well, it would have to be a person whose

15 vote was stolen as opposed to someone that sold their vote ––

16         MR. HOSKINS:  Correct.

17         THE COURT:  –– under Sixth Circuit authority.  So

18 we're really talking only about the identity of anyone that was

19 particularly vulnerable under 3A1.1.  And I'm not inclined to

20 find that there is the requisite nexus here between someone

21 particularly vulnerable and having their vote stolen.  But I

22 don't want to prevent you from putting on any proof if you want

23 to do that.

24         MR. HOSKINS:  Well, insofar as proof, Your Honor, the

25 only thing would be to find out if we ever had the identity of

1   any single person.  That would involve me recalling Agent

2   Briggs.

3            THE COURT:  Well, would it be for purposes of this

4   particular issue?  The only issue in front of me now is 3A1.1,

5   and I'm telling you that I'm not inclined to sustain their

6   objection.  But if you put on Agent Briggs, you run the risk of

7   him being able to identify particularly vulnerable victims.  But

8   if you want to recall him for that reason, I don't want to

9   prohibit you from doing that, but it can only hurt you if you

10  do.

11           MR. HOSKINS:  Based on that, Your Honor, I don't think

12  it would be very smart for me to —

13           THE COURT:  All right.  All right.

14           Anyone else wish to make any arguments or put on any

15  proof as to this issue?

16           MR. BALDANI:  Judge, I'm going to rest on the

17  assumption that your recollection of the trial testimony is

18  better than Agent Briggs' and that the testimony that I referred

19  to in my cross-examination that you recall.  I don't want to

20  belabor anything, Your Honor —

21           THE COURT:  Yes, sir.

22           MR. BALDANI:  — but you remember the evidence we

23  produced.  And, of course, Mr. Parman doesn't even mention it.

24  I trust you recall it, Your Honor, and hopefully that's part of

25  the basis for your statement that you're inclined not to go with

1    the government's objection.

2              THE COURT:  The Court has reviewed the relevant

3    portions of the testimony of Wanda White and Charles "Dobber"

4    Weaver as to this issue and is not convinced that the United

5    States has met its burden of establishing that they were

6    stealing votes from individuals that were particularly

7    vulnerable, and those individuals have not been identified.  And

8    under the application notes, the Court is not inclined to apply

9    a vulnerable victim enhancement for those reasons, based upon

10   the burden that's required in this Court's analysis of the

11   evidence.  So the Court would overrule the objection to the

12   presentence report that's requesting that it be included, but,

13   again, if anyone wants to make any additional arguments or put

14   on any proof —

15             Mr. Barclay?

16             MR. BARCLAY:  I got the message, Judge.

17             THE COURT:  All right.  Thank you.

18             That objection by the United States would be overruled

19   for the reasons stated.

20             I have addressed the items that were identified in the

21   Court's notice, which appear to be the issues affecting all

22   defendants in the case.  Individual defendants have raised

23   additional objections, including objections regarding role in

24   the offense and various other matters.  Those are, again,

25   individual to a particular defendant and they can certainly be

1  raised during the sentencing hearings, which are scheduled for

2  this week.

3           Under the current schedule, I believe we have

4  sentencing hearings for Mr. Stivers tomorrow at 9:30 and

5  Mr. Jones at 1:30, according to my calendar.  Mr. Thompson on

6  Wednesday morning and Mr. Adams on Wednesday afternoon,

7  Mr. Maricle on Thursday morning and Mr. Bowling on Thursday

8  afternoon, and then Ms. Morris on Friday morning, with

9  Mr. Morris being Friday afternoon.

10          Do the parties or any of the attorneys anticipate that

11  a particular sentencing proceeding will take longer than either

12  a morning or afternoon based on any presentation of proof or

13  other matters in the case?

14          MR. HOSKINS:  No, Your Honor.

15          MS. LOGAN:  No, Your Honor.

16          MR. WHITE:  No, Your Honor, but I have one quick

17  question about my —

18          THE COURT:  Yes, sir.

19          MR. WHITE:  The Court had appropriately sent me notice

20  on the enhancement for role.

21          THE COURT:  Role issue?

22          MR. WHITE:  Right.  I'm not sure if you saw the

23  footnote that I put in my sentencing memorandum that we were

24  abandoning that objection.

25          THE COURT:  All right.

1          MR. WHITE:  I'm sorry, I thought perhaps it got lost

2    in that footnote.

3          THE COURT:  It may have.  The notice that we're

4    referring to is after reviewing all of the presentence reports,

5    although Rule 32 doesn't require it, out of an abundance of

6    caution, I thought I better at least notify you that I would be

7    considering that issue, role enhancement of either three levels

8    or four levels.  Your position is that you're not going to

9    contest the role issue?

10         MR. WHITE:  Three-level.  We had actually spoke — I

11   had initially objected to it.  Ms. Bowling had pointed me to

12   some Sixth Circuit authority, I reviewed it, and I believe that

13   she's correct that the nature of — again, obviously, I'm not

14   conceding the evidence, but we lost the case and we take the

15   evidence as it is, that if you look at what occurred in the '06

16   election with respect to Dobber Weaver and Wanda White, I

17   believe the evidence — or the case law is going to — would

18   also mandate you to give a three.

19         THE COURT:  Well, and again —

20         MR. WHITE:  So on that basis, that's why I went ahead

21   and conceded that in my objections I filed.

22         THE COURT:  Well, I have to independently evaluate the

23   evidence and make a decision as to whether — in this particular

24   case whether a three-level or perhaps even a four-level

25   enhancement should be applied, and you can certainly make those

1    arguments, I don't want to preclude you from doing that.  And

2    actually, Sixth Circuit case law indicates that I don't really

3    even need to put parties on notice, but reviewing the

4    presentence reports, I thought it might be helpful to you that,

5    at least after having reviewed, that that was still in play,

6    that that possibility was still in play.

7            MR. WHITE:  It did, and it did help me, given the

8    amount of things to deal with.  I just wanted to know if I need

9    to be prepared on that tomorrow afternoon.  Thank you, Judge.

10           THE COURT:  Yeah, just be prepared to certainly

11   address it.  I have 1500 pages of notes from the trial.  I have

12   condensed it down to about a hundred pages or thereabouts, and

13   so I have gone through the transcripts pretty extensively in

14   preparation for these hearings, but there may be something that

15   I've missed or overlooked and I don't want to preclude you from

16   raising it if you think it's appropriate.

17           MR. WHITE:  Thank you, Your Honor.

18           THE COURT:  All right.  Let's see, anyone else have

19   any issues that need to be taken up before we recess and then

20   commence with individual hearings tomorrow morning?

21       (No audible response.)

22           THE COURT:  No?  We'll be in recess.

23                   (Proceedings concluded at 11:58 a.m.)

24                 C E R T I F I C A T E

25       I, Cynthia A. Oakes, certify that the foregoing is a

1   correct transcript from the record of proceedings in the

2   above-entitled matter.

3

4   7/22/2011                 s/CYNTHIA A. OAKES
     DATE                CYNTHIA A. OAKES, RPR, RMR, CRR

5

6

7

8                       I N D E X

9                                       PAGE

10  Testimony of TIMOTHY S. BRIGGS:
     Direct Examination by Mr. Parman:       82
11     Cross-Examination by Mr. Hoskins:       85
     Cross-Examination by Ms. Logan:        85
12     Cross-Examination by Mr. Abell:        86
     Cross-Examination by Mr. Baldani       86
13     Cross-Examination by Ms. Hughes:       90
     Cross-Examination by Mr. Barclay:      92

14

15

16

17

18

19

20

21

22

23

24

25