United States District Court
Eastern District of Kentucky
Southern Division at London

UNITED STATES OF AMERICA          )  London Criminal
                                  )  Action No. 09-16-S
    vs.                           )
                                  )  Frankfort, Kentucky
RUSSELL CLETUS MARICLE            )  March 22, 2010
DOUGLAS C. ADAMS                  )  10:30 a.m.
CHARLES WAYNE JONES               )
WILLIAM E. STIVERS                )
FREDDY W. THOMPSON                )
WILLIAM B. MORRIS                 )
DEBRA L. MORRIS                   )
STANLEY BOWLING                   )

TRANSCRIPT OF RULE 30 CONFERENCE
BEFORE THE HONORABLE DANNY C. REEVES

Appearances of Counsel:

On behalf of the United States:  STEPHEN C. SMITH, ESQ.
                                 JASON D. PARMAN, ESQ.

On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:          MARTIN S. PINALES, ESQ.

On behalf of the Defendant       R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant       T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant       ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:              R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant       JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant       ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant       DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, Kentucky  40741
 5

 6   On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:         107 East First Street
 7                                   Corbin, Kentucky  40701

 8                                   MARTIN S. PINALES, ESQ.
                                     150 East Fourth Street
 9                                   Federal Reserve Building
                                     Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant      R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.
12                                   220 West Main Street
                                     Suite 1900
13                                   Louisville, Kentucky  40202

14
     On behalf of the Defendant      T. SCOTT WHITE, ESQ.
15   Charles Wayne Jones:            133 West Short Street
                                     Lexington, Kentucky  40507
16

17   On behalf of the Defendant      ROBERT L. ABELL, ESQ.
     William E. Stivers:             120 North Upper Street
18                                   Lexington, Kentucky  40507

19
     On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
20   Freddy W. Thompson:             R. TUCKER RICHARDSON III, ESQ.
                                     300 West Short Street
21                                   Lexington, Kentucky  40507

22
     On behalf of the Defendant      JERRY W. GILBERT, ESQ.
23   William B. Morris:              212 North Second Street
                                     Richmond, Kentucky  40475
24

25
```

```
 1  On behalf of the Defendant          ELIZABETH SNOW HUGHES, ESQ.
    Debra L. Morris:                    201 West Short Street
 2                                      Lexington, Kentucky  40507

 3
    On behalf of the Defendant          DANIEL A. SIMONS, ESQ.
 4  Stanley Bowling:                    116 West Main Street
                                        Suite 2A
 5                                      Richmond, Kentucky  40475

