*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0179p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
0179_____

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee,*<br><br>*v.*<br><br>DOUGLAS C. ADAMS (11-5291), RUSSELL CLETUS MARICLE (11-5308), WILLIAM E. STIVERS aka AL Man (11-5311), CHARLES WAYNE JONES (11-5312), FREDDY W. THOMPSON (11-5313), WILLIAM B. MORRIS aka Bart Morris (11-5336), STANLEY BOWLING (11-5337), and DEBRA L. MORRIS, aka Debbie (11-5366),<br>*Defendants-Appellants.* | Nos. 11-5291/ 5308/ 5311/ 5312/ 5313/ 5336/ 5337/ 5366 |

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 6:09-cr-16—Danny C. Reeves, District Judge.

Argued: January 25, 2013

Decided and Filed: July 17, 2013  July 17, 2013

Before: NORRIS, MOORE, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** John D. Cline, LAW OFFICE OF JOHN D. CLINE, San Francisco, California, Trevor W. Wells, MILLER WELLS PLLC, Lexington, Kentucky, Jason R. Barclay, BARNES & THORNBURG LLP, Indianapolis, Indiana, for Appellants. Scott A.C. Meisler, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** John D. Cline, LAW OFFICE OF JOHN D. CLINE, San Francisco, California, R. Kent Westberry, Bennett E. Bayer, LANDRUM & SHOUSE LLP, Louisville, Kentucky for Appellant in 11-5291. Trevor W. Wells, MILLER WELLS PLLC, Lexington, Kentucky, Russell J. Baldani, BALDANI, ROWLAND, & RICHARDSON, Lexington, Kentucky, for Appellant in 11-5313. Jason R. Barclay, Larry A. Mackey, BARNES & THORNBURG LLP, Indianapolis, Indiana, for Appellant in 11-5337. Martin S. Pinales, Candace C. Crouse, STRAUSS TROY, LPA, Cincinnati, Ohio, for Appellant in 11-5308. Robert L. Abell, Lexington, Kentucky, for Appellant in 11-5311. Scott White, MORGAN & POTTINGER, P.S.C., Lexington, Kentucky, for

Appellant in 11-5312. Jerry W. Gilbert, COY, GILBERT & GILBERT, Richmond, Kentucky, for Appellant in 11-5336. Elizabeth S. Hughes, GESS, MATTINGLY & ATCHISON, PSC, Lexington, Kentucky, for Appellant in 11-5366. Scott A.C. Meisler, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

—————————————

## OPINION

—————————————

KAREN NELSON MOORE, Circuit Judge. After a seven-week trial, a jury convicted Douglas C. Adams, Russell Cletus Maricle, William E. Stivers, Charles Wayne Jones, Freddy W. Thompson, William B. Morris, Stanley Bowling, and Debra L. Morris on every charge levied against them by the government. Based on cumulative error from the district court's evidentiary rulings identified in this opinion, we **VACATE** defendants' convictions on all counts and **REMAND** for a new trial.

## I. BACKGROUND

On July 9, 2009, defendants were named in a thirteen-count indictment that charged them with, among other things, conspiring to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. § 1962(d). The charges stem from defendants' alleged participation in a vote-buying scheme in Clay County, Kentucky that lasted from 2002 to 2007, encompassing three election cycles (2002, 2004, and 2006).

Defendants' scheme allegedly operated as follows. Political candidates pooled money to buy votes and to pay "vote haulers" to deliver voters whose votes could be bought.[1] In order to be paid, voters had to vote for a particular set of candidates, known as a "slate" or "ticket." To ensure that these voters actually voted for the correct slate,

—————————————

[1] Legitimate vote hauling is legal in Kentucky; that is, individuals can be paid to drive voters to their polling places. Vote hauling in this case, however, refers to the illegal practice of bringing voters to polls to be paid to vote.

co-conspiring election officers and poll workers reviewed voters' ballots—a practice known in this case as "voting the voter."  Once the proper slate was confirmed, a token (such as a raffle ticket) or marking was given to the voters to confirm that they did in fact vote for the proper slate.  Voters with the token or marking were then paid by members of the conspiracy in a location away from the polls.  Conspirators retained lists of voters to avoid double payments and to keep track of whose votes could be bought in ensuing elections.

In addition to hiring vote haulers, defendants allegedly utilized other methods of buying votes.  Absentee voting and voter-assistance forms helped minimize the difficulty of checking paid voters' ballots.  In the latter case, co-conspiring poll workers were permitted to be in the voting booth under the pretext that they were assisting voters; in reality, co-conspiring poll workers were confirming that voters chose the proper slates. When electronic voting machines were introduced to Clay County in the 2006 election, the conspiracy both stole and bought votes.  To steal votes, conspirators, typically poll workers, purposefully misinformed voters that they did not need to click "cast ballot" on a screen that appeared after voters had selected candidates for whom they wished to vote.  Co-conspiring poll workers would enter the voting booth after the voter exited and change the electronic ballot to reflect the slate before finally casting the ballot.

Election officers are appointed by the Clay County Board of Elections (the "Board"), which must also certify the results.  The Board was alleged to be the racketeering enterprise in this conspiracy.  It is comprised of the County Clerk, the Sheriff, the Republican Election Commissioner, and the Democratic Election Commissioner.  The two Commissioners are responsible for appointing election judges and officers at the various precincts.  Defendants held various positions within Clay County, played different roles within the conspiracy, and were charged with numerous offenses.  Specifically, the Superseding Indictment, R. 272 (Page ID #1074–98), alleged the following:

*Douglas C. Adams* was the Clay County Superintendent of Schools from 1999 to 2007.  The indictment alleged that Adams was considered a political boss in Clay County and an associate and director of the enterprise, the Clay County Board of Elections.  As a leader of the conspiracy, Adams was alleged to have exerted influence over the selection of precinct workers and the appointment of corrupt members of the Board.  The indictment also alleged that he recruited individuals to run for county offices on a slate that would benefit the conspiracy.  Adams was charged with:  conspiracy to violate RICO under 18 U.S.C. § 1962(d) (Count 1) and conspiracy to money launder under 18 U.S.C. § 1956(h) (Count 2).  The government also sought forfeiture against Adams under 18 U.S.C. §§ 1963 (Count 12) and 982 (Count 13).

*Russell Cletus Maricle* was an elected circuit court judge for the 41st Judicial Circuit of the Commonwealth of Kentucky from 1991 through 2007.  The indictment alleged that Maricle was considered a political boss in Clay County and an associate and director of the enterprise.  As a leader of the conspiracy, Maricle—like Adams—was alleged to have exerted influence over the selection of precinct workers and the appointment of corrupt members of the Board.  Also like Adams, the indictment alleged that Maricle recruited candidates for the slate.  Maricle was charged with:  conspiracy to violate RICO under 18 U.S.C. § 1962(d) (Count 1), conspiracy to money launder under 18 U.S.C. § 1956(h) (Count 2), obstruction of justice and/or aiding and abetting its commission under 18 U.S.C. §§ 1503 and 2 (Count 8), conspiracy against rights under 18 U.S.C. § 241 (Count 10), and conspiracy to buy votes under 18 U.S.C. § 371 and 42 U.S.C. § 1973i (Count 11).  The government also sought forfeiture against Maricle under 18 U.S.C. §§ 1963 (Count 12) and 982 (Count 13).

*William E. "Al Man" Stivers* was appointed as election officer by the Board in 2002 and 2004.  He served on the Board as the Democratic judge for the Manchester precinct in 2002 and 2004.  The indictment alleged that Stivers used his position as an election officer to commit extortion and bribery.  As a conspiring election officer, he was also responsible for marking the hands of voters who had sold their votes and for stealing votes on the machines introduced in the 2006 election.  Stivers was charged with:

conspiracy to violate RICO under 18 U.S.C. § 1962(d) (Count 1), conspiracy to money launder under 18 U.S.C. § 1956(h) (Count 2), attempted extortion under 18 U.S.C. § 1951 (Count 4), obstruction of justice and/or aiding and abetting its commission under 18 U.S.C. §§ 1503 and 2 (Count 8), conspiracy against rights under 18 U.S.C. § 241 (Count 10), and conspiracy to buy votes under 18 U.S.C. § 371 and 42 U.S.C. § 1973i (Count 11).  The government also sought forfeiture against Stivers under 18 U.S.C. §§ 1963 (Count 12) and 982 (Count 13).

*Charles Wayne Jones* was as an election officer during the period of the charged conspiracy.  Jones was appointed as the Democratic Election Commissioner in 2000 and served until 2007.  He was a member of the Clay County Board of Elections during the election cycles of 2002, 2004, and 2006.  The indictment alleged that Jones appointed corrupt election officers and instructed those officers on how to purchase and steal votes. Jones was also responsible, as a Commissioner and a Board member, for certifying the accuracy of election results (which he knew to be false).  Jones was charged with: conspiracy to violate RICO under 18 U.S.C. § 1962(d) (Count 1), conspiracy to money launder under 18 U.S.C. § 1956(h) (Count 2), honest-services mail fraud under 18 U.S.C. §§ 1341 and 1346 (Counts 3, 5, 6, and 7), attempted extortion under 18 U.S.C. § 1951 (Count 4), conspiracy against rights under 18 U.S.C. § 241 (Count 10), and conspiracy to buy votes under 18 U.S.C. § 371 and 42 U.S.C. § 1973i (Count 11).  The government also sought forfeiture against Jones under 18 U.S.C. §§ 1963 (Count 12) and 982 (Count 13).

*Freddy W. Thompson* was elected as Clay County Clerk in 2002 and served until 2007. By virtue of that position, Thompson was also a member of the Board of Elections during the election cycles of 2004 and 2006.  The indictment alleged that Thompson provided money to be distributed by election officers to buy votes and instructed officers in the 2006 election on how to steal votes.  Thompson was also responsible, as a Board member, for certifying the accuracy of election results (which he allegedly knew to be false).  Thompson was charged with:  conspiracy to violate RICO under 18 U.S.C. § 1962(d) (Count 1), conspiracy to money launder under 18 U.S.C. § 1956(h) (Count 2),

honest-services mail fraud under 18 U.S.C. §§ 1341 and 1346 (Counts 3, 5, 6, and 7), obstruction of justice under 18 U.S.C. § 1503 (Count 9), conspiracy against rights under 18 U.S.C. § 241 (Count 10), and conspiracy to buy votes under 18 U.S.C. § 371 and 42 U.S.C. § 1973i (Count 11).  The government also sought forfeiture against Thompson under 18 U.S.C. §§ 1963 (Count 12) and 982 (Count 13).

*Stanley Bowling* was elected as Magistrate in 2002 and served until 2007.  He is also the owner and operator of B and B Excavating, an excavating company located in Clay County that obtained contracts from the city of Manchester and the County to provide excavation services.  The indictment alleged that Bowling distributed money to bribe voters and exerted influence over the selection of precinct workers in local elections.  Bowling was charged with:  conspiracy to violate RICO under 18 U.S.C. § 1962(d) (Count 1) and conspiracy to money launder under 18 U.S.C. § 1956(h) (Count 2).  The government also sought forfeiture against Bowling under 18 U.S.C. §§ 1963 (Count 12) and 982 (Count 13).

*William ("Bart") Morris* is the owner and operator of B and J Transport, Inc., a sanitation company located in Clay County that contracts with the city of Manchester and the County to provide sanitation services.  Bart is married to *Debra ("Debbie") L. Morris*.  The indictment alleges that Bart and Debbie distributed funds that were pooled by members of the conspiracy to buy votes.  Both Bart and Debbie Morris were charged with:  conspiracy to violate RICO under 18 U.S.C. § 1962(d) (Count 1), conspiracy to money launder under 18 U.S.C. § 1956(h) (Count 2), and conspiracy to buy votes under 18 U.S.C. § 371 and 42 U.S.C. § 1973i (Count 11).  The government also sought forfeiture against both Bart and Debbie Morris under 18 U.S.C. §§ 1963 (Count 12) and 982 (Count 13).

On March 25, 2010, after a seven-week trial, a jury found all defendants guilty of all charges and returned a special verdict against defendants on the two forfeiture counts.  R. 818 (Verdict Form) (Page ID #4965–78); R. 833 (Forfeiture Verdict Form) (Page ID #5162–63).  Subsequently, the district court granted post-trial motions for

judgment of acquittal from Jones and Stivers, finding that there was insufficient evidence to support their convictions of attempted extortion (Count 4). R. 947 (06/11/2010 D. Ct. Op.) (Page ID #12563–83); R. 1080 (12/01/2010 D. Ct. Op.) (Page ID #13278–87). After *Skilling v. United States*, — U.S. —, 130 S. Ct. 2896 (2010), the district court granted post-trial motions for judgment of acquittal from Jones and Thompson because their convictions for honest-services mail fraud (Counts 3, 5, 6, and 7) did not involve a bribery or a kickback scheme.

Defendants raise a host of issues on appeal, which we examine below in turn. However, we need not address defendants' challenges to their convictions for conspiracy to money launder (Count 2) and the related forfeiture count (Count 13) because the government concedes that those convictions rest on an invalid theory. Gov't Br. at 22, 59–66. We therefore vacate the convictions of all eight defendants on Count 2 and vacate the associated forfeiture under Count 13.

## II.  RICO PREDICATE ACT

Defendants contend that vote buying in violation of Kentucky Revised Statute § 119.205 does not constitute "bribery" and therefore is not "racketeering activity" under RICO.[2]  In other words, defendants claim that vote buying is not a valid predicate act for the purposes of RICO.  Under RICO, "racketeering activity" is

> (A) any act or threat involving . . . bribery . . . , which is chargeable under State law and punishable by imprisonment for more than one year;

> (B) any act which is indictable under any of the following provisions of title 18, United States Code:  Section 201 (relating to bribery), section 224 (relating to sports bribery) . . . .

---

[2] Defendant Bowling first raised this argument in his motion for judgment of acquittal or for a new trial, which he filed six months after the jury returned its guilty verdict. R. 1053-2 (Bowling Mot. for Acquittal at 7–10) (Page ID #13010–13). The district court struck Bowling's invalid-predicate argument from his motion on the ground that it was untimely, R. 1056 (10/04/2010 D. Ct. Op. at 8–9, 13) (Page ID #13049–50, 13054), and Bowling later filed a motion to dismiss for lack of subject-matter jurisdiction based on the same argument, R. 1074 (Bowling Mot. to Dismiss) (Page ID #13222–25). The district court determined that "Bowling's argument is more properly framed as a challenge to the sufficiency of the indictment" and denied the motion on the merits, determining that Kentucky Revised Statute § 119.205 is a valid predicate offense for RICO. R. 1081 (12/07/2010 D. Ct. Op. at 3, 16–17) (Page ID #13290, 13303–04).

18 U.S.C. § 1961(1).  Therefore, the question before this court is whether vote buying, chargeable under Kentucky law, is an act involving bribery.

Legislative history informs us that § 1961(1)(A) lists predicate state offenses by reference to their "generic designation" and that § 1961(1)(B) lists predicate federal offenses by "specific reference."  H.R. Rep. No. 91-1549, at 56 (1970).  As illustrated in the present case, this arrangement presents some difficulty because states classify offenses differently.  Defendants note that Kentucky Revised Statute § 119.205 does not use the term "bribery."[3]  Thus, according to defendants, vote buying in violation of Kentucky Revised Statute § 119.205 is not an act involving bribery.