 6
    Court Reporter:                     CYNTHIA A. OAKES, CRR
 7                                      Official Court Reporter
                                        United States District Court
 8                                      560 Athens Boonesboro Road
                                        Winchester, Kentucky  40391
 9                                      (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
    Proceedings recorded by mechanical stenography,
25  transcript produced by computer.
```

4

1   (Whereupon, the following proceedings were had outside the

2   presence of the jury.)

3          THE COURT:  Thank you.  Good morning, everyone.

4          At this time we will have our instructions conference

5   pursuant to Rule 30.  Hopefully everyone was able to pick up

6   copies of the draft jury instructions that incorporated a number

7   of the instructions that the parties had proposed.  Typically,

8   what I will do is start with the United States, see if they have

9   any objections or additions to the draft instructions and then

10  we'll move to the defendants in the same order that we proceeded

11  during the course of the trial.

12         Mr. Smith, have you had an opportunity to review the

13  instructions and the verdict form?

14         MR. SMITH:  Your Honor, I have reviewed all the

15  instructions and, I'm sorry, I may have failed to bring the

16  verdict form in here, so I may have to catch up with you on

17  that, but I'm ready to discuss the instructions at this point.

18         THE COURT:  All right.  Do you have objections to any

19  of the instructions that are included in the draft?

20         MR. SMITH:  Just a couple of things that I would like

21  to touch on, most of which I think are maybe typographical in

22  nature.  First is on page 17, it's the definition of the

23  elements on RICO conspiracy, it defines the elements.  In (D)

24  it — in the first paragraph, it talks about the conspiracy

25  range of dates March 2nd through the July 17th, 2007, tracking

5

1    the indictment.  However, paragraph (D) I believe it's just

2    omitted, the July 17th, 2007, date there.  So we would ask that

3    that be amended.

4            THE COURT:  All right.  That paragraph would read,

5    "Fourth, that on or about a day in March, 2002, the exact date

6    unknown, to on or about July 17th, 2007"?

7            MR. SMITH:  Yes, Your Honor.

8            THE COURT:  And then it would continue on with "two or

9    more persons reached an agreement?"  All right.

10           MR. SMITH:  Also, I noted on page 41, the instruction

11   on aiding and abetting, it refers to the crime as mail fraud,

12   which in a general sense that's correct, but we have referred to

13   the crime in the indictment as honest services mail fraud.  So

14   in the first sentence in paragraph one, "For you to find Charles

15   Wayne Jones or Freddy W. Thompson guilty of mail fraud," we

16   would ask the Court to consider referring to that as "honest

17   services mail fraud."  Likewise 2(A), the crime of mail fraud,

18   refer to it as the crime of honest services mail fraud.

19           MR. BALDANI:  Judge, if it's also — if you'll change

20   it in paragraph 2, it refers to plain mail fraud, too.

21           MR. SMITH:  I'm sorry, what paragraph?

22           MR. BALDANI:  The same page, but you said paragraph

23   one, but the first line of paragraph 2, it refers to —

24           MR. SMITH:  Yeah, you're right.

25           THE COURT:  All right.  Thank you.

1          MR. SMITH:  And Instruction 15, we have reviewed the

2     Court's instruction, and we're fine, we don't have any objection

3     to those instructions.  We had submitted and I just for the

4     record want to confirm the Court received our proposed

5     instruction on I believe page 48 of my proposed instructions, we

6     had cited a couple of cases and the one in which I guess I would

7     focus on here was the *Margiotta* case in the Second Circuit,

8     which said a violation of 1503 occurs also when a public

9     official extorts or attempts to extort payments intended to be

10    transferred to third parties, including political parties,

11    rather than the public official who has acted under official

12    right.

13          I think we were sending those late and I just want to

14    make sure for the record that those — page 48 did make it to

15    the Court.  Again, we understand the Court's instruction and

16    we're happy with it, that's the only additional instructions we

17    had requested on that.

18          THE COURT:  All right.  I had understood the way that

19    was worded that that was really authority, because it

20    contains — it's bolded and then it contains a note at the

21    beginning.  My understanding was that that was just additional

22    authority for the instruction that had been tendered in addition

23    to the cases that were cited below that.  But if you're

24    satisfied with the instruction as it's worded, we'll leave it

25    the way it is.

7

1          All right.

2          MR. SMITH:  I had a couple others.  Page 65, I think

3     in the instruction on the Title 42 offense, I saw where our

4     proposed instruction had made this error referring to that first

5     element, "that an election was held solely or in part for the

6     purpose of selecting or electing a candidate for the United

7     States Senate."  I think the indictment refers to Congress and

8     we would ask that that refer to Congress, which I think further

9     it does in the instruction.

10         THE COURT:  Yes, sir, I think this is actually a

11    combination of two different instructions that you tendered that

12    were essentially the same.  I removed what I thought was the

13    language that was duplicative and then proceeded on with what's

14    now paragraph three, which comes from that second tendered

15    instruction I believe that you had suggested.  But I will make

16    the change in paragraph 2(A).

17         MR. SMITH:  Page 68, I just highlighted the bold type

18    there at the bottom, I wasn't real sure.  I have no objection to

19    instruction.  It said "may not be appropriate," I just

20    highlighted that if there was a discussion that needed to be —

21         THE COURT:  Yes, sir.  I think the Sixth Circuit

22    pattern instructions, the commentary indicates that this

23    instruction may not be necessary unless venue is disputed in the

24    case by one of the parties, and so I wanted to highlight that so

25    it could be — so it can be discussed.  If anyone wants to leave

1  it in, I will leave it in, but if the parties don't object, I'll

2  take it out.  Let me see –– jump ahead and see if anyone objects

3  to taking that out.

4          MR. WHITE:  No, Your Honor.

5          MR. WESTBERRY:  No.

6          THE COURT:  All right.

7          MR. SMITH:  The only other comment that we would make,

8  Your Honor, was the proceeds definition on the money laundering.

9  We had also cited the Court to a Third Circuit case which said

10  proceeds of a state bribery offense is considered an SUA.  I'm

11  not real sure that that may not be duplicative, but we did offer

12  that as a further instruction specifically relating to state

13  bribery offenses.

14          THE COURT:  All right.  What ––

15          MR. SMITH:  Page 44 of our proposed instruction.

16          THE COURT:  Of your proposed ––

17          MR. SMITH:  And then, finally, Your Honor, we ––

18          THE COURT:  Let me catch up with you here.  I'm sorry.

19          Now, would you seek to include not the cases, but the

20  remainder of that paragraph that's in bold print or just the

21  sentence that reads "Proceeds of a state bribery offense is

22  considered an SUA"?

23          MR. SMITH:  We would also offer that *Mariano* case,

24  which is also I believe out of the Third Circuit, and

25  essentially, Your Honor, what –– I would ask the instruction to

1    read something to the effect that when the money is intended to

2    be used as bribes, it becomes SUA proceeds once it's given to a

3    third party and subsequent transfers are money laundering

4    offenses.  That's, again, page 44 and, as the Court notes, the

5    bold type.

6              THE COURT:  All right.  I'm going to wait and hear

7    from the other parties before I make a decision as to whether to

8    include that additional language.

9              MR. SMITH:  And our final argument as to further

10   instructions, Your Honor, would be on page 52 as to the

11   obstruction, 1503 count, which the Second Circuit in the *Cioffi*

12   case out of the Second Circuit, 1974, held that one who coerces

13   a witness to claim or with motive take the Fifth Amendment does

14   obstruct justice under 1503.  And there's also a Ninth Circuit

15   case which says essentially the same holding, and that's the

16   *Bhagat* case, 2006, Ninth Circuit case.

17             THE COURT:  What additional language would you want

18   included there?  There's actually a split in the circuits.  The

19   Third Circuit would support the instruction that Defendant

20   Maricle has tendered, the Second Circuit and the Eleventh

21   Circuits have specifically rejected that approach and would

22   support the position that you've taken.  But what specific

23   language would you like to have included if I do include

24   additional language?

25             MR. SMITH:  That the statute, 1503, would be violated

1  if a defendant advises with corrupt motive that a witness should

2  take the Fifth Amendment, to remain silent before a grand jury.

3          Your Honor, we have no objections to the verdict form.

4          THE COURT:  All right.  Thank you.

5          Let's see.  Mr. Hoskins or Mr. Pinales?

6          MR. HOSKINS:  Thank you, Your Honor.  Insofar as the

7  1503 instruction —