Although this argument has some superficial appeal, "[t]he labels placed on a state statute do not determine whether that statute proscribes bribery for purposes of the RICO statute."  *United States v. Garner*, 837 F.2d 1404, 1418 (7th Cir. 1987).  Instead, "[t]he test for determining whether the charged acts fit into the generic category of the predicate offense is whether the indictment charges a type of activity generally known or characterized in the proscribed category, namely, any act or threat involving bribery."  *United States v. Forsythe*, 560 F.2d 1127, 1137 (3d Cir. 1977); *see Garner*, 837 F.2d at 1418 ("Thus, any statute that proscribes conduct which could be generically defined as bribery can be the basis for a predicate act."); *see also Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409–10 (2003) (discussing *United States v. Nardello*, 393 U.S. 286 (1969), in the context of RICO predicate offenses).  Therefore, we must consider whether vote buying is the type of activity that is generally known or characterized as involving bribery.[4]

---

[3]The statute reads in part:  "Any person who makes or offers to make an expenditure to any person, either to vote or withhold his vote, or to vote for or against any candidate or public question at an election shall be guilty of a Class D felony."  KY. REV. STAT. ANN. § 119.205(1).

[4]As an initial matter, we note that bribery under RICO is not limited to its early common-law definition, which relates to acts of public officials.  *Perrin v. United States*, 444 U.S. 37, 42–45 (1979) (holding that commercial bribery falls under the definition of bribery under the Travel Act, which was passed nine years before RICO was enacted).

Although intuitively vote buying strikes us as an offense that involves bribery, we need not rest our decision on intuition. First, The Model Penal Code ("MPC"), which the Supreme Court has considered in construing RICO's provisions, supports our determination that vote buying in violation of Kentucky law constitutes an act involving bribery under RICO. *Scheidler*, 537 U.S. at 410 ("[W]here as here the Model Penal Code and a majority of States recognize the crime of extortion as requiring a party to obtain or to seek to obtain property, as the Hobbs Act requires, the state extortion offense for purposes of RICO must have a similar requirement."); *see Perrin*, 444 U.S. at 45 n.11 (looking to the MPC in construing the Travel Act). The MPC states that "[a] person is guilty of bribery, a felony of the third degree, if he offers . . . (1) any pecuniary benefit as consideration for the recipient's . . . vote or other exercise of discretion as a . . . voter." MODEL PENAL CODE § 240.1. Vote buying in violation of Kentucky Revised Statute § 119.205 is well within the prohibition of bribery under the MPC. Second, other states' classification of vote buying as a bribery offense, which the Supreme Court has also considered in construing RICO's provisions, shows that vote buying is generally understood as an act involving bribery. *Scheidler*, 537 U.S. at 410. As noted by the district court, a majority of states considers vote buying to be a form of bribery.[5] R. 1081 (12/07/2010 D. Ct. Op. at 11–12 n.1) (Page ID #13298–99) (listing twenty-six states that classify vote buying as a bribery offense or as involving bribery). Finally, the provisions of RICO must be construed liberally "to effectuate its remedial purpose[]," which is "to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new

---

[5]For example:  ARIZ. REV. STAT. ANN. § 16-1006.A ("It is unlawful for a person knowingly by . . . bribery . . . , either directly or indirectly:  1.  To attempt to influence an elector in casting his vote or to deter him from casting his vote."); FL. STAT. § 104.061(1) ("Whoever by bribery . . . , either directly or indirectly, attempts to influence . . . any elector in voting or interferes with him or her in the free exercise of the elector's right to vote at any election commits a felony of the third degree."); KAN. STAT. ANN. § 25-2409 ("Election bribery is conferring, offering or agreeing to confer, or soliciting, accepting or agreeing to accept any benefit as consideration to or from any person either to vote or withhold any person's vote, or to vote for or against any candidate or question submitted at any public election."); OHIO REV. CODE ANN. § 3599.01 ("(A) No person shall . . . during . . . any . . . election: . . . (3) . . . pay, or cause to be paid . . . money or other valuable thing . . . with the intent that it or part thereof shall be used to induce such person to vote or to refrain from voting.  (B) Whoever violates this section is guilty of bribery . . . ."); WASH. REV. CODE § 29A.84.620 ("Any person who . . . directly or indirectly offers any bribe, reward, or any thing of value to a voter in exchange for the voter's vote for or against any person or ballot measure, or authorizes any person to do so, is guilty of a class C felony . . . .").

penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." *United States v. Turkette*, 452 U.S. 576, 587, 589 (1981) (quotation marks and citation omitted).  Reading 18 U.S.C. § 1961(1)(A) to encompass vote buying comports with this mandate.  In conclusion, vote buying in violation of Kentucky Revised Statute § 119.205 is the type of activity that is generally known or characterized as involving bribery.

Defendants do little to rebut the fact that vote buying is generally understood as an offense involving bribery; instead, defendants assert that vote buying in violation of Kentucky Revised Statute § 119.205 cannot serve as a predicate offense because of the structure of 18 U.S.C. § 1961(1).  As noted earlier, subsection (A) lists state offenses that constitute "racketeering activity" by "generic designation," and subsection (B) lists federal offenses that constitute "racketeering activity" by "specific reference."  H.R. Rep. No. 91-1549, at 56 (1970).  Although two bribery statutes, 18 U.S.C. §§ 201 and 224, are listed among the specific federal offenses in 18 U.S.C. § 1961(1)(B), two federal vote-buying statutes, 18 U.S.C. § 597 and 42 U.S.C. § 1973i, are not listed in subsection (B).  Defendants note that Kentucky's vote-buying statute, Kentucky Revised Statute § 119.205, is virtually identical to one of the omitted federal vote-buying statutes, 18 U.S.C. § 597.[6]

According to defendants, the omission of vote buying in violation of § 597 as a predicate act for RICO means that the nearly identical Kentucky Revised Statute § 119.205 cannot serve as a predicate act for RICO.  Defendants claim that Congress could not have intended to include vote buying when it occurs in a state election but not a federal election.  Therefore, defendants argue that the absence of the federal vote-buying statutes from 18 U.S.C. § 1961(1)(B) makes the statute clear:  defendants assert that vote buying is not "racketeering activity" under RICO.  Although defendants' structural argument has some appeal, it rests on the false notion that subsections (A) and

---

[6]"Whoever makes or offers to make an expenditure to any person, either to vote or withhold his vote, or to vote for or against any candidate . . . Shall be fined under this title or imprisoned not more than one year, or both; and if the violation was willful, shall be fined under this title or imprisoned not more than two years, or both."  18 U.S.C. § 597.

(B) are coextensive in scope.  We have never imposed such a limitation on the scope of predicate acts under § 1961(1)(A) and decline to do so now.

In *United States v. Licavoli*, we held that both murder and conspiracy to commit murder in violation of Ohio law constitute "racketeering activity" because both involve murder under § 1961(1)(A).[7]  725 F.2d 1040, 1044–47 (6th Cir. 1984).  In doing so, this court implicitly rejected a coextensive reading of § 1961(1)(A) and (B).  Subsection (B) lists only one predicate federal offense involving murder:  18 U.S.C. § 1958 ("relating to use of interstate commerce facilities in the commission of murder-for-hire").  If § 1961(1)(A) and (B) are coextensive in scope, murder and conspiracy to commit murder could not be state predicate offenses for the purpose of RICO because neither necessarily involves murder-for-hire.  *See* OHIO REV. CODE ANN. § 2903.02; *see also id.* § 2923.01(A).  We rejected this reading of 18 U.S.C. § 1961(1) in *Licavoli* and declined to limit the scope of RICO predicates because 18 U.S.C. § 1961(1)(A) contains "expansive" language—*any* act or threat *involving*—and "'should be liberally construed to effectuate [RICO's] remedial purposes.'"  *Licavoli*, 725 F.2d at 1045 (quoting Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947).

Given *Licavoli*'s holding and reasoning, we need not read § 1961(1)(A) and (B) as coextensive in the present case.  We must, instead, construe § 1961(1) to effectuate RICO's purpose.  As noted earlier, vote buying in violation of Kentucky Revised Statute § 119.205 is an offense generally known or characterized as involving bribery.  This reading of 18 U.S.C. § 1961(1)(A) effectuates RICO's remedial purpose.  Finding no ambiguity in the 18 U.S.C. 1961(1), we hold that the district court did not err in determining that defendants' RICO convictions rest on a valid predicate act.[8]

---

[7]"'[R]acketeering activity' means (A) any act or threat involving murder . . . , which is chargeable under State law and punishable by imprisonment for more than one year."  18 U.S.C. § 1961(1)(A).

[8]Defendants insist that this court apply the rule of lenity in construing 18 U.S.C. § 1961(1).  We have no occasion to do so because the rule "only serves as an aid for resolving an ambiguity; it is not to be used to beget one."  *Callanan v. United States*, 364 U.S. 587, 596 (1961).  Thus, the rule of lenity "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers."  *Id.*  Where there is no ambiguity, as is the case here, "the rule of lenity does not come into play."  *Turkette*, 452 U.S. at 587 n.10.  For similar reasons, *United States v. Turner* is not controlling in the case at hand.  465 F.3d 667, 683 (6th

## III.  VARIANCE

Defendants contend that the evidence was insufficient to prove a single conspiracy and that, at most, the evidence showed two separate conspiracies:  Adams supporters and White supporters.  Therefore, according to defendants, there was a fatal variance between what the government charged in Count 1 of the indictment and the proof offered at trial.

Ordinarily, this court reviews de novo the question of whether a variance has occurred.  *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006).  That is, if a defendant alleges a variance at trial, we reverse the conviction if (1) a variance occurred and (2) that variance affected the defendant's substantial rights.  *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008).  However, when a defendant raises the variance issue for the first time on appeal, this court reviews for plain error.  *Id.*  Under this standard, the second part of our inquiry "requires the defendant to prove that the error affected the outcome of the district court proceedings."[9]  *Id.*  In the present case,

---

Cir. 2006) (discussing the rule of lenity when Congress alters "the federal-state balance in the prosecution of crimes.").  Furthermore, *Turner* involves the application of the mail-fraud statute after *McNally v. United States*, 483 U.S. 350 (1987), not the scope of RICO predicate acts.

On appeal, Maricle filed a pro se motion to dismiss Counts 1, 2, 12, and 13 of the indictment for lack of jurisdiction.  In essence, Maricle asserts that federal courts are without subject-matter jurisdiction because RICO cannot be used to regulate offenses dealing exclusively with state and local elections.  We fail to see a cognizable challenge to this court's subject-matter jurisdiction.  Instead, we note that Maricle's argument appears to be that his conviction cannot stand because Congress does not have power under the Commerce Clause, under which RICO was enacted, to regulate state and local elections.  Although his argument is somewhat opaque, it appears that Maricle overlooks our RICO precedents making clear that the predicate acts themselves do not require a connection to commerce, they must simply "further the goals of an enterprise that itself affects commerce."  *Waucaush v. United States*, 380 F.3d 251, 255 (6th Cir. 2004).  Nonetheless, insofar as we are reversing and remanding this case, Maricle's counsel on remand may consider raising these arguments.

[9]On appeal, Adams and Stivers suggest that they raised this issue at the district court and therefore are entitled to de novo review.  Adams notes that he filed a motion to dismiss Count 1 and Count 2 of the indictment.  Adams Br. at 32 n.6.  In that motion, he argued that the Superseding Indictment is defective because it would show multiple conspiracies under *Kotteakos v. United States*, 328 U.S. 750 (1946).  R. 407 (Memo in Support at 3) (Page ID #2410).  The district court denied this motion, stating that whether one or multiple conspiracies existed would be an issue for the jury to decide.  R. 484 (09/10/2009 D. Ct. Op. at 3) (Page ID #3117).  Stivers notes that he filed a motion for a bill of particulars to identify the "slates" that each defendant was alleged to have been a part of.  Stivers Br. at 25; R. 378 (Mot. for Bill of Particulars) (Page ID #1644–48).  It is unclear whether Adams or Stivers is entitled to the ordinary de novo review.  On the one hand their motions were filed before a variance could be proved because it requires showing that the evidence at trial varied from the charging terms of the indictment.  On the other hand, the district court did give material variance instructions to the jury at defendants' request.  R. 826 (Jury Instructions at 29–30) (Page ID #5035–36).

we need not decide which standard of review applies because under either standard, defendants have failed to show that a variance occurred.

"A variance to the indictment occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Caver*, 470 F.3d at 235.  In conspiracy cases, "a variance constitutes reversible error only if . . . the indictment alleged one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies." *Id*. at 235–36 (quotation marks, alterations, and citation omitted).  In our review for whether the evidence can support only a finding of multiple conspiracies, we must view the evidence in the light most favorable to the government because "whether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003).  Our "principal considerations in determining the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *Id*.

The thrust of defendants' argument is that the government proved multiple conspiracies, not one, because different members of the alleged conspiracy supported different candidates in the 2002 Clay County primary election.  According to Adams:

> For years, the White family and its allies had "[p]retty much ruled" Clay County.  In 2002, Jennings White—the family patriarch—held the office of County Clerk and ran for re-election.  Kennon White (Jennings' nephew) ran for jailer, and state representative Barbara White Colter (Jennings' cousin) ran for reelection.
>
> Adams opposed the White faction in the 2002 primary election, in part because Jennings White was a notorious drug dealer (Adams' daughter had a drug problem).  Adams encouraged a slate of candidates to run against the White candidates.  As one prosecution witness explained, "[i]t was a power struggle in the county."  Adams and Jennings White were known to "hate each other."  White was so furious that Adams opposed him in the 2002 election that he asked Kenny Day to plant drugs in Adams' car.

> The appellants (and other alleged conspirators) split across the White-Adams divide during the 2002 election.  Appellant Freddy Thompson ran for County Clerk on the slate Adams supported.  Appellants Charles Wayne Jones and William Stivers supported the Adams slate.  Appellants Stanley Bowling, William Morris, and Debra Morris supported the White faction.  Appellant Maricle did not take sides in the 2002 primary, although he usually supported the White family.

Adams Br. at 7–8 (citations to the record omitted).  Under this reading of the facts, defendants claim that there could not be an agreement among themselves—the essence of conspiracy—because they supported opposing candidates.  Although defendants are correct that the evidence showed competing factions within the conspiracy, this does not undermine the government's theory of the case.  Looking to defendants' common goal, the nature of their vote-buying scheme, and the overlap of participants in various elections, we cannot say that the evidence can reasonably be construed as supporting only a finding of multiple conspiracies.

Defendants' multiple-conspiracy theory overlooks the nature of the government's conspiracy charge.  The fact that there were competing slates of candidates within the conspiracy in the 2002 primary election does not change the possibility that defendants agreed to a common goal.[10]  Count 1 of the indictment charged defendants with conspiring to control the Clay County Board of Elections for their own benefit, not for the benefit of a political party or cause.  The indictment states that defendants' purposes

> were to obtain, solidify, preserve and expand for the Defendants and their associates, political power and control within the county, and personal enrichment for themselves and their associates, through the use and misuse of the authority and power of the Board [of Elections], and the offices of circuit judge, superintendent of schools, and county clerk, and the positions of election officers.

R. 272 (Super. Indict. at 4) (Page ID #1077).

---

[10]"To prove a single conspiracy, the government need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal."  *Smith*, 320 F.3d at 653.