8          THE COURT:  What page are you on?

9          MR. HOSKINS:  Page 52.  And I was just going to speak

10  to the instruction that we tendered that the Court mentioned a

11  minute ago.

12          THE COURT:  All right.  Yes, sir.

13          MR. HOSKINS:  I didn't see any Sixth Circuit authority

14  on that point, but the instruction that I tendered was

15  essentially the language that was given by Judge Forester in the

16  Nighbert and Lawson trial recently.

17          THE COURT:  All right.

18          MR. HOSKINS:  The only other request that I would make

19  is page 85, Instruction No. 35, which I believe is the 404(b)

20  instruction.

21          THE COURT:  Yes, sir.

22          MR. HOSKINS:  It's my understanding that the only

23  evidence that was admitted under 404(b) was the television show

24  interview from way back and it's my feeling that there was

25  nothing in there sufficiently bad insofar as Mr. Maricle's

1  actions that that instruction is even required.  So I would ask

2  the Court to remove Instruction No. 35.

3          THE COURT:  What about his admissions that he violated

4  the law, but it was prior to the statute of limitations period?

5          MR. HOSKINS:  Well —

6          THE COURT:  And that was not on the video, but that

7  was his admissions on his direct examination.

8          MR. HOSKINS:  Your Honor, I think the Court admitted

9  that evidence under the background evidence.

10         THE COURT:  It was admitted as background evidence

11 when it came in with respect to these other witnesses, but then

12 he took the witness stand and he testified to other crimes.

13 There is the acts that are outlined, not crimes, but acts that

14 are outlined in the videotape and that was originally the reason

15 for 404(b).  It was not a crime, but it was another act.

16         Let me see if the United States or anyone else would

17 like the Court to give the 404(b) instruction.  It may be a moot

18 point, but let me see.

19         First, Mr. Smith?  And, obviously, if I take this out,

20 it wouldn't preclude a party from arguing its relevance as

21 intent, preparation, plan, but in terms of giving the

22 instruction, typically it's given at the request of the

23 defendant as opposed to the United States.  Mr. Smith?

24         MR. SMITH:  Your Honor, you know, if the defense wants

25 it removed, we don't object.

1          THE COURT:  All right.  I'll take it out.

2          MR. HOSKINS:  Your Honor, what I would request is that

3   paragraph two of Instruction No. 35 be incorporated into

4   Instruction No. 36 that talks about background evidence.

5          THE COURT:  I think I have given that somewhere else

6   as well, but I will add that to the end of Instruction 36.

7          All right.  Mr. White, on this issue?

8          MR. WHITE:  Yes, Your Honor.

9          THE COURT:  Yes, sir.

10         MR. WHITE:  Thank you.  Good morning, Your Honor,

11  Scott White on behalf of Defendant Jones.  I had — I had

12  neglected to add an other acts of defendant's instruction, the

13  one I proposed, so that when I was reading over the instructions

14  this morning, I was going to actually propose that you include

15  Defendant Jones in addition to Defendant Maricle.  What my basis

16  for that was the evidence that came in regarding jury tampering

17  as well as — even though I think you covered it well in the

18  background evidence on No. 36, that would be the marijuana stuff

19  back in the late '80s, early '90s.  So I think 36 takes care of

20  the marijuana.  I was going to throw in my client on 35 due to

21  the jury tampering material, and I would request that

22  instruction.

23         THE COURT:  All right.  So you would — I would change

24  Defendant Maricle to Defendant Jones committed crimes, acts, or

25  wrongs other than the ones charged in the indictment?  Do you

1  want me to specifically mention jury tampering?

2          MR. WHITE:  No.

3          THE COURT:  Okay.

4          MR. WHITE:  I will probably deal with that in closing.

5          THE COURT:  All right.

6          MR. WHITE:  But if Your Honor would be —— feel it's

7  appropriate, just mention —— just have my client's name put in.

8          THE COURT:  All right.  I'll just substitute Jones in

9  place of Maricle.  That will give you the 404(b) instruction.

10 Of course, it will be paragraphs one and two, and then

11 paragraph two of Instruction 35 will also be added to the end of

12 36.

13         MR. WHITE:  Thank you, Your Honor.

14         THE COURT:  All right.  Mr. Smith?

15         MR. SMITH:  Your Honor, we would like to be heard on

16 that argument about the jury tampering.  If the Court wants to

17 hear that now?

18         THE COURT:  Yes, I think this is probably the best

19 time to do it.

20         MR. SMITH:  Essentially, as I recall the proof, Your

21 Honor, this came up through the tapes predominantly where

22 Stivers and Jones were discussing the prospect of one of their

23 own being on the jury, we're going to make a killing, and that

24 was reiterated many times through the recordings about them

25 making money.  This is also I think throughout numerous other

1  witnesses' testimony about jury tampering as being a common

2  occurrence with this enterprise.  And, obviously, if it is part

3  of the racketeering enterprise, we would argue that it is not

4  other acts evidence that 404(b) is intended to preclude or, in

5  this situation, be one in which an instruction should follow.

6          The fact that some of that was background evidence, as

7  the Court recalls, I would argue would not bring in a 404(b)

8  instruction, because it was out of the defendant's own

9  admissions throughout the tape, if the jury chooses to believe

10 those, that there was an intent, there was a plan that went

11 throughout this racketeering enterprise that they had access to

12 the office of the circuit judge.  They were there, they actually

13 talked about an instance where they were in his office helping

14 pick a jury.  And there were also instances in which they talked

15 about making money on juries and I think that it would be on

16 that evidence that this argument is it should be considered only

17 under 404(b).

18         We would argue that racketeering enterprise under

19 conspiracy that we have alleged includes not only those

20 enumerated, but unindicted acts that are in furtherance of

21 racketeering conspiracy, including jury tampering, has been

22 shown and, therefore, this offer of instruction under 404(b) we

23 would argue be inappropriate under those circumstances.

24         THE COURT:  All right.  Let me —

25         Mr. Abell, what is your position with respect to

1  Mr. Stivers on this specific issue?

2          MR. ABELL:  I don't wish to have Mr. Stivers included

3  in Instruction No. 35, Judge.

4          THE COURT:  All right.

5          MR. ABELL:  And I think the evidence of jury tampering

6  that has been suggested is weak on its best day.  That

7  conversation took place amongst laughter and exaggeration and

8  guffawing.

9          THE COURT:  All right.  In light of the position of

10  the parties in this particular case, if the reference is only to

11  the activities of jury tampering that are outlined on the

12  audiotapes, I would not be inclined to give the instruction just

13  for Defendant Jones.  I believe that certainly does allow the

14  parties to make their arguments, but quite frankly I think to

15  include the instruction would be more harmful than helpful to

16  the defendants, Jones and Stivers, in the case and would be

17  unduly confusing.  So I will reverse course and not give

18  Instruction 35 with respect to the defendants in this matter.

19  The 404(b) instruction will not be given.

20          All right.  Mr. Hoskins, did you have any additional

21  instructions or —

22          MR. HOSKINS:  No.

23          THE COURT:  All right.  Thank you.

24          Mr. Westberry.

25          MR. WESTBERRY:  Thank you, Judge.  Just a couple — a

1  few.  We had tendered at the beginning of trial, Judge, with our

2  proposed jury instructions an instruction on good faith.  It was

3  proposed Instruction No. 11 way back at the beginning.  It was

4  adapted from the Sixth Circuit pattern instructions.  We had

5  mentioned good faith as a defense to both counts, one, of

6  course, to RICO conspiracy and money laundering, Count 2.  What

7  I would like to speak with the Court just briefly about is why

8  we believe a good faith instruction would be applicable to the

9  RICO conspiracy, Count 1.

10          In numerical paragraph 13, Judge Reeves, of the

11  superseding indictment, it sets out, of course, the time frame

12  in the indictment, which we've discussed.  It also sets out the

13  various statutes that is alleged that the defendants violated

14  through conducting the affairs of the enterprise, the Board of

15  Elections.  Among the statutes that were mentioned were 1341

16  and, in particular, 1346, theft of honest services.  It would

17  seem that the theft of honest services statute, at least under

18  the theory advanced by the government, would have applicability

19  to the office of superintendent of schools, I believe.  And I

20  also believe, Judge Reeves, that good faith has been recognized

21  as a defense to both mail fraud and honest services fraud as

22  well, 1341 and, in particular, 1346.

23          What we are asking on behalf of the defendant,

24  Mr. Adams, is that the instruction be included, in particular --

25  I think the best argument in all candor, Judge, is that it has

1  applicability to Count 1.  I don't want to oversell my position

2  on money laundering and good faith as a defense to that, but

3  anytime, at least in my experience, we've talked about the fraud

4  statutes, in particular mail fraud and its prodigy, which would