Defendants contend that the present case is indistinguishable from *United States v. Camiel*, 689 F.2d 31 (3d Cir. 1982), because it involves ongoing antagonism between two rival factions within the alleged conspiracy.[11]  They argue that the government's theory in the present case substitutes "common goal" for "agreement" in defining conspiracy.  In support, Adams analogizes:  "The Republican Party and the Democratic Party share the 'common goal' of controlling the outcome of the presidential election, but they do not have an *agreement* to control the outcome."  Adams Reply Br. at 5.

Defendants' analogy misses the mark.  Although we agree with defendants that at times the members of the conspiracy were supporting candidates who ran against each other, "[t]he mere fact that a conspiracy can be subdivided . . . does not mean that multiple conspiracies existed."  *United States v. Wilson*, 168 F.3d 916, 924 (6th Cir. 1999).  Defendants did not, as they suggest in their analogy and reliance on *Camiel*, agree to control the Board for the benefit of a party or a particular faction thereof.[12]  Instead, the evidence showed defendants agreed to a common goal that remained the same throughout the period of the alleged conspiracy:  "to obtain, solidify, preserve and expand . . . political power and control within the county . . . ."  R. 272 (Super. Indict. at 4) (Page ID #1077).  In accord with their agreement to control the Clay County Board of Elections for their own personal benefit, conspiring election officers from both factions had to turn a blind eye to rampant vote buying.  Furthermore, the record shows that defendants' vote-buying scheme was not as simple as us-versus-them or Republicans-versus-Democrats.  As is the case with politics, defendants' allegiances to

---

[11]In *Camiel*, the Third Circuit affirmed a district court's entry of a directed verdict on the basis that there was a variance between the charges in the indictment and the proof at trial.  The government charged the defendants with running a mail-fraud scheme in which Democratic-party supporters were placed on the House and Senate payrolls for "no show" jobs for the purpose of increasing the power of the Democrats.  Relevant here, the Third Circuit affirmed the district court because the evidence showed an "antagonistic relationship between the two political factions" within the Democratic party, which undermined the possibility that there was a single scheme to increase the power and influence of the party. *Camiel*, 689 F.2d at 36.

[12]Further, defendants' reliance on *Camiel* is misplaced because:  (1) *Camiel* involved a mail fraud prosecution, not a conspiracy, (2) the issue basically was conceded by the government in *Camiel*, which is not true in the case at hand, and (3) the issue "was whether the evidence supported the existence of a common scheme to defraud, not (as here) whether a rational, properly instructed jury could find a single conspiracy."  Gov't Br. at 42–43.

one another were not drawn on clear lines, and their own self-interest led to seemingly strange alliances.

The nature of defendants' vote-buying scheme highlights how individuals working for competing slates simultaneously could have agreed to a broader common goal of personal benefit.  Veteran vote hauler, Bobby "Red" Sams, testified that it was common for vote buyers to trade off on which candidates they were supposed to tell paid voters to vote for based on "whoever had the most pull or the most money."  R. 933 (03/04/2010 Trial Tr. at 89) (Page ID #12291).  Kennon White's testimony confirmed that slates were not consistent across all precincts:

> Well, what would happen is that when we—when you would go and meet with them, they would be certain precincts that they would be able to help you in and certain precincts that they wouldn't.  They would tie with whatever would be the best to benefit the candidate.  In other words, someone you—might be for you in one precinct may be against you in another, it was just according to what they needed to do to get the votes that they wanted, you know.

R. 840 (02/11/2010 Trial Tr. at 31–32) (Page ID #5597–98); *see* R. 929 (02/18/2010 Trial Tr. at 13–15) (Page ID #11943–45).  Finally, the record confirms the jury's finding of a single conspiracy because faction lines were not as clearly drawn as defendants contend and the overlap of participants in each election demonstrates a single conspiracy.

Prior to the 2002 primary election, Doug Adams invited Kennon White to run for county clerk on his slate against Jennings White for the price of $60,000, and, if Kennon accepted, Adams "would get Freddy [Thompson] not to run and Freddy would do what [Adams] told him to do."  R. 929 (02/18/2010 Trial Tr. at 58–59) (Page ID #11988–89); R. 840 (02/11/2010 Trial Tr. at 26–27) (Page ID #5592–93).  Ultimately, Kennon White decided to run against Freddy Thompson on Jennings White's slate.  R. 929 (02/18/2010 Trial Tr. at 58–59) (Page ID #11988–89).  Wanda White testified that Doug Adams attended White faction meetings during the 2002 primary election because "he was just playing both sides."  R. 844 (02/19/2010 Trial Tr. at 104) (Page ID #5993).  Bart Morris,

Debbie Morris, Stivers, and Maricle were also present at those meetings, though Maricle remained in his car outside of the meeting and communicated with the others through a conspirator.  *Id.* at 103–05 (Page ID #5992–94).  Bobby "Red" Sams also testified that Maricle "was down at [William Stivers's] all the time, and I was there all the time.  He would tell me to go get the voters and vote them . . . ."  R. 933 (03/04/2010 Trial Tr. at 49) (Page ID #12251).  These facts show that in the 2002 election, members of each faction attempted to and did in fact work with one another—evidence that the jury could find to support a single conspiracy.

Regarding later elections, Frank Roberts testified that he bought votes for Barbara Jo Colter, a member of the White slate, in the 2004 election.  R. 875 (03/01/2010 Trial Tr. at 38–39) (Page ID #8946–47).  In the prior election, Roberts bought votes for Adams's slate.  *Id.* at 35 (Page ID #8943).  This shows that co-conspirators from different factions worked with one another after each election cycle, which supports the jury's finding of a single conspiracy.

The 2006 election cycle also involved a mix of members from both factions. Kennon White testified:

> A.  Okay.  [Wanda and I] got involved [in the 2006 election] whenever Wayne Jones had come and brought a list to my wife to further up on the conversation with Cletus [Maricle] about being appointed to election officer.  He brought a list to my wife at City Hall and told us to put the names down of the people we wanted to serve to help us there.
>
> Q.  All right.  So let's back up.  You said that there was a discussion with Cletus about becoming—serving, I guess?
>
> . . .
>
> A.  Okay.  We had talked with Cletus and he had talked about putting us in as election officers, one of us, and when it ended up coming time, he had wanted help for his son-in-law who was running for the tax commissioner or whatever that office is and that we could help my father and help him, you know, by my wife being in there as election officer.
>
> Q.  So what did you do after he made that offer?
>
> A.  We took him up on it, my wife did.

. . .

Q.  So there were other positions to be filled out besides Wanda's?

A.  Uh-huh.

. . .

Q.  And did you-all make suggested names for Charles Wayne Jones to put on—for the Democrat list [of election officers]?

A.  Yes, we did.

Q.  Do you recall who it was you-all put on the list?

A.  We put Earl Pennington, I think was one, and Dobber [Weaver], Charles Weaver's wife, Minnie Weaver.

. . .

Q.  Did you come up with those names yourself or did you seek input from others to suggest those names to Wayne Jones?

A.  I came up with them after talking with Cletus and talking with Darnell and Bart [Morris] and other people involved.

. . .

Q.  Did you ever—did you have any meetings with Doug Adams about this proposal?

A.  Yes.

. . .

Q.  Okay.  Did he make any specific requests of Wanda through you?

A.  He wanted Wanda to be for Kevin Johnson.

Q.  And what office was he seeking?

A.  Sheriff.

R. 840 (02/11/2010 Trial Tr. at 80–85) (Page ID #5646–51).

    Wanda White's testimony confirmed the involvement of Maricle, Jones, Stivers, Bowling, and Thompson in the 2006 election.  R. 931 (02/19/2010 Trial Tr. at 33–35) (Page ID #12113–15).  To this end, Stivers, Jones, and Thompson taught Wanda White how to steal votes on the new voting machines to be utilized in the 2006 election.  *Id.* at

36–37 (Page ID #12116–17).  If the White and Adams factions were as divided as defendants contend on appeal, it seems odd that Adams supporters would instruct a White supporter on how to steal votes.  The overlapping of participants from each faction in all three election cycles supports the jury's finding of a single conspiracy.

In viewing the evidence in the light most favorable to the government, we cannot say that it reasonably can be construed as supporting only a finding of multiple conspiracies.  Although there was antagonism among members of the conspiracy, the evidence supported the jury's finding of a single conspiracy because defendants agreed to a common goal, the nature of vote buying does not allow for a clean division of sides, and there was evidence to support the overlapping of participants from both factions in each election cycle.  Therefore, we conclude that there was no variance.[13]

## IV.  EVIDENTIARY ISSUES

Defendants raise a series of issues regarding the district court's evidentiary rulings.  We address each in turn.

### A.  Background and Rule 404(b) Evidence

Defendants challenge the district court's admission of the government's background and Rule 404(b) evidence.  Because the two often serve as alternative grounds for admission, we will consider them together.  *See United States v. Hardy*, 228 F.3d 745, 750 (6th Cir. 2000).

Federal Rule of Evidence 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."[14]  FED. R. EVID. 404(b)(1).  However, such "evidence may be admissible for another purpose, such as

---

[13]Given this holding, we need not examine whether any such variance would have prejudiced defendants.

[14]Recognizing that the 2011 Amendments to the Federal Rules of Evidence were merely stylistic, we use the current version of the Rules in this opinion.

Nos. 11-5291/ 5308/ 5311/ 5312/ 5313/  *United States v. Adams et al.*      Page 20
  5336/ 5337/ 5366

proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id*. Rule 404(b)(2). In determining the admissibility of evidence under Rule 404(b), a district court uses a three-step process:

> *First*, the district court must decide whether there is sufficient evidence that the other act in question actually occurred. *Second*, if so, the district court must decide whether the evidence of the other act is probative of a material issue other than character. *Third*, if the evidence is probative of a material issue other than character, the district court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect.

*United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003). With regard to the second step,"[e]vidence of other acts is probative of a material issue other than character if (1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is offered is material or 'in issue,' and (3) the evidence is probative with regard to the purpose for which it is offered." *Id*. (quotation marks and citation omitted).

Background or *res gestae* evidence is an exception to Rule 404(b). *United States v. Clay*, 667 F.3d 689, 697 (6th Cir. 2012). Background evidence "consists of those other acts that are inextricably intertwined with the charged offense." *Hardy*, 228 F.3d at 748. "Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *Id*. Concerned with the potential for abuse of background evidence as a means to circumvent Rule 404(b), we have recognized "severe limitations as to 'temporal proximity, causal relationship, or spatial connections' among the other acts and the charged offense." *Clay*, 667 F.3d at 698 (quoting *Hardy*, 228 F.3d at 749).

Typically, "we review a district court's evidentiary rulings for an abuse of discretion." *Id*. at 693. However, our review of a district court's admission of evidence under Rule 404(b) mirrors the district court's three-step process:

> *First*, we review for clear error the factual determination that other acts occurred. *Second*, we review de novo the legal determination that the

acts were admissible for a permissible 404(b) purpose.  *Third*, we review
for abuse of discretion the determination that the probative value of the
evidence is not substantially outweighed by unfair prejudicial impact.

*Id*. (emphasis added).

### 1.  Kenny Day, Eugene Lewis, and J.C. Lawson Vote-Buying Testimony

Prior to trial, the government filed a notice of admission of background evidence
in the form of testimony from three convicted drug dealers:  Kenny Day, Eugene Lewis,
and J.C. Lawson.  R. 581 (Gov't Notice of Admis.) (Page ID #3745–54).  Defendants
filed motions in opposition, and the district court conducted a hearing on the issue.  *See*
R. 671 (01/21/2010 D. Ct. Op. at 1) (Page ID #4257).  Ultimately, the district court
determined the following to be admissible background evidence:

> A.  The testimony of Kenny Day and/or other evidence that Maricle and
> Adams bought votes in the 1983 election and that Maricle was involved
> in attempting to influence a juror in 1990;
>
> B.  The testimony of Eugene Lewis and/or other evidence that, in the late
> 70's-90's, Lewis operated as a vote buyer at Maricle, Jones and
> Thompson's request[];
>
> C.  The testimony of J. C. Lawson and/or other evidence that Lawson
> contributed to Maricle's campaign in the 1980's, that Lawson was
> approached by Jones and Bowling to buy votes and that Lawson was paid
> $500 by Bowling after an election;

*Id*. at 26–27 (Page ID #4282–83).  On appeal, defendants argue that the district court
abused its discretion in admitting this evidence.

Defendants' first contention is that this evidence lacks temporal proximity to the
charged conspiracy, given that most of the events about which Day, Lewis, and Lawson
testified occurred in the 1980s.  Therefore, according to defendants, the district court
erred in admitting the testimony.  Adams Br. at 23 ("As in *Hardy*, such temporally
remote evidence cannot possibly be 'necessary to explain the charged offense, complete
the story [of a witness'] testimony, [or] tend to establish the charged conspiracy itself.'
228 F.3d at 749–50.").  This argument fails for two reasons, both noted by the district

court.  First, vote buying and jury tampering by nature cannot be committed every day because elections and trials are not everyday occurrences.  Therefore, in the context of this case, evidence of vote buying from the 1980s was not as remote as in other cases (although we agree with defendants that if the evidence was offered on temporal proximity alone it would have been an error).  Second, and more importantly, *Hardy* acknowledges that background evidence requires a close "causal, temporal *or* spatial connection."  Hardy, 228 F.3d at 748 (emphasis added).  The "or" is significant here because without a temporal connection, the evidence was admissible to show a causal connection.

Defendants' second contention is that the causal connection between vote buying in the 1980s and the charged conspiracy is too attenuated to be admissible under *Clay*.  A review of Day's, Lewis's, and Lawson's testimony is useful.  Day testified that Adams and Maricle served as corrupt election officers in the 1980s and bought votes for competing parties.  Day explained that the Republican Adams and the Democrat Maricle reached across party lines, however, to double-cross Corky McKeehan.[15]  R. 835 (02/04/2010 Trial Tr. at 30–31) (Page ID #5194–95).  Day also testified that Adams gave him money to purchase votes and that Maricle supplied Day with a list of who should serve as election officers in each precinct.  *Id.* at 25, 35–36 (Page ID #5189, 5199–60).  Lewis testified that he was given money to buy votes in Maricle's presence.  R. 869 (02/04/2010 Trial Tr. at 58) (Page ID #8308).  Lewis also testified that he gave Maricle $2,000 in cash to buy votes for Maricle's first campaign for circuit judge.  *Id.* at 59–60 (Page ID #8309–10).  Lawson testified that he gave money to be used to buy votes for Maricle.  R. 870 (02/05/2010 Trial Tr. at 53–54) (Page ID #8402–03).

As explained by the district court, this evidence is a prelude to and "completes the story" of the charged conspiracy by showing how Maricle and Adams rose to become political bosses in Clay County, their knowledge of vote buying, and their

---

[15]The double-cross worked by taking money from McKeehan to buy him votes but actually voting the voter for another candidate, Mike Hooker.  Day explained that out of fear of getting caught (and killed) for their double-cross, Adams and Maricle announced different results at the precinct than what they actually submitted to the Board to tally.

personal relationship.  Maricle's and Adams's rise to power and knowledge of vote buying was essential to the government's case because the indictment alleged that they led and directed the operations of the conspiracy.  Therefore, there is a causal connection between Maricle's and Adams's vote-buying activities in the 1980s and the charged conspiracy that they were alleged to have directed.  Similarly, the fact that they had a relationship was essential because the indictment alleged a single conspiracy and defendants presented a multiple-conspiracy defense.  *United States v. Escobar-de Jesus*, 187 F.3d 148, 169 (1st Cir. 1999) (collecting cases to support the proposition that "[i]n a conspiracy case, evidence of other bad acts . . . can be admitted to explain the background, formation, and development of the illegal relationship, . . . and, more specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust").  This is a missing and distinguishing feature from *Clay.*

Defendants' final contention is that the evidence should have been excluded under Federal Rule of Evidence 403.  Rule 403 provides:  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  The district court is afforded broad discretion in making this determination; therefore, we review for abuse of discretion and "must maximize the probative value of the challenged evidence and minimize its potential for unfair prejudice."  *United States v. Lloyd*, 462 F.3d 510, 516 (6th Cir. 2006).