5  include honest services, good faith has been recognized as a

6  defense.  That's the first point I wanted to discuss the with

7  Court.

8          THE COURT:  All right.  Mr. Smith, would you like to

9  respond to the issue of whether a good faith instruction should

10 be included?

11         MR. SMITH:  Could we have just a moment, Your Honor?

12         THE COURT:  Yes, sir, you may.

13         MR. SMITH:  Mr. Westberry, what Sixth Circuit

14 instruction are you referring to?

15         MR. WESTBERRY:  It is 10.04.

16         MR. BALDANI:  Your Honor, as he's discussing one, if

17 I've got a position on a particular instruction, do you want me

18 to chime in now or do you want me to wait until it comes around

19 to me?

20         THE COURT:  Let me hear from Mr. Smith and then I'll

21 jump back to you.

22         MR. WESTBERRY:  Steve, I think it's page 316, if

23 you've got the same book I've got.

24         MR. SMITH:  Your Honor, I think that in order for this

25 instruction to apply there must be some evidence to support and

1   I don't hear anything from Mr. Adams explaining how this scheme
2   to buy votes, bribe voters to vote for particular slated
3   candidates, would offer this instruction of good faith.
4   Essentially, trying to bootstrap this instruction on the RICO
5   would do so in violation, I believe, of the facts of the case,
6   because there have been no facts offered by Mr. Adams that would
7   suggest under any scenario that there was an honest mistake in
8   judgment here on his part in participating in a scheme to buy
9   votes.  There is application for this, I just don't think the
10  facts in this case support it.

11          Obviously, the instruction's here for a reason.  I
12  think in this scenario, the racketeering enterprise has defined
13  the predicate acts to include honest services mail fraud, but
14  when you read the indictment on honest services mail fraud, it
15  continues to reiterate the same thing, the theme is we're going
16  to steal votes, we're going to buy votes, and then we're going
17  to certify this and mail it up, and that is part of the scheme.

18          Are there facts in the record that would support that
19  Mr. Adams was acting in good faith?  I am not aware of them and
20  I do not hear anybody arguing that there are such facts.  This
21  would be confusing at best under these facts and would offer —
22  I don't believe it would offer an argument that is supported in
23  any way by any facts in the case.

24          THE COURT:  All right.  Mr. Westberry, what would be
25  the factual support for that instruction for Count 1?

1          MR. WESTBERRY:  I recall the testimony from Agent

2    Sagrecy when he testified, and I'm paraphrasing, but I think it

3    went like this:  But for the fraudulent scheme, you know, to

4    control politics in Clay County — I'm again paraphrasing in I

5    think paragraph 11 of the indictment, but for that fraudulent

6    scheme, these defendants would not have kept their contracts or

7    their salaries/positions in local government.  It seems to

8    strongly imply to me the position of judge, superintendent,

9    clerk, which would involve theft of honest services statute, I

10   believe.

11          THE COURT:  Let me jump over to Defendant Thompson.

12          Mr. Baldani.

13          MR. BALDANI:  At the outset, we had submitted a good

14   faith instruction in our initial instructions.  Now, in our

15   initial instructions I referred to Counts 1 and 2, but I want to

16   specifically ask the Court that that be applied to 3, 5, 6, and

17   7, because, obviously, good faith is a defense to honest service

18   mail fraud.

19          And with regard to the government's question or

20   assertion that there's not —— that there's not any evidence to

21   support it, basically with respect to honest service mail fraud,

22   our defense is Freddy Thompson was not aware if, in fact, any of

23   those reports that he sent in were fraudulent.  And, of course,

24   we have introduced evidence about his voter education efforts to

25   basically rebut the ——

1          THE COURT:  Well, I don't think that really gets you

2    where you need to go.  I think probably your best argument is

3    that there was evidence that someone other than Thompson

4    destroyed some of these forms.

5          MR. BALDANI:  That's right.  Actually, that's what I

6    was getting to next, Your Honor.

7          THE COURT:  And the issue for the jury would be

8    whether they would believe that testimony.  If they didn't

9    believe the testimony of Wanda White that she was told that

10   Thompson and Jones would take care of those forms, voter

11   assistance forms, if the jury disbelieves her, and there is

12   evidence that Mr. Short would have destroyed those forms.

13         MR. BALDANI:  Right.

14         THE COURT:  And so that may be I think your best

15   argument.  I'm not sure that there's a sufficient argument under

16   Counts 1 or 2, but let me see what Mr. Smith's position is on

17   Counts 3, 5, 6, and 7.

18         MR. SMITH:  Your Honor, as to Mr. Adams' argument

19   about Agent Sagrecy, Agent Sagrecy, his testimony was limited,

20   number one, to money laundering.  So here we're trying to pull

21   money laundering back into RICO, which he says he's not going to

22   argue, and I think that that's — I don't think that's a fair

23   characterization of what his testimony was, but even assuming it

24   was, it was related to solely to money laundering and not the

25   racketeering.  So I fail to see that being an issue.

1            Secondly, as to the good faith defense as it pertains

2   to Mr. Thompson, again, I think that there has to be evidence in

3   this case that there was a good faith basis, and I think if I

4   understand what the argument is, the argument is, yes, if the

5   jury believed that one instance where those voter assistance

6   forms were destroyed by Carl Anthony Short, which he only served

7   in that May 2006 primary, he did not serve in the fall, so it

8   would relate —

9            THE COURT:  So it would relate to Count 3?

10           MR. SMITH:  I do not —

11           THE COURT:  I don't remember the dates and I —

12           MR. SMITH:  I do not believe it's Three, Your Honor, I

13  believe it would be Six.  So as to Count 6 only, could we be

14  arguing those facts, and now, if we again look at —— the scheme,

15  of course, enumerates a manner and means of a number of things

16  that were involved, including the pooling of money, the marking

17  of voters, the destruction of assistance forms and falsely

18  reporting of fraudulent vote totals in the county to the

19  Secretary of State and the Board of Elections.  Again, it would

20  seem to me that if the facts were taken in the light most

21  favorable to the defendant on this issue, it would only relate

22  to Count 6 and it would only relate as to one of the numerous

23  acts that have been enumerated here, and I would say that it

24  should not be included in the racketeering.  If it has any

25  application, it would relate only to this one count and it would

 1 | only relate at this point as to Mr. Thompson.

 2 |           THE COURT:  All right.

 3 |           MR. BALDANI:  Could I respond, Judge?

 4 |           THE COURT:  Yes, sir, you may.

 5 |           MR. BALDANI:  Your Honor, I was actually getting ready

 6 | to discuss the voter assistance forms, because if you remember,

 7 | in both Mr. Thompson's testimony at the grand jury and his

 8 | statement when he was recorded by Kennon White, he said, "I

 9 | turned in everything that was submitted to me."  So that goes

10 | right to the heart of good faith.  He can only submit what is

11 | given to him.

12 |           And while Anthony Short -- there may only be evidence

13 | that Anthony Short destroyed voter assistance forms in May of

14 | '06, we certainly challenged I think pretty credibly Ms. White's

15 | assertion that she even turned them in in the fall of '06.  If

16 | you recall, she couldn't -- she admitted telling the grand jury

17 | she didn't know where they were signed, she was inconsistent

18 | about her reason that she claims she filled them all out.

19 |           So really the United States takes issue with how much

20 | evidence there is to support it, but I believe the law is if

21 | there's any evidence to support, then we're at least entitled to

22 | the instruction and the ability to argue.  So we would assert

23 | that as to Counts 1, 2, 3, 5, 6, and 7 good faith should be

24 | given.

25 |           THE COURT:  All right.  I'm not going to give a good

1  faith defense with respect to Defendant Adams.  I will give the

2  good faith defense with respect to Defendant Thompson, but only

3  with respect to Count 6 and only as it applies to the alleged

4  manner and means of subparagraph four of that paragraph.  Just

5  because you've challenged someone's testimony doesn't mean that

6  that's evidence to support your position, it's just argument

7  that you've made with a particular witness, and I don't think

8  that the evidence would support giving that instruction with

9  respect to other counts or other issues in the case.  And so it

10 will be given, but limited to that issue.

11         Mr. Westberry, you had also included a request for the

12 instruction on confessions and I wasn't sure if you wanted the

13 Court to give that based upon the testimony.

14         MR. WESTBERRY:  We've had some discussions about that

15 and I think -- could I -- I'm trying to move this along.  I did

16 have one thing very -- less than one minute in response.

17         THE COURT:  That's fine.

18         MR. WESTBERRY:  I respect your ruling.

19         THE COURT:  Yes, sir.  No, if you need to respond

20 further, you certainly can do so.

21         MR. WESTBERRY:  Thank you very much.  With regard to