Defendants argue that the probative value of the vote-buying testimony from Day, Lewis, and Lawson was far outweighed by the danger of unfair prejudice—showing a propensity to commit vote buying.  As discussed earlier, the vote-buying testimony was probative because it helped explain how Adams and Maricle obtained the knowledge to direct and control the conspiracy and to show their relationship.  With regard to prejudice, the picture painted by the government was not pretty, but it was not unfairly ugly either.  Furthermore, the district court gave adequate instructions:

> (1)    The United States introduced certain testimony and evidence which the Court has admitted as background evidence.  This includes

some testimony presented by Kenneth Day, Eugene Lewis, and J.C. Lawson. Background evidence includes an act or acts other than the specific acts charged in the indictment which are intertwined with the offense or offenses charged. The introduction of background evidence is offered to complete the story of the charged offense or offenses. Here, the United States offered the evidence to show the origins of the enterprise (i.e., the inception of the conspiracy) that has been alleged and the roles of some of the members of the alleged enterprise.

(2)    You are cautioned that the United States does not assert that the alleged conspiracy which is the subject of the indictment occurred in the 1980s with one or more of the Defendants participating in vote-buying. Instead, the United States offered this testimony as evidence of activity that allegedly was the origin of defendants joining the enterprise and their respective roles in the enterprise.

R. 826 (Jury Instructions at 86) (Page ID #5092); *see United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996) ("The magnitude of that risk might well have been reduced by a clear and concise instruction identifying for the jurors the specific purpose for which the evidence was admissible and limiting their consideration of the evidence to that purpose."). Therefore, we conclude that the district court did not abuse its discretion in admitting background evidence regarding vote buying in the 1980s and 1990s.

### 2. Kenny Day, Eugene Lewis, and J.C. Lawson Drug-Dealing Testimony

Defendants also challenge the admission of testimony from Day, Lewis, and Lawson that detailed their (and others') involvement in illicit-drug activities. The government responds that such evidence was admissible as proper background evidence, Rule 404(b) evidence, or under *United States v. Thornton*, 609 F.3d 373, 377 (6th Cir. 2010). Before addressing the parties' arguments, we recap just some of the abundant drug-dealing testimony given at trial.

The government elicited the following testimony from Day:

Q.  What kind of drugs did you sell, Mr. Day?

A.  Cocaine and marijuana.

Q.  And how big of quantities did you sell at the height of your business over there in Clay County?

A.  I was selling tons of marijuana at the height of it.  I would get a ton about every two to three weeks, I would get a ton of marijuana in.

Q.  Now, a ton, in my opinion—my recollection, is about 2,000 pounds?

A.  That is correct.

Q.  And is marijuana sold by the ton or by the pound when you sold it?

A.  I sold it by the pound.

Q.  And what was it bringing per pound?

A.  I sold mine for $1400 a pound.

. . .

Q.  And during the time period, Mr. Day, that you were operating there, did you also have some local customers?

A.  Well, I tried not to have none, but on the last, I did.  I got greedy and took on some local customers, and that was the downfall of me.

Q.  Did you ever know a fellow by the name of Oscar Hubbard?

A.  Yes, I do.

Q.  And how do you know Oscar Hubbard?

A.  I sold him marijuana.

Q.  And did he get prosecuted in your case?

A.  Yes, he did.

Q.  And was he convicted?

A.  Yes, he was.

Q.  And is he related to Doug Adams in any way?

A.  Yes, he is.

Q.  How is he related to Doug Adams?

A.  Doug married his sister.

R. 835 (02/04/2010 Trial Tr. at 9–10, 12–13) (Page ID #5173–74, 5176–77).[16]

After this line of questioning, defendants moved for a mistrial because a prior order by the district court ruled that "[g]eneric statements or testimony that Adams formed relationships with a number of drug dealers in Clay County, Kentucky," R. 671 (01/21/2010 D. Ct. Op. at 27) (Page ID #4283), would not be admissible as background or Rule 404(b) evidence without further justification from the government.  R. 835 (02/04/2010 Trial Tr. at 13–14) (Page ID #5177–78); *see* R. 671 (01/21/2010 D. Ct. Op. at 20–21) (Page ID #4276–77).  The government responded that "[Adams is] associated with people who are in [the drug-dealing] business, and that is not, in my understanding of the Court's ruling, impermissible."  R. 835 (02/04/2010 Trial Tr. at 14) (Page ID #5178).  The district court denied defendants' motion for mistrial, noting that "to the extent that my previous ruling was ambiguous and gave the impression that the United States could not seek to introduce such connections with Mr. Adams, I'll correct that, the United States may do so."[17]  *Id.* at 15 (Page ID #5179).

Day's drug-dealing testimony continued after making the "connection" with Adams:

> Q.  During this '90s period, what was the quantities of cocaine that you were buying and selling there in your business at the pawnshop?

---

[16]We note that the focus of Day's (proffered) testimony progressively shifted from vote buying to drug dealing through the district court proceedings.  In earlier proceedings, the drug-dealing evidence was presented as being tangential to Day's criminal history.  At trial, however, the government opened its case with testimony from Day about how he sold tons (in the literal sense) of marijuana.  *Compare* R. 581 (Gov't Notice of Admis.) (Page ID #3745–54), *and* R. 679 (01/19/2010 Hr'g Tr. at 7–29) (Page ID #4302–24), *with* R. 835 (02/04/2010 Trial Tr. at 5–51) (Page ID #5169–215).

[17]We are unsure how the fact that Day sold marijuana to Adams's brother-in-law shows that Adams and Day are "associated."  Even if it does show the two are associated, it was unnecessary given that a connection between Day and Adams was established permissibly through testimony detailing their vote buying in the 1980s.  Day's involvement in the drug business (which started in the mid-1990s) and the details surrounding it simply did not have any relevance to the government's case.  R. 835 (02/04/2010 Trial Tr. at 8) (Page ID #5172).  Furthermore, we find it troubling that the government's presentation of defendants' "association" with drug dealers (with the exception of Jones) appears to be based largely on innuendo.  *See Huddleston v. United States*, 485 U.S. 681, 689 (1988) ("This is not to say, however, that the Government may parade past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo."); *see also Flagg v. City of Detroit*, 715 F.3d 165, 176 (6th Cir. 2013) ("[A]ny connection between the excluded evidence and the Greene investigation is highly speculative.").

A.  I would get six, seven, eight kilos, just according to what kind of money I had when I went down there.

Q.  And what was cocaine, at that time, selling for?

A.  I sold mine for 1050.

Q.  Okay.  Now, 1050, is that per ounce, per kilo, per pound?

A.  Ounce, $1,050 an ounce.

Q.  And approximately how many ounces is [sic] in a kilo of cocaine?

A.  35.7.

Q.  So you got over 35 ounces out of a kilo of cocaine that you were selling for over a thousand dollars an ounce?

A.  That's right.

Q.  And you were getting around how many kilos every other week?

A.  Five, six, seven . . . .

*Id.* at 17–18 (Page ID #5181–82).

Lewis's testimony included these exchanges:

Q.  So what was the understanding that you all—what was the goal, I guess, for you and Mr. Baker and Mr. Jones?  What were you planning to do?

A.  To grow marijuana, sir.

Q.  And did you make any effort to actually follow through with that plan?

A.  Yes, we did.

Q.  And what did you do?

A.  We growed several hundred marijuana plants.

Q.  And where did you actually place this marijuana in the ground out, in the field somewhere?

A.  Yes, sir.  We dug in several little pot patches that were a good place to grow.  A lot of cedar thickets and pine thickets that accounted pretty well for camouflage.  And we put small patches in, 40, 50 in a patch.  We put in somewhere around 500 plants.

Q.  And this was put on the farm in Henry County?

A.  Most of it was.  Some of it was on another people's farm, sir.

Q.  And what were your plans to do with the marijuana once it had grown to maturity?

A.  To sell it, profit.

Q.  And did you follow through on those plans?

A.  Yes, sir.

Q.  And what did you do with the marijuana you harvested?

A.  We sold it.

Q.  Okay.  Did you divide it among yourselves, or did you divide the profits, or how did that work?

A.  Yes, we divided some of the marijuana in three different piles, and then sometimes I'd take it and hire some people to clean it for us and split the money.

R. 869 (02/04/2010 Trial Tr. at 51–52) (Page ID #8301–02).

Finally, the government elicited the following testimony from Lawson:

Q.  Mr. Lawson, I believe we're now publishing the copy of the [newspaper] article.  There's a picture there on the center of the screen.  Could you describe for us who that person is in there?

A.  Yes, sir, that's me.

Q.  And what's your background?  What have you got in your background?

A.  Marijuana.

Q.  And do you remember being interviewed for that article?

A.  Yes, I do.

Q.  Who did you give an interview to?

A.  Lexington Herald and Bill Estep.

Q.  And where did you all conduct that interview?

A.  Sugar Creek and Red Bird.

Q.  And did the reporters actually go out in the mountains with you?

A.  Yes.

Q.  And Bill Estep take that picture of you there?

A.  Yeah.

Q.  Now, at that time, Mr. Lawson, you hadn't had any convictions for marijuana growing, had you?

A.  No.

Q.  And what kind of a drug business did you have?  About how much marijuana were you growing at the height of your business?

A.  The most, the highest was—I think I made about 350,000 one year.

Q.  $350,000?

A.  Yeah.

Q.  You made that in one year?

A.  Um-hmm.

Q.  Growing marijuana, selling it?

A.  Yes, sir.  Yeah.

Q.  And did you grow all that marijuana in Clay County?

A.  Yes.

Q.  And did you sell that marijuana there in Clay County?

A.  No.  I sold it to up north.

Q.  Did they come from up north to Clay County to get it?

A. Yes, they did.

Q.  And that's one of your marijuana patches there that you took the reporters to?

A.  Yeah.

. . .

Q.  What would you average in a year?  Would you try to put out so many plants each year?

A.  Well, the one year I was talking about, I think I got about 300 pound.

> Q.  How many plants do you have to grow to harvest 300 pounds?
>
> A.  Probably about 2 or 3 thousand.
>
> Q.  And you grew all these thousands of plants there in Clay County?
>
> A.  Yes, sir.

R. 870 (02/05/2010 Trial Tr. at 45–47, 59) (Page ID #8394–96, 8408).

The government contends that the drug-dealing testimony from Day, Lewis, and Lawson was admitted properly as background evidence because "defendants' ties to drug dealing helped explain the possible origin of the large amounts of cash addressed at trial, even when the evidence showed . . . that defendants turned down money offered by a known drug dealer." Gov't Br. at 75. We disagree. Evidence of drug dealing from Day, Lewis, and Lawson does not qualify as background evidence because it is not inextricably intertwined with the charged offense. The evidence does not serve as "a prelude to the charged offense" or "complete the story" because there was no allegation that drug money from Day, Lewis, and Lawson was used to buy votes in the charged conspiracy. *Hardy*, 228 F.3d at 748. Therefore, there was no causal connection.

In *Clay*, the district court permitted the government to introduce evidence relating to an uncharged theft of a handgun from the car of an uninvolved person, Moser. We found the admission was an error:

> Here, Clay was charged with carjacking and brandishing a firearm during and in relation to the carjacking. In order to convict on both counts, the government had to establish that Clay did in fact brandish a firearm. Eyewitness testimony established that the carjacker used a silver semi-automatic handgun during the incident. Another witness, Abernathy, testified that she saw Clay with a semi-automatic handgun either the day of or the day before the carjacking. The government argues that the evidence of the uncharged theft was necessary to complete the story of the offense and explain how Clay obtained the handgun.
>
> This argument is logically flawed. There is no evidence that firmly establishes a relationship between the carjacking and the theft. The gun stolen from Moser's car was never recovered, and nothing

confirms that stolen weapon was the gun Abernathy saw with Clay, or the gun used during the carjacking.  Without confirmation that the gun is the same, the car theft is neither a prelude to the charged offense, nor probative of it.  It does not arise from the same events as the carjacking; in fact, it is a completely separate and distinct offense that is not essential for providing a "coherent and intelligible description of the charged offense."  *McCormick on Evidence* § 190 (6th ed. 2006).

*Clay*, 667 F.3d. at 698.

In the present case, the connection was even weaker.  There was no evidence to establish—nor was there even an allegation of—any relationship between drug money from Day, Lewis, and Lawson and the charged conspiracy.  Therefore, the evidence was neither a prelude to the charged offense nor was it probative of the charged offense.  Furthermore, in *Clay*, we found an error where the government "had to establish that Clay did in fact brandish a firearm."  *Id*.  Here, the government did not need to establish the source of the funds because it was neither an element of any charged offense nor alleged in the indictment.  In contrast, the evidence of vote buying in the 1980s was proper background evidence because it showed how Maricle and Adams rose to become political bosses in Clay County, their knowledge of vote buying, and their personal relationship.  Such evidence was causally connected to the charged conspiracy because the government alleged that, from 2002 to 2007, Maricle and Adams were political bosses, directed others to buy votes, and were involved in a single conspiracy.  Unlike the use of evidence of vote buying in the 1980s and 1990s, there was no causal connection between the evidence of drug dealing and the charged conspiracy.  The government did not charge defendants with purchasing votes with drug proceeds in the 2002, 2004, and 2006 election cycles.[18]  Thus, there was no link between the charged conspiracy and the admitted drug-dealing evidence.

---

[18]In fact, the government's opening statement acknowledges the lack of connection:

Money laundering, you hear it used in a lot of different contexts.  Maybe you're thinking of money laundering in terms of big drug conspiracies.  That's not what we're talking about.  The evidence is going to show that essentially what happened is that money that came from those interested pooled it together to vote for candidates . . . .

R. 892 (Gov't Opening Statement at 11–12) (Page ID #10758–59).

Additionally, the details surrounding their drug-dealing operations did not "form[] an integral part" of Day's, Lewis's, or Lawson's testimony. *Hardy*, 228 F.3d at 748. The fact that *witnesses* Day, Lewis, and Lawson used drug money to buy votes in the 1980s and 1990s might have been an integral part of their testimony if there was an allegation that defendants used money from Day, Lewis, and Lawson to buy votes in the charged conspiracy. Furthermore, as highlighted above, the testimony from Day, Lewis, and Lawson focused on the details of their drug-dealing operations, not the details of using drug money to buy votes. The overwrought details of their marijuana operations were not integral to their testimony and appear to have served one function: to paint defendants in a bad light by "connecting" them to drug dealers. For these reasons, the evidence of drug dealing from Day, Lewis, and Lawson does not comport with this court's strict limitations on the admission of background evidence.[19]

For similar reasons, the evidence is not admissible under Rule 404(b) because the evidence of drug dealing is not "'material' to matters 'in issue' in the case [or] 'probative' of them." *United States v. Tasis*, 696 F.3d 623, 627 (6th Cir. 2012); *see United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003). That is, the government did not need to prove that defendants used drug proceeds to purchase votes during the charged conspiracy because this was not an element of the offense and was not alleged in the indictment. Likewise, defendants did not present a defense that questioned where the vote-buying money came from, which would have put the matter "in issue." *See Tasis*, 696 F.3d at 627. Therefore, the drug-dealing testimony was not admissible under Rule 404(b).