22 Agent Sagrecy's testimony that we described just a moment ago,

23 certainly the agent was offered in support of the money

24 laundering count.  However, his portion of the testimony, but

25 for the fraudulent scheme, I believe the jury can fairly

1   construe that as having applicability not just to the money

2   laundering, but to Count 1, the RICO conspiracy, as well.  I was

3   looking at the commentary, Your Honor, in the Sixth Circuit

4   pattern instructions at 10.04, it's at page 317.  I have the

5   2005 blue West edition, perhaps we have the same copy.  I

6   just — I looked at page 317, it's 10.04, Judge, a *McGuire* case

7   from a number of years ago, which apparently is still good law,

8   and it simply says the good faith instruction should be given if

9   there is any evidence at all to support the charge.  The

10  citation is in there.  I think the Court knows my position on

11  that.  I think there's sufficient evidence that would warrant

12  the instruction as to Count 1.

13          THE COURT:  All right.  Well, I appreciate your

14  position, but in this particular case, with respect to Counts 1

15  and 2, I don't see that there is evidence to support the

16  position.  So I would not give that with respect to Defendant

17  Adams.

18          MR. WESTBERRY:  May I move before we get to the

19  confession issue, I know we had tendered that, a couple of

20  others, Your Honor?

21          THE COURT:  Yes, sir.

22          MR. WESTBERRY:  Page 79 of your draft, the Court's

23  draft instruction, it's Instruction No. 29, the testimony of a

24  witness under grant of immunity or reduced criminal liability.

25  The Court had included, of course, Wanda White in that.  What I

1  believe, I think, Judge, that it would also have applicability

2  to Mike Bishop, if my memory of the testimony serves me

3  correctly.  I think there was a line of direct or cross that

4  indicated that he was getting the same sort of treatment.

5          THE COURT:  I don't recall that testimony.

6          Mr. Smith, what is your position with respect to

7  Michael — Mike White?  Did he testify pursuant to a grant of

8  immunity?

9          MR. SMITH:  Well, I do believe that what was presented

10 on Mike Bishop was that his father, Paul Bishop, entered a plea

11 agreement.

12         THE COURT:  I think you referred to Mike White, who

13 was the —

14         MR. WESTBERRY:  Did I say Mike White?

15         THE COURT:  You did.

16         MR. WESTBERRY:  I meant to say Mike Bishop, excuse me.

17         THE COURT:  Mike Bishop, I know there was testimony

18 about his father.

19         MR. WESTBERRY:  Right, Paul.

20         THE COURT:  His father had entered a plea.  But I

21 don't recall any testimony about Mike Bishop.  I think he was

22 asked questions, but it didn't indicate that he had been given

23 any type of immunity or promises in exchange for his testimony.

24         MR. WESTBERRY:  My best recollection, and I have the

25 transcript.

1          MR. BALDANI:  I have a little recollection of that,

2    Judge.  I think that I asked him — referred him to his father's

3    plea agreement, and in his father's plea agreement, which I

4    think was introduced, I don't remember a hundred percent for

5    sure, maybe it wasn't, but I referred him to his father's plea

6    agreement, if I remember correctly in which it actually said

7    Mike Bishop would not be prosecuted.  So the transcript will

8    speak to that, but I was going to join in asking that Mike

9    Bishop be added there.  And I do have a pretty good recollection

10   of questioning Mr. Bishop.  In fact, his father's plea agreement

11   provided for the fact that Mike would not be testifying — I

12   mean, would not be prosecuted, which basically would amount to

13   immunity in our position, Your Honor.

14          THE COURT:  All right.  Mr. Smith?

15          MR. SMITH:  Your Honor, I would ask that we have an

16   opportunity to pull — if Paul Bishop is in — you say it's in

17   evidence?

18          MR. BALDANI:  I didn't remember if it was or not.

19          MR. SMITH:  Well, we have a copy of it and I probably

20   need to refer to that, because —

21          THE COURT:  The plea agreement itself is PA-7 or 8, I

22   believe.  I looked at it last night.  PA-6.  I don't see any

23   reference to Mike Bishop in Paul Bishop's plea agreement, an

24   agreement of the prosecutor not to bring action against him.

25          MR. WESTBERRY:  I thought it was in the testimony, is

1    my best recollection.  I'm happy at a break to -- if the Court

2    would allow, I've got it.

3              THE COURT:  All right.  I would need to be shown that

4    testimony before I would include that.  When we go through all

5    of these -- the parties' proposed changes, corrections, or

6    additions, we'll take a short break and I'll let you go look for

7    that while I make some of the charges that are not in dispute.

8              MR. WESTBERRY:  I'm trying to move along here.  That

9    may also have some applicability to the kind add-on instruction,

10   29A, Your Honor.  I saw that testimony of witnesses under

11   reduced criminal liability.  We were looking at that this

12   morning and wondering if we should include the names of all of

13   the witnesses who we believe testified under reduced criminal

14   liability.  I can see it would be somewhat extensive.

15             THE COURT:  The practice I follow in a lengthy trial

16   is if there is more than just a few witnesses, I usually will

17   just include a description of several witnesses and allow the

18   parties to argue whatever they wish to argue on that rather than

19   weigh down the instructions with a list of names.

20             MR. WESTBERRY:  Thank you.  And I expected that was

21   the response.  I can see the practical problems with 10 or 15 or

22   20 names in there.

23             We had tendered a missing witness instruction

24   involving Paul Bishop.  As I said, I can't find any Sixth

25   Circuit authority on it.  The Seventh was the one we found.

1          THE COURT:  And the Seventh says you shouldn't give

2     the instruction.  There are also two elements that the Seventh

3     Circuit recognizes, one is the witness is generally unavailable

4     to the parties if you would call the person, and, of course,

5     there's a relationship issue of whether the person is aligned to

6     one party or the other in the case, such as a confidential

7     witness, things of that nature.  I think that's what the

8     commentary indicates.

9          In this case, we have the opposite situation where

10    witnesses have testified that Paul Bishop was close friends with

11    Douglas Adams, and so there's no reason for the Court to

12    conclude that he could be called by the United States and not by

13    the defendant, number one; and, number two, if we go down that

14    route, then I'm sure the parties could also ask me to make

15    reference to all the other people that are alleged to be

16    co-conspirators in the case and should we list a hundred people

17    or just one person?

18         I don't think it's appropriate with respect to Paul

19    Bishop, but if it is appropriate with respect to Paul Bishop, it

20    really opens up a big can of worms and I don't think the parties

21    are going to ask me to give that particular instruction with

22    respect to every possible co-conspirator that's been mentioned.

23    So I would decline to give that instruction.

24         MR. WESTBERRY:  The last — you mentioned the

25    instruction that we initially tendered on the confession.

1          THE COURT:  Yes, sir.

2          MR. WESTBERRY:  I think we've talked about that

3   amongst ourselves.  Of course, the proof has developed somewhat

4   differently than what we anticipated two months ago, so we would

5   ask that not be included in the instructions.

6          THE COURT:  All right.

7          MR. WESTBERRY:  Thank you.

8          THE COURT:  Yes, sir.

9          Mr. White, I've addressed I think one of your

10  instructions previously.  I did include a number of the

11  supplemental instructions that you had tendered last week, but

12  did you have any others that you would like to tender?

13         MR. WHITE:  I just had a couple, and if I could, just

14  for the record, I was going to join in the good faith and point

15  out some testimony from Sarah Ball Johnson, but that was

16  hypothetical questions that she was asked and I don't need to be

17  heard further on that.

18         The other one I was going to mention is on the

19  Count 4, the extortion, there's an issue on that one that I

20  believe Mr. Abell is going to address that I'm going to join in.

21  I'll let him handle that.

22         The only other one I had had to do with Mr. Thompson's

23  theory of the defense instruction.

24         THE COURT:  All right.  If you can refer me to a page.

25         MR. WHITE:  That's page 74, I believe, and that's

1  Instruction 24B.

2           THE COURT:  Yes, sir.

3           MR. WHITE:  If you could look at line four,

4  paragraph three, where it says, "In that he had no knowledge

5  that the election reports in those years contained fraudulent

6  vote totals," obviously my client is also in those counts and so

7  I would ask that the — it state instead of that he had no

8  knowledge that the election reports, instead have it read "and

9  that he had no knowledge if the election reports in those years

10 contained fraudulent vote totals."

11          MR. BALDANI:  Your Honor, I would agree with that.

12 That is a correction in my defense theory instruction.

13          THE COURT:  All right.

14          MR. WHITE:  Your Honor, those are all the changes I

15 was going to suggest and thank you, Your Honor, for including

16 the Kentucky law, the ones that we provided.