---

[19]Consequently, the district court's jury instructions were flawed. Regarding this "background evidence," the district court instructed the jury:

> [Y]ou are also cautioned again that the Defendants are not charged in this matter with drug crimes. However, the United States has offered testimony regarding marijuana activity as evidence of funds which allegedly could be used to purchase votes, the relationship between persons who are alleged to be members of the conspiracy, and the Defendants' positions in the conspiracy.

R. 826 (Jury Instructions at 86) (Page ID #5092).

The government's other arguments for admissibility under the background-evidence exception or Rule 404(b) are equally unavailing:

> When Jones sought someone to commit illegal vote buying in Thompson's race, he turned to Lewis, an individual Jones could trust because of their previous relationship violating the drug laws. . . . Likewise, the fact that Lawson was a drug dealer whose exploits and status as a nonvoting felon were widely known refuted any suggestion that Bowling was simply seeking legitimate support when he gave Lawson money through an intermediary.

Gov't Br. at 74–75. These explanations show that portions of the above evidence were relevant to an individual's testimony, but they do not explain how the details of Day's, Lewis's, and Lawson's drug-dealing operations qualify as proper background or Rule 404(b) evidence.

The government's last-ditch argument is that the admission of the drug-dealing evidence from Day, Lewis, and Lawson was permissible "to 'blunt' forthcoming attacks on [its witnesses'] credibility." Gov't Br. at 74 n.13 (citing *United States v. Thornton*, 609 F.3d 373, 377 (6th Cir. 2010)). In *Thornton*, the prosecution preempted the defense's efforts to impeach by questioning its own witness about "the charge to which he pled guilty, the statutory penalties and sentencing guideline range he confronted, the reason for his agreement to testify at trial, and the charges which the Government had agreed to dismiss as a result of his cooperation." 609 F.3d at 377. In the present case, the government went well beyond the line of questioning in *Thornton* by eliciting testimony from Day regarding the amount of drugs he was selling and the amount of money he was making from such sales. This unnecessary, unfairly prejudicial line of questioning was not admissible to blunt defendants' forthcoming credibility attack.

Even if the evidence was properly admissible as background evidence, under Rule 404(b), or under *Thornton*, it should have been excluded under Rule 403. The probative value of the relationship between Jones and Lewis is minimal, given that the government's evidence showed that defendants approached many individuals to buy votes for their slate, and the government did not find it necessary to explain a

relationship of trust with many of those individuals.  With regard to the government's explanation for Lawson's testimony, the fact that money was given to Lawson to buy votes "refuted any suggestion that Bowling was simply seeking legitimate support"; the fact that Lawson was a former drug dealer does not change this.  The government's last argument is the least appealing because evidence of witnesses' drug dealing in the 1980s and 1990s was not probative of an issue in the case at hand, given that there was no need for the government to explain the source of money used to purchase votes.  The unfair prejudice is obvious:

> Q.  And that first year[, late 1980s,] that you had this partnership with Mr. Jones and Mr. Baker, do you know how much you all made that year from your marijuana?
>
> A.  No, sir.  But in a couple years together, just a low estimate, we made at least 50,000 apiece.

R. 869 (02/04/2010 Trial Tr. at 54–55) (Page ID #8304–05).  Again, the present case involves a RICO conspiracy that revolves around vote buying from 2002 to 2007. Evidence of a defendant's drug dealing from more than ten years before the start of a vote-buying conspiracy strikes us as unfairly prejudicial, and this unfair prejudice substantially outweighs the limited probative value of the evidence.  Furthermore, the sheer amount of drug-dealing evidence that was presented is entirely disproportionate to its probative value, tipping the scales towards unfair prejudice.  Therefore, it should have been excluded under Rule 403.

In sum, evidence of widespread drug dealing in Clay County did not serve as a prelude to the present case or help complete the story of the offense.  Likewise, the evidence was not admissible under Rule 404(b) because whether drug proceeds were used to buy votes in the charged conspiracy was not "in issue."  The evidence was also not admissible to weaken the blow that defendants might have levied on cross-examination of Day, Lewis, and Lawson because the line of questioning was outside of the bounds of *Thornton*.  Furthermore, even if the evidence were admissible as background evidence, Rule 404(b) evidence, or under *Thornton*, it should have been

excluded under Rule 403 because the danger of unfair prejudice substantially outweighed its limited probative value.[20]   Therefore, the district court abused its discretion in admitting this evidence of drug dealing.

We must analyze whether the erroneous admission of the drug-dealing evidence was nonetheless harmless.  Although typically we perform this inquiry with regard to each piece of evidence that has been erroneously admitted, we reserve this analysis to Part IV.E of this opinion because this case presents several evidentiary errors, prompting cumulative error analysis.  *See Walker v. Engle*, 703 F.2d 959, 968 (6th Cir.) ("We need not determine whether each of the alleged errors would, alone, require that we find a deprivation of due process.  It is clear that the cumulative effect of the conduct of the state was to arouse prejudice against the defendant to such an extent that he was denied fundamental fairness."), *cert. denied*, 464 U.S. 951 (1983); *see also Chambers v. Mississippi*, 410 U.S. 284, 298 (1973) ("We need not decide, however, whether this error alone would occasion reversal since [defendant's] claimed denial of due process rests on the ultimate impact of that error when viewed in conjunction with the trial court's refusal to permit him to call other witnesses.").

### 3.  Inside Edition Video

Defendants challenge the district court's admission of a video clip from a 1989 episode of the television show "Inside Edition."  Prior to trial, Maricle filed a motion in limine to exclude the video as evidence of prior bad acts under Rule 404. R. 604 (Maricle Mot.) (Page ID #3942–45).  The district court conducted a hearing on the matter and ultimately ruled that portions of the video were admissible under Rule 404(b).  R. 671 (01/21/2010 D. Ct. Op. at 27) (Page ID #4283).  The district court reasoned that "the statements made by Maricle provide insight into his intent, preparation, and plan, regarding how control of the political process with the county can

---

[20] We recognize that inevitably some evidence of drug dealing would surface at trial, given the pervasiveness of such conduct in Clay County; however, the government's evidence goes far beyond the inevitable, rests largely on innuendo, and appears to be admitted "merely to show a defendant's propensity to go down a once-trodden criminal path again."  *Tasis*, 696 F.3d at 627.

be accomplished." *Id.* at 24 (Page ID #4280).  Before engaging the parties' arguments on appeal, a highlight reel is necessary.

Inside Edition's report begins with narration explaining that the "storybook setting" of Clay County has been destroyed by marijuana growing.[21]  Dramatic music plays as the camera closes-in on a marijuana leaf.  Clay County Sheriff Harold Sizemore states that people tell him that they don't want to move to Clay County because "that's the county that raises all the pot."  A resident of Clay County remarks that "we're told we are the number one producer in the United States, and I'm ashamed of that."  Another resident explains "everybody in the county grows it."  Marijuana smoke is blown into the camera.  Defendant Maricle states that "it is the number one cash crop in this county."  He also explains that Clay County is dependent on marijuana.  More dramatic music plays while law-enforcement officers cut and burn marijuana plants.

Sheriff Sizemore states that there was a bounty placed on his life because of his aggressive cutting of marijuana plants.  He also tells Inside Edition that he was "ousted" in a recent election by marijuana growers.  Inside Edition's reporter narrates:

> Perhaps not coincidentally, thirteen people were recently indicted on charges of election fraud and, in some cases, out and out vote buying. And while thus far no link to pot growers has been established, several County insiders tell Inside Edition that if it had been a straight election, the Sheriff would have won.  And while no one is suggesting the marijuana growers had their own candidate, it is believed the growers played a strong part in the Sheriff's defeat.

Maricle states "a substantial percentage of voters can be bought on election day, and by substantial, I mean thirty percent or more."

Clay County Attorney Clay Bishop Jr. states that "there's hardly a week that goes by that we do not receive a complaint where someone has pointed a gun at someone else or shot someone else . . . because they thought [someone] was stealing their marijuana."

---

[21]The episode also contained introductory and concluding remarks by commentator Bill O'Reilly. Those remarks were properly left on the district court's editing room floor for lack of relevance and for their prejudicial nature.  R. 671 (01/21/2010 D. Ct. Op. at 25–27) (Page ID #4281–83).

Inside Edition's reporter says he and the law enforcement officers are leaving "nothing
to chance" and straps on a bullet-proof vest before venturing into the hills to find, cut,
and burn marijuana plants.  After cutting and burning a marijuana patch, the reporter
explains:  "During a ten-day sweep [law enforcement officers] say they pulled 15,000
plants out of Clay County.  They put the estimated street value at fifteen to twenty
million bucks."  The reporter's closing remarks begin:  "The burning issues remain.
Who's behind the business.  Law men say they don't know."  He concludes:  "most
frustrating is after all the hard work in the blistering heat, [the law men] can make no
arrests."

        The government argues that the video was relevant and properly admitted to
show Maricle's intent, preparation, and plan because his statements in the video "made
it more likely that Maricle knew—*e.g.*, when he met with Jones, Stivers, and Wanda
White, his hand-picked election officer—that he was part of a conspiracy that sought to
control county affairs precisely by buying votes."  Gov't Br. at 72 (citation to the record
omitted).  Defendants characterize this argument as saying that the video was admitted
to show knowledge or awareness of vote buying.  Maricle Reply Br. at 8–9.  Because the
issue of whether Maricle was aware of corruption in Clay County was not disputed or
at issue, defendants contend that evidence related to Maricle's knowledge was not
relevant and, therefore, was admitted for the improper purpose of showing propensity.
*See Merriweather*, 78 F.3d at 1076–77 ("After requiring the proponent to identify the
specific purpose for which the evidence is offered, the district court must determine
whether the identified purpose, whether to prove *motive* or *intent* or *identity* [or] some
other purpose, is 'material'; that is, whether it is 'in issue' in the case.").  Defendants
also assert that the admission violated Rule 403 and that the error in admitting the
evidence was not harmless.

        As described earlier, we must first review for clear error the factual determination
that other acts occurred.  There is no dispute in the present case that the video is what
it purports to be—a segment from Inside Edition containing an interview with Maricle.
Next, we review de novo the legal determination that the acts were admissible for a

permissible Rule 404(b) purpose.  Although we agree with the government that the segment does provide insight into Maricle's intent, preparation, and plan, the contents of the video were not limited to such information.  Much like the evidence of drug dealing from the testimony of Day, Lewis, and Lawson, the video was comprised mostly of information about marijuana growing in Clay County.  Such information was not relevant to Maricle's intent, preparation, and plan because the government did not allege that drug proceeds were used to buy votes in 2002 to 2007.  Similarly, the government did not need to show possible sources of money used to purchase votes because defendants did not present a defense based on lack of funding.  In other words, whether drug money was used to buy votes from 2002 to 2007 was not "in issue"; therefore, evidence going to that fact was not admissible under Rule 404(b).[22]  *See Merriweather*, 78 F.3d at 1076.  Because the evidence was not admissible for a proper purpose, we need not consider whether the probative value is substantially outweighed by the danger of unfair prejudice.  We conclude that the district court improperly admitted the Inside Edition video.[23]

## B.  MySpace Message and Mobile Home Burning

Defendants challenge the admission of two pieces of evidence relating to alleged witness intimidation.  First, Wanda White testified that she received a threatening MySpace message from Brian Hubbard after she testified before a grand jury regarding the instant case.[24]  R. 846 (02/24/2010 Trial Tr. at 63) (Page ID #6132).  Second, Wanda White also testified that a month after Terry Smith testified before the grand jury, the

---

[22]The evidence was also not admissible as "background" evidence for the same reasons that the drug dealing testimony from Day, Lewis, and Lawson was not admissible.

[23]We note that Maricle's statement that "a substantial percentage of voters can be bought on election day, and by substantial, I mean thirty percent or more" is relevant and proper evidence under Rule 404(b).  The government alleged that Maricle directed the conspiracy.  In order prove that theory, the government needed to show that Maricle possessed the knowledge and plan to control evidence.  Thus, Maricle's statement that thirty percent of voters could be bought is relevant because it shows Maricle's intimate understanding of just how many votes can be bought in Clay County.  If the video had been limited to this portion, it would have been admissible.

[24]Wanda White testified that the message said something along the lines of "good job, look what you've done with your lies" and contained a picture of a man pointing a gun at the viewer.  R. 846 (02/24/2010 Trial Tr. at 63) (Page ID #6132).

Nos. 11-5291/ 5308/ 5311/ 5312/ 5313/  *United States v. Adams et al.*      Page 39
    5336/ 5337/ 5366

mobile home that he rented from Wanda and Kennon White burned down.[25]  *Id.* at
65–66 (Page ID #6134–35); *see also* R. 878 (03/04/2010 Trial Tr. at 112) (Page ID
#9454).  The district court admitted both as intrinsic evidence or, alternatively, under
Rule 404(b).  *See* R. 846 (02/24/2010 Trial Tr. at 4–24) (Page ID #6073–93).

> In *United States v. Barnes*, we explained:
>
> > "Intrinsic" acts . . . are those that are part of a single criminal episode.
> > Rule 404(b) is not implicated when the other crimes or wrongs evidence
> > is part of a continuing pattern of illegal activity.

49 F.3d 1144, 1149 (6th Cir. 1995).  The contours of what constitutes "intrinsic"
evidence are not exactly clear; however, we have recognized that intrinsic evidence
requires a connection to the charged offense.[26]  *Id.* ("[T]here was a direct connection
between the earlier 'short' drug shipment and the receipt of the one for which defendants
were charged."); *United States v. Gonzalez*, 501 F.3d 630, 640 (6th Cir. 2007) ("But here
too there was a connection . . . between Rodriguez's tutoring of Gonzalez in the drug
trade as Gonzalez drove him to the earlier transactions and Gonzalez's role as driver of
the 'drug car' in the offense charged against Gonzalez and Rodriguez.").   The
government concedes on appeal that "testimony later at trial did not directly bear out the
government's proffer that defendants or their co-conspirators . . . were behind the
acts."[27]  Gov't Br. at 76.  With no connection to the charged conspiracy, the evidence
was not admissible as intrinsic evidence.

        Similarly, the evidence is not admissible under Rule 404(b).  As we recognized
in *Clay*, "the issue is not whether the [other act] occurred but whether there is sufficient

---

[25]They also testified that the home was uninsured and did not have electricity (suggesting that
arson was involved).

[26]We acknowledge that the distinctions among *res gestae*, inextricably intertwined evidence,
intrinsic evidence, and background evidence is far from clear.  *See* David P. Leonard, The New Wigmore:
Evidence of Other Misconduct and Similar Events, § 5.  For this reason, our court has relied previously
on cases involving background evidence when analyzing intrinsic evidence. *See United States v. Gonzalez*,
501 F.3d 630, 639 (6th Cir. 2007) (discussing *Hardy* in the context of intrinsic evidence).