17          THE COURT:  So I'm clear, your change would be to

18 Defendant Thompson's proposed theory of the case and he agrees

19 with that change from "that" to "if," so that that takes care of

20 that issue with respect to —

21          MR. WHITE:  It does, Your Honor.  Thank you.

22          THE COURT:  All right.  Thank you.

23          Mr. Abell.

24          MR. ABELL:  Judge, the two objections that I have to

25 raise deal really with *Pinkerton* Instruction No. 15D at page 50

1  as it relates to Count 4 and 16A identical instruction as it

2  relates in part to Count 8, which is obstruction of justice.

3         Count 4 charges Jones and Stivers with extortion as

4  relates to Ms. Lewis.  It does not charge a conspiracy.  Count 8

5  charges obstruction of justice by Mr. Maricle and Mr. Stivers.

6  It does explicitly advance an aiding and abetting theory, but

7  does not charge conspiracy and, therefore, as to 15D and 16A, I

8  respectfully submit a *Pinkerton* instruction would not be

9  appropriate.

10         THE COURT:  Now, in this case with respect to Count 4,

11  there was testimony of several contacts with either Ms. Lewis or

12  with her husband and one was a follow-up with Vernon Hacker.

13  Although not charged as a conspiracy, there was evidence that

14  more than the two defendants were involved with that activity.

15         With respect to Count -- Well, let me see what the

16  United States' position is first.  Again, this may be a moot

17  point.

18         Mr. Smith, what is your position with respect to the

19  *Pinkerton* instruction as to Count 4, which alleges matters

20  against the mayor, Carmen Webb Lewis, and Count 8?

21         MR. SMITH:  Your Honor, I believe it is appropriate.

22  This, of course, has a conspiracy charge for both racketeering

23  and money laundering.  Both these defendants are members of that

24  conspiracy.  The use note on page 121 of the Sixth Circuit says,

25  "This instruction should be used when the government is

1  attempting to convict the defendant of a substantive crime

2  committed by other members of the conspiracy and there's also

3  some evidence that the defendant personally committed or

4  participated in the commission of the substantive offense."  We

5  would argue that this is exactly what's intended by the

6  instruction.  It's not required that the extortion itself be a

7  conspiracy to commit extortion or I believe that's the way the

8  use note would have worded it.  It is on a substantive crime

9  where these defendants are members of a conspiracy and we would

10 argue that it has application in this instance factually and

11 supported by the Sixth Circuit.

12         THE COURT:  With respect to — with respect to

13 Count 4, is it your position that the defendants would have been

14 aided by Mr. Stivers — I'm sorry, would have been aided by

15 Mr. Hacker?

16         MR. SMITH:  Well, in recalling the facts supporting

17 that, there were — I'm blanking as to whether it was Hacker.  I

18 do believe there was another member of the conspiracy that was

19 sent in that — there were at least I think three passes they

20 made on this issue and also to the husband, and I think that in

21 the course of that she related that Stivers did most of the

22 conversation, although she said Jones mentioned it as well.  And

23 I think that in the course of the jury having the full benefit

24 of the facts, there is evidence to support that Stivers was

25 acting within the scope of an agreement that Jones also knew

1  about and it was reasonably foreseeable to him that follow-ups

2  by Stivers or other members could be attributed to him as well.

3  So I see application in the facts as I recall them, Your Honor,

4  and obviously —

5        THE COURT:  All right.  Well, I think there is

6  sufficient testimony for the Court to give a *Pinkerton*

7  instruction as to both Counts 4 and 8, and so I will overrule

8  the objection to those two instructions.

9        Mr. Abell, you had also proposed some instructions on

10  interstate commerce, which I think — not the ones you've

11  tendered, but there are instructions that are given with respect

12  to the counts that pertain to that element being required.

13        MR. ABELL:  Yes, those are in Instruction 12B, Judge.

14        THE COURT:  All right.

15        MR. ABELL:  And I had submitted supplemental

16  instructions that the Court has not included that are based on

17  testimony that's been given and inferences that can be drawn

18  from that testimony; No. 1, dealing with the civil lawsuit that

19  Mr. Stivers was involved in following his arrest in October of

20  2002 to the effect that contrary to what at times was suggested

21  by my opposition, the settlement with the City of Manchester is

22  something that is subject to disclosure under the open records

23  law and can't be done in a secret way and can't be made secret

24  by some intervention of the Clay Circuit Court or by

25  Co-defendant Maricle.

1          THE COURT:  That is the supplemental instruction

2     that's on page three —

3          MR. ABELL:  Yes, sir.

4          THE COURT:  — that you tendered earlier?

5          MR. ABELL:  Supplemental Instruction No. 1.

6          THE COURT:  I had intended to include that and

7     apparently did not.  All right.  I'm not going to give the

8     additional instructions on interstate commerce.  I think they're

9     sufficiently included, the definitions are sufficiently

10    included, in what has been tendered, but I will include the

11    supplemental Instruction No. 1 that you just referenced.

12         MR. ABELL:  Somewhat related I guess to that overall

13    incident is supplemental Instruction No. 3, and it's related

14    because there's been testimony, and this came directly from Todd

15    Roberts, that Mr. Stivers' point of contention the day he got

16    arrested was that it was improper for Dobber Weaver's parents to

17    serve as election officers since their son was on the ballot

18    running for school board in the fall of 2002.  And I believe

19    that Mr. Roberts conceded that a review of an election law

20    handbook was done that day and it reads that Mr. Stivers' point

21    in fact was correct, and it is in the statute they have cited,

22    117.045, subparagraph nine states that.

23         THE COURT:  Let me see if I'm understanding.  Your

24    position is that this instruction should be given because there

25    was a dispute between Mr. Stivers and Mr. Roberts and this

1   proves that Mr. Stivers was correct about that?

2           MR. ABELL:  Actually, I believe the dispute was

3   between Mr. Stivers and Jennings White, who had been lawfully

4   appointed by the Weavers as deputy clerk and was permitting them

5   to function as election officers in violation of the statute,

6   and I think the evidence supports that at Mr. White's direction

7   Mr. Roberts had Mr. Stivers arrested without any basis for him

8   being arrested.

9           THE COURT:  This is such a —

10          Mr. Smith, let me see what your position is.  I'm not

11  inclined to give this instruction, but I want to see what the

12  position of the government is.

13          MR. SMITH:  First of all, I do not agree with the

14  description that Todd Roberts conceded on the witness stand that

15  Mr. Stivers was correct in the debate over intricacies of

16  election law on the date of November 2002.  I believe that there

17  was — in this case, that's at best a collateral issue,

18  extrinsic from the issues and elements of the case at hand, and

19  how that could be supported by the facts is only by argument.

20  There's no facts that I recall specifically supporting this and

21  it's a collateral matter.  It's one in which if we were to

22  instruct this jury on all collateral matters, these instructions

23  would become —

24          THE COURT:  Bigger than they are.

25          MR. SMITH:  Yeah, much bigger.  And —

1          THE COURT:  All right.  I'm not inclined to give this

2   instruction.  I do tend to agree that this is such a collateral

3   matter that there's not an instruction that's necessary on this

4   point.

5          Yes, sir, Mr. Abell.

6          MR. ABELL:  Yes, Judge.  The supplemental proposed

7   Instruction No. 4 has to do with the period of permissible

8   absentee voting and, of course, there has been substantial

9   testimony —

10         THE COURT:  All right.  I'll give that one.  I'll give

11  that one.

12         MR. ABELL:  And No. 5 deals with the fact that who's

13  been appointed by the Board of Elections is to serve as election

14  officers.  That's not a secret list, it's a public document.

15         THE COURT:  All right.  I'll give that one as well.

16         MR. ABELL:  And, finally, No. 6 deals with the law

17  that provides that State Board of Elections can exercise veto

18  power if it so wishes over any election officer appointed and

19  nominated by the county Board of Elections.

20         THE COURT:  I'll include that as well, but I'll change

21  the word "who the Board find" to "finds," f-i-n-d-s.

22         MR. ABELL:  And that's all I have, Judge.  Thank you.

23         THE COURT:  All right.  I'll include Instruction

24  No. 1.  I thought I had already given Instruction 2, but if I

25  haven't, I'll give Instruction 2.  I'm not going to give three,

 1    I will give four, five, and six.  I think we've discussed the

 2    others, but those will be included.

 3            MR. ABELL:  And two, Judge, is included in

 4    Instruction 41 on page 92.

 5            THE COURT:  All right.  So you don't think there's a

 6    need to duplicate that?

 7            MR. ABELL:  No.

 8            THE COURT:  All right.  Okay.

 9            Let's see, Mr. Baldani.

10            MR. BALDANI:  Thanks, Judge.  For starters, Your

11    Honor, I think I can direct you on that Mike Bishop immunity