[27]With regard to the MySpace message, Hubbard testified that he was not asked by defendants
to send the message.  R. 878 (03/04/2010 Trial Tr. at 92) (Page ID #9434).

evidence that [the defendant] committed the act."   667 F.3d at 699.   Defendants
requested that the district court make this finding.   The district court responded that "at
this time, . . . there is sufficient evidence if, in fact, the United States offers proof, as
indicated that they will offer in the case, that there would be a connection to one or more
defendants in this matter."   R. 846 (02/24/2010 Trial Tr. at 24 (Page ID #6093).   As
noted before, the government concedes that it did not make that connection.   Thus, the
district court abused its discretion in admitting the evidence of witness intimidation.[28]

## C.  Audio Recordings and Transcripts

Over defendants' objections, the district court permitted the government to play
portions of audio recordings made by two cooperating witnesses, Wanda and Kennon
White.   The government was also allowed, over defendants' objections, to provide the
jury with transcripts of the recordings.   On appeal, defendants argue that the district
court erred by admitting the audio recordings, permitting the use of inaccurate
transcripts, and excluding defendants' exculpatory statements from the recordings and
transcripts.

### 1.  Admission of Audio Recordings

Defendants contend that the district court erred in admitting audio recordings of
conversations between Wanda and Kennon White and defendants.   In particular,
defendants argue that the recordings were inadmissible because they were "replete with
inaudible portions, barely intelligible portions, and unidentified speakers."   Jones Br. at
21.

"The admission at trial of tape recordings rests within the sound discretion of the
trial court."   *United States v. Wilkinson*, 53 F.3d 757, 761 (6th Cir. 1995).   "That
discretion presumes, as a prerequisite to admission, that the tapes be authentic, accurate

---

[28]The better practice, as the government points out, would have been conditionally to admit the
evidence at that time or to wait until the government has proffered evidence to make the connection and
admit the evidence then.   *See Huddleston v. United States*, 485 U.S. 681, 690 (1988).   Neither happened
in the present case, however, so we have no reason to consider what might have occurred in assessing
whether the district court erred.

and trustworthy." *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983). Recordings are not admissible "if the unintelligible portions are so substantial as to render the recording as a whole untrustworthy." *Id.* (quotation marks and citation omitted).

On appeal, defendants do not challenge the authenticity, accuracy, or trustworthiness of the recordings. Instead, they claim that the unintelligible portions of the recordings rendered the entire recordings untrustworthy and, consequently, inadmissible. Having listened to the recordings, we agree with defendants that the recordings contain portions that are unintelligible. *See United States v. Scarborough*, 43 F.3d 1021, 1024 (6th Cir. 1994) (reviewing recorded tapes on appeal). We cannot say, however, that the district court abused its discretion in admitting the audio recordings because the unintelligible portions do not "render the recording as a whole untrustworthy." *Robinson*, 707 F.2d at 876.

## 2. Use of Transcripts

Defendants' second argument regarding the audio recordings relates to the use of transcripts by the jury. Defendants contend that the district court abandoned this court's precedent by, in essence, preparing its own transcripts. Defendants also claim that the district court erred in finding the government's transcripts to be accurate because inaudible portions of the recordings were transcribed and other portions of the recordings were transcribed inaccurately.

"We review a district court's rulings as to a jury's use of transcripts under an abuse of discretion standard." *United States v. Jacob*, 377 F.3d 573, 581 (6th Cir. 2004). On appeal, defendants must show both error and prejudice. *Id.*; *see Scarborough*, 43 F.3d at 1025. "The admission of written transcripts of recorded conversations is not prejudicial error unless an inaccuracy exists." *United States v. King*, 272 F.3d 366, 372 (6th Cir. 2001). As outlined in *Robinson*:

> The ideal procedure for testing accuracy is to have the prosecution and
> defense attorneys stipulate to a transcript. If there is a dispute concerning

the contents of the [audio recordings], the second best method is for the trial court to make a pretrial determination of accuracy by reading the transcript against the [recordings].  The third and least preferred method is to present two transcripts to the jury, one of which contains the government's version and the other the defense's version.  Hence, the jury becomes the final arbiter of which version is most accurate.

707 F.2d at 876 (quotation marks and citations omitted).

In the present case, defendants allege that the district court abandoned this procedure by taking "the extra step of itself *interpreting* and *transcribing* the recording, making edits to the transcript, writing comments, and making admissibility decisions on whole sections of the proffered transcripts deemed not pertinent or relevant absent any adversary process." Jones Br. at 22–23.  The government responds that the district court did not disregard the process described in *Robinson* but "employed a variation on the second method." Gov't Br. at 83.  The government explains that "[a]fter reviewing the government's transcripts against the audio recordings, the court marked off phrases that were unintelligible and also made 'no[n] substantive changes or additions *** just to make the transcripts more complete.'" *Id.* (quoting R. 721 (12/22/2009 Hr'g Tr. at 27) (Page ID #4798)).  This explanation is quite misleading.  Looking to the source of the government's altered quotation, we observe that the district court stated "90 percent of the additions that I've made are not substantive changes or additions, it's just to make the transcripts more complete." R. 721 (12/22/2009 Hr'g Tr. at 27) (Page ID #4798).  This leads us to a simple conclusion:  the district court acknowledges that ten percent of its changes or additions are substantive.

This court has not explored what types of changes a district court is permitted to make to proposed transcripts.  In *United States v. Scarborough*, we noted that "[t]he District Court reviewed the transcript while listening to the tapes and found that the transcript was accurate with the exception of two words which the court added." 43 F.3d at 1024.  We failed to state, however, what words were added by the district court and what their effect was on the transcript.  In *United States v. Hogan*, we noted that "the magistrate judge's diligence in approving the transcripts for the jury's use safeguarded

Defendant from being prejudiced by the jury's use of the transcripts" where the magistrate judge had "underlined the portions of the transcript corresponding to audible parts of the recording, and ordered that the inaudible portions that were not underlined be excised from the transcript, and referred to as 'unintelligible.'"  402 F. App'x 54, 61 (6th Cir. 2010).  Finally, in *United States v. Segines*, we cautioned that a district court abuses its discretion when it allows its "best guess as to [a recording's] contents to be placed into the transcript."  17 F.3d 847, 855 (6th Cir. 1994).

These precedents provide the following guide for what changes a district court can make permissibly to a proposed transcript:  A district court has the discretion to mark portions of the proposed transcript that it finds to be inaudible or unintelligible and order that those portions be removed from the transcript and marked accordingly.  It also has the discretion to add words to enhance the completeness of the transcript.  A district court cannot, however, make substantive changes—those that affect the meaning of the transcript—that are unprompted by either party.

Here, the district court estimated that it made one-thousand changes to the government's proposed transcripts.  R. 721 (12/22/2009 Hr'g Tr. at 27) (Page ID #4798); *see* Appellants Appendix ("A.A.") at 566–773.  As noted earlier, the district court acknowledged that some of these changes were substantive.  Defendants highlight one example of the district court's substantive changes.  The transcript provided to the jury included this statement by Thompson:  "I think I'm in trouble."  The government did not include this inculpatory statement in its proposed transcript; rather, the district court added the statement to the government's proposed transcript after the court reviewed the audio recordings.  *See* R. 615 (Thompson Notice of Substantive Errors at 2) (Page ID #4037) ("In previous transcripts submitted by the Government, this passage was deemed unintelligible. . . .  This statement is highly prejudicial, was not heard by either party during their original efforts to make a transcript, and is not sufficiently intelligible to be included in the transcript."); *see also* R. 644 (01/14/2010 D. Ct. Op. at 3) (Page ID #4115).  This is a substantive change by the district court because it adds an inculpatory

statement that previously was not contained in the government's proposed transcript.[29] This and other substantive changes made by the district court were an abuse of its discretion.

Defendants also contend that portions of the government's transcript approved by the district court were inaccurate.  For example, defendants point to a statement allegedly made by Maricle that is included in the transcript:  "I'll take care of it." Reviewing the recordings ourselves, we agree with defendants that this statement is inaudible and therefore the transcript is inaccurate.  Also inaccurate is this exchange contained in the transcript:

> Maricle:  Last year . . . not been around him.  His big problem was a conspiracy charge . . . .
>
> Kennon:  Right.  Conspiracy charges, they could hit him on that, too?

A.A. at 14.  At trial, Maricle testified that this transcription was incorrect because the exchange was really:

> Maricle:  Last year, I don't remember ever being around him, his big problem was in the state.
>
> Kennon:  Stephen Charles represented him on that one too.

R. 883 (03/12/2010 Trial Tr. at 33) (Page ID #9983).  In our review of the audio recordings, we agree with Maricle that the transcript is inaccurate; however, we cannot say with certainty that Maricle's interpretation is exactly accurate.[30]  Thus, the district court erred in permitting the use of an inaccurate transcript.

---

[29]We acknowledge that the district court, of course, did not have the benefit of this opinion at that time.  We recognize also that the district court went to great lengths to ensure that the transcripts were accurate and commend it on that effort.

[30]We realize that without hearing the recording, readers may wonder just how these two seemingly different interpretations stem from the same portion of the recording.  With the benefit of the recording, we too are unsure as to how, but the fact remains that both appear to be accurate when read while listening to the recording.  This highlights the district court's error:  when there are two very plausible interpretations, the portion is better left as "unintelligible" on the transcript, so that the jury will reach its own conclusion when listening to the recording.

The district court did instruct the jury throughout trial and in its final charge to the jury that the jury should rely on what they heard in the recordings, not what they read on the transcripts.  Although this instruction helps to minimize the prejudice to defendants, "[w]here, as here, there are inaudible portions of the tape, the court should direct the deletion of the unreliable portion of the transcript."  *King*, 272 F.3d at 374. The reason is that "[w]hen tapes are unintelligible . . . a transcript intended as an aid to the jury inevitably becomes, in the minds of the jurors, the evidence itself."  *Segines*, 17 F.3d at 854.  Therefore, we hold that district court erred in failing to delete portions of the transcript that were unintelligible or inaudible as well as in making substantive changes to the transcript.

### 3. Exclusion of Exculpatory Statements

Defendants' final argument with regard to the audio recordings and related transcripts is that the district court erred in excluding defendants' exculpatory statements.  Defendants argue that such statements were admissible under Federal Rule of Evidence 106.

"The 'rule of completeness' allows a party to correct a misleading impression created by the introduction of part of a writing or conversation by introducing additional parts of it necessary to put the admitted portions in proper context."  *United States v. Holden*, 557 F.3d 698, 705 (6th Cir. 2009).  The common-law doctrine of completeness is partially codified in Rule 106:  "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  FED. R. EVID. 106; *see Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171–72 (1988).  We have determined previously that Rule 106 "covers an order of proof problem; it is not designed to make something admissible that should be excluded."  *United States v. Costner*, 684 F.2d 370, 373 (6th Cir. 1982).[31]  Right or

---

[31]Recognizing "that one panel of this court cannot overturn a decision of another panel," *United States v. Lanier*, 201 F.3d 842, 846 (6th Cir. 2000), we note that should this court sitting en banc address whether Rule 106 requires that the other evidence be otherwise admissible, it might consider:  Stephen A.

wrong, this court has acknowledged that under *Costner* "[e]xculpatory hearsay may not come in solely on the basis of completeness." *United States v. Shaver*, 89 F. App'x 529, 533 (6th Cir. 2004); *see Holden*, 557 F.3d at 706 (rejecting defendant's Rule 106 argument because "his statements are inadmissible hearsay and were properly excluded").

Defendants point to numerous instances where the purposes of Rule 106 would have been served by admitting their exculpatory statements. For example, cooperating witness Kennon White was directed by the government to tell Maricle about the questions that were asked when Kennon testified before the grand jury. In the present case, the jury heard:

> Kennon:  [D]id you use Cletus Maricle's influence as circuit judge to get people to vote for Phillip Mobley? . . .
>
> Maricle:  Did you promise anybody I'd do anything for them?
>
> Kennon:  Only one was that Downy boy; Bobby Downy's brother . . . .

A.A. at 769–70. The government was permitted to omit Maricle's response: "That's one thing I did very seldom, promised to do, I never promised anybody that I would help somebody in a Court case . . . UI . . . the simple reason is . . . UI . . . I don't believe having cases held over head forever for some political thing." *Id*. at 770. In a later recording when Kennon brought up the "Downy boy" again, Maricle stated "I don't

---

Saltzburg et al., 1-106 *Federal Rules of Evidence Manual* § 106.02 ("We believe that these rulings are misguided and contrary to the completeness principle embodied in Rule 106. A party should not be able to admit an incomplete statement that gives an unfair impression, and then object on hearsay grounds to completing statements that would rectify the unfairness."); Charles Alan Wright et al., 21A *Federal Practice and Procedure* § 5078.1 (2d ed. 2012) ("Even were Rule 106 ambiguous on this point, Rule 102 requires that it 'be construed to secure fairness in administration . . . to the end that the truth be ascertained and proceedings justly determined.' No one has ever explained how these standards would be met by a construction that would allow a party to present evidence out of context so as to mislead the jury, then assert an exclusionary rule to keep the other side from exposing his deception."); Dale A. Nance, *A Theory of Verbal Completeness*, 80 IOWA L. REV. 825 (1995); *United States v. Sutton*, 801 F.2d 1346, 1368 (D.C. Cir. 1986) ("The structure of the Federal Rules of Evidence indicates that Rule 106 is concerned with more than merely the order of proof. . . . Rule 106 can adequately fulfill its function only by permitting the admission of some otherwise inadmissible evidence when the court finds in fairness that the proffered evidence should be considered contemporaneously. A contrary construction raises the specter of distorted and misleading trials, and creates difficulties for both litigants and the trial court.").

know a thing about that no Downy boy." *Id.* at 730.  The district court excluded this statement too.

Wanda White, the government's other cooperating witness, was given the same instructions as her husband, Kennon.  In one instance, the jury heard:

> Wanda:  He asked me, um, oh, how I become an election officer over again.  Did you appoint me to election officer.
>
> Maricle:  Did I appoint you?  (Laugh)
>
> Wanda:  Yeah.

*Id*. at 291.  The district court excluded Maricle's response:  "I don't really have any authority to appoint anybody." *Id*. at 660.  Defendants claim that "by severely cropping the transcripts, the government significantly altered the meaning of what [defendants] actually said."  Maricle Br. at 35.  Although we agree that these examples highlight the government's unfair presentation of the evidence, this court's bar against admitting hearsay under Rule 106 leaves defendants without redress.

Maricle responds that if his exculpatory statements were not admissible under Rule 106 during the government's case-in-chief, such statements became admissible when he testified during his defense.  The district court rejected this argument because "[a]n exculpatory statement made outside the presence of the jury is still an exculpatory statement that's inadmissible under [Rule] 801."  R. 883 (03/12/2010 Trial Tr. at 30) (Page ID #9980).  On appeal, Maricle relies solely on *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).  *Paladino* does not, however, address the issue of whether hearsay is admissible under Rule 106, and Maricle fails to assert that his exculpatory

Nos. 11-5291/ 5308/ 5311/ 5312/ 5313/  *United States v. Adams et al.*    Page 48
    5336/ 5337/ 5366

statements fall within a valid hearsay exception.[32]  Therefore, the district court did not abuse its discretion in excluding defendants' exculpatory statements.

## D.  State-Election Records

    Defendants challenge the district court's admission of statements that defendants argue constitute testimonial hearsay.  The statements came from state-election records that were introduced in two government exhibits:  PR83 and PR84.