12    issue.  I found -- I had mentioned the plea agreement.  We

13    looked at the plea agreement and could not find it, but

14    Mr. Smith sent all defense counsel a letter on December 30th --

15    well, it's dated December 30th, I think we received it on

16    February 3rd, and in paragraph six of the letter it says, "The

17    undersigned has provided the plea agreement of Paul Bishop.  In

18    the written agreement it is set forth that Mike Bishop would not

19    be prosecuted provided that they provide truthful testimony if

20    called as a witness.  This agreement has been previously

21    provided."  So apparently, I suppose the government thought that

22    that had been included in the agreement.  Perhaps it had not,

23    but that -- I'm sure Mr. Smith will acknowledge sending that

24    letter to counsel.

25            And based upon that letter, if I recall, I think about

1    my last question on cross-examination of Mike Bishop was to the

2    effect that your father's plea deal involved the fact that you

3    wouldn't be prosecuted.  So if you're looking to the evidence to

4    find when that was mentioned, I think if you go to the very end

5    of my cross-examination, according to my notes, he was asked

6    about it and based upon the letter that we received from the

7    prosecution, Your Honor.  So that will direct you to the basis

8    of that issue.

9            THE COURT:  Well, keep in mind I don't have the

10    transcripts.  I don't have any of the daily copy or anything,

11    so —

12            MR. BALDANI:  I don't have that particular —

13            THE COURT:  So rather than direct me to it, you need

14    to provide it to me if you have it, but let's see what Mr. Smith

15    says.

16            Mr. Smith, Mr. Baldani says that you provided him with

17    a letter which indicated that immunity had been given to Mike

18    Bishop in exchange for truthful testimony.

19            MR. SMITH:  Well, I don't disagree that there was some

20    language, and I'm not real sure that that's my take on it.  I

21    believe there was something to the effect that if Paul Bishop —

22    and his plea agreement was that if he was truthful, as well as

23    his son truthful, that there was an agreement that he not be

24    prosecuted.  I do not recall that coming out in the testimony.

25    Obviously, we don't have an obligation to instruct the jury on

1  things outside the record.  If it's in the record, I think

2  that's where the inquiry needs to stop.  I'm not disputing that

3  there may have been a clause within a supplement to that.

4        THE COURT:  Okay.  Well, I'm going to need to look at

5  the transcript.  I'll try to find that at some point.

6        MR. WESTBERRY:  I do have it in my car.

7        THE COURT:  All right.  Well, if we get through the

8  jury instructions before 1:00, then I'll ask you to go out and

9  you can bring that in to me.

10        MR. WESTBERRY:  I hope we do.

11        THE COURT:  I hope we do, too.

12        Yes, sir.

13        MR. BALDANI:  And then very briefly, my other issues,

14  I did want to specifically join in the missing witness request

15  as to Paul Bishop and would simply state that I think that the

16  cases that disfavor are distinguishable, because in this case

17  the prosecutor in his opening statement cited what Paul Bishop

18  would tell the jury.

19        THE COURT:  All right.  Did you attempt to subpoena

20  Paul Bishop as a witness in the case?

21        MR. BALDANI:  No, Your Honor, I attempted to talk to

22  him and his attorney wouldn't allow me to talk to him, so I did

23  not —

24        THE COURT:  Well, did he prevent you from serving a

25  subpoena on him?

1          MR. BALDANI:  No, Your Honor.

2          THE COURT:  All right.  Thank you.  The Court's ruling

3     stands with respect to that issue.

4          MR. BALDANI:  And then the last thing I would mention,

5     Your Honor, is I think it's a problem that the instructions as

6     they relate to Counts 3, 5, 6, 7, 10, and 11 don't set out any

7     timeframe in the instructions.  For example, Judge, in the RICO

8     instruction, No. 1 on page 17, it starts out "Count 1 of the

9     indictment charges that from on or about March 2002 until

10    July 17th, 2007.  But by way of comparison, if you look over at

11    Instruction No. 11 on page 58, it doesn't say in Count 11 of the

12    indictment it alleges that on a particular date or on or about a

13    particular date.

14         And especially with respect to Counts 10 and 11, Your

15    Honor, I think that that is very significant, because basically

16    under the broad language with no specific on or about, the jury

17    could say, well, I think this defendant or that defendant

18    engaged in this conduct, but they may have thought that it

19    happened in '02, which would be totally, you know, not set out

20    in the indictment in any respect.

21         So I think that the indictment, especially with — or

22    the instructions, I'm sorry, especially with Instructions 10 and

23    11, you need to have some reference to an on or about time

24    period as alleged in the indictment.

25         Now, 3, 5, 6, and 7 is one instruction and covered all

1   of those offenses.  And of course, 3, 5 had to do with May and

2   fall of '04; 6 and 7, May and fall of '06.  But I believe that

3   in order for the verdict to reflect a finding of the jury that's

4   only limited -- that would be limited by the allegations in the

5   indictment, there needs to be some on or about dates in those

6   instructions.

7         THE COURT:  All right.  I'll need to go back and

8   revise the entire instructions to include specific dates with

9   respect to specific counts.  Of course, I'll be providing the

10  jury with a copy of the indictment as well that has those

11  counts, but I will go back and include specific dates with

12  respect to each specific count.

13        Mr. Gilbert.

14        MR. GILBERT:  Judge, I just have one additional point.

15  It's on page 60 and it's Instruction 18A.

16        THE COURT:  Yes, sir.

17        MR. GILBERT:  It's paragraph five.  That was not

18  included in previous versions of that and it refers to several

19  federal crimes and the underlying crime is -- there's only one

20  crime, and that would be vote buying.  So we think that that

21  would be -- that entire paragraph needs to be eliminated.

22        THE COURT:  All right.  I assume there's no objection,

23  Mr. Smith, to removing paragraph five from what would be page 60

24  and 61?

25        MR. SMITH:  Page 60, paragraph five?

1          THE COURT:  Yes, sir.

2          MR. SMITH:  No, I don't have any objection.

3          THE COURT:  Mr. Gilbert, did you have anything else?

4          MR. GILBERT:  Pardon?

5          THE COURT:  Anything else?

6          MR. GILBERT:  No, Your Honor.

7          THE COURT:  All right.  Thank you.

8          Ms. Hughes?

9          MS. HUGHES:  Your Honor, I only have two points to

10  make.  The first one would be on page 20, it's the interstate

11  commerce definition under the RICO count.  While I don't deny

12  that the federal government has the authority to regulate

13  federal — or federal elections, I think the RICO statute relies

14  upon interstate commerce as its foundation for the federal

15  jurisdiction, and so I don't think that there's authority to say

16  that the effect on the outcome of federal and state elections is

17  a basis for interstate commerce.  I don't deny that the

18  contracts and the federal grant money is correct, but I don't

19  think affecting elections should be considered commerce.

20          And then my only other point is that we do object to

21  including the specific language that Mr. Smith raised earlier

22  from the *Mariano* case I think about when proceeds — when

23  bribery money becomes a proceed of a specified unlawful

24  activity.

25          THE COURT:  It's I think from page 44 of his tendered

1   instructions.

2            MS. HUGHES:  From his.

3            THE COURT:  Uh-huh.

4            MS. HUGHES:  Yes.  But it would affect page 33 of your

5   instructions.

6            THE COURT:  Mr. Smith, would you like to respond to

7   the issue on Instruction 12B, page 20, whether paragraph three

8   should be revised to remove "by affecting the outcome of federal

9   and state elections" as an element of interstate commerce?

10           MR. SMITH:  Well, Your Honor, I do believe that it is

11  appropriate to support affecting interstate commerce if we have

12  actions which involve federal elections.  I think that counsel

13  has cited no case law for her argument, it's again one in which

14  she thinks it would be better to stick with just the contracts,

15  and obviously there were multiple witnesses which support that

16  these contracts for services did include federal grant monies.

17  And I think that that supports, obviously, our theory equally.

18  But to, again, take away the government's argument on the other

19  theory, the alternative theory, I believe is not called for,

20  there's no authority that she cites that would take that from

21  us.

22           You know, the case law on these type of issues that I

23  have reviewed have involved a lot more attenuated effect on

24  interstate commerce than this case, particularly schemes

25  involving of racketeering where insurance contracts were being

1  controlled through, again, controlling the members on the city
2  council and then, you know, talking about how insurance has the
3  ability to, again, have an effect on interstate commerce.  A
4  federal election in this case was affected, we believe, we
5  believe we've shown that it was affected in numerous ways and
6  that the fraudulent vote totals that were accumulated by the
7  scheme and to, again, state whether or not a federal election