    PR83 contains "913 pages of documents documenting statewide complaints of election violations between 2002 and 2006, which included a number of complaints regarding Clay County that individually named Thompson's alleged co-conspirators and co-defendants."[33]  Thompson Br. at 44.  The district court explained that PR83 was relevant for a non-hearsay purpose:

---

[32]Maricle contends that "the excluded portions of the recordings were consistent with Maricle's testimony, which would have rebut[t]ed the government's express and implied charges of recent fabrication or improper influence or motive."  Maricle Br. at 37.  Although this is a valid exception to hearsay, Maricle has not pointed to anything in the record that shows that his prior statement was offered for that purpose.  In fact, the record shows that the statements were offered prior to Maricle's cross-examination by the government, undermining the possibility of admitting the statements to rebut the government's charge of fabrication.  R. 883 (03/12/2010 Trial Tr. at 30) (Page ID #9980); *see United States v. Wells*, 623 F.3d 332, 344 (6th Cir. 2010).

[33]For example:

Anonymous complaint dated 05/28/2002:  "Jennings White/Stanley Bowling/Kennon White $75.00 a vote—payed by Bart Morris behind Super America."  A.A. at 509.

Anonymous complaint dated 11/04/2002:  "Rumor that votes will be bought with marijuana and oxycotin [sic].  Reports that William Stivers is behind the wrongdoing.  *Id.* at 518.

Jennings White reported on 05/11/2004:  "The Clay County School Superintendent will control the vote buying by offering jobs in the school system."  *Id.* at 519.

Anonymous complaint dated 05/15/2006:  "Doug Adams, Superintendent of Clay Co Schools, man[ipu]lates the county and tells people who to vote for, especially those who work for him."  *Id.* at 524.

Anonymous complaint dated 11/07/2006:  "Doug White is running for mayor and he is buying votes.  Precinct officers, his daughter-in-law and her brother, are handing out pieces of paper and telling voters to go to Bart Morris' house.  Caller doesn't know if this is in exchange for money or drugs."  *Id.* at 530.

> [T]here has already been testimony that when the Attorney General's office received complaints that those complaints would be relayed back to the [Clay County] clerk for investigation or for action to be taken.
>
> So knowledge of at least the clerk would certainly be relevant as to what was going on and then actions that were taken as a result of that, especially if, as has been offered here, there has been evidence that the clerk was intimately involved in the election irregularities that were taking place; and they would be taking some action to avoid detection.

R. 934 (03/04/2010 Trial Tr. at 109–10) (Page ID #12311–12); *see* R. 853 (03/08/2010 Trial Tr. at 7–8) (Page ID #6846–47); *see also* R. 876 (03/02/2010 Trial Tr. at 81–83) (Page ID #9157–59).  The district court also ruled that the records "were not unduly prejudicial," rejecting defendants' objections based on Federal Rule of Evidence 403 ("Rule 403").  R. 853 (03/08/2010 Trial Tr. at 8) (Page ID #6847).  Finally, the district court instructed the jury:

> [T]o the extent that these documents contain complaints that are raised by third parties, parties calling to make complaints, those are not being admitted for the truthfulness of the statements that are being made in those materials.
>
> They are admitted to show the complaints were received from the office and that the office recorded those complaints, and you are so instructed.

R. 934 (3/04/2010 Trial Tr. at 123) (Page ID #12325).  Defendants did not object to this instruction.

PR84 contains thirty-five pages of summaries of election-day complaints made to the State Board of Elections during the 2004 primary and 2006 primary and general elections in Clay County.  Thompson Br. at 49.  In a sidebar, the district court stated that it was admitting PR84 for the non-hearsay purpose of showing defendants' awareness of election irregularities.  R. 853 (03/08/2010 Trial Tr. at 93–95) (Page ID #6932–34).  The district court ruled that the admission of PR84 did not violate Rule 403:

> With respect to 403, these are separate complaints other than those that were received by the Attorney General's Office, but the complaints that were being received by both entities[, the State Board of Elections and

> the Attorney General's Office,] is clearly relevant in the case.  It's not
> unduly prejudicial.  The Court will give a limiting instruction, but, again,
> this goes to a very central issue that the United States is litigating in the
> case . . . .

*Id*. at 95 (Page ID #6934).  The district court's limiting instruction was similar to that
provided for PR83:

> I want to again advise the jury that with respect to any call-in complaints
> reflected in PR84, the exhibit that's just been introduced, I've admitted
> that document as an exhibit, but you should not accept the complaints
> that are contained in that document for the truth of those matters that are
> asserted or that are reflected in the document.

*Id.* at 106 (Page ID #6945).  Defendants did not object to this instruction at trial; on
appeal, defendants point out that the district court failed to instruct the jury as to the
purpose for which it could consider PR84.

Defendants argue that the admission of these exhibits violated their rights under
the Confrontation Clause, that the district court abused its discretion in weighing the
harm of unfair prejudice under Rule 403, and that the district court's limiting instructions
were insufficient under *Bruton v. United States*, 391 U.S. 123 (1968).

**1. Confrontation Clause**

Defendants contend that the complaints contained with the state-election reports
were testimonial hearsay that were admitted in violation of the Confrontation Clause of
the Sixth Amendment.  The government responds that defendants' awareness of election
irregularities was relevant for two non-hearsay purposes and, therefore, does not
implicate the Confrontation Clause.  First, the government contends that the evidence
supports its theory that after complaints were received, defendants adjusted their scheme
to avoid detection.  Second, the government explains that the evidence shows that
Thompson's grand jury testimony was false because he was aware of vote-stealing
complaints in the 2006 election (Count 9 - obstruction of justice).  We agree with the

government that the Confrontation Clause is not implicated because the records were admitted for valid non-hearsay purposes.

"The applicable standard of review for an evidentiary ruling of the district court where the evidentiary issues relate to a claimed violation of the Sixth Amendment is the *de novo* standard." *United States v. Robinson*, 389 F.3d 582, 592 (6th Cir. 2004). "Where testimonial evidence is at issue . . . , the Sixth Amendment demands what the common law required:  unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004).  The Confrontation Clause does not, however, bar the admission of testimonial statements that are offered for non-hearsay purposes (i.e., not for the truth of the matter asserted).  *Id*. at 59 n.9; *United States v. Davis*, 577 F.3d 660, 670 (6th Cir. 2009).

Defendants assert that PR83 and PR84 were not admitted for a non-hearsay purpose but were, instead, admitted for the substance of the complaints contained in the records; that is, evidence showing that defendants bought votes.  With regard to PR84, defendants argue that the government's closing argument acknowledges this improper purpose:

> Now, folks, evidence in this case, the attorney general's office had over 100 complaints in 2002, over 60 complaints in the 2006 election.  You've got those complaints that are numbered.  You've got those complaints that are in evidence.  We have evidence that Wanda White was literally seen—and reported to Freddy Thompson himself in 2006—looking over changing people's vote, and reported to him, and he didn't even tell the grand jury that.

R. 889 (03/22/2010 Trial Tr. at 13) (Page ID #10590).  Contrary to defendants' assertion, this statement shows that the government was using the election records for its stated non-hearsay purpose:  Freddy Thompson lied to the grand jury when discussing complaints about the 2006 election because he had, in fact, received reports of outright

vote buying.[34] This was, of course, highly relevant to Count 9 of the indictment, which charged Thompson with obstruction of justice.

Defendants also argue that PR83 could not have been admissible for showing defendants' knowledge of vote buying because Jennings White, not Freddy Thompson, was the Clay County Clerk in 2002. This argument overlooks one of the stated non-hearsay purposes for which the government admitted the evidence. As discussed by the district court, the 2002 election records were relevant to corroborate testimony that explained that defendants adjusted their scheme based on the complaints received by the County Clerk's office from the State Board of Elections. R. 853 (03/08/2010 Trial Tr. at 8) (Page ID #6847). In particular, testimony showed that defendants moved their vote-buying operation after being warned by Jennings White that investigators from the Office of the Attorney General ("OAG") were present in Clay County. R. 840 (02/11/2010 Trial Tr. at 47) (Page ID #5613). The fact that Jennings, as Clay County Clerk, had contact with the State Board of Elections regarding complaints of vote buying—which were forwarded to the OAG by the State Board of Elections—has the tendency to make it more probable that Jennings was able to warn conspirators about the OAG's investigation. Evidence of such contact from later elections, when Thompson served as County Clerk, served a similar purpose. For these reasons, we hold that the state-election records were admitted for a non-hearsay purpose; therefore, defendants' Confrontation Clause challenge fails.

## 2. Rule 403

Defendants argue that even if their right to confrontation was not violated, the district court should have excluded PR83 and PR84 under Rule 403. As noted in part IV.A.1 of this opinion, the district court is afforded broad discretion in making its balancing determination under Rule 403; however, such discretion is not unfettered. *E.g.*, *United States v. Haywood*, 280 F.3d 715, 723 (6th Cir. 2002). Even maximizing

---

[34]We acknowledge, however, that this relevance relies on other testimony that the complaints were in fact forwarded to Thompson.

the probative value of the state-election records and minimizing their potential for unfair prejudice, we hold that the district court abused its discretion in admitting the state-election records.

The probative value of the state-election records is minimal at best. As discussed earlier, the records were admitted to: (1) corroborate testimony that explained how defendants adjusted their scheme based on the complaints received by the Clay County Clerk's office from the State Board of Elections and (2) show that Thompson knew that there were reports of vote buying, contrary to his grand jury testimony. Defendants aptly point out that both of these purposes rest not on the records themselves but on testimony that the records were actually forwarded to the County Clerk from the State Board of Elections. The government responds that evidence of knowledge "is hard to come by" and therefore has a high probative value.[35] Gov't Br. at 98 (quoting *United States v. Ross*, 502 F.3d 521, 530 (6th Cir. 2007)). But the records were not evidence of knowledge—that came from linking the records from the State Board of Elections to the County Clerk. Thus, the evidence was valuable only to the extent that it corroborated testimony that defendants adjusted their scheme when the County Clerk (i.e., Thompson) received complaints of vote buying. Therefore, the contents of the records did not add anything to the government's case, if considered solely for the stated non-hearsay purpose.

The state-election records are unfairly prejudicial. "Regardless of the reason for which the court and the prosecutor thought the evidence was being offered, the prejudice inquiry asks whether 'the jury [was] likely to consider the statement for the truth of what was stated with significant resultant prejudice.'" *United States v. Evans*, 216 F.3d 80, 87 (D.C. Cir. 2000) (quoting *United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994)); *see United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994) ("When prior acts evidence is introduced, regardless of the stated purpose, the likelihood is very great that the jurors will use the evidence precisely for the purpose it may not be considered."); *see also* FED.

---

[35]The government's Rule 403 analysis more or less begins and ends there.

R. EVID. 403 advisory committee's note ("In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction.").  In the present case, the answer is unequivocally yes, the jury was likely to consider the statements for their truth.  The substance of the complaints contained within the state-election records do not simply paint defendants in a bad light.  *See, e.g.*, *United States v. Sanders*, 95 F.3d 449, 453 (6th Cir. 1996).  In fact, the complaints go even further than propensity evidence, reaching one of the most important findings that the jury was required to make:  whether defendants engaged in vote buying from 2002 to 2006.  *E.g.*, A.A. at 509 (Anonymous complaint dated 05/28/2002:  "Jennings White/Stanley Bowling/Kennon White $75.00 a vote—payed by Bart Morris behind Super America.").  In the words of Justice Cardozo, "[t]he reverberating clang of those accusatory words would drown all weaker sounds."  *Shepard v. United States*, 290 U.S. 96, 104 (1933); *see United States v. Stout*, 509 F.3d 796, 801 (6th Cir. 2007).

On balance, the danger of unfair prejudice substantially outweighs the probative value.  In making this determination, we note there was other evidence available with the same probative value but without the unfair prejudice.  *See United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996) ("One factor in balancing unfair prejudice against probative value under Rule 403 is the availability of other means of proof."); *see also Old Chief v. United States*, 519 U.S. 172, 182–83 (1997) ("If an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk.").  To corroborate testimony that the County Clerk had received complaints of vote buying, the government might have proffered redacted versions of the records—removing the unfairly prejudicial accusations that defendants were engaging in vote buying.  The names of the accused were not relevant

to the clerk's knowledge of vote buying.[36]  Furthermore, "the admission of this prejudicial evidence was not remedied by the district court's instruction to the jury that" the evidence should not be considered for the truth of the complaints contained within. *Haywood*, 280 F.3d at 724.  Making matters worse, the district court failed to instruct the jury of the purpose for which it could consider PR84.  Although this failure was likely because the district court presumed that the jury would understand that it was to consider PR84 for the same purpose as PR83, "a clear and concise instruction identifying for the jurors the specific purpose for which the evidence was admissible" was especially necessary here where the evidence is unfairly prejudicial.  *Merriweather*, 78 F.3d at 1077.

We hold that the district court abused its discretion in determining that the danger of unfair prejudice from admitting the state-election records did not substantially outweigh their probative value.[37]  Simply put, the state-election records should have been excluded under Rule 403.

**E.  Cumulative Error**

In sum, the district court erred by:  (1) admitting testimony from Kenny Day, Eugene Lewis, and J.C. Lawson regarding their drug-dealing activities in the 1980s and 1990s; (2) admitting the Inside Edition video; (3) admitting evidence of witness intimidation; (4) making unprompted, substantive changes to the government's proposed transcripts; (5) permitting the use of inaccurate transcripts; and (6) admitting unredacted versions of the state-election records.  Defendants argue that when combined, the prejudice from these errors necessitates a new trial.  We agree.

---

[36]The names might have been relevant and probative if the government had offered evidence that the scheme was adjusted based on whose name appeared in the complaints.  No such evidence was offered, however, so we need not address this.

[37]Given this holding, we need not address defendants' final argument that under *Bruton* the district court's limiting instructions did not "adequately shield[ defendants] from the readily apparent prejudice associated with introducing hundreds of pages of phone-in reports of wrongdoing from non-testifying 'tipsters.'"  Thompson Br. at 54.

"The cumulative effect of errors that are harmless by themselves can be so prejudicial as to warrant a new trial." *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 1650 (2013). "In order to obtain a new trial based upon cumulative error, . . . defendant[s] must show that the combined effect of individually harmless errors was so prejudicial as to render [their] trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004).

Although no one of the six identified errors may warrant reversal on its own, the cumulative effect of these errors rendered defendants' trial fundamentally unfair in violation of their rights to due process. *Walker v. Engle*, 703 F.2d 959, 968 (6th Cir.) ("We need not determine whether each of the alleged errors would, alone, require that we find a deprivation of due process. It is clear that the cumulative effect of the conduct of the state was to arouse prejudice against the defendant to such an extent that he was denied fundamental fairness."), *cert. denied*, 464 U.S. 951 (1983); *see United States v. Parker*, 997 F.2d 219, 221 (6th Cir. 1993) ("After examining [the errors] together, however, we are left with the distinct impression that . . . due process was not satisfied in this case."). The government charged a RICO conspiracy lasting from 2002 to 2007. In its attempt to prove that defendants were part of an enterprise involved with vote buying, the government was permitted to present evidence of profuse drug dealing in the 1980s and 1990s in Clay County, even though there was no evidence that drug money was used to buy votes in the charged conspiracy. The district court also admitted evidence that witnesses had been intimidated, even though the government offered no evidence that defendants were involved with the intimidation. The erroneous admission of this evidence caused great prejudice to defendants. With regard to direct evidence, the district court made its first error by injecting itself into the fact-finding process by making unprompted, substantive changes to the government's transcripts. These transcripts also contained glaring inaccuracies that should have been left untranscribed. Finally, the admission of hearsay accusations should have been excluded under Rule 403 because their probative value was exceptionally minimal in comparison to the danger of unfair prejudice. Given that the government was able to paint an unfair picture of

defendants and offer direct prejudicial evidence that should have been excluded, we remand the case for a new trial.