8  has no effect on interstate commerce, I think, strains reason
9  and common sense.  Obviously, a federal officer, officeholder
10 and member of Congress, is going to be approving Pride Grants,
11 that's how the Pride Grant got into Kentucky was through
12 Congress, and to take that argument away from us in this
13 setting, again, I fail to see any legal support for that
14 argument.
15         THE COURT:  All right.  I'm going to leave the
16 Instruction 12B as worded.  I'll overrule the objection to that
17 particular language as to the election activity.  And I am going
18 to include the proposed language in the United States' tendered
19 instruction on proceeds, the highlighted portion.  I'm not going
20 to include the case citations, but I will include the language
21 in bold print, and that will be included in my Instruction
22 No. 13, pages 32 and 33.  So that will be included.
23         MR. HOSKINS:  Your Honor?
24         THE COURT:  Yes, sir.
25         MR. HOSKINS:  I would just like to join in Ms. Hughes'

1   objection to that point, and I would also point out that the

2   outcome of that federal election was not affected by evidence we

3   heard.  Mr. Rogers, I believe, won that election.

4              THE COURT:  All right.

5              MR. BALDANI:  Judge, we would join in that as well.

6              THE COURT:  I assume that every defendant in the case

7   would join in that objection that's charged in that particular

8   count.

9              Mr. Simons?

10             MR. SIMONS:  Your Honor, with that presumption that

11  all defendants join in Ms. Hughes' comments, I don't have

12  anything further to add.  Thank you.

13             THE COURT:  All right.  Thank you.

14             Mr. Smith, we're scheduled to start at 1:00, but it's

15  going to take a substantial amount of time to make the

16  modifications that have been suggested, specifically including

17  dates in with each count.  If you wish to use the instructions

18  for your argument, I'll delay the jury until I've completed

19  those instructions.  I know that sometimes you do reference jury

20  instructions.  But I'll leave that up to you.  If you would

21  prefer to go ahead and make your initial argument without the

22  benefit of the instructions, we can do that.  We can make those

23  changes and they can be made available to counsel later this

24  afternoon, I would imagine before Mr. Hoskins or Mr. Pinales

25  would begin to argue.

1          MR. SMITH:  Your Honor, I am planning on using the
2     instructions.  I do not –– if the Court doesn't object, you
3     know, I think that I can make some modifications here and make
4     it work if that will assist us going forward.

5          THE COURT:  I'll go ahead and make the changes.  I'll
6     start making those changes.

7          Mr. Westberry, you're going to be kind enough to
8     attempt to locate the end portion of the transcript that deals
9     with Mike Bishop's testimony.

10         MR. WESTBERRY:  Yes, sir, I'll do that now.

11         THE COURT:  All right.  I appreciate that.

12         Mr. Abell.

13         MR. ABELL:  Judge, there is an additional point.  I
14    think it's time now to bring it to the Court's attention.  The
15    Court has remarked during the course of the trial of its
16    intention to allow the transcripts that were submitted to go to
17    the jury at the conclusion of the case.  The concern I want to
18    now raise with the Court is that doing that surely seems that it
19    will serve as a deterrent for them to come back to the courtroom
20    and review or listen again to the recordings, and the
21    consequence of that is that they will rely on the transcripts
22    rather than taking the trouble to listen to the recordings
23    again, in which case the transcript against the parties' wishes
24    will gain an undue prominence vis–a–vis the actual recordings.
25    My suggestion to the Court would be that if they wish to listen

1    to the recordings again, certainly be provided with the

2    transcripts while that occurs during their deliberations.   I

3    know the Court has included the Instruction 42 language from the

4    pattern instructions and the case law.

5              THE COURT:  All right.  I do understand your position.

6    The situation we have here is that, of course, the transcripts

7    were placed upon the overhead as the audiotapes were being

8    played, but the parties then specifically made references to

9    certain sections of the transcripts and disagreed with certain

10   sections.  As a matter of fact, at the conclusion of Defendant

11   Maricle's testimony, he spent quite a bit of time going through

12   the transcripts and what he thought was wrong about the

13   transcripts, and that, combined with the numerous references to

14   those, I think, it would make it appropriate to submit the

15   transcripts for the jury together with the instruction that, of

16   course, the transcripts are not the evidence, the audiotapes

17   are, and the jury understands that if they want to listen to a

18   recording, they'll have to come back into court to do that.   Of

19   course, we also have the problem with the video on the disk that

20   has the sound and they wouldn't be able to listen -- I couldn't

21   send that back to the jury obviously.

22              So I believe on balance that in the exercise of

23   discretion that the transcripts should go back to the jury with

24   the cautionary instruction being given.  So I'll decline to

25   follow the recommendation.

1          Mr. Westberry, if you would — do you think you can

2    get that for me?  You've got it?

3          MR. WESTBERRY:  I have it.  And Mr. Smith graciously

4    provided it to me.  And I think it's under Mr. Baldani's

5    cross-examination, page 94, beginning at line 18.

6          Question from Mr. Baldani, and he's cross-examining,

7    of course, Mike Bishop:  "Now, you're aware your dad entered a

8    plea agreement in this case; right?"

9          Answer:  "Yes, sir."

10         "And was part of his plea agreement that the

11   government wouldn't prosecute you?"

12         Answer:  "I think so, yes."

13         Russ tried another line of questioning and the United

14   States objected, you sustained it.  But I think those two

15   portions that I just read would be in support.

16         THE COURT:  All right.  I'll include his name in

17   paragraph one and I'll change the reference — the pronoun

18   references to "him or her"/"he or she" in that paragraph as

19   well.

20         One other matter.  Typically on a case where there are

21   counts that are not submitted to the jury, forfeiture counts

22   that are not submitted to the jury, I will give the parties the

23   option of including the following language, in this case it

24   would be at the conclusion of Instruction 52, page 104, and it

25   would simply read, "Following the return of your verdict, there

1  may be an additional brief proceeding."  I don't give that

2  unless all parties are in agreement to give that to the jury.

3             Mr. Hoskins?

4             MR. HOSKINS:  I would not request that additional

5  instruction, Your Honor.

6             THE COURT:  All right.  One can quash the whole deal.

7  So I'll take it out.

8             MR. HOSKINS:  Your Honor, just very briefly?

9             THE COURT:  Yes, sir.

10            MR. HOSKINS:  If I could join Mr. Abell's objection to

11 the transcripts going back to the jury, and I would just point

12 out that the government spent so much time showing those

13 transcripts that we really had no option but to point out parts

14 we disagreed with; otherwise, the inference would be we thought

15 they were all perfect.  And I would also submit that we have

16 prepared Mr. Maricle's certifications to those points in the

17 transcripts that we thought were incorrect and would offer those

18 and we submit those should go back.

19            THE COURT:  All right.  Well, we've gone over that

20 mountain several times on the transcripts and, again, the

21 Court's ruling would be the same.

22            Let's see before we finish here if everyone has had a

23 chance to review the verdict forms that have been reviewed in

24 the case.

25            MR. WESTBERRY:  Yes, sir.

1    THE COURT:  Any issues with the verdict forms the

2  parties would like to raise at this time?

3        MR. WHITE:  No objection, Your Honor.

4        THE COURT:  Anyone?

5    (No audible response.)

6        THE COURT:  All right.  I'll begin making those

7  changes.  It's my practice to remove the authorities from what

8  will be the bottom of the pages that you-all have received, so

9  if you put those -- in other words, if you put those on a screen

10  and use those in the jury, you're not going to have the

11  authorities at the bottom.  Once those changes are made, it

12  takes a significant amount of time just to make the copies for

13  everyone.  I think it took about an hour and a half last night

14  just to run the copies.  So it will be a little while.  I may

15  need to instruct the jury that we won't start probably before

16  2:00 at this point.

17        We'll be -- what I'll do is as soon as I finish the

18  instructions, I'll send those back out and you can quickly look

19  those over to make I haven't missed something.  We'll give you

20  about ten minutes or so to do that.  So we'll be in recess until

21  at least 1:00 this afternoon.

22                          (Transcript concluded.)

23

24

25

1                      C E R T I F I C A T E

2        I, Cynthia A. Oakes, certify that the foregoing is a

3   correct transcript from the record of proceedings in the

4   above-entitled matter.

5

6   1/24/2012                      s/CYNTHIA A. OAKES
        DATE                       CYNTHIA A. OAKES, RPR, RMR, CRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25