We note that this conclusion is bolstered by several other factors. First, Jones's and Thompson's convictions for honest-services mail fraud (Counts 3, 5, 6, and 7) have been vacated by the district court because they did not involve a bribery or kickback scheme. Second, the district court granted post-trial motions for judgment of acquittal from Jones and Stivers, finding insufficient evidence to support their convictions of attempted extortion (Count 4). Third, the government concedes that defendants' conspiracy to money launder (Count 2) and the related forfeiture count (Count 13) rest on an invalid theory and should be vacated, and we agree. Finally, the district court committed two additional errors: (1) the limitation of cross-examination of Mike Bishop and (2) the failure to instruct properly the jury regarding the testimony of Agents Sagrecy and Briggs. We address both errors below so that they may be corrected on remand; however, we need not determine whether either error constitutes plain error because remand is appropriate without these additional errors.[38]

## F. Cross-Examination of Mike Bishop

In its opening statement, the government told jurors that Paul Bishop would testify about a meeting in his house prior to the 2002 primary election.[39] R. 868 (02/03/2010 Trial Tr. at 44) (Page ID #8109). The alleged meeting was called by Adams, and the purpose was to pool money for defendants' vote-buying scheme. Paul Bishop did not testify at trial; instead, other witnesses verified that the meeting occurred, that some of the defendants were present, and that money was pooled. Relevant here, Mike Bishop gave testimony that his father, Paul, told Mike that between $150,000 to $200,000 was put on the table at that meeting. R. 849 (03/01/2010 Trial Tr. at 61) (Page

---

[38]Furthermore, this court has not determined whether plain errors can be factored into cumulative-error analysis. *See United States v. Warman*, 578 F.3d 320, 349 n.4 (6th Cir. 2009).

[39]Paul Bishop was named in the original indictment in this case, pleaded guilty, and agreed to cooperate with the government's investigation.

ID #6469).  Although Mike Bishop stated that he was present for some of the meeting, he was not present when money was placed on the table.

On cross-examination of Mike Bishop, defendants attempted to question Mike about his father's problems with his short-term memory, which were well documented in a 2002 report provided to defense counsel from the government.  The government objected, and the district court sustained the objection.  *Id*. at 95 (Page ID #6503).  Defendants replied:  "I understand that you allowed Mike Bishop to testify about what his father said over our objection because it's a co-conspirator statement, but I think it's fair game for him to testify if he has personal knowledge that his father has issues with his memory." *Id*. at 95–96 (Page ID #6503–04).  The district court adhered to its ruling, stating that "[i]t is a collateral matter" and that defendants are "attempting to attack the character of one witness through another witness."  *Id*. at 96, 98 (Page ID #6504, 6506).  The district court, however, did permit Mike Bishop to be questioned about his father's memory issues *outside* the presence of the jury.  *Id*. at 98–100 (Page ID #6506–08).  Mike Bishop acknowledged that his father did have serious issues with his short-term memory in 2002.  *Id.* at 100 (Page ID #6508).

"The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986).  However, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Id*. at 679.

Although Paul Bishop did not testify at trial, defendants correctly note that Federal Rule of Evidence 806 enables them to challenge Paul Bishop's credibility: "When a hearsay statement—or a statement described in Rule 801(d)(2) . . . (E)—has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant

had testified as a witness." FED. R. EVID. 806.  Mike Bishop's statement that Paul Bishop told him that between $150,000 to $200,000 was put on the table at the vote-buying meeting qualifies as both hearsay and as a coconspirator statement made during and in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E).  As part of their attack on Paul Bishop's credibility, defendants sought to introduce Mike Bishop's understanding of his father's memory problems.  This is the exact type of inquiry that the Confrontation Clause guarantees. *United States v. Owens*, 484 U.S. 554, 559 (1988) ("It is sufficient that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination . . . ) the very fact that he has a bad memory.").

    The government responds that even if Paul Bishop had testified, evidence of his mental illness and memory problems would still not be admissible because "'the decision of whether or not to allow in evidence of a witness's mental illness falls within the broad discretion of trial courts as they balance possible prejudice versus probative value.'" Gov't Br. at 102 (quoting *Boggs v. Collins*, 226 F.3d 728, 742 (6th Cir. 2000)).  Although district courts do retain such broad discretion, for the reasons discussed in *Vasquez v. Jones*, 496 F.3d 564, 573–74 (6th Cir. 2007), *Boggs* is not dispositive in the present case.  Furthermore, as defendants point out, this court determined in *Boggs* that there was no Confrontation Clause violation in part because there was "considerable cross-examination of [the victim's] past mental condition and treatment."  *Boggs*, 226 F.3d at 743.  Here, no cross-examination (in front of the jury) was permitted.  Finally, it is unclear whether Paul Bishop's memory problems are related to mental illness; thus, our cases restricting such a line of questioning are beside the point.  Therefore, the district court erred by limiting defendants' cross-examination of Mike Bishop regarding his father's memory issues.  Such a line of questioning is appropriate on remand.

### G.  Agents Sagrecy and Briggs Testimony

Agent Sagrecy testified as an expert witness on behalf of the government.  The government introduced his testimony as being relevant to the money-laundering counts because his testimony would revolve around "the manner and means employed by criminal organizations in money laundering." Jones Br. at 28 (quotation marks omitted). Defendants correctly point out that Agent Sagrecy gave both fact testimony and expert opinion testimony and that the line between the two was often indiscernible.[40]  Agent Briggs testified as a summary witness on behalf of the government.  Although the district court did not qualify Agent Briggs as an expert witness, defendants cite various portions of Agent Briggs's testimony that would qualify as inadmissible lay opinion testimony under Federal Rule of Evidence 701.[41]  The government acknowledges that "Briggs went beyond pure factual recitation when he evaluated some of the evidence based on his training and experience" and that such testimony from a law-enforcement agent is

---

[40]For example, the following exchange occurred between the prosecution and Agent Sagrecy:

Q.  And as you have been trained, in your experience in money laundering investigations, have you found in your experience and training that organizations often utilize financial transactions to conceal or promote their unlawful activities?

A.  Yes.

Q.  And in this case, did you see evidence that there were financial transactions that were involved which were used to promote or conceal the activity?

A.  Yes.  The financial transactions through the salary and the contracts, they appear to be legitimate contracts and salaries.  But this actually means a concealing the extortion and the bribery.  If it were not for those two, the extortion and bribery, the chances of receiving salaries are very slim.  And the same with the contracts.  It appears to be legitimate.  That's why people launder money.  You want to take dirty money and make it appear clean.

R. 854 (03/09/2010 Trial Tr. at 30–31) (Page ID #6981–82); *see id*. at 32 (Page ID #6983).

[41]For example, the following exchange occurred between the prosecution and Agent Briggs:

Q.  During your investigation, did you find that there were segments of the population of Clay County that were targeted by this enterprise?

A.  Yes.  They tried to partner with large drug dealers, because large drug dealers have a lot of disposable income, number one.  Number two, they're not afraid to break the law.  Number three, they want to get politicians in office so if they get arrested locally, they can get the charges taken care of by the sheriff or the judge.

R. 880 (03/09/2010 Trial Tr. at 103–04) (Page ID #9687–88).

generally considered to be expert testimony, which requires a district court to instruct the jury on the dual nature of the testimony: fact testimony and expert opinion testimony. Gov't Br. at 106. The district court did not instruct the jury as to the dual role of the agents' testimony.

On remand, witnesses giving expert opinion testimony should be qualified as experts by the district court before testifying. Similarly, the district court must specifically instruct the jury as to the dual nature of any witness who gives both fact testimony and expert opinion testimony. *United States v. Lopez-Medina*, 461 F.3d 724, 745 (6th Cir. 2006).

## V. SUFFICIENCY OF THE EVIDENCE

Adams contends that the evidence at trial was insufficient to show that he was "'associated with'" the alleged enterprise (the Board) or that he "'reached an agreement or came to an understanding to conduct or participate in the affairs of [the] enterprise, directly or indirectly, through a pattern of racketeering activity.'" Adams Br. at 45 (quoting R. 826 (Jury Instructions at 16) (Page ID #5022)). We disagree.

"In reviewing the sufficiency of the evidence, the relevant inquiry is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Sliwo*, 620 F.3d 630, 633 (6th Cir. 2010) (citation and quotation marks omitted). "Although circumstantial evidence alone can support a conviction, there are times that it amounts to only a reasonable speculation and not to sufficient evidence." *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008).

The district court instructed the jury that to find that Adams was "associated with" the charged enterprise:

> [Adams] must be involved with the enterprise in a way that is related to its affairs, although the person need not have a stake in the goals of the enterprise and may even act in a way that subverts those goals. A person

> may be associated with an enterprise without being so throughout its
> existence.

R. 826 (Jury Instructions at 20) (Page ID #5026).  On appeal, Adams does not challenge these instructions; instead, he argues that he was not associated with the Board of Elections because (1) he was not a member of the Board, (2) he could not have controlled the Board in 2002 (given that White's candidates held the majority then), and (3) the government did not present any evidence that Adams attempted to use Thompson's vote on the Board (the candidate he supported) after Thompson became County Clerk (replacing Jennings White as the head of the Board).

We reject these arguments.  First, the government did not need to show that Adams was a member of the Board or that he exercised some direct control over it; instead, the government was required to prove that Adams was involved with the Board's affairs.  Second, the evidence was sufficient to show that Adams was instrumental in the vote-buying scheme that led to Thompson's election as County Clerk in 2002 (and therefore Thompson's becoming head of the Board) and that Adams was involved with the Board's affairs in subsequent elections.

An example from each election cycle shows Adams's involvement in the Board's affairs.  In 2002, Adams attended the vote-buying meeting at Paul Bishop's house, where money was laid on the table to elect Thompson as County Clerk and therefore head of the Board.  R. 850 (03/02/2010 Trial Tr. at 90) (Page ID #6635).  In 2004, Adams induced a candidate to pay $1,000 into the vote-buying pool.  R. 849 (03/01/2010 Trial Tr. at 16–17) (Page ID #6424–25).  The jury could have inferred that Adams asked for money knowing that the Board—headed by Thompson—would sign off on the results.  In 2006, Adams requested that Wanda White, as an election judge, support Kevin Johnson for Sheriff.  R. 840 (02/11/2010 Trial Tr. at 80–85) (Page ID #5646–51).  A rational jury could infer from this evidence that Adams agreed to participate in the affairs of the enterprise throughout the existence of the alleged conspiracy.  Therefore, we hold that the evidence was sufficient to convict Adams.

Maricle, Jones, W. Morris, D. Morris, and Bowling attempt to adopt Adams's argument regarding the sufficiency of the evidence under Federal Rule of Appellate Procedure 28(i). "[T]ypically, an argument that a particular defendant did not join an alleged conspiracy is fact-specific and not readily transferable to a co-defendant." *United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999) (finding an exception because the argument was readily transferable). Defendants have not pointed to a reason to deviate from this rule in the case at hand. This is a fact-intensive issue and the evidence presented by the government regarding each defendant's involvement with the conspiracy was not uniform. Maricle, Jones, W. Morris, D. Morris, and Bowling have not offered individual analyses on why the evidence was not sufficient to convict each of them. Therefore, we deny their requests to adopt Adams's argument regarding the sufficiency of the evidence.

## VI. RECUSAL

Defendants contend that the district court judge erred in failing to recuse himself pursuant to 28 U.S.C. § 455 (a) and (b)(1). Maricle Br. at 37. The district court denied defendants' motions to recuse because it found their arguments to be meritless and the motion to be an attempt at judge shopping. R. 435 (08/27/2009 D. Ct. Op.) (Page ID #2579–613). This court reviews the district court's denial of defendants' motions to disqualify for abuse of discretion. *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993).

Federal judges "shall disqualify [themselves] in any proceeding in which [their] impartiality might reasonably be questioned" or "[w]here [they have] a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(a), (b)(1). "A district court judge must recuse himself where a reasonable person with knowledge of the all facts would conclude that the judge's impartiality might reasonably be questioned." *Dandy*, 998 F.2d at 1349 (quotation marks omitted). This is an objective standard. *Id.* As explained in *Liteky v. United States*:

It is wrong in theory, though it may not be too far off the mark as a practical matter, to suggest, as many opinions have, that "extrajudicial source" is the *only* basis for establishing disqualifying bias or prejudice. It is the only *common* basis, but not the exclusive one, since it is not the *exclusive* reason a predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as "bias" or "prejudice" because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment.

. . .

[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.

510 U.S. 540, 551, 555 (1994).

Defendants argue that the district court was biased because of:

1) comments made by the judge about the "culture of corruption" in Clay County at the sentencing hearing on a related case of Kenneth Day, who ultimately testified against Maricle at trial; 2) that in the judge's Memorandum Opinion and Order on Maricle's bond conditions, the court "found Mr. Day's testimony to be credible" based on his appearance before the judge in other cases; and 3) comments made by the court during a bond revocation of one of Maricle's codefendants that the court had a concern that "in many cases that have originated in Clay County, the defendants coming from Clay County don't seem to understand that once they're under bond conditions of this Court that those are pretty serious conditions."

Maricle Br. at 37–38 (citing R. 375 (Mot. to Disqualify) (Page ID #1560–68) and R. 381 (Mot. to Disqualify) (Page ID #1752–53)). These assertions do not show that the district court relied on an extrajudicial source of bias, and defendants cannot otherwise meet the "extreme" bias or prejudice standard discussed in *Liteky*. Defendants have not pointed to an extrajudicial source because "all the information known by the judge came from

his jusicial involvement with related cases." *United States v. Jamieson*, 427 F.3d 394, 405 (6th Cir. 2005); *see United States v. Hartsel*, 199 F.3d 812, 820–21 (6th Cir. 1999). Defendants have not met the "extreme" bias or prejudice standard under *Liteky* because the district court judge's statements amount to criticism and disapproval of defendants and other coconspirators, not deep-seated favoritism or antagonism. *See Liteky*, 510 U.S at 555. Because we do not question the district court's impartiality, we affirm the denial of defendants' motions to recuse and hold that the district court judge did not abuse his discretion in failing to recuse himself.[42]

## VII.  CONCLUSION

To be sure, this was an exceptionally difficult trial to manage, and we commend the district court on its close attention to all parties' concerns and the court's numerous thoughtful opinions.  In light of the foregoing, however, we **VACATE** defendants' convictions on all counts and **REMAND** for a new trial in accordance with this opinion. In light of this holding, defendants' remaining challenges do not warrant our attention on this appeal.[43]

---

[42]Defendants also contend that the district court judge was hostile and held deep-seated antagonism towards defendants and their counsel. Defendants argue that this hostility and antagonism had a chilling effect on defendants' case. *See United States v. Segines*, 17 F.3d 847, 853 (6th Cir. 1994). In our review of the record, we cannot say that the district court judge's statements and actions rise to a violation of due process. *See United States v. Hynes*, 467 F.3d 951, 960–61 (6th Cir. 2006).

[43]We note, however, that nothing in this opinion precludes defendants from raising those remaining challenges on remand. For example, defendants may file severance motions, and Bowling may argue that he was indicted in violation of his Fifth Amendment rights.